ACCEPTED
03-14-00735-CV
4703327
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/31/2015 9:04:27 AM
JEFFREY D. KYLE
CLERK

**No. 03-14-00735-CV**

IN THE
**THIRD COURT OF APPEALS**
**AT AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

3/31/2015 9:04:27 AM

JEFFREY D. KYLE
Clerk

**Entergy Texas, Inc., et al.,**
**Appellants**

**v.**

**Public Utility Commission of Texas, et al.,**
**Appellees**

*Appeal from the 353rd Judicial District Court, Travis County, Texas*
*The Honorable John K. Dietz, Judge Presiding*

_____

**APPELLANT'S BRIEF**
**OF ENTERGY TEXAS, INC.**

_____

John F. Williams
State Bar No. 21554100
jwilliams@dwmrlaw.com
Marnie A. McCormick
State Bar No. 00794264
mmccormick@dwmrlaw.com
DUGGINS WREN MANN & ROMERO, LLP
600 Congress Ave., Ste. 1900 (78701)
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*

ATTORNEYS FOR APPELLANT
ENTERGY TEXAS, INC.

March 2015

ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

The following is a list of all parties to the order appealed from and the names and addresses of all trial and appellate counsel:

| **Parties:** | **Attorneys:** |
|---|---|
| Entergy Texas, Inc.<br>Plaintiff in District Court | John F. Williams<br>Marnie A. McCormick<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900 (78701)<br>P. O. Box 1149<br>Austin, Texas 78767-1149<br>*Counsel in District Court and on Appeal* |
| Public Utility Commission of Texas<br>Defendant in District Court | Elizabeth R. B. Sterling<br>Assistant Attorney General<br>Environmental Protection Division<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin TX 78711-2548<br>*Counsel in District Court and on Appeal* |
| Office of Public Utility Counsel<br>Plaintiff/Intervenor in District Court | Sara J. Ferris<br>Office of Public Utility Counsel<br>1701 N. Congress Ave., Ste. 9-180<br>Austin TX 78711-2397<br>*Counsel in District Court and on Appeal* |
| Cities of Bridge City, et al.<br>Plaintiff/Intervenor in District Court | Daniel J. Lawton<br>Lawton Law Firm PC<br>12600 Hill Country Blvd., Ste. R275<br>Austin TX 78738<br>*Counsel in District Court* |

State Agencies
Plaintiff/Intervenor in District Court

Susan M. Kelley (retired)
Office of the Attorney General
P. O. Box 12548
Austin TX  78711-2548
*Counsel in District Court*

Texas Industrial Energy Consumers
Intervenor in District Court

Meghan Griffiths
Andrews Kurth LLP
111 Congress Ave., Ste. 1700
Austin TX  78701
*Counsel in District Court*

Rex VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin, Texas 78701
*Counsel in District Court*

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ i

TABLE OF CONTENTS ................................................................................ iii

INDEX OF AUTHORITIES ........................................................................... vi

STATEMENT OF THE CASE ........................................................................ ix

STATEMENT REGARDING ORAL ARGUMENT ...................................... ix

ADMINISTRATIVE RECORD ..................................................................... ix

ISSUES PRESENTED....................................................................................x

STATEMENT OF FACTS .............................................................................1

I.      Regulatory Framework ......................................................................1

II.     Procedural History ............................................................................4

SUMMARY OF THE ARGUMENT ............................................................5

ARGUMENT AND AUTHORITIES...........................................................7

I.      The Commission erred in disallowing over $11 million associated
        with ETI's unrecovered Hurricane Rita reconstruction costs. ........7

        A.      Background ...........................................................................7

        B.      The Commission erred as a matter of law in concluding that
                PURA required the insurance proceeds to be trued-up in Docket
                No. 37744. ............................................................................13

        C.      The Commission also erred in treating the issue as if it had in
                fact been resolved in Docket No. 37744. .............................15

        D.      The Commission's order contravenes legislative intent. .....18

II.     The Commission erred in refusing to include any of ETI's adjustments
        to test-year purchased capacity costs in setting rates. ..................19

        A.      Background .........................................................................19

B. The Commission misapplied the standard for adjustments to test-year expenses. ..................................................................24

    1. Adjustments to test-year data are not extraordinary relief ........24

    2. Adjustments to test-year data need not be proven with absolute certainty. ...............................................................26

C. The Commission's wholesale disallowance of any adjustment to test-year levels of capacity costs is not supported by substantial evidence. ...............................................................27

    1. ETI proved that it will incur an annual capacity cost increase of $15.8 million under the Frontier contract. ..............28

    2. ETI proved that it will incur an annual capacity cost increase of $8.1 million under the SRMPA contract. ..............30

    3. ETI proved that it will incur an annual capacity cost increase of $14.1 million under the Calpine contract. ..............31

    4. The record does not reasonably support the Commission's other reasons for disallowing 100 percent of these known capacity costs. ....................................32

        a. Load Growth ................................................................32

        b. MSS-1 Costs ................................................................34

        c. MSS-4 Costs ................................................................36

D. The consequences of the Commission's decision are extreme and unjust. ...............................................................38

III. The Commission erred in setting ETI's transmission equalization (MSS-2) expense at the test-year level. ...............................................................39

A. The Commission erred as a matter of law in applying the standard for adjustments to test-year expenses. ..................41

B. Additionally, the Commission's adherence to test-year expense levels is unsupported by substantial evidence. ...................42

CONCLUSION AND PRAYER ...............................................................43

CERTIFICATE OF COMPLIANCE........................................................................44

CERTIFICATE OF SERVICE ..............................................................................45

APPENDICES .....................................................................................................47

# INDEX OF AUTHORITIES

## Cases

*B.L.M. v. J.H.M., III,*
No. 03-14-00050-CV, 2014 WL 3562559 *11 (Tex. App. – Austin Jul. 17, 2014, pet. denied) .................................................................................17

*Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n of State of W.Va.,*
262 U.S. 679 (1923) ....................................................................................2

*Cameron v. Terrell & Garrett, Inc.,*
618 S.W.2d 535 (Tex. 1981) .....................................................................33

*Cities of Dickinson v. Public Util. Comm'n of Tex.,*
284 S.W.3d 449 (Tex. App. – Austin 2009, no pet.) ................................11

*City of Corpus Christi v. Public Util. Comm'n of Tex.,*
51 S.W.3d 231 (Tex. 2001) .......................................................................10

*City of El Paso v. Public Util. Comm'n of Tex.,*
344 S.W.3d 609 (Tex. App. – Austin 2011, no pet.) .............................. 3, 19, 20

*City of El Paso v. Public Util. Comm'n of Tex.,*
883 S.W.2d 179 (Tex. 1994) ........................................................ 3, 25, 26, 41

*Commint Technical Services, Inc. v. Quickel,*
314 S.W.3d 646 (Tex. App. – Houston [14th Dist.] 2010, no pet.) ......................16

*Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.,*
173 S.W.3d 199 (Tex. App. – Austin 2005, pet. denied).....................................1

*Federal Power Comm'n v. Hope Natural Gas Co.,*
320 U.S. 591 (1944) ....................................................................................2

*Idaho Power Co. v. Idaho State Tax Comm'n,*
109 P.3d 170 (Idaho 2005) ........................................................................10

*Office of Consumer Counsel v. Department of Public Util. Control,*
742 A.2d 1257 (Conn. 2000)......................................................................10

*Office of Consumer Counsel v. Department of Public Util. Control,*
905 A.2d 1 (Conn. 2006)............................................................................10

*Office of Public Util. Counsel v. Public Util. Comm'n of Tex.,*
104 S.W.3d 225 (Tex. App. – Austin 2003, no pet.) ..................................2

*Starr County v. Starr Industrial Servs., Inc.*,
   584 S.W.2d 352 (Tex. Civ. App. – Austin 1979, writ ref'd n.r.e.) ......................27

*State of Texas' Agencies & Institutions of Higher Learning v. Public Util.*
   *Comm'n of Tex.*,
   450 S.W.3d 615 (Tex. App. -- Austin 2014, pet. requested) ........................ 10, 17

*Suburban Util. Corp. v. Public Util. Comm'n of Tex.*,
   652 S.W.2d 358 (Tex. 1983) ................................................................... 3, 26

*TXU Elec. Co. v. Public Util. Comm'n of Tex.*,
   51 S.W. 3d 275 (Tex. 2001) (per curiam) ...........................................................8

*Woods v. William M. Mercer, Inc.*,
   769 S.W.2d 515 (Tex. 1988) ...................................................................16

**Statutes**

Tex. Gov't Code Ann. § 2001.174.................................................... 19, 39, 43

Tex. Gov't Code Ann. § 2001.190........................................................17

Tex. Util. Code Ann. §§ 11.001, *et seq.* ...................................................1

Tex. Util. Code Ann. §§ 36.001, *et seq.* ................................................14

Tex. Util. Code Ann. § 36.003........................................................2

Tex. Util. Code Ann. § 36.051.................................................... 2, 7, 25, 41

Tex. Util. Code Ann. §§ 39.001-.359 ...................................................2

Tex. Util. Code Ann. § 39.452.........................................................2, 8

Tex. Util. Code Ann. § 39.455.........................................................33

Tex. Util. Code Ann. § 39.458........................................................ 7, 8, 18

Tex. Util. Code Ann. §§ 39.458-463 ................................................ 7, 18

Tex. Util. Code Ann. § 39.459........................................................ 7, 13

Tex. Util. Code Ann. § 39.462......................................................... *passim*

**Rules**

16 Tex. Admin. Code § 22.222........................................................17

16 Tex. Admin. Code § 25.181.......................................................4

16 Tex. Admin. Code § 25.231................................................ 3, 24, 41

16 Tex. Admin. Code § 25.234.......................................................3

16 Tex. Admin. Code §§ 25.235-.237 ................................................4

16 Tex. Admin. Code § 25.236........................................................................ 19, 20

16 Tex. Admin. Code § 25.238............................................................................20

Tex. R. Civ. P. 94.............................................................................................15

**Commission Proceedings**

*Application of Entergy Gulf States, Inc. for Authority to Change Rates and
to Reconcile Fuel Costs*, Docket No. 34800 ........................................................13

*Application of Entergy Gulf States, Inc. for Determination of Hurricane
Reconstruction Costs,* Docket No. 32907 .................................................... *passim*

*Application of Entergy Texas, Inc. for Authority to Change Rates and
Reconcile Fuel Costs,* Docket No. 37744 ...........................................................17

## STATEMENT OF THE CASE

This is a suit for judicial review of the final order of the Public Utility Commission of Texas (the "Commission" or "PUCT") in its Docket Number 39896, a proceeding initiated by Entergy Texas, Inc. ("ETI" or the "Company") for authority to change its retail electric rates and reconcile fuel costs. ETI and several other parties to the contested case sought judicial review of the Commission's order.[1] The cases were consolidated.[2] The district court, Judge John K. Dietz presiding, reversed the Commission's order in one respect and summarily affirmed it in all other respects.[3]

## STATEMENT REGARDING ORAL ARGUMENT

Cases involving public utility regulation usually involve complex regulatory principles, and this one is no exception. For that reason, the Court's decisional process would be aided by oral argument.

## ADMINISTRATIVE RECORD

The Administrative Record ("AR") comprises Joint Exhibits 4-13 of the Reporter's Record. Joint Exhibit 13 was sealed per the requirements of Texas Rule of Civil Procedure 76a.[4] Joint Exhibits 1-3 are indices to the record.

---

[1] Clerk's Record ("CR") 5. The Clerk's Record does not yet contain the petitions filed by parties other than ETI.
[2] CR 81.
[3] CR 2118.
[4] CR 2109.

# ISSUES PRESENTED

1.     The Commission disallowed over $11 million of costs that ETI incurred to restore its system after Hurricane Rita and that no one disputes ETI is entitled to recover.  The Commission decided that ETI should have begun recovering these costs at the end of a previous rate case, Docket No. 37744, based upon a PURA provision and what the Commission characterizes as an ambiguity in the resolution of Docket No. 37744.

    a.     Did the Commission erroneously interpret PURA as requiring resolution of this issue in Docket No. 37744, when PURA section 39.462(a) says ETI may recover these costs in "any" proceeding authorized by Chapter 36?

    b.     Did the Commission err by requiring ETI to disprove its opponents' *res judicata* theory that the order in Docket No. 37744 bars ETI from seeking recovery of the costs in this case?

    c.     Does the record reasonably support the Commission's decision that the order in Docket No. 37744 required ETI to begin recovering these costs, when everyone agrees the Commission's order said nothing about the issue?

2.     The Commission disallowed over $30 million of ETI's expenses for purchasing capacity from third parties because the amount was not incurred in the test year and because the Commission found there was a possibility that some of the costs might be avoided or offset.

    a.     Did the Commission err as a matter of law by treating adjustments to test-year levels of expense as "exceptional" and by refusing to make any adjustments for anticipated costs?

    b.     Is every one of the Commission's multiple theories about how the costs might be avoided or offset supported by substantial evidence?

x

3.    The Commission refused to make any adjustment to ETI's test-year level of "transmission equalization" expense because the parties disagreed about how big an adjustment was warranted.

    a.    Did the Commission err as a matter of law by requiring proof of adjustments to test-year expenses with absolute certainty?

    b.    Is the Commission's decision to set this expense at the test-year level supported by substantial evidence, when every witness who testified on this issue agreed the test-year level was too low?

## STATEMENT OF FACTS

ETI is an investor-owned electric utility.[5] ETI provides bundled generation, transmission, distribution, and customer services to over 400,000 retail customers, primarily in southeastern Texas.[6] During the time periods at issue in this case, ETI served both wholesale and retail customers.

## I. Regulatory Framework

ETI is a subsidiary of Entergy Corporation, which also owns other subsidiaries, or "operating companies," including electric utilities in Louisiana, Arkansas, and Mississippi.[7] The utility subsidiaries each own facilities separately, but they have historically coordinated and shared resources for providing and transmitting energy.[8] This coordination across state lines is governed by the "Entergy System Agreement," a tariff approved by the Federal Energy Regulatory Commission ("FERC").[9] ETI's wholesale rates are also regulated by the FERC. *See Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.*, 173 S.W.3d 199, 207 (Tex. App. – Austin 2005, pet. denied).

The services ETI provides to Texas retail customers are subject to regulation by the PUCT under the Public Utility Regulatory Act ("PURA").[10] The Texas

---

[5] AR Binder 31, ETI Exh. 4 (Domino Direct at 1 of 38).
[6] *Id.*
[7] *Id.*
[8] AR Binder 36, ETI Exh. 39 (Cicio Direct at 6-10 of 75).
[9] *Id.*
[10] *See* Tex. Util. Code Ann. §§ 11.001, *et seq.*

legislature in 1999 ordered electric utilities to "unbundle" their generation, transmission, distribution, and customer service functions as part of an effort to introduce competition into the Texas retail electric industry. *See* Tex. Util. Code Ann. §§ 39.001-.359. However, in 2009, the legislature amended PURA to require ETI to cease activities relating to the transition to retail competition. *See id.* § 39.452(i). Accordingly, ETI remains subject to traditional cost-of-service rate regulation. *Id.* § 39.452(a).

Under traditional regulation, an electric utility provides service, from the acquisition to delivery of power, to all requesting customers in a service area at a Commission-approved "just and reasonable" rate. *See Office of Public Util. Counsel v. Public Util. Comm'n of Tex.*, 104 S.W.3d 225, 227-28 (Tex. App. – Austin 2003, no pet.); *see also* Tex. Util. Code Ann. § 36.003(a). Under PURA and applicable constitutional principles, a utility is entitled to rates that afford it a "reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses." Tex. Util. Code Ann. § 36.051; *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n of State of W.Va.*, 262 U.S. 679, 692 (1923). To set rates, the Commission determines each of these components, which cumulatively are the utility's "revenue requirement" or

2

"cost of service." *See, e.g., City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 187 (Tex. 1994); 16 Tex. Admin. Code § 25.231.

The PUCT by rule has adopted a process by which rates are based on a historical "test year," adjusted for known and measurable changes. *See* 16 Tex. Admin. Code § 25.231(a). The Commission evaluates the reasonableness of the utility's expenses, determines the appropriate level of capital investment (or rate base) and a reasonable rate of return on that investment, and then allocates the total revenue requirement among the utility's various classes of customer. *Id.* §§ 25.231(b), (c) & .234.

The central goal of this process is to arrive at cost recovery as representative as reasonably possible of the utility's "cost situation expected in the future." *Suburban Util. Corp. v. Public Util. Comm'n of Tex.,* 652 S.W.2d 358, 366 (Tex. 1983). The utility generally bears the risk that its actual operating expenses will exceed the expectations incorporated into the rate, while retail customers bear the converse risk, during the regulatory "lag" between rate cases. *City of El Paso v. Public Util. Comm'n of Tex.,* 344 S.W.3d 609, 613 (Tex. App. – Austin 2011, no pet.).

Exceptions to this general rule of risk exist for certain categories of costs, such as fuel costs and energy efficiency costs. For these types of costs, the utility has a separate rate or "rider" through which it collects its projected costs. The

utility later must reconcile those revenues to its actual, reasonable costs so that it recovers no more or less than its actual, reasonable costs for the particular category of expense covered by the rider. *See, e.g.,* 16 Tex. Admin. Code §§ 25.235-.237 & § 25.181.

## II. Procedural History

The Company initiated the underlying general rate case because the rates in effect did not adequately compensate it for its cost of providing service.[11] Among other things, ETI's third-party purchased power costs were doubling, a study showed that its current depreciation rates were severely understated, and its actual return on equity was some three percentage points lower than its then-authorized return.[12] ETI sought a total annual increase of $104.8 million.[13] The "test year" for the Company's application was July 1, 2010 through June 30, 2011.[14] Rates were proposed to go into effect in June 2012.[15]

After an evidentiary hearing, four Administrative Law Judges ("ALJs") issued a proposal for decision recommending that ETI's rates be increased by a total of $28.3 million annually.[16] The Commission, with a few exceptions, adopted

---

[11] AR Binder 31, ETI Exh. 4 (Domino Direct at 7 of 38).
[12] *Id.* at 7-8.
[13] AR Binder 37, ETI Exh. 55 (LeBlanc Rebuttal at 7 of 14).
[14] AR Binder 31, ETI Exh. 4 (Domino Direct at 8 of 38).
[15] AR Binder 43, Vol. K (5/2/12 Tr. at 1540).
[16] *See* AR Binder 7, Item 244 (Order on Rehearing at 1).

the proposal for decision and ordered that ETI's rates be increased by a total of $27.7 million annually.

ETI appealed several aspects of the final order to the district court.[17] Several parties that intervened in the Commission proceeding, including a group of cities ("Cities"), the Office of Public Utility Counsel ("OPUC"), and State Agencies, also appealed.[18] The district court sustained one of ETI's points, reversing the Commission's decision on that issue.[19] The court summarily affirmed the Commission's order in other respects.[20] More detailed facts are explained below in the context of the specific errors ETI brings to this Court.

## SUMMARY OF THE ARGUMENT

This case is about several multi-million-dollar outlays that ETI made to serve its customers, but that the Commission refused to include in ETI's rates.

First, ETI spent millions of dollars reconstructing its system after Hurricane Rita. The Commission long ago determined these costs were reasonable and necessary, and that ETI was entitled to recover them. Nevertheless, the Commission has now disallowed over $11 million of these costs on the theory that ETI should have started recovering them after its 2009 rate case. This decision is

---

[17] CR 5.

[18] Though the separate appeals were consolidated, CR 81, the Clerk's Record does not yet contain the petitions filed by parties other than ETI. In any event, after the cases were consolidated, State Agencies nonsuited their appeal but remained in the case as an intervenor defendant. CR 2084 & 2085.

[19] CR 2118.

[20]*Id.*

based upon an erroneous interpretation of a PURA provision. It is also based upon a legally and factually unsupportable conclusion that ETI should have divined that it was required to begin recovering these costs after the 2009 rate case, even though the order in that case said no such thing.

Second, ETI spent millions of dollars purchasing third-party capacity to serve its customers. Even though the Commission did not find that these purchases were unreasonable or unnecessary, the Commission refused to include the costs in ETI's rates. The Commission's decision is based upon an erroneous insistence that test-year data is more important than evidence of what costs the Company expects to bear when the rates go into effect. It is also based upon several fact-findings that ETI might be able to avoid or offset some of these costs. These findings do not support a total disallowance of the purchased capacity costs and are not rationally based upon the record evidence.

Similarly, ETI spent millions of dollars to pay for its share of the multi-jurisdictional transmission network that supports service to its customers, and those costs dramatically increased after the test year. Even though every witness who testified about this issue agreed that the test-year level of this expense was too low, the Commission refused to make any adjustment because the witnesses did not agree on how much of an increase was warranted. This decision is another example of the Commission's erroneous application of the standard for calculating

6

expenses that should be included in rates. It is also unsupported by substantial evidence.

The effect of all these decisions was that ETI had to bear all these costs at shareholder expense until its next rate case. ETI, therefore, did not have the opportunity to earn the reasonable return on its investment to which it is entitled under PURA. *See* Tex. Util. Code Ann. § 36.051. Because these decisions were fraught with error, this Court should reverse them.

## ARGUMENT AND AUTHORITIES

**I.    The Commission erred in disallowing over $11 million associated with ETI's unrecovered Hurricane Rita reconstruction costs.**

### A.    Background

In 2005, Hurricane Rita struck the upper Texas coast, causing extensive damage to southeastern Texas. The next year, the legislature enacted a set of provisions in PURA that entitles electric utilities like ETI to timely recover reconstruction costs they reasonably and necessarily incurred as a result of the hurricane. *See* Tex. Util. Code Ann. §§ 39.458-463.

The enactment requires the Commission, upon application by a utility, to determine whether particular hurricane reconstruction costs were reasonably and necessarily incurred and thus eligible for recovery. *Id.* §§ 39.459(a)(1) & 39.462(b). This determination need not be made in the context of a base-rate proceeding under PURA Chapter 36. *Id.* § 39.462(e).

7

If, upon a utility's application, the Commission determines it would benefit ratepayers for the utility to recover eligible costs through "securitization" financing,[21] as opposed to "conventional financing methods," the Commission must adopt a financing order authorizing the utility to issue bonds. *Id.* § 39.458. The bonds are repaid or secured by charges to ratepayers in the utility's service area. *E.g., TXU Elec. Co. v. Public Util. Comm'n of Tex.*, 51 S.W. 3d 275, 277 (Tex. 2001) (per curiam). Alternatively, a utility is entitled to recover eligible reconstruction costs in a base rate proceeding "or through any other proceeding authorized by Subchapter C, Chapter 36" of PURA. Tex. Util. Code Ann. § 39.462(a).

In December 2006, ETI's predecessor[22] initiated a proceeding to determine whether certain of its Hurricane Rita reconstruction costs were eligible for recovery and securitization.[23] The parties to that case reached a settlement and

---

[21] Securitization is a specialized form of debt financing where repayment of bondholders achieves a high degree of assurance, resulting in very low bond interest rates.

[22] ETI's predecessor was Entergy Gulf States, Inc. ("EGSI"). EGSI provided retail electric service in both Texas and Louisiana. In 2005, the Texas Legislature enacted legislation providing that EGSI could proceed with and complete jurisdictional separation of its Texas and Louisiana operations to establish two separate, vertically integrated utilities. *See* Tex. Util. Code Ann. § 39.452(e). By January 1, 2008, EGSI had separated into ETI, a Texas-only utility, and Entergy Gulf States Louisiana, L.L.C., a Louisiana-only utility.

[23] *See Application of Entergy Gulf States, Inc. for Determination of Hurricane Reconstruction Costs,* Docket No. 32907 (Jul. 5, 2006 Application). Public filings in Docket No. 32907 and other Commission dockets may be accessed at the Commission's interchange:
http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch.asp
by entering the docket number in the "Control Number" field.

agreed that $381,236,384 of the expenses at issue were eligible.[24] Because ETI expected to receive insurance proceeds of $65,700,000 in the future, the settlement provided that ETI would deduct that amount from its eligible costs.[25] The parties agreed that ETI should be allowed to securitize $381,236,384, plus carrying costs, minus the $65.7 million estimated insurance proceeds, plus other qualified costs.[26] It was understood that the Company might not receive exactly $65,700,000 in insurance proceeds, so the parties further agreed that after ETI received all of its insurance payments, a true-up would occur to determine the difference between the $65,700,000 estimate and the amount actually received.[27] The parties agreed that ETI would accrue interest on the anticipated payments until they were actually paid, either by insurance companies or ratepayers.[28]

The Commission approved the parties' agreement.[29] The order provided that if ETI received *more* insurance payments than estimated, the excess would be passed through to ratepayers via a rider.[30] But the agreed rider was only for *over-recovery*. Neither the settlement nor the order specified a method for recovering any insurance *under*-recovery from ratepayers.

---

[24] *See* Docket No. 32907 (Nov. 17, 2006, Settlement Agreement at 2 of 10).
[25] *Id.* at 3 of 10.
[26] *Id.* at 5 of 10.
[27] *Id.* at 3 of 10.
[28] *Id.*
[29] *See id.* (Dec. 1, 2006, Order at 1).
[30] *Id.* at FOF 30.

9

By 2009, ETI had received only $46,013,904 in insurance proceeds, resulting in a $19,686,096 under-recovery of its actual, eligible hurricane reconstruction costs.[31] ETI carried this unrecovered balance on its books, with interest, as a regulatory asset[32] because the Commission's order in Docket No. 32907 expressly contemplated that ETI would be authorized to recover these amounts in the future.[33]

In 2009, ETI filed a base rate case, Docket No. 37744. By that time, ETI had recovered most of the insurance proceeds it expected to recover, and it sought permission to begin recovering the regulatory asset of $19,686,096, plus interest, on a five-year amortization schedule.[34]

---

[31] AR Binder 5, Item 185 (Proposal for Decision at 16).

[32] A "regulatory asset" is a mechanism by which a utility carries a cost on its books as a balance sheet asset based on the expectation that a regulator will allow the utility to recover the cost over a period of years in the future instead of at the time the expenditure is made. *E.g. Office of Consumer Counsel v. Department of Public Util. Control,* 905 A.2d 1, 7 (Conn. 2006); *Idaho Power Co. v. Idaho State Tax Comm'n*, 109 P.3d 170, 173 (Idaho 2005); *Office of Consumer Counsel v. Department of Public Util. Control*, 742 A.2d 1257, 1263 (Conn. 2000); *City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 238 (Tex. 2001); *State of Texas' Agencies & Institutions of Higher Learning v. Public Util. Comm'n of Tex.*, 450 S.W.3d 615, 646 (Tex. App. -- Austin 2014, pet. requested). Public utility commissions often permit utilities to recover large capital expenditures on this deferred basis to avoid the "rate shock" that could result if the costs were passed on to ratepayers all at once. *E.g., Office of Consumer Counsel*, 905 A.2d at 7; *Idaho Power Co.,* 109 P.3d at 173. A regulatory asset is, therefore, a future debt of the ratepayers. *Office of Consumer Counsel,* 905 A.2d at 7. Regulatory assets are recovered over time from ratepayers on an "amortized" schedule. *See Idaho Power Co.,* 109 P.3d at 173; *Office of Consumer Counsel,* 742 A.2d at 1263.

[33] Docket 32907 (Dec. 1, 2006, Order at FOF 28) (authorizing ETI to accrue carrying costs on estimated insurance proceeds until paid by insurance companies or until the trued-up amount "is recovered in base rates"); AR Binder 5, Item 185 (Proposal for Decision at 19).

[34] AR Binder 5, Item 185 (Proposal for Decision at 16). Again, as explained above in footnote 32, regulatory assets are traditionally "amortized." That means they are recovered over a period of time so they are not charged to ratepayers all at once.

10

Docket No. 37744 was concluded by a "black box" settlement that did not mention the Hurricane Rita regulatory asset.[35] Neither the parties' stipulation nor the PUCT's order in Docket No. 37744 directed ETI to begin amortizing the regulatory asset or otherwise prescribed a method for recovering it. Neither indicated an intent to alter ETI's rights under PURA section 39.462 and the Commission's order in Docket No. 32907.[36] ETI, therefore, continued to account for and accrue interest on the unrecovered regulatory asset.

After Docket No. 37744, ETI received an additional $5.7 million in insurance proceeds.[37] In its next rate case, the one underlying this appeal, ETI sought permission to begin recovering the updated balance of the reconstruction costs eligible for recovery. With interest, that balance totaled $26,229,627.[38] The ALJs recommended ETI recover only $15,175,563.[39]

The ALJs determined that even though the order in Docket No. 37744 did not say so, ETI should have begun amortizing the regulatory asset on August 15, 2010, the effective date of the rates approved in that docket.[40] The ALJs expressed two rationales for their decision. First, they concluded that PURA required any

---

[35] In a "black box" settlement, the parties agree to a total amount that a utility can recover through its rates without specifying any of the individual numbers used to calculate the amount. *See, e.g., Cities of Dickinson, et al. v. Public Util. Comm'n of Tex.,* 284 S.W.3d 449, 450 (Tex. App. – Austin 2009, no pet.).

[36] Docket No. 32907, *supra* (Nov. 17, 2006, Settlement Agreement; Dec. 1, 2006, Order).

[37] AR Binder 37, ETI Exh. 46 (Considine Rebuttal at 18).

[38] *Id.*; AR Binder 5, Item 185 (Proposal for Decision at 16).

[39] AR Binder 5, Item 185 (Proposal for Decision at 23).

[40] *Id.* at 21-22.

true-up of insurance proceeds to occur in the first base rate case after the reconstruction costs were deemed eligible for recovery.[41] The ALJs believed that Docket No. 37744 was that case.[42] Second, though they characterized the issue as a "close call,"[43] the ALJs concluded that the amortization of the unrecovered costs "should be considered as having been approved in Docket No. 37744."[44] They believed the proposed amortization was not disputed in Docket No. 37744, and that ETI therefore had the burden of proving the issue was *not* resolved in the docket.[45] Because they believed ETI did not meet that burden, they treated the issue as if it had already been resolved.[46] The ALJs determined that if ETI had begun amortizing the regulatory asset upon the conclusion of Docket No. 37744, only $15,175,563 would be left to deal with in this case.[47]

The Commission adopted the ALJs' recommendation.[48] This decision must be reversed, because all the rationales for it are flawed.

---

[41] *Id.* at 15 & 21-22.
[42] *Id.* at 16 & 22.
[43] *Id.* at 20.
[44] *Id.* at 22.
[45] *Id.*
[46] *Id.*
[47] *Id.* at 23.
[48] AR Binder 7, Item 244 (Order on Rehearing at 1 & FOFs 19-22).

**B.**     **The Commission erred as a matter of law in concluding that PURA required the insurance proceeds to be trued-up in Docket No. 37744.**

The ALJs relied upon PURA section 39.459(c) in concluding that the insurance proceeds were required to be trued up in the first base rate case after the reconstruction costs were deemed eligible for recovery.[49] Section 39.459(c) reads:

> To the extent a utility subject to this subchapter receives insurance proceeds, governmental grants, or any other source of funding that compensates it for hurricane reconstruction costs, those amounts shall be used to reduce the utility's hurricane reconstruction costs recoverable from customers. If the timing of a utility's receipt of those amounts prevents their inclusion *as a reduction to* the hurricane reconstruction costs that are securitized, the commission shall take those amounts into account in:
>
> (1)     the utility's next base rate proceeding; or
>
> (2)     any proceeding in which the commission considers hurricane reconstruction costs.

Tex. Util. Code Ann. § 39.459 (c) (emphasis added). The Commission, in adopting the ALJs' construction of this provision, erred as a matter of law.[50]

PURA section 39.459(c) requires the Commission to remedy a double-recovery if a utility receives insurance or grant money for hurricane reconstruction costs *after those same costs have already been securitized*. That is the exact

---

[49] AR Binder 5, Item 185 (Proposal for Decision at 15 & 21-22).
[50] The Commission also erred as a matter of fact in assuming that Docket No. 37744 was ETI's first base rate case after the reconstruction costs were deemed eligible for recovery in Docket No. 32907. There was another base rate case filed and decided between Docket Nos. 32907 and 37744. *See Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Docket No. 34800.

13

opposite of what happened here. In Docket No. 32907, ETI agreed *not* to securitize amounts it expected to recover from insurance. Therefore, in the language of the statute, the timing of ETI's receipt of those amounts *did not* prevent their inclusion as a reduction to the amounts that were securitized. The Attorney General conceded in the district court that the wording of section 39.459(c) "is not an exact match to the circumstances of this case."[51] Indeed, section 39.459(c) is by its plain terms inapplicable.

Section 39.462(a), on the other hand, speaks directly to this situation. It says:

> An electric utility subject to this subchapter is entitled to recover hurricane reconstruction costs consistent with the provisions of this subchapter and is *entitled to seek recovery of amounts not recovered under this subchapter … in its next base rate proceeding or through any other proceeding authorized by Subchapter C, Chapter 36*.

*Id.* § 39.462(a) (emphasis added). There is no question that the proceeding underlying this appeal was authorized by PURA Subchapter C, Chapter 36. *See id.* § 36.001, *et seq.* Therefore, the Commission was expressly authorized to address the issue in this case. It certainly was not statutorily required to address the issue in Docket No. 37744 or some other particular case.

---

[51] CR 698 (PUCT Initial Brief at 14).

## C. The Commission also erred in treating the issue as if it had in fact been resolved in Docket No. 37744.

Nothing in the settlement agreement or final order in Docket No. 37744 even mentioned the regulatory asset, much less a method of recovering it. The ALJs acknowledged that.[52] They also recognized that utilities are typically not allowed to recover regulatory assets without express approval of the Commission.[53] The ALJs nevertheless concluded that the proposed amortization of the regulatory asset should be "considered to have been approved" in Docket No. 37744. They believed that the proposed amortization was not disputed in Docket No. 37744 and that ETI consequently should be required to prove the issue was *not* resolved in Docket No. 37744.[54] Both of these assumptions are incorrect.

First, as a matter of law, ETI did not bear the burden of proving what issues Docket No. 37744 did or did not resolve. The issue of whether Docket No. 37744 bars ETI from seeking particular relief in a subsequent case was a defensive issue raised by intervenors.[55] The argument is really that the order in Docket No. 37744 is *res judicata* of the reconstruction cost recovery issue. Because that is an affirmative defense, intervenors bore the burden of proof on the issue. *See, e.g.,* Tex. R. Civ. P. 94; *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.

---

[52] AR Binder 5, Item 185 (Proposal for Decision at 20-21).
[53] *Id.* at 21.
[54] *Id.* at 22.
[55] *See, e.g.,* AR Binder 8 (Cities Exh. 2, Garrett Direct at 11).

15

1988); *Commint Technical Services, Inc. v. Quickel*, 314 S.W.3d 646, 651 (Tex. App. – Houston [14th Dist.] 2010, no pet.).

There is no reasonable basis in the record upon which to conclude that the parties or the Commission intended ETI to begin amortizing the regulatory asset years ago. The only reason the intervenors gave in support of their argument was their allegation that the issue was "undisputed" in Docket No. 37744. It is true that no party to Docket No. 37744 argued that ETI should not recover the money at all.[56] They could not, given that Docket No. 32907 and PURA clearly entitle ETI to recover the full amount of its eligible restoration costs. Regardless, the parties' litigation positions during the contested phase of a proceeding do not inform what the parties intend when they settle the case, or what the Commission intends in approving the settlement.

Even assuming for the sake of argument that the parties' litigation positions in Docket No. 37744 were relevant, their positions on whether ETI was entitled to recover the money at all would not be the relevant issue. What would matter is what the parties' positions were on *how* and *when* ETI should recover the money, because that is the issue the Commission says was resolved in Docket No. 37744. Cities' witness in Docket No. 37744, Jacob Pous, *did* dispute ETI's request to amortize the regulatory asset over a five-year period. He testified that ETI should

---

[56] *See id.* at 11.

16

credit the amount to its storm reserve instead.[57] The ALJs were mistaken in concluding that this issue was uncontested in Docket No. 37744.[58] There certainly is no evidence in this docket that the parties or the Commission intended ETI to begin amortizing the regulatory asset upon the conclusion of Docket No. 37744.

Given that neither the settlement agreement nor the Commission's order said anything about this issue, and especially since the issue was disputed, ETI would have been unreasonable to "assume" it could begin amortizing the regulatory asset when Docket No. 37744 was over. As this Court recently recognized, the recovery of a regulatory asset is a *two*-step process. First, the Commission allows creation of the asset, and later, the Commission decides how the utility may recover the asset in rates. *State of Texas' Agencies & Institutions of Higher Learning v. Public Util. Comm'n of Tex.*, 450 S.W.3d 615, 646 (Tex. App. -- Austin 2014, pet requested). Here, the settlement and Commission order in Docket No. 32907 established that the hurricane reconstruction costs were reasonable and necessary and authorized creation of the regulatory asset. But the Company's proposed

---

[57] *See Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744 (Pous Direct at 113). Both the Commission and this Court may take notice of the fact this testimony was filed in Docket No. 37744. Tex. Gov't Code Ann. § 2001.190; 16 Tex. Admin. Code § 22.222(a); *B.L.M. v. J.H.M., III,* No. 03-14-00050-CV, 2014 WL 3562559 *11 (Tex. App. – Austin Jul. 17, 2014, pet. denied) (not designated for publication).

[58] In contrast, the ALJs correctly observed that another issue – regarding ETI's storm reserve balance -- was disputed in Docket No. 37744. AR Binder 5, Item 185 (Proposal for Decision at 48). They concluded that issue was *not* resolved by the black box settlement. *Id.* Using the ALJs' own logic, this fact leads to the conclusion that the Hurricane Rita issue was not adjudicated in Docket No. 37744. Resolving two issues differently based on materially similar facts is the essence of arbitrary and capricious action.

method of recovering that asset in Docket No. 37744 was a contested issue, and neither the parties' settlement nor the Commission's order resolved the issue in favor of one party or another. The only reasonable thing for the Company to do was to maintain the *status quo*, carrying the balance on its books as a regulatory asset until the Commission affirmatively addresses how the Company may recover it.[59]

## D. The Commission's order contravenes legislative intent.

The Commission's decision thwarts the legislature's purpose in enacting the hurricane reconstruction cost recovery provisions. *See* Tex. Util. Code Ann. §§ 39.458-.463. The legislature clearly intended to ensure that utilities that incurred reconstruction costs as a result of Hurricane Rita would be able to expeditiously recover those costs in full, with interest. Indeed, the legislature expressly articulated this purpose in PURA. *Id.* § 39.458. The effect of the Commission's order here is to disallow over $11 million in unrecovered hurricane reconstruction costs and interest. The order penalizes the utility for, instead of securitizing all of its hurricane reconstruction costs as authorized by the statute, opting not to securitize amounts that it anticipated recovering through insurance. No one has suggested that ETI was unreasonable in estimating its anticipated

---

[59] Even Cities opined that the Docket No. 37744 settlement should not be interpreted as changing the *status quo* unless expressly stated in the settlement agreement or the final order. *See* AR Binder 5, Item 185 (Proposal for Decision at 17).

18

insurance proceeds when the securitization docket was taking place. The Commission's reasons for disallowing the amounts that were not ultimately recovered through insurance are not legally or factually sound. The Court should reverse the Commission's disallowance. *See* Tex. Gov't Code Ann. § 2001.174(b)(2).

## II. The Commission erred in refusing to include any of ETI's adjustments to test-year purchased capacity costs in setting rates.

### A. Background

"Capacity" is the amount of power a utility has available at any given time to serve customers. Utilities are required to have a percentage surplus or "cushion" of capacity available in reserve, in case demand exceeds expectations. Traditionally regulated utilities supply their need for capacity either by owning generating plants or by buying capacity from someone else.

A utility's capital investment in building and maintaining its own plant become a part of its invested capital (or "rate base"), and the utility earns a return on that investment. The cost of fueling a power plant and other specified variable "energy" charges incurred to generate power are recoverable dollar-for-dollar as fuel expenses. 16 Tex. Admin. Code § 25.236(a); *City of El Paso*, 344 S.W.3d at 614.

Purchases of capacity from third parties are, however, treated differently. They are simply expenses, and earn no return for the utility. Moreover, the fixed

19

costs associated with obtaining capacity from third parties may not, absent special circumstances, be recovered as fuel expenses. 16 Tex. Admin. Code § 25.236(a)(4); *City of El Paso*, 344 S.W.3d at 614. Instead, they are recovered through base rates. *Id.*[60] Like other base rate expenses, "purchased capacity costs" are quantified during a "test year," are adjusted for known and measurable changes, and become a component of the utility's revenue requirement that forms the basis for prospective rates. There is no true-up or reconciliation for the purchased capacity costs recovered through base rates. Combined with the fact that there is no opportunity to earn a return on this type of expense, the adverse financial impact of "regulatory lag" is much more significant for this type of expense than it is for reconcilable fuel costs.

Before 2009, ETI was under a regulatory directive to position itself for retail competition, and that directive necessitated that the Company forego long-term resource procurement. During that time, ETI relied on or "shared" the capacity from Entergy System resources owned by other Entergy operating companies, and relied on short- and limited-term resources to reliably serve its retail customers.[61] ETI paid for this Entergy System capacity under Schedule MSS-1 of the Entergy System Agreement. That FERC-approved tariff requires the various Entergy

---

[60] In some circumstances, Commission rules allow utilities to recover purchased capacity costs through a rider. *See* 16 Tex. Admin. Code § 25.238. ETI does not have such a rider.

[61] *See* AR Binder 37, ETI Exh. 47 (Cooper Rebuttal at 5-6 of 21); AR Binder 43, Vol. L (5/3/12 Tr. at 1939).

operating companies to make and receive payments according to their relative share of total system capacity.[62] Some Entergy operating companies own a greater share of Entergy System capacity than they need to serve their own load.[63] These entities are considered "long" on capacity.[64] Other companies own less than they need, and are "short" on capacity.[65] Under Schedule MSS-1, "short" companies pay "long" companies a per-MW rate for the cost of owning these capacity reserves.[66] While it was in regulatory limbo, ETI controlled relatively less resources compared to its load than other Entergy companies. It, therefore, made "reserve equalization" payments under Schedule MSS-1.[67]

In addition to sharing Entergy System capacity under Schedule MSS-1, ETI also purchased power from specific units owned by other Entergy operating companies. Those unit-specific purchases were paid for under contracts with those operating companies under Schedule MSS-4 of the Entergy System Agreement. Schedule MSS-4 contains a formula that sets the price of power for these purchases based on the actual cost of producing the power.[68]

After the legislature in 2009 delayed the onset of retail competition in ETI's service area, ETI found it cost effective to begin to substantially increase its

---

[62] AR Binder 36, ETI Exh. 39 (Cicio Direct at 11-12 of 75).
[63] *Id.* at 12.
[64] *Id.*
[65] *Id.*
[66] *Id.* at 13-14.
[67] AR Binder 35, ETI Exh. 34 (Cooper Direct at 22-23 of 25).
[68] AR Binder 36, ETI Exh. 39 (Cicio Direct at 24-26 of 75).

reliance upon purchases of capacity from third parties.[69]  ETI did not buy more third-party capacity simply to serve additional load.  Rather, ETI employed the strategy to serve existing load, reduce its reliance on Entergy capacity resources, and render ETI less "short" compared to other Entergy entities.[70]  The strategy also reduced fuel costs for customers because the third-party resources were by and large more fuel-efficient than the combined Entergy resources and, as explained above, there was no return component included in the cost.[71]

In this case, ETI asked the Commission to recognize the cost of ETI's increased reliance on three new third-party purchased capacity contracts.  Those contracts cost ETI some $38 million annually.  ETI recognized that these contracts would enable ETI annually to avoid about $8 million of the costs it paid to Entergy affiliates for their capacity in the test year.  ETI, therefore, asked the Commission to increase its test-year expenses for purchased capacity by the net amount of about $30 million for purposes of setting its annual rates.

No party challenged the wisdom of ETI's entering into any of the new, third-party contracts or the prices reflected in the contracts.  The ALJs, however, included in ETI's base rates only purchased capacity costs that were incurred

---

[69] *E.g,* AR Binder 35, ETI Exh. 34 (Cooper Direct at 23 of 25).

[70] AR Binder 37, ETI Exh. 47 (Cooper Rebuttal at 5 of 21); *see also id.* at 10-11; AR Binder 37, ETI Exh. 57 (May Rebuttal at 13-15 of 31).

[71] AR Binder 35, ETI Exh. 34 (Cooper Direct at 24 of 25); AR Binder 37, ETI Exh. 47 (Cooper Rebuttal at 7-8 of 21).

during ETI's test year.[72]  The ALJs disallowed 100 percent of the additional expense associated with the third-party capacity contracts that would be incurred during the first year rates would be in effect (the "rate year") and thereafter.[73]  The Commission adopted the ALJs' proposal for decision on this issue.[74]

The ALJs concluded that ETI had not proven that the costs it would incur as a result of entering into the third-party purchase capacity contracts were "known and measurable" adjustments to the utility's test-year expenses.[75]  The ALJs found that there is "substantial uncertainty" about what ETI will be obligated to pay for the third-party purchased capacity because the third parties might not fully perform their obligations under the contracts.[76]  The ALJs suggested that the contract costs should not be in rates because they may be offset by increased revenues from load growth.[77]  The ALJs further found there is "substantial uncertainty" about how much money the third-party purchased power capacity contracts will enable ETI to avoid paying to other Entergy entities under Schedule MSS-1 of the Entergy System Agreement.[78]  The source of this perceived uncertainty was apparently the ALJs' view that the net costs were difficult to quantify because the calculations

---

[72] AR Binder 5, Item 185 (Proposal for Decision at FOF 86).
[73] *Id.* at FOF 73 & 86.
[74] AR Binder 7, Item 244 (Order on Rehearing at 1 & 7).
[75] AR Binder 5, Item 185 (Proposal for Decision at 108).
[76] *Id.* at FOFs 77-78.
[77] *Id.* at 109 & FOFs 84.
[78] *Id.* at FOFs 75, 76, & 79-82.

involve projections and "complex" formulae and "variables."[79]  Rather than accepting any of the calculations in evidence or adopting a result within the range of these recommendations, the ALJs simply disallowed the entire adjustment.[80] The Commission's order adopting these recommendations constitutes error of law and is not supported by substantial evidence.

## B.    The Commission misapplied the standard for adjustments to test-year expenses.

The fundamental error in the Commission's order is that it misapplies the legal standard for determining what expenses should be included in rates.  The order adopts the ALJs' erroneous view that an adjustment to test-year data is somehow extraordinary or "exceptional" rate relief.[81]  The ALJs also took the view that to the extent additional costs are based on anticipated changes, they cannot be "known and measurable."[82]  These assumptions are wrong as a matter of law.

### 1.    Adjustments to test-year data are not extraordinary relief.

To determine what a utility's reasonable and necessary expenses are, the Commission determines "the electric utility's historical test year expenses as adjusted for known and measurable changes."  16 Tex. Admin. Code § 25.231(b). Under the rule, known and measurable changes have equal weight with historical

---

[79] *Id.* at 108.
[80] *Id.* at 109.
[81] *Id.* at 108; AR Binder 7, Item 244 (Order on Rehearing at 1).
[82] AR Binder 5, Item 185 (Proposal for Decision at 102).

24

test-year levels. That makes sense, because PURA does not limit a utility's recoverable expenses to those incurred in a historical test year. Rather, PURA guarantees a utility a reasonable opportunity to earn a reasonable return on its investment over and above its "reasonable and necessary expenses." Tex. Util. Code Ann. § 36.051. The goal of ratemaking is to set utility rates that will meet the utility's and customers' needs in the future, not the past, as rates are set on a prospective basis.

The Texas Supreme Court has confirmed that making known and measurable adjustments is a critical component of establishing the costs upon which rates are set, and not a rare exception to the use of test-year cost levels. The Court has explained that "changes occurring after the test period, if known, may be taken into consideration by the regulatory agency to help mitigate the effects of inflation *and in order to make the test year data as representative as possible of the cost situation that is apt to prevail in the future.*" *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 188 (Tex. 1994) (emphasis added).

The recognition of changes to test-year data is especially critical in a case such as this one, where the inability to recover substantial post-test-year expenses inevitably causes ETI to recover an inadequate return, contrary to the requirements of PURA's fundamental cost-recovery standards. *See* Tex. Util. Code Ann. § 36.051. The Commission's conclusion that a utility is somehow less entitled to

25

expenses that occur beyond the test year is contrary to PURA and judicial precedent, and its erroneous application of the known and measurable standard tainted the entirety of its decision on this issue. This is reason enough to reverse the Commission's decision.

## 2. Adjustments to test-year data need not be proven with absolute certainty.

The quantum of proof required to establish adjustments to test-year data is not greater than the quantum required to establish the test-year data itself. The Texas Supreme Court has held that known and measurable adjustments should be made if they reflect costs that will be "actually realized," can be "anticipated with reasonable certainty," and if they are representative of the costs "apt" to prevail in the future. *See City of El Paso*, 883 S.W.2d at 188; *Suburban Util. Corp.*, 652 S.W.2d at 362. The standard is not an impossible-to-meet requirement of absolute or virtual certainty. *Suburban Util. Corp.*, 652 S.W.2d at 362. Contrary to its ruling regarding purchased capacity, the Commission in this and other cases has routinely adopted known and measurable adjustments that involve estimates and uncertainty.[83] In rejecting ETI's proposed adjustments to test-year purchased capacity expense, the Commission did not acknowledge or discuss the statute, rule, judicial precedent, or regulatory precedent that guide its inquiry. The decision is

---

[83] *E.g.*, AR Binder 5, Item 185 (Proposal for Decision at 68 (short-term asset update), 163-64 (payroll adjustments), & 182-86 (ad valorem tax rate update)).

26

contrary to and inconsistent with all those authorities.  Under the Commission's analysis, known and measurable changes routinely adopted by the Commission would never be allowed.  The Commission's ruling is, therefore, arbitrary and capricious.  *See Starr County v. Starr Industrial Servs., Inc.*, 584 S.W.2d 352, 355-56 (Tex. Civ. App. – Austin 1979, writ ref'd n.r.e.).  This is another reason the decision must be reversed.

## C.     The Commission's wholesale disallowance of any adjustment to test-year levels of capacity costs is not supported by substantial evidence.

The proposed adjustments for third-party purchased capacity expenses are attributable to three contracts the parties call the Frontier, Calpine, and Sam Rayburn Municipal Power Agency ("SRMPA") contracts.  ETI established with reasonable certainty what costs it would incur under each of these contracts while the rates being set in this case would be in effect.  The Commission did not discuss the contracts separately, but ruled on them in the aggregate.  The Commission said:

> 77.    ETI's projection of its rate-year third-party capacity contract payments includes numerous assumptions, one of which is that every single third-party supplier will perform at the maximum level under the contract, even though that assumption is inconsistent with ETI's historical experience.

> 78.    There is substantial uncertainty with regard to ETI's projection of its rate-year third-party capacity contract payments.[84]

---

[84] AR Binder 7, Item 244 (Order on Rehearing at FOFs 77-78); *see also* AR Binder 5, Item 185 (Proposal for Decision at 108-109).

27

These findings are not supported by substantial evidence. As discussed below, the adjustments were based on contracts already in place before and during the rate year. The contracts had clearly and specifically ascertainable prices and quantities, which were in evidence. No one disputed that ETI will pay money under these contracts. Rather, some parties speculated that ETI might not have to pay the full amount of these contracts because suppliers might not perform perfectly. Performance under each of the contracts is reasonably assured. There is no reasonable uncertainty regarding the outcome under any of these contracts, certainly none sufficient to support a finding that *none* of these contract costs are "apt to prevail" in the near future.

### 1. ETI proved that it will incur an annual capacity cost increase of $15.8 million under the Frontier contract.

There is no reasonable basis in the evidence for the Commission's finding that the costs of the Frontier contract are uncertain. ETI has had a contract with Frontier for years, leading up to and including the first ten months of the test year.[85] In the second-to-last month of the test year, ETI increased the annual amount of power it purchased under the Frontier contract from 150 MW to 300 MW.[86] Applying the language of the Texas Supreme Court, the 150 MW increase in capacity and capacity cost was "actually realized" *in the test year*. But because

---

[85] AR Binder 43, Vol. L (5/3/12 Tr. at 1938 & 1941).
[86] *Id.* at 1942 & 1959.

28

the step-up happened late in the test year, the test year does not reflect the full amount of expense ETI will incur going forward under the Frontier contract.[87] *No witness challenged ETI's quantification of what this contract would cost ETI during the rate year.*

On cross-examination at the hearing, ETI's witness Cooper acknowledged that ETI's purchased capacity contracts include provisions that authorize ETI to reduce its payments if the counter-party does not perform.[88] He explained that ETI did not assume any reduction in future payments for poor performance because in the past, any such adjustments have been "relatively minor."[89] ETI's witness May, who quantified the increase in annual Frontier costs at $15.8 million, confirmed that ETI has "quite a bit of experiences" with the contract, and a "good understanding of what the costs are today and what the costs will be in the future" under the contract.[90] The other parties did not produce evidence to the contrary.

It is simply not reasonable to conclude, based upon this record, that there is "substantial uncertainty" about what ETI's annual expenses will be in connection with the Frontier increase. The Commission's findings insofar as they implicate this contract are not supported by substantial evidence.

---

[87] *Id.* at 1942.
[88] AR Binder 43, Vol. F (4/26/12 Tr. at 705-06); *see also id.* at 682.
[89] *Id.* at 705.
[90] AR Binder 43, Vol. L (5/3/12 Tr. at 1942).

## 2. ETI proved that it will incur an annual capacity cost increase of $8.1 million under the SRMPA contract.

During the test year, ETI executed a 25-year agreement with SRMPA for 225 MW of capacity.[91] Power started flowing under the contract on December 1, 2011, just five months after the end of the test year, well before intervenors filed their testimony in March 2012, and well before the conclusion of the proceeding under review.[92] All of the capacity contracted for was allocated to ETI.[93] The price of this contract is a "very straightforward $3 per kW a month."[94] It is "very easy to calculate what those known and measurable costs are."[95] $3.00 x 225,000 kW = $675,000 per month. At $675,000 per month, the contract will cost $8.1 million annually. *No witness challenged ETI's quantification of the annual costs of the SRMPA contract.* In addition, the SRMPA contract commits "System Capacity," meaning multiple network resources and substitute resources are designated to supply the capacity. There is no evidence in the record that SRMPA's entire portfolio of network resources is likely to be simultaneously unavailable.

There is, therefore, *no* evidence in the record that there is "substantial uncertainty" about whether SRMPA will perform the contract, or what the annual

---

[91] AR Binder 35, ETI Exh. 34 (Cooper Direct at 17 of 25).
[92] *See id.*
[93] *Id.* at 17 & 19 of 25.
[94] AR Binder 43, Vol. L (5/3/12 Tr. at 1944).
[95] *Id.*

costs of the contract will be.  The Commission's findings insofar as they implicate this contract are not supported by substantial evidence.

### 3. ETI proved that it will incur an annual capacity cost increase of $14.1 million under the Calpine contract.

ETI purchased capacity from Calpine Energy Services under a one-year contract in effect from June 1, 2008 through May 31, 2009.[96]  In 2009, ETI entered into a ten-year purchased power agreement with Calpine to purchase 485 MW of capacity from its Carville Energy Center.[97]  Purchases under this contract were set to begin on June 1, 2012, the beginning of the rate year for this case.[98]  Fifty percent of the contract was allocated to ETI.[99]

The resource had been under contract with the Entergy system for some time, and the Entergy companies have significant experience with the pricing and costs under the contract.  The most recent contract simply allocated the resource differently to reflect the fact that the "overhang of retail competition" had been lifted for ETI.[100]  Because of ETI's experience with Calpine, the capacity costs are "well known."[101]  The contract sets out specific capacity quantities and prices, and includes default and other terms to ensure performance.  ETI's historical experience with the Calpine resource establishes that any deviations from the

---

[96] AR Binder 35, ETI Exh. 34 (Cooper Direct at 21-22 of 25).
[97] *Id.* at 16.
[98] *Id.*
[99] *Id.* at 19 of 25.
[100] *See* AR Binder 43, Vol. L (5/3/12 Tr. at 1938).
[101] *Id.* at 1942.

negotiated contract payments will be "very, very small."[102]   Both parties to the contract intend and are incentivized to perform such that they will get the full benefits of the capacity and price under the contract.[103]   ETI projected the annual cost of the Calpine contract will be $14.1 million.[104]

*No witness challenged ETI's quantification of the costs associated with the Calpine contract.*   There is *no* evidence in the record that there is "substantial uncertainty" about whether Calpine will perform the contract, or what the annual costs of the contract will be.  The Commission's findings insofar as they implicate this contract are not supported by substantial evidence.

> **4.     The record does not reasonably support the Commission's other reasons for disallowing 100 percent of these known capacity costs.**

> **a.     Load Growth**

Intervenors and Commission staff championed multiple theories they alleged would offset ETI's additional expense under these three contracts.   One such theory` was that the cost increase is not known and measurable because it may be offset by load growth that occurs after the test year.[105]

If it were appropriate to consider future load growth in setting base rates, PURA or the Commission's rules would say so.  Indeed, there are other instances

---

[102] *Id.*
[103] *Id.* at 1942-43.
[104] AR Binder 8 (Cities Exh. 4B [Highly Sensitive], Goins Direct Exh. DWG-2).
[105] AR Binder 5, Item 185 (Proposal for Decision at 109); AR Binder 7, Item 244 (Order on Rehearing at FOF 84).

in which PURA does specify that the utility's recovery of costs should be subject to an offsetting load growth adjustment. *See, e.g.*, Tex. Util. Code Ann. § 39.455 (utility entitled to recover specified incremental capacity costs "adjusted for load growth"). For base rates, the legislature has left load growth out of the equation, so that it may serve as a source of revenue to address other future cost increases and avoid or defer additional rate increases. The legislature's inclusion of "load growth" language for specific circumstances but not base rates is evidence the legislature did not intend it to apply generally. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

Even if load growth could properly be considered, however, it does not support a wholesale disallowance of the increased purchased capacity costs. First, the load growth that intervenors suggested would occur would not fully materialize for at least two years.[106] It could not logically offset the third-party capacity cost increases ETI began to experience during or shortly after the test year.

Second, Cities witness Goins is the only intervenor witness who attempted to quantify a load growth adjustment, and he quantified it at $15.8 million – a far cry from the $38 million in increased purchased capacity expense that ETI proved it would incur.[107] Moreover, Mr. Goins's proposal overstated retail load growth

---

[106] AR Binder 43, Vol. J (5/1/12 Tr. at 1299-1300 [Confidential]).
[107] AR Binder 8 (Cities Exhs. 4 & 4B [Highly Sensitive], Goins Direct at 9 & 16-19).

significantly and attempted to predict events beyond the rate year.[108] It does not provide a reasonable basis for a known and measurable change at all, much less one that negates all $38 million of ETI's third-party capacity contract costs.[109]

The large gap between Mr. Goins's speculative adjustment and the known costs ETI sought illustrates how far the Commission has strayed from setting rates at a level that will enable ETI to recover the costs it reasonably expects to incur when the rates are in effect. In any event, the Commission's reliance on the load growth theory to deny ETI *any* adjustment for its post-test-year increases in third-party purchased capacity costs is not supported by substantial evidence.

### b. MSS-1 Costs

Another "offset" theory that the Commission adopted concerned the amount of money ETI might save under Schedule MSS-1 as a result of the new third-party purchased capacity contracts. The Commission found that the impact the contracts would have on ETI's "reserve equalization" payments under Schedule MSS-1 was substantially uncertain, because the calculation of MSS-1 costs depends on "numerous assumptions."[110] The record does not support a wholesale disallowance of ETI's third-party capacity cost increases on this ground.

---

[108] *Id.* at 17-19.

[109] AR Binder 37, ETI Exh. 57 (May Rebuttal at 9-11 of 31); AR Binder 43, Vol. I (5/1/12 Tr. at pp. 1296-1306, 1316-1324 [Confidential]).

[110] AR Binder 5, Item 185 (Proposal for Decision at 108); AR Binder 7, Item 244 (Order on Rehearing at 1 & FOFs 75-76).

Company witness Cooper testified that the MSS-1 cost adjustment is a straightforward calculation.[111] While it is true that the MSS-1 amount is dependent on the relative load responsibility of ETI, that relative change in load responsibility was factored into the Company's calculation.[112]

Evidence from other parties regarding the MSS-1 costs likewise does not provide substantial evidence justifying a wholesale disallowance of the third-party contract costs. Cities, in fact, adopted ETI's calculation of MSS-1 impacts.[113] And though TIEC argued on one hand that ETI's MSS-1 expense would *increase* over test-year levels,[114] the evidence, including TIEC's, is undisputed that MSS-1 costs go *down* as ETI adds new capacity contracts.[115] In fact, the MSS-1 costs decreased during the test year and reached test-year lows during the last two months (when the new Frontier contract was first put in place).[116] TIEC's recommendations regarding MSS-1 costs are contrary to reality and all the record evidence. They certainly do not provide a reasoned basis to reject all of ETI's proposed increase in third-party purchased capacity costs.

---

[111] AR Binder 43, Vol. L (5/3/12 Tr. at 1947).

[112] *See* AR Binder 35, ETI Exh. 34 (Cooper Direct at 20 of 25 & ETI Exh. 34A RRC-1 [Highly Sensitive]).

[113] AR Binder 9, Cities Exh. 6 (Nalepa Direct at 17).

[114] AR Binder 41, TIEC Exh. 1 (Pollock Direct at 26).

[115] AR Binder 41, TIEC Exh. 1D (Pollock Direct at 22, Table 1); AR Binder 9, Cities Exh. 6 (Nalepa Direct Attachment KJN-3 at 2 [Highly Sensitive]).

[116] *See* AR Binder 9, Cities Exh. 6 (Nalepa Direct Attachment KJN-3 at 2 [Highly Sensitive]).

### c. MSS-4 Costs

The Commission also found that the impact the purchased capacity contracts would have on MSS-4 costs (costs of unit-specific purchases from other Entergy operating companies) was substantially uncertain because the calculation of MSS-4 costs depends on "complex mathematical formulae that utilize numerous variables."[117] However, as shown in the proposal for decision adopted by the Commission, the adjusted MSS-4 costs sought by the Company are *lower* than the test-year level of MSS-4 costs awarded by the Commission. As the Commission further acknowledged, "while the purchases pursuant to MSS-4 [from test year to rate year] remain fairly stable, the third-party purchases will substantially increase, with a somewhat corresponding decrease for purchases pursuant to MSS-1."[118]

In other words, the Commission recognized that the known and measurable adjustment to the test-year amount was driven by third-party purchases, not MSS-4 purchases. The small difference between the test-year and rate-year levels associated with MSS-4 purchases, under the Commission's own observations, is not material to determining the merits of ETI's proposed purchased power cost adjustments. In short, alleged uncertainty regarding the rate-year level of MSS-4

---

[117] AR Binder 7, Item 244 (Order on Rehearing at FOFs 79-82).
[118] AR Binder 5, Item 185 (Proposal for Decision at 100); AR Binder 7, Item 244 (Order on Rehearing at 1, adopting Proposal for Decision).

36

expense is not a reasonable basis for the Commission to reject ETI's additional third-party purchased power expense.

Even assuming *arguendo* that the Commission's rejection of the Company's adjustment to MSS-4 expense is material to the resolution of this issue, the evidence regarding MSS-4 expense does not support rejection of the entire increase in third-party purchased capacity costs. Similar to ETI, Cities' and TIEC's adjustments for MSS-4 costs in all but one respect varied only marginally from the test year. They come nowhere near to offsetting the entire cost of the third-party contracts.[119] Cities and TIEC proposed MSS-4 reductions that were materially larger than ETI's[120] only because one of ETI's Arkansas affiliate contracts (the "WBL" contract) was set to terminate after the test year. Intervenors' argument was based on the flawed assumption that ETI would take no action to replace the WBL contract. To the contrary, the evidence was undisputed that ETI was short of capacity and in fact extended the very contract in question.[121] The dispute over how much ETI might save in MSS-4 costs does not rationally support a disallowance of the entire increase for the new purchased capacity contracts

---

[119] AR Binder 41, TIEC Exh. 1 (Pollock Direct at Exh. JP-1) (Line 4 shows $1.4 million reduction to test year amount of affiliate contracts)); AR Binder 8, Cities Exh. 4B (Goins Errata 3 Exh. DWG-2 [Highly Sensitive]) (less than $3 million reduction to test-year costs for affiliate contracts excluding WBL).

[120] $12.7 million and $11.1 million, respectively.

[121] AR Binder 43, Vol. E (4/26/12 Tr. at 687-88 & 696); AR Binder 37, ETI Exh. 47 (Cooper Rebuttal at 5 of 21); AR Binder 43, Vol. L (5/3/12 Tr. at 1946).

**D.**   **The consequences of the Commission's decision are extreme and unjust.**

The three new third-party purchased power contracts that drive ETI's requested adjustment to test-year capacity costs benefit customers tremendously. They increase the capacity of ETI resources by 618 MW (150 by the Frontier contract, 225 by the SRMPA contract, and 243 by the half of the Calpine contract allocated to ETI). They result in substantial fuel savings for customers because of their diverse fuel resources and efficient heat rates.[122] Customers will benefit from those savings on a dollar-for-dollar basis in fuel reconciliations. While the third-party owners of the capacity resources profit from the capacity payments ETI must make, and the retail customers of ETI benefit from the superior heat rates and resulting fuel savings, the Commission's order forces the middleman – ETI –to pay for the capacity with shareholder funds.

The Commission's draconian adherence to the test-year data and incorrect application of the standard for making adjustments to that data are reasons alone to reverse the decision, because they taint every one of the Commission's findings discussed above. Even disregarding those errors, none of the Commission's findings rationally justifies the disallowance of 100 percent of the cost increase resulting from the three new contracts. Because the Commission did not quantify

---

[122] AR Binder 35, ETI Exh. 34 (Cooper Direct at 24 of 25); AR Binder 37, ETI Exh. 47 (Cooper Rebuttal at 7-8 of 21).

how much of a disallowance it made upon each individual theory, if this Court finds *any* of the findings are unsupported by substantial evidence, it must reverse the whole disallowance and remand to the Commission for further consideration. This Court may not decide fact issues the Commission did not. Tex. Gov't Code Ann. § 2001.174(1).

### III. The Commission erred in setting ETI's transmission equalization (MSS-2) expense at the test-year level.

The Commission also erred in refusing to make any adjustment for another known and measurable increase in ETI's expenses after the test year. The Entergy system transmission grid is a large network, the various pieces of which are owned by individual Entergy operating companies. The network, however, is integrated and operated for the mutual benefit of all of the Entergy operating companies.[123] In any given month, some of the operating companies may be "long" on the amount of transmission capacity they own. That is, they own a portion of the transmission capacity that is greater than their share of the overall load placed on the transmission system. Other operating companies may be "short" on capacity. The Entergy System Agreement includes a FERC-approved Schedule MSS-2 that equalizes the ownership costs of certain high-voltage transmission facilities among the operating companies. The long operating companies receive MSS-2 payments

---

[123] AR Binder 36, ETI Exh. 39 (Cicio Direct at 15 of 75); AR Binder 43, Vol. C (4/25/12 Tr. at 450); AR Binder 43, Vol. F (4/27/12 Tr. at 793).

from the short operating companies for the use of their transmission facilities so that each pays its fair share of the total ownership costs of the shared system on a monthly basis.[124]

Over the course of the test year, ETI was short, so it paid a total of $1,753,797 in MSS-2 payments to various other operating companies.[125] But ETI's MSS-2 expenses increased at the end of the test year and continued to increase after the test year.[126] ETI anticipated these costs would increase even more by the rate year because of transmission projects that were planned to go into service by the rate year.[127] ETI calculated that its MSS-2 expenses would be $10.7 million annually by the rate year.[128] ETI sought to include that level of its expense in its rates.

The ALJs recommended that the Commission disallow any increase in MSS-2 expense over the test-year level. They found that the increased expenses were not "known and measurable," again because the MSS-2 calculation depends on variables and projections, and because not all the projects ETI included in its

---

[124] AR Binder 36, ETI Exh. 39 (Cicio Direct at 15 of 75); AR Binder 43, Vol. F (4/27/12 Tr. at 731 & 735-36).

[125] AR Binder 43, Vol. F (4/27/12 Tr. at 724 & 737); AR Binder 9, Cities Exh. 28.

[126] AR Binder 9, Cities Exh. 29.

[127] AR Binder 43, Vol. F (4/27/12 Tr. at 761); AR Binder 37, ETI Exh. 59 (McCulla Rebuttal at 2-3 of 12).

[128] AR Binder 43, Vol. C (4/25/12 Tr. at 452-53); AR Binder 43, Vol. F (4/27/12 Tr. at 738 & 760).

calculation were in service during the test year.[129] The Commission adopted the ALJs' recommendation that only the test-year level of MSS-2 expense should be included in ETI's rates.[130]

### A. The Commission erred as a matter of law in applying the standard for adjustments to test-year expenses.

The Commission's decision is flawed as a matter of law for the same reason its decision about purchased capacity costs is flawed. That is, the goal of ratemaking is to give the utility a reasonable opportunity to earn a reasonable return on its investment over and above its reasonable and necessary expenses. Tex. Util. Code Ann. § 36.051. Commission Rule 25.231 mirrors this principle. 16 Tex. Admin. Code 25.231. This undertaking cannot lawfully turn on the manner in which the calculation is made, or on the number of inputs to the calculation. The Commission cannot arbitrarily rely upon test-year levels of expense to the extent they are proven not to represent the level of expense the utility is reasonably anticipated to bear in the rate year, or that is "apt to prevail in the future." *City of El Paso*, 883 S.W.2d at 188. If a change is known and can reasonably be measured, the Commission must make it.

None of the opposing parties' witnesses refuted that the projects underlying ETI's proposed MSS-2 adjustment were already approved and in process, or that

---

[129] AR Binder 5, Item 185 (Proposal for Decision at 116 & FOFs 87-93).
[130] AR Binder 7, Item 244 (Order on Rehearing at 1 & FOFs 87-94).

they will be completed. No intervenor or Staff witness offered any testimony or evidence casting doubt on the reasonableness of the construction cost estimates. Their position was simply that if there is any possibility of uncertainty or variability in the elements of an adjustment to test-year data, it must be denied. The Commission erred as a matter of law in adopting that standard.

**B.  Additionally, the Commission's adherence to test-year expense levels is unsupported by substantial evidence.**

It is undisputed that ETI's test-year level of MSS-2 expense was too low. *Every* witness testifying on the issue recognized that the test-year amount is too small and should be updated based on more recent, actual payment information. ETI proffered evidence that by the time of the hearing, its annualized MSS-2 expenses based upon *actual*, known, historical investment exceeded test-year levels by about $6.7 million, and its rate-year MSS-2 expenses would exceed test-year levels by almost $9 million.[131]  TIEC witness Pollock annualized the last six months of the test-year expense, increasing it by a million dollars.[132]  Cities witness Goins also rejected the test-year expense level and instead used a more recent 12-month period of actual payments, including six months that occurred after the test year. He recommended the Commission include an annual expense of

---

[131]AR Binder 43, Vol. C (4/25/12 Tr. at 452-53); AR Binder 43, Vol. F (4/27/12 Tr. at 738, 760, 763, 780, & 783-84).
[132] AR Binder 41, TIEC Exh. 1 (Pollock Direct at 32-33).

$4.1 million in ETI's rates, exceeding the test year by almost $2.5 million.[133] Indeed, Cities Exhibit 29 includes the MSS-2 payment for every month from January 2010 to February 2012. It shows that MSS-2 costs have steadily increased every month from the last month of the test year, and in fact have doubled since the last month of the test year.[134] *No* witness testified that the test year was representative of the expense ETI would bear during the rate year. The Commission's decision that the test-year level of MSS-2 expense is sufficient is simply not supported by *any* evidence in the record.

Viewing the evidence as a whole, there is no reasonable basis for a conclusion that the test-year level of $1.7 million is representative of costs apt to prevail in the future. The Commission's ruling is, therefore, unsupported by substantial evidence and must be reversed. Tex. Gov't Code Ann. § 2001.174(b)(2).

## CONCLUSION AND PRAYER

For all these reasons, Entergy Texas, Inc. respectfully requests this Court reverse the district court's judgment insofar as it affirms the Public Utility Commission's order in the respects discussed above. ETI requests the Court remand the case to the Commission for further proceedings consistent with the

---

[133] AR Binder 8, Cities Exh. 4 (Goins Direct at 21-22).
[134] AR Binder 9, Cities Exh. 29 (Response of ETI to Cities RFI 5-1).

Court's decision. Entergy Texas, Inc. further requests its costs of court and any other relief to which it may show itself justly entitled.

Respectfully submitted,


_/s/ Marnie A. McCormick_
John F. Williams
State Bar No. 21554100
Marnie A. McCormick
State Bar No. 00794264
mmccormick@dwmrlaw.com
**DUGGINS WREN MANN & ROMERO, LLP**
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*

**ATTORNEYS FOR APPELLANT**
**ENTERGY TEXAS, INC.**


## CERTIFICATE OF COMPLIANCE

I certify that this document contains 10,765 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.


_/s/ Marnie A. McCormick_
Marnie A. McCormick

# CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties via electronic service on the 31st day of March, 2015:

Elizabeth R. B. Sterling
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548 (MC 066)
Austin TX  78711-2548
*Counsel for Appellee Public Utility Commission of Texas*

Rex D. VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin TX  78701
*Counsel for Intervenor Texas Industrial Energy Consumers*

Susan M. Kelley (retired)[135]
Administrative Law Division
Office of the Attorney General
P. O. Box 12548
Austin TX  78711-2548
*Counsel for Intervenor State Agencies*

Sara Ferris
Office of Public Utility Counsel
1701 N. Congress Ave., Ste. 9-180
P. O. Box 12397
Austin TX  78711-2397
*Counsel for Intervenor Office of Public Utility Counsel*

---

[135] State Agencies have not yet appeared or designated a new lead counsel in this appeal.

Daniel J. Lawton
LAWTON LAW FIRM PC
12600 Hill Country Blvd., Ste. R-275
Austin TX  78738
*Counsel for Cities of Anahuac, et al.*


                                          */s/ Marnie A. McCormick*
                                          Marnie A. McCormick

# **APPENDICES**

A.     ALJs' Proposal for Decision in Docket No. 39896

B.     Commission's Order on Rehearing in Docket No. 39896

C.     District Court's Final Judgment

D.     Commission's Final Order in Docket No. 37744

APPENDIX A

ALJ's Proposal for Decision in Docket No. 39896

| APPLICATION OF ENTERGY TEXAS, INC. FOR AUTHORITY TO CHANGE RATES, RECONCILE FUEL COSTS, AND OBTAIN DEFERRED ACCOUNTING TREATMENT | § § § § § | BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS |
|---|---|---|

## PROPOSAL FOR DECISION

## TABLE OF CONTENTS

I.      INTRODUCTION [Germane to Preliminary Order Issue Nos. 1 and 4]........ 1

II.      JURISDICTION AND NOTICE ................................................................. 2

III.      PROCEDURAL HISTORY ....................................................................... 2

IV.      EXECUTIVE SUMMARY ......................................................................... 4

     A.      Rate Base.......................................................................................... 4

         1.      Capital Investment................................................................. 4

         2.      Hurricane Rita Regulatory Asset ......................................... 4

         3.      Prepaid Pension Asset Balance .............................................. 5

         4.      FIN 48 Tax Adjustment.......................................................... 5

         5.      Cash Working Capital............................................................ 5

         6.      Self-Insurance Storm Reserve ............................................... 5

         7.      Coal Inventory....................................................................... 5

         8.      Spindletop Gas Storage Facility ............................................. 5

         9.      Short Term Assets.................................................................. 6

         10.      Acquisition Adjustment......................................................... 6

         11.      Capitalized Incentive Compensation .................................... 6

     B.      Rate of Return and Capital Structure ............................................ 6

     C.      Cost of Service ................................................................................ 7

         1.      Purchased Power Capacity Expense ..................................... 7

         2.      Transmission Equalization (MSS-2) Expense ..................... 7

         3.      Depreciation Expense ............................................................ 7

         4.      Labor Costs............................................................................ 7

5.    **Interest on Customer Deposits**..................................................................... 8

6.    **Property (Ad Valorem) Tax Expense**............................................................. 9

7.    **Advertising, Dues, and Contributions**............................................................ 9

8.    **Other Revenue Related Adjustments**............................................................. 9

9.    **Federal Income Tax** ..................................................................................... 9

10.   **River Bend Decommissioning Expense**.......................................................... 9

11.   **Self-Insurance Storm Reserve Expense** ........................................................ 9

12.   **Spindletop Gas Storage Facility** ................................................................ 10

D.    **Affiliate Transactions** ................................................................................ 10

E.    **Jurisdictional Cost Allocation**.................................................................... 10

F.    **Class Cost Allocation** ................................................................................ 11

1.    **Renewable Energy Credit Rider**................................................................. 11

2.    **Class Cost Allocation** ................................................................................ 11

3.    **Revenue Allocation** ................................................................................... 12

4.    **Rate Design** .............................................................................................. 12

G.    **MISO Transition**........................................................................................ 14

V.    **RATE BASE [Germane to Preliminary Order Issue Nos. 4, 10, and 16]** ...... 14

A.    **Capital Investment [Germane to Preliminary Order Issue No. 17]**............... 14

B.    **Hurricane Rita Regulatory Asset** ................................................................ 15

C.    **Prepaid Pension Asset Balance** ................................................................... 23

D.    **FIN 48 Tax Adjustment**.............................................................................. 26

E.    **Cash Working Capital**................................................................................ 30

1.    **The Revenue Lag Component of the Lead-Lag Study** ........................ 31

2.    **The Expense Lead Component of the Lead-Lag Study**....................... 39

F.    **Self-Insurance Storm Reserve [Germane to Preliminary Order Issue No. 5]** .................................................................................................. 45

1.    **The Effect of Prior Settled Cases**.............................................. 46

2.    **OPC's Proposed Adjustment** .................................................... 49

3.    **1997 Ice Storm**....................................................................... 54

4.    **Jurisdictional Separation Plan Allocation** ............................... 57

5.    **$50,000 Reserve Threshold** .................................................... 58

6.    **Hurricane Rita Regulatory Asset** ............................................. 60

| | | | |
|---|---|---|---|
| | 7. | Conclusion | 60 |
| G. | | Coal Inventory | 61 |
| H. | | Spindletop Gas Storage Facility | 63 |
| I. | | Short Term Assets | 68 |
| J. | | Acquisition Adjustment | 69 |
| K. | | Capitalized Incentive Compensation | 71 |
| VI. | | RATE OF RETURN [Germane to Preliminary Order Issue Nos. 4 and 11] | 73 |
| A. | | Capital Structure | 73 |
| B. | | Return on Equity | 73 |
| | 1. | Proxy Group | 74 |
| | 2. | DCF Analysis | 76 |
| | 3. | Risk Premium Analysis | 83 |
| | 4. | Comparable Earnings | 88 |
| | 5. | CAPM Analysis | 90 |
| | 6. | ALJs' Analysis | 93 |
| C. | | Cost of Debt | 95 |
| D. | | Overall Rate of Return | 95 |
| VII. | | OPERATING EXPENSES [Germane to Preliminary Order Issue Nos. 2, 3, 4, and 16] | 95 |
| A. | | Purchased Power Capacity Expense [Germane to Supplemental Preliminary Order Issue No. 1] | 95 |
| | 1. | The Sources of ETI's Purchased Power | 95 |
| | 2. | ETI's Request Regarding PPCCs | 99 |
| | 3. | Staff and Intervenors' Opposition to ETI's PPCCs Proposal | 101 |
| | 4. | The Intervenors' Recommendations Regarding PPCCs | 106 |
| | 5. | The ALJs' Analysis Regarding PPCCs | 108 |
| B. | | Transmission Equalization (MSS-2) Expense | 110 |
| C. | | Depreciation Expense [Germane to Preliminary Order Issue No. 12] | 117 |
| | 1. | Terminology and Methodology | 118 |
| | 2. | Production Plant | 125 |
| | 3. | Transmission Plant | 132 |

4.    **Distribution Plant** ................................................................ 140

5.    **General Plant**........................................................................ 154

6.    **Fully Accrued Depreciation** ................................................. 160

7.    **Other Depreciation Issues – Accumulated Provision for Depreciation** ........................................................................ 161

D.    **Labor Costs**.................................................................................... **163**

1.    **Payroll and Related Adjustments**........................................ 163

2.    **Incentive Compensation** ....................................................... 165

3.    **Compensation and Benefits Levels**....................................... 175

4.    **Non-Qualified Executive Retirement Benefits** .................... 177

5.    **Employee Relocation Costs** ................................................... 179

6.    **Executive Perquisites** ............................................................ 180

E.    **Interest on Customer Deposits**...................................................... **181**

F.    **Property (Ad Valorem) Tax Expense**.............................................. **181**

G.    **Advertising, Dues, and Contributions**........................................... **185**

H.    **Other Revenue-Related Adjustments** ............................................ **185**

I.    **Federal Income Tax**........................................................................ **185**

J.    **River Bend Decommissioning Expense**.......................................... **186**

K.    **Self-Insurance Storm Reserve Expense [Germane to Preliminary Order Issue No. 5]**....................................................................... **188**

L.    **Spindletop Gas Storage Facility** .................................................... **193**

VIII.    **AFFILIATE TRANSACTIONS [Germane to Preliminary Order Issue No. 3]** .................................................................................... **194**

A.    **Large Industrial & Commercial Sales Reallocation**....................... **199**

B.    **Administration Costs**...................................................................... **201**

C.    **Customer Service Operations Class**................................................ **202**

1.    **Projects F3PCR29324 (Revenue Assurance - Adm.), F3PCR53095 (Headquarter's Credit & Collect), F3PCR73380 (Credit Systems), and F3PCR73458 (Credit Call Outsourcing)** .................... 202

2.    **Projects F3PCR73381 (Customer Svc Cntr Credit Desk), F3PCR73390 (Customer Svs Ctl - Entergy Bus), and F3PCR73403 (Customer Issue Resolution – ES)** .............................. 203

D.    **Distribution Operations Class** ....................................................... **203**

1.    **Project F5PCDW0200 (Lineman's Rodeo Expenses)**........................ 204

2.      Projects F3PCTJGUSE (Joint Use With Third Party – E) and F3PCTJTUSE (Joint Use With Third Parties – A)............................ 204

E.      Energy and Fuel Management Class ...................................................... 205

1.      Project F3PCWE0140 (EMO Regulatory Affairs) ............................ 205

2.      Projects F3PPSPE003 (SPO Summer 2009 RFP Expense), F3PPSPE003 (SPO Summer 2009 RFP Expense), F3PPSPE004 (SPO Summer09RFP IM & Propslsubmt), and F3PPWET303 (SPO2008 Winter Westn RegionRFP-IM) ........................................... 206

3.      Project F3PCCSPSYS (System Planning and Strategic) ................... 207

F.      Environmental Service Class .................................................................. 207

G.      Federal PRG Affairs Class ..................................................................... 209

1.      Project F5PPSPE044 (PMO Support Initiative-System) .................. 209

2.      Project F3PPUTLDER (Utility Derivatives Compliance) ................. 210

3.      Project F3PCSYSRAF (System Regulatory Affairs-Federal) .......... 211

H.      Financial Services Class .......................................................................... 214

1.      Projects F3PCF05700 (Corporate Planning & Analysis), F3PCF21600 (Corp Rptg Analysis & Policy), F3PCFF1000 (Financial Forecasting), F3PPADSENT (Analytic/Decision Support-Entergy), and F3PPSPSENT (Strategic Planning Svcs-Entergy) ............................................................................................... 214

2.      Projects F3PCF20990 (Operations Exec VP & CFO) and F3PCFF1001 (OCE Support)............................................................... 215

3.      Project F3PCR73345 (Quick Payment Center, Adm) ...................... 216

4.      Project F3PCF23936 (Manage Cash)................................................. 217

I.      Human Resources Class .......................................................................... 218

1.      Project F3PCHRCCSM (HR Competitive Compensation) .............. 218

2.      Projects  (Non-Qualified Post-Retirement) and F5PPZNQBDU (Non-Qual Pension/Benf-Dom Utl)..................................................... 219

J.      Information Technology Class ................................................................ 219

1.       (Evaluated Receipts Settlement)..................................................... 220

2.      Project F3PCFX3555 (BOD/Executive Support).............................. 220

K.      Internal and External Communications Class ...................................... 221

L.      Legal Services Class ................................................................................ 222

1.      Project F3PPCASHCT (Contractual Alternative/Cashpo) .............. 223

2.    **Project F5PCZLDEPT (Supervision & Support – Legal)**................. 223

3.    **Project F3PCF99180 (Corp. Compliance Tracking Sys)** ................. 223

4.    **Projects F3PPINVDOJ (DOJ Anti Trust Investigation) and F3PPTDHY19 (Dept. of Justice Investigation)** ................................. 224

5.    **Project F3PCE01601 (Ferc - Access Transmission)** ........................ 226

6.    **Project F3PCERAKTL (RAKTL Patent Matter)** ............................ 227

7.    **Project F3PPEASTIN (Willard Eastin *et al.*)** ................................... 228

8.    **Project F3PPTCGS11 (TX Docket Competitive Generation)** .......... 229

9.    **Project F5PCE13759 (Jenkins Class Action Suit)** ............................ 230

10.   **Project F3PCSYSAGR (System Agreement-2001)** ........................... 231

11.   **Project F3PCCDVDAT (Corporate Development Data Room)** ....... 232

12.   **Project F3PPWET302 (SPO 2008 Winter Western Region)** ........... 233

13.   **Project F3PPWET308 (SPO Calpine PPA/Project Houston)** .......... 234

M.    **Other Expenses Class** ....................................................................... 235

1.    **Projects F3PCSPETEI (Entergy-Tulane Energy Institute) and F5PPKATRPT (Storm Cost Processing & Review)** ......................... 235

2.    **Project F3PCC08500 (Executive VP, Operations)**........................... 236

3.    **Projects F3PPBFMESI (ESI Function Migration Relocation), F3PPBFRESI (ESI Business Function ), F3PPDRPESI (ESI Disaster Recovery Plan Charge), F5PPBFMREL (Business Function Migration Employee), F5PPBFRREL (Business Function Relocation), F5PPBFRSEV (Business Function Relocation Severance), F5PPDRPREL (Disaster Recovery Plan Relocation), and F5PPETXRFI (2009 Texas Ike Recovery Filing)** .. 236

N.    **Regulatory Services Class** ................................................................ 238

O.    **Retail Operations Class** .................................................................... 239

1.    **Project F5PPICCIMG (ICC – "Image" Message)**............................ 240

2.    **Projects F3PPR56640 (Wholesale - EGS-TX) and F3PPR56920 (Wholesale - All Jurisdictions)** ............................................................ 240

P.    **Supply Chain Class** .......................................................................... 241

Q.    **Transmission and Distribution Support Class** ................................ 242

R.    **Tax Services Class** ............................................................................. 244

S.    **Transmission Operations Class** ....................................................... 245

T.    **Treasury Operations Class** .............................................................. 246

U.     Utility and Executive Management Class ........................................................ 249

IX.     JURISDICTIONAL COST ALLOCATION [Germane to Preliminary
        Order Issue No. 13] ........................................................................................... 250

A.     A&E 4CP ............................................................................................................ 251

B.     12CP .................................................................................................................... 252

X.      CLASS COST ALLOCATION AND RATE DESIGN [Germane to
        Preliminary Order Issue No. 1] ...................................................................... 255

A.     Renewable Energy Credit Rider [Germane to Preliminary Order Issue
        No. 19] ................................................................................................................ 255

        1.     ETI's Proposed Cost Recovery .................................................................. 255

        2.     Opposition to ETI's Proposal .................................................................... 256

        3.     ETI's Response ........................................................................................... 260

        4.     ALJs' Analysis ........................................................................................... 261

B.     Class Cost Allocation [Germane to Preliminary Order Issue No. 14] ......... 262

        1.     Municipal Franchise Fees ......................................................................... 262

        2.     Miscellaneous Gross Receipts Taxes ....................................................... 267

        3.     Capacity-Related Production Costs ........................................................... 268

        4.     Transmission Costs .................................................................................... 273

C.     Revenue Allocation ........................................................................................... 274

        1.     Argument for Moving Rates to Cost .......................................................... 275

        2.     Argument for Gradualism .......................................................................... 278

        3.     ALJs' Recommendation ............................................................................. 281

D.     Rate Design [Germane to Preliminary Order Issue Nos. 15, 18, and 20] .... 282

        1.     Lighting and Traffic Signal Schedules ...................................................... 283

        2.     Demand Ratchet ........................................................................................ 287

        3.     Large Industrial Power Service (LIPS) ..................................................... 295

        4.     Schedulable Intermittent Pumping Service (SIPS) ................................... 299

        5.     Standby Maintenance Service (SMS) ........................................................ 303

        6.     Additional Facilities Charge (AFC) .......................................................... 310

        7.     Large General Service (LGS) .................................................................... 313

        8.     General Service (GS) ................................................................................. 315

        9.     Residential Service (RS) ............................................................................ 315

XI.          FUEL RECONCILIATION [Germane to Preliminary Order Issue Nos. 21-31] ............................................................................ 319

          A.          Spindletop Gas Storage Facility ................................................ 324

          B.          Use of Current Line Losses for Fuel Cost Allocation .................................. 325

          C.          ETI's Special Circumstances Request ........................................ 326

XII.          OTHER ISSUES ................................................................ 327

          A.          MISO Transition Expenses [Germane to Preliminary Order Issue Nos. 6-8 and Docket No. 39741 Preliminary Order Issue Nos. 1-9] ............ 327

                    1.          Deferred Accounting ................................................ 329

                    2.          Base Rate Recovery ................................................ 336

          B.          TCRF Baseline [Germane to Supplemental Preliminary Order Issue No. 2] ............................................................................ 338

          C.          DCRF Baseline [Germane to Supplemental Preliminary Order Issue No. 2] ............................................................................ 338

          D.          Purchased Power Capacity Cost Baseline [Germane to Supplemental Preliminary Order Issue No. 1] ........................................ 339

XIII.          CONCLUSION ................................................................ 341

XIV.          PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERING PARAGRAPHS .......................................................... 341

          A.          Findings of Fact ................................................................ 341

          B.          Conclusions of Law ............................................................ 364

          C.          Proposed Ordering Paragraphs .............................................. 366


List of Acronyms and Defined Terms


Attachment A

## List of Acronyms and Defined Terms

| TERM | DEFINITION |
|------|------------|
| 12CP | 12 Coincident Peak |
| A&E 4CP | Average and Excess, 4 Coincident Peak |
| A&P | Average and Single Coincident Peak |
| ADFIT | Accumulated Deferred Federal Income Tax |
| AFC | Additional Facilities Charge |
| AFUDC | Allowance for Funds Used During Construction |
| ALJs | Administrative Law Judges |
| BCII/U3 | Big Cajun II, Unit 3 |
| Brazos | Brazos Electric Cooperative, Inc. |
| Calpine | Calpine Energy Services |
| Carville Contract | Contract for the purchase of 485 MW of capacity from Calpine's Carville Energy Center |
| CAPM | Capital Asset Pricing Model |
| CenterPoint | CenterPoint Energy Houston Electric, LLC |
| CGS | Competitive Generation Service |
| CI | Conformance Index |
| Cities | Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange, Texas |
| Commission | Public Utility Commission of Texas |
| Company | Entergy Texas, Inc. |
| CP | Coincident Peak |
| CWIP | Construction Work in Progress |
| DCF | Discounted Cash Flow |
| DCRF | Distribution Cost Recovery Factor |
| DOE | United States Department of Energy |
| DOJ | United States Department of Justice |
| EAI | Entergy Arkansas, Inc. |
| EA WBL Contract | 2009 Contract between ETI and EAI for Wholesale Base Load Resources |
| EGSI | Entergy Gulf States, Inc., predecessor to ETI |
| EGSL | Entergy Gulf States Louisiana, LLC |
| ELL | Entergy Louisiana, Inc. |
| EMI | Entergy Mississippi, Inc. |
| Enbridge Contract | Long-term Gas Supply Contract between ETI and Enbridge Pipeline, L.P. |
| ENOI | Entergy New Orleans, Inc. |
| Entergy | Entergy Corporation |

| TERM | DEFINITION |
|---|---|
| ESI | Entergy Services, Inc. |
| ETEC | East Texas Electric Cooperative, Inc. |
| ETI | Entergy Texas, Inc. |
| FAS 106 | FASB Statement No. 106 |
| FASB | Financial Accounting Standards Board |
| FERC | Federal Energy Regulatory Commission |
| FIN 48 | Financial Interpretation Number 48 |
| GAAP | Generally Accepted Accounting Principles |
| GDP | Gross Domestic Product |
| GS | General Service |
| GSU | Gulf States Utilities Company |
| Iowa Curves | Various Known Patterns of Industrial Asset Mortality Rates |
| IRS | Internal Revenue Service |
| ISB | Intra-System Bill |
| Jenkins Class Action | Class action lawsuit filed in Texas district court in 2003 on behalf of all Texas retail customers served by ETI's predecessor-in-interest, EGSI |
| Kroger | The Kroger Co. |
| kW | Kilowatt |
| kWh | Kilowatt-hour |
| LED | Light Emitting Diode |
| LGS | Large General Service |
| LIPS | Large Industrial Power Service |
| MFF | Municipal Franchise Fees |
| MGRT | Miscellaneous Gross Receipts Tax |
| MISO | Midwest Independent Transmission System Operator, Inc. |
| MSS-2 | Schedule MSS-2 of the Entergy System Agreement |
| MW | Megawatt |
| Moody's | Moody's Investors Service |
| MWh | Megawatt-hour |
| NARUC | National Association of Regulatory Utility Commissioners |
| Nelson | Nelson 6, a 550 MW Unit located in Westlake, Louisiana |
| O&M | Operations and Maintenance |
| OATT | Open Access Transmission Tariff |
| OPC | Office of Public Utility Counsel |
| PFD | Proposal for Decision |
| PPCCs | Purchased Power Capacity Costs |
| PPR | Purchased Power Rider |
| PUC | Public Utility Commission of Texas |
| PURA | Public Utility Regulatory Act |
| Rate Year | June 1, 2012, through May 31, 2013 |
| Reconciliation Period | July 1, 2009, through June 30, 2011 |

| TERM | DEFINITION |
|---|---|
| RECs | Renewable Energy Credits |
| Reserve | Strategic Petroleum Reserve |
| River Bend | River Bend Nuclear Generating Station Unit No. 1 |
| ROE | Return on Equity |
| RRC | Railroad Commission of Texas |
| RS | Residential Service |
| RTO | Regional Transmission Organization |
| S&P | Standard & Poor's |
| SFAS | Statement of Financial Accounting Standards |
| SIPS | Schedulable Intermittent Pumping Service |
| SMS | Standby Maintenance Service |
| SOAH | State Office of Administrative Hearings |
| Spindletop Facility | Spindletop Gas Storage Facility |
| SRMPA | Sam Rayburn Municipal Power Agency |
| Staff | Staff of the Public Utility Commission of Texas |
| State Agencies | State of Texas State Agencies |
| T&D | Transmission and Distribution |
| TCRF | Transmission Cost Recovery Factor |
| Test Year | July 1, 2010, through June 30, 2011 |
| TIEC | Texas Industrial Energy Consumers |
| Value Line | Value Line Investment Survey |
| Wal-Mart | Wal-Mart Stores, LLC, and Sam's East, Inc. |
| Zacks | Zacks Investment Service |

| | | | |
|---|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | BEFORE THE STATE OFFICE | |
| INC. FOR AUTHORITY TO CHANGE | § | | |
| RATES, RECONCILE FUEL COSTS, | § | OF | |
| AND OBTAIN DEFERRED | § | | |
| ACCOUNTING TREATMENT | § | ADMINISTRATIVE HEARINGS | |

## PROPOSAL FOR DECISION

## I.   INTRODUCTION [Germane to Preliminary Order Issue Nos. 1 and 4]

Entergy Texas, Inc. (ETI or the Company) is an investor-owned electric utility with a retail service area located in southeastern Texas.  ETI serves retail and wholesale electric customers in Texas.  As of June 30, 2011, ETI served approximately 412,000 Texas retail customers.  The Federal Energy Regulatory Commission (FERC) regulates ETI's wholesale electric operations.

On November 28, 2011, ETI filed an application requesting approval of: (1) a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted revenues for the period beginning July 1, 2010, and ending June 30, 2011 (Test Year); (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities accompanying ETI's application and including new riders for recovery of costs related to purchased power capacity and renewable energy credit requirements; (3) a request for final reconciliation of ETI's fuel and purchased power costs for the reconciliation period from July 1, 2009, to June 30, 2011 (Reconciliation Period); and (4) certain waivers to the instructions in Rate Filing Package Schedule V accompanying ETI's application.  The rate year for ETI's proposed changes is June 1, 2012, through May 31, 2013 (Rate Year).[1]  On April 13, 2012, adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted Test Year revenues.

---

[1]  During the hearing the parties used the term "Rate Year" to refer to the period June 2012 through May 2013.  This was intended to represent the first 12 months of the rates adopted in this case.  However, the rates in this case will not go into effect (as temporary rates) until at least June 30, 2012.  Nevertheless, for purposes of this PFD, Rate Year will refer to the period June 2012 through May 2013.

## II.    JURISDICTION AND NOTICE

The Public Utility Commission of Texas (Commission or PUC) has jurisdiction over ETI and this rate case application pursuant to Public Utility Regulatory Act (PURA) §§ 14.001, 32.001, 33.002, and 35.004.  The State Office of Administrative Hearings (SOAH) has jurisdiction over the contested case hearing, including the preparation of the proposal for decision (PFD) pursuant to PURA § 14.053 and Tex. Gov't Code § 2003.049(b).  Those municipalities in ETI's service area that have not surrendered jurisdiction to the Commission continue to have exclusive original jurisdiction over ETI's rates, operations, and services in their respective municipalities pursuant to PURA § 33.001.  When ETI filed its application with the Commission, it also filed the application with its original jurisdiction cities.  Pursuant to PURA §§ 32.001(b), 33.051, and 33.053, ETI appealed the actions of the original jurisdiction cities to the Commission and had those appeals consolidated with this docket.

ETI's notice of its application and notice of the hearing were not contested and, therefore, do not require further discussion but will be addressed in the proposed findings of fact and conclusions of law.

## III.    PROCEDURAL HISTORY

As noted above, ETI filed its application and rate filing package on November 28, 2011.  On November 29, 2011, the Commission referred this proceeding to SOAH.   On December 19, 2011, the Commission issued its Preliminary Order setting forth 31 issues to be addressed in this proceeding. On January 19, 2012, the Commission issued a Supplemental Preliminary Order listing two additional issues to be considered and stating that ETI's request for a purchased power cost recovery rider should not be addressed in this docket.

On September 2, 2011, ETI filed an application requesting authority to defer accounting related to its proposed transition to membership in the Midwest Independent Transmission System Operator, Inc. (MISO).  This proceeding was docketed as Docket No. 39741.  On November 22, 2011, the Commission issued its Preliminary Order in Docket No. 39741 addressing certain

threshold legal/policy questions and setting forth nine issues to be addressed in the proceeding. On December 20, 2011, Docket No. 39741 was consolidated into this docket for all purposes.

The following entities were granted intervenor status in this case: Texas Industrial Energy Consumers (TIEC); State of Texas State Agencies (State Agencies); Office of Public Utility Counsel (OPC); the Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities); The Kroger Co. (Kroger); Wal-Mart Stores, LLC, and Sam's East, Inc. (Wal-Mart); East Texas Electric Cooperative, Inc. (ETEC); and the United States Department of Energy (DOE).

The hearing on the merits convened before SOAH Administrative Law Judges (ALJs) Thomas H. Walston, Steven D. Arnold, and Hunter Burkhalter on April 24, 2012, and continued through May 4, 2012. The record remained open for the filing of post-hearing briefs and proposed finds of fact and conclusions of law. On June 8, 2012, the parties filed proposed finds of fact and conclusions of law and the record closed. As permitted by P.U.C. PROC. R. 22.261(a), ALJ Lilo D. Pomerleau read the record and joined in writing the PFD. Number running began on June 26, 2012, and Staff returned the final numbers to the ALJs on July 3, 2012. The parties requested that the ALJs submit their PFD so the Commission could consider the matter at its July 27, 2012, open meeting.

The following is a list of the parties who participated in the hearing and their counsel:

| PARTIES | REPRESENTATIVES |
| --- | --- |
| ETI | Steven H. Neinast, Casey Wren, and John F. Williams[2] |
| Cities | Daniel J. Lawton, Stephen Mack, and Molly Mayhall |
| TIEC | Rex. D. VanMiddlesworth, Meghan Griffiths, and James Nortey |
| State of Texas | Susan Kelley |
| OPC | Sara J. Ferris |
| DOE | Steven A. Porter |

---

[2] Several other attorneys appeared on behalf of ETI. The ALJs listed only the three attorneys who appeared throughout the hearing.

| PARTIES | REPRESENTATIVES |
|---|---|
| Kroger | Kurt J. Boehm |
| Wal-Mart | Rick D. Chamberlain |
| Staff | Scott Smyth, Joseph Younger, Jacob J. Lawler, and Jason Haas |

## IV.    EXECUTIVE SUMMARY

ETI proposed an overall increase of approximately $104.8 million.  The ALJs recommend an overall rate increase for ETI of $16.4 million, as shown on the schedules attached to this PFD.  With respect to ETI's request to reconcile fuel and purchased power costs during the Reconciliation Period, the ALJs recommend approval without change.  Attachment A contains the schedules provided by Commission Staff reflecting the ALJs' recommendations.  On issues of particular significance, the ALJs' recommendations are set forth below.

### A.    Rate Base

#### 1.  Capital Investment

ETI's capital additions closed to plant in service between July 1, 2009, and June 30, 2011, were prudently incurred and are used and useful in providing service to ETI's customers.

#### 2.  Hurricane Rita Regulatory Asset

The appropriate calculation of the Hurricane Rita regulatory asset should begin with the amount claimed by ETI in Docket No. 37744,[3] less amortization accruals to the end of the Test Year in the present case, and less the amount of additional insurance proceeds received by ETI after the conclusion of Docket No. 37744.  This produces a remaining balance of $15,175,563, which should remain in rate base as a regulatory asset, applying a five-year amortization rate that commenced August 15, 2010.  Further, the Hurricane Rita regulatory asset should not be moved to the storm insurance reserve.

---

[3]  *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket

### 3.  Prepaid Pension Asset Balance

The construction work in progress (CWIP)-related portion of ETI's pension asset ($25,311,236 out of the total asset) should be excluded from the asset, but accrue allowance for funds used during construction.

### 4.  FIN 48 Tax Adjustment

The Commission should find that $4,621,778 (representing ETI's full FIN 48 Liability of $5,916,461 less the $1,294,683 cash deposit ETI has made with the Internal Revenue Service (IRS) for the FIN 48 Liability) should be added to ETI's ADFIT and thus be used to reduce ETI's rate base.

### 5.  Cash Working Capital

The ALJs recommend no changes to ETI's cash working capital.

### 6.  Self-Insurance Storm Reserve

The Commission should approve ETI's Test Year-end storm reserve balance of negative $59,799,744.

### 7.  Coal Inventory

The full value of ETI's coal inventory was reasonable and should be included in rate base.

### 8.  Spindletop Gas Storage Facility

The Spindletop Gas Storage Facility (Spindletop Facility) is a used and useful facility providing reliability and swing flexibility to ETI's customers at a reasonable price and should be included in rate base.

---

No. 37744 (Dec. 13, 2010).

### 9. Short Term Assets

The ALJs recommend Staff's proposal to include the following amounts in rate base: prepayments at $8,134,351 ($916,313 more than ETI's request); materials and supplies at $29,285,421 ($32,847 more than ETI's request); and fuel inventory at $52,693,485 ($1,066,490 less than ETI's request).

### 10. Acquisition Adjustment

The $1,127,778 incurred by ETI in internal acquisition costs associated with the purchase of the Spindletop Facility was reasonable, necessary, properly incurred, and should be included in rate base.

### 11. Capitalized Incentive Compensation

The Test Year for ETI's prior ratemaking proceeding ended on June 30, 2009. The reasonableness of ETI's capital costs (including capitalized incentive compensation) was dealt with by the Commission in that proceeding and is not at issue here. Thus, exclusion of capitalized incentive compensation that is financially-based can only be made for incentive costs that ETI capitalized during the period from July 1, 2009 (the end of the prior Test Year) through June 30, 2010 (the commencement of the current Test Year).

### B.   Rate of Return and Capital Structure

The ALJs recommend a return on equity (ROE) of 9.80 percent; a cost of debt of 6.74 percent; a capital structure comprised of 50.08 percent debt and 49.92 percent common equity; and an overall rate of return of 8.27 percent. This is a downward adjustment to ETI's request for a 10.60 percent ROE, and no change to ETI's 6.74 percent cost of debt and 50.08/49.92 capital structure. It compares to Staff's proposed 9.60 percent ROE; OPC's proposed 9.30 percent ROE; TIEC's proposed 9.50 percent ROE; Cities' proposed 9.50 percent ROE; and State Agencies' proposed 9.30 percent ROE. No party opposed ETI's proposed 6.74 percent cost of debt or its proposed 50.08/49.92 capital structure.

### C.      Cost of Service

#### 1.  Purchased Power Capacity Expense

ETI's purchased power capacity costs should be set at the amount of the Company's Test Year level, which is $245,432,884.

#### 2.  Transmission Equalization (MSS-2) Expense

ETI should recover only the amount of expenses under Schedule MSS-2 of the Entergy System Agreement it paid in the Test Year, $1,753,797.

#### 3.  Depreciation Expense

The interim retirements methodology should not be adopted.  The values proposed by ETI should be adopted except for the following:

*Service Lives:*
Account 364-40 R1.
Account 368-33 L0.5.

*Net Salvage:*
Production Plant- negative 5 percent.
Account 354-negative 5 percent
Account 361-negative 5 percent.
Account 362-negative 10 percent.
Account 368-negative 5 percent.
Account 369.1-negative 10 percent.
Account 369.2-negative 10 percent.

#### 4.  Labor Costs

> ➢ *Payroll and Related Adjustments*

The Commission should accept:  (1) the payroll adjustments proposed in the ETI application; and (2) the further payroll adjustments proposed by Staff as corrected by ETI.

> ➢ *Incentive Compensation*

ETI should not be entitled to recover its financially based incentive compensation costs. Thus, the ALJs recommend removing $6,196,037 from ETI's requested operation and maintenance (O&M) expenses. Additionally, an additional reduction should be made to account for the FICA taxes that ETI would have paid as a result of those costs.

> ➢ *Compensation and Benefit Levels*

ETI met its burden to prove the reasonableness of its base pay and incentive package costs. It is reasonable to view market price for these categories of costs as lying within a range of +/- 10 percent of median, rather than being a single point along a spectrum. As to both base pay and the incentive package, ETI has proven that its costs fall within such an acceptable range. Accordingly, the ALJs recommend rejecting the adjustments sought by Cities.

> ➢ *Nonqualified Executive Retirement Benefits*

The ALJs recommend an adjustment to remove $2,114,931, representing the full costs associated with ETI's non-qualified executive retirement benefits.

> ➢ *Employee Relocation Costs*

The Commission should allow ETI's relocation expenses.

> ➢ *Executive Perquisites*

The ALJs recommend an adjustment to remove $40,620, representing the full cost of ETI's executive perquisite costs.

## 5. Interest on Customer Deposits

The ALJs recommend using the active customer deposits amount of $35,872,476 and the 2012 interest rate, which produces a recommended interest expense of $43,047 ($35,872,476 multiplied by .12 percent).

**6.  Property (Ad Valorem) Tax Expense**

ETI's property tax burden should be adjusted upward by applying the effective tax rate of 0.007435784 for the calendar year 2011 to the final, adopted Test Year-end plant in service value for ETI.

**7.  Advertising, Dues, and Contributions**

The ALJs recommend an adjustment to remove $12,800 from ETI's costs of advertising, dues and contributions.

**8.  Other Revenue Related Adjustments**

These amounts were determined through number running and are reflected in Attachment A.

**9.  Federal Income Tax**

The Commission should adopt ETI's proposal on federal income taxes.

**10. River Bend Decommissioning Expense**

ETI's annual decommissioning revenue requirement should reflect the most current calculation of $1,126,000.  Therefore, an adjustment of $893,000 to the *pro forma* cost of service is needed to reflect the difference between the requested level for decommissioning costs of $2,019,000 and the recommended level of $1,126,000.

**11. Self-Insurance Storm Reserve Expense**

The Commission should approve a total annual accrual of $8,270,000, comprised of an annual accrual of $4,400,000 to provide for average annual expected storm losses, plus an annual accrual of $3,870,000 for 20 years to restore the reserve from its current deficit.  The ALJs recommend approval of ETI's proposed target reserve of $17,595,000.  The Commission should require ETI to continue recording its annual accrual until modified by future Commission orders.

**12. Spindletop Gas Storage Facility**

The ALJs recommend inclusion of the costs of operating the Spindletop Facility as requested by ETI.

**D.      Affiliate Transactions**

ETI agreed to remove the following affiliate transactions from its request, which the ALJs recommend be approved: (1) Project F3PPCASHCT (Contractual Alternative/Cashpo) in the amount of $2,553; (2) Project F3PCSPETEI (Entergy-Tulane Energy Institute) in the amount of $14,288; and (3) Project F5PPKATRPT (Storm Cost Processing & Review) in the amount of $929. Except as noted below, all remaining affiliate transactions should be approved. The ALJs recommend that the following affiliate transactions not be included:

- $356,151 (which figure includes the $112,531 agreed to by ETI) of costs associated with Projects F5PCZUBENQ (Non-Qualified Post Retirement) and F5PPZNQBDU (Non Qual Pension/Benf Dom Utl);

- $10,279 of costs associated with Project F3PPFXERSP (Evaluated Receipts Settlement);

- $19,714 of costs associated with Project F3PPEASTIN (Willard Eastin *et al*); and

- $171,032 of costs associated with Project F3PPE9981S (Integrated Energy Management for ESI).

**E.      Jurisdictional Cost Allocation**

The ALJs recommend the use of 12 Coincident Peak (12CP) to allocate capacity-related production costs between the retail and wholesale jurisdictions.

F.      **Class Cost Allocation**

1.  **Renewable Energy Credit Rider**

The Commission should deny ETI's request to institute a renewable energy credit rider, and the Test Year expense of $623,303 should be used for setting rates in this case. Finally, the Renewable Portfolio Standard Calculation Opt-Out Credit Rider should be maintained, with an adjustment to the credit rates to reflect the Test Year data used to set ETI's base rates.

2.  **Class Cost Allocation**

The parties generally agreed that ETI's cost-of-service study comported with accepted industry practices, but some parties had issues with specific items discussed below.

(a) **Municipal Franchise Fees**

Municipal franchise fees should be allocated on the basis of in-city kilowatt-hour (kWh) sales, without an adjustment for the municipal franchise fee rate in the municipality in which a given kWh sale occurred.  The ALJs recommend adoption of ETI's proposal to collect costs from all customers taking service from the system.

(b) **Miscellaneous Gross Receipts Tax**

Similar to municipal franchise fees, miscellaneous gross receipts taxes should be allocated to the rate classes according to ETI's cost of service study.

(c) **Capacity-Related Production Costs**

The ALJs recommend the use of Average and Excess 4 Coincident Peak (A&E 4CP) to allocate capacity-related production costs, as proposed by ETI.  The ALJs do not find sufficient support to allocate the reserve equalization payments differently than other capacity-related production costs.

### (d) Transmission Costs

ETI's proposed methodology for allocation of transmission costs should be approved. A&E 4CP is a well-accepted method for allocating such costs.

### 3. Revenue Allocation

Revenue allocation in this case should be based on each class's cost of service and consistent with the ALJs' recommendations in the PFD that impact revenue allocation.

### 4. Rate Design

#### (a) Lighting and Traffic Signal Schedules

ETI should be directed to perform a light emitting diode (LED) lighting cost study before significant changes are made to its lighting rates. The ALJs further recommend that ETI conduct this study before filing its next rate case and provide the results of any completed study to Cities and interested parties. The study should include detailed information regarding differences in the cost of serving LED and non-LED lighting customers, if ETI currently has LED lighting customers taking service. ETI should modify the applicable tariffs to eliminate its fee for any replacement of a functioning light with a lower-wattage bulb.

#### (b) Demand Ratchet

ETI's proposed Large Industrial Power Service (LIPS) tariff should be amended to include the language proposed by DOE witness Etheridge.

#### (c) Large Industrial Power Service

The ALJs recommend the adoption of a $630 customer charge for this customer class, a slight decrease in the LIPS energy charges, and an increase in the demand charges from current rates for this class, as proposed by Staff witness Abbott.

### (d) Schedulable Intermittent Pumping Service

The Commission should adopt the Schedulable Intermittent Pumping Service rider proposed by DOE witness Etheridge.

### (e) Standby Maintenance Service

The Commission should adopt the changes to Schedule SMS recommended by TIEC, with the exception of a $6,000 customer charge. Consistent with the ALJs' recommendation that a new LIPS charge of $630 is reasonable, the Standby Maintenance Service (SMS) charge should be limited to $630 and not apply if a Schedule SMS customer also purchased supplementary power under another applicable rate.

### (f) Additional Facilities Charge

Schedule AFC should be changed in accordance with TIEC's recommendations and those recommended numbers should be reduced in proportion to any authorized reduction in ETI's proposed rate of return, O&M expense, and property tax expense.

### (g) Large General Service

Schedule LGS should be amended as proposed by Kroger. Schedule LGS also has a demand ratchet, and the ALJs' recommendation for the elimination of ETI's LIPS demand ratchet is applicable to this class

### (h) General Service

The Commission should adopt the decrease in the Schedule GS customer charge to $39.91 from the current (and Company proposed) rate of $41.09, as well as Staff's recommended decrease in energy charges. Schedule GS also has a demand ratchet, and the ALJs' recommendation for the elimination of ETI's LIPS demand ratchet is applicable to this class.

### (i)  Residential Service

ETI's declining block winter rates provide a disincentive to energy efficiency.  The ALJs recommend an initial 20 percent reduction, followed by 20 percent subsequent reductions of the differential in the next three rate cases unless ETI provides sufficient evidence that such changes are unjust and unreasonable.

## G.     MISO Transition

The Commission should deny ETI's request for deferred accounting of its MISO transition expenses to be incurred on or after January 1, 2011.  However, the Commission should authorize ETI to include $2.4 million of MISO transition expense in base rates set in the present case, based on a five-year amortization of $12 million in total projected expenses.  Further, the Commission should authorize ETI to include in base rates $52,800 in MISO transition expenses for the 2010 portion of the Test Year expenses, plus $2.4 million for the post Test Year adjustment, for a total of $2,452,800.

## V.    RATE BASE [Germane to Preliminary Order Issue Nos. 4, 10, and 16]

## A.     Capital Investment [Germane to Preliminary Order Issue No. 17]

ETI presented for review $408,078,600 in capital additions closed to plant in service between July 1, 2009, and June 30, 2011; that is, from the end of the test year in the Company's last base rate case, which was Docket No. 37744, through the Test Year presented in this case.  The capital additions were detailed in the testimony and exhibits of the following Company witnesses: Garrison (Generation), McCulla (Transmission), Corkran (Distribution), Stokes (Customer Service), Brown (Information Technology), Plauche (Administrative), Cicio (System Planning and Operations), Hunter (Supply Chain), May (Regulatory), and Sloan (Legal).[4]  The evidence shows that these

---

[4]  ETI Ex. 27 (Garrison Direct) at 20-28 and  WWG-4; ETI Ex. 32 (McCulla Direct) at 64-92 and MFM-16; ETI Ex. 25 (Corkran Direct) at 78-108 and SBC-3; ETI Ex. 37A (Roman Direct, adopted by Stokes) at 121-125 and AFR-5; ETI Ex. 24 (Brown Direct) at 29-37 and JFB-3; ETI Ex. 20 (Plauche Direct) at 37-44 and TCP-11; ETI Ex. 39 (Cicio Direct) at 71-75 and PJC-6; ETI Ex. 16 (Hunter Direct) at 34-38 and JMH-7; ETI Ex. 7 (May Direct) at 53-54 and PRM-3; and ETI Ex. 38 (Sloan Direct) at 37-43 and RDS-4.

capital additions were prudently incurred and are used and useful in providing service to ETI's customers. No party challenged any of the capital additions or the costs thereof, and the ALJs find no reason to do so either.

**B.     Hurricane Rita Regulatory Asset**

Hurricane Rita struck the upper Texas coast in September 2005, causing extensive property damage. In 2006, the Texas Legislature enacted PURA Chapter 39 to authorize electric utilities such as ETI to securitize the recovery of their reconstruction costs incurred as a result of Hurricane Rita. Under the statute, the amount of reconstruction costs to be securitized had to be reduced by the insurance proceeds and government grants received by a utility. If additional insurance or grant proceeds were received after the securitization order was approved, the Commission was required to take those amounts into account in the utility's next base rate case. This was provided in Section 39.459(c) of PURA:

> To the extent a utility subject to this subchapter receives insurance proceeds, governmental grants, or any other source of funding that compensates it for hurricane reconstruction costs, those amounts shall be used to reduce the utility's hurricane reconstruction costs recoverable from customers. If the timing of a utility's receipt of those amounts prevents their inclusion as a reduction to the hurricane reconstruction costs that are securitized, the commission shall take those amounts into account in:
>
> (1) the utility's next base rate proceeding; or
>
> (2) any proceeding in which the commission considers hurricane reconstruction costs.

Docket No. 32907 was the proceeding for ETI to determine the amount of Hurricane Rita reconstruction costs that it could securitize, net of any proceeds received from insurance or government grants.[5] In that case, ETI asserted that it incurred $393,236,384 in Hurricane Rita reconstruction costs for its Texas Retail jurisdiction. The parties reached a settlement in that case, which set ETI's hurricane reconstruction expenses eligible for securitization at $381,236,384. In

---

[5] *Application of Entergy Gulf States, Inc. for Determination of Hurricane Reconstruction Costs*, Docket No. 32907 (Dec. 1, 2006).

addition, ETI estimated that it would receive $65,700,000 in future insurance proceeds that, pursuant to the settlement, was deducted from the amount to be securitized. The parties also agreed that after ETI received all of its insurance payments, a true-up would occur to reflect the difference between the $65,700,000 credited and the amount actually received. The settlement agreement provided that if ETI received more insurance payments than estimated, the excess payments would be passed through to ratepayers in the form of a rider; however, the agreement did not address how an under-recovery by ETI would be handled. It turned out that ETI received only $46,013,904 in insurance proceeds,[6] leaving a $19,686,096 under-recovery by ETI, which the parties refer to as Overestimated Insurance Proceeds.[7]

Docket No. 37744 was ETI's next base rate case after Docket No. 32907. In Docket No. 37744, ETI requested recovery of the Overestimated Insurance Proceeds by establishing a regulatory asset of $19,686,096, plus accrued carrying costs, to be amortized over five years.[8] Docket No. 37744 also concluded by a black-box settlement, and neither the Stipulation and Settlement Agreement nor the Order entered by the Commission specifically addressed the proposed regulatory asset or any other recovery for Overestimated Insurance Proceeds.

In the present case, ETI has again sought approval of a regulatory asset to recover $26,229,627, for the balance of Overestimated Insurance Proceeds, plus carrying costs through June 30, 2011.[9] Cities objected to the amount of ETI's request. They argue that this issue was resolved in Docket No. 37744 and that ETI should have been amortizing the asset since the conclusion of that case. Staff also argues that the issue was resolved in Docket No. 37744 and requested that ETI's request be denied entirely; or, alternatively, that it should be considered partially amortized and accordingly reduced. ETI argues that the issue was not resolved in Docket No. 37744 and that it should be allowed a full recovery in the present case. Alternatively, ETI argues that Cities' proposed reduction was not calculated correctly.

---

[6] *See* Docket No. 32907, Final Order at FoF 27. Cities Ex. 2 (Garrett Direct) at Exhibit MG2.3.

[7] $19,686,096 = 65,700,000 - $46,013,904.

[8] Cities Ex. 2 (Garrett Direct) at 11.

[9] Schedule P Cost of Service Workpapers, Vol. 2, ETI Ex. 3 at AJ 15, page 15.3.

Cities' expert accounting witness, Mark Garrett, testified that ETI should have been amortizing the balance of Overestimated Insurance Proceeds since the effective date of rates set in Docket No. 37744. In addition, he argues that ETI should not have continued to accrue interest on the balance that was added into rate base in that docket, because it would have then earned a rate of return. Therefore, Mr. Garrett's adjustment started with the balance of $25,278,210 that ETI requested in Docket No. 37744. He reduced that balance by $9,479,329 for amortization between the date rates went into effect in Docket No. 37744 and the date that rates will go into effect in the current case (22.5 months). Mr. Garrett further reduced the remaining balance by $5,678,960 to account for additional insurance proceeds received by ETI after Docket No. 37744. By Mr. Garrett's calculations, this left a remaining balance of Overestimated Insurance Proceeds of $11,071,338.[10] Both Mr. Garrett and Cities witness Jacob Pous also recommended that this remaining balance not be carried as a regulatory asset but, instead, be moved to the storm insurance reserve for recovery.[11] In their view, this would ensure that the remaining balance would be properly recovered.

In response to ETI's argument that the Hurricane Rita Regulatory Asset was not resolved in Docket No. 37744, Cities stress that Docket No. 37744 settled as a "black box settlement." In Cities' opinion, such a settlement should not be interpreted as changing the status quo unless expressly stated in the settlement agreement or final order. Cities contend that the status quo in Docket No. 37744 was that ETI was authorized to recover its Over Estimated Insurance Proceeds, because recovery was authorized by PURA § 39.459(c); recovery had been previously approved in Docket No. 32907; and no party objected to its recovery in Docket No. 37744. Therefore, Cities state, the final order in Docket No. 37744 should be interpreted as authorizing ETI's requested recovery of the Hurricane Rita Regulatory asset in the rates set in that docket.[12]

Cities also disagree with ETI's alternative argument that Mr. Garrett improperly calculated the remaining balance of the asset by deducting an amount for insurance proceeds ETI received after

---

[10]  Cities Ex. 2 (Garrett Direct) at Exhibit MG2.3.

[11]  *Id*. (Garrett Direct) at 12; Cities Ex. 5 (Pous Direct) at 64.

[12]  Cities Reply Brief at 10-14.

Docket No. 37744 concluded. Cities state that Mr. Garrett's adjustment was correct because it began with the balance requested in Docket No. 37744, before the additional insurance proceeds were received. In other words, Mr. Garret did not start with the balance claimed by ETI in the present case,[13] so he correctly applied the amount received after Docket No. 37744 to reduce the balance claimed in that docket.[14] According to Cities, Mr. Garrett began with the prior balance to properly reflect that no carrying charges would accrue on the balance after it was included in rate base and recovered a return through rates.[15] Cities also dispute ETI's argument that Mr. Garrett should not have accounted for amortization occurring between the Test Year and the Rate Year as an "invalid post-test year adjustment."[16] In Cities' view, this was a valid known and measureable change that should be taken into account.[17]

Staff recommends that the Hurricane Rita Regulatory Asset be removed from rate base entirely. Staff witness Anna Givens stated that it is reasonable to assume that this asset was included as part of the settlement in Docket No. 37744. Accordingly, she stated that it is not appropriate for ETI to request recovery of the same asset in the present docket. Therefore, Ms. Givens recommended removal of the entire requested $26,229,627 Hurricane Rita regulatory asset from ETI's rate base.[18]

Alternatively, Ms. Givens proposed that the Commission allow ETI a regulatory asset of $17,486,418, to be amortized over 40 months. Ms. Givens noted that higher rates from Docket No. 37744 first went into effect on August 15, 2010;[19] therefore, at least one-third of the regulatory asset should have been amortized by the conclusion of the present case. Using ETI's updated hurricane regulatory asset request of $26,229,627, Ms. Givens recommended a decrease of one-third

---

[13] Cities Initial Brief at 8.

[14] Cities Ex. 2B (Garrett Direct), Exhibit MG-2.3.

[15] Docket No. 32907, Final Order at FoF 28.

[16] ETI's Initial Brief at 7.

[17] Cities' Reply Brief at 10-14.

[18] Staff Ex. 1 (Givens Direct) at 32-34.

[19] Docket No. 37744, Order, FoF 16 (Dec. 13, 2010).

to ETI's request. This would equal an $8,743,209 reduction, resulting in her recommended regulatory asset of $17,486,418 ($26,229,627 - $8,743,209). Ms. Givens also recommended that the amortization period be decreased from 60 months to 40 months, which is the time remaining on ETI's original Docket No. 37744 request.[20]

ETI disagrees with Cities and Staff, and it argues that its total requested Hurricane Rita regulatory asset should be included in rate base in this case. First, it notes that no instruction in the Stipulation and Settlement Agreement filed in Docket No. 37744 required ETI to begin amortizing the asset or otherwise directed the treatment of the asset. Likewise, no Finding of Fact or Conclusion of Law in the agreed order entered in Docket No. 37744 authorized the proposed treatment of the asset. In contrast, ETI notes, the settlement in Docket No. 32907 does specifically address the treatment of this asset, and it argues that its request to include the full Hurricane Rita regulatory asset in rate base in the present case is consistent with that settlement. In ETI's opinion, it has not previously been authorized to establish the regulatory asset, it has not amortized it, and the full amount should be included in rate base in this case.[21]

Alternatively, if Cities' proposed amortization is accepted, ETI argues that Mr. Garrett's calculations were wrong. First, ETI states, Mr. Garrett incorrectly assumed that the $26,229,627 Hurricane Rita regulatory asset requested in this case did not account for the $5,678,960 of insurance proceeds that ETI received after Docket No. 37744. According to ETI, the $5,678,960 was accounted for, as shown on WP/P AJ 15.3. Therefore, ETI states, Mr. Garrett's adjustment for this $5.6 million would remove this amount from the asset a second time.[22] Second, ETI argues that Mr. Garrett erred by amortizing the asset by 22.5 months. Mr. Garrett calculated the amortization period from the time rates went into effect after Docket No. 37744 (August 15, 2010) through the time revised rates would go into effect in this docket (June 30, 2012). ETI states that Mr. Garrett

---

[20] Staff Ex. 1 (Givens Direct) at 34. Ms. Givens noted that amount recommended in Docket No. 37744 was $25,278,000, which is $951,627 less than the amount requested in the current proceeding. However, she stated that this does not affect her recommendation, because by the time the hearing on the merits concluded, at least another two months of amortization expense under the existing rates would be collected by the ETI and should adequately compensate it for the difference. Staff Ex. 1 (Givens Direct) at 35.

[21] ETI Ex. 46 (Considine Rebuttal) at 19-24; ETI Initial Brief at 5-6.

[22] ETI Ex. 46 (Considine Rebuttal) at 21-22; ETI Initial Brief at 7.

made an invalid post-test year adjustment because post-test year adjustments for rate base items are limited to plant additions recorded in FERC Accounts 101 or 102. In contrast, regulatory assets, like the Hurricane Rita regulatory asset, are recorded in Account 182.3. Therefore, in ETI's opinion, if it was required to amortize this regulatory asset, it would be appropriate to amortize it for only 10.5 months, to the end of the Test Year (August 15, 2010, through June 30, 2011). These two corrections would adjust Mr. Garrett's proposed asset balance from $10,714,557 to $21,805,940.[23]

ETI also disagrees with Mr. Pous' recommendation that the regulatory asset be removed from rate base and placed in the storm reserve, to be amortized over 20 years. In ETI's opinion, this approach would defeat the purpose of securitization, which is to provide ETI with cost recovery in an expedited manner.[24]

Finally, ETI argues that Ms. Givens' analysis was flawed. It reiterated that no provision in the Stipulation and Settlement Agreement or the final order filed in Docket No. 37744 directed the treatment of the regulatory asset or stated that ETI would begin amortizing the asset. Further, ETI stresses that it never sought recovery of the entire asset all at once in Docket No. 37744. Instead, ETI requests recovery over a period of years through amortization. Thus, according to ETI, even if Ms. Givens' argument were accepted, the entire asset should not be disallowed.[25]

This issue is a close call because the black-box settlement agreement and final order in Docket No. 37744 did not expressly state how the Hurricane Rita regulatory asset issue was resolved. The following factors support finding that the Hurricane Rita regulatory asset issue was resolved in Docket No. 37744:

- the settlement agreement and final order in Docket No. 32907 expressly provided that the difference between the amount of ETI's estimated insurance proceeds and the amount actually received by ETI would be trued up after ETI received the proceeds;

---

[23] ETI Ex. 46 (Considine Rebuttal) at 22; ETI Initial Brief at 7-8.

[24] ETI Initial Brief at 8.

[25] ETI Ex. 46 (Considine Rebuttal) at 21; *Id*. at 8-9.

- PURA § 39.459(c) provides that if the timing of a utility's receipt of insurance proceeds prevented their inclusion as a reduction to the securitized costs, the Commission "shall take those amounts into account . . . *in the utility's next base rate proceeding*;"

- Docket No. 37744 was ETI's next base rate proceeding;

- in Docket No. 37744, ETI requested a true-up concerning the insurance proceeds, and it requested that a regulatory asset be established for the deficit and amortized over five years;

- in Docket No. 37744, no party objected to ETI's proposed regulatory asset or amortization;

- the stipulation and settlement agreement entered by the parties in Docket No. 37744 stated that the parties resolved all issues, except for ETI's Competitive Generation Service (CGS) proposal; and

- neither the stipulation and settlement agreement nor the Order entered in Docket No. 37744 specifically disapproved, excluded, or deferred consideration ETI's proposed regulatory asset, although they did specifically exclude or disapprove other items, such as ETI's CGS proposal and various proposed riders.

On the other hand, some factors support a finding that the Hurricane Rita regulatory asset issue was not resolved in Docket No. 37744. The stipulation and settlement agreement and the Order entered in Docket No. 37744 did not expressly approve ETI's proposed regulatory asset, although certain other items were expressly approved, such as River Bend Nuclear Generating Station Unit No. 1 (River Bend) decommissioning costs, depreciation rates, and other items. Also, utilities are typically not allowed to create regulatory assets without express approval of the Commission.

Thus, the difficulty with this issue is the nature of the black-box settlement of Docket No. 37744. In the settlement, the parties agreed to an increase in base rate revenues of $59 million effective August 15, 2010, with an additional increase in base rate revenues effective May 2, 2011. However, there was no explanation on how this increase was determined, and there was no specific agreement or finding on the amount of ETI's rate base or its reasonable and necessary cost of service. In that case, there was no objection to ETI's proposed Hurricane Rita regulatory asset, it was authorized by the prior settlement in Docket No. 32907, and the Commission was directed by

PURA § 39.459(c) to take into account ETI's insurance proceeds related to the Hurricane Rita securitized costs in ETI's next rate case, which was Docket No. 37744. Moreover, when there is uncertainty whether an *undisputed issue* was deferred for future consideration or was included within the rates set in a black-box settlement, the burden should be on the utility to establish that the issue was deferred for future consideration. When all the evidence and factors are considered, the ALJs find that that ETI's proposed Hurricane Rita regulatory asset should be considered as having been approved in Docket No. 37744, and ETI should have amortized the asset since August 15, 2010, the effective date of rates approved in that docket.

The ALJs also find that none of the amortization calculations proposed by the parties were entirely correct. ETI's proposal to start with its requested $26,229,627 was flawed because it included carrying costs from August 15, 2010, when the asset should have been included in rate base, to June 30, 2011, the end of the Test Year in the present case. During that period, the asset would have earned a rate of return as part of rate base, and accrual of carrying costs should have ceased. Therefore, it would be more accurate to begin amortizing the Hurricane Rita regulatory asset by using the balance requested by ETI in Docket No. 37744. That amount, according to Mr. Garrett, was $25,278,210. However, the amortization calculation should not extend beyond the end of the Test Year in the present case (June 30, 2011), as proposed by Cities and Staff. P.U.C. SUBST. R. 25.231(c)(2)(F)(ii) provides for post-test-year reductions to rate base, and the recommendation for a post-test-year adjustment to the Hurricane Rita regulatory asset does not fall within the scope of that rule. The balance remaining after amortization to the end of the Test Year should be further reduced by $5,678,960 to account for additional insurance proceeds received by ETI after Docket No. 37744 concluded but before the end of the Test Year in the present case. ETI argues that this reduction was already included in its request. However, as discussed above, the appropriate calculation should begin with the balance of the asset at the conclusion of Docket No. 37744, not the balance requested by ETI in the present case. The balance of the asset at the conclusion of Docket No. 37744 did not account for the additional insurance proceeds paid to ETI afterwards, so it should be deducted now. In summary, the ALJs find that the appropriate amount of the Hurricane Rita regulatory asset to be included in rate base in this case should be calculated as follows:

| | |
|---|---|
| Beginning balance at conclusion of Docket No. 37744 (original balance + carrying charges) | $25,278,210 |
| Less amortization for period 8/15/10 to 6/30/11 = 10.5 months / 60 months = 17.5% | - $4,423,687 |
| Less additional insurance proceeds received | - $5,678,960 |
| Remaining balance of Hurricane Rita regulatory asset | $15,175,563 |

Finally, the ALJs recommend that the Commission not adopt the recommendation of Cities to move the Hurricane Rita regulatory asset to the storm insurance reserve for recovery. As noted by ETI, one purpose of enactment of PURA Chapter 39 was to allow expedited recovery of costs resulting from Hurricane Rita storm damage. Moving the regulatory asset to the storm insurance reserve would defeat that purpose and negate the five-year amortization plan the parties agreed to in Docket No. 37744.

In summary, the ALJs find that ETI's proposed Hurricane Rita regulatory asset was an issue resolved by the black-box settlement in Docket No. 37744. Therefore, ETI should have included the asset in rate base at the conclusion of that docket and should have begun amortizing it over a period of five years. The accrual of carrying charges should have ceased when Docket No. 37744 concluded, because the asset would have then begun earning a rate of return as part of rate base. The appropriate calculation of the asset should begin with the amount claimed by ETI in Docket No. 37744, less amortization accruals to the end of the Test Year in the present case, and less the amount of additional insurance proceeds received by ETI after the conclusion of Docket No. 37744. This produces a remaining balance of $15,175,563, which should remain in rate base as a regulatory asset, applying a five-year amortization rate that commenced August 15, 2010. Further, the Hurricane Rita regulatory asset should not be moved to the storm insurance reserve.

## C.     Prepaid Pension Asset Balance

ETI included in rate base an item titled Unfunded Pension in the amount of $55,973,545.[26] The amount requested in this account represents the accumulated difference between the Statement of Financial Accounting Standards (SFAS) No. 87 calculated pension costs each year and the actual

---

[26]  ETI Ex. 3, Sched. B-1, Line 10.

contributions made by the Company to the pension fund.[27]   It is a debit balance, meaning that the Company has contributed roughly $56 million more to its pension fund than the minimum required by SFAS 87.[28]  Other than Cities, no party opposes ETI's request to include this item in rate base.

Cities argue that ETI ought not be entitled to include this amount in rate base because it represents amounts the ETI overpaid to its pension, resulting in little to no benefit to ratepayers. Cities witness Mark Garrett pointed out that ETI earned only 1.37 percent on its pension assets over the past five years, while it is seeking a rate of return of more than 11 percent.  Thus, he argues, if the asset were included in rate base, ratepayers would pay a substantial premium for the slight pension cost savings ETI's excess contributions may have achieved.[29]

Cities argue that the entire prepaid pension asset should be removed from rate base because ETI has not justified its inclusion.  This would reduce *pro forma* rate base by $36,382,803, which is the net amount of the prepaid balance less accumulated deferred income tax ($55,973,545 – $19,590,740 = $36,382,803).   At the same time, Cities would increase operating expense by $498,284, to provide a 1.37 percent return on the net balance of ETI's prepaid pension asset balance.[30]

Alternatively, Cities contend that the Commission should treat the pension assets in the same manner as the approach adopted by the Commission in Docket No. 33309.[31]  In that docket, the Commission allowed a pension prepayment asset, less accrued deferred federal income taxes (ADFIT) and less the portion of the asset that is capitalized to CWIP, to be included in rate base.  As to the excluded portion, the Commission allowed the accrual of an allowance for funds used during construction (AFUDC).  Thus, Cities contend, if the Commission opts for this approach, it should allow ETI's pension prepayment asset, less ADFIT, to be included in rate base, but excluding

---

[27]  Cities Ex. 2 (Garrett Direct) at 7.

[28]  ETI Initial Brief at 10; Cities Ex. 2 (Garrett Direct) at 8.

[29]  Cities Ex. 2 (Garrett Direct) at 8-9.

[30]  *Id.* at 10, MG-2.2; Cities Initial Brief at 10.

[31]  *Remand of Docket No. 33309 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 38772, Order on Remand at FoF 15A (Jan. 30, 2011).

$25,311,236 for the portion of the prepaid pension balance associated with CWIP, and allow AFUDC to accrue on the excluded balance.[32]

ETI responds first by disputing Mr. Garrett's contention that it has unreasonably overpaid into its pension fund. It contends it has made contributions to the pension fund in accordance with contribution guidelines established by the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code of 1986, and that the contributions were within the allowable range of contributions deductible for tax purposes. ETI also was guided in its required pension contributions by the Pension Protection Act of 2006 rules, effective beginning with the 2008 plan year.[33]

ETI next disputes Cities' contention that the earnings associated with ETI's pension contributions provide insufficient benefits to justify inclusion of the asset in rate base. ETI points out that ratepayer benefits are not just limited to the level provided by the actual pension fund earnings on investment. Rather, under FAS 87, pension costs included in the cost of service for ratemaking purposes are intended to include the *expected* rate of return on assets. Thus, ETI argues that the expected long-term rate of return on ETI's assets is 8.5 percent, not the actual earnings as suggested by Mr. Garrett.[34]

On behalf of ETI, Mr. Considine testified that the pension balance is no different than any other prepayments made by the Company, which are included in rate base and earn a full return on rate base. Furthermore, the Company would be allowed to earn a full return on rate base had the Company invested these same dollars in Plant in Service, but the Company in this case used funds to contribute to a still under-funded pension plan and at the same time provided a timely reduction to formerly FAS 87 annual pension cost, thereby immediately benefitting ratepayers.[35] Therefore, ETI argues it is clearly investor-supplied capital and accordingly should earn the Company's requested return on rate base.

---

[32]  Cities Initial Brief at 8-9; Cities Ex. 2 (Garret Direct) at 12.

[33]  ETI Ex. 46 (Considine Rebuttal) at 22.

[34]  *Id*.

[35]  *Id*. at 23-24.

ETI acknowledged the approach to this issue taken by the Commission in Docket No. 33309, but failed to explain why it is distinguishable from the present case.[36]

The ALJs conclude that the approach taken by the Commission in Docket No. 33309 was sound and should be applied in the present case. Neither party adequately explained why the circumstances of the present case are distinguishable. Thus, the ALJs recommend that the CWIP-related portion of ETI's pension asset ($25,311,236 out of the total asset) should be excluded from the asset, but accrue allowance for funds used during construction.

## D.    FIN 48 Tax Adjustment

The Financial Accounting Standards Board (FASB) is the body that establishes the rules that constitute generally accepted accounting principles (GAAP). FASB's Interpretation No. 48 (FIN 48) prescribes the way in which a company must analyze, quantify, and disclose the potential consequences of tax positions that the company has taken which are legally "uncertain." Pursuant to FIN 48, ETI and its independent auditors are required to evaluate each of its uncertain tax positions to determine, under the most objective, reasonable standards, which portion of each position will most likely ultimately have to be paid to taxing authorities if challenged by the authorities. FIN 48 requires that this portion be excluded from ADFIT for financial reporting purposes and accrue interest and, in some cases, penalties.[37]

ETI and its auditors periodically perform the FIN 48 analysis. In so doing, they have concluded that the Company has taken a number of uncertain tax positions that the Company expects to lose if challenged by the IRS. ETI concluded that these uncertain tax positions result in a total of $5,916,461 in tax dollars that the Company expects it will ultimately have to pay, with interest, to the IRS. As required by FIN 48, this amount is recorded on ETI's balance sheet as a tax liability.[38] In other words, ETI has, thus far, avoided paying to the IRS $5,916,461 in tax dollars (ETI's FIN 48

---

[36] ETI Initial Brief at 10-11.

[37] ETI Ex. 70 (Warren Rebuttal) at 9-12.

[38] ETI Ex. 64 (Roberts Rebuttal) at 4-7.

Liability) in reliance upon tax positions that the Company believes will not prevail in the event the positions are challenged, via an audit, by the IRS.

In preparing its application in this proceeding, ETI made an accounting adjustment to its Test Year numbers by not including the $5,916,461 in its ADFIT balance. This had the effect of reducing the Company's Test Year deferred tax balance and, therefore, increasing its rate base.[39]

Cities witness Mark Garrrett asserted that the deduction of $5,916,461 – representing ETI's FIN 48 Liability – should be added to ETI's ADFIT balance and thus be used to reduce the Company's rate base. Mr. Garrett pointed out that the Commission first considered this issue in a recent Oncor docket.[40] In that docket, the Commission decided to include FIN 48 liabilities in ADFIT because of the low likelihood that the IRS would actually audit and review the issue.[41] Mr. Garrett testified that this is a fair result because: (1) a utility with FIN 48 liabilities might never have its underlying uncertain tax positions audited by the IRS; and (2) even if the uncertain positions are audited by the IRS, the utility might prevail on them. In either case, the utility would never have to pay those tax amounts. Moreover, during the time when the uncertainty exists, the utility enjoys the use of cost-free capital (from the deferred taxes associated with the deductions) at its disposal.[42] Thus, Mr. Garrett recommends that ETI's ADFIT balance be increased by $5,916,461 to reinstate the FIN 48 Liability removed by the Company.[43]

ETI witnesses Rory Roberts and James Warren stated that the $5,916,461 should not be included in the Company's ADFIT balance. Mr. Roberts explained that, because the Company expects to lose on its uncertain tax positions, it expects that it will ultimately have to pay $5,916,461 in taxes to the IRS, plus interest. Accordingly, Mr. Garrett testified that the amount does not

---

[39] *Id*. at 4.

[40] Cities Ex. 2 (Garrett Direct) at 5-7. *See also Application of Oncor Electric Delivery Company LLC for Authority to Change Rates*, Docket No. 35717, Order on Reh'g (Nov. 30, 2009).

[41] *Id*. at 18 FOF 59 ("The IRS may not audit or reverse Oncor's position as to the tax deductions identified as FIN 48 deductions and moved into the FIN 48 reserve.").

[42] Cities Ex. 2 (Garrett Direct) at 5-6.

[43] *Id*. at 7.

represent cost-free funds available to the Company and, as such, should not be included in the Company's ADFIT balance.[44]

Both the Cities and ETI agree that ETI's rate base "should reflect the actual amount of cost free capital in the ADFIT accounts at Test Year end."[45] However, ETI witness Mr. Warren testified that the FIN 48 Liability is not cost-free capital to the Company because the best available expert opinion in the record of this case is that ETI will "most likely" ultimately have to pay the money to the IRS, with interest.[46]

Moreover, Mr. Warren pointed out that, beginning with 2010 tax returns, a corporate taxpayer is required to complete and file a Schedule UTP, on which the taxpayer must specifically identify and describe its FIN 48 positions. Mr. Warren contended that, because ETI must now annually file a Schedule UTP, it is more likely that the IRS will audit the Company, thereby forcing it to pay the FIN 48 Liabilities, with interest.[47] This constitutes additional support for the notion that the FIN 48 Liability is not cost-free capital for the Company. Mr. Warren correctly points out that, in a recent CenterPoint Energy Houston Electric, LLC, (CenterPoint) rate case, the Commission specifically acknowledged that filing of a Schedule UTP makes it more likely that a company will be audited. In that case, the ALJs recommended that CenterPoint's FIN 48 Liability, totaling some $164 million, be added to CenterPoint's ADFIT, thereby reducing its rate base. The Commission adopted the recommendation. However, in light of its conclusion that the filing of a Schedule UTP increases the likelihood of an audit, the Commission authorized CenterPoint to establish a deferred tax account rider to enable it to recover any portion of its FIN 48 Liability that it might ultimately be forced to pay to the IRS, plus interest.[48] ETI does not necessarily oppose the use of a rider in this

---

[44] ETI Ex. 64 (Roberts Rebuttal) at 7.

[45] Cities Ex. 2 (Garrett Direct) at 6; see also ETI Ex. 70 (Warren Rebuttal) at 6-7.

[46] ETI Ex. 70 (Warren Rebuttal) at 17.

[47] *Id*. at 14, 20-21.

[48] ETI Ex. 70 (Warren Rebuttal) at 19-20. *See also Application of CenterPoint Electric Delivery Company, LLC, for Authority to Change Rates*, Docket No. 38339, Order on Reh'g at 3-4 (June 23, 2011).

case, but contends that it would be preferable to simply exclude ETI's FIN 48 Liability from its ADFIT balance, thereby increasing its rate base.[49]

In the alternative that the Commission rejects ETI's request to exclude the full amount of the FIN 48 Liability from the Company's ADFIT balance, ETI contends that at least any amount of cash deposit the Company has made with the IRS that is attributable to the FIN 48 Liability should be removed from the Company's ADFIT balance.[50] The Cities' witness, Mr. Garrett, agrees.[51] Staff also agrees, arguing that ETI should be required to increase its ADFIT balance by the amount of its FIN 48 Liability less the amount of any cash deposit attributable to the liability that ETI has made with the IRS.[52] ETI has made a cash deposit with the IRS in the amount of $1,294,683. This amount is associated with the Company's FIN 48 Liability.[53]

Consistent with prior Commission precedent from the Oncor and CenterPoint proceedings, the ALJs conclude that ETI's FIN 48 Liability should be included in the Company's ADFIT balance. There is, however, one caveat to this conclusion. The amount of the cash deposit made by ETI to the IRS which is attributable to the Company's FIN 48 Liability should not be included in the ADFIT balance. Therefore, the ALJs recommend that the Commission find that $4,621,778 (representing ETI's full FIN 48 Liability of $5,916,461 less the $1,294,683 cash deposit ETI has made with the IRS) should be added to ETI's ADFIT and thus be used to reduce ETI's rate base. No party expressly advocated the addition of a deferred tax account rider,[54] and the ALJs do not recommend one in this case.

---

[49] ETI Initial Brief at 13; ETI Ex. 70 (Warren Rebuttal) at 20.

[50] ETI Ex. 64 (Roberts Rebuttal) at 8-9.

[51] Cities Ex. 2 (Garrett Direct) at 7 n. 4.

[52] Staff's Initial Brief at 11-12.

[53] ETI Ex. 64 (Roberts Rebuttal) at 8.

[54] Cities and Staff both point out that there is much less need for a deferred tax account rider in the present case than there was in the CenterPoint case, where CenterPoint had $164 million in FIN 48 liabilities. Cities Reply Brief at 18; Staff Reply Brief at 10.

## E.     Cash Working Capital

Rate base includes a reasonable allowance for cash working capital.  Cash working capital represents the average amount of investor capital used to bridge the gap in time between when expenditures are made by ETI to provide services and when the corresponding revenues are received by ETI.[55]  Generally, an increase in revenue lag days and/or a decrease in expense lead days will result in an increase to the amount of cash working capital included in the rate base.  Conversely, a decrease in revenue lag days and/or an increase in expense lead days will reduce the cash working capital included in rate base.  A properly prepared lead-lag study can result in either a positive cash working capital amount (and therefore an increase to the rate base) or a negative cash working capital amount (and a corresponding decrease to the rate base).

Pursuant to P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV), ETI calculated its cash working capital allowance by performing a lead-lag study.  ETI witness Jay Joyce prepared the lead-lag study for the Company.  Based upon the study, ETI requests a cash working capital addition to its rate base of negative $2,013,921.[56]

Only Staff and Cities submitted evidence and argument relevant to the cash working capital requirement.  Staff does not challenge the accuracy of the lead and lag days determined in Mr. Joyce's study.  Instead, Staff witness Anna Givens recommends that the cash working capital calculation be updated to reflect the impacts of Staff's recommended adjustments to ETI's O&M costs and taxes.[57]  ETI agrees that the final cash working capital amount should be updated to reflect the actual revenue requirements approved by the Commission in this case.[58]

Cities witness Jacob Pous asserts that Mr. Joyce's lead-lag study contains a number of errors which understate the negative cash working capital requirements of the Company.  Mr. Pous asserts that the correct cash working capital amount for inclusion in ETI's rate base is negative $24,000,000

---

[55]  ETI Ex. 17 (Joyce Direct) at 4.

[56]  *Id*. at 20 and JJJ-3.

[57]  Staff Ex. 1 (Givens Direct) at 30-31.

[58]  ETI Ex. 54 (Joyce Rebuttal) at 37; ETI Initial Brief at 14.

(more than an order of magnitude increase of the negative amount).[59] Each of the major components

of the lead-lag study, and Cities' criticisms of same, will be discussed in turn.

### 1.   The Revenue Lag Component of the Lead-Lag Study

Mr. Pous raises a number of criticisms about the revenue lag component of Mr. Joyce's lead

lag study.  There are four parts to the  revenue lag component: (1) the "service period lag," which

consists of the roughly 15 days from the mid-point of the month in which service is provided to the

end of that month; (2) the "billing lag," which represents the time between the date a customer's

meter is read and the date a bill is issued to the customer; (3) the "collection lag," which represents

the time between the issuance of the bill and the date the customer's payment is received; and

(4) "receipt of funds lag," which measures the delay between ETI's receipt of payment and the

bank's clearance of the payment.[60]   When the four parts were combined together, Mr. Joyce

identified ETI's revenue lag as 43.86 days.[61]

### (a)  Billing Lag

Mr. Joyce identified the billing lags (*i.e.*, the delay between when meters are read and bills

are sent to customers) as ranging from 5.4 to 5.65 days, depending upon the customer class.[62]  On

behalf of the Cities, Mr. Pous asserted that this duration is too long.  Mr. Pous complained that the

billing lag in ETI's lead-lag study is longer than in studies from previous ratemaking proceedings

involving ETI's predecessor, despite the fact that, in the interim between studies, ETI has invested

substantially in electronic meter reading devices and computer systems that ought to shorten the lag

time.  According to Mr. Pous, in a previous proceeding, ETI's predecessor identified its billing lag

as only 3.61 days.[63]  Mr. Pous also pointed out that the Railroad Commission of Texas (RRC),

recently adopted a 1-day billing lag for a large gas utility, Atmos Mid-Tex, due to the utility's use of

---

[59]  Cities Ex. 5 (Pous Direct) at 72.

[60]  ETI Ex. 17 (Joyce Direct) at 8-10.

[61]  *Id.* at JJJ-3.

[62]  Cities Ex. 5 (Pous Direct) at 74.

[63]  *Id.*

modern electronic meter reading devices (the Atmos Mid-Tex RRC proceeding). Mr. Pous stated that the billing lag identified by ETI would unjustly reward the Company for being inefficient in sending out its bills because customers should not be punished if the utility decides to manage its billing processing and payment system less efficiently. Thus, Mr. Pous recommended a schedule of different billing lags for different customer classes. For residential and commercial customers, Mr. Pous recommended a 1.46 day billing lag, based since ETI's predecessor claimed such a lag in a prior PUC docket (Docket No. 12852). For large industrial, public authority, and street lighting customers, Mr. Pous recommends a billing lag of 3.72 days. He calculated that the combined impact of these adjustments would result in a 41.10-day total revenue lag (as compared to Mr. Joyce's figure of 43.86 days). Mr. Pous then calculates that this shorter lag period results in an additional negative cash working capital of $11.4 million.[64]

ETI responds by pointing out that the 1.46-day billing lag suggested by Mr. Pous for residential and commercial customers was derived from a rate case by ETI's predecessor from 1993, whereas Mr. Joyce more properly relied on actual Test Year data. Mr. Joyce asserted that Mr. Pous, in effect, "cherry picked" the 1.46-day figure from one page of a 47-page study associated with the 1993 rate case, and that the remaining pages of the study have not been located and, therefore, cannot be evaluated. Thus, Mr. Joyce testified, "[i]t is unfair and unreasonable to use such an old document to attempt to support a position when reasonable, contemporaneous evidence exists."[65]

ETI argues that it is more appropriate in this case to rely upon ETI's actual residential and commercial billing practices, rather than to substitute artificial and arbitrary 1.46-day and 3.72-day periods derived from other sources. According to Mr. Joyce, it is unavoidably necessary, when conducting a lead-lag study, to take into account the actual amount of time employed by ETI in performing all of the activities in its billing-cycle-based meter reading and billing processes. Mr. Joyce complains that Mr. Pous' approach would jettison this actual data and analysis derived

---

[64]  *Id*. at 75-77.

[65]  ETI Ex. 54 (Joyce Rebuttal) at 11.

from the Test Year and improperly substitute arbitrary numbers based upon a prior, dated, rate proceeding.[66]

Mr. Joyce acknowledged that the RRC recently adopted a 1-day billing lag in the Atmos Mid-Tex RRC proceeding. He pointed out, however, that the RRC did so simply because Atmos Mid-Tex failed to present evidence supporting a longer billing lag. Additionally, Mr. Joyce pointed out that the RRC promptly reversed itself in Atmos Mid-Tex's next rate case, adopting a longer billing lag after the company provided sufficient evidence to support the longer period.[67]

ETI also provided extensive evidence regarding the details of its meter reading and billing process.[68] ETI witness Dolores Stokes explained that the meter reading and billing cycle includes time for extensive quality assurance activities to ensure accurate billing, thereby preventing unnecessary frustration for the customer and additional costs to the Company that would be required for customer service, rebilling, and account corrections.[69]

Cities questioned Mr. Joyce at the hearing about the billing lag period in this case compared to ETI's last rate case. Mr. Joyce explained that the total period from meter reading to collection of billing revenues had not changed appreciably between the two cases, but due to a difference in lead-lag methodology, the date that divides the two components of that lag – metering to billing and billing to collection – had changed.[70] As a result, the first period – billing lag – was longer than in the previous case but the second period – collection lag – was shorter.[71] ETI introduced into evidence a response to a Cities RFI that discussed this difference in more detail.[72] After explaining

---

[66] *Id.* at 5-7.

[67] *Id.* at 8-9.

[68] ETI Ex. 54 (Joyce Rebuttal); ETI Ex. 66 (Stokes Rebuttal).

[69] ETI Ex. 66 (Stokes Rebuttal) at 18.

[70] Tr. at 499-500, 502.

[71] Tr. at 499-502.

[72] ETI Ex. 73.

the change in lead-lag methodology, the RFI response concluded that "the combined billing and collection lags are substantially similar from the prior case to this current case."[73]

The ALJs conclude that ETI has met its burden to show that the billing lag it utilized in the lead-lag study is reasonable and appropriate.   Absent his own opinion, Mr. Pous does not offer meaningful evidence to support his assertion that the Company's billing lag is too long or that the Company's billing practices are inefficient.  For example, he offered no criticism of any specific billing practice of the Company.  The only support for his charge of inefficiency is that the billing lag in a previous ETI rate case was shorter.  Mr. Joyce convincingly explained that this was merely an artifact of changes in the methodology of the lead-lag study – the billing lag became longer, but the collection lag became shorter.

Mr. Pous' reliance upon an example from the RRC is unconvincing.  Similarly, his reliance upon data from a previous rate case is unpersuasive, especially because only a very limited snippet of data from that case is available, the case occurred roughly 20 years ago, and it involved a different company.  It is not possible, from the evidence in the record, to know how different or similar ETI's current billing practices are to those used in the previous case.

In this case, ETI has thoroughly explained its metering and billing processes and established that those processes are reasonable.  The Company is therefore entitled to establish rates based on the actual cash working capital necessary to facilitate those policies.  The ALJs recommend rejecting Cities' request to shorten the billing lag time identified in ETI's lead-lag study

### (b) Collection Lag

In his lead-lag study, Mr. Joyce identified various collection lags (*i.e.*, the delay between the issuance of an electric bill and the date the customer's payment is received) for different classes of customers.  As to third-party customers, the collection lag was determined using a random sample of invoices from residential, commercial, industrial, public authority, and street light customer billings during the Test Year, measuring the time between when the bills were mailed and the payment

---

[73] ETI Ex. 73 at 2.

receipt date.  The collection lag for MSS-4 and Intra-System Bill (ISB) revenues was based on the actual payment dates for each of the affiliate revenue types.[74]

> ➢ *Collection Lag for Residential Customers*

As to the residential class, Mr. Joyce determined that the collection lag was 23.73 days.  On behalf of the Cities, Mr. Pous disputed the accuracy of that estimate, complaining that it is substantially longer than the lag identified for commercial customers.  Mr. Pous contended that Mr. Joyce determined the collection lag for residential customers by relying on a sample size that was too small.  Mr. Pous examined the month-end accounts receivable data for ETI's entire residential class for the entire Test Year, and concluded that the collection lag for the class is actually 22.07 days (as compared to Mr. Joyce's figure of 23.73 days).  Mr. Pous then calculated that this shorter lag period results in an additional negative cash working capital of $2.4 million.[75]

Mr. Joyce made several points in response.  First, he noted that, although Mr. Pous is advocating reliance upon month-end accounts receivable data to calculate the collection lag in this case, he has testified in another proceeding that such data is unusable and unreliable.  For example, in the Atmos Mid-Tex RRC proceeding, Mr. Pous argued *in favor* of measuring actual bill payment practices of actual customers (*i.e.*, the approach taken by Mr. Joyce in the present case) and *against* analyzing the monthly accounts receivable balances for each month of the Test Year (*i.e.*, the approach now being advocated for by Mr. Pous).[76]  Next, Mr. Joyce disputed Mr. Pous' assertion that the sample size used by Mr. Joyce was too limited.  According to Mr. Joyce, his sample of 100 residential customers is comparable to all of the residential collection lag calculations he has performed during his 15 years of performing lead-lag studies.[77]  Mr. Joyce also accused Mr. Pous of

---

[74]  ETI Ex. 17 (Joyce Direct) at 10.

[75]  Cities Ex. 5 (Pous Direct) at 77-79.

[76]  ETI Ex. 54 (Joyce Rebuttal) at 13-15.

[77]  *Id.* at 15-17.

inexplicably picking out a few data points, rather than relying upon the entirety of the sampling data, in order to derive his collection lag estimate.[78]

The ALJs are unpersuaded by Mr. Pous' criticisms and conclude that ETI has met its burden to show that the collection lag it utilized in the lead-lag study for residential customers is reasonable and appropriate.

> *Collection Lag for MSS-4 and ISB Affiliate Rate Classes*

As to MSS-4 and ISB rate classes, Mr. Joyce determined that the collection lags were 46.19 and 15.61 days, respectively.[79] Mr. Pous again disputed the accuracy of these estimates. Mr. Pous pointed out that the underlying data reveals that the majority of the MSS-4 revenue lag days range from 43 to 46 days, with only two values equaling or exceeding 50 days. Mr. Pous testified that the two values equaling or exceeding 50 days should be deemed unrepresentative and, therefore, excluded from the calculations for determining the average lag. Similarly, the majority of ISB revenue lag days range from 15 to 16 days, with only a few lags running as long as 22 days. Again, Mr. Pous contended that the longer revenue lag days should be deemed unrepresentative and excluded from the calculations for the average. Mr. Pous also complained that the payment deadlines for these affiliate transactions are stipulated in the Entergy System Agreement. Thus, it is Mr. Pous' opinion that ETI unreasonably contractually agreed to "excessively long" revenue lag days associated with the MSS-4 and ISB rate classes. Mr. Pous concluded that if what he considers to be the unrepresentative lag days are excluded from the calculations, then the collection lag would change for the MSS-4 class from 46.19 days to 45.14 days, and for the ISB class from 15.61 days to 14.77 days. Collectively, the lag for the two classes would be .77 days shorter, resulting in an additional negative cash working capital of $3.2 million.[80]

Mr. Joyce first responded by disputing Mr. Pous' contention that there are unusual outliers in the MSS-4 and ISB payment data. He noted that the lag days for MSS-4 payments ranged from 43

---

[78] *Id.* at 17.

[79] *Id.* at 18.

[80] Cities Ex. 5 (Pous Direct) at 79-81; ETI Ex. 54 (Joyce Rebuttal) at 18.

to 54 days. He described this as a "relatively tight payment range and certainly within the expected range of reasonableness."[81] Next, Mr. Joyce described Mr. Pous' assertion that outlier numbers should not be considered in the data as nonsensical. Mr. Joyce agreed that, in cases where sampling is used (such as was done for the residential customer class), it is appropriate to exclude data points that are unrepresentative of the population as a whole. In the case of the MSS-4 and ISB classes, however, Mr. Joyce determined the collection lag by reviewing the entire class populations. According to Mr. Joyce, it is inappropriate to eliminate data points when reviewing an entire population, unless it is necessary to make a known and measurable change.[82]

The ALJs are again unpersuaded by Mr. Pous' criticisms. The ALJs conclude that ETI has met its burden as to show that the collection lag it utilized in the lead-lag study is reasonable and appropriate.

### (c) Receipt of Funds Lag

In the lead-lag study, Mr. Joyce identified the receipt of funds lag (*i.e.*, the delay between the date the funds are received from the customers and the date the funds clear the bank and are available to ETI). As required by P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV)(-d-), Mr. Joyce assumed that one business day is needed to clear any payments by methods other than electronic transfer, while electronic payments are available to ETI on the date received. Because 53.39 percent of customer payments were made by methods other than electronic transfer, Mr. Joyce calculated the receipt of funds lag to be .77 days.[83]

Mr. Pous again contended that this duration is too long. He acknowledges that P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV)(-d-) mandates the assumption that funds paid by check will be available "no later than" the following business day. However, he stated that this is merely the maximum possible duration, and ETI should take into account that fact that many checks are cleared

---

[81] ETI Ex. 54 (Joyce Rebuttal) at 19.

[82] *Id.* at 19.

[83] ETI Ex. 17 (Joyce Direct) at 10. The receipt of funds lag is also sometimes referred to by the witnesses as the "cash receipts float."

(and therefore the funds are available) sooner than one day later. Therefore, the funds from all checks received on any day other than Saturday should be assumed to be available on the date of receipt, while the funds from checks received on Saturday should be assumed to be available two days later. Mr. Pous was also critical of the fact that Mr. Joyce treated the funds from all "walk-in" payments made by customers to be available the next day. Funds from walk-in payments ought to be deemed available on the date they are received. If these two changes are adopted, Mr. Pous contended that receipt of funds lag would be shortened from .77 days to .15 days, resulting in an additional negative cash working capital of $2.1 million.[84]

Mr. Joyce first responded by pointing out that Mr. Pous' contention that all funds are immediately available except for checks received on Saturdays is simply not accurate. Mr. Joyce cited from a 2007 Report to Congress made by the Board of Governors of the Federal Reserve System which supports the conclusion that most funds paid by check in this country are *not* available on the day they are received (and a significant portion are still not available the next business day).[85] Mr. Joyce also disagreed with Mr. Pous' contention that all walk-in payments should be considered immediately available. According to Mr. Joyce, walk-in payments are made at third-party vendor locations, such as grocery stores and check-cashing stores. Based upon his own investigation, Mr. Joyce determined that walk-in payments are actually available to ETI two days after receipt. Thus, his one-day assumption for walk-in payments is conservative.[86]

The ALJs conclude that ETI has met its burden as to show that the receipt of funds lag it utilized in the lead-lag study is reasonable and appropriate. The positions taken by Mr. Pous on this issue were unreasonable and counter to the requirements of P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV)(-d-).

---

[84] Cities Ex. 5 (Pous Direct) at 81-82; Cities Ex. 5A (Errata No. 1).

[85] ETI Ex. 54 (Joyce Rebuttal) at 21-23.

[86] ETI Ex. 54 (Joyce Rebuttal) at 23-24.

### 2. The Expense Lead Component of the Lead-Lag Study

For the expense lead portion of his lead-lag study, Mr. Joyce calculated different expense lead days for numerous different categories of expenses. Each category will be discussed in turn.

### (a) Expense Lead – Operations and Maintenance Expense

Mr. Joyce separated O&M expenses into two groups – energy costs and "other O&M" expenses. Each of those two groups was further divided into subgroups.[87]

➢ *Energy Costs*

*Fuel.* Mr. Joyce explains that, during the Test Year, ETI purchased two kinds of fuel: (1) coal and oil; and (2) natural gas. He concluded that there were 44.27 expense lead days for coal and oil, based upon the time between the service periods and payment dates or payment due dates for all coal and oil invoices from the Test Year. As to natural gas, he determined that there were 40.63 expense lead days, based upon a comparison of the service period and payment due dates and the payment dates from a random sample of gas invoices.[88] No party challenged this approach, and the ALJs find no reason to do so either.

*Purchased Power.* Mr. Joyce explained that there were two components to ETI's purchased power energy costs in the Test Year: (1) MSS-4 Purchases; and (2) Other Purchased Power (consisting of Joint Account Purchases, MSS-3 Purchases, Reserve Equalization, Cogeneration Purchases, Renewable Energy Credits, and Toledo Bend Purchases). Relying upon either the entire population or a sample from the Test Year (depending upon the category), Mr. Joyce concluded that there were 58.76 expense lead days for MSS-4, and 35.79 expense lead days for Other Purchased Power.[89]

---

[87] ETI Ex. 17 (Joyce Direct) at 11.

[88] *Id.* at 11 and JJJ-3.

[89] ETI Ex. 17 (Joyce Direct) at 12 and JJJ-3.

No party challenged the 35.79 day estimate for Other Purchased Power. However, on behalf of the Cities, Mr. Pous testified that the expense lead days for MSS-4 should be lengthened from 58.76 days to 60.65 days. According to Mr. Pous, Mr. Joyce made several errors in calculating the expense lead days for MSS-4 expenses. First, Mr. Joyce inadvertently placed the service period month after the billing month for two MSS-4 invoices. Mr. Pous based this conclusion on the fact that the expense leads for these two invoices are roughly 30 days shorter than the "vast majority" of the other invoices.[90] In response, Mr. Joyce denied that he erroneously placed the service period month after the billing month, and pointed out that Mr. Pous lacks any evidence to support his assertion. Instead, Mr. Joyce considered the entire population of MSS-4 invoices for the Test Year. Those invoices show payment lead days ranging from 30 to 120 days, with most points being near 30, 60, or 70 payment lead days. According to Mr. Joyce, this is reasonable and well within the range he has experienced in other rate cases.[91]

Mr. Pous testified that Mr. Joyce erred in calculating the expense lead days for MSS-4 expenses by considering only the payment due dates specified in the Entergy System Agreement, rather than also considering the actual payment dates. According to Mr. Pous, in four instances during the Test Year, extensions were granted to ETI to allow it to make MSS-4 payments after the deadline specified in the Entergy System Agreement. Therefore, Mr. Pous stated that the expense lead days for MSS-4 payments should have been calculated using the later of the actual payment date or the allowable payment period.[92] Mr. Joyce largely agreed with Mr. Pous on this point. That is, he agreed that the payment lead days should be based on the later of the paid date or the due date. However, he disagreed with some of Mr. Pous' calculations on this issue because Mr. Pous wrongly designated several due dates of Saturday or Sunday, when he should have selected Fridays as the due date.[93]

---

[90]  Cities Ex. 5 (Pous Direct) at 83-84.

[91]  ETI Ex. 54 (Joyce Rebuttal) at 26-28.

[92]  Cities Ex. 5 (Pous Direct) at 84.

[93]  ETI Ex. 54 (Joyce Rebuttal) at 28-29.

Next, Mr. Pous testified that Mr. Joyce erred in calculating the expense lead days for MSS-4 expenses by erroneously concluding that one invoice had been paid on the first of the month when, in fact, it had been paid on the 18th of the month.[94]  Mr. Joyce agreed with the change.[95]  Mr. Joyce then recalculated the expense lead days for MSS-4 and revised the number of lead days from 58.76 to 59.81.[96]

The ALJs conclude that ETI has met its burden as to show that there were 59.81 expense lead days for MSS-4, and 35.79 expense lead days for Other Purchased Power.

➢ *Other O&M Expenses*

This category of expenses was broken down in the lead-lag study into four groups – regular payroll costs, incentive payroll costs, affiliate service company costs, and all other O&M costs (such as materials, services, and so on).

*Regular Payroll Costs.*   The lead days for regular payroll costs were computed by determining the average days of service being reimbursed and adding the days between the end of each service period and the payments to employees.  This amount was then adjusted to incorporate the effects of vacation pay based upon actual ETI data.  By this method, Mr. Joyce determined the expense lead for regular payroll costs to be 20.68 days.[97]  No party challenged this approach, and the ALJs agree.

*Incentive Pay Costs.*  ETI has an annual employee incentive program in place.  Incentive payments for the year 2010 were made in the first quarter of 2011.  The lead days for incentive pay costs were based on the weighted days between the midpoint of the service period (*i.e.*, July 1, 2010) and the date the incentives were paid (March 10, 2011).  By this method, Mr. Joyce determined the

---

[94]  Cities Ex. 5 (Pous Direct) at 84.

[95]  ETI Ex. 54 (Joyce Rebuttal) at 29.

[96]  ETI Ex. 54 (Joyce Rebuttal) at JJJ-R-2.

[97]  ETI Ex. 17 (Joyce Direct) at 13 and JJJ-3.

expense lead for incentive pay costs to be 251.77 days.[98]    No party challenged this approach, and the ALJs agree.

*Affiliate Service Company Costs and Other O&M Costs*.  Charges from Entergy Services, Inc. (ESI) are paid in the month following the month in which the charges were incurred.  The lead days for affiliate service company costs were based on the number of days from the mid-month to the later of the contractual due date or the actual settlement date in the following month.  By this method, Mr. Joyce determined the expense lead for affiliate service company costs to be 39.64 days.[99]

The lead days for other O&M costs were based on a random sampling from the Test Year. Mr. Joyce originally determined the expense lead for other O&M costs to be 47.46 days.[100] However, to correct an error on his part, Mr. Joyce subsequently revised the expense lead time for other O&M costs down to 43.89 days.[101]

Mr. Pous testified that ETI's "FAS 106-related expenses" were wrongly included in either the affiliate service company costs or the other O&M costs.  FASB is the body that establishes the rules that constitute GAAP.  FASB's Statement Number 106 (FAS 106) establishes the standards for an employer's treatment of the non-cash retirement benefits it gives its employees.  Based on the action taken by the Commission in Docket No. 16705,[102] Mr. Pous believes that ETI's FAS 106 costs should have been separately identified and accounted for in the lead-lag study.  He contended

---

[98]  *Id*. at 14 and JJJ-3.

[99]  ETI Ex. 17 (Joyce Direct) at 15, and JJJ-3.

[100]  *Id*. at 15-17, and JJJ-3.

[101]  ETI Ex. 54 (Joyce Rebuttal) at JJJ-R-2.

[102]  *Application of Entergy Gulf States, Inc. for Approval of Its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs*, Docket No. 16705, (Oct. 13, 1998).

that, when those costs are properly accounted for, it results in an additional negative cash working capital of $3.8 million.[103]

Mr. Joyce contended that the prior Commission decision upon which Mr. Pous relies, Docket No. 16705, dates from 1996, is inapplicable to the facts in the present case, is outdated, and has been superseded by subsequent Commission decisions. Mr. Pous advocated a 312.55-day expense lead for FAS 106 expenses. However, Mr. Joyce pointed out that, during the Test Year, ETI made its FAS 106 payments to a trust at the end of each month, resulting in a one-half month payment lead (15.25 days). Mr. Joyce testified that his treatment of FAS 106 expenses in his lead-lag study is consistent with the approach that was approved by the Commission in a recent Oncor ratemaking case, Docket No. 35717.[104]

The ALJs conclude that ETI met its burden to show that there were 39.64 expense lead days for Affiliate Service Company Costs and 43.89 expense lead days for Other O&M Costs.

### (b) Expense Lead – Current Federal Income Tax Expense

As required by P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV)(-f-), Mr. Joyce calculated the lead days for federal income taxes by measuring the days between the midpoints of the annual calendar year service periods and the actual dates on which ETI made its estimated quarterly tax payments. By this method, Mr. Joyce determined the expense lead for current federal income tax costs to be 38 days. He then determined that this resulted in a $1.6 million cash working capital requirement associated with the Company's Federal Income Tax Expenses.[105]

Mr. Pous testified that the Company's cash working capital requirement for Federal Income Tax Expenses ought to be a negative number or, at most, zero. He bases this argument on his assertion that, during the past five years, the Company "has received in excess of a net $90 million of refunds" on its federal income taxes. In other words, because "refunds produce cash" for the

---

[103] Cities Ex. 5 (Pous Direct) at 85-88.

[104] ETI Ex. 54 (Joyce Rebuttal) at 29-32.

[105]  ETI Ex. 17 (Joyce Direct) at 17, and JJJ-3.

Company, Mr. Pous contends that the Company is seeking a positive cash working capital requirement for cash transactions "that have not been made and are not being made."[106]

Mr. Joyce responds by disputing Mr. Pous' contention that "refunds produce cash." Mr. Joyce points out that any refund from the IRS merely represents a return of the Company's own cash for payments previously made. Moreover, Mr. Joyce stresses that his approach for calculating the expense lead for current federal income taxes is perfectly consistent with: (1) the requirements of P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV)(-f-); (2) current IRS guidelines found at IRS Publication 542; and (3) Commission precedent. Mr. Joyce further points out that, by contrast, Mr. Pous' approach has been consistently rejected by the RRC.[107]    The ALJs find Mr. Joyce's arguments to be more persuasive on this point and conclude that ETI has met its burden as to show that the expense lead for current federal income tax costs it utilized in the lead-lag study is reasonable and appropriate.

The ALJs conclude that ETI met its burden to show that there were 39.64 expense lead days for Affiliate Service Company Costs and 43.89 expense lead days for Other O&M Costs.

### (c) Expense Lead and Lag – Taxes Other than Income Taxes

This group of taxes consists of: (1) payroll-related taxes; (2) ad valorem taxes; (3) Texas state gross receipts taxes; (4) the PUC assessment tax; and (5) Texas state franchise taxes. Calculating from the midpoints of the work periods to the respective payment dates of the taxes, Mr. Joyce determined that the payroll taxes had an expense lead time of 16.45 days. As to the franchise taxes, Mr. Joyce concluded that the Company had a collection lag of 46.42 days because the Company was required to pay the taxes in May 2010. As to the other non-payroll-related taxes, Mr. Joyce calculated from the midpoint of the period for which the tax was assessed to the payment date, resulting in the following expense lead days: 213.51 days for ad valorem taxes; 74.28 days for

---

[106]  Cities Ex. 5 (Pous Direct) at 88-89.

[107]  ETI Ex. 54 (Joyce Rebuttal) at 33-36, JJJ-R-1.

Texas state gross receipts taxes; and 225.50 days for the PUC tax.[108]  No party challenged this approach, and the ALJs agree.

### F.     Self-Insurance Storm Reserve [Germane to Preliminary Order Issue No. 5]

In Docket Nos. 16705 and 37744, the Commission authorized ETI to maintain a reasonable and necessary storm damage reserve account of $15,572,000.[109]  As of June 30, 1996, ETI had a positive reserve balance of $12,074,581, constituting a reduction to rate base.  Over the next 15 years, ETI charged $101,670,803 to the reserve related to more than 200 storms (excluding securitized events), but it accrued only $29,796,478 through base rates.  Thus, ETI's end-of-test-year balance for its storm damage reserve in the present case was a negative $59,799,744.[110]  This negative balance is an addition to rate base.[111]

OPC and Cities argue that ETI's current storm damage reserve negative balance should be adjusted.  OPC contends that ETI failed to prove that its storm damage expenses booked since 1996 were reasonable and prudently incurred, so it recommends disallowing all of those charges and refunding to customers the resulting positive balance that exceeds the authorized balance.  Alternatively, OPC suggests that ETI's negative balance be reset to its currently authorized balance, with no refund to customers.  Cities contend that ETI's current negative storm damage reserve balance should be reduced because it includes:  unreasonable expenditures associated with a 1997 ice storm; expenses associated with former assets in Louisiana; and amounts that Cities claim should have been treated as insurance deductibles.  Cities also recommend transferring ETI's Hurricane Rita Regulatory Asset to the storm damage reserve.  The parties' recommendations are summarized as follows:

---

[108]  ETI Ex. 17 (Joyce Direct) at 18-19, and JJJ-3.

[109]  Staff Ex. 4 (Roelse Direct) at 8.

[110]  $12,074,581 + $29,796,478 − $101,670,803 = ($59,799,744).

[111]  P.U.C. SUBST. R. 25.231(c)(2)(E).

| Party | Reserve Balance |
|-------|-----------------|
| ETI | ($59,800,000) |
| Cities | ($34,051,597) |
| OPC-1 | $41,871,059 |
| OPC-2 | $15,572,000 |

### 1.  The Effect of Prior Settled Cases

As with the Hurricane Rita Regulatory Asset (Section V.B.), the effect of the black-box settlements in Docket Nos. 34800 and 37744 is a significant issue concerning the storm damage reserve.  However, the parties' positions are generally reversed from the positions taken on the Hurricane Rita Regulatory Asset.  That is, ETI now argues that its storm reserve negative balance was resolved and approved in those settled dockets, while Cities and OPC argue that it was not.

ETI notes that the final orders in Docket Nos. 34800 and 37744 contained "stipulated and agreed upon" conclusions of law stating that overall total invested capital through the end of the test year in those cases met the requirements of PURA § 36.053(a) that electric utility rates be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.[112]  Then ETI cites language in P.U.C. SUBST. R. 25.231(c)(2)(E), which provides that any deficit in a self-insurance plan will be considered an increase to rate base, or invested capital.  As a result, ETI argues, the Commission could not make a determination that a rate base expense item was included in rate base as used and useful without also determining that the rate base expense was prudently and reasonably incurred.[113]  Thus, ETI asserts, a Commission conclusion of law that approved invested capital as meeting the requirements of PURA § 36.053(a) necessarily also determined that an expense included in rate base was prudently and reasonably incurred.  In other words, ETI states, the "prudent and reasonable" standard is incorporated into the "used and useful"

---

[112]  PURA § 36.053(a) provides: "Electric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service."

[113]  ETI cited: *City of Alvin v. Public Util. Comm'n of Texas*, 876 S.W.2d 346, 353-354 (Tex. App.—Austin, 1993, no pet.); *see also Application of Gulf States Utilities Company for Authority to Change Rates*, Docket Nos. 7195 and 6755, 14 P.U.C. BULL. 1943 at 1969 (May 16, 1998) ("dishonest or obviously wasteful or imprudent expenditures constitutionally can be excluded from a utility's rate base.  Such costs clearly are not used and useful in providing serviced to the public.").

standard in PURA § 36.053(a).[114]  Therefore, ETI argues that by issuing a final orders in Docket Nos. 34800 and 37744 with conclusions of law that ETI's overall total invested capital met the requirements of PURA § 36.053(a), the Commission implicitly approved the negative balances of its insurance reserve in both prior dockets; consequently, those orders preclude litigation in the present case of whether those expenses were prudently and reasonably incurred.[115]

Cities reject ETI's contention that the storm damage reserve balance was approved in Docket Nos. 34800 and 37744.  Cities point out that in order to comply with PURA, all final orders in rate cases must include a conclusion of law stating that the overall total invested capital through the end of the test year meets the requirements of PURA § 36.053(a).  However, Cities contend, pursuant to the parties' agreements in Docket Nos. 37744 and 34800, no determination was made as to what was included in ETI's total invested capital in those cases.  Cities explain that in Docket Nos. 37744 and 34800 Cities claimed that certain expenses were not properly included in the storm reserve balance, while ETI argues that they were.  However, neither Cities nor ETI's recommendation was specifically approved as part of the base rate settlement and neither of their recommended balances may be considered as the basis for setting rates in those dockets.[116]  Thus, Cities argues, in such "black box" settlements no specific storm reserve balance is approved unless expressly stated.  Cities also argues that the final orders in Docket Nos. 37744 and 34800 could just as logically be interpreted as denying ETI's request to include objectionable expenses in the storm damage reserve, because both orders specified that the revenue requirement approved in those cases did not include any prohibited expenses.  Finally, Cities states that adoption of ETI's arguments would make black-box settlements impossible in the future.[117]

---

[114]  ETI cited Docket No. 7195, 14 P.U.C. BULL. at 1969 ("the prudent investment test is embodied in traditional ratemaking principles as expressed through PURA Sections … 41."). PURA Section 41(a) is the predecessor to current Section 36.053.

[115]  ETI Initial Brief at 20-22; ETI Reply Brief at 17.

[116]  Docket No. 37744, Final Order at Ordering Paragraph 14; *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Docket No. 34800 at Ordering Paragraph 12.

[117]  Cities Reply Brief at 22-26.

OPC makes arguments similar to Cities, and notes that no storm damage reserve amount was either agreed to by the parties or approved by the orders in either Docket No. 34800 or Docket No. 37744.[118]

The ALJs find that the Commission did not implicitly approved all of ETI's storm damage expenses and its storm damage reserve balances in the final orders in Docket Nos. 34800 and 37744. Although the orders in those settled cases contained conclusions of law the that overall total invested capital through the end of the test year met the requirements of PURA § 36.053(a), the orders made no findings of what the total invested capital included, and specifically there were no findings or conclusions approving the amount of the storm damage reserve. As pointed out by Cities, in those dockets the intervenors disputed various items in ETI's requested storm damage reserve, but the "black box" settlement did not specifically address those issues; consequently, it is as logical to conclude that objectionable expenses were excluded from the storm damage reserve and from the total invested capital as it is to conclude that the objectionable expenses were included. In Section V.B., the ALJs conclude that ETI's Hurricane Rita regulatory asset should be considered as being included in the black-box settlement and final order in Docket No. 37744, even though the settlement and order did not expressly state how the Hurricane Rita regulatory asset issue was resolved. However, that issue involved unique circumstances and is distinguishable because PURA § 39.459(c) required the Commission to consider the insurance payments for the Hurricane Rita restoration expenses in ETI's next rate case, which was Docket No. 37744; ETI requested a true-up in that docket of the insurance proceeds it received concerning the regulatory asset; and no party objected to ETI's proposed regulatory asset or its proposed amortization. In contrast, intervenors in Docket Nos. 34800 and 37744 did object to ETI's proposed storm damage reserve and, under those circumstances, it is not possible to determine how the issues concerning the storm damage reserve were resolved by the black-box settlement. Therefore, the ALJs find that the black-box settlements and final orders in Docket Nos. 34800 and 37744 neither approved nor disapproved the reasonableness and necessity of ETI's storm damage expenses incurred since 1996 or ETI's current storm damage reserve negative balance.

---

[118] OPC Reply Brief at 7-8.

## 2. OPC's Proposed Adjustment

OPC witness Nathan Benedict testified that ETI failed to prove that any of its $101,670,803 in storm damage expense booked since 1996 was prudently incurred, so he recommended disallowing all of those charges and refunding to customers the resulting positive balance that exceeds the authorized balance. Removing those charges would leave ETI with a current positive storm reserve balance of $41,871,059 (beginning balance of $12,074,581 + accruals of $29,796,478). This balance exceeds the currently approved storm reserve balance of $15,572,000 by $26,299,059, and Mr. Benedict proposed that this surplus be refunded to rate payers at a rate of $1,314,953 per year for 20 years. Mr. Benedict acknowledged that some storm damage expenses incurred by ETI since 1996 likely were reasonable and necessary. Therefore, as an alternative proposal, Mr. Benedict suggested that ETI's current storm balance reserve be set at the last approved amount of $15,572,000 (*i.e.*, without any surplus or deficit). This proposal would result in a $75,363,744 reduction to ETI's current storm damage reserve negative balance and rate base.[119]

As discussed above, OPC disagrees with ETI's argument that the Commission implicitly approved these expenses in the final orders in Docket Nos. 34800 and 37744.[120] Therefore, OPC argues that ETI had to prove in the present case that the expenses were prudently incurred. Concerning ETI's burden of proof, OPC acknowledges that, although a utility has the ultimate burden to prove that its proposed rates are just and reasonable, once the utility establishes a *prima facie* case of prudence of a rate change, the burden shifts to the other parties to produce evidence to rebut that presumption. Then, if the other parties rebut the presumption, the burden shifts back to the utility to prove by a preponderance of the evidence that the challenged expenditures were prudent. However, OPC notes, if the utility fails to establish a *prima facie* case, the burden of going forward with evidence never shifts to the other parties.[121] In OPC's opinion, ETI never established a *prima facie* case because ETI's spreadsheet of storm damage expenses was excluded from evidence

---

[119] OPC Ex. 6 (Benedict Direct) at 6-16; OPC Initial Brief at 19.

[120] OPC Reply Brief at 7-8.

[121] OPC Reply Brief at 2-3, *citing, Entergy Gulf States, Inc. v. Public Utility Comm'n*, 112 S.W.3d 208 (Tex. App. – 2003, pet. denied).

and ETI witness Greg Wilson acknowledged on cross examination that he made no analysis of whether ETI's storm damage costs were reasonable and necessary.[122]

ETI complains that Mr. Benedict simply sought a global rejection of more than $100 million of expenses without any evidence to support his position, and it stressed that even Mr. Benedict acknowledged that some of ETI's expenses were prudently incurred. ETI also states that, in any event, it met its burden of proof with regard to expenses booked to the storm damage reserve.

Concerning its proof, ETI states that its burden was to make a *prima facie* case supporting the prudence of its invested capital,[123] and once it made that showing, the burden shifted to the opposing parties to overcome the presumption of prudence by presenting evidence that reasonably challenged the expenditures.[124] This is the same position as OPC. ETI argues that it met its burden to prove a *prima facie* case.[125] ETI notes that it provided storm cost data accompanied by narrative testimony that supported the reasonableness of ETI's self-insurance plan; storm preparedness and response; service quality; and cost of labor, materials, and services used to carry out distribution activities (including system restoration). For instance, ETI states, it presented its proposed storm reserve balance through the direct testimony of Mr. Greg Wilson[126] and in the Commission's rate filing package.[127] Mr. Wilson also explained the function of ETI's self-insurance program, described the $50,000 threshold to exclude minor weather events, and provided work papers detailing the nominal and trended losses for each storm booked to the reserve since 1986, as well as annual and total loss levels.[128]

---

[122]  OPC Reply Brief at 1-5.

[123]  ETI Initial Brief at 22, *citing, Application of Texas Utilities Electric Company for Authority to Change Rates*, Docket No. 9300, 17 P.U.C. BULL. 2057, 2148, Order on Rehearing (Sept. 27, 1991).

[124]  Docket No. 9300, 17 P.U.C. BULL. at 2148.

[125]  Although ETI contended that the storm damage reserve has been approved in prior dockets, it argued that its evidence also supported storm damage charges going back to July 1, 1996. ETI Initial Brief at 23, n. 147.

[126]  ETI Ex. 14 (Wilson Direct) at 11.

[127]  ETI Ex. 3 (Schedules) at Schedule B-1, line 7; Schedule WP_B-1, page 7.

[128]  ETI Ex. 14 (Wilson Direct) at 5-7; WP GSW-3_1.

Further, ETI witness Shawn Corkran presented testimony regarding subject matters that directly support the ability of the system to withstand storms, and ETI's ability to reasonably and efficiently respond to storm events, thereby supporting the conclusion that reasonable and necessary costs are booked to the storm reserve balance. This evidence included ETI's distribution operations, industry-recognized comprehensive storm plans, annual storm drills, storm response and restoration processes, distribution maintenance and asset improvement processes, service quality and continuous improvement programs, and vegetation management practices. ETI points out that Mr. Corkran also described how it prepares for emergency situations,[129] and Mr. Corkran explained how charges to the storm reserve are captured and recorded.[130] Mr. Corkran also noted that ETI has received either the Edison Electric Institute's Emergency Assistance Award or Emergency Response Award every year since 1998, which recognize ETI's exemplary storm restoration response.[131] Likewise, Mr. Corkran discussed ETI's reliability statistics since 2000, which demonstrated a high quality of service,[132] and he provided four exhibits demonstrating that, on both per-kilowatt-hour (kWh) and per-customer bases, ETI's distribution O&M costs compared favorably to the costs of other utilities.[133] In ETI's opinion, because it carried out its distribution activities in the same efficient and cost-effective manner while performing routine activities as during storm restoration, those metrics and reliability statistics support the reasonableness of costs booked to the reserve.[134]

ETI also argues that it supported the reasonableness of the costs booked to its storm reserve through the direct testimony of its supply chain witness, Mr. Joseph Hunter. Mr. Hunter explained that ETI's procurement policies and procedures are designed to streamline the acquisition of materials and services through the use of strategic supply networks in order to achieve the lowest reasonable cost.[135] Mr. Hunter also described how the centralization of the supply chain function on

---

[129] *Id.* at 28.

[130] *Id.* at 93.

[131] *Id.* at 29.

[132] *Id.* at 12-29.

[133] *Id.*, Exhibits SBC-2A, SBC-2B, SBC-2C, and SBC-2D.

[134] ETI Initial Brief at 22-24.

[135] ETI Ex. 16 (Hunter Direct) at 5, 9-10, and Exhibits JMH-1(Entergy Companies' Procurement Policy) and JMH-3 (Entergy Companies' Approval Authority Policy).

a system-wide basis provides greater leverage and buying power in the procurement of materials and, thus, lower costs than could be achieved by ETI alone.[136] Furthermore, Mr. Hunter specifically noted that the standardization of supply chain activities "makes possible a smoother day-to-day operation as well as *rapid response to major storms or emergencies*."[137]

Finally, ETI stated that it provided an extensive amount of storm reserve data through the discovery process, which provided a basis for any interested party to investigate the reasonableness of any particular storm response or expenditure booked to the reserve. It stressed that OPC witness Benedict acknowledged that ETI provided 420 pages and over 22,220 lines of detail reflecting every charge to the storm reserve over the last 15 years,[138] which specified the month, year, state, project code, work order type, function, storm name, account number, resource code, resource code description, and amount.[139] Therefore, ETI argues that it made a *prima facie* case regarding its storm reserve through the presentation of narrative testimony, schedules, work papers, and expense detail and, accordingly, the burden shifted to parties seeking to disallow the expenses allocated to the storm damage reserve to present evidence that reasonably challenges their prudence.[140] Yet, ETI contends, OPC did not challenge any specific expenditure booked to the reserve other than the 1997 ice storm expenses discussed later. Therefore, ETI argues that it met its *prima facie* burden and OPC's proposed disallowance of either $101,670,803 or $75,363,744 should be denied.[141]

Although it is a close call, the ALJs find that ETI established a *prima facie* case that its storm damage expenses incurred since June 30, 1996, were prudently incurred. A *prima facie* case is a low burden. It is not the same as a preponderance of the evidence. Rather, as stated in *Town of Fairveiw v. City of McKinney, prima facie* evidence "is merely that which suffices for the proof of a particular

---

[136] ETI Ex. 16 (Hunter Direct) at 17.

[137] *Id.* at 18 (emphasis added).

[138] Tr. at 1703.

[139] Tr. at 1704.

[140] Docket No. 9300, 17 P.U.C. BULL. at 2147.

[141] ETI Initial Brief at 22-26; ETI Reply Brief at 16-19.

fact until contradicted and overcome by other evidence."[142]   Similarly, Black's Law Dictionary defines a *prima facie* case as sufficient evidence "to allow the fact-trier to infer the fact at issue and rule in the party's favor."[143]

Except for expenses incurred with the 1997 ice storm, ETI did not present any testimony that explicitly stated that the expenses included in its storm damage reserve were prudently incurred. However, ETI did present sufficient other evidence that at least allows the ALJs to infer that the expenses were prudently incurred.  As noted above, a reasonable inference from the evidence presented is sufficient to establish a *prima facie* case.  ETI witness Gregory Wilson presented testimony about the background of the storm damage reserve and about ETI's yearly major storm damage losses, although OPC is correct that he did not explicitly evaluate or determine whether ETI's expenses were reasonable and necessary.[144]   In addition, OPC witness Benedict provided testimony that ETI has booked $101,670,908 to the storm damage reserve since 1996,[145] and that ETI's $50,000 threshold is a means of excluding from the reserve small storm-related expenses that ETI could anticipate as routine O&M expense and which should be excluded from the storm damage reserve.[146] ETI presented testimony that it had not recorded storm damage expense to both the storm damage reserve and to O&M expense,[147] and Mr. Benedict agreed that he had no information to contradict this[148] or that any securitized costs were charged to the storm damage reserve.[149] Although the document itself was excluded from evidence, Mr. Benedict testified that ETI provided him with a 420-page spreadsheet covering all of ETI's storm damage expenses back to 1996, including the month, year, state, project code, project name, work order type, function, storm name, account number, resource code, resource code description, and amount.[150] In addition, ETI provided

---

[142]   271 S.W.3d 461, 467 (Tex. App. – Dallas 2008 pet. denied).

[143]   Black's Law Dictionary, 8th Ed. (2004).

[144]   ETI Ex. 14 (Wilson Direct) at Ex. GSW-3.

[145]   OPC Ex. 6 (Benedict Direct) at 7-8.

[146]   Tr. at 1694.

[147]   ETI Ex. 72 (Wilson Rebuttal) at 2-3.

[148]   Tr. at 1695-1696.

[149]   Tr. at 1698.

[150]   Tr. at 1704.

other testimony described previously concerning its distribution operations, storm plans, storm response operations, purchasing procedures, and the like.

ETI did not present a witness who specifically testified that all of its storm damage expenses booked to the storm damage reserve were prudently incurred, except for expenses related to the 1997 ice storm. Such testimony would have been more helpful than the evidence ETI relied upon. Nevertheless, the burden of establishing a *prima facie* case does not require such direct testimony, if a fact can be reasonably inferred from other evidence presented. The ALJs reiterate that it is a close call, but they find that ETI did present sufficient evidence to infer that the expenses charged to the storm damage reserve were prudently incurred. At that point, the burden shifted to OPC to produce evidence to challenge specific expense items included in the storm damage reserve, but OPC did not present any such evidence except for the items discussed below. Therefore, the ALJs recommend that the Commission not adopt either of OPC's recommended denials of expenses contained in ETI's storm damage reserve.

### 3.  1997 Ice Storm

ETI's proposed negative storm reserve balance includes $13,014,379 in expenditures associated with a 1997 ice storm. Cities and OPC contend that this expense should be excluded from the storm balance reserve.

Cities witness Pous explained that ETI first requested to include the 1997 ice storm expense in the storm damage reserve as a post test year adjustment in its 1995-1996 test-year rate case, Docket No. 16705. The Commission denied the requested post test year adjustment and stated that the expense should be considered in ETI's next rate case. Thereafter, ETI had a series of rate cases (Docket No. 20150 – 1998 rate case; Docket No. 30123 – 2004 rate case; Docket No. 34800 – 2007 rate case; Docket No. 37744 – 2009 rate case) in which intervenors challenged the 1997 ice storm expenses, but those cases all settled or were otherwise concluded without any express decision concerning the prudence of ETI's 1997 ice storm expenses.[151] Mr. Pous testified that these expenses

---

[151] Cities Ex. 5 (Pous Direct) at 49-55.

are now appropriately at issue in the present case, and he recommended that the entire balance be excluded from the storm damage reserve. He pointed out that in Docket No. 18249, the Commission found that ETI's poor quality of service exacerbated the extent of damage caused by the storm, and it found that the response efforts were uneven and delayed and could have been more effective if ETI had a better communication and management program in place.[152] Mr. Pous also contended that in the present case ETI failed to prove that any portion of the 1997 Ice Storm expenses were reasonable.[153]

Thus, Cities argue that the Commission has already determined that ETI's negligence was a major factor in the extent and duration of the outages,[154] so no expenses associated with the 1997 ice storm should be eligible for recovery from customers through the storm damage reserve. In response to ETI's argument that it was already penalized for these issues in Docket No. 18249 through a reduction to the allowed ROE, Cities argue that the Commission did not absolve ETI from responsibility for damage caused by ETI's poor service quality, and ETI's customers should not be ordered to pay for expenses that were caused by ETI's negligence.[155]

OPC makes the same arguments as Cities concerning the 1997 ice storm expenses.[156]

ETI argues that, due to quality of service issues related to the 1997 ice storm, the Commission reduced Entergy Gulf States, Inc.'s (EGSI) ROE by 60 basis points in Docket No. 18249 and subjected EGSI to significant spending requirements and quantified performance guarantees. In ETI's opinion, it would be inequitable to now penalize ETI a second time for the same issues. Moreover, ETI argues that it established that its expenses were reasonable and necessary. ETI witness Shawn Corkran testified that the 1997 ice storm was the most destructive

---

[152] *Entergy Gulf States, Inc. Service Quality Issues Severed From Docket No. 16705*, Docket No. 18249, Final Order at FoF 97, 98, & 102 (Apr. 21, 1998).

[153] Cities Ex. 5 (Pous Direct) at 56-59; *see* Cities Initial Brief at 18-19.

[154] Cities Initial Brief at 18 ("The Company's failure to clear the limbs before the storm was a major factor in the number and duration of outages experienced by customers.").

[155] Cities Reply Brief at 28-30.

[156] OPC Ex. 6 (Benedict Direct) at 12; OPC Initial Brief at 16; OPC Reply Brief at 7-10.

winter storm ever to hit the EGSI/ETI system, with about 3,400 miles of distribution lines and 560 miles of transmission lines de-energized during the storm's peak. A large part of the restoration effort involved clearing broken and fallen trees and tree limbs from lines. Mr. Corkran reviewed all of the costs incurred in response to the 1997 ice storm and stated that they were reasonable and necessary to reliably restore service to customers as quickly as possible after the storm. He provided an exhibit with a detailed breakdown of labor, materials, transportation, lodging, and other expenses incurred. In his opinion, all of these costs charged to the storm damage reserve, totaling $13,014,379, were reasonable, necessary, and prudently incurred.[157]

The ALJs recommend that the Commission authorize ETI to include in the storm damage reserve its $13,014,379 in expenditures associated with the 1997 ice storm. ETI established that those expenses were reasonable and necessary to repair the damage and restore power to its customers. ETI witness Mr. Corkran provided detailed testimony concerning the seriousness of the storm and the resulting expenses incurred for repair work and restoration of power to customers.[158]

In contrast, Cities and OPC did not challenge any specific item in these restoration expenses. Instead, they relied upon the Commission's findings in Docket No. 18249 that ETI's deficient maintenance exacerbated the amount of damage caused by the storm. However, in that docket the Commission also reduced ETI's ROE by 60 basis points due to poor service issues, including deficient preventative maintenance. The Commission made the reduction in ROE retroactive and required ETI to make refunds to customers. Likewise, in that docket the Commission found that the ice storm was severe and that significant damage would have occurred even with exemplary vegetation management and other preventative measures. It is not feasible to accurately determine now what portion of ice storm damage that occurred 15 years ago was caused by preventative maintenance issues.

The ALJs conclude, however, that the Commission's retroactive reduction of ETI's ROE in Docket No. 18249 in part compensated ratepayers for the poor service issues that exacerbated the

---

[157]  ETI Ex. 48 (Corkran Rebuttal) at 2-12.

[158]  ETI Ex. 48 (Corkran Rebuttal) at 2-12 and Ex. SBC-R-1.

storm damage.  Nevertheless, once the ice storm occurred, ETI had to take appropriate action to repair the damage and restore service.  ETI has established the expenses incurred in those efforts were reasonable and necessary, and the ALJs find that they should be included in the storm damage reserve. Therefore, the ALJs recommend that the Commission deny Cities and OPC's proposed adjustment.

### 4.  Jurisdictional Separation Plan Allocation

Cities complained that ETI's storm damage reserve deficit includes $12,498,325 in costs that belong to Louisiana jurisdiction customers but were incorrectly transferred to Texas customers during implementation of the Jurisdiction Separation Plan.  Cities explain that before the jurisdictional separation of EGSI into ETI and Entergy Gulf States Louisiana, LLC (EGSL), the transmission investment and expense associated with maintaining the transmission system, including storm restoration costs, was allocated between the Texas and Louisiana retail jurisdictions.  In the jurisdictional separation of EGSI into ETI and EGSL, the transmission system investment was split between each company based upon a situs basis.  The transmission facilities in Texas were transferred to ETI and the transmission facilities in Louisiana were transferred to EGSL.  After the jurisdictional separation, ETI and EGSL were each responsible for future O&M expense, including storm restoration expense, associated with their respective transmission investments.

Cities claim that in the present case ETI has attempted to reverse the allocation of expenses incurred on behalf of Louisiana customers before the jurisdictional separation and to charge those expenses to Texas customers through the storm damage reserve.  In Cities' opinion, any expense that was allocated to Louisiana customers prior to the jurisdictional separation was properly charged to Louisiana customers.  Cities argue that ETI may not now reverse expenses allocated to Louisiana customers and charge them to Texas customers solely on the basis that ETI acquired the transmission investment located in Texas.[159]

---

[159] Cities Ex. 5 (Pous Direct) at 59-60; Cities Initial Brief at 19-20.

In response, ETI witness Considine explained that an analysis of storm reserve charges was preformed prior to the jurisdictional separation to determine if storm charges were incurred for Texas or Louisiana property.  The reclassification of certain charges was made as a result of that analysis, which is in evidence, to properly reflect the state in which the storm charges were incurred.  The largest charge assigned to ETI through this analysis was a $10,652,130 charge related to project "E2PPSJ8291 Trans EGSI-TX Hurricane Rita 9-24-05," which expressly related to damages to the Texas portion of the former EGSI transmission system.  Similarly, costs were assigned from ETI to EGSL for projects such as "E2PPSJ8296 Trans. Hurricane Katrina - EGSI-La" and "E2PPSJ8302 Trans EGSI-LA Hurricane Rita 9-24-05," that clearly related to assets located in Louisiana.  In other words, prior to the separation, the Texas portion of the storm damage reserve could include charges for restoration work performed on assets located in Louisiana, and vice versa.  The analysis conducted pursuant to the separation re-aligned the charges to the jurisdiction where the assets are located.  In that way, ETI argues, neither jurisdiction has charges in its storm reserve balance for assets located in the other jurisdiction.  In short, ETI argues that the assets and liabilities following the separation have been properly assigned and no improper cost shifting occurred.[160]

The ALJs recommend that the Commission deny Cities' proposed adjustment.  ETI offered evidence to explain how its reclassification study reassigned various costs from the Texas jurisdiction to Louisiana, as well as from the Louisiana jurisdiction to Texas.  This study resulted in more expenses from Louisiana being reassigned to the Texas jurisdiction than from Texas to Louisiana, but Cities offered no evidence to explain why the study was flawed or why the reassignments were in error.  The ALJs found ETI's evidence to be credible and that it supported the jurisdictional allocation of these expenses as proposed by ETI.

## 5.  $50,000 Reserve Threshold

Cities witness Pous also proposed a $10,950,000 reduction to ETI's negative storm damage reserve balance due to ETI including in the reserve the first $50,000 of expense for each separate storm event.  Mr. Pous asserted that this amount is equivalent to a deductible for insurance purposes

---

[160] ETI Ex. 46 (Considine Rebuttal) at 25 and Ex. MPC-R-3 at 25; ETI Initial Brief at 19-36; ETI Reply Brief at 20-21.

and should have not been charged to the reserve. Cities note that P.U.C. SUBST. R. 25.231(b)(1)(G) requires that a storm reserve only collect for "property and liability losses which occur, and which could not have been reasonably anticipated and included in operating and maintenance expenses." Because of ETI's low $50,000 threshold, Cities contend, ETI has recorded to the storm reserve expenses associated with 219 different weather events in the past 15 years. This equates to approximately 14.6 weather events per year, or 1.2 weather events per month, on average. In Cities' view, ETI's booking to the storm damage reserve of all expenses associated with a weather event exceeding $50,000 – including the first $50,000 – is inconsistent with P.U.C. SUBST. R. 25.231(b)(1)(G). Cities argue that ETI may not reasonably claim that such a recurring expense is "not reasonably anticipated" to qualify it for the storm reserve. Cities proposed adjustment is based on $50,000 for each of the 219 storm events, for a total of $10,950,000. In addition, based on the nature of ETI's recurring storm expense, Cities also recommend that the deductible amount be increased to $500,000, which Cities stated is consistent with the storm reserve treatment afforded to other utilities in Texas.[161]

ETI witness Gregory Wilson testified that Mr. Pous misconstrued the $50,000 trigger when he treated it as a deductible. Mr. Wilson explained that if a storm causes $50,000 or less in damage, the expenses are not charged to the storm damage reserve. However, if a storm causes more than $50,000 in damage, all of the expenses are charged to the reserve. He noted that if the $50,000 were treated as a deductible, then that amount would still be charged to O&M whenever storm damage exceeded the $50,000 threshold. But, under the current arrangement, when storm damage exceeds $50,000 all of the expenses are charged to the storm damage reserve, and the first $50,000 is not charged to O&M. Therefore, no double recovery occurs. Moreover, ETI argues that Cities' proposed retroactive removal of these amounts from the reserve would constitute a disallowance of costs without any finding of imprudence, as well as impermissible retroactive ratemaking. ETI also contends that even if the Commission were to implement Mr. Pous's recommendation prospectively, it would require a corresponding increase in ETI's O&M costs. Therefore, ETI disagreed with

---

[161] Cities Ex. 5 (Pous Direct) at 61-63; Cities Initial Brief at 20-21.

Cities' recommendation to reduce the current balance of the storm damage reserve by $10,950,000 or to change the current level of the threshold.[162]

The ALJs find that Cities' proposed adjustment to ETI's storm damage reserve is not warranted. ETI explained that the $50,000 threshold amount was included in the storm damage reserve whenever storm restoration expenses exceeded the threshold, but that amount was not included in O&M expense. Accordingly, no double recovery has occurred, and Cities presented no other valid reason to disallow the allocation of these expenses to the storm damage reserve. Therefore, the ALJs recommend that the Commission deny Cities' proposed $10,950,000 adjustment to ETI's current storm damage reserve balance. As a policy matter, the Commission may choose to increase ETI's threshold on a prospective basis to some higher amount, as recommended by Cities, but the evidence presented by the Cities on this issue was not sufficient for the ALJs to make such a recommendation.

### 6. Hurricane Rita Regulatory Asset

As discussed in Section V.B., Cities recommend an adjustment to the Hurricane Rita regulatory asset, and they recommended the adjusted balance be moved to the storm damage reserve. For the reasons stated in Section V.B., the ALJs recommend that the Commission not adopt Cities' proposal to move the Hurricane Rita regulatory asset to the storm damage reserve.

### 7. Conclusion

In conclusion, the ALJs find that ETI's storm damage expenses since 1996 and its storm damage reserve balance were not approved by the Commission as a result of the black-box settlements in Docket Nos. 34800 and 37744. The ALJs also find that ETI established a *prima facie* case concerning the prudence of its storm damage expenses incurred since 1996 and that intervenors' proposed adjustments should be denied. Therefore, the ALJs recommend that the Commission approve ETI's test-year-end storm reserve balance of negative $59,799,744.

---

[162] ETI Ex. 72 (Wilson Rebuttal) at 2-3; EIT's Initial Brief at 27-28; ETI Reply Brief at 21-22.

### G.     Coal Inventory

ETI is the partial owner of two coal-fired power generating facilities.  It owns a 29.75 percent interest in Nelson 6, a 550 megawatt (MW) unit located in Westlake, Louisiana (Nelson), and a 17.85 percent interest in Big Cajun II, Unit 3, a 588 MW unit located in New Roads, Louisiana (BCII/U3).  EGSL is the majority owner and operator of Nelson and is responsible for the supply and delivery of coal to that facility.  A third party, LaGen, is a co-owner of BCII/U3, and is the operator of the plant.  Pursuant to a joint operating agreement between the co-owners, LaGen is responsible for the acquisition and delivery of coal to BCII/U3.  The coal for both units comes, via train, from minefields in Wyoming.[163]

Entergy has adopted a "Coal Inventory Policy" at Nelson to ensure that a sufficient coal inventory is always maintained on-site to help mitigate transportation and unit operating risks.  The policy calls for, among other things, a 12-month average inventory target of a 43-day supply of coal.  Because Entergy is not the operator of BCII/U3, it does not have ultimate control over the coal inventories at that unit.  Pursuant to the joint operating agreement for that unit, however, each year ETI nominates for the next calendar year the level of coal to be delivered for its account at BCII/U3.  ETI's nomination process is targeted to ensure an end-of-year inventory target of a 43-day supply of coal.[164]

In its application, ETI includes a coal inventory amount in its rate base that is based upon the average inventories at Nelson and BCII/U3 for the 13 months ending in June 2011.[165]  The average coal inventory at Nelson was 384,860 tons, representing approximately 48 days of inventory, assuming an average daily burn rate of 8,000 tons.  The total proposed dollar amount for the coal inventories at both facilities is $9,846,037.  Of that total, the Nelson portion is $6,040,926, and the

---

[163]   ETI Ex. 33 (Trushenski Direct) at 3-4.

[164]   ETI Ex. 33 (Trushenski Direct) at 30-31.

[165]   ETI Ex. 68 (Trushenski Rebuttal) at 2.  Notably, the amount ETI is seeking in its Rate Base is calculated upon a 13-month average ending June 2011 (the last month of the Test Year), even though that amount is slightly *less* than the 12-month average for the Test Year.

BCII/U3 portion is $3,805,111.[166] ETI witness Ryan Trushenski, the Manager of the Solid Fuel Supply Group for ESI, testified that the coal inventory levels that were maintained at Nelson and BCII/U3 during the test year were reasonable and the costs incurred to maintain those levels were reasonable.[167]

Cities do not challenge the reasonableness of the Company's 43-day inventory targets. Rather, Cities point out that the size of the actual inventory that was maintained on-site at Nelson during the Test Year exceeded the Company's inventory target level. Therefore, Cities contend that customers should not be forced to pay for inventory levels exceeding a 43-day supply (the amount that the Company determined, through its Coal Inventory Policy, to be a reasonable and necessary inventory to maintain on-site). According to Cities' witness, Karl Nalepa, a 43-day inventory of coal at Nelson would equate to 340,000 tons. He recommends that the value of a 43-day supply of coal be included in the rate base, but that $1,451,415 be excluded from the rate base to account for inventory at Nelson that was in excess of the 43-day supply.[168]

The evidence shows that the Company's inventory "target" was a 43-day supply, while actual inventories during the Test Year averaged around a 48-day supply. Mr. Trushenski pointed out, and the ALJs concur, that the 43-day "target" was never intended to represent a hard and fast figure from which no deviations could be allowed. Rather, the target merely represents an operational planning tool. Moreover, there are many real-world factors – such as train cycle times, coal burn rates, and so on – that can cause the actual coal inventory to fluctuate over time.[169] The ALJs conclude that the 48-day coal inventory was acceptably close to the 43-day target and was not unreasonable. The total proposed dollar amount for this coal inventory is $9,846,037. The ALJs conclude that the full value of the coal inventory was reasonable and should be included in rate base.

---

[166] ETI Ex. 68 (Trushenski Rebuttal) at 2, and 3 at WP/P RB 4.2.

[167] ETI Ex. 33 (Trushenski Direct) at 30-31.

[168] Cities Ex. 6 (Nalepa Direct) at 28-29, 6C and 6E.

[169] ETI Ex. 68 (Trushenski Rebuttal) at 4.

### H.     Spindletop Gas Storage Facility

ETI relies upon a variety of fuel types to generate electricity.  A major fuel component is natural gas.  However, energy generated from natural gas typically has the highest marginal cost and, therefore, it is most often the last resource deployed to generate electricity.  The fluctuation of natural gas demand resulting from the changes in instantaneous demand is known as "swing." Although a portion of the system's base load requirement is met with natural gas, the primary role of natural gas is as a swing fuel on the system.[170]

Since 2004, ETI has owned and used the Spindletop Facility.  ETI, through a third-party operator, uses the Spindletop Facility to maintain a natural gas inventory that can be used to supply ETI's Sabine Station and Lewis Creek power generating facilities.  Spindletop consists of two salt-dome storage caverns (and associated equipment) located near Sabine Station.[171]  The Spindletop Facility serves a function similar to that of a city water tower – it enables ETI to buy natural gas at one point in time, store it, and use it at some future point when supplies are not available elsewhere or when peak needs cannot otherwise be met.  ETI maintains that the primary benefit of the Spindletop Facility is that it provides: (1) supply reliability; and (2) swing flexibility. "Supply reliability" means that the facility can provide a reliable supply of gas for Sabine Station and Lewis Creek during potential gas supply curtailments, such as can occur during hurricanes, freezes, or other unusual events.  In a worst-case scenario, the Spindletop Facility is capable of providing 100 percent of the fuel requirements for all five units at Sabine Station and one Lewis Creek unit for four days at 70 percent of capacity.  The Spindletop Facility also allows the Company to avoid almost all intra-day gas purchases for Sabine Station.  This is important because intra-day purchases tend to be more expensive than longer-term purchases.[172]

Because major supply disruptions are more likely to occur during hurricane season and during the winter, ETI manages its gas inventories conservatively during the period from June through March in order to ensure that it can provide a reliable supply of fuel to meet peak generation

---

[170]  ETI Ex. 28 (McIlvoy Direct) at 7.

[171]  *Id.* at 31.

loads for four consecutive days. During the remainder of the year, ETI will consider withdrawing gas from the Spindletop Facility when the current day spot market price is higher than the replacement cost for the gas, as determined by future market indicators. Conversely, ETI injects gas into the Spindletop Facility when the cost of gas in the current market is less than the price of gas in the futures market.[173] For these various reasons, ETI witness Karen McIlvoy, who is employed as the manager of ESI's Gas & Oil Supply Group, testified that that Spindletop Facility is used and useful for providing reliable, economical service to ETI's customers.[174] ETI witness Devon Jaycox, who is employed as the manager of ESI's Operations and Planning Group, testified that the Company is always evaluating how much reliability the Spindletop Facility can provide as compared to other options. He explained that, at Sabine Station, there is no other option that can provide ETI with the same level of reliability and flexible swing service that the Spindletop Facility provides.[175]

Cities are critical of the Spindletop Facility, contending that the costs of operating it outweigh the benefits gained from it. No other party challenged ETI's use of the Spindletop Facility. Cities' witness Karl Nalepa testified that it costs ETI $13,219,097 per year to operate the gas storage facility, whereas the Company could achieve the same supply reliability and swing flexibility benefits it gets from the Spindletop Facility through other gas supply options at a cost of only $1,724,659, thereby saving its customers $11,494,438. Thus, Mr. Nalepa stated that it is imprudent for ETI to continue operating the Spindletop Facility.[176]

Mr. Nalepa testified that no other Entergy operating company owns or leases its own gas storage facility, yet those other companies are able to satisfy their needs for supply reliability and swing flexibility through other methods, such as existing gas supply and transportation contracts, at much lower costs. According to Mr. Nalepa, those other companies obtain supply reliability and swing flexibility through the use of monthly, daily, and intra-day natural gas supply contracts. In

---

[172] ETI Ex. 28 (McIlvoy Direct) at 32-33; ETI Initial Brief at 39, n. 264.

[173] ETI Ex. 28 (McIlvoy Direct) at 33-34.

[174] *Id.* at 37.

[175] Tr. at 966.

[176] Cities Ex. 6 (Nalepa Direct) at 18-20; Cities Ex. 6B (Errata No. 2).

support of this claim, he pointed to one of the operating companies, EGSL, as an example. He pointed out that EGSL has no firm transportation contracts, no firm supply contracts, and no fuel oil back-up at its generating plants. Thus, Mr. Nalepa stated that the only cost incurred by EGSL for reliability and flexibility is the commodity cost of the natural gas it purchases. Mr. Nalepa testified that EGSL achieves the same level of service as ETI without incurring the large cost of the Spindletop Facility.[177]

Mr. Nalepa asserted that the long-term gas supply contract that ETI recently entered into with Enbridge Pipeline, L.P. (the Enbridge Contract) will help provide the Company with increased supply reliability because the gas supplied by Enbridge will come from production areas that are less susceptible to hurricane-related disruptions. Mr. Nalepa also noted that ETI could meet its swing flexibility requirements through use of spot gas purchases, its operational balancing agreement with the TETCO pipeline, and other pipeline companies, such as the Copano Pipeline that serves Lewis Creek.[178]

Mr. Nalepa also disputed ETI's contention that the Spindletop Facility serves as a valuable protection against extreme events such as hurricanes, by noting that the Spindletop Facility was out of service for almost two weeks in 2005 following Hurricane Rita.[179]

As noted above, Mr. Nalepa testified that it cost ETI $13,219,097 to operate the Spindletop Facility in the Test Year. Mr. Nalepa estimated that the sum of the Test Year withdrawals of gas from the Spindletop Facility equaled 8,560,604 MMBtu. He then divided his total estimated cost of the facility ($13,219,097) by his total estimated withdrawals of gas (8,560,604 MMBtu) to calculate an "all-in per unit rate" of $1.54 per MMBtu. He asserted that, by contrast, transportation costs on various gas pipelines connected to Sabine and Lewis Creek ranged from $0.025 to $0.22 per MMBtu. Mr. Nalepa estimated $0.18 per MMBtu as the average replacement cost that ETI would incur in transportation contracts if it were to stop using the Spindletop Facility and achieve the same

---

[177] Cities Ex. 6 (Nalepa Direct) at 22-23.

[178] Cities Ex. 6 (Nalepa Direct) at 25.

[179] *Id.* at 23-24.

level of supply reliability and swing flexibility through the use of gas supply contracts. By multiplying $0.18 times 8,560,604 MMBtu, he estimated that the benefits of the Spindletop Facility could have been achieved through other means at a cost of only $1,724,659. Thus, Mr. Nalepa recommended that $7,794,202 should be removed from ETI's base rate, and $5,424,895 should be excluded as an eligible fuel expense.[180]

ETI disagrees with essentially all of Mr. Nalepa's points and responds to his testimony on a number of fronts. Perhaps foremost, ETI points out that Mr. Nalepa's main premise – that ETI's customers pay all the costs of the Spindletop Facility while the other Entergy operating customers avoid those costs – is simply incorrect. According to ETI witnesses, 57.50 percent of the costs associated with the Spindletop Facility are billed to EGSL as part of the MSS-4 billing process between ETI and EGSL for its "legacy plants,"[181] and another 2.4 percent of the costs are passed on to other Entergy operating companies through the MSS-3 agreement. Only 40.1 percent of the Spindletop Facility costs are borne by ETI customers.[182] Thus, Mr. Nalepa's calculations greatly overstate the costs of the Spindletop Facility that are borne by ETI customers and greatly understate the costs that are borne by EGSL customers. ETI witness Considine also pointed out that the Commission has consistently and repeatedly concluded that the Spindletop Facility is used and useful and, therefore, has allowed ETI and its predecessors to recover the costs associated with the Spindletop Facility.[183]

Ms. McIlvoy also testified that, contrary to Mr. Nalepa's testimony, the conditions under which the other Entergy operating companies operate are so different from the conditions under which ETI operates that it makes no sense to assume they have similar supply reliability and swing flexibility needs. For example, EGSL and ETI both own roughly the same generating capacity from

---

[180] *Id.* at 24-27; Cities Ex. 6B (Errata No. 2).

[181] The legacy plants are the four power generating plants that were owned by Entergy Gulf States, Inc. – Lewis Creek, Sabine Station, Nelson, and Willow Glen. When EGSI was broken into ETI and EGSL in 2007, ETI became the owner of Lewis Creek and Sabine Station, while EGSL became the owner of Nelson and Willow Glen. ETI Ex. 60 (McIlvoy Rebuttal) at 5-6; ETI Ex. 46 (Considine Rebuttal) at 3.

[182] ETI Ex. 46 (Considine Rebuttal) at 3-4; ETI Ex. 60 (McIlvoy Rebuttal) at 18-19.

[183] ETI Ex. 46 (Considine Rebuttal) at 3-4.

gas-powered plants – 2,378 MW for EGSL versus 2,295 MW for ETI.  However, the ETI plants are operated at a much higher capacity than the EGSL plants.  During the Reconciliation Period, EGSL burned much less natural gas than did ETI – 63,420,554 MMBtu burned at the EGSL plants versus 144,538,535 MMBtu burned at the ETI plants.  Moreover, EGSL has four gas-powered plants while ETI has only two.  Of EGSL's four plants, two (Calcasieu and Ouachita) use combined cycle gas turbine technology.  This gives them a quick-start and shut-down capability, allowing them to be operated primarily only at peak demand times.  Thus, according to Ms. McIlvoy, Mr. Nalepa's premise – that because EGSL is able to reliably operate its gas-fired facilities without gas storage, ETI should be able to do so as well – makes no sense.  Because ETI burns a vastly larger amount of natural gas than EGSL, its need for supply reliability and swing flexibility is much greater.[184]

Ms. McIlvoy also disputed Mr. Nalepa's assertion that ETI could use the Enbridge Contract and call options to provide the Company with sufficient supply reliability.  She noted that the maximum amount of gas deliverable under the Enbridge Contract is insufficient to run the ETI plants even at minimum load.  By contrast, the Spindletop Facility is capable of supplying all Sabine Station units and one unit at Lewis Creek for four days at 70 percent capacity.   Moreover, the Enbridge Contract will expire, whereas the Spindletop Facility can be operated indefinitely.  Ms. McIlvoy explains that the use of call options is not viable because a call option must be delivered "ratably," meaning the gas must be delivered at a constant, even rate throughout the delivery period.  In order to have gas available to meet peak needs in the absence of the Spindletop Facility, ETI would have to exercise call options for a maximum delivery, but it would not need all of the gas delivered at off-peak times of the day.[185]

ETI witness Jaycox disputed Mr. Nalepa's premise that ETI could use call options to ensure reliability.   According to Mr. Jaycox, "call options are cheaper than storage, but there's no comparison" between the amount of reliability that they provide as compared to the Spindletop Facility.[186]  Mr. Jaycox also explained that, due to their geographic location and the limited import

[184]  ETI Ex. 60 (McIlvoy Rebuttal) at 3-8.

[185]  ETI Ex. 60 (McIlvoy Rebuttal) at 8-12.

[186]  Tr. at 969.

capability to the ETI service area, Sabine Station and Lewis Creek are considered particularly critical, thereby increasing the need for reliability at those plants.[187]

When Mr. Nalepa calculated ETI's cost of achieving supply reliability and swing flexibility without the use of the Spindletop Facility, he estimated it would cost only $1,724,659. He did so, in part, by assuming that a five-day 35,000 MMBtu/day call option would cost ETI $26,250. Ms. McIlvoy asserted that it is not reasonable to assume that all options would cost as little as $26,250. Based upon her calculations, ETI would have to purchase 14 five-day 35,000 MMBtu/day call options per month to achieve supply reliability. She posited that, based upon the laws of supply and demand, the more call options ETI has to purchase, the higher the cost of those options would be. She also pointed out that Mr. Nalepa's proposed use of call options would require ETI to spend hundreds of thousands of dollars each month to purchase call options that it would never exercise. According to Ms. McIlvoy, it is unclear from Commission precedents whether ETI would be entitled to recover the costs of these un-exercised options.[188]

The evidence establishes that the Spindletop Facility is critical to providing reliability and swing flexibility to ETI's Texas plants. The ALJs conclude that the Spindletop Facility is a used and useful facility providing reliability and swing flexibility to ETI's customers at a reasonable price, and Cities' arguments to the contrary lack merit.

## I.     Short Term Assets

In its application ETI requested that, as short term assets, the following amounts be included in the rate base: prepayments in the amount of $7,218,037; materials and supplies in the amount of $29,252,574; and fuel inventory in the amount of $53,759,975. These amounts were derived using 13-month averages ending June 2011.[189] Staff witness Anna Givens agrees with the approach of using 13-month averages to determine the appropriate amounts for short term assets. However, she recommends using the 13-month period ending December 2011, because it is the most recent

---

[187] Tr. at 975, 986-87.

[188] ETI Ex. 60 (McIlvoy Rebuttal) at 12-15.

[189] ETI Ex. 3 at Sched. B-1.

information available. Using this approach, Ms. Givens recommends that, as short term assets, the following amounts be included in the rate base: prepayments at $8,134,351 ($916,313 more than ETI's request); materials and supplies at $29,285,421 ($32,847 more than ETI's request); and fuel inventory at $52,693,485 ($1,066,490 less than ETI's request).[190] ETI does not oppose Staff's recommendation on this issue. No party has a criticism of Staff's estimates as to prepayment, materials and supplies, and fuel inventory, nor do the ALJs. Accordingly, the ALJs recommend adopting the numbers proposed by Staff.

## J.        Acquisition Adjustment

In its application, ETI included an adjustment of $1,127,778 for an "electric plant acquisition."[191] The proposed adjustment, which relates to costs incurred by ETI when it acquired the Spindletop Facility, consists of closing costs of $211,209 and legal and internal costs of $916,568.[192] ETI witness Considine explained that, prior to December 2009, the same amounts were included in the Electric Plant in Service (FERC Account 101). On January 11, 2010, FERC issued Opinion No. 505 in FERC Docket No. ER07-956-00 and ordered the Company to transfer the amounts above from Account 101 to FERC Account 114, Electric Plant Acquisition Adjustments. He also pointed out that the costs were included in ETI's filed rate base amounts in Docket Nos. 34800 and 37744.[193] Mr. Considine contended that these amounts should remain in rate base because they represent costs incurred by ETI for the purchase of a viable asset that benefits its retail customers. He pointed out that the amounts have previously been included in the Company's rate base, but the only thing that has changed is that the amounts were previously allocated to a different account. ETI argues that the fact that the costs were approved as part of rate base in two previous ETI dockets verifies that they were "reasonable, prudently incurred, and properly capitalized."[194]

---

[190]  Staff Ex. 1 (Givens Direct) at 31-32.

[191]  ETI Ex. 3 at Sched. C-1.

[192]  ETI Ex. 46 (Considine Rebuttal) at 4.

[193]  *Id.* at 4-5.

[194]  ETI Initial Brief at 43.

Thus, ETI contends it would be inappropriate to penalize it because of an accounting technicality imposed upon it by FERC.[195]

Staff advocates the removal of the entire electric plant acquisition adjustment from rate base, contending that, "[a]s a rule, the rate base component for plant in service includes only the original cost, net of accumulated depreciation."[196] Cities similarly contend, without citing to any legal authority, that acquisition adjustments are not legally permitted as an addition to rate base for ratemaking purposes or as a depreciable asset for regulatory ratemaking purposes.[197] Staff disputes ETI's contention that the fact that the costs were approved as part of rate base in two previous ETI dockets proves that they were reasonable, prudently incurred, and properly capitalized. Staff points out that those two prior dockets were settled rate cases and, therefore, "provide no illumination on this issue."[198] Finally, Staff argues that ETI failed to prove either element of the Commission's two-part *Hooks* test for the determination of whether the acquisition adjustment should be included in rate base. Pursuant to the *Hooks* test, in determining whether an acquisition adjustment should be included in rate base, "the Commission should consider whether or not the purchase price was excessive and whether or not specific and offsetting benefits have accrued to ratepayers."[199] According to Staff, ETI's acquisition adjustment should be disallowed because the Company failed to meet it burden of proof on these two issues.[200]

The ALJs are unpersuaded by the arguments of Staff and Cities. Their primary argument (*i.e.*, that acquisition adjustments are simply not allowed as an addition to rate base for ratemaking purposes) is incorrect. Indeed, the *Hooks* decision, the precedent on which Staff relies for its fallback argument, suggests that, more often than not, acquisition adjustments should be included in

---

[195] ETI Ex. 46 (Considine Rebuttal) at 5.

[196] Staff Ex. 1 (Givens Direct) at 35.

[197] Cities Initial Brief at 26.

[198] Staff Initial Brief at 11.

[199] *Application of Hooks Telephone Company for a Rate Increase within Bowie County*, Docket No. 2150, Examiner's Report at 2 (Mar. 28, 1980)(*Hooks*).

[200] Staff Reply Brief at 12.

rate base: "Amortization of an acquisition adjustment need not be allowed as an expense *in all cases*."[201]

Moreover, the evidence demonstrates that ETI met is burden under the *Hooks* test. As discussed more fully in Section V.H. of this PFD, above, there is ample evidence in the record to demonstrate that the Spindletop Facility is used and useful and provides specific and offsetting benefits to ratepayers in a cost-effective manner. The evidence further shows that the acquisition adjustment represents costs that were actually incurred by ETI in the furtherance of acquiring the Spindletop Facility, and not a mere mark-up in original cost. For these reasons, the ALJs conclude that the $1,127,778 incurred by ETI in internal acquisition costs associated with the purchase of the Spindletop Facility was reasonable, necessary, and properly incurred. Accordingly, the ALJs agree that it should be included in ETI's rate base.

## K.     Capitalized Incentive Compensation

In the application, some of the incentive payments ETI made to its employees were capitalized into plant in service accounts and ETI asks to include those amounts in rate base.[202] A portion of those capitalized accounts represents payments made by ETI for incentive compensation tied to financial goals (financially-based incentive compensation). Cities contend that, consistent with Commission precedent, ETI ought not be allowed to include in rate base the portion of its capitalized incentive compensation that is attributable to financially-based incentive compensation.[203] The issue of whether financially-based incentive compensation is recoverable as a portion of Operating Expenses is discussed at length in Section VII.D.2. of this PFD. ETI makes the same arguments in favor of recoverability in that section that it makes here as to the inclusion of financially-based incentive compensation in rate base. The discussion of that issue need not be repeated here, but the analysis is the same. In summary, the ALJs conclude that ETI should not be entitled to recover its financially-based incentive compensation costs. Thus, for the same reasons discussed in Section VII.D.2, the ALJs agree with Cities' contention that the portion of ETI's

---

[201] *Hooks* (emphasis added).

[202] Cities Ex. 2 (Garrett Direct) at 52.

incentive payments that are capitalized and that are financially-based should be excluded from ETI's rate base.

On the other hand, the ALJs disagree with Cities as to the amount of that exclusion. Cities argue that $9,835,111 (Cities' estimate of ETI's financially-based incentive payments that are capitalized each year into plant in service) should be removed from rate base.[204] Broadly speaking, ETI has two categories of incentive compensation programs – annual incentive programs, and long-term incentive programs. To arrive at the figure of $9,835,111, Cities' witness Garrett assumed that: (1) 100 percent of the costs of the long-term incentive programs were financially-based and, therefore, should be excluded from rate base; and (2) his calculated percentage of the annual incentive programs were financially-based and, therefore, should be excluded from rate base. He then applied those percentages to the incentive costs that ETI capitalized in 2008, 2009, and the portion of 2010 prior to the Test Year.[205]

As explained in Section VII.D.2., the ALJs agree that Mr. Garrett was correct to recommend removing 100 percent of the cost of ETI's long-term incentive programs. However, as to the annual incentive programs, he defined what qualifies as "financially based" much too broadly, and therefore wrongly assumed that his calculated percentage of the costs of those programs should be excluded. Instead, the ALJs conclude that the actual percentages should be used to determine the amount that is financially based.[206]

Finally, ETI challenges Mr. Garrett's attempt to disallow capitalized incentive costs from 2008 through June 30, 2009.

> Much of the rate base that Mr. Garrett seeks to disallow (namely, costs from 2007 through June 30, 2009) is not presented for review in this rate case. Rather those costs were presented for review in the Company's last rate case, Docket No. 37744,

---

[203] *Id.* at 52-53.

[204] *Id.* at 52-53; Cities Initial Brief at 27.

[205] Cities Ex. 2 (Garrett Direct) at 53 and MG-2.10.

[206] *See* discussion in Section VII.D.2.

in which the Company presented capital additions for the period of April 1, 2007, through June 30, 2009. . . . Even though Docket No. 37744 was a settled case, the final order concluded that '[b]ased on the evidence in this docket, the overall total invested capital through the end of the test year meets the requirements in PURA § 36.053(a) that electric utility rates be based on original cost, less depreciation of property used and useful to the utility in providing service.' This conclusion goes beyond merely settling issues without deciding anything and should be construed as to be conclusive as to the reasonableness of capital costs at issue in that prior case.[207]

The ALJs agree. The Test Year for ETI's prior ratemaking proceeding ended on June 30, 2009. The reasonableness of ETI's capital costs (including capitalized incentive compensation) was dealt with by the Commission in that proceeding and is not at issue here. Thus, the ALJs conclude that exclusion of capitalized incentive compensation that is financially-based can only be made for incentive costs that ETI capitalized during the period from July 1, 2009 (the end of the prior Test Year) through June 30, 2010 (the commencement of the current Test Year). The amount of the exclusion is not specifically known at this time.

## VI.    RATE OF RETURN [Germane to Preliminary Order Issue Nos. 4 and 11]

### A.    Capital Structure

ETI's capital structure is 50.08 percent debt and 49.92 percent equity. No party has taken issue with ETI's capital structure. Therefore, the ALJs recommend that the Commission enter an order finding that the appropriate capital structure for ETI is 50.08 percent debt and 49.92 percent equity.

### B.    Return on Equity

The United States Supreme Court has set forth a minimum constitutional standard governing equity returns for utility investors:

From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. By that standard the

---

[207] ETI Initial Brief at 44, *quoting* Docket No. 37744, Order at CoL 10 (Dec. 13, 2010).

return to the equity owner should be commensurate with returns on investments in other enterprises having comparable risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.[208]

Thus, a utility must have a reasonable opportunity to earn a return that is: (1) commensurate with returns on equity investments in enterprises having comparable risks; (2) sufficient to ensure the financial soundness of the utility's operations; and (3) adequate to attract capital at reasonable rates, thereby enabling it to provide safe, reliable service. The allowed ROE should enable the utility to finance capital expenditures at reasonable rates and to maintain its financial flexibility during the period in which the rates are expected to remain in effect.

### 1. Proxy Group

Because ETI is not a publicly traded company, it is necessary to establish a group of companies that are publicly traded and that are comparable to ETI in certain fundamental business and financial respects to serve as its "proxy" in the ROE estimation process. Both financial theory and legal precedent support the use of comparable companies within a proxy group to determine a utility's ROE, and all of the ROE witnesses in this case have relied on proxy groups to estimate a required ROE for ETI.

ETI witness Hadaway started with all the vertically integrated electric utilities that are included in the Value Line Investment Survey (Value Line). To improve the group's comparability with ETI, which has a senior secured bond ratings of BBB+ (Outlook Negative) from Standard &

---

[208] *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 288 (1944); *see also Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 692-93, 43 S. Ct. 675, 679 (1923) ("A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.").

Poor's (S&P) and Baa2 (stable) rating from Moody's Investors Service (Moody's), Dr. Hadaway imposed the following restrictions:

- comparable companies had to have senior secured bond ratings of at least BBB by S&P or Baa by Moody's;

- comparable companies had to derive at least 70 percent of revenues from regulated utility sales;

- comparable companies had to have consistent financial records not affected by recent mergers or restructuring; and

- comparable companies had to have a consistent dividend record with no dividend cuts or resumptions during the past two years.

Those selection criteria resulted in a 23-utility proxy group.

State Agencies witness Miravete excluded Entergy from his proxy group, but otherwise his proxy group was identical to ETI's. Cities witness Parcell ran his calculations using both Dr. Hadaway's 23-utility proxy group and another 8-utility proxy group, but they produced similar ROE results. TIEC witness Gorman used the same 23 utility proxy group as ETI witness Hadaway used.

Staff witness Cutter was the only witness to use a different proxy group. He used a 13 utility proxy group for his discounted cash-flow (DCF) analysis. To arrive at this proxy group, Mr. Cutter started with all of the domestic electric-utility companies tracked by Value Line because Value Line is the most widely used, independent investment service in the world. Then he eliminated the utilities that did not meet the following criteria:

- Value Line Financial Strength ratings of A+, A or B++;

- A capital structure including less than 45 percent, or more than 55 percent, debt;

- Total capitalization in excess of five billion dollars;

- No recent dividend cuts or omissions;

- No recent or potential merger activities or other major capital expansion; and

- No Value Line appraisal of being outside the norm.

On his final analysis, Mr. Cutter eliminated three of his 13 utility proxy group, referring to those he eliminated as "outliers." ETI points out, however, that one of the remaining ten companies, Con Ed, is not comparable to ETI because it is a delivery company as opposed to a vertically integrated utility. ETI's essential criticism of Mr. Cutter's proxy group analysis is that he should have used a larger proxy group and that he admitted a better comparison to ETI could be obtained from using a larger proxy group.

## 2. DCF Analysis

To analyze ETI's cost of equity capital, all of the testifying experts first performed a DCF analysis. The DCF approach is based on the theory that a stock's current price represents the present value of all expected future cash flows. In its most general form, the DCF model is expressed as follows:

$$P_o = \frac{D_1}{(1+k)} + \frac{D_2}{(1+k)} + \frac{D_\infty}{(1+k)}$$

Where $P_0$ represents the current stock price, $D_1 \ldots D_\infty$ are all expected future dividends, and $k$ is the expected discount rate, or required ROE. That equation can be simplified and rearranged to ascertain the required ROE:

$$k = \frac{D(1+g)}{P_o} + g$$

Where $P_0$ represents the current stock price, $D$ is expected future dividends, $g$ is the growth rate, and $k$ is the expected discount rate, or required ROE.

This is commonly referred to as the "Constant Growth DCF" model in which the first term is the expected dividend yield and the second term is the expected long-term growth rate. The

Constant Growth DCF model requires assumptions of:  (1) a constant growth rate for earnings and dividends; (2) a stable dividend payout ratio; (3) a constant price-to-earnings multiple; and (4) a discount rate greater than the expected growth rate.

ETI witness Hadaway's DCF analysis was based on three versions of the DCF model.  In the first version of the DCF model, he used the constant growth format with long-term expected growth based on analysts' estimates of five-year utility earnings growth.  In the second version of the DCF model, for the estimated growth rate, Dr. Hadaway used only the long-term estimated gross domestic product (GDP) growth rate.  In the third version of the DCF model, Dr. Hadaway used a two-stage growth approach, with stage one based on Value Line's three-to-five-year dividend projections and stage two based on long-term projected growth in GDP.  The dividend yields in all three of the annual models are from Value Line's projections of dividends for the coming year and stock prices are from the three-month average for the months that correspond to the Value Line editions from which the underlying financial data are taken.[209]

The DCF results for Dr. Hadaway's comparable company group using the traditional constant growth model indicated an ROE of 9.90 percent to 10.00 percent.  Dr. Hadaway then recalculated the constant growth results with the growth rate based on long-term forecasted growth in GDP.  With the GDP growth rate, the constant growth model indicates an ROE range of 10.40 percent to 10.70 percent.  Although the GDP growth rate is higher than the average of analysts' growth rates, Dr. Hadaway testified that his GDP estimate is within the analysts' range and slightly below the 6.00 percent 3-to-5 year average growth rate projection from Value Line.  Finally, Dr. Hadaway's multistage DCF model indicated an ROE range of 10.20 percent to 10.30 percent. The results from the DCF model, therefore, indicate an ROE range of 9.90 percent to 10.70 percent.[210]  In his rebuttal, Dr. Hadaway updated his ROE analysis using current market conditions but employing the same methodologies that he used in his previous analysis.  After

[209]  ETI Ex. 6 (Hadaway Direct) at 33-44.

[210]  *Id.* at 44, Exhibit SCH-4.

making adjustments to the proxy group to stay consistent with his selection criteria, Dr. Hadaway's indicated DCF range was 10.00 percent to 10.20 percent.[211]

The principal argument against Dr. Hadaway's analyses is that he used unsupported and excessive growth rates. According to the intervenors, these excessive growth rates exaggerate future cash flows, which results in an inflated ROE.

Intervenors argue that Dr. Hadaway's Analysts' Constant Growth DCF model produces excessive return estimates.[212] In rebuttal, Dr. Hadaway's analysts' growth model produced a 10.1 percent group average ROE and a 10.0 percent group median ROE.[213] The intervenors contend that the group average long-term growth rate on which his DCF study was based was 5.62 percent, which is far too high to be sustainable in the long-term (as required as an input in the Constant Growth DCF model).[214] According to intervenors, the excessive level of his growth rate is apparent by comparison to current analysts' projected growth for U.S. GDP, which range from 4.5 percent to 5.0 percent.[215] Dr. Hadaway's growth rate is more than 60 basis points above the most generous expected growth of the U.S. economy. Intervenors contend that that nominal GDP should be the *ceiling* of a reliable proxy for a utility dividend growth rate. Because the evidence shows that nominal GDP as projected by consensus analysts, the Executive Branch, and the Congressional Budget Office is 5 percent, Dr. Hadaway's 5.62 percent growth rate is excessive and undermines the reasonableness of his models.

Intervenors criticize Dr. Hadaway's decision on rebuttal to exclude Edison International in his proxy group.[216] Dr. Hadaway did so because Edison International's ROE of 5.2 percent was below a 5.07 percent cost of debt based on an average of Triple B utility rates for the time period

[211] *Id.* at 44.

[212] TIEC Ex. 2 (Gorman Direct) at 39.

[213] ETI Ex. 52 (Hadaway Rebuttal) at Ex. SCH-R-6.

[214] *Id.* at Ex. SCH-R-6; TIEC Ex. 2 (Gorman Direct) at 39; Cities Ex. 3 (Parcell Direct) at 36-37; OPC Ex. 1 (Szerszen Direct) at 23-24.

[215] TIEC Ex. 2 (Gorman Direct) at 19; Cities Ex. 3 (Parcell Direct) at 37.

[216] ETI Ex. 51 (Hadaway Rebuttal) at Ex. SCH-R-6.

January 12-March 12, plus 100 basis points.[217]   Intervenors contend that this rationale is tenuous, and that had Dr. Hadaway included Edison International (or even excluded Hawaiian Electric, the utility in his proxy group that had the highest ROE) his own analysis (even with its excessive growth rates) would have resulted in a 9.85 percent average ROE.

Finally, Dr. Hadaway conceded that he used the same methodology for calculating GDP in this case as he did in the Oncor rate case.[218]   Intervenors contend that Dr. Hadaway's GDP projections are not credible proxies for investor's expected dividend growth rates because they are not based on published analysts' or government GDP forecasts.  Rather, Dr. Hadaway forecasts future GDP growth using his own personal calculation that forecasts GDP by examining historic GDP growth over the last 10, 20, 30, 40, 50, and 60-year periods and weighting those averages.[219] Intervenors note that this approach was rejected by the Commission in the Oncor rate case.[220]

Staff witness Cutter used the DCF model to project ETI's cost of equity.  Under Mr. Cutter's view, the theory underlying the DCF model is that the price of a share is equal to the *present* value of all *future* earnings.  Unless the stock is sold for a profit (or loss) from the price it was originally purchased, the only way to determine earnings on a share is to determine its future dividends.  This requires, in Mr. Cutter's opinion, an understanding of investors' current expectations of growth of those dividends.  The issue is the growth *expectation* that investors have embodied in the current price of the stock.  According to Mr. Cutter, the best way to arrive at a reliable growth estimate of those dividends is to use the growth estimates of investment advisory firms rather than the estimates of a single, independent analyst.[221]

Mr. Cutter used both Value Line and Zacks Investment Service (Zacks) in ascertaining long-term earnings growth rates.  He used Value Line because it is the most widely used

---

[217]  *Id.*

[218]  Tr. at 227-228.

[219]  ETI Ex. 6 (Hadaway Direct) at Ex. SCH-3; Tr. at 218.

[220]  *Application of Oncor Electric Delivery Company, LLC, for Authority to Change Rates,* Docket No. 35717, PFD at 72-73.

[221]  Staff Ex. 6 (Cutter Direct) at 10-15.

independent investment service in the world and Zacks because it compiles consensus earnings forecasts from groups of professional security analysts.[222]

Mr. Cutter's DCF analysis resulted in range from 7.46 percent to 10.71 percent, with a point estimate for cost of equity being 9.3 percent.

TIEC witness Gorman's first DCF model was a constant growth model using consensus analysts' growth rates that resulted in an average constant growth DCF of 9.32 percent and a median constant growth DCF of 9.84 percent. The average analysts' growth rate was 4.94 percent.[223] According to TIEC, ETI does not claim that a constant growth model using analysts' growth rates is inappropriate and argues that Dr. Hadaway failed to offer any rebuttal testimony criticizing Mr. Gorman's Analysts' Growth DCF model.

Mr. Gorman also performed a constant growth DCF model using sustainable growth rates. His average sustainable growth rate for the proxy group was 4.54 percent and produced a proxy group average and median DCF result of 8.91 percent and 8.9 percent, respectively.[224] According to TIEC, a sustainable growth rate is based on the percentage of a utility's earnings that are retained and reinvested in utility plant and equipment.[225]

Mr. Gorman also performed a multi-stage DCF model to reflect changing growth expectations that would reflect the possibility of non-constant growth for a company over time. Mr. Gorman's multi-stage model reflected three growth periods: (1) a short-term growth period of five years; (2) a transition period for years six through ten; and (3) a long-term growth period, starting in year 11 through perpetuity. For the short-term period, Mr. Gorman relied on the consensus analysts' growth projections from his constant growth DCF model (*i.e.*, 4.94 percent). For the second stage (*i.e.*, the transition period), growth rates are reduced or increased by an equal

---

[222] Staff Ex. 6 (Cutter Direct) at 13.

[223] TIEC Ex. 2 (Gorman Direct) at Ex. MPG-4.

[224] TIEC Ex. 2 (Gorman Direct) at 18.

[225] TIEC Ex. 2 (Gorman Direct) at 17.

factor, which reflect the difference between the analysts' growth rates and the GDP growth rate. For the long-term period, he assumed the maximum sustainable growth rate for a utility company as proxied by the consensus analysts' projected growth rate for the U.S. GDP (*i.e.*, 5.0 percent). The result of his multi-stage growth DCF model was an average ROE of 9.37 percent and a median of 9.48 percent.[226]

Cities witness Parcell calculated the DCF results for each company in his proxy group by using and considering five indicators of growth expectations consisting of: (i) 2007 – 2011 earnings retention; (ii) five-year historical average earnings per share, dividends per share, and book value per share; (iii) projected earnings retention; (iv) projected EPS, DPS, BVPS; and (v) projected EPS as reported by Yahoo Finance. Using this in his DCF model resulted in an ROE of 9.0 percent to 9.5 percent.[227]

OPC witness Szerszen's DCF analysis used the same group of 23 comparable companies included in Dr. Hadaway's DCF analysis. Dr. Szerszen's DCF analysis was framed with consideration of ETI's financial integrity as discussed by the major bond rating agencies, the current and projected interest rate environment, and investment analyst views of the regulated utility sector.[228] Interest rates are currently very low, as reflected in the yields to maturity and interest rates on various fixed income investments. OPC contends, in contrast to Dr. Hadaway, that utility stocks have been less volatile than the stock market in general.[229] This is confirmed by Value Line's December 23, 2011, observation that "electric utility stocks have long been viewed as a safe haven in volatile markets, due in large part to their generous dividend yields."[230] Dr. Szerszen also took exception to Moody's characterization of ETI as having above average business and regulatory risk. Moody's assessment is primarily based on the lack of pass-through regulatory lag-reducing cost recovery mechanisms in Texas compared to Entergy's Louisiana and Mississippi jurisdictions. Dr.

---

[226] TIEC Ex. 2 (Gorman Direct) at 19, Ex. MPG-9.

[227] Cities Ex. 3 (Parcell Direct) at 24, 33.

[228] OPC Ex. 1 (Szerszen Direct) at 8-17.

[229] *Id.* at 15.

[230] *Id.*

Szerszen testified that ETI may not have a formula rate plan similar to the Louisiana and Mississippi Entergy operating companies, but it does have a Distribution Cost Recovery Factor (DCRF) and Transmission Cost Recovery Factor (TCRF) available that "will allow ETI to charge ratepayers for additional distribution and transmission investments outside of a traditional rate request filing."[231] None of Entergy's other operating companies have TCRF and DCRF riders. OPC notes that Cities witness Parcell agrees that the availability of such recovery mechanisms affects ETI's level of risk; he testified that a combination of ETI's fuel factor rider, TTC rider, energy efficiency rider, hurricane cost recovery rider, rate case expense rider, proposed increased customer service charge, and DCRF and TCRF riders results in about 30 percent of ETI's total overall requested revenue requirement being subject to revenue risk and regulatory lag.[232]

Dr. Szerszen incorporated two different dividend yield calculations in her DCF model. The first calculation estimated a dividend yield using 2011 average stock prices and 2012 projected dividend rates for each company, and the second calculation incorporated more recent March 5, 2012, closing prices for the comparables. The average dividend yield using 2011 average stock prices was 4.66 percent and, using March 5, 2012, closing prices, was 4.32 percent.[233]

Dr. Szerszen provided some practical examples of how blind reliance on analyst earnings growth projections can lead to questionable DCF growth rates. At least five of the comparable utility companies had five-year earnings growth rate projections that ranged from 8.5 percent to 11 percent. Dr. Szerszen stated that she was unaware of any regulated utility company that has consistently achieved such high earnings growth rate over the past 28 years, and that it is reasonable to assume such performance is unlikely in the longer term future. Dr. Szerszen's review of the comparable company past and projected growth rates resulted in a reasonable dividend growth rate expectation of 3.9 percent to 5 percent. Depending on whether 2011 average stock prices are used or

---

[231]  *Id* at 11-13.

[232]  Cities Ex. 3 (Parcell Direct) at 16-18.

[233]  OPC Ex. 1 (Szerszen Direct) at 17.

the updated 2012 stock prices are used, Dr. Szerszen's DCF analysis resulted in an ROE ranging from 8.32 percent to 9.32 percent.[234]

State Agencies' witness Miravete's DCF analysis used calculations for three averaging periods, 30, 90 (the reference period), and 180 days ending on March 2, 2012, respectively. For the commonly used 90 day averaging period, the capitalization-weighted average ROE is 9.23 percent. Evaluating the averaging period at either 30 or 180 days produces ROE estimates of 9.24 percent and 9.34 percent, respectively. Dr. Miravete weighed the computations by the capitalization of each firm to correct the effect of each variable according to the relative market value of the corresponding utility. According to Dr. Miravete, this approach avoids the distortion caused by adding numerous, but possibly irrelevant, firms that may produce biased estimates. Dr. Miravete conceded that the effect of ignoring differences in scale of utilities in the determination of the ROE is substantial. He acknowledged that if he had ignored the differences in size of these electric utilities, his DCF ROE estimate would have been 9.68 percent.[235]

### 3. Risk Premium Analysis

Dr. Hadaway's risk premium studies are divided into two parts. First, he compared electric utility authorized ROEs for the period 1980-2010 to contemporaneous long-term utility interest rates. The differences between the average authorized ROEs and the average interest rate for the year is the indicated equity risk premium. He then added the indicated equity risk premium to the forecasted and current triple-B utility bond interest rate to estimate ROE.[236]

In calculating the equity risk premium, Dr. Hadaway adjusted for the inverse relationship between equity risk premiums and interest rates (when interest rates are high, risk premiums are low and vice versa). Dr. Hadaway provided regression analyses of the allowed annual equity risk premiums relative to interest rate levels. The negative regression coefficients confirm the inverse relationship between equity risk premiums and interest rates according to ETI. Dr. Hadaway used

---

[234] *Id.* at 22.

[235] State Agencies Ex. 1 (Miravete Direct) at 12-13.

[236] ETI Ex. 6 (Hadaway Direct) at 36-38, 45.

that negative interest rate change coefficient in conjunction with current and forecasted interest rates to establish the appropriate ROE.[237] Staff witness Cutter agreed that the risk premium analysis needs to reflect this adjustment.[238]

The results of Dr. Hadaway's initial equity risk premium studies indicate an ROE range of 10.00 percent to 10.01 percent. ETI states that these results reflect the sharp drop in interest rates that have occurred for high quality borrowers. The Federal Reserve System's continuing "easy money" policies have provided renewed liquidity in the credit markets that is reflected in these lower yields. These models, however, cannot capture the current equity volatility or the increased level of risk aversion for equity investors. These circumstances indicate that the cost of equity has not declined to the extent that interest rates on utility debt have dropped. Thus, Dr. Hadaway testified that the results of the risk premium analysis must be discounted and more emphasis placed on the DCF analysis.[239]

In his rebuttal, Dr. Hadaway updated his ROE analysis using current market conditions but employing the same methodologies that he used in his previous analysis.[240] His updated risk premium analysis was an ROE of 10.38 percent using projected triple-B utility interest rates and 9.96 percent using current triple-B utility interest rates.[241]

TIEC contends that Dr. Hadaway's utility risk premium analysis is flawed for two primary reasons. First, Dr. Hadaway developed a forward-looking risk premium model that relied on forecasted interest rates and volatile utility spreads that are uncertain and produce inaccurate results. As Mr. Gorman testified, it is more reasonable at this time to rely on current observable interest rates rather than forecasted projections. Over the last several years, forecasted yield projections have proven to be overstated because, even though interest rates have been projected to increase,

---

[237] ETI Ex. 6 (Hadaway Direct) at 45-46, Ex. SCH-5; ETI Ex. 52 (Hadaway Rebuttal) at 32.

[238] Staff Ex. 6 (Cutter Direct) at 20.

[239] ETI Ex. 6 (Hadaway Direct) at 10-23, 45; Tr. at 233-235.

[240] ETI Ex. 52 (Hadaway Rebuttal) at 44.

[241] *Id.* at 45.

those projections have consistently been proven wrong.[242]  Accordingly, Dr. Hadaway's forecasted utility bond yield of 5.17 percent is overstated.

Second, TIEC argues that Dr. Hadaway's risk premium model is flawed because he improperly inflates his actual risk premium of 3.28 percent with an adjustment of 1.56 percent that he asserts reflects the inverse relationship between interest rates and utility risk premiums.[243]  TIEC argues that Dr. Hadaway's use of this adjustment is improper and not supported by academic research.  Mr. Gorman testified that "a relative investment risk differential cannot be measured simply by observing nominal interest rates."[244]  He noted:

> While academic studies have shown that, in the past, there has been an inverse relationship with these variables, researchers have found that the relationship changes over time and is influenced by changes in perception of the risk of bond investments relative to equity investments, and not simply changes to interest rates.[245]

As described in Mr. Gorman's testimony, correcting Dr. Hadaway's models for the elimination of this inverse relationship adjustment puts Dr. Hadaway's risk premium in the range of 8.5 percent to 10 percent, with a midpoint of 9.3 percent.[246]

Staff witness Cutter's "conventional risk premium estimate" estimated the cost of ETI's equity by comparing the costs of equity authorized for utilities across the United States to the yields of large-company corporate bonds that are rated Baa by Moody's within the timeframe of 1980 through 2011.  This risk premium approach relies on the historical relationship between two indices

---

[242]  TIEC Ex. 2 (Gorman Direct) at 42-43; OPC Ex. 1(Szerszen Direct) at 27-28.

[243]  TIEC Ex. 2 (Gorman Direct) at 42-43; *see also* ETI Ex. 6 (Hadaway Direct) at Ex. SCH-5 at 1.

[244]  TIEC Ex. 2 (Gorman Direct) at 44.

[245]  TIEC Ex. 2 (Gorman Direct) at 44 (*citing* "The Market Risk Premium:  Expectational Estimates Using Analysts' Forecasts," Robert S. Harris and Felicia C. Marston, *Journal of Applied Finance*, Volume 11, No. 1, 2001 and "The Risk Premium Approach to Measuring a Utility's Cost of Equity," Eugene F. Brigham, Dilip K. Shome, and Steve R. Vinson, *Financial Management*, Spring 1985).

[246]  TIEC Ex. 2 (Gorman Direct) at 45.

to forecast a value for one of the indices in a period for which it is unknown by using the known value of the other one during that same period.[247]

To account for the relationship between the authorized costs of equity and the bond yields required to quantify ETI's cost of equity, Mr. Cutter subtracted the bond yields from the authorized costs of equity to determine a risk premium for the riskier equity. He tested the data by performing a regression analysis, which showed with high confidence that there is a trend in the relationship. It is an inverse trend, in which the risk premiums increase as bond yields decrease. On average, from 1980 to 2011, risk premiums increased 0.4207 percent for every 1.00 percent that bond yields decreased.[248]

The calculation of the adjustment to the risk premium that the regression analysis indicated was incorporated in Staff's analysis. The results of this risk premium analysis produced a cost of equity of 9.81 percent.[249]

Mr. Gorman's risk premium analysis produced an ROE estimate in the range of 9.2 percent to 9.4 percent, with a midpoint estimate of approximately 9.3 percent. His risk premium model was based on two estimates of an equity risk premium. First, he estimated the difference between the required return on utility common equity investments and U.S. Treasury bonds for the period 1986 through 2011, which produced an equity risk premium of 5.23 percent. The second equity risk premium estimate was based on the difference between regulatory commission-authorized returns on common equity and contemporary "A" rated utility bond yields for the period 1986 through 2011, which produced an equity risk premium of 3.8 percent. Mr. Gorman testified that "[t]he equity risk premium should reflect the relative market perception of risk in the utility industry today."[250]

---

[247] Staff Ex. 6 (Cutter Direct) at 10, 19.

[248] Staff Ex. 6 (Cutter Direct) at 20.

[249] *Id.* at 20, Attachment SC-6.

[250] TIEC Ex. 2 Gorman Direct) at 26.

Accordingly, to gauge investor expectations he examined the yield spread between utility bonds and Treasury bonds over the last 32 years.[251]

According to TIEC, this analysis showed that the current utility bond yield spreads over Treasury bond yields are lower than the 32-year average spreads, which is evidence that "the market considers the utility industry to be a relatively low risk investment and demonstrates that utilities continue to have strong access to capital."[252]  Mr. Gorman then added a projected long-term Treasury bond yield to his estimated equity risk premium over Treasury yields, which produced a common equity in the range of 8.2 percent to 9.95 percent.  Due to unusually large yield spreads between Treasury bond and "Baa" utility bond yields, Mr. Gorman gave two-thirds weight to his high end risk premium of 9.95 percent and one-third weight to his low-end risk premium of 8.2 percent, which produced an equity risk premium of 9.4 percent.  He also added his equity risk premium over utility bond yields to the current 13-week average yield on "Baa" rated utility bonds for the period ending March 2, 2012, of 5.05 percent.  Adding his equity risk premium of 3.03 percent to 4.62 percent to the bond yield of 5.05 percent, produced an ROE in the range of 8.08 percent to 9.67 percent, which he then weighted more heavily on the high end estimate to produce a recommendation of 9.2 percent.[253]

The primary criticism that Dr. Hadaway lodged against Mr. Gorman's risk premium analysis was that Mr. Gorman did not adjust his analysis upward to reflect a purported inverse relationship between equity risk premiums and interest rates.[254]  For example, Dr. Hadaway's risk premium analysis adjusted his risk premium results by 1.56 percent to account for this relationship.[255]

OPC witness Szerszen also performed a risk premium analysis, using Dr. Hadaway's study of historical authorized electric company allowed returns on equity and average bond yields.  The

---

[251]  *Id.* at 25-28.

[252]  *Id.* at 27.

[253]  TIEC Ex. 2 (Gorman Direct) at 26-28.

[254]  ETI Ex. 52 (Hadaway Rebuttal) at 32.

[255]  ETI Ex. 6 (Hadaway Direct) at Ex. SCH-5.

average risk premium from Dr. Hadaway's 1980-2010 study was 328 basis points.[256]  Adding this historical risk premium to current triple B bond yield (4.67 percent) results in a 7.95 percent risk-premium derived DCF rate, and using Dr. Hadaway's 5.17 percent projected bond yield results in a risk premium derived rate of 8.45 percent.  Giving more weight to the 2001-2010 risk premiums shown in Dr. Hadaway's exhibit results in an average risk premium of 4.21 percent.  This yields an 8.88 percent to 9.38 percent risk premium derived cost of equity based on the current 4.67 percent and projected 5.17 percent bond yields, according to Dr. Szerszen's analysis.[257]

### 4.  Comparable Earnings

Cities witness Parcell also performed a Comparable Earnings analysis.  According to Mr. Parcell, the Comparable Earnings method is derived from the "corresponding risk" standard of the *Bluefield* and *Hope* cases.  This method is thus based upon the economic concept of opportunity cost.  The cost of capital is an opportunity cost: the prospective return available to investors from alternative investments of similar risk.[258]

The Comparable Earnings method is designed to measure the returns expected to be earned on the original cost book value of similar risk enterprises.  Thus, according to Mr. Parcell, this method provides a direct measure of the fair return, because the Comparable Earnings method translates into practice the competitive principle upon which regulation is based.[259]

The Comparable Earnings method normally examines the experienced and/or projected returns on book common equity.  The logic for examining returns on book equity follows from the use of original-cost, rate-base regulation for public utilities, which uses a utility's book common equity to determine the cost of capital.  This cost of capital is, in turn, used as the fair rate of return which is then applied (multiplied) to the book value of rate base to establish the dollar level of

---

[256]  ETI Ex. No. 6 (Hadaway Direct) at Ex. SCH-5.

[257]  OPC Ex. 1 (Szerszen Direct) at 29-30.

[258]  Cities Ex. 3 (Parcell Direct) at 28.

[259]  *Id.* at 29.

capital costs to be recovered by the utility. Mr. Parcell stated that this technique is thus consistent with the rate base methodology used to set utility rates.[260]

Mr. Parcell conducted the Comparable Earnings methodology by examining realized returns on equity for several groups of companies and evaluating the investor acceptance of these returns by reference to the resulting market-to-book ratios. He testified that in this manner it is possible to assess the degree to which a given level of return equates to the cost of capital.

Mr. Parcell's Comparable Earnings analysis is based on market data (through the use of market-to-book ratios) and is thus essentially a market test. As a result, he testified that his analysis is not subject to the criticisms occasionally made by some who maintain that past earned returns do not represent the cost of capital. In addition, he stated that his analysis uses prospective returns and thus is not confined to historical data.[261]

Mr. Parcell's Comparable Earnings analysis considered the experienced equity returns of the proxy groups of utilities for the period 1992-2011 (*i.e.,* the last twenty years). His Comparable Earnings analysis required an examination of a relatively long period of time to determine trends in earnings over at least a full business cycle. Further, in estimating a fair level of return for a future period, it is important to examine earnings over a diverse period of time to avoid any undue influence from unusual conditions that may occur in a single year or shorter period. Therefore, in forming his judgment of the current cost of equity he focused on two periods: 2002-2011 (the recent business cycle) and 1992-2001 (the prior business cycle).[262]

Based on the recent earnings and market-to-book ratios, Mr. Parcell's Comparable Earnings analysis indicated that the cost of equity for the proxy utilities is no more than 9.5 percent to 10.0 percent (9.75 percent mid-point). Recent returns of 10.0 percent to 12.1 percent have resulted in market-to-book ratios of 143 and greater. Prospective returns of 9.5 percent to 10.3 percent result

---

[260] *Id.*

[261] Cities Ex. 3 (Parcell Direct) at 29.

[262] *Id.* at 30.

in anticipated market-to-book ratios of over 125.  As a result, it is apparent that returns below this

level would result in market-to-book ratios of well above 100.  According to Mr. Parcell, an ROE of

9.5 percent to 10.0 percent should thus result in a market-to-book ratio of well over 100 .[263]

### 5.  CAPM Analysis

The Capital Asset Pricing Model (CAPM) is a risk premium approach that estimates the

ROE for a given security as a function of a risk-free return plus a risk premium to compensate

investors for the non-diversifiable, or systematic, risk of that security.  The CAPM formula is as

follows:

$$K_e = r_f + \beta(r_m - r_f)$$

Where $K_e$ equals the required market ROE; $\beta$ equals the Beta of an individual security; $r_f$ equals the

risk free rate of return; and $r_m$ equals the required return on the market as a whole.  In this equation,

$(r_m - r_f)$ represents the market risk premium.  According to the theory underlying the CAPM,

because diversifiable risk can be diversified away, investors should be concerned only with

non-diversifiable risk, which is measured by Beta.  In effect, Beta represents the risk of the particular

security relative to the market as a whole.

Only Staff witness Cutter, Cities witness Parcell, and State Agencies witness Miravete used

the CAPM methodology to estimate ETI's ROE.

Mr. Cutter used CAPM in the qualitative analysis of ETI's cost of equity.  He did not directly

use the CAPM in the determination of ETI's cost of equity because it yielded a cost of equity that

was over 200 basis points lower than the lower of the other two estimates, while those other two

estimates were less than half a percent apart from each other.[264]  The CAPM provides an additional

indication that a significant drop to the estimated costs of equity that Staff made in prior dockets is

---

[263]  Cities Ex. 3 (Parcell Direct) at 31-32.

[264]  Staff Ex. 6 (Cutter Direct) at 21.

appropriate because the CAPM estimate is lower than either of the two other approaches even when adjusted for the current low yield on Treasury Bonds.[265]

Mr. Cutter testified that the CAPM is one of the cornerstones of financial theory.[266]  In its simplest sense, the model describes the relationship between the risk of an asset and its expected return, and assumes that investors will not hold a risky asset unless they are adequately compensated for the risk.[267]

In this case, without any adjustment to the way it has been used in recent rate cases at the Commission, the CAPM yielded a cost of equity for ETI of 6.93 percent.  Mr. Cutter testified that aspects of the capital markets today were likely causing the CAPM's cost of equity estimate to be low.  Specifically, the Federal Reserve System is following an aggressive policy designed to keep the yields of both short-term and long-term Treasury bonds low.  This policy influences two of the three variables used in the CAPM formula to be lower, which, in turn, makes the CAPM's final estimate of ETI's cost of equity lower.[268]

To account for the impact of this aggressive Federal Reserve System policy, Mr. Cutter made two adjustments to his CAPM analysis.  First, Mr. Cutter adjusted the risk-free rate variable in the CAPM because it is most influenced by current Federal Reserve System policy.  By changing this variable to 3.7 percent (which is the average yield from 1926 through 2010 of the risk-free rate's proxy security, U.S. Treasury Bills), the CAPM's estimate of ETI's cost of equity increased from 6.93 percent to 7.92 percent, or by 99 basis points.[269]

The second adjustment to the CAPM result that Mr. Cutter made to account for the current aggressive Federal Reserve System policy was to the risk premium, which is also particularly sensitive to Federal Reserve System policy.  By using the difference between the *averages* of the

---

[265]  *Id*.

[266]  *Id.*

[267]  *Id.*

[268]  Staff Ex. 6 (Cutter Direct) at 21-24.

[269]  *Id.* at 24.

yield of long-term government bonds and the yield of large company stocks between 1926 and 2010, the effect of Federal Reserve System policy on the risk premium was significantly diluted. Mr. Cutter found that because the CAPM estimate of ETI's cost of equity was excessively low, even with adjustments for Federal Reserve System policy, it would be appropriate to further adjust it by multiplying the unadjusted estimate plus two times the effect of adjusting the risk-free rate, or: 6.93 percent + (2 * 0.99 percent) = 8.91 percent.[270]  It is important to note, however, that Mr. Cutter used the CAPM analysis only as a qualitative check on its DCF and risk premium analyses, not as an independent source of analysis.

Although Cities witness Parcell did perform a CAPM analysis, he does not employ the CAPM results in arriving at his 9.0 percent to 10.0 percent range of results.[271]

State Agencies witness Miravete used the daily average of the yield of the ten-year Treasury bond between December 1, 2011, and March 2, 2012, as reported by the Board of Governors of the Federal Reserve System, as his risk-free return in his CAPM model.  He used Value Line's most recent betas for the regulated utilities included in the proxy group.  Dr. Miravete corrected the betas by substituting an average between their value and 1.0 to recognize that markets trend towards long-term equilibrium because these regulated utilities were able to attract investors during the most troubled times, which indicates that the perceived market risk of these utilities is lower than for other firms.  Dr. Miravete's capitalization-weighted average CAPM ROE is 7.64 percent on a 90 days averaging period, with a range between 7.64 percent (30 days) and 8.28 percent (180 days). Dr. Miravete characterizes these estimates as low relative to those of the DCF model because of the low yields of Treasury bonds after the implementation of the quantitative easing monetary policy over the past two years.[272]

---

[270]  *Id.* at 21, 24-25.

[271]  Cities Ex. 3 (Parcell Direct) at 3, 25-28.

[272]  State Agencies Ex. 1 (Miravete Direct) at 19-21.

### 6. ALJs' Analysis

Given the detail, time, and effort that went into the various experts' testimony on this issue, one might easily conclude that the development of an estimated ROE is a precise science. But, as acknowledged by virtually all experts on the subject, estimating the cost of equity is not an exact science but rather a result of informed judgment.

The first question that must be addressed is the appropriate proxy group. There were essentially only two competing views on this issue – one presented by Dr. Hadaway and the other by Mr. Cutter. The ALJs have reviewed the evidence and the arguments of both sides with respect to the composition of the proxy group. Although Staff's proxy group could, in some respects, be considered more comparable to ETI than Dr. Hadaway's larger group, the ALJs do not believe that this overcomes the flaws inherent in such a small group. In the end, a group of nine companies, while comparable, simply does not provide a robust enough sample to create a valid group for comparison. The ALJs therefore find that the 23 utility group selected by ETI witness Hadaway is the appropriate proxy group.

The next issue is the core issue to be decided: the appropriate ROE for ETI. The experts in this case testified to the following ROE ranges or estimates, depending on the calculation methodology employed:

| Witness/Analysis | Range | Ultimate Recommendation |
|---|---|---|
| Hadaway - DCF | 9.9 – 10.7 | 10.6 |
| Hadaway – Risk Premium | 9.96 – 10.38 | |
| | | |
| Cutter – DCF | 7.46 – 10.71 | 9.6 |
| Cutter – Risk Premium | 9.81 | |
| Cutter – CAPM | 8.91 | |
| | | |
| Gorman –DCF | 9.3 – 9.7 | 9.5 |
| Gorman – Risk Premium | 9.2 – 9.4 | |
| | | |
| Parcell – DCF | 9.0 – 9.5 | 9.5 |
| Parcell – Comparable Earnings | 9.5 – 10.0 | |
| | | |

| Witness/Analysis | Range | Ultimate Recommendation |
|---|---|---|
| Szerszen – DCF | 8.32 – 9.32 | 9.3 |
| Szerszen – Risk Premium | 9.3 | |
| | | |
| Miravete – DCF | 9.23 – 9.34 | 9.3 |
| Miravete – CAPM | 7.64 – 8.28 | |

Just focusing on the ultimate ROE recommendations, it is clear that there is a fairly tightly grouped range when considering Staff and the intervenors. This ranges from a low of 9.3 percent to a high of 9.6 percent. The range expands when it is considered that Staff witness Cutter did not contest ETI's assertion that Staff's DCF recommended ROE would be 10.0 percent if he had used the same proxy group as the other witnesses.[273] The ALJs believe that the criticisms leveled at Dr. Hadaway's ROE recommendation are generally correct, certainly to the point that the ultimate recommendation is so high as to be an outlier. The ALJs conclude that the proper range of acceptable ROEs would be from 9.3 percent to 10.0 percent. This is actually confirmed by ETI's own witness, Mr. Barrileaux, who testified that, from a cash flow metric standpoint, an ROE of 9.99 percent would provide "a reasonable outcome that balances debt and equity financing."[274]

The mid-point of the range discussed above is 9.65 percent. There has been a tremendous amount of testimony about the unsettled economic conditions facing utilities and the effect of those conditions on the appropriate ROE. The ALJs believe that this is an effect that must be taken into account, and that the effect would be to move the ultimate ROE towards the upper limits of the range determined to be reasonable. In this case, the ALJs find that the reasonable adjustment would be 15 basis points, moving the reasonable ROE to 9.80 percent. Accordingly, the ALJs recommend that the Commission find that 9.80 percent is the appropriate ROE for ETI.

---

[273] Tr. at 1795.

[274] ETI Ex. 44 (Barrileaux Rebuttal) at 5, Ex. CEB-R-1.

**C.    Cost of Debt**

ETI's weighted average cost of debt at the end of the test year was 6.74 percent.[275]  No party has taken issue with that cost of debt.  Therefore, the ALJs recommend that the Commission enter an order finding that the appropriate cost of debt for ETI is 6.74 percent.

**D.    Overall Rate of Return**

The overall rate of return is a product of the capital structure, ROE, and cost of debt.  Based on the discussions set forth above, the ALJs recommend that the Commission adopt the following overall rate of return for ETI:

| Component | Cost | Weighting | Weighted Cost |
|---|---|---|---|
| Debt | 6.74 | 50.08% | 3.38 |
| Equity | 9.80 | 49.92% | 4.89 |
| Overall | | | 8.27 |

**VII.    OPERATING EXPENSES [Germane to Preliminary Order Issue Nos. 2, 3, 4, and 16]**

**A.    Purchased Power Capacity Expense [Germane to Supplemental Preliminary Order Issue No. 1]**

One of the most hotly contested issues in this case concerned the appropriate size of ETI's purchased power capacity costs (PPCCs).  In order to understand this issue, it is necessary to understand some background relative to how ETI obtains and uses power generation capacity.

**1.  The Sources of ETI's Purchased Power**

The Entergy System Agreement is a FERC-approved tariff that mandates that the Operating Companies operate as a single, integrated system.[276]  The System Agreement's essential function is to provide the contractual basis for the planning, construction, and operation of generation and

---

[275]  ETI Ex. 5 (Barrilleaux Direct) at 37.

[276]  ETI Ex. 30 (Jaycox Direct) at 5-6; ETI Ex. 39 (Cicio Direct) at 6-10.

transmission resources in an economic and reliable manner.  By jointly planning and operating their electric systems, the Operating Companies believe they are able to aggregate their loads and jointly dispatch their resources to serve that load using the lowest cost resources available from all of the Operating Companies, resulting in lower total costs than the total cost of each Operating Company planning and operating separately.  Another function of the Entergy System Agreement is to provide a basis for the equalization among the Operating Companies of any imbalances of costs arising from the construction, ownership, or operation of facilities that are used for the collective benefit of all Entergy Operating Companies.[277]

To provide reliable service, ETI must have sufficient generation capacity to meet the maximum demands imposed on its system.  Some of this generation capacity (approximately 1,200 MW) is generating plants owned and operated by ETI.[278]  The remainder of ETI's capacity comes from four types of purchased capacity: (1) capacity purchases from third parties; (2) capacity purchases from other Entergy affiliates through "legacy affiliate contracts" under MSS-4; (3) capacity purchases from other Entergy affiliates through "other affiliate contracts" under MSS-4; and (4) capacity purchases from the Entergy system through reserve equalization payments under MSS-1.[279]  MSS-1 and MSS-4 are schedules included in the Entergy System Agreement which set out complex mathematical formulas whereby the various Operating Companies can equalize and share the costs of power capacity among themselves.[280]  These four sources of purchased capacity are inversely related to one another:  the more ETI purchases from one source, the less it needs to purchase from the others.[281]

> ➢ *Capacity Purchases from Third Parties*

Third-party capacity contracts are contracts that the system has allocated in whole or part to ETI.  ETI has contracted to purchase capacity from a number of third parties, including

---

[277]  ETI Ex. 39 (Cicio Direct) at 6, 8-10, 11-30.

[278]  Tr. at 1539-40.

[279]  ETI Ex. 34 (Cooper Direct) at 20-21; Tr. at 1901; ETI Initial Brief at 71.

[280]  ETI Ex. 39 (Cicio Direct) at PJC-1, pp. 30 and 62.

[281]  Tr. at 1946-47.

ConocoPhillips-SRW, Dow Pipeline, Frontier, Calpine-Carville, and Sam Rayburn Municipal Power Agency (SRMPA). Since 2009, ETI has been in the process of substantially increasing its reliance upon third party purchases of capacity. During the Rate Year, it plans to more than double the amount of capacity it purchases from third parties as compared to the amount it purchased during the Test Year.[282]

Since the Test Year, Entergy has been engaged in an effort to increase ETI's long-term power capacity through dealing with third parties. It has entered into a number of agreements in that regard:

- In 2009, it entered into a ten-year purchased power agreement with Calpine Energy Services (Calpine) to purchase 485 MW of capacity from Calpine's Carville Energy Center (Carville Contract). Purchases pursuant to the Carville Contract will commence during the Rate Year, on June 1, 2012, and 50 percent of this contract is allocated to ETI.[283]

- During the Period from July 2009 through June 2011, the Company executed an agreement with NRG for a 75 MW one-year call option, with a delivery period that began on March 1, 2011, and 100 percent of this contract is allocated to ETI.[284]

- During the Period from July 2009 through June 2011, the Company executed a three-year agreement with Dow Pipeline for 100 MW capacity, with a delivery period that began on April 1, 2011, and 100 percent of this contract is allocated to ETI.[285]

- During the Period from July 2009 through June 2011, the Company executed a 25-year agreement with SRMPA for 225 MW, with a delivery period beginning on December 1, 2011, and 100 percent of this contract is allocated to ETI. ETI contends that the SRMPA contract will be beneficial because it provides "much-needed long-term base load capacity at an economically attractive price."[286]

---

[282] ETI Ex. 34 (Cooper Direct) at 23; see also ETI Init. Br. at 75-76.

[283] ETI Ex. 34 (Cooper Direct) at 16, 19.

[284] ETI Ex. 34 (Cooper Direct) at 16, 19.

[285] *Id.* at 17, 19.

[286] *Id.*

- An additional contract, the Frontier contract, was in place during the Test Year, and saw a 150 MW increase in contract capacity during the Test Year.[287]

ETI argues that its growing reliance on third-party purchases will diversify its energy portfolio and help the Company meet its reliability needs at a lower cost.[288] The new purchased power contracts will also reduce ETI's fuel costs and dependence upon aging, higher heat rate generation units within the Entergy system.[289]

> ➢ *Capacity Purchases from Other Entergy Affiliates Through "Legacy" Affiliate Contracts Under MSS-4*

The term "legacy affiliate contracts" refers to those contracts resulting from the December 31, 2007, jurisdictional separation of EGSI into ETI and EGSL, pursuant to which ETI purchases its allocated share of power from plants such as the River Bend nuclear plant, located in Louisiana and owned by EGSL as a result of the separation. The legacy affiliate purchases are made under MSS-4.[290]

> ➢ *Capacity Purchases from Other Entergy Affiliates Through "Other" Affiliate Contracts Under MSS-4*

"Other affiliate contracts" refers to all affiliate contracts other than legacy contracts whereby ETI purchases capacity and associated energy from other Operating Companies.[291] The other affiliate purchases are also made under MSS-4.[292] Among others, in 2009 ETI entered into a new affiliate contract with Entergy Arkansas, Inc. (EAI) for wholesale base load resources (the EA WBL Contract), whereby ETI was allocated 31.7 percent of 336 MW capacity.[293]

---

[287] Tr. 1937-38.

[288] ETI Ex. 34 (Cooper Direct) at 24.

[289] Tr. at 1112-13, 1940-41.

[290] ETI Ex. 39 (Cicio Direct) at 24-26.

[291] ETI Ex. 34 (Cooper Direct) at 21.

[292] ETI Ex. 39 (Cicio Direct) at 24-26.

[293] Cities Ex. 6 (Nalepa Direct) at 13-14.

>  ➢ *Capacity Purchases from the Entergy System Through Reserve Equalization Payments Under MSS-1*

Reserve Equalization payments are made under MSS-1. In any given month, some of the Operating Companies might be "long" on the amount of generating capacity they own (meaning that they own more capacity than they need) while others might be "short" on capacity (meaning they own less capacity than they need). In such a month, the long Operating Companies would receive MSS-1 payments from the short Operating Companies for use of their capacity.[294]

## 2. ETI's Request Regarding PPCCs

During the Test Year, ETI had total PPCCs of $245,432,884.[295] In the application, however, ETI is not seeking to recover its Test Year expenses. Rather, it is asking to recover roughly $276 million, which represents the Company's anticipated PPCCs in the Rate Year.[296] In other words, ETI is seeking roughly $31 million more than its actual Test Year expenses. ETI derived this estimate based largely upon what it believes will the purchased power agreements in place during the Rate Year.[297]

As the following tables illustrate, ETI projects that, during the Rate Year, the total quantity, and the relative quantities purchased from each source, will differ substantially from its Test Year purchases.

| Test Year vs. Rate Year Power Capacity Quantities (MW-Months)[298] | | |
|---|---|---|
| **Purchase** | **Test Year** | **Rate Year** |
| **Third Party Purchases** | 5,884 | 12,834 |

---

[294] ETI Ex. 39 (Cicio Direct) at 11-13; Cities Ex. 4 (Goins Direct) at 13.

[295] TIEC Ex. 1 (Pollack Direct) at Ex. JP-1; Tr. at 652-53.

[296] TIEC Ex. 1 (Pollack Direct) at JP-1; ETI Ex. 34 (Cooper Direct) at 20; ETI Ex. 34A (Errata to Cooper Direct).

[297] TIEC Ex. 1 (Pollack Direct) at 22.

[298] TIEC Ex. 1 (Pollack Direct) at 22, Table 1 (Errata).

| Test Year vs. Rate Year Power Capacity Quantities (MW-Months)[298] | | |
|---|---|---|
| Purchase | Test Year | Rate Year |
| Affiliate Purchases (both Legacy and Other) Under MSS-4 | 21,670 | 21,711 |
| Reserve Equalization Under MSS-1 | 8,309 | 5,262 |
| Total | 35,863 | 39,807 |

| Test Year vs. Rate Year Power Capacity Costs[299] | | |
|---|---|---|
| Purchase | Test Year | Rate Year |
| Third Party Purchases | $32,094,893 | $69,061,200 |
| Affiliate Purchases (both Legacy and Other) Under MSS-4 | $189,032,442 | $188,430,917 |
| Reserve Equalization Under MSS-1 | $25,461,353 | $18,317,367 |
| Total | $246,588,688[300] | $275,809,484 |

This indicates ETI will purchase roughly 11 percent more power in the Rate Year than it did in the Test Year. Moreover, while the purchases pursuant to MSS-4 will remain fairly stable, the third-party purchases will substantially increase, with a somewhat corresponding decrease for purchases pursuant to MSS-1. In other word, ETI's plan is to become "less short" (on capacity) relative to the other Operating Companies in the Rate Year than it was in the Test Year.

ETI contends that the shift toward more third party purchases is part of its effort to develop a more diverse, modern, and efficient portfolio of generation supply resources, both to serve current customer needs and to serve anticipated load growth. This, in turn, will lower energy costs and result in savings for customers.[301]

ETI's initial request in this case was for a Purchased Power Rider (PPR) that would allow the Company to recover $276 million, but would be subject to future reconciliation based on actual

---

[299] Cities Ex. 12.

[300] Cities now agree that the correct amount for the Test Year is $245,432,884. *See* TIEC Reply Brief at 18.

[301] ETI Ex. 47 (Cooper Rebuttal) at 7-8.

expenses and revenues, much like a fuel factor.[302]  The intervenors point out that the PPR proposal, while unprecedented, would have at least matched any post-Test Year increases in total purchased capacity costs with corresponding increases in sales, and would also have allowed for a prudence review of any post-Test Year purchased power capacity expenses in a future reconciliation proceeding.[303]   The Commission, however, rejected the PPR proposal in its Supplemental Preliminary Order.[304]   In lieu of the PPR proposal, ETI now proposes to simply recover the $276 million as part of its base rates.

### 3.  Staff and Intervenors' Opposition to ETI's PPCCs Proposal

Staff and all of the actively-engaged intervenors oppose ETI's proposed adjustment to its Test Year PPCCs.  They make a number of arguments against ETI's proposal.

### (a) The PPCCs Requested by ETI Are Not Known and Measurable

First, they contend that ETI's Rate Year forecast cannot be considered known or measurable. Staff points out that the four[305] components from which ETI purchases power are interrelated, such that, "when ETI adds capacity under one element, such as through third party contracts, the other components, such as ETI's MSS-1 payments, will decrease."[306]  Staff describes each of the components comprising ETI's PPCC Rate Year forecast as being "infected" with numerous assumptions.[307] For example, ETI necessarily made projections, rather than relying upon actual payments, when it estimated what it will pay for third-party contracts in the Rate Year.[308]  Many of the third party contracts that will be in effect in the Rate Year do not contain fixed price terms. Rather, the amounts ETI will pay will fluctuate based upon factors such as required availability and

---

[302]  Tr. at 1954; Cities Ex. 4 (Goins Direct) at 14.

[303]  TIEC Init. Br. at 25-26; Tr. at 1954; Cities Init. Br. at 37; Cities Ex. 6 (Nalepa Direct) at 8.

[304]  Supplemental Preliminary Order at 2 (Jan. 9, 2012).

[305] Staff (and some of the intervenors) describe them as three components, by combining affiliate purchases under legacy contracts and affiliate purchases under other contracts into one component.

[306] Staff Initial Brief at 25 (*citing* Tr. at 1946).

[307] Staff Initial Brief at 26.

[308] Tr. at 704.

performance. Nevertheless, ETI simply assumed it would pay the maximum amount possible under each of its third party contracts, and disregarded any of the contractual factors that might reduce its Rate Year payments.[309] Thus, the intervenors contend that ETI's cost estimates for third party purchased power are merely projections, as opposed to known and measurable changes.[310]

Similarly, ETI's contractual agreements with its affiliate Operating Companies require ETI to make assumptions about their future costs. The contracts do not definitively fix prices or quantities. Rather, prices and quantities under the contracts will fluctuate based on the specific operational conditions actually experienced by the various Operating Companies during the Rate Year.[311] The ultimate determination of payments made in the Rate Year will be calculated based upon the complex mathematical formula set out in schedule MSS-4. That formula contains a great number of variables. ETI had to make assumptions about each one of those variables in order to estimate its Rate Year costs.[312] The intervenors point to ETI's new contract with EAI (the EA WBL Contract) as evidence of the "inherently speculative nature" of ETI's PPCCs request. According to the intervenors:

- the EA WBL Contract was signed on April 11, 2012 (only days before the hearing in this matter commenced); purchases will not commence under the contract until January 1, 2013;

- pricing under the contract will be determined in 2013 pursuant to the complex formula contained in MSS-4;

- the quantity of capacity ETI ultimately purchases under the contract will be based on a yet-to-be-determined allocation percentage between ETI and the other Operating Companies;

- the contract itself may never go into effect because it is contingent upon ETI receiving all necessary "regulatory approvals" before August 1, 2012; and

- if it does go into effect, it will still be subject to at least two further revisions before any power is received by ETI under the contract.[313]

---

[309] Tr. at 704-05.

[310] TIEC Initial Brief at 29-30; Staff Initial Brief at 26.

[311] Tr. at 606.

[312] *See* Staff Initial Brief at 27; Tr. 606.

[313] ETI Ex. 47 (Cooper Rebuttal) at RRC-R-1, and Tr. at 628-9.

The EA WBL Contract accounts for more than one-third of ETI's upward adjustment to its Test Year PPCCs. The intervenors contend that, in order for ETI to arrive at its forecasted PPCCs for the Rate Year, it had to make myriad assumptions as to the future values of the many variables in the EA WBL Contract (and the other affiliate contracts).[314] Therefore, the intervenors argue that ETI's cost estimates for its contractual agreements with its affiliate Operating Companies are merely projections, as opposed to known and measurable changes.[315]

ETI's estimated costs for its MSS-1 payments also require assumptions about the future. In order to calculate its future reserve equalization responsibilities using the complex formula set out in MSS-1, ETI had to forecast its own future loads, along with the future loads of all the other Operating Companies. If those assumptions prove to be wrong, then ETI's actual MSS-1 costs will be different than as projected in the application.[316] It is noteworthy, according to the intervenors, that ETI projected the future load growths of all the Operating Companies when it calculated its projected Rate Year MSS-1 costs because, elsewhere in ETI's evidence, the Company has taken the position that future projected loads should not be considered known and measurable.[317] Staff argues:

> ETI cannot have it both ways. It cannot claim load growth to be speculative in one context, and then claim that it can forecast with absolute certainty the respective load growths for each EOC on the Entergy System.[318]

TIEC points out that ETI's estimated MSS-1 payments "were still changing on the eve of the hearing."[319] In the following exchange, even ETI witness Phillip May, one of the Company's

---

[314] Staff Initial Brief at 27-28. Staff makes the further point that, because the EA WBL Contract was executed only days before the hearing, Staff has been unable to determine whether the contract is even a prudent one.

[315] TIEC Initial Brief at 30-32; Staff Initial Brief at 27-28.

[316] Tr. at 651-52.

[317] Tr. at 1907; *see also* Staff Initial Brief at 28; TIEC Initial Brief at 27-28.

[318] Staff Initial Brief at 29; *see also* TIEC Initial Brief at 37.

[319] TIEC Initial Brief at 28.

primary witnesses regarding its PPCCs, seems to have conceded that the Company's MSS-1 projections are not known and measurable:

> Q:    Do you think that the projection . . . of rate year sales that is implicit in the calculation of MSS-1 costs . . . is a known and measurable change?
>
> A:    I think that there is some uncertainty with regard to that projection, yes, sir.[320]

In sum, the intervenors contend that ETI's cost estimates for all components of purchased power in the Rate Year are merely projections, as opposed to known and measurable changes.[321]

### (b) The PPCCs Requested by ETI Violate the Matching Principle

Second, the intervenors acknowledge the principle that Test Year expenses may be adjusted for known and measurable changes. However, they contend that such adjustments can only be made where the attendant impacts on all aspects of a utility's operations (including revenue, expenses, and invested capital) can with reasonable certainty be identified, quantified, and matched.[322] They assert that ETI's proposed adjustment does not satisfy this matching principle. The intervenors complain that ETI is improperly attempting to "compare apples to oranges" by mixing a forecast of future Rate Year PPCCs with actual Test Year billing determinants. As explained by Cities witness Nalepa, "[u]nder the company's approach of mixing estimated rate year costs with test year billing units, there is a failure to recognize customer growth and increased sales revenue – thus overstating the revenue requirement."[323] The argument, essentially, is that the various new or expanded contracts that ETI has entered into were executed so that, in whole or in part, ETI would be able to meet future demand, but that ETI is seeking to recover the costs of those new contracts from its existing customers.[324]

---

[320]  Tr. at 1918-19.

[321]  TIEC Initial Brief at 27-28; Staff Initial Brief at 29.

[322] Cities Ex. 6 (Nalepa Direct) at 12, *citing* P.U.C. SUBST. R. 25.231(c)(2)(F).

[323] Cities Ex. 6 (Nalepa Direct) at 8; Cities Ex. 4 (Goins Direct) at 14-15.

[324] Cities Ex. 6 (Nalepa Direct) at 11; *see also* Cities Initial Brief at 38, Staff's Initial Brief at 30, TIEC Initial

The intervenors offer various examples, of which the following is typical, to illustrate why it was inappropriate for ETI to fail to take load growth into account when it calculated its Rate Year PPCCs. Assume that, during the Test Year, Utility X had 100 billing units and $500 of PPCCs. Also assume that, during the Rate Year, Utility X had 200 billing units and $1,000 of PPCCs. If Utility X were limited to setting its rates based solely on its Test Year numbers, then it would recover precisely the right amount to cover its PPCCs in both the Test Year (100 billing units x $5 per unit = $500 of PPCCs) and in the Rate Year (200 billing units x $5 per unit = $1,000 of PPCCs). If, on the other hand, Utility X were allowed to set its rates based upon it billing units from the Test Year (100) and its PPCCs from the Rate Year ($1,000), then Utility X would unfairly recover twice the amount needed to cover its actual PPCCs in the Rate Year (200 billing units x $10 per unit = $2,000).[325] Thus, intervenors contend that ETI's load growth must be taken into account if PPCCs are to be based on Rate Year projections.[326] They point out that ETI itself expects steady load growth in the next few years,[327] and experienced "good" growth over the two years preceding the Test Year.[328]

For its part, ETI denies that its increased capacity has been obtained in order to meet load growth. Rather, it contends that it has added capacity in order to be "less short" in comparison to the other Operating Companies.[329] Moreover, ETI contends that the load growth adjustments proposed by intervenors are "uncertain and unnecessary."[330]

### (c) ETI's Proposal Would Preclude Prudence Review

Third, TIEC contends that ETI's future Rate Year proposal would set rates based on projections without any effective Commission review of: (1) what the actual expenditures under

---

Brief at 35-39.

[325] Cities Ex. 4 (Goins Direct) at 16-17.

[326] Cities Ex. 4 (Goins Direct) at 17; *see also* TIEC Ex. 23.

[327] Cities Ex. 4 (Goins Direct) at 17; Tr. at 706.

[328] Tr. at 130.

[329] ETI Initial Brief at 68-69.

[330] *Id.* at 69.

purchased capacity contracts turn out to be; (2) whether those expenditures turn out to be reasonable; and (3) whether the future contracts were prudent.[331]

### 4.   The Intervenors' Recommendations Regarding PPCCs

The intervenors agree that the amount requested by ETI is unreasonable, excessive, and should be rejected.  They do not universally agree, however, about what the proper number for PPCCs should be.  Staff, TIEC, and State Agencies argue that ETI's PPCCs should be set at the amount of the Company's Test Year PPCCs: $245.4 million.  This position is best summarized by Staff:

> Staff recommends that the Commission adhere to traditional ratemaking principles and set the amount of ETI's purchased power expenses based on what the Company actually experienced during its test year.  During its test year, ETI had total purchased power capacity expenses of $245.4 million.  This amount is not in dispute.  This amount *is* known.  This amount *is* measurable.  The Commission should utilize this amount to set just and reasonable rates for ETI and its ratepayers.[332]

Rather than recommending Test Year PPCCs, Cities offer two alternatives – one recommended by its witness Dr. Dennis Goins, and another recommended by its witness Mr. Nalepa.[333]   Dr. Goins recommends that ETI be allowed to recover PPCCs of roughly $242.9 million.[334]  This amount is roughly $33 million less than ETI's requested amount and $3 million less than ETI's actual Test Year costs.  To arrive at this amount, Dr. Goins made several calculations.  First, he adjusted the average per kW cost of ETI's legacy and other affiliate purchases using cost data from November 2010 through October 2011, which is slightly more current data than that relied upon by ETI.[335]  Second, as to MSS-4 costs, because the EA WBL contract is set to expire sooner than the three years he assumed ETI's new rates will be in effect, Dr. Goins "normalized" the

---

[331]   TIEC Initial Brief at 33-35.

[332]   Staff Initial Brief at 29.

[333]   Cities Initial Brief at 40.

[334]   Cities Ex. 6 (Nalepa Direct) at 17, and Errata No. 3.

[335]   Cities Ex. 4 (Goins Direct) at 17-18.

costs of the EA WBL contract over the three year period.[336]  Finally, he adjusted the Rate Year total

PPCCs estimate to reflect the effects of load growth, based upon ETI forecasts.[337]

Mr. Nalepa took a slightly different approach.  He recommended that ETI be allowed to

recover PPCCs of $236,838,634, or roughly $39 million less than ETI's requested amount and

$8 million less than ETI's Test Year costs.[338]  To arrive at this amount, Mr. Nalepa first calculated

the per kW cost of ETI's third party Rate Year capacity and applied it to ETI's Test Year-end

capacity.  In this way, "the increased cost of the new resources is recognized, but current demand is

better matched to current resources."[339]  Second, he made the same adjustment as Dr. Goins as to

MSS-4 costs due to the EA WBL contract.[340]

TIEC explains it is reluctant to "descend into the rabbit hole and engage in ratemaking based

on prognostications, estimates, projections, and assumptions about what may happen in the

future."[341]  If the Commission were to do so, however, TIEC argues that the final result would be

lower than the Test Year PPCCs, not higher.  TIEC's witness Jeffry Pollock calculated the impact of

projected unit prices based upon ETI's projections, and he eliminated the expiring EA WBL

Contract.  His result, which TIEC is not advocating, would allow ETI to recover PPCCs of $238.8

million, roughly $7 million less than its Test Year costs.[342]

ETI describes the proposals made by TIEC and Cities as "extreme" and contrary to common

sense.[343]  For example, Mr. Pollock's calculations indicate that ETI's MSS-1 costs would increase

by roughly $5 million, while its third-party and affiliate contracts would slightly decrease.  ETI

argues that this is the opposite of reality.  By adding capacity through third party contracts, its

---

[336]  Cities Ex. 4 (Goins Direct) at 18; Cities Ex. 6 (Nalepa Direct) at 15-16.

[337]  Cities Ex. 4 (Goins Direct) at 18-19.

[338]  Cities Ex. 6 (Nalepa Direct) at 17.

[339]  Cities Ex. 6 (Nalepa Direct) at 12-13.

[340]  *Id.* at 15-16.

[341]  TIEC Initial Brief at 41.

[342]  TIEC Ex. 1 (Pollack Direct) at 25-27; TIEC Initial Brief at 41-42.

[343]  ETI Initial Brief at 83.

reliance upon the other purchased power components, especially MSS-1, will necessarily decline, not increase.[344] ETI also argues that load growth is inherently uncertain and should not be taken into account.[345]

### 5. The ALJs' Analysis Regarding PPCCs

The ALJs conclude that ETI failed to meet its burden to prove that the adjustment it seeks to its Test Year PPCCs is known and measurable. The known and measurable standard is an *exception* to the actual data contained in the Test Year. The point of a historical Test Year is to review actual costs, which include the ups and downs of what actually occurred. As to a forecast of the Rate Year, by contrast, the evidence demonstrates that the costs attributable to a particular contract to purchase capacity cannot currently be known because there are so many variables that will play into the amount ETI ultimately pays. As stated above, ETI's third party contracts lack fixed prices and the amounts ETI will pay could fluctuate based upon factors such as required availability and performance. ETI simply assumed it would pay the maximum amounts under those contracts, and disregarded the contractual factors that could lower the payment amounts. Yet this assumption runs counter to ETI's historical experience with its contracts.[346] Similarly, ETI's affiliate contracts do not fix prices or quantities, and the amount ETI ultimately pays will fluctuate based upon operational conditions experienced by all of the Operating Companies during the Rate Year. Those operational conditions obviously cannot be known at this time. Both the affiliate contracts under MSS-4 and the equalization payments under MSS-1 are based upon highly complex mathematical formulae that utilize numerous variables. Any of the variables could change during the Rate Year, thereby altering the amounts paid by ETI under affiliate contracts or MSS-1. As a result, the evidence demonstrates that there could be a substantial difference between ETI's projected Rate Year costs and what actually ends up occurring. ETI asks the Commission to trust it that these differences would be "small,"[347] but provides no evidence as to what small means.

---

[344] *Id.* 83.

[345] *Id.* 84.

[346] Tr. at 705.

[347] ETI Initial Brief at 81.

The efforts made by ETI, Cities, and TIEC to forecast Rate Year PPCCs further illustrate the difficulty of deviating from actual Test Year data in an area that involves so many future contingencies and unknowns. Those forecasts swung wildly – ETI estimated Rate Year PPCCs that were $31 million *more* than the Test Year, while the Cities' and TIEC's estimates came in at $3 million, $8 million, and $7 million *less* than the Test Year, respectively. Indeed, even Cities' own witnesses disagreed substantially among themselves as to what the proper amount should be. Moreover, arguably ETI could not even agree with itself regarding the proper amount because, in its Initial Brief, it suggested that a reduction of roughly $4.5 million might be warranted to account for its latest projection of its MSS-1 costs in the Rate Year.[348]

The ALJs are similarly convinced that ETI's request violated the matching principle by mixing its forecast of future Rate Year PPCCs with Test Year billing determinants. It is logically inconsistent for ETI to have, on the one hand, based its estimate of Rate Year MSS-1 costs on its projections of the load growths of ETI and all the other Operating Companies and, on the other hand, argue that load growth cannot be considered known and measurable when calculating its overall PPCCs. This argument does not withstand scrutiny, especially in light of the fact that ETI clearly believes its load will be larger in the Rate Year than it was in the Test Year and it has, in fact, contracted for six percent more load in the Rate Year.[349]

Simply put, the intervenors presented substantial evidence that all of the components of ETI's purchased power capacity contain significant variability and uncertainty in costs, thereby leading to the conclusion that estimates of Rate Year PPCCs cannot be considered known and measurable. For this reason, the ALJs recommend that ETI's PPCCs request be rejected. In its place, the ALJs recommend that ETI be allowed to recover its Test Year PPCCs of $245,432,884.

---

[348] ETI Initial Brief at 77 (citing Tr. at 684, 1945).

[349] ETI Ex. 47 (Cooper Rebuttal) at 4; Tr. at 667-68.

## B.      Transmission Equalization (MSS-2) Expense

The Entergy system transmission grid is a large, integrated transmission network that is operated for the mutual benefit of all of the Entergy Operating Companies.[350]   Service Schedule MSS-2 is a FERC jurisdictional tariff that equalizes the ownership costs of certain high voltage transmission facilities among ETI and the other Operating Companies, so that each Operating Company pays its just and reasonable share of those costs.  Accordingly, those costs are referred to as "transmission equalization" payments.[351]  MSS-2 generally applies to equalization of transmission costs for transmission assets of 230 kV and larger.[352]

In any given month, some of the Operating Companies might be "long" on the amount of transmission capacity they own (meaning that they own more capacity than they need) while others might be "short" on capacity (meaning they own less capacity than they need).  In such a month, the long Operating Companies would receive MSS-2 payments from the short Operating Companies for use of their transmission facilities.[353]  Over the course of the Test Year, ETI was short, meaning that it paid a total of $1,753,797 in MSS-2 payments to various other Operating Companies.[354]

In the application, rather than seeking to recover only the $1.7 million in Test Year MSS-2 costs, ETI is seeking to recover roughly $10.7 million, which represents its anticipated MSS-2 expenses in the Rate Year.[355]  The additional $9 million that ETI seeks is based on the Company's estimates of transmission construction projects that are expected to have been completed by or during the Rate Year which will result in changes to the relative transmission line ownership ratios between the Operating Companies.  In other words, ETI expects that, by or during the Rate Year, its ownership share under the MSS-2 will decrease relative to the other Operating Companies (as the

---

[350]  Tr. at 450, 793.

[351]  Tr. at 724; ETI Ex. 39 (Cicio Direct) at 15-17 and PJC-1 at 38.

[352] Tr. at 450-51, 731.

[353] Tr. at 731, 735.

[354]  Tr. at 723-24, 737; Cities Ex. 28.

[355]  Tr. at 452-53, 738, 760.

transmission capacity owned by the other Operating Companies increases), thereby driving the amount of ETI's MSS-2 payments upward.[356]

The increase is driven by ETI's prediction that $184.9 million in additional transmission capacity will be built by other Operating Companies by the end of the Rate Year. ETI identified six construction projects that are either underway or approved for construction and which, collectively, will account for roughly $141 million of the predicted $184.9 million in additional transmission capacity. Of those six projects, one was completed and went into service on December 16, 2011, after the end of the Test Year. The other five are either under construction or still in the planning phase and are currently scheduled to go into service on dates ranging from June 29, 2012, to December 31, 2012.[357] According to ETI, the remaining $43.9 million of the $184.9 million in additional transmission capacity is derived from "an estimate of the capital investment necessary to maintain equalizable [*i.e.* MSS-2 qualifying] transmission investments across the Entergy Transmission System."[358] The estimate is based upon the Operating Company's projected budgets and historical spending patterns for maintenance of transmission facilities.[359]

Staff, State Agencies, TIEC, and Cities all oppose ETI's effort to recover $10.7 million in MSS-2 expenses. The parties make a number of arguments. First, they point out that MSS-2 utilizes a complex mathematical formula to calculate each Operating Company's liability (or credit) under the equalization process. There are a great number of variables that are used in the formula, such as the amount of investments made by each Operating Company in transmission facilities, the costs of capital for each Operating Company, the size of the load demanded by each Operating Company, and the amount of state and federal taxes paid by each Operating Company. Changes to any of these variables can change the amount ETI owes (or is due) pursuant to MSS-2.[360] Moreover, these variables relate not only to ETI, but to all of the Operating Companies. Indeed, Cities calculate that,

---

[356] Tr. at 775-77.

[357] ETI Ex. 59 (McCulla Rebuttal) at 2 and MFM-R-1; Tr. at 456-58.

[358] ETI Ex. 59 (McCulla Rebuttal) at 3.

[359] *Id.*

[360] ETI Ex. 39 (Cicio Direct) at PJC-1 at 38-43; Tr. at 454-55.

to perform the MSS-2 calculation, at least 360 "mini-forecasts" must be made, only 60 of which relate to ETI.[361]  As explained by TIEC witness Pollock, any effort to estimate future amounts of these many variables "is susceptible to a host of uncertainties."[362]  The intervenors argue that for ETI to arrive at its estimate of $10.7 in MSS-2 costs during the Rate Year, the Company had to speculate as to what the many MSS-2 variables would be in the Rate Year.  In other words, they contend that ETI's estimate of its future MSS-2 costs cannot possibly be considered "known and measurable" and, therefore, is not recoverable.[363]  State Agencies and Staff liken ETI's attempt to obtain an MSS-2 adjustment for not-yet-complete construction projects to an impermissible request to recover the costs of CWIP without having to meet PURA's burden of proving that recovery is necessary to protect the utilities financial integrity.[364]

Second, the parties oppose ETI's effort to recover its predicted MSS-2 expense in the Rate Year point out that the primary driver of the increased costs over the Test Year comes from a number of transmission projects that have not yet come into service, and are still in the planning or construction phase.  ETI concedes that if the projects do not actually come into service at the currently estimated times, then the Company's estimates of its MSS-2 costs during the Rate Year will be inaccurate.[365]  Thus, Staff contends that ETI's projections about future MSS-2 costs cannot be considered known and measurable.[366]  Moreover, TIEC and Staff contend that ETI is effectively seeking higher rates based upon expenses associated with projects that are not yet completed and, therefore, the projects cannot be considered "used and useful."[367]  As explained by TIEC:

> It would be bad public policy for the Commission to rely on speculative construction end dates to form the basis of a known and measurable change to test year costs.

---

[361]  Cities Reply Br. at 68-69.

[362]  TIEC Ex. 1 (Pollock Direct) at 29.

[363]  Staff Initial Brief at 31; State Agencies Initial Brief at 11-13; TIEC Initial Brief at 44-45; Cities Initial Brief at 44.

[364]  State Agencies Initial Brief at 12 (*citing* PURA § 36.054; P.U.C. SUBST. R. 25.231(c)(2)(D)); Staff Reply Brief at 20.

[365]  Tr. at 800-801

[366]  Staff Initial Brief at 32.

[367]  TIEC Initial Brief at 47; Staff Initial Brief at 19-20.

> ETI's own witness Mr. Cicio admitted that in-service dates can be uncertain. . . . Similarly, costs can change upward or downward. For this reason, the Commission has typically followed the policy that proper ratemaking requires that a utility actually build the transmission infrastructure suggested by its projections, and then seek to account for that investment on a historical basis in a future rate case. In Docket No. 28906, for example, the Commission held that LCRA's projections of future transmission investment did not support a finding that its projected capital needs satisfied the known and measurable test. It is similarly unreasonable for ETI to make a post-test year adjustment associated with transmission projects that are not serving any of its customers and that may or may not impact ETI's transmission equalization expense, depending on when the projects are finally completed.[368]

Third, in addition to the six transmission projects that are under development, another driver of the increased costs over the Test Year comes from ETI's estimate that $43.9 million will be spent to maintain transmission investments across the Entergy Transmission System. The intervenors contend that ETI has provided little to no evidentiary support for this estimate. State Agencies and Cities also point out the unfairness of allowing ETI to begin recovering $10.7 million per year in its rates immediately based upon new transmission facilities, even though many of those new facilities will not come into service (and ETI will therefore not incur higher MSS-2 payments for those facilities) for many months.[369]

Fourth, Cities points out that Entergy and the various Operating Companies have announced a plan to sell all of their transmission assets to a third party. That process is currently underway. The evidence suggests that, if and when that transaction is complete, ETI's MSS-2 expenses will disappear.[370]

Finally, TIEC argues that there is no need to grant ETI's request for a *pro forma* adjustment to its test year MSS-2 expenses because the Company can avail itself of a TCRF if its Rate Year costs deviate substantially from its Test Year costs. Thus, if it turns out that ETI experiences an

---

[368] TIEC Initial Brief at 47 (*citing* Docket No. 28906, Order at 6).

[369] State Agencies Initial Brief at 12; Cities Initial Brief at 45.

[370] Cities Reply Brief at 67-68; Tr. at 113-14; Cities Ex. 4 (Goins Direct) at 20-21. Admittedly, if these expenses disappear, ETI will still have to bear transmission expenses. However, it is impossible to know, at this time, what those expenses would be.

increase in its MSS-2 expenses during the Rate Year, the utility has cost recovery mechanisms at its disposal that could make it whole in a timely manner.

Staff and State Agencies argue that only $1.7 million (representing ETI's actual Test Year expenses) should be approved in this proceeding. TIEC witness Pollock recommends approving a slight upward adjustment to account for the fact that ETI's MSS-2 expenses were substantially higher in the second six months of the Test Year than they were in the first six months. Mr. Pollock and TIEC recommend a *pro forma* adjustment equal to twice the amount of MSS-2 payments incurred by ETI in the second six months of the Test Year, or $2.7 million.[371]

Cities' witness Goins presented yet another alternative. Dr. Goins proposes to adjust the projected Rate Year costs for known expenses incurred after the Test Year. He proposed reducing the adjusted Rate Year MSS-2 expense to a Test Year level by applying a load growth adjustment using ETI's own projected load growth as a benchmark indicator of the reasonable anticipated level of growth. (Cities invoke essentially the same "matching principle" argument regarding load growth that they raised with respect to PPCCs). The result of Dr. Goins' adjustment would be to would allow ETI to recover $4,103,850 in MSS-2 expenses.[372]

ETI responds to these arguments on a number of fronts. It contends that the main driver of changes in MSS-2 expenses is the relative amount of equalizable transmission investment in the transmission system by ETI and the other Operating Companies, compared to their proportionate responsibility for that investment, based on each company's responsibility ratio.[373] ETI argues that the other elements of the formula are relatively stable, and do not vary significantly from year to year.[374] ETI contends its requested level of MSS-2 expense is based on a known and measurable

---

[371]  TIEC Ex. 1 (Pollack Direct) at 32-33.

[372] Cities Ex. 4 (Goins Direct) at 20-21.

[373] ETI Ex. 45 (Cicio Rebuttal) at 3-4. Responsibility Ratio is an allocator that reflects the relative contribution of each Operating Company to the System's coincident peak load – in other words, an Operating Company's coincident peak load divided by the System peak load, calculated on a rolling twelve-month average. ETI Ex. 39 (Cicio Direct) at 12.

[374] Tr. at 763 and 780.

change because it is based on the $184.9 million in additional transmission investment for all of the Operating Companies that ETI knows will occur and can reasonably measure. ETI points out that "the vast majority" of the planned transmission projects have received full funding approval and have been constructed or are on schedule to be completed before the end of the Rate Year, while the remaining amount is reasonably quantified and measured based on the budget and historical spending for maintenance of equalizable transmission facilities.[375]

ETI also argues that its actual MSS-2 expenses have steadily trended upward since the Test Year. ETI explains as follows:

> [I]n the last month of the test year (June 2011), ETI's payments began to increase significantly, as the balance of relative equalizable investment levels shifted among the Operating Companies. ETI's actual monthly payments have climbed steadily ever since, reaching $698,289 in the most recent actual month's bill (February 2012). Annualization of this most recent actual data yields an annual MSS-2 amount of $8.4 million, almost five times the test year level. In light of this trend in actual historical data, the notion of basing the MSS-2 expense in rates on the test year level is unreasonable on its face.[376]

Thus, ETI contends its requested expense level is "consistent" with actual recent historical levels of MSS-2 expense.[377]

ETI describes Cities' concern regarding load growth as a "red herring." ETI contends that load growth is not the cause of changes in MSS-2 costs. Instead, its MSS-2 increases are driven by the other Operating Companies' transmission investments, "separate and apart from, and unaffected by," any increase in ETI's load.[378] Moreover, ETI contends that load growth adjustments are not

---

[375] ETI Ex. 59 (McCulla Rebuttal) at 2-3; ETI Initial Brief at 88-89.

[376] ETI Initial Brief at 90-91; Tr. at 784.

[377] ETI Initial Brief at 91.

[378] ETI Ex. 45 (Cicio Rebuttal) at 4-5; ETI Initial Brief at 93.

known and measurable and are not the proper subject of a post-test year adjustment for ordinary expenses such as MSS-2 costs.[379]

Finally, if the Commission rejects its request for $10.7 million in MSS-2 costs, ETI suggests annualizing the most recent period of its actual MSS-2 costs, by multiplying its February 2012 MSS-2 bill times 12, resulting in an amount of $8,379,480. ETI contends this would be more representative of expected Rate Year MSS-2 costs than the amounts proposed by the intervenors.[380]

For largely the same reasons as were discussed relative to PPCCs, the ALJs conclude that ETI failed to meet its burden to prove that its proposed Rate Year MSS-2 costs are known and measurable. The MSS-2 formula requires assumptions about a great number of variables. Changes to any of the variables could occur during the Rate Year, thereby altering the amount paid by (or received by) ETI during the Rate Year. The projects that underlie ETI's Rate Year request are largely not yet built, and might never be built. Additionally, much like with the PPCCs estimates, there is a wide gulf between the competing estimates by ETI, Cities, and TIEC of forecast Rate Year MSS-2 costs, illustrating the problem of deviating from actual Test Year data in an area that involves so many future contingencies and unknowns.

The ALJs are equally unconvinced by ETI's alternative proposal to multiply its February 2012 MSS-2 bill times 12, resulting in an amount of $8,379,480. ETI offered no evidence to establish that a single month's costs can serve as a reasonable representation of what ETI's future Rate Year MSS-2 costs will be. Moreover, February 2012 is outside of the Test Year.

The intervenors presented substantial evidence to demonstrate that ETI's estimate of its Rate Year MSS-2 costs cannot be considered known and measurable. For this reason, the ALJs recommend that ETI's MSS-2 request be rejected. In its place, the ALJs recommend that ETI be allowed to recover its Test Year MSS-2 costs of $1,753,797.

---

[379] ETI Ex. 57 (May Rebuttal) at 12; ETI Initial Brief at 93.

[380] ETI Ex. 46 (Considine Rebuttal) at 37; ETI Initial Brief at 32.

## C.     Depreciation Expense [Germane to Preliminary Order Issue No. 12]

ETI currently has an annual depreciation expense of approximately $72.1 million. This expense is based on the previously approved depreciation rates.[381] ETI now requests depreciation rates that would result in an annual depreciation expense of approximately $86 million. This requested amount represents an increase in the annual depreciation expense of approximately $13.9 million - almost 20 percent - from the current annual depreciation expense.[382] The depreciation expense ultimately included in retail rates, however, will be derived by applying the Commission approved rates to the test year end plant balances as of June 30, 2011.

The other parties have accepted the vast majority of ETI's recommendations, but take issue with the Company on a few issues related to generation, transmission, distribution, and general plant accounts. Staff recommends an annual depreciation expense of approximately $78.2 million, an increase of approximately $6.1 million from the current annual depreciation expense.[383] Cities recommend an annual depreciation expense of approximately $67.6 million.[384]

The identical positions of ETI, Staff, and Cities on depreciation issues are set forth in the following table:[385]

| Plant Group | Approved | ETI Proposal | Staff Proposal | Cities Proposal |
|---|---|---|---|---|
| Hydro Production | $7,137 | $245 | $245 | n/a |
| Regional Trans. & Market Operations | $685,351 | $685,351 | $685,351 | n/a |
| General Amortized Plant | $4,175,311 | $5,946,949 | $5,946,949 | n/a |

---

[381] ETI Ex. 13 (Watson Direct) Attachment DAW-1. Appendix B at 3.

[382] ETI Ex. 13 (Watson Direct) at 7.

[383]  Staff Ex. 2 (Mathis Direct) at 8.

[384]  Cities Ex. 5C (Pous Depreciation Study) at 2.

[385]  ETI Ex. 13 (Watson Direct) at 7; Staff Ex. 2 (Mathis Direct) at 7-8; Cities Ex. 5C (Pous Depreciation Study) at 7, 8, and 34.

The differing positions of ETI, Staff, and Cities on depreciation issues are set forth in the following table:[386]

| Plant Group | Approved | ETI Proposal | Staff Proposal | Cities Proposal |
|---|---|---|---|---|
| Steam Production | $17,497,781 | $18,660,946 | $14,709,942 | n/a |
| Transmission Plant | $13,679,827 | $16,493,761 | $16,417,727 | $13,451,479 |
| Distribution Plant | $32,110,774 | $40,493,392 | $38,806,863 | $33,186,546 |
| General Plant | $3,943,450 | $1,604,644 | $1,604,644 | $973,519 |
| General Plant Reserve Deficiency | $0 | $2,134,924 | $0 | n/a |
| *TOTAL* | $72,099,631 | $86,020,212 | $78,171,721 | n/a[387] |

The competing positions of ETI, Staff, and Cities reflected in the table above are primarily the result of different: (1) net salvage rates for certain accounts; (2) remaining life parameters for certain accounts; and (3) treatment of a potential general plant reserve deficiency. Cities witness Pous also questions the reliability of the data employed by ETI witness Watson in the performance of his study.

An analysis of the competing net salvage rates and life parameters for each account is presented in detail below, organized by plant and account group.

### 1. Terminology and Methodology

Depreciation is a method of allocating the loss of the service value, not restored by current maintenance, over the useful life of an asset. This loss may be caused by wear and tear, decay, obsolescence, or changes in demand.[388]

---

[386] ETI Ex. 13 (Watson Direct) at 7; Staff Ex. 2 (Mathis Direct) at 7-8; Cities Ex. 5C (Pous Depreciation Study) at 7, 8, and 34.

[387] A total value of Cities' adjustments in this format would be out of context and is therefore not provided in this table.

[388] Staff Ex. 2 (Mathis Direct) at 8.

Within the context of a rate case, the purpose of depreciation is to allow a company to recover the cost of an asset over the asset's useful life. Ideally, the cost of the asset is spread out evenly across the years the asset is in service, thus recovering the cost of the asset from the customers who receive the benefit of the asset.[389]

Both ETI and Staff use the remaining-life technique, average life group procedure, and straight-line method to calculate the depreciation rate.[390] The basic formula for the remaining life technique is presented below.

$$depreciation\ rate\ (\%) = \left\{ \frac{1 - book\ reserve\ ratio - net\ salvage\ ratio}{composite\ remaining\ life} \right\} * 100$$

For example, if an asset has a book reserve ratio of 0.5 (*i.e.*, 50 percent of the asset's value has already been recovered through prior depreciation expense), a net salvage ratio of zero (*i.e.*, the asset will cost nothing to retire, or all retiring costs will be recovered through its subsequent sale), and the composite remaining life is ten years (*i.e.*, the asset is expected to remain in service for another ten years), then the depreciation rate will be 5 percent (*i.e.*, {[(1 - 0.5 - 0) / 10 ] *100}).

By operation of the remaining-life formula, a greater net salvage value will reduce the numerator and result in a lower depreciation rate and a lower depreciation expense. Likewise, a lower net salvage value will increase the numerator and result in a higher depreciation rate and a higher depreciation expense. Similarly, a longer remaining-life will result in a lower depreciation rate and lower depreciation expense, and a shorter remaining-life will result in a higher depreciation rate and a higher depreciation expense.

Because net salvage and remaining-life values are the two contested variables in the remaining-life formula, a clear explanation of net salvage and remaining-life will be helpful.

---

[389] Staff Ex. 1 (Mathis Direct) at 8-9.

[390] ETI Ex. 13 (Watson Direct) at 15; Staff Ex. 2 (Mathis Direct) at 10-11.

*Net Salvage Value.* Net salvage is calculated by taking the amount received for an asset as a result of its sale, reuse, or reimbursement, and subtracting that amount from the cost associated with retiring the asset. This figure is then divided by the original cost of the asset to determine the net salvage ratio. For example, if an asset with an original cost of $200 is resold for $20, but it costs the owner $10 to ship the asset to the purchaser, then the net salvage value of that asset would be $10 ($20 - $10), and the net salvage ratio of that asset would be 5 percent ($10/$200).

ETI witness Watson and Staff witness Mathis used different methods of calculating a net salvage rate.[391] Mr. Watson took the average (mean) of recorded net salvage values for groups of successive years (rolling bands), and then selected the net salvage rate from among these averages.[392] Ms. Mathis also used rolling band averages (means), but then took the median from a representative group of rolling bands when the historical salvage data would have otherwise produced what Mr. Watson considers skewed results.[393]

Ms. Mathis' method of calculating net salvage rates follows recent Commission precedent.[394] As Mr. Watson explained at the hearing, it is appropriate to infer acceptance of a methodology by looking at whether the Commission adopted the conclusions that the methodology produced.[395] In other words, if the Commission adopts the conclusions, then by inference the Commission has adopted the methodology used to derive those conclusions. Thus, it is necessary to examine recent litigated rate cases to ascertain Commission precedent.

In the most recent fully-litigated rate case, Docket No. 38339,[396] Staff disagreed with CenterPoint's depreciation witness, Mr. Watson, concerning the net salvage rates for five

---

[391] Tr. at 415-416.

[392] ETI Ex. 13 (Watson Direct) at 20-21.

[393] *Id.* at 22-23, 32-33.

[394] Tr. at 1766; Staff Ex. 9 (Docket No. 38339 Final Order) at FoF 126, 128, 130, and 131.

[395] Tr. at 397.

[396] *Application of CenterPoint Energy Houston Electric, LLC, for Authority to Change Rates,* Docket No. 38339 (June 23, 2011).

accounts.[397]   In its order, the Commission adopted Staff's recommended net salvage rates for four out of those five accounts for which Staff disagreed with Mr. Watson.[398]   Staff's method for calculating net salvage rates is the same in the present case as it was in the CenterPoint rate case.[399]

ETI argues that the use of a median, as employed by Ms. Mathis, is not a sufficiently rigorous or expansive approach to depreciation analysis.  According to ETI, depreciation training and texts, as well as authoritative statistical texts, favor the average, or mean, not the median, as the best indicator of the central tendency of a data set.  ETI argues that this is particularly the case because depreciation analysis requires careful consideration of trends over time.[400]   ETI then offers the following comments:

> [Ms. Mathis] agreed in response to a hypothetical that the median value of an initial period of ten years of +5% net salvage, followed by one year of 0% salvage, followed by the most recent period of ten years of -5% salvage, would be 0%.  This hypothetical plainly illustrates how reliance on the median can overlook data trends.  In the hypothetical, if the depreciation analyst would otherwise wish to give more weight to the most recent historical period as indicative of conditions going forward, the use of the median would obscure that important trend information.[401]

A close examination of the hypothetical shows that in the case posited by ETI, however, the median and the mean are identical:  both are zero.  While the use of the median would produce a result that ignores the trend that ETI says should be taken into account, the mean produces the same result.  Changing the hypothetical produces no more clarity.  If the examination was of a period that had ten years of positive five percent salvage value, followed by one year of zero percent net salvage value, followed by the most recent 10-year period, which had negative 10 percent net salvage value, the median would still be zero but the mean would be negative 2.38 percent.  This appears to support the trending argument advanced by ETI.  If the analysis then focuses on a different hypothetical, one with ten years of positive 10 percent net salvage value followed by one year of zero percent net

---

[397]  Tr. at 401-402.

[398]  *See* Staff Ex. 9 (Docket No. 38339 Final Order); Tr. at 402.

[399]  Tr. at 415-416.

[400]  ETI Initial Brief at 105.

[401]  *Id.*

salvage value, with the most recent ten-year period having negative five percent net salvage value, the results are more perplexing. The median is still zero, but the mean, which ETI contends will recognize the trending, is 2.38. Although this does in some respects recognize the trend to a negative salvage value, it does not recognize it as well as the median.

*Principles and Procedures of Statistics*, by Steel and Torrie, states: "Certain types of data show a tendency to have a pronounced tail to the right or the left. Such distributions are said to be skewed, and the arithmetic mean may not be the most informative central value." Where the average of the incomes of a group of individuals is required, and most of those incomes are low, the mean income could be considerably larger than the median. In Docket No. 38339, Staff posed the following example, which the ALJs found both informative and persuasive: Suppose a sample of 50 incomes from professional baseball players was taken that happened to include the salary of two of the most highly compensated players in the league today. As a result, the mean of the salaries would likely be far greater than the median salary, because the use of the median would be skewed by the very high salaries. The median would likely provide a more accurate measure of the central tendency of the salaries. Such circumstances are found where using the median to find the central tendency prevents outliers in data that "skews" or shows extreme variations rather than showing more symmetrical variations. The ALJs believe this is as accurate today as it was during the Docket No. 38339 timeframe. They therefore find that the use of the median is the more appropriate methodology for determining net salvage value.

*Remaining Life.* Composite remaining life is the weighted average remaining life of the property account for a group of all vintages. The average remaining life represents the future years of service expected for the surviving property.

There are numerous ways to calculate the remaining life (life parameter) of a group of assets in a depreciation study. Examples include the interim retirement rate method and the retirement (actuarial) rate method. The interim retirement rate method uses interim retirement curves to model (predict) the retirement of individual assets within plant accounts. Alternatively, the retirement (actuarial) rate method uses historical mortality data for a group of assets and compares that data to various known patterns of industrial asset mortality rates (Iowa Curves). If the historical data

creates a pattern of mortality that closely follows one of the Iowa Curves, then that Iowa Curve may be used to approximate the remaining lives of that given group of assets in the future. Whether the historical mortality data creates a pattern that closely follows a given Iowa Curve is determined through plotting both sets of data (the historical mortality data and the Iowa Curve) on a graph and quantifying the closeness of fit through statistical analysis and visual examination.

Mr. Watson used multiple methods to calculate the remaining lives of assets, depending on the asset. Generally, he used the retirement rate (actuarial) method.[402] However, to calculate the remaining life of production plant accounts, he used the interim retirement rate method.[403] Ms. Mathis disagreed with the use of the interim retirement rate method because the Commission has rejected the application of interim retirement rates of production plant, as they are based on future projection of retirements, for ETI and Central Power and Light Company in Docket Nos. 16705[404] and 14965,[405] respectively.

ETI argues that the life span procedure, without the use of interim retirement curves, is unrealistic in its assumption that all production plant assets are "depreciated (straight-line) for the same number of periods and retire at the same time (the terminal retirement date)." Use of interim retirements is an important refinement that adds accuracy to the determination of the depreciation rates according to ETI. Mr. Watson offered the following explanation:

> Adding interim retirement curves to the procedure reflects the fact that some of the assets at a power plant will not survive to the end of the life of the facility and should be depreciated (straight-line) more quickly and retired earlier than the terminal life of the facility.[406]

---

[402] ETI Ex. 13 (Watson Direct) at 16.

[403] Staff Ex. 2 (Mathis Direct) at 14.

[404] *Application of Entergy Gulf States, Inc., for Approval of its Transition to Competition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Under-recovered Fuel Costs,* Docket No. 16705 (Oct. 14, 1998).

[405] *Application of Central Power & Light Company for Authority to Change Rates,* Docket No. 14965 (Oct. 16, 1997).

[406] ETI Ex. 13 (Watson Direct) at Ex. DAW-1, at 7-8.

ETI contends that this issue presents a unique situation where all the experts agree with the theoretical soundness of Mr. Watson's approach, but Mr. Pous and Ms. Mathis recommend its rejection due to the existence of contrary Commission precedent. The impact of their position is a $1,558,081 reduction to depreciation expense, based on December 31, 2010, plant balances. Mr. Pous generally supports the use of interim retirements because "I think it's right,"[407] and he uses the method in other jurisdictions, where it is a prevalent practice. Ms. Mathis "also appears to recognize the theoretical soundness of utilizing interim retirements."[408] Even in Docket No. 16705, the precedent cited by Mr. Pous and Ms. Mathis, the Staff depreciation witness agreed that the use of interim retirements was appropriate, though not blessed by the Commission. ETI argues that use of interim retirements reflects the undisputable fact that "generating units will have retirements of depreciable property before the end of their lives."[409]

ETI is correct that neither Ms. Mathis nor Mr. Pous provide any reasoning behind the prior Commission precedent. Moreover, it is also true that the Commission precedent is relatively old at this point (dating back to the mid-1990s) and apparently has not been revisited in any recent cases. ETI argues that the Commission has in at least one other case used interim retirements (Docket No. 15195[410]), but provides little more than that comment to support the concept. It is true that in concept, interim retirements are determined in much the same fashion as other elements of depreciation analysis. Primarily based on historical accounting data, the analyst identifies characteristics in the history of the data upon which to base a reasoned assessment of retirements going forward, which is similar to what occurs in determining asset lives or net salvage. Interim retirement determinations are supported by their own Iowa Curves, just as is the analysis of plant lives.

Although the ALJs are persuaded by ETI's arguments that the use of interim retirements may be the more theoretically correct methodology to employ, Commission precedent clearly disfavors

---

[407] ETI Ex. 71 (Watson Rebuttal) at 71, *citing* Pous Deposition at 49, 51.

[408] Staff Ex. 2 (Mathis Direct) at 12-13.

[409] ETI Ex. 13 (Watson Direct) at Ex. DAW-1, p. 8.

[410] *Application of Texas Utilities Electric Company for the Reconciliation of Fuel Costs,* Docket No. 15195 (Aug. 26, 1997).

the use of interim retirements and the ALJs are reluctant to rule contrary to Commission precedent. Accordingly, the ALJs find that the retirement (actuarial) rate method, rather than the interim retirement method, should be used.

### 2. Production Plant

#### (a) Lives

Mr. Watson primarily used the life span method to calculate remaining lives of the production plant accounts.[411]  The life span method estimates a production plant's life based on consultation with utility management, financial, and engineering staff.[412]  However, he used interim retirement methodology to reduce the remaining lives determined by the life span method.  Staff does not dispute the remaining lives determined by the life span methodology, but does dispute the use of interim retirements.  For the reasons discussed in Section VII.C.1, ETI should not be allowed to use the interim retirement methodology to adjust downward the remaining lives of its production plant accounts.

Cities witness Pous disputed only the remaining life determination for ETI's Sabine Power Plant Units 4 and 5, ETI's largest and newest gas fired generating units.  Mr. Pous recommended a life span for Sabine Units 4 and 5 of 64 years based on assessment of the units, comparison to the estimated life span of similar units owned by ETI as well as other gas fired generating units across the country.  ETI proposes a 60-year life for the two units.  Mr. Pous noted that a "64-year life span recommended for Sabine Units 4 and 5 is consistent with the life span proposed by the Company for its Lewis Creek 1 generating unit.  Lewis Creek Unit 1 is an older, smaller, and generally less efficient generating unit than Sabine Units 4 and 5.  Cities contend that there is no basis or logic for assigning a shorter life span for a more capital-intensive asset that is newer, larger, and generally more efficient."[413]

---

[411]  ETI Ex. 13 (Watson Direct) at 16.

[412]  Staff Ex. 2 (Mathis Direct) at 14.

[413]  Cities Ex. 5C (Pous Depreciation Study) at 9.

ETI witness Watson explained that he primarily relied on the determination of Company personnel to arrive at the 60-year life for the Sabine Units. Although Cities attempted to cast doubt on Mr. Watson's determinations regarding the life of these units, it is clear that his determinations are based on conversations with ETI various generation personnel and that those conversations confirmed that based on evaluation of a variety of considerations, including age, operational role, level of funding, unit condition, and operational risk, 60 years constitutes a reasonable threshold for the expected life of Sabine Units 4 and 5. It is also clear that comparisons to Lewis Creek Unit 1 are not appropriate. Lewis Creek Unit 1 has significant differences, which explain its longer life-span. Unlike the Sabine Units, ETI is planning to spend in excess of $100 million to refurbish the Lewis Creek critical equipment over the next three years to sustain operating reliability. ETI is not performing similar refurbishment activities at Sabine.[414]

The Sabine Units are projected to be "must-run" units. This means that these units are, for the most part, deployed to operate whenever they are available for service. Mr. Pous compared these units to EAI's Lake Catherine Units 1 & 2,[415] but ETI contends this is not a reasonable comparison. EAI's Lake Catherine Units 1 & 2 are not "must-run" units. They experience very infrequent operation and are not projected to run much in the future. Other things being equal, according to ETI, this would justify the longer 67-year life span assigned to these Arkansas units, because they would not be experiencing the wear and tear of daily operation.[416]

The explanations offered by ETI for the 60-year life of the Sabine Units 4 and 5 generating facilities are convincing. It appears that Mr. Watson engaged knowledgeable people within ETI to gather pertinent information and applied that information appropriately. The comparison to Lake Creek units is not appropriate given the planned refurbishment of those units. Similarly, the comparison to the Lake Catherine units also fails. A unit that does not carry the "must-run" designation can easily be expected to perform longer than a unit, such as the Sabine Units, that

---

[414] ETI Ex. 51 (Garrison Rebuttal) at 3.

[415] Cities Ex. 5 (Pous Direct) at 7-8.

[416] ETI Ex. 51 (Garrison Rebuttal) at 3.

carries the "must-run" designation.  Accordingly, the ALJs find that ETI's choice of a 60-year life for the Sabine Units 4 and 5 is reasonable.

### (b) Net Salvage Value

In determining the net salvage attributable to production plant, ETI witness Watson started with the negative 5 percent net salvage factor approved most recently for ETI in PUC Docket No. 16705.  This is a net salvage value that the Commission has adopted in a number of cases for production plant.[417]   Mr. Watson testified that the net salvage calculation must reflect known changes in the cost of retiring production plant since the net salvage factor was last set.  Accordingly, Mr. Watson's study used the Handy-Whitman labor index to calculate the change in labor costs applicable to removal activity for the years 1997 to 2010.  Consideration of the increases in labor costs over this 13-year period resulted in an increase in the cost of removal, and a corresponding increase in the level of negative net salvage, from negative five percent to negative 8.5 percent.[418]

Both Staff witness Mathis and Cities witness Pous disagreed with ETI's proposal for production plant net salvage.  Ms. Mathis proposed that the existing negative 5 percent net salvage factor be retained.  Ms. Mathis stated that Mr. Watson's analysis is flawed for three reasons:

- First, Mr. Watson did not calculate a gross salvage value for each plant.  This is a necessary element of the fundamental net salvage rate calculation.[419]

- Second, Mr. Watson unreasonably assumed that all steam production plants would be demolished at the end of their estimated remaining lives without any consideration of reuse of the unit after refurbishment, or mothballing the unit or selling the unit in the event of deregulation of the generating function of the utility.[420]

---

[417]  Staff Ex. 2 (Mathis Direct) at 17.

[418]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1, at 64.

[419]  Staff Ex. 2 (Mathis Direct) at 16-17.

[420]  *Id.* at 17.

- Third, Mr. Watson did not provide detailed plans for the actual demolition of each of its power plants. The Commission has consistently approved negative five percent net salvage rates for production plants if detailed plant-specific and reasonable demolition cost studies were not filed by the utility.[421]

ETI responds that Staff's recommendation fails to account for the fact that the negative 5 percent benchmark is stale, having been established in a Commission proceeding 35 years ago. Since that time, "labor costs have escalated by 267 percent with the rational expectation that they will continue to increase at least with inflation."[422]

Cities witness Pous recommended moving from the current negative five percent net salvage to a positive 5 percent net salvage; *i.e.*, that it should be determined that the gross salvage from the power plants will exceed the removal cost. Mr. Pous stated that he bases this claim on the ETI's actual experience over the past 45 years as well as current trends within the industry in the last 14 years. According to Mr. Pous, ETI has retired many units since 1965 and demolished or sold the units and achieved a range of net salvage values from zero percent net salvage to positive 180 percent.[423] Other utilities in Texas and elsewhere have also experienced positive net salvage levels.[424] Mr. Pous testified that since 1998 over 1,000 generating units have been sold, and in all instances resulted in positive net salvage.[425] He also claims that his positive five percent production net salvage is consistent with the Commission's decision in the most recent SPS case, Docket No. 32766, where Mr. Watson was hired by SPS as a depreciation witness and the Commission ultimately approved a positive five percent net salvage.[426] As ETI notes, however, the SPS rate case was the result of settlement[427] and is of little precedential value.

---

[421] *Id*.

[422] ETI Ex. 71 (Watson Rebuttal) at 17, 19.

[423] Cities Ex. 5 (Pous Direct) at 15.

[424] Cities Ex. 5C (Pous Depreciation Study) at 11; Cities Ex. 5 (Pous Direct) at 15-16.

[425] Cities Ex. 5C (Pous Depreciation Study) at 11.

[426] Cities Ex. 5 (Pous Direct) at 17.

[427] *See* ETI Ex. 71 (Watson Rebuttal) at 6.

ETI argues that Cities witness Pous appears to primarily base this claim on the fact that the sale of utility plants in circumstances bearing no relationship to depreciation analysis has yielded gains that Mr. Pous characterizes as "positive net salvage." He uses as examples sales that form a part of the restructuring of the Texas utility business to introduce retail competition. Ms. Mathis also concluded, without elaboration, that ETI's production plant net salvage analysis is flawed because it does not consider the possibility that the unit could be sold as a consequence of deregulation. Neither Ms. Mathis nor Mr. Pous, however, pointed to any instance in which the Commission has adopted such an approach to determining net salvage.

ETI contends that this argument should be rejected for a number of reasons. It argues that although there is no precedent supporting Ms. Mathis' and Mr. Pous' approach, there is clear recent precedent rejecting the inclusion of sales in depreciation analysis.[428] The sales referenced by these witnesses are unique and unpredictable events, as should be evident from the use of the restructuring of the utility industry as an example of this type of activity. Indeed, at this time the Texas Legislature has halted for the foreseeable future any ETI move to competition. For purposes of depreciation analysis, net salvage is aimed at determining the salvage received at the end of the plants' useful lives. Mr. Pous' analysis necessarily assumed that, due to the sale, the life of the plants will be truncated. Yet he made no adjustment to production plant lives to account for the effect of theoretical sales.[429]

ETI also contends that Mr. Pous' other examples of positive net salvage are equally unavailing. Mr. Pous points to ETI's retirement of Neches Station as an example of positive salvage,[430] but fails to mention that: (1) this outcome was uniquely the result of insurance proceeds received by ETI after a boiler explosion; and (2) the proceeds flowed back to customers via means other than depreciation rates.[431] ETI contends that Mr. Pous' claim that a contractor paid $1 million

---

[428] *See Application of AEP Texas Central Co. for Authority to Change* Rates, Docket No. 33309, FoF 107, 108, 112 (Mar. 4, 2008) (proceeds from sale of building properly removed from depreciation analysis as non-recurring item).

[429] ETI Ex. 71 (Watson Rebuttal) at 5-7.

[430] Cities Ex. 5 (Pous Direct) at 14.

[431] ETI Ex. 46 (Considine Rebuttal) at 49-50.

for the right to demolish a power plant, apparently based on unrecorded hearsay conversations, and without any information from Mr. Pous regarding the facts and circumstances surrounding the transaction, proves nothing.

Finally, Mr. Pous stated that Mr. Watson's adjustment to the net salvage rates is flawed because it does not adequately reflect the increase in scrap metal prices in recent years. ETI responds that although scrap metal prices have gone up recently, it is unknown what the prices will be in the future, and these commodity prices have proven to be quite volatile and unpredictable.[432] According to ETI, it is not reasonable to assume, as does Mr. Pous, that prices will stay indefinitely at what is their historically highest level. ETI argues that Mr. Pous' method is based on speculation and broad, conclusory opinions regarding economic trends, as to which he makes no attempt to actually arrive at a quantifiable analysis that yields his unprecedented positive net salvage recommendation.[433]

Mr. Pous' testimony that net salvage value should be revised to reflect a value of positive 5 percent is seriously flawed. First, pointing to a settled case as precedent carries no weight. Second, attempting to draw conclusions from sales that were forced to comply with the regulatory framework and apply those conclusions to an entity that is not subject to the same regulatory framework is equally flawed. Finally, Mr. Pous attempted to use ETI's own experience to support his position ignores the fact that ETI's experiences were driven by factors that were unique to ETI at the time and circumstances involved; they do not support the more universal application urged by Mr. Pous.

Ms. Mathis' analysis, in some respects, suffers from the same flaws as Mr. Pous'. Nevertheless, some of her points carry more weight. The ALJs believe that Mr. Watson is correct that labor costs have increased since the negative five percent net salvage value was first established by the Commission. However, that is not the end of the story. Are there other factors that also have changed in the corresponding time period? There is no evidence on this point, and that is the crux of

---

[432]  ETI Ex. 71 (Watson Rebuttal) at 17-18.

[433]  ETI Initial Brief at 103.

the matter. As Ms. Mathis argues, there is only one way that all the changing values can be evaluated; through the introduction of plant-specific demolition cost studies. Had studies of that nature been provided, the parties would have been able to evaluate them and provide a supportable, fully-vetted recommendation. The ALJs recommend that the Commission find that a negative 5 percent net salvage value for production plant is appropriate.

### (c) Depreciation Reserve

TIEC argues that $1.1 million of ETI's requested $13 million increase in depreciation expenses is related to ETI's production plant assets.[434] ETI has a $92,537,000 surplus in production plant assets. A surplus depreciation reserve occurs when the theoretical reserve (the reserve that would exist if the current proposed rates had been in place in the past) exceeds the per book depreciation reserve. According to TIEC, this indicates that ETI customers have overpaid the value of production plant assets.[435] Since ETI has already over-recovered the value of the production plant assets, there is no valid reason to seek any additional recovery. TIEC contends that ETI has not shown why it needs to increase production depreciation rates at this time given that the production depreciation reserve has a considerable surplus. Therefore, it argues, $1.1 million of the proposed increase should be rejected.

ETI rejects TIEC's recommendation because it is clearly contrary to Commission policy and precedent. According to ETI, the Commission has consistently adopted the remaining life, straight-line method for determining depreciation rates.[436] This method requires that the remaining life of the asset be determined, and depreciation rates established to recover the asset's remaining cost in equal installments over that life. In this way, by the end of the life, the costs will be recovered. Mr. Pollock's approach ignores these principles, and seeks to look back in time to compare how the

---

[434] ETI Ex. 13A (Watson Workpapers) at Appendix B. This figure is derived by subtracting the expenses from the existing production plant account from the proposed production plant account.

[435] TIEC Ex. 1 (Pollock Direct) at 36-37, Ex. JP-5.

[436] *See Application of AEP Texas Central Co. for Authority to Change* Rates, Docket No. 33309, PFD at 127-128 (Mar. 4, 2008); *Application of CenterPoint Electric Delivery Company for Authority to Change Rates;* Docket No. 39339, PFD at 86 (Dec. 3, 2010); *Application of Oncor Electric Delivery Company, LLC, for Authority to Change Rates,* Docket No. 35717, PFD at 153-154 (June 2, 2009).

depreciation rates now proposed would have affected the recovery in the past. Those past depreciation rates, however, were authorized for use by the Commission. ETI argues that depreciation rates are at all times estimates, subject to adjustment using updated studies, and there is no reason for adoption of Mr. Pollock's alternative. Finally, the Commission expressly rejected adjustment to the outcome of remaining life depreciation determinations based on differences between theoretical and book depreciation reserves in CenterPoint Docket No. 38339.[437]

The ALJs agree with TIEC that the Commission's decision in Docket No. 38339 is not four-square on point with this case. That is not sufficient, however, to overcome the arguments advanced by ETI in favor of its position in the current case. The Commission has consistently used the remaining life, straight-line methodology for determining depreciation rates, and that methodology requires that the remaining life of the asset be determined, and depreciation rates established to recover the asset's remaining cost in equal installments over that life. Mr. Pollock's proposal ignores that consistently applied methodology. The ALJs recommend that the Commission approve ETI's recommended treatment of the production plant depreciation reserve.

### 3. Transmission Plant

#### (a) Lives

Mr. Watson's study presents ETI's life proposal for transmission Accounts 350.2 to 359, a total of eight accounts.[438] Neither Staff witness Mathis nor Cities witness Pous took issue with any of the recommended lives for transmission plant accounts.[439] Accordingly, the ALJs recommend that the Commission adopt ETI's proposed lives for these accounts.

---

[437] ETI Ex. 71 (Watson Rebuttal) at 75-77 (*citing CenterPoint* Docket No. 38839 PFD).

[438] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 30-36.

[439] Staff Ex. 2A (Mathis Direct) at 21; Cities Ex. 5 (Pous Direct) at 28.

### (b) Net Salvage Value

Staff disagrees with Mr. Watson's recommendations for two of the eight transmission accounts, and Mr. Pous disagrees regarding three of the accounts. The parties' positions on transmission net salvage values in dispute are set out below:

| Transmission Account Net Salvage | | | | |
|---|---|---|---|---|
| **Account** | **Current Net Salvage Value** | **ETI Proposal** | **Staff Proposal** | **Cities Proposal** |
| 352-Structures & Improvements | -5% | -10% | -5% | -10% |
| 353-Station Equipment | +5% | -20% | -20% | 0% |
| 354-Towers & Fixtures | -5% | -20% | -5% | -20% |
| 355-Poles and Fixtures | -25% | -30% | -30% | -15% |
| 356-Overhead Conductors & Devices | -20% | -30% | -30% | -10% |

### (i) Account 352-Structures & Improvements

Mr. Watson's analysis of this account, and for all the accounts in his study, included the examination of trends and bands for numerous years. For Account 352, he found the five-year and ten-year moving averages for the years 2008-2010 particularly telling.[440] A moving average is a rolling average that updates each year to include the additional year as part of the average for the longer period under study. Mr. Watson testified that his recommendation of negative 10 percent net salvage is consistent (albeit less negative) with the five-year and ten-year moving averages for 2008, which range from negative 16.31 percent to negative 16.80 percent. Although the moving averages for 2009 and 2010 appear more positive, this was the result of a large, atypical gross salvage in 2009.[441] Cities propose no change to Mr. Watson's recommendation.

Staff witness Mathis recommended a net salvage rate of negative five percent for Account 352. This recommendation is based on analysis of historical salvage data for the period of

---

[440] ETI Ex. 71 (Watson Rebuttal) at 56.

[441] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 65. The atypical gross salvage resulted from the sale of a spare transformer, an asset whose cost is booked to an entirely different account. ETI Ex. 71 (Watson Rebuttal) at 57. The atypical amount is shown at Appendix E-2 at 1 of Mr. Watson's depreciation study.

1984 through 2010. Specifically, the three-year moving average for the same period produces a net salvage rate of negative 5.53 percent, which is very close to the currently approved net salvage rate for this account. Moreover, an examination of the mean and median rolling band averages for Account 352 shows a range of net salvage rates between positive 0.08 percent and negative 6.83 percent.[442] Thus, according to Ms. Mathis, the net salvage rate of negative 5 percent is a reasonable estimate based on the available historical data.

In response to Mr. Watson's contention that the 2008 moving average is the most important, Ms. Mathis pointed out that the 2009 five-year and ten-year moving averages feature *positive* 16.66 percent and *positive* 4.45 percent net salvage rates, respectively. Moreover, the 2010 five-year and ten-year moving averages feature *positive* 25.13 percent and *positive* 6.75 percent net salvage rates, respectively.[443] Ms. Mathis stated that if it is a sound depreciation methodology to select a net salvage rate based on recent five-year and ten-year moving averages, then the rate for this account should be significantly greater than either Ms. Mathis' or Mr. Watson's recommendation.[444]

Although the moving averages cited by Ms. Mathis for 2009 and 2010 appear to belie the arguments raised by Ms. Watson, the ALJs are persuaded that those are significantly influenced by the atypical gross salvage resulting from the 2009 sale of a spare transformer, an asset whose cost is booked to an entirely different account. If, as claimed by Mr. Watson, the sale was sufficiently atypical, it would influence both 2009 and 2010 moving averages, making them unreliable. Accordingly, the ALJs recommend that the Commission adopt ETI's negative 10 percent net salvage value for Account 352.

---

[442] Staff Ex. 2 (Mathis Direct) at 22, Appendix C at 1.

[443] *Id.*

[444] According to Ms. Mathis, if 2009's moving averages are adopted, the net salvage ratio should be around positive 4.45 percent or positive 16.66 percent. If 2010's moving averages are adopted, the net salvage ratio should be around positive 6.75 percent or positive 25.13 percent.

### (ii) Account 353-Station Equipment

Similar to Account 352, a large atypical positive salvage amount in this account makes the most recent moving average appear more positive than the history would otherwise suggest.[445] Mr. Watson recommended setting net salvage at negative 20 percent, which he contended is a reasonable middle ground between the values suggested by the five-year and ten-year moving averages for transaction year 2010 (which show net salvage of negative 14.42 percent and negative 20 percent, respectively).[446] Ms. Mathis agreed with the Company's proposal on this account.

Although Mr. Pous acknowledged that retention of the current Commission-approved positive five percent net salvage is supported by ETI's experience, he ultimately opted for a recommendation that the net salvage value be reduced to zero percent. Mr. Pous noted that the actual per book data for a five-year band and a ten-year band are a positive 117.04 percent and a positive 31.95 percent, respectively.[447] Mr. Pous stated that his analysis does not ignore the positive net salvage recorded by ETI because of the sale of transmission investment, rather he testified that:

> the Company has reported five separate sales during the past 22 years, or about once every four years. Such activity cannot be considered an 'unusual circumstance' or an outlier, and should be taken into consideration as an event that may continue to occur in the future. In a proper evaluation phase of a depreciation study, recognition of some level of future sales is appropriate.[448]

Mr. Pous' analysis also reflected that transformers, which contain large quantities of copper and produce gross salvage when retired, comprise a significant level of investment in this account, but were underreported in the five-year and ten-year band analyses.[449] Mr. Pous stated that, given the significant increase in the value of copper, the future proportionate retirement of transformers will result in future net salvage values being less negative or more positive than the historical data.

---

[445] The atypical amount is shown at Appendix E-2, p. 1 of 10 of Mr. Watson's depreciation study.

[446] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 65.

[447] Cities Ex. 5C (Pous Depreciation Study) at 21, 23.

[448] *Id*.

ETI responds that Cities' criticism that the *per book data* in Mr. Watson's workpapers show a large positive net salvage value for the five-year and ten-year bands is unfounded. According to ETI, Mr. Watson's workpapers clearly indicate that adjustments were required and made to the per book data for unique transactions involving sales and storm activity. As to sales, the workpapers[450] show that in the 26 years of data for Account 353, there were three occasions with very large sales proceeds for the sale of substations. As to storm activities, the same workpapers show only one occasion in 26 years where gross salvage amounts were recorded. ETI contends that these unique events are properly excluded from net salvage analysis and Mr. Pous' reliance on the per book data to establish positive net salvage is erroneous. With respect to Mr. Pous' concern's relating to the price of copper, ETI responds that Mr. Pous' reliance on copper's scrap value is pure speculation, unsupported by any ETI-specific data regarding the amount of copper at issue, or any consideration of the offsetting significant and increasing labor costs involved in the removal of large station transformers.

As explained by Mr. Watson, it appears to the ALJs that the adjustments made were, indeed, required because of the unique nature of the events they reflected. The ALJs also find that Mr. Pous' concerns relating to the price of copper are speculative. Coupled with the fact that Staff supports ETI's proposed net salvage value, the ALJs recommend that the Commission approve ETI's recommended negative 20 percent net salvage value.

### (iii)      Account 354-Towers and Fixtures

Although there is limited experience available for this account, the five-year and ten-year moving averages for transaction year 2010 show a substantial level of negative net salvage (negative 299 percent and negative 233 percent, respectively). Taking into account the low level of

---

[449] *Id.* at 22.

[450]  ETI Ex. 13A (Watson Direct) Workpaper on CD, "Entergy Net Salvage Transmission Distribution General" Spreadsheet, "Data Adjustments" Tab, Account 353.

retirement experience, Mr. Watson stated that he moderated the outcome by recommending moving to negative 20 percent net salvage.[451]  Mr. Pous concurred in this recommendation.

Ms. Mathis recommended a net salvage rate of negative 5 percent for Account 354.[452]  This recommendation is based on Commission precedent due to the absence of reliable historical salvage data.[453]  Although historical salvage data is available for the period of 1984 through 2010, this account had a low level of retirement during this period.[454]  Because of the limited retirement activity, Ms. Mathis stated that a reasonable net salvage rate cannot be calculated from the historical salvage data.[455]    For example, annual net salvage rates range from approximately negative 6,000 percent to approximately positive 31,253,400 percent.[456]  According to Ms. Mathis, such divergent numbers are indicative of the low retirement activity within this account.

The negative five percent net salvage value recommended by Ms. Mathis is the current Commission-approved number.  The ALJs find it difficult to draw any conclusions from the paucity of historical data.  Had there been additional historical data, it might have been possible to reach the conclusion urged by Mr. Watson; however, there was not.  The ALJs recommend that the Commission adopt the negative five percent net salvage value recommended by Staff.

### (iv) Account 355-Poles and Fixtures

The Commission approved net salvage value for this account is a negative 25 percent.[457]  This account has shown negative salvage since the 1990s, and the most recent ten-year moving averages show negative 33.84 percent net salvage.  Although years 2009-2010 reflect positive salvage values, Mr. Watson determined that these values were the product of differences in the

---

[451]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 66.

[452]  Staff Ex. 2 (Mathis Direct) at 23.

[453]  *Id*. at 23.

[454]  ETI Ex. 13 (Watson Direct) at DAW-1 at 66.

[455]  Staff Ex. 2 (Mathis Direct) at 23.

[456]  *Id.* at Appendix C at 2.

[457]  Cities Ex. 5C (Pous Depreciation Study) at 23.

timing of the recording of the various transactions associated with the asset retirement, rather than reflecting an actual positive salvage amount.[458]  For example, Mr. Watson's net salvage workpapers show a significant level of positive salvage only for the years 2009-2010 in Account 355.[459]  This is at odds with the remainder of the net salvage data shown in the workpapers, which is almost exclusively negative net salvage.[460]  Accordingly, Mr. Watson gave less weight to the 2009 and 2010 values, but moderated his recommendation compared to the ten-year moving averages, resulting in a recommended net salvage of negative 30 percent.  Ms. Mathis concurred.

Cities witness Pous disagreed with Mr. Watson's analysis, claiming:  (1) per book data from the five-year and ten-year moving averages show positive net salvage amounts; (2) authoritative depreciation treatises do not support Mr. Watson's decision to adjust relocation-related transactions out of the analysis;[461] (3) no portion of relocation-related costs can be treated as removal unless that treatment is prescribed by contract with the third-party; and (4) after the correction to his analysis, Mr. Watson changed his methodology to arrive at a negative net salvage recommendation.  Mr. Pous recommended an increase in the net salvage values to a negative 15 percent based on the actual historical data of ETI.  Cities contend that Mr. Pous was conservative in his recommendation given the trend in the data.  The most recent five-year band of actual data yields a positive two percent net salvage.[462]

The ALJs agree that the debate regarding this account essentially boils down to whether Mr. Watson's adjustment to remove relocation expense associated with third-party reimbursement from the analysis is appropriate.  Although Mr. Pous claims that Mr. Watson's approach is contrary

---

[458]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1, p. 66.

[459]  ETI Ex. 13A (Watson Workpapers CD), Adjusted Data Net Salvage Tab, account 355, lines 130-131, columns I – S.

[460]  ETI Ex. 13A (Watson Workpapers CD), Adjusted Data Net Salvage Tab, account 355, at lines 105 – 129, columns I – AC.  The 2005-2006 data in this workpaper show an obvious example of an accounting adjustment timing difference, wherein the year 2005 shows a $1,867,532 removal cost (row 126, column G), while the immediately following year 2006 shows a large *negative* removal adjustment of ($1,059,096), (row 127, column G).

[461]  Relocations involve the situation where the Company is reimbursed by a third party who desires the relocation or replacement of the facilities in question.

[462]  Cities Ex. 5C (Pous Depreciation Study) at 22-25.

to authoritative guidance, ETI contends that he arrives at that conclusion only by disregarding the guidance in question, as well as Commission precedent. ETI argues that the depreciation text in question squarely supports Mr. Watson's approach:

> A reimbursed retirement is one for which the company is fully compensated at the time of retirement …. Usually reimbursed retirements should not be included in analysis of property whose investment is recovered through depreciation accruals.[463]

Mr. Watson explained at hearing that, in his experience, adjustments to remove relocation expense are standard in depreciation analysis, and to do otherwise would result in a disproportionate impact on reasonably expected ongoing net salvage, caused by a transaction (the relocation) that constitutes a very small portion of the overall assets in question.[464]

Mr. Pous stated that all third-party reimbursements for facility relocation performed by the Company have to be deemed as salvage (thereby inflating the salvage portion of the net between removal costs and salvage proceeds) unless a contract between ETI and a third-party explicitly says otherwise. Mr. Watson's approach, however, is squarely supported the Commission's decision in the recent Oncor case, Docket No. 35717, where it was held that these third-party "reimbursements are prepayments for new property being installed."[465] The ALJs find that Mr. Pous' argument is not credible in light of Mr. Watson's treatment of relocations in general. Since Mr. Watson properly removed such relocation expense from the depreciation analysis altogether, those amounts correctly have no impact on depreciation rates, regardless of how they are allocated between gross salvage proceeds and the cost of installing new facilities.

ETI's evidence and argument support its request. Accordingly, the ALJs recommend that the Commission approve a net salvage of negative 30 percent as proposed by Mr. Watson.

---

[463] ETI Ex. 71 (Watson Rebuttal) at 63 (quoting *Depreciation Systems*, Iowa State Press, 1994, at 16-17).

[464] Tr. at 405.

[465] ETI Ex. 71 (Watson Rebuttal) at 63.

### (v) 356-Overhead Conductors and Devices

The Commission approved net salvage value for this account is a negative 20 percent.[466] Much as was the case with Account 355, ETI argues that timing differences in reflecting accounting adjustments made the more recent shorter data bands less representative of reasonably expected future net salvage. Mr. Watson's study determined that the longer ten-year moving average for transaction year 2010 showed salvage of negative 33 percent, so Mr. Watson recommended moving to negative 30 percent net salvage for this account.[467] Staff witness Mathis adopted the same negative net salvage value.

Cities' witness Pous recommended an increase to the net salvage value to a negative 10 percent based on a review of the actual historical data. The actual five-year and ten-year bands yield a positive one percent and a negative 31 percent. Mr. Pous argues that the trend in the data could justify even a less negative value.

As with Account 355, the ALJs find that ETI's evidence and arguments support its request. Accordingly, the ALJs recommend that the Commission approve a net salvage of negative 30 percent as proposed by Mr. Watson.

### 4. Distribution Plant

#### (a) Lives

An asset's useful life is used to determine the remaining life over which the cost will be spread for recovery through depreciation expense.[468] The Company's depreciation study addresses 14 distribution accounts included between Accounts 360.2 and 373.2. According to ETI, the life parameters in Mr. Watson's study reflect standard depreciation analysis procedures, including comparison to standard Iowa curves and actuarial analysis, along with the exercise of informed

---

[466] Cities Ex. 5C (Pous Depreciation Study) at 25.

[467] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 66-67.

[468] *Id*. at 16.

judgment.[469]   Multiple bands and trends were reviewed and, in general, Mr. Watson's study explained that the dispersion curve chosen for each account is based on examination of the various "placement and experience bands"[470] and the characteristics of the underlying asset in each account. The dispersion curve is then chosen that best matches the actual data.[471] Staff disagrees with Mr. Watson's life parameters for three accounts; Cities with five accounts.  The parties' various recommendations on the accounts in dispute are shown below:

| Depreciation Plant Lives | | | | |
|---|---|---|---|---|
| **Account** | **Approved Life** | **ETI Proposal** | **Staff Proposal** | **Cities Proposal** |
| 361 | 45 yrs. S2 | 65 yrs. R3 | 70 yrs. R3 | 65 yrs. R3 |
| 364 | 44 yrs. S1 | 38 yrs. R1.5 | 40 yrs. R1 | 44 yrs. L1 |
| 365 | 44 yrs. S1 | 39 yrs. R0.5 | 40 yrs. R0.5 | 42 yrs. S-0.5 |
| 367 | 40 yrs. S1 | 35 yrs. R1.5 | 35 yrs. R1.5 | 45 yrs. S-0.5 |
| 368 | 39 yrs. S0 | 29 yrs. L1 | 29 yrs. L1 | 33 yrs. L0.5 |
| 369.1 | 36 yrs. S4 | 26 yrs. L4 | 26 yrs. L4 | 33 yrs. R4 |

### (i)  Account 361 – Structures and Improvements

Mr. Watson's study depicts the fit between the actual data in the account and the 65 R3 life parameter that he proposed for this account.[472]   Mr. Pous agreed with this recommendation. Ms. Mathis stated, however, that a life parameter of 70 R3 is a better visual fit for the 1960-2010 experience band.[473]

Considering all the historical mortality data available for this account (the overall experience band), the selected Iowa Curve produces a conformance index (CI) of 37.53.[474]  The CI is a measure

---

[469]  *Id.* at Ex. DAW-1 at 37-54.

[470] Placement bands look at assets installed in various years and reveal the types of assets in the account over time.  Experience bands show accounting transactions associated with the assets over time and reveal trends associated with operational changes and other events.

[471] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 37-54.

[472]  *Id*. at Ex. DAW-1 at 37.

[473]  Staff Ex. 2 (Mathis Direct) at 25-26.

[474]  *Id.* at 26, Table-5.

of closeness of fit, and a higher CI value indicates a closer fit between the two sets of data that are being compared.[475]

Mr. Watson recommended a life parameter of 65 years based on comparing various slices (bands) of this account's mortality data to the 65 R3 Iowa Curve.[476]  However, Staff argues that Mr. Watson's recommended life parameter and Iowa Curve of 65-R3 produces a CI of only 23.61 when measured against the overall (1960 – 2010) experience band.[477]

ETI responds that the flaw in Ms. Mathis' position is that she only looks at one band.  As the average age of the investment is only 19.22 years, it is inadequate to look at only one band that examines a 50-year period.  When shorter bands are also factored in (1970-2010 and 1990-2010), the Company's proposal shows a significantly higher CI, which is indicative of a better fit to the actual data.[478]

The ALJs are persuaded that, in this instance, Ms. Mathis erred by limiting her review to a single band, especially when that band is significantly longer than the average age of the investment at issue.  In this case, looking at multiple, shorter bands will give a clearer picture of the average life of the investment at issue.  Therefore, the ALJs recommend the Commission approve the 65 R3 life parameter Mr. Watson proposes for this account.

### (ii) Account 364 – Poles, Towers, and Fixtures

Mr. Watson's study results in his proposing a life parameter of 38 R1.5.[479] He stated that the current plant in service reflects a life (13.97 years on average) that is substantially shorter than his recommendation, and all the bands examined reflect a shorter life than the currently approved 44 years.  Mr. Watson testified that his recommendation balances these facts with the additional fact

---

[475]  ETI Ex. 71 (Watson Rebuttal) at 24.

[476]  ETI Ex. 13 (Watson Direct) at 18, Figure 1.

[477]  Staff Ex. 2 (Mathis Direct) at 26, Table-5.

[478]  ETI Ex. 71 (Watson Rebuttal) at 24.

[479]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 41.

that ETI is currently using Penta and CCA-treated poles (as opposed to creosote treated poles), for which a longer life is expected.

Ms. Mathis (40 R1) and Mr. Pous (44 L1) both proposed different life parameters than Mr. Watson.  Ms. Mathis stated that her proposed life parameter is a better visual and mathematical fit for the single experience band (1959-2010) she considered.[480]  Mr. Watson responded to this argument, stating that the mathematical computer fitting emphasized by Ms. Mathis is too limited an approach, because there is too little information provided at the tail of the curve to rely on computer fitting in this instance.  Mr. Watson indicated that his proposed life parameter shows a better fit over the full range of placement and experience bands applicable to this account.[481]

Mr. Pous recommended that the expected service life remain at 44 years based on actuarial analysis and advances made by the industry and ETI in treating and preserving poles.[482]  Mr. Pous also noted that "absent identifiable and supportable specific problems, the industry is not experiencing shorter lives for poles and neither should ETI."[483]  He stated that selection of different types of poles and different treatments by other utilities have their engineers expecting lives between 50 and 70 years.[484]  According to Mr. Pous, it is simply not realistic to believe or assume that ETI would operate now or in the future in a manner that its poles would only last two-thirds the life expectance being achieved by others.[485]  Mr. Watson responded that the increased life span urged by Mr. Pous based on his general discussion of varieties of poles with longer lives is not verifiable, not consistent with the Company-specific data or the specific experience of its distribution personnel, and is plainly exaggerated.[486]

---

[480]  Staff Ex. 2 (Mathis Direct) at 28-29.

[481]  ETI Ex. 71 (Watson Rebuttal) at 29-31.

[482]  Cities Ex. 5C (Pous Depreciation Study) at 35-36.

[483]  *Id.* at 37.

[484]  *Id*.

[485]  *Id*. at 36.

[486]  ETI Ex. 71 (Watson Rebuttal) at 28-29.

The ALJs reviewed the evidence and arguments of the parties with respect to this issue and were most persuaded by the CIs that resulted from the recommendations of Staff and ETI. Considering all the historical mortality data available for this account (the overall experience band), Staff's selected Iowa Curve produces a CI of 41.44, while ETI's produces a CI of only 20.66 when measured against the overall (1958 – 2010) experience band.[487] The ALJs recommend that the Commission adopt Staff's proposal of 40 R1.

### (iii)     Account 365 – Overhead Conductors and Devices

The Commission approved average service life is 44 years.[488] All parties propose a change to this life parameter. Mr. Watson proposed a life parameter of 39 R0.5, Ms. Mathis proposes a life parameter of 40 R0.5, and Mr. Pous proposed a life parameter of 42 S.-5.

Mr. Watson noted that his analysis took into account the fact that the currently authorized life is longer than the history would support, and that the young average age of the current plant in service (12.15) points toward placing more weight on recent bands for life selection. He also noted that ETI's movement toward re-conductoring lines supports the conclusion that lives in this account will be shorter.

Ms. Mathis indicated that her recommendation is based on comparing the account's historical mortality data for the period of 1958 through 2010 to the 40 R0.5 Iowa Curve.[489] Considering all the historical mortality data available for this account (the overall experience band), the selected Iowa Curve produces a CI of 29.63.[490] Mr. Watson countered that Ms. Mathis used the wrong curve to represent the Company's proposal in her calculations. He stated that when her analysis is corrected

---

[487]  Staff Ex. 2 (Mathis Direct) at 29, Table-6.

[488]  Cities Ex. 5C (Pous Depreciation Study) at 38.

[489]  Staff Ex. 2 (Mathis Direct) at 30.

[490]  *Id*. at 31, Table-7.

to make the proper comparison, ETI's proposal has a higher CI (and thus a better fit) across all experience bands save one.[491]

Mr. Pous testified that his life parameter best matches the actuarial analysis taking into account the unusually high level of retirement activity recorded in the first 0.5 year of age.   As Mr. Pous noted, "the highest retirement ratio for this investment in the first 23 years occurred at age 0.5 years, for brand new assets.  While such events can and have occurred associated with utility plant, it is not the type of event that is reasonably expected to repeat itself in future periods as different equipment it purchases if it was an equipment problem, or different installation processes are employed if the early retirement were due to installation issues."[492]   Mr. Pous criticized Mr. Watson's recommendation on several grounds: (1) it is not consistent with expected lives reported by ETI personnel; (2) it did not account for anomalies and/or unusual activity in the retirement data; (3) the major re-conductoring activity shown in the account should not be expected to continue; and (4) the life-curve combination chosen by Mr. Watson is not long enough to match the actual data.[493]

Mr. Watson took issue with Mr. Pous.  He stated that Mr. Pous simply misread the data Mr. Watson argued that Exhibit DAW-R-1 to his rebuttal testimony shows that retirements are decreasing.[494]  Mr. Watson believes that his proposed life parameter is a better fit to the actual data. The very small amount of plant that may not last until the tail of the curve used by Mr. Watson does not alter this conclusion.[495]   Finally, ETI argues that Mr. Pous provides no persuasive basis for second guessing the opinion of Company personnel regarding re-conductoring.

The ALJs are persuaded by ETI's evidence and argument.  It does appear that Ms. Mathis used the wrong curve in her calculations.  If corrected, Mr. Watson's proposal renders the higher CI.

---

[491]  ETI Ex. 71 (Watson Rebuttal) at 36.

[492]  Cities Ex. 5C (Pous Depreciation Study) at 38-39.

[493]  *Id.* at 38-41.

[494]  ETI Ex.71 (Watson Rebuttal) at 32-33.

[495]  *Id*. at 32, 33-35.

Mr. Pous' arguments fair no better. To the ALJs' eye, Mr. Pous did misread the data, and the conclusions drawn by Mr. Pous are simply inaccurate. The ALJs recommend that the Commission adopt ETI's proposed life parameter of 39 R0.5.

### (iv)  Account 367 – Underground Conductors and Devices

The Commission approved average service life is 40 years.[496] Mr. Watson's life parameter for this account (35 R1.5) is based on his review of the various placement and experience bands, as well as the characteristics and longevity of the conductors in place in the ETI system and the retirement patterns that are unique to underground conductor performance and the locations where it is buried.[497] Ms. Mathis agreed with Mr. Watson on this account. Cities propose a significantly longer life (45 S-0.5). Mr. Pous stated that Mr. Watson's and Ms. Mathis' recommendations do not account for the increased durability of newer types of conductor, and that the actuarial analysis should focus on more recent data that he believes is more consistent with the newer conductors.[498]

Mr. Watson testified that Mr. Pous' recommendation should be rejected for a variety of reasons. The Southern California Edison-based opinions regarding longer life for the conductor, relied on by Mr. Pous, relate to plant installed less than ten years ago. Therefore, based on his own theory, much of the investment in question in this account is still the older, shorter-lived variety, and his recommendations are premature. Moreover, Mr. Watson's plotting of the dispersion curves show that his is a better fit than that of Mr. Pous. In this instance, Mr. Pous' analysis, relying only on the shortest band, failed to pick up the older investment that constitutes almost 80 percent of the surviving investment.[499]

It appears that Mr. Pous, in relying on the shortest band, did fail to take into account investment that comprises almost 80 percent of the surviving investment in this account. That is a significant flaw in his analysis. Similarly, his reliance on the Southern California Edison-based

---

[496]  Cities Ex. 5C (Pous Depreciation Study) at 41.

[497]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1, p. 45.

[498]  Cities Ex. 5C (Pous Depreciation Study) at 41-44.

[499]  ETI Ex. 71 (Watson Rebuttal) at 40.

opinions relate to newer plant, which again calls his analysis into question in the present circumstances. The ALJs recommend that the Commission approve ETI's recommended service life of 35 R1.5.

### (v) Account 368 – Line Transformers

The Commission approved anticipated service life is 39 years.[500] Mr. Watson proposed a service life of 29 L1,[501] with which Ms. Mathis agreed. Mr. Watson stated that this is consistent with the data showing decreasing lives for these assets, the expected lives per Company personnel, and the fact that transformers are junked or sold rather than repaired.[502]

Mr. Pous recommended that the expected service life be decreased to 33 years, representing a 15 percent reduction in the anticipated service life. Mr. Pous stated that his analysis is based on actuarial analyses and the Company's addition of approximately $80 million of pad mounted transformers since the last case, when the Commission approved a 39-year anticipated average service life. According to Mr. Pous, ETI personnel have stated that pole mounted transformers have a life of between 25 and 35 years. However, pad mounted transformers are expected to last up to 40 years by the same Company personnel. Given the sizable investment since the last case in the pad mounted transformers with a longer expected service life, a decrease in the anticipated service life of greater than 15 percent is not warranted, according to Mr. Pous. Moreover, Mr. Pous stated his analysis uncovered abnormally high retirement ratios in the 21.5 to 22.5 year age brackets indicative of one-time events such as the ice storm or changes in accounting systems. As such, Mr. Pous performed his curve fitting analysis recognizing the unusually high retirement activity between years 21.5 and 22.5 rather than emphasizing such unusual activity as Mr. Watson did for his proposal to reduce service life by 26 percent.[503]

---

[500] Cities Ex. 5C (Pous Depreciation Study) at 44.

[501] ETI Ex. 13 (Watson Direct) at Ex DAW-1 at 50.

[502] *Id*. at 47.

[503] Cities Ex. 5C (Pous Depreciation Study) at 45.

Mr. Watson recommended a decline in average service life from a 39-year anticipated service life to a 29-year anticipated service life citing the high occurrence of lightning in the ETI service area.[504] However, Mr. Pous noted that the effects of lightning in ETI's service area would have been present in ETI's last base rate case when a 39-year anticipated service life was approved by the Commission. Both Mr. Watson and Mr. Pous recognized that the pad mounted transformers are not subject to the same forces of retirement like weather, lightning, and animal disturbances.[505] However, Mr. Watson did not realistically factor ETI's relative increased investment in pad mounted transformers into his analysis. Moreover, when performing his curve fitting analysis, Mr. Watson neither analyzed nor adjusted for the abnormal unusual retirement ratios between years 21.5 and 22.5.[506] Instead, Mr. Watson attempted to select a life analysis that anticipates a high level of retirement within that time period in the future.[507] Cities argue that, by failing to recognize the sizable new investment in pad mounted transformers and failing to consider the unusual retirement ratios, Mr. Watson proposed an average service life that is lower than the bottom end of the range of life estimates of Company personnel for pad mounted transformers. Moreover, Mr. Watson's proposal does not even reach the midpoint of life estimates expected by Company personnel for pole mounted transformers.

The arguments and evidence advanced by Cities witness Pous are persuasive to the ALJs. Mr. Watson's contention regarding the occurrences of lightening in the ETI service area was equally applicable at the time the existing approved rate was set, and is, therefore, of little value in this proceeding. Further, Mr. Watson's failure to analyze the abnormal retirement ratios between years 21.5 and 22.5 also argues against his analysis. The ALJs recommend that the Commission adopt Mr. Pous' proposed life of 33 L0.5.

---

[504] ETI Ex. 13 (Watson Direct) at Ex DAW-1 at 50.

[505] *Id*.

[506] Cities Ex. 5C (Pous Depreciation Study) at 47.

[507] ETI Ex. 13 (Watson Direct) at Ex DAW-1 at 50-51.

### (vi) Account 369.1 – Overhead Services

The Commission previously approved anticipated service life for this account is 36 years.[508] Mr. Watson's analysis of this account shows that overhead assets have retired earlier and have been replaced more frequently than is consistent with the existing 36 S4 life. The average age of current investment is 10.12 years. Consistent with this data and his review of various curves and placement and experience bands, he recommended shortening the life to 26 L4. Ms. Mathis agrees with this proposal.[509]

Mr. Pous recommended that the expected service life be shortened to 33 years based on the lack of Company historical data and based on comparative utility experience including recent studies by Mr. Watson, where he proposed significantly longer average service lives. Mr. Pous testified that an evaluation of the actual data casts serious doubt about the reliability of the data for depreciation purposes. ETI does not have any records of services in this subaccount surviving past 1978. Mr. Pous stated that his recommended 33-year life expectancy for this sub-account is still far shorter than industry expectations, but is consistent with the depreciation study recently conducted for EGSL where the depreciation expert hired by EGSL recommended a 33-year life.[510]

ETI argues that Mr. Pous apparently made no attempt to perform any curve fitting regarding this account, as none appears in his study; in the absence of performing this essential analysis, he settles for again casting doubt on the reliability of Company accounting data. ETI contends that, in reality, Mr. Pous appears to present no recommendation for this account based on evaluation of any of the accounting data that actually depicts the past and current characteristics of the assets.[511]

---

[508] Cities Ex. 5C (Pous Depreciation Study) at 48.

[509] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 49.

[510] Cities Ex. 5C (Pous Depreciation Study) at 48-49.

[511] *Id*. at 48-50.

ETI argues that its recommended life is clearly supported by the Company-specific data, graphically depicted in Mr. Watson's rebuttal testimony, while Mr. Pous' suggested life parameter is not even close, and is based on unsupported speculation.[512]

Although the evidence on this issue is sparse, the ALJs ultimately are persuaded that ETI's (and Staff's) position is more reasonable. Accordingly, the ALJs recommend the Commission adopt ETI's proposed 26 L4 life span.

### (b) Net Salvage Value

Staff disagrees with Mr. Watson's recommendations for five of the distribution accounts, and Mr. Pous disagrees regarding two of the accounts. The parties' positions on distribution net salvage values in dispute are set out immediately below:

| Distribution Plant Net Salvage | | | | |
|---|---|---|---|---|
| Account | Approved Rate | ETI Proposal | Staff Proposal | Cities Proposal |
| 361 | -5% | -10% | -5% | -10% |
| 362 | +15% | -20% | -10% | 0% |
| 365 | +10% | -7% | -7% | 0% |
| 368 | 0% | 0% | -5% | 0% |
| 369.1 | -10% | -5% | -10% | -5% |
| 369.2 | -10% | -5% | -10% | -5% |

### (i) Account 361 – Structures and Improvements

The existing net salvage value for this account is negative five percent, which is the value proposed by Staff. Mr. Watson and Mr. Pous, on the other hand, proposed a salvage value of negative 10 percent.

Mr. Watson's recommendation is based on the most recent five-year and ten-year net salvage ratios, which are negative 9.70 percent and negative 36.70 percent, respectively. Ms. Mathis' recommendation is based on analysis of historical salvage data for the period of 1984 through 2010. Specifically, the two-year moving average median for the same period produces a net salvage rate of

---

[512] ETI Ex. 71 (Watson Rebuttal) at 46-48.

negative 5.87 percent, which is very close to the currently approved net salvage rate for this account.[513]  Moreover, the one-year, three-year, four-year, five-year, six-year, and seven-year moving average medians of negative 6.95 percent, negative 5.11 percent, negative 3.64 percent, negative 1.90 percent, negative 4.57 percent, and negative 7.24 percent, respectively, support this recommendation.   Additionally, this account contains a few significant outliers, such as negative 655.91 percent in 2002 and negative 322.55 percent in 2005.[514]  Ms. Mathis' use of the median average eliminates the skewing effect of these outlying values.

As discussed in Section VII.C.1, the use of the median is the most appropriate methodology. For this reason, the ALJs recommend the Commission approve Staff's proposed negative 5 percent net salvage value.

### (ii)  Account 362 – Station Equipment

The existing net salvage value of this account is positive 15 percent.  Mr. Watson proposed that it be changed to negative 20 percent, Staff proposes it be changed to negative 10 percent, and Cities propose it be changed to zero.

Mr. Watson's study shows that the most recent five-year and ten-year net salvage ratios are negative 22.10 percent  and  negative 43.55 percent,  respectively.   He recommended negative 20 percent net salvage based on the Company's experience.[515]

Ms. Mathis' recommendation is based on analysis of historical salvage data for the period of 1984 through 2010.  Specifically, the recommendation is supported by the two-year moving average median for the same period of negative 12.23 percent.[516]  Moreover, the one-year, three-year, five-year, six-year, seven-year, and eight-year moving average medians of negative 11.07 percent,

---

[513]  Staff Ex. 2 (Mathis Direct) at 27.

[514]  *Id*. at Appendix C at 4.

[515]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 68.

[516]  Staff Ex. 2 (Mathis Direct) at 27.

negative 14.16 percent, negative 7.62 percent, negative 8.19 percent, negative 11.75 percent, and negative 14.15 percent, respectively, support her recommendation.[517]

Mr. Pous' recommendation is based on what he characterizes as the Company's actual, unadjusted, experience; recognition of the type of investment in the account; recognition of significant value of scrap copper; investigation of retirement mix compared to investment mix over the past ten years; and recognition of industry values.[518]  According to Mr. Pous, given the significant increase in the value of copper, the retirement of a transformer could be expected to significantly influence the net salvage value for this account.

Mr. Pous' recommendation is the outlier among the three before the ALJs, and the ALJs are not convinced that the reasons put forth by Mr. Pous in support of his position are sufficient to carry the day.  The real argument here is between ETI and Staff, which centers on the use of the median (Staff) and the mean (ETI).  As discussed in Section VII.C.1, the use of the median is the most appropriate methodology.  For this reason, the ALJs recommend the Commission approve Staff's proposed negative 10 percent net salvage value.

### (iii)      Account 365 – Overhead Conductors and Devices

The current net salvage value for this account is positive 10 percent.[519]  ETI and Staff recommend changing it to negative seven percent, and Cities recommend changing it to zero.

Mr. Pous recommended a reduction in the current net salvage values to zero based on review of the actual historical data and the relative mix of the investment recorded in this account. Mr. Pous noted that $40 million of investment recorded in this account is associated with clearing rights of way, which will not likely be retired or incur cost of removal or gross salvage.  Another $40

---

[517]  *Id.* at Appendix C at 4-5.

[518]  Cities Ex. 5C (Pous Depreciation Study) at 26.

[519]  *Id.* at 28.

million is associated with investment in copper conductors, which has escalated in demand in recent years and should result in positive net salvage.[520]

Mr. Watson corrected his analysis and recognized that timing differences between the recording of accounting adjustments related to net salvage (*i.e.,* salvage and removal costs for a particular transaction were not recorded at the same time) made one of the recent years less representative of reasonably expected ongoing net salvage levels. He focused, therefore, on longer period averages and recommends negative seven percent net salvage consistent with the most recent ten-year ratios.[521] Mr. Watson explained that his adjustments removed relocation activity altogether from this account because it is not characteristic of the vast majority of retirements and because, if the adjustment is not made, it will shorten and skew the life analysis. Further, Mr. Watson stated that Mr. Pous' claims regarding the impact of copper prices ignore those prices' future volatility and are not supported by any analysis or quantification specific to these accounts. Mr. Watson indicated that his recommendations are based on the most clear and reliable source – Company-specific accounting data – not "selective comparisons of industry norms," as alleged by Mr. Pous.[522]

The ALJs find Mr. Watson's explanations of the rationale behind his analysis to be both credible and convincing. Accordingly, the ALJs recommend the Commission adopt ETI's requested negative 7 percent net salvage value.

### (iv) Account 368 – Line Transformers

The existing net salvage value for this account is zero, which both Mr. Watson and Mr. Pous recommended be retained. Ms. Mathis, on the other hand, argued that the net salvage value should be changed to negative five percent.

The argument here is whether the median or the mean best represents the appropriate net salvage value. ETI argues for the mean, and Staff argues for the median. As discussed in

---

[520] *Id*. at 28-29.

[521] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 69.

[522] ETI Ex. 71 (Watson Rebuttal) at 68-69.

Section VII.C.1, the use of the median is the most appropriate methodology. For this reason, the ALJs recommend the Commission approve Staff's proposed negative five percent net salvage value.

### (v) Account 369.1 – Overhead Services

The existing net salvage value for this account is negative 10 percent, which Staff recommends be retained. Mr. Watson and Mr. Pous argue in favor of a change to negative 5 percent net salvage value.

The argument here is whether the median or the mean best represents the appropriate net salvage value. ETI argues for the mean, and Staff argues for the median. As discussed in Section VII.C.1, the use of the median is the most appropriate methodology. For this reason, the ALJs recommend the Commission approve Staff's proposed negative 10 percent net salvage value.

### (vi) Account 369.2 – Underground Services

ETI began specifically charging salvage and removal cost to this account just in the last two years, producing a five-year net salvage ratio of negative 15.75 percent. Mr. Watson recommended moving from the current negative 10 percent to negative five percent net salvage.[523] Mr. Pous agreed. Because of the limited available data, Ms. Mathis recommended retaining the existing negative 10 percent net salvage.[524]

The ALJs agree with Staff that because of the limited retirement activity, a reasonable net salvage rate cannot be calculated from the historical salvage data. Accordingly, the ALJs recommend the Commission adopt the negative 10 percent net salvage value proposed by Staff.

### 5. General Plant

General plant includes some accounts that are subject to depreciation, and some that are subject to amortization. ETI proposes to adopt "Vintage Group Amortization," consistent with

---

[523] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 70.

[524] Staff Ex. 2 (Mathis Direct) at 34.

FERC Rule AR-15 for Accounts 391-397.1 and Account 398. This approach, approved by both the FERC and the Commission (Docket No. 38339), does not affect the annual level of expense, but provides for timely retirement of assets and simplifies accounting for general property.[525] Ms. Mathis concurred in the Company's proposal to adopt Vintage Group Amortization and with its recommendations for lives, amortization periods, and net salvage.[526]

The increase in expense for general plant proposed by ETI is due to the need to reduce the deficit in the general plant reserve caused by inadequate account level rates in the past.[527] This is a matter of debate among the parties, as discussed in more detail below.

### (a) Account 390 – Structures and Improvements (Life Parameter)

Based on his analysis of the data in comparison to various potential dispersion curves, Mr. Watson recommended an increase in the life of this account to 45 R2.[528] Ms. Mathis agreed with this life. Mr. Pous proposed a significantly longer life (54 S0.5) and claimed that Mr. Watson did not adequately investigate the data and investments in this account. Mr. Pous concluded that "superstructures and roadways" are a significant element in the account which can be expected to have a long life.[529]

ETI contends that Mr. Pous' analysis is incorrect. First, as confirmed by his workpapers, Mr. Watson conducted an analysis of five bands, not a single band as alleged by Mr. Pous. Furthermore, Mr. Pous' argument regarding long lives, based on the idea that the investment dates back to 1927, is contrary to the actual data showing a minute amount of old investment (0.02 percent of the account) dating back only to 1939. The average age of investment in the account, however, is

---

[525] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 2-3.

[526] Staff Ex. 2 (Mathis Direct) at 35-37.

[527] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 2-3.

[528] *Id*. at Ex. DAW-1 at 56.

[529] Cities Ex. 5C (Pous Depreciation Study) at 51.

only 15.87 years. Mr. Watson explained that the actual data shows no investment has achieved a life of 85 years, as alleged by Cities.[530]

The ALJs believe that the actuarial analysis and curve fitting shown in Mr. Watson's direct and rebuttal testimony demonstrate a more reasonable approach, as recognized by Staff witness Mathis. Therefore, the ALJs recommend the Commission adopt the 45 R2 life parameter recommended by ETI.

### (b) Account 390 – Structures and Improvements (Net Salvage Value)

Account 390 is a depreciable account for structures and improvements. Though the current authorized net salvage is zero, Mr. Watson recommended a negative five percent net salvage value, and Staff agrees with this recommendation. Mr. Pous recommended a positive 15 percent net salvage value.

Mr. Watson based his recommendation on the most recent five-year and ten-year ratios, which are negative 1.51 percent and negative 34.27 percent.[531] Mr. Pous disagreed, arguing that: (1) Mr. Watson's data adjustments present an incorrect picture of the salvage history; and (2) Mr. Watson failed to account for the difference in net salvage values between the retirements of leaseholds, versus Company-owned facilities, which should not produce negative salvage.[532]

According to ETI, Mr. Pous' argument that retirement and sales of buildings will result in positive net salvage is not backed up by the Company-specific data for this account. Such data shows that negative net salvage has occurred in every period of the most recent ten-year moving average. Averages of six years or longer range from negative 4.56 percent to negative 34.27 percent.[533] ETI also argues that Mr. Pous' attempt to use sales of facilities as an element of depreciation analysis is contrary to Commission precedent regarding building sales 'and that his

---

[530] ETI Ex. 71 (Watson Rebuttal) at 49.

[531] ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 73.

[532] Cities Ex. 5C (Pous Depreciation Study) at 31.

[533] ETI Ex. 71 (Watson Rebuttal) at 73-74.

opinion is contrary to the facts that such sales are unique circumstances that do not reasonably represent the ongoing year-to-year retirement activity that should form the basis of depreciation analysis.

The ALJs find that Mr. Pous' arguments are not supported by the facts and that Mr. Watson's explanations are the more credible. Accordingly, the ALJs recommend the Commission adopt ETI's proposed negative five percent net salvage value for this account.

### (c) General Plant Reserve Deficiency

A $21.3 million deficit has developed over time in the reserve for the accounts that ETI proposes should be converted to General Plant Amortization. This deficit, or under-recovery, has occurred because assets have been retired more quickly than can be addressed by the existing amortization rate. ETI, therefore, proposes a $2.1 million annual expense level to recover the deficit over ten years.[534] Ms. Mathis recommended that the amortization of the reserve deficiency be rejected and that the deficit be recovered through application of the remaining life method to the individual accounts where the deficit occurred.[535]

ETI argues that although Ms. Mathis' recommendation could theoretically allow recovery, her calculation of the amortization for the accounts that created the deficit is erroneous and insufficient to carry out her proposed concept for recovery. During her cross examination, Ms. Mathis agreed that she had intended to take the elements of the remaining life calculation method exclusively from Mr. Watson's depreciation study.[536] ETI contends that she failed to pull the correct values from Mr. Watson's study and her numbers did not match the corresponding entries from Mr. Watson's study.[537] For example, Ms. Mathis affirmed that her remaining life calculations were intended to allow recovery of the remaining investment in general plant account 391.2. The

---

[534] ETI Ex. 13 (Watson Direct) at Ex. DAW-2 at 2, App. A-2 at 1-2.

[535] Staff Ex. 2 (Mathis Direct) at 38.

[536] Tr. at 1752-1753.

[537] Tr. at 1746-1759.

remaining investment she provided for was $10.9 million of an original cost of $21.7 million.[538] The actual remaining investment in the account, however, as shown in the data she purported to rely on, was a *credit* balance of negative $4.4 million, meaning that not only the original cost, but $4.4 million *additional* investment remained unrecovered.[539] Ms. Mathis had no explanation for the difference. In fact, it appears that she erroneously substituted the *theoretical* reserve for the account in Mr. Watson's study ($10.789 million) as the actual book reserve, resulting in an erroneous calculation of the amount yet to be recovered.[540] Mr. Watson's rebuttal points out the errors in the calculation and provides an exhibit to properly reflect the remaining life approach that Ms. Mathis intended.[541]

However, Mr. Watson's rebuttal also explained the reasons that the Company's approach is better. By using a ten-year amortization period for the deficit, ETI lowers the annual amount of the expense in rates to $2.1 million. Once Ms. Mathis' calculation is corrected, because the remaining lives through which the asset value is recovered are so short, 'her remaining life approach increases the annual expense of amortization to $5.8 million. Given the significant level of expense involved, ETI personnel had asked Mr. Watson to moderate the remaining life approach in this instance by using a ten-year amortization period that was consistent with the approach used by another affiliate within the Entergy system. Moreover, although Ms. Mathis purports to rely on the Commission's decision in Docket No. 38339 in support of her proposal, that case includes no discussion of rejecting the proposal on general plant that Mr. Watson makes here.[542]

The ALJs have reviewed the evidence cited by both parties and the testimony offered in support of their respective positions. It is clear to the ALJs that Ms. Mathis inadvertently did exactly what ETI alleges – she got numbers confused and, in so doing, confused her analysis. The ALJs find

---

[538] Tr. at 1754; Staff Ex. 2 (Mathis Direct) at Ex. JLM-2 at 4.

[539] Tr. at 1755.

[540] Tr. at 1759-1761.

[541] ETI Ex. 71 (Watson Rebuttal) at 84, Ex. DAW-R-5.

[542] *Id*. at 80-81.

that ETI's proposed $2.1 million annual expense level to recover the deficit over ten years be approved by the Commission.

### (d) Amortization Period for Account 391.2 – Computer Equipment

Mr. Pous challenged the amortization period for this account, contending, contrary to Staff and Mr. Watson, that the Company's proposal to amortize general plant using "Vintage Group Amortization" is not consistent with FERC pronouncement AR-15.  ETI argues that Mr. Pous' critique is wrong because the five-year life of which Mr. Pous complains is based on standard life analysis.  The life has nothing to do with AR-15, which does not determine such matters.  Mr. Watson's study clearly explains that he based the life parameter on standard actuarial analysis.[543]

According to ETI, Mr. Pous' own recommendation points out the fallacy of his arguments about AR-15.  He recommended a one-year increase in the amortization, which does not match the previous period of depreciation for this account, or the previous depreciation rate, despite that being the supposed flaw in Mr. Watson's approach.[544]  Mr. Watson explained that the use of AR-15 does not involve any independent tinkering with the life of the asset account because the AR-15 process "provides for the amortization of general plant over the same life as recommended," based on standard life analysis, which Mr. Watson's study recognized.[545]

The ALJs are persuaded by ETI's arguments on this point.  FERC pronouncement AR-15 requires amortization over the same life as recommended based on standard life analysis.  Mr. Watson's study employed standard life analysis to ascertain the recommended five-year life.  The ALJs therefore recommend the Commission adopt the five-year life proposed by ETI.

---

[543]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 58.

[544]  Cities Ex. 5 (Pous Direct) at 36.

[545]  ETI Ex. 13 (Watson Direct) at Ex. DAW-1 at 2.

### 6.  Fully Accrued Depreciation

Mr. Pous claimed that the Company has failed to conform its Commission-authorized depreciation rates when it stops accruing depreciation on accounts and sub-accounts that are fully accrued.  He testified that the Company must continue to depreciate such accounts, despite the fact that this policy would mandate that the Company intentionally create negative depreciation amounts that do not relate to the existence of any depreciable asset still in existence.  Mr. Pous testified that neither standard depreciation definitions nor GAAP or National Association of Regulatory Utility Commissioners (NARUC) depreciation guidance support the Company's action.[546]  The impact of Mr. Pous' recommendation is to impute an additional $6,447,731 depreciation amount to reduce rate base and amortize that credit over four years, with an associated revenue requirement reduction of $1,611,933.[547]

ETI argues that Mr. Pous pointed to no instance in which his theory has been adopted by the Commission, or any other regulatory body.  Other regulators within the Entergy system have rejected his position.[548]  The RRC, which sets gas utility rates under essentially the same regulatory framework as PURA, has rejected Mr. Pous' position on three separate occasions.[549]  ETI contends that Mr. Pous' suggestion violates GAAP, which requires that once an asset's service value (original cost less net salvage) has been fully amortized through the application of the most recently approved depreciation rates, there is no further service value to be recognized.  This has been ETI's practice as long as ETI regulatory accounting witness Considine has been aware.  Furthermore, ETI suspends depreciation only so long as the account is fully amortized.  Once additional activity hits the account, depreciation will begin again under the Company's automated systems.[550]

ETI also argues that Mr. Pous' retroactive approach is unreasonably selective.  He would reach back into recoveries under existing rates to reclaim revenues associated with the depreciation

---

[546]  Cities Ex. 5 (Pous Direct) at 39-45.

[547]  *Id*. at 45.

[548]  ETI Ex. 46 (Considine Rebuttal) at 45-46.

[549]  ETI Ex. 71 (Watson Rebuttal) at 81, n. 61; ETI Ex. 46 (Considine Rebuttal) at Ex. MPC-R-11.

[550]  ETI Ex. 46 (Considine Rebuttal) at 44-45, 47.

expense that relates to the fully accrued accounts. According to ETI, Mr. Pous takes no notice of the depreciation taken on new assets that are not included in rate base or recovered through depreciation expense under existing rates. ETI witness Considine notes that Mr. Pous has essentially formulated a one-sided exact recovery mechanism for depreciation expense that is completely unique in the annals of base rates.[551]

According to ETI, Mr. Pous also ignores that the remaining life depreciation method already addresses any over- or under-accrual of depreciation expense. As depreciation rates and the remaining life are adjusted over time, any over (under) recovery will be carried forward and the net (if any) of the original investment less any accumulated reserve will begin to be recovered under the new and future rate structures. This is the basic concept of remaining life depreciation rates. Thus, ETI contends that no further actions or adjustments are appropriate.[552]

The ALJs find that Mr. Pous' recommendation has previously been rejected, by other regulatory bodies. There is nothing in the arguments advanced by Cities that changes that fact. Accordingly, the ALJs recommend the Commission reject Cities' proposal.

### 7. Other Depreciation Issues – Accumulated Provision for Depreciation

ETI proposes to amortize the $21 million general plant deficiency over ten years. Both the Cities and Staff agree with and use the accumulated depreciation reserve amounts per account from Mr. Watson's study.[553] TIEC witness Pollock, in arguing against amortization of the amortized general plant reserve deficiency, testified that this reserve deficiency should instead be simply reallocated to other depreciable general plant accounts that have depreciation surplus.[554]

Mr. Pollock discussed transferring the depreciation reserve between the amortizable and depreciable general plant accounts. He failed to show, however, how the reserve reallocation would

---

[551] *Id*. at 43, 45.

[552] ETI Ex. 71 (Watson Rebuttal) at 78.

[553] *Id*. at 77.

[554] TIEC Ex. 1 (Pollock Direct) at 38-39.

be computed and provided no workpapers to substantiate his analysis.  ETI argues that without a verifiable basis for the computations, his recommendations to recompute general plant depreciation accruals should be rejected.

ETI also argues that Mr. Pollock's testimony shows that he has reallocated the amortizable general plant deficiency from the amortized general plant accounts to the depreciable general plant accounts.  The depreciable plant accounts have shorter remaining lives than the ten-year amortization of the deficiency proposed by ETI.[555]  ETI contends that common sense dictates that transferring dollars from an account with a relatively longer remaining life to one with a shorter life will yield a higher annual depreciation or amortization expense, yet Mr. Pollock somehow takes this step and still arrives at a lower level of expense.

According to ETI, Mr. Pollock's methodology has the effect of "amortizing the difference between the book and theoretical reserve over a time period that is significantly shorter than the average remaining life of the assets within this function."[556]  ETI asserts that such an adjustment to depreciation and amortization expense was rejected by the Commission in the CenterPoint rate case, and it should be rejected here.[557]

TIEC argues that it does not propose any amortization of any accounts.  Rather, TIEC states that it is proposing a more efficient method for ETI to cure its deficits.  Because ETI retired equipment prior to the end of the assumed life of those assets, there is approximately a $21,300,000 deficiency in general plant accounts.  ETI seeks to amortize the deficiency over ten years so that the book reserve will "catch-up" with the theoretical depreciation reserve for the deficient reserve. TIEC contends that its position is that the catch-up adjustment is not necessary.[558]

---

[555]  ETI Ex. 13 (Watson Rebuttal) at Ex. DAW-1, App. A-1 at 4.

[556]  ETI Ex. 71 (Watson Rebuttal) at 75.

[557]  *Id*. at 75-76.

[558]  TIEC Ex. 1 (Pollock Direct) at 37.

The ALJs have reviewed the evidence and arguments advanced by the parties and find that those of ETI are more persuasive.  Accordingly, the ALJs recommend the Commission reject TIEC's recommendation.

## D.    Labor Costs

### 1.  Payroll and Related Adjustments

A number of parties suggest various adjustments to ETI's proposed payroll and related costs.  In the application, ETI's Test Year payroll costs were adjusted downward by $957,695 to reflect a decrease in the employee headcount levels at ETI during the Test Year.  At the same time, payroll costs were increased in the amount of $1,105,871 to account for employee pay raises.  The net result was that ETI's Test Year payroll expense was adjusted upward by $148,176.  Similar calculations were made for ESI employees, resulting in a net upward adjustment for ESI payroll expenses of $852,493.  Thus, ETI requested an upward adjustment of $1,000,669 ($148,176 plus $852,493) for ETI and ESI payroll expenses.[559]

Cities oppose one part of these proposed adjustments.  As noted above, ETI is proposing an upward adjustment to account for pay raises given to ETI and ESI employees.  One set of those raises was given to employees in early August 2011, one month after the end of the Test Year.  Another set of raises was given to employees in April 2012, roughly nine months after the end of the Test Year.  Cities witness Garrett testified that it is acceptable to make an adjustment for the raises made in August 2011 because they occurred shortly after the end of the Test Year.  However, he stated that it is unreasonable to include an adjustment for the raises given in April 2012.  He believes that any increase in costs due to the April 2012 pay raises might be offset by changes in productivity and the overall workforce that may occur during the same time period, such as the replacement of higher-paid workers who retire with new, lower paid employees.[560]  Thus, Cities propose an adjustment that would reverse ETI's proposed increase for the April 2012 pay raises thereby

---

[559] ETI Ex. 8 (Considine Direct) at 24-25; 3 at Sched. A-3 and WP/P AJ22.

[560] Cities Ex. 2 (Garrett Direct) at 13-15.

reducing payroll expense by $1,185,811.[561]  No other party makes a similar challenge to the April 2012 pay raise.

With regard to the adjustments proposed by ETI, Staff witness Givens accepted the adjustments for headcount changes and the pay raises, but recommended a further downward adjustment of $778,034 to account for a further decrease in ETI employee headcount levels from 678 at Test Year-end to 660 as of February 2012.  She also recommended an upward adjustment of $158,589 to account for an increase in ESI employee headcount levels from 3,055 to 3,089 as of December 2011.[562]  Ms. Givens also recommended that, in addition to adjusting payroll expense levels, the more recent headcount numbers should be used to adjust the level of payroll tax expenses, benefits expenses, and savings plan expenses.[563]  As an alternative to its primary line of attack (discussed above), Cities agree with the adjustments recommended by Staff.

ETI also agrees, in concept, with the adjustments recommended by Staff, but contends that Ms. Givens made some errors in her calculations.  First, according to ETI, Ms. Givens used erroneous headcounts for the end of the Test Year for ETI and ESI.  According to the Company, ETI's headcount at Test Year-end was 675 and ESI's was 3,054.  Ms. Givens wrongly used headcounts of 678 and 3,055, respectively, which caused a double counting of three ETI employees and one ESI employee.[564]  Second, Ms. Givens made an error in the calculation of benefits costs associated with the updated ESI headcount. Ms. Givens inadvertently used the ETI percentage in the calculation rather than the ESI percentage shown on her exhibit.[565]  Third, Ms. Givens' adjustment for savings plan expense was not necessary and is thus inappropriate.  According to ETI witness Considine, savings plan expense is already included in benefits expense levels so it would be double counting to adjust for both benefits expense and savings plan expense.[566]  Fourth, Ms. Givens'

---

[561]  *Id*. at 19.

[562]  Staff Ex. 1 (Givens Direct) at 10-12.

[563]  *Id.* at 13-15.

[564]  ETI Ex. 46 (Considine Rebuttal) at 32-33.

[565]  *Id.* at 33.

[566]  *Id*.

full-time equivalent calculations need to be corrected.  She included an incorrect assumption regarding part time employee salaries. Ms. Givens assumed that a part time employee's average salary is 50 percent of the full time average salary.  In his rebuttal testimony, Mr. Considine provided the correct calculation of full time equivalents, thereby making it unnecessary to rely upon an assumed average.[567]  According to Mr. Considine, the combined impacts of these errors is that Ms. Givens' ETI headcount adjustment overstated her O&M payroll reduction by $224,217, and her ESI headcount adjustment understated her O&M payroll increase by $37,531.[568]  No party challenged these corrected numbers.

The ALJs are unpersuaded by Cities' attempt to exclude the April 2012 pay raises.  There can be no real dispute about the fact that the pay raises are known and measurable.  Moreover, there is an obvious logical inconsistency in the Cities' position – on the one hand they oppose consideration of certain pay raises because they fall outside the Test Year, and on the other hand they support consideration of headcount reductions even though they also fall well outside the Test Year.

The ALJs are also persuaded that, conceptually, the adjustments suggested by Staff are reasonable and appropriate.  Indeed, all parties agree on this point.  Moreover, no party challenged the corrections to Staff's adjustments that were suggested by ETI, and the ALJs can find no basis for challenging those corrections.  Thus, the ALJs recommend that the Commission:  (1) accept the payroll adjustments proposed in the ETI application; and (2) accept the further payroll adjustments proposed by Staff, corrected by ETI.

## 2.  Incentive Compensation

One of the hotly contested issues concerns the extent to which ETI should be allowed to recover, through its rates, the incentive compensation it pays to its employees.  All parties agree that Commission precedent generally identifies two types of incentive compensation, only one of which is recoverable.  Specifically, pursuant to Commission precedent, incentive compensation that is tied

---

[567]  *Id*. at 34.

[568]  *Id*. at MPC-R-5, and MPC-R-6.

to operational goals is recoverable, while incentive compensation that is tied to financial goals is not.[569] In its application, however, ETI requests that it be allowed to recover its Test Year costs of all of its incentive compensation costs, regardless of whether those costs are tied to operational goals or to financial goals.

### (a) Financially Based Incentive Compensation Should Not Be Recoverable

ETI acknowledges that costs of incentive compensation tied to financial goals have typically been disallowed by the Commission. However, ETI asks for the Commission to reconsider its precedents on this issue.[570] ETI argues that the Commission precedent is not, and should not be, a hard and fast rule. ETI contends that the reason why cost recovery has been denied for incentive compensation in prior rates cases is that, in those prior cases, there was "a lack of evidence showing sufficient customer benefits."[571] ETI asserts that, in this case, it has assembled evidence not previously considered by the Commission that shows the benefits to customers of using financial measures in incentive compensation programs. For example, ETI argues that incentive compensation that encourages the financial health of a company also benefits customers because:

(1)     if a company maintains a financially healthy position, it will tend to have a lower cost of capital that will in turn benefit customers through lower rates;

(2)     a financially healthy company will be more prepared for emergency events such as storms (which is particularly important in the Gulf Coast areas served by ETI, which are subject to experiencing hurricanes); and

(3)     with financial health, the costs of doing business with suppliers (of both goods and services, including labor) will remain lower because, for example, if a company was not in a financially stable condition, suppliers would tend to demand higher prices or more onerous credit terms, resulting in higher costs that would lead to higher rates than would otherwise occur.

---

[569]   *See, e.g.,* TIEC Initial Brief at 51-52; *see also* AEP *Application of AEP Texas Central Company for Authority to Change Rates, See* Docket No. 33309, Order on Rehearing at FoF 82 (Mar. 4, 2007); *Application of AEP Texas Central Company for Authority to Change Rates,* Docket No. 28840, Order at FoF 164-170 (Aug. 15, 2005).

[570]   Tr. at 1726.

[571]   ETI Initial Brief at 129.

ETI witness Kevin Gardner, Vice President of Human Resources for ESI, testified that customers receive benefits from those portions of the incentive compensation plans that are tied to financial goals and measures. He explained that incentive compensation based on financial metrics is a reasonable, necessary, and common component of compensation for companies like ETI. He also opined that such incentives are a market necessity that ETI must include in its compensation package so that it can hire and retain talented employees. He contended that customers benefit from the incentives because they attract and keep qualified people.[572] Mr. Gardner further testified that disallowing financially-based incentives would only encourage utilities to eliminate them, thus weakening the alignment of employees' financial interests with the interest of the ratepayers in having an efficiently run and financially healthy utility. He opined that having only operational incentives could encourage utilities to overspend in some areas resulting in an incomplete, unbalanced incentive program that would be atypical when compared with American industry in general.[573]

A second ETI witness, Dr. Jay Hartzell, also testified in favor of the concept of allowing ETI to recover its costs associated with its financially-based incentive compensation. He is a professor of finance in the business school at the University of Texas at Austin. Dr. Hartzell acknowledged the historical distinction that has been made by the Commission between compensation tied to financial measures and compensation tied to operational measures. However, he argues that this distinction is based upon a "false dichotomy" and that the more appropriate focus should be on whether customers benefit from the incentive in question, regardless of whether it is a financial or operational incentive.[574] Dr. Hartzell summarized his key opinion as follows:

> In my opinion, a well-designed compensation plan that includes incentive compensation tied to cost controls, profitability, and stock prices would tend to provide greater benefits to customers than an otherwise similar compensation plan that did not include any such incentive compensation.[575]

---

[572] ETI Ex. 36 (Gardner Direct) at 31.

[573] *Id.* at 32.

[574] ETI Ex. 15 (Hartzell Direct) at 3-4, 6, and 9-10.

[575] *Id*. at 7.

Dr. Hartzell argues that compensation linked to stock prices (provided it is part of a reasonable, well-designed compensation plan) has four advantages for customers, :

- helps ensure that managers will consider the financial health of the company when they make decisions, and it is in customers' interests for the company be financially healthy;

- provides an incentive for managers and employees to ensure that the company operates efficiently, resulting in lower rates than would otherwise occur;

- provides a monitoring mechanism for managerial decision-making and the overall quality of management; and

- results in lower customer costs because capital markets will tend to reward efficient long-term investments or capital expenditures.[576]

Dr. Hartzell cited a number of studies which support the theory that the benefits of incentive compensation linked to stock price and profitability measures extend to customers of the company, such as by lowering the company's cost of capital, increasing the company's ability to respond to external shocks, improving customer satisfaction, and increasing oversight on managerial decisions.[577]

Conversely, Dr. Hartzell opined that if the use of incentive compensation linked to profitability and stock prices is discouraged, via Commission policy disallowing recovery of the costs of such compensation, then utility customers would be adversely affected. For example, if employees did not receive any incentive compensation, salaries would have to be higher to attract and retain the same quality of talent. Dr. Hartzell also testified that a compensation plan solely consisting of salary and incentives based on operational performance could likely lead to "horizon problems," meaning that, absent incentives to focus on the long run health of the company, managers might maximize their immediate compensation at the expense of longer-run benefits that the customer could have enjoyed.[578]

---

[576] *Id*. at 13-14.

[577] ETI Ex. 15 (Hartzell Direct) at 15-21.

[578] *Id*. at 22-25.

All of the other parties oppose ETI's efforts to recover the costs of its incentive compensation tied to financial goals. The parties uniformly agree that the Commission has a well-established and straightforward policy regarding the recoverability of incentive compensation through rates: incentive compensation that is tied to operational goals is recoverable; incentive compensation tied to financial goals is not.[579] They contend that ETI's position in this case flies directly in the face of that policy. TIEC points out that ETI has offered no legal authority, such as a statute or rule, which would justify its desire to have the Commission reverse its policy and allow the recovery of incentive compensation tied to financial goals. State Agencies similarly argue that ETI failed to establish a reason why the Commission should deviate from its long-standing policy. The parties also support the reasoning behind the Commission's policy: that financially-based incentives are of more immediate benefit to shareholders, not ratepayers, and therefore are not necessary and reasonable for the provision of service.

State Agencies point out that, in support of his theory that financially-based incentives provide benefits to ratepayers, Dr. Hartzell relied upon studies of utilities in competitive markets. Thus, State Agencies contend, the studies are of little to no benefit in evaluating the effects of financially-based incentives upon ETI customers because ETI is a monopoly that is not subject to competitive pressures. Moreover, State Agencies examine at length the underlying studies relied upon by Dr. Hartzell and assert, essentially, that the studies do not fully support the findings that Dr. Hartzell ascribes to them.

Staff refutes ETI's contention that the only reason why cost recovery has historically been denied for financially-based incentive compensation is that there has been a lack of evidence showing customer benefits. For example, Staff points out that, in one of the prior dockets cited by ETI, the Commission disallowed recovery for financially-based incentive costs after stating, "Incentive compensation based on financial measures or goals is of *more immediate benefit* to

---

[579] TIEC Reply Brief at 35; State Agencies Initial Brief at 14; OPC Reply Brief at 12; Staff Initial Brief at 56; Cities Initial Brief at 67; *see also, Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309, Order on Rehearing at FoF 82 (Mar. 4, 2007); *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840, Order at FoF 164-170 (Aug. 15, 2005).

shareholders."[580]  This suggests that the question is not, as ETI contends, whether the incentives provide *any* benefit to ratepayers.  Rather, the question is whether the incentives are primarily intended to provide benefits to shareholders.

Mark Garrett, an attorney and certified public accountant who works as a consultant in the area of public utility regulation, testified on behalf of the Cities in opposition to cost recovery for financially-based incentive compensation.  He stated there are a number of reasons why it makes sense to exclude financially based incentive costs from rates:  (1) there is no certainty from year to year what the level of incentive payments will be (because incentive payments are conditioned upon future events and triggers that might not occur), thereby making it difficult to set rates and recover a level of expense; (2) many of the types of factors that increase earnings per share—such as an unusually hot summer or customer growth—are outside the control of employees and have no value to customers; and (3) earnings-based incentives can discourage energy conservation.[581]  Mr. Garrett also discussed the results of a survey of 24 other states, which revealed that 17 states closely follow Texas' approach, and none allow full recovery of incentive compensation.[582]

Mr. Garrett testified that ETI will not be placed at a competitive disadvantage in its ability to obtain and retain qualified employees if its financially-based incentives are disallowed.  He stated that the Company's total payroll costs for 2011 were 10 percent above the market price, and that most of the above-market payroll costs derived from the incentive program.[583]

The ALJs conclude that ETI should not be entitled to recover its financially based incentive compensation costs.  Based upon prior Commission precedents, the ALJs conclude that the issue is not, as ETI contends, whether such incentives might provide any benefits to customers.  The proper question to be asked is whether they provide benefits most immediately or predominantly to shareholders.  Without a doubt, the primary purpose of financially based incentives, such as

---

[580] Staff Reply Brief at 44, quoting *Application of Oncor Electric Delivery Company for Authority to Change Rates*, Docket No. 35717, Order on Rehearing at FoF 92 (Nov. 30, 2009).

[581] Cities Ex. 2 (Garrett Direct) at 29-30

[582] *Id*. at 32-38.

[583] *Id.* at 45-46.

incentives tied to earnings per share or stock price, is to benefit shareholders, not ratepayers. Even construing Dr. Harzell's testimony in the most generous light, any benefits that might accrue to ratepayers would be merely tangential to that primary purpose.

Moreover, even if the ALJs were to completely accept as true the opinions offered by Dr. Hartzell, it would be of limited benefit to ETI because his opinions were almost completely theoretical. The premise of his testimony was that "a well-designed compensation plan" that includes incentive compensation tied to financial goals would "*tend to* provide greater benefits to customers" than a plan that did not include such compensation.[584] He stressed that the customer benefits of incentive compensation tied to financial goals can only exist if such compensation is part of a larger, reasonable, and well-designed overall compensation plan.[585] However, he did not meaningfully apply this abstract theory to ETI's compensation plan. For example, Dr. Harzell did not offer an evaluation of ETI's compensation plan and conclude that it is "well designed," nor did he testify that ETI's incentives tied to financial goals *actually* provide benefits to its customers. He admitted that he did not study the details of ETI's incentive plans, nor did he do any type of analysis to see if the costs of ETI's incentive programs outweighed their benefits.[586] He did not know the amounts of incentive compensation that was paid by ETI.[587] One of his major premises was that financially-based incentives can benefit customers by lowering their costs, but he did not know how ETI customer's costs compared with customer costs in the other Entergy operating companies.[588] Another of his major premises was that financially-based incentives can benefit customers by ensuring the financial health of the Company, but he made no attempt to determine whether ETI was, in fact, a financially healthy company.[589] By confining his testimony to the abstract, it is impossible to know whether Dr. Hartzell believes that ETI's incentive compensation tied to financial goals achieves the customer benefits that he believes such compensation can theoretically achieve.

---

[584] ETI Ex. 15 (Hartzell Direct) at 7 (emphasis added).

[585] *See, e.g.,* ETI Ex. 15 (Hartzell Direct) at 13.

[586] Tr. at 484.

[587] Tr. at 478.

[588] Tr. at 480.

[589] Tr. at 481-82.

It is true that Mr. Gardner described some of the specifics of ETI's incentive plans. However, because Dr. Hartzell did not explain the metrics of what he would consider "a well-designed compensation plan," it is impossible to know if ETI's plan meets those metrics.

Simply put, the ALJs conclude that ETI has failed to establish a sufficient justification for overturning the well-established Commission policy that financially based incentive compensation is not recoverable.

### (b) The Adjustment for Financially-Based Incentive Compensation Costs

Having concluded that ETI is not entitled to recover the costs of its financially based incentive programs, it is necessary to determine the amount of those costs so that they may be removed from consideration in this rate case. The parties disagree on the correct amount. Staff argues that $5.3 million of ETI's incentive compensation is financially based.[590] TIEC contends the correct number is $6.2 million.[591] Cities contend it is $8.4 million.[592]

Broadly speaking, ETI has two categories of incentive compensation programs – annual programs and long-term programs. ETI witness Gardner testified that 100 percent of ETI's long-term programs are financially based, whereas an average, representing a far lower percentage, of the Company's annual programs are financially based.[593] Staff witness Givens applied those percentages to determine her estimate of the amount spent by ETI in the Test Year on financially based incentives. As to the Company's long-term programs, she recommended removing the entire costs of those programs (*i.e.* 100 percent) from the cost of service. As to the Company's annual programs, she recommended removing average percentage of the costs of those programs. Ms. Givens then applied the FICA tax rate to the total amount she identified as financially based costs to account for direct taxes that ETI would have paid as a result of those costs. By her estimate,

---

[590] Staff Initial Brief at 56. (As discussed more below, Staff's original estimate was roughly $5.6 million. The estimate was reduced, however, in response to supplemental payroll tax information supplied to Staff by ETI.)

[591] TIEC Initial Brief at 53-54.

[592] Cities Initial Brief at 70.

[593] ETI Ex. 36 (Gardner Direct) at 30.

the FICA taxes associated with ETI's financially based incentives paid in the Test Year totaled $429,096. In total, Ms. Givens recommended removing $5,609,093 (representing ETI's financially based incentives paid in the Test Year, plus FICA taxes associated with those payments) from ETI's requested O&M expenses. However, based upon subsequent additional information supplied by ETI[594] relative to the actual payroll taxes paid by the Company for its financially based incentive compensation, Staff has agreed to lower its estimate of FICA taxes from $429,096 to $143,801. Thus, Staff now recommends removing $5,323,798 (representing ETI's financially based incentives paid in the Test Year, plus FICA taxes associated with those payments) from ETI's requested O&M expenses.[595]

Like Ms. Givens for Staff, TIEC witness Pollock relied on the numbers and percentages concerning ETI's incentive programs that were provided by Mr. Gardner. However, Mr. Pollock calculated those numbers and percentages in a slightly different manner, leading to a different recommended reduction amount. Just as Ms. Givens did, as to the Company's long-term programs, he recommended removing the entire costs of those programs from the cost of service. ETI witness Gardner testified that actual percentages of each annual program were quite different than the average percentages for all programs used by Ms. Givens.[596] Thus, as to the Company's annual programs, while Ms. Givens applied the average percentage reduction to all of the annual programs, Mr. Pollock applied the actual percentage reductions applicable to each of the annual programs. Based on Mr. Pollock's calculations, TIEC recommends removing $6,196,037 (representing ETI's financially based incentives paid in the Test Year) from ETI's requested O&M expenses.[597] TIEC appears not to have taken into account any payroll taxes associated with ETI's financially based incentives.

Cities witness Garrett took a substantially different approach when he calculated his estimate of ETI's financially based incentive costs. He agreed with Ms. Givens and Mr. Pollock that

---

[594]  ETI Ex. 46 (Considine Rebuttal).

[595]  Staff Ex. 1 (Givens Direct) at 15-22; Staff Initial Brief at 56-63.

[596]  ETI Ex. 36 (Gardner Direct) at 30 and KGG-4.

[597]  TIEC Ex. 1 (Pollock Direct) at 41-45 and JP-7; TIEC Initial Brief at 51-54.

100 percent of the Company's long-term program costs should be removed from the cost of service. As to the annual programs, however, Mr. Garrett defined what qualifies as "financially based" much more broadly than ETI, Staff, and TIEC. ETI witness Gardner testified that, when the Company's five annual programs were averaged together, specific percentages of those programs were financially based, aimed at "cost control," and aimed at "cost control, operational, safety."[598] Mr. Garrett added together the percentages representing the financially-based costs, the cost-control costs, and roughly one-third of the cost-control, operational safety costs to arrive at the figure he identified as the amount of ETI's costs for its annual programs that is "related to financial performance measures."[599] Cities contend this approach is supported by the decision in a prior docket.[600] Based on Mr. Garrett's calculations, Cities recommend removing $8,397,232 (representing ETI's incentives "related to financial performance measures" paid in the Test Year) from ETI's requested O&M expenses.[601] Mr. Garrett also agreed with Ms. Givens that an additional reduction should be made to account for the FICA taxes that ETI would have paid as a result of those costs.[602]

The ALJs reject Cities' attempt to broadly expand the definition of what qualifies as a financially based incentive to include items such as cost control measures. Cities' primary justification for doing so is that the Commission has done so previously in the *AEP Texas* case. As pointed out by ETI, however, the Commission did so in that case merely because AEP Texas lumped its cost control measures in with its financially based incentive costs. The evidence in this case demonstrates that ratepayers benefit when a utility incentivizes its employee to control costs. Even TIEC witness Pollock testified that "incentives that encourage employees to minimize costs are probably more or less in the best interest of ratepayers."[603] ETI further provided evidence

---

[598]  ETI Ex. 36 (Gardner Direct) at 30 and KGG-4.

[599]  Cities Ex. 2 (Garrett Direct) at 39-40, 46-50, MG2.10.

[600]  Cities Initial Brief at 68, *Application of AEP Texas Central Company for Authority to Change Rages*, Docket No. 28840, Final Order (August 15, 2005).

[601]  Cities Ex. 1 (Garrett Direct) at 51-52 and MG2.10; Cities Initial Brief at 70.

[602]  Cities Ex. 1 (Garrett Direct) at 53.

[603]  Tr. at 1528.

establishing that cost control incentives that result in lower costs for the Company likewise result in lower rates for customers.[604]

As to the approaches advocated by TIEC and Staff, the ALJs conclude that TIEC's approach more accurately captures the true cost of ETI's financially based incentive programs. Rather than averaging across all of ETI's annual programs (as was done by Staff), TIEC used the percentage applicable to the single annual program that included a component of financially based costs. Thus, the ALJs recommend removing $6,196,037 (representing ETI's financially based incentives paid in the Test Year) from ETI's requested O&M expenses. Additionally, the ALJs agree with Staff and Cities that an additional reduction should be made to account for the FICA taxes that ETI would have paid as a result of those costs. That amount is not specifically known at this time.

### 3. Compensation and Benefits Levels

In the application, ETI included, as part of its labor costs, $54,965,005 in base payroll paid by ETI and ESI in the Test Year. It also included $20,428,817 in costs associated with various benefits (such as medical/dental, and life insurance) that ETI and ESI provided to their employees.[605] Cities contend that the amounts for base pay and the benefits package should be reduced by $989,370 and $2,860,034, respectively, because the amounts paid were above the market price.[606] No other party challenges the reasonableness of the base payroll and benefits package.

As to base payroll, Cities contends that the amount paid by ETI and ESI was 1.8 percent above the prevailing market price (above market).[607] Cities witness Garrett acknowledges that ETI and ESI are free to pay their employees at above market wages, but he contends that ratepayers should only be asked to pay the market rate for wages, which he contends constitute the only "necessary" costs of providing utility service. Thus, Mr. Garrett and Cities recommend a 1.8 percent

---

[604] ETI Ex. 50 (Gardner Rebuttal) at 6-7, ETI Initial Brief at 137-38.

[605] Cities Ex. 2 (Garrett Direct) at 25, MG2.8, and MG2.9.

[606] *Id*.

[607] *Id*. at 25 and MG2.8.

downward adjustment to base payroll expense (or $989,370) "to bring the company's base payroll down to a market-based level."[608]

As to the Company's benefits package, Cities points out that the amount paid by ETI and ESI was 14 percent above market when compared to a peer group of Fortune 500 companies.[609] Cities witness Garrett again contends that ratepayers should only be asked to pay the market rate for benefits, which he contends constitute the only "necessary" costs of providing utility service. Thus, Mr. Garrett and Cities recommend a 14 percent downward adjustment to benefits expenses (or $2,860,034).[610]

ETI concedes that its Test Year base pay was 1.8 percent "above the market median," but argues that this is not the same thing as being "above market." As ETI witness Gardner explained, "being 'at market' means being within a reasonable range, such as +/-10 percent, of the market median; therefore, the Company's base pay levels are at market."[611] According to Mr. Gardner, some compensation consultants use an even broader range, such as a +/- 15 percent range, for determining whether compensation levels are at market.[612] Mr. Gardner testified that, because no two jobs are likely to be identical, attempting to benchmark jobs to a "market price" is an inexact science, involving inherent imprecision. Thus, Mr. Gardner testified that, when using a benchmark analysis to compare companies' levels of compensation, it is advisable to view the market level of compensation as a range (*e.g.*, +/- 10 percent of a mid-point) rather than a precise, single point.[613]

ETI also disputes Cities' contention that the Test Year costs of the Company's benefits package were 14 percent "above market." Mr. Gardner acknowledged that the costs were 14 percent higher than those of Fortune 500 companies, but he pointed out the costs were only 1 percent above

---

[608] *Id*. at 26-27 and MG2.8.

[609] *Id*. at 58 and MG2.9; ETI Ex. 36 (Gardner Direct) at 41-42.

[610] Cities Ex. 2 (Garrett Direct) at 58-59 and MG2.9.

[611] ETI Ex. 50 (Gardner Rebuttal) at 11.

[612] ETI Ex. 36 (Gardner Direct) at 23, and ETI Ex. 50 (Gardner Rebuttal) at 11 n. 1.

[613] ETI Ex. 50 (Gardner Rebuttal) at 11-12.

the market median of a peer group of utility companies.[614] ETI contends that the comparison against the peer group of utility companies provides a more appropriate comparison for ETI than Fortune 500 companies. ETI also points out that, even if equal weight were given to the comparisons against the Fortune 500 companies and the peer utilities group, the value of the Company's benefit plans would average within a +/- 10 percent range and, therefore, be at market. Thus, ETI argues that its benefit plan levels are within a reasonable range, and no disallowance should be required.[615]

The ALJs conclude that ETI has met its burden to prove the reasonableness of its base pay and incentive package costs. The ALJs agree that it is reasonable to view market price for these categories of costs as lying within a range of +/- 10 percent of median, rather than being a single point along a spectrum. As to both base pay and the incentive package, ETI has proven that its costs fall within such an acceptable range. Accordingly, the ALJs recommend rejecting the adjustments sought by Cities.

### 4. Non-Qualified Executive Retirement Benefits

ETI provides three types of supplemental executive retirement plans: the Pension Equalization Plan, the Supplemental Retirement Plan, and the System Executive Retirement Plan.[616] In the application, ETI included, as part of its labor costs, $2,114,931 in costs associated with its executive retirement plans. The expenses represent non-qualifying retirement plan expenses designed to provide retirement benefits to key managerial employees and executives who are invited to participate in the plans. They are generally available only to employees and executives earning more than $245,000 per year.[617]

On behalf of the Staff, Ms. Givens recommended a complete disallowance of the costs for these programs, on the grounds that they are offered to only select, highly compensated employees and are excessive. Ms. Givens offered the opinion that the expenses were not reasonable and

---

[614] ETI Ex. 36 (Gardner Direct) at 42.

[615] ETI Ex. 50 (Gardner Rebuttal) at 13-14; ETI Initial Brief at 139-142.

[616] ETI Ex. 50 (Gardner Rebuttal) at 14.

[617] Staff Ex. 1 (Givens Direct) at 22-23; Cities Ex. 2 (Garrett Direct) at 54.

necessary for the provision of electric utility service and were not in the public interest.[618] On behalf of Cities, Mr. Garrett agreed with Ms. Givens' recommendation, arguing that it is fair to have ratepayers pay for benefits included in regular pension plans, but that shareholders ought to pay for any additional benefits included in supplemental plans, "since these costs are not necessary for the provision of utility service, but are instead discretionary costs of the shareholders."[619] Mr. Garrett also testified that costs associated with supplemental executive retirement plans are typically excluded by utility commissions in Oklahoma, Oregon, Idaho, Arizona, and Nevada.[620] On behalf of OPC, Dr. Szerszen also recommended a complete disallowance of the portion of these costs allocated from ESI to ETI.[621] She stated that ETI has not shown that ratepayers benefit from the expenses, the costs are not necessary to provide utility service, and that the ESI allocation method is unjustified.[622]

ETI disagrees with all of these criticisms and maintains that the costs of the plans should be recoverable. ETI witness Gardner testified that the supplemental executive retirement plans are needed for attracting, retaining, and motivating highly competent and qualified leaders. He explained that the Pension Equalization Plan provides supplemental retirement benefits to account for the fact that Internal Revenue Code regulations limit the level of retirement benefits that qualify for tax treatment favorable to ETI and Entergy. The existence of this supplemental benefit program allows the Company to pay retirement benefits to highly-compensated employees that are proportionate to the compensation they receive while active in their employment. The Supplemental Retirement Plan and the System Executive Retirement Plan provide supplemental benefits beyond the amounts restricted in the qualified plan to some participants to attract, retain, and motivate employees.[623] According to Mr. Gardner, these types of retirement benefits are widely provided by

---

[618] Staff Ex. 1 (Givens Direct) at 23; Staff Initial Brief at 64.

[619] Cities Ex. 2 (Garrett Direct) at 55; Cities Initial Brief at 71-72.

[620] Cities Ex. 2 (Garrett Direct) at 56-57.

[621] OPC Ex. 1 (Szerzen Direct) at 68. Dr. Szerzen quantifies the costs of the plans as $1,391,861 (a much lower estimate than those of Ms. Givens and Mr. Garrett).

[622] *Id*. at 68-69.

[623] ETI Ex. 50 (Gardner Rebuttal) at 15-16.

companies within the utility business sector.[624]  Accordingly, ETI argues that it needs to offer them in order to be competitive in the employment market with peer companies, and thereby to retain and adequately compensate these employees in terms of future retirement benefits.

The ALJs conclude that the supplemental executive retirement plans are not reasonable and necessary for the provision of electric utility service and are not in the public interest.  They are non-qualifying retirement plan available only to employees and executives earning more than $245,000 per year, and they constitute benefits over and above the Company's standard retirement benefits package.  Because these costs are not necessary for the provision of utility service, but are instead discretionary costs, they should be paid by the shareholders.  Accordingly, the ALJs recommend an adjustment to remove $2,114,931, representing the full costs associated with ETI's non-qualified executive retirement benefits.

## 5.  Employee Relocation Costs

In the application, ETI included, as part of its labor costs, $436,723 in employee relocation costs.[625]  ETI contends that, in order to be competitive in the employment market, it must provide relocation assistance to certain of its employees.  ETI witness Gardner testified that ETI's relocation policies and costs are reasonable and consistent with general industry practice.  He also testified that the Company's average relocation costs are in line with the relocation costs for the companies surveyed by the Employee Relocation Council.[626]

Staff recommends an adjustment to remove the entire $436,723 of ETI's relocation expenses.[627]  No other party challenged the legitimacy of relocation expenses.  Staff points out that ETI pays 110 percent of the market median for total annual compensation.[628]  Staff contends that the fact that ETI pays more than the average market wage demonstrates that employees should be

---

[624]  *Id*. at 16.

[625]  Staff Ex. 1 (Givens Direct) at 25.

[626]  ETI Ex. 36 (Gardner Direct) at 45-46.

[627]  Staff Initial Brief at 64; Staff Ex. 1 (Givens Direct) at 24.

[628]  Staff Ex. 1 (Givens Direct) at 24 (*citing* ETI Ex. 36 (Gardner Direct) at 26).

sufficiently enticed to join and move around within its organization without the need for ETI to pay relocation expenses to attract employees. Therefore, Staff argues that the relocation expenses do not meet the reasonable and necessary standard required for inclusion in cost of service, nor are the expenses in the public interest.[629] Staff also points out that similar types of payments were removed from cost of service in recent proceedings, such as in Docket No. 28906, where payments for moving expenses or signing bonuses were removed from cost of service.[630]

ETI responds by pointing out that Staff does not challenge the reasonableness of the amount spent on relocations by ETI. It also contends that most of its peers offer moving assistance. Thus, it would be competitively disadvantaged if it did not offer it as well. ETI reiterates that its relocation costs are reasonable and necessary and should be authorized.[631]

The ALJs conclude that ETI has the better argument. There is no allegation that ETI was too lavish in its relocation expenditures. The only complaint offered by Staff is that ETI's overall compensation costs are 110 percent of the market median. It does not necessarily follow that the relocation program is unnecessary. ETI provided substantial evidence that, without a relocation program, it would be at a competitive disadvantage with its peers. Accordingly, the ALJs reject Staff's request to disallow the Company's relocation expenses.

### 6. Executive Perquisites

In the application, ETI included, as part of its labor costs, $40,620 in costs associated with its executive perquisites. Those perquisites consist of financial counseling and tax gross-ups for system officers and executives. Specifically, the financial counseling program promotes maximizing investment growth opportunities for eligible officers and executives, and allows reimbursement for certain expenses incurred for personal financial counseling services.[632] Staff recommends an

---

[629] Staff Initial Brief at 64; Staff Ex. 1 (Givens Direct) at 24.

[630] Staff Initial Brief at 64; Staff Ex. 1 (Givens Direct) at 24, *citing Application of LCRA Transmission Services Corporation to Change Rates*, Docket No. 28906, Final Order (Apr. 5, 2005).

[631] ETI Initial Brief at 143.

[632] Staff Ex. 1 (Givens Direct) at 23.

adjustment to remove the full cost of the executive perquisites ($40,620), reasoning that the costs are not reasonable and necessary for the provision of electric utility service.[633] ETI does not oppose that adjustment.[634] The ALJs agree that the adjustment is warranted. Therefore, the ALJs recommend an adjustment to remove $40,620, representing the full cost of ETI's executive perquisite costs.

## E.    Interest on Customer Deposits

Staff witness Givens adjusted ETI's requested interest expense of $68,985 by removing $(25,938) from FERC account 431.[635] This decrease is a result of applying the interest rate of 0.12 percent for calendar year 2012 on deposits held by utilities.[636] Using the active customer deposits amount of $35,872,476 and the 2012 interest rate, Ms. Givens calculated a recommended interest expense of $43,047 ($35,872,476 multiplied by .12 percent).[637]

This change, which reflects Commission-approved interest rates for 2012 as set in December 2011, complies with Project No. 39008 and ETI agreed with this amount. Accordingly, the ALJs recommend that the Commission approve this amount.

## F.    Property (Ad Valorem) Tax Expense

During the Test Year, ETI's property tax expense equaled $23,708,829.[638] Patricia Galbraith, ETI's Tax Officer, testified that a *pro forma* adjustment should be made to this level of expense for a known and measurable change that reflects the level of property tax expense ETI will experience in the Rate Year. Specifically, her proposed adjustment would increase the Test Year level of expense by $2,592,420 to $26,301,249.[639] As Ms. Galbraith testified, ETI's property tax expense for the calendar year 2012 will be paid in January of 2013 and be based on 2011 calendar

---

[633] Staff Initial Brief at 65; Staff Ex. 1 (Givens Direct) at 23.

[634] ETI Initial Brief at 144.

[635] Staff Ex. 1 (Givens Direct) at 24.

[636] *Setting Interest Rates for Calendar Year 2012*, Project No. 39008, Order (Dec. 8, 2011).

[637] Staff Ex. 1 (Givens Direct) at 24-25.

[638] ETI Ex. 26 (Galbraith Direct) at 5; ETI Ex. 3 at Sched. G-9.

[639] ETI Ex. 26 (Galbraith Direct) at 5 and PAG-1; ETI Ex. 3 at Sched. G-9.

year-end values for both net operating income and net plant amounts.[640] Her proposed adjustment is based on an expected ad valorem rate increase of 1 percent and expected increases in both net plant values and ETI net operating income that will equal 9.81 percent.[641]

TIEC, Cities, and Staff oppose the property tax adjustment proposed by ETI. TIEC argues that ETI's proposed adjustment should be rejected entirely, on the grounds that it is not a known and measurable change from ETI's Test Year property tax costs. Ms. Galbraith admitted that she does not know, with certainty, what the relevant property tax rate will be in 2012, nor has ETI received any tax bills advising that tax rates will rise.[642] Thus, TIEC witness Pollock testified that ETI's proposed adjustment is not known and measurable and recommended that the Commission reject the adjustment and include only the Test Year level of expense in cost of service.[643] TIEC further points out that the Commission has twice rejected requests to include projected property tax expense in rates.[644] For example, in Docket No. 28813, Cap Rock prepared an independent analysis indicating that property taxes were expected to increase to $2,700,000 per year from its test year tax level of approximately $900,000 per year. The analysis used an estimated tax assessment of $110,000 with an estimated tax rate of $2.47 per $100 of value. The ALJs in that case concluded that the property tax increases were estimates at the time of the hearing, and thus they were not known and measurable and should not be allowed.[645] Subsequently, the Commission adopted the ALJs'

---

[640] Tr. at 1235.

[641] ETI Ex. 26 (Galbraith Direct) at PAG-1.

[642] Tr. at 1221, 1238.

[643] TIEC Ex. 1 (Pollock Direct) at 40–41.

[644] In re Cap Rock Corp., *Petition of PUC (Staff) to Inquire into the Reasonableness of the Rates and Services of Cap Rock Energy Corporation,* Docket No. 28813, Order on Rehearing at FoF 137 (Nov. 9, 2005) ("Cap Rock failed to prove any increase in property taxes above those in the test year-$899,597-was known and measurable."); *Application of Gulf States Utilities Company for Authority to Change Rates, Application of Sam Rayburn G&T Electric Coop., Inc. for Sale Transfer or Merger, Appeal of Gulf States Utilities Company from Rate Proceedings of Various Municipalities*, Docket Nos. 8702, 8922, 8939, 8940, 8946, 8233, 8944, 8945, 8947, 8948 and 8949, Order at FoF 111 (May 2, 1991) ("The 1988 calendar year level of actual property taxes paid should be used in determining rate year taxes because it is a known and measurable change.").

[645] Docket No. 28813, PFD at 99 (Mar. 17, 2005).

finding.[646] The Commission rejected a similar request from ETI's predecessor Gulf States Utilities (GSU).[647] In consolidated Docket No. 8702, the Commission rejected GSU's request for projected 1989 property taxes and instead only allowed the actual calendar year property tax expenses.[648] In both cases the Commission found that projected tax expense is not a known and measurable change.[649] Accordingly, TIEC contends that ETI's request for a forecasted tax expense increase should be rejected.[650]

Staff concedes that some level of increase is warranted but argues that the increase should be smaller than ETI is asking for. Rather than an increase of $2,592,420, Staff contends that ETI's Test Year property tax expenses should be adjusted upward by only $1,214,688.[651] Staff witness Givens arrived at this increase by applying the effective tax rate for the calendar year 2011 to the Staff's Test Year end plant in service recommendation. She testified that both of these inputs to her calculation are known and measurable and thus may be used to determine the increase.[652]

Cities also concede that some level of increase is warranted, but argue that the increase should be smaller than ETI is asking for, and smaller than Staff proposes. Cities contend that ETI's Test Year property tax expenses should be adjusted upward by only 1,134,442.[653] Cities witness Garrett offered the opinion that ETI's proposed adjustment was based on estimates that were unreasonably high when compared to the actual tax valuation increases experienced since 2008. Mr. Garrett arrived at his projected increase in tax expense by applying the average annual valuation increase experienced over the period of 2009-11 to net plant value for 2011. Cities argue that both

---

[646] Docket No. 28813, Order on Rehearing at FoF 137 (Nov. 9, 2005).

[647] Docket No. 8702, Order at FoF 111 (May 2, 1991).

[648] Docket No. 8702, Order at 52.

[649] Docket No. 28813, Order on Rehearing at FoF 137 (Nov. 9, 2005); Docket No. 8702, Order at 52, FoF 111 (May 2, 1991).

[650] TIEC Initial Brief at 54-56.

[651] Staff Ex. 1 (Givens Direct) at 25.

[652] *Id*. at 25-26.

[653] Cities Ex. 2 (Garrett Direct) at 61.

of these inputs to the calculation are known and measurable and thus may be used to determine the increase.[654]

ETI responds to its opponents by pointing out that the Commission has, in the past, recognized that the adjustment proposed by Staff, which was obtained by applying a historical effective tax rate to the level of test year end plant in service, is known, measurable, and appropriate.[655] ETI also notes that, although it had not done so at the time Ms. Galbraith filed her testimony, ETI has since filed its 2011 year end FERC Form 1 data and now knows both the final net income amounts and net plant values for year end 2011 that will be used to determine the Company's 2012 tax expense (that will be paid in January of 2013).[656] ETI contends that those known values are substantially larger than the estimates used by Ms. Galbraith when she calculated the proposed adjustment, such that the known increases in 2011 net operating income and net plant amounts over 2010 are so large that, even without the 1 percent increase in tax rate assumed in the property tax adjustment, Rate Year property tax expenses will be larger than the $26,301,249 amount requested by the Company.[657]

The issue with regard to property taxes is whether a level of increase is known and measurable. The ALJs conclude that the approach taken by Staff does the best job of generating a known and measurable value for ETI's property tax burden in the Rate Year. As explained above, Staff's approach is supported by prior Commission precedent. Moreover, unlike the approaches advocated by ETI and Cities, Staff's approach requires no guesswork about future tax rates. Accordingly, the ALJs recommend that ETI's property tax burden should be adjusted upward by

---

[654] *Id.*

[655] ETI Initial Brief at 145; se*e also, Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840, Final Order at FOF 189-191 (Aug. 15, 2005); *Petition of General Counsel to Inquire Into the Reasonableness of the Rates and Services of Central Telephone Company of Texas,* Docket No. 9981, 19 Tex. P.U.C. BULL. 936, 1080-82, 1217 (Sept. 8, 1993); *Application of Central Power and Light Company for Rate Changes and Inquiry Into the Company's Prudence with Respect to South Texas Project Unit 2,* Docket No. 9561, 17 Tex. P.U.C. BULL. 157, 231-232 (Dec. 19, 1990).

[656] Tr. at 1236-37.

[657] ETI Initial Brief at 146-47.

applying the effective tax rate for the calendar year 2011 to the final, adopted Test Year-end plant in service value for ETI.

## G.     Advertising, Dues, and Contributions

In the application, ETI included, as part of its operating expenses, $2,046,214 in costs associated with advertising, dues, and contributions.[658] Staff recommended an adjustment to remove $12,800, representing contributions to organizations primarily focused on influencing legislative activities. Staff reasons that these costs are not reasonable and necessary for the provision of electric utility service.[659] ETI makes no response to the suggested adjustment.[660] The ALJs agree that the adjustment is warranted. Therefore, the ALJs recommend an adjustment to remove $12,800 from ETI's costs of advertising, dues and contributions.

## H.     Other Revenue-Related Adjustments

Several items within the Company's revenue requirement are interrelated. This means that changes to one area or item will impact one or more additional items, such as the Texas state gross receipts tax, the PUC Assessment tax, and Uncollectible Expenses.[661] From the discussions in briefs, it does not appear that there are any substantive differences among the parties regarding these amounts, which will ultimately be determined during number running.

## I.     Federal Income Tax

As explained by ETI witness Rory Roberts, the Company calculated its income tax expense in the cost of service by taking into account only the revenues and expenses included in the cost of service.[662] To the extent the Commission makes changes to the revenues and expenses that are ultimately included in the cost of service, the income tax expense amount included in the cost of

---

[658]  ETI Ex. 3, Sched. G-4.

[659]  Staff Initial Brief at 66; Staff Ex. 1 (Givens Direct) at 26.

[660]  ETI Initial Brief at 147.

[661]  Staff Ex. 1 (Givens Direct) at 28-29.

[662]  ETI Ex. 21 (Roberts Direct) at 10; Ex. 3 Sched. G-7.

service will change accordingly.  This represents a proper matching of income tax effects to the expenses and revenues that produced those tax effects.[663]

Mr. Roberts contended that the Commission's past practice of reducing tax expense for a consolidated tax adjustment based on some measure of the tax "savings" the utility realized by joining in a consolidated group federal income tax return was inappropriate.  He testified that it is improper to reduce tax expense for deductions or losses that are not also included in the cost of service.  In the case of the Commission's consolidated tax adjustment, tax expense is reduced to the extent that utility income is used to offset non-utility affiliate losses, even though those losses are not included in cost of service or borne in any manner by the utility's customers.[664]

Despite his disagreement with the approach, Mr. Roberts performed a calculation of the adjustment using the interest credit methodology adopted by the Commission.  He concluded that, instead of positive taxable income, ETI had net tax losses over the 15-year calculation period and thus provided no taxable income that could be used to offset affiliate losses.[665]  In fact, over the 15-year period, ETI's tax losses were offset by taxable income produced by other affiliates.  Thus, ETI contends that, were the Commission to be consistent in applying its interest credit methodology, it should increase ETI tax expense included in cost of service due to the fact that its affiliates' taxable income had to be used to offset ETI's tax losses.  Nevertheless, in its application, ETI rejected the interest credit methodology and has not requested that ETI's tax expense be increased as a result of the consolidated tax adjustment calculation.  No other party to the proceeding challenged the Company's position on federal income tax expense in testimony or at the hearing.  The ALJs find no reason to do so either.

## J.      River Bend Decommissioning Expense

ETI has an ownership interest in River Bend.  In the application, ETI requested that $2,019,000 be included in its cost of service to account for the Company's annual decommissioning

---

[663]  ETI Ex. 21 (Roberts Direct) at 10.

[664]  *Id*. at 10-11.

[665]  *Id*. at 10, and RLR-5.

expenses associated with River Bend.[666]  This is the same amount that was requested and approved on December 13, 2010, in Docket No. 37744.[667]  The amount of $2,019,000 was derived from an ETI decommissioning study that was completed in 2009.  In this case, ETI chose not to propose any change to its 2009 estimate.  ETI contends that this decision is supported by an August 9, 2011, letter from the Nuclear Regulatory Commission.[668]

Cities argue that the decommissioning expense should be reduced to $1,126,000.[669]  Cities point out that the larger amount sought by ETI was merely the amount agreed to by the parties, as opposed to being substantively considered and approved by the Commission in Docket No. 37744.[670] In the current case, ETI was asked through discovery to provide an updated estimate of the annual decommissioning expense responsibility for Texas retail customers calculated using the most current Texas jurisdictional decommissioning fund balance.  ETI responded that the current annual decommissioning revenue requirement is $1,126,000.[671]

Under P.U.C. SUBST. R. 25.231(b)(1)(F)(i), the annual cost of decommissioning for ratemaking purposes must "be determined in *each* rate case based on . . . *the most current information reasonably available* regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors."  The cost determined must then be expressly included in the cost of service established by the Commission's order.

The parties agree that $1,126,000 is the best estimate of the current annual revenue requirement to meet ETI's estimated decommissioning cost.  However, ETI relies on P.U.C. SUBST. R. 25.231(b)(1)(F)(iv) and Staff witness Cutter's testimony to contend that it need not adjust the

---

[666] ETI Ex. 3 Scheds. M-1 and M-2; ETI Ex. 8 (Considine Direct) at 57-58.

[667] ETI Ex. 8 (Considine Direct) at 58.

[668] *Id*. at 58 and MPC-2.

[669] Cities Ex. 2 (Garrett Direct) at 64-65.

[670] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Final Order at FoF 32 (Dec. 13, 2010); Cities Initial Brief at 73.

[671] Tr. at 348-49.

current amount being charged.[672]  Pursuant to subpart (iv), ETI is required to periodically study its decommissioning costs, and such a study must be done "at least every five years."  Because its last study was done in 2009, ETI contends that it need not do a new study now, but may simply rely of the outcome of its last study, which showed that its annual revenue requirement is $2,019,000.[673]

Cities agree that ETI is not required to conduct a new decommissioning study at this time.  However, the most current information reasonably available clearly shows that the annual amount required to meet the total cost determined in the Company's last decommissioning study has decreased.  Cities argue that to ignore the most current information available disposal would unreasonably shift future costs to current customers and would be a violation of P.U.C. SUBST. R. 25.231(b)(1)(F)(i).  The ALJs agree.  ETI's annual decommissioning revenue requirement should reflect the most current calculation of $1,126,000.  Therefore, an adjustment of $893,000 to the *pro forma* cost of service is needed to reflect the difference between the requested level for decommissioning costs of $2,019,000 and recommended level of $1,126,000.

## K.    Self-Insurance Storm Reserve Expense [Germane to Preliminary Order Issue No. 5]

In prior dockets, the Commission authorized ETI to recover $3,650,000 annually for storm damage expenses and to maintain a reasonable and necessary storm damage reserve account of $15,572,000.[674]  ETI requests to increase the authorized storm damage reserve account to $17,595,000 (an increase of $2,023,000) and to increase the annual accrual to $8,760,000 (an increase of $5,110,000).  ETI's proposed annual accrual is composed of two elements:  (1) an annual accrual of $4,890,000 to provide for average annual expected losses from all storms that do not exceed $100 million; and (2) a 20-year annual accrual of $3,870,000 to bring the reserve up from its current deficit of $59,799,744 to ETI's target reserve of $17,595,000.

No party disputes that ETI's proposal to self-insure for catastrophic property loss is appropriate under PURA § 36.064 and P.U.C. SUBST. R. 25.231(b)(1)(G).  However, Cities, OPC,

---

[672]  ETI Ex. 46 (Considine Rebuttal) at 38-39.

[673]  *Id*.

[674]  Staff Ex. 4 (Roelse Direct) at 8.

and Staff oppose the amount of ETI's proposed annual accrual, and Cities and OPC also oppose

ETI's proposed target reserve.  The parties' recommendations are:

|  | **Annual Accrual** | **Target Reserve** |
|---|---|---|
| Current | $3,650,000 | $15,572,000 |
| ETI | $8,760,000 | $17,595,000 |
| Cities | $6,150,339 | $15,572,000 |
| OPC-1 | $2,335,047 | $15,572,000 |
| OPC-2 | $3,650,000 | $15,572,000 |
| Staff | $8,270,000 | $17,595,000 |

The first component of ETI's requested annual accrual is $4,890,000 for expected annual

losses.  ETI explains that this is the amount of annual losses projected to be incurred by ETI from all

storm damage, except those over $100 million (the minimum amount likely to be securitized),[675]

adjusted to reflect current conditions and current cost levels.[676]  This recommended accrual was

calculated by ETI witness Gregory Wilson using a Monte Carlo simulation of ETI's loss history.[677]

A statistical distribution was estimated from ETI's trended loss experience, and the model indicated

an average annual loss of $4,890,000.  Mr. Wilson excluded losses from Hurricanes Rita, Gustav,

and Ike from the model because those losses were securitized and not recovered through the

insurance reserve.[678]  ETI adds that results from the model simulation were also adjusted by

removing any simulated year in which the total storm loss exceeded $100 million, which would

likely be securitized.

The second component of the proposed annual accrual is $3,870,000 per year for 20 years to

restore the reserve from the current deficit of $59,799,744 up to the $17,595,000 requested target

level.  In ETI's opinion, a 20-year period balances the interests of future and past ratepayers.  It

---

[675]  ETI Ex. 19 (McNeal Direct) at 32.

[676]  ETI Ex. 14 (Wilson Direct) at 5.

[677]  *Id*. at Ex. GSW-3.

[678]  *Id.* at 9.

added that Mr. Wilson's calculations were prepared in accordance with generally accepted actuarial procedures, with certain adjustments to reflect the nature of ratemaking for public utilities.[679]

ETI also requests a target reserve of $17,595,000. It argues that this would be an actuarially sound provision to cover self-insured losses. ETI noted that the target reserve was also developed by Mr. Wilson through the Monte Carlo simulation based upon the ETI's loss history.[680]

Cities recommend maintaining the current target reserve of $15,572,000 and adopting an annual storm damage accrual of $6,150,399. Cities' proposed annual accrual is comprised of two parts: (1) keeping the current accrual of $3,650,000 for projected annual storm expense; and (2) adding $2,500,399 annually to bring ETI's reserve deficit amount, as adjusted by Cities, up to a target reserve of $15,572,000. Cities' witness Jacob Pous testified that the current target reserve of $15,572,000 should be maintained given ETI's plan to divest itself of the transmission system, which would reduce storm damage expenses.[681] For the same reason, Mr. Pous also stated that the Commission should maintain the current annual accrual amount that was approved most recently in Docket No. 37744.[682]

According to Cities, ETI witness Wilson acknowledged that his calculations assumed that the current transmission system would be owned by ETI, and if the transmission system were sold, his analysis would need to be adjusted.[683] Cities also note that Mr. Wilson included ETI's 1997 ice storm expenses within the historical storm data used for his calculations.[684] As discussed in Section V.F., Cities challenge these expenses. If the Commission determines that those costs should be excluded, Mr. Wilson agreed that it would be inappropriate to include them in his analysis.[685] In addition, Cities stated, Mr. Wilson's Monte Carlo model analysis has been rejected in several cases

---

[679] ETI Ex. 14 (Wilson Direct) at 11-12.

[680] *Id*. at 9.

[681] Cities Ex. 5 (Pous Direct) at 65-66.

[682] *Id.* at 66; *see also* Docket No. 37744, Final Order at FoF 31 (Dec. 13, 2010).

[683] Tr. at 1247.

[684] Tr. at 1244-1246.

[685] Tr. at 1246-1247.

by the Commission, as noted by Staff witness Chris Roelse.[686] Cities noted that Mr. Wilson limited the storm reserve expense in his model to $100 million, as anything over that amount might be securitized.[687] But, Cities contend, Mr. Wilson did not consider that the storm loss history provided to him by ETI included only storm damage *expenses* and not *capital costs,* which are also included when determining the amount capable of being securitized. Thus, in Cities opinion, Mr. Wilson's cap of $100 million was overstated, and for all these reasons Cities argues that Mr. Wilson's analysis should not be considered reliable.

Finally, Cities note that ETI requested that the annual storm reserve accrual "would be made . . . only until it reaches the recommended target level, at which point contributions to the reserve would reduce to the lower of annual expected losses or actual losses."[688] In Cities view, this request should be rejected and the accrual should only be modified through a future rate case.

OPC also recommends adjustments to the storm damage reserve and the annual accrual. As discussed in Section V.F., OPC argues that ETI failed to prove that its storm damage expenses booked since 1996 were reasonable and prudently incurred. Consequently, OPC recommends disallowing all of those charges. Removing those charges would leave ETI with a positive storm reserve balance of $41,871,059, which exceeds the currently approved storm reserve balance of $15,572,000 by $26,299,059. OPC witness Benedict proposed that this surplus be refunded to rate payers at a rate of $1,314,953 per year for 20 years. He also recommended that current annual storm damage accrual of $3,650,000 be maintained, less his proposed customer refund of $1,134,953 per year, leaving a net annual storm damage accrual of $2,335,047 per year. Mr. Benedict acknowledged that some storm damage expenses incurred by ETI since 1996 likely were reasonable and necessary. Therefore, as an alternative proposal, Mr. Benedict suggested that ETI's current storm balance reserve be set at the last approved amount of $15,572,000 (*i.e.*, without any surplus or deficit) and that the currently approved total annual accrual of $3,650,000 be maintained. In

---

[686] Staff Ex. 4 (Roelse Direct) at 12.

[687] ETI Ex. 14 (Wilson Direct) at 9.

[688] ETI Initial Brief at 151.

addition, OPC argues that Mr. Wilson's Monte Carlo model analysis was flawed because it included expenses that ETI did not establish were reasonable and prudently incurred.[689]

Staff witness Chris Roelse agreed that ETI's proposed target reserve of $17,595,000 is reasonable. However, he recommended an annual accrual of $8,270,000, which is $490,000 less than ETI's request. Mr. Roelse pointed out that ETI's witness calculated the proposed annual accrual based on a Monte Carlo simulation, which projects a loss experience over a longer time than the period captured in the available loss history. However, Mr. Roelse stated, the Commission has not approved the use of these models in prior dockets; instead, it has relied on averaging known insurance losses over a period of time to compute the annual accrual. Using historical loss data, Mr. Roelse calculated an annual expected storm loss of approximately $4,400,000. When this amount is added to the proposed annual accrual of $3,870,000 to restore the reserve balance from its current deficit, it produces a total annual accrual of $8,270,000, which Staff recommends.[690]

In response, ETI agreed that if portions of the underlying costs upon which the Monte Carlo analysis was performed are removed from the reserve, then the outcome of Mr. Wilson's analysis would be different. However, ETI stressed that questions about the underlying expenses are not an attack on the Monte Carlo analysis itself. Rather, Mr. Wilson provided an analysis based upon information supplied by ETI, and he did not claim to support the expenses themselves. But ETI disagreed with the challenges to the underlying costs, as discussed in Section V.F.[691]

Most of Cities' and OPC's objections to ETI's requested storm damage annual accrual and target reserve relate to their objections to the underlying expenses, as discussed in Section V.F. For the reasons stated in that section, the ALJs denied those objections, and they do not support rejecting ETI's request for the annual accrual or target reserve. Likewise, the ALJs find that Cities' concerns about ETI selling its transmission system are too uncertain to justify altering the storm damage reserve at this time.

---

[689] OPC Ex. 6 (Benedict Direct) at 6-16; OPC Initial Brief at 14-20; OPC Reply Brief at 13-15.

[690] Staff Ex. 4 (Roelse Direct) at 10-15; Staff Initial Brief at 13-14.

[691] ETI Reply Brief at 81.

Cities also raised a question about whether Mr. Wilson properly calculated the cap he used to exclude from his analysis storms that would likely result in securitized costs. Staff pointed out that the Commission has not approved the use of the Monte Carlo simulation model in prior dockets. Rather, the Commission has traditionally used known insurance losses over a period of time. The ALJs note that neither PURA nor the Commission's rules either require or prohibit the use of actuarial models, such as the Monte Carlo simulation. The prior dockets cited by Staff did not adopt the recommendations developed by actuarial models, but the Commission also did not expressly reject the models in those cases. Likewise, however, ETI has not cited any Commission decisions that expressly adopted or used such models.

Staff witness Chris Roelse explained that the Commission has traditionally averaged known insurance losses over a period of time to compute the annual accrual. He made such a calculation that produced an annual accrual for storm damage loss of $4,400,000. When added to the proposed annual accrual of $3,870,000 to restore the reserve balance from its current deficit, the total annual accrual equals $8,270,000. No party challenged that calculation. Because a question remains as to whether Mr. Wilson properly calculated his cap to exclude storm damage expenses that would likely be securitized, the ALJs find it is more reasonable to adopt the annual accrual proposed by Staff. Therefore, the ALJs recommend that the Commission approve a total annual accrual of $8,270,000, comprised of an annual accrual of $4,400,000 to provide for average annual expected storm losses, plus an annual accrual of $3,870,000 for 20 years to restore the reserve from its current deficit. The ALJs also recommend approval of ETI's proposed target reserve of $17,595,000. Finally, the ALJs recommend that the Commission require ETI to continue recording its annual accrual until modified by an order in a future rate case, as requested by Cities. Otherwise, ETI could continue to receive rates based on the total accrual amount, but not record the receipts in the storm damage reserve. The ALJs find that such circumstances would not result in just and reasonable rates.

## L.      Spindletop Gas Storage Facility

Cities challenged ETI's use of the Spindletop Facility, arguing that the costs of operating it outweigh the benefits gained from it. In Section V.H., the ALJs rejected Cities' contention that a substantial portion of ETI's annual costs to operate the Spindletop Facility should be removed from

ETI's rate base. For the same reason he challenged the Spindletop Facility costs associated with rate base, Cities witness Nalepa also challenges a portion of ETI's costs derived from the Spindletop Facility that are associated with operating expenses. Specifically, Mr. Nalepa and Cities argue that $2,090,116 (consisting of $309,751 in depreciation expense and $1,780,365 associated with the Spindletop Facility) ought to be removed from ETI's operating expenses.[692] For the same reason that they rejected Cities' Spindletop Facility arguments relevant to rate base, the ALJs also reject Cities' Spindletop Facility arguments relevant to operating expenses.

## VIII.   AFFILIATE TRANSACTIONS [Germane to Preliminary Order Issue No. 3]

PURA requires that more stringent standards be applied to affiliate expenses than are applied to other utility company expenses. Section 36.058 begins by stating "except as provided by Subsection (b)," the PUC may not allow as capital cost or as expense a payment to an affiliate for the cost of a service, property, right, or other item or interest expense. Subsection 36.058(b) provides that the Commission may allow an affiliate payment "only to the extent" that the PUC finds the payment is reasonable and necessary for each item or class of item as determined by the Commission.

The seminal case interpreting PURA's affiliate transaction standard under Section 36.058 is *Railroad Commission v. Rio Grande Valley Gas Company*.[693] In that case, the court recognized that PURA's affiliate transaction statute created a presumption that a payment to an affiliate is unreasonable. The court explained:

> Rio's entire approach has been that the Commission is required to allow the residual affiliate charges unless they are shown to be imprudent, unreasonable, or out of line. Although this may be true with respect to arms length transactions, it is not true with respect to affiliates about which the Legislature has its suspicion and which to any reasonable mind are clearly tainted with the possibility of self-dealing.

---

[692]  Cities Ex. 6 (Nalepa Direct) at 19; Cities Initial Brief at 76.

[693]  683 S.W. 2d 783 (Tex. App.—Austin 1985, no writ).

The court went on to state that the burden was upon Rio to show that its affiliate charges were just and reasonable. The court interpreted the PURA affiliate transaction statute and explained four major areas in which Rio had failed to meet its burden of proof:

- Plaintiff had the burden of showing that the prices it was charged by its affiliate were no higher than the prices charged by the supplying affiliate to its other affiliates. . . .

- Plaintiff had the burden of showing that expenses which may not be allowed for rate making purposes for any reason . . . were not included in the "allocated expenses." . . .

- Plaintiff had the burden of proving that each item of allocated expense was reasonable and necessary. . . .

- Plaintiff had the burden of proving that the allocated amounts reasonably approximated the actual cost of services to it. . . .

In 2000, the Third Court of Appeals once again spoke on the issue of affiliate transactions in the utility setting. In *Central Power and Light Company/Cities of Alice v. Public Utility Commission*, the court cited to *Rio Grande Valley Gas Company* and stated:

> Because of the possibility for self-dealing between affiliated companies, however, expenses paid to an affiliated entity are presumptively not included in the rate base. A utility can overcome this presumption against affiliate expenses only if it demonstrates that its payments are 'reasonable and necessary for each item or class of items as determined by the commission.'[694]

PURA Section 36.058 places a greater burden of proof on the utility to prove the reasonableness and necessity of its affiliate transactions because of the nature of the relationship between the utility and its affiliates. These transactions are not considered to be arms-length, and there is a potential for self-dealing. The transactions must be disallowed for regulatory purposes, unless the utility presents sufficient evidence that it has met each of the affiliate transaction statutory requirements. If the regulatory tests for affiliate transactions are not properly enforced, the regulated utility may become a vehicle for cross-subsidization by ratepayers of other regulated or unregulated affiliates.

---

[694] 36 S.W.3d 547 at 564 (Tex. App.—Austin 2000, pet. denied) (citations omitted).

OPC witness Szerszen was the only witness to challenge ETI's affiliate transactions,[695] recommending a total affiliate disallowance (after erratas) of $8,945,221.[696] Dr. Szerszen reviewed a select subset of ETI's affiliate expenses using the PURA affiliate transaction standards. She reviewed the Company's affiliate transactions on a project by project basis, noting that such a review was more efficient and easier to understand.[697] Dr. Szerszen testified that a review by the Company's 25 classes of service presents a far too macro view of affiliate transactions that does not allow an adequate review of ETI's affiliate transactions according to PURA mandates and takes the focus away from the important issues.[698]

OPC notes that PURA Subsection 36.058(f) requires that if the Commission finds an affiliate expense for the test period to be unreasonable, then the Commission is to make a determination of what level of the expense is reasonable. By analyzing ETI's affiliate transactions on a project basis, OPC contends that it has facilitated the Commission's ability to make such a determination for each of ETI's classes of service; instead of an "up or down" decision on the macro level of expense for the class, the Commission can disallow the portion not shown to be reasonable and approve the remainder as reasonable.

ETI disagrees with OPC's contentions and argues that Dr. Szerszen's approach to addressing the Company's affiliate case is inappropriate for a number of reasons and should be rejected.

- First, her approach is directly contrary to the Commission's Guiding Principles included as part of the Commission's Transmission and Distribution Cost of Service Rate Filing Package that was issued on April 2, 2003.[699] Item 2 of the Guiding Principles clearly states that a class of

---

[695] Cities witness Mark Garrett recommended disallowance of certain short-term incentive compensation affiliate costs, but those disallowances are largely also recommended by Dr. Szerszen. See ETI Ex. 69 (Tumminello Rebuttal) at 17. ETI contends that the duplicated disallowances by Dr. Szerszen and Mr. Garrett would result in double counting $217,520 of the requested affiliate charges and requests that if the ALJs rule in OPC's and Cities' favor regarding these short-term incentive compensation costs, that disallowance should be reduced by $217,520. ETI Initial Brief at 157, n. 898.

[696] Tr. at 1607.

[697] OPC Exhibit No. 1 (Szerszen Direct) at 42-43.

[698] OPC Exhibit No. 1 (Szerszen Direct) at 42-43; Tr., at 1671-72.

[699] See ETI Ex. 69 (Tumminello Rebuttal) at Ex. SBT-R-1.

service approach is required for purposes of complying with the provisions of Section 36.058 of PURA.[700] Dr. Szerszen ignores the class of service approach required by Section 36.058 of PURA as detailed in the Guiding Principles, and instead states OPC's case on a project code-by-project code basis.

- Second, Dr. Szerszen's approach is directly contrary to the Commission's directives in Docket No. 16705. In that docket, the Commission disallowed a substantial amount of affiliate expense because Entergy Gulf States, Inc. had done then what Dr. Szerszen proposes here – based the affiliate analysis solely on project codes, rather than affiliate classes of service. Because the Commission found that a scope statement/project code-based affiliate analysis is "impossible," the Company, in its subsequent base rate cases, including its filing in this docket, changed to a class-based presentation, as directed by the Commission.

- Third, by refusing to consider a class-based analysis, Dr. Szerszen has ignored the Company's testimony, presented by 19 affiliate witnesses, which explains in detail why the Company's affiliate-incurred costs meet the Section 36.058 of PURA and *Rio Grande* standards.[701] According to ETI, the Company's affiliate class witnesses, who are knowledgeable about the activities that are encompassed in each of their classes, have each shown why the services provided through those classes are necessary. They have each also addressed numerous Commission-recommended metrics to measure the reasonableness of costs, including cost trends, staffing trends, the budgeting process, and, if applicable, benchmarking and outsourcing comparisons.[702] Their testimony and exhibits, according to ETI, show numerous different "views" of the costs in their classes, including the project codes that comprise their classes. Each affiliate witness also addressed the "not higher than" and "reasonably approximates cost" standards applicable to affiliate costs. ETI contends that the evidence provided by its witnesses meets the requirements of these Guiding Principles and supports the Company's burden of proof for the recovery of affiliate costs. ETI also contends that Dr. Szerszen ignores this overwhelming evidence and the careful attention paid to presenting it in an organized manner. In addition, she presents no evidence in accordance with the Guiding Principles that supports her proposed disallowances.

- Fourth, the Company's case is much less cumbersome and less complex than the approach suggested by OPC, which would require a showing on the necessity, reasonableness, "not higher than," and "reasonably approximates cost" standards for *each* of almost 1,300 project codes subject to this docket. Even if the Company were to do that, Dr. Szerszen's "cherry picking" approach among the project codes ignores any savings in other project codes that would

---

[700] Dr. Szerszen conceded that the Guiding Principles require that a utility's affiliate case be presented in a sufficient number of class or other logical groupings. Tr. at 1632.

[701] Dr. Szerszen claimed that, instead of considering the narrative class testimony, she instead "looked at more of the detail," presumably meaning the exhibits. Tr. at 1629.

[702] ETI Ex. 69 (Tumminello Rebuttal) at Ex. SBT-R-1. Dr. Szerszen conceded that the Company's testimony included proof items such as benchmarking data, outsourcing, staffing trends, and cost trends. Tr. at 1631.

comprise a class of affiliate costs, thereby resulting in an overall reasonable level of costs within the class even assuming that any of her complaints about individual project codes had merit.

- Fifth, ETI contends that Dr. Szerszen fails to mention Section 36.058(f) of PURA, which requires that the Commission determine the reasonable level of "an affiliate expense" if it first finds that the expense presented is unreasonable. But rather than offering an alternative "reasonable" level of an expense"", she either categorically disallows all costs in that project; or, in some instances, substitutes an arbitrary sharing or allocation of costs between ETI and its regulated affiliates, or ETI and its non-regulated affiliates. In doing so, Dr. Szerszen does not make any evidence-based attempt to ground her alternative allocation (and associated disallowance of ETI affiliate costs) on any objective basis reflecting cost causation principles. ETI contends that the effect of her approach is to presume that the Company needs zero dollars in its cost of service to perform a variety of essential utility support activities.

- Sixth, Dr. Szerszen's positions in the 2009 Oncor rate case,[703] which she agrees are similar to her positions in this ETI base rate case,[704] were rejected by the two SOAH ALJs and the Commission in that docket. ''Many of the allegations and arguments made by Dr. Szerszen in this case are very similar, if not identical, to the points she asserted in the *Oncor* case.

The ALJs agree that the Commission's Guiding Principles set forth the minimum that a utility must present to establish a *prima facie* case, and it is clear that ETI met that burden. That, however, is not the end of the question. Permitting a utility to escape further scrutiny of its affiliate transactions by resting on its *prima facie* presentation imposes too many limits and, as suggested by OPC, presents too macro a view to be a legitimate review for rate case purposes.

OPC performed essentially a sample review of ETI's affiliate transactions. The review was not exceptionally large, and (as evidenced by ETI's concurrence in the removal of some of the costs) it represented an additional layer of review to ensure that improper costs would not inadvertently be charged to ratepayers. That, of course, is not the sole focus of OPC's review, but it is important for purposes of determining whether the review itself is appropriate. If intervenors and Staff were limited to the macro level of review urged by ETI, such matters would never be revealed and there would exist a possibility that ratepayers would be charged for matters not their responsibility. The ALJs do not characterize OPC's review as "cherry picking."   It is more a reasonable sample for

---

[703] *Application of Oncor Electric Delivery Company, LLC for Authority to Change Rates,* Docket No. 35717 (PFD issued on Jun. 2, 2009; Order on Rehearing issued on Nov. 30, 2009) (*Oncor*).

[704]  Tr. at 1656.

examination that gives ETI a reasonable opportunity to explain the reasons for the charges to ratepayers. Accordingly, the ALJs find that the Commission's Guiding Principles do not limit the review performed by OPC, and the review performed by OPC is not contrary to the Commission's holdings in Docket No. 16705.

## A.    Large Industrial & Commercial Sales Reallocation

OPC contends that ETI incurs considerable amounts of sales and marketing expenses that are exclusively for the benefit of the larger commercial and industrial customers. However, most of ESI's sales, marketing, and customer service expenses are allocated to residential and small business customers.[705] The vast majority of the sales, marketing and customer service expenses are allocated to the operating companies based on customer counts, the majority of these expenses are consequently allocated to residential and small business customers. In the test year, residential and small general service customers made up 94.8 percent of the ETI total customer count. ETI's General Service, Large General Service, and Large Industrial Power Service, and Lighting classes combined comprise only 5.2 percent of ETI's customers. For the test year, OPC argues that ETI is requesting the recovery of $2.086 million of sales, marketing, billing and load research expenses that benefitted only the large customer service classes. OPC contends that it is inappropriate for residential and small customers to pay for these expenses, when cost causation is so readily identifiable, particularly since a disproportionately small portion of larger customer sales and marketing expenses is allocated to ETI's largest customers.[706] The total recommended reallocated large customer expense is $2,086,145.

ETI and TIEC oppose OPC's recommendation, arguing that it is "cherry-picking" and that the evidence does not demonstrate that the $2.086 million of affiliate expense should be directly assigned to the large commercial and industrial classes.[707]

---

[705] OPC Ex. 1 (Szerszen Direct) at 45.

[706] OPC Ex. 1 (Szerszen Direct) at 45.

[707] ETI Ex. 55 (LeBlanc Rebuttal) at 5; TIEC Ex. 3 (Pollock Cross Rebuttal) at 36.

With respect to the first argument, ETI and TIEC contend that Dr. Szerszen developed her adjustment by examining a limited sample of affiliate project code summaries and making the call, based on project code descriptions, that certain affiliate costs for marketing, sales and customer service expense should be directly assigned to large commercial and industrial customers.[708] Both TIEC and ETI contend that the bias and results-oriented nature of her recommendation became apparent when Dr. Szerszen admitted on cross examination that she made no effort to examine whether certain affiliate costs should be directly assigned to residential and small customers.[709] Both ETI and TIEC contend that it is inappropriate to take a "limited sample of costs" and directly assign them to a particular class.

According to TIEC, Dr. Szerszen admitted that it could have been appropriate to make an adjustment for direct assignment of costs to small commercial and residential customers based on principles of cost causation.[710] However, she made no effort to do that herself, nor did she ask ETI to conduct such an analysis.[711] The parties argue that the evidence shows that Dr. Szerszen's recommendation rests on an incomplete analysis of ETI's affiliate costs and her recommendation should be rejected because direct assignment of costs is only appropriate if there has been a thorough and complete cost study analysis to determine what costs are or are not appropriate for direct assignment to *all* of the classes.

TIEC further argues that the evidence did not demonstrate that the $2.086 million of affiliate expense that Dr. Szerszen proposes for direct assignment to large commercial and industrial customers is solely attributable to costs caused by those customers. Mr. Pollock testified that the project codes Dr. Szerszen selected include load research expenses that benefit residential and small commercial customers.[712] TIEC pointed out that ETI witness Stokes testified that the billing methods used for the affiliate expenses for customer service operations and retail operations were

---

[708] Tr. at 1609.

[709] Tr. at 1609-10.

[710] Tr. at 1685.

[711] Tr. at 1613-1624.

[712] TIEC Ex. 3 (Pollock Cross Rebuttal) at 35.

fair and reasonable.[713]  According to TIEC, Dr. Szerszen's proposal should be rejected because her assertion that these expenses exclusively benefit large commercial and industrial customers is incorrect.

The ALJs have reviewed the arguments of the parties and find that Dr. Szerszen's analysis is far from complete.  It appears to be result-oriented, ignoring critical aspects (such as failing to make an adjustment for direct assignment of costs to small commercial and residential customers based on principles of cost causation).  The ALJs believe that Dr. Szerszen's analysis with respect to this issue should not be adopted.

## B.     Administration Costs

Dr. Szerszen recommended disallowance of $94,709 (25 percent) of the charges in Project F3PCFACALL, contending that ESI failed to directly charge any of the costs in this project code to ETI.  She claimed that the billing method applied to this project code by ESI (that is, Billing Method "SQFALLC"), which is based on square footage, is not appropriate for these types of costs.[714]

ETI witness Plauche explained that the costs captured in this project code are primarily for the oversight of administrative functions, such as facilities, real estate, and security.[715]  This project code applies to the administration of these types of functions.  These services benefit all companies that receive facility services and are not attributable to any one specific Entergy affiliate.  Therefore, it is appropriate to bill these costs to all companies based on their pro rata share of square footage occupied.[716]

The ALJs concur that this is the appropriate method to employ and, therefore, recommend that the Commission approve the inclusion of these costs as requested by ETI.

---

[713]  ETI Ex. 66 (Stokes Rebuttal) at 3.

[714]  OPC Ex. 1 (Szerszen Direct) at 80-82.

[715]  ETI Ex. 20 (Plauche Direct) at 15-26.

[716]  ETI Ex. 69 (Tumminello Rebuttal) at Ex. SBT-R-2 at 10.

## C.     Customer Service Operations Class

Dr. Szerszen recommended disallowances in seven project codes covered primarily by ETI's Customer Service Operations Class: (1) F3PCR29324 (Revenue Assurance - Adm.) for a disallowance of $70,849; (2) F3PCR53095 (Headquarter's Credit & Collect) for a disallowance of $110,338; (3) F3PCR73380 (Credit Systems) for a disallowance of $73,562; (4) F3PCR73458 (Credit Call Outsourcing) for a disallowance of $197; (5) F3PCR73381 (Customer Svc Cntr Credit Desk) for a disallowance of $43,378; (6) F3PCR73390 (Customer Svs Ctl - Entergy Bus) for a disallowance of $60,926; and (7) F3PCR73403 (Customer Issue Resolution – ES) for a disallowance of $1,869.[717]

### 1.     Projects F3PCR29324 (Revenue Assurance - Adm.), F3PCR53095 (Headquarter's Credit & Collect), F3PCR73380 (Credit Systems), and F3PCR73458 (Credit Call Outsourcing)

For the costs captured by these project codes, Dr. Szerszen recommended that the costs be reallocated based on the Company's 10 percent "bad debt" expense percentage.

ETI witness Stokes responded that the costs captured by these project codes are for management and supervision of credit, collection, and revenue assurance activities for all of the Operating Companies. These functions ensure the most efficient processes are used in managing write-offs for all the Operating Companies and have contributed to Entergy's first quartile ranking in benchmarking of credit and collection operations. These managerial and supervisory costs, which include bankruptcy administration, surety administration, arrears management, collection agency administration, skip tracing, and final bill collections, remain consistent whether ETI's bad debt percentage is 10 percent, 30 percent, or any other percent and are appropriately allocated using the CUSTEGOP billing method, which is based on the number of electric and gas customers for each Operating Company.[718]

---

[717] OPC Ex. 1 (Szerszen Direct) at 76-78.

[718] ETI Ex. 66 (Stokes Rebuttal) at 15-16.

ETI has provided credible evidence that it has chosen the correct billing methodology. Therefore, the ALJs recommend the Commission approve inclusion of these costs as requested by ETI.

## 2. Projects F3PCR73381 (Customer Svc Cntr Credit Desk), F3PCR73390 (Customer Svs Ctl - Entergy Bus), and F3PCR73403 (Customer Issue Resolution – ES)

Dr. Szerszen recommended that these costs be reallocated using the CUSTCALL billing method. Given ESI's demonstrated tracking capabilities, Dr. Szerszen reallocated the costs of this project using a 10.8 percent customer call allocator, which is on the low end of the 10.70 percent-11.04 percent Test-Year CUSTCALL allocators.[719]

ETI witness Stokes believes that Dr. Szerszen's proposed reallocation is arbitrary and fails to consider the cost causation associated with the actual project code at issue. These costs are not driven by a specific proportion of calls from each Operating Company (that is, by the CUSTCALL allocator). The costs captured by Project F3PCR73345 reflect the costs of overseeing the Quick Payment Center vendors in each of the Entergy Operating Companies, regardless of the number of calls by customers to the Company.

The ALJs are persuaded that the allocation methodology chosen by ETI is the superior method and that the CUSTCALL allocator would not be appropriate given the cost causation associated with the project. Accordingly, the ALJs recommend the Commission approve the costs proposed by ETI.

## D. Distribution Operations Class

Dr. Szerszen addressed three project codes that are within the Distribution Operations Class: (1) F5PCDW0200 (Lineman's Rodeo Expenses) for a disallowance of $7; (2) F3PCTJGUSE (Joint

---

[719] OPC Exhibit No. 1 (Szerszen Direct) at 77 and 118; OPC Exhibit No. 27 (ETI's Ex. SBT-15, Attachment 6) at 2; Tr., at 838-839.

Use With Third Party – E) for a disallowance of $6,405; and (3) F3PCTJTUSE (Joint Use With 3rd

Parties – A) for a disallowance of $36,293.[720]

### 1. Project F5PCDW0200 (Lineman's Rodeo Expenses)

Dr. Szerszen claimed that the expenses captured by this project should be disallowed because ETI is a monopoly and Texas ratepayers should not have to pay for corporate image costs.

ETI witness Tumminello responds, stating that this minimal amount is related to a safety competition known as the "Lineman's Rodeo," it is not a corporate "image" expense. The cost, according to Ms. Tumminello, is driven by Entergy employee safety in the Distribution business units.[721]

The ALJs agree that the Lineman's Rodeo competition is not a corporate image expense, rather it is designed to promote employee safety. The ALJs recommend the Commission approve inclusion of the costs captured by this project as requested by ETI.

### 2. Projects F3PCTJGUSE (Joint Use With Third Party – E) and F3PCTJTUSE (Joint Use With Third Parties – A)

Dr. Szerszen recommends exclusion of these two projects, which she claims represent the difference between the costs incurred for ETI for pole rental costs and the revenues received from pole space rentals.

With respect to this proposed disallowance, ETI witness McCulla states that Dr. Szerszen has confused the rental of space on transmission poles and the rental of space on distribution poles. She has essentially performed a cost-benefit analysis that erroneously compares the cost of providing rental space on distribution poles with the income received solely from rental of space on transmission poles. Mr. McCulla explained that data for the distribution poles show that the more than $2.5 million in revenues from distribution pole rentals far exceeds the $67,174 in costs billed to

---

[720]   OPC Ex. 1 (Szerszen Direct) at 66, 75.

[721]   ETI Ex. 41 (Tumminello Direct) at Ex. SBT-E at 1234.

ETI under these two project codes and, therefore, Dr. Szerszen's misassumption that the revenues were less than the costs incurred is unfounded.[722]

The ALJs find that Dr. Szerszen erred. Making the correct comparison, as demonstrated by Mr. McCula, shows there is no basis for the disallowance claimed by Dr. Szerszen. The ALJs, therefore, recommend the Commission deny the requested disallowance.

## E.    Energy and Fuel Management Class

Dr. Szerszen addresses seven project codes that are within the Energy and Fuel Management Class: (1) F3PCCSPSYS (System Planning And Strategic) for a disallowance of $29,304; (2) F3PCWE0140 (EMO Regulatory Affairs) for a disallowance of $114,468; (3) F3PPSPE002 (SPO 2009 Renewable RFP Expense) for a disallowance of $3,014; (4) F3PPSPE003 (SPO Summer 2009 RFP Expense) for a disallowance of $56,672; (5) F3PPSPE004 (SPO Summer09RFP IM&Propslsubmt) for a disallowance of $42,018; (6) F3PPWET300 (SPO 2008 Western Region RFP-Te) for a disallowance of $645; and (7) F3PPWET303 (SPO2008WinterWestnRegionRFP-IM) for a disallowance of $4,200.[723]

### 1.  Project F3PCWE0140 (EMO Regulatory Affairs)

Dr. Szerszen testified that Texas ratepayers do not receive benefits as a result of the costs captured by this project code and should therefore not be charged those costs.[724]

ETI witness Cicio explained that Dr. Szerszen misinterpreted an RFI response to conclude that Texas ratepayers did not receive benefits from the activities whose costs were booked through this project code. That project code is not intended to capture costs for docketed or large System Planning and Operations projects. Mr. Cicio states that it is not possible to assign a specific project code for every discrete activity performed by each employee, nor would it be appropriate to attempt to do so. Regardless of the number of activities specifically identified through project codes, there

---

[722]  ETI Ex. 59 (McCulla Rebuttal) at 8-12.

[723]  OPC Ex. 1 (Szerszen Direct) at 55, 60, and 65-66.

[724]  *Id*. at 55.

will remain the need to have generic project codes that capture time spent on more general, undocketed matters and activities that are no less beneficial to ratepayers.[725]

The ALJs agree that Texas ratepayers receive benefits as a result of the costs charged to this account. Accordingly, the ALJs recommend the Commission approve inclusion of the costs as requested by ETI.

## 2. Projects F3PPSPE003 (SPO Summer 2009 RFP Expense), F3PPSPE003 (SPO Summer 2009 RFP Expense), F3PPSPE004 (SPO Summer09RFP IM & Propslsubmt), and F3PPWET303 (SPO2008 Winter Westn RegionRFP-IM)

Dr. Szerszen testified that the costs captured by these projects should be disregarded because they were incurred during the 2008-2009 period, which is outside of the Test Year, and are nonrecurring.[726]

ETI witness Cicio explained that although these projects were initiated prior to the Test Year, the costs that the Company seeks to recover through these project codes were expenses incurred during the Test Year, including development activities, request for proposal issuance, bidders conferences, written and posted questions and answers from market participants and other interested parties, submission of proposals, screening of proposals, proposal evaluation, follow-up questions and clarifications, recommendations and awards, contract negotiations, Independent Monitor reports, and regulatory approvals, if necessary. These routinely encompass a multi-year time frame, and the costs required to perform those activities, although associated with a project that may have been initiated several years previously, are properly incurred over the life span of the project. He also states that they are recurring because they reflect the kinds and levels of charges that would be expected to be incurred on an ongoing basis in association with requests for proposals managed by ESI on behalf of the Entergy Operating Companies, and the Company has been involved in these types of solicitations since 2002.[727]

---

[725] ETI Ex. 45 (Cicio Rebuttal) at 8-9.

[726] OPC Ex. 1 (Szerszen Direct) at 65.

[727] ETI Ex. 45 (Cicio Rebuttal) at 13-14.

The ALJs find that the costs captured by these projects were incurred during the Test Year and represent the kinds and levels of costs routinely incurred on a recurring basis. Accordingly, the ALJs recommend that the Commission approve their inclusion as requested by ETI.

### 3. Project F3PCCSPSYS (System Planning and Strategic)

Dr. Szerszen recommended total disallowance of the costs captured by this project code because they are allocated based on the total assets of the Entergy affiliates.[728] Dr. Szerszen's conclusion appears to be that no such corporate-level costs should be allocated to ETI because there are other project codes that allocate corporate planning and analysis-type costs only to the regulated utilities, such as ETI; thus, any corporate-level costs that are allocated to all subsidiaries, whether regulated or non-regulated, should not be charged to ETI.

ETI witness Tumminello testified that Dr. Szerszen's theory neither considers the Entergy organization as a family of companies and ETI's place in that family, nor the fact that these services are not only relevant to ETI as part of the Entergy family, but are reasonable, necessary and meet the Commission's affiliate cost recovery standard. ESI's corporate oversight services are provided to both individual companies and groups of companies within the Entergy 'corporate structure. As a member of the corporate group, ETI receives the benefit of corporate-level planning, reporting, and forecasting activities provided by ESI.[729]

The ALJs find that ETI (and, therefore, its ratepayers) does receive benefits as a member of the Entergy family of companies and that it is appropriate for it to receive charges for those services. Therefore, the ALJs recommend the Commission approve the inclusion of costs as requested by ETI.

### F.    Environmental Service Class

Dr. Szerszen recommended disallowance of $301,879 in six project codes primarily within ETI's Environmental Services Class: (1) F3PCCE0129 (Corporate Sustainability Strat) for a

---

[728]  OPC Ex. 1 (Szerszen Direct) at 60-61.

[729]  ETI Ex. 69 (Tumminello Rebuttal) at 10-11.

disallowance of $6,781; (2) F3PCCE0193 (Corp Environmental Special Pro) for a disallowance of $1,203; (3) F3PCCEIE01 (Corp Environmental Initiatives) for a disallowance of $2,413; (4) F3PCCEII01 (Corp Environmental Initiatives) for a disallowance of $2,413; (5) F3PCCEP001 (Corporate Environmental Policy) for a disallowance of $269,248; and (6) F5PPBCNAVF (Avian Flu Contingency Planning) for a disallowance of $47.[730]

Dr. Szerszen's reasoning for this disallowance was that these six project codes, which all deal with corporate environmental policy, initiatives, strategy, and consulting services, were allocated based on Billing Method CAPAOPCO, which is based on the fossil plant capacity of the regulated utility operating companies, even though "non-regulated entities clearly benefit from the corporate level expenses."[731]     Dr. Szerszen recommended a $47 disallowance for Project F5PPCCNAVF (Avian Flu Contingency Planning), asserting that this charge is a "corporate imaging expense that should not be borne by Texas ratepayers."[732]

According to ETI, Dr. Szerszen has a fundamental misunderstanding of how the affiliate billing system works and, as a result, she incorrectly assumed that ESI charges are not being properly allocated. ETI argues that the non-regulated Entergy affiliates do receive the proper and appropriate allocation of costs. The two service companies for non-regulated affiliates also provide services to their non-regulated affiliates directly. There simply is no subsidization or improper allocation.[733]

Dr. Szerszen noted that Entergy's website indicates that nuclear-related environmental issues are being pursued.[734] She argued that this shows that the non-regulated affiliates are under-allocated

---

[730] OPC Ex. 1 (Szerszen Direct) at 62-63.

[731] *Id*.

[732] *Id*. at 66.

[733] *See, e.g.,* ETI Ex. 41 (Tumminello Direct) at 10-15. Moreover, while ESI bills the regulated utility affiliates such as ETI at cost, it bills the non-regulated affiliates at cost plus a 5 percent mark-up pursuant to a June 1999 Securities and Exchange Commission order. ETI Ex. 41 (Tumminello Direct) at 15. This 5 percent mark-up is then flowed back to entities that receive service from ESI. Therefore, the regulated affiliates are, by federal order, receiving essentially a rebate from the non-regulated affiliates.

[734] OPC Ex. 1 (Szerszen Direct) at 62.

environmental-related costs.  Ms. Stokes explained that the project codes at issue "deal with services provided to the operating companies. . . . and just looking at the website there are other things . . . that are not covered or paid for by Texas ratepayers in these project codes that are in this testimony."[735]  Therefore, according to Ms. Stokes, these project codes are not allocated in such a way that under-recovers costs from the non-regulated affiliates; they pay their own way.

Finally, the Project Summary for the Avian Flu Contingency Planning project shows that these costs involve developing and communicating Avian Flu business continuity plans and then maintaining, checking, and adjusting those plans once established.[736]  These are not "corporate imaging expenses" as characterized by Dr. Szerszen.

The ALJs agree that ETI's evidence demonstrates the recoverability of the costs captured by these project codes.  Therefore, the ALJs recommend the Commission approve their recovery.

## G.    Federal PRG Affairs Class

Dr. Szerszen recommended disallowances for three project codes primarily in the Federal PRG Affairs Class: (1) F5PPSPE044 (PMO Support Initiative-System) for a disallowance of $344; (2) F3PPUTLDER (Utility Derivatives Compliance) for a disallowance of $20,447; and (3) F3PCSYSRAF (System Regulatory Affairs-Federal) for a disallowance of $352,084.[737]

### 1.  Project F5PPSPE044 (PMO Support Initiative-System)

Dr. Szerszen recommended disallowance of $344.29 from Project F5PPSPE044 (PMO Support Initiative System).  ETI responds, however, that a review of the Project Summary for that project code in Ex. SBT-E reveals that ETI already removed those costs before even filing its direct

---

[735]  Tr. at 884.

[736]  ETI Ex. 41 (Tumminello Direct) at SBT-E at 1342-43.

[737]  OPC Ex. 1 (Szerszen Direct) at 46-47, 66-67.

case. Therefore, according to ETI, Dr. Szerszen is recommending disallowance of a cost that is not in this case.[738]

The ALJs agree that examination of the exhibit referenced by ETI appears to reveal that the costs challenged by Dr. Szerszen have been removed from this case through a *pro forma* adjustment. Accordingly, the ALJs recommend the Commission reject OPC's challenge.

### 2. Project F3PPUTLDER (Utility Derivatives Compliance)

Dr. Szerszen recommended disallowance of $20,447 of derivatives expenses because ETI did not use derivative instruments and therefore should not be charged these costs and because ratepayers do not benefit from derivatives.[739]

ETI witness Tumminello responded that Project F3PPUTLDER was charged by a group developing compliance mechanisms to protect Entergy's regulated utility interests in observance of the Dodd-Frank Act. Although ETI does not currently use any derivative activities, understanding the impacts of that Act is necessary to ensure current and future compliance through Entergy. The definitions under the legislation have not been finalized, and there remain issues that ETI must be aware of to fully comply. These costs, therefore, are necessary and reasonable charges that should not be disallowed.[740]

The explanation offered by ETI for the inclusion of these charges appears reasonable to the ALJs. Even though ETI does not now use derivatives, it is possible that it will in the future and it is important that it be aware of the regulatory framework associated with such actions to avoid problems. The ALJs therefore recommend the Commission approve inclusion of these costs as requested by ETI.

---

[738] ETI Initial Brief at 174-175.

[739] ETI stated that it assumes that Dr. Szerszen must be referring to Project Code F3PPUTLDER (Utility Derivatives Compliance) because her recommended disallowance is the same total ETI adjusted amount shown on the Project Summary for that project code. *See* SBT-E at 1113. The ALJs make the same assumption as it appears reasonable.

[740] ETI Ex. 69 (Tuminello Rebuttal) at Ex. SBT-R-2 at 3.

### 3. Project F3PCSYSRAF (System Regulatory Affairs-Federal)

In the regulatory affairs category, ETI requests the recovery of various legal, testimony-related, communications, and filing costs associated with both Texas-specific regulatory activities, FERC-related regulatory activities, and non-Texas specific regulatory activities. OPC witness Szerszen did not recommend a disallowance of the $1,442,223 in adjusted Test Year expenses for regulatory affairs that ETI has shown to be specific to the Texas jurisdiction.[741] Rather, Dr. Szerszen recommended that all regulatory affairs expenses not specific to Texas be disallowed.[742] These expenses total $759,868.[743]

Project F3PCSYSRAS (System Regulatory Affairs – State) was incurred for administrative activities for senior management, project work associated with system-wide regulatory matters, system-wide regulatory strategies and emerging regulatory issues, and it relates to multiple regulated jurisdictions.[744] Project No. F3PCSYSRAF (System Regulatory Affairs – Federal) was incurred for regulatory oversight and coordination of FERC matters.[745] OPC contends that ETI provided no evidence that Texas ratepayers receive any tangible benefits from "system" regulatory affairs costs in proportion to the costs being allocated to Texas.

Project F3PCSYSRAS costs are allocated to the subsidiaries based on electric customer counts, and OPC states that it is questionable whether Entergy's positions on "emerging" state or national regulatory issues or "system-wide regulatory strategies" are conveying any benefits to its electric customers beyond those already captured in the Texas-specific regulatory affairs project codes.[746] In fact, according to OPC, the Company's shareholders are the primary beneficiaries of these system-wide regulatory strategies.[747] The federal regulatory affairs costs captured under

---

[741] *See* OPC Ex. 3 (Szerszen Workpapers) at 368-371.

[742] OPC Ex. 1 (Szerszen Direct) at 46-47.

[743] *Id*. at 46.

[744] OPC Ex. 3 (Szerszen Workpapers) at 365.

[745] OPC Ex. 1 (Szerszen Direct) at 46-47; OPC Ex. 3 (Szerszen Workpapers) at 367.

[746] OPC Ex. 3 (Szerszen Workpapers) at 368-371.

[747] OPC Ex. 1 (Szerszen Direct) at 47.

Project F3PCSYSRAF are allocated to the regulated subsidiaries based on each company's load responsibility ratio; this ratio assumes that every FERC docket and/or FERC issue is related to ETI's peak demand.  According to OPC, this is not reality, nor is it consistent with FERC's primary responsibility to ensure that electric wholesale buyers and sellers are provided open access transmission across utility systems.

ETI witness May offered the following as rebuttal of Dr. Szerszen's contentions regarding these two project codes:

> The affiliate charges to Project Codes F3PCSYSRAS and F3PCSYSRAF are directly associated with the issues and matters within the federal jurisdiction of the Federal Energy Regulatory Commission ("FERC")  including but not limited to the Open Access Transmission Tariff ("OATT") as well as any other federal statutes, rules and regulations.  These are the result of issues and matters raised concerning the OATT, operations of the transmission system, requests for transmission service and interpretation of applicable provisions under the jurisdiction of FERC.  They are costs incurred on an Entergy System-wide basis that cannot be directly assigned to any one Operating Company, such as ETI.[748]

He then went on to state that the affiliate Test Year issues and costs related to these project codes are reflective of typical issues and costs that the Company experiences on an ongoing basis.[749]  With respect to the benefits derived by Texas ratepayers as a result of activities conducted under these project codes, Mr. May stated that:

> the benefit to ETI involves a multitude of issues that are directly related to the jurisdiction of the FERC, including but not limited to any revisions to Service Schedules under the System Agreement that applies to all operating companies including ETI, power purchase agreements for cost-based, short-term power sales, and compliance with FERC by each Operating Company to the market-based rate tariff and cost-based rate tariff.  The Entergy Operating Companies' market-based rate tariff and cost-based rate tariff are joint tariffs containing terms and conditions of service.[750]

---

[748]  ETI Ex. 57 (May Rebuttal) at 25.

[749]  ETI Ex. 57 (May Rebuttal) at 25.

[750]  ETI Ex. 57 (May Rebuttal) at 27-28; *see also,* Tr. at 370-371.

Mr. May also explained why the billing methods applied to these two project codes are appropriate. The cost drivers for Project F3PCSYSRAF are labor, employee expenses, consultant expenses, and other general operating expenses incurred for the benefit of the Entergy Operating Companies and their regulated customers.    Therefore, a billing method based on load responsibility – "LOADOPCO" – is appropriate for this type of project code.  Project F3PCSYSRAS captures costs associated with general regulatory support work that is applicable across all of the jurisdictions.  The primary activities associated in this project code include but are not limited to: special project work associated with system-wide regulatory matters, analysis of emerging state or national regulatory and accounting issues affecting the Entergy System, and internal process improvement work.  What drives the cost of this project code is the average number of both electric and gas customers served – CUSTEGOP – because all such customers benefit from these services provided by ESI to ETI.[751]  In short, according to ETI, the activities undertaken under both of these project codes benefit Texas ratepayers, and they are properly allocated to the regulated operating companies using the billing methods employed.

The ALJs believe that resolution of this question is a close call.  Although ETI provided an adequate explanation of the reasons underlying the allocation of costs to Texas ratepayers and the appropriateness of the allocation methodologies used, the one troubling aspect, as noted by OPC, was that Mr. May's testimony regarding Projects F3PCSYSRAF and FP3PCSYSRAS contradicted the fact that ESI has a specific project dedicated to open access transmission issues entitled "FERC-Open Access Transmission" (Project F3PCE01601).[752]  As OPC notes, if Mr. May was correct that OATT issues have been included in Projects F3PCSYSRAF and FP3PCSYSRAS the project pages should arguably be more specific about the purpose of the expenditure.  Nevertheless, the ALJs find ETI's testimony credible and recommend that the costs of Projects F3PCSYSRAF and FP3PCSYSRAS not be disregarded.

---

[751]  ETI Ex. 57 (May Rebuttal) at 28-29.

[752]  OPC Ex. 11; *also found in* OPC Exhibit No. 3 (Szerszen Workpapers)at 363-364.

## H.     Financial Services Class

Dr. Szerszen recommended disallowances in nine project codes that are primarily captured within ETI's Financial Services Class of affiliate costs: (1) F3PCF05700 (Corporate Planning & Analysis) for a disallowance of $4,254; (2) F3PCF21600 (Corp Rptg Analysis & Policy) for a disallowance of $320,157; (3) F3PCFF1000 (Financial Forecasting) for a disallowance of $96,734; (4) F3PPADSENT (Analytic/Decision Support-Entergy) for a disallowance of $93,544; (5) F3PPSPSENT (Strategic Planning Svcs-Entergy) for a disallowance of $45,265; (6) F3PCR73345 (Quick Payment Center, Adm) for a disallowance of $14,484; (7) F3PCF20990 (Operations Exec VP & CFO) for a disallowance of $146,267; (8) F3PCFF1001 (OCE Support) for a disallowance of $1,923; and (9) F3PCF23936 (Manage Cash) for a disallowance of $15,677.[753]

### 1.     Projects F3PCF05700 (Corporate Planning & Analysis), F3PCF21600 (Corp Rptg Analysis & Policy), F3PCFF1000 (Financial Forecasting), F3PPADSENT (Analytic/Decision Support-Entergy), and F3PPSPSENT (Strategic Planning Svcs-Entergy)

Dr. Szerszen proposed to disallow all costs related to these five project codes, which she collectively describes as addressing Corporate Planning, Reporting, and Forecasting issues because she contends that an assets-based allocator should not be used to allocate these costs and, regardless of the allocator used, these types of services do not benefit Texas ratepayers because ESI has, in other instances, directly billed corporate-level services to ETI.

ETI witness Tumminello responded, stating that Dr. Szerszen failed to consider the Entergy organization as a family of companies and ETI's place in that family. The services provided under these project codes are not only relevant to ETI as part of the Entergy family, but are reasonable and necessary. ESI's corporate oversight services are provided to both individual companies and groups of companies within the Entergy Companies' corporate structure. As a member of the corporate group, ETI receives the benefit of corporate-level planning, reporting, and forecasting activities provided by ESI. Ms. Tumminello contested that the use of an asset-based allocator is appropriate

---

[753]  OPC Ex. 1 (Szerszen Direct) at 56, 60-62, and 74, and Schedules CAS-9, CAS-10, and CAS-15.

because this is an example of the stewardship of the company-wide assets and such an allocator is, therefore, appropriate.[754] The ALJs agree.

The ALJs find that ETI's proposed allocator is appropriate and that the costs benefit Texas ratepayers. Accordingly, the ALJs recommend the Commission approve the costs proposed by ETI.

## 2. Projects F3PCF20990 (Operations Exec VP & CFO) and F3PCFF1001 (OCE Support)

Dr. Szerszen recommended disallowance of all costs captured by these project codes because, in her opinion: (1) there are "no perceivable benefits to ETI's ratepayers"; (2) they should be paid for by the parent entity (presumably meaning Entergy's shareholders); and (3) an assets-based allocator is not appropriate.[755]

As to Dr. Szerszen's assertion that Texas ratepayers do not benefit from the costs captured by these project codes, ETI witness Domino, President of Entergy, provided anecdotal evidence that that Entergy was vital to ETI's restoration efforts on two fronts. First, the parent provided cash to ETI for its hurricane restoration efforts; second, ETI was not required to pay dividends to the parent while it was strapped for funds due to hurricane restoration efforts.[756] With respect to the argument that an asset-based allocator is not appropriate, Ms. Tumminello testified that the functions covered by this project code relate to the oversight of all system operations and the stewardship of corporate assets and that because ETI is part of a corporate group, the allocated charges associated with these services are relevant to ETI as part of that group. Furthermore, ETI argues, the asset-based allocator is appropriate because it reflects the cause of the costs incurred, in that services provided relate to the stewardship of all the corporation's assets.[757]

---

[754] ETI Ex. 69 (Tumminello Rebuttal) at 10-11.

[755] OPC Ex. 1 (Szerszen Direct) at 56-57.

[756] Tr. at 141.

[757] ETI Ex. 69 (Tumminello Rebuttal) at 9-11.

Dr. Szerszen took too narrow a view and, without justification, argued that these costs provide no benefit to Texas ratepayers. There are innumerable benefits provided by the corporate structure adopted; those mentioned by Mr. Domino are just a few. Ms. Tumminello's testimony explained why an asset-based allocator is appropriate. Accordingly, the ALJs recommend the Commission approve the inclusion of these costs as requested by ETI.

### 3. Project F3PCR73345 (Quick Payment Center, Adm)

Dr. Szerszen recommended that these costs be reallocated using the CUSTCALL billing method. Given ESI's demonstrated tracking capabilities, Dr. Szerszen reallocated the costs of this project using a 10.8 percent customer call allocator, which is on the low end of the 10.70 percent-11.04 percent Test-Year CUSTCALL allocators.[758] As a result of Dr. Szerszen's reallocation, $14,484 associated with this project should, according to Dr. Szerszen, be disallowed.[759]

ETI witness Stokes responded, stating that Dr. Szerszen's proposed reallocation is arbitrary and fails to consider the cost causation associated with the actual project code at issue. These costs are not driven by a specific proportion of calls from each Operating Company (that is, by the CUSTCALL allocator). The costs captured by Project F3PCR73345 reflect the costs of overseeing the Quick Payment Center vendors in each of the Entergy Operating Companies, regardless of the number of calls by customers to the Company.[760]

The ALJs are persuaded that the allocation methodology chosen by ETI is the superior method and that the CUSTCALL allocator would not be appropriate given the cost causation associated with the project. Accordingly, the ALJs recommend the Commission approve the costs proposed by ETI.

---

[758] OPC Exhibit No. 27 (ETI's Ex. SBT-15, Attachment 6) at 2; Tr. at 838-839.

[759] OPC Exhibit No. 1 (Szerszen Direct) at 77 and 118.

[760] ETI Ex. 66 (Stokes Rebuttal) at 11.

### 4. Project F3PCF23936 (Manage Cash)

Dr. Szerszen recommended disallowance of $15,677 from Project F3PCF23936 (Manage Cash), arguing that this project: (1) is duplicative of ETI-specific financing and cash management activates; (2) the allocator is wrong; and (3) Entergy, not ETI ratepayers, should pay for this activity.[761]

ETI witness McNeal testified that the services are not duplicative of the cash management services performed by the Cash Management department in the Treasury Class. The services provided under Project F3PCF23936 are associated with daily cash management responsibilities, such as loading bank balances, setting daily cash position for all the Entergy Companies, transmitting wire/ACH files to Entergy Company banks for vendor payments, and maintaining proper cash controls over these cash functions. These services are necessary for the daily operation of all the Entergy Companies, including ETI, and are thus not directly associated with any one specific legal entity. The costs are driven by the time spent on the daily cash management activities, which is directly related to the number of bank accounts that the Entergy Companies have open. Since the services provided under this project code cannot be identified to a particular Entergy Company, the billing method based on the number of open bank accounts is the best allocation. Billing method BNKACCTA does that and, according to Mr. McNeal, is therefore appropriate for allocating costs for this project code.[762]

The evidence demonstrates that the activities captured by this project code are not directly associated with any one specific entity; rather, they benefit all the entities under the Entergy umbrella. It also appears that a billing method based on the number of open bank accounts is the appropriate allocation methodology. Accordingly, the ALJs recommend the Commission approve inclusion of costs as requested by ETI.

---

[761] OPC Ex. 1 (Szerszen Direct) at 74 and Schedule CAS-15.

[762] ETI Ex. 61 (McNeal Rebuttal) at 4, 6; Tr. at 546-547.

## I.      Human Resources Class

Dr. Szerszen recommended disallowances for three project codes that are primarily within the Human Resources Class of affiliate costs:  (1) F3PCHRCCSM (HR Competitive Compensation) for a disallowance of $20,146; (2) F5PCZUBENQ (Non-Qualified Post-Retirement) for a disallowance of $115,078; and (3) F5PPZNQBDU (Non-Qual Pension/Benf-Dom Utl) for a disallowance of $241,073.[763]

### 1.  Project F3PCHRCCSM (HR Competitive Compensation)

Dr. Szerszen testified that an asset-based allocator is not appropriate for a project, such as Project F3PCHRCCSM, that captures overall executive management-related costs.[764]

ETI contends that the functions covered by this project code relate to the oversight of all system operations and the stewardship of corporate assets and that because ETI is part of a corporate group, the allocated charges associated with these services are relevant to ETI as part of that group of companies.  Furthermore, ETI argues, the asset-based allocator is appropriate because it reflects the cause of the costs incurred, in that services provided relate to the stewardship of all the corporation's assets.[765]

A corporation cannot function without executives, who are charged with the responsibility of overseeing, among other things, the assets of the corporation.  This is an important function that Dr. Szerszen did not acknowledge in her testimony.  The utility and executive management class costs that she challenged are reasonable and necessary costs that are allocated to ETI based on a logical allocator – the assets the executives are charged with overseeing.  The ALJs recommend that OPC's challenge be rejected.

---

[763]  OPC Ex. 1 (Szerszen Direct) at 56, 68.

[764]   OPC Ex. 1 (Szerszen Direct) at 56.

[765]  ETI Ex. 4 (Domino Direct) at 18-38; ETI Ex. 69 (Tumminello Rebuttal) at 9-11.

### 2.  Projects F5PCZUBENQ (Non-Qualified Post-Retirement) and F5PPZNQBDU (Non-Qual Pension/Benf-Dom Utl)

With respect to Projects F5PCZUBENQ and F5PPZNQBDU, Dr. Szerszen testified that: (1) there is no evidence that Texas ratepayers benefit from the pension-related benefits in these codes; and (2) the LBRBILAL allocator (Labor Billings to All) is not appropriate because the benefits are unrelated to ESI labor costs.[766]

Initially, ETI agrees that $112,531 of the costs in total for both of these project codes should be excluded because that amount is attributable to nuclear and non-regulated employees.[767]

With respect to the remaining costs, ETI disagrees.  The ALJs, however, have already resolved this issue in their discussions related to Section VII.D.4, above, where they concluded that that the supplemental executive retirement plans are not reasonable and necessary for the provision of electric utility service and are not in the public interest.  Accordingly, the ALJs recommend the Commission accept OPC's proposed disallowance of $356,151 (which includes the $112,531 agreed to by ETI).

### J.  Information Technology Class

Dr. Szerszen recommended disallowances in two project codes that are primarily within ETI's Information Technology Class: (1) F3PPFXERSP (Evaluated Receipts Settlement) for a disallowance of $10,279; and (2) F3PCFX3555 (BOD/Executive Support) for a disallowance of $3,148.[768]

---

[766]  OPC Ex. 1 (Szerszen Direct) at 68.

[767]  ETI Initial Brief at 179.

[768]  OPC Ex. 1 (Szerszen Direct) at 56, 71.

### 1.  F3PPFXERSP (Evaluated Receipts Settlement)

Dr. Szerszen testified that Project F3PPFXERSP is not moving forward due to tax and freight implications and, as such, the cost is not recurring.[769] Ms. Tumminello testified in response that the "Evaluated Receipt Settlement" program was originally being capitalized in a capital project.  But when it was decided that the program would be cancelled, the capital project was closed and the charges to the project were expensed.  Although the costs for this particular project do not recur every year, they are part of normal utility operations, and this type of project does recur as necessary.[770]

Although the ALJs understand the concept of normally recurring cost types, they do not believe that the costs captured by this project code fall within that category.  Those costs related to a project that was cancelled and sufficient explanation of how similar projects in the future might occur was not provided.  Accordingly, the ALJs recommend the Commission reject inclusion, as proposed by OPC.

### 2.  Project F3PCFX3555 (BOD/Executive Support)

Dr. Szerszen argued that Project F3PCFX3555 is an executive-related project that does not provide perceivable benefits to ETI ratepayers, the Entergy shareholders should bear this cost, and an assets-based allocator is not appropriate.[771]

ETI argues that the functions covered by this project code relate to the oversight of all system operations and the stewardship of corporate assets and that because ETI is part of a corporate group, the allocated charges associated with these services are relevant to ETI as part of that group of companies.  Furthermore, ETI argues, the asset-based allocator is appropriate because it reflects the

---

[769]  OPC Ex. 1 (Szerszen Direct) at 71.

[770]  ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 4.

[771]  OPC Ex. 1 (Szerszen Direct) at 56.

cause of the costs incurred, in that services provided relate to the stewardship of all the corporation's assets.[772]

A corporation cannot function without executives who are charged with the responsibility of overseeing, among other things, the assets of the corporation. This is an important function that Dr. Szerszen did not acknowledge in her arguments. The utility and executive management class costs that she challenged are reasonable and necessary costs that are allocated to ETI based on a logical allocator – the assets the executives are charged with overseeing. The ALJs recommend that OPC's challenge be rejected.

## K.     Internal and External Communications Class

Dr. Szerszen recommended disallowances in four project codes that are primarily within ETI's Internal and External Communications Class: (1) F3PCR40118 (Utility Communications for a $6 disallowance; (2) F5PCZPDEPT (Supervision and Support – Public) for a $138 disallowance; (3) F5PPICC000 (Integrated Customer Communications) for a $199 disallowance; and (4) F5PPICCEMP (ICC - Employee Education Initiative) for a $3 disallowance.[773]

ETI witness Tumminello responded to Dr. Szerszen's claim that the costs captured by these project codes are corporate image costs by stating that the costs are for advertising activities that are of a good will or institutional nature, which is primarily designed to improve the image of the utility or the industry, including advertisement which inform the public concerning matters affecting the Company's operations, such as, the costs of providing service, the Company's efforts to improve the quality of service, the Company's efforts to improve and protect the environment. According to FERC, such costs are properly includable in FERC Account 930.1 and are recoverable. According to Ms. Tumminello, as contemplated by FERC, the fact that ETI is a monopoly has no bearing on the recoverability of these costs.[774]

---

[772] ETI Ex. 4 (Domino Direct) at 18-38; ETI Ex. 69 (Tumminello Rebuttal) at 9-11.

[773] OPC Ex. 1 (Szerszen Direct) at 66.

[774] ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 4-6.

OPC provided little support for its claim that costs covered by these project codes should not be recoverable, essentially limiting the basis to the contention that ETI is a monopoly and ratepayers should not be charged with such costs. ETI did little better, but it did provide the testimony of Ms. Tumminello, which confirms that the costs are properly includable in FERC Account 930.1 and are, therefore, recoverable. In the end, the ALJs must go with the weight of the evidence, which is in ETI's favor. The ALJs recommend the Commission reject OPC's contention that costs covered by these project codes are not recoverable.

## L.     Legal Services Class

Dr. Szerszen recommended disallowances in 13 project codes that are primarily within the Legal Services Class: (1) F3PPCASHCT (Contractual Alternative/Cashpo) for a disallowance of $2,553; (2) F3PCF99180 (CORP. COMPLIANCE TRACKING SYS) for a disallowance of $9; (3) F3PPINVDOJ (DOJ Anti Trust Investigation) for a disallowance of $1,039,664;[775] (4) F3PCE01601 (Ferc - Open Access Transmission) for a disallowance of $84,183; (5) F3PCERAKTL (RAKTL Patent Matter) for a disallowance of $75; (6) F3PPEASTIN (Willard Eastin et al) for a disallowance of $19,714; (7) F3PPTCGS11 (TX Docket Competitive Generation) for a disallowance of $310,746; (8) F5PCE13759 (Jenkins Class Action Suit) for a disallowance of $205,107; (9) F5PCZLDEPT (Supervision & Support – Legal) for a disallowance of $225,794; (10) F3PCCDVDAT (Corporate Development Data Room) for a disallowance of $6,147; (11) F3PCSYSAGR (System Agreement-2001) for a disallowance of $880,841; (12) F3PPWET302 (SPO 2008 Winter Western Region) for a disallowance of $13,919; and (13) F3PPWET308 (SPO Calpine PPA/Project Houston) for a disallowance of $435,963.

---

[775] Dr. Szerszen also proposed disallowance of $765 in charges for related Project Code F3PPTDHY19 (Dept. of Justice Investigation), which is actually primarily attributable to the Transmission Operations Class, rather than the Legal Services Class. Because the issues are intertwined, that project will be discussed here, rather than in the Transmission Operations Class.

### 1.   Project F3PPCASHCT (Contractual Alternative/Cashpo)

With respect to Project F3PPCASHCT ($2,553 disallowance), ETI agrees that these costs are non-recurring and should be disallowed.  Accordingly, the ALJs recommend the Commission exclude those costs.

### 2.   Project F5PCZLDEPT (Supervision & Support – Legal)

As to Project F5PCZLDEPT ($225,794), OPC, through its Second Errata, removed that proposed disallowance, and it is no longer contested by Dr. Szerszen.  Accordingly, the ALJs recommend the Commission approve inclusion of those costs.

### 3.   Project F3PCF99180 (Corp. Compliance Tracking Sys)

F3PCF99180 (Corp. Compliance Tracking Sys) is one of the project codes that Dr. Szerszen claimed should be disallowed because ETI is a monopoly and Texas ratepayers should not have to pay for corporate image costs.[776]

ETI witness Tumminello testified that these costs are for advertising activities that are of a good will or institutional nature, which is primarily designed to improve the image of the utility or the industry, including advertisement which inform the public concerning matters affecting the Company's operations, such as, the costs of providing service, the Company's efforts to improve the quality of service, the Company's efforts to improve and protect the environment.  According to FERC, such costs are properly includable in FERC Account 930.1 and are recoverable.  According to Ms. Tumminello, as contemplated by FERC, the fact that ETI is a monopoly has no bearing on the recoverability of these costs.[777]

OPC provided little support for its claim that costs covered by these project codes should not be recoverable, essentially limiting the basis to the contention that ETI is a monopoly and ratepayers should not be charged with such costs.  ETI did little better, but it did provide the testimony of

---

[776]  OPC Ex. 1 (Szerszen Direct) at 66.

[777]  ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 4-6.

Ms. Tumminello, which confirms that the costs are properly includable in FERC Account 930.1 and are, therefore, recoverable. The weight of the evidence is in ETI's favor. The ALJs recommend the Commission reject OPC's contention that costs covered by these project codes are not recoverable.

### 4. Projects F3PPINVDOJ (DOJ Anti Trust Investigation) and F3PPTDHY19 (Dept. of Justice Investigation)

Entergy is currently under investigation by the Department of Justice (DOJ) for certain business practices of the Operating Companies, including the procurement of generating assets and power, dispatch of generation within the Entergy system, and transmission capacity expansion. This is a civil investigation under Section 2 of the Sherman Act and Section 7 of the Clayton Act. The investigation has been ongoing since 2010, and Entergy does not know when the investigation will conclude.[778]

Dr. Szerszen testified that there are two reasons why ratepayers should not pay for the DOJ expenses. First, ETI does not have the ability to make its own power procurement, generation dispatch, or transmission capacity decisions. These decisions are made by ESI and Entergy's corporate management, which has traditionally planned and managed the electric operating companies' generation and transmission functions on a system-wide basis. Second, ETI is not responsible for the development and administration of the system agreement, and should not be held responsible for these antitrust investigation expenses. Furthermore, according to Dr. Szerszen, if the DOJ finds that Entergy has acted illegally, it is even more inappropriate to charge ETI ratepayers for corporate-level illegal actions. These expenses should be borne by Entergy's corporate parent and/or the corporation's shareholders, and not the ratepayers.[779]

ETI contends that Dr. Szerszen fundamentally misunderstands the nature of the System Agreement and the benefits that ETI derives from that agreement. All of the Entergy Operating Companies voluntarily entered into the System Agreement so that the Entergy system can be planned and operated on a total system basis, in order to maximize economic benefit and reliability

---

[778] OPC Ex. 1 (Szerszen Direct) at 51-52.

[779] *Id*. at 52.

of service.  All of the Operating Companies benefit from integrated planning and operations in this manner.  This does not mean that ETI has no decision-making role in these activities.  ETI notes that under Section 5.01 of the System Agreement, the agreement is administered through an Operating Committee, which includes an ETI representative, as well as representatives of the other Operating Companies and Entergy.  ETI's representative is one of the voting members of the Committee, and all decisions of the Operating Committee must be approved by a majority vote.  As a voting member of the Operating Committee, ETI is responsible for administering the System Agreement and does participate in decision-making on generation and transmission matters.[780]

ETI acknowledges that ESI is tasked with providing services and making decisions related to generation dispatch, power procurement, and transmission operations on behalf of the Entergy Operating Companies and at the direction of the Operating Committee, but these activities are for the benefit of the Operating Companies and their ratepayers.  ETI receives the benefits of these services and integrated planning and operations under the System Agreement and, according to ETI, should also be responsible for its portion of costs related to those services and operations.[781]

As to Dr. Szerszen's contention that the costs should be disallowed because DOJ might find that Entergy acted illegally, ETI notes that the DOJ is not an adjudicatory body or regulatory agency and, thus, it does not make "findings of fact."  If DOJ believes the civil antitrust laws have been violated, it can file a complaint in federal district court.  To date, no complaint has been filed.  ETI points out that ESI routinely incurs legal costs in responding to regulatory audits and investigations on behalf of ETI and the other Operating Companies in the same manner in which other operating costs are incurred.  ESI is authorized to retain legal counsel on behalf of, and for the benefit of, ETI and the other Entergy Operating Companies.  ESI is authorized to allocate the respective costs to the Operating Companies under a service agreement with the Entergy Operating Companies designated as Rate Schedule FERC No. 435.  This service agreement is on file with, and was approved by,

---

[780]  ETI Ex. 65 (Sloan Rebuttal) at 8.

[781]  *Id*.

FERC under FERC Docket No. ER07-38-000.[782]  Thus, according to ETI, it is appropriate that ETI is allocated its share of the costs of legal services related to the DOJ investigation.[783]

The DOJ antitrust investigation is a massive undertaking.  Unfortunately, it is a part of the ordinary course of modern business life.  OPC's arguments that ESI is solely responsible for decision-making under the System Agreement miss the mark, as pointed out by ETI.  It is clear that ETI and the other Operating Companies play an active role in the decision-making.  As to OPC's arguments about what would happen if Entergy were found to have violated the antitrust laws, those arguments are little more than speculation.  As ETI noted, the DOJ is not an adjudicatory body and its investigation can only result in the filing of a complaint in Federal court (if the DOJ believes that such an action is justified).  Until that time, it is imperative for the company to fully respond to the DOJ investigation.  The ALJs find that ETI has met its burden of proving that Texas ratepayers should be charged the costs of the DOJ investigation allocated to them by ETI.

## 5.  Project F3PCE01601 (Ferc - Open Access Transmission)

Project F3PCEO1601 costs are incurred to manage costs associated with regulatory oversight and coordination of the Entergy System Open Access Transmission Service before FERC.  OPC contends that not only are most of the FERC dockets accruing costs under Project F3PPEO1601 no longer open as of December 31, 2011,[784] most of the closed dockets have absolutely nothing to do with Texas operations.[785]  Furthermore, according to OPC, ETI witness Sloan agreed that only three of the dockets shown in OPC Exhibit No. 12 were open at the end of the test year, and one of the open dockets involves a transmission service agreement involving the Missouri Joint Municipal Electric Utility Commission and various cities in Missouri and Arkansas.[786]

---

[782]  *Entergy Serv. Inc.,*  117 FERC ¶ 61,288 (2006).

[783]  ETI Ex. 65 (Sloan Rebuttal) at 8-9.

[784]  OPC Ex. 12 (OPC RFI No. 7-3); OPC Ex. 3 (Szerszen Workpapers) at 363.

[785]  OPC Ex. 12 (OPC RFI No. 7-3); OPC Ex. 1 (Szerszen Direct) at 54.

[786]  Tr. at 280.

ETI responds that the activities in this project relate to oversight and coordination of the OATT proceedings before the FERC.  Costs billed to this project code are related to ESI's representation of the Operating Companies, including ETI, before the FERC on OATT issues.  Revenues derived from provision of service under the OATT are credited to all of the Operating Companies on a load responsibility ratio basis.  ETI's retail share of these revenues was $168,366 during the test period, demonstrating the benefits derived by Texas ratepayers as a result of the activities undertaken through this project code.[787]

Activities relating to a company's OATT are not one-time activities; they will continue from year to year.  OPC's contention that because most of the dockets listed as having taken place during the Test Year were completed by the end of the Test Year they should be disregarded is not well-founded.  It is clear that the activities covered by this project code not only benefit ETI's Texas ratepayers, but will continue (albeit under new docket numbers) into future years.  The ALJs recommend that costs under this project code be allowed.

### 6.  Project F3PCERAKTL (RAKTL Patent Matter)

The costs under this project code involve the RAKTL patent, which relates to call center operations.  RAKTL is a patent infringement claim lodged against several Entergy companies. The alleged patents are for voice prompting technology used in call centers.[788]

Dr. Szerszen testified that it is not appropriate to charge ETI for the costs associated with this litigation because ETI did not purchase the call center telephone equipment at issue, and therefore should not be required to pay any legal costs associated with patent infringement investigation or settlement costs.  ESI is totally responsible for system-wide technology purchases and operations, and, according to Dr. Szerszen, it is not reasonable to require the operating companies to pay legal costs associated with ESI technology acquisition or technology application errors.[789]

---

[787]  ETI Ex. 65 (Sloan Rebuttal) at 10.

[788]  *Id*. at 4; OPC Ex. 1 (Szerszen Direct) at 49-50.

[789]  OPC Ex. 1 (Szerszen Direct) at 50.

ETI contends that ESI incurred the legal expenses on this patent matter on behalf of the Entergy Operating Companies, whose residential and small commercial customers call into the call centers to obtain customer service for issues related to connection and disconnection of electric service, billing issues, and other customer transactions. The call centers provide an interface between ETI customers and the Entergy Operating Companies and, as such, are valuable in providing quality service to customers. Consequently, according to ETI, costs related to the call centers, including the costs of defending lawsuits involving technologies used at those call centers, is a reasonable and necessary expense that is appropriately allocated to ETI.[790]

OPC tends to ignore the purpose and benefits of a centralized service company such as ESI. If ETI were to fund stand-alone call centers, it is likely that the costs to Texas ratepayers would be higher than those proposed by ETI in this case. Part of the costs that ESI incurs is the cost of patent claims. Those are legitimate costs that should be borne by all who receive service from ESI. Accordingly, the ALJs recommend the Commission reject OPC's challenge.

### 7. Project F3PPEASTIN (Willard Eastin *et al.*)

This project code, which contains costs in the amount of $19,714, collects costs related to an age discrimination law suit filed by Willard Eastin, *et al*. against Entergy. The defendants to the lawsuit were Entergy, ESI, Entergy Louisiana, Inc. (ELL), and Entergy New Orleans, Inc. (ENOI). The plaintiffs to the lawsuit were employees of ESI, ELL, and ENOI.[791]

OPC witness Szerszen testified that ETI should not be required to pay any of the costs of this litigation. Although ESI provides services to the Operating Companies, this does not imply that the Operating Companies should be charged costs associated with the service company's employment practice problems or errors according to Dr. Szerszen.[792]

---

[790] ETI Ex. 65 (Sloan Rebuttal) at 4.

[791] ETI Ex. 65 (Sloan Rebuttal) at 2; OPC Ex. 1 (Szerszen Direct) at 49-50.

[792] OPC Ex. 1 (Szerszen Direct) at 50.

ETI argues that costs are driven by ESI having the need for legal services to defend itself. As shown on the Project Code Summary for this project, since all ESI functions are in service to the various affiliates and arise as a consequence of providing such services, it is appropriate to relate these legal costs to the total ESI billings to the affiliates.[793]

ETI has provided little in the way of explanation regarding these costs or the litigation that generated them. What is troubling to the ALJs is that the only named defendants are Entergy, ESI, ELL, and ENOI; ETI is not included among the named defendants. If this were simply a cost of doing business for ESI, as claimed by ETI, why were ELL and ENOI named? No explanation was offered. It appears to the ALJs that although this litigation is related to ESI's operations, it is more immediately related to ELL and ENOI. The ALJs do not believe that ETI's Texas ratepayers should be charged for these costs; therefore the ALJs recommend that $19,714 not be included.

### 8. Project F3PPTCGS11 (TX Docket Competitive Generation)

The costs billed through this project code all pertain to ETI's CGS matter currently pending before the Commission in Docket No. 38951.[794]

OPC witness Szerszen testified that because no decision has been made yet as to the disposition of the expenses associated with the CGS tariff, ETI should not be expensing the costs associated with that docket. Dr. Szerszen disallowed $310,746 in Test-Year expenses, and recommended that ETI be allowed to defer the expenses until the Commission determines the appropriate regulatory treatment.[795]

ETI argues that these costs were incurred during the Test Year in a pending Commission docket, and ETI continues to incur costs related to this matter. As such, according to ETI, these

---

[793] ETI Ex. 65 (Sloan Rebuttal) at 2.

[794] *Id*. at 5; OPC Ex. 1 (Szerszen Direct) at 50.

[795] OPC Ex. 1 (Szerszen Direct) at 50.

costs are appropriately included in ETI's cost of service and should neither be disallowed nor deferred.[796]

OPC's arguments with respect to these costs are not well-founded. It appears to be likening these regulatory costs to rate case expense, which would be subject to Commission review and approval in the proceeding to which they relate. But that is not the nature of these expenses. They are simply regulatory expenses incurred in the course of ongoing regulatory proceedings. They are ordinary and necessary expenses, the reasonableness of which OPC did not challenge. Accordingly, the ALJs find that it is appropriate for ETI to charge these expenses to its Texas ratepayers.

### 9. Project F5PCE13759 (Jenkins Class Action Suit)

The project code relates to a class action lawsuit filed in Texas District Court in 2003 on behalf of all Texas retail customers served by ETI's predecessor-in-interest, EGSI (Jenkins Class Action). The Jenkins Class Action plaintiffs allege that they have been damaged due to manipulation of the dispatch and pricing of the Entergy system's generating units and electricity purchases. As a result of this alleged manipulation, they contend that ETI's Texas retail customers were charged more than they should have been for purchased power.[797] Dr. Szerszen asserted there are three reasons why these legal expenses should not be borne by ETI:

- ESI charges 100 percent of the legal expenses to ETI, even though ETI is only        one of several defendants;

- ETI claims that it is defending practices relating to system operations, but        fails        to acknowledge that Entergy's system operations are comprised of many  generation        and transmission components other than those of ETI; and

- ETI does not have any authority to administer the System Agreement, that        being a function solely within the purview of ESI.[798]

---

[796]  ETI Ex. 65 (Sloan Rebuttal) at 5.

[797]  OPC Ex. 1 (Szerszen Direct) at 49; ETI Ex. 65 (Sloan Rebuttal) at 2-3.

[798]  OPC Ex. 1 (Szerszen Direct) at 49.

Dr. Szerszen testified that "[i]t would be more appropriate for the Entergy parent to be charged for these lawsuit expenses, particularly since ETI cannot make unilateral power purchases and power sales decisions."[799]

ETI responds that the plaintiffs in this lawsuit are challenging the reasonableness of ETI's Commission-set rates and that the Commission has filed an *amicus* brief in support of ETI's position in the case. ETI further argues that retail ratepayers are benefitting from ETI's pursuit of the litigation because ETI is defending practices that are in place to ensure the lowest reasonable cost consistent with system reliability. Finally, ETI states that the costs are reasonable and necessary expenses because the plaintiffs purport to represent only ETI's ratepayers and seek to recover damages inconsistent with ETI's filed rates approved by the Commission.[800]

The ALJs understand Dr. Szerszen's concerns that there are multiple defendants involved in this litigation, there are many aspects to Entergy's system operations, and ETI does not have power to unilaterally make decisions under the System Agreement. The crucial point, however, is that these are Texas ratepayers pursuing a challenge to ETI's Texas rates. The matter centers around Texas, and the costs of the litigation should be borne by Texas ratepayers.

### 10. Project F3PCSYSAGR (System Agreement-2001)

OPC witness Szerszen disallowed $880,841 in legal expenses regarding the 2001 complaint filed by the Louisiana Public Service Commission and the City of New Orleans seeking revisions to the Entergy System Agreement.[801] OPC states that it generally agrees with ETI witness Sloan that the complaint challenges the equalization of costs between all Entergy Operating Company jurisdictions.[802] However, OPC does not agree that the inquiry "will" affect all Entergy jurisdictions. Texas has benefitted from the complaint primarily through the past receipt of equalization payments pursuant to FERC's decision in this complaint matter. However, Entergy's

---

[799] *Id*.

[800] ETI Ex. 65 (Sloan Rebuttal) at 3.

[801] OPC Ex. 1 (Szerszen Direct) at 53.

[802] ETI Ex. 65 (Sloan Rebuttal) at 9.

SEC Form10-K shows that for 2012 and 2013, ETI will receive no equalization payments, and further shows that ETI received no rough production cost equalization payments in 2010.[803] Thus, according to OPC, the legal expenses sought to be recovered under Project F3PCSYSAGR are non-recurring for ETI and therefore not representative of future costs and should be removed from ETI's cost of service.[804]

ETI established that this litigation involved the System Agreement, which governs the equalization of costs between all of the Entergy Operating Company jurisdictions, it provides benefits to ETI's Texas ratepayers as well as those of the other Entergy Operating Companies. OPC's argument that ETI did not receive equalization payments in 2010 and is non-recurring for ETI does not overcome the benefits received by ETI's Texas ratepayers. The ALJs recommend that OPC's disallowance be denied.

### 11. Project F3PCCDVDAT (Corporate Development Data Room)

ETI requests the recovery of $6,147 in ESI allocated costs for the corporate development data room. The stated purpose of the data room is for due diligence reviews associated with Entergy merger, acquisition, or diversification activities. The expenses associated with the corporate development data room are for the gathering, collating, indexing, manning, and storage of data during the due diligence reviews.[805] OPC contends that the costs incurred for the corporation's analysis of merger, acquisition, and diversification opportunities should not be charged to ETI's ratepayers. Entergy has not acquired any utilities or utility operations that might produce system-wide benefits to utility customers.[806] The $6,147 of expenses for the corporate development room are not reasonable and necessary expenses that ratepayers should shoulder and therefore, according to OPC, recovery of these expenses should be disallowed.

---

[803] ETI Ex. 98 (Entergy's SEC Form 10-K) at 79-80.

[804] OPC Ex. 1 (Szerszen Direct) at 52-53.

[805] OPC Ex. 3 (Szerszen Workpapers) at 394.

[806] OPC Ex. 1 (Szerszen Direct) at 45-46.

ETI responds that these costs are driven by each company's need for corporate services and the costs, therefore, are appropriately allocated based on the level of service provided by ESI, which is a reasonable proxy of each company's need for corporate services.[807]   Further, just because Entergy has not acquired any utility or utility operations in the recent past does not mean that these are not reasonable and necessary costs.  Entergy points out that as Dr. Szerszen noted in her description of this project, it is not only for the acquisition of other operating units, but also used to analyze diversification activities, which is a legitimate and reasonable undertaking by an integrated utility and its parent company.

The ALJs believe that there are legitimate costs that may not on their face appear to be properly allocable to entities such as ETI, but on closer examination they merit such an allocation. These fall into that class.  As Ms. Tumminello testified, the Corporate Development Data Room includes costs not only related to mergers and acquisitions, but also diversification activities that could benefit ETI ratepayers.  Accordingly, they are properly allocated to ETI ratepayers.

### 12. Project F3PPWET302 (SPO 2008 Winter Western Region)

Dr. Szerszen argued that Project F3PPWET302 costs should be disregarded because they were incurred during the 2008-2009 period, which is outside of the Test Year, and they are nonrecurring.[808]

ETI witness Cicio explained that although this project was initiated prior to the Test Year, the costs that the Company seeks to recover through this project code were expenses incurred during the Test Year.  These costs included development activities, requests for proposal issuance, bidders' conferences, written and posted questions and answers from market participants and other interested parties, submission of proposals, screening of proposals, proposal evaluation, follow-up questions and clarifications, recommendations and awards, contract negotiations, Independent Monitor reports, and regulatory approvals, if necessary.  He stated that these types of costs routinely encompass a multi-year time frame, and the costs required to perform those activities, although associated with a

---

[807]   ETI Ex. 69 (Tumminello Rebuttal) Ex. SBT-R-2 at 1.

[808]   OPC Ex. 1 (Szerzen Direct) at 65.

project that may have been initiated several years previously, are properly incurred over the life span of the project. He also stated that they are recurring because they reflect the kinds and levels of charges that would be expected to be incurred on an ongoing basis in association with request for proposals managed by ESI on behalf of the Entergy Operating Companies, and the Company has been involved in these types of solicitations since 2002.[809]

The ALJs find that the costs captured by Project F3PPWET302 were incurred during the Test Year and represent the kinds and levels of costs routinely incurred on a recurring basis. Accordingly, the ALJs recommend the Commission approve their inclusion as requested by ETI.

### 13. Project F3PPWET308 (SPO Calpine PPA/Project Houston)

With respect to Project F3PPWET308, which deals with the Calpine-Carville purchased power agreement, Dr. Szerszen testified that the costs were either non-recurring, or rate case expenses, or expenses that should have been charged to Louisiana ratepayers.[810]

ETI witness Cicio explained that these are recurring costs because they reflect the kinds and levels of charges that the Company expects to incur on an ongoing basis in association with RFPs managed by ESI on behalf of the Entergy Operating Companies; they were not incurred as part of some rate case preparation and, therefore, are not a rate case expense that is otherwise sought for recovery by ETI; and the costs in the matter are costs that were billed only to Texas and should not have been billed to Louisiana because there is a separate project code that captures the Louisiana costs that are billed to Louisiana.[811]

The ALJs find that these costs, like those captured by Project F3PPWET302, are recurring in that they represent the kinds and levels of costs routinely incurred on a year-in and year-out basis. Further, the ALJs find that the costs should not have been charged to Louisiana and that there

---

[809] ETI Ex. 45 (Cicio Rebuttal) at 13-14.

[810] OPC Ex. 1 (Szerszen Direct) at 65-66.

[811] ETI Ex. 45 (Cicio Rebuttal) at 14-17.

existed a separate project code to capture costs attributable to Louisiana.  Accordingly, the ALJs recommend the Commission approve the inclusion of these costs as requested by ETI.

## M.    Other Expenses Class

Dr. Szerszen recommended disallowances in 11 project codes that are primarily within the Other Expenses Class of affiliate costs:  (1) F3PCSPETEI (Entergy-Tulane Energy Institute) for a disallowance of $14,288; (2) F3PCC08500 (Executive VP, Operations) for a disallowance of $4,117; (3) F3PPBFMESI (ESI Function Migration Relocation) for a disallowance of $4,187; (4) F3PPBFRESI (ESI Business Function Relocation) for a disallowance of $11,444; (5) F3PPDRPESI (ESI Disaster Recovery Plan Charge) for a disallowance of $761; (6) F5PPBFMREL (Business Function Migration Employee) for a disallowance of $33,624; (7) F5PPBFRREL (Business Function Relocation) for a disallowance of $15,624; (8) F5PPBFRSEV (Business Function Relocation Severance) for a disallowance of $3,066; (9) F5PPDRPREL (Disaster Recovery Plan Relocation) for a disallowance of $31,006; (10) F5PPETXRFI (2009 Texas Ike Recovery Filing) for a disallowance of $441; and (11) F5PPKATRPT (Storm Cost Processing & Review) for a disallowance of $929.[812]

### 1.    Projects F3PCSPETEI (Entergy-Tulane Energy Institute) and F5PPKATRPT (Storm Cost Processing & Review)

ETI agrees with Dr. Szerszen that the $14,288 amount she proposed to disallow for Project F3PCSPETEI (Entergy-Tulane Energy Institute) can be treated as a donation, and so should be removed from ETI's cost of service.  ETI also agrees with Dr. Szerszen to remove the $929 billed to ETI under Project F5PPKATRPT (Storm Cost Processing & Review).  The charges for the remaining nine project codes, however, are contested.

---

[812]  OPC Ex. 1 (Szerszen Direct) at 56, 67, and 72.

## 2.  Project F3PCC08500 (Executive VP, Operations)

As to Project F3PCC08500 (Executive VP Operations), Dr. Szerszen testified that an asset-based allocator is not appropriate for these types of executive management costs, and there is "no perceivable benefit" to ETI ratepayers for these types of allocated costs.[813]

Ms. Tumminello disagreed, stating that asset-based allocation methods are selected for projects where the costs are driven by the oversight and stewardship of corporate assets of the Entergy Companies including, but not limited to, services provided by financial management and certain finance functions, among others. Each Entergy affiliate with assets on Entergy's consolidated balance sheet will be billed their proportionate share of the costs. The use of the Total Assets allocation method is, in fact, an appropriate method to allocate corporate-level corporate governance type services.[814]

The ALJs find credible ETI's assertion that the costs captured by this project code are for oversight and stewardship of the corporate assets of Entergy and, therefore, an asset-based allocator is appropriate. Accordingly, the ALJs recommend the Commission reject OPC's challenge to the inclusion of these costs.

## 3.  Projects F3PPBFMESI (ESI Function Migration Relocation), F3PPBFRESI (ESI Business Function Relocation), F3PPDRPESI (ESI Disaster Recovery Plan Charge), F5PPBFMREL (Business Function Migration Employee), F5PPBFRREL (Business Function Relocation), F5PPBFRSEV (Business Function Relocation Severance), F5PPDRPREL (Disaster Recovery Plan Relocation), and F5PPETXRFI (2009 Texas Ike Recovery Filing)

The remaining eight of the project codes attributable to the Other Expenses Class all deal with system restoration and business continuity resulting from Hurricane Katrina, with one applying to Hurricane Ike. Dr. Szerszen testified that these costs should be disallowed because they should not be considered to be system restoration costs or, if they are, citing to PURA § 36.405, ETI should have requested recovery of these costs in its first base rate following Hurricane Katrina (Docket

---

[813] *Id*. at 56-57.

[814] ETI Ex. 69 (Tumminello Rebuttal) at 9-10.

No. 34800).  She also testified that ETI has not shown that Texas ratepayers benefited from these costs.[815]

Ms. Tumminello testified that because of the magnitude of Hurricane Katrina, these expenses were necessary so that activities in connection with the restoration of service and infrastructure associated with electric power outages affecting customers could continue.  These expenses relate to critical functions needed to support storm restoration, such as business function relocation, and provided a direct benefit to ratepayers.  Ms. Tumminello stated that the costs in seven of these project codes (F3PPBFMESI, F3PPBFRESI, F3PPDRPESI, F5PPBFMREL, F5PPBFRREL, F5PPBFRSEV, and F5PPDRPREL) are being amortized over five years.  Though these particular costs do not recur every year, they are a part of ETI's normal utility operations given the service area served by ETI, and do recur as necessary.[816]

As to Dr. Szerszen's legal conclusion that ETI is no longer authorized to recover Hurricane Katrina costs, ETI argues that PURA § 36.405 does not restrict or even apply to ETI's recovery of such costs.  That section deals with securitization of system restoration costs, but ETI did not seek to securitize any Hurricane Katrina costs.  Even so, argues ETI, if that section did apply, it does not restrict system restoration cost recovery solely to Docket No. 34800; that is, the "next base rate proceeding" following the hurricane.  Instead, the final clause in PURA § 36.405(a) states in full that the Company is entitled to recover such costs "in its next base rate proceeding or through any other proceeding authorized by Subchapter C or D."  The same point applies to the Hurricane Ike costs; while ETI did securitize the Hurricane Ike costs that it had incurred up to the date subject to that securitization, it continued to incur costs in this test year for that storm restoration (in this case, $441 billed to the Ike-related project code). The costs in these projects were incurred during the test year for this docket and could not have been recovered in an earlier docket.  Moreover, ETI's filing in

---

[815] OPC Ex. 1 (Szertrszen Direct) at 72, Schedule CAS-14.

[816] ETI Ex. 69 (Tumminello Rebuttal) at16.

this docket was filed in accordance with PURA Subchapter C as a rate change proposed by a utility. As such, ETI contends that it is entitled to recover these costs.[817]

To the ALJs, the most important part of the argument is that ETI did not seek to avail itself of PURA § 36.405 with respect to Hurricane Katrina costs. It is difficult to understand how that section, which deals with securitization of hurricane costs, could block recovery when ETI did not seek to securitize those costs. Similarly, with respect to Hurricane Ike costs, the $441 challenged by Dr. Szerszen was not incurred until the Test Year and could not have been securitized. Ms. Tumminello provided testimony that the costs were reasonable and necessary, representing a part of ETI's normal utility operations. Accordingly, the ALJs recommend the Commission approve inclusion of the costs.

## N.     Regulatory Services Class

Dr. Szerszen challenged one project code that is primarily within the Regulatory Services Class of affiliate costs: Project F3PPE9981S (Integrated Energy Management for ESI) for a disallowance of $171,032.

Dr. Szerszen testified that these costs were incurred for the implementation, coordination, and promotion of demand side and supply side management and energy efficiency programs. But, she stated, these costs should instead have been recovered through ETI's Energy Efficiency Cost Recovery Factor (EECRF) Rider and, as such, it is inappropriate to recover these costs through affiliate billings in base rates.[818]

ETI witness May testified that recovery of these costs through base rates rather than through the EECRF Rider is appropriate because these activities are not subject to an active ETI energy efficiency program. These activities are more in the nature of general research and development activities that help drive the Company's strategy on these topics, such as the timing of implementing related programs. In the meantime, until these activities result in an actual program proposal, these

---

[817]  ETI Initial Brief at 188-189.

[818]  OPC Ex. 1 (Szerszen Direct) at 69-70.

are legitimate known and measurable costs that the Company has incurred and should then be recovered from retail customers.[819] At the hearing, Mr. May further explained that the costs in this project code are labor costs that are "not really consistent" with the energy efficiency rule, but instead involve "primarily costs of investigating" potential future activities (such as smart meters and electric vehicle chargers) that are generally not consistent with the energy efficiency rider.[820] ETI witness Considine also addresses this issue from a regulatory accounting perspective. He testified: "Because these are not costs that must be, or are currently being recovered through the EECRF, they are not double recovered and should be included in the Company's cost of service."[821] According to ETI, the costs in this project code, therefore, are not costs that should or can be recovered through ETI's EECRF Rider.

This is a close call. The Commission's Energy Efficiency Rule places limits on the amount of research and development costs a utility may recover,[822] which supports the argument that the costs should be included in the EECRF. Further, it appears to the ALJs that research and development costs, by their very nature, do not relate to an active program, which negates many of the arguments advanced by ETI witnesses May and Considine. In the end, the ALJs believe that these costs should be included in the EECRF. Accordingly, the ALJs recommend the Commission disallow costs in the amount of $171,032 relating to Project F3PPE9981S.

## O.    Retail Operations Class

Dr. Szerszen challenged three project codes that are primarily within ETI's Retail Operations Class of affiliate costs: (1) F5PPICCIMG (ICC – "Image" Message) for a disallowance of $3,912; (2) F3PPR56640 (Wholesale - EGS-TX) for a disallowance of $229,938; and (3) F3PPR56920 (Wholesale - All Jurisdictions) for a disallowance of $333.

---

[819]  ETI Ex. 57 (May Rebuttal) at 30-31.

[820]  Tr. at 1929-1930 and 1934-1935.

[821]  ETI Ex. 46 (Considine Rebuttal) at 36.

[822]  P.U.C. SUBST. R. 25.181(i).

### 1.  Project F5PPICCIMG (ICC – "Image" Message)

Project Code F5PPICCIMG (ICC-"Image" Message) is one of the project codes that Dr. Szerszen testified should be disallowed because ETI is a monopoly and Texas ratepayers should not have to pay for corporate image costs.[823]

Ms. Tumminello testified that the costs are for advertising activities that are of a good will or institutional nature, which is primarily designed to improve the image of the utility or the industry, including advertisement which inform the public concerning matters affecting the Company's operations, such as, the costs of providing service, the Company's efforts to improve the quality of service, the Company's efforts to improve and protect the environment.  According to FERC, such costs are properly includable in FERC Account 930.1 and are recoverable.  According to Ms. Tumminello, as contemplated by FERC, the fact that ETI is a monopoly has no bearing on the recoverability of these costs.[824]

OPC provided little support for its claim that costs covered by these project codes should not be recoverable, essentially limiting the basis to the contention that ETI is a monopoly and ratepayers should not be charged with such costs.  ETI did provide the testimony of Ms. Tumminello, which confirms that the costs are properly includable in FERC Account 930.1 and are, therefore, recoverable.  In the end, the weight of the evidence is in ETI's favor.  The ALJs recommend the Commission reject OPC's contention that costs covered by these project codes are not recoverable.

### 2.  Projects F3PPR56640 (Wholesale - EGS-TX) and F3PPR56920 (Wholesale - All Jurisdictions)

As to Projects F3PPR56640 and F3PPR56920, Dr. Szerszen stated that these costs are associated with assisting ETI's wholesale customers in evaluating alternative energy supply and

---

[823]  OPC Ex. 1 (Szerszen Direct) at 66.

[824]  ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 4-6.

demand options and that ETI's retail customers should not be charged for expenses associated with ETI's wholesale customers.[825]

ETI witness Stokes noted that ETI has allocated costs to its single large wholesale customer through its jurisdictional allocation in this rate case and, therefore, to disallow the costs in these two project codes would essentially result in a double disallowance of those costs. She also explained that the costs were properly allocable to ETI (keeping in mind that ETI then allocated costs to this customer) as reasonable and necessary due to the need to have staff on hand to handle contract negotiations and the like with this large wholesale customer.[826]

The ALJs are persuaded by ETI's argument that disallowing the costs associated with Projects F3PPR56640 and F3PPR56920, which are already allocated to ETI's single large wholesale customer through its jurisdictional allocation, would constitute a double disallowance. Accordingly, the ALJs recommend the Commission reject OPC's challenge to these costs.

## P.     Supply Chain Class

Dr. Szerszen challenged two project codes that are primarily within the Supply Chain Class: (1) F3PPH54075 (Business Development - TX) for a disallowance of $1,888; and (2) F5PCZSDEPT (Supervision & Support - Supply) for a disallowance of $146. Dr. Szerszen claimed the costs associated with these project codes should be disallowed because ETI is a monopoly and Texas ratepayers should not have to pay for corporate image costs.[827]

Ms. Tumminello testified that the costs are for advertising activities that are of a good will or institutional nature, which is primarily designed to improve the image of the utility or the industry, including advertisement which inform the public concerning matters affecting the Company's operations, such as, the costs of providing service, the Company's efforts to improve the quality of service, the Company's efforts to improve and protect the environment, etc. According to FERC,

---

[825] OPC Ex. 1 (Szerszen Direct) at 73.

[826] ETI Ex. 66 (Stokes Rebuttal) at 6-9.

[827] OPC Ex. 1 (Szerszen Direct) at 66.

such costs are properly includable in FERC Account 930.1 and are recoverable. According to Ms. Tumminello, as contemplated by FERC, the fact that ETI is a monopoly has no bearing on the recoverability of these costs.[828]

OPC provided little support for its claim that costs covered by these project codes should not be recoverable, essentially limiting the basis to the contention that ETI is a monopoly. ETI did provide the testimony of Ms. Tumminello, which confirms that the costs are properly includable in FERC Account 930.1 and are, therefore, recoverable. The ALJs go with the weight of the evidence, which is in ETI's favor. The ALJs recommend the Commission reject OPC's contention that costs covered by these project codes are not recoverable.

## Q.      Transmission and Distribution Support Class

Dr. Szerszen challenged three project codes that are included within the Company's Transmission and Distribution Support Class of affiliate costs: (1) F3PCT53130 (Operations Manager, Claims Management) for a disallowance of $42,287.50; (2) F3PCTDAMAG (Damage Claims Of Entergy Property) for a disallowance of $5,555; and (3) F3PCTPUBLC (Public Claims) for a disallowance of $3,968. Dr. Szerszen's rationale for disallowing 50 percent of the costs in each of these codes is the same. She believes that ETI's property damage and workers compensation claims should be direct billed instead of allocated through a customer count-based allocator; managerial and supervisory costs should be allocated to the jurisdictions based on the jurisdictional direct charges; and the Company has not met its burden of proof as to these charges.[829]

Ms. Tumminello addressed Project F3PCT53130, stating that workers' compensation claims are tracked by jurisdiction as Dr. Szerszen suggested, and are the basis for billing method COMCLAIM. Project F3PCTWCOMP is used to capture the costs of workers' compensation claims, and bills to both regulated and non-regulated affiliates. Project F3PCT53130 captures costs that are primarily for the oversight of the Entergy Companies' Claims Management organization as it relates to property damage and liability. These services benefit only the companies that serve

---

[828] ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 4-6.

[829] OPC Exhibit No. 1 (Szerszen Direct) at 79-80.

retail electric and gas customers.  Since only the regulated utility operating companies (and not the non-regulated companies) serve retail customers, it is appropriate to bill these costs to the regulated companies based on their pro-rata share of total customers.[830]

Projects F3PCTDAMAG and F3PCTPUBLC are addressed by ETI witness Corkran.  With respect to Project F3PCTDAMAG, Mr. Corkran stated that the costs associated with this project are associated with the Public Claims employees in the Claims Management Organization.  Those employees pursue the recovery of claims allowed by law when the public inflicts damage to Company property.  The costs of this service are allocated among all of Entergy's Operating Companies through billing method CUSTEGOP, which allocates costs based on the number of customers in each Operating Company.  Dr. Szerszen claimed that the affiliate costs associated with pursuing those claims should be directly charged to each Entergy Operating Company based on the extent to which each claim pertains to the Operating Company instead of generally allocating the costs to all utility customers.  Mr. Corkran testified that the allocation methodology is appropriate because the Public Claims employees provide knowledgeable, centralized, and consistent pursuit of damage claims.  The actual monies recovered for damage to ETI's property are returned to ETI ratepayers as credits against the cost of repairing those damaged facilities, *i.e.*, the recoveries are not allocated pursuant to CUSTEGOP.  Only the Public Claims employees' time and overheads are allocated pursuant to CUSTEGOP, which is reasonable and appropriate because the overall time spent by Public Claims employees in pursuing the recovery of claims is driven by the number of gas and electric customers in each Operating Company.[831]

With respect to Project F3PCTPUBLC, Mr. Corkran stated that the costs associated with this project are related to Public and Auto Liability employees in the Claims Management Organization.  These employees pursue the resolution and settlement of damage claims made against the Operating Companies in a timely and fair manner through denials, negotiations, and payments.  Such claims include allegations of damaged appliances due to voltage fluctuation, food loss due to power outages, and damage caused by Company vehicles (*e.g.,* mailboxes, fence posts, and automobiles).

---

[830]  ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 10.

[831]  ETI Ex. 48 (Corkran Rebuttal) at 13-15.

This is an important process that ensures that only warranted and justifiable claims are paid. The CUSTEGOP billing method is appropriate because the Public and Auto Liability employees provide knowledgeable, centralized, and consistent resolution of damage claims. The actual payments associated with ETI public damage claims are charged to ETI through the use of other project codes. Only the Public and Auto Liability employees' time and overheads are allocated pursuant to CUSTEGOP, which is reasonable and appropriate because the overall time spent by Public and Auto Liability employees in processing claims is driven by the number of gas and electric customers in each Operating Company.[832]

The explanations that ETI provides for the charges captured by these project codes and the method of allocation employed makes sense to the ALJs. In a large organization, it is necessary to have a group of people to process claims efficiently so that economies of scale can be realized; that is what ETI is doing with these project codes. These costs benefit all companies within the Entergy umbrella (or within the regulated entities portion as noted), so the allocation methodology employed is appropriate. The ALJs recommend the Commission reject OPC's challenge to the recovery of these costs.

### R.     Tax Services Class

Dr. Szerszen proposed a 25 percent ($221,007) disallowance of costs billed to ETI from a single project code in this Tax Services Class: Project Code F3PCF10445 (Entergy Consolidated Tax Services). The costs in this project were incurred in the preparation, research, and other costs associated with Entergy's consolidated tax return. Dr. Szerszen testified that an assets-based allocator is not appropriate for these costs and that the costs in the project should instead be directly billed to each affiliate based on the time spent on preparing that affiliate's income and expense data.[833]

Company witness Galbraith, who sponsors ETI's Tax Services Class, stated that Dr. Szerszen apparently believes that all costs associated with the preparation of Entergy's consolidated tax return

---

[832]  *Id*.

[833]   OPC Ex. 1 (Szerszen Direct) at 63.

are captured by this project code and are allocated, when they should be direct-billed.  Most of the costs associated with preparation of Entergy's consolidated tax return, according to Ms. Galbraith, are assigned to other project codes and are direct billed.  Ms. Galbraith then explained that: (1) 56 percent of the time that Tax Services spent on the Entergy consolidated tax return were direct billed through other project codes to the affiliates; (2) the project code also captures costs for tax research (both federal and state and local), monthly closing activities not specific to one legal entity, tax training that is not jurisdiction specific, compliance with file retention policy, and administration staff time; and (3) why the assets-based allocator is the best method for allocating these departmental costs.  According to Ms. Galbraith, the costs captured by this code are not susceptible to direct billing.[834]

The ALJs find that Dr. Szerszen did fail to consider that most of the costs of preparing Entergy's tax return are direct billed and that the costs covered by this project code are not susceptible to such a billing, which is why they are allocated.  The ALJs, therefore, recommend the Commission reject OPC's challenge to ETI's allocation of these costs.

## S.    Transmission Operations Class

Dr. Szerszen challenged three project codes that are primarily within the Transmission Operations Class: (1) F3PPTDHY19 (Dept. of Justice Investigations) for a disallowance of $765; (2) F3PPTREORG (Transmission Re-Organization) for a disallowance of $3,661; and (3) F3PPF30211 (ESI Transmission Bldg (Reclassification)) for a disallowance of $229,991.[835]

Dr. Szerszen addressed Project F3PPTREORG (Transmission-Reorganization) and testified that costs covered by this project were incurred in 2009 and 2010 and, therefore, are not recurring.[836] Ms. Tumminello responds that, while these particular costs do not recur every year, they are

---

[834]  ETI Ex. 26 (Galbraith Direct) at 10-12.

[835]  Project F3PPTDHY19 (Dept. of Justice Investigations) was discussed in Section VIII.L. (Legal Services Class) and will not be repeated here

[836]  OPC Ex. 1 (Szerszen Direct) at 54, Schedule CAS-8.

representative of normal recurring utility operations and do recur as necessary and, as such, they should not be disallowed.[837]

Dr. Szerszen testified that Project F3PPF30211 (ESI Transmission Bldg.) captures interest costs after the ESI transmission building was placed in service. She contends that the costs are reclassified pre-Test Year payments and post-Test Year interest costs that are not known and measureable.[838] Ms. Tumminello testified that Dr. Szerszen has misconstrued accounting entries. She explains that these charges capture 12 months of interest payments and the annual bond fee incurred only during the Test Year.[839]

The ALJs find that the costs associated with Project F3PPTREORG are representative of costs that recur every year and should not be disallowed. It appears to the ALJs that Dr. Szerszen did misconstrue accounting entries in preparing her analysis of Project F3PPF30211and that the charges in that project capture fees paid during the Test Year. Accordingly, the ALJs recommend that OPC's proposed disallowance be denied.

## T.     Treasury Operations Class

Dr. Szerszen challenged three project codes that are primarily within the Treasury Operations Class: (1) F5PCZZI07P (Directors & Officers (EIM)) for a disallowance of $14,483; (2) F3PCF25300 (Daily Cash Mgt Activities) for a disallowance of $7,286; and (3) F3PCF26022 (Financing & Short Term Funding) for a disallowance of $96,700.

With respect to Project F5PCZZ107P (Directors & Officers (EIM)), Dr. Szerszen testified that the directors and officers liability insurance subject to this project code is primarily aimed at

---

[837] ETI Ex. 69 (Tumminello Rebuttal) at SBT-R-2 at 1.

[838] OPC Ex. 1 (Szerszen Direct) at 71.

[839] ETI Ex. 69 (Tumminello Rebuttal) at 15.  See also Ex. SBT-R-5.

benefiting shareholders, rather than ratepayers and, because ETI does not manage ESI's operations, it should not be responsible for indemnifying against shareholder lawsuits.[840]

ETI witness McNeal stated that ESI provides essential administrative and operational services to ETI on a daily basis. To do this, it must employ (and retain) qualified officers and directors. These individuals must be assured that they can make reasoned decisions without fear of personal liability and the manner to provide them this assurance is to purchase director's and officer's liability insurance. Because ETI benefits from the services provided by the officers and directors, ETI argues, it is appropriate to allocate a portion of the cost of the director's and officer's liability insurance to ETI.[841]

Dr. Szerszen addressed Projects F3PCF25300 (Daily Cash Mgt Activities) and F3PCF26022 (Financing & Short Term Funding), contending that these projects are duplicative of ETI-specific financing and cash management activities; that these costs should be borne by Entergy shareholders; and that the bank accounts-based and level of service-based allocators applicable to this projects are not appropriate.[842]

ETI responds that Project F3PCF25300 captures costs for activities performed by the Cash Management Department for work associated with maintaining bank relationships, bank fee analysis, administrative of bank systems and controls, and all other banking and cash management activities that are general in nature. These are not specific to any one company, but are applicable to all of the companies within the umbrella of the Entergy corporate family. There are Company-specific activities that are charged directly to ETI under different project codes, and this constitutes the majority of financing and cash management activities during the Test Year. For Project F3PCF25300, the costs are driven by cash management products and services delivered to all the Entergy companies. Because the number of transactions executed on behalf of each Entergy company is directly related to the number of bank accounts by company irrespective of account size,

---

[840] OPC Ex. 1 (Szerszen Direct) at 59.

[841] ETI Ex. 61 (McNeal Rebuttal) at 7-8.

[842] OPC Ex. 1 (Szerszen Direct) at 74-75, Ex. CAS-15.

billing method BNKACCTA, which allocates costs based on the number of open bank accounts is, according to ETI, the appropriate method to allocate the costs of these services.[843]

With respect to Project F3PCF26022, ETI explains that the project code captures costs for managing Entergy companies' liability portfolios comprised of Entergy company securities, bank lines, and project financings. The work is performed for the benefit of all companies under the Entergy corporate umbrella, not just ETI and is not duplicative of services performed for ETI. When work is performed by ESI personnel that relates specifically to ETI, then ETI is charged directly under a different project code. The services include analyzing and supporting general capital structure policy, developing and analyzing general financial policies, investigating and evaluating financing options generally that might prove beneficial for any or all Entergy companies, including ETI, and facilitating ongoing administration related to all Entergy Operating Company financings. Accordingly, ETI argues that it is appropriate to allocate a share of those costs to ETI. The costs of this project are driven by the level of service needed to complete the project or activity. Allocator LVSVCAL allocates costs based upon the overall service level of ESI. This allocation is appropriate because ESI is providing the service and no one Operating Company alone benefits from the services provided under this project code.[844]

OPC appears to have taken too narrow a view with respect to these project codes. First, it appears that where services are performed solely for ETI, they are charged to ETI through specific project codes. The project codes that OPC challenges are for company-wide services that are partially allocated to ETI. It is logical to assume that a certain level of services can be performed more efficiently at a company-wide level and that Texas ratepayers will benefit by paying only the allocated portion of those costs, as is done in these cases. The allocators chosen by ETI appear to reasonably reflect the cost-causation. Therefore, the ALJs recommend that OPC's challenge be rejected.

---

[843]  ETI Ex. 61 (McNeal Rebuttal) at 3-6; Tr. at 546.

[844]  ETI Ex. 61 (McNeal Rebuttal) at 2-3; Tr. at 547-548.

### U.     Utility and Executive Management Class

OPC challenges five project codes that are primarily within the Utility & Executive Management Class: (1) F3PPCCS010 (Climate Consulting Services) for a disallowance of $19,821; (2) F3PCCPM001 (Corporate Performance Management) for a disallowance of $173,867; (3) F3PCC31255 (Operations-Office of the CEO) for a disallowance of $372,919; (4) F3PPCAO001 (Chief Administrative Officer) for a disallowance of $177,156; and (5) F3PPCOO001 (Chief Operating Officer) for a disallowance of $74,485.

As to the first, Project F3PPCCS010 (Climate Counseling Services), Dr. Szerszen testified that these costs are incurred for the development of company-wide environmental policies, procedures, and programs; that expenses are improperly allocated to the subsidiaries based on each company's fossil operating capacity; and, as a result, the non-regulated affiliates are not allocated any environmental initiative expenses. She therefore recommended that 50 percent of this project's costs be disallowed.[845]

ETI witness Stokes addressed Dr. Szerszen's challenge to this project. Ms. Stokes explained that although nuclear-related environmental projects are being pursued, they are not being pursued using the project code referenced by Dr. Szerszen in her challenge. The costs for non-regulated affiliates are charged to projects not included in ETI's affiliate costs in this case. Non-regulated affiliates use project codes specific to their businesses to maintain a separation of costs between regulated and non-regulated Entergy subsidiaries.[846]

For the remaining four project codes in this class, Dr. Szerszen stated that executive management is primarily concerned with overall corporate functions rather than issues for any one specific subsidiary, and there is no relationship between an assets-based allocator and executive management.[847]

---

[845] OPC Ex. 1 (Szerszen Direct) at 62.

[846] ETI Ex. 66 (Stokes Rebuttal) at 5.

[847] OPC Ex. 1 (Szerszen Direct) at 56, 60.

ETI responds to these arguments by stating that the functions covered by these project codes relate to the oversight of all system operations and the stewardship of corporate assets and that because ETI is part of a corporate group, the allocated charges associated with these services are relevant to ETI as part of that group of companies. Furthermore, ETI argues, the asset-based allocator is appropriate because it reflects the cause of the costs incurred, in that, services provided relate to the stewardship of all the corporation's assets.[848]

A corporation cannot function without executives, who are charged with the responsibility of overseeing, among other things, the assets of the corporation. This is an important function that Dr. Szerszen did not acknowledge in her testimony. The utility and executive management class costs that she challenges are reasonable and necessary costs that are allocated to ETI based on a logical allocator – the assets the executives manage. The ALJs recommend that OPC's challenge be rejected.

## IX.  JURISDICTIONAL COST ALLOCATION [Germane to Preliminary Order Issue No. 13]

Jurisdictional cost allocation involves the proper method for allocating production costs between ETI's Texas retail customers and its wholesale customers, which are subject to FERC jurisdiction. During the Test Year, ETI provided electric service to retail customers and to three wholesale customers—including ETEC—under service agreements and rates approved by FERC. ETEC is a partial requirements customer, and it will be ETI's only wholesale customer during the Rate Year. ETI estimated its cost of serving wholesale customers in a jurisdictional separation study that split ETI's cost of service between retail and the wholesale jurisdictions.[849]

To calculate the wholesale cost allocation factor, ETI proposed the use of 150 MW for the wholesale load. This results in a retail production demand allocation factor of 95.3838 percent. The 150-MW load represents the contractual minimum amount of capacity for which ETEC is obligated

---

[848]  ETI Ex. 4 (Domino Direct) at 18-38; ETI Ex. 69 (Tumminello Rebuttal) at 9-11.

[849]  Cities Ex. 4 (Goins Direct) at 4.

to pay under its partial requirements agreement.  No party contests this aspect of ETI's proposed allocation of costs between retail and wholesale customers.[850]

However, Cities contest the type of allocation methodology used to assign demand-related (fixed) production costs to each jurisdiction.  In this proceeding, ETI used the A&E 4CP allocation method.  Although this is the same methodology ETI used in this proceeding's class cost-of-service study (to assign demand-related production costs to each retail customer class), ETI used a different methodology – 12 Coincident Peak (12CP) – in its last rate case to assign costs between jurisdictions.[851]

## A.     A&E 4CP

Kroger witness Kevin C. Higgins explained the A&E 4CP method:

> [T]he Average and Excess Demand method uses an average demand or total energy allocator to allocate that portion of the utility's generating capacity that would be needed if all customers used energy at a constant 100 percent load factor.  The cost of capacity above average demand is then allocated in proportion to each class's excess demand, where excess demand is measured as the *difference* between each class's individual peak demand and its average demand.  In this manner, the incremental amount of production plant that is required to meet loads that are above average demand is assigned to the users who create the need for the additional capacity.  . . .  the A&E/4CP variant . . . uses 4 CP to measure excess demand, whereas the conventional version uses class non-coincident peak . . . .[852]

ETI witness Myra L. Talkington also explained that the A&E 4CP method, noting that ETI's coincident peak demand is measured for the months of June through September.  Ms. Talkington recommends the A&E 4CP allocation because it "reasonably reflects the mix of the Company's customers and their respective electrical load characteristics and the relative cost incurred to serve

---

[850] ETI Ex. 7 (May Direct) at 23-24.  Ms. Talkington used the 150 MW number sponsored by Mr. May, and the associated energy use, to calculate the jurisdictional allocation factor.  ETI Ex. 22 (Talkington Direct) at 11-12.

[851] Cities Ex. 4 (Goins Direct) at 10.

[852] Kroger Ex. 2 (Higgins Cross Rebuttal) at 3 (footnotes deleted).

such loads."[853]   She also believes this allocation methodology provides a reasonable balance between the contribution to the system peak and energy requirements.[854]

As noted above, ETI's use of A&E 4CP is a change from the 12CP methodology it used when it operated within two states.  Ms. Talkington testified that 12CP was appropriate in the past because System Agreement costs were allocated between Entergy Operating Companies using 12CP. The Texas retail portion of the production costs were then allocated between the retail classes using the A&E 4CP methodology (as ETI is doing in this case).  However, according to Ms. Talkington, now that ETI operates in only one state, no jurisdictional allocation among states is necessary; therefore, only one allocation methodology, *i.e.*, A&E 4CP, should be used to allocate production costs between the retail classes and the wholesale jurisdiction.  Ms. Talkington testified that the A&E 4CP methodology factors in year-round demand through the average and excess function and also matches the allocator used to allocate costs within the retail class.[855]

Cities opposes the use of A&E 4CP and suggest a 12CP methodology is preferable. Commission Staff does not oppose ETI's use of A&E 4CP.  No other party takes a position on this issue.

## B.    12CP

The 12CP methodology allocates production capacity costs in proportion to each class's demands that occur on the date and time of ETI's system peak in each of the 12 months.[856]  Cities believe it is more appropriate for ETI to allocate fixed production costs between the wholesale customers and Texas retail customers using 12CP.  Cities witness Dennis W. Goins testified that the 12CP approach is consistent with the cost-of-service approach FERC typically uses to allocate demand-related production costs reflected in wholesale rate schedules, and it is consistent with the assignment of MSS-1 costs (as well as MSS-2 transmission costs) to ETI under the Entergy System

---

[853]  ETI Ex. 23 (Talkington Direct) at 6; OPC Ex. 6 (Benedict Direct) at 17.

[854]  ETI Ex. 23 (Talkington Direct) at 6.

[855]  ETI Ex. 67 (Talkington Rebuttal) at 6-7.

[856]  TIEC Ex. 3 (Pollock Cross Rebuttal) at 26.

Agreement. Dr. Goins reviewed ETI's Rate Year purchased power capacity costs month by month. He determined that ETI's heavy reliance on capacity purchases to serve retail and wholesale load, and the relative stability of those projected monthly purchased power capacity costs, suggest that the 12CP method should properly split ETI's demand-related production costs between the Texas retail and wholesale jurisdictions.[857]

Dr. Goins calculated Test Year 12CP allocation factors for the Texas retail and wholesale jurisdictions, and provided them to Cities witness Karl Nalepa for inclusion in his jurisdictional separation study. He determined the following:[858]

| Jurisdiction | A&E 4CP | 12CP |
|---|---|---|
| Texas Retail | 95.3838% | 94.6208% |
| Wholesale | 4.6162% | 5.7923% |
| Total | 100% | 100% |

In making this calculation, Dr. Goins used a loss-adjusted 150 MW (ETEC's monthly billing MW) as a proxy for the 12 monthly CPs. In his view, the 150 MW is indicative of ETI's capacity obligations to ETEC, and it reflects known and measurable changes compared to test-year wholesale CPs (which would include CPs for wholesale customers that ETI no longer serves).[859]

Cities point out that ETI previously allocated production costs to the wholesale jurisdiction on a 12CP basis. ETI first requested that the Commission change the 12CP method in Docket No. 37744.[860] According to Cities, ETI's request to change the 12CP methodology in Docket No. 37744 is significant because ETI's wholesale load consisted of Brazos Electric Cooperative, Inc. (Brazos) and ETEC. The Brazos contract assigned Brazos' share of ETI's production costs based upon a 12CP allocator. Thus, contends Cities, all costs that would have been over-allocated to retail

---

[857]  Cities Ex. 4 (Goins Direct) at 10-12.

[858]  Cities Ex. 4 (Goins Direct) at 12.

[859]  Cities Ex. 4 (Goins Direct) at 10-12.

[860]  The parties in that docket stipulated the majority of issues in the case, including issues relating to jurisdictional allocation.

customers would have been pocketed by ETI (if the 12CP allocator had changed). Cities argue that ETI's request to deviate from its approved 12CP allocator will result in retail customers subsidizing production costs. Dr. Goins calculated that the 12CP allocation factor for ETI's wholesale jurisdiction is approximately 5.38 percent versus 4.62 percent under the A&E 4CP method.[861] Cities conclude that retail customers will subsidize the difference between the two allocators, which is 0.76 percent. Because the allocation is applied to all production costs, including purchased power capacity costs, the 0.76 percent difference is significant, contend Cities.

According to ETI, Cities' arguments are based on a non-existent situation—the provision of service to Brazos—and should be rejected. The ALJs acknowledge that ETI is no longer serving Brazos. Dr. Goins noted such in his testimony. Rather, the basis for his recommendation was: (1) the 12CP approach is consistent with FERC's wholesale rate allocation; (2) the 12CP method is used to derive each Entergy Operating Company's load responsibility ratio and share of monthly MSS-1 and MSS-2 charges; and (3) ETI's purchased power capacity costs do not vary significantly month to month. Although Ms. Talkington understood that the A&E 4CP methodology is the same one used to allocate production costs between classes, TIEC witness Pollock noted that it is often not appropriate to use the same allocation method for both jurisdictional and class allocations. He noted that, in jurisdictional separation, allocations are between retail and wholesale entities, with wholesale subject to FERC regulation.[862] ETI did not fully explain why A&E 4CP is the best methodology for allocation production costs between the retail and wholesale jurisdictions. Dr. Goins' and Mr. Pollock's testimonies were ultimately more persuasive on this issue. Accordingly, the ALJs recommend the use of 12CP to allocate capacity-related production costs between the retail and wholesale jurisdictions.

---

[861]   Cities Ex. 4 (Goins Direct) at 11-12.

[862]   TIEC Ex. 3 (Pollock Cross Rebuttal) at 29. The ALJs acknowledge that Mr. Pollock does not contest ETI's use of the A&E 4CP jurisdictional allocation methodology—rather, his testimony was explaining why 12CP is not appropriate as an allocator among the different customer classes.

X.    **CLASS COST ALLOCATION AND RATE DESIGN [Germane to Preliminary Order Issue No. 1]**

ETI witness Talkington testified regarding the allocation methods for each of the major function/classification cost categories used in the Company's retail class cost-of-service study. Ms. Talkington also sponsors ETI's proposed rate design.  Contested issues are set out below.

A.    **Renewable Energy Credit Rider [Germane to Preliminary Order Issue No. 19]**

The Legislature has established a goal for the installation of an additional 5,000 MW of generating capacity from renewable energy technology.  It also set out annual goals for electric utilities to meet on a cumulative basis in order to encourage the development of renewable energy generation in Texas. A utility may meet its annual goals by installing generation, by purchasing capacity based on renewable energy technology, or by purchasing sufficient renewable energy credits (RECs).[863]

1.    **ETI's Proposed Cost Recovery**

Staff witness William B. Abbott explained that the Company currently recovers its REC costs through base rates.  Each credit represents one megawatt-hour (MWh) of renewable energy that meets certain criteria set forth in P.U.C. SUBST. R. 25.173(e), and these credits can be traded among participants in the Texas market.  ETI proposes to remove these costs from base rates and implement a REC Rider to recover its projected REC costs.  After the initial rider is established, the REC Rider would be reset annually to recover projected REC costs for the upcoming year, adjusted by any past over- or under-recovery and any revenue-related expenses.[864]  With the introduction of the REC Rider, ETI would withdraw its current Renewable Portfolio Standard Calculation Opt-Out Credit Rider, which provides a credit to offset the base rate REC costs for certain customers who are

---

[863]  PURA §39.904(a) and (b).

[864]  *See* ETI Ex. 31 (LeBlanc Direct) at 26.

exempt from paying REC costs. These customers would instead be exempt from charges under the proposed REC Rider.[865]

ETI suggests that a rider is necessary because the level of REC costs incurred from year to year is not known, and the cots are unknowable and very volatile. ETI witness Heather G. LeBlanc testified that certain customers can opt out, and a rider is the most efficient manner to administer such opt out.[866]

Initially, ETI based its rates for the proposed rider on the Company's Test Year renewable energy credit costs, which were incurred on a Texas retail basis for the 12 months ending June 30, 2011. ETI requested $623,303 and, after applying the revenue-related expense factor of 1.01307, proposed a revenue requirement of $631,450.[867] In rebuttal testimony, Ms. LeBlanc stated that the Company's proposal should be updated to reflect the most current data available. She stated that "events" since the Company's initial filing in November 2011 caused costs for the Company to increase.[868] She calculated an updated amount of $1,145,043, which, when the revenue-related expense factor is applied, results in an updated revenue requirement of $1,160,008.[869] She believes that the updated amounts further support the Company's position that REC costs are volatile.

## 2. Opposition to ETI's Proposal

Cities, OPC, State Agencies, and Commission Staff oppose ETI's proposed REC Rider.

State Agencies argue that ETI's proposed REC Rider should be rejected because it deviates from the Commission's ratemaking policies and is inconsistent with PURA. State Agencies witness Kit Pevoto testified that the proposed rider is not appropriate because: (1) the rider is piecemeal ratemaking, which deviates from the Commission's traditional ratemaking policies and is

---

[865] Staff Ex. 7 (Abbott Direct) at 11-12.

[866] ETI Ex. 31 (LeBlanc Direct) at 25.

[867] *Id*. at 24. This amount is then divided by all non-transmission level kWh sales.

[868] ETI Ex. 55 (LeBlanc Rebuttal) at 10-11.

[869] *Id*. at 11. This amount is then divided by all non-transmission level kWh sales.

inconsistent with PURA; (2) the reconciliation (true-up) process in the proposed tariff is not specifically provided for by PURA or PUC rule, or required to implement the REC process; (3) the redetermination of rates in the proposed annual filings would be based on projected or estimated costs, rather than historical test year costs; which is not in compliance with PURA or the Commission's rules; and (4) ETI has not justified the need to have a rate recovery for REC costs outside of the traditional PURA base rate recovery. Ms. Pevoto explained that the traditional test year cost of service ratemaking process, including regulatory lag, helps to match costs and revenues and to provide incentives that balance the utility's and its customers' interests. The proposed REC rider deviates from the traditional PURA rate-setting because it allows the Company to reset its rates automatically each year without going through a comprehensive rate proceeding. In her view, the rider would eliminate the regulatory lag incentive for ETI to prudently manage these costs because the rider allows for annual cost recovery adjustments. Ms. Pevoto observed that various provisions in PURA authorize riders for collection of other expenses, but no such provision exists for recovery of REC expenses, even though the Legislature mandated that utilities be responsible for a certain level of REC MWs. And she noted that if ETI's REC expenses increase due to increases in total REC MW requirements, ETI can request to include those increased costs in a future rate case.[870]

In reference to Ms. LeBlanc's rebuttal testimony that "events" caused ETI's REC costs to increase, State Agencies contend that ETI may have paid more for RECs during the Test Year because it contacted suppliers only after the REC requirement was mandated. ETI acknowledged that RECs were in the $1.10 to $1.25 range at the beginning of the year and then appreciated to over $2.00 and peaked out at $2.55 in the first quarter of 2012. Moreover, one of the largest REC suppliers unexpectedly withdrew its offers in March of 2011, which also led to price increases. March 31 is the end of the compliance period, and the deadline may increase the volume of purchases, which can add to price increases.[871] State Agencies note that ETI did not participate in the competitive REC market until February 2012 and bought its RECs near the peak price. State Agencies contend that only Test Year costs of $623,303 should be included in base rates.

---

[870] State Agencies Ex. 2 (Pevoto Direct) at 6, 8-11.

[871] State Agencies Ex. 12, RFI.

Cities witness Karl Nalepa also opposed the REC Rider. He testified that the Commission should not permit ETI to single out REC costs from base rates because it presented no evidence that these costs should be treated differently than they are now. He added that RECs are not related to fuel so much as they are related to retail sales and plant output. In his opinion, the Test Year amount for REC of $633,985 should be included in base rates.[872] Cities witness James Z. Brazell also testified that ETI currently recovers a large portion of its revenues through non-fuel piecemeal riders. While he believes some riders are necessary and appropriate, ETI's general movement of cost recovery from base rates to riders (as evidenced in this proceeding) is inconsistent with PURA and the prohibition against piecemeal ratemaking.[873]

OPC also opposed ETI's proposed REC Rider on the basis that it constitutes piecemeal ratemaking. OPC witness Nathan A. Benedict noted that in Project No. 35628, the Commission rejected alternative mechanisms for the recovery of REC costs but reserved the right to consider the issue at a later date.[874] He stressed that, when rejecting alternative recovery mechanisms for REC costs, the Commission recognized that REC costs are variable, that the purchase of RECs is mandated by law, and that certain customers can opt out of the Renewable Portfolio Standard program. Thus, in Mr. Benedict's view, the Commission has already rejected the arguments advanced by ETI here. He added that ETI did not indicate a negative and substantial impact as a result of transmission customers opting out of the Renewable Portfolio Standard program, and ETI appears to be currently administering the program effectively without REC Rider. In short, Mr. Benedict concluded that costs related to renewable energy credits should be recovered through base rates, and ETI's current opt-out rider should continue as the vehicle for ETI to handle transmission-level opt-outs.[875]

---

[872] Cities Ex. 6 (Nalepa Direct) at 30-32. Mr. Nalepa's figure of $633,985 differs from that the figure of $623,303 found in ETI's testimony at ETI Ex. 31 (LeBlanc Direct) at 24 and State Ex. 9.

[873] Cities Ex. 1 (Brazell Direct) at 14-16.

[874] OPC Ex. 6 (Benedict Direct) at Ex. NAB-8, Project No. 35628, *Rulemaking Relating to Industrial Customer Opt-Out of Renewable Portfolio Standard*, Order at 6 (December 4, 2008).

[875] OPC Ex. 6 (Benedict Direct) at 37-41. ETI currently has a Renewable Portfolio Standard Calculation Opt-Out Credit Rider to credit REC costs collected in base rates from transmission level customers who have opted out of the program.

Commission Staff also opposes ETI's request, stating that it amounts to unauthorized piecemeal ratemaking that should be disallowed. In Staff's view, the existing opt-out rider should be maintained but updated to reflect the test year data used to set the ETI's base rates. Because ETI's proposed rider would include a true-up provision that would guarantee recovery of all of its REC costs, Staff witness Abbott testified that it would violate PURA § 36.051, which provides the utility a reasonable opportunity to earn a reasonable return on invested capital but does not guarantee full recovery of all costs. Mr. Abbott acknowledged that the Legislature has authorized the recovery of certain specific costs outside of base rates, but no such authorization exists for the recovery of REC costs.[876]

In addition, Mr. Abbott criticized the proposed REC rider because in the future it would allow *prospective* recovery of *estimated* REC costs. He believed that such an arrangement would eliminate any regulatory lag and thus eliminate any incentive for ETI to minimize the costs of purchasing the required RECs.[877] Mr. Abbott also pointed out that the proposed rider contains a single rate for all customer classes and includes a "revenue related expense factor," which increases the overall rider revenue requirement to, in part, account for projected uncollectable bills.[878] This would shift the costs of uncollectable bills from customer classes with greater bad debt onto customer classes with lower bad debt. Further, Mr. Abbott stated, the proposed true-up portion of the REC Rider would eliminate the need for a bad debt factor, as any actual under-collected amounts would carry forward and could be recovered in future filings. Also, the single rate could result in cost-shifting between customer classes, as over- or under- recoveries resulting from billing determinant forecast error would vary by customer class. Finally, Mr. Abbott stated, the ETI's proposed billing determinants are based on a historical year. But if load grows over the long term,

---

[876] Staff Ex. 7 (Abbott Direct) at 12-13. Mr. Abbott cites to PURA §§ 36.203 (Fuel Cost Recovery), 36.205 (Purchased Power Cost Recovery), 36.209 (Transmission Cost Recovery), 36.210 (Distribution Cost Recovery), 39.107(h) (Advanced Meter Deployment Surcharge), 39.461 (Hurricane Reconstruction Costs), 39.905(b)(1) (Energy Efficiency Cost Recovery).

[877] While the price of RECs at any point in time are set by the market, presumably a purchaser has some ability to seek relatively better terms—such as making an effort to accurately forecast the number of credits required and perhaps purchasing or contracting to purchase available credits beforehand if prices are favorable, seeking volume discounts, banking excess credits when prices are favorable, etc.

[878] Schedule Q-8.8 at 45.4.

this will lead to persistent over-recovery of the REC Rider revenue requirements, as Rate Year

billing determinants will tend to exceed the historical billing determinants systematically.[879]

Based on these concerns, Mr. Abbott recommended that the Commission deny ETI's request

for a REC Rider, and that the ETI's Test Year REC costs of $623,303 be included in base rates.

Additionally, he recommended that the Renewable Portfolio Standard Calculation Opt-Out Credit

Rider should be maintained; however, the credit rates should be updated to reflect the Test Year data

used to set ETI's base rates.  In the alternative, if the Commission approves the REC Rider requested

by ETI, Mr. Abbott recommended the following changes from the Company's request:

> The REC Rider should be set every year to collect the previous year's actual REC costs (instead of projected REC costs), plus any over- or under- recovery from prior periods.

> The previous year's actual REC costs should be allocated to each customer class based upon each class's actual energy usage over the time period for which the RECs were acquired.

> Any over- or under- recovery balances should be tracked by each customer class, and thus a separate REC Rider rate should be calculated for each customer class based on that class's allocated REC costs adjusted by that class's over- or under- recovery balance.

> The REC Rider rates should be calculated using billing determinants based upon ETI's best forecast of each customer class's energy usage over the rider's Rate Year.[880]

### 3.  ETI's Response

ETI contends that adoption of the rider does not result in piecemeal ratemaking because these

are the types of costs that the Company cannot control.  Ms. LeBlanc believes that there is a greater

---

[879]  Staff Ex. 7 (Abbott Direct) at 13-14.

[880]  Staff Ex. 7 (Abbott Direct) at 14-15.

risk of over-recovery of REC costs through base rates than there would be under the proposed rider.[881]

As to the issue that the Company would be disincentivized to purchase RECs at an appropriate time, ETI claims that the proposed rider has a true-up mechanism that would allow for review. ETI disputes State Agencies' claims that ETI could have purchased RECs at a lower level at other points in the year, stating there is no evidence that the Company could have bought RECs at a lower level at other points in the year.

Finally, ETI takes issue with the parties' argument that there is no statutory recovery for REC costs outside of base rates. ETI argues that there is no statutory authority requiring the Company to refund costs to opt-out industrial customers. According to ETI, no explicit statutory authority is necessary, and the parties have failed to establish that any harm would result from implementation of the rider.

### 4. ALJs' Analysis

The ALJs are persuaded by the testimonies of Staff and intervenor witnesses Pevoto, Nalepa, Abbot, Benedict, and Brazell that ETI's proposed REC rider should be rejected. The testimony supports a finding that adoption of the rider results in piecemeal ratemaking. ETI's argument that costs are volatile and, therefore, should be isolated and recovered in a manner similar to an annual fuel factor filing was not supported by sufficient evidence. Additionally, the ALJs agree that the proposed rider eliminates any incentive for ETI to minimize the costs of purchasing the required RECs. ETI proffered unconvincing argument and insufficient evidence that standard cost recovery was insufficient for ETI to recover its total REC costs and a reasonable return.

The ALJs further find that the Test Year expense of $623,303 should be used for setting rates in this case.[882] ETI failed to proffer sufficient evidence and argument to support any increase to its

---

[881] ETI Ex. 55 (LeBlanc Rebuttal) at 11.

[882] This is the amount referenced in Ms. LeBlanc's testimony at ETI Ex. 31 at 24 and confirmed in State Agencies Ex. 9.

initial request through rebuttal testimony.  As recommended by Staff witness Abbott, the Renewable Portfolio Standard Calculation Opt-Out Credit Rider should be maintained, with an adjustment to the credit rates to reflect the Test Year data used to set ETI's base rates.

## B.        Class Cost Allocation [Germane to Preliminary Order Issue No. 14]

A cost-of-service study is an analysis used to determine the responsibility for a utility's costs for each customer class.  Thus, it determines whether the revenues a class generates cover that class's cost-of-service.  A class cost-of-service study separates the utility's total costs into portions incurred on behalf of the various customer groups.  Most of a utility's costs are incurred to jointly serve many customers.  For purposes of rate design and revenue allocation, customers are grouped into homogeneous classes according to their usage patterns and service characteristics.

The parties generally agreed that ETI's cost-of-service study comported with accepted industry practices, but some parties had issues with specific items discussed below.

### 1.  Municipal Franchise Fees

Municipal Franchise Fees (MFF) are charges for a utility's use of municipal rights-of-way. The charges are levied by municipalities based on the amount of electricity sold within the municipal boundaries.  They are also referred to as street rental taxes.  The MFF charged to ETI are based on ordinances passed by the cities in which ETI makes retail sales.  Different cities have enacted different levels of MFF on in-city kWh sales, ranging from 0.0956¢ to as much as 0.2644¢ per kWh.[883]  For the portion of fees ETI collects through base rates, ETI proposes to allocate among customer classes based on customer class revenues relative to total revenues.[884]  Once MFF costs are

---

[883] TIEC Ex. 1 (Pollock Direct) at 52 and Ex. JP-9.  Nineteen cities also charge MFF through separate "Incremental Franchise Fee Recovery" Riders.  These incremental MFF are not included in ETI's proposed revenue requirements in this case.  TIEC Ex. 1 (Pollock Direct) at 53.

[884]  Schedule P-13 at10, lines 32-33; the allocation factor "RSRRTOA-Total" is rate schedule revenue.

allocated to the rate classes, ETI proposes to collect the costs from all customers regardless of their geographic location.[885]

ETI proposes the same allocation and collection of MFF in this case as was approved by the Commission in Docket No. 16705, ETI's last litigated rate case.[886] The positions of the parties, as set out in testimony and briefs, are listed below:

| Party/Precedent | MFF Allocation Between Customer Classes By: | Collection of MFF Expenses From: |
|---|---|---|
| ETI | Total revenues | All customers |
| Cities | Total revenues | All customers |
| OPC | kWh sales in city | All customers |
| Staff | kWh sales in city | All customers |
| TIEC | Franchise fee payments in city | Only from municipal customers |
| Docket No. 16705 | Total revenues | All customers |

### (a) MFF Allocation Between Customer Classes

Cities and ETI recommend adoption of ETI's proposal to allocate to customer classes based on total rate schedule revenues, which the Commission approved in Docket No. 16705. ETI notes that it is following Commission precedent, and it opposes the use of different allocation factors for these FERC accounts: Account 408.152, Franchise Tax State; Account 408.154 Franchise Tax Local; and Account 408.163, Street Rental.

OPC witness Benedict testified that MFF should be allocated on the basis of in-city kWh sales, without an adjustment for the MFF rate in the municipality in which a given kWh sale occurred. Staff witness Abbot concurs. Stated differently, Messrs. Benedict and Abbot suggest

---

[885] OPC Ex. 8 (Benedict Cross Rebuttal) at 9.

[886] *Application of Entergy Gulf States, Inc. for Approval of Its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs,* Docket No. 16705, Second Order on Rehearing at 98 (FoF 224) (Oct. 13, 1998).

allocating MFF relative to each class's inside-city kWh sales with the same MFF per unit cost (*i.e.,* 0.1965¢ per kWh) for all customer classes.[887]  Mr. Benedict noted that this allocation method is based on Commission precedent, as indicated in the recent CenterPoint rate case, Docket No. 38339:

> CenterPoint's allocation of municipal franchise fees to the customer classes based upon in-city kilowatt-hour (kWh) sales and collection of the fees from all customers within the customer class is reasonable and consistent with Commission precedent.[888]

Mr. Benedict also noted that allocating on the basis of in-city kWh sales is consistent with PURA § 33.008(b).[889]

Commission Staff supports Mr. Benedict's analysis.  Staff points out that PURA § 33.008(b), which authorizes the collection of municipal franchise fees, states that "[t]he compensation a municipality may collect from each electric utility . . . shall be equal to the charge per kilowatt hour . . . times the *number of kilowatt hours delivered within the municipalities boundaries.*"[890]  According to Staff, PURA § 33.008(b) plainly links the amount of municipal franchise fees to each class's in-city kWh sales.  Moreover, the Commission has an established policy of allocating municipal franchise fees based on in-city kWh sales.[891]  According to Staff, the Commission should reaffirm

---

[887]  *See* OPC Ex. 7 (Benedict Cross Rebuttal) at 4-5; Staff Ex. 7 (Abbott Direct) at 22; TIEC Ex. 3 (Pollock Cross Rebuttal) at 34.

[888]  OPC Ex. 6 (Benedict Direct) at Ex. NAB-1, *Application of CenterPoint Electric Delivery Company, LLC, for Authority to Change Rates,* Docket No. 38339, Order on Rehearing at 34, (FoF 179) (June 23, 2011).

[889]  OPC Ex. 7 (Benedict Cross Rebuttal) at 5.

[890]  PURA § 33.008(b)(emphasis added).

[891]  *Application of TXU Electric Company for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule 25.344*, Docket No. 22350, Order at FoF 156 (Oct. 4, 2001).  The Commission reached an identical conclusion in *Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA  39.201 and Public Utility Commission Substantive Rule 25.344*, Docket No. 22355, Order at FoF 222A (Oct. 4, 2001).  More recently, *Application of CenterPoint Electric Delivery Company, LLC, for Authority to Change Rates*, Docket No. 38339, Order on Rehearing at FoF 179 (June 23, 2011) (stating that "CenterPoint's allocation of municipal franchise fees to the customer classes based upon in-city kilowatt-hour (kWh) sales and collection of the fees from all customers within the customer class is reasonable and consistent with Commission precedent.").

Staff notes in their initial brief that the Commission has further indicated that this allocation should be conducted without any adjustment for differences in the rates charged by individual municipalities within a utility's service territory. *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309, Order on Rehearing at FoF 150 (Mar. 4, 2008) (stating in connection with a proposed municipal

this precedent in this case by allocating ETI's MFF to each customer class on the basis of in-city kWh sales.

TIEC witness Pollock disagrees with OPC's and Staff's proposed allocation method, although Mr. Pollock stated their proposal was better than ETI's proposed allocation. He believes OPC's and Staff's proposal fails to recognize the different MFF rates charged by cities. Because cities that have a preponderance of industrial sales generally charge lower MFF rates, this proposal would require LIPS customers to pay 0.1965¢ per kWh, which is more than the weighted average MFF cost to the LIPS class of 0.1612¢ per kWh. Thus, Mr. Pollock argues that this would require LIPS customers to subsidize other customer classes and would not be consistent with cost causation. Mr. Pollock thought his proposal to allocate MFF by city by class resulted in each customer class paying only the MFF expenses actually incurred.[892]

The ALJs find OPC's and Staff's proposed allocation methodology best comports with PURA § 33.008 and Commission precedent. As noted by Mr. Benedict, PURA was amended after the Commission's decision in Docket No. 16705, which allocated MFF on the basis of rate schedule revenue. PURA § 33.008 expressly calls for a kWh basis for allocation and this is confirmed in the cases litigated since Docket No. 16705, which were cited by Commission Staff. Accordingly, the ALJ recommend that MFF be allocated on the basis of in-city kWh sales, without an adjustment for the MFF rate in the municipality in which a given kWh sale occurred.

### (b) MFF Collection

All parties except TIEC recommend that the Commission approve ETI's proposed allocation of franchise fee rentals to all customers. Cities witness Mr. Brazell testified that franchise fees are in the nature of a rental, not a tax, and like all rental charges ETI incurs, the expense should be spread among all customers. He stated that MFF charges have always been collected from all customers, whether or not they take service within the corporate limits, except for the limited incremental

---

franchise fee expense rider that "[h]aving different rates in each municipality in TCC's service territory is contrary to the Commission's desire for uniform, simple rates").

[892] TIEC Ex. 3 (Pollock Cross Rebuttal) at 8, 33-35.

franchise fees specifically addressed by PURA § 39.456.  Mr. Brazell explained that electrical facilities within ETI's system are physically interconnected and electrically synchronized.  The facilities located within a city's boundaries are not isolated physically or electrically from the facilities outside the city limits.  Rather, they are tied to one another and function as a single integrated system, and ETI's facilities inside each city benefit all customers in ETI's service area, whether or not those customers are within the city.  Therefore, Mr. Brazell recommended that the Commission approve ETI's request to recover MFF in base rates from all customers.[893]

Mr. Benedict holds the same opinion.  He stated that the Commission's policy to collect MFF from all customers within a customer class is also consistent with the concept that MFF are system costs that are rightly paid by all customers taking service from the system.  He explained that MFF are paid by a utility to municipalities for use of the municipalities' rights-of-way.  Because these rights-of-way are necessary to operate an integrated electric delivery system from which all customers benefit, regardless of geographic location, Mr. Benedict stated that MFF should be collected uniformly from all customers within a given rate class.  He stressed that the Commission agreed with this reasoning in Docket No. 16705, where the Commission concluded:

> Current cost of services studies are not based on geographical differences.  Classes are not divided based on geography, and industrial sites are not self-sufficient islands. The use of city streets and property enables [EGSI] to have an integrated utility system from which all ratepayers benefit.[894]

Mr. Pollock objected to the proposals by Mr. Brazell and Mr. Abbott.  He stated that Mr. Brazell's recommendation to adopt ETI's proposed MFF allocation should be rejected because there is no evidence that outside city customers benefit from ETI's use of city streets and rights-of-way or that the benefits are evenly distributed between inside and outside city customers.  Further, according to Mr. Pollock, the standard used in class cost-of-service studies is cost causation, not

---

[893]  Cities Ex. 1 (Brazell Direct) at 28-32.

[894]  OPC Ex. 6 (Benedict Direct) at Ex. NAB-2, Docket No. 16705, Second Order on Rehearing at 98, (FoF 224).

benefits, and he believes allocating MFF based on outside city usage is contrary to cost causation principles.[895]

The ALJs recommend adoption of ETI's proposal to collect costs from all customers taking service from the system.  The ALJs find persuasive the fact that MFF is compensation for the use of municipalities rights-of-way, which is used to operate an integrated electric delivery system from which all customers benefit.

## 2.  Miscellaneous Gross Receipts Taxes

Miscellaneous gross receipts taxes (MGRT) are state taxes imposed on each utility company's taxable gross receipts derived from sales in an incorporated city or town having a population of more than 1,000.  Like MFF, these taxes are levied only on sales within the cities.  ETI proposes to allocate MGRT to all retail customer classes based on customer class revenues relative to total revenues.[896]

TIEC objects to ETI's allocation of MGRT based on class revenues for the same reasons stated for ETI's allocation of MFF.  It argues that these costs should be allocated and charged to customers within the municipalities to which the MGRT applied.

The allocation of MGRT is similar to the allocation of MFF and should be similarly applied.  For the reasons set out above and to ensure consistent treatment, the ALJs do not recommend the direct method of allocation suggested by TIEC.  Rather, these costs should be allocated to the rate classes according to ETI's cost of service study.

---

[895]  TIEC Ex. 3 (Pollock Cross Rebuttal) at 7, 32-33.

[896]  ETI Ex. 3, Schedule P-13 at 10, line 34.

### 3. Capacity-Related Production Costs

#### (a) Allocation Methodology

ETI proposes to allocate capacity-related production and transmission costs to the retail classes on the basis of A&E 4CP. As noted by TIEC and Commission Staff, this allocation methodology is consistent with the method ETI used in Docket No. 16705, its last contested rate proceeding:

> Finding of Fact No. 221. The continued use of the A&E 4CP allocator is the most reasonable methodology for allocating production and transmission plant among classes. The A&E 4CP allocator sufficiently recognizes customer demand and energy requirements and assigns cost responsibility to peak and off-peak users. It best recognizes the contribution of both peak demand and the pattern of capacity use through the year.

> Finding of Fact No. 222. The A&E 4CP method is also preferable because it is devoid of any double counting problem.[897]

ETI witness Ms. Talkington explained that the A&E 4CP allocation is appropriate because it is a method that reasonably reflects the mix of the Company's customers, their respective electrical load characteristics, and the relative costs incurred to serve such loads. She testified that the A&E 4CP method provides a reasonable balance between the two primary costing concerns: contribution to the system peak and energy requirements. While the contribution made to the system peak is inherently recognized with the use of the average four coincident peaks, energy is also recognized by reflecting the average demands.[898]

OPC witness Benedict proposed the use of the average and single coincident peak (A&P) method to allocated production (and transmission costs, which are discussed in the section below)

---

[897] Docket No. 16705, Second Order on Rehearing at 97, FoF 221 and 222 (Oct. 14, 1998).

[898] ETI Ex. 22 (Talkington Direct) at 5. As noted previously, A&E 4CP is developed by adding each rate class's average demand for the test year (the "average" component representing the rate class's average energy consumption), weighted by the ETI system load factor, to each rate class's amount of average coincident peak demand for the months of June through September in excess of its average demand, weighted by one minus the ETI system load factor.

among retail classes. As noted in the discussion concerning jurisdictional allocation, A&E 4CP is a variant of the A&E allocator. Mr. Benedict believes that A&E 4CP fails to properly assign cost responsibility to both peak and off-peak usage.[899] Instead, he found that the A&E 4CP allocator results in the same factors reached by the 4CP method, which means that A&E 4CP assigns cost responsibility only to peak demand and not to off-peak demand. He believes that the A&P methodology is the proper plant allocator because it takes into account both peak usage and off-peak usage patterns.[900]

Mr. Benedict's methodology and recommendation was disputed by Kroger witness Higgins. He indicated that the A&E method does not converge to a CP result. Rather, the A&E method addresses a fundamentally important question in production cost allocation—once capacity needed to serve the average demand on the system is accounted for, how does the regulator fairly assign the responsibility for the additional or excess capacity that is needed to meet the various capacity requirements (placed on the system by each customer class). Mr. Higgins concluded that the A&E method makes an objective and reasonable allocation. However, he did not advocate changing ETI's use of A&E 4CP.[901]

Mr. Higgins explained that:

> [T]he Average and Excess demand method begins by allocating a portion of costs on the basis of average demand—or energy. The <u>remaining</u> (or "excess") capacity needs of the system are then allocated to classes based on peak usage—class NCP in the case of the "standard" approach, 4 CP in the case of the A&E/4CP method. In contrast, the A&P method proposed by Mr. Benedict, which is classified by the NARUC Manual as a "Judgmental Energy Weighting" approach, incorporates a subjective determination that includes the <u>full</u> value of average demand both in the "average" component of the A&P calculation as well as in the peak component of that calculation.[902]

---

[899] Mr. Benedict performed a mathematical proof that he believed demonstrated that the A&E 4CP allocator is nearly identical to the 4CP allocator. OPC Ex. 6 (Benedict Direct) at 21-22.

[900] *Id*.

[901] Kroger Ex. 2 (Higgins Cross Rebuttal) at 4-5.

[902] *Id*. at 6 (emphasis in originial).

TIEC witness Pollock also disputed Mr. Benedict's proposed methodology, stating that A&P does not reflect cost causation and is not reasonable for ETI. He believes that Mr. Benedict's support of the A&P method is based on an oversimplification of the planning process. He also noted that A&E is recognized in the NARUC Electric Utility Cost Allocation Manual and has been repeatedly used by the Commission.[903]

The following calculations performed by Messrs. Benedict and Higgins demonstrate the different results stemming from the allocation methodologies:[904]

| Rate Class | ETI *Proposed* A&E/4CP (%) | OPC *Recommended* A&P (%) | Kroger Standard A&E | *Alternative* 12CP |
|---|---|---|---|---|
| Residential | 47.4494 | 40.1181 | 48.4013 | 43.4768 |
| Small General Service | 2.0990 | 2.0595 | 2.7209 | 2.0169 |
| General Service | 18.0259 | 19.4933 | 18.5183 | 18.6122 |
| Large General Service | 7.0794 | 8.3822 | 6.6558 | 7.4339 |
| Lg. Indust. Power Serv. | 20.4401 | 25.5485 | 20.2122 | 22.9417 |
| Total Lighting | 0.2900 | 0.2768 | 0.4042 | 0.1394 |
| *Total Texas Retail* | *95.3838* | *95.8784* | *96.9127* | *94.6208* |
| Total Wholesale and Wheeling | 4.6162 | 4.1216 | 3.0873 | 5.3792 |
| *Total Company* | *100.0000* | *100.0000* | *100.0000* | *100.0000* |

The ALJs recommend the use of A&E 4CP to allocate capacity-related production costs, as proposed by ETI. The weight of the evidence as well as Commission precedent does not support the methodology proposed by Mr. Benedict. A&E 4CP was approved for the Company in Docket No. 16705, and the extensive testimonies (which included calculations and graphs) of Messrs. Higgins and Pollock indicate that, not only is the methodology frequently adopted by the Commission, it is also a standard and reasonable methodology. As noted by ETI, it reasonably reflects the mix of the Company's customers and their respective load characteristics and the relative

---

[903] TIEC Ex. 3 (Pollock Cross Rebuttal) at 12-14, citing the NARUC *Electric Utility Cost Allocation Manual,* January 1992.

[904] OPC Ex. 6 (Benedict Direct) at 25; Kroger Ex. 2 (Higgins Cross Rebuttal) at 5.

costs incurred to serve such loads.  It recognizes the contribution of both peak demand and the pattern of capacity use throughout the year.[905]  It also recognizes that ETI, like all Texas utilities, is a summer peaking utility.  The ALJs recommend that ETI's allocation of capacity production costs be adopted.

### (b) Reserve Equalization Payments

A subset of the Company's requested capacity-related production costs relate to reserve equalization payments made by the Company pursuant to the Entergy System Agreement (Service Schedule MSS-1).  The System Agreement, which is approved by the FERC, prescribes a method by which each Entergy Operating Company's share of Entergy system reserves are calculated.  ETI, as one of the Operating Companies, is responsible to provide the system with its allocated share of system reserves.  Some Entergy Operating Companies own less than their share of system reserves and are considered "short" with respect to generation capability.  Companies that own more than their share are considered "long" companies.  Short companies make payments to long companies pursuant to the terms of the System Agreement.  Because ETI is a short company, it makes reserve equalization payments which are included in the cost of service.[906]

ETI allocates MSS-1 payments using A&E 4CP.  Mr. Benedict argues that this allocation method is not consistent with the way costs are incurred, as ETI does not make MSS-1 payments on the basis of A&E 4CP.  According to Mr. Benedict, ETI incurs costs by being short with respect to system reserves—the payment is simply the number of MW by which it is short, multiplied by a $/MW rate as determined by a contract formula.  The degree to which ETI is short is determined by comparing its generation capability to its allocated share of system reserves.  Total system reserves are allocated to the other Operating Companies on the basis of the Responsibility Ratio.  Thus, as determined by the Responsibility Ratio, ETI's share of system reserves relative to its generating capability is what causes ETI to make MSS-1 Reserve Equalization payments.[907]

---

[905]  *See* Docket No. 16705, Second Order on Rehearing at FoF 221 (Sept. 4, 1998).

[906]  OPC Exhibit No. 6 (Benedict Direct) at 29-30.

[907]  *Id*.

Mr. Benedict concluded that, because Reserve Equalization payments are incurred on the basis of ETI's Responsibility Ratio, which is a rolling 12CP allocator, the payments should be allocated to ETI's rate classes on a similar basis. As a result, he recommended that Reserve Equalization payments be allocated on the basis of 12CP.[908]

According to OPC, Mr. Benedict's proposal for allocating MSS-1 payments has been criticized because 12CP measures class demands at ETI's peak monthly demands whereas the Responsibility Ratio is measured at the Entergy system's peak monthly demands. OPC agrees that 12CP uses peak hours that may differ from those used to compute the Responsibility Ratio, but contends that the Company fails to mention that the A&E 4CP method it uses to allocate MSS-1 payments is also subject to the same critique. When choosing between the 12CP allocator and the A&E 4CP allocator for the purpose of allocating reserve equalization payments, OPC believes 12CP is more desirable. ETI's contributions to the Entergy system's peaks in all 12 months, not just the four summer months, determine ETI's share of Entergy system reserves. ETI's share of system reserves, relative to its generation capability, is what causes reserve equalization payments to the other Entergy Operating Companies. Moving to a 12CP allocation for MSS-1 payments aligns cost allocation more closely with cost causation.

TIEC witness Pollock explained that the Entergy System Agreement is regulated by the FERC, which does not control the rate design policy applicable to Texas retail customers under Commission jurisdiction. He views the System Agreement as an accounting mechanism to equalize the benefits and costs associated with interconnected operation and joint planning. In his opinion, it is not relevant to determining which production capacity allocation method best reflects cost causation for Texas retail customer. According to Mr. Pollock, the MSS-1 payments are no different in concept from the costs associated with ETI's high-voltage transmission lines, which are allocated on an A&E 4CP basis. He further indicated that the 12CP method ignores the reality the ETI is a predominantly summer peaking utility.[909]

---

[908] *Id*. at 31.

[909] TIEC Ex. 3 (Pollock Cross Rebuttal) at 27-29.

The ALJs do not find sufficient support to allocate the reserve equalization payments differently than other capacity-related production costs. For the same reasons noted in the section above, the ALJs find the weight of the evidence supports allocation using A&E 4CP. While 12CP is a reasonable methodology for jurisdictional separation between retail and wholesale entities, the evidence does not support this methodology for allocation of reserve equalization payments.

### 4. Transmission Costs

As noted above, ETI also allocates transmission costs using the A&E 4CP methodology. Again, TIEC and Staff cite to the Commission's decision in Docket No. 16705, which adopted the A&E 4CP approach for both production and transmission costs. OPC witness Benedict, however, proposes allocating transmission plant using A&E methodology that he proposed for the allocation of production plant.[910]

TIEC argues that methodologies similar to Mr. Benedict's proposal have been repeatedly rejected by the Commission, and the A&E 4CP methodology has been repeatedly approved. TIEC suggests that Mr. Benedict offers no rationale for a different result for transmission costs. According to TIEC, the rationale that he offers for using the A&P method for production costs—the potential trade-off between capital costs and fuel costs—is entirely absent with respect to transmission plant. Mr. Benedict does not even assert that such trade-offs exist. Rather, the only basis he offers for using the average and peak methodology is his assertion that the A&E 4CP allocator "mathematically reduces to a 4CP allocator."[911] TIEC points out that the Commission, by rule, has adopted the 4CP method for the allocation of transmission plant within ERCOT.[912]

ETI witness Talkington indicated the same reasons and rationale for using the A&E 4CP methodology to allocate transmission costs as she noted for capacity-related production costs.[913]

---

[910] OPC Ex. 6 (Benedict Direct) at 26-28.

[911] TIEC Initial Brief at 68, *citing* OPC Ex. 6 (Benedict Direct) at 27.

[912] P.U.C. SUBST. R. 25.192 specifically provides that transmission costs are allocated based on the "coincident peak demand for the months of June, July, August, and September (4CP) . . . ."

[913] ETI Ex. 67 (Talkington Rebuttal) at 8-9.

Kroger witness Higgins also disputed the use of A&E 4CP for allocation of transmission costs for the same reasons noted above concerning production cost allocation.  Moreover, he compared the different allocation factors—specifically, ETI's proposed A&E 4CP, the A&E, and Mr. Benedict's recommended A&P.  His calculations indicated that A&E 4CP and the A&E produce similar results, while A&P radically departs from ETI's proposed allocations.[914]

The ALJs do not find sufficient or persuasive evidence to change ETI's proposed methodology for allocation of transmission costs.  A&E 4CP is a well-accepted method for allocating such costs, which the Commission has repeatedly adopted.  The ALJs recommend the use of the A&E 4CP to allocate ETI's transmission costs.

## C.      Revenue Allocation

Wal-Mart, Kroger, TIEC, and Commission Staff advocate that the rates be set on the basis of the utility's costs of service.  These parties recommends the adoption of ETIs proposed base rate revenue allocation, recovering from each class 100 percent of it respective Test-Year base rate costs per the revenue requirement ultimately adopted.

TIEC witness Pollock testified that revenue allocation is the process of determining how any base revenue change approved by the Commission should be spread to each customer class served by the utility.  ETI proposed an overall increase in non-fuel revenues of 17.53 percent, but the increase is not spread proportionally to all the classes.[915]  Rather, ETI proposed class revenue requirements that are closely aligned with the Company's proposed cost of service.  Set out below is the impact of ETI's proposed base rate increase for each class:[916]

| Class | Change in Base Revenues |
|---|---|
| Residential | 25.10% |

---

[914]  Kroger Ex. 2 (Higgins Cross Rebuttal) at 5-6.

[915]  ETI's revenue requirement does not include the costs associated with its requested REC Rider.

[916]  *See* Kroger Ex. 1 (Higgins Direct) at 5-6; s*ee also* Cities Ex. 6 (Nalepa Direct) at 34.

| | |
|---|---|
| Small General Service | 1.82% |
| General Service | 5.54% |
| Large General Service | 19.06% |
| Large Industrial Power Service | 11.17% |
| Lighting Service | 29.36% |
| *System Average* | *17.53%* |

The contested issue concerns whether rates should be set at cost, and any approved change in base rate revenues should reflect the actual cost of providing service, or whether any rate increase should be phased in for certain classes (notably Residential and Lighting classes) to reduce the impact (rate shock)

### 1.  Argument for Moving Rates to Cost

ETI and the parties in support of ETI's class revenue allocation contend it is appropriate to set rates at each class' cost of service as ETI has proposed in order to avoid continuing inappropriate and inequitable cost shifting between customer classes.  TIEC witness Mr. Pollock testified that cost-based rates send the proper price signals to customers.  He noted other reasons for using cost-of-service principles: equity, engineering efficiency (cost-minimization), stability, and conservation. If rates are not based on cost, then some customers subsidize part of the cost of providing service to other customers.  Moreover, he suggested that by providing balanced price signals, cost-based rates encourage conservation and may prevent waste or inefficient use.  If rates are not based on a class cost-of-service study, then consumption choices can be distorted.[917]

Mr. Pollock developed a class revenue allocation based on his proposed jurisdictional and class cost-of-service studies.  If these recommendations are adopted, his class revenue allocation produced the following results:

---

[917]  TIEC Ex. 1 (Pollock Direct) at 63-65.

| Rate Class Service | Present Non-Fuel Revenues | Proposed Base Revenue Increases | Percent Increase |
|---|---|---|---|
| Residential | $379,382,000 | $80,390,000 | 21.2% |
| Small General | $26,430,000 | $283,000 | 1.1% |
| General | $159,768,000 | $9,797,000 | 6.1% |
| Large General | $49,380,000 | $8,714,000 | 17.6% |
| Large Indus. Power | $104,308,000 | $9,862,000 | 9.5% |
| Lighting | $10,813,000 | $2,143,000 | 19.8% |
| Total | $730,080,000 | $111,189,000 | 15.2% |

As discussed below, Mr. Pollock also recommended lower rates for Schedules SMS and AFC, which would reduce ETI's revenues by about $2 million. To offset this loss, he testified that revenues would need to be increased for other classes to achieve the total increase requested by ETI. These changes would produce the following results:[918]

| Rate Class Service | Present Non-Fuel Revenues | Proposed Base Revenue Increases | Percent Increase |
|---|---|---|---|
| Residential | $379,382,000 | $81,500,000 | 21.5% |
| Small General | $26,430,000 | $340,000 | 1.3% |
| General | $159,768,000 | $10,205,000 | 6.4% |
| Large General | $49,380,000 | $8,860,000 | 17.9% |
| Large Indus. Power | $104,308,000 | $10,153,000 | 9.7% |
| Lighting | $10,813,000 | $2,160,000 | 20.0% |
| **Total** | **$730,080,000** | **$113,218,000** | **15.5%** |
| SMS/AFC Impacts | $13,816,000 | ($2,029,000) | -14.7% |
| Total Sales | $743,896,000 | 111,189,000 | 14.9% |

---

[918] *Id*. at 63-67 and Exs. JP-12 and JP-13.

If the Commission disallows other elements of ETI's rate request, Mr. Pollock testified that class revenue allocation should be reduced in accordance with how such disallowed costs were allocated to each rate class.[919]

Mr. Pollock's tables provide examples of the impact on each class of customers when the Commission makes final decisions concerning the Company's proposed rate design and the final revenue requirement.

Staff witness Abbott testified that the Commission ordinarily sets rates for each customer class to recover the costs incurred by the utility to serve that class. In this case, ETI's proposed revenues for all customer classes result in base revenues that are close to the cost of service allocated costs. No single customer class' proposed revenue requirement differs from ETI's calculated cost to serve that class by more than 3 percent. Staff acknowledges that certain classes face proportionally larger rate increases to bring them closer to unity, where revenue recovery is based on actual cost of service. However, Staff agrees with Mr. Pollock that setting each customer class at their cost of service avoids inflating rates for some customer classes and subsidizing the usage of others. Staff believes that recovering from each class its respective base rate cost is equitable and provides appropriate pricing signals to facilitate the most efficient use of resources in the provision and consumption of electricity. Staff also argues that the Commission has approved such class cost of service allocation in recent rate cases.[920]

Wal-Mart and Kroger concur with Staff and TIEC.

---

[919] *Id*. at 67.

[920] Staff cites *Application of CenterPoint Electric Delivery Company, LLC for Authority to Change Rates*, Docket No. 28339, Order at FoF 175 (May 12, 2011) and Docket No. 16705, Second Order on Rehearing at FoF 245 (Sept. 4, 1998). TIEC witness Pollock also testified that Commission precedent supports allocation of costs based on the cost of service study. He also cited to the CenterPoint case and to *Application of AEP Texas Central for Authority to Change Rates, Docket No. 28840,* Order at 50 (Aug. 15, 2005). TIEC Ex. 1 (Pollock Direct) at 65.

## 2.  Argument for Gradualism

Cities witness Karl Nalepa pointed out that, under ETI's proposed rates, the Residential and Lighting customer classes receive the highest rate increases while the Small General Service, General Service, and Large Industrial Power Service classes receive below system average rate increases of 1.62 percent, 4.81 percent, and 10.77 percent, respectively.  However, he examined Test Year customer quantities, energy and loads by customer class for each of ETI's last three cases, and he concluded that residential and lighting customers are not imposing an undue cost burden on the system.  Instead, other classes are growing at a faster rate, causing system costs to increase. Moreover, Mr. Nalepa testified that a number of events are occurring with the Entergy system that will have significant impact on costs, including:  Entergy's efforts to join MISO; plans by EAI and EMI to leave the Entergy System Agreement; and the possible divestiture of the transmission system by all Entergy Operating Companies.  Given these uncertainties, Mr. Nalepa proposed that any rate increase or decrease be spread proportionately across the system classes.  Then, once Entergy and ETI address the proposed system cost changes, a reasonable class cost allocation study can be presented.[921]

State Agencies do not take a position on overall class revenue allocation but request that ETI's proposed rate increase for the Lighting class be moderated.  ETI proposes to set base rate revenues for the Lighting class based on the class cost allocation study, without any adjustment, which would result in a 20.38 percent increase to the Lighting class, when the entire ETI system would receive a 15.32 percent increase.  Thus, under ETI's proposal, this class would receive a percentage increase about 1.33 times the system average.  Ms. Pevoto contended that that this increase would be excessive and would create significant rate shock to the class.  Because the services of the Lighting class provides benefits all customers on the system, Ms. Pevoto believes it would be reasonable to mitigate the rate shock so that lighting customers can afford to continue their lighting service.  Otherwise, she suggested, some lighting customers may reduce lighting services or

---

[921]  Cities Ex. 6 (Nalepa Direct) at 34-37.

refrain from ordering additional lights. This, in turn, would adversely affect the benefits that lighting service provides to the public.[922]

Ms. Pevoto also pointed out that in 2009, the Commission adopted a rate moderation proposal for a similar rate class served by another utility. In that case, the Commission recognized that the Lighting class was unique in the combination of the public good it performs and in its demand characteristics.[923] To mitigate the rate shock on the lighting customers in the present case, Ms. Pevoto recommended a cap on any base rate increase that would be equal to the smaller of: (1) the lighting class percentage rate increase resulting from the PUC-approved cost of service allocation study, or (2) the allowed system percentage rate increase. If the percentage rate increase is smaller than the allowed system percentage rate increase, then no mitigation adjustment would be necessary. However, if the PUC-approved cost of service allocation results in a percentage base rate increase for the lighting class that is greater than the allowed system percentage increase, then she urged that a mitigation reduction should occur. She also proposed that any mitigation reduction for the lighting class should be spread to other remaining classes, based on each class' cost of service.[924]

ETI argues that the State Agencies are proposing the continuation of a significant subsidy by other classes. The Company notes that its allocation of costs to the Lighting class is based on the revenue requirement developed for that class. ETI acknowledges that its proposed increase for the Lighting class is 20.38 percent greater than the system average increase, but it is less than the Residential class's proposed increase of 21.64 percent. ETI witness Ms. Talkington testified that the Company does not support any subsidies between rate classes. She testified that previous rate cases with subsidies for the Lighting class have pushed the class farther away from cost.[925]

OPC argues that cost of service should not be the sole factor in setting rates and that gradualism should be used in appropriate circumstances. OPC witness Benedict disagreed with

---

[922] State Agencies Ex. 2 (Pevoto Direct) at 12-13.

[923] *Application of Oncor Electric Delivery Company for Authority to Change Rates*, Docket No. 35717, Order on Rehearing at 32 (Nov. 30, 2009).

[924] State Agencies Ex. 2 (Pevoto Direct) at 15-16.

[925] ETI Ex. 67 (Talkington Rebuttal) at 18-19.

Mr. Pollock's (and Staff's) citation to the CenterPoint and AEP TCC rate cases to reject the concept of gradualism because both CenterPoint and TCC are unbundled transmission and distribution (T&D) utilities whose charges had a small impact on retail customers' total bill. He noted that the number runs for TCC and CenterPoint showed retail revenue increases of only 0.14 percent and 1.30 percent, respectively, with some classes receiving rate decreases.[926] Mr. Benedict cited the following language by the Commission in its Order for the TCC case:

> The Commission declines to adopt gradualism in this case. This proceeding develops the T&D rates, as opposed to the broader rates developed for a fully integrated utility. As the T&D rates are only a subset of the total rates paid by customers, changes to the T&D rates would not have as large an impact as they would if the broader rates for a customer class were changed by the same percentage. . . .[927]

In Mr. Benedict's opinion, gradualism should be employed when setting rates for ETI because ETI is an integrated utility and has proposed a large rate increase.[928]

Mr. Benedict also emphasized the imprecise nature of a cost of service study. He noted that ETI's cost of service study had 47 allocation factors and, even at the summary level, 22 expense categories and 24 rate base categories.[929] Thus, he stated, there are a host of decisions made by the cost of service analyst which, in combination with the various account entries, yield a class' reported cost of service. Mr. Benedict also pointed to disagreement among qualified experts on the "correct" allocation for certain classes of costs.[930] In addition to these allocation questions, Mr. Benedict stated that any disallowances made to ETI's requested costs will have asymmetric effects on class

---

[926] OPC Ex. 8 (Benedict Cross Rebuttal) 11-12; Ex. NAB-4, Docket No. 28840, TCC Number Run (July 21, 2005); and Ex. NAB-5, Docket No. 38339, Revised Number Running Schedules (Feb. 18, 2011).

[927] *Id. citing* Docket No. 28840, Order at 23 (Aug. 15, 2005).

[928] OPC Ex. 8 (Benedict Cross Rebuttal) at 9-14.

[929] Allocation factors are provided in Schedule P-7.1; Expenses are summarized in Schedule P-7.4; Rate Base is summarized in Schedule P-7.5.

[930] He noted, for example, that his direct testimony and Mr. Nalepa's direct testimony proposed a different allocation methodology for production-related capacity costs, transmission costs, and certain System Agreement costs. Mr. Pollock proposed a different allocation method for municipal franchise fees and local gross receipts taxes. Mr. Abbott recommended different allocation methods for municipal franchise fees and other franchise taxes.

cost of service depending on how the costs were allocated.  Thus, while the cost of service study is an important element of ratemaking, Mr. Benedict stressed that it is not the only consideration.[931]

Due to the wide variation of rate increases obtained from ETI's cost of service study, Mr. Benedict thought that rate moderation (gradualism) would be appropriate.  However, he added, until decisions are made regarding the cost disallowances and allocation modifications proposed by the parties, it is unclear which rate classes should be granted rate moderation and the degree to which rate moderation is needed.  Mr. Benedict said that the system average rate increase should be used as a benchmark for rate moderation, but not assigned uniformly to all classes as Mr. Nalepa proposed or to just one class as Ms. Pevoto suggested.  Instead, he believed it would be reasonable to establish a floor and a ceiling for the increases in revenue from each class, such that a class' individual percentage increase in revenue requirement is within a defined range of the system's average revenue increase.  Therefore, Mr. Benedict recommended that any rate increase for a particular class be restricted to a range of 0.75 to 1.25 times the system's average increase.  This would result in rate increases up to 25 percent lower or 25 percent higher than the average rate increase for the system as a whole.  Based on a system average increase of 17.53 percent, individual class increases would range from 13.15 percent to 21.91 percent under Mr. Benedict's proposal.[932]

### 3.  ALJs' Recommendation

The parties presented persuasive argument on both sides of the issue.  Clearly, in any rate case, movement toward unity—setting rates to cost—is appropriate when such movement does not result in rate shock to a particular class or classes.  If rate shock is likely, Commission precedent supports the use of gradualism.  These policies apply to both a fully integrated utility, as well as a T&D.  The salient issue is whether the utility's proposed increase is so out of proportion or harsh to a particular class that some form of gradualism should be applied.  In this rate case, the preponderance of the evidence does not support the use of gradualism, even for the Lighting class.  While that class may receive an increase almost 1.33 times the system average increase, Commission

---

[931]  OPC Ex. 8 (Benedict Cross Rebuttal) at 14-17.

[932]  OPC Ex. 8 (Benedict Cross Rebuttal) at 17-19.

precedent indicated an appropriate ceiling of 1.5 or even 1.75 times the system average is appropriate.[933] As to applying OPC's proposed floor and ceiling approach, this method was introduced in cross-rebuttal with no calculations depicting the impact on each class. The ALJs do not recommend its adoption because it fails to offer significant movement towards class responsibility for cost of service. The ALJs do not recommend Mr. Nalepa's suggestion to impose any revenue change on an equal percent basis because it offers no movement towards unity. Accordingly, the ALJs concur with the parties supporting ETI that revenue allocation in this case should be based on each class's cost of service and consistent with the ALJs' recommendations in the PFD that impact revenue allocation.

## D.　　Rate Design [Germane to Preliminary Order Issue Nos. 15, 18, and 20]

Staff explained that the Commission has traditionally established class costs of service based on the principle of cost causation. Staff believes the Commission has consistently required substantial justification for departing from this principle when setting rates that result in cross-subsidization between customer classes. With respect to intra-class cost causation and rate design, Staff maintains that the considerations are somewhat different. Rather, the Commission has traditionally given more weight to policy considerations other than cost causation in determining intra-class rate design issues because the danger of permanent subsidies within a particular class is relatively low.[934] For instance, Staff witness Abbott testified that customer usage within a class may vary throughout the year. He noted that a low-load-factor customer might become a high-load-factor customer, resulting in a different mix of charges throughout the year.[935] While an individual customer's usage characteristics might frequently change and thereby lessen the impact of cost shifting within a class, Mr. Abbott testified that such customers were unlikely to shift to a different customer class.[936] While subsidies in the customer class allocation context might be permanent, this

---

[933] *See* Docket No. 28840, Order at 23 (rejecting ALJs' proposed ceiling of 1.75 times the system average).

[934] Staff cites to Mr. Abbott's cross-examination at Tr. at 1818 ("Q: And is there a distinction between factors that you would consider such as costs or other factors when you're discussing class allocation as opposed to rate design issues? A: I would say there are different considerations and weights to considerations and the analysis of allocating costs to classes versus the analysis of allocating costs to rates within a class.").

[935] Tr. at 1818.

[936] *Id*.

was not necessarily the case for intra-class rates.  Moreover, these shifting usage characteristics make it more difficult to identify cost drivers within a rate class.  Staff suggests that consideration be given to policies such as customer impact and energy efficiency.

The ALJs agree with Staff's analysis.  Mr. Abbott recommended that the Commission apply gradualism—limiting the magnitude of rate changes—to help stabilize customer expectations and reduce risk.[937]  ETI witness Talkington also advised caution in response to suggested changes to ETI's proposed rate design, noting that the ultimate impact on a customer's bill is important.[938]  However, the ALJs' rate design recommendations are based on the evidence and argument for each customer class or rate schedule.  Thus, the ALJs' recommendation on the specific rates or charges for the industrial customers will impact all other customer classes but that impact is not known at this time.

## 1.  Lighting and Traffic Signal Schedules

Cities witness Dennis W. Goins explained ETI's Lighting and Traffic Signal Schedules.  ETI's principal rate schedule for street lighting customers is Schedule SHL (Street and Highway Lighting Service), while Schedule TSS (Traffic Signal Services) is the principal rate schedule for ETI's traffic lighting customers that own and maintain their lighting facilities.  For Schedule SHL, the rate includes four categories of service (Rate Groups A, C, D, and E).  Rate Group A includes ETI's standard fixture and lamps mounted on existing standard wood poles that ETI installs and maintains.  If a customer wants nonstandard lighting facilities (those not provided in Rate Group A), the customer is assigned to Rate Group C and required to prepay ETI for the incremental cost of the nonstandard facilities.  Lighting facilities that are customer-owned and customer-maintained are assigned to Rate Group D, while incidental lighting services (for example, underpass lighting) are assigned to Rate Group E.  Customers in Rate Groups A and C pay a fixed monthly charge per lighting fixture, while customers in Rate Groups D and E pay a fixed (and identical) energy charge per kWh.  Each customer's monthly bill also includes charges for ETI's fixed fuel factor

---

[937]  Staff Ex. 7 (Abbott Direct) at 25-26.

[938]  ETI Ex. 67 (Talkington Rebuttal) at 16.

(Schedule FF) and applicable riders applied to monthly kWh per fixture.  Under Schedule TSS, traffic signal customers are subject to a minimum monthly charge ($3.20 proposed) per point of delivery, plus a fixed kWh rate and all applicable rider charges.[939]

Cities request that the Commission require ETI to institute a discounted lighting rate for Light Emitting Diode (LED) installations.  Mr. Goins testified that the basic structure and pricing provisions of the SHL and TSS rates were designed for lighting fixtures that use older, less energy-efficient bulb technology, and ETI did not conduct any analyses to estimate the cost differential of serving street lighting and traffic signal customers that use energy-efficient LED fixtures.  In fact, Dr. Goins noted that the basic structure and pricing provisions of the SHL and TSS rates have been place for years.[940]

In Dr. Goins' opinion, adoption of LED lighting rates would help reduce energy consumption in Texas because such rates help offset the high front-end cost of LED lights and encourage municipalities to adopt energy-efficient LED options.  In 2010, the Commission approved a street and traffic signal rate for El Paso Electric Company that included separate charges for LED traffic signals.[941]  In that case, the fixed monthly rate for LED signals was generally less than one-third the comparable rate for incandescent signals.

Dr. Goins recommended that the Commission require ETI to modify monthly fixed charges in Schedule SHL (Rate Groups A and C) and the monthly minimum charge in Schedule TSS to reflect a 25 percent discount for LED installations.  Under his proposal, the discounted Rate Group A fixed charges (if applicable) in Schedule SHL would be applied according to the estimated monthly kWh consumption of the installed LED fixture.  In addition, he recommended reducing by 25 percent the Schedule SHL kWh charges applicable to LED customers assigned to Rate Groups D and E to reflect the lower cost of operating and maintaining LED fixtures.  And he added that, in the

---

[939] Cities Ex. 4 (Goins Direct) at 22-23.

[940] *Id*. at 23.

[941] *Application of El Paso Electric Company to Change Rates, to Reconcile Fuel Costs, to Establish Formula-Based Fuel Factors, and to Establish an Energy Efficiency Cost Recovery Factor*, Docket No. 37690 (July 30, 2010).

future, ETI should be required to provide detailed information regarding differences in the cost of serving LED and non-LED lighting customers.[942]

Dr. Goins also requested that the Commission require ETI to eliminate the service condition applicable to Rate Groups A and C in Schedule SHL that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb. He stated that this fee actively discourages customers from adopting more energy-efficient lighting technologies (for example, LED devices), and was not supported in ETI's filing. In Dr. Goins' view, this barrier to conservation and efficiency improvements should be eliminated.[943]

Staff disagrees with Cities' request that ETI institute a discounted lighting rate for LED installations. Mr. Abbott testified that Cities did not provide empirical cost data to support this request. Without data on which to base an LED installation discount, he recommended that the Commission not require ETI to provide such a discount at this time. However, because of the growing use of LED installations and the potential cost savings to be realized from these installations, Mr. Abbott did recommend that the Commission require ETI to perform a cost study to determine appropriate cost-based rates for LED installations. This cost study could be used to develop LED lighting rates, which Mr. Abbott recommended ETI be required to submit as part of its next base-rate case.[944]

ETI is willing to perform a study to determine the feasibility of implementing LED lighting rates as part of its next base rate case filing. ETI witness Talkington explained that the Company does not currently offer ETI-owned LED lights but may do so in the future. She stated that if a customer wishes to use LED technology, it can install LE fixtures and receive service under Schedule SHL, Rate Groups D and E, or the existing Schedule TSS.[945]

---

[942] Cities Ex. 4 (Goins Direct) 22-26.

[943] *Id*.

[944] Staff Ex. 7 (Abbott Direct) at 28.

[945] ETI Ex. 67 (Talkington Rebuttal) at 17.

Ms. Talkington took issue with Dr. Goins' proposed 25 percent decrease in Schedule SHL (Rate Groups A and C) and Schedule TSS for an LED option because the 25 percent rate reduction was not calculated. Thus, ETI prefers that it propose rates after a cost study. Ms. Talkington also disagreed with Dr. Goins' proposal for a 25 percent decrease in the energy-only options under Schedule SHL, Rate Groups D and E or Schedule TSS for customer-owned lights. She believes that a customer will have the benefit of more efficient LED lights by the reduction in energy consumed.[946]

The ALJs find persuasive Dr. Goins' testimony that: (1) the cost of street and traffic lighting services can be significant for many cities and towns; (2) government agencies face increasing pressure to control budgets and energy-efficient lighting is a good option; (3) LED fixtures use significantly less energy than incandescent and most other light options, last longer, and may require less maintenance; and (4) LED lighting rates would encourage municipalities to adopt energy-efficient LED options and help offset the high front-end cost of LED lights.[947] However, the ALJs concur with ETI and Staff that ETI should be directed to perform a LED lighting cost study before extensive changes are made to its lighting rates. The ALJs further recommend that ETI conduct this study before filing its next rate case and provide the results of any completed study to Cities and interested parties as soon as practicable but no later than the filing of its next rate case, as requested by Cities. Further, the ALJs recommend that the study include detailed information regarding differences in the cost of serving LED and non-LED lighting customers, if ETI has LED lighting customers taking service at the time it conducts its study. Finally, the ALJs note that ETI did not dispute Dr. Goins' suggestion to eliminate the service condition for Rate Groups A and C in Schedule SHL that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb. As noted by Dr. Goins, this fee discourages customers from adopting more energy-efficient lighting (such as LED devises). The ALJs concur and recommend that ETI modify the applicable tariffs to eliminate this fee for any replacement of a functioning light with a lower-wattage bulb.

---

[946] *Id.* at 17-18.

[947] Cities Ex. 4 (Goins Direct) at 24-25.

## 2. Demand Ratchet

Staff witness Abbott testified that a demand ratchet is a provision in a utility's tariff that allows it to bill a customer based upon on the greater of either demand by that customer in the current month, or some fixed percentage of the customer's demand occurring during previous months. The Commission approved a settlement in Docket No. 37744, ETI's last base rate case, in which, among other things, ETI agreed to eliminate all life-of-contract demand ratchets from its tariffs for new customers with the implementation of rates. ETI further agreed that, in its next rate case, it would eliminate the life-of-contract ratchet for existing customers.[948] The Docket No. 37744 stipulation stated:

> Life-of-Contract Demand Ratchet. The Signatories agree that the life-of-contract demand ratchet provision in Rate Schedules Large Industrial Power Service [LIPS], Large Industrial Power Service-Time of Day [LIPS-TOD], General Service [GS], General Service-Time of Day [GS-TOD], Large General Service [LGS], and Large General Service-Time of Day [LGS-TOD] shall be excluded from the rate schedules in ETI's next rate case. The Signatories further stipulate that the foregoing rate schedules will be revised so that the life-of-contract demand ratchet provision shall not be applicable to new customers and, for existing customers, shall not exceed the level in effect on August 15, 2010.[949]

ETI then filed compliance tariffs in Docket No. 37744, which implemented the first part of the settlement by excluding new customers from its proposed life-of-contract demand ratchet. The following is the relevant sections from that compliance tariff, which is applicable to Large Industrial Power Service (LIPS) customers (all customers taking service under this tariff are required to enter into a service agreement contract with ETI):

---

[948] Staff Ex. 7 (Abbott Direct) at 16; *Application of Entergy Texas, Inc., for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744, Order at FOF 26(f) (Dec. 13, 2010). The ratchet is applicable to the General Service (GS), General Service – Time of Day (GS-TOD), Large General Service (LGS), Large General Service – Time of Day (LGS-TOD), Large Industrial Power Service (LIPS), and Large Industrial Power Service – Time of Day (LIPS-TOD).

[949] TIEC Ex. 27 (Docket No. 37744 Stipulation and Settlement Agreement) at 6.

VI.     DETERMINATION OF BILLING LOAD
        The kW of Billing Load will be the greatest of the following:

(A)     The Customer's maximum measured 30-minute demand during any 30-minute interval of the current billing month, subject to §§ III, IV and V above; or

(B)     75% of Contract Power as defined in § VII; or

(C)     **(1) For existing accounts with contracts for service for loads existing prior to August 15, 2010 – 60% of the Highest Contract Power established prior to August 15, 2010 as defined in § VII, (2) For new accounts with contracts for service for loads not existing prior to August 15, 2010 – Does Not Apply;** or

(D)     2,500 kW.

VII.    DETERMINATION OF CONTRACT POWER
        Unless Company gives Customer written notice to the contrary, Contract Power will be as defined below:

        **Highest Contract Power – the greater of (i) the highest Billing Load established under the currently effective contract, or (ii) the kW specified in the currently effective contract.**

        Contract Power- the highest load established under § VI (A) above during the 12 months ending with the current month. For the initial 12 months of Customer's service under the currently effective contract, the Contract Power shall be the kW specified in the currently effective contract unless exceeded in any month during the initial 12-month period.[950]

In this case, ETI changed the tariff provisions for all customers:

VI.     DETERMINATION OF BILLING LOAD
        The kW of Billing Load will be the greatest of the following:

(A)     The Customer's maximum measured 30-minute demand during any 30-minute interval of the current billing month, subject to §§ III, IV and V above; or

(B)     75% of Contract Power as defined in § VII; or

(C)     2,500 kW; or

(D)     **60% of the kW specified in the currently effective contract.**

VII.    DETERMINATION OF CONTRACT POWER
        Unless Company gives Customer written notice to the contrary, Contract Power will be as defined below:

---

[950] TIEC Ex. 29 (Tariff Approved in Docket No. 37744)(emphasis added).

> Contract Power shall be the highest load established under § VI(A) above during the 12 months ending with the current month. For the initial 12 months of Customer's service under the currently effective contract, Contract Power shall be the kW specified in the currently effective contract unless exceeded in any month during the initial 12-month period.[951]

The contested issue concerns ETI's new language. ETI maintains the new language is not a life-of-contract ratchet. Commission Staff, TIEC, and DOE disagree. Stated simply, Department of Energy (DOE) witness Dwight D. Etheridge testified that the introduction of the term "kW specified in the currently effective contract" transforms what was a 12-month ratchet into a life-of-contract ratchet.[952]

At the outset, the ALJs note that some of ETI's proposed tariffs do comply with the stipulation in the prior case. ETI eliminated the life-of-contract provisions for the GS and GS-ToD customer classes. However, ETI's new language for the remaining ratchet classes, according to Staff witness Mr. Abbott, has the effect of maintaining a slightly different type of life-of-contract demand ratchet.[953] The discussion in this section applies to the LIPS class but the same argument follows for LGS and GS classes.

The parties contesting ETI's demand ratchet language argue that: (1) ETI's compliance tariff in Docket No. 37744 was consistent with the parties' agreement; (2) ETI's proposal imposes a life-of-contract demand ratchet; (3) the service agreement and tariff are linked; and (4) the new demand ratchet is not equitable or cost-based. These arguments are set out below.

---

[951] ETI 67 (Talkington Direct) at Ex. MLT-R-4 at 15 (emphasis added). ETI changed the relevant language in its tariff in its rebuttal testimony. Thus, the testimony of Messrs. Etheridge and Abbott can be slightly confusing because these witnesses address the tariff initially proposed by ETI.

[952] DOE Ex. 1 (Etheridge Direct) at 11.

[953] Staff Ex. 7 (Abbott Direct) at 16-19.

> ➢ *The agreed tariff from Docket No. 37744 was consistent with the parties'*
> *agreement and shows how LIPS billing load should be calculated.*

Staff, TIEC, and DOE agree that when ETI filed the compliance tariff in Docket No. 37744, the only demand ratchet that remained in the LIPS tariff for ETI's new customers was a 12-month demand ratchet. ETI removed the life-of-contract ratchet that set a perpetual obligation for a customer to pay for power based on its highest contract power or a percentage of its contract power. Staff, DOE, and TIEC argue that ETI's action in removing those provisions was consistent with the agreement and is evidence of what ETI should have done in this case. They contend that ETI witness Ms. Talkington agreed that the settlement eliminated *both* the highest load established under the currently effective contract *and* the amount specified in the contract.[954] In other words, the compliance tariff tracked the agreement.

ETI does not directly respond to this argument: Ms. Talkington did not address this in her rebuttal testimony. However, ETI states that the ALJs should "not be distracted by ETI's initial error of unintentionally removing the contracted capacity provision as to new customers in its compliance tariffs in Docket No. 37744."[955] Apparently, ETI believes that the tariffs it filed in compliance with the Docket No. 37744 agreement were in error.

> ➢ *ETI proposes a demand ratchet in this case that is based on the contracted quantity*
> *stated in the tariff-required service agreement.*

All parties agree that what ETI proposes in this docket is different from the Docket No. 37744 tariff, as evidenced by Ms. Talkington:

Q:     So last time, when the company and the parties implemented the elimination
       of the life-of-contract ratchet, it eliminated the 60 percent ratchet applicable
       to both actual demand during the contract period or the contract – the amount
       specified in the contract.

A.     Yes, the way it's put in the schedule, yes.

Q:     And that's different than what you proposed in this case?

---

[954] Tr. at 1432.

[955] ETI Reply Brief at 91.

A:    *It is.*

Q:    And do you apply a different meaning to the agreement of what the life of contract ratchet meant than was applied in the tariff?

A:    Yes.  What we have in this case is that the life-of-contract power relates to the highest load established under the currently effective contract . . . [956]

According to ETI, its proposed language does not impose life-of-contract ratchet, as defined by Mr. Pollock in Docket No. 37744 or by Messrs. Etheridge and Abbot in this case.

| Witness | Definition |
|---------|-----------|
| Pollock | "A life-of-contract ratchet is based on the highest demand ever imposed by a customer during the term of the contract."  He further explained that ETI's proposed Docket No. 37744 tariff had "a life-of-contract ratchet [which] imposes a perpetual obligation to pay a minimum demand charge throughout the term of the contract."[957] |
| Etheridge | "A life-of-contract ratchet is a ratchet where you're not looking solely at current loads but some other loads in some prior period, so it creates a perpetual obligation to pay."[958] |
| Abbott | "[A] life of contract demand ratchet, which is based upon the highest demand established in the time period. . . . is one type of life-of-contact demand ratchet"[959] |

ETI argues that the above definitions all make reference to the demand actually imposed by the operations of the customer's physical plant.  But the contracted quantity provision it proposes is a minimum kW amount *contractually agreed* between the two parties to the service agreement, which is a required contract between the customer and ETI.[960]  ETI argues the provision is not set by actual events during the term of the contract or in a prior period of the term of the contract, or in a monthly or 30-minute time period within the term of the contract; rather, it is set in the contract:

---

[956]  Tr. at 1432-1433 (emphasis added).

[957]  DOE Ex. 3 (Docket No. 37744 testimony excerpt) at 5-6.

[958]  Tr. at 2004.

[959]  Tr. at 1817.

[960]  Mr. Etheridge testified that customers taking service under Schedule LIPS must sign a contract for service. Tr. at 1991.

> That contracted quantity is set as, to use Mr. Etheridge's words, "an estimate" that cannot be unilaterally changed by the Company; instead, a change to that kW amount could only be made through negotiation between the two parties or through a proceeding before the Commission. To use Mr. Pollock's definition, it is not a demand "imposed <u>by the customer during the term</u> of the contract." It is instead a fixed, contractually agreed to amount that is set as a condition of service prior to the contract term.[961]

In sum, ETI argues the provision in question are not life-of-contract ratchets that lock the customer into the highest demand ever imposed by the customer's actual load during the term of the contract. Rather, they are, at most, 12-month ratchets that set the billing demand over a 12-month period, but not the life of the contract, at 75 percent.

Staff suggests that the Commission does not, fortunately, have to determine what contract provision may or may not constitute a life-of-contract demand ratchet. Rather, the Commission must ensure that ETI fulfilled its obligations under the Docket No. 37744 settlement. Staff believes that the parties to that settlement understood the meaning of the life-of-contract term, ETI followed through with compliance tariffs that evidenced its understanding, and now ETI should be required to stick with its agreement.

> ➢ *The service agreement and tariff are linked.*

According to TIEC, ETI tries to make the argument that its proposal is justified because ETI and its large customers may sign an agreement for service that specifies a customer's contract power. This does not justify ETI's proposal because ETI's form "Agreement for Electric Service" expressly states that the agreement is subject to the terms of "applicable rate schedules."[962] Thus, maintains TIEC, the LIPS tariff billing load provisions impact a customer's contract power and can reasonably reduce a customer's billing load below its contract power if the customer has a reduction in load lasting longer than 12 months.

---

[961] ETI Initial Brief at 211 (footnotes omitted), *citing* Tr. at 1994, 2012.

[962] ETI Ex. 3, Schedule Q 8.8 at 11.1.

ETI's proposal should be rejected, argues TIEC, because it would allow the utility to indefinitely seek revenue from a customer that has nothing to do with the customer's actual usage or the utility's costs. For example, if a plant took 150 MW of load in its heyday, under ETI's proposal, the plant would be obligated to pay demand charges based on 60 percent of its original contract power. This is because ETI's standard agreement requires the utility's "express approval" to set a new contract power and the utility therefore could choose not to negotiate (or negotiate in a timely manner) a new contract power.[963] If LIPS billing load is tied to contract power, then its customers would be completely at its mercy to negotiate a reasonable contract power based on the customer's actual usage for the time period. TIEC contends this is a ridiculous result and would render the parties' agreement to eliminate the life-of-contract ratchet meaningless.

> ### ETI's new demand ratchet is not equitable or cost-based.

TIEC does not dispute that a 12-month ratchet is reasonable. However, Mr. Pollock, in Docket No. 37744, explained why a perpetual obligation to pay demand costs for load that the utility does not serve is objectionable:

> While it is appropriate to require customers to pay for the facilities they use, a perpetual obligation is both extreme and unnecessary. Typical demand ratchets reach back twelve months. A life-of-contract ratchet can reach back decades. This is particularly inappropriate when longstanding customers have permanently reduced operations. A customer that has reduced operations is not purchasing the same level of generation and transmission services as in the past, nor is ETI procuring the same level of generation and transmission services for the customer. Further, because of load growth on the ETI system, the capacity no longer being used by the customer would be used by other customers. Thus, a life-of-contract ratchet does not properly reflect cost-causation.[964]

> ### Witness Recommendations.

Staff witness Mr. Abbott recommended that ETI be required to eliminate from its LGS, LGS-ToD, LIPS, and LIP-ToD tariffs the language that results in a ratchet based upon the current

---

[963]  ETI Ex. 3, Schedule Q 8.8 at 11.2.

[964]  DOE Ex. 3.

effective contract-specific demand.     Also, if the Commission approves Mr. Abbott's
recommendation, he stated that the billing determinants used to calculate the rates for the affected
customer classes will likely change.  Therefore, ETI should be required to update the affected billing
determinants and reflect the resulting change in its rates in the compliance filing of this docket.[965]

DOE witness Etheridge also recommends that same for the LIPS tariff.  He specified
language that will exclude the life-of-contract ratchet language and retain the existing rolling
12-month ratchet language in Schedule LIPS.[966]  Specifically, he proposed the following:

VI.     DETERMINATION OF BILLING LOAD
The kW of Billing Load will be the greatest of the following:

(A)     The Customer's maximum measured 30-minute demand during any
30-minute interval of the current billing month, subject to §§ III, IV and V
above; or
(B)     [60%] of Contract Power as defined in § VII; or
(C)     2,500 kW.

VII.    DETERMINATION OF CONTRACT POWER
Unless Company gives Customer written notice to the contrary, Contract
Power will be as defined below:

Contract Power- the highest load established under § VI (A) above during the
12 months ending with the current month.  For the initial 12 months of
Customer's service under the currently effective contract, the Contract Power
shall be the kW specified in the currently effective contract unless exceeded
in any month during the initial 12-month period.

> ➤ *ALJs Recommendation.*

The ALJs find that ETI violated its agreement with the signatories in Docket No. 37744:  the
tariff language proposed by ETI is a life-of-contract demand ratchet.  ETI failed to explain how the
compliance tariffs adopted in Docket No. 37744 were in error.  ETI's argument that its new
language is not a life-of-contract demand ratchet was unpersuasive.  To justify its modification, ETI

---

[965]  Staff Ex. 7 (Abbott Direct) at 20.

[966]  ETI can adopt similar language for its LGS, LGS-ToD, LIPS, and LIP-ToD tariffs.

relied only on a portion of Mr. Pollock's Docket No. 37744 definition. Moreover, both Messrs. Abbott and Etheridge were unequivocal that ETI, contrary to its agreement in the previous rate case, is imposing a life-of-contract or perpetual obligation to pay. Finally, the weight of the evidence supports a finding that the demand ratchet ETI proposes in this case is not equitable or cost based. The ALJs recommend that ETI's proposed LIPS tariff be amended to include the language proposed by Mr. Etheridge. The ALJs concur with Mr. Etheridge that, with such language, ETI has a financial incentive to negotiate the maximum possible contracted level of capacity, not the minimum, and the result is consistent with the Docket No. 37744 agreement.

### 3. Large Industrial Power Service (LIPS)

TIEC witness Pollock explained that Schedule LIPS recovers base rates through a seasonally adjusted demand charge (per kW) and a two-step non-fuel energy charge (per kWh). The demand charges are also adjusted (either up or down) to reflect the differences in costs by delivery voltage. ETI's existing LIPS schedule has no customer charge. In its initial filing, ETI removed all purchased power capacity costs from base rates and proposed recovering them through a PPR as a demand charge. When it did so, the proposed demand charges were increased, but the proposed non-fuel energy charges were substantially reduced. Following the Supplemental Preliminary Order, which removed the PPR from further consideration, ETI proposed to roll these costs back into base rates. The resulting rebundled demand and energy charges would increase by about the same percentage.[967]

Mr. Pollock testified that the proposed structure of Schedule LIPS does not track costs as derived in ETI's class cost-of-service study. Specifically, he complained: (1) there is no customer charge, despite the fact that the customer costs allocated to the LIPS class would translate into a monthly rate of over $6,000, and (2) the proposed non-fuel energy charges would recover a significant amount of demand related costs. According to Mr. Pollock, production/transmission demand-related costs are $8.47 per kW, and distribution costs add another $0.99 per kW, for a total of $9.46 per kW. The proposed LIPS demand charges are $7.07 per kW for transmission delivery

---

[967] TIEC Ex. 1 (Pollock Direct) at 68-69.

and an additional $1.82 for distribution service, for a total of $8.89 per kW. Thus, in Mr. Pollock's opinion, the proposed demand charges (given ETI's requested rate increase) are too low. By contrast, he noted, non-fuel energy costs are about 0.226¢ per kWh, while the proposed non-fuel energy charges would average over 0.600¢. Thus, these charges are 2.5 times higher than the non-fuel energy costs based on ETI's filing.[968]

### (a) A New Customer Charge

TIEC urged that any increase in Schedule LIPS should be used to create a customer charge. Mr. Pollock calculated that a cost-based customer charge should be about $6,050 per month, and he recommended an initial customer charge of $6,000 per month. This would collect approximately $5.9 million ($6,000 x 984 bills). He added that any remaining increase not accounted for by the initial customer charge should be collected in the demand charges. He also stated that the non-fuel energy charges should not be changed unless the LIPS class is allocated less than a $5.9 million increase. In that event, he recommended that the non-fuel energy charges should be decreased. This would gradually correct the imbalance between the below-cost demand charges and above-cost energy charges. Mr. Pollock further stated that the delivery voltage adjustment applicable to distribution service should be retained so that the rate better reflects the cost. Should the LIPS class not receive an increase or if base rates are decreased, Mr. Pollock recommended that the customer charge should be reduced proportionally. Any remaining revenue surplus should be applied to reduce the non-fuel energy charges to cost and then to reduce the demand charges.[969]

Staff witness Abbott also recommends the introduction of a customer charge, but a much smaller one than that recommended by Mr. Pollock – $630.[970]

DOE supports Staff's proposed $630 customer charge. DOE witness Etheridge testified that TIEC's proposed $6,000 customer charge far exceeds a reasonable initial customer charge for Schedule LIPS. For example, the existing Commission-approved monthly customer charge for

---

[968] TIEC Ex. 1 (Pollock Direct) at 69-70.

[969] *Id*. at 70.

[970] Staff Ex. 7 (Abbott Direct) at 27.

Schedule LGS is $425.05. Mr. Etheridge stated that the introduction of a $6,000 customer charge will lead to large shifts in intra-class revenue responsibility from high load factor customers to low load factor customers because a customer charge does not vary with usage. He noted, as an example, that TIEC's proposal would increase DOE's Big Hill annual costs by $72,000 or nearly 10 percent. Moreover, Mr. Etheridge pointed out that two parties are proposing to lower the Schedule LGS customer charge—approving either of these recommendations and TIEC's would levy Schedule LIPS customers with a new customer charge that is over 23 times the level of the LGS class. He believes such inconsistencies are inexplicable. Additionally, such disparity would present a challenge to any customer migrating from the LGS to the LIPS class.[971]

DOE witness Etheridge agreed that is appropriate to move toward cost-based rates, however, he indicated that gradualism should be properly applied to move rates toward cost without undue impact on low usage and low load factor customers in the LIPS class. If a new customer charge for the LIPS class is to be imposed—it should be that recommended by Commission Staff.[972]

The ALJs are persuaded by Mr. Etheridge's testimony that the adoption of a $6,000 customer charge far exceeds ETI's existing customer charge in the LGS Schedule and results in a significant and inappropriate impact to low load factor customers. Rather, Mr. Abbott's proposed customer charge of $630 is an appropriate charge to this customer class, particularly as ETI's current rates applicable to LIPS customers do not include any customer charge.[973]

### (b)          Demand and Energy Charges

In an effort to move more towards cost-based rates, Mr. Abbott recommends a slight decrease in the LIPS energy charges and an increase in the demand charges from current rates.[974] Mr. Pollock does not recommend an increase in energy charges. However, he recommends increasing demand charges to cover any remaining revenue increase for the LIPS class that is not

---

[971]  DOE Ex. 2 (Etheridge Cross-Rebuttal) at 3-4.

[972]  DOE Ex. 2 (Etheridge Cross-Rebuttal) at 5.

[973]  TIEC Ex. 1 (Pollock Direct) at 70.

[974]  Staff Ex. 7 (Abbott Direct) at 27.

accounted for with the customer charge. He suggested that such a change will gradually correct the imbalance between the below-cost demand charges and above-cost energy charges.[975]

DOE witness Etheridge expressed concerns with both proposals. He stated that Schedule LIPS customers are, on average, substantially more energy intensive than customers taking service under Schedule LIPS-TOD customers. He indicated that TIEC's proposed rate design (with the $6,000 customer charge) would double the cost increase associated with base rates and the fuel factor for LIPS-TOD customers compared with the average cost increase for the class as a whole. Customers with lower load factors than Schedule LIPS-TOD customers would fare even worse.[976]

Mr. Etheridge also was concerned about Staff's proposed charges, noting that Mr. Abbott failed to explain how the slight decrease in the LIPS energy charge and the large increase in the demand charge would affect customers with changes in the revenue requirement ultimately assigned to the class. Mr. Etheridge stated that even Staff's proposed changes will noticeably shift intra-class cost responsibility toward Schedule LIPS customers with relatively low load factors. To address his concern that changes in the revenue requirement may have a significant impact even with Staff's gradual movement in rates, Mr. Etheridge recommended that Staff's proposal should set the limit on intra-class cost responsibility shifts.[977]

The ALJs find evidentiary support for and recommend the adoption of Mr. Abbott's proposed changes to Schedule LIPS. There is sufficient evidence, based on Mr. Pollock's testimony, that Mr. Abbott's suggested changes gradually move the rates towards cost without the risk of rate shock. TIEC's demand and energy proposals result in unreasonable large shifts in intra-class revenue responsibility. However, the ALJs also agree with Mr. Etheridge that Staff's proposal may need to be adjusted depending on the ultimate revenue requirement adopted.

---

[975]  TIEC Ex. 1 (Pollock Direct) at 70.

[976]  DOE Ex. 2 (Etheridge Cross-Rebuttal) at 5.

[977]  DOE Ex. 2 (Etheridge Cross-Rebuttal) at 5.

### 4.  Schedulable Intermittent Pumping Service (SIPS)

DOE proposes that a new rider, Schedulable Intermittent Pumping Service (SIPS), be included in the LIPS tariff.  This will allow DOE and other customers with intermittent pumping loads to avoid application of a demand ratchet to schedulable, temporary, increased demand during off-peak months when ETI's costs are lowest.  DOE suggests that the proposed rider will allow the DOE to schedule important testing and oil exchanges, when possible, during off-peak months, is consistent with existing riders, and does not adversely impact other customers.

DOE explained that its Strategic Petroleum Reserve (Reserve) Texas sites—Big Hill in Jefferson County and Bryan Mound in Brazoria County—play an important role in ensuring the energy security of the United States.  With a crude oil inventory of about 726.5 million barrels in 2010, the Reserve is the largest emergency supply of oil in the world.  The Reserve was established by Congress as a result of the oil supply disruption in the early 1970s.[978]

DOE witness Etheridge testified that DOE takes service to its Big Hill site under Schedule LIPS at an annual cost of approximately $770,000.  Mr. Etheridge explained that the Reserve's sites typically operate in standby mode, with routine cyclical tests of pumping equipment.  The largest of these tests is performed every other year.  These cyclical equipment tests can be coordinated with ETI so that they occur during low peak periods.[979]

On rare occasions, the Reserve can also be tapped.  In its nearly 35 years of operations, there have been three Presidential-ordered drawdowns:  January 1991, the beginning of Desert Storm; September 2005, Hurricane Katrina; and July-August 2011, the International Energy Agency coordinated release.  The latter was the largest of the three drawdowns at 30.6 million barrels. Additionally, the Reserve has provided support to the oil industry in localized emergency or operational situations involving a disruption in supply, such as ship channel closures and hurricanes.

---

[978]  DOE Ex. 1 (Etheridge Direct) at 3.

[979]  DOE Ex. 1 (Etheridge Direct) at 3-4

When oil is exchanged during these situations, the Reserve will operate pumps at higher levels than would occur during normal standby operations.[980]

Mr. Etheridge proposed a rider to Schedule LIPS where maximum demands during pre-scheduled, non-summer month operations of a limited duration are not subject to demand ratchets. For this new rider, he proposed that the non-summer months be classified as October through May to give customers and ETI more flexibility. (Under Schedule LIPS, non-summer months are November through April.) Key provisions of the proposed SIPS rider include:

➢     A requirement that customers schedule with ETI limited duration operations during non-summer months four weeks in advance.

➢     ETI must approve scheduled operations.

➢     Operations would not be allowed to exceed 10,000 kW in magnitude nor last for more than 80 hours per year.

➢     ETI could cancel operations at any time if a capacity constraint develops. If a customer failed to comply, the customer would incur costs associated with ETI's ratchet.

➢     A customer in compliance would not be subject to ETI's demand ratchets for loads established during those operations, but would pay the demand charge in the month in which the operations occur.[981]

Mr. Etheridge gave an example of charges under Schedule LIPS versus charges if the rider were adopted. In September 2010, Big Hill conducted a test and established a maximum measured demand of 11,640 kW, well above the site's average maximum demand of approximately 3,000 kW. DOE paid demand charges on the 11,640 kW in September 2010. In October 2010, ETI billed DOE for 75 percent of that level of demand or 8,730 kW based on the rolling 12-month ratchet. Its actual demand was 2,520 kW. In terms of actual costs, DOE paid $683,000 for its September usage. Under the 75 percent ratchet, DOE would pay $609,000 per month. Mr. Etheridge estimated that the

---

[980]   DOE Ex. 1 (Etheridge Direct) at 3-4.

[981]   DOE Ex. 1 (Etheridge Direct) at 18.

charges amounted to $59/kW per year, which could easily represent nearly one-half of the annual carrying cost of a combustion turbine. Whereas, under the proposed rider, if DOE conducted the test in February as it intended to, it would have paid ETI for the 11,640 kW level of demand, but the usage would not be used in conjunction with ETI's ratchets. Mr. Etheridge concluded ETI's tariff is not equitable. At the hearing, Mr. Etheridge estimated that the rider's impact on other customer classes at approximately $500,000, where Schedule LIPS base rate revenues are approximately $110 million.[982]

According to DOE, for 15 years, June 1996-June 2011, ETI, by contract, accommodated the Reserve's intermittent load by allowing the DOE to, once annually, "reset" the demand level to be used by ETI when applying demand ratchets. The DOE was able to avoid significant demand charges when typical demand was very low. After June 2011, ETI declined to apply the terms of the long-time contract and allow the reset. DOE concedes that cost-based rates to reflect the Reserve's unique operations should ultimately be addressed by contract and/or new tariffs.

DOE notes that the very purpose of some riders is to address specific customer characteristics. For instance, Standby and Maintenance Service is available only to those customers that co-generate electricity; the Optional Rider to Schedule LIPS for Pipeline Pumping Service alters the designation of on peak-hours only for customers with pipeline pumping stations. Other riders, claims DOE, seek a win-win for all customers. For instance, the Rider to LIPS for Planned Maintenance rewards customers for scheduling routine maintenance and idling facilities during ETI's peak summer months of June through September by waiving the demand ratchet. DOE argues that the proposed SIPS rider mirrors Planned Maintenance by waiving the demand ratchet if customers are able to schedule intermittent loads outside of ETI's peak summer months. Moving toward cost-based rates is not discriminatory, claims DOE. Nor is rewarding customers who use their load scheduling flexibility for the benefit of all customers.

DOE's proposed SIPS rider is opposed by ETI, TIEC, and Staff.

---

[982] DOE Ex. 1 (Etheridge Direct) at 19-20; Tr. at 2034.

ETI witness Talkington testified that the actual Reserve load, as Mr. Etheridge described, does not appear to match the parameters of his proposed SIPS rider. As recently as July and August 2011, the Reserve sites had significant load requirements in order to pump vast quantities of oil. She further testified that the Reserve loads are random in occurrence and are significant. ETI must at all times maintain generation resources to meet this significant and randomly occurring load. In addition, the Company has invested in transmission and other facilities to serve this customer even if there is no or very little consumption. She believed it would not be appropriate or equitable to other customers to remove or forgive the 12-month ratchet provision after the Company made these investments to serve the Reserve and while the Company has maintained generation to meet its load. If the 12-month ratchet were forgiven, then the costs incurred to serve DOE would have to be borne by other customers in the LIPS rate class.[983]

TIEC witness Pollock complained that Mr. Ethridge failed to analyze the impact on other LIPS customers. Mr. Pollock contended the rider would discriminate against both Schedule LIPS customers (by redefining the summer billing period) and Schedule SMS customers (whose ability to schedule maintenance power could be subordinate to LIPS customer taking advantage of the new Rider).[984]

Staff is concerned that the rider's unusual eligibility requirements—that a customer must schedule load four weeks in advance, limit the high load occurrence to "off-peak months" (which is redefined in the rider), and limit the yearly hours of load—indicate it is tailored solely to meet the unique needs of the Reserve. According to Staff, DOE conceded that, although other customers with intermittent loads might take advantage of the proposed SIPS rider, Mr. Etheridge was not aware of any other actual customer that could do so.[985] Staff argues the rider appears to offer unreasonably preferential treatment to the DOE and should be rejected.

---

[983] ETI Ex. 67 (Talkington Rebuttal) at 41.

[984] TIEC Ex. 3 (Pollock Cross Rebuttal) at 9-10, 44-46.

[985] Tr. at 2008 ("Q: Now, who else would take advantage of this SIPS rate schedule, other than DOE? A: It's written such that any other customer that would have an intermittent schedulable load could take advantage of it. But I'm not sure if there are other customers on Entergy's system that could take advantage of it. Q: So

Beyond issues of discrimination, Staff is also concerned that the rider would shift costs from the DOE to other LIPS customers. Although DOE indicates that any shift would have a small overall impact on the LIPS class, Staff argues that the Commission should not endorse any discriminatory rate rider.

Although Staff and TIEC claim the proposed rider is discriminatory, other riders applicable to Schedule LIPS customers are available at different times of the year as well (Planned Maintenance is available only during the months of June through September) and others are limited to customer-specific needs—such as PPS for pipeline customers. Mr. Etheridge testified that this rider could apply to any customer—it is not restricted solely to the DOE. The ALJs do not find this rider to be unreasonably discriminatory. As to ETI's concern on this issue, it was focused on whether the DOE's load met the proposed rider's requirements. However, if a customer taking service under the rider is unable to schedule its maintenance and oil exchanges with ETI, then the usage would be under the SIPS Schedule and the SIPS tariffed demand ratchet would apply. Moreover, Mr. Etheridge testified that the impact on other customer classes is limited. As to ETI's cost recovery, the LIPS rider customers will pay a demand charge to cover the costs they impose on the system in the month SIPS service is taken. The ALJs agree with DOE that the SIPS rider is reasonable and should be adopted.

### 5. Standby Maintenance Service (SMS)

TIEC witness Pollock explained that Schedule SMS applies to customers that use self-generation to supply a portion of their electricity requirements. These customers contract with ETI for either standby and/or maintenance power service to replace capacity or energy normally generated by the customer's on-site generation. Standby (or backup) power is electric energy or capacity supplied to replace energy or capacity that is unavailable due to an unscheduled or forced outage of the facility. Thus, backup power must be available at any time. Maintenance power is electric energy or capacity supplied during a scheduled outage. Unlike backup power, maintenance power must be arranged with 24-hour notice and only during such times and at such locations that,

---

you don't know that there are others who could use it. This could apply just to DOE? A: It could.").

in ETI's opinion, will not result in adversely affecting or jeopardizing firm service to other customers, prior commitments, or commitments to other utilities. In addition, the customer must make arrangements and schedule maintenance power in writing in advance and confirmed in writing by ETI. ETI can also limit requests for maintenance power and allocate and schedule available service, if requests are made from more than one customer. Thus, Mr. Pollock stated that maintenance power is of a lower quality of service than backup or standby power. He also indicated that, because the Company can limit the amount of maintenance power, it is more likely that customers would prefer to schedule maintenance power during the non-summer months.[986]

ETI witness Talkington explained that standby service includes both the readiness to serve and the actual delivery of power and energy delivered when a customer requires service due to a forced outage or a planned maintenance period. She indicated that many utilities offer a combination of pricing and terms for demand and energy service as well as a form of reservation charge dealing with the readiness to serve. She further indicated that the actual rate design may differ, but standby tariffs usually contain provisions for back-up (forced outage) or maintenance (planned outage). She concluded that ETI's current rate schedule provides for these features, and ETI is not proposing to change Schedule SMS in this proceeding.[987]

TIEC proposes to redesign SMS service to better reflect the cost characteristics of standby and maintenance power customers. Mr. Pollock provided his analysis to support TIEC's position. Under the current Schedule SMS, customers pay a monthly demand (or billing load) charge of $1.12 per kW for backup power. The corresponding charges for maintenance power are $1.12 per kW for outages during the summer months (May through October) and $0.84 per kW for outages during the non-summer months. Thus, the non-summer month charge is 75 percent of the summer month charge. Energy is priced under an array of time-differentiated charges, as shown in the table below:[988]

---

[986] TIEC Ex. 1 (Pollock Direct) at 70-71.

[987] ETI Ex. 67 (Talkington Rebuttal) at 19-20.

[988] TIEC Ex. 1 (Pollock Direct) at 72-73.

| Current Schedule SMS Non-Fuel Energy Charges (¢ per kWh) | | |
|---|---|---|
| Delivery Voltage | On-Peak[989] | Off-Peak |
| Distribution (less than 69KV) | 3.386¢ | 0.514¢ |
| Transmission (69KV and greater) | 2.334¢ | 0.211¢ |

Mr. Pollock examined P.U.C. SUBST. R. 25.242(k)(1) and concluded that, for Standby Service, cost-based standby rates should recognize system-wide costing principles and must not be discriminatory. According to his analysis, the SMS demand charges should be $0.82 per kW for delivery at transmission and $2.64 per kW for delivery at distribution. He also determined that cost-based energy charges should be as follows:[990]

| Cost-Based Schedule SMS Non-Fuel Energy Charges (¢ per kWh) | | |
|---|---|---|
| Delivery Voltage | On-Peak | Off-Peak |
| Distribution (less than 69KV) | 0.955¢ | 0.639¢ |
| Transmission (69KV and greater) | 0.916¢ | 0.614¢ |

Mr. Pollock explained that, on average, 7 percent of Schedule SMS billing demand was coincident with ETI's summer month system peaks. This compares to 74 percent for Schedule LIPS; thus, the ratio of the SMS to LIPS coincidence factors is 12 percent. By Mr. Pollock's calculations, the resulting demand charge for transmission service would be $0.82 per kW ($7.07 x 12 percent), and the corresponding SMS distribution demand charge would be the sum of the transmission charge and the Schedule LIPS distribution demand charge, or $2.64 per kW ($0.82 + $1.82).[991]

---

[989] On-peak hours are from 1:00 p.m. to 9:00 p.m., Monday through Friday of each week, beginning on May 15 and continuing through October 15. In addition, fuel charges are priced at avoided energy cost as calculated under Schedule LQF. TIEC Ex. 1 (Pollock Direct) at 72.

[990] TIEC Ex. 1 (Pollock Direct) at 73-74 and Ex. JP-15.

[991] *Id*. at 72-74.

Mr. Pollock testified that he combined production and transmission costs in deriving a cost-based schedule SMS demand charge for transmission delivery, because both production and transmission demand-related costs are allocated to customer classes using the A&E 4CP method. This method recognizes that production/transmission plant is sized to meet the diversified summer peak demands of all ETI customers. That is, Mr. Pollock stated, the 4CP demands are a primary driver of the costs of the power plants, PPAs, and transmission facilities. As noted above, Mr. Pollock contended and verified by analysis that a cost-based Schedule SMS demand charge should be only 12 percent of the corresponding demand charge for Schedule LIPS.[992]

Mr. Pollock also stated that he proposed to differentiate the standby demand charge by delivery voltage because it more directly recognizes the different costs to provide service at transmission and distribution voltage. He added that this recommendation is consistent with the current Schedule SMS energy charges.[993] However, Mr. Pollock did not apply the 12 percent coincidence ratio to determine the distribution-related schedule SMS demand charge. He explained that distribution facilities are electrically closer to customers, so a customer's peak demand determines how distribution facilities must be sized to ensure reliable service. He stated that ETI recognized this driver by using maximum diversified demand to allocate distribution demand-related costs. For this reason, Schedule SMS customers require the same amount of distribution capacity as a similarly sized Schedule LIPS customer. Thus, according to Mr. Pollock, the Schedule SMS distribution demand charge should be the same as the corresponding Schedule LIPS demand charge.[994]

Concerning energy charges, Mr. Pollock testified that the Schedule SMS energy charge should reflect the composite Schedule LIPS energy charges, or 0.614¢ per kWh. In his view, a Schedule SMS customer should also pay additional demand charges during on-peak hours, because this would recognize that an SMS customer that purchases more energy during on-peak hours would more closely resemble a LIPS customer. For this reason, cost-based on-peak energy charge should

---

[992] *Id*. at 75-77.

[993] TIEC Ex. 1 (Pollock Direct) at 77.

[994] *Id*. at 77-78.

be a composite of the Schedule LIPS energy charge and the remaining demand charges (not collected in the SMS demand charge). He calculated an additional on-peak energy charge of 0.303¢, which yields a total on-peak energy charge of 0.917¢. Under this structure, an SMS customer that experiences an outage would pay approximately the same for electricity as a LIPS customer.[995]

In summary, Mr. Pollock contended that Schedule SMS should be reduced to more closely reflect the cost of providing standby service as follows:[996]

| Cost-Based Schedule SMS Charges Based on ETI's Proposed Schedule LIPS Design | | |
| --- | --- | --- |
| Charge | Distribution (less than 69kV) | Transmission (69kV and greater) |
| Billing Load Charge ($/kW) | | |
| Standby | $2.64 | $0.82 |
| Maintenance | $2.44 | $0.62 |
| Non-Fuel Energy Charge (¢/kWh) | | |
| On-Peak | 0.955¢ | 0.916¢ |
| Off-Peak | 0.639¢ | 0.614¢ |

Using his recommended Schedule LIPS rate design, he proposed Schedule SMS charges shown in the table below:[997]

| TIEC Proposed SMS Charges | | |
| --- | --- | --- |
| Charge | Distribution (less than 69kV) | Transmission (69kV and greater) |
| Customer Charge (Stand Alone) | $6,000 | |
| Billing Load Charge ($/kW) | | |
| Standby | $2.46 | $0.79 |
| Maintenance | $2.27 | $0.60 |
| Non-Fuel Energy Charge (¢/kWh) | | |

---

[995] *Id*. at 77-78; Ex. JP-15.

[996] *Id*. at 79.

[997] TIEC Ex. 1 (Pollock Direct) at 80.

| On-Peak  | 0.881¢ | 0.846¢ |
| Off-Peak | 0.575¢ | 0.552¢ |

Mr. Pollock based his recommended charges on ETI's proposed revenue requirements and class revenue allocation. If the Schedule LIPS revenue requirement is reduced, the charges should be correspondingly reduced. Mr. Pollock also added a customer charge, but he stated that the customer charge should not apply if a Schedule SMS customer also purchased supplementary power under another applicable rate.[998]

To determine maintenance power charges, Mr. Pollock maintained the same relationship; that is, the current maintenance power demand charge is 75 percent of the standby power demand charge. He stated that the 75 percent should apply to the production/transmission component of the recommended standby power demand charge because distribution costs are caused by maximum demands occurring at any time, as previously discussed. This would result in a $0.20 and $0.19 per kW differential based on ETI's proposed and Mr. Pollock's recommended Schedule LIPS designs, respectively.[999]

The ALJs note that Mr. Pollock's suggested changes to Schedule SMS are extensive. For instance, he introduced a $6,000 customer charge and, for the monthly billing load (demand) charges, he introduced separate rates for distribution and transmission customers.[1000]

Ms. Talkington testified that Mr. Pollock erred in using load data for the period of 2007 through 2011 to develop a coincidence factor that he then uses to develop a lower back-up and maintenance demand charge for transmission-level customers, while significantly increasing the charge for distribution-level customers. She also stated that Mr. Pollock's proposal fails to recognize the "readiness to serve" aspect of standby service. ETI must be ready to serve the load

---

[998] *Id*. at 79.

[999] TIEC Ex. 1 (Pollock Direct) at 80.

[1000] TIEC Ex. 1 (Pollock Direct) at 80.

represented by the largest generation unit taking standby service, plus account for the forced outage rates for all other existing customer-owned generators.[1001]

Ms. Talkington also stated Mr. Pollock failed to recognize that standby load does not lend itself to the typical rate design practices. She opined that the cost of providing SMS service is not driven only by the degree to which standby customers contribute to peak demand, but also by the Company's obligation to serve whenever called upon. This is the major reason Schedule SMS is not included in the development of allocation factors.[1002]

Ms. Talkington admitted that she is not familiar with how ETI originally developed Schedule SMS, but stated that she knows that when a customer takes back-up or maintenance service, costing is generally designed to mimic what the customer would have paid on standard rates, absent the use of its own generator. She concluded that Mr. Pollock's analysis is over-simplified and incomplete.[1003]

In rebuttal testimony, Ms. Talkington proposed a new rate design for SMS service, including a new service, Non-Reserved Service, which is an optional service designed to supplement Maintenance Service. ETI's new SMS proposal increases ETIs test year base rate revenues by 53.27 percent, with an overall increase of $5.1 million. ETI did not include this rate increase in its notice.[1004] Accordingly, the ALJs determine that ETI's new SMS proposal is not an option to be considered in this case.

Commission Staff does not oppose ETI's request to retain its current Schedule SMS.

---

[1001] ETI Ex. 67 (Talkington Rebuttal) at 20-21.

[1002] ETI Ex. 67 (Talkington Rebuttal) at 21.

[1003] ETI Ex. 67 (Talkington Rebuttal) at 21-22.

[1004] PURA § 36.102 and P.U.C. PROC. R. 22.51 require a utility to publish notice of its intent to change rates, with proposed revisions of tariffs and a detailed statement of each proposed change, the effect it is expected to have on revenues, the class and number of customers affected by the change.

ETI did not demonstrate how its current rates are just and reasonable. Rather, ETI's evidence on the reasonableness of Schedule SMS is conclusory and insufficient in light of Mr. Pollock's testimony that the rates are not cost-based. Moreover, although Ms. Talkington indicated her concern with Mr. Pollock's analysis, she provided no quantitative support for her concern. The ALJs, however, are concerned that Mr. Pollock's suggested changes are not accompanied by a rate impact analysis. And, as noted above, his suggested changes are extensive. Mr. Pollock's recommendations included a significant increase in the charge for distribution-level customers. Consistent with his Schedule LIPS recommendation, Mr. Pollock also included a $6,000 customer charge when no previous customer charge existed. Again, there is no analysis as to the effect such a charge would have on customer bills. The testimony of witnesses Benedict, Abbott, Higgins, and Pevoto caution that gradualism should be considered in rate design. As noted by Mr. Higgins, "full movement to cost-based rates in a single step is sometimes opposed on the grounds of intra-class rate impacts."[1005] However, the rate impact at this time is not known.

Based on the evidence and discussion above, the ALJs recommend adoption of Mr. Pollock's suggested changes to Schedule SMS , with the exception of a $6,000 customer charge. Consistent with the ALJs' recommendation that a new LIPS charge of $630 is reasonable, the SMS charge should be limited to $630 and, as suggested by Mr. Pollock, not apply if a Schedule SMS customer also purchased supplementary power under another applicable rate.

## 6. Additional Facilities Charge (AFC)

Mr. Pollock testified that Schedule AFC is the mechanism for charging customers directly for the costs of transformers, breakers and lines when those facilities provide service only to specific customers. Some of these facilities are booked to transmission accounts while others are booked to distribution accounts. Schedule AFC is applied as a percentage of the original (un-depreciated) cost of the facilities.[1006]

---

[1005] Kroger Ex. 1 (Higgins Direct) at 10.

[1006] TIEC Ex. 1 (Pollock Direct) at 81.

TIEC contends that the Schedule AFC charges should be revised.  According to Mr. Pollock, the current charges exceed ETI's ownership and O&M costs; therefore, he recommended that the monthly charges in Schedule AFC be reduced.  Under this rate schedule, there are two separate pricing options.  Option A charges 1.49 percent per month; Option B applies when a customer elects to amortize the direct assigned facilities over a shorter term, ranging from one to ten years.  Thus, the Option B Monthly Recovery Term charge varies depending on the length of the amortization period of the directly assigned investment.  A 0.453 percent Monthly Post-Recovery term charge also applies after a facility has been fully depreciated.  ETI did not propose to change either the Option A or Option B charges in Schedule AFC.[1007]

According to Mr. Pollock's analysis, charges imposed under Option A should be 1.20 percent per month under ETI's proposed revenue requirements.  Under Option B, Mr. Pollock proposes various changes to the Recovery Term charges, and reduces the Monthly Post-Recovery term to 0.35 percent per month.  Further, if the Commission approves a lower base revenue requirement than ETI has proposed, Mr. Pollock stated that the recommended Schedule AFC charges (both Option A and Option B) should be reduced in proportion to any authorized reduction in ETI's proposed rate of return, O&M expense, and property tax expense.[1008]

In reaching this recommendation, Mr. Pollock used two different methods to derive a cost-based rate:  a levelized cost analysis and a revenue requirement analysis.  The former resulted in an Option A rate of 1.20 percent per month, and the revenue requirement analysis resulted in a weighted average rate of 1.18 percent.  For Option B charges, Mr. Pollock also used a levelized cost analysis for each of the Option B amortization periods, which resulted in lower charges.[1009]

ETI witness Talkington disagrees with Mr. Pollock's description of Schedule AFC.  She testified that the rate schedule encompasses the costs associated with the installation of facilities other than those normally furnished.  Or, under one option, the rates are like a monthly rental charge

---

[1007]  *Id*. at 82-85.

[1008]  TIEC Ex. 1 (Pollock Direct) at 81-85 and at Exs. JP-17 and JP-18.  *See* ETI Ex. 3, Sch. Q-8-8 at 24.

[1009]  TIEC Ex. 1 (Pollock Direct) at Ex. JP-18.

paid for facilities that would not normally be supplied by the Company.  She also stated that Mr. Pollock's example of facilities (transformers, breakers and lines) is understated.[1010]

ETI contends that revisions to this discretionary rate are unwarranted at this time.  The Commission approved this rate structure (and rate) in Docket No. 16705.  Moreover, ETI witness Talkington testified that this rate is voluntary—a customer has alternatives beyond those offered by ETI.  Therefore, it is actually a market-driven rate.  If a customer does not want to use this schedule to obtain the services it provides, the customer can secure services through other sources—either ETI-owned or otherwise.  Ms. Talkington further stated that Mr. Pollock's suggested changes would be detrimental to the customers who do not have AFC rates because the AFC revenue is treated as an offset to the revenue requirement to the rate classes.[1011]

Staff does not oppose ETI's request to retain the AFC rate as it is currently designed.

The ALJs find insufficient support in the record to retain ETI's Schedule AFC as-is.  As noted by TIEC, there is no evidence in this case to support ETI's claim that:  (1) the rate is a voluntary rate; (2) there are other options in the market for customers; or (3) that the rate continues to be based on a cost that the market will bear (as the Commission found years ago in Docket No. 16705).[1012]  While Ms. Talkington disagreed with Mr. Pollock's proposal because he did not take into consideration the scope of facilities provided and that his proposal could be detrimental to other ratepayers because ETI's revenues from this rate will decrease, she did not quantify her concerns.[1013]  The evidence supports a change to Schedule AFC that will move the rate more towards costs, and TIEC's proposals are the only ones for which there is evidence in the record.  The ALJs further agree with Mr. Pollock that his numbers should be reduced in proportion to any authorized reduction in ETI's proposed rate of return, O&M expense, and property tax expense.

---

[1010]  ETI Ex. 67 (Talkington Rebuttal) at 31.

[1011]  ETI Ex. 67 (Talkington Direct) at 27-28.

[1012]  *See* Docket No. 16705, Final Order, FoFs 292-296.

[1013]  Tr. at 1437, 1439-1440.

### 7.  Large General Service (LGS)

Kroger witness Kevin C. Higgins testified that the LGS rate schedule serves customers with monthly billing demands between 300 kW and 2,500 kW.  ETI proposes to increase the LGS demand charge from $8.56 per kW-month to $10.25 per kW-month and to increase the energy charge from $.00854 per kWh to $.01023 per kWh.  The Company proposes no change in the customer charge of $425.05 per month.[1014]

Mr. Higgins testified that ETI's proposed LGS demand charge would recover only 72 percent of LGS demand-related costs.  To compensate for the resultant revenue shortfall, the LGS energy charges proposed by ETI would significantly over-recover energy-related costs.  Specifically, the overall LGS energy charge is proposed to be 428 percent of base energy costs.  In addition, although the customer charge is proposed to be unchanged, it is set at 328 percent of cost.  If, instead, the LGS customer charge were set at cost, it would only be $129.60 per month.[1015]

Mr. Higgins illustrated his findings in the table below:[1016]

| LG Total Class Functionalized Cost Recovery | | | | |
|---|---|---|---|---|
| Functions | Costs | Collected in Rates | (Under)/Over Collection | Percentage Recovered |
| Demand | $46,266,083 | $33,116,674 | $(13,149, 409) | 71.6% |
| Energy | $3,6625,811 | $15,556,253 | $11,920,442 | 427.9% |
| Customer | $561,445 | $1,841,316 | $1,279,871 | 328.0% |
| Total | $50,463,339 | $50,514,243 | $50,904 | |

Mr. Higgins stated that if a utility proposes a demand charge that is below the cost, it is going to seek to recover its class revenue requirement by over-recovering its costs in another area, typically through an energy charge that is above unit energy costs.  In his opinion, for LGS, when demand charges are set below costs and energy charges are set above cost, customers with relatively

---

[1014]  Kroger Ex. 1 (Higgins Direct) at 7.

[1015]  *Id*. at 8.

[1016]  Kroger Ex. 5.

higher load factors are required to subsidize the costs of lower load factor customers within the rate class. The subsidy is different for each higher load factor customer (a customer whose load factor is greater than the average for the rate schedule) and consists of the net increase in rates paid by these customers as a result of setting energy charges above energy costs and demand charges below demand related costs. When the customer charge is set significantly above costs, smaller customers are overcharged and subsidize the larger customers.[1017]

Recognizing that a full movement towards cost-based rates (without gradualism) in a single step may create intra-class rate impacts, Mr. Higgins proposed the following changes to better align costs:[1018]

| Functions | ETI Proposed Charge | % of Cost | Kroger Proposed Charge | % of Cost |
|---|---|---|---|---|
| Demand ($/kW) | $10.25 | 72% | $12.81 | 90% |
| Energy ($/kWh) | $0.01023 | 428% | $0.00513 | 216% |
| Customer ($/Mo) | $425.05 | 328% | $260.00 | 201% |

Mr. Higgins developed his proposed rate impacts, which indicated a smaller rate impact on higher load factor customers than those with low load factors. He found them to be comparable to the rate impact found in ETI's proposed rates.[1019]

ETI witness Talkington did not object to gradually moving rates toward setting demand energy and customer components closer to cost of service in the LGS class.[1020]

Based on principles of cost-based rates and of gradualism, Staff witness Abbott recommended a decrease in the LGS customer charge to $397.02 from the current (and Company

---

[1017] Kroger Ex. 1 (Higgins Direct) at 9.

[1018] *Id*. at 10-11.

[1019] *Id*. at 11, Ex. KCH-3.

[1020] Tr. at 1452.

proposed) $425.05, and an increase in the energy charges, which is less than the increase proposed by the Company.[1021]

The ALJs found Mr. Higgins' proposed changes reasonable and well supported. Schedule LGS should be amended as proposed by Kroger. Schedule LGS also has a demand ratchet, and the ALJs' recommendation for the elimination of ETI's LIPS demand ratchet is applicable to this class.

### 8. General Service (GS)

Based on principles of cost-based rates and of gradualism, Staff witness Abbott recommended a decrease in the GS customer charge to $39.91 from the current (and Company proposed) rate of $41.09. Staff also recommended a decrease in the energy charges.[1022]

No party disputed Staff's recommendations, which the ALJs adopt. Schedule GS also has a demand ratchet, and the ALJs' recommendation for the elimination of ETI's LIPS demand ratchet is applicable to this class.

### 9. Residential Service (RS)

ETI's RS rate schedule is composed of two elements: a customer charge of $5 per month and a consumption-based energy charge. The Energy charge is a fixed rate of 5.802¢ per kWh from May through October (Summer). In the months November through April (Winter), the rates are structured as a declining block, in which the price of each unit is reduced after a defined level of usage. For instance, the same energy charge of 5.802¢ applies, but only for each of the first 1,000 kWh consumed. Each kWh consumed beyond 1,000 is billed at a lower rate of 3.834¢.[1023]

---

[1021] Staff Ex. 7 (Abbott Direct) at 25-27.

[1022] *Id.*

[1023] OPC Ex. 6 (Benedict Direct) at 41, Ex. NAB-1, ETI's Response to State RFI No. 4-17; ETI Ex. 67 (Talkington Rebuttal) at 9.

ETI proposes to retain the general structure of the RS rate design but proposes an increase in the dollar amount of each rate element. OPC witness Benedict noted ETI's proposed changes in his testimony, as set out below:[1024]

| Rate Element | ETI Current | ETI Proposed | Percent Increase |
|---|---|---|---|
| Customer Charge (per month) | $5.00 | $6.00 | 20.0% |
| Energy Charge (Summer, all kWh) | $0.05802 | $0.07268 | 25.3% |
| Energy Charge (Winter, kWh ≤ 1000) | $0.05802 | $0.07268 | 25.3% |
| Energy Charge (Winter, kWh > 1000) | $0.03834 | $0.04799 | 25.2% |

OPC criticized ETI's declining block rate structure as being contrary to energy efficiency efforts. OPC witness Benedict noted that under ETI's proposed rate structure, once kWh usage exceeds 1,000 in a winter month, the per-kWh cost of consumption falls by 34 percent. Thus, because a declining block rate structure lowers the per-unit rate for high levels of consumption, heavy users are induced to consume more than they would otherwise. In his view, this runs contrary to the Legislature's goal of reducing both energy demand and energy consumption in Texas, as stated in PURA § 39.905:

> (a) It is the goal of the legislature that: . . . (2) all customers, in all customer classes, will have a choice of and access to energy efficiency alternatives and other choices from the market that allow each customer to reduce energy consumption, summer and winter peak, or energy costs.

Therefore, Mr. Benedict recommended that the declining block rate be phased out over time. He stated this would ease the transition to a rate structure without a declining block, and it would allow time for customers to switch to more efficient heating systems. Mr. Benedict proposed that the phase-out take place over three rate cases, beginning with a one-third reduction in the block differential proposed by ETI in this case. Reducing ETI's proposed block differential from 2.469¢

---

[1024] OPC Ex. 6 (Benedict Direct) at 42.

to 1.645¢ accomplishes the initial one-third reduction, as illustrated below (using ETI's requested revenue requirement):[1025]

| Rate Element | ETI Current | ETI Proposed | Percent Increase | Reduced Block Rate Differential | Percent Increase |
|---|---|---|---|---|---|
| Customer Charge (per month) | $5.00 | $6.00 | 20.0% | $6.00 | 20% |
| Energy Charge (Summer, all kWh) | $0.05802 | $0.07268 | 25.3% | $0.07141 | 23.1% |
| Energy Charge (Winter, kWh ≤ 1000) | $0.05802 | $0.07268 | 25.3% | $0.07141 | 23.1% |
| Energy Charge (Winter, kWh > 1000) | $0.03834 | $0.04799 | 25.2% | $0.05496 | 43.3% |

Mr. Benedict stated that his proposal related to an intra-class rate design issue and was not intended to affect the amount of revenue to be collected from the residential class or any other class. If, however, the Commission approves a different revenue requirement for the residential class to reflect various proposed adjustments, rates for the class will need to be recomputed regarding a reduced block differential[1026]

Staff generally agreed with OPC's recommendation for a reduction in the rate differential between the residential winter kWh ≤ 1000 block and the winter kWh > 1000 block, due to the inconsistency between the incentives produced under declining block rates and the State's energy efficiency goals. Staff witness Abbott stated that the extreme cold weather event of February 2011 demonstrated a need to incentivize wintertime energy efficiency measures, or at least a need to avoid encouraging excess energy usage. Therefore, Mr. Abbott agreed that some reduction in the rate block differential is warranted to better encourage wintertime energy conservation at the margin.[1027]

ETI witness Talkington testified that the RS rates are cost-based with a declining block rate in winter. According to Ms. Talkington, residential load factors in winter increase as energy usage increases, and there is also a decrease in the fixed unit cost ($/kWh) as energy usage increases. She

---

[1025] OPC Ex. 6 (Benedict Direct) at 43-45.

[1026] OPC Ex. 6 (Benedict Direct) at 46.

provided analysis to support her position.[1028] Ms. Talkington explained that residential rates do not include demand charges because of the absence of residential demand meters. However, residential energy rates can be structured the same as the non-residential classes; that is, customer charge, demand charge and energy charge. She developed residential rates on this basis to show that the declining block rate is appropriate to account for reductions in the cost of service to residential customers as consumption increases. With no declining block rate, high load factor customers are disadvantaged as the customer charge is reduced and the demand charge is moved into the energy charge. She believes that declining block rates alleviate the disadvantage.[1029]

Ms. Talkington illustrated the impact of Mr. Benedict's suggestion to phase out the declining block rate for RS customers. Approximately 54 percent of ETI's residential customers use more than 1,000 kWh in January and February. For a customer using 3,000 kWh in a winter month of November-April, this customer's bill would increase by 16.28 percent or about $48 over current rates. (Of ETI's total number of RS customers, approximately 10 percent use 3,000 kWh or more in the months of January and February.) For that same customer, ETI's as-filed proposal shows an increase of 11.96 percent or approximately $35. Mr. Benedict's proposal is $13 greater than ETI's proposal for one winter month at 3,000 kWh. That dollar amount is over a third of the total increase ETI is proposing.[1030]

After Mr. Benedict's proposed phase-out is completed, based on the proposed residential rates in the Company's case, the residential rate would be $0.06887 per kWh in both summer and winter. A customer using 3,000 kWh in a winter month of November-April would see an increase of 24.89 percent or about $73 over current rates. After the final phase out, Mr. Benedict's proposal is $38 per month greater than ETI's as-filed proposal of $35 for one winter month at 3,000 kWh.[1031]

---

[1027]   Staff Ex. 7 (Abbott Direct) at 27.

[1028]   ETI Ex. 67 (Talkington Rebuttal) at 13, Ex. MLT-R-1.

[1029]   *Id*. at 14.

[1030]   *Id*. at 15.

[1031]   *Id*. at 15-16.

Ms. Talkington further noted that rate design professionals always take into consideration the effect on customer bills. Even though Mr. Benedict proposes to implement the change over the next three rate cases, she concludes there will still be winners and losers within the residential class as a result of his proposed change. According to Ms. Talkington, some customers have made decisions about investing in electric appliances based on the current rate design. The elimination of the declining block in the winter time changes the economics of customer decisions that have already been made. She believes that great caution needs to be exhibited and very good reasons need to be demonstrated before changes are made to the rate design. She recommended that if a change to the rate structure is recommended, the initial phase-in should be reduced to 10 percent rather than one-third and subsequent reductions should be reviewed for consideration at the occurrence of each rate case filing and not mandated at this time.[1032]

The ALJs concur with OPC and Staff that the structure of the declining block winter rates provide a disincentive to energy efficiency. However, ETI provided evidence that OPC's suggested changes, combined with ETI's proposed rate increase, will have too great an impact. OPC suggested a one-third reduction in the differential, while Ms. Talkington suggested a 10 percent reduction, with subsequent reductions reviewed before being mandated. The ALJs recommend an initial 20 percent reduction, which should alleviate some of ETI's concerns but still reduce the block differential sufficiently to move towards compliance with the energy goals set out in PURA. The ALJs further recommend that 20 percent subsequent reductions of the differential be required in the next three rate cases unless ETI provides sufficient evidence that such changes are unjust and unreasonable.

## XI.   FUEL RECONCILIATION [Germane to Preliminary Order Issue Nos. 21-31]

In the application, ETI seeks to reconcile approximately $1.3 billion in fuel and purchased power expenses incurred over the 24 month Reconciliation Period. Summaries of ETI's total fuel and purchased power expenses and over/under recovery balance are shown below.

---

[1032] ETI Ex. 67 (Talkington Rebuttal) at 15-17.

| Fuel Reconciliation | |
|---|---:|
| Gas and Oil | $616,248,686 |
| Emissions Allowance | 360,236 |
| Coal | 90,821,317 |
| **Total Fuel:** | **$707,430,239** |
| | |
| Purchase Power Expense | 990,041,434 |
| Off-system Sales Revenues | (376,671,969) |
| **Total Purchased Power:** | **$613,369,465** |
| | |
| **Total Fuel Costs:** | **$1,321,799,704** |
| | |
| **Over-recovery Balance:** | **$243,339,353** |
| | |
| **Special Circumstances** | **$99,715** |
| Sources: ETI Ex. 3 Schedules I-16, H-12.4a-g, H-12.5b-e, I-21; ETI Ex. 11 (McCloskey Direct); ETI Ex. 23 (Zakrzewski Direct). | |

ETI contends, and the evidence presented at the hearing demonstrates, that these fuel factor expenses were eligible for reconciliation and were reasonable and necessary to provide reliable service to ETI's customers during the Reconciliation Period. With the exception of three minor issues that are discussed below, none of the intervenors raised a substantive issue with respect to ETI's fuel reconciliation request.

During the Reconciliation Period, ETI's Texas fuel factor revenues over-recovered total fuel and purchased power expense by $243,339,353, inclusive of interest. The Commission authorized the refund of the fuel over-recovery balance in Docket Nos. 37580, 38403, and 38967. ETI proposes that the amount of any fuel over-recovery balance not already refunded or authorized for refund be rolled forward as the beginning balance for the next reconciliation period.[1033]

P.U.C. SUBST. R. 25.236(d)(1) states that in a fuel reconciliation proceeding, the utility has the burden of showing that:

(A)    its eligible fuel expenses during the fuel reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers;

---

[1033]   ETI Ex. 40 (Thiry Direct) at 7.

(B)    if its eligible fuel expenses for the reconciliation period included an item or class of items supplied by an affiliate of the electric utility, the prices charged by the supplying affiliate to the electric utility were reasonable and necessary and no higher than the prices charged by the supplying affiliate to its other affiliates or divisions or to unaffiliated persons or corporations for the same item or class of items; and

(C)    it has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period.

In Docket No. 15102, an EGSI fuel reconciliation case, the Commission explained the traditional prudence standard to be applied in reviewing decisions made by the utility:

> The exercise of that judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

> There may be more than one prudent option within the range available to a utility in any given context. Any choice within the select range of reasonable options is prudent, and the Commission should not substitute its judgment for that of the utility . . . . The reasonableness of an action or decision must be judged in light of the circumstances, information, and available options existing at the time, without benefit of hindsight.[1034]

ESI purchases power and procures fossil fuels on behalf of the individual Operating Companies. Fossil fuel costs are borne directly by the Operating Company that contracts for and uses the fuel. Once resources are procured to meet forecasted demand, the system is operated during the current day using all of the resources available to the system to meet the total system demand. Throughout the course of the day, system operators may modify planned operations to maintain reliability, take advantage of less-expensive resources in the hourly wholesale power markets, or make off-system sales. For example, when spot market power purchases are available at a cost

---

[1034] *Application of Gulf States Utilities Company to Reconcile its Fuel Costs*, Docket No. 15102, Order on Rehearing at 2 (Jun. 24, 1997).

lower than the cost of energy that can be generated by units owned by the Operating Companies, that energy is purchased to displace owned generation, subject to operating constraints.[1035]

Expenses for coal, gas, power purchases, and fuel oil are incurred directly by the respective Operating Company.  For example, if coal is purchased for ETI's share of Nelson Station, Unit 6, then ETI is responsible for the invoiced cost and makes payment directly to the supplier.  Wholesale power, purchased and sold for the system, however, is accounted for per the terms of the System Agreement.  After dispatch, or after-the-fact, the System Agreement prescribes an accounting protocol to bill the costs of operating the system to the individual Operating Companies.[1036]

The following Fuel Reconciliation-related issues were uncontested:

➢ *Natural Gas Purchases*

ETI witness Karen McIlvoy presented direct testimony describing ETI's natural gas procurement policies and strategies.  She explained that the Company buys gas through a long-term contract with Enbridge, through participation in the monthly and daily markets depending on fuel needs, and on a delivered-to-plant basis or arrange for transportation to the plant.  Ms. McIlvoy described how the gas buyers for ETI survey the markets and solicit offers for gas supplies.  Ms. McIlvoy also provided a comparison of the Company's gas costs to the *Inside FERC* and *Gas Daily* published indices for the Houston Ship Channel.[1037]  No party challenged the Company's natural gas purchases.

➢ *Fuel Oil*

Ms. McIlvoy testified that the Company purchased fuel oil for start-up and flame stabilization at certain units.  Fuel oil can also be used for emergency back-up fuel or as an economic alternative to natural gas at certain units.  During the Reconciliation Period, the Company purchased

---

[1035] ETI Ex. 40 (Thiry Direct) at 18-21.

[1036] ETI Ex. 39 (Cicio Direct) at 31-37.

[1037] ETI Ex. 28 (McIlvoy Direct) at 23, Ex. KDM-3.

all fuel oil on a short-term basis from spot market sources after solicitation of bids from multiple potential suppliers.[1038]  No party contested ETI's fuel oil costs.

> ## Longer-Term Purchased Power

ETI witness Robert R. Cooper addressed the Entergy system's long-term planning process and described the Strategic Resource Plan process.  He explained how the system determined its capabilities and needs for additional resources to reliably serve system load requirements.  Mr. Cooper described the process by which the system developed requests for proposals and analyzed a combination of capacity and firm energy contracts to satisfy the system's identified resource needs.[1039]  A portion of these system purchases was allocated to ETI.  No party proposed a disallowance of these purchases on the basis of prudence.

> ## Short-Term Purchased Power

Ms. Thiry described the Power Marketing Team's procurement strategies, practices and procedures during the Reconciliation Period.  Ms. Thiry testified that the Power Marketing Team fulfilled its objective of purchasing energy in the wholesale market when it was more economical than using the system's generation and in order to maintain system reliability.   Ms. Thiry demonstrated that third-party purchases for the system compared favorably to market price indices and to proxy costs of avoided generation.[1040]  The Power Marketing Team maintained effective cost controls and procured a diverse portfolio of product to provide electricity for customers at a reasonable cost.[1041]  No party contested the prudence of ETI's short-term power purchases.

> ## Coal Commodity and Transportation

ETI has ownership interest and/or obtains power through Schedule MSS-4 of the Entergy System Agreement, in two coal-burning generating units – Nelson and BCII/U3.  ETI owns a

---

[1038]  ETI Ex. 28 (McIlvoy Direct) at 5-6.

[1039]  ETI Ex. 34 (Cooper Direct) at 6-10.

[1040]  ETI Ex. 40 (Thiry Direct) at 24.

[1041]  *Id*.

29.75 percent interest in Nelson 6 and operates the unit. ETI owns a 17.85 percent interest in BCII/U3, but the unit is operated by a third party. ETI witness Ryan Trushenski, the Manager of Coal Supply for ESI, testified that ETI prudently managed its coal supply and transportation expenses during the Reconciliation Period.[1042]

With respect to coal and transportation expenses at Nelson 6, ETI obtained coal during the Reconciliation Period under a supply contract previously reviewed by the Commission, and entered into a new coal supply contract after a competitive bid process. ETI chose the supplier with the lowest priced coal that met the specifications necessary for use at Nelson 6. Similarly, ETI arranged for transportation of coal according to transportation contracts previously reviewed in prior fuel reconciliations. When those contracts expired, ETI initiated a competitive bid process and chose the lowest cost option available that met its requirements. With respect to BCII/U3, ETI incurred costs to run the unit and took reasonable steps to ensure that the third party operator properly charged for coal and transportation expenses under an arrangement previously reviewed and approved in prior fuel reconciliations.[1043] No party challenged the reasonableness and necessity of ETI's coal or transportation expense during the Reconciliation Period

The three contested issues are discussed below.

## A.      Spindletop Gas Storage Facility

During the Reconciliation Period, ETI incurred $10,261,663 of non-fuel expense associated with operating the Spindletop Facility. Cities challenged ETI's use of the Spindletop Facility, arguing that the costs of operating it outweigh the benefits gained from it. For the same reason he challenged the Spindletop Facility costs associated with rate base, Cities witness Nalepa also challenges ETI's non-fuel expense associated with the facility. Specifically, Mr. Nalepa recommends that ETI's total fuel reconciliation balance be reduced by $6,595,290, which he calculates as the difference between the $10,261,633 non-fuel operational costs associated with the Spindletop Facility over the Reconciliation Period and the costs of alternative sources of providing a

---

[1042]  ETI Ex. 33 (Trushenski Direct) at 2.

[1043]  *Id*. at 11-13.

reliable and flexible gas supply over the same period.[1044]  In Section V.H., above, the ALJs rejected Cities' contention that the Spindletop Facility is not used or useful.  For the same reason they rejected Cities' Spindletop Facility arguments relevant to rate base, the ALJs also reject Cities' Spindletop Facility arguments relevant to Fuel Reconciliation.

## B.          Use of Current Line Losses for Fuel Cost Allocation

Cities propose that the allocation of fuel costs incurred over the Reconciliation Period reflect the current line loss study performed by ETI for this case and recommended for approval on a going forward basis.  In the fuel reconciliation case, ETI proposes to allocate costs to customers using a line loss study performed in 1997, which Cities claim does not reflect the current cost of providing service to the current wholesale customers and to the various retail customers.[1045]  According to Cities, updating ETI's allocation of fuel costs to reflect current line losses and the cost of providing service to customers results in a $3,981,271 reduction to the Texas retail fuel expenses incurred over the Reconciliation Period.[1046]

ETI responds that the Cities' recommendation is unprecedented.  It notes that the Commission's substantive rules *require* use of "a *commission-approved* adjustment to account for line losses corresponding to the voltage at which the electric service is provided."[1047]  Moreover, ETI argues that retroactive use of new loss factors to calculate its fuel over/under-recovery balance would result in a mismatch between the revenues recovered under the fuel factor and the costs billed and allocated to the various customer classes.[1048]

Fuel costs are collected through Commission-approved fixed fuel factors.  One of the elements the fuel factor is required to take into account is line losses.  P.U.C. SUBST. R. 25.237(c)(2)(B) states that the utility must prove that: "the proposed fuel factors utilize a

---

[1044]  Cities Ex. 6 (Nalepa Direct) at 42-43; Cities Initial Brief at 84.

[1045]  Cities Ex. 6 (Napala Direct) at 44; *see also* Tr. at 1469-1470.

[1046]  Cities Ex. 6 (Napala Direct) at 47, Table 14.

[1047]  ETI Ex. 58 (McCloskey Rebuttal) at 2, *quoting* P.U.C. SUBST. R. 25.237(c)(2)(B) (emphasis added).

[1048]  Tr. at 1484.

*commission-approved* adjustment to account for line losses corresponding to the voltage at which the electric service is provided."[1049] If the Commission were to adopt Cities' recommendation that the newly-developed line losses be used in the reconciliation of fuel costs, the allocation of those costs would not match the collections (determined through the use of historical line losses). This mismatch could result in some customers receiving more than they are entitled and others receiving less than they are entitled. The ALJs find that the Commission's rules require the use of Commission-approved line losses that were in effect at the time fuel costs were billed to customers in a fuel reconciliation. The ALJs, therefore, recommend that the Commission reject the Cities' proposed adjustment.

## C.     ETI's Special Circumstances Request

In the application, ETI seeks to include $99,715 in the Fuel Reconciliation to allow it to recover "the reversal of certain credits that were previously included in the Company's [Incremental Purchased Capacity Rider] Rider IPCR."[1050] ETI witness Zakrzewski explained that the FERC revised the amount of purchased capacity-related production costs allocable to ETI through the FERC-approved Rough Production Cost Equalization mechanism for allocating production costs among the Operating Companies. As Mr. Zakrzewski explained, the result of the decision was a recalculation of ETI's capacity costs recoverable through the Commission-approved Rider IPCR, which expired during the Reconciliation Period.[1051]

During the hearing, no party contested ETI's special circumstances request of $99,715 with regard to the IPCR-related adjustment. For the first time in its Initial Brief, however, Cities opposed the request, asserting that it conflicts with the settlement reached in Docket No. 37744.[1052] The ALJs are not swayed by Cities' argument. As pointed out by ETI,[1053] Cities provided no testimony or other evidence to support its position. Furthermore, Cities failed to explain how a settlement

---

[1049]  P.U.C. SUBST. R. 25.237(c)(2)(B) (emphasis added).

[1050]  ETI Ex. 23 (Zakrzewski Direct) at 13.

[1051]  *Id*.

[1052]  Cities Initial Brief at 86.

[1053]  ETI Reply Brief at 93.

agreement reached in Docket No. 37744 could or should trump the FERC's jurisdiction to determine the amount of purchased capacity costs attributable to ETI. The only evidence in the record supports ETI's recovery of these costs. Accordingly, the ALJs recommend that these FERC-imposed costs should be found to be recoverable and Cities' request to deny their recovery should be rejected.

In summary, the ALJs conclude that, consistent with the requirements of P.U.C. SUBST. R. 25.236(d)(1), ETI met its burden to prove that: (1) its eligible fuel expenses during the Reconciliation Period were reasonable and necessary expenses incurred to provide reliable electric service to its retail customers; (2) the prices charges by its affiliates were reasonable and necessary and no higher than the prices charged by the supplying affiliates to other affiliates or to unaffiliated persons; and (3) ETI has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the Reconciliation Period.

## XII.    OTHER ISSUES

### A.    MISO Transition Expenses [Germane to Preliminary Order Issue Nos. 6-8 and Docket No. 39741 Preliminary Order Issue Nos. 1-9]

Entergy is seeking to transfer operational control of the Entergy Operating Companies' transmission assets to the MISO Regional Transmission Organization (RTO). ETI expects its share of the costs for this transfer will include approximately $17 million of expense.[1054] ETI has made two alternate proposals to recover these expenses. ETI's first proposal requests the Commission to approve a deferred accounting of its transition expense incurred on or after January 1, 2011, and to approve accrual of interest on the deferred amount at ETI's overall rate of return. Under this proposal, ETI would present the resulting regulatory asset for review in a future proceeding. ETI originally requested this deferred accounting in Docket No. 39741, which was later consolidated into this case for all purposes. In its Preliminary Order in Docket 39741, the Commission stated that it had authority to allow such a deferral of costs "when it is necessary to carry out a provision of PURA." It also stated that whether ETI's request met this requirement "hinges on the factual issue of necessity . . . ."

---

[1054]   ETI Ex. 42 (Lewis Supplemental Direct) at 5.

As an alternative proposal, ETI requested the Commission to include $4 million of transition expense in base rates set in the present case, based on a three-year amortization of a total of $12 million in MISO transition expenses. ETI's Test Year MISO transition expenses totaled only $916,535, but ETI's request for deferred accounting addressed expenses incurred on or after January 1, 2011, which is after the Test Year concluded. ETI argues that its request is a conservative known and measureable change because the post-Test-Year expenses will be significantly more than $4 million per year. Further, these costs would be removed from ETI's cost of service if its deferred accounting proposal is approved.

As noted, ETI's proposals concern MISO transition expenses incurred on or after January 1, 2011. However, ETI also incurred $263,908 in these expenses during the 2010 portion of the Test Year. ETI has proposed a five-year amortization of this amount ($52,800 per year), assuming either its primary proposal or its alternative proposal is adopted. However, if ETI's primary and alternative proposals are both rejected, ETI requested that no reduction be made to its total Test Year amount of $916,535.[1055]

Cities, TIEC, State Agencies, and Staff opposed ETI's requests. They argue that ETI failed to establish that the proposed deferred accounting is necessary to carry out a provision of PURA, as required by the Commission's Preliminary Order. They also contended that ETI's alternate request to include $4 million in base rates is not a known and measureable change and should be disallowed.

The ALJs recommend that the Commission deny ETI's request for deferred accounting of its MISO transition expenses to be incurred on or after January 1, 2011. However, the ALJs do recommend that the Commission authorize ETI to include $2.4 million of MISO transition expense in base rates set in the present case, based on a five-year amortization of $12 million in total projected expenses.

---

[1055] ETI Ex. 42 (Lewis Supplemental Direct) at 4 and Adjustment No. 16.L.

### 1.   Deferred Accounting

In support of its deferred accounting request, ETI cited *State v. Public Utility Comm'n of Texas*.[1056]  In that case, the Texas Supreme Court stated that a deferred accounting is "necessary" when it will "ensure that the requirements of [PURA] are met."[1057]  In ETI's opinion, deferred accounting is necessary in the present case to ensure that PURA §§ 36.051 and 36.003(a) are met (*i.e.*, that utilities have a reasonable opportunity to recover their expenses and receive reasonable rates).  ETI also relied on *Hammack v. Public Utility Commission of Texas*, which stated that "a need . . . is a relative requirement, ranging from an imperative need to one that is minimal . . . ."[1058]

ETI-witness Brett Perlman testified that deferred accounting is also necessary to ensure the requirements of PURA § 31.001(c) are carried out.[1059]  That section encourages development of a competitive wholesale electric market.   ETI noted that the *Hammack* opinion stated that Section 31.001(c) amounts to a "legislative directive that the Commission formulate policies responsive to the needs of the emerging competitive wholesale market."[1060]  Therefore, ETI asserted that RTO membership and deferred accounting are necessary because they will ensure that the Commission meets its obligation under Section 31.001(c).  More specifically, ETI stated, both RTO membership and deferred accounting itself constitute examples of policies required by section 31.001(c) to support wholesale competition.  Therefore, ETI argues that its request for deferred accounting should be approved because it is necessary to carry out PURA §§ 36.051, 36.003, and 31.001(c).[1061]

Cities argue that ETI's request for deferred accounting of MISO transition expenses should be denied because deferred accounting is not necessary to carry out any requirement of PURA.

---

[1056]  883 S.W.2d 190 (Tex. 1994).

[1057]  883 S.W.2d at 194.

[1058]  *Hammack v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 713, 723-24 (Tex. App.—Austin 2004, pet. denied).

[1059]  ETI Ex. 43 (Perlman Supplemental Direct) at 7.

[1060]  131 S.W.3d at 723.

[1061]  ETI's Initial Brief at 231-234; ETI Ex. 42 (Lewis Supplemental Direct) at 2-4; ETI Ex. 43 (Perlman Supplemental Direct) at 5-7.

Cities witness James Brazell stated that ETI's proposed transition to MISO is not mandatory, and the anticipated expenses are not extraordinary. He added that ETI has been exploring membership in an RTO for over ten years and those costs have historically been included in ETI's base rates; therefore, he concluded that deferred accounting was not necessary in the past and is not necessary now. Cities stressed that ETI conceded that deferred accounting of these expenses is not necessary to maintain its financial integrity, and in Cities' opinion, both *State v. Public Utility Comm'n of Texas*,[1062] and the Commission's Preliminary Order require a showing of impairment of financial integrity to conclude that deferred accounting is necessary to comply with PURA § 36.051. Cities also stated that ETI failed to show that deferred accounting is necessary to comply with PURA §§ 36.003 and 31.001(c); therefore, Cities argues that ETI's request for deferred accounting should be denied.

TIEC also opposed ETI's request for deferred accounting, arguing that ETI failed to demonstrate that it is necessary to carry out PURA §§ 36.051, 36.003, or 31.001(c). TIEC witness Jeffry Pollock stated there is no indication that deferred accounting treatment is necessary for ETI to earn a reasonable return on its invested capital or that denying the deferred accounting would prevent ETI from having just and reasonable rates. Further, Mr. Pollock asserted there is no evidence that a lack of deferred accounting treatment for ETI would prevent Entergy from pursuing its MISO proposal.[1063] Mr. Pollock added that ETI has incurred other similar costs to carry out various purposes of PURA without deferred accounting. For example, since 2005, ETI has spent nearly $20 million pursuing various similar activities, including transitioning to competition, investigating RTO options, examining changes to the Entergy System Agreement, and supporting the Entergy OATT. Yet, ETI did not seek deferred accounting for any of those costs. Finally, Mr. Pollock testified that the projected transition costs are not material. He noted that ETI expects to incur $17 million of transition costs.[1064] This equates to $5.8 million per year, which is only 1 percent of ETI's Test Year operating revenues, according to Mr. Pollock. In his opinion, this level

---

[1062]   883 S.W.2d 190 (Tex. 1994).

[1063]   TIEC Ex. 1 (Pollock Direct) at 46-47.

[1064]   ETI Ex. 42 (Lewis Supplemental Direct) at 5.

of MISO transition costs is easily subsumed in the normal variation in ETI's year-to-year expenses.[1065]

TIEC also disagreed with ETI's interpretation of *State v. Public Utility Comm'n of Texas*.[1066] In TIEC's view, that case held that deferred accounting is necessary only when needed to protect the financial integrity of the utility. Likewise, TIEC disagreed with ETI's argument that *Hammack*[1067] held that "need" is a relative requirement that must be viewed in light of legislative policy directives.[1068] TIEC noted that *Hammack* had nothing to do with deferred accounting. Instead, it was limited to the issue of whether, in granting a certificate of convenience and necessity for a transmission line under PURA §37.056, the Commission should include evidence that considered customers and market participants throughout the state.[1069] In TIEC's view, the *Hammack* case is irrelevant in determining whether deferred accounting is necessary to carry out the provisions of PURA §§ 36.003, 36.051, and 31.003(c). State Agencies made similar arguments.

Commission Staff also argues that ETI did not establish why deferred accounting is necessary to carry out a provision of PURA. In Staff's view, the applicable court cases and other precedent required ETI to show that deferred accounting is necessary to maintain its financial integrity, in order to carry out the provisions of PURA § 36.051. Staff argues that the Commission's Preliminary Order did not reject the financial integrity standard when it stated: "[t]his standard is not appropriate, however, for all circumstances and the Commission has applied different standards in various circumstances."[1070] Rather, Staff stated, the Commission merely declined to designate a specific standard.

---

[1065] ETI Ex. 1 (Pollock Direct) at 48-49 and Ex. JP-8.

[1066] 883 S.W.2d 190 (Tex. 1994).

[1067] *Hammack v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 713, 723-24 (Tex. App.—Austin 2004, pet. denied).

[1068] ETI Initial Brief at 232-233.

[1069] *Hammack v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 713, 724 (Tex .App.−Austin 2004, pet. denied).

[1070] *Application of Entergy Texas, Inc. for Authority to Defer Expenses Related to its Proposed Transition to Membership in The Midwest Independent Transmission System Operator*, Docket No. 39741 Preliminary Order at 9 (Sep. 2, 2011).

Staff also rejected ETI's argument that deferred accounting will "ensure that the Commission meets its obligation under Section 31.001(c) to support the achievement of a competitive wholesale market."[1071]  First, Staff noted, the Commission stated in the Preliminary Order that merely showing movement towards a policy goal is not a sufficient standard upon which to approve deferral.[1072] Thus, ETI's statement that deferred accounting will "support" wholesale competition addresses a standard that the Commission already rejected.  Second, Staff argues that ETI failed establish that deferred accounting is "necessary" to support a competitive wholesale market or that failure to allow deferred accounting would prevent that goal.  In other words, ETI did not show that, absent deferral, it would not join MISO; thus, ETI did not show how deferral would "ensure" that it joins an RTO. Therefore, Staff concluded, because ETI failed to prove that deferred accounting is necessary to carry out any provision of PURA, ETI's request should be denied.

In response to these arguments, ETI noted that no party disputed that the Commission may grant deferred accounting "when it is necessary to carry out a provision of PURA."  It also argues that Staff and intervenors misinterpreted *State v. Public Utility Comm'n of Texas*[1073] as holding that deferred accounting is necessary to carry out PURA § 36.051 only when a utility's financial integrity is at stake.  Although lack of financial integrity is an indication that PURA § 36.051 has not been carried out, ETI noted that this section contains other express requirements that can be met through deferred accounting, such as ensuring utilities a reasonable opportunity to recover their costs.  ETI also cited other Commission cases in which it authorized deferred accounting when financial integrity was not at stake, such as deferral of rate case expenses and merger costs for subsequent review and recovery.[1074]  ETI added that deferred accounting would permit the Commission to review ETI's transition expenses in a subsequent proceeding, after determining whether ETI's transition to MISO is in the public interest.  Thus, under ETI's proposal, there is no risk that ETI would recover such costs absent a finding that they are reasonable and necessary.

---

[1071]  ETI Initial Brief at 234.

[1072]  Docket No. 39741, Preliminary Order at 11.

[1073]  883 S.W.2d 190 (Tex. 1994).

[1074]  ETI Reply Brief at 95-96.

As for Staff and TIEC's argument that deferred accounting is not necessary to carry out PURA § 31.001(c), ETI argues that the "necessary" standard is not a "but for" test. In response to arguments that the proposed deferred accounting will merely further policy objectives of Section 31.001(c), which the Commission has deemed insufficient to meet the "necessary" standard,[1075] ETI reiterated that the *Hammack* opinion held that "the Commission's interpretation of need must be viewed in light of the legislative directive that the Commission formulate policies responsive to the needs of the emerging competitive wholesale market," as well as "overall policy objectives."[1076] Thus, ETI argues, that it has demonstrated that deferred accounting is necessary to carry out Section 31.001(c) – *i.e.,* it will "ensure" that the requirements of that provision are carried out, and in particular ensure that the Legislature's specific instruction to develop the wholesale market is carried out.[1077]

Although ETI's proposal for deferred accounting has some practical appeal, the ALJs conclude that ETI has not shown that it is necessary to carry out a provision of PURA. The ALJs find that ETI was not required to show that a deferred accounting is necessary to maintain its financial integrity, as argued by intervenors. In *State v. Public Utility Comm'n of Texas,*[1078] the Texas Supreme Court held that preserving the financial integrity of a utility was necessary to carry out a provision of PURA, and thus justified deferred accounting for certain expenses in that case, but the court did not hold that preserving financial integrity was the sole basis upon which a deferred accounting could be approved. Likewise, in its Preliminary Order for the present case, the Commission stated: "This standard [financial integrity] is not appropriate, however, for all circumstances and the Commission has applied different standards in various circumstances, although none of these standards or circumstances has been reviewed by any court."[1079] On the other hand, the ALJs also find that ETI's contention that deferred accounting of the MISO transition expenses will help the development of a competitive wholesale electric market, as described in

---

[1075]  Docket No. 39741, Preliminary Order at 7.

[1076]  *Hammack v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 713, 723-24 (Tex. App.—Austin 2004, pet. denied).

[1077]  ETI Reply Brief at 97-99.

[1078]  883 S.W.2d 190 (Tex. 1994).

PURA § 31.001(c), is not sufficient to authorize deferred accounting.  Again, the Commission stated in the Preliminary Order that "to carry out a provision of PURA" means more than undefined progress or movement towards a statutory objective.[1080]

The Commission made clear that ETI's burden was not only to show that a provision of PURA would be carried out by an accounting deferral of the MISO transition expenses, but that the deferral is *necessary* to carry out that provision.  The Commission added that necessity was a question of fact that "can only be determined after development of an adequate factual record that demonstrates the necessity, of whatever degree."[1081]  Intervenors argue that Entergy's efforts to transfer operational control of the Entergy Operating Companies' transmission assets to MISO will proceed with or without the deferred accounting requested by ETI; thus, deferred accounting is not necessary.  Likewise, intervenors argue that ETI's alternate proposal to recover the transition costs through base rates shows that deferred accounting is not necessary.  ETI, however, asserted that necessity should not be considered a "but for" requirement.  It noted that no provision of PURA would be impossible to carry out absent a deferral of rate case expenses or merger expenses, yet the Commission has allowed deferred accounting of such expenses in other cases.  ETI also cited the statement in *Hammack v. Public Utility Commission of Texas* that "a need . . . is a relative requirement, ranging from an imperative need to one that is minimal . . . ."[1082]  Intervenors criticized ETI's reliance on the *Hammack* case because it concerned a transmission line.  While that is correct, the case does make the general point that the question of need is not an absolute "but for" test.  This is also consistent with the Commission's statement in the Preliminary Order that ETI's burden was to demonstrate necessity, "of whatever degree."

ETI's complaint is that its MISO transition expenses will soon increase above the Test Year amount, from $916,535 for the Test Year to over $5 million per year, but it will not be able to recover the increased costs through normal Test Year cost-of-service ratemaking principles.  Thus,

---

[1079]  Docket No. 39741, Preliminary Order at 9 (Nov. 22, 2011).

[1080]  *Id*. at 11.

[1081]  *Id*. at 8.

[1082]  *Hammack v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 713, 723-24 (Tex. App.—Austin 2004, pet. denied).

although ETI's financial integrity may not be jeopardized, ETI argues that it nevertheless will not be able to have a reasonable opportunity to recover its expenses and receive reasonable rates as required by PURA §§ 36.051 and 36.003(a).  Therefore, ETI believes the proposed deferred accounting is necessary to carry out those provisions of PURA.

The ALJs find that the essence of ETI's complaint is that regulatory lag works against it in this particular situation.  But as noted by the court in *State v. Public Utility Comm'n of Texas*, regulatory lag is an ordinary element of risk for utilities.[1083]  One of the characteristics of Test Year cost-of-service ratemaking is that some expenses upon which rates are based may go up and others may go down during the time the rates are in effect.  Such changes can be corrected in future ratemaking proceedings, but in this case ETI desires to ensure that it will recover all of its MISO transition costs.  But *State v. Public Utility Comm'n of Texas* and the Commission's Preliminary Order in this case make clear that eliminating the normal effects of regulatory lag by allowing a deferred accounting should not be undertaken lightly.  If ETI's arguments were taken to their extreme, a utility could obtain deferred accounting any time it anticipated a post Test Year increase in a particular expense, under the argument that it must be allowed to recover all of its expenses to carry out the requirements of PURA §§ 36.051 and 36.003(a).  In this case, ETI's estimated MISO transition costs will equal about $5.8 million per year.  As Mr. Pollock noted, this is only one percent of ETI's Test Year operating revenues, which may easily be subsumed in the normal variation in ETI's year-to-year expenses.  Under these circumstances, ETI has not shown that granting its requested deferred accounting is necessary to carry out the requirements of PURA §§ 36.051 and 36.003(a) that it receive just and reasonable rates.  Therefore, the ALJs recommend that the Commission deny ETI's request for deferred accounting treatment of its MISO transition expenses to be incurred on or after January 1, 2011.

---

[1083]  883 S.W.2d 190, 196 (Tex. 1994).

## 2. Base Rate Recovery

As mentioned above, if the Commission denies ETI's request for deferred accounting, ETI requested the Commission to include $4 million of MISO transition expense in base rates set in the present case, based on a three-year amortization of $12 million in total projected expenses.

Cities disputed the amount of MISO expenses ETI requested in this proposal. Cities witness Mark Garrett testified that a $4 million annual expense is inconsistent with ETI's own projected costs. The Test Year expenses were $916,535, and the actual expenses incurred during January through November 2011 were only $2.513 million, which annualized would be $2.742 million.. For 2013, ETI projected MISO transition expenses of only $2.587 million, although ETI's projected 2012 level of $8.9 million. However, Mr. Garrett added that 2012 is an estimated level and is not consistent with actual 2011 results. In his opinion, the actual 2011 level of about $2.7 million or the expected 2013 level of about $2.6 million should be the outside range of what the Commission should use for setting prospective rates. In any event, however, Cities argue that these projected levels are not sufficiently known and measurable to include for ratemaking purposes. Cities pointed out that it is unknown whether ETI's proposed move to MISO will even be approved, or whether the ETI will even continue to incur costs toward a MISO transition. Therefore, Cities argues that only the Test Year level of $916,535 should be included in rates, which would result in a downward adjustment of $3,083,462 to ETI's request.[1084]

TIEC also argues that ETI's alternative proposal should be rejected. Mr. Pollock complained that this proposal would allow ETI to recover post Test Year expenses that are not known and measureable. Mr. Pollock noted that ETI's own estimate of its share of transition costs has changed. When ETI filed its request for deferred accounting in Docket No. 39741, it estimated transition costs of $12 million. Now it estimates costs of $17 million, an increase of over 40 percent. Further, Mr. Pollock stated, ETI based its share of the estimated transition costs by assuming a 17 percent responsibility ratio, but ETI's future responsibility ratios are not known because they are based on projected growth rates of ETI relative other Entergy Operating Companies. Thus, Mr. Pollock

---

[1084] Cities Ex. 2 (Garrett Direct) at 61-63 and Ex. MG2.14; Cities Initial Brief at 89-91; Cities Reply Brief at 112-113.

concluded that ETI's share of future MISO transition costs cannot be appropriately measured.[1085]  In

summary, TIEC argues that the Commission should deny ETI's request for deferred accounting and

should allow ETI to recover only Test Year MISO transition expenses.[1086]  Commission Staff made

arguments similar to Cities and TIEC.[1087]

In response, ETI argues that the $4 million annual expense requested is known and

measurable.  ETI noted that it already incurred over $3.6 million in transition expense in the nine

months since the end of the Test Year,[1088] which equates to $4.8 million on an annual basis.

Furthermore, ETI's expects $17 million in transition expenses to be incurred over three years, which

equates to $5.8 million annually.[1089]  In ETI's view, the issue is whether it is sufficiently known that

ETI will incur at least $12 million in transition expense, not whether ETI can predict an exact level

of future expense.[1090]

The ALJs recommend that the Commission authorize ETI to include $2.4 million in base

rates set in the present case for MISO transition expense incurred on or after January 2, 2011, based

on a five-year amortization of $12 million in total projected expenses.  The primary argument of

intervenors against the adjustment is that the total of $12 million is not a known and measurable

change.  However, the ALJs find that ETI's evidence established that such expenses will total *at

least* $12 million.  It is true that the Test Year expenses were less, but ETI filed its application to

effectuate the transfer to MISO in 2012, so it is clear that those expenses will increase significantly

to levels well above the Test Year amount.  It is true that ETI has not established the precise total

amount of MISO transition expenses it will incur, but the ALJs find that those expenses will likely

exceed the $12 million included in ETI's request.  ETI requested that the $12 million total be

amortized over three years, which would produce a $4 million annual cost.  However, ETI also

---

[1085]  TIEC Ex. 1 (Pollock Direct) at 49-50.

[1086]  TIEC Initial Brief at 97-98; TIEC Reply Brief at 70-71.

[1087]  Staff Reply Brief at 65-66.

[1088]  ETI Ex. 46 (Considine Rebuttal), Ex. MPC-R-1.

[1089]  TIEC Ex. 1 (Pollock Direct) at 48:3-4.

[1090]  ETI Initial Brief at 236-239; ETI Reply Brief at 99-100.

requested to amortize over five years its $263,908 in MISO transition expenses that were incurred during the 2010 portion of the Test Year ($52,800 per year). If a five-year amortization is appropriate for those expenses, a five-year amortization would also be appropriate for the post Test Year MISO transition expenses. Therefore, the ALJs recommend that the Commission authorize ETI to include in base rates $52,800 in MISO transition expenses for the 2010 portion of the Test Year expenses, plus $2.4 million for the post Test Year adjustment, for a total of $2,452,800.

## B.      TCRF Baseline [Germane to Supplemental Preliminary Order Issue No. 2]

In its Supplemental Preliminary Order, the Commission found that it would be appropriate to establish for ETI baseline values for a TCRF and a DCRF, which may be established in future dockets. ETI's filing package included worksheets for these baseline values,[1091] and ETI attached revised versions of the worksheets to its initial brief to reflect ETI's revised depreciation calculations. The revised version of the transmission worksheet calculated total transmission cost baseline revenue requirements of $75,074,987-Total Company and $74,997,366-Retail.[1092] However, ETI acknowledged that these values may change, depending on the rulings in this case. If the Commission makes other changes to ETI's requested costs, ETI proposes filing another revised TCRF baseline value calculation in the compliance phase of this case, to reflect the final decisions of the Commission.[1093] TIEC, Cities, and Staff also point out that various items in ETI's calculation have been contested. Therefore, they also recommend that the baseline values be set during the compliance phase of this case. The ALJs agree that TCRF baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

## C.      DCRF Baseline [Germane to Supplemental Preliminary Order Issue No. 2]

As discussed above, the Commission found in its Supplemental Preliminary Order that it would be appropriate to establish for ETI baseline values for a DCRF, which may be established in a

---

[1091]  ETI Ex. 31 (LeBlanc Direct) at Ex. HGL-5 and HGL-6.

[1092]  ETI Initial Brief at 239 and Attachment 1.

[1093]  ETI Initial Brief at 239.

future docket.  ETI's filing package included worksheets for a DCRF baseline value,[1094] and ETI attached a revised version of the worksheet to its initial brief to reflect ETI's revised depreciation calculations.  The revised version of the distribution worksheet calculated total distribution cost baseline revenue requirements of $163,560,232-Total Company and $161,537,490-Retail.[1095] However, ETI acknowledged that these values may change, depending on the rulings in this case.  If the Commission makes other changes to ETI's requested costs, ETI proposes filing another revised DCRF baseline value calculation in the compliance phase of this case, to reflect the final decisions of the Commission.[1096]  TIEC, Cities, and Staff also recommend that the baseline values be set during the compliance phase of this case.  The ALJs agree that DCRF baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

D.    **Purchased Power Capacity Cost Baseline [Germane to Supplemental Preliminary Order Issue No. 1]**

ETI requested a PPR rider in its application, but the Commission held in its Supplemental Preliminary Order that the proposed rider should not be considered due to the pending rulemaking Project No. 39246, which was opened to consider purchased capacity riders.  However, the Commission did add the following issue to the present case:  "What is the amount of purchased-capacity costs that are proposed to be included in Entergy's base rates?"  ETI requested authority to include $275,809,485 in its PPR rider, but because the Commission excluded the PPR rider from consideration, this amount would now be included in base rates.  ETI acknowledged that this amount should be revised to correspond with the Commission's final decision on purchased power capacity recovery (*See* Section VII.A.). [1097]

State Agencies noted that ETI's purchased power request included the following:

---

[1094]  ETI Ex. 31 (LeBlanc Direct) at Ex. HGL-5 and HGL-6.

[1095]  ETI Initial Brief at 239 and Attachment 2.

[1096]  ETI Initial Brief at 239.

[1097]  ETI Initial Brief at 240.

1.      Third-party contracts;

2.      Legacy affiliate contracts;

3.      Other affiliate contracts; and

4.      Reserve Equalization.

The costs for all of these but third-party contracts are determined through various MSS Schedules in the FERC-approved Entergy System Agreement. Therefore, State Agencies argue that if the Commission decides to allow purchased capacity cost recovery riders in Project No. 39246, the baseline costs for ETI should be limited to only the purchased capacity costs associated with non-affiliate third-party contracts. In State Agencies' opinion, ETI should not be allowed to pass through purchased capacity costs associated with legacy and other affiliate contracts or reserve equalization purchases, because those are not market competitive contracts. Instead, according to State Agencies, the affiliate contracts and reserve equalization purchases are essentially agreements to share centralized planned generation capacity resources among Entergy Operating Companies and to allocate generation costs among those companies. State Agencies also noted that these capacity payments are determined based on formulae in Service Schedules MSS-1 and MSS-4, included in the FERC-approved Entergy System Agreement. In other words, these costs are not driven by market prices and are not subject to market price volatility. Therefore, State Agencies argue that purchases other than third-party contracts should not be used as a baseline for any rider intended to address market price volatility and competitive wholesale market pressure for purchased generation capacities.[1098]

Cities agree with the arguments of State Agencies. In addition, Cities stressed that if the Commission establishes a baseline for purchased power capacity costs, the baseline should reflect the unit cost of capacity rather than total dollars. Cities witness Nalepa testified that the unit cost would provide a more accurate measure than total dollars. In Cities' opinion, if a unit cost finding is not made in this case, then Commission will be prevented from considering all options in the rulemaking.

---

[1098]   State Agencies Ex. 2 (Pevoto Direct) at 17.

TIEC points out that the notice in Project No. 39246 provided that "[t]he purpose of this rulemaking project is to address the recovery of purchased power capacity costs considering generation embedded in base rates, load growth, and the impact of purchased power capacity recovery on the financial standing of the utility."[1099]   Accordingly, TIEC argues that the baseline set in this proceeding should reflect ETI's total purchased power and installed capacity costs determined to be properly included in base rates on a total cost basis and on a per unit ($/MW) basis.[1100]

As discussed in Section VII.A., the ALJs find that the appropriate amount for ETI's purchased power capacity expense to be included in base rates is $245,432,884. This responds to the issue included in the Commission's Supplemental Preliminary Order. This amount includes third-party contracts, legacy affiliate contracts; other affiliate contracts; and reserve equalization. Whether the amounts for all contracts should be included in the baseline for a purchased capacity rider that may be approved in Project No. 39246 is an issue that should be decided in that proceeding, not in the present case. Therefore, the ALJs make no recommendation on that issue raised by the intervenors.

## XIII.    CONCLUSION

The ALJs recommend that the Commission implement the findings of the ALJs set forth in the discussion above by adopting the following proposed findings of fact and conclusions of law in the Commission's final order.

## XIV.    PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERING PARAGRAPHS

### A.    Findings of Fact

#### *Procedural History*

1.    Entergy Texas, Inc. (ETI or the Company) is an investor-owned electric utility with a retail service area located in southeastern Texas.

---

[1099]  Project No. 39246, Public Notice (May 10, 2011).

[1100]  TIEC Initial Brief at 99.

2.       ETI serves retail and wholesale electric customers in Texas.  As of June 30, 2011, ETI served approximately 412,000 Texas retail customers.  The Federal Energy Regulatory Commission (FERC) regulates ETI's wholesale electric operations.

3.       On November 28, 2011, ETI filed an application requesting approval of: (1) a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted test year revenues; (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities (RFP) accompanying ETI's application and including new riders for recovery of costs related to purchased power capacity and renewable energy credit requirements; (3) a request for final reconciliation of ETI's fuel and purchased power costs for the reconciliation period from July 1, 2009 to June 30, 2011; and (4) certain waivers to the instructions in RFP Schedule V accompanying ETI's application.

4.       The 12-month test year employed in ETI's filing ended on June 30, 2011 (Test Year).

5.       ETI provided notice by publication for four consecutive weeks before the effective date of the proposed rate change in newspapers having general circulation in each county of ETI's Texas service territory.  ETI also mailed notice of its proposed rate change to all of its customers.  Additionally, ETI timely served notice of its statement of intent to change rates on all municipalities retaining original jurisdiction over its rates and services.

6.       The following parties were granted intervenor status in this docket:  Office of Public Utility Counsel (OPC); the cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities), the Kroger Co. (Kroger); State Agencies (State Agencies); Texas Industrial Energy Consumers (TIEC); East Texas Electric Cooperative, Inc. (ETEC); the United States Department of Energy (DOE); and Wal-Mart Stores Texas, LLC, and Sam's East, Inc. (Wal Mart).  The Staff (Staff) of the Public Utility Commission of Texas (Commission or PUC) was also a participant in this docket.

7.       On November 29, 2011, the Commission referred this case to the State Office of Administrative Hearings (SOAH).

8.       On December 7, 2011, the Commission issued its order requesting briefing on threshold legal/policy issues.

9.       On December 19, 2011, the Commission issued its Preliminary Order, identifying 31 issues to be addressed in this proceeding.

10.      On December 20, 2011, the Administrative Law Judges (ALJs) issued SOAH Order No. 2, which approved an agreement among the parties to establish a June 30, 2012 effective date for the Company's new rates resulting from this case pursuant to certain agreed language and consolidate *Application of Entergy Texas, Inc. for Authority to Defer Expenses Related to its Proposed Transition to Membership in the Midwest Independent System Operator*, Docket

No. 39741 (pending) into this proceeding. Although it did not agree, Staff did not oppose the consolidation.

11.     On January 13, 2012, the ALJs issued SOAH Order No. 4 granting the motions for admission *pro hac vice* filed by Kurt J. Boehm and Jody M. Kyler to appear and participate as counsel for Kroger and the motion for admission *pro hac vice* filed by Rick D. Chamberlain to appear and participate as counsel for Wal-Mart.

12.     On January 19, 2012, the Commission issued a Supplemental Preliminary Order identifying two additional issues to be addressed in this case and concluding that the Company's proposed purchased power capacity rider should not be addressed in this case and that such costs should be recovered through base rates.

13.     ETI timely filed with the Commission petitions for review of the rate ordinances of the municipalities exercising original jurisdiction within its service territory. All such appeals were consolidated for determination in this proceeding.

14.     On April 4, 2012, the ALJs issued SOAH Order No. 13 severing rate case expense issues into Application *of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 39896*, Docket No. 40295 (pending).

15.     On April 13, 2012, ETI adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted Test Year revenues.

16.     The hearing on the merits commenced on April 24 and concluded on May 4, 2012.

17.     Initial post-hearing briefs were filed on May 18 and reply briefs were filed on May 30, 2012.

## *Rate Base*

18.     Capital additions that were closed to ETI's plant-in-service between July 1, 2009, and June 30, 2011, are used and useful in providing service to the public and were prudently incurred.

19.     ETI's proposed Hurricane Rita regulatory asset was an issue resolved by the black-box settlement in *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744 (Dec. 13, 2010).

20.     Accrual of carrying charges on the Hurricane Rita regulatory asset should have ceased when Docket No. 37744 concluded because the asset would have then begun earning a rate of return as part of rate base.

21.     The appropriate calculation of the Hurricane Rita regulatory asset should begin with the amount claimed by ETI in Docket No. 37744, less amortization accruals to the end of the Test Year in the present case, and less the amount of additional insurance proceeds received by ETI after the conclusion of Docket No. 37744.

22. A Test-Year-end balance of $15,175,563 for the Hurricane Rita regulatory asset should remain in rate base, applying a five-year amortization rate beginning August 15, 2010.

23. The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

24. The Company requested in rate base its Prepaid Pension Assets Balance of $55,973,545, which represents the accumulated difference between the Statement of Financial Accounting Standards (SFAS) No. 87 calculated pension costs each year and the actual contributions made by the Company to the pension fund.

25. The Prepaid Pension Assets Balance includes $25,311,236 capitalized to construction work in progress (CWIP).

26. It is not necessary to the financial integrity of ETI to include CWIP in rate base, and there was insufficient evidence showing that major projects under construction were efficiently and prudently managed.

27. The portion of the Prepaid Pension Assets Balance that is capitalized to CWIP should not be included in ETI's rate base.

28. The remainder of the Prepaid Pension Assets Balance should be included in ETI's rate base.

29. ETI should be permitted to accrue an allowance for funds used during construction on the portion of ETI's Prepaid Pension Assets Balance capitalized to CWIP.

30. The Financial Accounting Standard Board (FASB) Financial Interpretation No. 48 (FIN 48), "Accounting *for Uncertainty in Income Taxes,"* requires ETI to identify each of its uncertain tax positions by evaluating the tax position on its technical merits to determine whether the position, and the corresponding deduction, is more-likely-than-not to be sustained by the Internal Revenue Service (IRS) if audited.

31. FIN 48 requires ETI to remove the amount of its uncertain tax positions from its Accumulated Deferred Federal Income Tax (ADFIT) balance for financial reporting purposes and record it as a potential liability with interest to better reflect the Company's financial condition.

32. At Test Year-end, ETI had $5,916,461 in FIN 48 liabilities, meaning ETI has, thus far, avoided paying to the IRS $5,916,461 in tax dollars (the FIN 48 Liability) in reliance upon tax positions that the Company believes will not prevail in the event the positions are challenged, via an audit, by the IRS.

33. ETI has deposited $1,294,683 with the IRS in connection with the FIN 48 Liability.

34. The IRS may never audit ETI as to its uncertain tax positions creating the FIN 48 Liability.

35. Even if ETI is audited, ETI might prevail on its uncertain tax positions.

36.    ETI may never have to pay the IRS the FIN 48 Liability.

37.    Other than the amount of its deposit with the IRS, ETI has current use of the FIN 48 Liability funds.

38.    Until actually paid to the IRS, the FIN 48 Liability represents cost-free capital and should be deducted from rate base.

39.    The amount of $4,621,778 (representing ETI's full FIN 48 Liability of $5,916,461 less the $1,294,683 cash deposit ETI has made with the IRS for the FIN 48 Liability) should be added to ETI's ADFIT and thus be used to reduce ETI's rate base.

40.    ETI's application and proposed tariffs do not include a request for a tracking mechanism or rider to collect a return on the FIN 48 Liability.

41.    ETI has not proven that a tracking mechanism or rider to collect a return on FIN 48 Liability is necessary.

42.    Investor-owned electric utilities may include a reasonable allowance for cash working capital in rate base as determined by a lead-lag study conducted in accordance with the Commission's rules.

43.    Cash working capital represents the amount of working capital, not specifically addressed in other rate base items, that is necessary to fund the gap between the time expenditures are made and the time corresponding revenues are received.

44.    The lead-lag study conducted by ETI considered the actual operations of ETI, adjusted for known and measurable changes, and is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii).

45.    It is reasonable to establish ETI's cash working capital requirement based on ETI's lead-lag study as updated in Jay Joyce's rebuttal testimony and on the cost of service approved for ETI in this case.

46.    As a result of the black-box settlements in *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Docket No. 34800 (Nov. 7, 2008) and Docket No. 37744, the Commission did not approve ETI's storm damage expenses since 1996 and its storm damage reserve balance.

47.    ETI established a *prima facie* case concerning the prudence of its storm damage expenses incurred since 1996.

48.    Adjustments to the storm damage reserve balance proposed by intervenors should be denied.

49.    The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

50.     ETI's appropriate Test-Year-end storm reserve balance was negative $59,799,744.

51.     The amount of $9,846,037, representing the value of the average coal inventory maintained at ETI's coal-burning facilities, is reasonable, necessary, and should be included in rate base.

52.     The Spindletop gas storage facility (Spindletop Facility) is used and useful in providing reliable and flexible natural gas supplies to ETI's Sabine Station and Lewis Creek generating plants.

53.     The Spindletop Facility is critical to the economic, reliable operation of the Sabine Station and Lewis Creek generating plants due to their geographic location in the far western region of the Entergy system.

54.     It is reasonable and appropriate to include ETI's share of the costs to operate the Spindletop Facility in rate base.

55.     Staff recommended updating ETI's balance amounts for short-term assets to the 13-month period ending December 2011, which was the most recent information available.  Staff's proposed adjustments should be incorporated into the calculation of ETI's rate base.

56.     The following short-term asset amounts should be included in rate base:  prepayments at $8,134,351; materials and supplies at $29,285,421; and fuel inventory at $52,693,485.

57.     The amount of $1,127,778, representing costs incurred by ETI when it acquired the Spindletop facility, represent actual costs incurred to process and close the acquisition, not mere mark-up costs.

58.     ETI's $1,127,778 in capitalized acquisition costs should be included in rate base because ETI incurred these costs in conjunction with the purchase of a viable asset that benefits its retail customers.

59.     In its application, ETI capitalized into plant in service accounts some of the incentive payments ETI made to its employees.  ETI seeks to include those amounts in rate base.

60.     A portion of those capitalized incentive accounts represent payments made by ETI for incentive compensation tied to financial goals.

61.     The portion of ETI's incentive payments that are capitalized and that are financially-based should be excluded from ETI's rate base because the benefits of such payments inure most immediately and predominantly to ETI's shareholders, rather than its electric customers.

62.     The Test Year for ETI's prior ratemaking proceeding ended on June 30, 2009, and the reasonableness of ETI's capital costs (including capitalized incentive compensation) for that prior period was dealt with by the Commission in that proceeding and is not at issue in this proceeding.

63.    In this proceeding, ETI's capitalized incentive compensation that is financially-based should be excluded from rate base, but only for incentive costs that ETI capitalized during the period from July 1, 2009 (the end of the prior Test Year) through June 30, 2010 (the commencement of the current Test Year).

## *Rate of Return and Cost of Capital*

64.    A return on common equity (ROE) of 9.80 percent will allow ETI a reasonable opportunity to earn a reasonable return on its invested capital.

65.    The results of the discounted cash flow model and risk premium approach support a ROE of 9.80 percent.

66.    A 9.80 percent ROE is consistent with ETI's business and regulatory risk.

67.    ETI's proposed 6.74 percent embedded cost of debt is reasonable.

68.    The appropriate capital structure for ETI is 50.08 percent long-term debt and 49.92 percent common equity.

69.    A capital structure composed of 50.08 percent debt and 49.92 percent equity is reasonable in light of ETI's business and regulatory risks.

70.    A capital structure composed of 50.08 percent debt and 49.92 percent equity will help ETI attract capital from investors.

71.    ETI's overall rate of return should be set as follows:

| COMPONENT | CAPITAL STRUCTURE | COST OF CAPITAL | WEIGHTED AVG COST OF CAPITAL |
|---|---|---|---|
| LONG-TERM DEBT | 50.08% | 6.74% | 3.38% |
| COMMON EQUITY | 49.92% | 9.80% | 4.89% |
| TOTAL | 100.00% | | 8.27% |

## *Operating Expenses*

72.    ETI's Test Year purchased capacity expenses were $245,432,884.

73.    ETI requested an upward adjustment of $30,809,355 as a post-Test Year adjustment to its purchased capacity costs. This request was based on ETI's projections of its purchased capacity expenses during a period beginning June 1, 2012 and ending May 31, 2013 (the Rate Year).

74.   ETI's purchased capacity expense projections were based on estimates of Rate Year expenses for: (a) reserve equalization payments under Schedule MSS-1; (b) payments under third-party capacity contracts; and (c) payments under affiliate contracts.

75.   ETI's projection of its Rate Year reserve equalization payments under Schedule MSS-1 is based on numerous assumptions, including load growths for ETI and its affiliates, future capacity contracts for ETI and its affiliates, and future values of the generation assets of ETI and its affiliates.

76.   There is substantial uncertainty with regard to ETI's projection of its Rate Year reserve equalization payments under Schedule MSS-1.

77.   ETI's projection of its Rate Year third-party capacity contract payments includes numerous assumptions, one of which is that every single third-party supplier will perform at the maximum level under the contract, even though that assumption is inconsistent with ETI's historical experience.

78.   There is substantial uncertainty with regard to ETI's projection of its Rate Year third-party capacity contract payments.

79.   ETI's estimates of its Rate Year purchases under affiliate contracts are based on a mathematical formula set out in Schedule MSS-4.

80.   The MSS-4 formula for Rate Year affiliate capacity payments reflects that these payments will be based on ratios and costs that cannot be determined until the month that the payments are to be made.

81.   Over $11 million of ETI's affiliate transactions were based on a 2013 contract (the EAI WBL Contract) that was not signed until April 11, 2012.

82.   There is uncertainty about whether the EAI WBL Contract will ever go into effect.

83.   ETI projects purchasing over 300 megawatts (MW) more in purchased capacity in the Rate Year than it purchased in the Test Year.

84.   ETI experienced substantial load growth in the two years before the Test Year, and it continues to project similar load growth in the future.

85.   ETI did not meet its burden of proof to demonstrate that a known and measurable adjustment of $30,809,355 should be made to its Test Year purchased capacity expenses.

86.   ETI's purchased capacity expense in this case should be based on the Test Year level of $245,432,884.

87.   ETI incurred $1,753,797 of transmission equalization expense during the Test Year.

88.    ETI proposed an upward adjustment of $8,942,785 for its transmission equalization expense. This request was based on ETI's projections of its transmission equalization expenses during the Rate Year.

89.    The transmission equalization expense that ETI will pay in the Rate Year will depend on future costs and loads for each of the Entergy operating companies.

90.    ETI's projection of its Rate Year transmission equalization expenses is uncertain and speculative because it depends on a number of variables, including future transmission investments, deferred taxes, depreciation reserves, costs of capital, tax rates, operating expenses, and loads of each of the Entergy operating companies.

91.    ETI seeks increased transmission equalization expenses for transmission projects that are not currently used and useful in providing electric service. ETI's post-Test Year adjustment is based on the assumption that certain planned transmission projects will go into service after the Test Year. At the close of the hearing, none of the planned transmission projects had been fully completed and some were still in the planning phase.

92.    It is not reasonable for ETI to charge its retail ratepayers for transmission equalization expenses related to projects that are not yet in-service.

93.    ETI's request for a post-Test Year adjustment of $8,942,785 for Rate Year transmission equalization expenses should be denied because those expenses are not known and measurable. ETI's post-Test Year adjustment does not with reasonable certainty reflect what ETI's transmission equalization expense will be when rates are in effect.

94.    ETI's transmission equalization expense in this case should be based on the Test Year level of $1,753,797.

95.    P.U.C. SUBST. R. 25.231(c)(2)(ii) states that the reserve for depreciation is the accumulation of recognized allocations of original cost, representing the recovery of initial investment over the estimated useful life of the asset.

96.    Except in the case of the amortization of the general plant deficiency, the use of the remaining life depreciation method to recover differences between theoretical and actual depreciation reserves is the most appropriate method and should be continued.

97.    It is reasonable for ETI to calculate depreciation reserve allocations on a straight-line basis over the remaining, expected useful life of the item or facility.

98.    Except as described below, the service lives and net salvage rates proposed by the Company are reasonable, and these service lives and net salvage rates should be used in calculating depreciation rates for the Company's Production, Transmission, Distribution, and General Plant assets.

99.    A 60-year life for Sabine Units 4 and 5 is reasonable for purposes of establishing production plant depreciation rates.

100.    The retirement (actuarial) rate method, rather than the interim retirement method, should be used in the development of production plant depreciation rates.

101.    Production plant net salvage is reasonably based on the negative five percent net salvage in existing rates.

102.    The net salvage rate of negative 10 percent for ETI's transmission structures and improvements (FERC Account 352) is the most reasonable of those proposed and should be adopted.

103.    The net salvage rate of negative 20 percent for ETI's transmission station equipment (FERC Account 353) is the most reasonable of those proposed and should be adopted.

104.    The net salvage rate of negative five percent for ETI's transmission towers and fixtures (FERC Account 354) is the most reasonable of those proposed and should be adopted.

105.    The net salvage rate of negative 30 percent for ETI's transmission poles and fixtures (FERC Account 355) is the most reasonable of those proposed and should be adopted.

106.    The net salvage rate of negative 30 percent for ETI's transmission overhead conductors and devices (FERC Account 356) is the most reasonable of those proposed and should be adopted.

107.    A service life of 65 years and a dispersion curve of R3 for ETI's distribution structures and improvements (FERC Account 361) are the most reasonable of those proposed and should be approved.

108.    A service life of 40 years and a dispersion curve of R1 for ETI's distribution poles, towers, and fixtures (FERC Account 364) are the most reasonable of those proposed and should be approved.

109.    A service life of 39 years and a dispersion curve of R0.5 for ETI's distribution overhead conductors and devices (FERC Account 365) are the most reasonable of those proposed and should be approved.

110.    A service life of 35 years and a dispersion curve of R1.5 for ETI's distribution underground conductors and devices (FERC Account 367) are the most reasonable of those proposed and should be approved.

111.    A service life of 33 years and a dispersion curve of L0.5 for ETI's distribution line transformers (FERC Account 368) are the most reasonable of those proposed and should be approved.

112.    A service life of 26 years and a dispersion curve of L4 for ETI's distribution overhead service (FERC Account 369.1) are the most reasonable of those proposed and should be approved.

113.   The net salvage rate of negative five percent for ETI's distribution structures and improvements (FERC Account 361) is the most reasonable of those proposed and should be adopted.

114.   The net salvage rate of negative 10 percent for ETI's distribution station equipment (FERC Account 362) is the most reasonable of those proposed and should be adopted.

115.   The net salvage rate of negative seven percent for ETI's distribution overhead conductors and devices (FERC Account 365) is the most reasonable of those proposed and should be adopted.

116.   The net salvage rate of negative five percent for ETI's distribution line transformers (FERC Account 368) is the most reasonable of those proposed and should be adopted.

117.   The net salvage rate of negative 10 percent for ETI's distribution overhead services (FERC Account 369.1) is the most reasonable of those proposed and should be adopted.

118.   The net salvage rate of negative 10 percent for ETI's distribution underground services (FERC Account 369.2) is the most reasonable of those proposed and should be adopted.

119.   A service life of 45 years and a dispersion curve of R2 for ETI's general structures and improvements (FERC Account 390) are the most reasonable of those proposed and should be approved.

120.   The net salvage rate of negative 10 percent for ETI's general structures and improvements (FERC Account 390) is the most reasonable of those proposed and should be adopted.

121.   It is reasonable to convert the $21.3 million deficit that has developed over time in the reserve for general plant accounts to General Plant Amortization.

122.   A ten-year amortization of the deficit in the reserve for general plant accounts is reasonable and should be adopted.

123.   FERC pronouncement AR-15 requires amortization over the same life as recommended based on standard life analysis. A standard life analysis determined that a five-year life was appropriate for general plant computer equipment (FERC Account 390.2). Therefore, a five year amortization for this account is reasonable and should be adopted.

124.   ETI proposed adjustments to its Test Year payroll costs to reflect: (a) changes to employee headcount levels at ETI and Entergy Services, Inc. (ESI); and (b) approved wage increases set to go into effect after the end of the Test Year.

125.   The proposed payroll adjustments are reasonable but should be updated to reflect the most recent available information on headcount levels as proposed by Commission Staff. In addition to adjusting payroll expense levels, the more recent headcount numbers should be used to adjust the level of payroll tax expense, benefits expense, and savings plan expense.

126.   Staff has appropriately updated headcount levels to the most recent available data but errors made by Staff should be corrected. The corrections related to: (a) a double counting of three ETI and one ESI employee; (b) inadvertent use of the ETI benefits cost percentage in the calculation of ESI benefits costs; (c) an inappropriate reduction of savings plan costs when such costs were already included in the benefits percentage adjustments; and (d) corrections for full-time equivalents calculations. Staff's ETI headcount adjustment (AG-7) overstated operation and maintenance (O&M) payroll reduction by $224,217, and ESI headcount adjustment (AG-7) understated O&M payroll increase by $37,531.

127.   ETI included $14,187,744 for incentive compensation expenses in its cost of service.

128.   The compensation packages that ETI offers its employees include a base payroll amount, annual incentive programs, and long-term incentive programs. The majority of the compensation is for operational measures, but some is for financial measures.

129.   Incentive compensation that is based on financial measures is of more immediate and predominant benefit to shareholders, whereas incentive compensation based on operational measures is of more immediate and predominant benefit to ratepayers.

130.   Incentives to achieve operational measures are necessary and reasonable to provide utility services but those to achieve financial measures are not.

131.   The $5,376,975 that was paid for long term incentive programs was tied to financial measures and, therefore, should not be included in ETI's cost of service.

132.   Of the amounts that were paid pursuant to the Executive Annual Incentive Plan, $819,062 was tied to financial measures and, therefore, should be disallowed.

133.   In total, the amount of incentive compensation that should be disallowed is $6,196,037 because it was related to financial measures that are not reasonable and necessary for the provision of electric service.

134.   The amount of incentive compensation that should be included in the cost of service is $7,991,707.

135.   To attract and retain highly qualified employees, the Entergy Companies provide a total package of compensation and benefits that is equivalent in scope and cost with what other comparable companies within the utility business and other industries provide for their employees.

136.   When using a benchmark analysis to compare companies' levels of compensation, it is reasonable to view the market level of compensation as a range rather than a precise, single point.

137.   ETI's base pay levels are at market.

138.   ETI's benefits plan levels are within a reasonable range of market levels.

139.    ETI's level of compensation and benefits expense is reasonable and necessary.

140.    ETI provides non-qualified supplemental executive retirement plans for highly compensated individuals such as key managerial employees and executives that, because of limitations imposed under the Internal Revenue Code, would otherwise not receive retirement benefits on their annual compensation over $245,000 per year.

141.    ETI's non-qualified supplemental executive retirement plans are discretionary costs designed to attract, retain, and reward highly compensated employees whose interests are more closely aligned with those of the shareholders than the customers.

142.    ETI's non-qualified executive retirement benefits in the amount of $2,114,931 are not reasonable or necessary to provide utility service to the public, not in the public interest, and should not be included in ETI's cost of service.

143.    For the employee market in which ETI operates, most peer companies offer moving assistance.  Such assistance is expected by employees, and ETI would be placed at a competitive disadvantage if it did not offer relocation expenses.

144.    ETI's relocation expenses were reasonable and necessary.

145.    The Company's requested operating expenses should be reduced by $40,620 to reflect the removal of certain executive prerequisites proposed by Staff.

146.    Staff properly adjusted the Company's requested interest expense of $68,985 by removing $25,938 from FERC account 431 (using the interest rate of 0.12 percent for calendar year 2012), leaving a recommended interest expense of $43,047.

147.    During the Test Year, ETI's property tax expense equaled $23,708,829.

148.    ETI requested an upward *pro forma* adjustment of $2,592,420, to account for the property tax expenses ETI estimates it will pay in the Rate Year.

149.    ETI's requested *pro forma* adjustment is not reasonable because it is based, in part, upon the prediction that ETI's property tax rate will be increased in 2012, a change that is speculative is not known and measurable.

150.    Staff's recommendation to increase ETI's Test Year property tax expenses by $1,214,688 is based on the historical effective tax rate applied to the known Test Year-end plant in service value, consistent with Commission precedent, and based upon known and measurable changes.

151.    ETI's Test Year property tax burden should be adjusted upward by $1,214,688.

152.    Staff recommended reducing ETI's advertising, dues, and contributions expenses by $12,800.  The recommendation, which no party contested, should be adopted.

153. The final cost of service should reflect changes to cost of service that affect other components of the revenue requirement such as the calculation of the Texas state gross receipts tax, the local gross receipts tax, the PUC Assessment Tax and the Uncollectible Expenses.

154. The Company's requested Federal income tax expense is reasonable and necessary.

155. ETI's request for $2,019,000 to be included in its cost of service to account for the Company's annual decommissioning expenses associated with River Bend is not reasonable because it is not based upon "the most current information reasonably available regarding the cost of decommissioning" as required by P.U.C. SUBST. R. 25.231(b)(1)(F)(i).

156. Based on the most current information reasonably available, the appropriate level of decommissioning costs to be included in ETI's cost of service is $1,126,000.

157. ETI's appropriate total annual self-insurance storm damage reserve expense is $8,270,000, comprised of an annual accrual of $4,400,000 to provide for average annual expected storm losses, plus an annual accrual of $3,870,000 for 20 years to restore the reserve from its current deficit.

158. ETI's appropriate target self-insurance storm damage reserve is $17,595,000.

159. ETI should continue recording its annual storm damage reserve accrual until modified by a Commission order.

160. The operating costs of the Spindletop Facility are reasonable and necessary.

161. The operating costs of the Spindletop Facility paid to PB Energy Storage Services are eligible fuel expenses.

## *Affiliate Transactions*

162. ETI affiliates charged ETI $78,998,777 for services during the Test Year. The majority of these O&M expenses—$69,098,041—were charged to ETI by ESI. The remaining affiliate services were charged (or credited) to ETI by: Entergy Gulf States Louisiana, L.L.C.; Entergy Arkansas, Inc.; Entergy Louisiana, LLC; Entergy Mississippi, Inc.; Entergy Operations, Inc.; and non-regulated affiliates.

163. ESI follows a number of processes to ensure that affiliate charges are reasonable and necessary and that ETI and its affiliates are charged the same rate for similar services. These processes include: (a) the use of service agreements to define the level of service required and the cost of those services; (b) direct billing of affiliate expenses where possible; (c) reasonable allocation methodologies for costs that cannot be directly billed; (d) budgeting processes and controls to provide budgeted costs that are reasonable and necessary to ensure appropriate levels of service to its customers; and (e) oversight controls by ETI's Affiliate Accounting and Allocations Department.

164.    Affiliates charged expenses to ETI through 1292 project codes during the Test Year.

165.    ETI agreed to remove the following affiliate transactions from its application:
(1) Project F3PPCASHCT (Contractual Alternative/Cashpo) in the amount of $2,553;
(2) Project F3PCSPETEI (Entergy-Tulane Energy Institute) in the amount of $14,288; and
(3) Project F5PPKATRPT (Storm Cost Processing & Review) in the amount of $929.

166.    The $356,151 (which figure includes the $112,531 agreed to by ETI) of costs associated with Projects F5PCZUBENQ (Non-Qualified Post Retirement) and F5PPZNQBDU (Non Qual Pension/Benf Dom Utl) are costs that are not reasonable and necessary for the provision of electric utility service and are not in the public interest.

167.    The $10,279 of costs associated with Project F3PPFXERSP (Evaluated Receipts Settlement) are not normally-recurring costs and should not be recoverable.

168.    The $19,714 of costs associated with Project F3PPEASTIN (Willard Eastin *et al*) are related to ESI's operations, it is more immediately related to Entergy Louisiana, Inc. and Entergy New Orleans, Inc.  As such, they are not recoverable from Texas ratepayers.

169.    The $171,032 of costs associated with Project F3PPE9981S (Integrated Energy Management for ESI) are research and development costs related to energy efficiency programs.  As such, they should be recovered through the energy efficiency cost recovery factor rather than base rates.

170.    Except as noted in the above Findings of Fact Nos. 162-169, all remaining affiliate transactions were reasonable and necessary, were allowable, were charged to ETI at a price no higher than was charged by the supplying affiliate to other affiliates, and the rate charged is a reasonable approximation of the cost of providing service.

## *Jurisdictional Cost Allocation*

171.    ETI has one full or partial requirements wholesale customer – East Texas Electric Cooperative, Inc.

172.    ETI proposes that 150 MW be set as the wholesale load for developing retail rates in this docket.  Using 150 MW to set the wholesale load is reasonable.  The 150 MW used to set the wholesale load results in a retail production demand allocation factor of 95.3838 percent.

173.    The 12 Coincident Peak (12 CP) allocation method is consistent with the approach used by the FERC to allocate between jurisdictions.

174.    Using 12CP methodology to allocate production costs between the wholesale and retail jurisdictions is the best method to reflect cost responsibility and is appropriate based on ETI's reliance on capacity purchases.

## *Class Cost Allocation and Rate Design*

175.    There is no express statutory authorization for ETI's proposed Renewable Energy Credits Rider (REC Rider).

176.    REC Rider constitutes improper piecemeal ratemaking and should be rejected.

177.    ETI's Test Year expense for renewable energy credits, $623,303, is reasonable and necessary and should be included in base rates.

178.    Municipal Franchise Fees (MFF) is a rental expense paid by utilities for the right to use public rights-of-way to locate its facilities within municipal limits.

179.    ETI is an integrated utility system. ETI's facilities located within municipal limits benefit all customers, whether the customers are located inside or outside of the municipal limits.

180.    Because all customers benefit from ETI's rental of municipal right-of-way, municipal franchise fees should be charged to all customers in ETI's service area, regardless of geographic location.

181.    It is reasonable and consistent with the Public Utility Regulatory Act (PURA) § 33.008(b) that MFF be allocated to each customer class on the basis of in-city kilo-watt hour (kWH) sales, without an adjustment for the MFF rate in the municipality in which a given kWH sale occurred.

182.    The same reasons for allocating and collecting MFF as set out in Finding of Fact Nos. 178-181 also apply to the allocation and collection of Miscellaneous Gross Receipts Taxes. The Company's proposed allocation of these costs to all retail customer classes based on customer class revenues relative to total revenues is appropriate.

183.    The Average and Excess (A&E) 4CP method for allocating capacity-related production costs, including reserve equalization payments, to the retail classes is a standard methodology and the most reasonable methodology.

184.    The A&E 4CP method for allocating transmission costs to the retail classes is standard and the most reasonable methodology.

185.    ETI appropriately followed the rate class revenue requirements from its cost of service study to allocate costs among customer classes. ETI's revenue allocation properly sets rates at each class's cost of service.

186.    It is reasonable for ETI to eliminate the service condition for Rate Groups A and C in Schedule SHL [Street and Highway Lighting Service] that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb.

187.    It is appropriate to require ETI to prepare and file, as part of its next base rate case, a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates it next rate case.

188.    An agreement was reached by the parties and approved by the Commission in Docket No. 37744 that directed ETI to exclude, in its next rate case, the life-of-contract demand ratchet for existing customers in the Large Industrial Power Service (LIPS), Large Industrial Power Service-Time of Day, General Service, General Service-Time of Day, Large General Service, and Large General Service-Time of Day rate schedules.

189.    ETI's proposed tariffs in this case did not remove the life-of-contract demand ratchet from these rate schedules consistent with the parties' agreement in Docket No. 37744.

190.    A perpetual billing obligation based on a life-of-contract demand ratchet, as ETI proposed, is not reasonable.

191.    ETI's proposed LIPS and LIPS Time of Day tariffs should be modified to reflect the agreement that was adopted by the Commission as just and reasonable in Docket No. 37744. Accordingly, these tariffs should be modified as set out in Findings of Fact No. 192-194.

192.    ETI's Schedule LIPS and LIPS Time of Day § VI should be changed to read:

>           DETERMINATION OF BILLING LOAD
>
>           The kW of Billing Load will be the greatest of the following:
>
>           (A) The Customer's maximum measured 30-minute demand during any 30-minute interval of the current billing month, subject to §§ III, IV and V above; or
>
>           (B) 60% of Contract Power as defined in § VII; or
>
>           (C) 2,500 kW.

193.    ETI's Schedule LIPS and LIPS Time of Day § VII should be changed to read:

>           DETERMINATION OF CONTRACT POWER
>
>           Unless Company gives customer written notice to the contrary, Contract Power will be defined as below:
>
>           Contract Power - the highest load established under § VI(A) above during the 12 months ending with the current month. For the initial 12 months of Customer's service under the currently effective contract, the Contract Power shall be the kW specified in the

currently effective contract unless exceeded in any month during the initial 12-month period.

194.  The Large General Service and Large General Service-Time of Day schedules should be similarly revised to eliminate ETI's life-of-contract demand ratchet.

195.  In its proposed rate design for the LIPS class, the Company took a conservative approach and increased the current rates by an equal percentage. This minimized customer bill impacts while maintaining cost causation principles on a rate class basis.

196.  It is a reasonable move towards cost of service to add a customer charge of $630 to the LIPS rate schedule with subsequent increases to be considered in subsequent base rate cases.

197.  It is a reasonable move towards cost of service to slightly decrease the LIPS energy charges and increase the demand charges as proposed by Staff witness William B. Abbott.

198.  DOE proposed a new Schedule LIPS rider—Schedule "Schedulable Intermittent Pumping Service" (SIPS) for load schedulable at least four weeks in advance, that occurs in the off-season (November through April), that can be cancelled at any time, and for load not lasting more than 80 hours in a year. For customers whose loads match these SIPS characteristics (for example, DOE's Strategic Petroleum Reserve), the 12-month demand ratchet provision of Schedule LIPS does not apply to demands set under the provisions of the SIPS rider. The monthly demand set under the SIPS provisions would be applicable for billing purposes only in the month in which it occurred. In short, if a customer set a 12-month ratchet demand in that month, it would be forgiven and not applicable in the succeeding 12 months.

199.  DOE's proposed Schedule SIPS is not restricted solely to the DOE and should be adopted. It more closely addresses specific customer characteristics and provides for cost-based rates, as does another ETI rider applicable to Pipeline Pumping Service.

200.  Standby Maintenance Service (SMS) is available to customers who have their own generation equipment and who contract for this service from ETI.

201.  P.U.C. Subst. R. 25.242(k)(1) provides that rates for sales of standby and maintenance power to qualifying facilities should recognize system wide costing principles and should not be discriminatory.

202.  It is reasonable to move Schedule SMS toward cost of service by: (a) adding a customer charge equivalent to that of the LIPS rate schedule only for SMS customers not purchasing supplementary power under another applicable rate; and (b) revising the tariff as follows:

| Charge | Distribution (less than 69KV) | Transmission (69KV and greater) |
|---|---|---|
| Billing Load Charge ($/kW): | | |
| Standby | $2.46 | $0.79 |
| Maintenance | $2.27 | $0.60 |
| Non-Fuel Energy Charge (¢/kWh) | | |
| On-Peak | 0.881¢ | 0.846¢ |
| Off-Peak | 0.575¢ | 0.552¢ |

203.   ETI's Additional Facilities Charge Rider (Schedule AFC) prescribes the monthly rental charge paid by a customer when ETI installs facilities for that customer that would not normally be supplied, such as line extensions, transformers, or dual feeds.

204.   ETI existing Schedule AFC provides two pricing options. Option A is a monthly charge. Option B, which applies when a customer elects to amortize the directly-assigned facilities over a shorter term ranging from one to ten years, has a variable monthly charge. There is also a term charge that applies after the facility has been fully depreciated.

205.   It is reasonable and cost-based to reduce the Schedule AFC Option A rate to 1.20 percent per month of the installed cost of all facilities included in the agreement for additional facilities.

206.   It is reasonable and cost-based to reduce the Schedule AFC Option B monthly rate and the Post Term Recovery Charge as follows:

| Selected Recovery Term | Recovery Term Charge | Post Recovery Term Charge |
|---|---|---|
| 1 | 10.88% | 0.35% |
| 2 | 5.39% | 0.35% |
| 3 | 3.92% | 0.35% |
| 4 | 3.20% | 0.35% |
| 5 | 2.76% | 0.35% |
| 6 | 2.48% | 0.35% |
| 7 | 2.28% | 0.35% |
| 8 | 2.14% | 0.35% |
| 9 | 1.97% | 0.35% |
| 10 | 1.94% | 0.35% |

207.   The revisions in the above Findings of Fact to Schedule AFC rates reasonably reflect the costs of running, operating, and maintaining the directly-assigned facilities.

208.  It is reasonable to modify the Large General Service rate schedule by increasing the demand charge from $10.25 to $12.81; decreasing the energy charge from $.01023 to $.00513; and maintaining the customer charge at $425.05.

209.  Staff's proposed change to the General Service (GS) rate schedule to gradually move GS customers towards their cost of service by recommending a decrease in the customer charge from the current rate of $41.09 to $39.91, and a decrease in the energy charges is reasonable and should be adopted.

210.  ETI's Residential Service (RS) rate schedule is composed of two elements:  a customer charge of $5 per month and a consumption-based energy charge.  The Energy charge is a fixed rate of 5.802¢ per kWh from May through October (Summer).  In the months November through April (Winter), the rates are structured as a declining block, in which the price of each unit is reduced after a defined level of usage.

211.  ETI's Schedule RS declining block rate structure is contrary to energy efficiency efforts and the Legislature's goal of reducing both energy demand and energy consumption in Texas, as stated in PURA § 39.905.

212.  Schedule RS winter block rates should be modified consistent with the goal set out in PURA § 39.905, with the initial phase-in of a 20 percent reduction in the block differential proposed by ETI and subsequent reductions should be reviewed for consideration at the occurrence of each rate case filing.

213.  Other elements of Schedule RS are just and reasonable.

### *Fuel Reconciliation*

214.  ETI incurred $616,248,686 in natural-gas expenses during the Reconciliation Period, which is from July 2009 through June 2011.

215.  ETI purchased natural gas in the monthly and daily markets and pursuant to a long-term contract with Enbridge Inc. pipeline.  ETI also transported gas on its own account and negotiated operational balancing agreements with various pipeline companies.

216.  ETI employed a diversified portfolio of gas supply and transportation agreements to meet its natural-gas requirements, and ETI prudently managed its gas-supply contracts.

217.  ETI's natural gas expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

218.  ETI incurred $90,821,317 in coal expenses during the Reconciliation Period.

219.    ETI prudently managed its coal and coal-related contracts during the Reconciliation Period.

220.    ETI monitored and audited coal invoices from Louisiana Generating, LLC for coal burned at the Big Cajun II, Unit 3 facility.

221.    ETI's coal expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

222.    ETI incurred $990,041,434 in purchased-energy expenses during the Reconciliation Period.

223.    The Entergy System's planning and procurement processes for purchased power produced a reasonable mix of purchased resources at a reasonable price.

224.    During the Reconciliation Period, ETI took advantage of opportunities in the fuel and purchased-power markets to reduce costs and to mitigate against price volatility.

225.    ETI's purchased-energy expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

226.    ETI provided sufficient contemporaneous documentation to support the reasonableness of its purchased-power planning and procurement processes and its actual power purchases during the Reconciliation Period.

227.    The Entergy system sold power off system when the revenues were expected to be more than the incremental cost of supplying generation for the sale, subject to maintaining adequate reserves.

228.    The System Agreement is the tariff approved by the FERC that provides the basis for the operation and planning of the Entergy system, including the six Operating Companies. The System Agreement governs the wholesale-power transactions among the Operating Companies by providing for joint operation and establishing the bases for equalization among the Operating Companies, including the costs associated with the construction, ownership, and operation of the Entergy system facilities.

229.    Under the terms of the Entergy System Agreement, ETI was allocated its share of revenues and expenses from off-system sales.

230.    During the Reconciliation Period, ETI recorded off-system sales revenue in the amount of $376,671,969 in FERC Account 447 and credited 100 percent of off-system sales revenues and margins from off-system sales to eligible fuel expenses.

231.   ETI properly recorded revenues from off-system sales and credited those revenues to eligible fuel costs.

232.   The Entergy system consists of six Operating Companies, including ETI, which are planned and operated as a single, integrated electric system under the terms of the System Agreement.

233.   Service Schedule MSS-1 of the System Agreement determines how the capability and ownership costs of reserves for the Entergy system are equalized among the Operating Companies. These inter-system "reserve equalization" payments are the result of a formula rate related to the Entergy system's reserve capability that is applied on a monthly basis.

234.   Reserve capability under Service Schedule MSS-1 is capability in excess of the Entergy system's actual or planned load built or acquired to ensure the reliable, efficient operation of the electric system.

235.   By approving Service Schedule MSS-1, the FERC has approved the method by which the Operating Companies share the cost of maintaining sufficient reserves to provide reliability for the Entergy system as a whole.

236.   Service Schedule MSS-3 of the System Agreement determines the pricing and exchange of energy among the Operating Companies. By approving Service Schedule MSS-3, the FERC has approved the method by which the Operating Companies are reimbursed for energy sold to the exchange energy pool and how that energy is purchased.

237.   Service Schedule MSS-4 of the System Agreement sets forth the method for determining the payment for unit power purchases between Operating Companies. By approving Service Schedule MSS-4, the FERC has approved the methodology for pricing Inter-Operating Company unit power purchases.

238.   The Entergy system is planned using multi-year, annual, seasonal, monthly, and next-day horizons. Once the planning process has identified the most economical resources that can be used to reliably meet the aggregate Entergy system demand, the next step is to procure the fuel necessary to operate the generating units as planned and acquire wholesale power from the market.

239.   Once resources are procured to meet forecasted load, the Entergy system is operated during the current day using all the resources available to meet the total Entergy system demand.

240.   After current-day operation, the System Agreement prescribes an accounting protocol to bill the costs of operating the system to the individual Operating Companies. This protocol is implemented via the Intra-System Bill (ISB) to each Operating Company on a monthly basis.

241.    ETI purchased power from affiliated Operating Companies per the terms of Service Schedule MSS-3 of the System Agreement. The payments made under Schedule MSS-3 to affiliated Operating Companies are reasonable and necessary, and the FERC has approved the pricing formula and the obligation to purchase the energy. ETI pays the same price per megawatt hour for energy under Service Schedule MSS-3 as does any other Operating Company purchasing energy under Service Schedule MSS-3 during the same hour.

242.    The Spindletop Facility is used primarily to ensure gas-supply reliability and guard against gas-supply curtailments that can occur as a result of extreme weather or other unusual events.

243.    The Spindletop Facility provides a secondary benefit of flexibility in gas supply. ETI can back down gas-fired generation to take advantage of more economical wholesale power, or use gas from storage to supplement gas-fired generation when load increases during the day and thereby avoid more expensive intra-day gas purchases.

244.    ETI's customers received benefits from the Spindletop Facility during the Reconciliation Period through reliable gas supplies and ETI's monthly and daily storage activity.

245.    ETI prudently managed the Spindletop Facility to provide reliability and flexibility of gas supply for the benefit of customers.

246.    ETI proposed new loss factors, based on a December 2010 line loss study, to be applied for the purpose of allocating its costs to its wholesale customers and retail customer classes.

247.    ETI's proposed loss factors are reasonable and shall be implemented on a prospective basis as a result of this final order.

248.    ETI seeks a special-circumstances exception to recover $99,715 resulting from the FERC's reallocation of rough production equalization costs in FERC Order No. 720-A, and to treat such costs as eligible fuel expense.

249.    Special circumstances exist and it is appropriate for recovery of the rough production cost equalization costs reallocated to ETI as a result of the FERC's decision in Order No. 720-A.

*Other Issues*

250.    A deferred accounting of ETI's Midwest Independent Transmission System Operator (MISO) transition expenses is not necessary to carry out any requirement of PURA.

251.    ETI should include $2.4 million in base rates for MISO transition expense incurred on or after January 2, 2011, based on a five-year amortization of $12 million in total projected expenses.

252.    ETI should include an additional $52,800 in base rates for MISO transition expenses incurred during the 2010 portion of the Test Year, based on a five-year amortization of $263,908 in such expenses.

253.    Transmission Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

254.    Distribution Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

255.    The appropriate amount for ETI's purchased power capacity expense to be included in base rates is $245,432,884.

256.     The amount of ETI's purchased power capacity expense includes third-party contracts, legacy affiliate contracts, other affiliate contracts, and reserve equalization.  Whether the amounts for all contracts should be included in the baseline for a purchased capacity rider that may be approved in Project No. 39246 is an issue that should be decided in that project.

## B.    Conclusions of Law

1.    ETI is a "public utility" as that term is defined in PURA § 11.004(1) and an "electric utility" as that term is defined in PURA § 31.002(6).

2.    The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 14.001, 32.001, 32.101, 33.002, 33.051, 36.101–.111, and 36.203.

3.    SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049.

4.    This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act, TEX. GOV'T CODE ANN. Chapter 2001.

5.    ETI provided notice of its application in compliance with PURA § 36.103, P.U.C. PROC. R. 22.51(a), and P.U.C. SUBST. R. 25.235(b)(1)-(3).

6.  Pursuant to PURA § 33.001, each municipality in ETI's service area that has not ceded jurisdiction to the Commission has jurisdiction over the Company's application, which seeks to change rates for distribution services within each municipality.

7.  Pursuant to PURA § 33.051, the Commission has jurisdiction over an appeal from a municipality's rate proceeding.

8.  ETI has the burden of proving that the rate change it is requesting is just and reasonable pursuant to PURA § 36.006.

9.  In compliance with PURA § 36.051, ETI's overall revenues approved in this proceeding permit ETI a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses.

10. Consistent with PURA § 36.053, the rates approved in this proceeding are based on original cost, less depreciation, of property used and useful to ETI in providing service.

11. The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

12. Including the cash working capital approved in this proceeding in ETI's rate base is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV), which allows a reasonable allowance for cash working capital to be included in rate base.

13. The ROE and overall rate of return authorized in this proceeding are consistent with the requirements of PURA §§ 36.051 and 36.052.

14. The affiliate expenses approved in this proceeding and included in ETI's rates meet the affiliate payment standards articulated in PURA §§ 36.051, 36.058, and *Railroad Commission of Texas v. Rio Grande Valley Gas Co*., 683 S.W.2d 783 (Tex. App.—Austin 1984, no writ).

15. The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

16. Pursuant to P.U.C. SUBST. R. 25.231(b)(1)(F), the decommissioning expense approved in this case is based on the most current information reasonably available regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors.

17.    ETI has demonstrated that its eligible fuel expenses during the Reconciliation Period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers as required by P.U.C. SUBST. R. 25.236(d)(1)(A). ETI has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the Reconciliation Period as required by P.U.C. SUBST. R. 25.236(d)(1)(C).

18.    ETI prudently managed the dispatch, operations, and maintenance of its fossil plants during the Reconciliation Period.

19.    The Reconciliation Period level operating and maintenance expenses for the Spindletop Facility are eligible fuel expenses pursuant to P.U.C. SUBST. R. 25.236(a).

20.    Special circumstances are warranted pursuant to P.U.C. SUBST. R. 25.236(a)(6) to recover rough production equalization payments reallocated to ETI by the FERC.

21.    ETI's rates, as approved in this proceeding, are just and reasonable in accordance with PURA § 36.003.

## C.    Proposed Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.    The Proposal for Decision prepared by the SOAH ALJs is adopted to the extent consistent with this Order.

2.    ETI's application is granted to the extent consistent with this Order.

3.    ETI shall file tariffs consistent with this Order within 20 days of the date of this Order. No later than ten days after the date of the tariff filings, Staff shall file its comments recommending approval, modification, or rejection of the individual sheets of the tariff proposal. Responses to the Staff's recommendation shall be filed no later than 15 days after the filing of the tariff. The Commission shall by letter approve, modify, or reject each tariff sheet, effective the date of the letter.

4.    The tariff sheets shall be deemed approved and shall be become effective on the expiration of 20 days from the date of filing, in the absence of written notification of modification or rejection by the Commission. If any sheets are modified or rejected, ETI shall file proposed revisions of those sheets in accordance with the Commission's letter within ten days of the date of that letter, and the review procedure set out above shall apply to the revised sheets.

5.      Copies of all tariff-related filings shall be served on all parties of record.

6.      ETI shall prepare and file as part of its next base rate case a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates in that case. If ETI has LED lighting customers taking service, the study shall include detailed information regarding differences in the cost of serving LED and non-LED lighting customers. ETI shall provide the results of this study to Cities and interested parties as soon as practicable but no later than the filing of its next rate case.

7.      All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.


        **SIGNED July 6, 2012.**


                              THOMAS H. WALSTON
                              ADMINISTRATIVE LAW JUDGE
                              STATE OFFICE OF ADMINISTRATIVE HEARINGS


                              STEVEN D. ARNOLD
                              ADMINISTRATIVE LAW JUDGE
                              STATE OFFICE OF ADMINISTRATIVE HEARINGS


                              HUNTER BURKHALTER
                              ADMINISTRATIVE LAW JUDGE/MEDIATOR
                              STATE OFFICE OF ADMINISTRATIVE HEARINGS


                              LILO D. POMERLEAU
                              ADMINISTRATIVE LAW JUDGE
                              STATE OFFICE OF ADMINISTRATIVE HEARINGS

APPENDIX B

Commission's Order on Rehearing in Docket No. 39896

APPLICATION OF ENTERGY TEXAS,  § PUBLIC UTILITY COMMISSION
INC. FOR AUTHORITY TO CHANGE     §
RATES, RECONCILE FUEL COSTS,     §            OF TEXAS
AND OBTAIN DEFERRED              §
ACCOUNTING TREATMENT            §

## ORDER ON REHEARING

This Order addresses the application of Entergy Texas, Inc. for authority to change rates, reconcile fuel costs, and defer costs for the transition to the Midwest Independent System Operator (MISO). In its application, Entergy requested approval of an increase in annual base-rate revenues of approximately $111.8 million (later lowered to $104.8 million), proposed tariff schedules, including new riders to recover costs related to purchased-power capacity and renewable-energy credit requirements, requested final reconciliation of its fuel costs, and requested waivers to the rate-filing package requirements.

On July 6, 2012, the State Office of Administrative Hearings (SOAH) administrative law judges (ALJs) issued a proposal for decision in which they recommended an overall rate increase for Entergy of $28.3 million resulting in a total revenue requirement of approximately $781 million. The ALJs also recommended approving total fuel costs of approximately $1.3 billion. The ALJs did not recommend approving the renewable-energy credit rider and the Commission earlier removed the purchased-power capacity rider as an issue to be addressed in this docket.[1] On August 8, 2012, the ALJs filed corrections to the proposal for decision based on the exceptions and replies of the parties.[2] Except as discussed in this Order, the Commission adopts the proposal for decision, as corrected, including findings of fact and conclusions of law.

Parties filed motions for rehearing on September 25 and October 4, 2012 and filed replies to the motions for rehearing on October 15, 2012. The Commission considered the motions for

---

[1] Supplemental Preliminary Order at 2, 3 (Jan. 19, 2012).

[2] Letter from SOAH judges to PUC (Aug. 8, 2012).

rehearing at the October 25, 2012 open meeting. The Commission granted Commission Staff's motion for rehearing that requested technical corrections to reflect the rates that resulted from the Commission Staff number-running memo that was filed on August 28, 2012. The Commission modifies findings of fact 205, 206, 208, and 210 as requested by Commission Staff and attaches Commission schedules I through V to reflects its decisions. The Commission granted the Department of Energy's motion for rehearing requesting that finding of fact 198 be modified to reflect the applicable off-season for the schedulable intermittent pumping service. Finding of fact 198 is modified to reflect that the off-season is October through May. In its motion for rehearing, Entergy noted that findings of fact 17B and 17D should be modified to more accurately reflect the procedural history. The Commission modifies findings of fact 17B and 17D to state that Entergy agreed to extend time to provide the Commission sufficient time to consider the issues in this proceeding on two occasions—at the July 27 and August 30, 2012 open meetings.

## I. Discussion

### A. Prepaid Pension Asset Balance

Entergy included in rate base an approximately $56 million item named Unfunded Pension.[3] This amount represents the accumulated difference between the annual pension costs calculated in accordance with the Statement of Financial Accounting Standards (SFAS) No. 87 and the actual contributions made by Entergy to the pension fund—Entergy contributed nearly $56 million more to its pension fund than the minimum required by SFAS No. 87.[4]

In Docket No. 33309, the Commission allowed a pension prepayment asset, excluding the portion of the asset that is capitalized to construction work in progress (CWIP), less accrued deferred federal income taxes (ADFIT) to be included in rate base.[5] For the excluded portion, the Commission allowed the accrual of an allowance for funds used during construction

---

[3] Proposal for Decision at 23 (July 6, 2012) (PFD).

[4] PFD at 23-24.

[5] *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 33309, Order on Rehearing (March 4, 2008).

(AFUDC).[6] The ALJs concluded that this approach was sound and should be followed in this case.[7] Thus, the ALJs recommended that the CWIP-related portion of Entergy's prepaid pension asset ($25,311,236) should be excluded from the asset and should accrue AFUDC.[8] However, the ALJs did not address ADFIT.

The Commission agrees that the CWIP-related portion of Entergy's pension asset should be excluded from the asset and that this excluded portion should accrue AFUDC. However, the Commission also finds that the impact of this exclusion on Entergy's ADFIT should be reflected. When items are excluded from rate base, the related ADFIT should also be excluded. The adjusted ADFIT for the prepaid pension asset remaining in Entergy's rate base should be reduced by $8,858,933, the deferred taxes related to the excluded $25 million. The Commission adds new finding of fact 28A to reflect this modification to Entergy's ADFIT.

## B. FIN 48

The Financial Accounting Standards Board's Interpretation No. 48 (FIN 48) prescribes the way in which a company must analyze, quantify, and disclose the potential consequences of tax positions that the company has taken that are legally uncertain. Entergy reported that its uncertain tax positions totaled $5,916,461. FIN 48 requires that this amount be recorded on Entergy's balance sheet as a tax liability. Entergy also reported that it made a cash deposit with the IRS in the amount of $1,294,683 associated with its FIN 48 liability.[9]

The ALJs concluded that Entergy's FIN 48 liability should be included in its ADFIT balance, but the amount of the cash deposit made by Entergy to the IRS attributable to Entergy's FIN 48 liability should not be included in Entergy's ADFIT balance. Accordingly, the ALJs recommended that $4,621,778 (Entergy's FIN 48 liability of $5,916,461 less the $1,294,683 cash deposit Entergy has already made with the IRS) be added to Entergy's ADFIT balance and thus

---

[6] *Remand of Docket No. 33309 (Application of AEP Texas Central Company for Authority to Change Rates)*, Docket No. 38772, Order on Remand (Jan. 20, 2011).

[7] PFD at 26.

[8] *Id.* at 24-26.

[9] PFD at 26-27 (citing Rebuttal Testimony of Roberts, Entergy Ex. 64 at 6), 29 (citing Rebuttal Testimony of Roberts, Entergy Ex. 64 at 8).

be used to offset Entergy's rate base.[10]  The ALJs did not recommend the addition of a deferred-tax-account rider because no party expressly advocated the addition of such a rider.[11]

The Commission adopts the proposal for decision regarding the adjustment to Entergy's ADFIT for the amount attributable to Entergy's FIN 48 liability.  However, the Commission also follows its precedent regarding the creation of a deferred-tax-account tracker and modifies the proposal for decision on this point.  In CenterPoint's Electric Delivery Company's last rate case, Docket No. 38339,[12] the Commission found that tax schedule UTP—on which companies must describe, list, and rank each uncertain tax position—would provide the IRS auditors sufficient information to quickly determine which uncertain tax positions are of a magnitude worth investigating and that an IRS audit would be more likely to occur on some uncertain tax positions.  If an IRS audit of a FIN 48 uncertain tax position results in an unfavorable outcome, the utility would not be able to earn a return on the amount paid to the IRS until the next rate case.

Accordingly, the Commission authorizes Entergy to establish a rider to track unfavorable FIN-48 rulings by the IRS.  The rider will also allow Entergy to recover on a *prospective* basis an after-tax return of 8.27% on the amounts paid to the IRS that result from an unfavorable FIN-48 unfavorable-tax-position audit.  The return will be applied prospectively to FIN-48 amounts disallowed by an IRS audit after such amounts are actually paid to the federal government.  If Entergy subsequently prevails in an appeal of an unfavorable FIN-48 unfavorable-tax-position decision by the IRS, then any amounts collected under rider related to that overturned decision shall be credited back to ratepayers.

The Commission adds new finding of fact 40A and deletes finding of fact 41 consistent with its decision to authorize the deferred-tax-account tracker.

---

[10] PFD at 29.

[11] *Id*. at 29.

[12] *Application of CenterPoint Electric Delivery Company, LLC for Authority to Change Rates*, Docket No. 38339, Order on Rehearing at 3-4 (June 23, 2011).

## C. Capitalized Incentive Compensation

Entergy capitalized into plant-in-service accounts some of the incentive payments made to employees and sought to include those amounts in rate base. The ALJs determined that Entergy should not be able to recover its financially based incentive-compensation costs.[13] Therefore, the portion of Entergy's incentive-compensation costs capitalized during the period July 1, 2009 through June 30, 2010 that were financially based was excluded from Entergy's rate base. The ALJs also determined that the actual percentages should be used to determine the amount that is financially based.[14]

In discussing Entergy's incentive compensation as a component of operating expenses, the ALJs adopted the method advocated by Texas Industrial Energy Consumers (TIEC) for calculating the amount of the financially based incentive costs. This method uses the actual percentage reductions applicable to each of the annual incentive programs that included a component of financially-based costs.[15]

In its exceptions regarding capitalized incentive compensation, Entergy advocated for the use of TIEC's methodology to also calculate the amount of capitalized incentive compensation that is financially based. Entergy also noted that the amount of the disallowance reflected in the schedules, $1,333,352, was calculated using a disallowance factor that included incentive compensation tied to cost-control measures, which the ALJs found to be recoverable in the operating-cost incentive-compensation calculation.[16] When the TIEC methodology is applied to the capitalized incentive-compensation costs in rate base, the net result under TIEC's methodology is that only $335,752.96 should be disallowed from capital costs.[17]

The Commission agrees that capitalized incentive compensation that is financially based should be excluded from rate base and that the exclusion only applies to incentive costs that Entergy capitalized during the period from July 1, 2009 through June 30, 2010. However, the Commission finds that a consistent methodology should be used to calculate the amount to be

---

[13] PFD at 171.

[14] *Id.* at 72.

[15] *Id.* at 174; *see also* Entergy's Exceptions to the Proposal for Decision at 25-26 (July 23, 2012).

[16] Entergy's Exceptions to the Proposal for Decision at 25-26.

[17] *Id.* at 25-26.

excluded and therefore that TIEC's methodology should also be used for calculating the amount of capitalized financially based incentive-compensation costs that should be excluded from rate base. Accordingly, the total amount of capitalized incentive-compensation costs that should be disallowed from rate base is $335,752.96. Finding of fact 61 is modified to reflect this determination.

As noted by Commission Staff, this disallowance to plant-in-service alters the expense for ad valorem taxes. Accounting for this disallowance, the appropriate expense amount for ad valorem taxes is $24,921,022,[18] an adjustment of $1,222,106 to Entergy's test year amount. Finding of fact 151 is modified to reflect this adjustment to property taxes.

## D. Rate of Return and Cost of Capital

The ALJs found the proper range of an acceptable return on equity for Entergy would be from 9.3 percent to 10.0 percent.[19] The mid-point of the range is 9.65 percent. The ALJs found that the effect of unsettled economic conditions facing utilities on the appropriate return on equity should be taken into account and that the effect would be to move the ultimate return on equity towards the upper limits of the range that was determined to be reasonable.[20] The ALJs found that the reasonable adjustment would be 15 basis points, moving the reasonable return on equity to 9.80 percent.[21]

The Commission must establish a reasonable return for a utility and must consider applicable factors.[22] The Commission disagrees with the ALJs that a utility's return on equity should be determined using an adder to reflect unsettled economic conditions facing utilities. The Commission agrees with the ALJs, however, that a return on equity of 9.80 percent will allow Entergy a reasonable opportunity to earn a reasonable return on its invested capital, but finds this rate appropriate independent of the 15-point adder recommended by the ALJs. A return on equity of 9.80 percent is within the range of an acceptable return on equity found by

---

[18] Commission Number-Run Memorandum at 2 (Aug. 28, 2012).

[19] PFD at 94.

[20] *Id.*

[21] *Id.* at 94.

[22] PURA §§ 36.051, .052.

the ALJs. Accordingly, the Commission adds new finding of fact 65A to reflect the Commission's decision on this point.

## E. Purchased-Power Capacity Expense

The ALJs rejected Entergy's request to recover $31 million more in purchased-power capacity costs than its actual test-year expenses because Entergy had failed to prove that the adjustment was known and measurable,[23] and because the request violated the matching principle.[24] Consequently, the ALJs recommended that Entergy's test-year expenses of $245,432,884 be used to set rates in this docket.[25]

Entergy pointed to an additional $533,002 of purchased-power capacity expenses that were properly included in Entergy's rate-filing package, but not provided for in the proposal for decision.[26] The Commission finds that an additional $533,002 ($6,132 for test-year expenses for Southwest Power Pool fees, $654,082 for Toledo Bend hydro fixed-charges, and -$127,212 for an Entergy intra-system billing adjustment that were all recorded in FERC account 555) of purchased-power capacity costs were incurred during the test-year and should be added to the purchased-power capacity costs in Entergy's revenue requirement. The Commission modifies findings of fact 72 and 86 to reflect the inclusion of the additional $533,002 of test-year purchased-power capacity costs, increasing the total amount to $245,965,886.

## F. Labor Costs – Incentive Compensation

The ALJs found that $6,196,037, representing Entergy's financially-based incentives paid in the test-year, should be removed from Entergy's O&M expenses.[27] The ALJs agreed with Commission Staff and Cities that an additional reduction should be made to account for the FICA taxes that Entergy would have paid for those costs,[28] but did not include this reduction in a finding of fact.

---

[23] PFD at 108-09.

[24] *Id.* at 109.

[25] *Id.*

[26] Entergy's Exceptions to the Proposal for Decision at 51.

[27] PFD at 175.

[28] *Id.* at 175-76.

The Commission agrees with the ALJs, but modifies finding of fact 133 to specifically include the decision that an additional reduction should be made to account for the FICA taxes Entergy would have paid on the disallowed financially-based incentive compensation. The Commission notes that this reduction for FICA taxes is reflected in the schedules attached to this Order.[29]

## G. Affiliate Transactions

OPUC argued that Entergy's sales and marketing expenses exclusively benefit the larger commercial and industrial customers, but the majority of the sales, marketing, and customer service expenses are allocated to the operating companies based on customer counts. Therefore, the majority of these expenses are allocated to residential and small business customers. OPUC argued that it is inappropriate for residential and small business customers to pay for these expenses.[30] The ALJs did not adopt OPUC's position on this issue.

The Commission agrees with OPUC and reverses the proposal for decision regarding allocation of Entergy's sales and marketing expense and finds that $2.086 million of sales and marketing expense should be reallocated using direct assignment. The Commission has previously expressed its preference for direct assignment of affiliate expenses.[31] The Commission finds that the following amounts should be allocated based on a total-number-of-customers basis: (1) $46,490 for Project E10PCR56224 – Sales and Marketing – EGSI Texas; (2) $17,013 for Project F3PCD10049 – Regulated Retail Systems O&M; and (3) $30,167 for Project F3PPMMALI2 – Middle Market Mkt. Development. The remainder, $1,992,475, should be assigned to (1) General Service, (2) Large General Service and (3) Large Industrial Power Service.[32] The reallocation has the effect of increasing the revenue requirement allocated to the large business class customers and reduces the revenue requirement for small business and residential customers. New finding of fact 164A is added to reflect the proper allocation of these affiliate transactions.

---

[29] *See* Commission Number Run-Memorandum at 3 (Aug. 28, 2012).

[30] Direct Testimony of Carol Szerszen, OPUC Ex. 1 at 44-45.

[31] *Application of Central Power and Light Company for Authority to Change Rates*, Docket No. 14965, Second Order on Rehearing at 87, COL 29 (Oct. 16, 1997).

[32] Direct Testimony of Carol Szerszen, OPUC Ex. 1 at Schedule CAS-7.

### H. Fuel Reconciliation

Entergy proposed to allocate costs for the fuel reconciliation to customers using a line-loss study performed in 1997. Entergy conducted a line-loss study for the year ending December 31, 2010, which falls in the middle of the two year fuel reconciliation period—July 2009 through June 2011—and therefore reflects the actual line losses experienced by the customer classes during the reconciliation period. Cities argued that the allocation of fuel costs incurred over the reconciliation period should reflect the current line-loss study performed by Entergy for this case and recommended approval on a going-forward basis. Fuel factors under P.U.C. SUBST. R. 25.237(a)(3) are temporary rates subject to revision in a reconciliation proceeding described in P.U.C. SUBST. R. 25.236. P.U.C. SUBST. R. 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses.[33] Cities calculated a $3,981,271 reduction to the Texas retail fuel expenses incurred over the reconciliation period using the current line-losses. The ALJs rejected Cities' proposed adjustment finding that the P.U.C. SUBST. R. 25.237(c)(2)(B) requires the use of Commission-approved line losses that were in effect at the time fuel costs were billed to customers in a fuel reconciliation.[34]

The Commission agrees with Cities and reverses the proposal for decision regarding which line-loss factors should be used in Entergy's fuel reconciliation. Entergy used the 2010 study line-loss calculations to calculate the demand- and energy-related allocations in its cost of service analysis supporting its requested base rates. These same currently available line-loss factors should have been utilized in Entergy's fuel reconciliation. The Commission finds that Entergy's 2010 line-loss factors should be used to calculate Entergy's fuel reconciliation over-recovery. As a result, Entergy's fuel reconciliation over-recovery should be reduced by $3,981,271. Finding of fact 246A and conclusions of law 19A and 19B are added to reflect the Commission's finding that the 2010 line-loss factors be used to reconcile Entergy's fuel costs.

---

[33] Cities' Exceptions to the Proposal for Decision at 20-21 (July 23, 2012).

[34] PFD at 327-328.

## I. MISO Transition Expenses

During the Commission's consideration of the proposal for decision, the parties that contested the amount of Entergy's MISO transition expenses and how the transition expenses should be accounted for reached announced on the record that they had reached an agreement on these issues.[35] Those parties agreed that the MISO transition expenses would not be deferred and that Entergy's base rates should include $1.6 million for MISO transition expense.[36] The Commission adopts the agreement of the parties and accordingly modifies finding of fact 251 and deletes finding of fact 252.

## J. Purchased-Power Capacity Cost Baseline

The Commission modified the amount of purchased-power capacity expense in the test-year to be $245,965,886 (see section E above). Finding of fact 255 is modified to reflect the change to the proper test-year purchased-power capacity expense.

## K. Other Issues

New findings of fact 17A, 17B, 17C, 17D, and 17 E are added to reflect procedural aspects of the case after issuance of the proposal for decision.

In addition, to reflect corrections recommended by the ALJs, findings of fact 116, 123, 192, 194, and 202 are modified; and new finding of fact 182A is added.

The Commission adopts the following findings of fact and conclusions of law:

## II. Findings of Fact

### *Procedural History*

1.  Entergy Texas, Inc. (ETI or the company) is an investor-owned electric utility with a retail service area located in southeastern Texas.

---

[35] Open Meeting Tr. at 138 (Aug. 17, 2012).

[36] *Id.*

2. ETI serves retail and wholesale electric customers in Texas. As of June 30, 2011, ETI served approximately 412,000 Texas retail customers. The Federal Energy Regulatory Commission (FERC) regulates ETI's wholesale electric operations.

3. On November 28, 2011, ETI filed an application requesting approval of: (1) a proposed increase in annual base rate revenues of approximately $111.8 million over adjusted test-year revenues; (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities (RFP) accompanying ETI's application and including new riders for recovery of costs related to purchased-power capacity and renewable energy credit requirements; (3) a request for final reconciliation of ETI's fuel and purchased-power costs for the reconciliation period from July 1, 2009 to June 30, 2011; and (4) certain waivers to the instructions in RFP Schedule V accompanying ETI's application.

4. The 12-month test-year employed in ETI's filing ended on June 30, 2011 (test-year).

5. ETI provided notice by publication for four consecutive weeks before the effective date of the proposed rate change in newspapers having general circulation in each county of ETI's Texas service territory. ETI also mailed notice of its proposed rate change to all of its customers. Additionally, ETI timely served notice of its statement of intent to change rates on all municipalities retaining original jurisdiction over its rates and services.

6. The following parties were granted intervenor status in this docket: Office of Public Utility Counsel; the cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (Cities), the Kroger Co. (Kroger); State Agencies; Texas Industrial Energy Consumers; East Texas Electric Cooperative, Inc.; the United States Department of Energy (DOE); and Wal-Mart Stores Texas, LLC, and Sam's East, Inc. (Wal-Mart). The Staff (Staff) of the Public Utility Commission of Texas (Commission or PUC) was also a participant in this docket.

7. On November 29, 2011, the Commission referred this case to the State Office of Administrative Hearings (SOAH).

8. On December 7, 2011, the Commission issued its order requesting briefing on threshold legal/policy issues.

9. On December 19, 2011, the Commission issued its Preliminary Order, identifying 31 issues to be addressed in this proceeding.

10. On December 20, 2011, the Administrative Law Judges (ALJs) issued SOAH Order No. 2, which approved an agreement among the parties to establish a June 30, 2012 effective date for the company's new rates resulting from this case pursuant to certain agreed language and consolidate *Application of Entergy Texas, Inc. for Authority to Defer Expenses Related to its Proposed Transition to Membership in the Midwest Independent System Operator*, Docket No. 39741 (pending) into this proceeding. Although it did not agree, Staff did not oppose the consolidation.

11. On January 13, 2012, the ALJs issued SOAH Order No. 4 granting the motions for admission pro hac vice filed by Kurt J. Boehm and Jody M. Kyler to appear and participate as counsel for Kroger and the motion for admission *pro hac vice* filed by Rick D. Chamberlain to appear and participate as counsel for Wal-Mart.

12. On January 19, 2012, the Commission issued a supplemental preliminary order identifying two additional issues to be addressed in this case and concluding that the company's proposed purchased-power capacity rider should not be addressed in this case and that such costs should be recovered through base rates.

13. ETI timely filed with the Commission petitions for review of the rate ordinances of the municipalities exercising original jurisdiction within its service territory. All such appeals were consolidated for determination in this proceeding.

14. On April 4, 2012, the ALJs issued SOAH Order No. 13 severing rate case expense issues into *Application of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 39896*, Docket No. 40295 (pending).

15. On April 13, 2012, ETI adjusted its request for a proposed increase in annual base rate revenues to approximately $104.8 million over adjusted test-year revenues.

16. The hearing on the merits commenced on April 24 and concluded on May 4, 2012.

17.     Initial post-hearing briefs were filed on May 18 and reply briefs were filed on May 30, 2012.

17A.    On August 7, 2012, the SOAH ALJs filed a letter with the Commission recommending changes to the PFD.

17B     At the July 27, 2012 open meeting, ETI agreed to extend time to August 31, 2012 to provide the Commission sufficient time to consider the issues in this proceeding.

17C.    The Commission considered the proposal for decision at the August 17, 2012 and August 30, 2012 open meetings.

17D.    At the August 30, 2012 open meeting, ETI agreed to extend time to September 14, 2012 to provide the Commission sufficient time to consider the issues in this proceeding.

17E.    At the August 17, 2012 open meeting, parties announced on the record a settlement of the amount of costs for the transition to MISO.

### *Rate Base*

18.     Capital additions that were closed to ETI's plant-in-service between July 1, 2009 and June 30, 2011, are used and useful in providing service to the public and were prudently incurred.

19.     ETI's proposed Hurricane Rita regulatory asset was an issue resolved by the black-box settlement in *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744 (Dec. 13, 2010).

20.     Accrual of carrying charges on the Hurricane Rita regulatory asset should have ceased when Docket No. 37744 concluded because the asset would have then begun earning a rate of return as part of rate base.

21.     The appropriate calculation of the Hurricane Rita regulatory asset should begin with the amount claimed by ETI in Docket No. 37744, less amortization accruals to the end of the test-year in the present case, and less the amount of additional insurance proceeds received by ETI after the conclusion of Docket No. 37744.

22.     A Test-Year-end balance of $15,175,563 for the Hurricane Rita regulatory asset should remain in rate base, applying a five-year amortization rate beginning August 15, 2010.

23.    The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

24.    The company requested in rate base its prepaid pension assets balance of $55,973,545, which represents the accumulated difference between the Statement of Financial Accounting Standards (SFAS) No. 87 calculated pension costs each year and the actual contributions made by the company to the pension fund.

25.    The prepaid pension assets balance includes $25,311,236 capitalized to construction work in progress (CWIP).

26.    It is not necessary to the financial integrity of ETI to include CWIP in rate base, and there was insufficient evidence showing that major projects under construction were efficiently and prudently managed.

27.    The portion of the prepaid pension assets balance that is capitalized to CWIP should not be included in ETI's rate base.

28.    The remainder of the prepaid pension assets balance should be included in ETI's rate base.

28A.    When items are excluded from rate base, the related ADFIT should also be excluded. The amount of ADFIT associated with the $25 million capitalized to CWIP and excluded from rate base is $8,858,933. The adjusted ADFIT for the prepaid pension asset remaining in Entergy's rate base should be reduced by $8,858,933.

29.    ETI should be permitted to accrue an allowance for funds used during construction on the portion of ETI's Prepaid Pension Assets Balance capitalized to CWIP.

30.    The Financial Accounting Standard Board (FASB) Financial Interpretation No. 48 (FIN 48), "Accounting for Uncertainty in Income Taxes," requires ETI to identify each of its uncertain tax positions by evaluating the tax position on its technical merits to determine whether the position, and the corresponding deduction, is more-likely-than-not to be sustained by the Internal Revenue Service (IRS) if audited.

31.    FIN 48 requires ETI to remove the amount of its uncertain tax positions from its Accumulated Deferred Federal Income Tax (ADFIT) balance for financial reporting

purposes and record it as a potential liability with interest to better reflect the company's financial condition.

32.    At test-year-end, ETI had $5,916,461 in FIN 48 liabilities, meaning ETI has, thus far, avoided paying to the IRS $5,916,461 in tax dollars (the FIN 48 liability) in reliance upon tax positions that the company believes will not prevail in the event the positions are challenged, via an audit, by the IRS.

33.    ETI has deposited $1,294,683 with the IRS in connection with the FIN 48 liability.

34.    The IRS may never audit ETI as to its uncertain tax positions creating the FIN 48 liability.

35.    Even if ETI is audited, ETI might prevail on its uncertain tax positions.

36.    ETI may never have to pay the IRS the FIN 48 liability.

37.    Other than the amount of its deposit with the IRS, ETI has current use of the FIN 48 liability funds.

38.    Until actually paid to the IRS, the FIN 48 liability represents cost-free capital and should be deducted from rate base.

39.    The amount of $4,621,778 (representing ETI's full FIN 48 liability of $5,916,461 less the $1,294,683 cash deposit ETI has made with the IRS for the FIN 48 liability) should be added to ETI's ADFIT and thus be used to reduce ETI's rate base.

40.    ETI's application and proposed tariffs do not include a request for a tracking mechanism or rider to collect a return on the FIN 48 liability.

40A.    It is appropriate for ETI to create a deferred-tax-account tracker in the form of a rider to recover on a prospective basis an after–tax return of 8.27% on the amounts paid to the IRS that result from an unfavorable FIN 48 audit.  The rider will track unfavorable FIN 48 rulings and the return will be applied prospectively to FIN 48 amounts disallowed by an IRS audit after such amounts are actually paid to the federal government.  If ETI prevails in an appeal of a FIN 48 decision, then any amounts collected under the rider related to that decision should be credited back to ratepayers.

41.  Deleted.

42.  Investor-owned electric utilities may include a reasonable allowance for cash working capital in rate base as determined by a lead-lag study conducted in accordance with the Commission's rules.

43.  Cash working capital represents the amount of working capital, not specifically addressed in other rate base items, that is necessary to fund the gap between the time expenditures are made and the time corresponding revenues are received.

44.  The lead-lag study conducted by ETI considered the actual operations of ETI, adjusted for known and measurable changes, and is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii).

45.  It is reasonable to establish ETI's cash working capital requirement based on ETI's lead-lag study as updated in Jay Joyce's rebuttal testimony and on the cost of service approved for ETI in this case.

46.  As a result of the black-box settlements in *Application of Entergy Gulf States, Inc. for Authority to Change Rates and to Reconcile Fuel Costs*, Docket No. 34800 (Nov. 7, 2008) and Docket No. 37744, the Commission did not approve ETI's storm damage expenses since 1996 and its storm damage reserve balance.

47.  ETI established a prima facie case concerning the prudence of its storm damage expenses incurred since 1996.

48.  Adjustments to the storm damage reserve balance proposed by intervenors should be denied.

49.  The Hurricane Rita regulatory asset should not be moved to the storm damage insurance reserve.

50.  ETI's appropriate Test-Year-end storm reserve balance was negative $59,799,744.

51.  The amount of $9,846,037, representing the value of the average coal inventory maintained at ETI's coal-burning facilities, is reasonable, necessary, and should be included in rate base.

52.     The Spindletop gas storage facility (Spindletop facility) is used and useful in providing reliable and flexible natural gas supplies to ETI's Sabine Station and Lewis Creek generating plants.

53.     The Spindletop facility is critical to the economic, reliable operation of the Sabine Station and Lewis Creek generating plants due to their geographic location in the far western region of the Entergy system.

54.     It is reasonable and appropriate to include ETI's share of the costs to operate the Spindletop facility in rate base.

55.     Staff recommended updating ETI's balance amounts for short-term assets to the 13-month period ending December 2011, which was the most recent information available. Staff's proposed adjustments should be incorporated into the calculation of ETI's rate base.

56.     The following short-term asset amounts should be included in rate base: prepayments at $8,134,351; materials and supplies at $29,285,421; and fuel inventory at $52,693,485.

57.     The amount of $1,127,778, representing costs incurred by ETI when it acquired the Spindletop facility, represent actual costs incurred to process and close the acquisition, not mere mark-up costs.

58.     ETI's $1,127,778 in capitalized acquisition costs should be included in rate base because ETI incurred these costs in conjunction with the purchase of a viable asset that benefits its retail customers.

59.     In its application, ETI capitalized into plant in service accounts some of the incentive payments ETI made to its employees. ETI seeks to include those amounts in rate base.

60.     A portion of those capitalized incentive accounts represent payments made by ETI for incentive compensation tied to financial goals.

61.     The portion of ETI's incentive payments that are capitalized and that are financially-based should be excluded from ETI's rate base because the benefits of such payments inure most immediately and predominantly to ETI's shareholders, rather than its electric

customers.    ETI's capitalized incentive compensation that is financially based is $335,752.96 and should be removed for rate base.

62.    The test-year for ETI's prior ratemaking proceeding ended on June 30, 2009, and the reasonableness of ETI's capital costs (including capitalized incentive compensation) for that prior period was dealt with by the Commission in that proceeding and is not at issue in this proceeding.

63.    In this proceeding, ETI's capitalized incentive compensation that is financially-based should be excluded from rate base, but only for incentive costs that ETI capitalized during the period from July 1, 2009 (the end of the prior test-year) through June 30, 2010 (the commencement of the current test-year).

### *Rate of Return and Cost of Capital*

64.    A return on common equity (ROE) of 9.80 percent will allow ETI a reasonable opportunity to earn a reasonable return on its invested capital.

65.    The results of the discounted cash flow model and risk premium approach support a ROE of 9.80 percent.

65A.    It is not appropriate to add 15 points to the ROE due to unsettled economic conditions facing utilities.

66.    A 9.80 percent ROE is consistent with ETI's business and regulatory risk.

67.    ETI's proposed 6.74 percent embedded cost of debt is reasonable.

68.    The appropriate capital structure for ETI is 50.08 percent long-term debt and 49.92 percent common equity.

69.    A capital structure composed of 50.08 percent debt and 49.92 percent equity is reasonable in light of ETI's business and regulatory risks.

70.    A capital structure composed of 50.08 percent debt and 49.92 percent equity will help ETI attract capital from investors.

71. ETI's overall rate of return should be set as follows:

| COMPONENT | CAPITAL STRUCTURE | COST OF CAPITAL | WEIGHTED AVG COST OF CAPITAL |
|---|---|---|---|
| LONG-TERM DEBT | 50.08% | 6.74% | 3.38% |
| COMMON EQUITY | 49.92% | 9.80% | 4.89% |
| TOTAL | 100.00% | | 8.27% |

### *Operating Expenses*

72. ETI's test-year purchased capacity expenses were $245,965,886.

73. ETI requested an upward adjustment of $30,809,355 as a post-test-year adjustment to its purchased capacity costs. This request was based on ETI's projections of its purchased capacity expenses during a period beginning June 1, 2012 and ending May 31, 2013 (the rate-year).

74. ETI's purchased capacity expense projections were based on estimates of rate-year expenses for: (a) reserve equalization payments under Schedule MSS-1; (b) payments under third-party capacity contracts; and (c) payments under affiliate contracts.

75. ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1 is based on numerous assumptions, including load growths for ETI and its affiliates, future capacity contracts for ETI and its affiliates, and future values of the generation assets of ETI and its affiliates.

76. There is substantial uncertainty with regard to ETI's projection of its rate-year reserve equalization payments under Schedule MSS-1.

77. ETI's projection of its rate-year third-party capacity contract payments includes numerous assumptions, one of which is that every single third-party supplier will perform at the maximum level under the contract, even though that assumption is inconsistent with ETI's historical experience.

78. There is substantial uncertainty with regard to ETI's projection of its rate-year third-party capacity-contract payments.

79. ETI's estimates of its rate-year purchases under affiliate contracts are based on a mathematical formula set out in Schedule MSS-4.

80.     The MSS-4 formula for rate-year affiliate capacity payments reflects that these payments will be based on ratios and costs that cannot be determined until the month that the payments are to be made.

81.     Over $11 million of ETI's affiliate transactions were based on a 2013 contract (the EAI WBL Contract) that was not signed until April 11, 2012.

82.     There is uncertainty about whether the EAI WBL Contract will ever go into effect.

83.     ETI projects purchasing over 300 megawatts (MW) more in purchased capacity in the rate-year than it purchased in the test-year.

84.     ETI experienced substantial load growth in the two years before the test-year, and it continues to project similar load growth in the future.

85.     ETI did not meet its burden of proof to demonstrate that a known and measurable adjustment of $30,809,355 should be made to its test-year purchased capacity expenses.

86.     ETI's purchased capacity expense in this case should be based on the test-year level of $245,965,886.

87.     ETI incurred $1,753,797 of transmission equalization expense during the test-year.

88.     ETI proposed an upward adjustment of $8,942,785 for its transmission equalization expense. This request was based on ETI's projections of its transmission equalization expenses during the rate-year.

89.     The transmission equalization expense that ETI will pay in the rate-year will depend on future costs and loads for each of the Entergy operating companies.

90.     ETI's projection of its rate-year transmission equalization expenses is uncertain and speculative because it depends on a number of variables, including future transmission investments, deferred taxes, depreciation reserves, costs of capital, tax rates, operating expenses, and loads of each of the Entergy operating companies.

91.     ETI seeks increased transmission equalization expenses for transmission projects that are not currently used and useful in providing electric service. ETI's post-test-year adjustment is based on the assumption that certain planned transmission projects will go

into service after the test-year. At the close of the hearing, none of the planned transmission projects had been fully completed and some were still in the planning phase.

92. It is not reasonable for ETI to charge its retail ratepayers for transmission equalization expenses related to projects that are not yet in-service.

93. ETI's request for a post-test-year adjustment of $8,942,785 for rate-year transmission equalization expenses should be denied because those expenses are not known and measurable. ETI's post-test-year adjustment does not with reasonable certainty reflect what ETI's transmission equalization expense will be when rates are in effect.

94. ETI's transmission equalization expense in this case should be based on the test-year level of $1,753,797.

95. P.U.C. SUBST. R. 25.231(c)(2)(ii) states that the reserve for depreciation is the accumulation of recognized allocations of original cost, representing the recovery of initial investment over the estimated useful life of the asset.

96. Except in the case of the amortization of the general plant deficiency, the use of the remaining life depreciation method to recover differences between theoretical and actual depreciation reserves is the most appropriate method and should be continued.

97. It is reasonable for ETI to calculate depreciation reserve allocations on a straight-line basis over the remaining, expected useful life of the item or facility.

98. Except as described below, the service lives and net salvage rates proposed by the company are reasonable, and these service lives and net salvage rates should be used in calculating depreciation rates for the company's production, transmission, distribution, and general plant assets.

99. A 60-year life for Sabine Units 4 and 5 is reasonable for purposes of establishing production plant depreciation rates.

100. The retirement (actuarial) rate method, rather than the interim retirement method, should be used in the development of production plant depreciation rates.

101. Production plant net salvage is reasonably based on the negative five percent net salvage in existing rates.

102. The net salvage rate of negative 10 percent for ETI's transmission structures and improvements (FERC Account 352) is the most reasonable of those proposed and should be adopted.

103. The net salvage rate of negative 20 percent for ETI's transmission station equipment (FERC Account 353) is the most reasonable of those proposed and should be adopted.

104. The net salvage rate of negative five percent for ETI's transmission towers and fixtures (FERC Account 354) is the most reasonable of those proposed and should be adopted.

105. The net salvage rate of negative 30 percent for ETI's transmission poles and fixtures (FERC Account 355) is the most reasonable of those proposed and should be adopted.

106. The net salvage rate of negative 30 percent for ETI's transmission overhead conductors and devices (FERC Account 356) is the most reasonable of those proposed and should be adopted.

107. A service life of 65 years and a dispersion curve of R3 for ETI's distribution structures and improvements (FERC Account 361) are the most reasonable of those proposed and should be approved.

108. A service life of 40 years and a dispersion curve of R1 for ETI's distribution poles, towers, and fixtures (FERC Account 364) are the most reasonable of those proposed and should be approved.

109. A service life of 39 years and a dispersion curve of R0.5 for ETI's distribution overhead conductors and devices (FERC Account 365) are the most reasonable of those proposed and should be approved.

110. A service life of 35 years and a dispersion curve of R1.5 for ETI's distribution underground conductors and devices (FERC Account 367) are the most reasonable of those proposed and should be approved.

111. A service life of 33 years and a dispersion curve of L0.5 for ETI's distribution line transformers (FERC Account 368) are the most reasonable of those proposed and should be approved.

112.  A service life of 26 years and a dispersion curve of L4 for ETI's distribution overhead service (FERC Account 369.1) are the most reasonable of those proposed and should be approved.

113.  The net salvage rate of negative five percent for ETI's distribution structures and improvements (FERC Account 361) is the most reasonable of those proposed and should be adopted.

114.  The net salvage rate of negative 10 percent for ETI's distribution station equipment (FERC Account 362) is the most reasonable of those proposed and should be adopted.

115.  The net salvage rate of negative seven percent for ETI's distribution overhead conductors and devices (FERC Account 365) is the most reasonable of those proposed and should be adopted.

116.  The net salvage rate of positive five percent for ETI's distribution line transformers (FERC Account 368) is the most reasonable of those proposed and should be adopted.

117.  The net salvage rate of negative 10 percent for ETI's distribution overhead services (FERC Account 369.1) is the most reasonable of those proposed and should be adopted.

118.  The net salvage rate of negative 10 percent for ETI's distribution underground services (FERC Account 369.2) is the most reasonable of those proposed and should be adopted.

119.  A service life of 45 years and a dispersion curve of R2 for ETI's general structures and improvements (FERC Account 390) are the most reasonable of those proposed and should be approved.

120.  The net salvage rate of negative 10 percent for ETI's general structures and improvements (FERC Account 390) is the most reasonable of those proposed and should be adopted.

121.  It is reasonable to convert the $21.3 million deficit that has developed over time in the reserve for general plant accounts to General Plant Amortization.

122.  A ten-year amortization of the deficit in the reserve for general plant accounts is reasonable and should be adopted.

123.    FERC pronouncement AR-15 requires amortization over the same life as recommended based on standard life analysis. A standard life analysis determined that a five-year life was appropriate for general plant computer equipment (FERC Account 391.2). Therefore, a five year amortization for this account is reasonable and should be adopted.

124.    ETI proposed adjustments to its test-year payroll costs to reflect: (a) changes to employee headcount levels at ETI and Entergy Services, Inc. (ESI); and (b) approved wage increases set to go into effect after the end of the test-year.

125.    The proposed payroll adjustments are reasonable but should be updated to reflect the most recent available information on headcount levels as proposed by Commission Staff. In addition to adjusting payroll expense levels, the more recent headcount numbers should be used to adjust the level of payroll tax expense, benefits expense, and savings plan expense.

126.    Staff has appropriately updated headcount levels to the most recent available data but errors made by Staff should be corrected. The corrections related to: (a) a double counting of three ETI and one ESI employee; (b) inadvertent use of the ETI benefits cost percentage in the calculation of ESI benefits costs; (c) an inappropriate reduction of savings plan costs when such costs were already included in the benefits percentage adjustments; and (d) corrections for full-time equivalents calculations. Staff's ETI headcount adjustment (AG-7) overstated operation and maintenance (O&M) payroll reduction by $224,217, and ESI headcount adjustment (AG-7) understated O&M payroll increase by $37,531.

127.    ETI included $14,187,744 for incentive compensation expenses in its cost of service.

128.    The compensation packages that ETI offers its employees include a base payroll amount, annual incentive programs, and long-term incentive programs. The majority of the compensation is for operational measures, but some is for financial measures.

129.    Incentive compensation that is based on financial measures is of more immediate and predominant benefit to shareholders, whereas incentive compensation based on operational measures is of more immediate and predominant benefit to ratepayers.

130.    Incentives to achieve operational measures are necessary and reasonable to provide utility services but those to achieve financial measures are not.

131.    The $5,376,975 that was paid for long term incentive programs was tied to financial measures and, therefore, should not be included in ETI's cost of service.

132.    Of the amounts that were paid pursuant to the Executive Annual Incentive Plan, $819,062 was tied to financial measures and, therefore, should be disallowed.

133.    In total, the amount of incentive compensation that should be disallowed is $6,196,037 because it was related to financial measures that are not reasonable and necessary for the provision of electric service. An additional reduction should be made to account for the FICA taxes ETI would have paid on the disallowed financially based incentive compensation.

134.    The amount of incentive compensation that should be included in the cost of service is $7,991,707.

135.    To attract and retain highly qualified employees, the Entergy companies provide a total package of compensation and benefits that is equivalent in scope and cost with what other comparable companies within the utility business and other industries provide for their employees.

136.    When using a benchmark analysis to compare companies' levels of compensation, it is reasonable to view the market level of compensation as a range rather than a precise, single point.

137.    ETI's base pay levels are at market.

138.    ETI's benefits plan levels are within a reasonable range of market levels.

139.    ETI's level of compensation and benefits expense is reasonable and necessary.

140.    ETI provides non-qualified supplemental executive retirement plans for highly compensated individuals such as key managerial employees and executives that, because of limitations imposed under the Internal Revenue Code, would otherwise not receive retirement benefits on their annual compensation over $245,000 per year.

141.   ETI's non-qualified supplemental executive retirement plans are discretionary costs designed to attract, retain, and reward highly compensated employees whose interests are more closely aligned with those of the shareholders than the customers.

142.   ETI's non-qualified executive retirement benefits in the amount of $2,114,931 are not reasonable or necessary to provide utility service to the public, not in the public interest, and should not be included in ETI's cost of service.

143.   For the employee market in which ETI operates, most peer companies offer moving assistance. Such assistance is expected by employees, and ETI would be placed at a competitive disadvantage if it did not offer relocation expenses.

144.   ETI's relocation expenses were reasonable and necessary.

145.   The company's requested operating expenses should be reduced by $40,620 to reflect the removal of certain executive prerequisites proposed by Staff.

146.   Staff properly adjusted the company's requested interest expense of $68,985 by removing $25,938 from FERC account 431 (using the interest rate of 0.12 percent for calendar year 2012), leaving a recommended interest expense of $43,047.

147.   During the test-year, ETI's property tax expense equaled $23,708,829.

148.   ETI requested an upward *pro forma* adjustment of $2,592,420, to account for the property tax expenses ETI estimates it will pay in the rate-year.

149.   ETI's requested *pro forma* adjustment is not reasonable because it is based, in part, upon the prediction that ETI's property tax rate will be increased in 2012, a change that is speculative is not known and measurable.

150.   Staff's recommendation to increase ETI's test-year property tax expenses by $1,214,688 is based on the historical effective tax rate applied to the known test-year-end plant in service value, consistent with Commission precedent, and based upon known and measurable changes.

151.   ETI's test-year property tax burden should be adjusted upward by $1,222,106 for a total expense of $24,921,022.

152.    Staff recommended reducing ETI's advertising, dues, and contributions expenses by $12,800. The recommendation, which no party contested, should be adopted.

153.    The final cost of service should reflect changes to cost of service that affect other components of the revenue requirement such as the calculation of the Texas state gross receipts tax, the local gross receipts tax, the PUC Assessment Tax and the Uncollectible Expenses.

154.    The company's requested Federal income tax expense is reasonable and necessary.

155.    ETI's request for $2,019,000 to be included in its cost of service to account for the company's annual decommissioning expenses associated with River Bend is not reasonable because it is not based upon "the most current information reasonably available regarding the cost of decommissioning" as required by P.U.C. SUBST. R. 25.231(b)(1)(F)(i).

156.    Based on the most current information reasonably available, the appropriate level of decommissioning costs to be included in ETI's cost of service is $1,126,000.

157.    ETI's appropriate total annual self-insurance storm damage reserve expense is $8,270,000, comprised of an annual accrual of $4,400,000 to provide for average annual expected storm losses, plus an annual accrual of $3,870,000 for 20 years to restore the reserve from its current deficit.

158.    ETI's appropriate target self-insurance storm damage reserve is $17,595,000.

159.    ETI should continue recording its annual storm damage reserve accrual until modified by a Commission order.

160.    The operating costs of the Spindletop facility are reasonable and necessary.

161.    The operating costs of the Spindletop facility paid to PB Energy Storage Services are eligible fuel expenses.

### *Affiliate Transactions*

162.    ETI affiliates charged ETI $78,998,777 for services during the test-year. The majority of these O&M expenses—$69,098,041—were charged to ETI by ESI. The remaining affiliate services were charged (or credited) to ETI by: Entergy Gulf States Louisiana,

L.L.C.; Entergy Arkansas, Inc.; Entergy Louisiana, LLC; Entergy Mississippi, Inc.; Entergy Operations, Inc.; and non-regulated affiliates.

163. ESI follows a number of processes to ensure that affiliate charges are reasonable and necessary and that ETI and its affiliates are charged the same rate for similar services. These processes include: (a) the use of service agreements to define the level of service required and the cost of those services; (b) direct billing of affiliate expenses where possible; (c) reasonable allocation methodologies for costs that cannot be directly billed; (d) budgeting processes and controls to provide budgeted costs that are reasonable and necessary to ensure appropriate levels of service to its customers; and (e) oversight controls by ETI's Affiliate Accounting and Allocations Department.

164. Affiliates charged expenses to ETI through 1292 project codes during the test-year.

164A. The $2,086,145 in affiliate transactions related to sales and marketing expenses should be reallocated using direct assignment. The following amounts should be allocated to all retail classes in proportion to number of customers: (1) $46,490 for Project E10PCR56224 – Sales and Marketing – EGSI Texas; (2) $17,013 for Project F3PCD10049 – Regulated Retail Systems O&M; and (3) $30,167 for Project F3PPMMALI2 – Middle Market Mkt. Development. The remainder, $1,992,475, should be assigned to (1) General Service, (2) Large General Service and (3) Large Industrial Power Service.

165. ETI agreed to remove the following affiliate transactions from its application: (1) Project F3PPCASHCT (Contractual Alternative/Cashpo) in the amount of $2,553; (2) Project F3PCSPETEI (Entergy-Tulane Energy Institute) in the amount of $14,288; and (3) Project F5PPKATRPT (Storm Cost Processing & Review) in the amount of $929.

166. The $356,151 (which figure includes the $112,531 agreed to by ETI) of costs associated with Projects F5PCZUBENQ (Non-Qualified Post Retirement) and F5PPZNQBDU (Non Qual Pension/Benf Dom Utl) are costs that are not reasonable and necessary for the provision of electric utility service and are not in the public interest.

167. The $10,279 of costs associated with Project F3PPFXERSP (Evaluated Receipts Settlement) are not normally-recurring costs and should not be recoverable.

168. The $19,714 of costs associated with Project F3PPEASTIN (Willard Eastin et al) are related to ESI's operations, it is more immediately related to Entergy Louisiana, Inc. and Entergy New Orleans, Inc. As such, they are not recoverable from Texas ratepayers.

169. The $171,032 of costs associated with Project F3PPE9981S (Integrated Energy Management for ESI) are research and development costs related to energy efficiency programs. As such, they should be recovered through the energy efficiency cost recovery factor rather than base rates.

170. Except as noted in the above findings of fact Nos. 162-169, all remaining affiliate transactions were reasonable and necessary, were allowable, were charged to ETI at a price no higher than was charged by the supplying affiliate to other affiliates, and the rate charged is a reasonable approximation of the cost of providing service.

*Jurisdictional Cost Allocation*

171. ETI has one full or partial requirements wholesale customer – East Texas Electric Cooperative, Inc.

172. ETI proposes that 150 MW be set as the wholesale load for developing retail rates in this docket. Using 150 MW to set the wholesale load is reasonable. The 150 MW used to set the wholesale load results in a retail production demand allocation factor of 95.3838 percent.

173. The 12 Coincident Peak (12 CP) allocation method is consistent with the approach used by the FERC to allocate between jurisdictions.

174. Using 12CP methodology to allocate production costs between the wholesale and retail jurisdictions is the best method to reflect cost responsibility and is appropriate based on ETI's reliance on capacity purchases.

*Class Cost Allocation and Rate Design*

175. There is no express statutory authorization for ETI's proposed Renewable Energy Credits rider (REC rider).

176. REC rider constitutes improper piecemeal ratemaking and should be rejected.

177. ETI's test-year expense for renewable energy credits, $623,303, is reasonable and necessary and should be included in base rates.

178. Municipal Franchise Fees (MFF) is a rental expense paid by utilities for the right to use public rights-of-way to locate its facilities within municipal limits.

179. ETI is an integrated utility system. ETI's facilities located within municipal limits benefit all customers, whether the customers are located inside or outside of the municipal limits.

180. Because all customers benefit from ETI's rental of municipal right-of-way, municipal franchise fees should be charged to all customers in ETI's service area, regardless of geographic location.

181. It is reasonable and consistent with the Public Utility Regulatory Act (PURA) § 33.008(b) that MFF be allocated to each customer class on the basis of in-city kilowatt hour (kWh) sales, without an adjustment for the MFF rate in the municipality in which a given kWh sale occurred.

182. The same reasons for allocating and collecting MFF as set out in Finding of Fact Nos. 178-181 also apply to the allocation and collection of Miscellaneous Gross Receipts Taxes. The company's proposed allocation of these costs to all retail customer classes based on customer class revenues relative to total revenues is appropriate.

182A. ETI's proposed gross plant-based allocator is an appropriate method for allocating the Texas franchise tax.

183. The Average and Excess (A&E) 4CP method for allocating capacity-related production costs, including reserve equalization payments, to the retail classes is a standard methodology and the most reasonable methodology.

184. The A&E 4CP method for allocating transmission costs to the retail classes is standard and the most reasonable methodology.

185. ETI appropriately followed the rate class revenue requirements from its cost of service study to allocate costs among customer classes. ETI's revenue allocation properly sets rates at each class's cost of service.

186.     It is reasonable for ETI to eliminate the service condition for Rate Groups A and C in Schedule SHL [Street and Highway Lighting Service] that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb.

187.     It is appropriate to require ETI to prepare and file, as part of its next base rate case, a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates in its next rate case.

188.     An agreement was reached by the parties and approved by the Commission in Docket No. 37744 that directed ETI to exclude, in its next rate case, the life-of-contract demand ratchet for existing customers in the Large Industrial Power Service (LIPS), Large Industrial Power Service-Time of Day, General Service, General Service-Time of Day, Large General Service, and Large General Service-Time of Day rate schedules.

189.     ETI's proposed tariffs in this case did not remove the life-of-contract demand ratchet from these rate schedules consistent with the parties' agreement in Docket No. 37744.

190.     A perpetual billing obligation based on a life-of-contract demand ratchet, as ETI proposed, is not reasonable.

191.     ETI's proposed LIPS and LIPS Time of Day tariffs should be modified to reflect the agreement that was adopted by the Commission as just and reasonable in Docket No. 37744. Accordingly, these tariffs should be modified as set out in Findings of Fact No. 192-194.

192.     ETI's Schedule LIPS and LIPS Time of Day § VI should be changed to read:

DETERMINATION OF BILLING LOAD

The kW of Billing Load will be the greatest of the following:

(A) The Customer's maximum measured 30-minute demand during any 30-minute interval of the current billing month, subject to §§ III, IV and V above; or

(B) 75% of Contract Power as defined in § VII; or

(C) 2,500 kW.

193.   ETI's Schedule LIPS and LIPS Time of Day § VII should be changed to read:

DETERMINATION OF CONTRACT POWER

Unless Company gives customer written notice to the contrary, Contract Power will be defined as below:

Contract Power - the highest load established under § VI(A) above during the 12 months ending with the current month. For the initial 12 months of Customer's service under the currently effective contract, the Contract Power shall be the kW specified in the currently effective contract unless exceeded in any month during the initial 12-month period.

194.   The Large General Service, Large General Service-Time of Day, General Service, and General Service-Time of Day schedules should be similarly revised to eliminate ETI's life-of-contract demand ratchet.

195.   In its proposed rate design for the LIPS class, the company took a conservative approach and increased the current rates by an equal percentage. This minimized customer bill impacts while maintaining cost causation principles on a rate class basis.

196.   It is a reasonable move towards cost of service to add a customer charge of $630 to the LIPS rate schedule with subsequent increases to be considered in subsequent base rate cases.

197.   It is a reasonable move towards cost of service to slightly decrease the LIPS energy charges and increase the demand charges as proposed by Staff witness William B. Abbott.

198.   DOE proposed a new Schedule LIPS rider—Schedule "Schedulable Intermittent Pumping Service" (SIPS) for load schedulable at least four weeks in advance, that occurs in the off-season (October through May), that can be cancelled at any time, and for load not lasting more than 80 hours in a year. For customers whose loads match these SIPS characteristics (for example, DOE's Strategic Petroleum Reserve), the 12-month demand ratchet provision of Schedule LIPS does not apply to demands set under the provisions of the SIPS rider. The monthly demand set under the SIPS provisions would be applicable for billing purposes only in the month in which it occurred. In short, if a customer set a

12-month ratchet demand in that month, it would be forgiven and not applicable in the succeeding 12 months.

199. DOE's proposed Schedule SIPS is not restricted solely to the DOE and should be adopted. It more closely addresses specific customer characteristics and provides for cost-based rates, as does another ETI rider applicable to Pipeline Pumping Service.

200. Standby Maintenance Service (SMS) is available to customers who have their own generation equipment and who contract for this service from ETI.

201. P.U.C. SUBST. R. 25.242(k)(1) provides that rates for sales of standby and maintenance power to qualifying facilities should recognize system wide costing principles and should not be discriminatory.

202. It is reasonable to move Schedule SMS toward cost of service by: (a) adding a customer charge equivalent to that of the LIPS rate schedule only for SMS customers not purchasing supplementary power under another applicable rate; and (b) revising the tariff as follows:

| Charge | Distribution (less than 69KV) | Transmission (69KV and greater) |
|---|---|---|
| Billing Load Charge ($/kW): | | |
| Standby | $2.46 | $0.79 |
| Maintenance | $2.27 | $0.60 |
| Non-Fuel Energy Charge (¢/kWh) | | |
| On-Peak | 4.245¢ | 4.074¢ |
| Off-Peak | 0.575¢ | 0.552¢ |

203. ETI's Additional Facilities Charge rider (Schedule AFC) prescribes the monthly rental charge paid by a customer when ETI installs facilities for that customer that would not normally be supplied, such as line extensions, transformers, or dual feeds.

204. ETI existing Schedule AFC provides two pricing options. Option A is a monthly charge. Option B, which applies when a customer elects to amortize the directly-assigned facilities over a shorter term ranging from one to ten years, has a variable monthly charge. There is also a term charge that applies after the facility has been fully depreciated.

205.    It is reasonable and cost-based to reduce the Schedule AFC Option A rate to 1.11 percent
        per month of the installed cost of all facilities included in the agreement for additional
        facilities.

206.    It is reasonable and cost-based to reduce the Schedule AFC Option B monthly rate and
        the Post Term Recovery Charge as follows:

| Selected Recovery Term | Recovery Term Charge | Post Recovery Term Charge |
|---|---|---|
| 1 | 9.52% | 0.28% |
| 2 | 5.14% | 0.28% |
| 3 | 3.68% | 0.28% |
| 4 | 2.95% | 0.28% |
| 5 | 2.52% | 0.28% |
| 6 | 2.23% | 0.28% |
| 7 | 2.03% | 0.28% |
| 8 | 1.88% | 0.28% |
| 9 | 1.76% | 0.28% |
| 10 | 1.67% | 0.28% |

207.    The revisions in the above findings of fact to Schedule AFC rates reasonably reflect the
        costs of running, operating, and maintaining the directly-assigned facilities.

208.    It is reasonable to modify the Large General Service rate schedule by increasing the
        demand charge from $8.56 to $11.43; decreasing the energy charge from $.00854 to
        $.00458; and reducing the customer charge to $260.00.

209.    Staff's proposed change to the General Service (GS) rate schedule to gradually move GS
        customers towards their cost of service by recommending a decrease in the customer
        charge from the current rate of $41.09 to $39.91, and a decrease in the energy charges is
        reasonable and should be adopted.

210.    ETI's Residential Service (RS) rate schedule is composed of two elements:  a customer
        charge and a consumption-based energy charge.  In the months November through April
        (winter), the rates are structured as a declining block, in which the price of each unit is
        reduced after a defined level of usage.  ETI's proposed increase in the RS customer
        charge to $6 per month is reasonable and should be adopted.  For the RS summer rate and

the first winter block rate, the 6.296¢ per kWh energy charge resulting from the increased revenue requirement for residential customers is reasonable and should be adopted.

211. ETI's Schedule RS declining block rate structure is contrary to energy-efficiency efforts and the Legislature's goal of reducing both energy demand and energy consumption in Texas, as stated in PURA § 39.905.

212. Schedule RS winter block rates should be modified consistent with the goal set out in PURA § 39.905, with the initial phase-in of a 20 percent reduction in the block differential proposed by ETI and subsequent reductions should be reviewed for consideration at the occurrence of each rate case filing.

213. Other elements of Schedule RS are just and reasonable.

## *Fuel Reconciliation*

214. ETI incurred $616,248,686 in natural-gas expenses during the reconciliation period, which is from July 2009 through June 2011.

215. ETI purchased natural gas in the monthly and daily markets and pursuant to a long-term contract with Enbridge Inc. pipeline. ETI also transported gas on its own account and negotiated operational balancing agreements with various pipeline companies.

216. ETI employed a diversified portfolio of gas supply and transportation agreements to meet its natural-gas requirements, and ETI prudently managed its gas-supply contracts.

217. ETI's natural gas expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

218. ETI incurred $90,821,317 in coal expenses during the reconciliation period.

219. ETI prudently managed its coal and coal-related contracts during the reconciliation period.

220. ETI monitored and audited coal invoices from Louisiana Generating, LLC for coal burned at the Big Cajun II, Unit 3 facility.

221. ETI's coal expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

222. ETI incurred $990,041,434 in purchased-energy expenses during the reconciliation period.

223. The Entergy System's planning and procurement processes for purchased-power produced a reasonable mix of purchased resources at a reasonable price.

224. During the reconciliation period, ETI took advantage of opportunities in the fuel and purchased-power markets to reduce costs and to mitigate against price volatility.

225. ETI's purchased-energy expenses were reasonable and necessary expenses incurred to provide reliable electric service to retail customers.

226. ETI provided sufficient contemporaneous documentation to support the reasonableness of its purchased-power planning and procurement processes and its actual power purchases during the reconciliation period.

227. The Entergy system sold power off system when the revenues were expected to be more than the incremental cost of supplying generation for the sale, subject to maintaining adequate reserves.

228. The System Agreement is the tariff approved by the FERC that provides the basis for the operation and planning of the Entergy system, including the six operating companies. The System Agreement governs the wholesale-power transactions among the operating companies by providing for joint operation and establishing the bases for equalization among the operating companies, including the costs associated with the construction, ownership, and operation of the Entergy system facilities.

229. Under the terms of the Entergy System Agreement, ETI was allocated its share of revenues and expenses from off-system sales.

230. During the reconciliation period, ETI recorded off-system sales revenue in the amount of $376,671,969 in FERC Account 447 and credited 100 percent of off-system sales revenues and margins from off-system sales to eligible fuel expenses.

231. ETI properly recorded revenues from off-system sales and credited those revenues to eligible fuel costs.

232.  The Entergy system consists of six operating companies, including ETI, which are planned and operated as a single, integrated electric system under the terms of the System Agreement.

233.  Service schedule MSS-1 of the System Agreement determines how the capability and ownership costs of reserves for the Entergy system are equalized among the operating companies. These inter-system "reserve equalization" payments are the result of a formula rate related to the Entergy system's reserve capability that is applied on a monthly basis.

234.  Reserve capability under service schedule MSS-1 is capability in excess of the Entergy system's actual or planned load built or acquired to ensure the reliable, efficient operation of the electric system.

235.  By approving service schedule MSS-1, the FERC has approved the method by which the operating companies share the cost of maintaining sufficient reserves to provide reliability for the Entergy system as a whole.

236.  Service schedule MSS-3 of the System Agreement determines the pricing and exchange of energy among the operating companies. By approving service schedule MSS-3, the FERC has approved the method by which the operating companies are reimbursed for energy sold to the exchange energy pool and how that energy is purchased.

237.  Service schedule MSS-4 of the System Agreement sets forth the method for determining the payment for unit power purchases between operating companies. By approving service schedule MSS-4, the FERC has approved the methodology for pricing inter-operating company unit power purchases.

238.  The Entergy system is planned using multi-year, annual, seasonal, monthly, and next-day horizons. Once the planning process has identified the most economical resources that can be used to reliably meet the aggregate Entergy system demand, the next step is to procure the fuel necessary to operate the generating units as planned and acquire wholesale power from the market.

239. Once resources are procured to meet forecasted load, the Entergy system is operated during the current day using all the resources available to meet the total Entergy system demand.

240. After current-day operation, the System Agreement prescribes an accounting protocol to bill the costs of operating the system to the individual operating companies. This protocol is implemented via the intra-system bill to each operating company on a monthly basis.

241. ETI purchased power from affiliated operating companies per the terms of service schedule MSS-3 of the System Agreement. The payments made under Schedule MSS-3 to affiliated operating companies are reasonable and necessary, and the FERC has approved the pricing formula and the obligation to purchase the energy. ETI pays the same price per megawatt hour for energy under service schedule MSS-3 as does any other operating company purchasing energy under service schedule MSS-3 during the same hour.

242. The Spindletop facility is used primarily to ensure gas-supply reliability and guard against gas-supply curtailments that can occur as a result of extreme weather or other unusual events.

243. The Spindletop facility provides a secondary benefit of flexibility in gas supply. ETI can back down gas-fired generation to take advantage of more economical wholesale power, or use gas from storage to supplement gas-fired generation when load increases during the day and thereby avoid more expensive intra-day gas purchases.

244. ETI's customers received benefits from the Spindletop facility during the reconciliation period through reliable gas supplies and ETI's monthly and daily storage activity.

245. ETI prudently managed the Spindletop facility to provide reliability and flexibility of gas supply for the benefit of customers.

246. ETI proposed new loss factors, based on a December 2010 line-loss study, to be applied for the purpose of allocating its costs to its wholesale customers and retail customer classes.

246A. ETI's 2010 line-loss factors should be used to reconcile ETI's fuel costs. Therefore, ETI's fuel reconciliation over-recovery should be reduced by $3,981,271.

247. ETI's proposed loss factors are reasonable and shall be implemented on a prospective basis as a result of this final order.

248. ETI seeks a special-circumstances exception to recover $99,715 resulting from the FERC's reallocation of rough production equalization costs in FERC Order No. 720-A, and to treat such costs as eligible fuel expense.

249. Special circumstances exist and it is appropriate for ETI to recover the rough production cost equalization costs reallocated to ETI as a result of the FERC's decision in Order No. 720-A.

### *Other Issues*

250. A deferred accounting of ETI's Midwest Independent Transmission System Operator (MISO) transition expenses is not necessary to carry out any requirement of PURA.

251. ETI should include $1.6 million in base rates for MISO transition expense.

252. Deleted.

253. Transmission Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

254. Distribution Cost Recovery Factor baseline values should be set during the compliance phase of this docket, after the Commission makes final rulings on the various contested issues that may affect this calculation.

255. The appropriate amount for ETI's purchased-power capacity expense to be included in base rates is $245,965,886.

256. The amount of ETI's purchased-power capacity expense includes third-party contracts, legacy affiliate contracts, other affiliate contracts, and reserve equalization. Whether the amounts for all contracts should be included in the baseline for a purchased-capacity rider that may be approved in Project No. 39246 is an issue that should be decided in that project.

### III. Conclusions of Law

1.   ETI is a "public utility" as that term is defined in PURA § 11.004(1) and an "electric utility" as that term is defined in PURA § 31.002(6).

2.   The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 14.001, 32.001, 32.101, 33.002, 33.051, 36.101–.111, and 36.203.

3.   SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049.

4.   This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act, Tex. Gov't Code Ann. Chapter 2001.

5.   ETI provided notice of its application in compliance with PURA § 36.103, P.U.C. PROC. R. 22.51(a), and P.U.C. SUBST. R. 25.235(b)(1)-(3).

6.   Pursuant to PURA § 33.001, each municipality in ETI's service area that has not ceded jurisdiction to the Commission has jurisdiction over the company's application, which seeks to change rates for distribution services within each municipality.

7.   Pursuant to PURA § 33.051, the Commission has jurisdiction over an appeal from a municipality's rate proceeding.

8.   ETI has the burden of proving that the rate change it is requesting is just and reasonable pursuant to PURA § 36.006.

9.   In compliance with PURA § 36.051, ETI's overall revenues approved in this proceeding permit ETI a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses.

10.  Consistent with PURA § 36.053, the rates approved in this proceeding are based on original cost, less depreciation, of property used and useful to ETI in providing service.

11.  The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

12.    Including the cash working capital approved in this proceeding in ETI's rate base is consistent with P.U.C. SUBST. R. 25.231(c)(2)(B)(iii)(IV), which allows a reasonable allowance for cash working capital to be included in rate base.

13.    The ROE and overall rate of return authorized in this proceeding are consistent with the requirements of PURA §§ 36.051 and 36.052.

14.    The affiliate expenses approved in this proceeding and included in ETI's rates meet the affiliate payment standards articulated in PURA §§ 36.051, 36.058, and *Railroad Commission of Texas v. Rio Grande Valley Gas Co.*, 683 S.W.2d 783 (Tex. App.—Austin 1984, no writ).

15.    The ADFIT adjustments approved in this proceeding are consistent with PURA § 36.059 and P.U.C. SUBST. R. 25.231(c)(2)(C)(i).

16.    Pursuant to P.U.C. SUBST. R. 25.231(b)(1)(F), the decommissioning expense approved in this case is based on the most current information reasonably available regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors.

17.    ETI has demonstrated that its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers as required by P.U.C. SUBST. R. 25.236(d)(1)(A).  ETI has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period as required by P.U.C. SUBST. R. 25.236(d)(1)(C).

18.    ETI prudently managed the dispatch, operations, and maintenance of its fossil plants during the reconciliation period.

19.    The reconciliation period level operating and maintenance expenses for the Spindletop facility are eligible fuel expenses pursuant to P.U.C. SUBST. R. 25.236(a).

19A.   Fuel factors under P.U.C. SUBST. R. 25.237(a)(3) are temporary rates subject to revision in a reconciliation proceeding.

19B.　P.U.C. SUBST. R. 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses.  It is proper to use the new line-loss study to calculate Entergy's fuel reconciliation and over-recovery.

20.　Special circumstances are warranted pursuant to P.U.C. SUBST. R. 25.236(a)(6) to recover rough production equalization payments reallocated to ETI by the FERC.

21.　ETI's rates, as approved in this proceeding, are just and reasonable in accordance with PURA § 36.003.

## IV.  Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.　The proposal for decision prepared by the SOAH ALJs is adopted to the extent consistent with this Order.

2.　ETI's application is granted to the extent consistent with this Order.

3.　ETI shall file in Tariff Control No. 40742 *Compliance Tariff Pursuant to Final Order in Docket No. 39896 (Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment)* tariffs consistent with this Order within 20 days of the date of this Order.  No later than ten days after the date of the tariff filings, Staff shall file its comments recommending approval, modification, or rejection of the individual sheets of the tariff proposal.  Responses to the Staff's recommendation shall be filed no later than 15 days after the filing of the tariff.  The Commission shall by letter approve, modify, or reject each tariff sheet, effective the date of the letter.

4.　The tariff sheets shall be deemed approved and shall become effective on the expiration of 20 days from the date of filing, in the absence of written notification of modification or rejection by the Commission.  If any sheets are modified or rejected, ETI shall file proposed revisions of those sheets in accordance with the Commission's letter within ten

days of the date of that letter, and the review procedure set out above shall apply to the revised sheets.

5.      Copies of all tariff-related filings shall be served on all parties of record.

6.      ETI shall prepare and file as part of its next base rate case a study regarding the feasibility of instituting LED-based rates and, if the study shows that such rates are feasible, ETI should file proposals for LED-based lighting and traffic signal rates in that case.  If ETI has LED lighting customers taking service, the study shall include detailed information regarding differences in the cost of serving LED and non-LED lighting customers.  ETI shall provide the results of this study to Cities and interested parties as soon as practicable, but no later than the filing of its next rate case.

7.      All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

SIGNED AT AUSTIN, TEXAS the _____ day of October 2012.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
**DONNA L. NELSON, CHAIRMAN**

_____
**ROLANDO PABLOS, COMMISSIONER**

I respectfully dissent regarding the utility- and executive-management-class affiliate transactions.  To be consistent with Commission precedent in Docket No. 14965,[37] the indirect costs of the management of Entergy's ultimate parent should not be borne by Texas ratepayers.  Therefore, I would disallow the following:  $173,867 for Project No. F3PCCPM001 (Corporate Performance Management); $372,919 for Project No. F3PCC31255 (Operations-Office of the CEO); and $74,485 for Project No. F3PPCOO001 (Chief Operating Officer).  I join the Commission in all other respects for this Order.

_____
**KENNETH W. ANDERSON, JR., COMMISSIONER**

q:\cadm\orders\final\39000\39896o on reh.docx

---

[37] *Application of Central Power and Light Company for Authority to Change Rates*, Docket No. 14965, Second Order on Rehearing (Oct. 16, 1997).

APPENDIX C

District Court's Final Judgment

CAUSE NO. D-1-GN-13-000121

| | | |
|---|---|---|
| ENTERGY TEXAS, INC., | § | IN THE DISTRICT COURT OF |
| **Plaintiff** | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PUBLIC UTILITY COMMISSION, | § | |
| **Defendant** | § | 353RD JUDICIAL DISTRICT |

## ORDER ON ADMINISTRATIVE APPEAL

On July 22, 2014, the Court heard Plaintiff's appeal from Defendant's Order in PUC

Docket No. 39896, SOAH Docket No. 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. The administrative record was admitted

into evidence, and the Court heard oral argument. Entergy, the Cities, and OPUC each asserted

points of error challenging the Commission's order. Having considered the pleadings, the

evidence and the arguments of counsel, the Court makes the following rulings:

1. Entergy's Point of Error No. 1 addressing the use of a current line loss study rather that a prior-approved line loss study in allocating line loss costs among classes of customers establishes that the Commission erred in applying the current study in violation of Commission rules found at 16 TAC §25.236(e)(3) and 16 TAC 25.237(a) and (c)(2)(B). Accordingly, the Court FINDS that the PUC's ruling was arbitrary and capricious and constitutes an error of law. The Court REVERSES such ruling and REMANDS this matter to the Commission for further proceedings consistent with this Court's Order.
2. All other points of error are DENIED, and the Commission's Order is in all other respects AFFIRMED.

All relief not granted, herein, is DENIED.

Signed this ___14th___ day of ~~September~~ October, 2014.

_____
JUDGE PRESIDING

APPENDIX D

Commission's Final Order in Docket No. 37744

# PUC DOCKET NO. 37744
# SOAH DOCKET NO. 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

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
| INC. FOR AUTHORITY TO CHANGE | § | |
| RATES AND RECONCILE FUEL | § | OF TEXAS |
| COSTS | § | |

## ORDER

This Order addresses the application of Entergy Texas, Inc. (ETI) for authority to change rates and reconcile fuel costs. ETI, Commission Staff, the Office of Public Utility Counsel (OPUC), the Steering Committee of Cities Served by ETI (Cities),[1] Texas Industrial Energy Consumers (TIEC), The Kroger Company (Kroger), and Wal-Mart Stores Texas, LLC and Sam's East, Inc. (collectively Wal-Mart), through their duly authorized representatives entered into and filed a stipulation and settlement agreement that resolves all of the issues in this proceeding except the issues related to ETI's proposal for competitive generation service. Cottonwood Energy, L.P. and the State of Texas agencies and institutions of higher education (State Agencies) did not join but do not oppose the stipulation.

The Commission severed the competitive generation service issues into Docket No. 38951[2] in Order No. 14.

The Commission adopts the following findings of fact and conclusions of law:

---

[1] Steering Committee of Cities is comprised of the Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

[2] *Application of Entergy Texas, Inc. for Approval of Competitive Generation Service Tariff (Issues Severed From Docket No. 37744)*, Docket No. 38951.

## I. Findings of Fact

### *Procedural History*

1. On December 30, 2009, ETI filed an application requesting approval of (1) base rate tariffs and riders designed to collect an overall revenue requirement of $1,758.4 million, which includes a total non-fuel retail revenue requirement of $838.3 million (base rate revenues of $486 million plus revenue from riders of $352.3 million); (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities (RFP) accompanying ETI's application; (3) a request for final reconciliation of ETI's fuel and purchased power costs for the reconciliation period from April 1, 2007 to June 30, 2009; and (4) certain waivers to the instructions in RFP Schedule V accompanying ETI's application.

2. The 12-month test year employed in ETI's filing ended on June 30, 2009.

3. ETI provided notice by publication for four consecutive weeks before the effective date of the proposed rate change in newspapers having general circulation in each county of ETI's Texas service territory. ETI also mailed notice of its proposed rate change to all of its customers. Additionally, ETI timely served notice of its statement of intent to change rates on all municipalities retaining original jurisdiction over its rates and services. ETI also published one-time supplemental notice by publication in newspapers and by bill insert.

4. The following parties were granted intervenor status in this docket: OPUC, Cities, Cottonwood, Kroger, State Agencies, TIEC, and Wal-Mart. Commission Staff was also a participant in this docket.

5. On January 4, 2010, the Commission referred this case to the State Office of Administrative Hearings (SOAH) for processing.

6. On February 19, 2010, the ALJs issued Order No. 3, which approved an agreement between ETI, Staff, Cities, State Agencies, OPUC, TIEC, Kroger, and Wal-Mart, to (1) establish an interim rate increase of $17.5 million annually above ETI's then-existing base rates commencing with service rendered on and after May 1, 2010 subject to true-up and refund for service rendered prior to September 13, 2010 to the extent final

overall rates established by the Commission amounted to less than a $17.5 million rate increase; (2) extend the jurisdictional deadline by which the Commission must issue a final order on the Company's rate request from July 5, 2010 to November 1, 2010; (3) establish a September 13, 2010 effective date for rates such that, notwithstanding the extension of the jurisdictional deadline, the final overall rates established by the Commission would relate back to service rendered on and after September 13, 2010; (4) require ETI to publish supplemental notice, once in newspapers and by a bill insert, setting forth the effect of its proposed rate change in terms of the percentage increase in non-fuel revenues; and (5) establish a procedural schedule and discovery deadlines for this proceeding. Order No. 3 also granted Mr. Kurt Boehm's motion for admission pro hac vice as counsel for Kroger and ETI's February 3 and February 11, 2010 petitions for review of cities' ordinances and motions to consolidate with respect to the rate decisions adopted by the Cities of Ames, Anderson, Bedias, Bevil Oaks, Bremond, Caldwell, Calvert, Chester, China, Colmesneil, Corrigan, Cut and Shoot, Daisetta, Dayton, Devers, Franklin, Groveton, Hardin, Hearne, Iola, Kosse, Kountze, Liberty, Lumberton, Madisonville, Midway, New Waverly, Normangee, Nome, Patton Village, Plum Grove, Riverside, Rose Hill Acres, Somerville, Taylor Landing, Todd Mission, Trinity, and Woodville.

7. On June 14, 2010, the ALJs issued Order No. 6 granting Staff's June 1, 2010 motion and severing rate case expense issues to Docket No. 38346.[3] Through Order No. 6, the ALJs also granted ETI's March 12, April 29, and May 17 petitions for review and motions to consolidate with respect to the rate decisions adopted by the Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Panorama Village, Pine Forest, Pinehurst, Port Arthur, Port Neches, Roman Forest, Rose City, Shenandoah, Shepard, Silsbee, Sour Lake, Splendora, Vidor, West Orange, Willis, Woodbranch Village, and Woodloch.

---

[3] *Application of Entergy Texas, Inc. for Rate Case Expenses Severed from PUC Docket No. 37744*, Docket No. 38346.

8.      The hearing on the merits commenced on July 13, 2010 and was immediately recessed in order to facilitate settlement negotiations. The hearing was again convened on July 15, 2010, at which time the signatories announced their intent to continue settlement discussions to resolve all issues related to the Company's application with the exception of those related to ETI's proposal for competitive generation service (CGS) and associated riders.

9.      On August 6, 2010, the signatories submitted the stipulation resolving all outstanding issues regarding the Company's application with the exception of those related to ETI's CGS proposal. Under the stipulation, ETI will be allowed to implement base rate tariffs and riders designed to collect an overall revenue requirement of $1,614.9 million,[4] which includes a total non-fuel retail revenue requirement of $694.9 million (base rate revenues of $599 million plus revenue from riders of $95.9 million). The signatories also submitted, on August 6, 2010, an agreed motion to revise interim rates and to consolidate the severed rate-case expense docket. The interim rates requested in the agreed motion mirrored the final rates proposed for Commission approval in the stipulation. The agreed motion further requested that the ALJs consolidate with the instant proceeding Docket No. 38346, related to severed Docket No. 37744 rate case expense issues, and admit the parties' pre-filed exhibits into evidence.

10.     On July 16 and July 20, 2010, the ALJs held the hearing on the merits with respect to ETI's CGS proposal.

11.     On August 9, 2010, the ALJs issued Order No. 12, granting approval of revised interim rates for usage on and after August 15, 2010.

12.     On October 5, 2010, the ALJs issued a proposal for decision regarding issues related to ETI's CGS proposal.

13.     On October 5, 2010, the ALJs issued Order No. 13, ordering the consolidation of Docket No. 38346, related to severed rate-case expense issues, into the instant proceeding,

---

[4] This figure includes fuel at test year prices. If current fuel prices are substituted for test year fuel prices, the overall revenue requirement figure would be $1,504.0 million.

admitting evidence, and returning this docket to the Commission consistent with the agreed motion filed on August 6, 2010.

14.     The Commission considered this Docket at the November 10, 2010 and December 1, 2010 open meetings.

15.     On November 30, 2010 ETI filed an unopposed motion to sever the competitive CGS issues from the settled issues in this docket. The Commission granted the motion at the December 1, 2010 open meeting and the Commission's decision was memorialized in Order No. 14 issued on December 3, 2010. The CGS issues were severed into Docket No. 38951 in Order No. 14.

*Description of the stipulation and Settlement Agreement*

16.     The signatories to the settlement stipulated that ETI should be allowed to implement an initial overall increase in base-rate revenues of $59 million for usage on and after August 15, 2010. The signatories further stipulated that they would request approval of interim rates by the ALJs presiding or by the Commission, as necessary, to ensure timely implementation of this initial rate increase. The signatories further stipulated that ETI should be allowed to implement an additional overall increase in base-rate revenues of $9 million on an annualized basis effective for bills rendered on and after May 2, 2011, the first billing cycle for the revenue month of May.

17.     The signatories agreed that ETI's authorized return on equity shall be 10.125% and its weighted average cost of capital shall be 8.5209%.

18.     The signatories stipulated that the amount of rate increase authorized under finding of fact 16 includes rate-case expenses and contemplates their full amortization in 2010, and that this amount constitutes the full and final recovery of all rate-case expenses relating to Docket No. 37744.

19.     The signatories stipulated to the amount of transmission and distribution invested capital by function as of June 30, 2009 as set out in attachment 1 to the stipulation.

20.  The signatories stipulated that the Company's proposed purchased-power recovery rider will not be approved in this docket, and purchased capacity costs will be included in base rates.

21.  The signatories stipulated that the Company's proposed transmission cost recovery factor (TCRF) will not be approved in this docket. The signatories stipulated to the baseline values as shown in attachment 2 to the stipulation to be used in the Company's request, if any, for a TCRF in a separate proceeding.

22.  The signatories agreed that ETI's proposed cost-of-service adjustment rider and formula rate plan will not be approved in this docket.

23.  The signatories stipulated that the Company's proposed renewable-energy-credit rider will not be approved in this docket, and the Company's renewable-energy-credit costs shall be recovered in base rates. The signatories further stipulated that a transmission customer that opts out pursuant to P.U.C. SUBST. R. 25.173(j) shall receive a credit that offsets the amount of renewable-energy-credit costs that are recovered in base rates from the transmission customer.

24.  The signatories agreed that ETI's proposed remote-communications-link rider should be approved as filed by the Company.

25.  The signatories agreed that ETI's proposed market-valued-energy-reduction service rider will not be approved in this docket.

26.  The signatories reached the following specific agreements regarding rate design as a part of the overall resolution of this docket:

     a.   Rate Schedule IS. Rate Schedule IS will be opened to new business. In the Company's next base-rate case, the amount of interruptible credits recoverable from Texas retail customers shall be limited to an increase of $1 million more than the amount requested in this docket (or a total of $6.8 million); provided, however, that in the next rate case, the Company may request an exception to this limitation upon a showing that the test-year credit amount in excess of the $6.8 million cap is both cost effective and necessary to meet the Company's generation reserve margin requirement. The signatories further agreed that the

Company will not offer additional interruptible service if the availability of total interruptible service supplied by the Company under all interruptible service riders exceeds 5% of the projected aggregate Company peak demand unless the additional level of interruptible service offered in excess of the 5% cap is both cost effective and necessary to meet the Company's generation reserve margin requirement. To the extent that the credit amount or participation level exceeds the limitations described in this paragraph and the Company includes test-year credits over the $6.8 million credit-amount cap or additional participation in excess of the 5% participation-level cap in its next rate case, the Company shall have the burden to prove whether those test-year credits or participation levels meet the standards established in this paragraph for inclusion in the test year. The standards in this paragraph are in addition to any requirements in PURA for inclusion of costs in rates. The signatories further agreed to the Schedule IS revisions shown on attachment 3 to the stipulation.

b. <u>Rate Schedule IHE</u>. The signatories agreed that no change shall be made to rate schedule IHE in this docket.

c. <u>Lighting Class Rates</u>. The signatories stipulated that the language under the paragraph relating to rate group C in rate schedule SHL will be revised to reflect that, where the Company agrees to install facilities other than its standard street light fixture and lamp as provided under Rate Group A, a lump sum payment will be required, based upon the installed cost of all facilities excluding the cost of the standard street light fixture and lamp, and the customer will be billed under rate group A.

e. <u>Electric Extension Policy</u>. The signatories agreed to the line-extension terms and conditions as reflected in attachment 4 to the stipulation.

f. <u>Life-of-Contract Demand Ratchet</u>. The signatories agreed that the life-of-contract demand ratchet provision in rate schedules Large Industrial Power Service, Large Industrial Power Service-Time of Day, General Service, General Service-Time of Day, Large General Service, and Large General Service-Time of

Day shall be excluded from rate schedules in ETI's next rate case. The signatories further stipulated that the foregoing rate schedules will be revised so that the life-of-contract demand ratchet provision shall not be applicable to new customers and shall not exceed the level in effect on August 15, 2010 for existing customers.

g.     Residential Customer Charge. The signatories agreed that the residential customer charge shall be increased to $5.00.

h.     Non-Sufficient Funds Charge. The signatories agreed that the non-sufficient funds charge shall be increased to $15.00.

27.   The signatories agreed to the class cost allocation set forth in attachment 5 to the stipulation.

28.   The signatories stipulated that the appropriate allocation between ETI's wholesale and retail jurisdictions of baseline values and costs to be included in a TCRF is to be addressed in the proceeding, if any, in which ETI seeks approval of a TCRF.

29.   The signatories stipulated that no party waives its right to address in any subsequent proceeding the appropriate treatment for Texas retail ratemaking purposes of power sales between ETI and Entergy Gulf States Louisiana, L.L.C.

30.   The signatories reached the following specific agreements regarding fuel-related issues as part of the overall resolution of this docket:

a.     Agreed Fuel Disallowance. The Company stipulated to a fuel disallowance of $3.25 million not associated with any particular issue raised by the signatories. The disallowance will be allocated pro rata with interest over each month of the reconciliation period and reflected in the refund in Docket No. 38403.[5] The signatories stipulated that the Company's fuel costs shall be finally reconciled for the reconciliation period of April 1, 2007 through June 30, 2009.

b.     Rider IPCR. The signatories agreed that ETI's eligible Rider IPCR costs for the

---

[5] *Application of Entergy Texas, Inc. to Implement an Interim Fuel Refund*, Docket No. 38403, Order (Sept. 16, 2010).

period April 1, 2007 through the date the rider terminated shall be finally reconciled with a disallowance of $300,000. The signatories further agreed that the under-recovered balance of Rider IPCR costs shall be booked as fuel expense in the month in which the Commission issues an order adopting the stipulation; provided, however, that the under-recovered balance shall be allocated to customer classes using A&E4CP.

c. <u>Rough Production Cost Equalization (RPCE) Payments</u>. The signatories agreed that ETI will credit an additional $18.6 million to Texas fuel-factor customers, which the signatories stipulated represents the remaining portion of RPCE payments ETI received in 2007 that were at issue in Docket No. 35269.[6] The RPCE credit shall be allocated to rate classes based on loss-adjusted kilowatt hours at plant for calendar year 2006. For customers in the Large Industrial Power Service rate class, the credit will be refunded based on the customer's actual kWh usage during the billing months of January 2006 through December 2006. Upon issuance of a final order approving the stipulation, the RPCEs shall be credited to customers as a separate one-month bill credit in the same form as the RPCEA Rider last approved in Docket No. 38098.[7] ETI agreed that it will terminate all appeals related to Docket No. 35269.

31. The signatories agreed that ETI will continue its accrual of storm-cost reserves at the level of $3.65 million annually and that this amount shall be subsumed in the base-rate revenue increase described in finding of fact 16 above.

32. The signatories agreed that ETI shall maintain River Bend depreciation rates at current levels, *i.e.*, based on a 60-year life. River Bend decommissioning costs will be set at $2,019,000 annually, which is based upon a labor-factor escalation rate of 1.67%, an energy-factor escalation rate of 0.25%, and a waste-burial-factor-escalation rate of

---

[6] *Compliance Filing of Entergy Texas, Inc. Regarding Jurisdictional Allocation of 2007 System Agreement Payments*, Docket No. 35269, Order (Jan. 7, 2009).

[7] *Application of Entergy Texas, Inc. for Authority to Implement New RPCEA Rate*, Docket No. 38098, Order (July 1, 2010).

1.71%, resulting in an overall escalation rate of 3.62%, and net investment yields as follows:

Nuclear-Decommissioning-Trust Projected Returns

|  | Tax-Qualified Investments | Non-Tax-Qualified Investment |
|---|---|---|
| 2010 | 5.475% | 5.057% |
| 2011 | 5.837% | 5.236% |
| 2012 | 6.306% | 5.567% |
| 2013 | 6.304% | 5.607% |
| 2014 | 6.481% | 5.896% |
| 2015 | 6.493% | 5.909% |
| 2016 | 6.412% | 5.826% |
| 2017 | 6.412% | 5.830% |
| 2018 | 6.364% | 5.790% |
| 2019 | 6.316% | 5.748% |
| 2020 | 6.268% | 5.712% |
| 2021 | 6.220% | 5.670% |
| 2022 | 2.503% | 5.458% |
| 2023 | 5.817% | 5.055% |
| 2024 | 5.382% | 4.628% |
| 2025 | 5.036% | 4.516% |
| 2026-2034 | 4.920% | 4.409% |

33. The signatories stipulated that the Company's depreciation rates for non-River Bend production plant, transmission, distribution, and general plant will remain at current levels and the Company will maintain its accounting records on a prospective basis for purposes of depreciation accrual, depreciation reserve, retirements, additions, salvage, and cost of removal by FERC account.

***Consistency of the Agreement with PURA and the Commission Requirements***

34. Considered in light of (1) the pre-filed testimony by the parties entered into evidence and (2) the additional evidence and testimony admitted during the course of the hearing on the merits on the Company's application, the stipulation is the result of compromise from each signatory, and these efforts, as well as the overall result of the stipulation viewed in light of the record evidence as a whole, support the reasonableness and benefits of the terms of the stipulation.

35.    The evidence addressed in finding of fact 34 demonstrates that the rates, terms, and conditions resulting from the stipulation are just and reasonable and consistent with the public interest.

36.    The total level of the Texas retail revenue requirement contemplated by the stipulation will allow ETI the opportunity to earn a reasonable return over and above its reasonable and necessary operating expense.

37.    The stipulated revenue requirement is consistent with applicable provisions of PURA chapter 36 and the Commission's rules.

38.    To the extent that affiliate costs are included in the stipulated revenue requirement and fuel expense, they are reasonable and necessary for each class of affiliate costs presented in ETI's application.

39.    To the extent that affiliate costs are included in the stipulated revenue requirement and fuel expense, the price charged to ETI is not higher than the prices charged by the supplying affiliate for the same item or class of items to its other affiliates or divisions, or a non-affiliated person within the same market area or having the same market conditions.

40.    The retail revenue requirement in the stipulation does not include any expenses prohibited from recovery under PURA.

41.    A return on equity of 10.125% and a weighted average cost of capital of 8.5209% for ETI should be adopted consistent with the stipulation.

42.    The agreed rate-design provisions and terms and conditions of service included in the stipulation are just and reasonable.

43.    The treatment of rate-case expenses described in the stipulation is reasonable.

44.    The Company's proposed remote-communications-link rider as filed by the Company is reasonable.

45.    The depreciation rates agreed to in the stipulation are just and reasonable.

46.     The recovery of $2,019,000 annually for decommissioning costs of nuclear production assets based on the factors agreed to in the stipulation is reasonable.

47.     A $3.65 million annual storm cost accrual is reasonable.

48.     The class allocation methodologies described in the stipulation are just and reasonable.

49.     The fuel and IPCR-related provisions of the stipulation are reasonable.


## II.     Conclusions of Law

1.      ETI is a public utility as that term is defined in PURA § 11.004(1) and an electric utility as that term is defined in PURA § 31.002(6).

2.      The Commission exercises regulatory authority over ETI and jurisdiction over the subject matter of this application pursuant to PURA §§ 14.001, 32.001, 32.101, 33.002, 33.051, 36.001–.111, 36.203, 39.452, and 39.455.

3.      SOAH has jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049.

4.      This docket was processed in accordance with the requirements of PURA, the Texas Administrative Procedure Act,[8] and Commission rules.

5.      ETI provided notice of its application in compliance with PURA § 36.103, P.U.C. PROC. R. 22.51(a), and P.U.C. SUBST. R. 25.235(b)(1)-(3).

6.      This docket contains no remaining contested issues of fact or law.

7.      The stipulation, taken as a whole, is a just and reasonable resolution of all issues it addresses; results in just and reasonable rates, terms, and conditions; is supported by a preponderance of the credible evidence in the record; is consistent with the relevant provisions of PURA; and is consistent with the public interest.

8.      ETI has properly accounted for the amount of fuel and IPCR-related revenues collected pursuant to the fuel factor and Rider IPCR.

---

[8] TEX. GOV'T CODE ANN. Chapter 2001 (Vernon 2007 and Supp. 2009).

9. The revenue requirement, cost allocation, revenue distribution, and rate design implementing the stipulation result in rates that are just and reasonable, comply with the ratemaking provisions in PURA, and are not unreasonably discriminatory, preferential, or prejudicial.

10. Based on the evidence in this docket, the overall total invested capital through the end of the test year meets the requirement in PURA § 36.053(a) that electric utility rates be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

11. ETI has met its burden of proof in demonstrating that it is entitled to the level of retail base rate and rider revenue set out in the stipulation.

12. ETI has met its burden of proof in demonstrating that the rates resulting from the stipulation are just and reasonable, and consistent with PURA.

### III. Ordering Paragraphs

1. ETI's application seeking authority to change its rates; reconcile its fuel and purchased power costs for the Reconciliation Period from April 1, 2007 to June 30, 2009; and for other related relief is approved consistent with the above findings of fact and conclusions of law.

2. Rates, terms, and conditions consistent with the stipulation are approved.

3. The tariffs and riders consistent with the stipulation are approved for the initial and second step rate increases.

4. ETI's request for waivers of RFP instructions (RFP Schedule V) is granted.

5. ETI shall adjust decommissioning expense related to the River Bend Nuclear Generating Station consistent with the terms of this Order.

6. Neither the stipulation and settlement agreement nor this Order constitutes the Commission's agreement with, or consent to, the manner in which ETI, or any entity affiliated with ETI, has interacted with any decommissioning trust to which ETI or its ratepayers have made contributions or provided funds. Furthermore, this Order in no

way constitutes a waiver or release of any conduct, whether or not such conduct occurred before the date of this Order, that may constitute a violation of any provision of state law, including, without limitation, the rules and regulations of this Commission relating to nuclear decommissioning trust funds; or prevents the Staff of the Commission from opening an investigation and taking enforcement action relating to violations of such rules and regulations.

7. Nothing contained in this Order constitutes the consent or approval, explicit or implied, of any modification, amendment or clarification of any power purchase agreement between ETI and any other Entergy entity relating to the River Bend Station. Without limiting the foregoing, nothing contained in this Order shall constitute the consent or approval of any modification, amendment, or clarification of any power purchase agreement between ETI and any other Entergy entity relating to the River Bend Station, which is made to address any concerns raised by the NRC in its Request for Additional Information regarding the River Bend Station dated March 11, 2010.

8. The Rider IPCR costs and eligible fuel costs requested by ETI are, consistent with this Order, reconciled through June 30, 2009, and are approved consistent with the stipulation.

9. ETI shall adjust its fuel over/under recovery balance consistent with the findings in this Order.

10. ETI shall file an RPCEA Rider consistent with the above findings of fact and conclusions of law to be effective with the first billing cycle of the billing month immediately following the effective date of this Order.

11. Because the final approved rates are equal to or higher than the interim rates adopted in Order No. 3, no refund of the interim rates authorized by Order No. 3 is necessary.

12. The interim rates approved in Order No. 12 are herby approved for the initial step rate increase contemplated by the stipulation, and ETI shall implement the second step rates for bills rendered on and after May 2, 2011, the first billing cycle for the revenue month of May.

13. Within 30 days of the date of this Order, ETI shall file a clean copy of all of the tariffs and schedules approved in this docket and a clean copy of the attachments to the stipulation.

14. The entry of this Order consistent with the stipulation does not indicate the Commission's endorsement of any principle or method that may underlie the stipulation. Neither should entry of this Order be regarded as a precedent as to the appropriateness of any principle or methodology underlying the stipulation.

15. All other motions, requests for entry of specific findings of fact, conclusions of law, and ordering paragraphs, and any other requests for general or specific relief, if not expressly granted in this order, are hereby denied.

**SIGNED AT AUSTIN, TEXAS the _____ day of December 2010**

**PUBLIC UTILITY COMMISSION OF TEXAS**

---
**BARRY T. SMITHERMAN, CHAIRMAN**

---
**DONNA L. NELSON, COMMISSIONER**

---
**KENNETH W. ANDERSON, JR., COMMISSIONER**

q:\cadm\orders\final\37000\37744fo.docx

Page i

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

APPLICATION OF ENTERGY    )    STATE OFFICE OF
TEXAS, INC., FOR          )
AUTHORITY TO CHANGE RATES )
AND RECONCILE FUEL COSTS, )
AND OBTAIN DEFERRED       )
ACCOUNTING TREATMENT      ) ADMINISTRATIVE HEARINGS

HEARING ON THE MERITS

Wednesday, April 25, 2012

TABLE OF CONTENTS

(Volume 2, Pages i through xxiv)

---

Page ii

TABLE OF CONTENTS

| | PAGE |
|---|---|
| PROCEEDINGS, TUESDAY, APRIL 24, 2012 - VOL. 1 | 5 |
| OPENING STATEMENT ON BEHALF OF ENTERGY TEXAS, INC. (Neinast) | 16 |
| OPENING STATEMENT ON BEHALF OF ENTERGY TEXAS, INC. (Wren) | 22 |
| OPENING STATEMENT ON BEHALF OF CITIES (Lawton) | 37 |
| OPENING STATEMENT ON BEHALF OF TEXAS INDUSTRIAL ENERGY CONSUMERS (VanMiddlesworth) | 41 |
| OPENING STATEMENT ON BEHALF OF OFFICE OF PUBLIC UTILITY COUNSEL (Ferris) | 49 |
| OPENING STATEMENT ON BEHALF OF STAFF (Smyth) | 52 |
| OPENING STATEMENT ON BEHALF OF THE UNITED STATES DEPARTMENT OF ENERGY (Porter) | 54 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. | 60 |
| JOSEPH DOMINO | |
| - Direct (Wren) | 60 |
| - Cross (Lawton) | 62 |
| AFTERNOON SESSION | 103 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | |
| JOSEPH DOMINO | |
| - Cross (Lawton - Continued) | 103 |
| - Cross (VanMiddlesworth) | 115 |
| - Cross (Kelley) | 131 |
| - Redirect (Wren) | 139 |
| - Recross (Lawton) | 143 |
| - Recross (VanMiddlesworth) | 144 |

---

Page iii

TABLE OF CONTENTS (CONTINUED)

| | PAGE |
|---|---|
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | |
| CHRIS E. BARRILLEAUX | |
| - Direct (Olson) | 149 |
| - Cross (Lawton) | 151 |
| - Cross (Griffiths) | 167 |
| - Redirect (Olson) | 187 |
| - Recross (Lawton) | 198 |
| SAMUEL C. HADAWAY | |
| - Direct (Williams) | 199 |
| - Cross (Lawton) | 201 |
| - Cross (Griffiths) | 212 |
| - Cross (Kelley) | 230 |
| - Redirect (Williams) | 231 |
| - Recross (Griffiths) | 239 |
| PROCEEDINGS RECESSED | 246 |

---

Page iv

TABLE OF CONTENTS

| | PAGE |
|---|---|
| PROCEEDINGS, WEDNESDAY, APRIL 25, 2012 - VOLUME 2 | 248 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | 250 |
| ROBERT D. SLOAN | |
| - Direct (Cyr) | 250 |
| - Cross (Kelley) | 253 |
| - Cross (Ferris) | 258 |
| - Redirect (Cyr) | 285 |
| - Recross (Ferris) | 295 |
| H. VERNON PIERCE, JR. | |
| - Direct (Cyr) | 303 |
| - Cross (Mack) | 305 |
| - Cross (Younger) | 315 |
| MICHAEL P. CONSIDINE | |
| - Direct (Neinast) | 317 |
| - Cross (Lawton) | 318 |
| - Cross (Griffiths) | 352 |
| - Cross (Kelley) | 355 |
| - Redirect (Neinast) | 358 |
| - Recross (Lawton) | 362 |
| AFTERNOON SESSION | 365 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | 366 |
| WALTER C. FERGUSON | |
| - Direct (McNally) | 366 |
| - Cross (Ferris) | 367 |
| - Redirect (McNally) | 369 |
| - Recross (Ferris) | 372 |
| - Further Redirect (McNally) | 374 |
| DANE A. WATSON | |
| - Direct (Williams) | 376 |
| - Cross (Lawton) | 380 |
| - Cross (Lawler) | 397 |
| - Redirect (Williams) | 403 |
| - Recross (Lawton) | 410 |
| - Recross (Lawler) | 414 |

Page 447

understand your term of human resource costs, to the extent that there were labor dollars applied to a project, and my schedule will often have the impact through the loading of benefits. And so through that mechanism, I see that, but I couldn't tell you that it had to do with human resource costs in the sense of work that I would do or anybody on my staff.

Q I understand. But it's in the human resources class on your exhibit.

A Ma'am, I understand.

Q Yes.

MS. KELLEY: I have no further questions, and I would offer State Agency Exhibit No. 3.

JUDGE WALSTON: Any objection?

MR. BRITT: Just with the caveat that it's subject to check and verification.

JUDGE WALSTON: Subject to verification, State's Exhibit 3 is admitted.

(Exhibit State No. 3 admitted)

JUDGE WALSTON: Public Utility Counsel?

MS. FERRIS: No questions, Your Honor.

JUDGE WALSTON: Okay. Staff?

MR. SMYTH: No questions.

JUDGE WALSTON: Redirect?

MR. BRITT: No questions, Your Honor.

Page 448

JUDGE WALSTON: Okay. Thank you, Mr. Gardner.

WITNESS GARDNER: Thank you.

JUDGE WALSTON: Will you raise your right hand?

(Witness McCulla sworn)

JUDGE WALSTON: State your full name.

WITNESS McCULLA: Mark F. McCulla.

JUDGE WALSTON: Thank you.

MARK F. McCULLA, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OLSON:

Q Mr. McCulla, you just stated your name. Please state your title and position with the Company.

A I'm the vice president of transmission regulatory compliance.

Q Okay. You have in front of you what has been marked ETI Exhibit 32. Do you see that?

A I do.

Q Can you please identify that exhibit?

A It's my direct testimony and exhibits.

Q Okay. And you also have before you ETI 59.

A I do.

Q Can you identify that, please?

Page 449

A It's my rebuttal testimony and exhibits.

Q Okay. Was your direct testimony, rebuttal testimony, and exhibits prepared by you or under your supervision?

A Yes, it was.

Q Do you have any corrections you need to make to your testimony?

A No.

Q If I were to ask you the same questions today that were asked in your written testimony, would your answers be the same?

A Yes.

MR. OLSON: All right. Your Honor, at this time, we move for the admission of ETI 32 and 59.

JUDGE WALSTON: Okay. ETI Exhibits 32 and 59 are admitted.

(Exhibit ETI Nos. 32 and 59 admitted)

MR. OLSON: All right. At this time, I offer the witness for cross-examination.

JUDGE WALSTON: Cities?

MR. MACK: No questions.

JUDGE WALSTON: TIEC?

MS. GRIFFITHS: Yes, Your Honor.

Page 450

CROSS-EXAMINATION

BY MS. GRIFFITHS:

Q Good afternoon, Mr. McCulla. You're here today for your direct and your rebuttal testimony. Correct?

A That's correct.

Q All right. And what was your title again, Mr. McCulla?

A Vice president of transmission regulatory compliance.

Q Okay. And as vice president of transmission and regulatory compliance, you know what MSS-2 means, do you not?

A Yes.

Q Okay. What is MSS-2?

A It's schedule that's used for transmission facilities, but certain qualifications are equalized because they lend themselves to serving the needs of the entire system.

Q Okay. So MSS-2 is part of the Entergy system agreement which is a FERC-approved schedule. Correct?

A That's correct.

Q All right. And is it fair to say that what MSS-2 does is it equalizes the costs of transmission investment across the Entergy system for particular transmission projects that I believe are at 230-kV and

Page 451

above? Is that accurate?

A  230 and above and other qualifications, tie lines and other things like that. But generally 230 and above is correct.

Q  Okay. And an issue in this case is the amount of MSS-2 expense that the Company is entitled to. Is that fair to say?

A  That's one of the issues, yes.

Q  All right. And the Company is requesting, as part of its rate request here -- as part of the about 104 or $10 million -- whatever it is -- rate request -- approximately $10.6 million in MSS-2 expense. Correct?

A  That's correct.

Q  And you offer rebuttal testimony on that issue. Yes?

A  Yes, I do.

Q  Okay. So earlier today -- and I'm not sure if you were here with -- when this testimony was given, but Mr. Lawton with the Cities went over the post test year adjustment that the Company did for MSS-2 expense. Were you here for that?

A  I was not.

Q  Okay. I believe what you have in front of you -- it should have been passed out -- is a document that I'm not going to be admitting into the record, but

Page 452

it is labeled at the bottom WP/PAJ-23.1.

A  Okay. I have it in front of me.

Q  All right. And that is a workpaper that is a backup to Mr. Considine's testimony, because Mr. Considine also sponsored that post test year adjustment for MSS-2 expense.

If you turn to Page 23.2 at the bottom -- just flip it over.

A  Okay.

Q  All right. You'll see adjusted total, and under that is approximately $10.7 million. Correct?

A  Yes. Correct.

Q  Okay. And that correlates to the amount of MSS-2 expense that the Company is requesting?

A  Okay.

Q  Is that accurate?

A  Correct.

Q  Okay. And that is not a test year number, but it is a projected rate year number for MSS-2 expense. Correct?

A  That's my understanding. What my rebuttal testimony was reflecting was the transmission projects and their status and expected completion.

Q  Okay. But you understand that the projects that you discussed in your rebuttal testimony were -- I

Page 453

don't know if this is the right word or the right way to phrase it -- but essentially embodied in this number that the Company is requesting as an increase in its MSS-2 expense. Is that correct?

A  Yes, that's correct.

Q  All right. Now, you have some familiarity with the MSS-2 service schedule?

A  Some familiarity.

Q  All right. Is it accurate that MSS-2 -- that there are various inputs to the MSS-2 calculation? In that I mean that there are various inputs to how much each operating company must pay to figure out what their MSS-2 expense is going to be.

A  I wouldn't say I'm very familiar with the calculation that takes place. I'm familiar with the assets -- the transmission assets and what -- what I'm familiar with is whether they're determined to be qualified as equalizable or not. But as far as the calculation and how it goes into the rates, I'm not as familiar with that.

Q  Okay. I understand. And I don't want to test your knowledge or give you a test on the FERC schedule, because I counted the pages of the FERC schedule, and it's about a seven-page calculation.

A  Okay. Thanks.

Page 454

Q  But do you agree that that calculation does look at various variables, and one of those variables will be the -- basically the inter-transmission investment on the system?

A  Correct. Yes.

Q  All right. And another variable will be the ownership or operating costs of a particular company. Correct?

A  The --

Q  The ownership or operating costs?

A  I'm not sure how that goes into it, but --

Q  Okay. Fair enough. Do you know what the term "responsibility ratio" means?

A  I'm not familiar with how it's used.

Q  Okay. Do you understand that each particular operating company makes -- makes or receives MSS-2 --

A  Okay.

Q  -- costs based --

A  Yes.

Q  -- on its particular responsibility ratio?

A  Okay. Yes, I'm familiar with that.

Q  Okay. So if an operating company has -- I know it's all relative, but a higher responsibility ratio, its MSS-2 expense may go up depending upon its actual costs?

Page i

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

APPLICATION OF ENTERGY    )    STATE OFFICE OF
TEXAS, INC., FOR          )
AUTHORITY TO CHANGE RATES )
AND RECONCILE FUEL COSTS, )
AND OBTAIN DEFERRED       )
ACCOUNTING TREATMENT      ) ADMINISTRATIVE HEARINGS

HEARING ON THE MERITS

Thursday, April 26, 2012

TABLE OF CONTENTS

(Volumes 1 through 3, Pages i through xxviii)

---

Page iii

TABLE OF CONTENTS (CONTINUED)

PAGE

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)

CHRIS E. BARRILLEAUX
     - Direct (Olson)                         149
     - Cross (Lawton)                         151
     - Cross (Griffiths)                      167
     - Redirect (Olson)                       187
     - Recross (Lawton)                       198
SAMUEL C. HADAWAY
     - Direct (Williams)                      199
     - Cross (Lawton)                         201
     - Cross (Griffiths)                      212
     - Cross (Kelley)                         230
     - Redirect (Williams)                    231
     - Recross (Griffiths)                    239
PROCEEDINGS RECESSED                          246

---

Page ii

TABLE OF CONTENTS

PAGE

PROCEEDINGS, TUESDAY, APRIL 24, 2012 - VOL. 1     5
OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Neinast)                    16

OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Wren)                       22
OPENING STATEMENT ON BEHALF OF
CITIES (Lawton)                                  37

OPENING STATEMENT ON BEHALF OF
TEXAS INDUSTRIAL ENERGY CONSUMERS (VanMiddlesworth)  41
OPENING STATEMENT ON BEHALF OF
OFFICE OF PUBLIC UTILITY COUNSEL (Ferris)        49

OPENING STATEMENT ON BEHALF OF
STAFF (Smyth)                                    52
OPENING STATEMENT ON BEHALF OF
THE UNITED STATES DEPARTMENT OF ENERGY (Porter)  54

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC.                              60

    JOSEPH DOMINO
        - Direct (Wren)                         60
        - Cross (Lawton)                        62

AFTERNOON SESSION                               103

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)
    JOSEPH DOMINO
        - Cross (Lawton - Continued)           103
        - Cross (VanMiddlesworth)              115
        - Cross (Kelley)                       131
        - Redirect (Wren)                      139
        - Recross (Lawton)                     143
        - Recross (VanMiddlesworth)            144

---

Page iv

TABLE OF CONTENTS

PAGE

PROCEEDINGS, WEDNESDAY, APRIL 25, 2012 - VOLUME 2    248
PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                     250

    ROBERT D. SLOAN
        - Direct (Cyr)                         250
        - Cross (Kelley)                       253
        - Cross (Ferris)                       258
        - Redirect (Cyr)                       285
        - Recross (Ferris)                     295
    H. VERNON PIERCE, JR.
        - Direct (Cyr)                         303
        - Cross (Mack)                         305
        - Cross (Younger)                      315

    MICHAEL P. CONSIDINE
        - Direct (Neinast)                     317
        - Cross (Lawton)                       318
        - Cross (Griffiths)                    352
        - Cross (Kelley)                       355
        - Redirect (Neinast)                   358
        - Recross (Lawton)                     362

AFTERNOON SESSION                              365

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                366
    WALTER C. FERGUSON
        - Direct (McNally)                     366
        - Cross (Ferris)                       367
        - Redirect (McNally)                   369
        - Recross (Ferris)                     372
        - Further Redirect (McNally)           374

    DANE A. WATSON
        - Direct (Williams)                    376
        - Cross (Lawton)                       380
        - Cross (Lawler)                       397
        - Redirect (Williams)                  403
        - Recross (Lawton)                     410
        - Recross (Lawler)                     414

---

**KENNEDY REPORTING SERVICE, INC.**

512.474.2233

Page 681

here showed a cost of $1,100, an increase of $100 over Year 1 -- Year 1 to Year 3. Do you see that?

A  Yes.

Q  Now, this is not rocket science. Nobody will be surprised by the simplicity of this. But if it's more, if the increase in capacity is actually greater than $1,100 -- say $1,300 -- because of the increase in capacity cost in Year 3, then under the chart that's been developed by Mr. VanMiddlesworth, does the revenue of $1,100 cover the capacity cost?

A  Not at that rate, no.

Q  All right. I would like to also ask you -- maybe turn to the chart. It's a pretty popular item -- but I would like to ask you some questions about the Exhibit -- let's see. I think it's TIEC Exhibit No. 34 -- I think it's 34A. It's the blow-up version --

MR. WESTERBURG: Is this 34 or 34A? 34A. Excuse me. I need to get my numbering straight for the record here, Your Honor.

Q  (BY MR. WESTERBURG) I'm talking about the blown-up version -- Mr. Cooper, you can look at the actual size document or you can look at the larger document, which actually I find easier to look at, too, that Mr. VanMiddlesworth provided for us.

A  I have it.

Page 682

Q  And explain to us what this is. What is this document?

A  This is a listing of contracts that ETI has entered into for the rate year, and it's divided up into third-party contracts and Legacy affiliate contracts, other affiliate contracts. And then the last line item is reserve equalization. These are contracts that have either been in place or will be coming on-line or new contracts that have been entered into for the rate year.

Q  Okay. And I would like to ask you, Mr. Cooper, these are capacity costs associated with those contracts. Is that right?

A  Yes, that's correct.

Q  Now, are the costs that we're looking at here projections or are they contractually based?

A  Well, they are contractually based projections of what the costs will be. So, you know, there are terms and conditions associated with delivery on these contracts that, you know, if someone fails to deliver, there may be penalties associated with the third-party contracts. But in general, they are contractually based.

Q  Right. In other words, they are charges that the company will have to pay?

A  Yes.

Page 683

MR. VanMIDDLESWORTH: Objection, as leading. I move to strike.

JUDGE BURKHALTER: Sustained.

Q  BY MR. WESTERBURG) Let me ask you this, Mr. Cooper: If you would clarify the record, what are the costs based on that appear in this chart?

A  The costs are based on the contracts between ETI and the counter-parties and the rates that are established in those contracts. So these would be capacity costs associated with those contracts. Reserve equalization is also a part of the system agreement contract, and those costs will be incurred as part of the system agreement expense.

Q  Does the calculation of the reserve equalization have a load growth component?

A  No, not really. The reserve equalization includes a number of different elements associated with it. The two main elements are the amount of capability each company brings to the system's load. And the other main ingredient is each company's responsibility ratio, so the responsibility ratio as a percentage of the system peak that each company shares. And the extent that a company is short -- in other words, they do not have enough capability to meet their requirements -- then they would pay their responsibility ratio share of

Page 684

the excess from the long companies.

Q  Now, the responsibility ratio that is the basis of the reserve equalization on Line 25 --

A  Yes.

Q  -- is that a projected responsibility ratio?

A  Yes, it is. It's based on the projected loads of all of the system companies during the rate year.

Q  Okay. Now, are there any other numbers on this chart that are affected by a projected load?

A  No, not that I'm aware of.

Q  With respect to the reserve equalization, do you know what the result would be if, in fact, the projected load you have in this exhibit were held constant from the test year?

A  If we looked at the responsibility ratios of each of the companies during the test year and we applied it to these contracts and rates, the reserve equalization would be about four and a half million dollars less for ETI.

Q  Now, there was a lot of talk about the EAI WBL, and that contract is reflected on Line 19.

A  Yes.

Q  To clarify for the Judges -- to the extent they may need it; they may not -- but for the record, the discussion about the operating committee minutes for

Page 685

what may have been referred to as a new WBL contract, when does that contract that is made the discussion of the operating committee minutes, when does that contract begin? And if you could refer us to the chart.

A  The contract that was approved by the operating committee in mid-March actually goes into effect in January of 2013.

Q  Okay. So what do we have represented for the EAI WBL on Line 19, prior to January 13?

A  That's the existing EAI WBL contract.

Q  Okay. Do you recall when the case was filed in this docket, Mr. Cooper? I'm just asking.

A  In November.

Q  Right. November. And I see here that the first date entry or the first month entry for this chart is June 12. Do you see that?

A  Yes, I do.

Q  Is it your understanding that that's the beginning of what we refer to as the rate year?

A  Yes, that is.

Q  So was the company -- and were you, Mr. Cooper, when you prepared this chart, projecting future cost?

JUDGE BURKHALTER:  For what time period?

MR. WESTERBURG:  Thank you.

Q  (BY MR. WESTERBURG) For the rate year.

Page 686

A  The EAI WBL, the contract that existed, that was a projection of the MSS-4 costs associated with the existing contract, yes.

Q  How does the projection of the capacity cost for your RRC-1, for the EAI WBL, how does that compare to the projection of cost beginning in January '13 for the EAI WBL, in terms of the way that it was developed?

A  The way it was developed was similar. We used a similar process to develop that. The resources that make up the new contract do not include two of the nuclear units that Arkansas has.

So we eliminated those two resources from the WBL, and we then changed the megawatt amount, because the total megawatts that ETI is going to be receiving from this new contract has increased from 110 megawatts to 186 megawatts. So we applied the new megawatts and the rates that were the same from the existing contract, to the resources that are part of the new WBL contract.

Q  Did the projections prior to January of 2013, were they based on the MSS-4 rate of the system agreement?

A  Yes.

Q  The projections after January of 2013, were they based on the MMS-4 of the system agreement?

Page 687

A  Yes.

Q  Mr. Cooper, now the chart we're looking at here, this is a revision. Is that correct?

A  Yes, it is.

Q  Okay. And was the revision for the purpose of reflecting the new WBL contract in January 2013?

A  Yes, it was.

Q  Now, in the lower right-hand corner, the number that is $275,800,000 and some additional dollars, I believe that's the total capacity charges that's indicated on the chart. Does that represent a total of all the charges on this chart?

A  Yes.

Q  Okay. Now, can you tell us whether or not that number that appears on your revised RRC-1 is higher or lower than the number that was there prior to the revision?

A  It's lower by about $400,000.

Q  Now, was that --

JUDGE ARNOLD:  Mr. Westerburg, you're getting into specific numbers. Are those highly sensitive?

MR. WESTERBURG:  The totals, Your Honor, are not. But I appreciate the warning. Thank you.

Q  (BY MR. WESTERBURG) And can you tell us,

Page 688

Mr. Cooper, if that is attributable in part or in whole to the new WBL contract?

A  That's the $400,000?

Q  Yes, the reduction in cost.

A  Yes, that would be attributable to the change in the WBL contract.

Q  What are the megawatts associated with the new contract, beginning in January 2013?

A  It's 186 megawatts.

Q  And what were the megawatts associated with the existing contract that runs through the end of this year?

A  I believe it was 110 megawatts.

Q  As a result of the new WBL, is the company and customers receiving greater megawatts at a lesser cost?

A  Yes, they are.

Q  Are you aware of any -- back up, lay a predicate. Have you reviewed the intervenors' testimony on the issue of the EAI WBL?

A  Yes, I have.

Q  Are you aware of any objections to the projected cost of the existing EAI WBL?

A  No, I'm not.

JUDGE BURKHALTER:  When you say "existing," are you talking about the original one? I'm

Page 689

not sure I'm following you.

MR. WESTERBURG: I'll ask the witness, Your Honor.

Q (BY MR. WESTERBURG) Can you clarify for us the meaning of "existing"?

A The existing contract that goes through the end of 2012.

Q And, Mr. Cooper, is that the contract associated with the numbers -- well, let me just ask you: What numbers on this chart are associated with what we refer to as the existing EAI WBL?

A Those would be Line 19, June through December of 2012.

Q Now, this MSS-4 tariff, do you know whether that is part of what's referred to as the Energy System Agreement?

A Yes. MSS-4 is a schedule in the system agreement.

Q Does the company have any discretion in the way it bills under that tariff?

A No. That's a FERC-regulated tariff that the company really has no discretion in how it bills.

Q Do you know if there have been changes to that tariff -- scratch that and start again. Do you know whether there will be changes to that tariff between now

Page 690

and the time that the company implements the new WBL contract in January 2013?

A No, I'm unaware of any changes.

Q There was a discussion about the volatility of fuel cost, Mr. Cooper. Is it your experience that the cost of gas is volatile?

A Yes. The cost of gas, as recently as several years ago, was $14 a million Btu. And, you know, in recent weeks it's been two dollars a million Btu. It goes up; it goes down.

Q Has it been your experience that it has gone up and down over relatively short periods of time?

A It has gone up and down over short periods of time, too.

Q How does the volatility of gas cost compare to the volatility of cost associated with the resources in the new WBL contract?

A Well, gas historically has been much more volatile than coal and nuclear fuel. Nuclear fuel is typically procured on long-term contracts; coal is also typically procured on long-term contracts. And so the price of those two fuels has been relatively stable over the past.

Q Now, there was some discussion also, Mr. Cooper, about the timing of the production of the

Page 691

operating committee minutes. Do you recall that?

A Yes, I do.

Q And my questions will be directed toward the February operating committee minutes. And you understand the distinction?

A Yes.

Q Are you familiar with the processes of the operating committee?

A I'm somewhat familiar with the processes, not intimately familiar.

Q Have you had an experience with there being delays of the finality of presentations with operating committee minutes?

A Yes. As I mentioned, it typically takes at least a month to get the minutes from the operating committee subsequent to the actual meeting.

Q Do you know whether or not the operating committee sometimes requests changes to those presentations?

A No, I do not.

Q Do you know -- I'm looking for the contract. And I'm going to refer to the exhibit marked as TIEC Exhibit No. 21.

A Yes, I have it.

Q Right now, is this also an exhibit that's made

Page 692

an exhibit to your rebuttal testimony?

A Yes, it is.

Q And what is it that we're looking at here, Exhibit 21?

A This is the agreement between ETI and EAI for the WBL contract that begins in 2013.

Q Do you have any knowledge, Mr. Cooper, regarding whether there are or are not negotiations related to the signing of these kinds of agreements?

A No, I do not.

Q Let me take you to Page 2 of the agreement. There is a page number in the lower right-hand corner that is 25.

A Yes, I'm there.

Q Now, would you read Section 6.

A Yes. "Condition Precedent. This Agreement shall be conditioned upon Buyer receiving all regulatory approvals required by Buyer for this Agreement no later than August 1, 2012."

Q And who is the buyer here?

A That would be Entergy Texas.

Q Okay. Do you know whether the operating committee has made any indication of whether this contract will go forward for Entergy Texas if, in fact, it turns out that the Commission did not approve the

Page 693

contract?

A   No, I'm not aware.

Q   There was a discussion about hedging, Mr. Cooper.  Rather than to try to capture what you said -- and I don't think I'll do a good job of it -- would you state again your understanding of the practice or the opportunities for hedging as they may be exercised by Entergy Services on behalf of the operating companies and the Texas Commission, the PUCT's position, your understanding of that.

A   Yes.  I know that in the State of Louisiana and the State of Mississippi, the utilities there practice a gas hedging program where they fix forward a portion of their projected requirements in order to reduce the volatility of gas supply costs.  And it was my understanding that we have proposed a similar hedging program in Texas, and it was denied.

Q   Are you aware of any intervenors proposing hedging in this case?

A   No.

Q   You mentioned your knowledge or your belief that there was a proposal by the company.  Do you know whether or not either the Staff or any intervening party has ever proposed hedging for Texas?

A   No, I'm not aware.

Page 694

Q   Back to EAI WBL -- sorry for jumping around -- but there is an existing EAI WBL in place.  Correct?

A   Yes, that's correct.

Q   And do you know how long the term is of that one -- not when it ends.  I know it ends in December.  We saw that.

A   Yes.  I believe that was a three-year agreement.

Q   Okay.  Was there an EAI WBL in place under which Texas received or Entergy Texas or its predecessor received capacity prior to that?

A   I don't recall.

(Brief pause)

MR. WESTERBURG:  Your Honor, I'm trying to weed out questions, so if you'll bear with me.

JUDGE BURKHALTER:  Thank you.  I appreciate it.

Q   (BY MR. WESTERBURG)  Mr. Cooper, I think toward the end of Mr. VanMiddlesworth's cross-examination, you made a reference to all files regarding the EAI WBL as being the basis -- being available for the Commission's review.  Do you remember your comment on files?

A   No.

Q   I may be remembering wrong.  What is your

Page 695

understanding of what is before the Commission that is available for the review of the operating committee's decision regarding the EAI WBL in this case?

A   The operating committee minutes and the presentations associated with it and the contract associated with the new WBL.

Q   In Mr. VanMiddlesworth's cross-examination of you on that?

A   Yes.

Q   To clarify a timing issue, if you could look at the exhibit that is the MSS-4 contract.

A   Yes, I have it here.

Q   Now, what is the date at the top of the contract that the contract is dated?

A   This agreement is dated as of April 11, 2012.

Q   Okay.  And it will be obvious from the record, but do you recall whether or not the operating committee's decision approving this contract was provided in this case prior to this date?

A   Yes, that's my understanding.

Q   Okay.  Mr. Cooper, with regard to Mr. VanMiddlesworth's chart up here, is it your understanding that only capacity charges are reflected?  Is there an energy cost reflected?

A   The only charges that Mr. VanMiddlesworth

Page 696

reflects are capacity charges, and then he tries to allocate those across Entergy.  And, you know, as associated with these contracts, you know, many of these contracts are actually going to provide lower cost energy than would be available from existing resources or if they were just to rely on the resources of the reserves of the Entergy system.

In addition, these capacity charges assume that they are incremental.  And in the case of ETI being a short company, we're not even getting ETI up to their capacity needs.  And so, you know, I don't even consider these capacity charges incremental.  They're just, you know, trying to bring them up to the level that they need to be, because they're short on resources.

Q   Let me ask you about that, Mr. Cooper.  If you would go back to your RRC-1 --

A   Yes.

Q   -- now, are there new third-party contracts that are in place for the rate year that were not in place for the test year?

A   Yes.

Q   And which ones are those?

A   Well, we have Calpine-Carville and SRMPA.

Q   And if you could tell us the line number, just so we --

Page 705

has various provisions for required availability rates and other things that affect what gets actually paid. Correct?

A  That's correct, yes.

Q  And what do you assume for disallowances for availability factor adjustments in this?

A  We did not assume anything.

Q  But there have been adjustments in the past years for availability, haven't there?

A  Yes, there have, and they have been relatively minor.

Q  And for the -- well, let's pick another one. For the ConocoPhillips -- I guess that's the SRW contract -- that also has various provisions for performance and for reducing the payment based on that. Correct?

A  Yes, that's correct.

Q  And in the Line 1, you didn't assume that the payment would be reduced at all for that?

A  Yes, that's correct.

Q  Okay.  And we won't know until the actual year comes and goes.  Right?

A  Yes, sir.

Q  You talked about lower fuel costs associated with some of these contracts.  The fuel costs flow

Page 706

through the fuel factor.  Isn't that right?

A  Yes, sir.

Q  And Entergy receives its actual reasonable fuel costs from ratepayers -- no more, no less.  Correct?

A  It's subject to reconciliation in Texas, yes.

Q  And are you suggesting that you ought to overrecover your actual capacity charges if you lower fuel costs?

A  No, I'm not.

Q  So you're still believing you should only recover your actual capacity charge?

A  I'm suggesting we should recover the costs that we incur for our capacity transactions.

Q  All right.  And even if they reduce fuel costs, you don't get more than your actual costs.  Right?

A  I'm sorry.  I don't understand that question.

Q  Well, it's probably my fault.  Let me ask about this chart, ETI Exhibit 7, for you.  You were asked what would happen if there were no load growth between Year 1 and Year 3 here.  Do you recall that?

A  Yes.

Q  Does ETI project load growth between the test year and the rate year?

A  Yes, they do.

Q  How much?

Page 707

A  I don't know.

Q  Did ETI experience load growth in the two years between the last test year and this test year?

A  I don't know.

Q  Were you here for Mr. Domino's testimony the other day?

A  No, I wasn't.

Q  So this no-load-growth scenario that results in an underrecovery, that's not what ETI is projecting, is it?

A  No.

Q  Now let me refer you to Exhibit 19.  I wanted to clarify some things that Mr. Westerburg asked. Exhibit 19A is this sensitive material.  Do you have that?

MR. WESTERBURG:  I'm sorry.  Exhibit 19A, which one is that, so I can look it up?

MR. VanMIDDLESWORTH:  That's the March 23, 2012 copy of the February 17 operating committee meeting minutes.

MR. WESTERBURG:  Got it.

JUDGE BURKHALTER:  And are you intending to go into highly sensitive?

MR. VanMIDDLESWORTH:  I'm not.

JUDGE BURKHALTER:  Okay.

Page 708

A  Yes, sir, I have it.

Q  (BY MR. VanMIDDLESWORTH)  All right.  Now, first of all, turning to the page that's marked TH794. Do you see that?  Under "Item 3 -- 2013 EAI Wholesale Baseload, (Attachment C)"?

A  I'm afraid my pages got messed up here.

MR. VanMIDDLESWORTH:  May I approach the witness, Your Honor?

JUDGE BURKHALTER:  Yes.

Q  (BY MR. VanMIDDLESWORTH)  You can look at mine.

A  Is that it, 794?

Q  Yes.

A  Okay.

Q  You see Item 3 refers to 2013 EAI wholesale baseload?  And it says Attachment C?

A  Yes.

Q  And then the next line says Charles DeGeorge provided the Committee members with a wholesale baseload sales analysis?

A  Yes.

Q  Now, let me ask you to turn to Page 858 of TIEC Exhibit 19A.

A  It's stuck in here.

Q  All right.  Let me show you mine.  I refer you to Page 858 --

Page i

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

APPLICATION OF ENTERGY     )     STATE OFFICE OF
TEXAS, INC., FOR           )
AUTHORITY TO CHANGE RATES  )
AND RECONCILE FUEL COSTS,  )
AND OBTAIN DEFERRED        )
ACCOUNTING TREATMENT       ) ADMINISTRATIVE HEARINGS

HEARING ON THE MERITS

Friday, April 27, 2012

TABLE OF CONTENTS

(Volumes 1 through 4, Pages i through xxxii)

---

Page iii

TABLE OF CONTENTS (CONTINUED)

                PAGE

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)

   CHRIS E. BARRILLEAUX
      - Direct (Olson)          149
      - Cross (Lawton)          151
      - Cross (Griffiths)       167
      - Redirect (Olson)        187
      - Recross (Lawton)        198
   SAMUEL C. HADAWAY
      - Direct (Williams)       199
      - Cross (Lawton)          201
      - Cross (Griffiths)       212
      - Cross (Kelley)          230
      - Redirect (Williams)     231
      - Recross (Griffiths)     239
PROCEEDINGS RECESSED                  246

---

Page ii

TABLE OF CONTENTS

                PAGE

PROCEEDINGS, TUESDAY, APRIL 24, 2012 - VOL. 1     5
OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Neinast)                    16

OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Wren)                       22
OPENING STATEMENT ON BEHALF OF
CITIES (Lawton)                                  37

OPENING STATEMENT ON BEHALF OF
TEXAS INDUSTRIAL ENERGY CONSUMERS (VanMiddlesworth)  41
OPENING STATEMENT ON BEHALF OF
OFFICE OF PUBLIC UTILITY COUNSEL (Ferris)        49

OPENING STATEMENT ON BEHALF OF
STAFF (Smyth)                                    52
OPENING STATEMENT ON BEHALF OF
THE UNITED STATES DEPARTMENT OF ENERGY (Porter)  54

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC.                              60

   JOSEPH DOMINO
      - Direct (Wren)           60
      - Cross (Lawton)          62

AFTERNOON SESSION                                103

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)
   JOSEPH DOMINO
      - Cross (Lawton - Continued)    103
      - Cross (VanMiddlesworth)       115
      - Cross (Kelley)                131
      - Redirect (Wren)               139
      - Recross (Lawton)              143
      - Recross (VanMiddlesworth)     144

---

Page iv

TABLE OF CONTENTS

                PAGE

PROCEEDINGS, WEDNESDAY, APRIL 25, 2012 - VOLUME 2    248
PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                      250

   ROBERT D. SLOAN
      - Direct (Cyr)            250
      - Cross (Kelley)          253
      - Cross (Ferris)          258
      - Redirect (Cyr)          285
      - Recross (Ferris)        295
   H. VERNON PIERCE, JR.
      - Direct (Cyr)            303
      - Cross (Mack)            305
      - Cross (Younger)         315

   MICHAEL P. CONSIDINE
      - Direct (Neinast)        317
      - Cross (Lawton)          318
      - Cross (Griffiths)       352
      - Cross (Kelley)          355
      - Redirect (Neinast)      358
      - Recross (Lawton)        362

AFTERNOON SESSION                                365

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                  366
   WALTER C. FERGUSON
      - Direct (McNally)        366
      - Cross (Ferris)          367
      - Redirect (McNally)      369
      - Recross (Ferris)        372
      - Further Redirect (McNally)   374

   DANE A. WATSON
      - Direct (Williams)       376
      - Cross (Lawton)          380
      - Cross (Lawler)          397
      - Redirect (Williams)     403
      - Recross (Lawton)        410
      - Recross (Lawler)        414

Page 723

subject to the prior ruling on objections to ETI Exhibit No. 39, it is admitted.

(Exhibit ETI No. 39 admitted)

MR. WESTERBURG: Your Honor, ETI tenders the witness for cross.

JUDGE WALSTON: All right. Cities?

MR. LAWTON: Yes, Your Honor. May I begin?

JUDGE WALSTON: Yes.

MR. LAWTON: Thank you.

CROSS-EXAMINATION

BY MR. LAWTON:

Q Good morning, Mr. Cicio. How are you, sir?

A Good morning, Mr. Lawton. Just fine.

Q Okay. Start off with Page 3, Line 20 of your testimony, which is, I think -- ETI Exhibit 39, Is it?

A Page 3 --

Q Line 20.

A -- Line 20. Okay.

Q Okay. Now, I want to understand the purpose of your testimony and exactly what you do.

The first thing I see there is you support the costs and revenues associated with ETI's participation in the Entergy service agreement during the test year, July 1, 2010 to June 30, 2011. Correct?

Page 724

A It's the Entergy system agreement, yes.

Q Okay. And so when you say you support the costs and revenues associated with the service agreement, what costs and revenues are you talking about?

A I think I go through and list those in my testimony, but generally speaking, it's the MSS-1 service -- Schedule MSS-1, MSS-2, MSS-3, MSS-5 and I think that's it -- and MSS-4. I think I forgot that.

Q Okay. And if we -- and we're going to focus a bit today on what's called MSS-2.

So would you tell us what MSS-2 is?

A Generally speaking, MSS-2 is the service schedule by which certain transmissions costs are equalized among the operating companies, and it's the ownership costs of those transmission assets.

Q And as I understand it, you support the test year cost of MSS-2?

A In my testimony, I support the test year cost of MSS-2.

Q And exactly what is the amount of those costs in the test year?

A I believe the test year costs are $1.7 million.

Q And you also support the MSS-2 costs in the reconciliation period, or the other MSS costs? I'm

Page 725

sorry -- other -- let me rephrase that. Too many MSSs.

You also support the system agreement costs in the fuel reconciliation period to the extent they're included there?

A Yes, I support the other service schedule costs, whether they're in the fuel part or in base rates in this case.

Q But to be clear, you support the test year costs, whatever they were, about 1.7 million. Correct?

A Are we talking about my direct testimony or are we talking about my rebuttal testimony in this?

Q It's my understanding you're only here for direct today.

A Okay. In this particular case, Mr. Considine supported the pro forma to the test year MSS-2 costs in this case.

Q Okay. He supported a 9 million-dollar pro forma in MSS-2 costs. Correct?

A The total was 10.7 million for the pro forma, as I recall.

Q And when I asked him about the basis for that 9 million-dollar adjustment the other day, Mr. Considine told me he got it from, I think, your group.

A Okay. That's what he testified. I haven't read Mr. Considine's testimony.

Page 726

Q He got it from some accounting group that does this work, MSS-2. Would that be your group or can you think of somebody else?

A He got that information from a combination of sources. I think it was looked at by my group as well.

Q Well, I'm wondering, who do I ask questions about the 10.6 million calculation?

In this direct case, I've asked Mr. Considine about it, and now I'm asking you about it. And you don't testify to the 10.6 million. Who in this case testifies to the 10.6 million of MSS-2 costs the company is requesting in this direct case?

Who does it? Who do I ask?

A It depends on what component of the calculations you're talking about. The investment, I believe, was sponsored -- or was supported by Mr. McCulla's organization. The calculation was done in another group, but, you know, my group reviewed that. So I feel comfortable talking about the calculation.

Q Okay. You're comfortable talking about how we get to 10.6 million?

A Generally speaking, I can generally talk about it, yes. But it came from Mr. Considine's thing, but I can talk about it.

Q Okay. Fair enough. Now, if we turn to your

Page 731

Q   Under the system agreement, the operating companies that we've talked about are to equalize their cost of transmission.  Is that correct?

A   **Of certain transmission.  It's not all transmission.  There are certain guidelines within the service schedule that govern what transmissions are equalized.**

Q   And generally speaking, would you agree that it's all transmission assets at 230 kV and above?

A   **I think that's generally the case.**

Q   Okay.  So if a utility has a lot of transmission relative to the other operating companies and its responsibility ratio reflects it, it may get paid MSS-2 dollars -- correct -- from the other operating companies?

A   **I'm not sure I would characterize it exactly that way.**

Q   Okay.  Well, would you agree with this statement:  Some of the operating companies are paid on a monthly basis for transmission and others pay the cost?

A   **And there are long companies and there are short companies, as it relates to equalizable transmission investment.**

Q   Okay.  I've put some -- had Ms. Mayhall put

Page 732

some exhibits in front of you, and the first one I want to look at is what has been marked as Cities Exhibit 28.

A   **I have it.  Yes, I have it.  Okay.  Cities Exhibit 28 is the response to Cities 3-3?**

Q   Yes.  You're getting ahead of me, sir.

A   **Okay.**

Q   Would you agree that Cities Exhibit 28 is a discovery response to Cities 3-3?

A   **Yes, I would agree with that.**

Q   And would you agree with me that you are the sponsoring witness for Subparts g. and h.?

A   **I am the sponsoring witness for g. and h.**

Q   And you've seen this document before, haven't you, sir?

A   **I have seen it.**

Q   Okay.  And it's true and correct to the best of your knowledge.  Correct?

A   **That's correct.**

MR. LAWTON:  Your Honor, I would offer, at this time, Cities 28.

JUDGE WALSTON:  Any objection?

MR. WESTERBURG:  No, Your Honor.

JUDGE WALSTON:  Cities Exhibit 28 is admitted.

(Exhibit Cities  No. 28 marked and

Page 733

admitted)

Q   (BY MR. LAWTON)  What I want to focus on, Mr. Cicio, is last page of Cities 28.  Are you there, sir?  It's a table.  Do you see that table?

A   **Yes, I see the table.**

Q   This is the response to Cities 3-3 g.  Correct?

A   **That's correct.**

Q   Now, what we have here on this table on the left-hand side is the year from 2006 to 2011, along with a grand total.  Do you see that?

A   **Yes, I see that.**

Q   And then across the top of the table, we have EAI.  That would be the Arkansas company --

A   **That's correct.**

Q   -- and EGSI.  Which company is that, the Louisiana Texas -- I mean, Louisiana Gulf States?

A   **That is both companies, ETI and EGSL.  That was prior to the jurisdictional separation of those two companies.**

Q   Fair enough.  And then you have -- and so what happened is on January 1st, 2008, Texas and Louisiana separated.  Correct?

A   **I think that's the case.**

Q   Okay.  And then the next company is ELL.  Which one is that?  That's another operating company?

Page 734

A   **That's Entergy Louisiana.**

Q   And EGSL, that's the Louisiana version that separated.  Correct?

A   **Right.  That's the Louisiana portion of what used to be EGSI.**

Q   And EMI would be the Mississippi company I forgot before.  Right?

A   **Entergy Mississippi, correct.**

Q   And ENOI, that would be the New Orleans operations?

A   **That would be Entergy New Orleans, Inc.**

Q   And ETI at the far right would be the company we're here about today, Entergy Texas, Inc.  Correct?

A   **That's correct.**

Q   And let's look at ETI for a second starting in 2008.  You have a number that says a negative $2,660,494.  Do you see that?

A   **Yes, I do.**

Q   And what does that number mean?

A   **That means for the year -- calendar year 2008 that Entergy Texas received MSS-2 payments in the amount of $2.6 million.**

Q   So the other operating companies had to pay Entergy Texas transmission dollars for equalization in 2008.  Correct?

Page 735

A   On a net basis -- net for the year.

Q   On a net basis?

A   Month-to-month it could have been different.

Q   Okay.  Well, if we look -- let's stay on 2008 for a moment.  Okay?

If we look across all the 2008 numbers and if we were to add, for example, the EAI number for 2008, that's a negative 1.4 million.  Do you see that?

A   Yes.

Q   And that means they got paid.  Correct?

A   Again; for the year, yes.

Q   Right.  And then we see the ELL number is something like 7.8 million for 2008.  Do you see that?

A   Yes, I do.

Q   And they were paid 7.8 million.  Right?

A   Yes.

Q   And EGSL had to pay.  It's a positive number.  That means they had to pay some money.  Correct?

A   That's right.

Q   If we added the numbers across in any year, would they equal zero?

A   They should equal zero.

Q   And the reason they equal zero is basically the short companies have to pay the long companies.  Correct?

Page 736

A   It's a system, so we're equalizing the cost among the system.  So for the system, it would equal -- should equal zero.

Q   Fair enough.  Now, in -- if we look at ETI, we see in 2000 -- I think it's 2010, we have a positive number of 559,000.  Do you see that?

A   Yes, I do.

Q   That means on the year, Entergy Texas, Inc., had to pay money to the operating companies -- other operating companies.  Correct?

A   That's correct.

Q   Okay.  And then in the following year, 2011, they had to pay -- "they" being ETI, Entergy Texas -- had to pay roughly 1.3 million.  Correct?

A   That's correct.

Q   But on a grand total basis, you just added those numbers up and said, on a net basis, Entergy Texas, Inc., got paid 1.7 million.  Correct?

A   I think if you added up Entergy -- add all the years for Entergy Texas, they would have received 1.7 million.

Q   Fair enough.

A   We're just saying for four years, you know, they got a net payment.  It's not -- that's just a total.

Page 737

Q   Okay.  Well, I just want to make sure what it is because we said the test year was 1.7.  I'm trying to distinguish it.

A   Okay.

Q   Now, if we go to the bottom of that graph, below it, you -- it looks like what appears to be the test year numbers.  Is that correct, sir?

A   That's what it looks like, yes.

Q   It says -- its starts off July 2010-June 6th -- June 2011.  Correct?

A   That's right.

Q   Okay.  And so these are the actual numbers in the test year.  Right?

A   These are the actual amounts recorded for MSS-2 during the test year.

Q   And Entergy Texas ended up paying the other operating companies roughly 1.7 million.  Correct?

A   Yes.  They paid 1.7 million on a net basis for the year.

Q   On a net basis.  And if we added the test year numbers across, it would, again, equal zero on a system basis.  Right?

A   That's correct.

Q   Fair enough.  And it's that 1.7 million -- 1,753,797 that you sponsor?

Page 738

A   Yes, that's what I sponsor in my testimony.

Q   Fair enough.  But to be clear -- just go back there a second -- what you're asking for in this case -- I'm sorry.

What the company is asking for in this case is roughly not the 1.7 million test year number.  They're asking for a number of 10.6 million.  Correct?

A   They're asking for 10.6 million because, you know, the way the calculation works, if there's added investment across the companies, which you see here -- there are changes in transmission investment year to year, and so as those transmission projects are put in service, the balance will shift between the different companies, depending on their transmission responsibility relative to their investment.

Q   Fair enough.  Now, sir, I've had -- I want to go through that calculation for a moment so we all understand how it's done.

I've had a two-page demonstrative put in front of you, and the first page is just a. through w.  You'll see those lines.  And the second page is a sheet that has a bunch of numbers.  Okay, sir?  Do you see that?

A   I have this in front of me, yes.

Q   And I just wanted you to assist us on how this

Page 759

Q   Okay.  Fair enough.  Fair enough.

Now, you said, when we started this examination this morning, that you could talk about the $10.6 million request.

JUDGE WALSTON:  Can I ask one clarifying question just to make sure I'm clear?

MR. LAWTON:  Yes, sir.

JUDGE WALSTON:  You said some were removed due to an adjustment.  Is that -- do I understand some assets were included that should not have been included and then removed, or why were they removed?  I didn't follow that.

THE WITNESS:  Each month we -- being my group -- receives the equalizable transmission investment from the transmission organization, who, I'm assuming, get it from the property accounting records.

So they look at the investment in transmission month to month, and, say, based on the rules of MSS-2, what should be determined to be equalizable investment.

They review that as they provide it, and in that particular month, there was an adjustment where they said that the investment that was there the month before -- a portion of that was no longer equalizable and shouldn't have been equalizable.  So it was adjusted

Page 760

out.  The investment is still there.  It's just not determined to be equalizable investment.

JUDGE BURKHALTER:  Meaning it's not 230 kV or above?

THE WITNESS:  Generally, yes, that's correct.

Q   (BY MR. LAWTON)  Now, sir --

MR. LAWTON:  I'm sorry.  I don't want to interrupt again.

JUDGE WALSTON:  Okay.

Q   (BY MR. LAWTON)  Now, the company has, in fact, forecast a 10.6 million-dollar number for this MSS-2 category.  Correct?

A   It's 10.696, I think.

Q   You've got more decimal places than I, sir.

But this $10.6 million is roughly a 9 million-dollar increase, and it's included in the 111 million request the company originally made.  Right?

A   It's a -- yes.  The $10.69 million is the rate year -- expected rate year MSS-2 expense.

Q   All right.  Fair enough.  Now, go back, for a moment, to the demonstrative for Cities, Exhibit 39.

MR. LAWTON:  Your Honor, may I use this a second?

JUDGE WALSTON:  Yes.

Page 761

MR. LAWTON:  Thank you.

Q   (BY MR. LAWTON)  What's the rate year, sir, in this case?  Do you know?

A   I believe it begins June of '12 and ends May of '13.

Q   So June 2012 to May 2013.  That's your rate year, and you would agree that's a forecast period.  Correct?

A   I believe that's -- I'm not exactly sure that those are the 12 months, but I believe it's generally --

Q   I think you got it right.

A   Okay.

Q   I think it's right.

A   Okay.

Q   So your 10.6 dollar-million estimate in this case is based upon MSS-2 costs for this time period, June 2012 to May 2013.  Correct, sir?

A   It's based on the expected investment, the changes in responsibility ratio for that 12-month period.

Q   Okay.  And do you have Cities Exhibit 39 there, sir?  That's the demonstrative with all the numbers.

A   Yes, I have that in front of me.

Q   Okay.  For that time period that we just discussed, June 2012 to May 2013, you had to get an

Page 762

estimate of all the plant costs on Lines a. through d.  Correct?

A   That's correct.  We would had to have a point of view on the expected transmission investment.

Q   Somebody had to forecast all that stuff.  Right?

A   They had to forecast, or they looked at what projects were already being built that they thought were going to be completed, so a forecast based on existing projects and forecasted projects.

Q   Okay.  And then if we look under the category cost of capital; debt ratio, bond costs, all the way down to Item e., did you get a forecast for all those numbers?

A   I don't think those numbers were updated for that period.

Q   They weren't?

A   I don't -- I don't know, to be honest.

Q   You don't know?

A   No, I don't.

Q   Who knows?

A   Somebody that -- the gentlemen or gentleman that reviewed that.  I don't -- I don't know personally.

Q   But I thought you reviewed it.

A   I reviewed it, but I don't remember whether

Page 763

those changed or not.  I just don't remember that.

Q   Let's go to the tax rate.  Do you think that changed?

A   I don't -- the factors I'm not sure of.

Q   Okay.  Well, would that include the factors under O&M expenses, too?

A   Everything from cost of capital through, you know, the net investment ratio.  Those numbers, I just don't know if the financial factors were updated.

Q   Is there somebody in this case I can ask about it?

A   I don't know, Mr. Lawton.

Q   Okay.  What about all the other numbers, net investment ratio, and all that, was that --

A   Those are calculations, so those are embedded in -- if you update, you know, the net transmission investment, then you update, you know, the ratio -- that ratio anyway.

Q   Would you agree with me, sir -- we went through this -- that the cost of capital and all these O&M factors are important parts of the calculation as well?

A   Yes.  They're important parts of the calculation, but they don't typically vary a great deal.  I mean, the significant change that generated the 10.6 million was the change in the investment.

Page 764

Q   Well, let's talk about the load responsibility ratio.  Isn't that line -- what line is that, sir?

A   On the demonstrative exhibit, it's Line s.

Q   Line s.  And isn't that load responsibility ratio based upon the forecast of loads in your example here in your estimate?

A   Are we talking about the rate year?

Q   Yes, sir.  Did somebody forecast the load responsibility for the rate year to get 10.6 million?

A   Yes, they updated -- that they did update, but it's a very small percentage.  I mean, basically out of 10.6, you know, that was less than 15 percent of the adjustment.

Q   Based on your calculations.  Correct?

A   Based on my calculations.  Correct.

Q   In rebuttal testimony, and we're going to talk about it at another time.  Right?

A   It was calculated, you know, under my supervision, and it's included in my rebuttal testimony.

Q   Okay.

A   It's a very small percentage of the total.

Q   Who did the load forecast, sir?

A   I believe the load forecast was generated out of one of the groups in our system planning organization.

Page 765

Q   When they did the load forecast for Entergy Texas, did they have an increase in load for Entergy Texas, sir?  Do you know?

A   I don't know.

Q   Is the -- okay.

The last area that I want to ask you about is I think on your -- I have passed out this morning -- is copy of Cities Exhibit 7.  It's part of 10-K.  It's already into the record.  I just wanted to ask you a little bit about the 10-K.

A   Okay.

Q   Go to Page 364 of the 10-K, sir.

A   Okay.  I'm there.

Q   Under "Other income statement variances" -- do you see that in bold?

A   Yes, I see that.

Q   Go to the first bullet point and read that to yourself.

A   To myself?

Q   Yes.

(Brief pause)

A   Okay.  I've read it.

Q   (BY MR. LAWTON)  All right.  What I understand the 10-K -- the company, Entergy Corp., is reporting that Entergy Texas, Inc., had some billing adjustments

Page 766

to make in its MSS-2 expenditures.  Is that a fair characterization creation of that statement?

A   As it reads here, there was a transmission -- a change of 2011 -- down to year 2011 over calendar year 2010.  There was a variance in transmission expenses of roughly 8 and a half million dollars.

Q   Okay.  Would those be -- that 8 and a half million referred to MSS-2 payments?

A   The 8 and a half million appears to be due to a change in the MSS-2 expenses from 2011 to 2010, a portion of that, and it's not a large portion of that, was related to that 16-year period from 1996 to 2011, the billing adjustment for that period.

Q   Okay.  So would it fair to say that the company, Entergy Texas, Inc., or one of the groups there, did an audit for that time period, 1996 to 2011?  Fair?

A   There was a review of the MSS-2 balances for that period, 1996 to 2011, that resulted in a change in the MSS-2 payments for -- over that 16-year period, and when you look at 2011 versus 2010, the variance is 8 and a half million dollars for that period, but only a small -- less than half of that really related to that adjustment.

It could be other changes in transmission

Page 779

know whether he's also appeared for cross-examination in this proceeding?

A Yes, he's already appeared.

Q And, now, what does -- does Mr. Considine support the pro forma for MSS-2?

A Mr. Considine also supports the pro forma for MSS-2.

Q And what is the nature of his support for that?

A Mr. Considine looks -- took all the changes to the test year that were perceived to be known and measurable changes to the test year and adjusted the test year expenses by those known and measurable adjustments.

Q Do you know whether Mr. Considine has already appeared for cross-examination in this proceeding?

A Yes, he has already appeared.

Q I would like to turn to Mr. Lawton's demonstrable exhibit.

MR. WESTERBURG: Was that Exhibit 37?

JUDGE WALSTON: 39.

MR. WESTERBURG: 39. Excuse me. Exhibit 39.

Q (BY MR. WESTERBURG) Mr. Lawton took you through a discussion of the numbers and the columns and the lines that appear on Page 2 here. You recall that?

Page 780

A Yes, I do.

Q Do you have a sense, or do you have an opinion, Mr. Cicio, about -- with respect to the number in the bottom right-hand corner, which on Exhibit 39, it shows an MSS-2 payment for ETI -- with respect to that number, do you know, or would you have an opinion as to which numbers or groups of numbers change more than others to affect that number?

A I mean, the majority of this calculation is -- a large percent of the calculation turns on the change in total investment and net transmission investment. Generally speaking, the rest of the components, the cost rates, the responsibility ratios don't change typically, you know, much year over year.

Q And, now, this document we're looking at, at Page 2 of exhibit -- Cities Exhibit 39, this same form of document -- well, let me ask you, is -- this is a page in an attachment to what's referred to as the inter-system bill. Is that correct?

A Yes, that's correct.

Q And just for the sake of the way the transcript might read, what page is this to the inter-system bill in terms of -- you know, what part of the inter-system bill would this be a page of?

A This is -- the MSS-2 calculation is found on

Page 781

Attachment 5 of the inter-system bill.

Q And has the company provided the inter-system bill for a period of time in this case?

A I believe in Cities 5-1, it's provided these attachments, I believe, through February of 2011 -- 2012. I'm sorry.

Q And that is an attachment to 5-1?

A Yes.

Q And I think that is Cities Exhibit 29, so let's turn to that.

A Okay.

Q Now, would we find Page 2 of Cities Exhibit 39 in the documents attached to -- or in the attachments to Cities Exhibit 29?

A Attachment 5 is -- which is the second page of the Cities exhibit, is found as an attachment to Cities 5-1.

Q Right. And, I mean, this -- what I'm talking about is the very specific month that -- could we turn to that?

JUDGE WALSTON: Which page are we turning to?

MR. WESTERBURG: What I'm trying to do, Your Honor, is find, in Cities Exhibit 29, 5-1, which is a number of Attachment 5 to the inter-system bill. I'm

Page 782

trying to find this specific page that is Page 2 of Cities 39. So I'm dealing with both 39 and 29.

A If you go to Page 22 of Cities 5-1, you'll find the July 2011 MSS-2 calculation, which is the same page as -- second page of the Cities demonstrative exhibit.

Q (BY MR. WESTERBURG) Okay. Thank you, Mr. Cicio. And can you verify whether all of the attachments to Cities 5-1, the -- sounds strange, but I'm referring to them as the Attachment 5s -- with an "S" on the end of it.

A Okay.

Q All of those are historical. Is that correct?

A Yes, these are historical periods. I think the last month is February of 2012.

Q And does that mean that the information contained on these Attachment 5s reflect actual data and recordings return?

A These are based on the actual inter-system bills for those representative months.

Q Okay. And can we turn to the very last page of Attachment 5, which would be Page 29?

A Yes, I'm there.

Q And what is this?

A This is the Attachment 5 for February of 2012.

Q Just -- do you know why -- we're sitting here

Page 783

today in April.  Do you know why we don't have March attached to attachment -- Cities Exhibit 29?

A   Yes.  The inter-system bill is prepared twice a month.  It's prepared on the second work day of a month, and the actual bill is rendered about 30 days after the conclusion of the preceding month.  So the actual March bill was actually prepared this week -- was issued this week.  And so it's not yet -- it will be provided once it was complete, which is, I think, mid-week or early part of this week.

Q   Okay.  So February was the latest available?

A   Yes, February was the latest available.

Q   Okay.  And what's the number in the lower right-hand corner under payments for ETI for February, which is Page 29?

A   For February of 2012, ETI had an MSS-2 payment of $698,289.82.

Q   And those are based on -- that is based on actual investment and transmission of the operating companies.  Is that right?

A   That's correct.

Q   There's no projections on this page?

A   There are no projections on this page.

Q   Do you know, Mr. Cicio, what -- or if you have it, I think it's a simple calculation.

Page 784

Do you know what, you know, 12 times 698,000 would be?

A   No, I don't have a calculator on me, but if I rounded it to 700,000, it would be about $8.4 million.

Q   8.4.  And what was the amount of test year MSS-2 expenses?

A   The test year amount was 1.7 million.

Q   Do you know whether the MSS-2 payments, as reflected in this Cities 29 since the test year, have been increasing or decreasing?

A   To get to -- I mean, if I looked at the test year payments and receipts -- and since the test year, they've been all payments, and they've been increasing since the end of the test year.

I mean, I'm going back, you know, since the test year.  I think there was a slight dip in the -- in the month of January, it went from 620 to 596, but generally above the test year monthly levels.

Q   And do you know why that has occurred?

A   There's been, as we talked about, you know, a major factor in the change in how the payments and receipts for MSS-2 are generated by transmission investment across the system.  And so there's been a fair amount of transmission investment built and placed in service across the system during this period.

Page 785

Q   Now, there was also discussion with Mr. Lawton about an adjustment to MSS-2.  Do you recall that?

A   Yes, I do.

Q   Now, does -- the adjustment that's been discussed, does that play a part in the increase in the MSS-2 expense from the test year to what we see here on Page 29 of Exhibit 29?

A   By -- what you're saying is, "does it play a part."  To the extent there were changes in the investment balance resulting from that review from '96 to 2011, this calculation is based on cumulative balances of transmission investment.

So to the extent there was any change, it would have had some effect on those balances, but the majority of this has been -- has occurred post that adjustment -- the change in transmission investment, the majority of which has been just new investment that's been put in service.

Q   Maybe this is a cleaner question.  Does the February Attachment 5 on Page 29 reflect the adjustment and equalizable investment that you discussed with Mr. Lawton?

A   Does it reflect the equalizable --

Q   The adjustment in equalizable investment you discussed with Mr. Lawton.

Page 786

A   It reflects the balance -- the changes in the balances.

Q   Well, let me ask for clarification.  What was the adjustment?  What was adjusted?

A   What was adjusted during that -- from '96 to 2011, there were changes in the investment balances across the different companies.

Q   The equalizable investment?

A   The equalizable investment.

Q   Okay.  Are those changes reflected in Page 29 of Exhibit 29?

A   Yes.  Yes, they are reflected.

Q   Do you know whether those changes will continue to be reflected going forward in the MSS-2 payments?

A   It's a cumulative balance, so to the extent those changes in -- those assets are still part of the net investment, yes, they will continue to be included.

Q   Mr. Lawton asked you about certain operating companies leaving the system agreement or having given notice to leave the system agreement.  Do you recall that?

A   Yes, I do.

Q   And those operating companies are Entergy Mississippi and Entergy Arkansas?

A   That's correct.

Page 791

Do you see that?

A  Yes.  I think it's Line s. on the --

Q  And that's what you just explained.  Correct?

A  I explained coincident peak.  Responsibility ratio is the average of the 12 -- preceding 12 months.

Q  Twelve months what, coincident peak?

A  Twelve months coincident peak.

Q  Okay.  Now, is there any other calculation on this page that reflects the concept of load, other than responsibility ratio?

A  No, there's not.

Q  Now, I think Mr. Lawton established that for the purpose of the projections into the rate year of MSS-2, there needed to be a projection of the responsibility ratio.  Is that correct?

A  Yes, that's correct.

Q  Does that mean that the -- there was a projection of load in order to make that calculation?

A  For purposes of the rate year calculation, there was a forecasted load, which generated a forecast of responsibility ratios that was included as part of that.

Q  Okay.  Have you made a calculation of what the rate year MSS-2 cost would be if you held the load and responsibility ratio constant from the test year?

Page 792

A  Yes, I have.

Q  And what is that?

A  That number was 86 percent of the total.  I think the adjustment was around $9.4 million, I believe.

Q  That's what the adjustment would be in the rate year if you held it?

A  Yes, the total.  I think the adjustment is 7-something.

Q  Excuse me.  Thank you.  And you address that in your rebuttal?

A  It's all -- yeah, the actual numbers are contained in my rebuttal testimony.

Q  What is your opinion of whether the rate year change in transmission investment is known?

A  I relied on Mr. McCulla's assessment of the known and measurable aspect of the MSS-2 -- MSS-2 inputs of transmission investment that -- Mr. McCulla believes those are known and measurable changes, then they were known and measurable changes and they were included in the pro forma adjustment.

Q  My next question for you I think you just answered, but what is your opinion of whether the change in investment -- excuse me -- the change in the investment dollars is measurable?

A  They are measurable if they were based on

Page 793

projects that are in service or in service early or projected to be in service, and there's a construction amount associated with each of those projects.  So they're measurable by that aspect of it.

Q  What value does ETI receive for its MSS-2 payments?

A  What ETI receives as a benefit from its MSS-2 payments is the ability to have resources available to them through the use of the system's bulk electric power system.  So if there are resources that are in a different area outside of Texas, by use of that system, they have available to them purchased power opportunities, other generation from the system that would benefit customers in terms of lower fuel costs.

So it's part of the coordinated dispatch of the system.  So if you have a coordinated dispatch, you have to rely on a system to move that power.  That would be the bulk electric power system.

MR. WESTERBURG:  I believe I'm finished.  Can I have a 60-second break?

JUDGE WALSTON:  Yeah.

(Brief pause)

MR. WESTERBURG:  No more questions, Your Honor.

JUDGE WALSTON:  Do the Cities have

Page 794

recross?

MR. LAWTON:  Just a bit, Your Honor.  Thank you.

RECROSS-EXAMINATION

BY MR. LAWTON:

Q  Mr. Cicio, counsel asked you about your testimony I crossed you about regarding your support for the test year.  You support the test year number.  Correct?

A  That's correct.

Q  And he also asked you that -- whether you supported the 9 million pro forma.  Correct?  And you do.  Right?

A  Yes, I support the calculation.

Q  Right.  And you've reviewed the calculations, but you didn't do the calculations?

A  I have looked at the calculations, that's correct.

Q  Okay.  And you still don't know who did all the calculations for the load forecast.  Correct?

A  I don't know the specific individual.

Q  Okay.  And then you also said that Mr. Considine also supports the 9 million pro forma.  Correct?

A  Yes, that's correct.

Page i

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

APPLICATION OF ENTERGY    )    STATE OFFICE OF
TEXAS, INC., FOR          )
AUTHORITY TO CHANGE RATES )
AND RECONCILE FUEL COSTS, )
AND OBTAIN DEFERRED       )
ACCOUNTING TREATMENT      ) ADMINISTRATIVE HEARINGS

HEARING ON THE MERITS

Wednesday, May 2, 2012

TABLE OF CONTENTS

(Volumes 1 through 7, Pages i through xlviii)

Page ii

TABLE OF CONTENTS

|  | PAGE |
|---|---|
| PROCEEDINGS, TUESDAY, APRIL 24, 2012 - VOL. 1 | 5 |
| OPENING STATEMENT ON BEHALF OF ENTERGY TEXAS, INC. (Neinast) | 16 |
| OPENING STATEMENT ON BEHALF OF ENTERGY TEXAS, INC. (Wren) | 22 |
| OPENING STATEMENT ON BEHALF OF CITIES (Lawton) | 37 |
| OPENING STATEMENT ON BEHALF OF TEXAS INDUSTRIAL ENERGY CONSUMERS (VanMiddlesworth) | 41 |
| OPENING STATEMENT ON BEHALF OF OFFICE OF PUBLIC UTILITY COUNSEL (Ferris) | 49 |
| OPENING STATEMENT ON BEHALF OF STAFF (Smyth) | 52 |
| OPENING STATEMENT ON BEHALF OF THE UNITED STATES DEPARTMENT OF ENERGY (Porter) | 54 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. | 60 |
| JOSEPH DOMINO | |
| - Direct (Wren) | 60 |
| - Cross (Lawton) | 62 |
| AFTERNOON SESSION | 103 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | |
| JOSEPH DOMINO | |
| - Cross (Lawton - Continued) | 103 |
| - Cross (VanMiddlesworth) | 115 |
| - Cross (Kelley) | 131 |
| - Redirect (Wren) | 139 |
| - Recross (Lawton) | 143 |
| - Recross (VanMiddlesworth) | 144 |

Page iii

TABLE OF CONTENTS (CONTINUED)

|  | PAGE |
|---|---|
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | |
| CHRIS E. BARRILLEAUX | |
| - Direct (Olson) | 149 |
| - Cross (Lawton) | 151 |
| - Cross (Griffiths) | 167 |
| - Redirect (Olson) | 187 |
| - Recross (Lawton) | 198 |
| SAMUEL C. HADAWAY | |
| - Direct (Williams) | 199 |
| - Cross (Lawton) | 201 |
| - Cross (Griffiths) | 212 |
| - Cross (Kelley) | 230 |
| - Redirect (Williams) | 231 |
| - Recross (Griffiths) | 239 |
| PROCEEDINGS RECESSED | 246 |

Page iv

TABLE OF CONTENTS

|  | PAGE |
|---|---|
| PROCEEDINGS, WEDNESDAY, APRIL 25, 2012 - VOLUME 2 | 248 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | 250 |
| ROBERT D. SLOAN | |
| - Direct (Cyr) | 250 |
| - Cross (Kelley) | 253 |
| - Cross (Ferris) | 258 |
| - Redirect (Cyr) | 285 |
| - Recross (Ferris) | 295 |
| H. VERNON PIERCE, JR. | |
| - Direct (Cyr) | 303 |
| - Cross (Mack) | 305 |
| - Cross (Younger) | 315 |
| MICHAEL P. CONSIDINE | |
| - Direct (Neinast) | 317 |
| - Cross (Lawton) | 318 |
| - Cross (Griffiths) | 352 |
| - Cross (Kelley) | 355 |
| - Redirect (Neinast) | 358 |
| - Recross (Lawton) | 362 |
| AFTERNOON SESSION | 365 |
| PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC. (CONTINUED) | 366 |
| WALTER C. FERGUSON | |
| - Direct (McNally) | 366 |
| - Cross (Ferris) | 367 |
| - Redirect (McNally) | 369 |
| - Recross (Ferris) | 372 |
| - Further Redirect (McNally) | 374 |
| DANE A. WATSON | |
| - Direct (Williams) | 376 |
| - Cross (Lawton) | 380 |
| - Cross (Lawler) | 397 |
| - Redirect (Williams) | 403 |
| - Recross (Lawton) | 410 |
| - Recross (Lawler) | 414 |

**KENNEDY REPORTING SERVICE, INC.**
512.474.2233

Page 1538

MR. VanMIDDLESWORTH: Yes.

Q (BY MR. VanMIDDLESWORTH) Do you see the chart at the bottom of Page 22?

A Yes.

Q Okay. What does that tell you about the amount of capacity that Entergy is purchasing in what they call the "rate year" versus the test year?

A That chart shows that as far as purchased capacity is concerned that the Company anticipates that it will need additional capacity or, roughly, if you take it on average, the test year number, 35,863, is about 2,989 megawatts per month, and the rate year would go up to 39,807 which suggests an average amount of purchases of 3,317 megawatts per month.

Q Can you give me the -- so the numbers you have here are megawatt month numbers and you just converted them to annual megawatt numbers?

A Yes.

Q Can you give me the test year and rate year megawatts again, please?

A 2,989 test year; 3,317 rate year.

Q And is that just third-party purchases, or does that include the effect of all the purchases?

A That's all the purchases. So it's third-party, affiliate and MSS-1.

Page 1539

Q And what are the MSS-1?

A The MSS-1 is the reserve equalization payments. So the Company takes service from the system. So to the extent that the Company's owned resources or purchased power resources are less than its obligation, then it will purchase capacity from the other operating companies.

Q Is that firm or interruptible capacity?

A It's firm -- the system provides service to the Company and those system resources are network resources; therefore, the power is considered firm.

Q Is it -- but does each company operate separately, or is the system generation operated as a system?

A The system agreement is what basically ties all six operating companies together as a single unit for planning and operational purposes. So for all things in effect, it's the system that's providing the service.

Q So, if you show that there's, I think, a little more than 300 megawatts difference in purchases --

A Yes.

Q -- is there any difference in the -- I guess purchases aren't all of their generation capacity. They have -- what else do they have?

A ETI has about 1200 megawatts of owned

Page 1540

generation. So that would be in addition to the twenty-nine eighty-nine and the thirty-three seventeen megawatt numbers purchased.

Q Okay. So do you know about what the overall growth in the overall generation is from year-to-year?

A So if we take the purchases plus the owned capacity and compare the two, the test year and the rate year, it's about a 7.8 percent change in overall capacity.

Q By the way, for the rate year, you mentioned something about the timing of the rate year. What has Entergy used for the rate year?

A So the rate year that Entergy uses is the period -- I might get this wrong. Let me look -- June 2012 through May 2013.

Q And I guess that was what they used in their filing?

A That's correct.

Q And since then, do you know if there's been any agreement about the implementation of rates in this case?

A My understanding is that rates would become effective on June 30th. So that effectively moves the rate year up a month -- or back a month.

Q All right.

Page 1541

Now, you mentioned the importance of unit costs. The 300-plus megawatts of additional purchases, what does that go to? I'm talking about the 300-plus megawatts of the difference between the test year and rate year.

A The utility will purchase additional capacity mainly because it anticipates serving additional load.

Q It would make sense to purchase additional capacity if you didn't and to have more capacity if you weren't planning on serving more load?

A No.

Q Do you know whether that load is wholesale load or retail load?

A I do not.

Q Does that matter for purposes of the unit cost analysis?

A No.

Q Why not?

A Because initially we're determining the Company's overall revenue requirement which includes retail and wholesale. Ultimately, once you've established what that number is, then you've got to separate the retail and the wholesale to set rates in this case.

Q So we've seen the number -- the proposed rate

Page i

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

APPLICATION OF ENTERGY    )    STATE OFFICE OF
TEXAS, INC., FOR          )
AUTHORITY TO CHANGE RATES )
AND RECONCILE FUEL COSTS, )
AND OBTAIN DEFERRED       )
ACCOUNTING TREATMENT      )  ADMINISTRATIVE HEARINGS

HEARING ON THE MERITS

Thursday, May 3, 2012

TABLE OF CONTENTS

(Volumes 1 through 8, Pages i through l)

Page iii

TABLE OF CONTENTS (CONTINUED)

                                                    PAGE
PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)

     CHRIS E. BARRILLEAUX
          - Direct (Olson)                          149
          - Cross (Lawton)                          151
          - Cross (Griffiths)                       167
          - Redirect (Olson)                        187
          - Recross (Lawton)                        198
     SAMUEL C. HADAWAY
          - Direct (Williams)                       199
          - Cross (Lawton)                          201
          - Cross (Griffiths)                       212
          - Cross (Kelley)                          230
          - Redirect (Williams)                     231
          - Recross (Griffiths)                     239
PROCEEDINGS RECESSED                                246

Page ii

TABLE OF CONTENTS

                                                    PAGE
PROCEEDINGS, TUESDAY, APRIL 24, 2012 - VOL. 1         5
OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Neinast)                        16

OPENING STATEMENT ON BEHALF OF
ENTERGY TEXAS, INC. (Wren)                           22
OPENING STATEMENT ON BEHALF OF
CITIES (Lawton)                                      37

OPENING STATEMENT ON BEHALF OF
TEXAS INDUSTRIAL ENERGY CONSUMERS (VanMiddlesworth)  41
OPENING STATEMENT ON BEHALF OF
OFFICE OF PUBLIC UTILITY COUNSEL (Ferris)            49

OPENING STATEMENT ON BEHALF OF
STAFF (Smyth)                                        52
OPENING STATEMENT ON BEHALF OF
THE UNITED STATES DEPARTMENT OF ENERGY (Porter)      54

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC.                                  60

     JOSEPH DOMINO
          - Direct (Wren)                            60
          - Cross (Lawton)                           62

AFTERNOON SESSION                                   103

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)
     JOSEPH DOMINO
          - Cross (Lawton - Continued)              103
          - Cross (VanMiddlesworth)                 115
          - Cross (Kelley)                          131
          - Redirect (Wren)                         139
          - Recross (Lawton)                        143
          - Recross (VanMiddlesworth)               144

Page iv

TABLE OF CONTENTS

                                                        PAGE
PROCEEDINGS, WEDNESDAY, APRIL 25, 2012 - VOLUME 2        248
PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                          250

     ROBERT D. SLOAN
          - Direct (Cyr)                                 250
          - Cross (Kelley)                               253
          - Cross (Ferris)                               258
          - Redirect (Cyr)                               285
          - Recross (Ferris)                             295
     H. VERNON PIERCE, JR.
          - Direct (Cyr)                                 303
          - Cross (Mack)                                 305
          - Cross (Younger)                              315

     MICHAEL P. CONSIDINE
          - Direct (Neinast)                             317
          - Cross (Lawton)                               318
          - Cross (Griffiths)                            352
          - Cross (Kelley)                               355
          - Redirect (Neinast)                           358
          - Recross (Lawton)                             362

AFTERNOON SESSION                                        365

PRESENTATION ON BEHALF OF
ENTERGY TEXAS, INC. (CONTINUED)                          366
     WALTER C. FERGUSON
          - Direct (McNally)                             366
          - Cross (Ferris)                               367
          - Redirect (McNally)                           369
          - Recross (Ferris)                             372
          - Further Redirect (McNally)                   374

     DANE A. WATSON
          - Direct (Williams)                            376
          - Cross (Lawton)                               380
          - Cross (Lawler)                               397
          - Redirect (Williams)                          403
          - Recross (Lawton)                             410
          - Recross (Lawler)                             414

**KENNEDY REPORTING SERVICE, INC.**
512.474.2233

Page 1938

Frontier is a contract that is already in place. It was in place during the test year. All that remains to be done is to ensure that the costs, because those costs stepped up during the test year as well as the capacity stepped up during the test year, that those costs are adequately adjusted for in the adjusted test year.

Another example is the Calpine contract. The Calpine contract does not increase the capacity of the Entergy system. That is a contract that is already in place. What will happen at the end of this month, that contract will be allocated differently to reflect the fact that overhang of retail competition has been removed and now we are allocating modern and highly efficient, flexible generation to Entergy Texas; and that allocation is consistent with those criteria that Mr. Cooper talked about in his testimony.

And so for those reasons, no, I don't believe that that example is consistent.

Q   And you mentioned in your answer -- and this also came up, I think, from Mr. Lawton -- that ETI is short. Can you explain --

MS. FERRIS:  Your Honor, I object.  This is beyond the scope of my cross-examination.

JUDGE WALSTON:  Well, but there was also other cross before the lunch break.

Page 1939

MS. FERRIS:  Okay.  You're -- I'm sorry.

JUDGE WALSTON:  Right.  Yeah.

MR. NEINAST:  I agree.

JUDGE WALSTON:  No problem.

MR. NEINAST:  It is beyond hers.

MS. FERRIS:  Sorry about that.

Q   (BY MR. NEINAST) Mr. Lawton had asked you, I believe -- I believe it was Mr. Lawton -- about the company being short, and you had started to talk about why the company is short and it's been there -- can you go into more detail?  Why is the company short?  What is it doing about it?

A   Yeah, and, you know, primarily, what -- what happened is, we were required to go to retail competition; and that requirement began in 1999 with the -- with the -- if I recall correctly, the objective to go to retail competition in 2002.  However, for a number of reasons, we were not able to do that, and so we had this sort of constant overhang that we're going to go to retail competition by such-and-such date.  Constantly a moving target.  You really can't go out and procure long-term cash capacity.  You really can't go out and build a new highly efficient, modern generating plant in a world where your customers could be severed by someone else in the very near future.

Page 1940

And for those reasons, this company could not procure in a manner that was consistent with our general planning principles, as described by Mr. Cooper.  And so for those reasons, we're now put in the position of having to sort of make up.  It would be almost like if you missed a few mortgage payments, you still have to make those mortgage payments up.  And that's kind of where -- the position we are in today, trying to rebalance the company's portfolio in a way that's consistent with those planning principles.

Q   And can you explain -- do you have an idea of when the company on its current track would catch up and no longer become a short company?

A   No.  That -- that's a question --

Q   But we're not there now?

A   No, we certainly are not.

Q   You had mentioned that the Calpine contract was not brought for serving new load.  Does it nonetheless provide benefits to customers?

A   Yes, sir, it does.  The Calpine contract -- and that's the contract, as I mentioned, is already providing service to the system. It's currently not allocated to ETI.  However, I believe it's -- at the end of this month, it will begin providing service to Entergy Texas customers, a very attractive contract.  It

Page 1941

has an attractive heat rate, a 7500 heat rate; and the cost of that contract, given, for instance, the fact that it also displaces MSS-1 capacity, gas prices would probably have to drop below a dollar per MMBtu for that contract not to be economic.  In other words, at gas prices today, the fuel savings alone from that contract pay for that contract over multiple times.

Q   And that benefits ETI's customers?

A   Yes, sir, it does.

Q   You might -- let me ask the question again; and if you've already answered this question, then, please, you don't need to go any further into it.

But what I had written down, based on the cross-examination, was some discussion you had with Mr. VanMiddlesworth, and, I think, Mr. Lawton, asking you about whether the post-test year PPA costs can be known and measurable?

A   Yes, sir.

Q   Can you explain why the costs for those contracts can be known and measurable?

A   I'll try.

The costs in question here -- and I sort of ticked off a number of these.  One of them is the Frontier contract.  That Frontier contract has probably been in place -- I don't -- close to a decade, perhaps.

Page 1942

Not long after the plant was completed, we began contracting for it.

What we're talking about here is that contract stepping up from -- I believe it's 150 megawatts up to 300 megawatts. And so all that needs to be done is to recognize those additional costs because that step-up occurs in the -- in the midst of the test year. It doesn't occur through the entire test year, so it doesn't fully recognize the cost of that contract. That contract is needed to serve load today, and because we have quite a bit of experiences, we have a good understanding of what the costs are today and what the costs will be in the future.

Similarly, Calpine, we have -- that is a contract that we have some experience with as well. The capacity costs are well known. It's based upon our experience and based upon a negotiated contract. I understand that there could be instances, as indicated by Mr. VanMiddlesworth, that there could be some deviations from the actual payments made. But, you know, the history there is those are very, very small deviations from the actual contracted costs.

When we negotiate those contracts, our intent is to get the full benefit of that capacity. Those provisions are generally intended to enforce and

Page 1943

make sure that we get the full benefits of that capacity. The counterparties intend to get the full benefit of those capacity costs. They want to make sure that in the event they do have an outage or need to take the unit off-line, that it's done in a way that's consistent so they can continue to get paid their full capacity.

So, for those reasons, we have a need -- we know what those costs are. They are measurable, and I think that is consistent with the known and measurable standard.

Q Well, and also you mentioned inconsistencies among contracts. If a contract -- go back to some -- not the contract we're talking about here, but some contract that's already in base rates.

Once it's in base rates, does that mean there are no inconsistencies in the costs going forward, or those fluctuate so it's not absolutely without doubt known that it is fixed and never going to change during its life?

A Well, while those fluctuations are rather small, the fact is, even those contracts in base rates can fluctuate. It's just that there's not any real significant deviation from that.

And another example of this, in my mind

Page 1944

is, one of the routine sort of adjustments that are made are, for instance, merit increases for employees. And so that's measured -- a known and measurable change. The fact of the matter is, the day after that implementation of that merit increase or the acceptance of that as a known and measurable change, an employee could resign from the company; and, therefore, the costs would deviate. But, in general, those cost changes are known, they are measurable, and those little deviations are just not that much a significant part of the outcome.

Q And, finally, on this purchased power topic, you'd discussed the Frontier contract, the Calpine contract. I think there's another, the SRMPA?

A Yes, sir.

Q Was there anything about that contract that --

A With the SR --

Q -- makes it not known and measurable?

A Well, the SRMPA has a very straightforward $3 per kW a month stated rate. So it's very easy to calculate what those known and measurable costs are.

Q My next topic -- almost done -- is MSS-1. You were asked some questions by -- I think it was Mr. VanMiddlesworth. Generally, I mean, to cut to the chase, there was discussion of maintaining test year

Page 1945

loads by taking into account rate year costs. In the course of that discuss -- and Mr. VanMiddlesworth was asking you for some analyses in doing different things with Entergy Arkansas. I remember that.

A Yes, sir.

Q But in the course of that discussion, you said something about an analysis by Mr. Cooper that involved 4.5 million. What was that -- what was that?

A Yes, sir. That is extremely relevant.

The situation that was being described by Mr. VanMiddlesworth is what if EAI had higher load, would that result -- in the test -- in the rate year, what if they had higher load? What if ETI had higher load? What if they had lower load?

Mr. Cooper examined that very situation. What he did is he locked in the responsibility ratios, and what I mean by that is the actual load that was in the test year was locked in via those responsibility ratios. And then he measured for that rate year, what would have been the difference in cost for MSS-1 if nothing changed with regard to those -- that load growth. No operating company deviated whatsoever. They actually used the test year load. The result of that was approximately $4.5 million reduction in our MSS-1 cost as a result of locking in those loads.

Page 1946

MR. NEINAST: No further questions.

CLARIFYING EXAMINATION

BY JUDGE WALSTON:

Q   Okay.  I want to ask a couple of clarifying questions, if I can, and I may just show my lack of understanding.

But if I understood your testimony, the new purchased power contracts are being -- or have been entered into to account for the shortage of capacity.  Correct?

A   Yes, sir.

Q   Okay.  And not for load growth.  Correct?

A   Yes.  In this case, the needs that are driven by the allocation -- for instance, Calpine.  That is a contract that already exists on the system.  What is happening right now, none of that comes to ETI.  But what will happen is, 50 percent of that will be allocated to ETI.  The other 50 percent will be to Entergy Gulf States Louisiana.  That is essentially recognizing the fact that this company now has some resolution less uncertainty about what its future is, and so it's allocating long-term contracts to meet its needs.

Q   But what I was leading up to is that capacity is added, then the MSS-1 costs would go down?

Page 1947

A   Yes, sir.

Q   Okay.

A   It is a very straightforward calculation.

Q   Okay.  And actually, that's all I want to know.

But just can you tell me, just in ballpark amounts, is the increase and the decrease, is that a wash or is one more or less?

A   It depends on the contract, sir.  For instance, the Calpine contract is priced higher than MSS-1.  Now, when you look at our rate year MSS-1 calculation, it includes all that that you just identified there.  All of that capacity results, and that's what's reflected in our rate year, lower MSS-1 cost.

And in the case of Calpine, it has higher cost per kW than MSS-1 costs would be.  So the net cost of that contract -- net after the fact that MSS-1 goes down -- is still a positive value.  That's reflected in our rate year clause.

In the case of SRMPA, this is a contract.

Q   You've gone beyond my -- I got the answer that I wanted.

A   Thank you.

Q   But I appreciate it.

JUDGE WALSTON: Okay.  Further cross?

MR. LAWTON: I do.  Thank you, Your Honor.

Page 1948

RECROSS-EXAMINATION

BY MR. LAWTON:

Q   Mr. May, you would agree that the company has had load growth over the past number of years?

A   Yes, sometimes --

Q   Some years --

A   -- load growth, sometimes no.

Q   Okay.  And you would agree that the -- between the test year and the rate year, the company is projecting load to grow?

A   Yes, sir.

Q   Okay.  And if load growth occurs and the company does not buy any additional capability, what happens?  Does it become more short?

A   That would depend upon what happens with the other operating companies.

Q   Fair enough.  All else equal, to use one of Mr. VanMiddlesworth's phrases.

A   To the extent that load grows and we do not add capacity, it is an accurate statement that the company will become more short.

Q   Okay.  So we know that load grows from year to year, or it's projected.  Correct?

A   Certainly a possibility.

Q   All right.  And is some of the purchased power

Page 1949

here in this case being purchased to replace contracts that are dropping off in the test year, or do you know?

A   That direct relationship, I can't speak to.

Q   That's something I'd ask Mr. Cooper?

A   You certainly can.  But certainly, it's a fact that there are changes in the overall makeup.

Q   Fair enough.

MR. LAWTON: Your Honor, I pass the witness.  Thank you.

Thank you, Mr. May.

JUDGE WALSTON: TIEC?

MR. VanMIDDLESWORTH: Yes.

RECROSS-EXAMINATION

BY MR. VanMIDDLESWORTH:

Q   Following up on Judge Walston's questions, ETI in this filing shows that it's projecting to purchase about 600 megawatts more capacity in the rate year, third-party purchases, than in the test year.  Is that right?

A   Let me think about that for a moment.  How much is the number again?

Q   About 600 megawatts.

A   It's probably approaching 600.

Q   Okay.  And ETI is also projecting to purchase about 300 megawatts less of MSS-1 capacity in the rate

Page 1950

year than in the test year. Correct?

A  I can't tell you the specific amount, sir.

Q  You don't know?

A  I don't have that document in front of me.

Q  Okay. You know it's a lot less than the amount of purchased capacity?

A  Absolutely, for the very reasons we discussed.

Q  Oh, and those --

A  Those reasons being that as you add capacity, that the MSS-1 amounts would be reduced.

Q  Right. But why wouldn't they be reduced by the same amount of the capacity you're adding?

A  There would be a number of reasons why that would be. One of the primary reasons would be the fact that the system has other changes. There are capacity being acquired on the other operating companies as well. We will be acquiring capacity at Arkansas and Mississippi, I believe. Those will likely occur this year.

Q  And you're saying the capacity acquired by Arkansas and Mississippi means that the MSS-1 won't decrease as much as the purchased capacity for ETI?

A  All things being relative.

Q  All right. And so you -- do you dispute that ETI projects, when you add all the purchased capacity,

Page 1951

purchased -- all the purchased capacity, third party, and we sometimes -- by the way, when we talk -- when you use the term "short," you're not talking about all purchased capacity as we use the term for the purchased power rider. Right? You're talking about a subset of that.

A  I'm not sure I understand the question. I'm sorry.

Q  When you say they're short, when ETI is short, don't you mean that if you look at just the purchased power and the legacy contracts and the other affiliate contracts, that that -- and you don't look at MSS-1, you just look at the stuff either owned or purchased directly by ETI, that that's not sufficient to meet their load?

A  That's correct.

Q  And then you have to add -- and then the way that ETI becomes not short anymore is it purchases MSS-1.

A  Yes, I think that's a reasonably accurate statement.

Q  Okay. I think sometimes the record -- it's probably partially my fault. Sometimes the record has gotten a little fuzzy about what that means.

Now, but all in, all purchased capacity,

Page 1952

including MSS-1, ETI is proposing to add about 300 megawatts more in the rate year than in the test year. Right?

A  If you put that in an exhibit, I can confirm that. I don't know the number precisely.

Q  Okay. We can -- that's a -- we could get that from, I think, H-12 in the rate filing, couldn't we?

A  I'm sorry.

Q  We could do that calculation from H-12? I'm not going to make you do the calculation. I think it's in the record.

A  Okay.

Q  You don't have any reason to disagree?

A  No. I believe that's right. The company will be adding capacity. Correct.

Q  All right. And when you add -- when a company adds capacity, they need -- if a company is planning on experiencing load growth, it needs to add a little more in capacity than the estimated load growth. Right? Talking about reserve margins.

A  If the -- okay. I'm sorry.

To the extent that you have a hundred megawatts of load growth, planning principles would suggest, if the company was perfectly balanced in the first place, that they should add, for instance, 115.

Page 1953

Q  Right. And the 115 is the reserve --

A  Reserve margin.

Q  And that's built into your rates. I mean, everybody that buys a megawatt from you is buying -- is paying for the reserve margin as a part of the rate?

A  Theoretically.

Q  All right.

A  It should include that.

Q  All right. So 300 megawatts of additional purchased capacity would serve a little less than that -- I'm not going to -- can't do the math right here -- of actual load growth?

A  You know, I'm not sure I can agree with that without seeing the facts.

Q  Okay. Well, you may be able to do that. If somebody said, "Phillip May, I need -- we're going to have a hundred megawatts of load growth next year, and we need the capacities -- you need to get capacity to meet that," how many megawatts capacity would you need, more or less, to do that?

A  Depends on a number of factors. But if this were a standalone company, it would probably add 20 percent more than that hundred.

Q  Okay. A little -- and that's the reserve margin?

Page 1954

A   Yes.

Q   Okay.  Now, you've previously taken the position that it was appropriate in looking at the rate year purchased power to take load growth into account to make sure that ETI doesn't over-recover, haven't you?

A   Are you referring to the incremental capacity rider testimony?

Q   No.  I'm referring to actually the position you originally filed in this case.

A   Which was with regard to a capacity rider.  Correct?

Q   I'm just -- and in that -- in your initial proposal, it was your position that the -- you should take load growth into account, revenue growth into account, in addition to costs.

A   Yes.  In my original testimony, I indicated that we would true that capacity up.  The only way to do that is to consider load growth.

Q   And you indicated that if revenues collected from the rider, which is how you proposed it, were increased due to sales, then that would automatically be reflected in updates to the rider via over or under recovery?

A   Yes, sir, that would be part of the reconciliation process.

Page 1955

Q   So this problem we've talked about here under the purchased power rider, as you proposed it, if this hypothetical utility was adding --

A   Yes, sir.

Q   -- a hundred dollars to meet an expected 10 percent load --

A   Yes, sir.

Q   -- increase on TIEC Exhibit 23 and that's what they had --

A   Yes, sir.

Q   -- then there would be no over or under recovery because it would be trued up?

A   That's right.

Q   But when the Commission rejected your purchased capacity rider in this case, your position after that was, "Well, just take the purchased capacity costs and apply it to test year sales"?

A   Well, I think our position was kind of an either/or.  We represented that had we not had a capacity -- if we did not get a capacity rider, then you would use these for base rates.

Q   Right.  Right.  And I'm showing that the initial proposal dealt with this, and you thought that was a reasonable thing to do.

A   I think the initial proposal is still very

Page 1956

attractive.

Q   But the fallback proposal did not deal with load growth or load shrinkage or whatever happened.  It just stuck with the test year sales?

A   Yes, sir, the fallback proposal is consistent with the current ratemaking in the PUCT.

Q   Well, I was just --

MR. VanMIDDLESWORTH:  I'm going to take issue with that and move to strike the volunteering that its current -- consistent with current practice at the PUC.

MR. NEINAST:  I object.  He opened up the question by going back to the exhibit.

MR. VanMIDDLESWORTH:  My question was simply, is this what you proposed?  His answer was -- I'm not sure if he said yes, but then he said, "And that's consistent with PUCT practice."

MR. NEINAST:  But it --

JUDGE WALSTON:  I think his answer -- you asked another question about, well, what you're doing now in base rates, and he was responding to the base rate question.

MR. VanMIDDLESWORTH:  Oh, okay.

JUDGE WALSTON:  Yeah.

MR. VanMIDDLESWORTH:  Let me withdraw my

Page 1957

motion to strike.

Q   (BY MR. VanMIDDLESWORTH)  Are you aware of any prior PUC decision where the PUC has said, "We're going to look out two years past the test year and estimate purchased power costs and then apply those to test year billing determinants"?  Any other PUC case ever in Texas?

A   Well, I think a number of these cases have been settled, so that would be hard to say.

Q   Are you aware of any PUC decision?

A   I -- I can't recall any specific PUCT finding on that.

Q   I mean, this -- we're treading new ground.  This -- what you proposed here has never been done by this commission, has it?

A   I don't agree.

Q   Okay.  Then tell me when this commission has ordered the use of test year -- or of rate year purchased capacity and test year sales numbers.

A   In my mind, this is really not different than a merit increase adjustment.  It's known; it's measurable.  Sure, it extends beyond the test year, but in this case, the capacity that this company must add is not being added because we have some great load growth expectation.

Page 1958

Q I'm just asking --

A **And I'm answering the question, sir.**

JUDGE WALSTON: I think you went beyond his question.

Q (BY MR. VanMIDDLESWORTH) Yeah. My question, sir, is, tell me the case where there's a PUC decision that says, "We will look two years out for purchased capacity and come up with a projection of that and apply it to test year sales." Tell me the case.

A **Sir, I can't point to specific language in a PUCT finding.**

Q Can you point to any language about purchased power capacity that does that?

A **No.**

MR. NEINAST: Objection, badgering the witness.

JUDGE WALSTON: I don't know that he's badgering, but I think he's already told you before he doesn't know --

MR. VanMIDDLESWORTH: Okay.

JUDGE WALSTON: -- a finding or a case. So it's repetitive, if nothing else.

MR. VanMIDDLESWORTH: I haven't had an objection levied against me in years, Your Honor. I thought the witness was badgering me.

Page 1959

(Laughter)

MR. NEINAST: But you asked the question.

Q (BY MR. VanMIDDLESWORTH) Let me go to another subject.

You mentioned a Frontier contract, and it was actually in place during the test year?

A **Yes.**

Q And that it was at a lower megawatt level. Right?

A **Yes. It straddled the test year, so there was an increase in the capacity and the cost that was in the midst of the test year.**

Q Okay. And I'm going to try to avoid asking you anything that's highly sensitive. We know there's a Frontier contract.

A **Yes, sir.**

Q I think we may know the megawatts, but I'm not sure. So I'm going to try to avoid that.

But for the first ten months of the test year, the Frontier contract was in one level, and then it went to another level.

A **Yes, sir.**

Q Now, you talked about the stability of that contract, but isn't it the fact -- a fact that for the first ten months of the test year, when that Frontier

Page 1960

contract was in place, that there were never ever two months that had the same capacity payment from ETI to Frontier?

A **I don't have that data in front of me, but I don't believe that there are huge variations in the capacity cost. Now, it is a shaped product --**

Q My question --

JUDGE WALSTON: Okay.

Q (BY MR. VanMIDDLESWORTH) Can you answer my question?

JUDGE WALSTON: Try and just answer his question as concisely as you can.

WITNESS MAY: I'm sorry.

Q (BY MR. VanMIDDLESWORTH) We won't badger each other.

Do you -- isn't it a fact that for the entire ten months that contract was in place, there were no two months that had the same capacity payment from ETI, if you know?

A **I don't have the contract in front of me, but --**

Q I'm just asking you --

A **-- on a dollar basis, I would suspect that that's correct.**

Q All right. And, in fact, weren't there

Page 1961

adjustments made for availability during the test year for --

A **I suspect --**

Q -- the Frontier contract?

A **Yes, sir. I suspect there could have been.**

Q And, in fact, weren't there months where the payments under the Frontier contract were about half of the full contract amount?

A **I'm not familiar with that, but it is a shaped product.**

Q Yes.

A **And that may be driving that.**

Q Yes. So in some months, all other things being equal, even if they performed completely --

A **Yes, sir.**

Q -- there would be higher capacity costs than others?

A **Yes, sir.**

Q But, in fact, for the Frontier contract, in the test year, there were months when -- I mean, if that were the case, there were a number of months that had the same percentage applicable. Right? June, July, August, September all have the same?

A **Yes, sir.**

Q And so everybody knows what we're talking about

**KENNEDY REPORTING SERVICE, INC.**

512.474.2233

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | |
| INC. FOR AUTHORITY TO CHANGE | § | BEFORE THE STATE OFFICE |
| RATES, RECONCILE FUEL COSTS, | § | OF |
| AND OBTAIN DEFERRED | § | ADMINISTRATIVE HEARINGS |
| ACCOUNTING TREATMENT | § | |

DIRECT TESTIMONY AND EXHIBITS

OF

MARK E. GARRETT

ON BEHALF OF

CITIES SERVED BY ENTERGY TEXAS, INC.

MARCH 27, 2012

Mark Garrett
Garrett Group, LLC
Oklahoma City, Oklahoma

Blank Page

## TABLE OF CONTENTS

Section I.      Witness Identification ..................................................................................... 3

Section II.     Purpose of Testimony...................................................................................... 4

Section III.    Rate Base Adjustments

                A. FIN 48 Tax Adjustment ............................................................................. 5
                B. Prepaid Pension Costs in Rate Base............................................................ 7
                C. Rita Regulatory Asset.............................................................................. 11

Section IV.     Payroll and Benefits Expense Adjustments

                A. ETI Payroll Adjustment ........................................................................... 12
                B. ESI Payroll Adjustment ........................................................................... 19
                C. Lewis Creek and Sabine Payroll Adjustments ..................................... 23
                D. Above-Market Payroll Cost Adjustments............................................. 25
                E. Incentive Compensation Adjustment.................................................... 27
                F. Supplemental Executive Retirement Compensation ......................... 54
                G. Above-Market Benefit Costs Adjustment ........................................... 58
                H. Ad Valorem Tax Expense Adjustment ................................................. 60

Section V.      MISO Transition Expense Adjustment ................................................... 61

Section VI.     River Bend Decommissioning Expense Adjustment ........................... 64

Exhibit MG-1 Qualifications of Mark E. Garrett ...........................................Attached

Exhibit MG-2 Garrett Adjustment Workpapers ............................................Attached

Blank Page

## SECTION I.  WITNESS IDENTIFICATION

**Q:** **PLEASE STATE YOUR NAME AND OCCUPATION.**

**A:** My name is Mark Garrett and I am the President of Garrett Group, LLC, a firm specializing in public utility regulation, litigation and consulting services.

**Q:** **WOULD YOU PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND AND YOUR PROFESSIONAL EXPERIENCE RELATED TO UTILITY REGULATION?**

**A:** I am an attorney and a certified public accountant. I work as a consultant in the area of public utility regulation. I received my bachelor's degree from the University of Oklahoma and completed post graduate hours at Stephen F. Austin State University and at the University of Texas at Arlington and Pan American. I received my juris doctorate degree from Oklahoma City University Law School and was admitted to the Oklahoma Bar in 1997. I am a Certified Public Accountant licensed in the States of Texas and Oklahoma with a background in public accounting, private industry, and utility regulation. In public accounting, as a staff auditor for a firm in Dallas, I primarily audited financial institutions in the State of Texas. In private industry, as controller for a mid-sized ($300 million) corporation in Dallas, I managed the Company's accounting function, including general ledger, accounts payable, financial reporting, audits, tax returns, budgets, projections, and supervision of accounting personnel. In utility regulation, I served as an auditor in the Public Utility Division of the Oklahoma Corporation Commission from 1991 to 1995. In that position, I managed the audits of

major gas and electric utility companies in Oklahoma. Since leaving the Commission, I have worked on various rate cases and other regulatory proceedings on behalf of industrial interveners, gas pipelines and the Attorney General of Oklahoma.

**Q: HAVE YOUR QUALIFICATIONS BEEN ACCEPTED IN PROCEEDINGS DEALING WITH COST-OF-SERVICE AND OTHER RATEMAKING ISSUES?**

A: Yes, they have. A more complete description of my qualifications and a list of the proceedings in which I have been involved are included at the end of my testimony.

**Q: ON WHOSE BEHALF ARE YOU APPEARING IN THESE PROCEEDINGS?**

A: I am appearing on behalf of Certain Cities Served by Entergy Texas, Inc. ("Cities").[1]

## SECTION II.     PURPOSE OF TESTIMONY

**Q: WHAT IS THE PURPOSE OF YOUR TESTIMONY IN THIS PROCEEDING?**

A: The purpose of my testimony is to address various revenue requirement issues identified in the Company's rate case application and to provide the Commission with recommendations for the resolution of these issues. I address several rate base issues, including the Company's Prepaid Pension Asset, the Rita Regulatory Asset, Uncertain Tax Positions, and several operating expense issues, including Payroll Expense, Incentive Compensation, Employee Benefits Expense, Supplemental Executive

---

[1] Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

Retirement Expense, Ad Valorem Tax Expense, MISO Transition Costs and River Bend Decommissioning Costs. In total, my recommended adjustments reduce the Company's requested revenue requirement increase by approximately $34.835 million.

**SECTION III. A.    FIN 48 TAX ADJUSTMENT**

Q:    **HAVE YOU REVIEWED ETI'S PROPOSED *FIN 48* ADJUSTMENT TO ACCUMULATED DEFERRED FEDERAL INCOME TAX ("ADFIT")?**

A:    Yes.   In June 2006, the Financial Accounting Standards Board issued Financial Interpretation 48, ("FIN 48"), *Accounting for Uncertainty in Income Taxes*, which requires companies with uncertain tax positions to remove these amounts from the ADFIT balance and record them as a separate liability, for financial accounting purposes. FIN 48 became effective January 1, 2007.

Q:    **HAS THE COMMISSION CONSIDERED THE RATEMAKING TREATMENT OF THE FIN 48 PRONOUNCEMENT IN THE PAST?**

A:    Yes. In Docket No. 35717, the Commission found that the subject utility, Oncor, should include its FIN 48 amounts in ADFIT as a rate base deduction, stating: "Oncor may not have to pay the IRS the FIN 48 deductions of $96,972,460; and therefore they should be added back into the ADFIT for ratemaking purposes."[2] This ruling (1) reflects the fact that the eventual treatment of these deductions is not currently known and (2) that in the

---

[2] Order on Rehearing, Docket 35717, page 18 at 60.

meantime, the utility does have the use of the cost free capital – from the deferred taxes associated with these deductions – at its disposal.

**Q: IS THE COMPANY'S TREATMENT OF ITS FIN 48 ADJUSTMENTS CONSISTENT WITH THE COMMISSION'S RULING IN DOCKET NO. 35717?**

A: No. The Company's FIN 48 adjustments remove $5,916,461 from ADFIT balance that should be included for ratemaking purposes.[3] In response to Cities RFI 19-6, the Company states:

> "Because the Company removed all ADIT related to FIN48 uncertain tax positions from test year end ADIT balances, there would be no change to rate base. Please see the Company's response to Cities 4-21 (d) for the amounts removed from test year end ADIT."

**Q: SHOULD THE COMMISSION'S RULING IN DOCKET NO. 35717 APPLY IN THIS CASE?**

A: Yes. The FIN 48 adjustments do reflect actual tax benefits from deductions taken by the utility on its tax return, and the utility does have the use of these additional funds even if the IRS were to reject the deductions, which may or may not ever happen. For ratemaking purposes, rate base should reflect the actual amount of cost free capital in the ADFIT accounts at test year end.

---

[3] See AJ10 for accounts 282901 and 282903 and the Highly Sensitive response to Cities 4-21.

**Q:** WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THE COMPANY'S FIN 48 ADJUSTMENT?

**A:** Consistent with the Commission's ruling in Docket No. 35717, I recommend that the Company's ADFIT balance be increased by $5,916,461 to reinstate the FIN 48 amounts removed by the Company.[4] This adjustment is set forth at Exhibit MG-2.1.

**SECTION III. B.      PREPAID PENSION ASSET IN RATE BASE**

**Q:** PLEASE DESCRIBE THE COMPANY'S UNFUNDED PENSION BALANCE.

**A:** The Company included in pro forma rate base an item entitled Unfunded Pension Balance. The amount requested in this account is supposed to represent the accumulated difference between the Statement of Financial Accounting Standards ("SFAS") No. 87 calculated pension costs each year and the actual contributions made by the Company to the pension fund.[5] The balance requested in rates is $55.9 million.[6]

**Q:** WHAT IS THE ISSUE WITH RESPECT TO A PENSION ASSET IN RATE BASE?

**A:** In general terms, a portion of the balance in Account 253.012, Unfunded Pension Plans actually represents the accumulated difference between the SFAS 87 calculated pension costs each year and actual contributions made by the Company to the pension fund.

---

[4] This amount could be reduced by attributable IRS cash deposits identified by the Company in rebuttal testimony.
[5] The Company incorrectly referred to this item as a PURA Section 36.065(b) reserve account. PURA Section 36.065(b) allows a utility to record the difference between the SFAS No. 87 pension cost established in a rate case and the actual SFAS No. 87 cost experienced during the rate-effective period. The balance here is the difference in SFAS 87 costs and contributions.
[6] See ETI response to Cities' 13-21.

When there is a debit balance in the account, as is the case here, the Company has been contributing more to the fund than its SFAS 87 calculated cost levels.[7]

Q:   ARE THESE CONTRIBUTIONS MANDATORY?

A:   No.  Schedule G-2.1 shows the payments to the fund have significantly exceeded the required minimum contributions levels.

Q:   HAS THIS COMMISSION ADDRESSED THIS ISSUE IN A PREVIOUS CASE?

A:   Yes.  The Commission addressed this issue in an AEP Texas Central Company rate case, PUC Docket No. 33309.   The Commission determined in that case that the excess contributions to the pension fund, net of CWIP, resulted in lower future pension expense levels for ratepayers.  In effect, the Commission allowed the inclusion of a net pension asset in rate base, because it provided a benefit to ratepayers.

Q:   DOES THE BENEFIT RECEIVED BY RATE PAYERS EQUAL THE INCREASE IN RATES FROM INCLUDING EXCESS PENSION FUNDING IN RATE BASE?

A:   No.  ETI's pension fund earns a much lower return on plan assets than ETI's requested pretax return on rate base.  The requested return on rate base is 11.5%, but the average actual return on pension plan assets over the 5-year period since ETI became a separate company, and the period over which substantially all of the prepaid pension buildup

---

[7] See ETI response to Cities' 13-16.

occurred, is only 1.37%.[8] Thus, if this asset were included in rate base, ratepayers would pay a substantial premium for the slight pension cost savings ETI's excess contributions may have achieved. From a ratemaking perspective, it would be inappropriate for the Company to receive a greater benefit, through earning a full rate base return on the excess contributions, than the benefit ratepayers receive through lower pension costs that result from the pension fund returns.[9] In short, it would be inappropriate for the Company to earn an 11.5% return on contributions that have only produced a 1.37% benefit to ratepayers.

Q:   **HOW ARE PREPAID PENSION ASSETS TREATED IN OTHER STATES?**

A:   At least one state, Virginia, has included a prepaid pension balance in rate base and Texas has included a portion of a prepaid balance in rate base (which was the prepaid pension balance less CWIP in the AEP TCC case). West Virginia, on the other hand, in a recent decision, entirely excluded a requested prepaid pension balance.[10] In Oklahoma, the commission addressed this issue in four separate decisions, and in each decision excluded the prepaid pension balance from rate base and provided a cost of debt carrying charge on the balance.[11] In effect, the Oklahoma commission provided a return on the balance because ratepayers had received a benefit from the excess contributions in the

---

[8] The annual returns for 2007 through 2011 are the actual returns divided by the average of the beginning and ending balance. The average of these amounts is 1.37%. See Exhibit MG2.2.
[9] For example, in Oklahoma, the commission allows a cost-of-money return (rather than a full rate base return) on excess pension contributions if the utility can show that ratepayers benefited from the excess contributions. In those cases, the utility's long term debt rate was representative of, though lower than, the actual returns received in the pension fund.
[10] See Commission Order on March 30, 2011 in Case No. 10-0699-E-42T.

form of lower annual pension costs. In those cases, the actual pension fund returns were much more similar to a long-term debt return than to a full rate base return.

Q:   **WHAT ADJUSTMENT ARE YOU PROPOSING?**

A:   I propose to remove the entire prepaid pension asset from rate base, because the Company has not justified its inclusion in any way. This adjustment reduces pro forma rate base by $36,382,803, which is the net amount of the prepaid balance less accumulated deferred income tax (55,973,543 − 19,590,740 = 36,382,803).[12] I also recommend that the Commission increase operating expense by $498,284, to provide a 1.37% return on the net balance. The adjustment calculations are set forth at Exhibit MG-2.2.

In the alternative, if the Commission decides to follow its prior ruling in the AEP TCC case, Docket No. 33309, the necessary reduction to pro forma rate base would be $25,311,236, which is the portion of the prepaid pension balance associated with CWIP.[13]

---

[11] ONG rate case Cause No. PUD 91-1190; OG&E rate case Cause No. PUD 05-151; AEP PSO rate case Cause No. PUD 06-285; AEP PSO Cause No. PUD 08-144.
[12] See ETI RFI response to Cities' 13-21.
[13] The Company's expense ratio for pensions is 55.78% and the capitalization ratio is 44.22%. See ETI W/P AJ20.

Q:   WHAT IS THE ISSUE WITH RESPECT TO THE RITA REGULATORY ASSET?

A:   In this application the Company seeks to include a Rita Regulatory Asset in the amount of $26,229,627.[14] This balance represents the unrecovered insurance proceeds from the Rita storm loss. The Company seeks rate base treatment of the regulatory asset balance along with a 5-year amortization of the balance in rates. The problem with the Company's recommended treatment in this case is that the Rita balance was presented in the Company's last rate case, Docket No. 37744, as a regulatory asset with a 5-year amortization of the balance and no party in that case opposed the recovery of those costs through rates. This means that, even though the last rate case settled, since no party opposed the Company's inclusion in rates of the Rita regulatory costs, the Company should have been amortizing the Rita regulatory balance since the last case, which would mean that 22.5 months of the 60 month amortization would be complete by the time new rates go into effect from this case.[15] From a ratemaking perspective, the appropriate balance for rate treatment at this point would be $10,714,557,[16] which is the original balance of $26,229,627, less $9,836,110, 22.5 months of the 5-year amortization, less $5,678,960, which is the difference between insurance proceeds estimated in Docket No. 37744 and actual receipts. These calculations are set forth at MG-2.3

---

[14] See Sch. P, P. 19, L. 23.
[15] New rates from Docket No. 37744 went into effect on August 15, 2010 and new rates from this case will go into effect on June 30, 2012.
[16] This is the balance that Mr. Pous will include in the storm reserve.

Q: **WHAT DOES CITIES RECOMMEND WITH RESPECT TO THE RITA REGULATORY ASSET?**

A: The recommended rate treatment of the Rita regulatory asset going forward is being addressed in the testimony of Cities' witness, Mr. Jacob Pous, who recommends that the Rita regulatory asset balance be added to and amortized in the storm reserve. In light of this alternate recovery methodology for the Rita regulatory asset balance I am recommending that the entire balance be removed from pro forma rate base and the amortization expense be removed from pro forma cost of service. This results in a reduction to the requested rate base of $26,229,627 and a reduction to the requested cost of service of $5,245,925. These adjustments are set forth at Exhibit MG 2.3.

## SECTION IV. A.    ETI PAYROLL ADJUSTMENT

Q: **PLEASE DESCRIBE ETI'S PROPOSED PAYROLL ADJUSTMENT.**

A: ETI's payroll adjustment contains three components: (1) a decrease of $648,362 for a reduction in the number of ETI employees during the test year, estimated by multiplying the effective number of employees who left the Company by an average annual salary amount; (2) an increase of $350,047 to recognize test year pay raises for both bargaining and non-bargaining employees;[17] and (3) an increase of $628,947 for post-test year pay raises for both bargaining and non-bargaining employees, calculated by multiplying total payroll expense by the nominal rate of the pay raise. The post-test year raises for bargaining employees occurred in early August 2011, just over one month after test year

end. The post-test year raises for non-bargaining employees are scheduled to occur in April 2012, nine months after test year end. The combination of these three adjustments results in a net requested increase to ETI payroll expense of $330,632.[18]

**Q:  DO YOU AGREE WITH THE COMPANY'S PROPOSED ADJUSTMENT TO ETI PAYROLL EXPENSE?**

A:  I agree with the first two components of the Company's proposed adjustment, where the Company attempts to reflect workforce reductions and pay raises that occur during the test year. And, in the third component, I agree with the post-test year raises for bargaining employees that occurred shortly after test year end. However, I do not agree with the Company's adjustment which attempts to reflect the effects of pay raises that are expected to occur up to nine months after test year end. From a ratemaking perspective, there are several problems with the Company's proposed recognition of these post-test year raises.

**Q:  WHAT ARE THE PROBLEMS YOU SEE WITH THE COMPANY'S PROPOSED APPROACH?**

A:  First, the Company's method of calculating the impact of the pay raise is based on the flawed assumption that a pay raise that occurs nine months after test year end would increase test year payroll expense by the same amount as the pay raise. This assumption,

---

[17] The Company awarded bargaining employees an effective 0.72% pay raise on 3/20/11 and non-bargaining employees an effective 1.50% pay raise on 4/1/11.
[18] See Workpaper AJ22.12.

however, fails to consider other events occurring during the same period that could decrease payroll levels by the same, or even greater, amounts. For example, workforce reductions could have a greater impact on payroll expense than pay raises. In addition, other more subtle changes may also decrease payroll levels. Even with a stable overall workforce level, employees are being added to and removed from the payroll registers on a fairly regular basis. Since retiring employees are generally paid higher salaries than new employees, payroll expense levels can decrease significantly if higher paid employees leave the company and are replaced with employees paid at lower compensation levels. These potential reductions in payroll expense can more than offset the anticipated increase from an annual raise. As a consequence, even if the Commission were inclined to accept an adjustment for pay raises that occur up to nine months outside the test year, the Company's proposed adjustment is inappropriate because it fails to show that net payroll expense levels actually increased by the amount of the pay raises.

Q: IF THE COMMISSION WERE INCLINED TO ACCEPT AN INCREASE FOR PAY RAISES THAT OCCUR UP TO NINE MONTHS OUTSIDE THE TEST YEAR, HOW WOULD THE IMPACT OF THESE RAISES BE PROPERLY MEASURED FOR RATEMAKING PURPOSES?

A: In my experience, payroll levels generally do not increase by the nominal amount of a pay raise. In other words, a 3.5% pay raise typically does not result in a 3.5% increase in overall payroll costs. To calculate the effective impact of a pay raise, it is necessary to

annualize the Company's actual payroll cost levels <u>after</u> the raise was awarded. This approach takes the guess-work out of estimating the impact of a pay raise. The Company's approach of merely taking the amount of the nominal pay raise increase and applying it to overall payroll expense is not an accurate method for estimating the impact of a pay raise and should not be used for ratemaking purposes. In this case, it would be necessary to annualize the April 2012 payroll levels in order to effectively realize the April 2012 pay raise for non-bargaining employees.

**Q: EVEN IF THE ADJUSTMENT WAS APPROPRIATELY BASED ON A PROPER ANNUALIZATION OF PAYROLL LEVELS AT APRIL 2012, WOULD THE RECOGNITION OF THESE POST TEST YEAR RAISES BE APPROPRIATE FROM A RATEMAKING PERSPECTIVE?**

A: No. From a ratemaking perspective, it is generally considered inappropriate to go beyond the test year to recognize an isolated increase in one expense item, such as payroll, without also recognizing other potential offsetting decreases, such as higher revenue levels from load growth. The Company's proposed isolated recognition of pay raises that occur nine months after test year end, without offsetting adjustments, amounts to a piecemeal ratemaking approach for payroll costs and, in my opinion, should be rejected by this Commission. The Company makes no attempt to update its Revenue, or Accumulated Depreciation, or Accumulated Deferred Income Tax balances to a nine-month post-test year level, each of which would more than offset the proposed increase from the April 2012 raises. In my opinion, it is inappropriate to recognize an increase in

one item nine months after test year end, while ignoring other obvious decreases. Jurisdictions with which I am familiar typically require that if one item is updated to a point in time substantially after test year end, then all items must be updated to that later date as well. An isolated increase in one expense item is not allowed.

**Q:** **ARE THERE OTHER REASONS WHY THE COMMISSION SHOULD NOT INCLUDE THE APRIL 2012 PAY RAISES IN RATES?**

**A:** Yes. According to Mr. Gardner's testimony, the Company's total payroll costs for 2011, including both base pay and incentives, was 10% above market.[19] Most of these above-market payroll costs relate to the Company's incentives. The Company's incentive levels are 63% above-market and the Company's base pay levels are 2% above market, resulting in total above-market level of 10% for base pay and incentives.[20] The above-market incentive pay is addressed in detail later in this testimony. However, the Company's above-market base pay is relevant to mention here as well. Because the Company's 2011 base pay is already 2% above market, an additional 2% pay raise increase in April 2012 will only further exacerbate the problem.

---

[19] See Table 5 at page 26 of Mr. Gardner's Direct Testimony.
[20] See ETI response to Cities' RFI 18-8(b).

**Q:** **IF THE COMMISSION FINDS IT APPROPRIATE TO RECOGNIZE THE COMPANY'S POST TEST YEAR PAY RAISES IN APRIL 2012, WHAT OTHER ADJUSTMENTS SHOULD THE COMMISSION ALSO RECOGNIZE?**

**A:** If the Commission decides to recognize the April 2012 post-test year pay raises, I believe the Commission should, at a minimum, consider offsetting the post-test year pay raise increases with the overall productivity improvements that should occur over the same period of time. These productivity improvements must be considered in forward-looking adjustments to payroll costs, such as the Company's proposed pay raise increases. It would be inappropriate for the Company to recognize the incremental increases to payroll associated with post-test year pay raises payroll and not consider the mitigating effects of increased productivity.

**Q:** **WHAT IS PRODUCTIVITY GROWTH AND WHY IS IT IMPORTANT IN THIS CASE?**

**A:** In economic terms, increased productivity is the ability to produce more with less input. Productivity is measured by comparing the amount of goods and service produced with the inputs used in the production of a product. Specifically, labor productivity is the ratio of the output of goods and service to the labor hours devoted to the production of the output. The Bureau of Labor Statistics ("BLS") reports significant growth in labor productivity over the past few years.

Q: **WHY IS IT IMPORTANT TO RECOGNIZE PRODUCTIVITY GROWTH IN THIS SITUATION?**

A: Labor productivity is important here because of the forward-looking impacts of the post-test year pay raises. An accurate projection of post-test year labor costs must give some recognition to the expectation of increased productivity.

Q: **WHAT AMOUNT OF PRODUCTIVITY GROWTH COULD BE EXPECTED FOR THE COMPANY?**

A: Based on projected productivity growth statistics, a reasonable productivity adjustment would reduce labor cost by about 2.1%. The BLS reported "business sector" productivity growth of .4% for 2011, 4% for 2010, and 2.3% for 2009. This results in a 3-year average productivity growth of about 2.2%. The past 2-year average is 2.1%. A productivity offset of 2.1% would recognize the fact that the Company should be expected to achieve the same type of productivity gains that the business sector achieves on average.

Q: **HOW WOULD A PRODUCTIVITY ADJUSTMENT IMPACT THE COMPANY'S PROPOSED INCREASE FOR APRIL 2012 PAYRAISES?**

A: The Company's projected labor cost increases of 2% would be more than offset with a 2.1% annual productivity factor.

Q: **WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THE COMPANY'S PAYROLL EXPENSE?**

A: I recommend the Commission: (1) accept the Company's adjustment to decrease payroll expense for workforce reductions in the test year; (2) accept the Company's adjustment to increase payroll expense for pay raises awarded in March and April 2011 for bargaining and non-bargaining employees respectively; (3) accept the Company's adjustment to increase payroll for pay raises awarded in August 2011 for bargaining employees; and (4) reject the Company's adjustment to increase payroll expense for pay raises awarded in April 2012 for non-bargaining employees.

Q: **PLEASE DESCRIBE YOUR PROPOSED ADJUSTMENT TO PAYROLL EXPENSE.**

A: My recommended adjustment reverses the Company's proposed increase for April 2012 pay raises in the amount of $316,989 and associated payroll-related expense of $41,081, for a total adjustment of $358,071. The calculations supporting Cities' recommended ETI payroll adjustment is set forth at Exhibit MG-2.4.

## SECTION IV. B.    ESI PAYROLL ADJUSTMENT

Q: **HAVE YOU REVIEWED THE COMPANY'S PROPOSED ADJUSTMENT FOR ESI PAYROLL EXPENSE?**

A: Yes. Like the ETI payroll adjustment, the ESI payroll adjustment contains three components: (1) a decrease of $243,416 for a reduction in the number of ESI employees

during the test year, estimated by multiplying the effective number of employees who left the Company by an average annual salary amount; (2) an increase of $466,666 to recognize test year pay raises for non-bargaining employees;[21] and (3) an increase of $622,221 for post-test year pay raises for non-bargaining employees, calculated by multiplying total payroll expense by the nominal rate of the pay raise. The post-test year pay raises for ESI employees are scheduled to occur in April, nine months after test year end. The combination of all three of these adjustments results in a net requested increase in ESI payroll expense allocated to ETI of $845,471.[22]

Q:  **DO YOU AGREE WITH THE ESI PAYROLL ADJUSTMENT?**

A:  Not entirely. I agree with the first two components of the adjustment that occur during the test year—the test year workforce reductions and the test year pay raises—but I do not agree with the third component of the adjustment that inappropriately increases payroll expense for pay raises expected to occur nine months after test year end. Not only does this proposed adjustment fall far outside the test year, it also improperly calculates the impact of these raises by merely multiplying labor costs times the nominal percentage of the raise.

---

[21] The Company awarded bargaining employees an effective .72% pay raise on 3/20/11 and non-bargaining employees an effective 1.50% pay raise on 4/1/11.
[22] See Workpaper AJ22.23.

**Q:** EVEN IF THE ADJUSTMENT WAS APPROPRIATELY BASED ON A PROPER ANNUALIZATION OF PAYROLL LEVELS AT APRIL 2012, WOULD THE RECOGNITION OF THESE POST TEST YEAR RAISES BE APPROPRIATE FROM A RATEMAKING PERSPECTIVE?

**A:** No. From a ratemaking perspective, it is inappropriate to go beyond the test year to recognize an isolated increase in one expense item, such as payroll, without also recognizing other potential offsetting decreases, such as higher revenue levels from load growth. As I testified with respect to the Company's proposed ETI Payroll adjustment, the proposed adjustments to ESI payroll expense also recognize pay raises that occur nine months after test year end without offsetting adjustments. This amounts to piecemeal ratemaking for payroll costs and should be rejected by this Commission. Because the Company makes no attempt to update Revenue, or Accumulated Depreciation or Accumulated Deferred Income Tax balances to the nine-month post-test year level, it is inappropriate to recognize an increase in a single isolated item.

**Q:** ARE THERE OTHER REASONS WHY THE COMMISSION SHOULD NOT INCLUDE THE APRIL 2012 PAY RAISES IN RATES?

**A:** Yes. As discussed in the previous section of this testimony, Mr. Gardner's testimony and responses to Cities' RFIs indicate that the Company's 2011 base pay levels are 2% above market.[23] With the Company's 2011 base pay levels already 2% above-market, an

---

[23] See ETI response to Cities' RFI 18-8(b).

additional 2% increase for pay raises in April 2012 would only further exacerbate the problem.

Q: **IF THE COMMISSION FINDS IT APPROPRIATE TO RECOGNIZE THE COMPANY'S POST TEST YEAR PAY RAISES, IN APRIL 2012, WHAT OTHER ADJUSTMENTS SHOULD THE COMMISSION ALSO RECOGNIZE?**

A: If the Commission should decide to recognize the April 2012 post-test year pay raises, I believe the Commission should offset the 2% pay raises with a 2.1% productivity adjustment, which, according to the BLS, is the two-year average productivity factor for the business sector.

Q: **WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THE COMPANY'S PAYROLL EXPENSE?**

A: I recommend the Commission: (1) accept the Company's adjustment to decrease payroll expense for workforce reductions in the test year; (2) accept the Company's adjustment to increase payroll expense for pay raises awarded in April 2011 (during the test year); and (3) reject the Company's adjustment to increase payroll expense for post-test year pay raises awarded in April 2012.

Q: **PLEASE DESCRIBE YOUR PROPOSED ADJUSTMENT TO PAYROLL EXPENSE.**

A: My recommended adjustment reverses the Company's proposed increase for April 2012

pay raises in the amount of $622,220, and associated payroll-related expense in the amount of $80,640, for a total adjustment of $702,861. The calculations supporting Cities' recommended ESI payroll adjustment is set forth at Exhibit MG-2.7.

**SECTION IV. C.     SABINE AND LEWIS CREEK PAYROLL ADJUSTMENT**

**Q:     HAVE YOU REVIEWED THE COMPANY'S PROPOSED ADJUSTMENTS FOR SABINE AND LEWIS CREEK PAYROLL EXPENSE?**

A:     Yes. Like the ETI and ESI payroll adjustment, the Sabine and Lewis Creek payroll adjustment contains three components: (1) an increase for employees added during the test year; (2) an increase to recognize test year pay raises for both bargaining and non-bargaining employees; and (3) an increase for post-test year pay raises for both bargaining and non-bargaining employees, calculated by multiplying total payroll expense by the nominal rate of the pay raise. The post-test year raises for bargaining employees occurred in early August 2011, just over one month after test year end. The post-test year raises for non-bargaining employees are scheduled to occur in April 2012, nine months after test year end.[24]

**Q:     DO YOU AGREE WITH THE COMPANY'S PROPOSED SABINE AND LEWIS CREEK PAYROLL ADJUSTMENTS?**

A:     No. As with the ETI and ESI adjustments, I agree with the first two components of the Company's proposed adjustment, where the Company attempts to reflect workforce

---

[24] See Workpapers AJ22.15 and AJ22.18.

additions and pay raises that occur during the test year. And, I also agree with the post-test year raises for bargaining employees that occurred shortly after test year end. However, I do not agree with the component of the Company's adjustment that attempts to reflect the effects of pay raises that are expected to occur up to nine months after test year end. From a ratemaking perspective it is inappropriate to go that far beyond the test year to recognize an isolated increase in one expense item without also recognizing offsetting decreases in other items, such as revenue, accumulated depreciation and accumulated deferred income taxes. Also, pay raises projected that far beyond the test year should be offset with an appropriate corresponding productivity adjustment.

Q: **WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THE COMPANY'S PAYROLL EXPENSE?**

A: I recommend the Commission: (1) accept the Company's adjustment to increase payroll expense for workforce additions in the test year; (2) accept the Company's adjustment to increase payroll expense for pay raises awarded in April 2011 (during the test year) and in August 2011 shortly after test year end; and (3) reject the Company's adjustment to increase payroll expense for post-test year pay raises awarded in April 2012, nine months after test year end.

Q: **PLEASE DESCRIBE YOUR PROPOSED ADJUSTMENT TO PAYROLL EXPENSE.**

A: For Sabine, my recommended adjustment reverses the Company's proposed increase for

April 2012 pay raises in the amount of $81,894 and associated payroll-related expense in the amount of $10,613, for a total adjustment of $92,507. For Lewis Creek, my recommended adjustment reverses the Company's proposed increase for April 2012 pay raises in the amount of $28,659 and associated payroll-related expense in the amount of $3,713, for a total adjustment of $32,372. The calculations supporting Cities' recommended Sabine and Lewis Creek payroll adjustments are set forth at Exhibit MG-2.5 and MG 2.6.

### SECTION IV. D.   ABOVE-MARKET BASE PAY COMPENSATION

Q:   **WHAT IS THE ISSUE REGARDING THE COMPANY'S ABOVE-MARKET BASE PAY LEVELS?**

A:   According to Mr. Gardner's testimony, the Company's total payroll costs for 2011, including both base pay and incentives, is 10% above market.[25] Most of these above-market payroll costs relate to the Company's incentives. The Company's incentive levels are 63% above-market, and the Company's base pay levels are 2% above market, resulting in total above-market level of 10% for both components.[26] The Company's incentive compensation is addressed in another section of this testimony. In this section, I address the Company's above-market base pay compensation.

---

[25] See Table 5 at page 26 of Mr. Gardner's Direct Testimony.

Q:   ARE YOU PROPOSING AN ADJUSTMENT TO THE BASE PAY LEVEL REQUESTED IN RATES?

A:   Yes. From a ratemaking perspective, ratepayers are only required to pay the *necessary* costs of providing utility service. Although the Company is certainly free to pay its employees at above-market wage levels if it so chooses, ratepayers should only be asked to pay market-based costs for utility services the Company provides. Based upon the Company's own calculation, its base pay wage levels are above market. This is particularly inappropriate when ratepayers are experiencing, arguably, the worst economy in the past 30 to 35 years – and quite possibly the worst economy since the great depression. In light of this economic downturn, it would be particularly unfair to ask captive ratepayers to pay above-market wages for utility services. As a result, I am recommending a 2% adjustment to the payroll expense included in pro forma rates, to bring the Company's base pay down to a market-based level.

Q:   IF THE COMMISSION ADOPTS YOUR ADJUSTMENT, WILL IT RESULT IN A 2% PAYROLL REDUCTION?

A:   No, certainly not. The Company alone decides how much it pays its employees; the Commission, on the other hand, decides how much of that cost should be collected from ratepayers. The Company will continue to pay its employees whatever it believes is appropriate. Ratepayers, however, should bear only the necessary market-based price for employee pay.

---

[26] See ETI response to Cities' RFI 18-8(b).

**Q:** HOW IS YOUR PROPOSED ADJUSTMENT CALCULATED?

**A:** The adjustment is calculated by multiplying base pay wages in operating expense by 2%.[27] This results in an adjustment of $989,370,[28] which can be seen at Exhibit MG2.8.

## SECTION IV. E.    ETI INCENTIVE COMPENSATION

**Q:** HAVE YOU REVIEWED THE LEVEL OF INCENTIVE COMPENSATION EXPENSE INCLUDED IN THE COMPANY'S COST OF SERVICE?

**A:** Yes. The Company seeks to include $14,187,744 in cost of service for incentive compensation expense. This includes 100% of ETI and ESI annual incentive plan compensation, 100% of ETI and ESI long-term incentive compensation, and 100% of ETI and ESI equity ownership incentive compensation. The Company makes no adjustment to remove any of its test year incentive expense from cost of service, even though it admits that at least 35% of the annual incentive plans and 100% of the long-term plans are tied to the type of financial performance measures that the Commission has routinely excluded in the past.[29] The Company's proposed inclusion of financial-based incentive compensation is supported in the testimony of Jay C. Hartzell, who asserts that incentive programs tied to cost controls, profitability and stock price help companies attract, motivate and retain talented employees. The Company asserts that without financial-based incentives, employees would not be motivated to look after the

---

[27] The actual percentage is 1.8%. See, ETI response to Cities' RFI 18-8(b).

[28] Base pay payroll expense for ETI and ESI = $54.965 million times 1.8%. = $989,370. (See, TIEC 9-1 and Cities' 18-8(b)).

[29] Please see Testimony of Jay C. Hartzell, PhD at page 9 for the admission, and Gardner Exhibit KGG-4 for the percentage.

financial health of the company.[30] The inclusion of financial-based incentives is also supported in the testimony of Kevin G. Gardner, who asserts that the incentives are part of a total package of compensation and benefits that is reasonable when compared with other companies.[31] ETI's test year incentive expense levels and the amounts included in cost of service are set forth in the table below:

| Table 1: Total Incentive Compensation Expense in Cost of Service | | |
|---|---|---|
| **Incentive Compensation Programs** | Test Year Expense | Amount Included in Cost of Service |
| Management Incentive Plan | $4,749,198 | $4,749,198 |
| Exempt Incentive Plan | $1,858,337 | $1,858,337 |
| Team Share Incentive Plan | $153,447 | $153,447 |
| Team Share for Bargaining Employees | $384,877 | $384,877 |
| Executive Annual Incentive Plan | $1,483,447 | $1,483,447 |
| ML6 Operational Plan | 181,462 | 181,462 |
| Long-Term Incentive Plans | $815,608 | $815,608 |
| Equity Ownership Plans | $4,561,367 | $4,561,367 |
| **Total Incentive Compensation** | **$14,187,744** | **$14,187,744** |

Q. WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THE COMPANY'S INCENTIVE COMPENSATION EXPENSE?

A. For incentive compensation expense, the general rule followed in most states is that incentive payments related to the financial performance of the company are excluded for ratemaking purposes. Under this rule, most short-term incentive expense and virtually

---

[30] Direct Testimony of Jay C. Hartzell, PhD at page 7, lines 9-17.
[31] Direct Testimony of Kevin G. Gardner at pages 5-30.

all long-term incentive expense for executives is excluded. In my opinion, this rule should be applied to ETI's incentive plans.

Q: **WHAT IS THE GENERAL RATIONALE FOR EXCLUDING INCENTIVE COMPENSATION TIED TO FINANCIAL PERFORMANCE?**

A: When incentive compensation costs associated with financial performance are excluded from rates, the rationale is generally based on one or more of the following reasons:

(1) **Payment is uncertain.** Often, payment of incentive compensation is conditioned upon meeting some predetermined financial goal such as achieving a certain increase in earnings, reaching a targeted stock price or meeting budget objectives. If the predetermined goals are not met, the incentive payment is not made, or payment is made at some lesser amount. Therefore, there is no certainty from year to year what the level of the payment may be or whether the payment will be made at all. It is generally considered inappropriate to set rates to recover a tentative level of expense.[32]

(2) **Many of the factors that significantly impact earnings are outside the control of most company employees and have limited value to customers.** For example, an unusually hot summer can easily trigger an incentive payment based on company earnings for an electric utility. Obviously, weather conditions are outside the control of utility employees and customers receive no benefit from the higher utility bills that result from an unusually hot summer. Similarly, company earnings may increase, thus triggering incentive payments, as a result of customer growth, which commonly occurs without significant influence from company personnel. In fairness, since shareholders enjoy the benefits of customer growth between rate cases, shareholders should also bear the cost of any incentive payments such growth may trigger. Finally, utility earnings may increase substantially if the utility is able to successfully argue for a higher ROE in a rate case proceeding. However, utility efforts to maximize ROE in a rate proceeding have little to do with improving overall employee performance across the company. If utility employee efforts are geared toward securing an

---

[32] This general rationale for excluding financial-based incentives is on point in this case. At page 28, lines 8-14, of his Direct Testimony, Mr. Gardner admits that actual payments for financial incentives may be considerably less than the targeted level. For example, the actual payouts under the Performance Unit Programs were only 57% of the targeted level in 2010 and a mere 10% of the target level in 2011.

*unreasonably* high ROE in a rate proceeding, the incentive mechanism actually would work to the detriment of the utility customers.

(3) **Earnings-based incentive plans can discourage conservation.** When incentive payments are based on earnings, employees may not be as supportive of conservation programs designed to reduce usage if they perceive these programs could adversely impact incentive payment levels. To the extent earnings-based incentive plans discourage conservation and demand-side management programs, these plans would not be in the public interest. This point is especially important in light of the growing focus on energy efficiency at both the national and state level.[33]

(4) **The utility and its stockholders assume none of the financial risks associated with incentive payments.** Ratepayers assume the risk that the amounts collected through rates for incentive payments will instead be retained by the utility whenever targeted increases are not reached. Employees assume the risk that the incentive payments will not be made in a given year. However, the utility and its stockholders assume no risk associated with these payments. Instead, the company's only responsibility is to decide who gets the money, the stockholders or the employees.

(5) **Incentive payments based on financial performance measures should be made out of increased earnings.** Whatever the targets or goals may be that trigger an incentive payment, when the plan is based in whole or in part on financial performance measures there is always a financial benefit to the company that comes from achieving these objectives. This financial benefit should provide ample funds from which to make the payment. If not, the incentive plan was poorly conceived in the first place. As such, employees should be compensated out of the increased earnings, and not through rates.

(6) **Incentive payments embedded in rates shelter the utility against the risk of earnings erosion through attrition.** When utilities are allowed to embed amounts for incentive payments in rates that money is available to the utility not only to pay the incentive payment when financial performance goals are met but also to supplement earnings in those years when the company does not perform well. In those years when financial performance measures are met, the increased earnings of the company provide ample additional funds from which to make the incentive payments to employees, and the incentive payment amount embedded in rates is not needed. In those years when financial performance measures are not met and the incentive payments are not made, the amount embedded in rates

---

[33] This general rationale for excluding financial-based incentives is particularly important in Texas, since the Commission's rules specifically disallow expenses that would promote increased consumption of electricity. See §25.231(b)(2)(F).

for incentive payments acts as a financial hedge to shelter the poor financial performance of the company.

Even though regulators often exclude incentive compensation payments based on one or more of the reasons outlined above, this does not mean that regulated companies should not offer incentive compensation packages. To the contrary, incentive plans that motivate employees to achieve increased efficiencies (i.e., cost control) should be encouraged. However, since the utility retains the savings generated from these increased efficiencies between rate cases, payment to the employees for these plans should be made from a portion of the savings these plans help achieve. Thus, incentive compensation plans designed to enhance financial performance need not be subsidized by ratepayers.

Q. **HOW IS INCENTIVE COMPENSATION TREATED FOR RATEMAKING PURPOSES IN TEXAS?**

A. My understanding is that the Commission generally excludes the portion of incentive payments designed to increase the financial position of the utility. For example, in PUC Docket No. 28840,[34] the Commission disallowed sixty-six percent (66%) of AEP-Texas Central's test year incentive payments in the amount of $4.2 million -- the portion of the utility's incentive payments that was based on financial performance measures.[35]

---

[34] *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840; SOAH Docket No. 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, Final Order (August 15, 2005).

**Q: HOW IS INCENTIVE COMPENSATION TREATED IN OTHER STATES?**

A: The results of an Incentive Survey of 24 Western States[36] taken by the Garrett Group in 2007, and updated in 2009 and again in 2011, show that most states follow guidelines similar to those described above for Texas, where incentive pay associated with financial performance is not allowed in rates. Some states disallow incentive pay using other criteria. None of the jurisdictions surveyed allow full recovery of incentive compensation through rates as a general rule. The results of the survey are set forth below.

**States that closely follow the Financial Performance rule**

| | |
|---|---|
| **Arizona** | The commission deals with incentive compensation plans on a case by case basis. It first compares overall compensation to the state norm, then asks if the costs are prudent and reasonable. The commission leans toward disallowing programs which benefit only the shareholder even if total compensation is comparable to the state norm. Staff's position is that unless a plan is tied to performance issues it is unnecessary for the provision of service and that shareholders should pay for plans tied to financial measures. In practice, the costs of annual incentive plans are often shared 50/50 between ratepayers and shareholders.[37] |
| **Arkansas** | Excludes 100% of the long-term, equity-based plans. Short-term incentive plans are evaluated to determine if they are based on financial or operational measures. Operational-based plans are allowed. 50% of plans containing financial measures are disallowed. Any plans based solely on the discretion of the company are seen as having no direct benefit to ratepayers and are disallowed 100%. Settlements in recent cases have upheld this treatment.[38] |

---

[35] See ALJ's Proposal for Decision at page 113 in PUC Docket No. 28840, SOAH Docket No. 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, issued July 1, 2004. The PFD with respect to the treatment of incentive compensation was adopted by the Commission in its Final Order.

[36] The survey does not cover Nebraska because the state does not regulate investor-owned electric utilities.

[37] *See* e.g., APS 2008 rate case, Decision 70360, Southwest Gas 2008 rate case, Decision 70665 and UNS Gas 2008 rate case, Decision 70011.

[38] Entergy Arkansas, 06-101-U, Order No. 10.

| California | Incentive funding is an issue that is typically litigated. In CPUC Decision 00-02-046, the commission established that utilities could recover 50% of the regular employee's incentive compensation costs in rates. In California's latest litigated rate case, the commission decided that Edison's non-executive plans and 50% of the short-term executive plans would be funded in rates and that <u>100% of the executive long-term stock plans would be disallowed.</u>[39] |
|---|---|
| **Colorado** | Regular employee programs are judged based on ratepayer verses stockholder benefit ratio. Plans with metrics for goals benefiting ratepayers but dependent on an earnings-per-share trigger are considered to benefit shareholders and opposed by staff. Staff's approach is set forth most recently, in 10AL-963G by staff witness Kahl. The settlement in that case removed the dollar amount opposed by Kahl. All executive incentives are excluded from rates and typically no longer sought in company filings. |
| **Hawaii** | Hawaii does not allow incentive compensation to be included in rates. In Docket No. 6531 the commission agreed that bonus awards tied to company income and earnings benefit stockholders, not ratepayers. The commission further states, "...we believe that a utility employee, especially at the executive level, should perform at an optimum level without additional compensation. Ratepayers should not be burdened with additional costs for expected levels of service."[40] |
| **Idaho** | The commission's policy for evaluating incentive compensation plans involves determining who benefits, the customer or the company. This treatment has been refined in the recent Idaho Power rate case for plans which benefit the customer but require a financial trigger to be paid. For these plans the commission reduced the percentage allowed in rates. <u>The commission also now does not include any executive compensation in rates.</u>[41] |
| **Kansas** | Plans based solely on financial goals are not allowed. For executive incentive programs, the Commission also disallows 100% of plans based on financial measures and 50% for plans using a balance of financial and operational measures. The Commission has allowed in rates non- |

[39] Southern California Edison (Application #: 07-11-011, Decision #: 09-03-025).

[40] Hawaii's policy is set forth in Docket No. 6531 in the October 17, 1991 Order No. 11317. Prior Dockets in which the commission disallowed incentive compensation include No. 3216, No. 4215, No. 4588 and No. 5114.

[41] The Commission's focus on customer benefit is reflected in the direct testimony of Staff witness Leckie, and in the final order for the recent IPC General Rate Case IPC-E-08-10. For earlier examples of the basic policy, see Idaho Power Company Rate Case IPC-E-05-28, Corrected Motion for Approval of Stipulation 3/1/06, 6e, p. 4; Idaho Power Company IPC-05-28, Order No. 30035, p. 4/10.

executive annual incentive programs that have no focus on profitability or earning[42]

**Louisiana**   Traditionally incentive compensation for upper level management and officers is excluded, while costs for lower level managers and employees are allowed. The criteria used to evaluate plan design consider whether the goals of each plan directly benefit ratepayers or shareholders. Stock based compensation plans at all levels are excluded.

**Minnesota**   Minnesota distinguishes between incentive plans tied to financial triggers (such as a threshold ROE), and plans tied to criteria benefitting the ratepayer. Plans based on goals which benefit ratepayers are allowed in rates, but their costs are capped at 25% of base salaries.[43] The portions of these plans that are allowed into rates are tracked and must be returned to ratepayers if they are not paid to employees. Executive plans are largely not allowed.[44]

**Missouri**   Missouri's treatment disallows incentives tied to goals benefitting primarily the stockholders (e.g. tied to earnings per share) while allowing plans with customer-specific goals (e.g. safety). Plans must also be reasonable. The Commission also allows only the amounts actually paid, not those accrued. The same criteria are used for executive plans and few are allowed.[45]

**Nevada**   The commission excludes 100% of the long-term plans and all short-term plans directly related to financial performance.[46]

---

[42] In the litigated 2010 KCP&L rate case (10-KCPE-415-RTS) the Commission also stated that relying on peer group statistics "can result in a continuing upward spiral [instead] the Commission must examine the elements of incentive packages, and the behavior they incent." The Commission held that a focus on profitability or earning might incent employee behavior "detrimental to customers."

[43] This general policy is demonstrated in recent orders in the Minnesota Power and Ottertail rate cases: E002/GR-09-1151 and E002/GR-10-239 respectively.

[44] Minnesota's general policy is demonstrated in recent orders in the Minnesota Power and Ottertail rate cases: E002/GR-09-1151 and E002/GR-10-239 respectively. See also Minnesota Power General Rate Case E002/GR/05/1428.

[45] See, e.g., in the latest Missouri American rate case (WR-2010-0131), not only were plans based on financial goals disallowed, but incentive payments based on customer satisfaction were disallowed due to the unreasonably small sample size used to establish a positive rating (a phone survey of 927 of roughly 450,000 customers). The commission also removed incentive payments tied to lobbying and charitable activity. In the most recent case processed, the Ameren UE rate case, the company did not seek even short-term incentive compensation tied to earnings, providing further indication that staff's practice of disallowing financial performance based incentives is accepted by the companies. All incentive compensation adjustments were made not only to expense charges, but to construction charges as well. See also recent Kansas City Power and Light and Empire Electric District orders on the commission's website.

[46] See, for example, the PUCN's final order in Docket 11-06006.

Direct Testimony of Mark E. Garrett                                        Page 34 of 65
Docket No. 39896

**New Mexico** The commission does not favor incentive compensation plans that are tied to financial goals and tends to allow in rates those based on operational goals. This standard is applied to all levels of utility employees and tends to eliminate the greater portion of executive plans.[47]

**Oklahoma** The commission excludes incentive payments tied to financial performance. From a practical perspective this means that all executive stock plans are excluded and some portion of the annual cash plan for all employees. Since the commission has not been able to determine in recent cases the precise portion of the annual plans tied to financial measures, the commission has excluded 50% of the annual plans. 100% of the executive stock plans are excluded.[48]

**Oregon** The commission's general policy is to evaluate plans based on whether they benefit the customers or the company. Customer-based plans involving reliability, response speed, etc. are called "merit" (operational) plans. Company-based plans which track increases to the bottom line, ROE, etc. are called "performance" (financial) plans. 50% of the cost of merit plans is disallowed and 75% of the performance plans is disallowed. 100% of officer bonuses are disallowed.[49]

**S. Dakota** The commission's general policy is to disallow the portion of incentive plans that are based on the company's financial performance.[50] Current treatment also includes disallowing both executive and non-executive management incentive compensation. There are no incentive compensation plans for union employees. Several utilities have whole incentive programs that hinge on whether or not the company earns a certain return. These financial prerequisites cause the whole plans to be excluded from rates.

**Texas** The general rule is that incentive payments designed to improve the financial performance of the utility are excluded. For example, in PUC Docket No. 28840,[51] the commission disallowed sixty-six percent (66%)

---

[47] *See* Docket 07-00077-UT.

[48] *See e.g.*, AEP-PSO Cause No. PUD 06-285; OG&E Cause No. PUD 05-151; and ONG Cause No. PUD 04-610.

[49] A recent order reflecting this policy can be found in Docket UE 197, Order No. 09-020.

[50] In Docket No. EL 08-030 the settlement excluded bonuses related to "stockholder-benefitting financial goals." The settlement in Xcel rate case Docket No. EL09-009 removed payments based on financial performance indicators. In the settlement agreement signed July 7, 2010 in the Black Hills Power rate case Docket No. EL09-018 the *Staff Memorandum* states, "The settlement removes financial based incentive payments that were included in the capitalized labor costs for plant. Shareholders are the overwhelming beneficiaries of incentive plans that promote the financial performance of the Company and therefore should be responsible for the cost of such compensation."

[51] *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840; SOAH Docket No. 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, Final Order (August 15, 2005).

of AEP-Texas Central's test year incentive payments in the amount of $4.2 million. This was the portion of the utility's incentive payments that were based on financial performance measures.[52]

**Utah**   The commission's general policy is to allow in rates the parts of a plan that are tied to ratepayer benefit and disallow the parts tied to financial goals. Equity-based incentive compensation is excluded from rates.[53]

**Washington**   Incentive plans are evaluated on a case by case basis. Incentives tied to operational efficiency or other measures which benefit ratepayers are allowed in rates and incentives based on return on earnings or other measures that benefit the shareholders are disallowed.[54]

**Wyoming**   Employee incentive compensation plans are evaluated on a case by case basis, distinguishing between employee programs that benefit the ratepayer or the stockholders and requiring the benefitting party to pay. Executive incentive compensation plans are all excluded from rates.

## States that use another approach

**Alaska**   Incentive compensation is not an issue in rate cases in Alaska. There is no relevant regulation or policy.

**Iowa**   Incentive compensation is not typically an issue because few rate cases are litigated in this jurisdiction. Mid-America has an incentive compensation plan but hasn't filed a rate case in many years. For the state's other utilities, it has been a long time since they have filed a rate case or had a rate increase. The standing treatment is to consider incentive compensation plans on a case by case basis and to evaluate whether they are reasonably and prudently incurred. Both of the investor owned utilities in Iowa are under rate freezes until 2013 and 2014.

**Montana**   Montana has no specific treatment directive and considers the issue on a case by case basis. In a recent NorthWestern Energy rate case, as part of a stipulation agreement, the company took a portion of its incentive

---

[52] *See* ALJ's Proposal for Decision at page 113 in PUC Docket No. 28840, SOAH Docket No. 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, issued July 1, 2004. The PFD with respect to the treatment of incentive compensation was adopted by the Commission in its Final Order.

[53] The recent final order in Docket 09-035-23 follows this general policy as does the order in Docket 07-35-93. *See also* Missouri Corp. Rate Case Docket 97-035-01, pp. 10-12; US West Communications Rate Case Docket 95-049-05.

[54] *See* the Order in Pacific Power and Light Docket 061546.

compensation out of rates, but reserved the right to propose that it be included in a later filing.

**N. Dakota**   Historically, North Dakota has followed the general policy that the portion of incentive compensation that relates to shareholder earnings is disallowed and the rest is included. Recently the commission chose to consider overall compensation and determine whether it was reasonable as compared to the market.[55] Executive incentive compensation is not allowed in rates, and is typically not sought by the company.

Q:   **HOW IS INCENTIVE COMPENSATION TREATED IN THE OTHER STATES WHERE YOU HAVE PERSONAL EXPERIENCE?**

A:   The states in which I routinely practice all follow the majority rule that incentive expense associated with financial performance is excluded from rates. As a practical matter, this means that some portion of all incentive plans are excluded in these jurisdictions, as set forth in the summary below:

**In Arizona**, the commission follows the same rule – that costs associated with financial performance are excluded. In practice, this means that the costs of long-term plans are excluded altogether and the costs of the short term annual cash plans are shared 50/50 between shareholders and ratepayers. As examples, see APS 2008 rate case, Decision 70360, Southwest Gas 2008 rate case, Decision 70665 and UNS Gas 2008 rate case, Decision 70011.

**In Arkansas,** incentive payments tied to financial performance measures that benefit only the company such as stock-based plans and EPS measures are assigned

---

[55] Other than Xcel, the utilities in North Dakota (Otter Tail and MDU) are highly diversified now (with mostly unregulated operations, e.g. MDU 90%). This allows utility executives to draw on the unregulated components for their compensation.

100% to the shareholders while measures that benefit both the company and its customers are shared 50/50.

**In Nevada**, in the 2008 Nevada Power rate case, the commission excluded 100% of the long-term plan for executives and key employees of the company, based on the fact that these costs mainly benefit shareholders.[56] In Nevada Power's recent 2011 rate case, Docket No. 11-06006, the Company voluntarily excluded the costs of its long-term plan. With respect to short-term incentives, the commission excludes all plans directly related to financial performance.

**In Oklahoma**, the commission also excludes incentive payments tied to financial performance. From a practical perspective this means that all executive stock plans are excluded and some portion of the annual cash plan for all employees. Since the commission has not determined in recent years the precise portion of the annual plans tied to financial measures, the commission has excluded 50% of the expense. All of the long-term plan costs are routinely excluded.[57]

**In Utah,** costs associated with financial performance are excluded. The rule is followed so closely that the utility typically no longer submits the cost of its long term incentive plan for rate case recovery.

---

[56] *See* Draft Order issued June 17, 2009 in Docket No. 08-12002, at page 138.
[57] *See,* e.g., AEP-PSO Cause No. PUD 06-285; OG&E Cause No. PUD 05-151; and ONG Cause No. PUD 04-610.

**Q: WHY IS THE DISTINCTION BETWEEN FINANCIAL PERFORMANCE MEASURES AND OPERATIONAL MEASURES IMPORTANT FOR INCENTIVE COMPENSATION ANALYSIS?**

A: When incentive compensation payments are based on financial performance measures, the compensation agreement between shareholders and employees could be loosely stated in this manner: "if you will help increase shareholder earnings, we will pay you a bonus." The intended beneficiaries to this agreement are the shareholders and the employees. Ratepayers have no stake in this agreement; therefore, they should bear none of the costs that result from such an agreement. If, instead, the agreement were stated in this manner: "if you will help increase reliability and quality of service to the customers, we will pay you a bonus," then, ratepayers would have a stake in the agreement, and could share in a portion of the costs. However, so long as some portion of the incentive plan is designed to increase earnings, that portion of the plan should be funded out of the increased earnings the plan helps produce.

**Q: HOW MUCH OF THE COMPANY'S INCENTIVE COMPENSATION IS TIED TO FINANCIAL PERFORMANCE?**

A: The Company estimates that 35% of the annual incentive plan payments are related to financial performance measures. This percentage is a weighted average percentage that includes: (1) all payments tied to Financial and Cost Control measures; and (2) one- third of the payments tied to a combination of Cost Control, Safety and Operational

measures.[58]  The Company also indicates that 100% of the equity-based long-term incentive plans and 100% of the stock option plans are related to financial performance.[59]

Q:  **WHAT TYPES OF INCENTIVES ARE PROVIDED TO COMPANY EXECUTIVES?**

A:  Under the Company's plan, executives are provided three types of incentive compensation: (1) the Executive Annual Incentive Plan; (2) the Long-Term Cash Incentive plan; and (3) the Equity Ownership Plan, which provides stock options and other stock–based awards to executives and other employees of the Company.

Q:  **DO YOU RECOMMEND THE INCLUSION OF THE EXECUTIVE INCENTIVE EXPENSE IN RATES?**

A:  Generally, incentive compensation payments to officers, executives and key employees of a utility company are excluded for ratemaking purposes, and I agree with this treatment.  Executive stock-based compensation in particular is excluded in most jurisdictions because stock-based compensation is, on its face, tied to financial performance.  Since officers of any corporation have a duty of loyalty to the corporation itself and not to the customers of the company, these individuals typically put the interests of the company first.  Undoubtedly, the interests of the company and the

---

[58] This percentage is derived from Exhibit KGG-4 and is the weighted average of payments tied to financial and cost control measures.  However, because Exhibit KGG-4 has been identified by the Company as a highly sensitive exhibit the exact derivation of this percentage is not provided in this "public" testimony, but is available for review.

interests of the customer are not always the same, and at times, can be quite divergent. This natural divergence of interests creates a situation where not every cost associated with executive compensation is presumed to be a necessary cost of providing utility service.

It has been my experience that some utilities no longer seek recovery of executive long-term incentive compensation, since long-term executive incentive plans, such as stock option plans, are specifically designed to tie executive compensation to the financial performance of the company to further align the interests of the executives with those of the shareholders. Since the compensation of the employee is tied over a long period of time to the company's stock price, it creates an incentive for the employee to make business decisions from the perspective of long-term shareholders. This intentional alignment of employee and shareholder interests means the costs of these plans should be borne solely by the shareholders. It would be inappropriate to require ratepayers to bear the costs of incentive plans designed to encourage utility executives to put the interest of the shareholders first, especially when the interest of the shareholder is directly bolstered by increases in utility rates.

While many regulators are inclined to exclude all executive bonuses, incentive compensation and supplemental benefits from utility rates, my recommendation in this testimony merely follows the Texas rule – which excludes incentives tied to financial performance measures – effectively eliminating most of the executive incentives.

---

[59] See ETI responses to Cities' RFI 10-9(k) and Cities' RFI 10-10(k).

**Q:** **IS YOUR RECOMMENDATION TO EXCLUDE ALL EQUITY INCENTIVE COMPENSATION CONSISTENT WITH THE TREATMENT OF INCENTIVES IN THE OTHER STATES WHERE YOU REGULARLY PRACTICE?**

**A:** Yes. Oklahoma, Nevada and Utah all follow the same general rule that excludes incentive compensation tied to financial performance measures. This means that long-term equity incentive plans are all excluded. For example, in Oklahoma, in each of the most recently litigated rate cases for the three major utilities in that state, the commission has excluded 100% of the utilities' long-term incentive compensation plans. Likewise, in Nevada, the commission excluded 100% of the long-term incentive compensation plan costs in Nevada Power's 2008 rate case. In the Company's 2011 rate case, the utility voluntarily excluded the long-term incentive costs. In Utah, PacifiCorp also voluntarily removes all costs associated with its long-term incentive compensation plans.[60] The table below sets forth the most recent treatment of long-term incentive compensation for the major utilities in these jurisdictions.

---

[60] In PacifiCorp's last two general rate case, Docket No. 07-035-93 and Docket No. 08-035-38, the Company did not seek recovery of its long-term executive compensation plans.

| TABLE: 2 | | |
|---|---|---|
| LONG-TERM INCENTIVE TREATMENT IN OKLAHOMA, NEVADA AND UTAH | | |
| **Utility Company** | **Amount Excluded** | **Docket Number** |
| AEP/PSO | 100% Excluded | Cause Nos. PUD 06-285;08-144 |
| Oklahoma Gas & Electric | 100% Excluded | Cause No. PUD 05-151 |
| Oklahoma Natural Gas | 100% Excluded | Cause No. PUD 04-610 |
| Nevada Power | 100% Excluded | Docket No. 08-12002; 11-06006 |
| PacifiCorp | 100% Excluded | Docket No. 08-035-38 |

Q: HOW IS EQUITY INCENTIVE COMPENSATION TREATED IN OTHER STATES?

A: As shown in the Garrett Group's Incentive Survey, most states follow guidelines similar to those described above for Texas, Oklahoma, Nevada and Utah, that disallow incentive pay associated with financial performance. As a result, equity-based incentives typically are not allowed in most states. A synopsis of the survey results from each state was included earlier in this section of testimony, with the treatment of executive incentives in each state underlined. According to the survey, the following western states exclude all or virtually all executive incentive pay: Oregon, California, Nevada, Idaho, Utah, South Dakota, Oklahoma, Wyoming, North Dakota, Missouri, Arkansas, Louisiana and Minnesota. Other states, like Washington, Missouri and Texas, apply the *financial performance* rule, which has the effect of excluding executive incentives, especially stock-based awards.

**Q: WHEN UTILITIES DO SEEK TO INCLUDE EXECUTIVE STOCK COMPENSATION IN RATES, WHAT RATIONALE IS GENERALLY PROVIDED?**

A: Generally, utilities argue that executive incentives are part of an overall compensation package that is designed to attract and retain qualified personnel. Generally, the rationale is that some other utilities may offer incentive plans to their executives, thus a company runs the risk of not being able to compete for key personnel if it does not offer a comparable plan.[61]

**Q: IS THIS ARGUMENT PLAUSIBLE?**

A: No. The common problem with the Company's "total compensation package" argument is that when an incentive payment is based on achieving financial performance goals there should be a financial benefit to the company that comes from achieving these goals. This financial benefit should provide ample additional funds from which to make the incentive payments. If not, the plan was poorly conceived. Thus, a utility is not placed at a competitive disadvantage when incentive payments tied to financial performance are not collected through rates, because the funding for these payments is available from the additional earnings the incentive plans help achieve.

Further, when utilities, such as ETI, compete with other utilities for qualified executives, and the executive incentive compensation plans of the other utilities are not being recovered through rates, ETI is not at a disadvantage when its equity incentive

---

[61] See, for example, the Direct Testimony of Jay C. Hartzell at page 7, lines 10-13.

compensation is excluded as well. Since most states exclude equity incentive pay as a matter of course, and many others exclude equity incentives as a practical matter, ETI would actually be given an unfair advantage if its equity plans were included in rates. The fact that other utilities may offer equity incentive plans is not relevant; what is relevant is the fact that other utilities typically are not recovering the costs of these plans in rates. The Nevada Commission articulated this important ratemaking concept in its order disallowing Nevada Power's long-term incentive plan in the Company's 2008 general rate case.

> Therefore the Commission accepts BCP's and SNHG's recommendations to disallow recovery of expenses associated with LTIP. Both parties provide a valid argument that this type of incentive plan is mainly for the benefit of shareholders. Further, both BCP and SNHG provide examples of numerous other jurisdictions that do not allow the recovery of these costs and, therefore, disallowance in this instance would not place NPC in a competitive disadvantage.[62] (Emphasis added).

**Q:  IS THERE OTHER EVIDENCE THAT THE COMPANY WILL NOT BE DISADVANTAGED BY A DISALLOWANCE OF INCENTIVE EXPENSE?**

A:  Yes. According to Mr. Gardner, the Company's total payroll costs for 2011, including both base pay and incentives, was 10% above market.[63] Most of these above-market payroll costs relate to the Company's incentives. The Company's incentive levels are 63% above-market and the Company's base pay levels are 2% above market, resulting in a total above-market level of 10% for both base pay and incentives.[64] The above-market

---

[62] See Final Order in Docket 08-12002 at paragraph 549. NPC did not seek recovery of its LTIP in the 2011 rate case, Docket No. 11-06006.
[63] See Table 5 at page 26 of Mr. Gardner's Direct Testimony.
[64] See ETI response to Cities' RFI 18-8(b).

Direct Testimony of Mark E. Garrett                                     Page 45 of 65
Docket No. 39896

base pay is addressed earlier in this testimony. The Company's 63% above-market incentive pay, however, is relevant in this section of testimony. Cities' adjustment, proposed below, to reduce incentive compensation levels associated with financial based incentives (35% of the short term cash incentives and 100% for long term equity-based incentives), only reduces the Company's overall incentive compensation by 59%, which is less than the 63% that the incentives are above-market.

Q: **WHAT ADJUSTMENT DO YOU PROPOSE WITH RESPECT TO THE COMPANY'S INCENTIVE COMPENSATION COSTS?**

A: My proposed adjustment removes 35% of the annual incentive plan costs. This is the weighted-average portion of the Company's plan that is tied to financial performance, according to the Company. My adjustment also removes 100% of (1) the Long-Term Incentive plan and (2) the Stock Option awards. These plans are clearly based entirely upon the financial performance of the Company. Stock options are financial-based on their face, and the Company admits that the Long-Term awards are based on financial performance.[65]

---

[65] See ETI responses to Cities' RFI 10-9(k) and Cities' RFI 10-10(k).

Q: DOES THE AMOUNT YOU IDENTIFIED IN THE ANNUAL PLANS AS ASSOCIATED WITH FINANCIAL PERFORMANCE DIFFER FROM THE AMOUNT IDENTIFIED BY THE COMPANY?

A: Yes. The Company identified 14.1% costs in the annual incentive plans as associated with financial performance.[66] The Company divided the plans into four categories: (1) financial performance goals; (2) cost control goals; (3) operational goals; and (4) safety goals.[67] The Company included only category (1), financial performance goals, in the 14.1% tied to financial performance.[68] This category includes goals tied solely to increasing shareholder wealth such as earnings per share, shareholder returns, and stock price.[69] The Company did not include category (2), cost control goals, as goals tied to financial performance, but does acknowledge that this category should be included based on prior Commission orders.[70]

Q: WHAT DID YOU DO TO ARRIVE AT YOUR CALCULATED 35% FOR FINANCIAL PERFORMANCE COMPONENT OF THE ANNUAL INCENTIVE PLANS?

A: To arrive at 35%, I included costs in category (2), cost control goals, as related to financial performance. I also included one-third of the costs in category (5), which included a combination of cost control, safety and operational goals. When categories (1) and (2) and one-third (1/3) of category (5) are combined, the amount related to

---

[66] Direct Testimony of Kevin G. Gardner at page 30, line 7.
[67] Highly Confidential Exhibit KGG-4, page 1 of 1.
[68] Calculated from the information on Highly Confidential Exhibit KGG-4.

financial performance is 35%. I included the category (2), cost control goals, as related to financial performance because, in my experience, this is the typical treatment for cost control measures. Since the Company retains all of the savings generated from cost cutting measures between rate cases, it should pay the related incentives out of the savings these cost cutting measures generate. Moreover, this treatment is consistent with the regulatory treatment used by this Commission in the past on this issue.[71]

**Q: HOW WAS YOUR ADJUSTMENT DEVELOPED?**

A: The following table shows the amount of Cities' proposed adjustment for incentives:

---

[69] From the *Description of Goals* box at the bottom of page 1 of Highly Confidential Exhibit KGG-4.
[70] See Direct Testimony of Jay C. Hartzell, PhD, at page 9, lines 9-13.
[71] See *Id.* at page 8, lines 9-13 and footnote 1.

### Table 3: Cities' Incentive Compensation Adjustment

| Incentive Compensation Plans | Amount Included in Cost of Service | % Tied to Financial Performance | CITIES' Adjustment |
|---|---|---|---|
| Management Incentive Plan | $4,749,198 | 35% | $1,862,219 |
| Exempt Incentive Plan | $1,858,337 | 35% | $650,418 |
| Team Share Incentive Plan | $153,447 | 35% | $53,706 |
| Team Share - Bargaining Employees | $384,877 | 35% | $134,707 |
| Executive Annual Incentive Plan | $1,483,447 | 35% | $519,206 |
| Long-Term Incentive Plans | $815,608 | 100% | $815,608 |
| Equity Ownership Plans | $4,561,367 | 100% | $4,561,367 |
| CITIES' Adjustment | $14,187,774 | | $8,397,232 |

Q: ARE THERE OTHER REASONS THE COMMISSION COULD CONSIDER A LARGER ADJUSTMENT TO INCENTIVE PAY?

A: Yes. The Company's "allowable" incentive payments, in effect, those not tied to *financial goals*, are tied primarily to *operational goals*, made up of "reliability, customer service, capacity factor and community relations." In the test year, the Company made substantial incentive payments based on employees achieving some perceived acceptable level with respect to these goals. However, these payments seem inconsistent with Entergy's ratings in the annual J.D. Power's Report on Customer Satisfaction for Residential customers.[71] The J.D. Power and Associates Reports are widely recognized and unbiased. The J.D. Power's report ranks utilities based on customer satisfaction. The Entergy companies did not fare well, with Entergy Arkansas and Entergy Louisiana ranking below average and Entergy New Orleans ranking 124th out of the 125 utilities

ranked in the 2011 report. Entergy Texas ranked only slightly above average. The poor showing of the Entergy companies in general in an independent, objective customer satisfaction evaluation report brings into question whether ratepayers should be required to pay any of the "allowable" ETI incentives that are based on customer service and community relations.

Q: IS THERE EVIDENCE THAT THE ANNUAL INCENTIVE PLANS ACTUALLY MAY BE TIED TO FINANCIAL PERFORMANCE AT LEVELS HIGHER THAN THE 35% DIRECTLY RELATED TO STOCK PRICE GOALS AND COST CONTROL GOALS?

A: Yes. Each Entergy business unit designs its incentive targets based on goals that include both financial-performance and operational goals such as spending level goals, cost constraint goals, reliability goals, safety goals and customer service goals. However, the Company still uses the EAM (Entergy Achievement Multiplier) to arrive at the amount to be funded each year. In the past, the EAM was a composite of the Company's *earnings per share increase* and *operating cash flows,* and was used as a performance target. Now, the EAM operates as a funding mechanism for all plans to ensure that adequate additional funds exist to pay the incentives, and as a performance target for certain executives.[73] This indicates that all incentive payments are directly dependent on the financial success of the Company each year. For ratemaking purposes, this means that the entire amount of incentive payments could be viewed as tied to financial

[72] J.D. Power and Associates 2011 Electric Utility Residential Customer Satisfaction Study.

performance and disallowed on this basis.[74] If that were the case, the adjustment necessary to remove the entire amount of incentive payments from the cost of service would be $14,187,744.

Q: **HOW SHOULD THE COMMISSION TREAT INCENTIVE COMPENSATION IN THIS CASE?**

A: At a minimum, the Commission should continue to follow the rule observed in Texas and in most other jurisdictions, by disallowing for ratemaking purposes all incentive payments associated with financial performance goals. This approach would exclude the portion of annual incentive costs associated with stock price and cost control goals – as well as the costs of the long-term incentive plan and the stock option plans. In light of the overwhelming trend against including financial-based incentives in rates, and considering the current national economic downturn and the economic shortfalls being experienced in Texas in particular, I believe the Commission should continue to follow the approach to incentive compensation that protects ratepayers against even the appearance of being forced to pay costs designed to increase shareholder wealth. A policy that includes incentive payments based on financial performance in rates, as proposed by the Company, has the effect of forcing ratepayers to become captive contributors to the financial prosperity of one company. Cities' proposed adjustment

---

[73] See Direct Testimony of Kevin G. Gardner at page 17-18.
[74] In Oklahoma, the Commission disallowed 100% of the ONEOK, Inc. incentives for regular employees, because, although many of the goals were purportedly customer-related goals, actual funding of the incentive payments depended on the financial success of the company each year. See Cause Nos. PUD 91-1190 and PUD 2004-610.

decreases pro forma operating expense by $8,397,232, and is set forth at Exhibit MG-2.10.

In the alternative, the Commission could consider a larger adjustment based on the fact the Company's performance with respect to operational goals, such as customer service and customer satisfaction, should not be included in rates if the Company's performance in these areas is clearly below average. Based on the assessment of an independent third party in the J.D. Power report, the Company's performance in customer satisfaction is below average and, thus, the Commission may determine that a larger disallowance of incentive compensation is appropriate.

Q:  **ARE YOU PROPOSING ANY OTHER ADJUSTMENTS FOR INCENTIVE COSTS?**

A:  Yes. Disallowed incentive costs should not just be removed from operating expense but should also be removed from rate base as well.  When a cost is disallowed for ratemaking purposes it must be removed from both operating expense and rate base. Since a significant portion of the Company's incentive payments are capitalized each year into the plant accounts, these amounts are included in pro forma rate base where they will earn a return and be recovered through depreciation rates if not adjusted in this case. Thus, it is necessary to reduce the amount of incentives capitalized in rate base by the same percentage disallowed in operating expense.  In effect, capitalized annual incentives should be reduced by 35% and capitalized stock-based incentives should be reduced by 100%.

Q:   HAVE YOU BEEN ABLE TO QUANTIFY THIS ADJUSTMENT?

A:   Yes.  In response to Cities' 10th Set of RFIs, the Company provided the amounts capitalized for each incentive plan from 2008 through the end of the test year.  For my proposed adjustment, I included capitalized incentives from 2008 through the beginning of the test year but did not include incentive capitalized during the test year, as test year incentives may still be recorded in the CWIP accounts and not included in pro forma rate base in this case.

Cities' proposed adjustment decreases pro forma rate base by $9,835,111 and is set forth at Exhibit MG-2.10.  This adjustment removes 35% of the annual incentives in rate base and 100% of the equity-based incentives, from the 2007 inception of ETI forward excluding the test year.

Q:   ARE YOU PROPOSING ANY OTHER ADJUSTMENTS FOR INCENTIVE COSTS?

A:   Yes.  Accumulated deferred federal income tax (ADFIT) associated with disallowed long-term incentive plans should be removed from rate base.  This means that rate base should be reduced by a net $694,730 debit balance in ADFIT accounts associated with the Company's long-term incentive and stock option plans.  The calculations for this adjustment are set forth at Exhibit MG2.10.

## SECTION IV. F.   SUPPLEMENTAL EXECUTIVE RETIREMENT PLANS

Q:   **PLEASE DESCRIBE THE COMPANY'S SUPPLEMENTAL EXECUTIVE RETIREMENT PLANS.**

A:   The Company provides supplemental retirement benefits to highly compensated employees of the Company. These supplemental retirement plans for highly compensated individuals are provided because benefits under the general retirement plans are subject to certain limitations under the Internal Revenue Code (the "Code"). As such, these types of plans are often referred to as *non-qualified* plans. Benefits payable under these non-qualified plans are typically equivalent to the amounts that would have been paid but for the limitations imposed by the Code. In general, the limitations imposed by the Code allow for the computation of benefits on annual compensation levels of up to $245,000 for the year.[75] Retirement benefits on compensation levels in excess of the $245,000 limitation are paid through supplemental plans. Supplemental retirement plans for highly compensated employees are designed to provide benefits in addition to the benefits provided under the general pension plans of the company.

The Company has three non-qualified retirement plans for highly compensated employees:

1) Pension Equalization Plan;
2) System Executive Retirement Plan; and
3) Supplemental Retirement Plan.

---

[75] The limits are $225,000 for 2007, $230,000 for 2008 and $245,000 for 2009.

The first plan covers all employees with compensation levels above the $245,000 limitation under the internal revenue code. The other two plans are supplemental plans for executives only. Benefits are paid out of the general funds of the Company.

Q: **WHAT AMOUNTS WERE INCLUDED IN PRO FORMA OPERATING EXPENSE FOR THE EXECUTIVE PENSION PLAN?**

A: The amount of non-qualified supplemental retirement plan costs included in the filed cost-of-service was $2,114,931. Of this amount, direct ETI costs were $721,643 and the amount allocated from ESI was $1,393,288.[76]

Q: **WHAT DO YOU RECOMMEND FOR THE SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN COSTS?**

A: I recommend that shareholders pay for the costs of the supplemental executive retirement plans. This means that ratepayers will pay for all of the executive benefits included in the Company's regular pension plans, and that shareholders pay for the additional executive benefits included in the supplemental plan. For ratemaking purposes, shareholders should bear the additional costs associated with supplemental benefits to highly compensated executives, since these costs are not necessary for the provision of utility service, but are instead discretionary costs of the shareholders designed to attract, retain and reward highly compensated employees. However, because officers of any corporation have a duty of loyalty to the corporation, these individuals

---

[76] See ETI responses to Cities' RFI 12-47.

will put the interests of the company first. This creates a situation where not every cost associated with executive compensation is presumed to be a cost appropriately passed on to ratepayers. Many regulators are inclined to exclude executive bonuses, incentive compensation and supplemental benefits from utility rates, understanding that these costs would be better borne by the utility shareholders.[77]

Q: HOW IS SERP TREATED IN OTHER STATES?

A: Although I have not conducted a comprehensive study of SERP treatment in other states, I know that SERP is disallowed in the states of Oregon,[78] Idaho[79] and Arizona.[80] Moreover, in Nevada, the commission disallowed all SERP expense in Docket Nos. 01-10001 and 03-10001, and in Docket Nos. 06-11022and 08-12002, the Nevada Commission disallowed a portion of SERP costs.

---

[77] For example, this Commission excluded SERP costs in PSO's last rate case, PUD 200600285.

[78] See Oregon Public Utilities Commission, Order No. 01-787, September 7, 2001, page 44.

> The Commission has not allowed recovery of SERP expenses in other utility rate cases. PacifiCorp has not persuaded us that it is necessary to pay SERP to hire and retain executive officers. The SERP costs are not allowed."

[79] See Idaho Public Utilities Commission Order No. 32196 issued February 28, 2011 in Rocky Mountain Power's rate case, Case No. Pac-E-10-07:

> The Commission finds Staffs argument persuasive and finds it reasonable to disallow Company recovery of SERP costs of $2.6 million (total Company) in this case. The Company has not demonstrated that the costs are related to providing services to southeast Idaho. The responsibility for generous severance benefits for executives, we find, is the responsibility of the Company and its shareholders, not Idaho customers.

[80] The Arizona Corporation Commission has issued several decisions in which it denied rate recovery for SERP expenses. See 258 PUR 4th 353 (2007) Re Arizona Public Service Company, 247 PUR 4th 243 (2006), In Re Southwest Gas Corp., 2008 WL 2332953 (Arizona Corp Commission Decision 70360, May 27, 2008), In the Matter of the Application of UNS Electric, and 2007 WL 4731250 (Arizona Corp Commission Decision 70011, November 27, 2007) Re UNS Gas, Inc.

In Oklahoma, the Commission disallowed 100% of AEP/PSO's SERP expense in PSO's 2006 rate case, Cause No. PUD 200600285:

> q. **Employee Benefits-Supplemental Executive Retirement Plan ("SERP").**
>
> PSO included $596,081 as Supplemental Executive Retirement Plan ("SERP") in its cost-of-service. The Commission adopts OIEC's proposal to remove the SERP Expense from the revenue requirement in this proceeding. The Commission adopts OIEC's recommendation that ratepayers pay for all of the executive benefits included in PSO's regular pension plans and that shareholders pay for the additional executive benefits included in the supplemental plan.

Again, in PSO's 2008 rate case, Cause No. PUD 200800144, the Oklahoma commission disallowed 100% of the Company's SERP expense.

> 11. Supplemental Executive Retirement Plan ("SERP")
>
> The AG and OIEC recommend reductions to reflect the elimination of SERP expense from PSO's cost of service. Staff proposed no adjustment to PSO's recommendation. SERP is AEP's non-qualified defined benefit retirement plan that allows PSO argued allows AEP the flexibility to attract and retain key employees and provides benefits that cannot be provided under AEP's qualified defined benefit plans. PSO stated that the combined plans, of which SERP is a part, allow employees to accumulate an appropriate level of replacement income upon retirement. According to PSO, SERP plans and other benefits are part of a market competitive benefits program for the utility industry and large employers in general. The Commission finds that the SERP expenses do not provide a benefit to the ratepayers of PSO and therefore adopts the recommendation of the AG and OIEC to deny recovery of these costs from PSO's ratepayers.

**Q: WHAT IS THE AMOUNT OF YOUR ADJUSTMENT?**

A: Cities' proposed adjustment, in the amount of $2,114,931, removes the costs of the non-qualified retirement plans from cost of service. The adjustment is set forth at Exhibit MG-2.11.

**SECTION IV. G.     ABOVE-MARKET EMPLOYEE BENEFITS**

**Q: WHAT IS THE ISSUE WITH RESPECT TO ABOVE-MARKET EMPLOYEE BENEFITS?**

A: This section of my testimony addresses the above-market value of the Company's employee benefit plans. At page 41 of his direct testimony, Mr. Gardner admits that the value of the Company's employee benefit plans is 14% above market when compared to a peer group of Fortune 500 companies.

**Q: HAVE YOU PROPOSED AN ADJUSTMENT TO THE BASE PAY LEVEL REQUESTED IN RATES?**

A: Yes. From a ratemaking perspective, ratepayers are only required to pay the *necessary* costs of providing utility service. Although the Company is free to pay its employees above-market wages and above-market benefits, ratepayers should only be asked to pay market-based prices for employee costs. For purposes of this adjustment, the calculation of market-based wages is based the Company's own calculation. Because ratepayers are experiencing the effects of perhaps the most severe financial downturn in the past 30 to 35 years, it would be particularly unfair at this time to ask captive ratepayers to pay

above-market wages for utility services. As a result, I am recommending a 14% adjustment to the employee benefits expense included in pro forma rates.

Q: HOW IS YOUR ADJUSTMENT CALCULATED?

A: The adjustment, calculated in the table below, removes 14% of the Company's identified employee benefits expense. The adjustment can be seen at Exhibit MG 2.9.

| Table 4: Cities' Employee Benefits Adjustment[81] | | | |
|---|---|---|---|
| **Employee Benefit Plans** | **ETI** | **ESI** | **Total Amount in Cost of Service** |
| Medical / Dental | 4,476,874 | 2,504,140 | 5,981,014 |
| LTD | 131,273 | 58,058 | 189,331 |
| Life | 142,636 | 79,328 | 221,964 |
| Retirement Plans | 7,324,753 | 5,711,755 | 13,036,508 |
| Executive Retirement Plans | 721,643 | 1,393,288 | 0 |
| | | | |
| Totals | 12,797,179 | 9,746,569 | 20,426,817 |
| | | | |
| Above Market Percentage | | | 14% |
| **CITIES' Adjustment** | | | **$2,860,034** |

---

[81] The information in this table is from ETI's response to Cities' RFI 18-1(d)(vii).

## SECTION IV. H.     AD VALOREM TAX EXPENSE

Q:     **WHAT IS THE COMPANY PROPOSING AS AN AD VALOREM TAX EXPENSE ADJUSTMENT?**

A:     The Company is proposing a 10.81% increase in property tax expense based on a weighted average projected increase in net plant and net operating income for 2011.[82] The Company asserts that both net plant and net income are drivers in determining a company's calculation for property tax assessment purposes.[83] The Company gives its projected net plant increase a 20% weighting and its projected net income increase an 80% weighting and then adds an additional 1% for "Annual Tax Rate Creep."[84] The Company's 10.81% projected increase in property tax valuation results in an adjustment of $2,592,417 to test year property tax expense.

Q:     **DO YOU AGREEE WITH THE COMPANY'S PROPOSED ADJUSTMENT?**

A:     No. The Company's proposed adjustment is based on estimates and seems unreasonably high when compared to actual valuation increase over the last couple of years. The Company provided actual valuation increases for 2010 and 2011 in Chart 1 at page 8 of Patricia Galbraith's direct testimony. These actual valuation increases were 7.0% in 2010 and 4.2% in 2011, much less than the Company's predicted 10.81% increase for 2012.

---

[82] See AJ25, Adjustment to Property Tax Expense.
[83] See Direct Testimony of P. Galbraith at page 7, line 16.
[84] See AJ25, Adjustment to Property Tax Expense.

Q: **WHAT ADJUSTMENT WOULD YOU RECOMMEND FOR PROPERTY TAX EXPENSE?**

A: I would recommend a more conservative approach when estimating tax increases. Since actual valuation increases have averaged about 5.6% over the last two year period, I would recommend an increase in that range for ratemaking purposes. Since property tax is typically assessed on the appraised value of property located within the jurisdiction of the taxing authority,[85] I recommend an adjustment based upon the Company's estimated percentage increase in net plant for 2011, which is 3.73%.[86] With a 1% "Tax Rate Creep" added, this results in a 4.73% increase, which is much closer to the Company's actual average valuation increase of 5.6%. A 4.73% increase in property tax expense results in an increase to test year property tax expense of $1.1 million. Using a 4.73% increase instead of the Company's recommended 10.81% increase results in an adjustment to pro forma cost of service of $1,457,975. This adjustment can be seen at Exhibit MG2.13.

### SECTION V.     MISO TRANSITION EXPENSE ADJUSTMENT

Q: **WHAT IS THE ISSUE REGARDING MISO TRANSITION EXPENSE?**

A: In this case, the Company is requesting deferred accounting treatment for its MISO transition costs.[87] The Company is also proposing a pro forma adjustment to include its estimated MISO transition costs in rates in the event its requested deferred accounting

---

[85] See P. Galbraith Direct Testimony at page 6, line 16.
[86] See AJ25.
[87] See the Direct Testimony and the Supplemental Testimony of Mr. Jay A. Lewis.

treatment is not approved. Cities oppose the Company's requested deferred accounting for the MISO transitions costs in the testimony of Mr. James Brazell. In my testimony, I address the Company's pro forma adjustment to recover MISO transition costs in the event the deferred treatment is not approved.

Q: **WHAT IS THE COMPANY PROPOSING FOR A PRO FORMA ADJUSTMENT TO RECOVER ESTIMATED MISO TRANSITION COSTS?**

A: The Company's adjustment increases cost of service by $4 million annually to recover a 3-year amortization of estimated MISO transition costs of $12 million.[88]

Q: **DO YOU AGREE WITH THE COMPANY'S PROPOSED ADJUSTMENT IN THE EVENT DEFERRED ACCOUNTING IS NOT APPROVED FOR MISO TRANSITION COSTS?**

A: No. The Company's requested $4 million annual expense level is inconsistent with the Company's own projections of anticipated cost levels provided in response to Cities' 6-3. The test year level for these expenses was $916,535.[89] The actual expenses incurred in 2011, January through November, were only $2.513 million.[90] Annualized, this would be $2.742 million. For 2013, the Company is expecting to incur an expense level

---

[88] See adjustment AJ16.23L. The Company also removes test year expense of $916K so that the amount included in pro forma expense is $4 million.
[89] See AJ16L is ETI Workpapers.
[90] This amount appears in ETI's response to Cities' 6-3(b), Confidential Attachment 2. Attachment 2 is not being provided as an exhibit to this testimony because of its confidential designation. Cities, however, is using the $2,513,932 total from Attachment 2 with permission of the Company.

of $2.587 million,[91] which is considerably less than the pro forma level of $4 million. The projected 2012 level of $8.9 million is higher than $4 million, but the 2012 is an estimated level and is not consistent with actual 2011 results, and, 2012 will be half-over by the time new rates go into effect. In my opinion, the actual 2011 level of about $2.7 million or the expected 2013 level of about $2.6 million would be the outside range of what the Commission would use for setting prospective rates. However, these levels, on a going forward basis, are not sufficiently known and measurable to include for ratemaking purposes. It is unknown at this point whether the move to MISO will even be approved by this or other commissions and whether the Company will continue to incur costs toward a MISO transition. Consequently, we are left with only the test year level as the level to include in rates.

Q:    HOW IS YOUR ADJUSTMENT CALCULATED?

A:    My recommendation to reduce the Company's requested level of $4 million to the actual test year level of $916,535 results in an adjustment of $3,083,462. This adjustment can be seen at Exhibit MG2.14.

---

[91] This amount appears in ETI's responses to Cities' 6-3(a)and (c), Confidential Attachment 1. Attachment 1 is not being provided as an exhibit to this testimony because of its confidential designation. Cities, however, is using the $2,587,943 total from Attachment 1 with permission of the Company.

## SECTION VI. RIVER BEND DECOMMISSIONING EXPENSE

**Q:** WHAT IS THE ISSUE REGARDING THE RIVER BEND DECOMMISSIONING EXPENSE?

**A:** In its application, the Company has included River Bend decommissioning costs in the amount of $2,019,000. This level is based on an agreement of the parties in the Company's 2009 rate case, Docket No. 37744.[92] In this case, the Company was requested to provide the annual decommissioning expense responsibility for Texas retail customers required for River Bend 70% calculated using the most current Texas Jurisdictional decommissioning fund balance and assuming the escalation rates agreed to in the settlement of Docket No. 37744. The Company was also asked to provide the most current fund balance sheet for the total fund balance, the calculation of the annual decommissioning expense, the proposed funding term, and any other assumptions supporting ETIs calculation. In response, the Company provided the annual decommissioning revenue requirement based on the Texas retail trust fund liquidation values as of December 31, 2011, the assumed nuclear cost escalation rate of 3.625% agreed to in the settlement of Docket No. 37744, and the projected trust fund earnings rates and the NRC minimum cost estimate utilized in the decommissioning revenue requirement approved in Docket No. 37744. This annual revenue requirement is $1,126,000.

---

[92] See Order signed 12/13/10 in Docket No. 37744 at paragraph 32, and ETI responses to Cities' 10-20 and 10-22.

**Q:** **WHAT IS YOUR RECOMMENDATION WITH RESPECT TO THIS ISSUE?**

**A:** Chapter 25 of the *Substantive Rules Applicable to Electric Providers* at §25.231(b)(F)(i) provides that the annual cost of decommissioning for ratemaking purposes must be determined in each rate case and expressly included in the cost of service established by the commission's order. The amount expressly established in this case should be the Company's calculated annual decommissioning revenue requirement of $1,126,000. Also, an adjustment of $893,000 to the pro forma cost of service is needed to reflect the difference between the requested level for decommissioning costs of $2,019,000 and recommended level of $1,126,000. This adjustment is included at Exhibit MG 2.12.

**Q:** **DOES THIS CONCLUDE YOUR TESTIMONY?**

**A:** Yes. It does.

Blank Page

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | |
| INC. FOR AUTHORITY TO CHANGE | § | BEFORE THE STATE OFFICE |
| RATES, RECONCILE FUEL COSTS, | § | OF |
| AND OBTAIN DEFERRED | § | ADMINISTRATIVE HEARINGS |
| ACCOUNTING TREATMENT | § | |

DIRECT TESTIMONY AND EXHIBITS

OF

DR. DENNIS W. GOINS

ON BEHALF OF

CITIES SERVED BY ENTERGY TEXAS, INC.

MARCH 27, 2012

REDACTED PUBLIC VERSION

Blank Page

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND QUALIFICATIONS .................................................................... 1

CONCLUSIONS ........................................................................................................ 4

RECOMMENDATIONS .............................................................................................. 8

WHOLESALE JURISDICTION ALLOCATION ........................................................... 10

PURCHASED POWER CAPACITY COSTS ................................................................ 13

MSS-2 COSTS ....................................................................................................... 19

STREET LIGHTING AND TRAFFIC SIGNAL RATES ................................................ 21

EXHIBITS

APPENDIX: QUALIFICATIONS

Blank Page

| APPLICATION OF ENTERGY TEXAS, INC. | § | BEFORE THE |
| FOR AUTHORITY TO CHANGE RATES, | § | STATE OFFICE OF |
| RECONCILE FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |

## DIRECT TESTIMONY OF
## DENNIS W. GOINS
## ON BEHALF OF
## CITIES

## INTRODUCTION AND QUALIFICATIONS

**Q. PLEASE STATE YOUR NAME, OCCUPATION, AND BUSINESS ADDRESS.**

A. My name is Dennis W. Goins. I operate Potomac Management Group, an economics and management consulting firm. My business address is 5801 Westchester Street, Alexandria, Virginia 22310.

**Q. PLEASE DESCRIBE YOUR EDUCATIONAL AND PROFESSIONAL BACKGROUND.**

A. I received a Ph.D. degree in economics and a Master of Economics degree from North Carolina State University. I also earned a B.A. degree with honors in economics from Wake Forest University. Following graduate school I worked as a staff economist at the North Carolina Utilities Commission (NCUC). During my tenure at the NCUC, I testified in numerous cases involving electric, gas, and telephone utilities on such issues as cost of service, rate design, intercorporate transactions, and load forecasting. While at the NCUC I also served as a member of the Ratemaking Task Force in the national Electric Utility Rate Design Study

sponsored by the Electric Power Research Institute (EPRI) and the National Association of Regulatory Utility Commissioners (NARUC).

Since leaving the NCUC, I have worked as an economic and management consultant to firms and organizations in the private and public sectors. My assignments focus primarily on market structure, policy, planning, and pricing issues involving firms that operate in energy markets. For example, I have conducted detailed analyses of product pricing, cost of service, rate design, and interutility planning, operations, and pricing issues; prepared analyses related to utility mergers, transmission access and pricing, and the emergence of competitive markets; evaluated and developed regulatory incentive mechanisms applicable to utility operations; and assisted clients in analyzing and negotiating interchange agreements and power and fuel supply contracts. I have also assisted clients on electric power market restructuring issues in Arkansas, New Jersey, New York, South Carolina, Texas, and Virginia.

I have submitted testimony and affidavits and provided technical assistance in nearly 200 proceedings before state and federal agencies as an expert in competitive market issues, regulatory policy, utility planning and operating practices, cost of service, and rate design. These agencies include the Federal Energy Regulatory Commission (FERC), the Government Accountability Office, state courts in Iowa, Montana, and West Virginia, and regulatory agencies in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Texas, Utah, Vermont, Virginia, West Virginia, Wyoming, and the District of Columbia. Additional details of my educational and professional background are presented in the Appendix.

Q. ON WHOSE BEHALF ARE YOU APPEARING IN THIS PROCEEDING?

A. I am appearing on behalf of the Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange (collectively, the Cities).

Q. WHAT ASSIGNMENT WERE YOU GIVEN WHEN YOU WERE RETAINED?

A. I was asked to undertake two primary tasks:
1. Review the application, testimony, and exhibits filed by Entergy Texas, Inc. (ETI) to adjust its base rates, reconcile fuel costs, and obtain deferred accounting. In particular, I was asked to focus on issues related to ETI's proposed treatment of demand-related production costs associated with serving wholesale customers, recovery of purchased power and transmission capacity costs, and the design of street lighting and traffic signal rates.
2. Evaluate the reasonableness of ETI's proposals, and recommend necessary changes.

Q. WHAT INFORMATION DID YOU REVIEW IN CONDUCTING YOUR EVALUATION?

A. I reviewed ETI's filing, testimony, exhibits, and responses to requests for information. I also reviewed selected testimony and Commission orders in prior ETI rate cases related to issues that I address in my testimony. I also reviewed street lighting and traffic signal rates offered by selected utilities other than ETI. Finally, I reviewed information found on web sites operated by ETI's parent company, Entergy, Inc., FERC, the Commission, and other selected state regulatory commissions.

## CONCLUSIONS

**Q.** **WHAT CONCLUSIONS HAVE YOU REACHED?**

**A.** On the basis of my review and evaluation, I have concluded the following:

1.   During the test year in this case (July 2010-June 2011), ETI provided electric service to retail customers in Texas, as well as three wholesale customers—including East Texas Electric Cooperative (ETEC)—under service agreements and rates approved by FERC.[1] ETEC—a partial requirements customer—will be ETI's only wholesale customer during the forward-looking rate year (June 2012-May 2013).

2.   Because ETI does not own sufficient capacity to serve its Texas retail and ETEC wholesale loads, it must rely on purchased capacity. The principal sources of ETI's purchased capacity resources are:

■   System capacity purchases from EOCs with surplus capacity that is billed under Service Schedule MSS-1 of the Entergy System Agreement (ESA). Because Schedule MSS-1 is designed to share the cost of system reserve capacity among the EOCs, MSS-1 transactions are referred to as Reserve Equalization.

■   Unit power purchases from EOCs under Service Schedule MSS-4 of the ESA. Several of these purchases are related to purchased power agreements arising from the JSP.[2] For

---

[1] In addition to ETI, the other regulated Entergy Operating Companies (EOCs) are Entergy Gulf States Louisiana, LLC (EGSL), Entergy Arkansas, Inc. (EAI), Entergy Louisiana (ELL), Entergy Mississippi (EMI), and Entergy New Orleans, Inc. (ENOI). ETI's and EGSL's predecessor was Entergy Gulf States, Inc. (EGSI), which was split into two vertically integrated utilities—ETI and EGSL—as a result of the Jurisdictional Separation Plan (JSP) that became effective December 31, 2007.

[2] Under the JSP, all of EGSI's transmission and distribution assets and gas-fired generating plants were assigned to ETI and EGSL on a situs basis. ETI also got an undivided 42.5-percent share in EGSI's 70-percent ownership interest in Nelson 6 and a 42-percent ownership interest in Big

example, as a result of the JSP, ETI has a life-of-unit purchased power agreement for 42.5 percent of the 70 percent of EGSL's River Bend nuclear station subject to retail regulation. ETI refers to these purchases as Legacy Affiliate Contracts. In addition, ETI makes unit power purchases from EOCs that are unrelated to the JSP. ETI refers to these affiliate purchases as Other Affiliate Contracts[3]

■ Third-party purchases from firms not affiliated with ETI or other Entergy companies—for example, ETEC. Two of the third-party contracts—the 10-year, 485-MW Carville contract and the 25-year, 225-MW purchase power agreement with Sam Rayburn Municipal Power Agency (SRMPA)—were not in place during the test year, but will be in place during the rate year.[4]

3. ETI estimated its cost of serving Wholesale customers in a jurisdictional separation study that split ETI's cost of service between the Texas Retail and the Wholesale jurisdictions. In this jurisdictional study, ETI assigned demand-related (fixed) production costs to each jurisdiction using the average and excess, 4 coincident peak (AED4CP) allocation method—the same method that ETI used in its class cost-of-service study to assign demand-related production cost responsibility to each retail customer class.

4. ETI (and its predecessors) has historically recovered purchased power capacity costs in base rates. However, in this case, ETI initially proposed recovering $276.2 million in rate year FERC Account 555 purchased power expense—including MSS-1 and

---

Cajun 2, Unit 3—two coal units in Louisiana. EGSL became the owner of EGSI's remaining generating plants—including the River Bend nuclear plant.
[3] See the direct testimony of ETI witness Robert R. Cooper (Cooper Direct) at 21:1-8 and Exhibit RRC-1 (HS). (ETI updated and revised Exhibit RRC-1 (HS) on March 16, 2012.)
[4] Ibid. at 21:10-22:14.

MSS-4 capacity payments—through a new purchased power recovery rider instead of base rates.[5] As a result of a Commission ruling following ETI's filing, recovery of ETI's purchased power capacity costs (PPCC) is restricted to base rates at present, and ETI's proposed purchased power recovery rider will not be considered in this case.

5. In this case ETI proposed adjusting test-year PPCC to reflect known and measurable changes (primarily the expiration of some test-year contracts and the commencement of two new purchase power agreements). To reflect these changes, ETI recommends setting its adjusted test-year PPCC equal to its forecast rate year PPCC ($276.2 million), which will be recovered in base rates. Including *rate-year* PPCC in base rates set using historical adjusted *test-year* billing determinants ensures overrecovery of ETI's PPCC if its load grows relative to test-year levels—that is, if rate-year billing determinants are expected to be greater than test-year billing determinants. ETI made no adjustment to its rate-year PPCC to prevent this likely overrecovery.

6. ETI has proposed a similar approach to recover transmission costs associated with payments under Service Schedule MSS-2. Specifically, ETI adjusted its test-year MSS-2 costs (approximately $1.84 million) to reflect a nearly ███████ increase in rate-year MSS-2 costs (almost ███████████). ETI's MSS-2 test-year adjustment ignores Entergy's announced divestiture/merger of its transmission assets into ITC Holdings Corp. (ITC) in 2013. In

---

[5] On March 16, 2012, ETI updated and revised Exhibit RRC-1 (HS) to reflect the impacts of recent changes in the EAI WBL contract on ETI's rate-year costs for Other Affiliate Contracts and Reserve Equalization. The updated PPCC shown in Exhibit RRC-1 (HS-revised) is $275.8 million. Because ETI has not yet updated and revised witness Cooper's direct testimony, I use the $276.2 million shown in ETI's original filing and Exhibit RRC-1 when referring to ETI's rate-year PPCC in my testimony. However, Cities recommended adjustments to ETI's rate-year PPCC that I present later include ETI's PPCC adjustments shown in Exhibit RRC-1 (HS-revised).

effect, ETI's rate-year estimate assumes that the divestiture/merger will have no effect on either the level of or method of recovering (via Schedule MSS-2 of the ESA) such costs. In addition, ETI again ignored the effects of load growth when it set rate-year MSS-2 costs as adjusted test-year MSS-2 costs recovered in base rates. That is, by ignoring load growth in setting both PPCC and MSS-2 costs that will be recovered in base rates, ETI almost certainly ensured that it will overrecover both types of costs going forward.

7. ETI's principal rate schedules for street lighting and traffic signal customers are Schedules SHL and TSS, respectively. Schedule SHL applies to lighting for public streets, roads, and thoroughfares in cities and in subdivisions with an incorporated homeowners association. Schedule SHL sets fixed monthly charges for standard and nonstandard fixture and lamps that ETI installs and maintains (Rate Groups A and C). ETI also offers a fixed kWh rate for lighting facilities that the customer owns and maintains (Rate Groups D and E). Schedule TSS is a fixed kWh rate with a monthly customer charge per delivery point applicable to customer-owned and -maintained traffic signals. Both proposed rates do not reflect the lower cost of operating and maintaining lighting facilities using energy-efficient light-emitting diode (LED) bulbs. Moreover, Schedule SHL includes a provision that penalizes a customer that replaces a high-wattage bulb with a more energy-efficient LED bulb.

## RECOMMENDATIONS

**Q. WHAT DO YOU RECOMMEND ON THE BASIS OF THESE CONCLUSIONS?**

**A.** I recommend that the Commission take the following actions regarding the major issues discussed in my testimony:

1. Reject the AED4CP method used in ETI's jurisdictional separation study to assign demand-related production costs to its Texas retail and wholesale jurisdictions. Instead, the Commission should require ETI to assign these costs to the wholesale jurisdiction using the 12 coincident peak (12CP) method to allocate demand-related production costs. This approach is consistent not only with the cost-of-service approach FERC typically uses to allocate demand-related production costs reflected in wholesale rate schedules, but also with the assignment of MSS-1 costs (as well as MSS-2 transmission costs) to ETI under the ESA. I have calculated test-year 12CP allocation factors for the Texas Retail (94.6208 percent) and Wholesale (5.3792 percent) jurisdictions, and provided them to Cities witness Karl Nalepa for inclusion in his jurisdictional separation study.

2. Reject ETI's adjusted test-year purchased power capacity costs ($276.2 million). Instead, ETI should be allowed to recover no more than approximately $241.3 million in PPCC. This approximately $35 million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

   ■ ███████ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

   ■ ███████ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract

pricing data and Cities recommended adjustment in costs related to the EAI WBL contract.[6]

■ ████████ reduction to reflect the effects of load growth on rate-year PPCC costs that ETI will recover going forward.

3. Reject ETI's adjusted test-year MSS-2 costs. ETI's unexplained ████████████████ in MSS-2 costs relative to test-year costs, plus complete uncertainty regarding the magnitude of ETI's post-2012 MSS-2 costs under Entergy's proposed divestiture/merger deal with ITC in 2013, make ETI's projected rate-year MSS-2 costs speculative at best. I recommend setting ETI's adjusted test-year MSS-2 costs no higher than ████████— or ████████████████████ This lower value reflects ETI's actual 2011 MSS-2 costs ██████ plus a ████████ to reflect the effects of load growth.

4. Require ETI to modify Schedules SHL (Rate Groups A and C) and TSS to include a minimum 25 percent reduction in monthly fixed charges applicable to street and traffic lighting fixtures that use LED technology. Energy charges in Schedule SHL (Rate Groups D and E) should also be reduced by 25 percent for LED customers. This reduction should partially reflect the lower cost of operating and maintaining energy-efficient LED fixtures. In addition, the Commission should require ETI to eliminate the $50 fee applicable to Rate Groups A and C under Schedule SHL when an existing light is replaced with a more efficient light with lower wattage (for example, an LED bulb). Eliminating this fee will remove a disincentive for customers to adopt LED fixtures as conservation measures.

---

[6] EAI WBL denotes capacity entitlements in several of EAI's baseload generating units that EAI sells at wholesale. Justification for Cities recommended EAI WBL rate-year cost adjustment is provided in the direct testimony of Cities witness Karl Nalepa.

## WHOLESALE JURISDICTION ALLOCATION

**Q. DID ETI SERVE ANY WHOLESALE CUSTOMERS DURING THE TEST YEAR?**

A. Yes. ETI provided partial requirements service to 3 wholesale customers during the test year. However, during the rate year, ETI projects that ETEC will be its only partial requirements wholesale customer.

**Q. DOES ETI OWN SUFFICIENT GENERATING CAPACITY TO SERVE ITS RETAIL AND WHOLESALE CUSTOMERS?**

A. No. ETI is a *short* EOC—that is, its owned capacity and firm purchases are insufficient to meet its capability responsibility under the ESA. As a result, ETI must rely on additional capacity purchases to meet this shortfall.

**Q. IN ITS FILING, DID ETI ESTIMATE ITS COST OF SERVING WHOLESALE CUSTOMERS?**

A. Yes. ETI conducted a jurisdictional separation study to determine its cost of serving customers in its Texas Retail and Wholesale jurisdictions. As part of this separation study, ETI used the AED4CP method to allocate demand-related production costs. ETI also used the AED4CP method to allocate demand-related production costs in its retail class cost-of-service study.

**Q. IS THE AED4CP THE MOST APPROPRIATE METHOD TO ALLOCATE THESE COSTS BETWEEN JURISDICTIONS?**

A. No. In my opinion, the 12CP allocation method would be preferable. The 12CP approach is consistent with the cost-of-service approach FERC typically uses to allocate demand-related production costs reflected in wholesale rate schedules. Moreover, the ESA uses a 12CP method to

derive each EOC's load responsibility ratio, which is then used to derive each EOC's share of monthly MSS-1 and MSS-2 charges. Finally, in reviewing monthly data reflected in ETI's rate-year PPCC shown in Exhibit RRC-1, I noticed that estimated PPCC by month are relatively stable—that is, total projected PPCC do not vary significantly by month. ETI's heavy reliance on capacity purchases to serve load (both retail and wholesale), and the relative stability of projected monthly PPCC costs imply that the 12CP method should properly split ETI's demand-related production costs between the Texas Retail and Wholesale jurisdictions.

Q.    IN DOCKET NO. 37744, DID YOU TESTIFY THAT THE AED4CP METHOD WOULD BE REASONABLE TO USE IN ETI'S JURISDICTIONAL SEPARATION STUDY?

A.    Yes. Although I recommended the 12CP method, I noted that the AED4CP method would also be reasonable to use in ETI's jurisdictional separation study. However, in this case, ETI's reliance on capacity purchases is even greater that it was during test- and rate-years that ETI used in Docket No. 37744. Moreover, in my opinion, for the reasons I cited earlier, the 12CP allocation method is preferable to the AED4CP method proposed by ETI, and should be used to assign ETI's demand-related production costs to jurisdictions.

Q.    DID YOU CALCULATE JURISDICTIONAL 12CP ALLOCATION FACTORS IN THIS CASE?

A.    Yes. I calculated test-year 12CP allocation factors for the Texas Retail and Wholesale jurisdictions. I provided the 12CP factors to Cities witness Karl Nalepa for inclusion in his jurisdictional separation study. As shown in Exhibit DWG-1 and Table 1 below, the 12CP allocation factor for the Wholesale jurisdiction is about 5.38 percent versus 4.62 percent under ETI's recommended AED4CP method.

**Table 1. Jurisdictional Separation**

| Jurisdiction | Demand-Related Production Cost Allocation Factor | |
| --- | --- | --- |
| | AED4CP | 12CP |
| TX Retail | 95.3838% | 94.6208% |
| Wholesale | 4.6162% | 5.3792% |
| Total | 100.0000% | 100.0000% |

Source: Schedule P-7.2 and Exhibit DWG-1.

Q. **WHAT LOADS DID YOU USE IN CALCULATING THE 12CP WHOLESALE ALLOCATION FACTOR THAT YOU PROVIDED WITNESS NALEPA FOR USE IN HIS JURISDICTIONAL SEPARATION ANALYSIS?**

A. I used a loss-adjusted 150 MW (ETEC's monthly billing MW) as a proxy for the 12 monthly CPs. The 150 MW is indicative of ETI's capacity obligations to ETEC, and reflects known and measurable changes compared to test-year wholesale CPs (which would include CPs for wholesale customers that ETI no longer serves).

Q. **SHOULD THE COMMISSION REQUIRE ETI TO USE THE 12CP METHOD TO ASSIGN DEMAND-RELATED PRODUCTION COSTS TO JURISDICTIONS?**

A. Yes. The 12CP method best reflects how ETI incurs demand-related production costs to serve Texas Retail and Wholesale customers.

**PURCHASED POWER CAPACITY COSTS**

Q. DOES ETI CURRENTLY HAVE ENOUGH CAPACITY RESOURCES TO SERVE ITS RETAIL AND WHOLESALE CUSTOMERS?

A. No. Under Schedule MSS-1, an EOC with fewer capacity resources than its capacity responsibility must buy capacity from other EOCs whose capacity resources exceed their capacity obligations. This capacity deficit situation is commonly referred to as a *short* position, in contrast to a *long* position involving a capacity surplus. Even with major increases in purchased capacity, ETI expects to be short more than ▮▮▮▮ during the rate year.[7]

Q. WHAT TYPES OF PURCHASES DOES ETI PLAN TO USE TO MEET THIS CAPACITY SHORTFALL?

A. ETI plans to use four principal categories of purchases:

- Schedule MSS-1 purchases (Reserve Equalization) from other EOCs with surplus capacity.
- Schedule MSS-4 purchases related to purchased power agreements arising from the JSP (Legacy Affiliate Contracts).
- Schedule MSS-4 unit power purchases unrelated to the JSP (Other Affiliate Contracts).
- Third-party purchases from companies not affiliated with ETI or other Entergy companies.

ETI witness Robert R. Cooper discusses these categories of purchases in his direct testimony, and presents rate-year estimates of ETI's purchases in each category in Exhibit RRC-1 (Highly Sensitive).

---

[7] *See* ETI's responses to Cities 2-1.d (RRC-1 Workpaper – MSS-1 111215_HSPM) and TIEC 1-17 (HS).

Q.   ARE ETI'S RATE-YEAR PPCC SIGNIFICANTLY HIGHER THAN ITS TEST-YEAR PPCC?

A.   Yes. ETI's projected rate-year PPCC ($276.2 million) exceed test-year PPCC by about ███████. My review of these costs indicates that third-party purchases are the principal driver of the increase—growing more than ███████ from ███████ to ███████.[8]

Q.   HOW HAS ETI TRADITIONALLY RECOVERED PURCHASED POWER CAPACITY COSTS?

A.   ETI has traditionally recovered these costs in base rates since the Commission's current fuel rule excludes purchased power demand or capacity costs from eligible and reconcilable fuel expenses absent a finding of special circumstances.[9]

Q.   IN THIS CASE, DID ETI INITIALLY PROPOSE TO CONTINUE RECOVERING PPCC IN BASE RATES?

A.   No. ETI proposed recovering PPCC in a purchased power recovery rider. However, the Commission issued a ruling indicating that ETI's proposed rider would not be considered in this case because of the ongoing rulemaking in Project No. 39246 to consider the issue of how PPCC should be recovered. As a result, ETI will continue to recover PPCC approved by the Commission in base rates.

Q.   WHY IS IT IMPORTANT TO ENSURE THAT THE LEVEL OF PPCC INCLUDED IN BASE RATES IS REASONABLE AND NOT SIGNIFICANTLY OVERSTATED?

A.   Purchased power capacity costs included in base rates are not subject to true-up and reconciliation. If the level of PPCC included in base rates is

---

[8] See ETI's response to Cities 2-1.a.iii-iv (including Addendum 1).
[9] PUC Subst. R. 25.236(a)(4).

significantly overstated, ratepayers will simply pay for costs that ETI never incurs. The level of PPCC included in base rates must strike a balance between giving ETI a reasonable opportunity to recover prudent capacity costs that it incurs going forward, and protecting ratepayers from giving a windfall to ETI.

**Q.  DID ETI ADJUST ITS TEST-YEAR PPCC?**

A.  Yes.  ETI recommends adjusting test-year PPCC for known and measurable changes (including the expiration of some test-year contracts and the start of two new post-test-year purchase power agreements).  To reflect these changes, ETI set adjusted test-year PPCC equal to rate-year PPCC ($276.2 million).

**Q.  DOES ETI'S ADJUSTED TEST-YEAR PPCC RAISE ANY CONCERNS?**

A.  Yes.  ETI's estimate raises two major concerns:

- ETI did not modify the level of adjusted test-year PPCC it proposes to include in base rates for the going-forward effects of load growth on PPCC recovery.  This oversight ensures that ETI will overrecover its adjusted test-year PPCC if load growth results in base rate billing determinants greater than test-year billing determinants used to set base rates in this case.

- ETI developed rate-year cost estimates for Legacy Affiliate and Other Affiliate transactions using the September 2010-August 2011 average cost per MW for each affiliate contract. More recent average cost (price proxy) data for ETI's affiliate transactions are available, and should be used to reflect known and measurable cost changes.

**Q. PLEASE EXPLAIN THE LOAD GROWTH ISSUE AND WHY IT SHOULD BE REFLECTED IN THE LEVEL OF PPCC INCLUDED IN BASE RATES IN THIS CASE.**

**A.** A simple example illustrates the problem. Assume Utility X files a rate case in which its test-year billing units and PPCC are 100 units and $500, respectively (see Table 2 below). Also assume that Utility X's projected rate-year PPCC is $1,000, which it asks the regulator to include in base rates set in the current rate case instead of $500 in test-year PPCC that Utility X actually incurred. Finally, assume the regulator allows Utility X to include rate-year PPCC in base rates instead of test-year PPCC. As a result, the level of PPCC included in base rates set in the current rate case is $10 per billing unit (that is, $1,000 in rate-year PPCC, divided by 100 test-year billing units).

Now move forward to the rate year when rates set in the rate case are in effect. Assume that Utility X was correct in the rate case—its rate-year PPCC turns out to be $1,000 exactly as it had projected. However, Utility X's rate-year billing units have grown to 200 units—not 100 units that it sold in the test year. As a result of this load growth, Utility X will recover $2,000 of PPCC during the rate year ($10 per billing unit in base rates, times 200 rate-year billing units)—or twice the level of PPCC that it actually incurs in the rate year, and twice the amount the regulator assumed would occur when approving base rates in the rate case to recover projected rate-year PPCC.

Table 2. Effect of Load Growth on PPCC Recovery

| Line | Item | Test Yr | Rate Yr | Comment |
|------|------|---------|---------|---------|
| 1 | Billing Units | 100 | 200 | |
| 2 | Actual PPCC | $500 | | |
| 3 | Projected PPCC | | $1,000 | |
| 4 | Base Rate PPCC | $1,000 | | Rate-Yr PPCC included in Base Rates |
| 5 | PPCC/Billing Unit in Base Rates | $10 | | Line 4 / 100 Test-Yr billing units |
| 6 | Actual PPCC Recovered | | $2,000 | Line 5 * 200 Rate-Yr billing units |

ETI's proposed adjusted test-year PPCC creates the same problem, because ETI is implicitly asking the Commission to ignore load growth and set base rates in this case using rate-year PPCC and test-year billing units. Using test-year billing determinants to set rates to recover ETI's rate-year PPCC guarantees that ETI will overrecover its estimated rate-year PPCC if rate-year billing units exceed test-year billing units—that is, if ETI's load grows.

Q. **DOES ETI EXPECT ITS LOAD TO GROW FROM THE TEST YEAR THROUGH THE RATE YEAR?**

A. Yes. ETI expects a steady growth in both energy sales and peak load in the next few years.[10]

Q. **HAVE YOU MODIFIED ETI'S ESTIMATED RATE-YEAR PPCC TO REFLECT YOUR CONCERNS REGARDING THE LOAD GROWTH AND AFFILIATE TRANSACTION PRICING ISSUES?**

A. Yes. I first adjusted the average cost per MW (proxy price) used to develop the rate-year cost of Legacy Affiliate and Other Affiliate (excluding EAI WBL) transactions. Specifically, I used transaction cost data from November 2010-October 2011 (instead of September 2010-August 2010 data that ETI used) to develop the transaction proxy prices

---

[10] *See* ETI's response to Cities 2-2 (HS).

and rate-year costs. Next, I adjusted ETI's rate-year estimates of costs for the EAI WBL contract and Reserve Equalization to reflect the adjustment recommended by Cities witness Karl Nalepa. Finally, I adjusted the rate-year total PPCC estimate to reflect the effects of load growth. The resulting adjusted test-year PPCC by transaction category is shown in Exhibit DWG-2.[11] As shown in this exhibit, ETI's adjusted test-year PPCC should be set no higher than $241.3 million—or $35 million less than ETI's original request. As I noted earlier, this $35 million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

- ■ ███████ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

- ■ ███████ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract pricing data and Cities recommended adjustment in costs related to the Cities recommended 50-percent reduction in adjusted test-year costs for the EAI WBL contract.

- ■ ███████ reduction to reflect the effects of load growth.

Q. **HOW DID YOU DEVELOP THE LOAD GROWTH ADJUSTMENT YOU APPLIED TO YOUR PPCC ESTIMATE?**

A. The development of my recommended ███████ load growth adjustment is presented in Exhibit DWG-3. I first reviewed forecasts of ETI's firm load (energy sales and peak demand) from 2011 through 2014. I then calculated the growth in ETI's energy sales and peak demands over different intervals (Exhibit DWG-3, page 1). On the basis of this review, I selected ███████ as a reasonable estimate of the likely growth in ETI's energy and demand billing determinants from the test year to the rate year.

---

[11] Results shown in Exhibit DWG-2 are presented in a format similar to that used by ETI's witness Robert Cooper in Exhibit RRC-1 (HS-revised).

I next estimated ETI's rate-year energy billing units, and derived an average cost per billing unit (Exhibit DWG-3, page 2) for the estimated rate-year PPCC shown in column (c) of Exhibit DWG-2. The product of this average rate-year PPCC and ETI's test-year kWh billing units equals the adjusted test-year PPCC that ETI should be allowed to include in base rates.

Q. IS YOUR RECOMMENDED $241.3 MILLION IN ADJUSTED TEST-YEAR PPCC A REASONABLE AND FAIR ESTIMATE OF COSTS THAT ETI IS LIKELY TO INCUR IN THE RATE YEAR?

A. Yes. My estimate mitigates two problems that cause ETI to overstate its rate-year PPCC—its failure to adjust rate-year projections to reflect load growth, and the use of dated transaction price proxies. In addition, my estimate reflects witness Nalepa's recommended cost adjustments related to the EAI WBL contract.

**MSS-2 COSTS**

Q. WHAT ARE MSS-2 COSTS?

A. Under the ESA's Service Schedule MSS-2, the EOCs share cost responsibility for the Entergy transmission system much like they share cost responsibility for generating resources under Service Schedule MSS-1. Each month an EOC receives a payment or bill for System transmission costs based on the EOC's level of transmission investment relative to total System transmission investments, its load responsibility ratio, and the average cost of total System investments.

Q.  WHAT LEVEL OF MSS-2 COSTS HAS ETI PROPOSED TO INCLUDE IN BASE RATES IN THIS CASE?

A.  ETI has proposed including almost ████████ of rate-year MSS-2 costs in base rates.

Q.  IS ETI'S PROPOSED LEVEL OF MSS-2 COSTS SIGNIFICANTLY GREATER THAN ITS TEST-YEAR MSS-2 COSTS?

A.  Yes. ETI's projected rate-year MSS-2 costs ████████ are more than ████████ actual test-year MSS-2 costs ($1.8 million).

Q.  DID ETI PROVIDE DETAILS REGARDING WHY ITS RATE-YEAR MSS-2 COSTS ARE EXPECTED TO GROW SO MUCH?

A.  No. ETI provided workpapers supporting its rate-year MSS-2 cost projection,[12] but did not provide details explaining the ████████ ████████████████████████████████████.

Q.  DID ETI ADJUST ITS PROJECTED RATE-YEAR MSS-2 COSTS TO REFLECT CHANGES IN BILLING AND TRANSMISSION INVESTMENTS THAT MAY ARISE WHEN THE DIVESTITURE/MERGER OF ENTERGY'S TRANSMISSION ASSETS INTO ITC IS COMPLETED IN 2013?

A.  No. ETI's MSS-2 cost projections assume business-as-usual even though Entergy will no longer be sole owner of transmission assets used to deliver power and energy to its EOCs following the proposed divestiture/merger. This calls into question the future applicability of Service Schedule MSS-2 to the EOCs, and the reasonableness of ETI's MSS-2 rate-year projection—a conclusion indirectly supported by ETI. For example, during his deposition, ETI witness Phillip May acknowledged that if the divestiture/merger takes place as planned, ETI's MSS-2 costs would be

zero.[13] In general, the pending divestiture/merger makes ETI's MSS-2 cost projections problematic.

**Q. IS THERE AN ADDITIONAL PROBLEM WITH ETI'S ADJUSTED TEST-YEAR MSS-2 COSTS?**

A. Yes. Including ETI's MSS-2 rate-year costs in base rates creates the same problem that I discussed with respect to ETI's rate-year PPCC. Specifically, using base rates that reflect test-year billing determinants to recover projected rate-year MSS-2 costs guarantees overrecovery if rate-year billing units exceed test-year billing units—that is, if ETI's load grows.

**Q. HOW SHOULD ETI'S RATE-YEAR MSS-2 COSTS BE ADJUSTED TO ADDRESS THESE ISSUES?**

A. I recommend a 2-step approach:

- Because of the pending divestiture/merger of Entergy's transmission assets, limit MSS-2 costs included in base rates to no more than actual MSS-2 costs incurred in the most recent 12 months. This modification also addresses the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ of ETI's MSS-2 costs.

- Adjust the modified post-test year MSS-2 cost estimate for load growth in a manner similar to the approach I used in adjusting rate-year purchased power capacity costs.

---

[12] *See* ETI's response to Cities 5-3.a.
[13] *See* the transcript of the March 6, 2012, deposition of ETI witness Phillip R. May at 43:10.

Q. HAVE YOU DEVELOPED AN ADJUSTED TEST-YEAR ESTIMATE OF MSS-2 COSTS THAT SHOULD BE INCLUDED IN BASE RATES?

A. Yes. As shown in Exhibit DWG-4, the level of adjusted test-year MSS-2 costs included in base rates should not exceed $4.1 million. This value reflects ETI's actual annual MSS-2 costs through December 2011, and a load growth adjustment.

## STREET LIGHTING AND
## TRAFFIC SIGNAL RATES

Q. DID YOU REVIEW ETI'S STREET LIGHTING AND TRAFFIC SIGNAL RATES?

A. Yes. ETI's principal rate schedule for street lighting customers is Schedule SHL, while Schedule TSS is the principal rate schedule for ETI's traffic lighting customers that own and maintain their lighting facilities.

Q. IS SERVICE UNDER SCHEDULE SHL UNIFORM FOR ALL STREET LIGHTING CUSTOMERS?

A. No. The rate includes four categories of service (Rate Groups A, C, D, and E). Rate Group A includes ETI's standard fixture and lamps mounted on existing standard wood poles that ETI installs and maintains. If a customer wants nonstandard lighting facilities (those not provided in Rate Group A), the customer is assigned to Rate Group C and required to prepay ETI for the incremental cost of the nonstandard facilities. Lighting facilities that are customer-owned and customer–maintained are assigned to Rate Group D, while incidental lighting services (for example, underpass lighting) are assigned to Rate Group E.

Q. DO CHARGES VARY BY CATEGORY OF SERVICE IN SCHEDULE SHL?

A. Yes. Customers in Rate Groups A and C pay a fixed monthly charge per lighting fixture, while customers in Rate Groups D and E pay a fixed (and identical) energy charge per kWh. Each customer's monthly bill also includes charges for ETI's fixed fuel factor (Schedule FF) and applicable riders applied to monthly kWh per fixture.

Q. WHAT TYPES OF CHARGES ARE APPLICABLE UNDER SCHEDULE TSS?

A. Traffic signal customers pay a fixed monthly charge ($3.20 proposed) per point of delivery, plus a fixed kWh rate and all applicable rider charges.

Q. DO ETI'S LIGHTING RATES INCORPORATE ANY SPECIAL SERVICE OR PRICING PROVISIONS FOR NEW ENERGY-EFFICIENT LIGHTING TECHNOLOGIES—FOR EXAMPLE, LED FIXTURES?

A. No. The basic structure and pricing provisions of the SHL and TSS rates have been in place for years. The rates were designed for lighting fixtures that use older, less energy-efficient bulb technology.

Q. DID ETI CONDUCT A DETAILED COST ANALYSIS IN DEVELOPING PROPOSED CHARGES FOR STREET LIGHTING AND TRAFFIC SIGNAL CUSTOMERS?

A. I have seen no evidence that ETI conducted such an analysis. Moreover, in this case, ETI did not conduct any analyses to estimate the cost differential of serving street lighting and traffic signal customers that use energy-efficient LED fixtures.

Q. HOW DID ETI ADJUST PROPOSED PRICES IN ITS LIGHTING RATES IN THIS CASE?

A. ETI applied a uniform percentage increase to the kWh and fixed charges in Schedule SHL. In Schedule TSS, ETI left the fixed monthly charge per delivery point unchanged, but reduced the kWh charge to reflect its proposal to recover PPCC through a rider. (This latter change will be reversed to reflect the Commission's ruling in this case regarding recovery of PPCC in base rates.)

Q. WHY ARE LED FIXTURES AN ATTRACTIVE LIGHTING OPTION FOR MUNICIPALITIES?

A. The cost of street and traffic lighting services can be significant for many cities and towns. As government agencies face increasing pressure to control budgets, municipalities are increasingly looking at energy-efficient lighting options such as LED fixtures to provide an ongoing, long-term reduction in operating costs. LED fixtures use significantly less energy than incandescent and most other lighting options, last longer, and may require less maintenance (for example, fewer bulb replacements).

Q. HAVE ANY OF THE CITIES ADOPTED LED LIGHTING AS A WAY TO REDUCE THEIR OPERATING COSTS?

A. Yes. Counsel has informed me that at least one of the Cities has an ongoing program to replace incandescent fixtures with LED options, and several others are actively considering moving to LED lighting.

Q. WOULD WIDESPREAD ADOPTION OF LED LIGHTING RATES HELP REDUCE ENERGY CONSUMPTION IN TEXAS?

A. Yes. Such rates would encourage municipalities to adopt energy-efficient LED options, and help offset the high front-end cost of LED lights.

**Q.** **HAVE MOST UTILITIES IMPLEMENTED LIGHTING RATES THAT REFLECT THE LOWER COST OF OPERATING LED FIXTURES?**

**A.** No. I reviewed street lighting and traffic signal rates offered by a number of utilities. Although some of them have implemented LED rates, most utilities have not updated their rates to reflect the lower operating and maintenance cost of serving energy-efficient LED fixtures.

**Q.** **DOES ANY UTILITY IN TEXAS HAVE AN LED LIGHTING OPTION?**

**A.** Yes. In 2010 the Commission approved a street and traffic signal rate for El Paso Electric (Docket No. 37690) that included separate charges for LED traffic signals. (*See* Exhibit DWG-5.) The fixed monthly rate for LED signals is generally less than one-third the comparable rate for incandescent signals.

**Q.** **SHOULD THE COMMISSION REQUIRE ETI TO INCLUDE AN LED OPTION IN ITS SHL AND TSS RATES?**

**A.** Yes. ETI should offer an LED option in these rates to encourage energy efficiency investments and promote conservation. To facilitate these goals, the Commission should require ETI to modify monthly fixed charges in Schedule SHL (Rate Groups A and C) and TSS to reflect a 25-percent discount for LED installations. The discounted Rate Group A fixed charges (if applicable) in Schedule SHL should be applied according to the estimated monthly kWh consumption of the installed LED fixture. In addition, I recommended reducing by 25 percent the Schedule SHL kWh charges applicable to LED customers assigned to Rate Groups D and E to reflect the lower cost of operating and maintaining LED fixtures. In the future, ETI should be required to provide detailed information

regarding differences in the cost of serving LED and non-LED lighting customers.

Q.  **HAVE YOU IDENTIFIED ANY OTHER CHANGES THAT SHOULD BE MADE IN ETI'S PROPOSED LIGHTING RATES?**

A.  Yes. The Commission should require ETI to eliminate the service condition applicable to Rate Groups A and C in Schedule SHL that charges a $50 fee for any replacement of a functioning light with a lower-wattage bulb. This fee actively discourages customers from adopting more energy-efficient lighting technologies (for example, LED devices), and is not supported in ETI's filing. The Commission should get rid of this barrier to conservation and efficiency improvements.

Q.  **DOES THIS COMPLETE YOUR DIRECT TESTIMONY?**

A.  Yes.

## Jurisdictional Separation: Demand-Related Production Costs - 12CP

| Class of Service | 12CP kW at Plant | 12CP Factor |
|---|---|---|
| (a) | (b) | (c) |
| Residential | 1,240,632 | 43.4768% |
| Small General Service | 57,554 | 2.0169% |
| General Service | 531,108 | 18.6122% |
| Large General Service | 212,129 | 7.4339% |
| Large Industrial Power Service | 654,652 | 22.9417% |
| Roadway Lighting | 1,633 | 0.0572% |
| Non-Roadway Lighting | 2,345 | 0.0822% |
| Total Texas Retail | 2,700,053 | 94.6208% |
| | | |
| Wholesale For Resale | 153,498 | 5.3792% |
| Wheeling | 0 | 0.0000% |
| Total Texas Wholesale | 153,498 | 5.3792% |
| | | |
| Total ETI | 2,853,551 | 100.0000% |

Source: Schedule P-7.2, pages 21-22, and ETI's response to TIEC 1-38 Highly Sensitive.

Blank Page

**Exhibit DWG-2**
**Redacted**

**Highly Sensitive**

Blank Page

**Exhibit DWG-3**
**Redacted**

**Highly Sensitive**

Blank Page

**Exhibit DWG-4**
**Redacted**

**Highly Sensitive**

Blank Page

EL PASO ELECTRIC'S SCHEDULE NO. 08 – GOVERNMENT STREET
LIGHTING AND SIGNAL SERVICE RATE

Blank Page

# EL PASO ELECTRIC COMPANY

## SCHEDULE NO. 08
## GOVERNMENTAL STREET LIGHTING
## AND SIGNAL SERVICE RATE

## APPLICABILITY

This rate is available to any village, town, city, county, state of Texas and Federal facilities for Mercury Vapor and High Pressure Sodium Vapor street light, freeway lighting and for traffic signal lights.

## TERRITORY

Texas Service Area

## MONTHLY RATE

Street Lights

### MERCURY VAPOR – OVERHEAD SYSTEM – COMPANY OWNED
### 35 FOOT MOUNTING HEIGHT – WOOD POLE *

|  | Total Wattage | Per Lamp Charge |
| --- | --- | --- |
| 175W - 7,000 Lumen Single | 195 | $15.22 |
| 250W - 11,000 Lumen Single | 275 | $18.26 |
| 400W - 20,000 Lumen Single | 460 | $21.66 |
| 400W - 20,000 Lumen Double | 920 | $35.19 |

### HIGH PRESSURE SODIUM VAPOR – DOWNTOWN EL PASO AREA – COMPANY
### OWNED STEEL BASE STANDARD AND LUMINAIRE

|  | Total Wattage | Per Lamp Charge |
| --- | --- | --- |
| 1,000W - 119,500 Lumen Overhead System | 1,102 | $54.81 |
| 1,000W - 119,500 Lumen Underground System | 1,102 | $89.45 |

### HIGH PRESSURE SODIUM VAPOR – DOWNTOWN EL PASO AREA – COMPANY
### OWNED STEEL BASE STANDARD AND LUMINAIRE

|  | Total Wattage | Per Lamp Charge |
| --- | --- | --- |
| 450W - 50,000 Lumen Overhead System | 485 | $47.87 |

\* Refer to Mercury Vapor Closed to New Installations and Conversion/Replacement of Existing Installations section of the tariff.

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED

JUL 30 '10   DOCKET   37690

CONTROL #_____

Section Number_____1_____     Revision Number_____20_____
Sheet Number_____7_____       Effective for consumption on or
Page_____1 of 8_____          after July 1, 2010

# EL PASO ELECTRIC COMPANY

## SCHEDULE NO. 08
## GOVERNMENTAL STREET LIGHTING
## AND SIGNAL SERVICE RATE

### MERCURY VAPOR – OVERHEAD SYSTEM – COMPANY OWNED
### 30 FOOT MOUNTING HEIGHT – STEEL POLE *

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 400W - 20,000 Lumen Single | 460 | $33.46 |
| 400W - 20,000 Lumen Double | 920 | $46.99 |

### MERCURY VAPOR – NON-COMPANY OWNED SYSTEMS
### INTERSTATE OR FREEWAY LIGHTING *

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 250W - 11,000 Lumen – Wall Mounted | 292 | $8.78 |
| 400W - 20,000 Lumen – 40 Foot Maximum Mounting Height | 460 | $12.08 |
| 1,000W - 60,000 Lumen – 50 Foot Maximum Mounting Height | 1,102 | $31.67 |

### MERCURY VAPOR – NON-COMPANY OWNED – WOOD POLE
### UNDERGROUND OR OVERHEAD RESIDENTIAL SERVICE *

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 175W - 7,000 Lumen – 35 Foot Maximum Mounting Height | 195 | $6.68 |

\* Refer to Mercury Vapor Closed to New Installations and Conversion/Replacement of Existing Installations section of the tariff.

### HIGH PRESSURE SODIUM VAPOR - NON-COMPANY OWNED SYSTEMS
### INTERSTATE OR FREEWAY LIGHTING

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 150W - 16,000 Lumen – Wall Mounted | 193 | $7.00 |
| 250W - 23,200 Lumen – Wall Mounted | 313 | $9.42 |
| 250W - 23,200 Lumen – 40 Foot Maximum Mounting Height | 313 | $9.42 |
| 400W - 50,000 Lumen – 50 Foot Maximum Mounting Height | 485 | $12.95 |
| 400W - 50,000 Lumen – Tower Structure 150 Foot-Climbing Maximum Mounting Height<br>10 Luminaires per Tower<br>Rate per fixture | 485 | $13.67 |

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED

JUL 30 '10   DOCKET   37690

CONTROL #_____

Section Number_____1_____      Revision Number_____20_____
Sheet Number_____7_____       Effective for consumption on or
Page_____2 of 8_____          after July 1, 2010

# EL PASO ELECTRIC COMPANY

## SCHEDULE NO. 08
## GOVERNMENTAL STREET LIGHTING
## AND SIGNAL SERVICE RATE

| | | |
|---|---|---|
| 400W - 50,000 Lumen – Tower Structure 150 Foot-Lowering Maximum Mounting Height<br>10 Luminaires per Tower<br>Rate per fixture | 485 | $12.79 |
| 116W – Obstruction Lights Incandescent  40 Foot Maximum Mounting Height | 116 | $4.47 |
| 116W – 150 Foot Tower | 116 | $5.35 |

### HIGH PRESSURE SODIUM VAPOR – NON-COMPANY OWNED SYSTEMS
### LARGE ARTERIAL LIGHTING

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 150W – 16,000 Lumen Wall Mounted | 193 | $7.11 |
| 250W – 23,200 Lumen Wall Mounted | 313 | $10.24 |
| 250W – 23,200 Lumen 40 FT Maximum Mounting Height | 313 | $10.24 |
| 400W –  50,000 Lumen 50 FT Maximum Mounting Height | 485 | $14.73 |

### HIGH PRESSURE SODIUM VAPOR - NON-COMPANY OWNED
### WOOD/STEEL POLE UG OR OH STANDARD RESIDENTIAL SERVICE

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 100W - 8,500 Lumen – 30 Foot Maximum Mounting Height | 124 | $5.32 |
| 150W - 14,400 Lumen – 30 Foot Maximum Mounting Height | 193 | $6.21 |
| 250W - 23,200 Lumen – 30 Foot Maximum Mounting Height | 313 | $9.59 |

### HIGH PRESSURE SODIUM VAPOR - OVERHEAD - NON-COMPANY OWNED
### FIXTURE – COMPANY OWNED EXISTING WOOD POLE
### (DISTRIBUTION OR STREET LIGHT CF or D)

| | Total Wattage | Per Lamp Charge |
|---|---|---|
| 100W - 8,500 Lumen – 35 Foot Maximum Mounting Height | 124 | $7.43 |
| 150W - 14,400 Lumen – 35 Foot Maximum Mounting Height | 193 | $8.99 |
| 250W - 23,200 Lumen – 35 Foot Maximum Mounting Height | 313 | $11.41 |
| 250W - 23,200 Lumen – Double 35 Foot Maximum Mounting Height | 626 | $18.65 |
| 450W - 50,000 Lumen – 50 Foot Maximum Mounting Height | 485 | $14.06 |

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED

JUL 3 0 '10      DOCKET      37690

| | | |
|---|---|---|
| Section Number        1 | Revision Number   CONTROL # |
| Sheet Number        7 | Effective for consumption on or |
| Page        3 of 8 | after July 1, 2010 |

## EL PASO ELECTRIC COMPANY

### SCHEDULE NO. 08
### GOVERNMENTAL STREET LIGHTING
### AND SIGNAL SERVICE RATE

#### OVERHEAD SYSTEM - HIGH PRESSURE SODIUM VAPOR
#### COMPANY OWNED - WOOD POLE

|  | Total Wattage | Per Lamp Charge |
|---|---|---|
| 100W - 8,500 Lumen – 35 Foot Maximum Mounting Height | 124 | $15.20 |
| 150W - 14,400 Lumen – 35 Foot Maximum Mounting Height | 193 | $16.49 |
| 250W - 23,200 Lumen – 35 Foot Maximum Mounting Height | 313 | $19.18 |
| 400W - 50,000 Lumen – 50 Foot Maximum Mounting Height | 485 | $27.02 |

#### ORNAMENTAL HIGH PRESSURE SODIUM VAPOR -
#### NON-COMPANY OWNED, OPERATED AND MAINTAINED

|  | Total Wattage | Per Lamp Charge |
|---|---|---|
| 70W - 5,300 Lumen | 82 | $1.67 |
| 150W - 14,400 Lumen | 193 | $3.04 |
| 175W - 14,400 Lumen | 210 | $6.65 |
| 250W - 16,000 Lumen | 295 | $3.94 |

#### HIGH PRESSURE SODIUM VAPOR –
#### ROADWAY ILLUMINATION – NON COMPANY OWNED

|  | Total Wattage | Per Lamp Charge |
|---|---|---|
| 100W - HPS | 124 | $2.04 |
| 150W – HPS | 193 | $5.02 |
| 250W – HPS | 313 | $5.08 |
| 400W - HPS | 485 | $13.48 |

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED

JUL 30 '10   DOCKET   37690

CONTROL #_____

### MONTHLY RATE

Traffic Signal Lights

#### INCANDESCENT TRAFFIC SIGNALS

| Type of Unit | Type and Hours Of Operation | Wattage of Incandescent Lamp | Monthly Rate Per Unit |
|---|---|---|---|
| 3 Lamp Head | 24 Hours | 61 | $1.24 |
| 4 Lamp Head | 24 Hours | 61 | $1.24 |

---

| | | | |
|---|---|---|---|
| Section Number | 1 | Revision Number | 20 |
| Sheet Number | 7 | Effective for consumption on or | |
| Page | 4 of 8 | after July 1, 2010 | |

# EL PASO ELECTRIC COMPANY

## SCHEDULE NO. 08
## GOVERNMENTAL STREET LIGHTING
## AND SIGNAL SERVICE RATE

| | | | |
|---|---|---|---|
| 3 Lamp Head | 24 Hours | 103 | $2.09 |
| 3 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 103 | $2.09 |
| 5 Lamp Head | 24 Hours | 133 | $2.72 |
| 4 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 103 | $2.09 |
| 3 Lamp Head | 24 Hours | 133 | $2.72 |
| 3 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 133 | $2.72 |
| 4 Lamp Head | 24 Hours | 133 | $2.72 |
| 4 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 133 | $2.72 |
| 2 Unit Walk Light | 24 Hours | 61 | $1.24 |
| 2 Unit Walk Light | 24 Hours | 103 | $2.09 |
| 2 Unit Walk Light | 18 Hours Normal, 6 Hours Flashing | 103 | $2.09 |
| 1 Unit Flashing | 24 Hours | 103 | $2.09 |
| 1 Unit Flashing | 24 Hours | 133 | $2.72 |
| 2 Unit Flashing | 24 Hours | 103 | $2.09 |
| 2 Unit School Flashers | 351 Annual Burning Hours | 103 | $2.09 |
| 2 Unit School Flashers | 790 Annual Burning Hours | 133 | $2.72 |
| 30 Watt Controller | 24 Hours | 30 | $0.61 |
| 100 Watt Controller | 24 Hours | 100 | $2.60 |

## LIGHT-EMITTING DIODE ("LED") TRAFFIC SIGNALS

| Type of Unit | Type and Hours Of Operation | Wattage of High-Efficiency LED Lamp | Monthly Rate Per Unit |
|---|---|---|---|
| 3 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 14 | $0.34 |
| 5 Lamp Head | 24 Hours | 14 | $0.69 |
| 4 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 14 | $0.69 |
| 3 Lamp Head | 24 Hours | 14 | $0.35 |
| 3 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 14 | $0.34 |
| 4 Lamp Head | 24 Hours | 14 | $0.69 |
| 4 Lamp Head | 18 Hours Normal, 6 Hours Flashing | 14 | $0.69 |
| 2 Unit Walk Light | 24 Hours | 9 | $0.23 |
| 2 Unit Walk Light | 18 Hours Normal, 6 Hours Flashing | 9 | $0.23 |
| 1 Unit Flashing | 24 Hours | 14 | $0.18 |
| 2 Unit Flashing | 24 Hours | 14 | $0.35 |
| 2 Unit School Flashers | 351 Annual Burning Hours | 14 | $0.28 |
| 2 Unit School Flashers | 790 Annual Burning Hours | 14 | $0.28 |
| 4 Unit School Flashers | 351 Annual Burning Hours | 14 | $0.69 |
| 4 Unit School Flashers | 790 Annual Burning Hours | 14 | $0.69 |

PUBLIC UTILITY COMMISSION   JUL 30 '10   DOCKET 37690   CONTROL #

---

Section Number _____1_____        Revision Number _____20_____
Sheet Number _____7_____          Effective for consumption on or
Page _____5 of 8_____             after July 1, 2010

## EL PASO ELECTRIC COMPANY

### SCHEDULE NO. 08
### GOVERNMENTAL STREET LIGHTING
### AND SIGNAL SERVICE RATE

PUBLIC UTILITY COMMISSION OF TEXA
APPROVED

JUL 3 0 '10   DOCKET   37690

CONTROL #

## MONTHLY RATE PER UNIT

Street lights and traffic signal lights that do not operate under any of the preceding conditions will be billed under the rate with the closest operating conditions.

## MERCURY VAPOR CLOSED TO NEW INSTALLATIONS AND CONVERSION/REPLACEMENT OF EXISTING INSTALLATIONS

Mercury Vapor lamp categories are closed to new installations. The Company will continue to maintain existing Mercury Vapor installations and will, at the Company's option, install High Pressure Sodium Vapor ballasts in place of defective non-repairable Mercury Vapor ballasts. Customers with existing fixtures which are defective and must be replaced will have the option to convert its service to high pressure sodium vapor lamps or may cancel service at no cost.

### Mercury Vapor Fixture Replacement Schedule

For Company owned lights, when existing mercury vapor fixtures require replacement, the Company will make such replacements with comparable high pressure sodium vapor lighting at no cost, as specified below:

### Mercury Vapor – Overhead System – Company Owned, 35 Foot Mounting Height – Wood Pole

| Existing Mercury Vapor Lighting: | | | High Pressure Sodium Vapor Replacement: | | |
|---|---|---|---|---|---|
| Wattage | Lumens | kWh | Wattage | Lumens | kWh |
| 195 | 7,000 | 70 | 124 | 8,500 | 44 |
| 275 | 11,000 | 98 | 193 | 14,400 | 69 |
| 460 | 20,000 | 164 | 313 | 23,200 | 112 |
| 920 | 20,000D | 328 | 313* | 23,200 | 112 |

### Mercury Vapor – Overhead System – Company Owned, 30 Foot Mounting Height – Steel Pole

| Existing Mercury Vapor Lighting: | | | High Pressure Sodium Vapor Replacement: | | |
|---|---|---|---|---|---|
| Wattage | Lumens | kWh | Wattage | Lumens | kWh |
| 460 | 20,000 | 164 | 313 | 23,200 | 112 |
| 920 | 20,000D | 328 | 313* | 23,200 | 112 |

*D=Double – Mercury Vapor with double lamps on a single pole will be converted to two separate poles with a Single High Pressure Sodium Vapor lamp each.

For Non-Company owned lights, upon the request of the Customer, the Company will convert or replace facilities with the high pressure sodium vapor lighting options listed below, at an amount equal to all applicable costs of such conversion or replacement.

---

Section Number _____ 1 _____   Revision Number _____ 20 _____
Sheet Number _____ 7 _____   Effective for consumption on or _____
Page _____ 6 of 8 _____   after July 1, 2010

# EL PASO ELECTRIC COMPANY

## SCHEDULE NO. 08
## GOVERNMENTAL STREET LIGHTING
## AND SIGNAL SERVICE RATE

### Mercury Vapor – Non-Company Owned Systems – Interstate or Freeway Lighting

| Existing Mercury Vapor Lighting: | | | High Pressure Sodium Vapor Replacement: | | |
|---|---|---|---|---|---|
| Wattage | Lumens | kWh | Wattage | Lumens | kWh |
| 292 | 11,000 | 104 | 193 | 16,000 | 69 |
| 460 | 20,000 | 164 | 313 | 23,200 | 112 |
| 1102 | 60,000 | 393 | 485 | 45,000 | 173 |

### Mercury Vapor – Non-Company Owned – Wood Pole, Underground or Overhead Residential Service

| Existing Mercury Vapor Lighting: | | | High Pressure Sodium Vapor Replacement: | | |
|---|---|---|---|---|---|
| Wattage | Lumens | kWh | Wattage | Lumens | kWh |
| 195 | 7,000 | 70 | 124 | 8,500 | 44 |

At the time of the replacement, the Customer will be billed at the applicable rate charge and associated kWh usage for the high pressure sodium vapor replacement lighting.

Mercury Vapor Fixture Conversion Or Replacement Of Existing Facilities

Upon the request of the Customer, the Company will convert or replace existing Company owned mercury vapor lighting to applicable Company offered street lighting options other than those indicated above.

Upon the request of and payment by the Customer, the Company will convert existing Company owned facilities (size or type of luminaire) to a different applicable Company offered size or type of luminaire at an amount equal to all applicable costs less the salvage value of the existing facilities.

Upon the request of and payment by the Customer, the Company will replace existing Company owned lighting facilities at an amount equal to all applicable costs less the salvage value of the existing facilities. Installation of new facilities requested by the Customer will be performed pursuant to the applicable Schedule and lamp category described above.

## FIXED FUEL FACTOR

The above rates are subject to the provisions of the Company's Tariff Schedule No. 98 entitled Fixed Fuel Factor.

## ENERGY EFFICIENCY COST RECOVERY FACTOR

The above rates are subject to the provisions of the Company's Tariff Schedule No. 97, entitled Energy Efficiency Cost Recovery Factor.

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED
JUL 30 '10    DOCKET 37690
CONTROL #

| | | | |
|---|---|---|---|
| Section Number | 1 | Revision Number | 20 |
| Sheet Number | 7 | Effective for consumption on or | |
| Page | 7 of 8 | after July 1, 2010 | |

## EL PASO ELECTRIC COMPANY

### SCHEDULE NO. 08
### GOVERNMENTAL STREET LIGHTING
### AND SIGNAL SERVICE RATE

**MILITARY BASE DISCOUNT RECOVERY FACTOR**

The above rates are subject to the provisions of the Company's Tariff Schedule No. 96, entitled Military Base Discount Recovery Factor.

**TERMS OF PAYMENT**

The due date of the bill for utility service shall not be less than sixteen (16) days after issuance. A bill becomes delinquent if not received at the Company by the due date.

**TERMS AND CONDITIONS**

The Company's Rules and Regulations apply to service under this rate schedule.

Specific terms are as covered in various written agreements.

PUBLIC UTILITY COMMISSION OF TEXAS
APPROVED

JUL 3 0 '10    DOCKET    37690

CONTROL #_____

| | | | |
|---|---|---|---|
| Section Number | 1 | Revision Number | 20 |
| Sheet Number | 7 | Effective for consumption on or | |
| Page | 8 of 8 | after July 1, 2010 | |

**APPENDIX**


**QUALIFICATIONS OF**

**DENNIS W. GOINS**

Blank Page

# DENNIS W. GOINS

## PRESENT POSITION

Economic Consultant, Potomac Management Group, Alexandria, VA

## PREVIOUS POSITIONS

- Vice President, Hagler, Bailly & Company, Washington, DC
- Principal, Resource Consulting Group, Inc., Cambridge, MA
- Senior Associate, Resource Planning Associates, Inc., Cambridge, MA
- Economist, North Carolina Utilities Commission, Raleigh, NC

## EDUCATION

| College | Major | Degree |
|---|---|---|
| Wake Forest University | Economics | BA |
| North Carolina State University | Economics | ME |
| North Carolina State University | Economics | PhD |

## RELEVANT EXPERIENCE

Dr. Goins specializes in pricing, planning, and market structure issues affecting firms that buy and sell products in electricity and natural gas markets. He has extensive experience in evaluating competitive market conditions, analyzing power and fuel requirements, prices, market operations, and transactions, developing product pricing strategies, setting rates for energy-related products and services, and negotiating power supply and natural gas contracts for private and public entities. He has participated in more than 150 cases as an expert on competitive market issues, utility restructuring, power market planning and operations, utility mergers, rate design, cost of service, and management prudence before the Federal Energy Regulatory Commission, the General Accounting Office (now the Government Accountability Office), the First Judicial District Court of Montana, the Circuit Court of Kanawha County, West Virginia, the Linn County District Court of Iowa, and regulatory commissions in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Texas, Utah, Vermont, Virginia, West Virginia, Wyoming, and the District of Columbia. He has also prepared an expert report on behalf of the

1

# Dennis W. Goins

United States regarding pricing and contract issues in a case before the United States Court of Federal Claims.

## PARTICIPATION IN REGULATORY, ADMINISTRATIVE, AND COURT PROCEEDINGS

1. Potomac Electric Power Company, before the Maryland Public Service Commission, Case No. 9286 (2012), on behalf of the General Services Administration, re retail cost recovery.

2. Indiana Michigan Power Company, before the Indiana Utility Regulatory Commission, Cause No. 44075 (2012), on behalf of Steel Dynamics, Inc., re retail cost-of-service and fuel and purchased power cost recovery.

3. Entergy Texas, Inc., before the Public Utilities Commission of Texas, PUC Docket No. 39896 (2012), on behalf of Texas Cities, re cost of service and retail rate design.

4. Potomac Electric Power Company, before the District of Columbia Public Service Commission, Formal Case No. 1087 (2012), on behalf of the General Services Administration, re retail cost recovery.

5. Dominion North Carolina Power, before the North Carolina Utilities Commission, Docket No. E-22, Sub 474 (2011), on behalf of Nucor Steel-Hertford, re fuel rate adjustments.

6. Mid-Kansas Electric Company, before the Kansas Corporation Commission, Docket No. 11-GIME-597-GIE (2011),on behalf of Kansas Electric Power Cooperative, Inc., re local delivery service and operating agreements.

7. Duke Energy Corporation *et al.*, before the Federal Energy Regulatory Commission, Docket No. EC11-60-000 (2011), on behalf of the North Carolina Electric Membership Corporation, re merger-related market power issues.

8. Resale Power Group of Iowa *et al.*, before the Linn County District Court of Iowa, Case No. LACV 054271 (2011), on behalf of Central Iowa Power Cooperative, re compensation for unauthorized transmission access.

9. Columbus Southern Power Company *et al.*, before the Public Utilities Commission of Ohio, Case No. 11-346-EL-SSO *et al.*, (2011), on behalf of the OMA Energy Group., re standard service offer electric security plan rate design issues.

# Dennis W. Goins

10. Appalachian Power Company and Wheeling Power Company, dba American Electric Power, before the Public Service Commission of West Virginia, Case No. 11-0274-E-GI (2011), on behalf of Steel of West Virginia, Inc., re expanded net energy cost rate issues.

11. Rocky Mountain Power Company, before the Wyoming Public Service Commission, Docket No. 20000-384-ER-10 (2011), on behalf of Cimarex Energy Company, QEP Field Services Company, and Kinder Morgan Interstate Gas Transmission, re utility rates, cost-of-service, and resource acquisition issues.

12. Duke Energy Indiana, Inc., before the Indiana Utility Regulatory Commission, Cause No. 43955 (2011), on behalf of Nucor Steel and Steel Dynamics, Inc., re utility-sponsored energy efficiency programs.

13. Kansas City Power & Light Company, before the Missouri Public Service Commission, Case No. ER-2010-0355 (2010), on behalf of the U.S. Department of Energy (Federal Executive Agencies), re cost-of-service and rate design issues.

14. Appalachian Power Company and Wheeling Power Company, dba American Electric Power, before the Public Service Commission of West Virginia, Case No. 10-0699-E-42T (2010), on behalf of Steel of West Virginia, Inc., re cost-of-service and rate design issues.

15. Entergy Arkansas, Inc., before the Arkansas Public Service Commission, Docket No. 10-010-U (2010), on behalf of Arkansas Electric Energy Consumers, Inc., re industrial opt out of utility-sponsored energy efficiency programs.

16. Indiana Michigan Power Company, before the Indiana Utility Regulatory Commission, Cause No. 38702 – FAC 62-S1 (2010), on behalf of Steel Dynamics, Inc., re fuel and purchased power cost recovery.

17. Dominion North Carolina Power, before the North Carolina Utilities Commission, Docket No. E-22, Sub 459 (2010), on behalf of Nucor Steel-Hertford, re cost of service and retail rate design.

18. Dominion North Carolina Power, before the North Carolina Utilities Commission, Docket No. E-22, Sub 461 (2010), on behalf of Nucor Steel-Hertford, re fuel rate adjustments.

19. Entergy Texas, Inc., before the Public Utilities Commission of Texas, PUC Docket No. 37744 (2010), on behalf of Texas Cities, re cost of service and retail rate design.

20. Kentucky Utilities, Inc., before the Kentucky Public Service Commission, Case No. 2009-00548 (2010), on behalf of the Kentucky Industrial Utility Customers, re interruptible rates.

# Dennis W. Goins

21. Louisville Gas and Electric Company, Inc., before the Kentucky Public Service Commission, Case No. 2009-00549 (2010), on behalf of the Kentucky Industrial Utility Customers, re interruptible rates.

22. Ohio Edison *et al.*, before the Public Utilities Commission of Ohio, Case No. 09-1948-EL-POR *et al.*, (2010), on behalf of Nucor Steel Marion, Inc., re energy efficiency and peak demand reduction portfolios.

23. Kauai Island Utility Cooperative, before the Hawaii Public Utilities Commission, Docket No. 2009-0050 (2010), on behalf of Kauai Marriott Resort & Beach Club, re retail cost allocation and rate design issues.

24. Entergy Arkansas, Inc., before the Arkansas Public Service Commission, Docket No. 09-024-U (2009), on behalf of Arkansas Electric Energy Consumers, Inc., re power plant environmental retrofit.

25. Appalachian Power Company, before the Virginia State Corporation Commission, Case No. PUE-2009-00030 (2009), on behalf of Steel Dynamics, Inc., re retail cost allocation and rate design issues.

26. Ohio Edison *et al.*, before the Public Utilities Commission of Ohio, Case No. 09-906-EL-SSO (2009), on behalf of Nucor Steel Marion, Inc., re market rate offer.

27. Dominion North Carolina Power, before the North Carolina Utilities Commission, Docket No. E-22, Sub 456 (2009), on behalf of Nucor Steel-Hertford, re fuel cost adjustment.

28. Appalachian Power Company, before the Virginia State Corporation Commission, Case No. PUE-2009-00068 (2009), on behalf of Steel Dynamics, Inc., re demand response programs.

29. Indiana Michigan Power Company, before the Indiana Utility Regulatory Commission, Cause No. 43750 (2009), on behalf of Steel Dynamics, Inc., re wind power purchased power agreement.

30. Entergy Arkansas, Inc., before the Arkansas Public Service Commission, Docket No. 07-085-TF (2009), on behalf of Arkansas Electric Energy Consumers, Inc., re energy efficiency cost recovery.

31. CenterPoint Energy Arkansas Gas, before the Arkansas Public Service Commission, Docket No. 07-081-TF (2009), on behalf of Arkansas Gas Consumers, Inc., re energy efficiency cost recovery.

32. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2009-261-E (2009), on behalf of CMC Steel-SC, re DSM cost recovery surcharge.

# Dennis W. Goins

33. Duke Energy Indiana, Inc., before the Indiana Utility Regulatory Commission, Cause No. 38707 FAC81 (2009), on behalf of Steel Dynamics, Inc., re fuel and purchased power cost recovery.

34. Potomac Electric Power Company, before the District of Columbia Public Service Commission, Formal Case No. 1076 (2009), on behalf of the General Services Administration, re retail cost allocation and standby rate design issues for distributed generation resources.

35. Appalachian Power Company, before the Virginia State Corporation Commission, Case No. PUE-2009-00039 (2009), on behalf of Steel Dynamics, Inc., re environmental and reliability cost recovery.

36. Indiana Michigan Power Company, before the Indiana Utility Regulatory Commission, Cause No. 38702 – FAC 63 (2009), on behalf of Steel Dynamics, Inc., re fuel and purchased power cost recovery.

37. Appalachian Power Company, before the Virginia State Corporation Commission, Case No. PUE-2009-302-00038 (2009), on behalf of Steel Dynamics, Inc., re fuel and purchased power cost recovery.

38. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2008-302-E (2008), on behalf of CMC Steel-SC, re fuel and purchased power cost recovery.

39. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2008-196-E (2008), on behalf of CMC Steel-SC, re base load review order for a nuclear facility.

40. Ohio Edison *et al.*, before the Public Utilities Commission of Ohio, Case No. 08-935-EL-SSO *et al.* (2008), on behalf of Nucor Steel Marion, Inc., re standard service offer via an electric security plan.

41. Ohio Edison *et al.*, before the Public Utilities Commission of Ohio, Case No. 08-936-EL-SSO (2008), on behalf of Nucor Steel Marion, Inc., re market rate offer via a competitive bidding process.

42. Alabama Power Company, before the Alabama Public Service Commission, Docket No. 18148 (2008), on behalf of CMC Steel Alabama, Nucor Steel Birmingham, Inc., and Nucor Steel Tuscaloosa, Inc, re energy cost recovery.

43. Entergy Texas, Inc., before the Public Utilities Commission of Texas, PUC Docket No. 35269 (2008), on behalf of Texas Cities, re jurisdictional allocation of system agreement payments.

44. Duke Energy Indiana, Inc., before the Indiana Utility Regulatory Commission, Cause No. 43374 (2008), on behalf of Nucor Steel and Steel Dynamics, Inc., re alternative regulatory plan.

45. Entergy Gulf States Inc., before the Public Utilities Commission of Texas, PUC Docket No. 34800 (2008), on behalf of Texas Cities, re affiliate transactions.

46. Commonwealth Edison Company, before the Illinois Commerce Commission, Docket No. 07-0566 (2008), on behalf of Nucor Steel Kankakee, Inc., re cost-of-service and rate design issues.

47. Ohio Edison *et al.*, before the Public Utilities Commission of Ohio, Case No. 07-0551-EL-AIR *et al.* (2008), on behalf of Nucor Steel Marion, Inc., re cost-of-service and rate design issues.

48. Appalachian Power Company dba American Electric Power, before the Public Service Commission of West Virginia, Case No. 06-0033-E-CN (2007), on behalf of Steel of West Virginia, Inc., re power plant cost recovery mechanism.

49. Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership, before the Public Utilities Commission of Texas, PUC Docket No. 34077 (2007), on behalf of Nucor Steel - Texas, re acquisition of TXU Corp. by Texas Energy Future Holdings Limited Partnership.

50. Arkansas Oklahoma Gas Company, before the Arkansas Public Service Commission, Docket No. 07-026-U (2007), on behalf of West Central Arkansas Gas Consumers, re gas cost-of-service and rate design issues.

51. Idaho Power Company, before the Idaho Public Utilities Commission, Case No. IPC-E-07-08 (2007), on behalf of the U.S. Department of Energy (Federal Executive Agencies), re cost-of-service and rate design issues.

52. Potomac Electric Power Company, before the District of Columbia Public Service Commission, Formal Case No. 1056 (2007), on behalf of the General Services Administration, re demand-side management and advanced metering programs.

53. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2007-229-E (2007), on behalf of CMC Steel-SC, re cost-of-service and rate design issues.

54. Potomac Electric Power Company, before the Maryland Public Service Commission, Case No. 9092 (2007), on behalf of the General Services Administration, re retail cost allocation and standby rate design issues for distributed generation resources.

55. Potomac Electric Power Company, before the District of Columbia Public Service Commission, Formal Case No. 1053 (2007), on behalf of the General Services Administration, re retail cost allocation and standby rate design issues for distributed generation resources.

# Dennis W. Goins

56. Entergy Gulf States Inc., before the Public Utilities Commission of Texas, PUC Docket No. 32907 (2006), on behalf of Texas Cities, re hurricane cost recovery.

57. Entergy Gulf States Inc., before the Public Utilities Commission of Texas, PUC Docket No. 32710/ SOAH Docket No. 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 (2006), on behalf of Texas Cities, re reconciliation of fuel and purchased power costs.

58. Florida Power & Light Company, before the Florida Public Service Commission, Docket No. 060001-EI (2006), on behalf of the U.S. Air Force (Federal Executive Agencies), re fuel and purchased power cost recovery.

59. Arizona Public Service Company, before the Arizona Corporation Commission, Docket No. E-01345A-05-0816 (2006), on behalf of the U.S. Air Force (Federal Executive Agencies), re retail cost allocation and rate design issues.

60. PacifiCorp (dba Rocky Mountain Power), before the Utah Public Service Commission, Docket No. 06-035-21 (2006), on behalf of the U.S. Air Force (Federal Executive Agencies), re rate design issues.

61. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2006-2-E (2006), on behalf of CMC Steel-SC, re fuel and purchased power cost recovery.

62. Entergy Gulf States Inc., before the Public Utilities Commission of Texas, PUC Docket No. 31544/ SOAH Docket No. 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 (2006), on behalf of Texas Cities, re transition to competition rider.

63. Idaho Power Company, before the Idaho Public Utilities Commission, Case No. IPC-E-05-28 (2006), on behalf of the U.S. Department of Energy (Federal Executive Agencies), re cost-of-service and rate design issues.

64. Alabama Power Company, before the Alabama Public Service Commission, Docket No. 18148 (2005), on behalf of SMI Steel-Alabama, re energy cost recovery.

65. Florida Power & Light Company, before the Florida Public Service Commission, Docket No. 050001-EI (2005), on behalf of the U.S. Air Force (Federal Executive Agencies), re fuel and capacity cost recovery.

66. Entergy Gulf States Inc., before the Public Utilities Commission of Texas, PUC Docket No. 31315/ SOAH Docket No. 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 (2005), on behalf of Texas Cities, re incremental purchased capacity cost rider.

67. Florida Power & Light Company, before the Florida Public Service Commission, Docket No. 050045-EI (2005), on behalf of the U.S. Air Force (Federal Executive Agencies), re cost-of-service and interruptible rate issues.

# Dennis W. Goins

68. Arkansas Electric Cooperative Corporation, before the Arkansas Public Service Commission, Docket No. 05-042-U (2005), on behalf of Nucor Steel and Nucor-Yamato Steel, re power plant purchase.

69. Arkansas Electric Cooperative Corporation, before the Arkansas Public Service Commission, Docket No. 04-141-U (2005), on behalf of Nucor Steel and Nucor-Yamato Steel, re cost-of-service and rate design issues.

70. Dominion North Carolina Power, before the North Carolina Utilities Commission, Docket No. E-22, Sub 412 (2005), on behalf of Nucor Steel-Hertford, re cost-of-service and interruptible rate issues.

71. Public Service Company of Colorado, before the Colorado Public Utilities Commission, Docket No. 04S-164E (2004), on behalf of the U.S. Air Force (Federal Executive Agencies), re cost-of-service and interruptible rate issues.

72. CenterPoint Energy Houston Electric, LLC, *et al.*, before the Public Utility Commission of Texas, PUC Docket No. 29526 (2004), on behalf of the Coalition of Commercial Ratepayers, re stranded cost true-up balances.

73. PacifiCorp, before the Utah Public Service Commission, Docket No. 04-035-11 (2004), on behalf of the U.S. Air Force (United States Executive Agencies), re time-of-day rate design issues.

74. Arizona Public Service Company, before the Arizona Corporation Commission, Docket No. E-01345A-03-0347 (2004), on behalf of the U.S. Air Force (Federal Executive Agencies), re retail cost allocation and rate design issues.

75. Idaho Power Company, before the Idaho Public Utilities Commission, Case No. IPC-E-03-13 (2004), on behalf of the U.S. Department of Energy (Federal Executive Agencies), re retail cost allocation and rate design issues.

76. PacifiCorp, before the Utah Public Service Commission, Docket No. 03-2035-02 (2004), on behalf of the U.S. Air Force (United States Executive Agencies), re retail cost allocation and rate design issues.

77. Dominion Virginia Power, before the Virginia State Corporation Commission, Case No. PUE-2000-00285 (2003), on behalf of Chaparral (Virginia) Inc., re recovery of fuel costs.

78. Jersey Central Power & Light Company, before the New Jersey Board of Public Utilities, BPU Docket No. ER02080506, OAL Docket No. PUC-7894-02 (2002-2003), on behalf of New Jersey Commercial Users, re retail cost allocation and rate design issues.

## Dennis W. Goins

79. Public Service Electric and Gas Company, before the New Jersey Board of Public Utilities, BPU Docket No. ER02050303, OAL Docket No. PUC-5744-02 (2002-2003), on behalf of New Jersey Commercial Users, re retail cost allocation and rate design issues.

80. South Carolina Electric & Gas Company, before the South Carolina Public Service Commission, Docket No. 2002-223-E (2002), on behalf of SMI Steel-SC, re retail cost allocation and rate design issues.

81. Montana Power Company, before the First Judicial District Court of Montana, *Great Falls Tribune et al. v. the Montana Public Service Commission*, Cause No. CDV2001-208 (2002), on behalf of a media consortium (*Great Falls Tribune*, *Billings Gazette*, *Montana Standard*, *Helena Independent Record*, *Missoulian*, Big Sky Publishing, Inc. dba *Bozeman Daily Chronicle*, the Montana Newspaper Association, *Miles City Star*, *Livingston Enterprise*, Yellowstone Public Radio, the Associated Press, Inc., and the Montana Broadcasters Association), re public disclosure of allegedly proprietary contract information.

82. Louisville Gas & Electric *et al.*, before the Kentucky Public Service Commission, Administrative Case No. 387 (2001), on behalf of Gallatin Steel Company, re adequacy of generation and transmission capacity in Kentucky.

83. PacifiCorp, before the Utah Public Service Commission, Docket No. 01-035-01 (2001), on behalf of Nucor Steel, re retail cost allocation and rate design issues.

84. TXU Electric Company, before the Public Utilities Commission of Texas, PUC Docket No. 23640/ SOAH Docket No. 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 (2001), on behalf of Nucor Steel, re fuel cost recovery.

85. FPL Group *et al.*, before the Federal Energy Regulatory Commission, Docket No. EC01-33-000 (2001), on behalf of Arkansas Electric Cooperative Corporation, Inc., re merger-related market power issues.

86. Entergy Mississippi, Inc., *et al.*, before the Mississippi Public Service Commission, Docket No. 2000-UA-925 (2001), on behalf of Birmingham Steel-Mississippi, re appropriate regulatory conditions for merger approval.

87. TXU Electric Company, before the Public Utilities Commission of Texas, PUC Docket No. 22350/ SOAH Docket No. 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 (2000), on behalf of Nucor Steel, re unbundled cost of service and rates.

88. PacifiCorp, before the Utah Public Service Commission, Docket No. 99-035-10 (2000), on behalf of Nucor Steel, re using system benefit charges to fund demand-side resource investments.

89. Entergy Arkansas, Inc. *et al.*, before the Arkansas Public Service Commission, Docket No. 00-190-U (2000), on behalf of Nucor-Yamato Steel and Nucor Steel-Arkansas, re the development of competitive electric power markets in Arkansas.

90. Entergy Arkansas, Inc. *et al.*, before the Arkansas Public Service Commission, Docket No. 00-048-R (2000), on behalf of Nucor-Yamato Steel and Nucor Steel-Arkansas, re generic filing requirements and guidelines for market power analyses.

91. ScottishPower and PacifiCorp, before the Utah Public Service Commission, Docket No. 98-2035-04 (1999), on behalf of Nucor Steel, re merger conditions to protect the public interest.

92. Dominion Resources, Inc. and Consolidated Natural Gas Company, before the Virginia State Corporation Commission, Case No. PUA990020 (1999), on behalf of the City of Richmond, re market power and merger conditions to protect the public interest.

93. Houston Lighting & Power Company, before the Public Utility Commission of Texas, Docket No. 18465 (1998) on behalf of the Texas Commercial Customers, re excess earnings and stranded-cost recovery and mitigation.

94. PJM Interconnection, LLC, before the Federal Energy Regulatory Commission, Docket No. ER98-1384 (1998) on behalf of Wellsboro Electric Company, re pricing low-voltage distribution services.

95. DQE, Inc. and Allegheny Power System, Inc., before the Federal Energy Regulatory Commission, Docket Nos. ER97-4050-000, ER97-4051-000, and EC97-46-000 (1997) on behalf of the Borough of Chambersburg, re market power in relevant markets.

96. GPU Energy, before the New Jersey Board of Public Utilities, Docket No. EO97070458 (1997) on behalf of the New Jersey Commercial Users Group, re unbundled retail rates.

97. GPU Energy, before the New Jersey Board of Public Utilities, Docket No. EO97070459 (1997) on behalf of the New Jersey Commercial Users Group, re stranded costs.

98. Public Service Electric and Gas Company, before the New Jersey Board of Public Utilities, Docket No. EO97070461 (1997) on behalf of the New Jersey Commercial Users Group, re unbundled retail rates.

99. Public Service Electric and Gas Company, before the New Jersey Board of Public Utilities, Docket No. EO97070462 (1997) on behalf of the New Jersey Commercial Users Group, re stranded costs.

## Dennis W. Goins

100. DQE, Inc. and Allegheny Power System, Inc., before the Federal Energy Regulatory Commission, Docket Nos. ER97-4050-000, ER97-4051-000, and EC97-46-000 (1997) on behalf of the Borough of Chambersburg, Allegheny Electric Cooperative, Inc., and Selected Municipalities, re market power in relevant markets.

101. CSW Power Marketing, Inc., before the Federal Energy Regulatory Commission, Docket No.ER97-1238-000 (1997) on behalf of the Transmission Dependent Utility Systems, re market power in relevant markets.

102. Central Hudson Gas & Electric Corporation *et al.*, before the New York Public Service Commission, Case Nos. 96-E-0891, 96-E-0897, 96-E-0898, 96-E-0900, 96-E-0909 (1997), on behalf of the Retail Council of New York, re stranded-cost recovery.

103. Central Hudson Gas & Electric Corporation, supplemental testimony, before the New York Public Service Commission, Case No. 96-E-0909 (1997) on behalf of the Retail Council of New York, re stranded-cost recovery.

104. Consolidated Edison Company of New York, Inc., supplemental testimony, before the New York Public Service Commission, Case No. 96-E-0897 (1997) on behalf of the Retail Council of New York, re stranded-cost recovery.

105. New York State Electric & Gas Corporation, supplemental testimony, before the New York Public Service Commission, Case No. 96-E-0891 (1997) on behalf of the Retail Council of New York, re stranded-cost recovery.

106. Rochester Gas and Electric Corporation, supplemental testimony, before the New York Public Service Commission, Case No. 96-E-0898 (1997) on behalf of the Retail Council of New York, re stranded-cost recovery.

107. Texas Utilities Electric Company, before the Public Utility Commission of Texas, Docket No. 15015 (1996), on behalf of Nucor Steel-Texas, re real-time electricity pricing.

108. Central Power and Light Company, before the Public Utility Commission of Texas, Docket No. 14965 (1996), on behalf of the Texas Retailers Association, re cost of service and rate design.

109. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 95-1076-E (1996), on behalf of Nucor Steel-Darlington, re integrated resource planning.

110. Texas Utilities Electric Company, before the Public Utility Commission of Texas, Docket No. 13575 (1995), on behalf of Nucor Steel-Texas, re integrated resource planning, DSM options, and real-time pricing.

11

# Dennis W. Goins

111. Arkansas Power & Light Company, *et al.*, Notice of Inquiry to Consider Section 111 of the Energy Policy Act of 1992, before the Arkansas Public Service Commission, Docket No. 94-342-U (1995), Initial Comments on behalf of Nucor-Yamato Steel Company, re integrated resource planning standards.

112. Arkansas Power & Light Company, *et al.*, Notice of Inquiry to Consider Section 111 of the Energy Policy Act of 1992, before the Arkansas Public Service Commission, Docket No. 94-342-U (1995), Reply Comments on behalf of Nucor-Yamato Steel Company, re integrated resource planning standards.

113. Arkansas Power & Light Company, *et al.*, Notice of Inquiry to Consider Section 111 of the Energy Policy Act of 1992, before the Arkansas Public Service Commission, Docket No. 94-342-U (1995), Final Comments on behalf of Nucor-Yamato Steel Company, re integrated resource planning standards.

114. South Carolina Pipeline Corporation, before the South Carolina Public Service Commission, Docket No. 94-202-G (1995), on behalf of Nucor Steel, re integrated resource planning and rate caps.

115. Gulf States Utilities Company, before the United States Court of Federal Claims, *Gulf States Utilities Company v. the United States*, Docket No. 91-1118C (1994, 1995), on behalf of the United States, re electricity rate and contract dispute litigation.

116. American Electric Power Corporation, before the Federal Energy Regulatory Commission, Docket No. ER93-540-000 (1994), on behalf of DC Tie, Inc., re costing and pricing electricity transmission services.

117. Texas Utilities Electric Company, before the Public Utility Commission of Texas, Docket No. 13100 (1994), on behalf of Nucor Steel-Texas, re real-time electricity pricing.

118. Carolina Power & Light Company, *et al.*, Proposed Regulation Governing the Recovery of Fuel Costs by Electric Utilities, before the South Carolina Public Service Commission, Docket No. 93-238-E (1994), on behalf of Nucor Steel-Darlington, re fuel-cost recovery.

119. Southern Natural Gas Company, before the Federal Energy Regulatory Commission, Docket No. RP93-15-000 (1993-1995), on behalf of Nucor Steel-Darlington, re costing and pricing natural gas transportation services.

120. West Penn Power Company, *et al.*, v. State Tax Department of West Virginia, *et al.*, Civil Action No. 89-C-3056 (1993), before the Circuit Court of Kanawha County, West Virginia, on behalf of the West Virginia Department of Tax and Revenue, re electricity generation tax.

12

# Dennis W. Goins

121. Carolina Power & Light Company, *et al.*, Proceeding Regarding Consideration of Certain Standards Pertaining to Wholesale Power Purchases Pursuant to Section 712 of the 1992 Energy Policy Act, before the South Carolina Public Service Commission, Docket No. 92-231-E (1993), on behalf of Nucor Steel-Darlington, re Section 712 regulations.

122. Mountain Fuel Supply Company, before the Public Service Commission of Utah, Docket No. 93-057-01 (1993), on behalf of Nucor Steel-Utah, re costing and pricing retail natural gas firm, interruptible, and transportation services.

123. Texas Utilities Electric Company, before the Public Utility Commission of Texas, Docket No. 11735 (1993), on behalf of the Texas Retailers Association, re retail cost-of-service and rate design.

124. Virginia Electric and Power Company, before the Virginia State Corporation Commission, Case No. PUE920041 (1993), on behalf of Philip Morris USA, re cost of service and retail rate design.

125. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 92-209-E (1992), on behalf of Nucor Steel-Darlington.

126. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Rate Design (1992), on behalf of the Department of Energy, Strategic Petroleum Reserve.

127. Georgia Power Company, before the Georgia Public Service Commission, Docket Nos. 4091-U and 4146-U (1992), on behalf of Amicalola Electric Membership Corporation.

128. PacifiCorp, Inc., before the Federal Energy Regulatory Commission, Docket No. EC88-2-007 (1992), on behalf of Nucor Steel-Utah.

129. South Carolina Pipeline Corporation, before the South Carolina Public Service Commission, Docket No. 90-452-G (1991), on behalf of Nucor Steel-Darlington.

130. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 91-4-E, 1991 Fall Hearing, on behalf of Nucor Steel-Darlington.

131. Sonat, Inc., and North Carolina Natural Gas Corporation, before the North Carolina Utilities Commission, Docket No. G-21, Sub 291 (1991), on behalf of Nucor Corporation, Inc.

132. Northern States Power Company, before the Minnesota Public Utilities Commission, Docket No. E002/GR-91-001 (1991), on behalf of North Star Steel-Minnesota.

# Dennis W. Goins

133. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Phase IV-Rate Design (1991), on behalf of the Department of Energy, Strategic Petroleum Reserve.

134. Houston Lighting & Power Company, before the Public Utility Commission of Texas, Docket No. 9850 (1990), on behalf of the Department of Energy, Strategic Petroleum Reserve.

135. General Services Administration, before the United States General Accounting Office, Contract Award Protest (1990), Solicitation No. GS-00P-AC87-91, Contract No. GS-00D-89-B5D-0032, on behalf of Satilla Rural Electric Membership Corporation, re cost of service and rate design.

136. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 90-4-E (1990 Fall Hearing), on behalf of Nucor Steel-Darlington, re fuel-cost recovery.

137. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Phase III-Rate Design (1990), on behalf of the Department of Energy, Strategic Petroleum Reserve, re cost of service and rate design.

138. Atlanta Gas Light Company, before the Georgia Public Service Commission, Docket No. 3923-U (1990), on behalf of Herbert G. Burris and Oglethorpe Power Corporation, re anticompetitive pricing schemes.

139. Ohio Edison Company, before the Ohio Public Utilities Commission, Case No. 89-1001-EL-AIR (1990), on behalf of North Star Steel-Ohio, re cost of service and rate design.

140. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Phase III-Cost of Service/Revenue Spread (1989), on behalf of the Department of Energy, Strategic Petroleum Reserve.

141. Northern States Power Company, before the Minnesota Public Utilities Commission, Docket No. E002/GR-89-865 (1989), on behalf of North Star Steel-Minnesota.

142. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Phase III-Rate Design (1989), on behalf of the Department of Energy, Strategic Petroleum Reserve.

143. Utah Power & Light Company, before the Utah Public Service Commission, Case No. 89-039-10 (1989), on behalf of Nucor Steel-Utah and Vulcraft, a division of Nucor Steel.

# Dennis W. Goins

144. Soyland Power Cooperative, Inc. v. Central Illinois Public Service Company, Docket No. EL89-30-000 (1989), before the Federal Energy Regulatory Commission, on behalf of Soyland Power Cooperative, Inc., re wholesale contract pricing provisions

145. Gulf States Utilities Company, before the Public Utility Commission of Texas, Docket No. 8702 (1989), on behalf of the Department of Energy, Strategic Petroleum Reserve.

146. Houston Lighting and Power Company, before the Public Utility Commission of Texas, Docket No. 8425 (1989), on behalf of the Department of Energy, Strategic Petroleum Reserve.

147. Northern Illinois Gas Company, before the Illinois Commerce Commission, Docket No. 88-0277 (1989), on behalf of the Coalition for Fair and Equitable Transportation, re retail gas transportation rates.

148. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 79-7-E, 1988 Fall Hearing, on behalf of Nucor Steel-Darlington, re fuel-cost recovery.

149. Potomac Electric Power Company, before the District of Columbia Public Service Commission, Formal Case No. 869 (1988), on behalf of Peoples Drug Stores, Inc., re cost of service and rate design.

150. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 88-11-E (1988), on behalf of Nucor Steel-Darlington.

151. Northern States Power Company, before the Minnesota Public Utilities Commission, Docket No. E-002/GR-87-670 (1988), on behalf of the Metalcasters of Minnesota.

152. Ohio Edison Company, before the Ohio Public Utilities Commission, Case No. 87-689-EL-AIR (1987), on behalf of North Star Steel-Ohio.

153. Carolina Power & Light Company, before the South Carolina Public Service Commission, Docket No. 87-7-E (1987), on behalf of Nucor Steel-Darlington.

154. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-17282, Phase I (1987), on behalf of the Strategic Petroleum Reserve.

155. Gulf States Utilities Company, before the Public Utility Commission of Texas, Docket No. 7195 (1987), on behalf of the Strategic Petroleum Reserve.

# Dennis W. Goins

156. Gulf States Utilities Company, before the Federal Energy Regulatory Commission, Docket No. ER86-558-006 (1987), on behalf of Sam Rayburn G&T Cooperative.

157. Utah Power & Light Company, before the Utah Public Service Commission, Case No. 85-035-06 (1986), on behalf of the U.S. Air Force.

158. Houston Lighting & Power Company, before the Public Utility Commission of Texas, Docket No. 6765 (1986), on behalf of the Strategic Petroleum Reserve.

159. Central Maine Power Company, before the Maine Public Utilities Commission, Docket No. 85-212 (1986), on behalf of the U.S. Air Force.

160. Gulf States Utilities Company, before the Public Utility Commission of Texas, Docket Nos. 6477 and 6525 (1985), on behalf of North Star Steel-Texas.

161. Ohio Edison Company, before the Ohio Public Utilities Commission, Docket No. 84-1359-EL-AIR (1985), on behalf of North Star Steel-Ohio.

162. Utah Power & Light Company, before the Utah Public Service Commission, Case No. 84-035-01 (1985), on behalf of the U.S. Air Force.

163. Central Vermont Public Service Corporation, before the Vermont Public Service Board, Docket No. 4782 (1984), on behalf of Central Vermont Public Service Corporation.

164. Gulf States Utilities Company, before the Louisiana Public Service Commission, Docket No. U-15641 (1983), on behalf of the Strategic Petroleum Reserve.

165. Southwestern Power Administration, before the Federal Energy Regulatory Commission, Rate Order SWPA-9 (1982), on behalf of the Department of Defense.

166. Public Service Company of Oklahoma, before the Federal Energy Regulatory Commission, Docket Nos. ER82-80-000 and ER82-389-000 (1982), on behalf of the Department of Defense.

167. Central Maine Power Company, before the Maine Public Utilities Commission, Docket No. 80-66 (1981), on behalf of the Commission Staff.

168. Bangor Hydro-Electric Company, before the Maine Public Utilities Commission, Docket No. 80-108 (1981), on behalf of the Commission Staff.

169. Oklahoma Gas & Electric, before the Oklahoma Corporation Commission, Docket No. 27275 (1981), on behalf of the Commission Staff.

# Dennis W. Goins

170. Green Mountain Power, before the Vermont Public Service Board, Docket No. 4418 (1980), on behalf of the PSB Staff.

171. Williams Pipe Line, before the Federal Energy Regulatory Commission, Docket No. OR79-1 (1979), on behalf of Mapco, Inc.

172. Boston Edison Company, before the Massachusetts Department of Public Utilities, Docket No. 19494 (1978), on behalf of Boston Edison Company.

173. Duke Power Company, before the North Carolina Utilities Commission, Docket No. E-7, Sub 173, on behalf of the Commission Staff.

174. Duke Power Company, before the North Carolina Utilities Commission, Docket No. E-100, Sub 32, on behalf of the Commission Staff.

175. Virginia Electric & Power Company, before the North Carolina Utilities Commission, Docket No. E-22, Sub 203, on behalf of the Commission Staff.

176. Virginia Electric & Power Company, before the North Carolina Utilities Commission, Docket No. E-22, Sub 170, on behalf of the Commission Staff.

177. Southern Bell Telephone Company, before the North Carolina Utilities Commission, Docket No. P-5, Sub 48, on behalf of the Commission Staff.

178. Western Carolina Telephone Company, before the North Carolina Utilities Commission, Docket No. P-58, Sub 93, on behalf of the Commission Staff.

179. Natural Gas Ratemaking, before the North Carolina Utilities Commission, Docket No. G-100, Sub 29, on behalf of the Commission Staff.

180. General Telephone Company of the Southeast, before the North Carolina Utilities Commission, Docket No. P-19, Sub 163, on behalf of the Commission Staff.

181. Carolina Power and Light Company, before the North Carolina Utilities Commission, Docket No. E-2, Sub 264, on behalf of the Commission Staff.

182. Carolina Power and Light Company, before the North Carolina Utilities Commission, Docket No. E-2, Sub 297, on behalf of the Commission Staff.

183. Duke Power Company, *et al.*, Investigation of Peak-Load Pricing, before the North Carolina Utilities Commission, Docket No. E-100, Sub 21, on behalf of the Commission Staff.

184. Investigation of Intrastate Long Distance Rates, before the North Carolina Utilities Commission, Docket No. P-100, Sub 45, on behalf of the Commission Staff.

effect, ETI's rate-year estimate assumes that the divestiture/merger will have no effect on either the level of or method of recovering (via Schedule MSS-2 of the ESA) such costs. In addition, ETI again ignored the effects of load growth when it set rate-year MSS-2 costs as adjusted test-year MSS-2 costs recovered in base rates. That is, by ignoring load growth in setting both PPCC and MSS-2 costs that will be recovered in base rates, ETI almost certainly ensured that it will overrecover both types of costs going forward.

7. ETI's principal rate schedules for street lighting and traffic signal customers are Schedules SHL and TSS, respectively. Schedule SHL applies to lighting for public streets, roads, and thoroughfares in cities and in subdivisions with an incorporated homeowners association. Schedule SHL sets fixed monthly charges for standard and nonstandard fixture and lamps that ETI installs and maintains (Rate Groups A and C). ETI also offers a fixed kWh rate for lighting facilities that the customer owns and maintains (Rate Groups D and E). Schedule TSS is a fixed kWh rate with a monthly ~~customer~~ minimum charge per delivery point applicable to customer-owned and -maintained traffic signals. Both proposed rates do not reflect the lower cost of operating and maintaining lighting facilities using energy-efficient light-emitting diode (LED) bulbs. Moreover, Schedule SHL includes a provision that penalizes a customer that replaces a high-wattage bulb with a more energy-efficient LED bulb.

effect, ETI's rate-year estimate assumes that the divestiture/merger will have no effect on either the level of or method of recovering (via Schedule MSS-2 of the ESA) such costs. In addition, ETI again ignored the effects of load growth when it set rate-year MSS-2 costs as adjusted test-year MSS-2 costs recovered in base rates. That is, by ignoring load growth in setting both PPCC and MSS-2 costs that will be recovered in base rates, ETI almost certainly ensured that it will overrecover both types of costs going forward.

7. ETI's principal rate schedules for street lighting and traffic signal customers are Schedules SHL and TSS, respectively. Schedule SHL applies to lighting for public streets, roads, and thoroughfares in cities and in subdivisions with an incorporated homeowners association. Schedule SHL sets fixed monthly charges for standard and nonstandard fixture and lamps that ETI installs and maintains (Rate Groups A and C). ETI also offers a fixed kWh rate for lighting facilities that the customer owns and maintains (Rate Groups D and E). Schedule TSS is a fixed kWh rate with a monthly minimum charge per delivery point applicable to customer-owned and -maintained traffic signals. Both proposed rates do not reflect the lower cost of operating and maintaining lighting facilities using energy-efficient light-emitting diode (LED) bulbs. Moreover, Schedule SHL includes a provision that penalizes a customer that replaces a high-wattage bulb with a more energy-efficient LED bulb.

Docket No. 39896
Dennis W. Goins - Direct
Page 7

## RECOMMENDATIONS

Q. **WHAT DO YOU RECOMMEND ON THE BASIS OF THESE CONCLUSIONS?**

A. I recommend that the Commission take the following actions regarding the major issues discussed in my testimony:

1. Reject the AED4CP method used in ETI's jurisdictional separation study to assign demand-related production costs to its Texas retail and wholesale jurisdictions. Instead, the Commission should require ETI to assign these costs to the wholesale jurisdiction using the 12 coincident peak (12CP) method to allocate demand-related production costs. This approach is consistent not only with the cost-of-service approach FERC typically uses to allocate demand-related production costs reflected in wholesale rate schedules, but also with the assignment of MSS-1 costs (as well as MSS-2 transmission costs) to ETI under the ESA. I have calculated test-year 12CP allocation factors for the Texas Retail (94.6208 percent) and Wholesale (5.3792 percent) jurisdictions, and provided them to Cities witness Karl Nalepa for inclusion in his jurisdictional separation study.

2. Reject ETI's adjusted test-year purchased power capacity costs ($276.2 million). Instead, ETI should be allowed to recover no more than approximately ~~$241.3~~ $242.9 million in PPCC. This approximately ~~$35~~ $33.3 million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

   ■ ███████ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

   ■ ███████ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract

Docket No. 39896
Dennis W. Goins - Direct
Page 8

RECOMMENDATIONS

Q.  **WHAT DO YOU RECOMMEND ON THE BASIS OF THESE CONCLUSIONS?**

A.  I recommend that the Commission take the following actions regarding the major issues discussed in my testimony:

1.  Reject the AED4CP method used in ETI's jurisdictional separation study to assign demand-related production costs to its Texas retail and wholesale jurisdictions.  Instead, the Commission should require ETI to assign these costs to the wholesale jurisdiction using the 12 coincident peak (12CP) method to allocate demand-related production costs.  This approach is consistent not only with the cost-of-service approach FERC typically uses to allocate demand-related production costs reflected in wholesale rate schedules, but also with the assignment of MSS-1 costs (as well as MSS-2 transmission costs) to ETI under the ESA.  I have calculated test-year 12CP allocation factors for the Texas Retail (94.6208 percent) and Wholesale (5.3792 percent) jurisdictions, and provided them to Cities witness Karl Nalepa for inclusion in his jurisdictional separation study.

2.  Reject ETI's adjusted test-year purchased power capacity costs ($276.2 million).  Instead, ETI should be allowed to recover no more than approximately $242.9 million in PPCC.  This approximately $33.3 million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

    ■ ███████ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

    ■ ███████ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract

pricing data and Cities recommended adjustment in costs related to the EAI WBL contract.[6]

■       reduction to reflect the effects of load growth on rate-year PPCC costs that ETI will recover going forward.

3. Reject ETI's adjusted test-year MSS-2 costs. ETI's unexplained       in MSS-2 costs relative to test-year costs, plus complete uncertainty regarding the magnitude of ETI's post-2012 MSS-2 costs under Entergy's proposed divestiture/merger deal with ITC in 2013, make ETI's projected rate-year MSS-2 costs speculative at best. I recommend setting ETI's adjusted test-year MSS-2 costs no higher than      — or      . This lower value reflects ETI's actual 2011 MSS-2 costs     , plus a       to reflect the effects of load growth.

4. Require ETI to modify Schedules SHL (Rate Groups A and C) and TSS to include a minimum 25 percent reduction in monthly fixed       charges applicable to street and traffic lighting fixtures that use LED technology. Energy charges in Schedule SHL (Rate Groups D and E) should also be reduced by 25 percent for LED customers. This reduction should partially reflect the lower cost of operating and maintaining energy-efficient LED fixtures. In addition, the Commission should require ETI to eliminate the $50 fee applicable to Rate Groups A and C under Schedule SHL when an existing light is replaced with a more efficient light with lower wattage (for example, an LED bulb). Eliminating this fee will remove a disincentive for customers to adopt LED fixtures as conservation measures.

---

[6] EAI WBL denotes capacity entitlements in several of EAI's baseload generating units that EAI sells at wholesale. Justification for Cities recommended EAI WBL rate-year cost adjustment is provided in the direct testimony of Cities witness Karl Nalepa.

Docket No. 39896
Dennis W. Goins - Direct
Page 9

pricing data and Cities recommended adjustment in costs related to the EAI WBL contract.[6]

- ■ ███████ reduction to reflect the effects of load growth on rate-year PPCC costs that ETI will recover going forward.

3. Reject ETI's adjusted test-year MSS-2 costs. ETI's unexplained ████████████████ in MSS-2 costs relative to test-year costs, plus complete uncertainty regarding the magnitude of ETI's post-2012 MSS-2 costs under Entergy's proposed divestiture/merger deal with ITC in 2013, make ETI's projected rate-year MSS-2 costs speculative at best. I recommend setting ETI's adjusted test-year MSS-2 costs no higher than ██████— or █████████████████████████. This lower value reflects ETI's actual 2011 MSS-2 costs ████████, plus a ████████████ to reflect the effects of load growth.

4. Require ETI to modify Schedules SHL (Rate Groups A and C) and TSS to include a minimum 25 percent reduction in monthly fixed (SHL) and minimum (TSS) charges applicable to street and traffic lighting fixtures that use LED technology. Energy charges in Schedule SHL (Rate Groups D and E) should also be reduced by 25 percent for LED customers. This reduction should partially reflect the lower cost of operating and maintaining energy-efficient LED fixtures. In addition, the Commission should require ETI to eliminate the $50 fee applicable to Rate Groups A and C under Schedule SHL when an existing light is replaced with a more efficient light with lower wattage (for example, an LED bulb). Eliminating this fee will remove a disincentive for customers to adopt LED fixtures as conservation measures.

---

[6] EAI WBL denotes capacity entitlements in several of EAI's baseload generating units that EAI sells at wholesale. Justification for Cities recommended EAI WBL rate-year cost adjustment is provided in the direct testimony of Cities witness Karl Nalepa.

Docket No. 39896
Dennis W. Goins - Direct
Page 9

and rate-year costs. Next, I adjusted ETI's rate-year estimates of costs for the EAI WBL contract and Reserve Equalization to reflect the adjustment recommended by Cities witness Karl Nalepa. Finally, I adjusted the rate-year total PPCC estimate to reflect the effects of load growth. The resulting adjusted test-year PPCC by transaction category is shown in Exhibit DWG-2.[11] As shown in this exhibit, ETI's adjusted test-year PPCC should be set no higher than ~~$241.3~~ ▓▓▓▓ million—or ~~$35~~ ▓▓▓▓ million less than ETI's original request. As I noted earlier, this ~~$35~~ ▓▓▓▓ million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

- ▓▓▓▓▓ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

- ▓▓▓▓▓ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract pricing data and Cities recommended adjustment in costs related to the Cities recommended 50-percent reduction in adjusted test-year costs for the EAI WBL contract.

- ▓▓▓▓▓ reduction to reflect the effects of load growth.

Q. **HOW DID YOU DEVELOP THE LOAD GROWTH ADJUSTMENT YOU APPLIED TO YOUR PPCC ESTIMATE?**

A. The development of my recommended ▓▓▓▓ load growth adjustment is presented in Exhibit DWG-3. I first reviewed forecasts of ETI's firm load (energy sales and peak demand) from 2011 through 2014. I then calculated the growth in ETI's energy sales and peak demands over different intervals (Exhibit DWG-3, page 1). On the basis of this review, I selected ▓▓▓▓ as a reasonable estimate of the likely growth in ETI's energy and demand billing determinants from the test year to the rate year.

---

[11] Results shown in Exhibit DWG-2 are presented in a format similar to that used by ETI's witness Robert Cooper in Exhibit RRC-1 (HS-revised).

Docket No. 39896
Dennis W. Goins - Direct
Page 18



and rate-year costs. Next, I adjusted ETI's rate-year estimates of costs for the EAI WBL contract and Reserve Equalization to reflect the adjustment recommended by Cities witness Karl Nalepa. Finally, I adjusted the rate-year total PPCC estimate to reflect the effects of load growth. The resulting adjusted test-year PPCC by transaction category is shown in Exhibit DWG-2.[11] As shown in this exhibit, ETI's adjusted test-year PPCC should be set no higher than $242.9 million—or $33.3 million less than ETI's original request. As I noted earlier, this $33.3 million reduction in ETI's proposed rate-year PPCC estimate reflects the following three adjustments:

- ■ ███████ reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data.

- ■ ███████ reduction in costs for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract pricing data and Cities recommended adjustment in costs related to the Cities recommended 50-percent reduction in adjusted test-year costs for the EAI WBL contract.

- ■ ███████ reduction to reflect the effects of load growth.

Q. **HOW DID YOU DEVELOP THE LOAD GROWTH ADJUSTMENT YOU APPLIED TO YOUR PPCC ESTIMATE?**

A. The development of my recommended ███████ load growth adjustment is presented in Exhibit DWG-3. I first reviewed forecasts of ETI's firm load (energy sales and peak demand) from 2011 through 2014. I then calculated the growth in ETI's energy sales and peak demands over different intervals (Exhibit DWG-3, page 1). On the basis of this review, I selected ███████ as a reasonable estimate of the likely growth in ETI's energy and demand billing determinants from the test year to the rate year.

[11] Results shown in Exhibit DWG-2 are presented in a format similar to that used by ETI's witness Robert Cooper in Exhibit RRC-1 (HS-revised).

**Docket No. 39896**
**Dennis W. Goins - Direct**
**Page 18**



I next estimated ETI's rate-year energy billing units, and derived an average cost per billing unit (Exhibit DWG-3, page 2) for the estimated rate-year PPCC shown in column (c) of Exhibit DWG-2. The product of this average rate-year PPCC and ETI's test-year kWh billing units equals the adjusted test-year PPCC that ETI should be allowed to include in base rates.

**Q. IS YOUR RECOMMENDED ~~$241.3~~ $242.9 MILLION IN ADJUSTED TEST-YEAR PPCC A REASONABLE AND FAIR ESTIMATE OF COSTS THAT ETI IS LIKELY TO INCUR IN THE RATE YEAR?**

A. Yes. My estimate mitigates two problems that cause ETI to overstate its rate-year PPCC—its failure to adjust rate-year projections to reflect load growth, and the use of dated transaction price proxies. In addition, my estimate reflects witness Nalepa's recommended cost adjustments related to the EAI WBL contract.

## MSS-2 COSTS

**Q. WHAT ARE MSS-2 COSTS?**

A. Under the ESA's Service Schedule MSS-2, the EOCs share cost responsibility for the Entergy transmission system much like they share cost responsibility for generating resources under Service Schedule MSS-1. Each month an EOC receives an MSS-2 transmission equalization payment or bill ~~for System transmission costs based on~~ that reflects the EOC's level of transmission investment relative to its responsibility for total System transmission investments, ~~its load responsibility ratio,~~ and the System average annual transmission ownership ~~cost of total System investments~~.

Docket No. 39896
Dennis W. Goins - Direct
Page 19

I next estimated ETI's rate-year energy billing units, and derived an average cost per billing unit (Exhibit DWG-3, page 2) for the estimated rate-year PPCC shown in column (c) of Exhibit DWG-2. The product of this average rate-year PPCC and ETI's test-year kWh billing units equals the adjusted test-year PPCC that ETI should be allowed to include in base rates.

Q. **IS YOUR RECOMMENDED $242.9 MILLION IN ADJUSTED TEST-YEAR PPCC A REASONABLE AND FAIR ESTIMATE OF COSTS THAT ETI IS LIKELY TO INCUR IN THE RATE YEAR?**

A. Yes. My estimate mitigates two problems that cause ETI to overstate its rate-year PPCC—its failure to adjust rate-year projections to reflect load growth, and the use of dated transaction price proxies. In addition, my estimate reflects witness Nalepa's recommended cost adjustments related to the EAI WBL contract.

## MSS-2 COSTS

Q. **WHAT ARE MSS-2 COSTS?**

A. Under the ESA's Service Schedule MSS-2, the EOCs share cost responsibility for the Entergy transmission system much like they share cost responsibility for generating resources under Service Schedule MSS-1. Each month an EOC receives an MSS-2 transmission equalization payment or bill that reflects the EOC's level of transmission investment relative to its responsibility for total System transmission investment, and the System average annual transmission ownership.

23

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | |
| INC. FOR AUTHORITY TO CHANGE | § | BEFORE THE STATE OFFICE |
| RATES, RECONCILE FUEL COSTS, | § | OF |
| AND OBTAIN DEFERRED | § | ADMINISTRATIVE HEARINGS |
| ACCOUNTING TREATMENT | § | |

DIRECT TESTIMONY AND EXHIBITS

OF

KARL J. NALEPA

ON BEHALF OF

CITIES SERVED BY ENTERGY TEXAS, INC.

MARCH 27, 2012

REDACTED PUBLIC VERSION

ReSolved Energy Consulting, LLC
11044 Research Blvd., Suite D-230
Austin, Texas 78759

Blank Page

**DIRECT TESTIMONY OF**
**KARL J. NALEPA**

**TABLE OF CONTENTS**

**I.**    INTRODUCTION AND QUALIFICATIONS .................................................................... 2

**II.**   PURPOSE AND SCOPE ................................................................................................ 4

**III.**  SUMMARY AND RECOMMENDATIONS ................................................................... 4

**IV.**  COST OF SERVICE ADJUSTMENTS ......................................................................... 7

      A.     PURCHASED CAPACITY COSTS ................................................................... 7

      B.     NATURAL GAS STORAGE ........................................................................... 18

      C.     COAL INVENTORIES .................................................................................... 27

      D.     RENEWABLE ENERGY CREDIT RIDER ..................................................... 30

      E.     COST OF SERVICE MODEL .......................................................................... 32

      F.     COST ALLOCATION ..................................................................................... 34

**V.**    OVERVIEW OF ETI'S FUEL COSTS ....................................................................... 37

**VI.**  FUEL COST ADJUSTMENTS .................................................................................... 38

      A.     NATURAL GAS STORAGE COSTS .............................................................. 38

      B.     LOSS FACTORS ............................................................................................. 43

**APPENDICES**

**APPENDIX A** – Statement of Qualifications
**APPENDIX B** – Previously Filed Testimony

Blank Page

**DIRECT TESTIMONY OF**
**KARL J. NALEPA**

**TABLE OF CONTENTS**

## ATTACHMENTS

| | |
|---|---|
| **KJN-1** | **Cities' Cost of Service Model** |
| **KJN-2** | **Fuel Reconciliation Adjustments** |
| **KJN-3** | **Test Year Capacity Costs** |
| **KJN-4** | **Rate Year Capacity Costs** |

Blank Page

| APPLICATION OF ENTERGY | § | BEFORE THE |
| TEXAS, INC. FOR AUTHORITY | § | STATE OFFICE OF |
| TO CHANGE RATES AND TO | § | ADMINISTRATIVE HEARINGS |
| RECONCILE FUEL COSTS | § | |

DIRECT TESTIMONY OF
KARL J. NALEPA

## I. INTRODUCTION AND QUALIFICATIONS

Q. PLEASE STATE YOUR NAME, OCCUPATION, AND BUSINESS ADDRESS.

A. My name is Karl J. Nalepa. I am the President of ReSolved Energy Consulting, LLC ("REC"), formerly R.J. Covington Consulting, LLC. REC is an independent utility consulting company. My business address is 11044 Research Blvd., Suite D-230, Austin, Texas 78759.

Q. ON WHOSE BEHALF ARE YOU PRESENTING TESTIMONY IN THIS PROCEEDING?

A. I am presenting testimony on behalf of Cities served by Entergy Texas, Inc. ("Cities").

Q. PLEASE OUTLINE YOUR EDUCATIONAL AND PROFESSIONAL BACKGROUND.

A. I hold a Bachelor of Science degree in Mineral Economics and a Master of Science degree in Petroleum Engineering, and am a certified mediator. My professional

## II.    PURPOSE AND SCOPE

**Q.    WHAT IS THE PURPOSE AND SCOPE OF YOUR TESTIMONY IN THIS PROCEEDING?**

A.    The purpose and scope of my testimony is twofold: First, to review certain issues ranging from purchase power to expense and rate base items and if necessary to present certain recommendations regarding Entergy Texas, Inc.'s ("ETI") proposed cost of service, based on a test year ending June 30, 2011.[1]  Second, to review fuel related issues and if necessary to present recommendations regarding ETI's request to reconcile its fuel costs incurred during the period July 1, 2009 through June 30, 2011 (the "Reconciliation Period").[2]  Third, I sponsor the cost of service for the Cities case and propose an allocation of any increase in the event Cities recommendation to maintain the existing rates is not approved. Within my testimony, references to "ETI" or the "Company" may be used interchangeably.

## III.    SUMMARY AND RECOMMENDATIONS

**Q.    PLEASE SUMMARIZE YOUR RECOMMENDATIONS IN THIS PROCEEDING?**

A.    I make the following recommendations regarding the Company's proposed rate request:

---

[1] Statement of Intent and Application for Authority to Change Rates and to Reconcile Fuel Costs, p. 4.

[2] *Id.*, p. 1.

1. ETI is requesting purchased power capacity expense of $275,809,485. I propose several alternative adjustments to the MSS-4 and 3rd party purchase components of ETIs request for purchased power capacity expense to better reflect the known and measurable nature of these costs as well as all attendant impacts. My recommendation is that the Commission approves purchased power capacity expense of $236,838,634, a reduction of $38,970,851 to the ETI requested capacity cost amount. This adjustment is presented as an alternative to Dr. Goins purchase power recommendation—should the ALJs and the Commission adopt my alternative for adjusting the Company's purchase power request.

2. The Company operates the Spindletop gas storage facility to provide gas supply reliability and flexibility for ETI's Sabine and Lewis Creek power plants. The Company has acknowledged there are less costly options to provide this same supply reliability and flexibility in gas supply. Eliminating the Spindletop facility and selecting the less costly and readily available alternative will save customers $ 11.4 million per year without diminishing fuel supply flexibility or reliability. It would be imprudent to continue with the Company's Spindletop alternative. As such, I recommend that the facility be removed from rates and from regulated service if necessary. Total base rate costs to be removed are $7,653,293. In addition, the Commission should exclude as an eligible fuel expense the variable non-gas operating costs of Spindletop, which during the test year were $5,424,895. The variable non-gas operating costs of Spindletop for the reconciliation period will be addressed in the fuel reconciliation portion of my testimony.

3. ETI is requesting an average test year coal inventory value of $6,740,528 at Nelson 6. This is equivalent to 66 days of inventory at full burn. However, the Company has established that an average target inventory of 43 days at Nelson 6 is sufficient to meet its reliability requirements. I recommend that the 43 day coal inventory level be included in rate base, resulting in a revised inventory level for Nelson 6 of $4,381,988 and reducing the Company's requested inventory level by $2,358,540.

4. ETI is requesting approval of a Renewable Energy Credit Rider ("REC") in this case. It proposes to shift recovery of its renewable energy credit costs from base rates to the REC Rider. The Commission should not permit the Company to single out REC costs from base rates. ETI has presented no evidence that suggests the costs should be treated differently than they are now. As a result, I recommend the adjusted test year amount of $633,985 be included in base rates for REC costs.

5. I am sponsoring Cities' cost of service model based on the Company's model, and have compiled the adjustments to the Company's proposed revenue requirement recommended by each of the Cities' experts The Cities' proposed revenue requirement is $1,367.5 million, which is $126.0 million less than the Company's proposed revenue requirement.

In addition, I make the following recommendations regarding the Company's reconcilable costs:

6. During the reconciliation period, the Spindletop gas storage facility did not provide any increased supply reliability or flexibility relative to other options available to ETI at the Sabine and Lewis Creek Generating Stations. Compared to other supply options available to the Company, the Spindletop facility cost customers $11.4 million more per year for the same supply reliability and flexibility. It would not be prudent to continue charging customers for this unreasonable level of expense. I adjusted reconcilable storage costs to reflect the average cost of transportation to Sabine plus call options on supply as a reasonable alternative to storage. This reduces storage related reconcilable costs by $6,595,290.

7. ETI's proposed tariff Schedule FF Fixed Fuel Factor includes loss multipliers by voltage level which were calculated in a study based on the 12 months ending December 31, 1997. I adjust line loss factors to reflect current losses, reducing fuel expenses properly allocable to Texas retail customers by $3,981,271.

Q. **WHAT IS THE TOTAL DOLLAR AMOUNT OF YOUR RECOMMENDATIONS?**

A. My recommended adjustments to the Company's proposed base rate or non fuel cost of service are summarized in Table 1. I recommend a total adjustment to reconcilable fuel costs of $10,576,561 (consisting of $6,595,290 in storage costs and $3,981,271 in line loss costs). This adjustment is summarized on a monthly basis in Attachment KJN-2.

TABLE 1

| Adjustment | Rate Base | Expense |
|---|---|---|
| Nelson 6 Coal Inventory | ($2,358,540) | - |
| Spindletop Gas Storage | ($48,301,624) | ($2,090,116) |
| Renewable Energy Credit Rider | Deny Rider - include $633,985 in cost of service | |
| Purchased Power Capacity EAI WBL | - | ███████ |
| Total | ($50,660,164) | ███████ |

It should be noted that the load growth related third party Purchased Power Capacity adjustment included in the $38,970,851 recommendation above is presented as an alternative to Dr. Goins purchase power capacity recommendation and is not part of the total adjustment shown in Table 1. Another portion of my $38,970,851 purchase power adjustment related to the Entergy Arkansas Inc. or EAI WBL contract is proposed to be included in the cost of service and is part of Dr. Goins' analysis. The two components of the purchase power adjustment are discussed in detail below.

## IV. COST OF SERVICE ADJUSTMENTS

Q. **PLEASE DESCRIBE THE COST OF SERVICE ADJUSTMENTS YOU ARE RECOMMENDING.**

A. I am recommending the following cost of service adjustments:

1. Purchased Capacity Costs;
2. Natural Gas Storage;
3. Coal Inventories;
4. Renewable Energy Credit Rider;
5. Cost of Service Model quantification of adjustments provided by other Cities witnesses; and
6. Customer Class Allocation

### A. PURCHASED CAPACITY COSTS

Q. **WHAT ISSUE ARE YOU ADDRESSING IN THIS SECTION OF YOUR TESTIMONY?**

A. In this section of my testimony I develop the MSS-4 and third party purchased power capacity costs for inclusion in base rates.

Q. **DID THE COMPANY ORIGINALLY REQUEST A RECONCILABLE PURCHASED POWER RIDER?**

A. Yes. Originally, ETI filed this case requesting a total purchase power amount (including MSS-1, MSS-4, and third party capacity purchases) of $276,242,239[3] which would be part of a Purchased Power Rider ("PPR") and subject to periodic reconciliation.[4] Thus, the fact that the Company's forecast and estimate of future purchase power levels of $276,242,239 could be overstated was of little concern to ETI because under the original proposal, such amounts would be subject to periodic reconciliation and true-up to actual levels.

Now that the Commission has ruled that a PPR will not be authorized in this proceeding, the Company has requested that the full estimated purchase power amount of $276,242,239 be included in base rates. The problem with the Company's proposal to include the entire $276,242,239 estimate in base rates is that there is no future reconciliation for excess purchase power estimates. Furthermore, the Company has mixed and matched apples and oranges by including a forecast of rate year purchase power costs with test year end billing determinates. Under the Company's approach of mixing estimated rate year costs with test year billing units, there is a failure to recognize customer growth and increased sales revenue—thus overstating the revenue requirement. And while it is true that a reconciliation mechanism, such as proposed by ETI, may alleviate any excess earnings caused by an overestimate of capacity costs or a mismatch of test year costs to rate year billing

[3] ETI Schedule Q-8.8, ETI Proposed Tariffs at page 44.5.

[4] Direct Testimony of Phillip May, p. 5-6.

determinates, ETI should not be permitted to overestimate capacity costs to artificially create its own need for a reconcilable PPR.

Q. **PLEASE PROVIDE AN EXAMPLE DEMONSTRATING THE BIAS IN ETI'S APPROACH AND THE PROPER METHOD OF ADJUSTING RATE YEAR PURCHASED POWER COSTS FOR TEST YEAR CAPACITY LEVELS?**

A. Assume that a utility has one cost—purchase power capacity—and a test year purchase power cost of $100.00 for 100 kW of capacity to serve test year load of 100 kW (including reserves). The test year rate would be $1.00 /kW shown in Table 2:

TABLE 2

|  | Test Year |
|---|---|
| Total Capacity Costs | $100.00 |
| Capacity to Serve Load | 100 kW |
| Capacity Cost Embedded in Rates | $1.00 /kW |

Now, if during some future period this utility needs 50 more kW for an increase in load and it can acquire the 50 kW of capacity for $50, then the cost of capacity embedded in rates--$1 /kW of supply—would be sufficient to recover the additional costs. This is demonstrated in Table 3 below:

TABLE 3

|  | Test Year | Future Year |
|---|---|---|
| Total Capacity Costs | $100.00 | $150.00 |
| Capacity to Serve Load | 100 kW | 150 kW |
| Cost of Capacity | $1.00 /kW | $1.00 /kW |
| Capacity Cost Embedded in Rates | $1.00 /kW | $1.00 /kW |

Under the above scenario, no change in the rate would be necessary to recover the additional costs of acquiring the additional kW of capacity. But, if the added 50 kW cost $1.50 /kW, or $75.00, the utility would need an increase in rates of $0.1667 to recover the incremental costs, as shown in Table 4:

TABLE 4

|  | Test Year | Future Year |
|---|---|---|
| Total Capacity Costs | $100.00 | $175.00 |
| Capacity to Serve Load | 100 kW | 150 kW |
| Cost of Capacity | $1.00 /kW | $1.1667 /kW |
| Capacity Cost Embedded in Rates | $1.00 /kW | $1.00 /kW |
|  | Difference | $0.1667 /kW |

Under the Company's approach in this case, ETI would ignore the fact that it already collects $1.00 of revenues under the existing rate and requests the full $1.50 incremental increase for the added 50 kW. This would lead to an over-collection of revenues by the Company and would result in excess profits for shareholders.

Q.   DO YOU AGREE WITH THE COMPANY'S REQUESTED AMOUNT?

A.   No, the $276,242,239 purchased power capacity amount is not reasonable and is excessive.

Q.   WHY IS THE REQUESTED AMOUNT NOT REASONABLE?

A.   I compared the requested purchased power capacity expenses to the test year amount in this proceeding. Table 5 summarizes these values:

TABLE 5

| Source | Test Year | Rate Year |
|--------|-----------|-----------|
| MSS-1 | $25,461,352 | ███████ |
| MSS-4 | $189,032,441 | ██████ |
| Third Party | $30,818,009 | ██████ |
| Total | $245,311,802 | $276,242,239 |

ETI's request is almost $31 million higher than its test year capacity costs.

Q.  **WHAT HAS CAUSED THIS DRAMATIC INCREASE IN COSTS?**

A.  While the MSS-1 and MSS-4 rate year requests are actually less than the test year amount, the rate year third party purchases are more than ██ million higher than the test year. This increase is mostly attributable to three new purchased power agreements. These are with Exelon-Frontier, which added 150 MW to its existing 150 MW contract beginning May 2011, Calpine-Carville, which will add 243 MW (50% of 485 MW) for a ten year term beginning June 2012, and 225 MW with Sam Rayburn Municipal Power Agency ("SRMPA") for a 25 year term beginning December 2011.[5]

Q.  **HOW DOES THE COMPANY'S PROPOSAL ADVERSELY AFFECT CUSTOMERS?**

A.  The Company is contracting for capacity resources to meet future demand, but is intending to recover these costs from current customers. As discussed earlier, dividing projected rate year costs by test year adjusted billing determinants results in

---

[5] Direct Testimony of Robert Cooper, p. 16-17.

a violation of the matching principal of ratemaking. Commission Rules require that only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered in allowable expenses.[6] Post test year adjustments for known and measurable rate base additions to historical test year data will be considered in part only where the attendant impacts on all aspects of a utility's operations (including but not limited to, revenue, expenses and invested capital) can with reasonable certainty be identified, quantified and matched.[7] And while this section of the Rule refers to rate base additions, the concept of matching a post test year adjustment with its attendant impacts applies to post test year expense adjustments as well. In fact, prior versions of the Substantive Rules did require this:

> Post test-year adjustments for known and measurable changes to historical test-year data (including, but not limited to revenue, expenses, and invested capital) will be considered only where the attendant impacts on all aspects of a utility's operations can be with reasonable certainty identified, quantified, and matched.[8]

The development of the proposed purchased capacity costs should correspond with the billing determinants used to calculate the rates.

Q.  **WHAT AMOUNT OF CAPACITY COSTS DO YOU PROPOSE BE INCLUDED IN RATES?**

A.  I propose that third party capacity costs be calculated using the average cost of the Company's third party rate year capacity applied to the test year end capacity. In this way, the increased cost of the new resources is recognized, but current demand is

---

[6] Rule §25.231(b).

[7] Rule §25.231(c)(2)(F).

[8] Docket No. 1175, *Application Of Texas Utilities Electric Company For Authority To Change Rates And Investigation Of The General Counsel Into The Accounting Practices Of Texas Utilities Electric Company,*

better matched to current resources. My Attachments KJN-3 and KJN-4 detail the test year and rate year capacity and capacity costs. The Company's proposed rate year capacity cost of ████████ divided by the total capacity of 12,834 annual MW (or an average 1,070 kW/mo) yields an average rate of ████████. This compares to the test year cost of $5.08 /kW/mo. Multiplying the test year end third party capacity of 671 MW (or 8,052 annual MW) by the average rate year cost yields third party capacity costs of ████████, which is an increase of ████████ over the test year but a reduction of ████████ to the Company's proposed third party capacity costs. These calculations are summarized in Table 6.

TABLE 6

| Third Party Capacity Cost Calculation | | | | |
|---|---|---|---|---|
| Rate Year | | | | Proposed |
| Annual Capacity Cost | Average Monthly Capacity | Average Monthly Rate | Test Year End Capacity | Annual Capacity Cost |
| ████████ | 1,070 MW | ████████ | 671 MW | ████████ |

Q. DO YOU MAKE ANY ADJUSTMENTS TO ETI'S PROPOSED MSS-4 CAPACITY COSTS?

A. Yes. I recommend an adjustment to the EAI WBL contract expense, included in its MSS-4 tariff.

Q. PLEASE DESCRIBE THE EAI WBL CONTRACT.

A. The contract is with affiliate Entergy Arkansas, Inc. for wholesale baseload resources ("EAI WBL"), selected as a result of Entergy's July 2009 Baseload RFP. ETI was allocated 31.7% of the 336 MW capacity associated with the units that make-up this

WBL resource.[9] It consists of a portion of EAI's nuclear and coal generating capacity as summarized in Table 7:[10]

TABLE 7

| Resource | Total Capacity | Contract Capacity |
|---|---|---|
| ███████████ | █ | █ |
| ███████ | | |
| ██████ | █ | █ |
| ████ | █ | █ |
| ██ | █ | █ |
| Total | 3,455 | 336 |

**Q. WHAT IS YOUR ADJUSTMENT?**

A. The original term of the EAI WBL contract was for three years ending December 31, 2012. ████████████████████████████████████████.[11] My adjustment recognizes that the contract will expire only 18 months after the rates are expected go into effect in this proceeding. Assuming that ETI's rates will be in effect for three years, I recommend that the EAI WBL contract be "normalized" over the three year period.

---

[9] Docket No. 37744, Direct Testimony of Robert Cooper, p. 27.

[10] *Id.*, WP/RRC Testimony 2 (Highly Sensitive)

[11] ETI Response to TIEC 5-1 (Highly Sensitive).

Q. **WHAT IS YOUR BASIS FOR ASSUMING THAT ETI'S RATES WILL BE IN EFFECT FOR THREE YEARS?**

A. Three years is a common assumption for the time period between rate changes. For example, in this proceeding, ETI proposes to amortize over three years its expected MISO transition costs.[12]

Q. **PLEASE EXPLAIN THE COMPANY'S AMORTIZATION OF MISO TRANSITION COSTS.**

A. ETI is proposing two adjustments to rates in this proceeding regarding its MISO transition costs. First, it seeks to defer expenses incurred after January 1, 2012 related to its proposed transition to membership in the MISO regional transmission organization. Its request for deferral was filed in Docket No. 39741, but was subsequently consolidated with this proceeding.[13] Second, if the Company is not granted deferred accounting, then it proposes to amortize its projected MISO transition expenses of $12 million over 3 years and recover the amount of $4 million annually in account 575100.[14]

Q. **HOW DO YOU NORMALIZE THE EAI WBL CONTRACT?**

A. The rates in this proceeding are expected to be effective July 2012, based on the agreed procedural schedule. ETI has projected rate year EAI WBL contract expense

---

[12] Direct Testimony of Michael Considine, p. 21-22.

[13] Docket No. 39741, SOAH Order No. 2.

[14] WP_P AJ16.20-16.23L.

of ███████,[15] but has subsequently revised this amount to ████████[16] Since the contract will expire half way through the expected period that the rates will be effect, I recommend that only half the contract expense be included in rates. This ensures that the Company collects in rates only the capacity expenses that it actually incurs. Therefore, I recommend the amount of capacity expense for the EAI WBL contract to be included in rates is ████████, a reduction of ████████ from the Company's requested amount. I have provided this adjustment to Dr. Goins for inclusion in his overall purchase power capacity adjustment.

Q.   **WHAT ARE MSS-1 PAYMENTS?**

A.   Service Schedule MSS-1 (called "Reserve Equalization" in the Entergy System Agreement) prescribes a method for sharing some of the fixed costs of generating capability among Entergy Operating Companies. Some Operating Companies own more than their share of the System's total capability relative to their load, and thus are "long" or own more than their share of System reserves. Other Companies own less than their share, or are "short." A short company makes a payment for the MW by which it is short. The payments are computed monthly by multiplying the company's MW shortfall times a $/MW rate for the cost of owning reserve capability.[17]

---

[15] Direct Testimony of Robert Cooper, Exhibit RRC-1 (Highly Sensitive).

[16] *Id.*, Revised Exhibit RRC-1 (Highly Sensitive).

[17] Direct Testimony of Patrick Cicio, p. 11-15.

Q. DO YOU MAKE ANY ADJUSTMENTS TO ETI'S PROPOSED MSS-1 CAPACITY COSTS?

A. No, I recommend the Company's updated level of MSS-1 capacity costs of ███████████,[18] which was revised from the Company's original request of ███████████.[19] I provided this updated MSS-1 value to Dr. Goins for use in his purchase power analysis in this case.

Q. WHAT IS YOUR TOTAL PURCHASED CAPACITY RECOMMENDATION?

A. I recommend total purchased capacity expense of $236,838,634, which is a reduction of $38,970,851 from the Company's request, as summarized in Table 8.

TABLE 8

| Source | Company Proposed | City Recommended |
|---|---|---|
| MSS-1 | ███████████ | ███████████ |
| MSS-4 | ███████████ | ███████████ |
| 3rd Party | ███████████ | ███████████ |
| Total | $275,809,485 | $236,838,634 |

Q. DO YOU HAVE ANY OTHER COMMENTS RELATED TO ETI'S PURCHASED CAPACITY REQUEST?

A. Yes. While Cities' are opposed to a purchase power rider as proposed by ETI, to the extent that this proceeding is used to establish a baseline for purchased capacity costs, any baseline should reflect the unit cost of capacity, i.e., $/kW, rather than simply total dollars. As I discussed earlier in my testimony, the unit cost provides a more accurate measure of the level of capacity costs required by the utility. In my

---

[18] Direct Testimony of Robert Cooper, Revised Exhibit RRC-1 (Highly Sensitive).

[19] Id., Exhibit RRC-1 (Highly Sensitive).

Attachments KJN-3 and KJN-4, the total dollars as well as the total kW purchased power capacity supply and owned generation is provided.

## B.  NATURAL GAS STORAGE

Q.  WHY ARE YOU ADDRESSING NATURAL GAS STORAGE COSTS?

A.  As I discuss in the following section of my testimony, based on the Company's filed or claimed costs the SpindletopGas Storage Facility ("Spindletop") costs $13,078,188 per year to operate.  ETI can achieve the same supply reliability and flexibility benefits derived from Spindletop through other alternative gas supply options at an alternative cost of $ 1,724,659 per year.  Thus, eliminating Spindletop saves customers $11,353,529 per year.  It would be imprudent to continue including Spindletop in rates.

Q.  WHAT IS THE ISSUE WITH THE COMPANY'S NATURAL GAS STORAGE FACILITY?

A.  The Spindletop facility costs customers approximately $13,078,188 annually.  The costs are detailed in Table 9:

## TABLE 9

### SPINDLETOP GAS STORAGE FACILITY
### TOTAL COST IMPACT

| Component | Amount | Source |
|---|---|---|
| **Return Component** | | |
| Net Plant | $5,974,070 | Cities 7-73 |
| Gas Inventory | $42,327,554 | Schedule E-2.3 |
| Rate Base | $48,301,624 | |
| | | |
| **Rate of Return** | | |
| Long Term Debt | 0.03376777 | Schedule K-1 |
| Common Equity | 0.05291520 | Schedule K-1 |
| Tax Adjustment | 1.53846154 | |
| Adjusted Common Equity | 0.08140800 | |
| Adjusted Rate of Return | 0.11517577 | |
| | | |
| Return | $5,563,177 | |
| Depreciation Expense | $309,751 | Cities 7-74 |
| Other Taxes | | |
| Ad Valorem Taxes | $1,780,365 | Cities 7-72 |
| | | |
| Total Base Rate Costs | $7,653,293 | |
| | | |
| Spindletop Storage | | |
| Total Eligible Fuel Costs | $5,424,895 | Exhibit KDM-13 |
| | | |
| Total Annual Cost | $13,078,188 | |

**Q. ARE THESE CHARGES TO CUSTOMERS REASONABLE OR JUSTIFIED?**

A. No. Spindletop costs customers about $13 million during the test year. However, the facility is not used to provide any necessary services that are not provided by other gas transportation contracts or balancing agreements of ETI. Table 10 provides a cost benefit analysis comparing the costs ETI would incur to acquire the same services that were provided by the Spindletop facility.

## TABLE 10

| Month | Storage Withdrawals/ Adjustments | Base Rate Storage Costs | Variable Storage Costs | Total Storage Costs | Alternative Transport Costs | Call Options | Total Alternative Costs | Net Cost (e – h) |
|---|---|---|---|---|---|---|---|---|
| a | b | c | d | e | f | g | h | 1 |
| 7/10 | 1,248,176 | $637,774 | $ 769,753 | $1,407,527 | $ 224,672 | $ 26,250 | $ 250,922 | $1,156,605 |
| 8/10 | 1,000,525 | $637,774 | $ 112,203 | $ 749,977 | $ 180,095 | $ 26,250 | $ 206,345 | $543,632 |
| 9/10 | 715,348 | $637,774 | $ 419,413 | $ 1,057,187 | $ 128,763 | $ 26,250 | $ 155,013 | $902,174 |
| 10/10 | 831,584 | $637,774 | $ 449,539 | $ 1,087,313 | $ 149,685 | $ 0 | $ 149,685 | $937,628 |
| 11/10 | 413,276 | $637,774 | $ 433,368 | $ 1,071,142 | $ 74,390 | $ 0 | $ 74,390 | $996,752 |
| 12/10 | 288,652 | $637,774 | $ 130,669 | $ 768,443 | $ 51,957 | $ 0 | $ 51,957 | $716,486 |
| 1/11 | 411,742 | $637,774 | $ 338,323 | $ 976,097 | $ 74,114 | $ 26,250 | $ 100,364 | $875,733 |
| 2/11 | 601,934 | $637,774 | $ 612,537 | $ 1,250,311 | $ 108,348 | $ 26,250 | $ 134,598 | $1,115,713 |
| 3/11 | 580,673 | $637,774 | $ 667,727 | $ 1,305,501 | $ 104,521 | $ 26,250 | $ 130,771 | $1,174,730 |
| 4/11 | 766,831 | $637,774 | $ 606,674 | $ 1,244,448 | $ 138,030 | $ 0 | $ 138,030 | $1,106,418 |
| 5/11 | 827,689 | $637,774 | $ 574,684 | $ 1,212,458 | $ 148,984 | $ 0 | $ 148,984 | $1,063,474 |
| 6/11 | 874,174 | $637,774 | $ 310,005 | $ 947,779 | $ 157,351 | $ 26,250 | $ 183,601 | $764,178 |
| Total | 8,560,604 | $ 7,653,293 | $ 5,424,895 | $ 13,078,188 | $ 1,540,909 | $ 183,750 | $ 1,724,659 | $11,353,529 |

As shown above, ETI's charges to customers associated with the Spindletop gas storage facility are about $ 11.4 million more, annually, than the cost of providing comparable services. Even so, I recommend that the full amount of costs associated with the Spindletop facility be removed from cost of service because ETI does not use or need the Spindletop facility, as more fully detailed below. No other Entergy Operating Company owns or leases its own gas storage facility[20] and the supply reliability and swing flexibility provided by Spindletop is obtained under other existing gas supply and transportation contracts at a much lower cost. Moreover, other Entergy Operating Companies do not even contract for the transportation and balancing agreements ETI acquires for its Texas gas generating facilities.

---

[20] Response to Cities 18-15.

Q.   WHAT WAS THE STATED PURPOSE OF THE SPINDLETOP GAS STORAGE FACILITY WHEN IT WAS ORIGINALLY PLACED IN SERVICE?

A.   Gulf States Utilities ("GSU"), the predecessor to ETI, first raised the issue of the benefits of the gas storage facility in Docket No. 10894. In that proceeding, GSU alleged that the purpose of using the Spindletop Facility was to provide the maximum/minimum swing requirements presently supplied by GSU's existing suppliers. GSU further stated that the gas storage facility provided the same benefits to customers, but at a much lower cost:

> There is only one basic difference between the SGT agreement and other transportation agreements—the SGT agreement is a far better deal for ratepayers. . . . . As a result of the SGT arrangement, ratepayers will receive transportation and swing services at a very reasonable price in the near term and at an extremely low price following payoff of the facility costs. These benefits are reflected in the Company's cost benefit analysis, which shows net savings ranging from $10 to $15 million per year through year eight and then increasing to approximately $25 million per year thereafter, following payoff of the facility.[21]

The Company's cost benefit analysis relies on costly firm transportation backed up by third party storage to provide equivalent reliability and flexibility. While this might have been necessary in 1992 when the study was prepared, the Company now admits that it can obtain sufficient reliability and flexibility without these more expensive options. I discuss this in more detail later in my testimony.

---

[21] Docket No. 10894, Reply Brief of GSU at 102-103.

Q.    WHAT IS THE STATED PURPOSE OF THE SPINDLETOP GAS STORAGE FACILITY TODAY?

A.    Ms. McIlvoy explains that the primary benefits derived from the storage facility are increased supply reliability and swing flexibility. In the event of a total curtailment of supply, Spindletop is capable of providing 100 percent of the fuel requirements for all five units at Sabine Station and either one of the Lewis Creek units for a period of up to four days, at a 70 percent capacity factor. The storage facility also provides flexibility of gas supply to Sabine Station and Lewis Creek, both on a daily and instantaneous basis.[22]

Q.    HOW DO OTHER ENTERGY OPERATING COMPANIES OBTAIN SUPPLY RELIABILITY AND SWING FLEXIBILITY?

A.    According to Ms. McIlvoy, other operating companies obtain supply reliability and swing flexibility simply through the companies' monthly, daily, and intra-day natural gas supply contracts.[23] Entergy Gulf States Louisiana ("EGSL") for example has no firm transportation contracts, no firm supply contracts, and no fuel oil back-up at its generating plants in Louisiana.[24] The only cost incurred by EGSL for reliability and flexibility is the commodity cost of the gas purchased at its generating plants.[25]

---

[22] Direct Testimony of Karen McIlvoy, p. 32-33.

[23] Deposition of Karen McIlvoy, p. 32.

[24] Id., p. 26-29.

[25] Id., p. 33.

Q. **DO THE OTHER OPERATING COMPANIES EXPERIENCE THE SAME LEVEL OF SERVICE AS ETI?**

A. Ms. McIlvoy claims that ETI provides a much higher level of service than does EGSL, reasoning that Spindletop would protect ETI's operations in the event of an extreme gas curtailment such as a hurricane or freeze-off, because it would allow ETI to operate for four days without the need to obtain gas from outside sources.[26] Even Ms. McIlvoy admits, however, that EGSL is subject to the same risks for hurricanes and freeze-offs as is ETI, and that the Entergy System has nonetheless determined that EGSL does not need firm transportation contracts, firm supply contracts, fuel oil back-up, or gas supply backed up by gas storage at its generating plants. And while EGSL is backed up by other generating units and purchased power in the event of the loss of fuel supply, so is ETI.[27] In short, the options for reliability and flexibility at EGSL also exist at ETI, without incurring the cost of the Spindletop facility for the Louisiana generating plants.

Q. **YOU MENTIONED THAT ONE REASON THAT ETI MAINTAINS SPINDLETOP IS FOR PROTECTION AGAINST EXTREME EVENTS SUCH AS HURRICANES. DO YOU HAVE ANY ADDITIONAL COMMENTS ON THIS?**

A. Yes. The Company testified that the Spindletop facility was out of service for nearly 2 weeks when Hurricane Rita made landfall in 2005.[28] While the facility was

---

[26]*Id.*, p. 44.

[27]*Id.*, p. 44-46.

[28] Docket No. 32710, Rebuttal Testimony of KenroyHinkson, p. 10.

prudently evacuated for safety reasons, this event highlights the fact that the facility was not available for the specific purpose the Company argues makes it valuable.

Q. **PLEASE SUMMARIZE THE FINDINGS RELATED TO THE SPINDLETOP NATURAL GAS STORAGE FACILITY THAT YOU DEVELOPED EARLIER IN YOUR TESTIMONY.**

A. The Company could, and has, entered into long term gas supply and transportation agreements that provide the same reliability and flexibility as the Spindletop facility, at a lower cost. Therefore, I adjusted storage costs incurred during the reconciliation period to reflect the reasonable cost of providing these services to customers.

Q. **WHAT WERE THE TEST YEAR COSTS ASSOCIATED WITH THE FACILITY?**

A. Table 9 summarizes the test year expenses associated with the Spindletop facility. Total base rate costs are $7,653,293 and total variable non-gas operating costs recovered in the fuel factor are $5,424,895.

Q. **CAN YOU ESTIMATE THE TOTAL COST OF OPERATING THE SPINDLETOP FACILITY?**

A. Yes. The sum of test year base rate and variable O&M costs is $13,078,188. These costs divided by the sum of the test year withdrawals and adjustments of 8,560,604 MMBtu, results in an all-in per unit rate of $1.53 per MMBtu.[29]

---

[29] ($7,653,293 + $5,424,895) / (8,106,576 + 454,028) = $1.53 per MMBtu.

**Q. PLEASE SUMMARIZE THE ALTERNATIVES TO STORAGE THAT PROVIDE SUPPLY RELIABILITY AND SWING FLEXIBILITY TO THE SABINE AND LEWIS CREEK STATIONS.**

A.    Effective December 2008, ETI entered into a long-term gas supply and transportation agreement with Enbridge Pipeline L.P. The agreement will provide increased supply reliability at Lewis Creek and Sabine because the supply associated with the Enbridge agreement is from the Barnett Shale and East Texas production areas rather than the prior south Texas and Louisiana Gulf Coast production areas, which are susceptible to tropical weather related disruptions. The agreement adds diversity to ETI's supply portfolio and therefore reduces the dependence on the other intrastate pipelines at both plants.[30]

In addition, spot gas to meet swing requirements can be delivered through multiple pipeline connections at both plants,[31] and The Company can even take advantage of imbalances under its operational balancing agreement with TETCO pipeline for hourly swing flexibility, depending on operating conditions.[32] Other pipelines provide swing service as well. For instance, Copano Pipeline serving the Lewis Creek plant, ████████████████████████████████████ ███████████████████████████████.[33]

---

[30] Docket No. 37744, Direct Testimony of Devon Jaycox, p. 15-17.

[31] Schedule I-6.

[32] Response to Cities RFI 18-14.

[33] Schedule I-6, Intrastate Gas Transportation Agreement with Copano Pipeline (Highly Sensitive).

Q. CONSIDERING THESE OTHER OPTIONS, DID YOU DO A COST BENEFIT STUDY OF THE SPINDLETOP FACILITY?

A. Yes, I did. The results are presented above in Table 10. Based on the operating plans for EGSL's generating plants, sufficient reliability and swing flexibility can be obtained through the existing natural gas supply and transportation contracts at Sabine and Lewis Creek. Compared to the $1.53 per MMBtu cost of operating the Spindletop facility, transportation on various pipelines connected to Sabine and Lewis Creek ranged from 2.5¢ to 22¢ per MMBtu. I used as an average transportation rate the margin between the average cost of gas delivered to the Sabine Station and the Gas Daily Houston Ship Channel Index. This average margin is 18¢ per MMBtu and is a reasonable rate because Spindletop primarily serves the Sabine Station and the daily index best represents the supply flexibility described by Ms. McIlvoy in her deposition. I then added call options to provide the additional supply reliability that ETI claims is provided by storage. I included call options on 35,000 MMBtu/d for 5 days at a cost of $0.15 per option, and purchased options for June through September and January through March. These assumptions are consistent with the Company's experience during the last rate case.[34]

Using 18¢ per MMBtu as the replacement cost of providing flexibility and the call options to provide reliability, the cost of the test year Spindletop withdrawals and adjustments of 8,560,604 MMBtu would have been $1,724,659. On a total cost basis, the Spindletop facility costs $13.1 million per year to operate compared to $1.7 million for the same amount of gas delivered by other existing contracts. ETI could

---

[34] Docket No. 37744, Direct Testimony of Devon Jaycox, Exhibit DSJ-2.

save its customers $11.4 million per year by simply relying on its other supply options and selling the facility or at least removing it from regulated service

**Q. WHAT IS YOUR RECOMMENDATION REGARDING THE COST TO OPERATE AND MAINTAIN THE SPINDLETOP STORAGE FACILITY?**

A. No other Entergy Operating Company owns its own gas storage facility[35] and the supply reliability and swing flexibility provided by Spindletop can be obtained under other existing gas supply and transportation contracts at a much lower cost. Therefore, the costs outlined in Table 9 should be removed from the cost of service and fuel factor. Total base rate costs to be removed are $7,653,293 and the Commission should also exclude as an eligible fuel expense the variable non-gas operating costs of the Spindletop facility. During the test year these costs were $5,424,895. I will discuss the non-gas operating costs that should be excluded from the reconciliation period in the fuel reconciliation portion of my testimony.

**C.  COAL INVENTORIES**

**Q. WHY DOES THE COMPANY REQUIRE COAL INVENTORIES?**

A. Coal is obtained from the Power River Basin ("PRB") in Wyoming and delivered by rail,[36] so coal inventories are maintained at ETI's coal-fired power plants to help

---

[35] Response to Cities 18-15.

[36] Direct Testimony of Ryan Trushenski, p. 6-7.

mitigate delivery uncertainties, physical measurement uncertainties, and plant equipment failures.[37]

Q.   WHAT ARE THE COMPANY'S TARGET INVENTORY LEVELS?

A.   For Nelson 6, the current inventory policy provides for (1) a base target of 290,000 tons (36 days) of inventory and (2) an average annual inventory target of 340,000 tons (43 days).[38]

Q.   WHAT LEVEL OF COAL INVENTORY IS THE COMPANY REQUESTING?

A.   ETI is requesting an average test year inventory level of $6,740,528.[39] This reflects its actual inventory level at test year end of approximately ███████ tons and is equivalent to approximately ██ days of inventory at full burn.[40]

Q.   DO YOU AGREE WITH THE COMPANY'S REQUESTED LEVEL OF INVENTORY?

A.   No. Figure 1 compares the actual and target inventory levels.

---

[37] Schedule E-2.1.

[38] Id.

[39] Schedule E-2.3.

[40] ETI Response to Cities 6-28 (Highly Sensitive).

FIGURE 1

**HIGHLY SENSITIVE MATERIAL REDACTED**

The Company's actual inventory levels far exceed its target inventory level. Since the Company has established that its average target inventory of 43 days at Nelson 6 is sufficient to meet its reliability requirements, there is no reason to require customers to pay for more than this level of inventory. In other words, customers should not be responsible for paying for inventory levels over and above the inventory levels the Company determined to be reasonable and necessary. Therefore, I recommend that the 43 day coal inventory level amount be included in rate base, resulting in a revised inventory level for Nelson 6 of $4,381,988 and reducing the Company's requested inventory level by $2,358,540.

## D. RENEWABLE ENERGY CREDIT RIDER

**Q.** **PLEASE DESCRIBE RENEWABLE ENERGY CREDITS.**

**A.** To encourage the development of renewable energy technologies and to meet the State's goals for renewable capacity, the Commission has adopted a set of rules governing the issuance and trading of Renewable Energy Credits ("RECs").[41] A "retail entity" must hold RECs equal to its proportionate share of sales based on the State's renewable energy goals on an annual basis, and a generator will earn RECs when it generates energy from a renewable energy resource.

**Q.** **HOW ARE REC COSTS CURRENTLY RECOVERED?**

**A.** REC costs are currently recovered through base rates.[42]

**Q.** **HOW IS THE COMPANY PROPOSING TO TREAT ITS PURCHASE OF RENEWABLE ENERGY CREDITS?**

**A.** The Company is requesting approval of a Renewable Energy Credit Rider ("REC") in this case. It proposes to shift recovery of its renewable energy credit costs from base rates to the REC Rider. The initial amount to be included in the Rider is $633,985, based on test year REC costs.[43] The grossed up amount will be divided by non-transmission level KWh sales and applied to applicable retail rate schedules. Customers taking transmission level service are eligible to opt out of the Rider.[44]

---

[41] 16 TAC §25.173. *Goal for Renewable Energy.*

[42] Direct Testimony of Heather LeBlanc, p. 25.

[43] ETI Schedule Q-1 (Rev.)

[44]*Ibid.,* p. 26.

**Q.  HOW WOULD THE REC RIDER BE ADJUSTED AS COSTS CHANGE OVER TIME?**

A.  The Company proposes that the tariff be updated on an annual basis and on or before May 1, beginning in 2013, a redetermination of purchased power rates would be made. The revised rate will include:[45]

- renewable energy credit costs that the Company expects to incur during the twelve-month period beginning June 1 immediately following the filing;
- a true-up adjustment for past over(under)-recovery of Rider REC revenue; and
- any corresponding revenue-related expenses associated with the recovery of the above costs

**Q.  WHY IS THE COMPANY PROPOSING THE RIDER IN THIS CASE?**

A.  The Company argues that because RECs are mandated by law, the costs are variable, and because certain customers can opt out of the Rider, the REC Rider is the most efficient method to recover the costs.[46]

**Q.  DO YOU AGREE WITH THE COMPANY'S PROPOSAL?**

A.  No. The Commission should not permit the Company to single out REC costs from base rates. It has presented no evidence that suggests the costs should be treated differently than they are now. RECs are not related to fuel so much as they are related to retail sales and plant output. And RECs must be held to meet the renewal energy

_____

[45] *Ibid.*

[46] *Ibid.*, p. 25.

rules but the purchase and sale of the RECs are not related to fuel consumption at all. For example, these transactions have occurred generally on an annual basis, as summarized in Table 11 for the years since 2006.[47]

TABLE 11

| Year | Month | Amount |
|---|---|---|
| 2006 | March | $323,561 |
| 2007 | March | $390,864 |
| 2008 | March | $873,064 |
| 2009 | January | $367,500 |
|  | February | $185,000 |
|  | March | $138,616 |
| 2010 | June | $378,469 |
| 2011 | Mar | $584,000 |
|  | Apr | $47,803 |

Q. **WHAT AMOUNT OF REC EXPENSE DO YOU RECOMMEND BE INCLUDED IN BASE RATES?**

A. I recommend the adjusted test year amount of $633,985.

E. **COST OF SERVICE MODEL**

Q. **ARE THE CITIES PROPOSING AN OVERALL REVENUE REQUIREMENT IN THIS PROCEEDING?**

A. Yes. I am sponsoring a cost of service model based on the Company's model, and have compiled the adjustments to the Company's proposed revenue requirement recommended by each of the Cities' experts. The cost of service model is included as Attachment KJN-1.

---

[47] Response to Staff RFI 2-8 and State of Texas RFI 4-10.

Q. HOW WAS THE COST OF SERVICE MODEL DEVELOPED?

A. The cost of service model is a reproduction of the Company's model. It incorporates all of the components of the Company's model, and generates the same results as the Company's model prior to any adjustments by the City.

Q. ARE YOU SPONSORING THE CITIES' ADJUSTMENTS TO THE COST OF SERVICE MODEL?

A. No. I have compiled the adjustments to the cost of service model, but I am only sponsoring the model. The individual experts sponsor their own adjustments. A summary of the adjustments proposed by Cities' experts is included in my workpapers.

Q. WHAT IS THE CITIES' PROPOSED REVENUE REQUIREMENT?

A. The Company is proposing a total revenue requirement of $1,493.5 million, which is an increase of $111.8 million over current revenues.[48] The Cities' proposed revenue requirement is $1,367.5 million, which is $126.0 million less than the Company's proposed revenue requirement and approximately $14.2 million less than current revenues. Although Cities adjustments would support a decrease in current rates, Cities are recommending that the rates set by agreement and approved by the Commission in Docket No. 37744 remain in effect.

---

[48] Schedule Q-1.

## F.      COST ALLOCATION

Q.   **WHAT ISSUE DO YOU ADDRESS IN THIS SECTION OF YOUR TESTIMONY?**

A.   In this section of my testimony I address an alternative class cost allocation issues. Specifically, I address the Company's proposed production and transmission related class cost allocation employing the Average and Excess/4 Coincident Peak ("A&E/4CP") allocation method. I also address the Company's complete failure to recognize substantial cost changes and uncertainties occurring in the near future.

Q.   **WHAT IS THE IMPACT, BY CUSTOMER CLASS, OF THE PROPOSED RATE INCREASE UNDER THE COMPANY'S COST ALLOCATION METHOD?**

A.   The Company's proposed increase by customer class is set forth in Table 12:

TABLE 12

| Customer Class | Increase | Percent |
|---|---|---|
| Residential | $ 82,095,079 | 21.64% |
| Small General | $ 428,754 | 1.62% |
| General | $ 7,690,498 | 4.81% |
| Large General | $ 8,171,696 | 16.55% |
| LIPS | $ 11,233,897 | 10.77% |
| Lighting | $ 2,203,940 | 20.38% |
| **Total** | **$ 111,823,864** | **15.32%** |

As can be seen from the above table, the residential and lighting customer classes receive the highest rate increases while the Small General Service, General Service, and LIPS classes receive below system average rate increases of 1.62%, 4.81%, and 10.77%, respectively.

Q. **HAVE THE RESIDENTIAL AND LIGHTING CUSTOMERS PLACED AN INCREASED BURDEN ON THE SYSTEM DUE TO LOAD OR CUSTOMER GROWTH?**

A. No. I have examined test year customer quantities, energy and loads by customer class for each of the last three cases. Residential and lighting customers are not imposing an undue cost burden on the system. Instead, other classes are growing at a faster rate causing system costs to increase.

Q. **HOW DOES THE COMPANY PLAN FOR SYSTEM GROWTH TO MEET PRODUCTION AND TRANSMISSION DEMANDS?**

A. The system is planned pursuant to the requirements of the System Agreement. Under the System Agreement production and transmission assets are added and costs are incurred based on meeting the EOC's peak demands coincident with the System peak. (See Section 2.16 of the System Agreement) Moreover, the System is planned and costs are incurred to meet all twelve monthly System coincident peaks ("12 CP"). Cost responsibility under the System Agreement for production and transmission costs (MSS-1 and MSS-2 tariffs ) is assigned to each Entergy Operating Company ("EOC") based on the 12 CP.

Q. ARE CHANGES OCCURRING ON THE SYSTEM THAT CAN AFFECT SYSTEM AND SPECIFICALLY ETI'S COSTS?

A. Yes, a number of factors are occurring which will impact costs. First, the Entergy Operating Company's ("EOC's") are seeking approval for a change in control and joining the Midwest Independent System Operator ("MISO") as the Regional Transmission Organization ("RTO"). A change to the current Independent Coordinator of Transmission ("ICT") could have implications "…for the quantity and mix of resource requirements…"[49] Thus, system production plans and costs may be impacted and quite possibly substantially impacted by the MISO decision.

Another potential impact on System planning and costs is the fact that Entergy Arkansas ("EAI") and Entergy Mississippi ("EMI") are leaving the joint system. These EOC's - EAI and EMI - have given their respective notice to exit the System Agreement. The impact of EAI and EMI on the remaining four EOC Systems is not known at this time, but production costs and planning will be impacted.[50]

Q. ARE THERE OTHER CHANGES THAT MAY IMPACT SYSTEM COSTS?

A. Yes, recently Entergy Corp announced its plan to totally divest the EOC's including ETI of the transmission system. In other words, the EOC's and ETI would purchase transmission service from a third party and there would be no transmission investment to allocate or to plan in the future.

---

[49] See 2009 Strategic Resource Plan Refresh at 5.
[50] *Id* at 4.

Q. GIVEN THE SUBSTANTIAL CHANGES EXPECTED TO IMPACT THE SYSTEM, HOW SHOULD THE RATE CHANGES AND COST RESPONSIBILITY BE ALLOCATED AMONG CUSTOMER CLASSES?

A. At this time, given the changes and uncertainties with MISO, the System Agreement and the proposed divestiture of the entire transmission system, I propose that any increase or decrease be spread proportionately across the system classes. Once Entergy and ETI address the proposed system cost changes – a reasonable class cost allocation study can be presented.

## V. OVERVIEW OF ETI'S FUEL COSTS

Q. WHAT ARE THE COMPANY'S TOTAL FUEL AND PURCHASED POWER EXPENSES DURING THE RECONCILIATION PERIOD?

A. For the period July 1, 2009 through June 30, 2011, ETI generated or purchased 44,145,144 MWh at a total cost of $1,697,471,673 or an average cost of $38.45 per MWh. The Company had off-system sales of 7,778,021 MWh with total revenues of $376,671,971 or average revenue of $48.43 per MWh. The net cost during the period was $36.32 per MWh.[51]

---

[51] Direct Testimony of Gregory Zakrzewski, Exhibit GRZ-1.

Q. **WHAT IS THE STANDARD BY WHICH ETI'S FUEL COSTS SHOULD BE EVALUATED?**

A. PUC Rule §25.236 (d) requires that in a proceeding to reconcile fuel factor revenues and expenses, an electric utility has the burden of showing that:

(A) its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers;

(B) if its eligible fuel expenses for the reconciliation period included an item or class of items supplied by an affiliate of the electric utility, the prices charged by the supplying affiliate to the electric utility were reasonable and necessary and no higher than the prices charged by the supplying affiliate to its other affiliates or divisions or to unaffiliated persons or corporations for the same item or class of items; and

(C) it has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period.

## VI. FUEL COST ADJUSTMENTS

Q. **PLEASE DESCRIBE THE FUEL COST ADJUSTMENTS YOU ARE RECOMMENDING.**

A. I am recommending several adjustments to fuel costs related to:

1. Natural Gas Storage Costs
2. Line Loss Factors

## A. NATURAL GAS STORAGE COSTS

Q. **PLEASE DESCRIBE THE COMPANY'S NATURAL GAS STORAGE FACILITY.**

A. The Spindletop storage facility consists of two salt-dome storage caverns, a compression facility used for injecting gas into the caverns, and a pipeline header

system that interconnects the storage caverns with Sabine Station. The Lewis Creek station is served from Spindletop through interconnections with Kinder Morgan Tejas Gas Pipeline, Kinder Morgan Texas Pipeline, and Copano Pipeline.[52] In 2004, the Company purchased the Spindletop gas storage facility from Spindletop Gas Transmission Company. Beginning in January 2005, the Company contracted with PB Energy Storage Services ("PB Energy") to operate the facilities. The payments ETI makes to PB Energy are treated as fuel payments and are included in the fuel reconciliation.

Q. **WHAT IS THE PURPOSE OF THE SPINDLETOP GAS STORAGE FACILITY?**

A. As detailed earlier in my testimony, Ms. McIlvoy explains that the primary benefits derived from the storage facility are increased supply reliability and swing flexibility.[53]

Q. **HOW HAS THE SPINDLETOP GAS STORAGE FACILITY BEEN USED?**

A. Figure 1 shows by month the sum of daily injections and withdrawals during the reconciliation period.[54]

---

[52] Direct Testimony of Karen McIlvoy, p. 31.
[53] *Id.*, p. 32-33.
[54] *Id.*, Exhibit KDM-12.

FIGURE 2



Q. WHAT WERE THE ELIGIBLE FUEL COSTS ASSOCIATED WITH THE FACILITY?

A. Table 13 summarizes the eligible fuel costs associated with the Spindletop facility.[55]

TABLE 13

| Payments to Storage Operator | Costs Allocated to Injections | Costs Allocated to Withdrawals | Eligible Fuel Costs |
|---|---|---|---|
| $10,002,745 | $(144,752) | $403,670 | $10,261,663 |

Q. ARE THE SPINDLETOP STORAGE COSTS REASONABLE?

A. No. As I discussed earlier in my testimony, the costs are not reasonable and the facility should be removed from rates.

---

[55] *Id.*, Exhibit KDM-13.

Q. **HAVE YOU MADE AN ADJUSTMENT TO STORAGE COSTS FOR THE RECONCILIATION PERIOD?**

A. Yes. The Company can and has entered into long term gas supply and transportation agreements that provide the same reliability and flexibility as the Spindletop facility, at a lower cost. I have adjusted the storage costs to reflect this alternative.

Q. **PLEASE SUMMARIZE THE ALTERNATIVES TO STORAGE THAT PROVIDE SUPPLY RELIABILITY AND SWING FLEXIBILITY TO THE SABINE AND LEWIS CREEK STATIONS.**

A. Effective December 2008, ETI entered into a long-term gas supply and transportation agreement with Enbridge Pipeline L.P. The agreement will provide increased supply reliability at Lewis Creek and Sabine because the supply associated with the Enbridge agreement is from the Barnett Shale and East Texas production areas rather than the prior south Texas and Louisiana Gulf Coast production areas, which are susceptible to tropical weather related disruptions. The agreement adds diversity to ETI's supply portfolio and therefore reduces the dependence on the other intrastate pipelines at both plants.[56]

In addition, spot gas to meet swing requirements can be delivered through multiple pipeline connections at both plants,[57] and the Company can even take advantage of imbalances under its operational balancing agreement with TETCO pipeline for hourly swing flexibility, depending on operating conditions.[58] Other

---

[56] Docket No. 37744, Direct Testimony of Devon Jaycox, p. 15-17.

[57] Schedule I-6.

[58] Response to Cities RFI 18-14.

pipelines provide swing service as well. For instance, Copano Pipeline serving the Lewis Creek plant, ██████████████████████████████████████ ██████████████████████████████████████.[59]

**Q. CONSIDERING THESE OTHER OPTIONS, DID YOU DO CALCULATE AN ADJUSTMENT TO STORAGE COSTS?**

A. Yes. Based on the operating plans for EGSL's generating plants, sufficient reliability and swing flexibility can be obtained through the existing natural gas supply and transportation contracts at Sabine and Lewis Creek. Transportation rates on various pipelines connected to Sabine and Lewis Creek ranged from 2.5¢ to 22¢ per MMBtu. I used as an average transportation rate the margin between the average cost of gas delivered to the Sabine Station and the Gas Daily Houston Ship Channel Index. This average margin is 18¢ per MMBtu and is a reasonable rate because Spindletop primarily serves the Sabine Station and the daily index best represents the supply flexibility described by Ms. McIlvoy in her deposition. I then added call options to provide the additional supply reliability that ETI claims is provided by storage. I included call options on 35,000 MMBtu/d for 5 days at a cost of $0.15 per option, and purchased options for June through September and January through March. These assumptions are consistent with the Company's experience during the last rate case.[60]

---

[59] Schedule I-6, Intrastate Gas Transportation Agreement with Copano Pipeline (Highly Sensitive).

[60] Docket No. 37744, Direct Testimony of Devon Jaycox, Exhibit DSJ-2.

Q. **WHAT IS YOUR RECOMMENDATION REGARDING THE COST TO OPERATE AND MAINTAIN THE SPINDLETOP STORAGE FACILITY?**

A. The average operating cost of the Spindletop facility during the reconciliation period was $0.56 per MMBtu.[61] I restated the average operating cost at the Spindletop facility to $0.18 per MMBtu plus the call options to provide reliability for the period and applied the resulting average $0.20 per MMBtu rate to the period withdrawals and adjustments of 18,331,863 MMBtu. This reduces storage costs to $3,666,373, or $6,595,290 less than the period amount. I addressed the base rate portion of Spindletop-related costs earlier in my testimony.

# B. LOSS FACTORS

Q. **WHAT ISSUE DO YOU ADDRESS IN THIS SECTION OF YOUR TESTIMONY?**

A. In this section of my testimony, I recommend that the Commission approve ETI's updated calculation of line loss factors and associated line loss multipliers. The line loss study was performed by ETI for the annual period ending December 31, 2010, in order to fairly allocate base rate demand and energy costs in this case to the wholesale class and the respective retail customer classes based upon the delivery voltage level of each customer. Loss factors are the actual average line losses experienced at each voltage level of the ETI transmission and distribution system. Line loss multipliers are the corresponding factors for each customer class, wholesale and retail, based

---

[61] $10,261,663 (Exhibit KDM-13) / 18,331,863 (Exhibit KDM-12) = $0.56 per MMBtu.

upon the make-up of the various voltage level customers within that class. The purpose of line loss factors and line loss multipliers is to ensure that customers, who are billed for energy at the meter, are responsible for their fair share of costs incurred at the plant.

Q. **IS THERE A PROBLEM WITH CONTINUING TO USE THE LINE LOSS FACTORS AND ASSOCIATED LINE LOSS MULTIPLIERS REFLECTED IN ETI'S FUEL FACTOR?**

A. Yes. ETI's proposed tariff Schedule FF Fixed Fuel Factor[62] includes loss multipliers by voltage level which were calculated in a study based on the 12 months ending December 31, 1997, and approved in Docket No. 19834. The loss factors by voltage level used to calculate the fuel factor and any fuel factor over/(under) recovery, are over 14 years old and do not represent the current cost of providing service to the wholesale customers or to the various retail customer classes. ETI's own analysis demonstrates that adjusting the allocation of fuel costs over the reconciliation period to reflect the actual line losses for each voltage level for the reconciliation period results in retail customers subsidizing wholesale customers by approximately $3.98 million.

---

[62] Schedule Q-8.8, p. 26.1.

Q. ARE THERE MORE RECENT LOSS FACTORS AVAILABLE TO CALCULATE THE FIXED FUEL FACTOR?

A. Yes there are. ETI performed a line loss study for the twelve months ending December 31, 2010, which falls squarely within the current reconciliation period. Schedule O-6.3 of the Company's rate filing package provides the results of the line loss study and ETI's amended response to Cities' RFI 6-1 provides the corresponding line loss multipliers by customer class. ETI uses these loss factors to calculate the demand and energy related allocation factors in its Schedule P-9 cost of service analysis, but did not apply these current loss factors to its fuel factor reconciliation. In ETI's response to Cities' RFI 16-9, ETI applies these line loss factors to the fuel costs over the reconciliation period.

Q. HAVE YOU CALCULATED THE IMPACT ON THE RETAIL CUSTOMER CLASS ALLOCATION OF FUEL COSTS USING THE CURRENT LOSS FACTORS?

A. Yes I have. In response to a request for information,[63] the Company provided a revised Schedule I-22A for the reconciliation period of July 2009 through June 2011 which was updated to reflect the actual loss factors calculated by the Company in Docket No. 39896 for the annual period in the middle of the two-year reconciliation period. In addition the Company provided kWh sales at the meter for each customer class for the reconciliation period. Using the data provided in this RFI response, I

---

[63] ETI's Response to Cities RFI 16-9.

have calculated the actual fuel costs incurred at the plant by wholesale customers and retail customer classes by voltage level.

Q.   **PLEASE DESCRIBE YOUR ANALYSIS.**

A.   I first allocated the Company's proposed Fixed Fuel Factor allocable fuel cost provided in the rate filing package Schedule I-22a using metered kWh adjusted for losses using the 1997 loss factors. This allocation is provided on pages 2 through 6 of 23 in my Fuel Cost Recovery workpapers. I then allocated the fuel cost provided in the updated Schedule I-22a included in the response to requests for information using metered kWh adjusted for losses based on the Company's current actual loss factors. This allocation is provided on pages 7 through 11 of 23 in my Fuel Cost Recovery workpapers and reflects the actual fuel costs at plant incurred by wholesale and retail customers at each voltage level. Pages 12 through 23 of these workpapers detail the loss adjustment to metered kWh using the 1997 and current loss factors.

Q.   **PLEASE DESCRIBE THE RESULTS OF YOUR ANALYSIS.**

A.   Table 14 compares a fuel cost allocation using line losses calculated in 1997 with the recommended fuel cost allocation using the Company's actual current loss factors provided in Docket No. 39896.

TABLE 14

| Line No. | Customer Class | ETI Allocated Fuel Costs | Cities Allocated Fuel Costs | Change |
|---|---|---|---|---|
| | (a) | (b) | (c) | (d) |
| 1 | RS Secondary | 466,940,745 | 464,097,898 | (2,842,847) |
| 2 | SGS - SA Secondary | 9,079 | 8,858 | (221) |
| 3 | SGS Secondary | 25,354,289 | 25,199,082 | (155,207) |
| 4 | GS - SA Secondary | 326,370 | 324,415 | (1,956) |
| 5 | GS Secondary | 243,253,190 | 241,761,967 | (1,491,223) |
| 6 | GS - SA Primary | 312,020 | 310,920 | (1,100) |
| 7 | GS Primary | 10,904,338 | 10,867,331 | (37,007) |
| 8 | GS 69/138 KV | 5,087,170 | 5,104,073 | 16,903 |
| 9 | GS 230 KV | 413,814 | 415,688 | 1,874 |
| 10 | LGS Secondary | 76,900,410 | 76,427,635 | (472,776) |
| 11 | LGS Primary | 31,339,382 | 31,232,487 | (106,894) |
| 12 | LGS 69/138 KV | 4,095,205 | 4,108,800 | 13,595 |
| 13 | LIPS-CS Primary | 8,771,136 | 8,740,784 | (30,352) |
| 14 | LPS 69/138 KV | 0 | 0 | 0 |
| 15 | LPS 230 KV | 0 | 0 | 0 |
| 16 | LIPS 69/138 KV | 266,481,094 | 267,370,925 | 889,831 |
| 17 | LIPS 230 KV | 64,476,161 | 64,748,818 | 272,656 |
| 18 | HLFS 69/138 KV | 0 | 0 | 0 |
| 19 | S&OL Secondary | 5,950,713 | 5,914,165 | (36,548) |
| 20 | Total Retail | 1,210,615,116 | 1,206,633,845 | (3,981,271) |

Q.  **WHAT IS YOUR RECOMMENDATION REGARDING THE ALLOCATION OF FUEL COSTS?**

A.  I recommend that the Commission approve the Company's line loss study and associated line loss factors and multipliers for use in future allocations of fuel costs, including the proposed future surcharge or refund for fuel factor over (under) recovery. I also recommend that the Commission approve the line loss multipliers calculated by ETI for use in future revisions of the fixed fuel factor tariff Schedule

FF. A comparison of the current fuel factor loss multipliers and those based on the current line loss study performed in Docket No. 39896 are provided in Table 15:

TABLE 15

| Delivery Voltage | 1997 Loss Multiplier | 2011 Loss Multiplier |
|---|---|---|
| Secondary | 1.034603 | 1.021709 |
| Primary | 1.004911 | 0.995128 |
| 68kV/138kV | 0.962921 | 0.960014 |
| 230kV | 0.945741 | 0.943839 |

The updated 2011 Loss Multipliers were calculated by the Company and provided in the amended response to RFI Cities 6-1.

Q. **DOES THIS CONCLUDE YOUR TESTIMONY?**

A. Yes, it does.

APPENDIX A

STATEMENT OF QUALIFICATIONS

Blank Page

# KARL J. NALEPA

Mr. Nalepa is an energy economist with more than 25 years of private and public sector experience in the electric and natural gas industries. He has extensive experience analyzing utility rate filings and resource plans with particular focus on fuel and power supply requirements, quality of fuel supply management, and reasonableness of energy costs. Mr. Nalepa developed peak demand and energy forecasts for municipal and electric cooperative utilities and has forecast the price of natural gas in ratemaking and resource plan evaluations. He led a management and performance review of the Texas Public Utility Commission, and has conducted performance reviews and valuation studies of a number of municipal utility systems. Mr. Nalepa previously directed the Railroad Commission of Texas' Regulatory Analysis & Policy Section, with responsibility for preparing timely natural gas industry analysis, managing ratemaking proceedings, mediating informal complaints, and overseeing consumer complaint resolution. He has prepared and defended expert testimony in both administrative and civil proceedings, and has served as a technical examiner in natural gas rate proceedings.

## EDUCATION

| | |
|---|---|
| 1998 | Certificate of Mediation<br>Dispute Resolution Center, Austin |
| 1989 | NARUC Regulatory Studies Program<br>Michigan State University |
| 1988 | M.S. - Petroleum Engineering<br>University of Houston |
| 1980 | B.S. - Mineral Economics<br>Pennsylvania State University |

## PROFESSIONAL HISTORY

| | |
|---|---|
| 2003 - | ReSolved Energy Consulting, LLC<br>(Formerly R.J. Covington Consulting, LLC)<br>President and Managing Director |
| 1997 – 2003 | Railroad Commission of Texas<br>Asst. Director, Regulatory Analysis & Policy |
| 1995 – 1997 | Karl J. Nalepa Consulting<br>Principal |
| 1992 – 1995 | Resource Management International, Inc.<br>Supervising Consultant |
| 1988 – 1992 | Public Utility Commission of Texas<br>Fuels Analyst |
| 1980 – 1988 | Transco Exploration Company<br>Reservoir and Evaluation Engineer |

# AREAS OF EXPERTISE

## Regulatory Analysis

*Electric Power*: Analyzed electric utility rate, certification, and resource forecast filings. Assessed the quality of fuel supply management, and reasonableness of costs recovered from ratepayers. Projected the cost of fuel and purchased power. Estimated the impact of environmental costs on utility resource selection. Participated in regulatory rulemaking activities. Provided expert staff testimony in a number of proceedings before the Texas Public Utility Commission.

As consultant, represent interests of municipal clients intervening in large utility rate proceedings through analysis of filings and presentation of testimony before the Public Utility Commission. Also assist municipal utilities in preparing and defending requests to change rates and other regulatory matters before the Public Utility Commission.

*Natural Gas*: Directed the economic regulation of gas utilities in Texas for the Railroad Commission of Texas. Responsible for monitoring, analyzing and reporting on conditions and events in the natural gas industry. Managed Commission staff representing the public interest in contested rate proceedings before the Railroad Commission, and acted as technical examiner on behalf of the Commission. Mediated informal disputes between industry participants and directed handling of customer billing and service complaints. Oversaw utility compliance filings and staff rulemaking initiatives. Served as a policy advisor to the Commissioners.

As consultant, represent interests of municipal clients intervening in large utility rate proceedings through analysis of filings and presentation of testimony before the cities and Railroad Commission. Also assist small utilities in preparing and defending requests to change rates and other regulatory matters before the Railroad Commission.

## Litigation Support

Retained to support litigation in natural gas contract disputes. Analyzed the results of contract negotiations and competitiveness of gas supply proposals considering gas market conditions contemporaneous with the period reviewed. Supported litigation related to alleged price discrimination related to natural gas sales for regulated customers. Provided analysis of regulatory and accounting issues related to ownership of certain natural gas distribution assets in support of litigation against a natural gas utility. Supported independent power supplier in binding arbitration regarding proper interpretation of a natural gas transportation contract. Provided expert witness testimony in administrative and civil court proceedings.

## Utility System Assessment

Led a management and performance review of the Public Utility Commission. Conducted performance reviews and valuation studies of municipal utility systems. Assessed ability to compete in the marketplace, and recommended specific actions to improve the competitive position of the utilities. Provided comprehensive support in the potential sale of a municipal gas system, including preparation of a valuation study and all activities leading to negotiation of contract for sale and franchise agreements.

## Energy Supply Analysis

Reviewed system requirements and prepared requests for proposals (RFPs) to obtain natural gas and power supplies for both utility and non-utility clients. Evaluated submittals under alternative demand and market conditions, and recommended cost-effective supply proposals. Assessed supply strategies to determine optimum mix of available resources.

## Econometric Forecasting

Prepared econometric forecasts of peak demand and energy for municipal and electric cooperative utilities in support of system planning activities. Developed forecasts at the rate class and substation levels. Projected price of natural gas by individual supplier for Texas electric and natural gas utilities to support review of utility resource plans.

## Reservoir Engineering

Managed certain reserves for a petroleum exploration and production company in Texas. Responsible for field surveillance of producing oil and natural gas properties, including reserve estimation, production forecasting, regulatory reporting, and performance optimization. Performed evaluations of oil and natural gas exploration prospects in Texas and Louisiana.

## PROFESSIONAL MEMBERSHIPS

Society of Petroleum Engineers
International Association for Energy Economics

# SELECT PUBLICATIONS, PRESENTATIONS, AND TESTIMONY

"Natural Gas Regulatory Policy in Texas," Hungarian Oil and Gas Policy Business Colloquium, U.S. Trade and Development Agency, Houston, May 2003

"Railroad Commission Update," Texas Society of Certified Public Accountants, Austin, April 2003

"Gas Utility Update," Railroad Commission Regulatory Expo and Open House, October 2002

"Deregulation: A Work in Progress," Interview by Karen Stidger, *Gas Utility Manager*, October 2002

"Regulatory Overview: An Industry Perspective," Southern Gas Association's Ratemaking Process Seminar, Houston, February 2001

"Natural Gas Prices Could Get Squeezed," with Commissioner Charles R. Matthews, *Natural Gas*, December 2000

"Railroad Commission Update," Texas Society of Certified Public Accountants, Austin, April 2000

"A New Approach to Electronic Tariff Access," Association of Texas Intrastate Natural Gas Pipeline Annual Meeting, Houston, January 1999

"A Texas Natural Gas Model," United States Association for Energy Economics North American Conference, Albuquerque, 1998

"Texas Railroad Commission Aiding Gas Industry by Updated Systems, Regulations," *Natural Gas,* July 1998

"Current Trends in Texas Natural Gas Regulation," Natural Gas Producers Association, Midland, 1998

"An Overview of the American Petroleum Industry," Institute of International Education Training Program, Austin, 1993

Direct testimony in PUC Docket No. 10400 summarized in *Environmental Externality,* Energy Research Group for the Edison Electric Institute, 1992

"God's Fuel - Natural Gas Exploration, Production, Transportation and Regulation," with Danny Bivens, Public Utility Commission of Texas Staff Seminar, 1992

"A Summary of Utilities' Positions Regarding the Clean Air Act Amendments of 1990," Industrial Energy Technology Conference, Houston, 1992

"The Clean Air Act Amendments of 1990," Public Utility Commission of Texas Staff Seminar, 1992

"The Industrial End-Use Model," Chapter Three, *End Use Modeling Project: Interim Report,* Public Utility Commission of Texas, 1989

APPENDIX B

PREVIOUSLY FILED TESTIMONY

# KARL J. NALEPA
## TESTIMONY FILED

| DKT NO. | DATE | REPRESENTING | UTILITY | PHASE | ISSUES |
|---|---|---|---|---|---|
| Louisiana Public Service Commission | | | | | |
| U-31971 | Nov 11 | PSC Staff | Entergy Louisiana, LLC/ Entergy Gulf States Louisiana | Resource Certification | Prudence / Cost Recovery |
| Public Utility Commission of Texas | | | | | |
| 39366 | Jul 11 | Cities | Entergy Texas, Inc. | Energy Efficiency Cost Recovery Factor | Cost of Service/Rate Design |
| 38480 | Nov 10 | Cities | Texas-New Mexico Power | Cost of Service | Cost of Service/Rate Design |
| 38815 | Sep 10 | Denton Municipal Electric | Denton Municipal Electric | Interim TCOS | Wholesale Transmission Rate |
| 37744 | Jun 10 | Cities | Entergy Texas, Inc. | Cost of Service/ Fuel Reconciliation | Cost of Service/ Nat Gas/ Purch Power/ Gen |
| 37580 | Dec 09 | Cities | Entergy Texas, Inc. | Fuel Refund | Fuel Refund Methodology |
| 36956 | Jul 09 | Cities | Entergy Texas, Inc. | EECRF | EECRF Methodology |
| 36392 | Nov 08 | TMPA | TMPA | Interim TCOS | Wholesale Transmission Rate |
| 35717 | Nov 08 | Cities Steering Committee | Oncor | Cost of Service | Cost of Service/Rate Design |
| 34800 | Apr 08 | Cities | Entergy Gulf States | Fuel Reconciliation | Natural Gas/Coal/Nuclear |
| 16705 | May 97 | North Star Steel | Entergy Texas | Fuel Reconciliation | Natural Gas/Fuel Oil/ |

| DKT NO. | DATE | REPRESENTING | UTILITY | PHASE | ISSUES |
|---|---|---|---|---|---|

Public Utility Commission of Texas (continued)

| DKT NO. | DATE | REPRESENTING | UTILITY | PHASE | ISSUES |
|---|---|---|---|---|---|
| 10694 | Jan 92 | PUC Staff | Midwest Electric Coop | Revenue Requirements | Depreciation/ Quality of Service |
| 10473 | Sep 91 | PUC Staff | HL&P | Notice of Intent | Environmental Costs |
| 10400 | Aug 91 | PUC Staff | TU Electric | Notice of Intent | Environmental Costs |
| 10092 | Mar 91 | PUC Staff | HL&P | Fuel Reconciliation | Natural Gas/Fuel Oil |
| 10035 | Jun 91 | PUC Staff | West Texas Utilities | Fuel Reconciliation Fuel Factor | Natural Gas Natural Gas/Fuel Oil/Coal |
| 9850 | Feb 91 | PUC Staff | HL&P | Revenue Req. Fuel Factor | Natural Gas/Fuel Oil/ETSI Natural Gas/Coal/Lignite |
| 9561 | Aug 90 | PUC Staff | Central Power & Light | Fuel Reconciliation Revenue Requirements Fuel Factor | Natural Gas Natural Gas/Fuel Oil Natural Gas |
| 9427 | Jul 90 | PUC Staff | LCRA | Fuel Factor | Natural Gas |
| 9165 | Feb 90 | PUC Staff | El Paso Electric | Revenue Requirements Fuel Factor | Natural Gas/Fuel Oil Natural Gas |
| 8900 | Jan 90 | PUC Staff | SWEPCO | Fuel Reconciliation Fuel Factor | Natural Gas Natural Gas |
| 8702 | Sep 89 Jul 89 | PUC Staff | Gulf States Utilities | Fuel Reconciliation Revenue Requirements Fuel Factor | Natural Gas/Fuel Oil Natural Gas/Fuel Oil Natural Gas/Fuel Oil |
| 8646 | May 89 Jun 89 | PUC Staff | Central Power & Light | Fuel Reconciliation Revenue Requirements Fuel Factor | Natural Gas Natural Gas/Fuel Oil Natural Gas |
| 8588 | Aug 89 | PUC Staff | El Paso Electric | Fuel Reconciliation | Natural Gas |

7

| DKT NO. | DATE | REPRESENTING | UTILITY | PHASE | ISSUES |
|---|---|---|---|---|---|
| Railroad Commission of Texas | | | | | |
| 10106 | Oct 11 | Gulf Coast Coalition | CenterPoint Energy Entex | Cost of Service | Cost of Service/Rate Design |
| 10083 | Aug 11 | City of Magnolia, Texas | Hughes Natural Gas | Cost of Service | Cost of Service/Rate Design |
| 10038 | Feb 11 | Cities Steering Committee | CenterPoint Energy Entex | Cost of Service | Cost of Service/Rate Design |
| 10021 | Oct 10 | AgriTex Gas, Inc. | AgriTex Gas, Inc. | Cost of Service | Cost of Service/Rate Design |
| 10000 | Dec 10 | Cities Steering Committee | Atmos Pipeline Texas | Cost of Service | Cost of Service/Rate Design |
| 9902 | Oct 09 | Gulf Coast Coalition | CenterPoint Energy Entex | Cost of Service | Cost of Service/Rate Design/Riders |
| 9810 | Jul 08 | Bluebonnet Natural Gas | Bluebonnet Natural Gas | Cost of Service | Cost of Service/Rate Design |
| 9797 | Apr 08 | Universal Natural Gas | Universal Natural Gas | Cost of Service | Cost of Service/Rate Design |
| 9732 | Jul 08 | Cities Steering Committee | Atmos Energy Corp. | Gas Cost Review | Natural Gas Costs |
| 9670 | Oct 06 | Cities Steering Committee | Atmos Energy Corp. | Cost of Service | Affiliate Transactions/ O&M Expenses/GRIP |
| 9667 | Nov 06 | Oneok Westex Transmission | Oneok Westex Transmission | Abandonment | Abandonment |
| 9598 | Sep 05 | Cities Steering Committee | Atmos Energy Corp. | GRIP Appeal | GRIP Calculation |
| 9530 | Apr 05 | Cities Steering Committee | Atmos Energy Corp. | Gas Cost Review | Natural Gas Costs |
| 9400 | Dec 03 | Cities Steering Committee | TXU Gas Company | Cost of Service | Affiliate Transactions/ O&M Expenses/Capital Costs |

Entergy Texas, Inc.
Docket No. 39896
Cities Schedule P
For the Test Year Ended June 30, 2011

| Ln No. | DESCRIPTION | ALLOCATION FACTOR | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | WHOLESALE |
|---|---|---|---|---|---|
| | **SUMMARY OF RESULTS** | | | | |
| 1 | RATE BASE | | 1,558,489,613 | 1,538,729,862 | 19,759,751 |
| | REVENUES | | | | |
| 2 | RATE SCHEDULE REVENUE | | 648,019,550 | 634,114,242 | 13,905,308 |
| 3 | OTHER SALES FOR RESALE | | 58,675,159 | 55,518,905 | 3,156,254 |
| 4 | TOTAL SALES REVENUES (L2 + L3) | | 706,694,709 | 689,633,147 | 17,061,562 |
| 5 | OTHER OPERATING REVENUES | | 48,171,991 | 47,772,887 | 399,105 |
| 6 | PROVISION FOR RATE REFUND | | 0 | 0 | 0 |
| 7 | TOTAL REVENUES (L4 + L5 + L6) | | 754,866,700 | 737,406,034 | 17,460,666 |
| 8 | TOTAL OPERATING EXPENSES | | 460,474,258 | 449,744,074 | 10,730,184 |
| 9 | TOTAL OPERATING INCOME (L7 - L8) | | 294,392,442 | 287,661,960 | 6,730,482 |
| 10 | EARNED RATE OF RETURN ON RATE BASE (L9 / L1) | | 18.89% | 18.69% | 34.06% |
| | REVENUE REQUIREMENT DETERMINATION | | | | |
| 11 | REQUIRED RATE OF RETURN | | 8.12% | 8.12% | 8.12% |
| 12 | REQUIRED OPERATING INCOME (L1 * L11) | | 126,536,524 | 124,932,195 | 1,604,329 |
| | REVENUE CONVERSION FACTORS | | | | |
| 13 | INCOME TAX REVENUE CONVERSION FACTOR | | 53.85% | 53.85% | 53.85% |
| 14 | REVENUE RELATED TAX REVENUE CONVERSION FACTOR | | 1.03% | 1.03% | 1.03% |
| 15 | BAD DEBT REVENUE CONVERSION FACTOR | | 0.27% | 0.27% | 0.00% |
| | REVENUE DEFICIENCY | | | | |
| 16 | OPERATING INCOME DEFICIENCY (L12 - L9) | | (167,855,918) | (162,729,765) | (5,126,153) |
| 17 | INCREMENTAL INCOME TAX (L16 * L13) | | (90,383,956) | (87,623,719) | (2,760,236) |
| 18 | INCREMENTAL REVENUE RELATED TAX (L16 + L17 + L19) * L14 | | (2,662,910) | (2,581,781) | (81,129) |
| 19 | INCREMENTAL BAD DEBT EXPENSE (L16 + L17 + L18) * L15 | | (616,247) | (616,247) | 0 |
| 20 | TOTAL REVENUE DEFICIENCY/(EXCESS) EXCL PUR. PWR. (SUM OF L16 - L19) | | (261,519,031) | (253,551,512) | (7,967,519) |
| 21 | PLUS PPR RIDER | 1 | (35,870,747) | (33,941,188) | (1,929,559) |
| 22 | PLUS IS RIDER | 79 | - | - | - |
| 23 | PLUS REC RIDER | 79 | - | - | - |
| | PLUS MUNICIPAL FRANCHISE FEES | | | | |
| 24 | TOTAL REVENUE DEFICIENCY/(EXCESS) | | (297,389,778) | (287,492,700) | (9,897,078) |
| 25 | % INCREASE/(DECREASE) (L20 / L2) | | -45.89% | -45.34% | -71.17% |
| 26 | RATE SCHEDULE REVENUE REQUIREMENT (L2 + L20) | | 350,629,772 | 346,621,542 | 4,008,229 |
| 27 | ETI'S REQUESTED REVENUE REQUIREMENT | | 479,928,299 | 472,621,802 | 7,306,497 |
| 28 | ETI'S REQUESTED REVENUE DEFICIENCY INCL RIDERS (LINE 24) | | 118,142,929 | 111,823,864 | 6,319,065 |
| 29 | CITIES ADJUSTMENT | | (129,298,527) | (126,000,260) | (3,298,268) |
| 30 | REVENUE DEFICIENCY/(EXCESS) | | (11,155,598) | (14,176,396) | 3,020,797 |
| 31 | CITIES ADJUSTMENT EXCLUDING PPR IS & REC RIDERS | | (93,427,780) | (92,059,072) | (1,368,708) |

Entergy Texas, Inc.
Docket No. 39896
Cities Schedule P
For the Test Year Ended June 30, 2011

| Ln No. | DESCRIPTION | ALLOCATION FACTOR | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | WHOLESALE |
|---|---|---|---|---|---|
| | **RATE BASE SUMMARY** | | | | |
| 1 | PLANT IN SERVICE | | 3,198,793,204 | 3,139,991,077 | 58,802,127 |
| 2 | ACCUMULATED DEPRECIATION / AMORTIZATION | | (1,212,712,279) | (1,178,895,472) | (33,816,807) |
| 3 | NET PLANT | | 1,986,080,925 | 1,961,095,605 | 24,985,320 |
| 4 | WORKING CASH | | (21,237,882) | (20,974,670) | (263,212) |
| 5 | FUEL INVENTORY | | 9,073,881 | 8,719,426 | 354,455 |
| 6 | MATERIALS AND SUPPLIES EXCLUDING ALLOWANCES | | 29,252,574 | 28,711,438 | 541,136 |
| 7 | PREPAYMENTS | | 7,218,037 | 7,186,858 | 31,179 |
| 8 | PROPERTY INSURANCE RESERVE | | 34,051,597 | 34,051,597 | 0 |
| 9 | INJURIES & DAMAGES RESERVES | | (5,569,243) | (5,404,120) | (165,122) |
| 10 | COAL CAR MAINTENANCE RESERVE | | 1,400,350 | 1,345,648 | 54,702 |
| 11 | UNFUNDED PENSION | | (9,835,109) | (9,543,509) | (291,601) |
| 12 | ALLOWANCES | | 68,914 | 67,647 | 1,267 |
| 13 | COMMERCIAL LITIGATION | | 0 | 0 | 0 |
| 14 | ENVIRONMENTAL RESERVES | | (1,062,190) | (1,044,215) | (17,974) |
| 15 | CUSTOMER DEPOSITS | | (35,872,476) | (35,872,476) | 0 |
| 16 | ACCUMULATED DEFERRED INCOME TAXES | | (441,391,997) | (435,921,599) | (5,470,398) |
| 17 | ACCUMULATED DEFERRED ITC | | 0 | 0 | 0 |
| 18 | RATE CASE EXPENSES | | 6,175,000 | 6,175,000 | 0 |
| 19 | REGULATORY ASSETS AND LIABILITIES | | 137,232 | 137,232 | 0 |
| 20 | **RATE BASE** | | 1,558,489,613 | 1,538,729,862 | 19,759,751 |
| | | | (182,606,822) | | |

Entergy Texas, Inc.
Docket No. 39896
Cities Schedule P
For the Test Year Ended June 30, 2011

| Ln No. | DESCRIPTION | ALLOCATION FACTOR | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | WHOLESALE |
|---|---|---|---|---|---|
| | **REVENUES** | | | | |
| 1 | SALES REVENUES | | 706,694,709 | 689,633,147 | 17,061,562 |
| 2 | OTHER OPERATING REVENUES | | 48,171,991 | 47,772,887 | 399,105 |
| 3 | PROVISION FOR RATE REFUND | | 0 | 0 | 0 |
| 4 | **TOTAL REVENUES** | | 754,866,700 | 737,406,034 | 17,460,666 |
| | | | | | |
| | **OPERATING EXPENSES** | | | | |
| | O & M EXPENSE | | | | |
| 5 | PRODUCTION EXPENSES | | 47,575,533 | 45,344,134 | 2,231,399 |
| 6 | TRANSMISSION EXPENSES | | 22,891,692 | 22,891,692 | 0 |
| 7 | REGIONAL MARKET EXPENSES | | 1,009,426 | 1,008,442 | 984 |
| 8 | DISTRIBUTION EXPENSES | | 30,680,337 | 30,398,544 | 281,793 |
| 9 | CUSTOMER ACCOUNTING EXPENSES | | 17,839,743 | 17,088,390 | 751,353 |
| 10 | CUSTOMER SERVICES EXPENSES | | 4,340,078 | 4,340,078 | 0 |
| 11 | SALES EXPENSES | | 1,089,611 | 1,070,128 | 19,483 |
| 12 | ADMINISTRATIVE & GENERAL EXPENSES | | 63,160,315 | 61,282,501 | 1,877,815 |
| 13 | OPERATION & MAINTENANCE EXPENSE | | 188,586,734 | 183,423,907 | 5,162,827 |
| 14 | GAINS FROM DISP OF ALLOWANCES | | 0 | 0 | 0 |
| 15 | REGULATORY DEBITS AND CREDITS | | 5,245,925 | 4,963,736 | 282,189 |
| 16 | INTEREST ON CUSTOMER DEPOSITS | | 68,985 | 68,130 | 855 |
| 17 | DEPRECIATION AND AMORTIZATION EXPENSE | | 75,569,475 | 74,395,233 | 1,174,242 |
| 18 | TAXES OTHER THAN INCOME | | 58,804,807 | 58,172,965 | 631,842 |
| | CURRENT INCOME TAXES | | | | |
| 19 | FEDERAL INCOME TAX | | 118,847,134 | 115,799,865 | 3,047,269 |
| 20 | STATE INCOME TAX | | (37,732) | (36,613) | (1,119) |
| 21 | CURRENT INCOME TAXES | | 118,809,402 | 115,763,252 | 3,046,150 |
| | PROVISION FOR DEFERRED INCOME TAXES | | | | |
| 22 | PROVISION FOR DEFERRED INCOME TAXES - FEDERAL | | 14,962,189 | 14,502,193 | 459,995 |
| 23 | PROVISION FOR DEFERRED INCOME TAXES - STATE | | 84,347 | 81,846 | 2,501 |
| 24 | PROVISION FOR DEFERRED INCOME TAXES | | 15,046,536 | 14,584,039 | 462,496 |
| 25 | INVESTMENT TAX CREDITS A/C 411 | | (1,657,606) | (1,627,189) | (30,417) |
| 26 | **TOTAL OPERATING EXPENSES** | | 460,474,258 | 449,744,074 | 10,730,184 |

Blank Page

Fuel Reconciliation Cost Adjustment Summary

| | Spindletop Storage Facility Operating Costs | | | | | | | Line Loss Costs | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Payments to Storage Operator | Cost Allocation to Inventory | | ETI Eligible Storage Fuel Cost | Storage Withdrawals and Adjustments | Cities Proposed Storage Fuel Cost | Difference in Storage Fuel Cost | ETI Allocated Fuel Cost | Cities Allocated Fuel Cost | Difference in Line Loss Fuel Cost | Total Difference |
| | | Injections | Withdrawals | | | | | | | | |
| Jul-09 | 190,586 | 0 | 68,341 | 258,927 | (967,954) | 193,591 | (65,336) | 60,508,694 | 60,309,479 | (199,215) | (264,551) |
| Aug-09 | 458,607 | (7,636) | 0 | 450,971 | (910,787) | 182,157 | (268,814) | 47,892,586 | 47,734,672 | (157,913) | (426,727) |
| Sep-09 | 277,203 | (637) | 0 | 276,566 | (809,549) | 161,910 | (114,656) | 38,132,827 | 38,007,278 | (125,549) | (240,205) |
| Oct-09 | 586,214 | (17,862) | 0 | 568,352 | (675,482) | 135,096 | (433,256) | 39,860,472 | 39,729,460 | (131,012) | (564,267) |
| Nov-09 | 558,364 | 0 | 28,091 | 586,455 | (328,023) | 65,605 | (520,850) | 34,608,184 | 34,494,283 | (113,901) | (634,751) |
| Dec-09 | 0 | 0 | 46,849 | 46,849 | (642,533) | 128,507 | 81,658 | 53,047,070 | 52,872,626 | (174,444) | (92,787) |
| Jan-10 | 346,088 | (34,181) | 0 | 311,907 | (402,070) | 80,414 | (231,493) | 68,250,582 | 68,026,673 | (223,909) | (455,402) |
| Feb-10 | 623,341 | 0 | 14,501 | 637,842 | (340,204) | 68,041 | (569,801) | 53,105,832 | 52,931,070 | (174,762) | (744,564) |
| Mar-10 | 185,536 | 0 | 32,417 | 217,953 | (352,558) | 70,512 | (147,441) | 37,225,005 | 37,102,516 | (122,489) | (269,930) |
| Apr-10 | 406,932 | 0 | 37,736 | 444,668 | (650,919) | 130,184 | (314,484) | 33,053,739 | 32,945,129 | (108,610) | (423,094) |
| May-10 | 568,957 | (9,251) | 0 | 559,706 | (761,151) | 152,230 | (407,476) | 54,062,212 | 53,884,276 | (177,936) | (585,412) |
| Jun-10 | 490,857 | (14,285) | 0 | 476,572 | (828,524) | 165,705 | (310,867) | 68,342,777 | 68,118,429 | (224,348) | (535,215) |
| Jul-10 | 733,329 | 0 | 36,424 | 769,753 | (1,248,176) | 249,635 | (520,118) | 70,356,347 | 70,124,901 | (231,446) | (751,563) |
| Aug-10 | 113,151 | (948) | 0 | 112,203 | (1,000,525) | 200,105 | 87,902 | 81,934,891 | 81,665,245 | (269,646) | (181,744) |
| Sep-10 | 430,021 | (10,608) | 0 | 419,413 | (715,348) | 143,070 | (276,343) | 49,869,341 | 49,705,504 | (163,837) | (440,180) |
| Oct-10 | 426,185 | 0 | 23,354 | 449,539 | (831,584) | 166,317 | (283,222) | 25,631,179 | 25,546,682 | (84,497) | (367,719) |
| Nov-10 | 446,619 | (13,251) | 0 | 433,368 | (413,276) | 82,655 | (350,713) | 31,317,885 | 31,214,945 | (102,940) | (453,653) |
| Dec-10 | 132,759 | (2,090) | 0 | 130,669 | (288,652) | 57,730 | (72,939) | 45,737,661 | 45,587,106 | (150,555) | (223,493) |
| Jan-11 | 341,006 | (2,683) | 0 | 338,323 | (411,742) | 82,348 | (255,975) | 51,829,772 | 51,659,579 | (170,193) | (426,168) |
| Feb-11 | 603,212 | 0 | 9,325 | 612,537 | (601,934) | 120,387 | (492,150) | 48,624,815 | 48,464,956 | (159,859) | (652,009) |
| Mar-11 | 699,044 | (31,317) | 0 | 667,727 | (580,673) | 116,135 | (551,592) | 45,801,902 | 45,651,389 | (150,512) | (702,105) |
| Apr-11 | 537,836 | 0 | 68,838 | 606,674 | (766,831) | 153,366 | (453,308) | 42,429,275 | 42,289,625 | (139,650) | (592,958) |
| May-11 | 555,439 | 0 | 19,245 | 574,684 | (827,689) | 165,538 | (409,146) | 60,993,800 | 60,793,134 | (200,666) | (609,812) |
| Jun-11 | 291,458 | 0 | 18,547 | 310,005 | (874,174) | 174,835 | (135,170) | 67,998,268 | 67,774,884 | (223,384) | (358,554) |
| | 10,002,744 | (144,749) | 403,668 | 10,261,663 | (16,230,358) | 3,246,072 | (7,015,591) | 1,210,615,116 | 1,206,633,845 | (3,981,271) | (10,996,863) |
| Using Exhibit KDM-12 totals: | | | | | (18,331,863) | 3,666,373 | (6,595,290) | | | | (10,576,562) |

Blank Page

HIGHLY SENSITIVE: CONFIDENTIAL

TEST-YEAR CAPACITY COSTS

Blank Page

HIGHLY SENSITIVE: CONFIDENTIAL

RATE-YEAR CAPACITY COSTS

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
SOAH DOCKET NO. 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
PUC DOCKET NO. 39896 - 2011 ETI Rate Case

| | |
|---|---|
| Response of: Entergy Texas, Inc. | Prepared By: Subparts "a through "f" Counsel; Subparts "g" and "h" Kelly Louque |
| to the Third Set of Data Requests | Sponsoring Witness: Subparts "a through "f" N/A; Subparts "g" and "h" Patrick Cicio |
| of Requesting Party: Cities | Beginning Sequence No. Ending Sequence No. |

Question No.: Cities 3-3          Part No.:          Addendum:

Question:

In reference to the proposed sale of the Entergy transmissions assets to ITC Holdings, please provide the following formation:

a.   A copy of the current agreement of sale;

b.   A copy of all due diligence analyses performed by or on behalf of Entergy evaluating the sale;

c.   The current expected or estimated date for completion of the proposed transaction;

d.   The total proceeds expected to be received by Entergy from the proposed transaction;

e.   The book value of transmission assets to be sold under the transaction;

f.   The book value of transmission assets located in Texas that are to be sold under the proposed transaction;

g.   The total MSS-2 charges to all Entergy operating companies for each of the past five years 2006-2010 and the test year in this case;

h.   The total MSS-2 charges to Entergy Texas for each of the past five years 2006-2010 and for the test year.

Response:

ETI objects to this RFI because it seeks information or data that is not relevant to the Company's pending request for relief and is therefore outside the scope of this proceeding. Parties and the Commission will have a full opportunity to review issues

**39896**          **CITIES' EXHIBIT 28**          Cities 3-3 LR154

Question No.: Cities 3-3

relating to the Company's plan to transfer its electric transmission business to ITC Holdings Corp. in a future, separate proceeding requesting approval of that proposed transaction. ETI is not seeking any relief or approval associated with that proposed transaction in the instant proceeding. Notwithstanding this objection, and without waiving the same, ETI provides the following response:

(a)     See the Company's response to State 1-6.
(b)     The Company has filed an objection to this request.
(c)     As disclosed in the December 5, 2011 press release, the transaction is expected to close by the end of 2013.
(d)     See the Company's response to TIEC 1-48.
(e)     See the Company's response to State 1-6. Refer to the Form 8-K filed December 6, 2011, Item 1.01. Entry into a Material Definitive Agreement, Separation Agreement.
(f)     See (e) above.
(g)     Please see the attached.
(h)     See (g) above.

Entergy Operating Companies MSS-2 payments/(receipts) for the years 2006 - 2011
Credits reflect revenue (receipts); Debits reflect expense (payments)

| Year | EAI | EGSI | ELL | EGSL | EMI | ENOI | ETI |
|------|-----|------|-----|------|-----|------|-----|
| 2006 | $ 7,691,868 | $ (2,649,584) | $ (8,111,212) | | $ (1,971,870) | $ 5,040,797 | |
| 2007 | 2,204,469 | 5,882,997 | (6,856,050) | | (5,962,975) | 4,731,559 | |
| 2008 | (1,415,587) | | (7,837,669) | 11,762,725 | (5,653,578) | 5,804,604 | (2,660,494) |
| 2009 | (3,812,177) | | (7,896,585) | 9,427,916 | (3,532,269) | 6,773,517 | (960,402) |
| 2010 | (4,909,612) | | (7,424,245) | 7,377,010 | (3,835,941) | 8,233,158 | 559,630 |
| 2011* | (2,104,269) | | (1,691,230) | 1,515,163 | (3,400,589) | 4,331,993 | 1,348,932 |
| Grand Total | $ (2,345,309) | $ 3,233,413 | $ (39,816,991) | $ 30,082,815 | $ (24,357,222) | $ 34,915,628 | $ (1,712,334) |

*2011 includes January - June 2011

Entergy Operating Companies MSS-2 payments/(receipts) for the test year July 2010 - June 2011
Credits reflect revenue (receipts); Debits reflect expense (payments)

| | EAI | ELL | EGSL | EMI | ENOI | ETI |
|------|-----|-----|------|-----|------|-----|
| 7/2010 - 6/2011 | $ (4,169,001) | $ (4,738,043) | $ 3,955,371 | $ (5,329,599) | $ 8,527,476 | $ 1,753,797 |

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
SOAH DOCKET NO. 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
PUC DOCKET NO. 39896 - 2011 ETI Rate Case

| | |
|---|---|
| Response of: Entergy Texas, Inc. | Prepared By: Frances Grant/Rachelle Hayes |
| to the Fifth Set of Data Requests | Sponsoring Witness: Robert R. Cooper/ Patrick Cicio |
| of Requesting Party: Cities | Beginning Sequence No. |
| | Ending Sequence No. |

| | | |
|---|---|---|
| Question No.: Cities 5-1 | Part No.: | Addendum: 2 |

Question:

In reference to Mr. Cicio's direct testimony at page 8 of 75, lines 19–23, through page 9, lines 1-11, please provide:

    a.    A complete and detailed explanation outlining how the system does its joint planning of generation resources;

    b.    List all the factors that go into the joint plan of resources;

    c.    Provide copies of the most recent three joint resource plans;

    d.    Provide monthly peaks coincident with the System for each of the operating companies for the past five years 2006-2010 and all the months available in 2011 that are employed in the joint planning process;

    e.    Provide a list of generating resources for each operating company showing Mw capability for each resource by month for calendar 2010 and test year and rate year;

    f.    Provide a list of all firm purchase capability available to each operating company showing Mw capability for each resource purchase by month for calendar 2010, test year and rate year;

    g.    Provide the current load forecast for each operating company;

    h.    Provide the current system estimate long or short resources for each system operating company.

Response:

In response to several data requests in this set, Entergy Texas is providing a copy of the Intra-System Bill (ISB) for January 2006 through November 2011. We will reference the responsive Attachment number for each subsequent inquiry. See the attached public CD.

a. Please see the response to Cities 1-36.

b. Please see the response to Cities 1-36.

c. Please see the response to Cities 1-36.

d. See Attachment 4 of the ISBs for Monthly Coincident Peaks.

e. The Company objects to this request on grounds that the responsive materials are highly sensitive protected ("highly sensitive") materials. Specifically, the responsive materials are protected pursuant to Texas Government Code Sections 552.101, 552.104 and/or 552.110. Highly sensitive materials will be provided pursuant to the terms of the Protective Order in this docket.

   See attachment 5 section (A) of the ISBs for owned generating resources with MW. Please also see the attached Highly Sensitive CD for supporting workpapers.

f. The Company objects to this request on grounds that the responsive materials are highly sensitive protected ("highly sensitive") materials. Specifically, the responsive materials are protected pursuant to Texas Government Code Sections 552.101, 552.104 and/or 552.110. Highly sensitive materials will be provided pursuant to the terms of the Protective Order in this docket.

   See Attachment 5 sections (B) and (D) of the ISBs for purchased capability with MW. Please also see the attached Highly Sensitive CD for supporting workpapers.

g. The Company objects to this request on grounds that the responsive materials are highly sensitive protected ("highly sensitive") materials. Specifically, the responsive materials are protected pursuant to Texas Government Code Sections 552.101, 552.104 and/or 552.110. Highly sensitive materials will be provided pursuant to the terms of the Protective Order in this docket.

   See the attached Highly Sensitive CD.
   "FEA121_Firm_NonCoin_Pks_xBrazos_HSPI.xls" contains the current long-term forecast for each operating company's annual firm peak, non-coincident to the system. AECC load is not included.

h. Please see the response to Cities 1-36.

Question No.: Cities 5-1 Addendum 2

**Addendum 1:**

Please see the attached public CD containing the December 2011 Intra-System Bill (ISB).

**Addendum 2:**

See the attached ISBs for January and February 2012.

Entergy Electric System
Intra-System Billing-201001RA

Date range - 20100101 through 20100131
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 46

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 410,205,414.53 | 494,272,097.89 | 260,087,078.50 | 31,189,868.31 | 320,330,456.87 | 214,793,237.35 |
| Deferred Taxes | 36,427,497.00 | 58,284,456.00 | 31,434,045.00 | 3,238,453.00 | 28,094,818.00 | 19,886,865.00 |
| Depreciation Reserve | 159,055,766.00 | 175,602,699.00 | 92,625,850.00 | 14,199,888.00 | 161,930,338.00 | 57,270,189.00 |
| Net Transmission Investment | 214,722,151.53 | 260,384,942.89 | 136,027,183.50 | 13,751,527.31 | 130,305,300.87 | 137,636,183.35 |
| Cost of Capital |  |  |  |  |  |  |
| Debt Ratio (DR) | 0.477800 | 0.497100 | 0.484800 | 0.453100 | 0.478900 | 0.486400 |
| Bond Cost (i) | 0.061400 | 0.068000 | 0.061900 | 0.060800 | 0.058700 | 0.053500 |
| Preferred Ratio (PR) | 0.039500 | 0.022700 | 0.035800 | 0.047300 | 0.003600 |  |
| Preferred Cost (p) | 0.059900 | 0.075800 | 0.056900 | 0.048200 | 0.087100 |  |
| Common Ratio (ER) | 0.482700 | 0.480200 | 0.479400 | 0.499600 | 0.517500 | 0.513600 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084800 | 0.088346 | 0.084780 | 0.084784 | 0.085350 | 0.082518 |
| Tax Rate (F) | 0.035797 | 0.034112 | 0.033927 | 0.035796 | 0.035798 | 0.030421 |
| Operating Expenses |  |  |  |  |  |  |
| Depreciation Factor (D) | 0.0148650 | 0.0280260 | 0.0225760 | 0.0282250 | 0.0198170 | 0.0200000 |
| Insurance Expense (I) |  | 0.0043880 | 0.0040920 |  | 0.0062920 | 0.0008440 |
| Property Tax (PT) | 0.0045360 | 0.0091200 | 0.0174110 | 0.0112200 | 0.0085080 | 0.0075140 |
| Franchise Tax (FT) | 0.0000490 |  | 0.0010150 | 0.0014940 | (0.0000140) | 0.0014770 |
| Operations & Maintenance (OM) | 0.0377920 | 0.0420730 | 0.0351650 | 0.0475470 | 0.0509460 | 0.0343280 |
| Total Operating Expenses | 0.0572420 | 0.0836070 | 0.0802590 | 0.0884860 | 0.0855490 | 0.0641630 |
| Net Investment Ratio (K) | 0.523450 | 0.526805 | 0.523006 | 0.440897 | 0.406784 | 0.640785 |
| Annual Ownership Cost | 0.229952 | 0.281163 | 0.272164 | 0.321275 | 0.331453 | 0.213070 |
| Net Transmission Investment * AOC | 49,375,788.00 | 73,210,612.00 | 37,021,702.00 | 4,418,022.00 | 43,190,083.00 | 29,326,142.00 |

| System Average Annual Ownership Cost | 236,542,349.00 / | | 892,827,289.45 | = | 0.2649363 | |
|---|---|---|---|---|---|---|
| System Average Monthly Ownership Cost | | | 0.2649363 | / 12 | 0.0220780 | |

| Responsibility Ratio | 0.2100 | 0.2600 | 0.1389 | 0.0450 | 0.1920 | 0.1541 |
|---|---|---|---|---|---|---|
| Transmission Responsibility | 187,493,730.78 | 232,135,095.26 | 124,013,710.50 | 40,177,228.03 | 171,422,839.57 | 137,584,685.30 |
| Investment Difference | 27,228,420.75 | 28,249,847.63 | 12,013,473.00 | (26,425,700.72) | (41,117,538.70) | 51,498.05 |
| Payments |  |  |  | 583,427.26 | 907,794.01 |  |
| Receipts | 601,149.73 | 623,700.82 | 265,233.75 |  |  | 1,136.98 |

Entergy Electric System
Intra-System Billing-201002RA

Date range - 20100201 through 20100228
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 39

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 410,284,549.48 | 494,946,439.93 | 260,055,826.87 | 31,189,868.31 | 320,881,450.31 | 214,892,263.91 |
| Deferred Taxes | 36,427,497.00 | 58,284,456.00 | 31,434,045.00 | 3,238,453.00 | 28,094,818.00 | 19,886,865.00 |
| Depreciation Reserve | 159,055,766.00 | 175,602,699.00 | 92,625,850.00 | 14,199,888.00 | 161,930,338.00 | 57,270,189.00 |
| Net Transmission Investment | 214,801,286.48 | 261,059,284.93 | 135,995,931.87 | 13,751,527.31 | 130,856,294.31 | 137,735,209.91 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.477800 | 0.497100 | 0.484800 | 0.453100 | 0.478900 | 0.486400 |
| Bond Cost (i) | 0.061400 | 0.068000 | 0.061900 | 0.060800 | 0.058700 | 0.053500 |
| Preferred Ratio (PR) | 0.039500 | 0.022700 | 0.035800 | 0.047300 | 0.003600 | |
| Preferred Cost (p) | 0.059900 | 0.075800 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.482700 | 0.480200 | 0.479400 | 0.499600 | 0.517500 | 0.513600 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084800 | 0.088346 | 0.084780 | 0.084784 | 0.085350 | 0.082518 |
| Tax Rate (F) | 0.035797 | 0.034112 | 0.033927 | 0.035796 | 0.035798 | 0.030421 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0148650 | 0.0280260 | 0.0225760 | 0.0282250 | 0.0198170 | 0.0200000 |
| Insurance Expense (I) | | 0.0043880 | 0.0040920 | | 0.0062920 | 0.0008440 |
| Property Tax (PT) | 0.0045360 | 0.0091200 | 0.0174110 | 0.0112200 | 0.0085080 | 0.0075140 |
| Franchise Tax (FT) | 0.0000490 | | 0.0010150 | 0.0014940 | (0.0000140) | 0.0014770 |
| Operations & Maintenance (OM) | 0.0377920 | 0.0420730 | 0.0351650 | 0.0475470 | 0.0509460 | 0.0343280 |
| Total Operating Expenses | 0.0572420 | 0.0836070 | 0.0802590 | 0.0884860 | 0.0855490 | 0.0641630 |
| Net Investment Ratio (K) | 0.523542 | 0.527450 | 0.522949 | 0.440897 | 0.407803 | 0.640950 |
| Annual Ownership Cost | 0.229933 | 0.280969 | 0.272180 | 0.321275 | 0.330928 | 0.213045 |
| Net Transmission Investment * AOC | 49,389,904.00 | 73,349,566.00 | 37,015,373.00 | 4,418,022.00 | 43,304,012.00 | 29,343,798.00 |
| System Average Annual Ownership Cost | 236,820,675.00 / | 894,199,534.81 | = | 0.2648410 | | |
| System Average Monthly Ownership Cost | | 0.2648410 | / 12 | 0.0220701 | | |
| Responsibility Ratio | 0.2100 | 0.2610 | 0.1384 | 0.0454 | 0.1894 | 0.1558 |
| Transmission Responsibility | 187,781,902.31 | 233,386,078.59 | 123,757,215.62 | 40,596,658.88 | 169,361,391.89 | 139,316,287.52 |
| Investment Difference | 27,019,384.17 | 27,673,206.34 | 12,238,716.25 | (26,845,131.57) | (38,505,097.58) | (1,581,077.61) |
| Payments | | | | 592,474.23 | 849,810.63 | 34,894.51 |
| Receipts | 596,320.00 | 610,749.91 | 270,109.46 | | | |

Entergy Electric System
Intra-System Billing-201003RA

Date range - 20100301 through 20100331
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 44

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 410,321,729.39 | 515,491,730.27 | 265,915,679.32 | 27,047,831.26 | 323,328,537.13 | 216,671,976.21 |
| Deferred Taxes | 36,427,497.00 | 58,284,456.00 | 31,434,045.00 | 3,238,453.00 | 28,094,818.00 | 19,886,865.00 |
| Depreciation Reserve | 159,055,766.00 | 175,602,699.00 | 92,625,850.00 | 14,199,888.00 | 161,930,338.00 | 57,270,189.00 |
| Net Transmission Investment | 214,838,466.39 | 281,604,575.27 | 141,855,784.32 | 9,609,490.26 | 133,303,381.13 | 139,514,922.21 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.477800 | 0.497100 | 0.484800 | 0.453100 | 0.478900 | 0.486400 |
| Bond Cost (i) | 0.061400 | 0.068000 | 0.061900 | 0.060800 | 0.058700 | 0.053500 |
| Preferred Ratio (PR) | 0.039500 | 0.022700 | 0.035800 | 0.047300 | 0.003600 | |
| Preferred Cost (p) | 0.059900 | 0.075800 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.482700 | 0.480200 | 0.479400 | 0.499600 | 0.517500 | 0.513600 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084800 | 0.088346 | 0.084780 | 0.084784 | 0.085350 | 0.082518 |
| Tax Rate (F) | 0.035797 | 0.034112 | 0.033927 | 0.035796 | 0.035798 | 0.030421 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0148650 | 0.0280260 | 0.0225760 | 0.0282250 | 0.0198170 | 0.0200000 |
| Insurance Expense (I) | | 0.0043880 | 0.0040920 | | 0.0062920 | 0.0008440 |
| Property Tax (PT) | 0.0045360 | 0.0091200 | 0.0174110 | 0.0112200 | 0.0085080 | 0.0075140 |
| Franchise Tax (FT) | 0.0000490 | | 0.0010150 | 0.0014940 | (0.0000140) | 0.0014770 |
| Operations & Maintenance (OM) | 0.0377920 | 0.0420730 | 0.0351650 | 0.0475470 | 0.0509460 | 0.0343280 |
| Total Operating Expenses | 0.0572420 | 0.0836070 | 0.0802590 | 0.0884860 | 0.0855490 | 0.0641630 |
| Net Investment Ratio (K) | 0.523585 | 0.546283 | 0.533462 | 0.355278 | 0.412285 | 0.643899 |
| Annual Ownership Cost | 0.229924 | 0.275505 | 0.269156 | 0.369641 | 0.328647 | 0.212586 |
| Net Transmission Investment * AOC | 49,396,520.00 | 77,583,469.00 | 38,181,335.00 | 3,552,062.00 | 43,809,756.00 | 29,658,919.00 |
| System Average Annual Ownership Cost | 242,182,061.00 / | | 920,726,619.58 | = | 0.2630336 | |
| System Average Monthly Ownership Cost | | | 0.2630336 | / 12 | 0.0219195 | |
| Responsibility Ratio | 0.2099 | 0.2604 | 0.1376 | 0.0455 | 0.1882 | 0.1584 |
| Transmission Responsibility | 193,260,517.45 | 239,757,211.74 | 126,691,982.85 | 41,893,061.19 | 173,280,749.80 | 145,843,096.54 |
| Investment Difference | 21,577,948.94 | 41,847,363.53 | 15,163,801.47 | (32,283,570.93) | (39,977,368.67) | (6,328,174.33) |
| Payments | | | | 707,638.73 | 876,282.69 | 138,710.22 |
| Receipts | 472,977.18 | 917,271.98 | 332,382.47 | | | |

Entergy Electric System
Intra-System Billing-201004RA

Date range - 20100401 through 20100430
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 40

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 410,959,209.58 | 515,178,314.04 | 267,631,740.26 | 27,048,535.93 | 331,250,005.35 | 216,613,685.21 |
| Deferred Taxes | 36,427,497.00 | 58,284,456.00 | 31,434,045.00 | 3,238,453.00 | 28,094,818.00 | 19,886,865.00 |
| Depreciation Reserve | 159,055,766.00 | 175,602,699.00 | 92,625,850.00 | 14,199,888.00 | 161,930,338.00 | 57,270,189.00 |
| Net Transmission Investment | 215,475,946.58 | 281,291,159.04 | 143,571,845.26 | 9,610,194.93 | 141,224,849.35 | 139,456,631.21 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.477800 | 0.497100 | 0.484800 | 0.453100 | 0.478900 | 0.486400 |
| Bond Cost (i) | 0.061400 | 0.068000 | 0.061900 | 0.060800 | 0.058700 | 0.053500 |
| Preferred Ratio (PR) | 0.039500 | 0.022700 | 0.035800 | 0.047300 | 0.003600 | |
| Preferred Cost (p) | 0.059900 | 0.075800 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.482700 | 0.480200 | 0.479400 | 0.499600 | 0.517500 | 0.513600 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084800 | 0.088346 | 0.084780 | 0.084784 | 0.085350 | 0.082518 |
| Tax Rate (F) | 0.035797 | 0.034112 | 0.033927 | 0.035796 | 0.035798 | 0.030421 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0148650 | 0.0280260 | 0.0225760 | 0.0282250 | 0.0198170 | 0.0200000 |
| Insurance Expense (I) | | 0.0043880 | 0.0040920 | | 0.0062920 | 0.0008440 |
| Property Tax (PT) | 0.0045360 | 0.0091200 | 0.0174110 | 0.0112200 | 0.0085080 | 0.0075140 |
| Franchise Tax (FT) | 0.0000490 | | 0.0010150 | 0.0014940 | (0.0000140) | 0.0014770 |
| Operations & Maintenance (OM) | 0.0377920 | 0.0420730 | 0.0351650 | 0.0475470 | 0.0509460 | 0.0343280 |
| Total Operating Expenses | 0.0572420 | 0.0836070 | 0.0802590 | 0.0884860 | 0.0855490 | 0.0641630 |
| Net Investment Ratio (K) | 0.524324 | 0.546007 | 0.536453 | 0.355294 | 0.426339 | 0.643803 |
| Annual Ownership Cost | 0.229769 | 0.275582 | 0.268317 | 0.369630 | 0.321807 | 0.212601 |
| Net Transmission Investment * AOC | 49,509,693.00 | 77,518,780.00 | 38,522,767.00 | 3,552,216.00 | 45,447,145.00 | 29,648,619.00 |
| System Average Annual Ownership Cost | 244,199,220.00 / | | 930,630,626.37 | = | 0.2624019 | |
| System Average Monthly Ownership Cost | | | 0.2624019 | / 12 | 0.0218668 | |
| Responsibility Ratio | 0.2080 | 0.2609 | 0.1372 | 0.0457 | 0.1881 | 0.1601 |
| Transmission Responsibility | 193,571,170.28 | 242,801,530.42 | 127,682,521.94 | 42,529,819.63 | 175,051,620.82 | 148,993,963.28 |
| Investment Difference | 21,904,776.30 | 38,489,628.62 | 15,889,323.32 | (32,919,624.70) | (33,826,771.47) | (9,537,332.07) |
| Payments | . | | | 719,847.60 | 739,684.02 | 208,551.15 |
| Receipts | 478,987.86 | 841,645.89 | 347,449.02 | | | |

Entergy Electric System
Intra-System Billing-201005RA

Date range - 20100501 through 20100531
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 42

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 411,217,204.18 | 515,213,187.86 | 270,079,411.77 | 27,048,703.26 | 331,270,197.89 | 222,210,473.94 |
| Deferred Taxes | 36,427,497.00 | 58,284,456.00 | 31,434,045.00 | 3,238,453.00 | 28,094,818.00 | 19,886,865.00 |
| Depreciation Reserve | 159,055,766.00 | 175,602,699.00 | 92,625,850.00 | 14,199,888.00 | 161,930,338.00 | 57,270,189.00 |
| Net Transmission Investment | 215,733,941.18 | 281,326,032.86 | 146,019,516.77 | 9,610,362.26 | 141,245,041.89 | 145,053,419.94 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.477800 | 0.497100 | 0.484800 | 0.453100 | 0.478900 | 0.486400 |
| Bond Cost (I) | 0.061400 | 0.068000 | 0.061900 | 0.060800 | 0.058700 | 0.053500 |
| Preferred Ratio (PR) | 0.039500 | 0.022700 | 0.035800 | 0.047300 | 0.003600 | |
| Preferred Cost (p) | 0.059900 | 0.075800 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.482700 | 0.480200 | 0.479400 | 0.499600 | 0.517500 | 0.513600 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084800 | 0.088346 | 0.084780 | 0.084784 | 0.085350 | 0.082518 |
| Tax Rate (F) | 0.035797 | 0.034112 | 0.033927 | 0.035796 | 0.035798 | 0.030421 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0148650 | 0.0280260 | 0.0225760 | 0.0282250 | 0.0198170 | 0.0200000 |
| Insurance Expense (I) | | 0.0043880 | 0.0040920 | | 0.0062920 | 0.0008440 |
| Property Tax (PT) | 0.0045360 | 0.0091200 | 0.0174110 | 0.0112200 | 0.0085080 | 0.0075140 |
| Franchise Tax (FT) | 0.0000490 | | 0.0010150 | 0.0014940 | (0.0000140) | 0.0014770 |
| Operations & Maintenance (OM) | 0.0377920 | 0.0420730 | 0.0351650 | 0.0475470 | 0.0509460 | 0.0343280 |
| Total Operating Expenses | 0.0572420 | 0.0836070 | 0.0802590 | 0.0884860 | 0.0855490 | 0.0641630 |
| Net Investment Ratio (K) | 0.524623 | 0.546038 | 0.540654 | 0.355298 | 0.426374 | 0.652775 |
| Annual Ownership Cost | 0.229707 | 0.275573 | 0.267154 | 0.369627 | 0.321791 | 0.211231 |
| Net Transmission Investment * AOC | 49,555,596.00 | 77,525,859.00 | 39,009,698.00 | 3,552,249.00 | 45,451,383.00 | 30,639,779.00 |
| System Average Annual Ownership Cost | 245,734,564.00 / | | 938,988,314.90 | = | 0.2617014 | |
| System Average Monthly Ownership Cost | | | 0.2617014 | / 12 | 0.0218084 | |
| Responsibility Ratio | 0.2088 | 0.2597 | 0.1363 | 0.0456 | 0.1887 | 0.1609 |
| Transmission Responsibility | 196,060,760.15 | 243,855,265.38 | 127,984,107.32 | 42,817,867.16 | 177,187,095.02 | 151,083,219.87 |
| Investment Difference | 19,673,181.03 | 37,470,767.48 | 18,035,409.45 | (33,207,504.90) | (35,942,053.13) | (6,029,799.93) |
| Payments | | | | 724,204.23 | 783,840.49 | 131,500.59 |
| Receipts | 429,041.60 | 817,179.38 | 393,324.34 | | | |

Entergy Electric System
Intra-System Billing-201006RA

Date range - 20100601 through 20100630
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 44

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 411,270,947.16 | 516,493,136.74 | 270,353,906.99 | 27,048,703.25 | 331,881,485.90 | 242,644,575.63 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 211,252,878.16 | 271,715,269.74 | 142,327,441.99 | 9,819,978.25 | 139,077,313.90 | 161,462,597.63 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.513659 | 0.526077 | 0.526449 | 0.363048 | 0.419057 | 0.665428 |
| Annual Ownership Cost | 0.235372 | 0.262191 | 0.267144 | 0.352778 | 0.297437 | 0.208279 |
| Net Transmission Investment * AOC | 49,723,012.00 | 71,241,298.00 | 38,021,922.00 | 3,464,272.00 | 41,366,739.00 | 33,629,268.00 |
| System Average Annual Ownership Cost | 237,446,511.00 / | | 935,655,479.67 | = | 0.2537756 | |
| System Average Monthly Ownership Cost | | | 0.2537756 | / 12 | 0.0211480 | |
| Responsibility Ratio | 0.2100 | 0.2594 | 0.1366 | 0.0455 | 0.1874 | 0.1611 |
| Transmission Responsibility | 196,487,650.73 | 242,709,031.43 | 127,810,538.52 | 42,572,324.32 | 175,341,836.89 | 150,734,097.77 |
| Investment Difference | 14,765,227.43 | 29,006,238.31 | 14,516,903.47 | (32,752,346.07) | (36,264,522.99) | 10,728,499.86 |
| Payments | | | | 692,645.47 | 766,920.86 | |
| Receipts | 312,254.51 | 613,422.91 | 307,002.97 | | | 226,885.94 |

Entergy Electric System
Intra-System Billing-201007RA

Date range - 20100701 through 20100731
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 44

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,292,644.47 | 516,998,737.69 | 270,282,974.70 | 26,290,825.51 | 332,286,730.47 | 246,384,445.14 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 214,274,575.47 | 272,220,870.69 | 142,256,509.70 | 9,062,100.51 | 139,482,558.47 | 165,202,467.14 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.517206 | 0.526541 | 0.526324 | 0.344687 | 0.419766 | 0.670507 |
| Annual Ownership Cost | 0.234587 | 0.262067 | 0.267180 | 0.365167 | 0.297138 | 0.207639 |
| Net Transmission Investment * AOC | 50,266,030.00 | 71,340,107.00 | 38,008,094.00 | 3,309,180.00 | 41,445,568.00 | 34,302,475.00 |
| System Average Annual Ownership Cost | 238,671,454.00 / | | 942,499,081.98 | = | 0.2532326 | |
| System Average Monthly Ownership Cost | | | 0.2532326 | / 12 | 0.0211027 | |
| Responsibility Ratio | 0.2108 | 0.2590 | 0.1370 | 0.0450 | 0.1853 | 0.1629 |
| Transmission Responsibility | 198,678,806.48 | 244,107,262.23 | 129,122,374.23 | 42,412,458.69 | 174,645,079.89 | 153,533,100.45 |
| Investment Difference | 15,595,768.99 | 28,113,608.46 | 13,134,135.47 | (33,350,358.18) | (35,162,521.42) | 11,669,366.69 |
| Payments | | | | 703,783.04 | 742,024.61 | |
| Receipts | 329,113.04 | 593,273.42 | 277,165.89 | | | 246,255.30 |

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,756,346.25 | 517,198,430.56 | 273,055,871.75 | 26,286,818.76 | 346,877,541.44 | 248,054,884.20 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 214,738,277.25 | 272,420,563.56 | 145,029,406.75 | 9,058,093.76 | 154,073,369.44 | 166,872,906.20 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.517746 | 0.526723 | 0.531135 | 0.344587 | 0.444172 | 0.672726 |
| Annual Ownership Cost | 0.234468 | 0.262018 | 0.265801 | 0.365238 | 0.287447 | 0.207362 |
| Net Transmission Investment * AOC | 50,349,254.00 | 71,379,091.00 | 38,548,961.00 | 3,308,360.00 | 44,287,928.00 | 34,603,100.00 |

System Average Annual Ownership Cost    242,476,694.00 /    962,192,616.96    ≈    0.2520043

System Average Monthly Ownership Cost        0.2520043 / 12    0.0210004

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Responsibility Ratio | 0.2118 | 0.2586 | 0.1376 | 0.0449 | 0.1830 | 0.1641 |
| Transmission Responsibility | 203,792,396.27 | 248,823,010.75 | 132,397,704.09 | 43,202,448.50 | 176,081,248.90 | 157,895,808.44 |
| Investment Difference | 10,945,880.98 | 23,597,552.81 | 12,631,702.66 | (34,144,354.74) | (22,007,879.46) | 8,977,097.76 |
| Payments | | | | 717,043.74 | 462,173.39 | |
| Receipts | 229,867.44 | 495,557.10 | 265,270.30 | | | 188,522.28 |

Entergy Electric System
Intra-System Billing-201009RA

Date range - 20100901 through 20100930
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 43

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,738,135.57 | 517,477,482.94 | 273,038,040.36 | 26,298,420.03 | 346,868,159.71 | 223,998,394.51 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 214,720,066.57 | 272,699,615.94 | 145,011,575.36 | 9,069,695.03 | 154,063,987.71 | 142,816,416.51 |
| **Cost of Capital** |  |  |  |  |  |  |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 |  |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 |  |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** |  |  |  |  |  |  |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 |  | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 |  | 0.0010110 | 0.0020450 |  | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.517724 | 0.526979 | 0.531104 | 0.344876 | 0.444157 | 0.637578 |
| Annual Ownership Cost | 0.234473 | 0.261950 | 0.265810 | 0.365032 | 0.287452 | 0.211973 |
| Net Transmission Investment * AOC | 50,346,058.00 | 71,433,664.00 | 38,545,527.00 | 3,310,729.00 | 44,286,001.00 | 30,273,224.00 |
| System Average Annual Ownership Cost | 238,195,203.00 / | 938,381,357.12 | = | 0.2538362 |  |  |
| System Average Monthly Ownership Cost |  | 0.2538362 | / 12 | 0.0211530 |  |  |
| Responsibility Ratio | 0.2120 | 0.2588 | 0.1387 | 0.0449 | 0.1826 | 0.1630 |
| Transmission Responsibility | 198,936,847.71 | 242,853,095.22 | 130,153,494.23 | 42,133,322.93 | 171,348,435.81 | 152,956,161.21 |
| Investment Difference | 15,783,218.86 | 29,846,520.72 | 14,858,081.13 | (33,063,627.90) | (17,284,448.10) | (10,139,744.70) |
| Payments |  |  |  | 699,395.60 | 365,618.29 | 214,486.23 |
| Receipts | 333,862.75 | 631,344.07 | 314,293.30 |  |  |  |

Entergy Electric System
Intra-System Billing-201010RA

Date range - 20101001 through 20101031
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 42

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,791,036.09 | 505,655,952.56 | 273,529,330.19 | 26,299,394.26 | 347,196,039.47 | 223,962,656.04 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 214,772,967.09 | 260,878,085.56 | 145,502,865.19 | 9,070,669.26 | 154,391,867.47 | 142,780,678.04 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.517786 | 0.515920 | 0.531946 | 0.344900 | 0.444682 | 0.637520 |
| Annual Ownership Cost | 0.234460 | 0.264960 | 0.265571 | 0.365015 | 0.287256 | 0.211981 |
| Net Transmission Investment * AOC | 50,355,670.00 | 69,122,258.00 | 38,641,341.00 | 3,310,930.00 | 44,349,990.00 | 30,266,791.00 |
| System Average Annual Ownership Cost | 236,046,980.00 / | | 927,397,132.61 | = | 0.2545263 | |
| System Average Monthly Ownership Cost | | | 0.2545263 | / 12 | 0.0212105 | |
| Responsibility Ratio | 0.2115 | 0.2601 | 0.1386 | 0.0450 | 0.1810 | 0.1638 |
| Transmission Responsibility | 196,144,493.55 | 241,215,994.19 | 128,537,242.58 | 41,732,870.97 | 167,858,881.00 | 151,907,650.32 |
| Investment Difference | 18,628,473.54 | 19,662,091.37 | 16,965,622.61 | (32,662,201.71) | (13,467,013.53) | (9,126,972.28) |
| Payments | | | | 692,782.50 | 285,642.45 | 193,587.89 |
| Receipts | 395,119.74 | 417,043.31 | 359,849.79 | | | |

Entergy Electric System
Intra-System Billing-201011RA

Date range - 20101101 through 20101130
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 40

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,855,854.25 | 506,433,213.41 | 273,547,229.46 | 26,299,413.85 | 348,837,905.80 | 224,013,632.72 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 214,837,785.25 | 261,655,346.41 | 145,520,764.46 | 9,070,688.85 | 156,033,733.80 | 142,831,654.72 |
| | | | | | | |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| | | | | | | |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| | | | | | | |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| | | | | | | |
| Net Investment Ratio (K) | 0.517861 | 0.516663 | 0.531977 | 0.344901 | 0.447296 | 0.637603 |
| | | | | | | |
| Annual Ownership Cost | 0.234443 | 0.264754 | 0.265562 | 0.365015 | 0.286282 | 0.211969 |
| | | | | | | |
| Net Transmission Investment * AOC | 50,367,215.00 | 69,274,300.00 | 38,644,785.00 | 3,310,937.00 | 44,669,649.00 | 30,275,883.00 |
| | | | | | | |
| System Average Annual Ownership Cost | 236,542,769.00 / | | 929,949,973.49 | = | 0.2543608 | |
| | | | | | | |
| System Average Monthly Ownership Cost | | | 0.2543608 | / 12 | 0.0211967 | |
| | | | | | | |
| Responsibility Ratio | 0.2104 | 0.2606 | 0.1377 | 0.0450 | 0.1808 | 0.1655 |
| | | | | | | |
| Transmission Responsibility | 195,661,474.42 | 242,344,963.09 | 128,054,111.35 | 41,847,748.81 | 168,134,955.21 | 153,906,720.61 |
| | | | | | | |
| Investment Difference | 19,176,310.83 | 19,310,383.32 | 17,466,653.11 | (32,777,059.96) | (12,101,221.41) | (11,075,065.89) |
| | | | | | | |
| Payments | | | | 694,766.45 | 256,506.31 | 234,755.17 |
| | | | | | | |
| Receipts | 406,475.06 | 409,316.96 | 370,235.91 | | | |

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 415,060,255.12 | 506,501,649.34 | 273,867,644.31 | 26,291,850.27 | 350,235,178.26 | 225,614,138.80 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 215,042,186.12 | 261,723,782.34 | 145,841,179.31 | 9,063,125.27 | 157,431,006.26 | 144,432,160.80 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.518099 | 0.516728 | 0.532524 | 0.344712 | 0.449501 | 0.640173 |
| Annual Ownership Cost | 0.234391 | 0.264736 | 0.265408 | 0.365149 | 0.285470 | 0.211615 |
| Net Transmission Investment * AOC | 50,403,953.00 | 69,287,707.00 | 38,707,416.00 | 3,309,391.00 | 44,941,829.00 | 30,564,012.00 |
| System Average Annual Ownership Cost | 237,214,308.00 / | 933,533,440.10 | = | 0.2541037 | | |
| System Average Monthly Ownership Cost | | 0.2541037 | / 12 | 0.0211753 | | |
| Responsibility Ratio | 0.2094 | 0.2598 | 0.1373 | 0.0450 | 0.1818 | 0.1667 |
| Transmission Responsibility | 195,481,902.36 | 242,531,987.74 | 128,174,141.33 | 42,009,004.80 | 169,716,379.41 | 155,620,024.46 |
| Investment Difference | 19,560,283.76 | 19,191,794.60 | 17,667,037.98 | (32,945,879.53) | (12,285,373.15) | (11,187,863.66) |
| Payments | | | | 697,639.18 | 260,146.57 | 236,906.47 |
| Receipts | 414,195.05 | 406,392.18 | 374,104.99 | | | |

Entery Electric System
Intra-System Billing-201101RA

Date range - 20110101 through 20110131
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 42

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 415,393,432.12 | 507,724,414.94 | 274,208,896.85 | 26,332,130.65 | 351,726,496.11 | 226,605,916.47 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 215,375,363.12 | 262,946,547.94 | 146,182,431.85 | 9,103,405.65 | 158,922,324.11 | 145,423,938.47 |
| **Cost of Capital** |  |  |  |  |  |  |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 |  |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 |  |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** |  |  |  |  |  |  |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (i) | 0.0038030 | 0.0011480 | 0.0038520 |  | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 |  | 0.0010110 | 0.0020450 |  | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.518485 | 0.517892 | 0.533106 | 0.345715 | 0.451835 | 0.641748 |
| Annual Ownership Cost | 0.234306 | 0.264414 | 0.265243 | 0.364438 | 0.284620 | 0.211399 |
| Net Transmission Investment * AOC | 50,463,740.00 | 69,526,749.00 | 38,773,867.00 | 3,317,627.00 | 45,232,472.00 | 30,742,475.00 |
| System Average Annual Ownership Cost | 238,056,930.00 / | | 937,954,011.14 | = | 0.2538045 | |
| System Average Monthly Ownership Cost | | | 0.2538045 | / 12 | 0.0211504 | |
| Responsibility Ratio | 0.2101 | 0.2601 | 0.1374 | 0.0451 | 0.1804 | 0.1669 |
| Transmission Responsibility | 197,064,137.74 | 243,961,838.30 | 128,874,881.13 | 42,301,725.90 | 169,206,903.61 | 156,544,524.46 |
| Investment Difference | 18,311,225.38 | 18,984,709.64 | 17,307,550.72 | (33,198,320.25) | (10,284,579.50) | (11,120,585.99) |
| Payments |  |  |  | 702,156.87 | 217,522.70 | 235,204.55 |
| Receipts | 387,289.25 | 401,533.70 | 366,061.16 |  |  |  |

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 415,506,469.44 | 510,394,566.06 | 289,177,798.89 | 26,421,689.73 | 351,505,989.04 | 227,499,338.89 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 215,488,400.44 | 265,616,699.06 | 161,151,333.89 | 9,192,964.73 | 158,701,817.04 | 146,317,360.89 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.518616 | 0.520414 | 0.557274 | 0.347933 | 0.451491 | 0.643155 |
| Annual Ownership Cost | 0.234278 | 0.263721 | 0.258725 | 0.362881 | 0.284744 | 0.211208 |
| Net Transmission Investment * AOC | 50,484,191.00 | 70,048,701.00 | 41,693,879.00 | 3,335,952.00 | 45,189,390.00 | 30,903,397.00 |
| System Average Annual Ownership Cost | 241,655,510.00 / | | 956,468,576.05 | = | 0.2526539 | |
| System Average Monthly Ownership Cost | | | 0.2526539 | / 12 | 0.0210545 | |
| Responsibility Ratio | 0.2100 | 0.2608 | 0.1376 | 0.0453 | 0.1815 | 0.1648 |
| Transmission Responsibility | 200,858,400.97 | 249,447,004.63 | 131,610,076.06 | 43,328,026.50 | 173,599,046.55 | 157,626,021.33 |
| Investment Difference | 14,629,999.47 | 16,169,694.43 | 29,541,257.83 | (34,135,061.77) | (14,897,229.51) | (11,308,660.44) |
| Payments | | | | 718,696.36 | 313,653.59 | 238,098.09 |
| Receipts | 308,027.19 | 340,444.69 | 621,976.15 | | | |

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 415,658,021.66 | 510,490,052.28 | 289,224,221.25 | 26,421,689.73 | 351,339,192.74 | 229,664,396.61 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 215,639,952.66 | 265,712,185.28 | 161,197,756.25 | 9,192,964.73 | 158,535,020.74 | 148,482,418.61 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.518792 | 0.520504 | 0.557345 | 0.347933 | 0.451231 | 0.646519 |
| Annual Ownership Cost | 0.234239 | 0.263697 | 0.258706 | 0.362881 | 0.284839 | 0.210752 |
| Net Transmission Investment * AOC | 50,511,287.00 | 70,067,506.00 | 41,702,827.00 | 3,335,952.00 | 45,156,957.00 | 31,292,967.00 |
| System Average Annual Ownership Cost | 242,067,496.00 / | | 958,760,298.27 | = 0.2524797 | | |
| System Average Monthly Ownership Cost | | | 0.2524797 | / 12 0.0210400 | | |
| Responsibility Ratio | 0.2088 | 0.2615 | 0.1377 | 0.0455 | 0.1809 | 0.1656 |
| Transmission Responsibility | 200,189,150.28 | 250,715,818.00 | 132,021,293.07 | 43,623,593.57 | 173,439,737.96 | 158,770,705.39 |
| Investment Difference | 15,450,802.38 | 14,996,367.28 | 29,176,463.18 | (34,430,628.84) | (14,904,717.22) | (10,288,286.78) |
| Payments | | | | 724,419.52 | 313,594.86 | 216,465.28 |
| Receipts | 325,084.47 | 315,523.17 | 613,872.01 | | | |

Entergy Electric System  
Intra-System Billing-201104RA

Date range - 20110401 through 20110430  
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5  
Page 45

|  | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 415,088,642.28 | 512,511,972.90 | 290,098,703.50 | 26,520,278.59 | 353,427,619.57 | 232,455,038.76 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 215,070,573.28 | 267,734,105.90 | 162,072,238.50 | 9,291,553.59 | 160,623,447.57 | 151,273,060.76 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.518132 | 0.522396 | 0.558680 | 0.350357 | 0.454473 | 0.650763 |
| Annual Ownership Cost | 0.234384 | 0.263182 | 0.258363 | 0.361202 | 0.283668 | 0.210185 |
| Net Transmission Investment * AOC | 50,409,101.00 | 70,462,797.00 | 41,873,470.00 | 3,356,128.00 | 45,563,732.00 | 31,795,328.00 |
| System Average Annual Ownership Cost | 243,460,556.00 / | | 966,064,979.60 | = 0.2520126 | | |
| System Average Monthly Ownership Cost | | | 0.2520126 | / 12 | 0.0210010 | |
| Responsibility Ratio | 0.2071 | 0.2627 | 0.1380 | 0.0454 | 0.1811 | 0.1657 |
| Transmission Responsibility | 200,072,057.28 | 253,785,270.14 | 133,316,967.18 | 43,859,350.07 | 174,954,367.81 | 160,076,967.12 |
| Investment Difference | 14,998,516.00 | 13,948,835.76 | 28,755,271.32 | (34,567,796.48) | (14,330,920.24) | (8,803,906.36) |
| Payments | | | | 725,960.05 | 300,964.38 | 184,891.28 |
| Receipts | 314,984.60 | 292,940.21 | 603,890.91 | | | |

Entergy Electric System
Intra-System Billing-201105RA

Date range - 20110501 through 20110531
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 42

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 418,905,714.73 | 516,003,522.22 | 290,104,664.22 | 27,616,205.12 | 353,181,118.18 | 235,558,750.94 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920.00 | 19,783,447.00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861.00 | 167,174,252.00 | 61,398,531.00 |
| Net Transmission Investment | 218,887,645.73 | 271,225,655.22 | 162,078,199.22 | 10,387,480.12 | 160,376,946.18 | 154,376,772.94 |
| | | | | | | |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0.075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0.516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0.093126 |
| | | | | | | |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0.030593 |
| | | | | | | |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0.0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0.0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0.0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0.0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0.0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| | | | | | | |
| Net Investment Ratio (K) | 0.522522 | 0.525628 | 0.558689 | 0.376137 | 0.454093 | 0.655364 |
| | | | | | | |
| Annual Ownership Cost | 0.233430 | 0.262311 | 0.258361 | 0.344684 | 0.283805 | 0.209578 |
| | | | | | | |
| Net Transmission Investment * AOC | 51,094,943.00 | 71,145,473.00 | 41,874,686.00 | 3,580,398.00 | 45,515,779.00 | 32,353,975.00 |
| | | | | | | |
| System Average Annual Ownership Cost | 245,565,254.00 / | | 977,332,699.41 | = | 0.2512606 | |
| | | | | | | |
| System Average Monthly Ownership Cost | | | 0.2512606 | / 12 | 0.0209384 | |
| | | | | | | |
| Responsibility Ratio | 0.2058 | 0.2627 | 0.1385 | 0.0457 | 0.1804 | 0.1669 |
| | | | | | | |
| Transmission Responsibility | 201,135,069.54 | 256,745,300.14 | 135,360,578.87 | 44,664,104.36 | 176,310,818.97 | 163,116,827.53 |
| | | | | | | |
| Investment Difference | 17,752,576.19 | 14,480,355.08 | 26,717,620.35 | (34,276,624.24) | (15,933,872.79) | (8,740,054.59) |
| | | | | | | |
| Payments | | | | 717,697.25 | 333,629.61 | 183,002.65 |
| | | | | | | |
| Receipts | 371,710.33 | 303,195.29 | 559,423.90 | | | |

Entergy Electric System
Intra-System Billing-201106RA

Date range - 20110601 through 20110630
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 41

|                          | AR             | LA             | MS             | NO            | EGSL           | ETI            |
|--------------------------|----------------|----------------|----------------|---------------|----------------|----------------|
| Total Investment         | 424,209,890.60 | 517,632,426.21 | 298,253,065.58 | 27,638,800.89 | 372,099,963.16 | 236,387,445.08 |
| Deferred Taxes           | 40,474,156.00  | 66,697,341.00  | 34,898,123.00  | 2,321,112.00  | 28,441,593.00  | 23,459,553.00  |
| Depreciation Reserve     | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00  |
| Net Transmission Investment | 215,648,342.60 | 245,032,707.21 | 157,213,718.58 | 13,777,867.89 | 169,780,792.16 | 143,947,942.08 |
| **Cost of Capital**      |                |                |                |               |                |                |
| Debt Ratio (DR)          | 0.474200       | 0.474400       | 0.508300       | 0.431500      | 0.474500       | 0.500000       |
| Bond Cost (i)            | 0.056200       | 0.064700       | 0.062000       | 0.062200      | 0.058300       | 0.069800       |
| Preferred Ratio (PR)     | 0.039700       | 0.019200       | 0.031500       | 0.053800      | 0.003200       |                |
| Preferred Cost (p)       | 0.059900       | 0.075300       | 0.056900       | 0.048200      | 0.087100       |                |
| Common Ratio (ER)        | 0.486200       | 0.506300       | 0.460200       | 0.514700      | 0.522300       | 0.500000       |
| Common Cost (c)          | 0.110000       | 0.110000       | 0.110000       | 0.110000      | 0.110000       | 0.110000       |
| Total Cost of Capital (CM) | 0.082510     | 0.087833       | 0.083929       | 0.086049      | 0.085395       | 0.089900       |
| Tax Rate (F)             | 0.036053       | 0.035736       | 0.032467       | 0.037031      | 0.036106       | 0.029615       |
| **Operating Expenses**   |                |                |                |               |                |                |
| Depreciation Factor (D)  | 0.0152270      | 0.0283830      | 0.0229140      | 0.0292210     | 0.0201180      | 0.0205130      |
| Insurance Expense (I)    | 0.0036370      | 0.0003100      | 0.0039710      |               | 0.0021970      | 0.0017570      |
| Property Tax (PT)        | 0.0043900      | 0.0098690      | 0.0168800      | 0.0138350     | 0.0072620      | 0.0077650      |
| Franchise Tax (FT)       | 0.0001400      |                | 0.0010400      | 0.0018540     |                | 0.0001760      |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560      | 0.0365650      | 0.0588120     | 0.0435820      | 0.0288180      |
| Total Operating Expenses | 0.0606820      | 0.0824180      | 0.0813700      | 0.1037220     | 0.0731590      | 0.0590290      |
| Net Investment Ratio (K) | 0.508353       | 0.473189       | 0.527115       | 0.498497      | 0.456277       | 0.608949       |
| Annual Ownership Cost    | 0.237932       | 0.297744       | 0.270764       | 0.331149      | 0.281840       | 0.216450       |
| Net Transmission Investment * AOC | 51,309,641.00 | 72,957,018.00 | 42,567,815.00 | 4,562,527.00 | 47,851,018.00 | 31,157,532.00 |

System Average Annual Ownership Cost: 250,405,551.00 / 945,401,370.52 = 0.2648669

System Average Monthly Ownership Cost: 0.2648669 / 12 = 0.0220722

| | AR | LA | MS | NO | EGSL | ETI |
|--------------------------|----------------|----------------|----------------|---------------|----------------|----------------|
| Responsibility Ratio     | 0.2044         | 0.2626         | 0.1392         | 0.0457        | 0.1796         | 0.1685         |
| Transmission Responsibility | 193,240,040.13 | 248,262,399.90 | 131,599,870.78 | 43,204,842.63 | 169,794,086.15 | 159,300,130.93 |
| Investment Difference    | 22,408,302.47  | (3,229,692.69) | 25,613,847.80  | (29,426,974.74) | (13,293.99)  | (15,352,188.85) |
| Payments                 |                | 71,286.56      |                | 649,519.35    | 293.43         | 338,857.25     |
| Receipts                 | 494,601.51     |                | 565,355.09     |               |                |                |

Entergy Electric System
Intra-System Billing-201107RA

Date range - 20110701 through 20110731
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 42

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 424,795,416.73 | 518,659,046.34 | 313,547,024.61 | 27,618,517.54 | 374,379,933.08 | 236,535,467.35 |
| Deferred Taxes | 40,474,156.00 | 66,697,341.00 | 34,898,123.00 | 2,321,112.00 | 28,441,593.00 | 23,459,553.00 |
| Depreciation Reserve | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00 |
| Net Transmission Investment | 216,233,868.73 | 245,859,327.34 | 172,507,677.61 | 13,757,584.54 | 172,060,762.08 | 144,095,964.35 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0152270 | 0.0283830 | 0.0229140 | 0.0292210 | 0.0201180 | 0.0205130 |
| Insurance Expense (I) | 0.0036370 | 0.0003100 | 0.0039710 | | 0.0021970 | 0.0017570 |
| Property Tax (PT) | 0.0043900 | 0.0098690 | 0.0168800 | 0.0138350 | 0.0072620 | 0.0077650 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560 | 0.0365650 | 0.0588120 | 0.0435820 | 0.0288180 |
| Total Operating Expenses | 0.0606820 | 0.0824180 | 0.0813700 | 0.1037220 | 0.0731590 | 0.0590290 |
| Net Investment Ratio (K) | 0.509031 | 0.474029 | 0.550181 | 0.498129 | 0.459589 | 0.609194 |
| Annual Ownership Cost | 0.237773 | 0.297435 | 0.264292 | 0.331303 | 0.280684 | 0.216411 |
| Net Transmission Investment * AOC | 51,414,576.00 | 73,127,169.00 | 45,592,399.00 | 4,557,929.00 | 48,294,703.00 | 31,183,952.00 |

System Average Annual Ownership Cost   254,170,728.00 / 964,515,184.65 = 0.2635218

System Average Monthly Ownership Cost   0.2635218 / 12   0.0219602

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Responsibility Ratio | 0.2031 | 0.2637 | 0.1389 | 0.0459 | 0.1795 | 0.1689 |
| Transmission Responsibility | 195,893,034.00 | 254,342,654.19 | 133,971,159.15 | 44,271,246.98 | 173,130,475.64 | 162,906,614.69 |
| Investment Difference | 20,340,834.73 | (8,483,326.85) | 38,536,518.46 | (30,513,662.44) | (1,069,713.56) | (18,810,650.34) |
| Payments | | 186,295.09 | | 670,084.47 | 23,491.07 | 413,084.62 |
| Receipts | 446,687.69 | | 846,267.56 | | | |

Entergy Electric System
Intra-System Billing-201108RA

Date range - 20110801 through 20110831
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 41

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 430,480,300.58 | 519,579,413.16 | 313,895,896.12 | 27,619,102.03 | 375,886,576.07 | 236,733,348.30 |
| Deferred Taxes | 40,474,156.00 | 66,697,341.00 | 34,898,123.00 | 2,321,112.00 | 28,441,593.00 | 23,459,553.00 |
| Depreciation Reserve | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00 |
| Net Transmission Investment | 221,918,752.58 | 246,779,694.16 | 172,856,549.12 | 13,758,169.03 | 173,567,405.07 | 144,293,845.30 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0152270 | 0.0283830 | 0.0229140 | 0.0292210 | 0.0201180 | 0.0205130 |
| Insurance Expense (I) | 0.0036370 | 0.0003100 | 0.0039710 | | 0.0021970 | 0.0017570 |
| Property Tax (PT) | 0.0043900 | 0.0098690 | 0.0168800 | 0.0138350 | 0.0072620 | 0.0077650 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560 | 0.0365650 | 0.0588120 | 0.0435820 | 0.0288180 |
| Total Operating Expenses | 0.0606820 | 0.0824180 | 0.0813700 | 0.1037220 | 0.0731590 | 0.0590290 |
| Net Investment Ratio (K) | 0.515514 | 0.474960 | 0.550681 | 0.498140 | 0.461755 | 0.609521 |
| Annual Ownership Cost | 0.236274 | 0.297095 | 0.264158 | 0.331298 | 0.279937 | 0.216359 |
| Net Transmission Investment * AOC | 52,433,631.00 | 73,317,013.00 | 45,661,440.00 | 4,558,054.00 | 48,587,939.00 | 31,219,272.00 |
| System Average Annual Ownership Cost | 255,777,349.00 / | | 973,174,415.26 | = | 0.2628279 | |
| System Average Monthly Ownership Cost | | | 0.2628279 | / 12 | 0.0219023 | |
| Responsibility Ratio | 0.2043 | 0.2630 | 0.1389 | 0.0456 | 0.1792 | 0.1690 |
| Transmission Responsibility | 198,819,533.04 | 255,944,871.21 | 135,173,926.28 | 44,376,753.34 | 174,392,855.21 | 164,466,476.18 |
| Investment Difference | 23,099,219.54 | (9,165,177.05) | 37,682,622.84 | (30,618,584.31) | (825,450.14) | (20,172,630.88) |
| Payments | | 200,738.66 | | 670,618.08 | 18,079.27 | 441,827.45 |
| Receipts | 505,926.54 | | 825,336.93 | | | |

Entergy Electric System
Intra-System Billing-201109RA

Date range - 20110901 through 20110930
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 40

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 434,281,095.23 | 519,752,682.65 | 314,109,029.61 | 27,619,102.03 | 377,406,576.04 | 236,757,056.43 |
| Deferred Taxes | 40,474,156.00 | 66,697,341.00 | 34,898,123.00 | 2,321,112.00 | 28,441,593.00 | 23,459,553.00 |
| Depreciation Reserve | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00 |
| Net Transmission Investment | 225,719,547.23 | 246,952,963.65 | 173,069,682.61 | 13,758,169.03 | 175,087,405.04 | 144,317,553.43 |
| | | | | | | |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| | | | | | | |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| | | | | | | |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0152270 | 0.0283830 | 0.0229140 | 0.0292210 | 0.0201180 | 0.0205130 |
| Insurance Expense (I) | 0.0036370 | 0.0003100 | 0.0039710 | | 0.0021970 | 0.0017570 |
| Property Tax (PT) | 0.0043900 | 0.0098690 | 0.0168800 | 0.0138350 | 0.0072620 | 0.0077650 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560 | 0.0366650 | 0.0588120 | 0.0435820 | 0.0288180 |
| Total Operating Expenses | 0.0606820 | 0.0824180 | 0.0813700 | 0.1037220 | 0.0731590 | 0.0590290 |
| | | | | | | |
| Net Investment Ratio (K) | 0.519754 | 0.475136 | 0.550986 | 0.498140 | 0.463923 | 0.609560 |
| | | | | | | |
| Annual Ownership Cost | 0.235314 | 0.297030 | 0.264076 | 0.331298 | 0.279197 | 0.216353 |
| | | | | | | |
| Net Transmission Investment * AOC | 53,114,970.00 | 73,352,439.00 | 45,703,550.00 | 4,558,054.00 | 48,883,878.00 | 31,223,536.00 |

System Average Annual Ownership Cost     256,836,427.00 /     978,905,320.99     =     0.2623711

System Average Monthly Ownership Cost     0.2623711     / 12     0.0218643

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Responsibility Ratio | 0.2054 | 0.2636 | 0.1384 | 0.0454 | 0.1781 | 0.1691 |
| Transmission Responsibility | 201,067,152.93 | 258,039,442.61 | 135,480,496.43 | 44,442,301.57 | 174,343,037.67 | 165,532,889.78 |
| Investment Difference | 24,652,394.30 | (11,086,478.96) | 37,589,186.18 | (30,684,132.54) | 744,367.37 | (21,215,336.35) |
| Payments | | 242,397.60 | | 670,885.70 | | 463,857.52 |
| Receipts | 539,006.24 | | 821,859.55 | | 16,275.04 | |

Entergy Electric System
Intra-System Billing-201110RA

Date range - 20111001 through 20111031
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 37

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 435,044,558.90 | 520,322,159.84 | 315,132,168.58 | 27,616,290.90 | 381,121,510.02 | 236,812,347.39 |
| Deferred Taxes | 40,474,156.00 | 66,697,341.00 | 34,898,123.00 | 2,321,112.00 | 28,441,593.00 | 23,459,553.00 |
| Depreciation Reserve | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00 |
| Net Transmission Investment | 226,483,010.90 | 247,522,440.84 | 174,092,821.58 | 13,755,357.90 | 178,802,339.02 | 144,372,844.39 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (I) | 0.056200 | 0.064700 | 0.062200 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0152270 | 0.0283630 | 0.0229140 | 0.0292210 | 0.0201180 | 0.0205130 |
| Insurance Expense (I) | 0.0036370 | 0.0003100 | 0.0039710 | | 0.0021970 | 0.0017570 |
| Property Tax (PT) | 0.0043900 | 0.0098690 | 0.0168800 | 0.0138350 | 0.0072620 | 0.0077650 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560 | 0.0365650 | 0.0588120 | 0.0435820 | 0.0288180 |
| Total Operating Expenses | 0.0606820 | 0.0824180 | 0.0813700 | 0.1037220 | 0.0731590 | 0.0590290 |
| Net Investment Ratio (K) | 0.520597 | 0.475710 | 0.552444 | 0.498089 | 0.469148 | 0.609651 |
| Annual Ownership Cost | 0.235125 | 0.296821 | 0.263686 | 0.331319 | 0.277441 | 0.216339 |
| Net Transmission Investment * AOC | 53,251,818.00 | 73,469,858.00 | 45,905,840.00 | 4,557,411.00 | 49,607,100.00 | 31,233,477.00 |

| System Average Annual Ownership Cost | 258,025,504.00 / | | 985,028,814.63 | = | 0.2619472 | |
|---|---|---|---|---|---|---|
| System Average Monthly Ownership Cost | | | 0.2619472 | / 12 | 0.0218289 | |

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Responsibility Ratio | 0.2072 | 0.2618 | 0.1390 | 0.0448 | 0.1769 | 0.1703 |
| Transmission Responsibility | 204,097,970.39 | 257,880,543.67 | 136,919,005.23 | 44,129,290.90 | 174,251,597.31 | 167,750,407.13 |
| Investment Difference | 22,385,040.51 | (10,358,102.83) | 37,173,816.35 | (30,373,933.00) | 4,550,741.71 | (23,377,562.74) |
| Payments | | 226,106.30 | | 663,030.47 | | 510,307.19 |
| Receipts | 488,641.49 | | 811,464.65 | | 99,337.82 | |

Entergy Electric System
Intra-System Billing-201111RA

Date range - 20111101 through 20111130
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 37

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 457,964,979.45 | 510,584,691.68 | 314,533,166.34 | 27,617,140.62 | 381,298,924.42 | 236,909,330.02 |
| Deferred Taxes | 40,474,156.00 | 66,697,341.00 | 34,898,123.00 | 2,321,112.00 | 28,441,593.00 | 23,459,553.00 |
| Depreciation Reserve | 168,087,392.00 | 206,102,378.00 | 106,141,224.00 | 11,539,821.00 | 173,877,578.00 | 68,979,950.00 |
| Net Transmission Investment | 249,403,431.45 | 237,784,972.68 | 173,493,819.34 | 13,756,207.62 | 178,979,753.42 | 144,469,827.02 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0152270 | 0.0283830 | 0.0229140 | 0.0292210 | 0.0201180 | 0.0205130 |
| Insurance Expense (I) | 0.0036370 | 0.0003100 | 0.0039710 | | 0.0021970 | 0.0017570 |
| Property Tax (PT) | 0.0043900 | 0.0098690 | 0.0168800 | 0.0138350 | 0.0072620 | 0.0077650 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372880 | 0.0438560 | 0.0365650 | 0.0588120 | 0.0435820 | 0.0288180 |
| Total Operating Expenses | 0.0606820 | 0.0824180 | 0.0813700 | 0.1037220 | 0.0731590 | 0.0590290 |
| Net Investment Ratio (K) | 0.544591 | 0.465711 | 0.551591 | 0.498104 | 0.469395 | 0.609811 |
| Annual Ownership Cost | 0.229989 | 0.300541 | 0.263914 | 0.331313 | 0.277359 | 0.216313 |
| Net Transmission Investment * AOC | 57,360,046.00 | 71,464,133.00 | 45,787,448.00 | 4,557,610.00 | 49,641,645.00 | 31,250,702.00 |
| System Average Annual Ownership Cost | 260,061,584.00 / | | 997,888,011.53 | = | 0.2606120 | |
| System Average Monthly Ownership Cost | | | 0.2606120 | / 12 | 0.0217177 | |
| Responsibility Ratio | 0.2100 | 0.2617 | 0.1394 | 0.0446 | 0.1755 | 0.1688 |
| Transmission Responsibility | 209,556,482.42 | 261,147,292.62 | 139,105,588.81 | 44,505,805.31 | 175,129,346.02 | 168,443,496.35 |
| Investment Difference | 39,846,949.03 | (23,362,319.94) | 34,388,230.53 | (30,749,597.69) | 3,850,407.40 | (23,973,669.33) |
| Payments | | 507,375.06 | | 667,809.50 | | 520,652.15 |
| Receipts | 865,382.74 | | 746,832.11 | | 83,621.86 | |

Entergy Electric System
Intra-System Billing-201112RA

Date range - 20111201 through 20111231
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 41

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 457,923,799.10 | 553,067,455.46 | 315,119,324.43 | 27,811,915.33 | 382,387,047.05 | 237,338,942.04 |
| Deferred Taxes | 41,509,084.00 | 66,689,174.00 | 34,950,141.00 | 2,321,112.00 | 28,927,199.00 | 23,457,174.00 |
| Depreciation Reserve | 170,463,164.00 | 212,366,961.00 | 107,272,787.00 | 13,895,838.00 | 185,508,528.00 | 72,198,072.00 |
| Net Transmission Investment | 245,951,551.10 | 274,011,320.46 | 172,896,396.43 | 11,594,965.33 | 167,951,320.05 | 141,683,696.04 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| **Operating Expenses** | | | | | | |
| Depreciation,Factor (D) | 0.0179350 | 0.0282680 | 0.0229150 | 0.0292230 | 0.0200840 | 0.0199850 |
| Insurance Expense (I) | 0.0036430 | 0.0003100 | 0.0039710 | | 0.0022010 | 0.0017570 |
| Property Tax (PT) | 0.0043920 | 0.0098170 | 0.0168800 | 0.0129480 | 0.0072380 | 0.0077710 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010400 | 0.0018540 | | 0.0001760 |
| Operations & Maintenance (OM) | 0.0372840 | 0.0438560 | 0.0365640 | 0.0588120 | 0.0435800 | 0.0288180 |
| Total Operating Expenses | 0.0633940 | 0.0822510 | 0.0813700 | 0.1028370 | 0.0731030 | 0.0585070 |
| Net Investment Ratio (K) | 0.537101 | 0.495439 | 0.548670 | 0.416906 | 0.439218 | 0.596968 |
| Annual Ownership Cost | 0.236592 | 0.289585 | 0.264700 | 0.369747 | 0.287939 | 0.217521 |
| Net Transmission Investment * AOC | 58,190,169.00 | 79,349,568.00 | 45,765,676.00 | 4,287,204.00 | 48,359,735.00 | 30,819,179.00 |
| System Average Annual Ownership Cost | 266,771,531.00 | / | 1,014,089,249.41 | 0.2630651 | | |
| System Average Monthly Ownership Cost | | 0.2630651 | / 12 | 0.0219221 | | |
| Responsibility Ratio | 0.2099 | 0.2636 | 0.1393 | 0.0449 | 0.1745 | 0.1678 |
| Transmission Responsibility | 212,857,333.45 | 267,313,926.14 | 141,262,632.44 | 45,532,607.30 | 176,958,574.02 | 170,164,176.05 |
| Investment Difference | 33,094,217.65 | 6,697,394.32 | 31,633,763.99 | (33,937,641.97) | (9,007,253.97) | (28,480,480.01) |
| Payments | | | | 743,984.21 | 197,457.88 | 624,351.79 |
| Receipts | 725,494.58 | 146,820.91 | 693,478.38 | | | |

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 459,376,596.35 | 578,023,878.86 | 315,198,832.13 | 27,838,490.60 | 406,901,848.55 | 249,029,020.71 |
| Deferred Taxes | 41,509,083.72 | 66,689,174.20 | 34,950,140.83 | 2,321,111.83 | 28,927,199.09 | 23,457,174.17 |
| Depreciation Reserve | 170,463,164.00 | 212,366,961.00 | 107,272,787.00 | 13,895,838.00 | 185,508,528.00 | 72,198,072.00 |
| Net Transmission Investment | 247,404,348.63 | 298,967,743.66 | 172,975,904.30 | 11,621,540.77 | 192,466,121.46 | 153,373,774.54 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0179352 | 0.0282677 | 0.0229146 | 0.0292235 | 0.0200843 | 0.0199853 |
| Insurance Expense (I) | 0.0036433 | 0.0003102 | 0.0039709 | | 0.0022009 | 0.0017573 |
| Property Tax (PT) | 0.0043916 | 0.0098170 | 0.0168802 | 0.0129483 | 0.0072383 | 0.0077706 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010403 | 0.0018543 | | 0.0001763 |
| Operations & Maintenance (OM) | 0.0372840 | 0.0438563 | 0.0365643 | 0.0588118 | 0.0435803 | 0.0288184 |
| Total Operating Expenses | 0.0633941 | 0.0822512 | 0.0813703 | 0.1028379 | 0.0731038 | 0.0585079 |
| Net Investment Ratio (K) | 0.538565 | 0.517224 | 0.548783 | 0.417463 | 0.473004 | 0.615887 |
| Annual Ownership Cost | 0.236272 | 0.282593 | 0.264670 | 0.369420 | 0.276053 | 0.214512 |
| Net Transmission Investment * AOC | 58,454,720.00 | 84,486,192.00 | 45,781,533.00 | 4,293,230.00 | 53,130,850.00 | 32,900,515.00 |
| System Average Annual Ownership Cost | 279,047,040.00 | / | 1,076,809,433.36 | 0.2591424 | | |
| System Average Monthly Ownership Cost | | | 0.2591424 / 12 | 0.0215952 | | |
| Responsibility Ratio | 0.2104 | 0.2641 | 0.1390 | 0.0448 | 0.1736 | 0.1681 |
| Transmission Responsibility | 226,560,704.78 | 284,385,371.35 | 149,676,511.24 | 48,241,062.61 | 186,934,117.63 | 181,011,665.75 |
| Investment Difference | 20,843,643.85 | 14,582,372.31 | 23,299,393.06 | (36,619,521.84) | 5,532,003.83 | (27,637,891.21) |
| Payments | | | | 790,806.06 | | 596,845.91 |
| Receipts | 450,122.75 | 314,909.31 | 503,155.16 | | 119,464.75 | |

Entergy Electric System
Intra-System Billing-201202RA

Date range - 20120201 through 20120229
Service Schedule MSS - 2 / Transmission Equalization

Attachment 5
Page 37

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 460,071,953.17 | 577,667,972.08 | 332,961,761.29 | 32,031,480.30 | 406,917,788.37 | 248,907,519.55 |
| Deferred Taxes | 41,509,083.72 | 66,689,174.20 | 34,950,140.83 | 2,321,111.83 | 28,927,199.09 | 23,457,174.17 |
| Depreciation Reserve | 170,463,164.00 | 212,366,961.00 | 107,272,787.00 | 13,895,838.00 | 185,508,528.00 | 72,198,072.00 |
| Net Transmission Investment | 248,099,705.45 | 298,611,836.88 | 190,738,833.46 | 15,814,530.47 | 192,482,061.28 | 153,252,273.38 |
| Cost of Capital | | | | | | |
| Debt Ratio (DR) | 0.474200 | 0.474400 | 0.508300 | 0.431500 | 0.474500 | 0.500000 |
| Bond Cost (i) | 0.056200 | 0.064700 | 0.062000 | 0.062200 | 0.058300 | 0.069800 |
| Preferred Ratio (PR) | 0.039700 | 0.019200 | 0.031500 | 0.053800 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075300 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.486200 | 0.506300 | 0.460200 | 0.514700 | 0.522300 | 0.500000 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.082510 | 0.087833 | 0.083929 | 0.086049 | 0.085395 | 0.089900 |
| Tax Rate (F) | 0.036053 | 0.035736 | 0.032467 | 0.037031 | 0.036106 | 0.029615 |
| Operating Expenses | | | | | | |
| Depreciation Factor (D) | 0.0179352 | 0.0282677 | 0.0229146 | 0.0292235 | 0.0200843 | 0.0199853 |
| Insurance Expense (I) | 0.0036433 | 0.0003102 | 0.0039709 | | 0.0022009 | 0.0017573 |
| Property Tax (PT) | 0.0043916 | 0.0098170 | 0.0168802 | 0.0129483 | 0.0072383 | 0.0077706 |
| Franchise Tax (FT) | 0.0001400 | | 0.0010403 | 0.0018543 | | 0.0001763 |
| Operations & Maintenance (OM) | 0.0372840 | 0.0438563 | 0.0365643 | 0.0588118 | 0.0435803 | 0.0288184 |
| Total Operating Expenses | 0.0633941 | 0.0822512 | 0.0813703 | 0.1028379 | 0.0731038 | 0.0585079 |
| Net Investment Ratio (K) | 0.539263 | 0.516926 | 0.572855 | 0.493718 | 0.473024 | 0.615700 |
| Annual Ownership Cost | 0.236119 | 0.282685 | 0.258439 | 0.331372 | 0.276046 | 0.214541 |
| Net Transmission Investment * AOC | 58,581,054.00 | 84,413,087.00 | 49,294,353.00 | 5,240,493.00 | 53,133,903.00 | 32,878,896.00 |
| System Average Annual Ownership Cost | 283,541,786.00 | / | 1,098,999,240.92 | 0.2580000 | | |
| System Average Monthly Ownership Cost | | | 0.2580000 / 12 | 0.0215000 | | |
| Responsibility Ratio | 0.2104 | 0.2644 | 0.1389 | 0.0446 | 0.1727 | 0.1690 |
| Transmission Responsibility | 231,229,440.29 | 290,575,399.30 | 152,650,994.56 | 49,015,366.14 | 189,797,168.91 | 185,730,871.72 |
| Investment Difference | 16,870,265.16 | 8,036,437.58 | 38,087,838.90 | (33,200,835.67) | 2,684,892.37 | (32,478,598.34) |
| Payments | | | | 713,817.92 | | 698,289.82 |
| Receipts | 362,710.68 | 172,783.40 | 818,888.48 | | 57,725.18 | |

DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | PUBLIC UTILITY COMMISSION |
| TEXAS, INC. FOR AUTHORITY | § | |
| TO CHANGE RATES AND | § | OF TEXAS |
| RECONCILE FUEL COSTS | § | |

DIRECT TESTIMONY

OF

JOSEPH F. DOMINO

ON BEHALF OF

ENTERGY TEXAS, INC.

NOVEMBER 2011

ENTERGY TEXAS, INC.
DIRECT TESTIMONY OF JOSEPH F. DOMINO
2011 RATE CASE

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | Purpose of Testimony | 3 |
| III. | Overview of Filing | 5 |
| | A. Reason for Filing | 5 |
| | B. Summary of the Filing | 8 |
| | C. The Company's Anticipated Future Expenditures | 9 |
| IV. | Case Presentation and List of Witnesses | 11 |
| V. | The Utility and Executive Management Class of Affiliate Costs | 18 |
| VI. | Conclusion | 38 |

## EXHIBITS

Exhibit JFD-1      Witnesses and Testimony Content

Exhibit JFD-A      Affiliate Billings by Witness, Class and Department

Exhibit JFD-B      Affiliate Billings by Witness, Class and Project

Exhibit JFD-C      Affiliate Billings by Witness, Class, Department and Project

Exhibit JFD-D      Affiliate Billings Pro Forma Summary by Witness and Class

I.     INTRODUCTION

Q.     PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A.     My name is Joseph F. Domino.  My business address is 350 Pine Street, Beaumont, Texas.

Q.     BY WHOM ARE YOU EMPLOYED AND IN WHAT CAPACITY?

A.     I am employed by Entergy Texas, Inc. ("ETI" or the "Company") as President and Chief Executive Officer.  ETI is an integrated investor-owned electric utility that provides bundled generation, transmission, distribution, and customer services to approximately 412,000 retail customers in Texas.  ETI is a subsidiary of Entergy Corporation ("Entergy Corp."), which also owns, among other subsidiaries, Entergy Gulf States Louisiana, L.L.C., Entergy Louisiana, LLC, Entergy New Orleans, Inc., Entergy Arkansas, Inc., and Entergy Mississippi, Inc. (along with ETI, the "Operating Companies").[1]  Schedule F of the rate filing package describes the Company in more detail.

---

[1]    In the remainder of this testimony, I will use the term "Entergy Companies" to mean Entergy Corp. and its subsidiaries, including ETI, Entergy Services, Inc. ("ESI"), and the other Operating Companies.  Each of these subsidiaries is a separate legal entity.

Q. PLEASE BRIEFLY DESCRIBE YOUR EDUCATIONAL AND PROFESSIONAL EXPERIENCE.

A. I earned a Bachelor of Science Degree in Electrical Engineering from Louisiana State University, where I graduated in 1970. I was awarded a Master's Degree in Engineering Science from Lamar University in 1975. I began my utility career of 41 years in 1970 when I joined ETI, formerly Entergy Gulf States, Inc. ("EGSI"), which was formerly Gulf States Utilities Company ("GSU"), as a planning engineer. I have been with the Company since that time.

I was named plant manager at Sabine Plant in Bridge City, Texas in 1979, and later was promoted to the position of general manager– production with responsibility for the operation of all GSU's non-nuclear generating plants in both Texas and Louisiana. Following the merger of GSU into Entergy Corp. in 1993, I was appointed director of the Southern Region, overseeing six fossil-fueled power plants. A year later, I was assigned a similar post with responsibility for the Eastern Region, overseeing eleven fossil-fueled power plants. In June of 1997, I became Director–Southwest Franchise in EGSI's distribution group. I was named to my current position of President and CEO of ETI in October 1998.

In my current position, I have financial responsibility for all of ETI's assets, including generation, transmission, distribution, and customer service. I am directly responsible for the day-to-day operation of ETI's Distribution and Customer Service Organization, the discrete organization

within ETI that is responsible for the distribution and customer service-related functions in ETI's service territory. I exercise oversight of distribution operations and customer service from the point of interconnection of ETI's distribution lines with its transmission lines down to the customer's meter. My responsibilities also include oversight of economic development, as well as regulatory and governmental affairs.

While I have financial responsibility for the generation and transmission assets of ETI, I do not have the day-to-day operational responsibilities for the generation and transmission assets, which assets are managed and operated by separate organizations within the Entergy System.[2]

## II.     PURPOSE OF TESTIMONY

Q.    WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A.    I will discuss why the Company is filing this case, provide a brief description of the major components of the Company's filing, and present an overview presentation of the case and supporting witnesses. I also sponsor the Utility and Executive Management class of affiliate costs.

---

[2]    The Operating Companies, together with their resources and facilities, are referred to as the "Entergy System."

Q.    DO YOU SPONSOR ANY SPECIFIC RATE FILING PACKAGE ("RFP")
SCHEDULES?

A.    Yes.  The schedules I sponsor are as follows:

- Schedule F – Description of Company;

- Schedule H – Engineering Information;

- Schedule T – Notice;

- Schedule U – Compliance with PUCT Orders;

- Schedule V – Request for Waiver of RFP Requirements; and

- Schedule W – Confidentiality Disclosure Agreement.

Q.    DO YOU SPONSOR ANY EXHIBITS?

A.    Yes.  I sponsor the exhibits listed in the Table of Contents to my testimony.

Q.    HOW IS THE REMAINDER OF YOUR TESTIMONY ORGANIZED?

A.    In Section III, I provide an overview of the filing, including the reasons for the filing, a summary of this filing, and the Company's anticipated future expenditures.  Section IV describes the presentation of the case, including a list of witnesses and the content of their testimony.  Section V is the presentation of the affiliate class that I support—the Utility and Executive Management class of services.  Section VI concludes my testimony.

III.    OVERVIEW OF FILING

Q.    WHAT IS THE PURPOSE OF THIS SECTION OF YOUR TESTIMONY?

A.    In this section, I discuss why the Company is making this filing and provide a brief summary of the filing.    I also generally discuss the Company's anticipated future expenditures.

A.    Reason for Filing

Q.    WHY IS ETI MAKING THIS FILING?

A.    Since the June 30, 2009 close of the test year in ETI's last base rate case, the Company has made substantial investments in transmission and distribution infrastructure and incurred significant increases in purchased power costs to reliably serve its customers.    The Company has also completed a new depreciation study that demonstrates that the Company's current depreciation rates, and resulting annual depreciation expense, are too low.    The relief requested in this case is needed to address these substantial and recent incremental costs, and to provide the Company a reasonable opportunity to earn a reasonable return on invested capital.

Q.    IS THE COMPANY PROPOSING A PURCHASED POWER RECOVERY RIDER?

A.    Yes.  The Company is proposing implementation of a rider to recover its current purchased power costs, as well as future incremental purchased

power costs. For the reasons explained in detail by Company witnesses Phillip R. May and Robert R. Cooper, the Company's resource portfolio relies heavily on purchased power contracts to meet its incremental resource requirements. The significant regulatory lag associated with recovering these costs through successive base rate cases is expensive in and of itself, and results in rates that are already stale by the time they become effective. A purchased power rider would address those concerns in that it would avoid the need for serial base rate cases and shield both the Company and its customers from large over- and under-recoveries that are possible under the current regulatory system. Further, as Mr. May discusses, timely recovery of purchased power capacity costs will afford flexibility to make use of the variety of resources, suppliers, and products available to meet the needs of retail customers.

Q. IS THE COMPANY ALSO MAKING A PROPOSAL THAT AFFECTS THE WAY IT RECOVERS TRANSMISSION- AND DISTRIBUTION-RELATED COSTS?

A. The Company is not proposing a transmission cost recovery factor ("TCRF") or a distribution cost recovery factor ("DCRF") in this case, but the Company is seeking to establish baseline values that will be identified and used on a prospective basis in conjunction with later implementation of those factors. Company witness Heather G. LeBlanc addresses these baselines in her direct testimony.

Q. CAN YOU EXPLAIN IN MORE DETAIL WHAT IS DRIVING THE MAGNITUDE OF THE INCREASE, PARTICULARLY GIVEN THAT THE COMPANY RECENTLY IMPLEMENTED A BASE RATE INCREASE?

A. The Company's last base rate change (Docket No. 37744) resulted in a two-step rate increase, the last part of which became effective as of May 2, 2011, and that case was an important step in addressing ETI's financial health at that time. However, since the end of the test year for that base rate case, ending June 30, 2009, the Company's projected third-party purchased power costs have more than doubled with an increase of over $36 million. Between July 2009 and June 2011, the Company has completed $113.6 million in transmission capital projects and $148.2 million in distribution line and distribution-related general plant additions.[3] At the same time, those increased expenses are outpacing load growth, which has been low since the end of the last test year (on a weather-adjusted basis). In addition, the depreciation study filed in this case shows that current depreciation rates are understated, justifying an addition of $16.2 million to ETI's revenue requirement.[4]

---

[3] Company witnesses Shawn B. Corkran and Mark F. McCulla discuss the additions in distribution and transmission plant since the Company's last rate case. Mr. Corkran also addresses the Company's recent reliability statistics.

[4] Company witness Dane Watson discusses the depreciation study.

Q.   ARE THERE OTHER FACTORS INDICATIVE OF THE INADEQUACY OF THE COMPANY'S CURRENT RATES?

A.   Yes, there are.  As reported in the Commission's earnings monitoring report for 2010, ETI had a return on equity of only 7.10%, which is 303 basis points short of the 10.125% ROE authorized in the Company's last rate case.

### B.      Summary of the Filing

Q.   WHAT RELIEF IS THE COMPANY REQUESTING?

A.   The Company requests a total annual base rate and rider increase of $111.8 million, which is exclusive of changes in charges for miscellaneous electric services.

Q.   WHAT ARE THE MAJOR COMPONENTS OF THE COMPANY'S REQUEST?

A.   The filing is made up of the following major components:

1.   The total annual rate increase of $111.8 million, or 15.32% (when calculated on base rate and rider revenues), reflecting costs recorded in Test Year July 2010 through June 2011 as adjusted for known and measurable changes.

2.   Approval to implement a rider to recover all purchased capacity costs and certain other costs, including future incremental amounts. That rider is designed to recover $272.7 million annually.  In the

event the Commission rejects the Company's request to recover purchased power through a rider, the Company requests that the adjusted test year level of expense be included in base rates. Company witness May addresses the need for this rider and the costs to be recovered through this rider.

3.    The Company is seeking to reconcile approximately $1.3 billion in fuel and purchased power expense in this proceeding, reconciling the period from July 2009 through June 2011.

4.    Establishing of base line values for future implementation of a TCRF and DCRF as authorized by PURA.

Q.    WHAT IS THE EFFECT OF THE REQUESTED RATE INCREASE, INCLUSIVE OF BASE RATES AND RIDERS, ON THE TYPICAL RESIDENTIAL CUSTOMER?

A.    Residential rates will increase $14.37 per month for 1000 kilowatt-hours ("kWh").

C.    The Company's Anticipated Future Expenditures

Q.    IS THIS CASE IMPORTANT WITH REGARD TO THE COMPANY'S ANTICIPATED FUTURE EXPENDITURES?

A.    Yes.  In order to maintain and further improve its level of service reliability and to facilitate planned upgrades and expansion, the Company will continue to invest in capital projects.  ETI's capital budget reflects plans to

invest approximately $664 million in capital projects over the years 2012 through 2014. The Company anticipates substantial investment related to growth in its service area, particularly growth in ETI's Western Region, which includes Conroe and The Woodlands. Some of those capital projects include costs for "storm hardening" in the coastal areas and other areas that are more susceptible to flooding and/or high winds during severe weather events, and which would benefit from such measures. A primary purpose of storm hardening is to build stronger facilities in an effort to mitigate the damage caused by severe weather, which can speed restoration times. Of the $664 million planned capital expenditures, approximately $388 million is for maintenance of existing assets. The remaining $276 million is associated with other investments such as environmental compliance spending, plant upgrades, and transmission upgrades and system improvements.

ETI also must address the continued need for supply-side resources. Granting the rate relief requested in this case will provide important financial support as ETI takes on these new investments and expenditures. ETI's customers are expected to benefit from a financially healthy company that can access capital markets on favorable terms.

Q.   PLEASE PROVIDE FURTHER EXPLANATION REGARDING ETI'S EXPECTED EFFORTS TO OBTAIN SUPPLY-SIDE RESOURCES.

A.   Resource planning for the Entergy System, including each Operating Company, is designed to achieve the right mix of resources to serve customer load shape requirements at the lowest reasonable costs.  As explained by ETI witness Robert R. Cooper, ETI currently projects a need for capacity totaling 260 MW in 2012 and 504 MW in 2013.  The System is systematically pursuing resource options to fill these needs and those of the other Operating Companies.


IV.   CASE PRESENTATION AND LIST OF WITNESSES

Q.   HOW IS THE PRESENTATION OF THE CASE ORGANIZED?

A.   The Company's case is presented through the testimony of 39 witnesses. The witnesses can be grouped generally into nine groups:

- Financial;

- Operations and Customer Service;

- Overview Affiliate;

- Affiliate Classes;

- Non-Affiliate Revenue Requirement;

- Cost of Service and Rate Design;

- Employee Compensation;

- Fuel Reconciliation; and

- • Rate Case Expenses.

Some witnesses present testimony in support of more than one subject or component of the case, and, consequently, a witness may appear in more than one of these groups. However, each witness presents only one piece of testimony. A complete listing of all of the witnesses and the subject(s) they address is attached to my testimony as Exhibit JFD-1.

Q. PLEASE DESCRIBE THE FINANCIAL GROUP OF WITNESSES.

A. The financial group of Company witnesses includes Chris E. Barrilleaux and Dr. Sam Hadaway. Mr. Barrilleaux explains the financial status of the Company and the importance of adequate rates to support the Company's financial health as the Company moves forward, as well as provides the Company's proposed capital structure. Dr. Hadaway testifies as to ETI's proposed return on equity.

Q. PLEASE DESCRIBE THE OPERATIONS AND CUSTOMER SERVICE WITNESSES.

A. This group includes Company witnesses Corkran, testifying regarding distribution operations, Abdon F. Roman, testifying regarding customer service, H. Vernon Pierce, testifying regarding miscellaneous electric

services,[5] Mark F. McCulla, discussing transmission issues, and Winfred W. Garrison, discussing fossil plant operations. Several of these witnesses also address affiliate services and costs associated with distribution operations, customer service, transmission operations and fossil plant operations.

Q.    PLEASE DESCRIBE THE OVERVIEW AFFILIATE WITNESSES.

A.    ETI is provided certain services by its affiliates. The bulk of these affiliate services are provided by ESI. In order to provide assurance as to the reasonableness and necessity of these service company charges, and to comply with the requirements of PURA concerning proof of affiliate costs, a large portion of the case is devoted to presenting and supporting the affiliate costs associated with services provided by these affiliates. The Company's use of a service company affiliate and the treatment of the associated costs are discussed in greater detail elsewhere in my testimony as well as in the testimony of other Company witnesses.

The first set of affiliate witnesses are the overview affiliate witnesses: Stephanie B. Tumminello, Jeanne J. Kenney, and Donna S. Doucet.

---

[5]    The proposed changes in miscellaneous electric service charges discussed by Mr. Pierce will result in an approximate revenue increase of $911,000.

- Ms. Tumminello supports the propriety of ESI affiliate cost allocation methods, and the necessity for, benefits of, and absence of duplication in the services provided by ESI to the Company. Ms. Tumminello is also the ESI affiliate classes overview witness. She describes the Entergy Corp. corporate structure, explains the ESI billing methods for assigning costs, and explains how affiliate costs are presented in the schedules and exhibits in the case. Finally, Ms. Tumminello addresses benchmarking that applies at the overall service company (ESI) level.

- Ms. Kenney discusses benchmarking of ETI's 2008, 2009, and 2010 non-production O&M expense compared to the electric utility industry.

- Ms. Doucet explains and supports the reasonableness of the Entergy Companies' budgeting process.

Q. THE NEXT GROUP IS THE AFFILIATE CLASSES GROUP. PLEASE DESCRIBE THIS GROUP.

A. These witnesses, in general, present the explanation and support for the affiliate costs being requested by the Company in this case. As indicated previously, certain witnesses appearing in other groups also support affiliate costs. The affiliate classes group and the respective affiliate classes they support are:

- Julie F. Brown—Information Technology;

- Patrick Cicio—Energy and Fuel Management;

- Shawn B. Corkran—Transmission and Distribution Support and Distribution Operations;

- Donna S. Doucet—Financial Services;

- Walter C. Ferguson—Federal PRG Affairs;

- Patricia A. Galbraith—Tax Services;

- Kevin G. Gardner—Human Resources;

- Winfred W. Garrison—Fossil Plant Operations;

- Chester N. Herrington—Internal and External Communications;

- Joseph Hunter—Supply Chain;

- Phillip R. May—Regulatory Services;

- Mark F. McCulla—Transmission Operations;

- Steven C. McNeal—Treasury Operations;

- Thomas C. Plauché—Administration;

- Rory Roberts—ESI Income Taxes;

- Abdon F. Roman—Customer Service Operations, Environmental Services, and Retail Operations;

- Robert D. Sloan—Legal Services;

- Stephanie B. Tumminello—Depreciation, Service Company Recipient Offsets, and Other Expenses; and

- Myself—Utility and Executive Management.

Q.   PLEASE DESCRIBE THE NON-AFFILIATE REVENUE REQUIREMENT GROUP OF WITNESSES.

A.   These witnesses include:

- Michael P. Considine—Regulatory and Tax Accounting, Revenue Requirement Issues, Pensions and other Post-Retirement Benefits, and Pro Forma Adjustments;

- Patricia A. Galbraith—ETI Property Tax Pro Forma;

- Jay Joyce—Lead Lag Study Review;

- Rory L. Roberts—Income Tax;

- Dane Watson—Depreciation; and

- Gregory S. Wilson—Property Insurance Reserve.

Q.   PLEASE DESCRIBE THE COST OF SERVICE AND RATE DESIGN GROUP.

A.   Mr. Considine is the overall accounting witness for the Company and presents the Company's revenue requirement. Heather G. LeBlanc supports the Class Cost of Service study (and the proposed Purchased Power Recovery Rider). Mr. Richard A. Lynch supports the weather-related adjustments to the Test Year billing determinants, and Myra Talkington presents the Company's rate design, class cost allocation, and rate schedules and tariff.

Q. HOW HAVE YOU ADDRESSED THE ISSUE OF EMPLOYEE COMPENSATION LEVELS?

A. Company witness Gardner, who was identified above as addressing Human Resources affiliate charges, also provides benchmarking support for total compensation among the various categories of employees. He demonstrates that total annual compensation for all categories of employees, taken as a whole, is reasonable and necessary, based on market surveys. He also demonstrates that awards under the annual and long-term incentive plan, and employee benefit programs and levels, are reasonable.

In addition to Mr. Gardner, the Company presents Dr. Jay C. Hartzell, an outside expert from the University of Texas, who examines the bases of the Commission's past decisions regarding disallowance of "financially-based" incentive compensation. While the Company is cognizant of those past decisions, it continues to urge further examination of the merits and details of that policy.

Q. WHO ARE THE WITNESSES PRESENTING THE FUEL AND PURCHASED POWER RECONCILIATION PORTION OF THE CASE?

A. The fuel reconciliation witnesses include:

- Robert R. Cooper—Long Term Planning and Long-Term Purchased Power;

- Devon S. Jaycox—Economic Dispatch for the Reconciliation Period;

- Karen MacIlvoy—Reconcilable Gas Purchases, and Gas and Oil Base Rate Components;

- Margaret McCloskey—Over/Under Recovery Balance for Reconcilable Fuel;

- Michelle H. Thiry—Reconcilable Fuel Overview and Short-Term Purchased Power;

- Ryan Trushenski—Reconcilable and Non-Reconcilable Coal Expense; and

- Gregory R. Zakrzewski—Fuel Accounting.

Q.   WHO PRESENTS THE COMPANY'S RATE CASE EXPENSES?

A.   Mr. Stephen F. Morris presents the Company's rate case expenses associated with outside attorneys and consultants.   Mr. Considine presents the Company's rate case expenses associated with ETI, ESI employees, and miscellaneous expenses.

V.      THE UTILITY AND EXECUTIVE MANAGEMENT CLASS OF AFFILIATE COSTS

Q.   WHAT IS THE PURPOSE OF THIS SECTION OF YOUR TESTIMONY?

A.   The purpose of this section of my testimony is to support the Company's request for recovery of affiliate costs associated with the Utility and Executive Management class of affiliate services.  I will demonstrate that the costs for this class are reasonable and necessary, and that the amounts billed to ETI for these services are billed to the other affiliates using the same methodology and at prices that are no higher than those

charged to other affiliates for the same or similar services. My testimony will also show that the prices for these services that have been charged to ETI represent the actual cost for these services.

Q.    PLEASE PROVIDE A BRIEF DESCRIPTION OF THIS CLASS.

A.    The ESI Utility and Executive Management class is comprised of 30 departments. Generally, however, this class can be broken into two groups of services: The Utility Management group and the Executive Management group. As described in more detail below, the Utility Management group provides executive leadership and management for the regulated utility operations, and the Executive Management group provides overall oversight of the operations of all Entergy Companies, including regulated legal entities, and stewardship of the corporate assets.

Q.    WHAT IS THE TOTAL ETI ADJUSTED AMOUNT FOR THIS CLASS OF SERVICES?

A.    The Total ETI Adjusted amount for the Utility and Executive Management class of affiliate services is $1,939,228. Table 1 below shows for the class the following information:

| Total Billings | Dollar amount of total Test Year billings from ESI to all Entergy Companies, plus the dollar amount of all other affiliate charges that originated from any Entergy Company. This is the amount from Column (C) of the cost exhibits JFD-A, JFD-B, and JFD-C. |
| --- | --- |
| Total ETI Adjusted Amount | ETI's adjusted amount for electric cost of service after pro forma adjustments and exclusions. |
| % Direct Billed | The percentage of the ETI adjusted test year amount that was billed 100% to ETI. |
| % Allocated | The percentage of the ETI adjusted test year amount that was allocated to ETI. |

Table 1

| Class | Total Billings | Total ETI Adjusted | | |
| --- | --- | --- | --- | --- |
| | | Amount | % Direct | % Allocated |
| Utility and Executive Management | $30,702,565 | $1,939,228 | 4.34% | 95.66% |

Q.   PLEASE DESCRIBE THE EXHIBITS THAT SUPPORT THE INFORMATION INCLUDED IN TABLE 1.

A.   Attached to my testimony are exhibits showing the calculation of the Total ETI Adjusted amount for the Utility and Executive Management Class. In my Exhibit JFD-A, the information is shown broken down by the departments comprising the class. My Exhibit JFD-B shows the same information broken down by project code and the billing method assigned to each project code. My Exhibit JFD-C shows the information by department, project code, and the billing method assigned to the project

code. For each exhibit, the amounts in the columns represent the following information:

| | |
|---|---|
| **Column (A) –**<br>**Support** | Dollar amount of total Test Year billings and charges from ESI to all Entergy Business Units to ETI, plus the dollar amount of all other affiliate charges to ETI that originated from any Entergy Business Unit. |
| **Column (B) –**<br>**Service Company Recipient** | Dollar amount that was included in the service company recipient allocation. Service company recipient charges are the cost of services that ESI provides to itself, which in turn, are charged to affiliates that receive those services. The service company recipient allocation process is described in the testimony of Company witness Tumminello. |
| **Column (C) –**<br>**Total** | Represents the sum of Columns (A) and (B). |
| **Column (D) –**<br>**All Other Business Units** | That portion of Column (C) that was billed and charged to Business Units other than ETI. |
| **Column (E) –**<br>**ETI Per Books** | Represents the difference between Columns (C) and (D). |
| **Column (F) –**<br>**Exclusions** | Represents amounts that are excluded from ETI electric cost of service. The exclusions are described in the testimony of Company witness Tumminello. |
| **Column (G) –**<br>**Pro Forma Amount** | Pro Forma Amounts include adjustments for known and measurable changes, and corrections. |
| **Column (H) –**<br>**Total ETI Adjusted** | ETI adjusted amount requested for recovery in this case for this class (Column (E) plus Columns (F) and (G)). |

In her direct testimony, Ms. Tumminello describes the calculations that take the dollars of support services in Column (E) to the Total ETI Adjusted numbers shown on Column (H).

Q.  ARE THERE ANY PRO FORMA ADJUSTMENTS TO THIS CLASS?

A.  Yes.  The pro forma adjustments for the Utility and Executive Management class of services are shown on Exhibit JFD-D, which also identifies the Company witnesses who sponsor those pro forma adjustments.

Q.  WHAT ARE THE MAJOR COST COMPONENTS OF THIS CLASS?

A.  The major cost components are as follows:

Table 2

| Cost Component | Utility and Executive Management | |
|---|---|---|
| | | % of Total |
| Payroll and Employee Costs | $956,108 | 49.3% |
| Outside Services | $738,073 | 38.1% |
| Office and Employee Expenses | $97,947 | 5.1% |
| Other | $23,427 | 1.2% |
| Service Company Recipient | $123,674 | 6.4% |
| Total | $1,939,228 | 100% |

Q.    WHAT IS THE IMPORTANCE OF THESE COST CATEGORIES?

A.    This breakout provides an additional view of the costs in this class.  The breakout is significant, moreover, because other Company witnesses in this case provide additional overall support for the affiliate costs included in several of these categories.  For instance, in this class, the Payroll and Employee Costs component is the largest component of the class.  With respect to this component, Company witness Gardner supports the market competitiveness and overall reasonableness of salary and benefits costs.

"Outside Services" pertains to services provided by non-Entergy Companies employees and firms, such as outside consultants and vendors.  This is the second largest component of this class.  I later address some of the activities performed by these consultants in my description of the Utility Management and Executive Management groups.

"Office and Employee Expenses" covers the costs of maintaining work spaces and office supplies.  Company witness Plauché addresses these types of costs in more detail in his direct testimony.

The "Service Company Recipient" row of the table pertains to costs common throughout ESI, such as IT, rents, and human resources, which are primarily incurred to support ESI operations.  These costs are spread to all affiliate classes as explained by Company witness Tumminello.

Q.   WHAT AREAS DO YOU ADDRESS IN THE REMAINDER OF YOUR TESTIMONY IN THIS SECTION?

A.   I provide further description of the services provided in the two Utility and Executive Management groups of services.  I also address the necessity and reasonableness of the services and level of charges associated with this class.  Finally, I discuss the predominant billing methods included this class and describe why those methods are reasonable.

Q.   WHAT TYPES OF SERVICES DOES THE UTILITY MANAGEMENT GROUP PROVIDE?

A.   This group provides executive leadership and management for the regulated utility operations, including Customer Service Support, Sales and Marketing, the State Presidents, Utility Group Safety and Regulatory Affairs, as well as the operation, engineering, construction and maintenance of the distribution system.  This group also provides executive oversight and guidance related to the Fossil, Transmission and System Planning organizations.  Also provided by this group are access to consulting services, including the retention of outside consultants, required for federal and state regulatory matters, including those related to open access of the Entergy Companies' transmission system and the Independent Coordinator of Transmission.  The group further provides oversight for Entergy Continuous Improvement, corporate performance measurement efforts and ongoing O&M benchmarking.  Consulting

activities for the development of alternate technologies and power generation projects are also part of this group.

In summary, activities include providing executive guidance with respect to the development of short-term and long-term plans to ensure the continued reliable operation of the regulated electric system, and performance management to monitor and support improvement in those operations. This function provides guidance and leadership for federal, state and local matters common to all jurisdictions and avoids unnecessary duplication of these management activities. This organizational structure enables management to provide these services in a cost-effective manner.

Q. WHAT TYPES OF SERVICES DOES THE EXECUTIVE MANAGEMENT GROUP PROVIDE?

A. This group provides overall oversight of the operations of all Entergy Companies, including regulated legal entities, and stewardship of the corporate assets. The class further provides policy direction, including the appropriate use of consulting services, with respect to regulatory, legal and strategic decisions. During the Test Year, this function coordinated the Entergy Companies' responses to various legal, regulatory, and policy issues. This function provides guidance and leadership for matters common to all jurisdictions and avoids unnecessary duplication of these

management activities. This organizational structure enables management to provide these services in a cost-effective manner.

Q.    DOES THE UTILITY AND EXECUTIVE MANAGEMENT CLASS PROVIDE NECESSARY SERVICES?

A.    Yes. The highly integrated and extensively regulated nature of the Entergy Companies' multi-jurisdictional utility operations requires a centralized management structure that provides leadership, guidance and decision-making as well as making it necessary to coordinate legal, regulatory, and policy matters on a system-wide basis. This supports consistent implementation of operational practices that provide efficiencies and ensures that services are not duplicated within the individual organizations or within the individual Operating Companies. The leadership and direction provided by this centralized management structure have been effective, as shown by the achievement of the operational performance results described by Mr. Corkran.

Q.    PLEASE ADDRESS THE STAFFING LEVEL TRENDS FOR 2008, 2009, 2010, AND THE TEST YEAR.

A.    Staffing levels for the Utility and Executive Management class that I support are shown in Table 3, below.

Table 3

| Class | 2008[6] | 2009 | 2010 | Test Year |
|---|---|---|---|---|
| Utility and Executive Management Class | 36 | 39 | 43 | 42 |

Q. WHAT WERE THE COST TRENDS FOR THE UTILITY AND EXECUTIVE MANAGEMENT CLASS THAT YOU SUPPORT FOR THE LAST THREE YEARS AS COMPARED TO THE TEST YEAR?

A. Table 4 below shows the total affiliate O&M charges to ETI for each of the past three calendar years and the Test Year for this class of service. These charges have been adjusted to remove costs billed to ETI from nuclear, gas, and "spin off" department codes. Charges to ETI from these departments have also been removed from ETI's Test Year cost of service.

Table 4

| | 2008 | 2009 | 2010 | Test Year |
|---|---|---|---|---|
| Total O&M (in millions) | $2.5 | $2.1 | $2.3 | $2.2 |

Q. PLEASE EXPLAIN THE TREND IN STAFFING LEVELS AND COSTS.

A. As shown in Tables 3 and 4, there is a cumulative staffing increase of six personnel between 2008 and the Test Year, while O&M costs over that same period have remained relatively level. The higher O&M costs in

---

[6] The 2008, 2009, and 2010 figures are year-end (December 31) headcounts. The Test Year figure is the headcount as of June 30, 2011.

2008 were primarily due to activities associated with Qualified Power Region regulatory proceedings in Texas.

The cumulative increase in staffing levels is the result of occasional reorganizations and the creation of new departments and projects. The majority of the increase in staffing levels is due to the addition of the Critical Infrastructure Protection department in 2010. The Critical Infrastructure Protection department has overall responsibility for leading the Entergy Companies' implementation of, and adherence to, mandatory North American Electric Reliability Corporation Critical Infrastructure Protection standards designed to protect Entergy Critical Cyber Assets that support the reliable operation of the Bulk Electric System.

Q. ARE THESE NECESSARY SERVICES PROVIDED AT A REASONABLE COST?

A. Yes. First, the costs reflected in this class are subject to the cost control and monitoring process more fully described in the testimony of Company witness Doucet. The process includes a budgeting process aimed at establishing long-range financial plans, based upon prior year performance and future objectives. The budgeting process, which is a top-down as well as a bottom-up process, includes a detailed budgeting phase that requires the input of each organization within ETI, including my review and input as the President of ETI. The process assures the meaningful input of the ETI organizations utilizing the affiliate services.

The cost control and monitoring process also includes a cost reporting stage that requires evaluation by ETI management of the variance between actual and budgeted amounts. As the executive ultimately accountable for ETI's costs, including the costs associated with services provided by its affiliate service company, I am responsible for monitoring the reporting stage and reviewing all variances.

This budgeting and reporting process supports accountability between ETI and its service company affiliates with respect to its use of affiliate services and the associated costs that are charged to ETI. The process provides assurance that affiliate costs are reasonable, including the costs for this class.

In addition, as discussed above, the headcount and cost trends support the reasonableness of these costs. The cumulative increase in staffing levels includes a reasonable increase of six positions over four years, and simply reflects normal corporate activities, which includes occasional reorganizations and new departments — such as the Critical Infrastructure Protection department — and projects to address emerging technologies, environmental and safety issues, and regulatory expectations.

Moreover, the reasonableness of the costs associated with the Utility and Executive Management class is supported by the benchmarking analyses sponsored by Company witnesses Kenney. Eighty-nine percent (89%) of the costs associated with this affiliate class are charged to A&G

FERC accounts and included in Ms. Kenney's analysis of A&G costs among utilities throughout the United States.[7]   Ms. Kenney's analysis demonstrates that the level of ETI's A&G costs was at 68% of the industry average on a cost per MWh basis for 2008, 65% of the industry average on a cost per MWh basis for 2009, and 70% of the industry average on a cost per MWh basis for 2010.  Those levels equated to a ranking of 28th, 27th, and 33rd, from least cost to the greatest, among the 100-plus utilities included in the benchmarking for the years 2008 through 2010, respectively.  That places ETI in the top of the second quartile in each year.

Based on the cost control process, the historical cost and staff trends, and the benchmarking performed by Ms. Kenney, in addition to my previous discussion of the benefits of non-duplication of the services provided by a centralized service company, I conclude that the costs associated with the Utility and Executive Management class are reasonable.

---

[7]   As discussed by Ms. Kenney, there were 107 electric operating companies, including ETI, in the study for 2008, and 116 electric operating companies, including ETI, in the study for 2009 and 2010.

Q.    IS THE UTILITY AND EXECUTIVE MANAGEMENT CLASS OF AFFILIATE SERVICES DUPLICATED BY ETI?

A.    No.  By having these services provided through a central organization (ESI), ETI and each of the other Entergy Operating Companies avoid the need to maintain their own contingent of personnel to perform these services and avoid the costs associated with maintaining that personnel.

Q.    HOW ARE THE COSTS OF THIS CLASS OF SERVICES BILLED TO ETI?

A.    Exhibit JFD-B shows all of the costs included in this class broken down by project code and shows the billing method associated with each project code.

Q.    ON WHAT BASIS ARE COSTS IN THIS CLASS ALLOCATED?

A.    The costs for the services included in this class are collected in one or more project codes.  As Ms. Tumminello explains, a billing method for the project code is selected based upon cost causation, and while several organizations may bill to a single project code, only one billing method is assigned to each project code.  Through the use of a single billing method, the costs of all services performed under a project code are allocated among the Entergy Operating Companies using the same criteria, at cost. This ensures that all Entergy Operating Companies that cause costs to be incurred and benefit from the service pay their appropriate proportion of

the costs. It also ensures that the Entergy Operating Companies are, in total, charged no more and no less than one hundred percent of the costs for services provided under the project code. Finally, the use of a single billing method ensures that each Entergy Operating Company is paying the same price for the same service, and that the price charged to ETI for the services is no higher than the price charged by ESI to other affiliates for the same or similar services and represents the actual cost of the services.

Q.  ABOVE YOU NOTED THAT 4.34% OF THE COSTS IN THIS CLASS WERE DIRECTLY BILLED TO ETI, AND THE REMAINDER ALLOCATED. PLEASE DISTINGUISH BETWEEN COSTS THAT ARE "DIRECT" BILLED VERSUS COSTS THAT ARE "ALLOCATED" TO THE ENTERGY COMPANIES.

A.  Whenever appropriate, costs are direct billed to ETI and other affiliates. This means the services provided (and associated costs) are caused by, and benefiting, only ETI or whatever entity is the sole cause of the services, and associated costs, provided. Only when costs are incurred that are caused by ETI and *one or more of the other* Entergy Companies are such costs billed by ESI to ETI using an allocation method.

Q.    WHAT ARE THE PREDOMINANT BILLING METHODS USED FOR THIS CLASS OF SERVICES?

A.    For this class of services, the following billing methods are used to bill 92.57% of the costs for this class of services:

- "ASSTSALL" – Total Assets (35.58%);

- "CAPAOPCO" – System Capacity (22.49%);

- "CUSTEGOP" – Electric and Gas Customers (22.17%);

- "CUSEOPCO" – Electric Customers (8.01%);

- "DIRECTTX" – 100% to ETI (4.34%).

Q.    WHY IS BILLING METHOD "ASSTSALL" APPROPRIATE TO USE FOR THE PROJECT CODES TO WHICH IT IS ASSIGNED?

A.    For project codes assigned this billing method, costs are allocated based on total assets.  For example, Project Code F3PCC08500 — Executive VP, Operations — captures costs associated with the operations of the office of the President and Chief Operating Officer, Domestic Operations, of Entergy Corp.  The President/COO and staff provide cross-functional management and direction to the Entergy System, and services provided under this project relate to the oversight of all System Operations and the stewardship of corporate assets.   Billing Method "ASSTSALL" is appropriate because it reflects the cause of the costs incurred, in that, services provided relate to the stewardship of all the corporation's assets.

Q. WHY IS BILLING METHOD "CAPAOPCO" APPROPRIATE TO USE FOR THE PROJECT CODES TO WHICH IT IS ASSIGNED?

A. For the project codes assigned this billing method, costs are allocated based on the fossil capacity of each Operating Company relative to the fossil system capacity. For example, Project Code F3PCCEP001 — Corporate Environmental Policy — captures and manages costs associated with developing and implementing environmental policies and programs to support fossil operations company-wide. The primary activities conducted under this project code are the performance of systematic reviews of existing, pending, and proposed environmental regulations impacting the Entergy Operating Companies' fossil operations. Activities also include the development and implementation of environmental policies, standards, and programs as well as active participation in industry coalition groups to improve environmental regulations that govern the electric industry. Because the costs associated these activities are primarily associated with the Operating Companies' fossil operations, the relative size and complexity of each entity is appropriately measured by fossil generating capacity, making CAPAOPCO the appropriate billing method.

Q.     WHY IS BILLING METHOD "CUSTEGOP" APPROPRIATE TO USE FOR THE PROJECT CODES TO WHICH IT IS ASSIGNED?

A.     For the project codes assigned this billing method, costs are allocated based on the number of electric and gas customers. For example, Project Code F3PCE99795 — Group President - Utility Operations — captures costs associated with general activities of the office of the Group President - Utility Operations related to executive management and oversight of the Entergy Operating Companies' regulated utility operations. The activities under this project include meetings with utility company presidents to discuss day-to-day operations of the companies, Board of Directors meetings and activities, and meetings with regulators and their staffs on utility matters, which activities directly relate to regulated utility customers served by each Operating Company. Consequently, Billing Method "CUSTEGOP" is appropriate because the relative level of activities and costs are driven by the number of customers at each company.

Q.     WHY IS BILLING METHOD "CUSEOPCO" APPROPRIATE TO USE FOR THE PROJECT CODES TO WHICH IT IS ASSIGNED?

A.     Billing Method "CUSEOPCO" allocates costs based on the number of electric customers. For example, Project Code F3PPE9974S — Utility ECI Continuing Improvement ESI — captures and manages costs associated with the general activities of the Entergy Continuing Improvement ("ECI") department. That department is related to the

executive management and oversight of the various Strategic Initiatives (*e.g.*, Six Sigma, Benchmarking, ECI) in the Entergy Operating Companies' regulated utility operations. The primary activities include meetings with utility company presidents and operating departments to review and discuss ECI-Entergy Continuing Improvement and other Strategic Initiatives status and implementation issues. Because the focus of these types of projects is on improvements in the delivery of service to regulated distribution customers, the pertinent cost driver for these services is the number of electric customers, and the appropriate billing method is CUSEOPCO.

Q. WHY IS BILLING METHOD "DIRECTTX" APPROPRIATE TO USE FOR THE PROJECT CODES TO WHICH IT IS ASSIGNED?

A. This project code directs that 100% of the charges be allocated to ETI. For instance, project codes assigned to this billing method often include activities in which ESI assists with ETI fillings before the Commission. In such instances, it is appropriate that ESI's charges are allocated (or billed directly) 100% to ETI.

Q. YOU HAVE ADDRESSED THE BILLING METHODS USED TO BILL 92.57% OF THE COSTS ASSOCIATED WITH THIS CLASS. WHAT ABOUT THE REMAINING 7.43% OF THE COSTS OF THIS CLASS?

A. The remaining costs are billed through the use of other billing methods. Given the number of billing methods, project codes, and relative dollar amounts, I have not gone into detail in this discussion in an effort to keep the discussion at a manageable level. However, the project codes and billing methods used to bill the remaining 7.43% of the costs in this class are provided in Exhibit JFD-B, discussed earlier. A reader may reference this exhibit and then refer to the specific scope statement contained in Ms. Tumminello's testimony for a discussion of the particular billing method used and the cost drivers for the activities captured in the particular project code.

Q. HAVE YOU DETERMINED THAT THE COSTS REFLECTED IN THE REMAINING 7.43% OF COSTS ASSOCIATED WITH THIS CLASS HAVE BEEN BILLED APPROPRIATELY?

A. Yes. I have reviewed each of the project codes and the associated billing methods used to bill the remaining 7.43% of the costs of this class. The cost drivers reflected in the billing method used to bill the costs of each project code are consistent with and reflect the cost drivers of the services captured in each respective project code. Therefore, the price charged to ETI represents the costs of the services received by ETI and is no higher

than the price charged to other affiliates for the same or similar types of services.

## VI.  CONCLUSION

Q.  DOES THIS CONCLUDE YOUR DIRECT TESTIMONY?

A.  Yes.

**November 2011 Rate Case**
**Witness and Testimony Content**

| Witness | Testimony Subject |
|---|---|
| Chris E. Barrilleaux | Company's Financial Status and Importance of Adequate Rates; Capital Structure. |
| Julie F. Brown | Information Technology Affiliate Charges; Information Technology Capital Additions. |
| Patrick J. Cicio | Energy and Fuel Management Affiliate Charges; Energy and Fuel Management Capital Additions; Entergy System Agreement. |
| Michael P. Considine | Regulatory and Tax Accounting; Revenue Requirement Issues; Pension and OPEB Expenses; Pro Forma Adjustments. |
| Robert R. Cooper | Long-Term Resource Planning; Long-Term Purchased Power Contracts. |
| Shawn B. Corkran | Overall Distribution O&M Charges; Distribution Operations Affiliate Charges; Transmission and Distribution Support Affiliate Charges; Distribution Operations Capital Additions; Texas Distribution Operations; Service Quality & Service Quality Improvement; Miscellaneous Electric Services Charges. |
| Joseph F. Domino | Case Overview and Presentation; Executive and Utility Management Affiliate Charges. |
| Donna S. Doucet | Financial Services Affiliate Charges; Budget Process. |
| Walter C. Ferguson | Federal Policy, Regulatory and Governmental Affairs Affiliate Charges. |
| Patricia A. Galbraith | ETI Property Tax Pro Forma; Tax Services Affiliate Charges. |
| Kevin G. Gardner | Compensation, Benefits, and Labor-Related Charges; Human Resources Affiliate Charges. |

| Winfred W. Garrison | Fossil Plant Capital Additions; Fossil Plant Operations and Nelson 6 Co-Owner Service Affiliate Charges; Fossil Plant Efficiency. |
|---|---|
| Samuel C. Hadaway | Return on Equity. |
| Jay C. Hartzell | Alignment of Incentive Compensation Goals and Customer Benefits. |
| Chester N. Herrington | Communications Affiliate Charges. |
| Joseph Hunter | Supply Chain Affiliate Charges; Supply Chain Capital Additions. |
| Devon S. Jaycox | Reasonableness of Energy Acquisition and Economic Dispatch for the Reconciliation Period. |
| Jay Joyce | Lead Lag Study Review. |
| Jeanne J. Kenney | FERC Form 1 non-production O&M Cost Benchmarking. |
| Heather G. LeBlanc | Class Cost of Service Study; Purchased Power Recovery Rider; REC Rider. |
| Richard A. Lynch | Weather-Normalized Demand and Energy. |
| Phillip R. May | Regulatory Support Affiliate Charges; Regulatory Support Capital Additions; Purchased Power Recovery Rider; Competitive Generation Service |
| Margaret McCloskey | Over/(Under)-Recovery Balance for Reconcilable Fuel Expense. |
| Mark F. McCulla | Overall ETI Transmission O&M Charges; Transmission Operations Affiliate Charges; Transmission Operations Capital Additions. |
| Karen McIlvoy | Reconcilable Gas Purchases; Gas and Oil Base Rate Components. |
| Stephen C. McNeal | Treasury Operations Affiliate Charges. |
| Stephen F. Morris | External Rate Case Expenses. |

| | |
|---|---|
| H. Vernon Pierce | Texas Retail Operations; Miscellaneous Electric Services Charges. |
| Thomas C. Plauché | Administration Affiliate Charges; Capital Additions for Administration Services. |
| Rory L. Roberts | ETI FIT Expense; Consolidated Tax Savings Issues; FIT Expense Affiliate Charges. |
| Abdon F. Roman | Affiliate Charges for the Customer Service Operations, Environmental Services, and Retail Operations Classes; Customer Service Operations Capital Additions. |
| Robert D. Sloan | Legal Services Affiliate Charges; Legal Services Capital Additions. |
| Myra L. Talkington | Rate Design; Class Cost Allocation Factors; Rate Schedules and Tariffs. |
| Michelle H. Thiry | Reconcilable Fuel Expense Overview; Short-Term Purchased Power Expense. |
| Ryan Trushenski | Reconcilable and Non-Reconcilable Coal Expense. |
| Stephanie B. Tumminello | Overview of Affiliate Structure and Transactions; FERC Form 60 Benchmarking, Explanation of Affiliate Charges Presentation; Depreciation Affiliate Charges; Service Company Recipient Offsets Affiliate Charges; Other Expenses Affiliate Charges. |
| Dane Watson | Depreciation. |
| Gregory S. Wilson | Recommendation for Insurance Reserve Accrual. |
| Gregory R. Zakrzewski | Non-Reconcilable/Reconcilable Fuel Accounting. |

This page has been intentionally left blank.

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, and Department**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | (A) Total Billings Support | (B) Total Billings Service Company Recipient | (C) Total Billings Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | 1,289,256 | 81,310 | 1,370,566 | 1,366,479 | 4,086 | - | (536) | 3,551 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | (19,654) | - | (19,654) | (19,654) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | 1,281,690 | 105,837 | 1,387,527 | 1,387,448 | 78 | (78) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | 208,351 | - | 208,351 | 185,100 | 23,251 | (23,251) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP027 | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | 5,400,646 | 337,276 | 5,737,922 | 5,387,064 | 350,858 | (5,438) | (7,095) | 338,326 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | 1,347,769 | 96,578 | 1,444,347 | 1,442,753 | 1,594 | (28) | (1,058) | 509 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | 223,988 | 23,886 | 247,874 | 211,700 | 36,173 | - | 479 | 36,652 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | 322,809 | 36,140 | 358,949 | 343,256 | 15,693 | - | (98) | 15,595 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | 1,434,339 | 142,884 | 1,577,223 | 1,422,591 | 154,631 | (769) | (6,288) | 147,574 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | 1,689,442 | 155,849 | 1,845,292 | 1,634,094 | 211,197 | (13,968) | 2,448 | 199,678 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | 5,517,075 | 167,988 | 5,685,063 | 5,117,844 | 567,219 | (45) | (217,446) | 349,728 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CSODW | 688 | - | 688 | 688 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | 1,233,220 | 146,323 | 1,379,544 | 1,243,365 | 136,178 | - | (218) | 135,961 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6G | 1,183 | - | 1,183 | 1,183 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | 429,757 | 46,171 | 475,927 | 475,855 | 73 | - | (73) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | 995,135 | 106,776 | 1,101,911 | 1,101,858 | 53 | - | (53) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | 550,596 | 55,966 | 606,562 | 606,458 | 104 | - | (104) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | 296,789 | 33,879 | 330,668 | 330,541 | 127 | - | (127) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | 226,639 | 24,752 | 251,391 | 251,199 | 192 | - | (192) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | 113,151 | 11,803 | 124,955 | 124,955 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2J | 132,031 | 13,670 | 145,701 | 145,701 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | 228,461 | 17,876 | 246,337 | 246,326 | 10 | - | (10) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | 208,592 | 25,135 | 233,726 | 233,726 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | 755,995 | 87,575 | 843,570 | 842,847 | 723 | - | (723) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | 3,239,437 | 143,246 | 3,382,683 | 2,924,024 | 458,659 | (373) | (3,967) | 454,318 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU085 | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | 1,434,169 | 151,485 | 1,585,654 | 1,366,430 | 219,224 | 4,446 | 3,300 | 226,970 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUOS | 14,122 | - | 14,122 | 12,175 | 1,947 | - | - | 1,947 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | 132,639 | 1,847 | 134,487 | 105,927 | 28,560 | - | (141) | 28,420 |
| | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | Total ESI | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | |
| Total UTILITY & EXECUTIVE MANAGEMENT | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | |
| Total for Witness Domino, Joe | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**



This page has been intentionally left blank.

ENTERGY TEXAS, INC.
**Affiliate Billings - by Witness, Class and Project**
For the Twelve Months Ended June 30, 2011
**Amounts in Dollars**

**EXHIBIT JFD-B**
**2011 TX Rate Case**
**Page 1 of 6**

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | | | | 80 | - | 80 | 80 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C1PPFI5207 | Payroll Time & Labor - Phase I | EMPLOYAL | (25) | (2) | (27) | (26) | (1) | 0 | 1 | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C1PPFIRGTL | Regulated Time-LBR & Absence M | EMPOPCPE | 1,786 | 246 | 2,032 | 1,853 | 179 | (179) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C1PPHR8800 | PS HCM (Human Cap Mgmt) Upgrd | EMPLOYAL | (9) | (1) | (10) | (10) | (0) | 0 | 0 | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | - | (2) | (2) | (2) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C5PC449602 | GAS FAILURES BLANKET | DIRCTENO | 35,953 | - | 35,953 | 35,953 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C5PP449606 | Gas Serv Storm Rebuild Replace | DIRCTENO | 109,358 | 13,157 | 122,515 | 122,515 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 796 | 96 | 892 | 892 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PPAMBSGN | AMI:BASE Non-Incremental, EGSL | DIRECTLG | (54) | (7) | (61) | (61) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 834 | 95 | 928 | 928 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PPWGP516 | SBC CIP Compliance | DIRECTTX | 12,289 | 1,679 | 13,968 | - | 13,968 | (13,968) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PPWS0534 | System Planning Pet Coke Repow | DIRCTELI | 274 | 31 | 305 | 305 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C6PPWS0783 | Ninemile 6 Development | DIRCTELI | 8,423 | 1,072 | 9,495 | 9,495 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ1214 | WINTER STORM DL EAI DIST 01/26 | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ1244 | STORM DL ARK DIST EAI 1/7/11 I | DIRCTEAI | 98 | 13 | 111 | 111 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ1250 | STORM DL EAI DIST 4/19/11-4/24 | DIRCTEAI | 2,890 | 433 | 3,323 | 3,323 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ1251 | TORNADOES DL EAI DIST 4/25/11 | DIRCTEAI | 5,554 | 861 | 6,416 | 6,416 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ2462 | STORM DMG LA DIST ELL 1/8/11 I | DIRCTELI | 1,575 | 260 | 1,835 | 1,835 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ2474 | STORM Dmg ELL 4/25 to 4/27/11 | DIRCTELI | 100 | 12 | 112 | 112 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ3183 | EMI 04/24/10 Tornadoes Distr O | DIRCTEMI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ3198 | EMI Storm Distr Ops 1/7/11Wint | DIRCTEMI | 20,268 | 2,733 | 23,001 | 23,001 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C7PPSJ3204 | EMI StormTornadoes DistrOps 4/ | DIRCTEMI | 100 | 12 | 112 | 112 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | C8PPTL5496 | Replace Storm Damages | DIRCTEAI | 20,682 | 3,097 | 23,779 | 23,779 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E1PCD10064 | DISTR WK MGMT-SUBST AOR/COS/SF | CUSEOPCO | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E1PCR56025 | CUSTOM SALES & SERVICE UNIT- M | DIRCTELI | 688 | - | 688 | 688 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E1PCR56226 | Sales & Mktg - ALL JURIS | MACCTALL | 8,492 | 956 | 9,448 | 8,222 | 1,226 | - | (23) | 1,202 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E1PPNXCRP1 | Unwind - Employee | DIRCTNI | 21,844 | 3,253 | 25,096 | 25,096 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPLG11DA | Logistics Jan 2011 DIST Ark | DIRCTEAI | 0 | (2) | (2) | (2) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPLG11DL | Logistics Jan 2011 DIST ELL | DIRCTELI | 0 | (15) | (15) | (15) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPLG11DM | Logistics Jan 2011 DIST Miss | DIRCTEMI | 0 | (25) | (25) | (25) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPLG11TL | Logistics Jan 2011 TRN ELL | DIRCTELI | - | (0) | (0) | (0) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPLG11TM | Logistics Jan 2011 TRN Miss | DIRCTEMI | - | (1) | (1) | (1) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPSJ1255 | T-Grid Storm Tornadoes EAI 4/2 | DIRCTEAI | 315 | 44 | 359 | 359 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPSJ2447 | T-Grid Storm O&M ELL 1/7/201 I | DIRCTELI | 11 | 2 | 13 | 13 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | E2PPSJ3188 | T-Grid Storm Damage EMI 1/7/11 | DIRCTEMI | 28 | 4 | 31 | 31 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PC6H0026 | NORTHEAST MGMT OVERSITE IP2/IP | SPL77N7A | 24,988 | - | 24,988 | 24,988 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PC6HENNE | ENN EQUAL SPLIT | DIRCTENU | 588 | - | 588 | 588 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCC08500 | Executive VP, Operations | ASSTSALL | 17,701 | 951 | 18,652 | 16,787 | 1,864 | - | (96) | 1,768 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCC14900 | EXPENSES-CHAIRMAN ENTERGY | DIRCTETR | 448,364 | 56,234 | 504,599 | 504,599 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCC31255 | OPERATIONS-OFFICE OF THE CEO | ASSTSALL | 3,036,304 | 193,032 | 3,229,335 | 2,909,321 | 320,015 | (645) | (4,828) | 314,542 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCC31256 | LEADERSHIP CONFERENCE | EMPLOYAL | 186,861 | - | 186,861 | 178,151 | 8,711 | - | - | 8,711 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCC31257 | EVENTS ADMINISTRATION | DIRCTETR | 826,330 | - | 826,330 | 826,330 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCDVCCN | PROJECT GUMBO | CUSGOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCDVETR | CORP DEV-ANALYSIS STRATEGIC ME | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCE0155 | BELOW THE LINE-C ENVIRONMENTAL | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCEP001 | CORPORATE ENVIRONMENTAL POLICY | CAPAOPCO | 2,196,785 | - | 2,196,785 | 1,959,288 | 237,496 | - | - | 237,496 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | 1,197,217 | 142,793 | 1,340,010 | 1,207,839 | 132,171 | - | (68) | 132,103 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCSE060 | SAFETY & ENVIRONMENTAL SUPPORT | EMPLOYAL | 747 | 62 | 810 | 770 | 40 | - | 1 | 41 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 27,668 | 3,370 | 31,038 | 26,324 | 4,714 | - | 98 | 4,811 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10006 | FIELD DEVELOPMENT | CUSTEGOP | 6 | 1 | 7 | 6 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10010 | PROGRAM MANAGEMENT - O&M | CUSTEGOP | 9 | 1 | 10 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10033 | SSS PRELIMINARY PLANNING, SCOP | CUSTEGOP | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10049 | REGULATED RETAIL SYSTEMS - O&M | CUSTEGOP | 25 | 3 | 28 | 24 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10077 | REGULATORY AFFAIRS WORLDOX IMP | DIRCTENO | 4 | 1 | 5 | 5 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCD10105 | CUSTOMER CARE SYSTEM SUPPORT | CUSEGXTX | 83 | 10 | 93 | 93 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCDG0004 | OPERATOR QUAL DEVELOP & TRAIN | DIRCTENO | 27,119 | 2,217 | 29,336 | 29,336 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCDG0005 | OPERATOR QUAL DEVELOP & TRAIN | DIRECTLG | 89,501 | 8,908 | 98,409 | 98,409 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE13100 | GEN CORP. LEGAL ENTERGY CORP. | DIRCTETR | 3,792 | 552 | 4,344 | 4,344 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE13321 | ESI GENERAL LEGAL ADVICE | LVLSVCAL | 3,792 | 552 | 4,344 | 3,931 | 413 | - | 8 | 421 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 26 | - | 26 | 26 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE14987 | FGA-Climate/Environmental | ASSTSALL | 47,580 | - | 47,580 | 42,787 | 4,793 | (4,793) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE99741 | Utl Ops ECI & 6-Sigma Improve | CUSEOPCO | 249 | - | 249 | 212 | 37 | - | - | 37 |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings -  by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Total Billings | | | | | | | |
| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE99750 | PRES- ENT. LA-GEN'L OPS-ELI/EG | CUSELGLA | 1,114,809 | 70,756 | 1,185,564 | 1,185,564 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE99751 | SPECIAL PROJECTS - LA STATE PR | CUSELGLA | 71 | - | 71 | 71 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCE99795 | GROUP PRES - UTILITY OPERATION | CUSTEGOP | 2,011,555 | 130,481 | 2,142,037 | 1,845,705 | 296,332 | (373) | (3,718) | 292,241 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 10,104 | 1,234 | 11,338 | 9,775 | 1,563 | - | 31 | 1,595 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF10414 | ESI TAX SERVICES | LVLSVCAL | 24 | 3 | 27 | 24 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF10445 | ENTERGY CONSOLIDATED TAX SERVI | ASSTSALL | 2 | 0 | 2 | 2 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF15260 | IT - BUSINESS & PROJECT SUPPOR | CAPAOPCO | 5 | 1 | 5 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF21600 | CORP RPTG ANALYSIS & POLICY AL | GENLEDAL | 4,616 | 418 | 5,035 | 4,717 | 317 | - | 7 | 324 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF22511 | IR - GENERAL, INQUIRIES & MAIL | DIRCTETR | 404 | - | 404 | 404 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF22514 | MEETINGS ANALYSTS/INVESTORS/SH | DIRCTETR | 5,306 | - | 5,306 | 5,306 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF23033 | GENERAL ACCOUNTING - ESI | LVLSVCAL | 977 | 135 | 1,112 | 1,007 | 105 | - | 2 | 107 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF23425 | ACCOUNTS PAYABLE PROCESSING | APTRNALL | 190 | 17 | 207 | 188 | 19 | - | 0 | 19 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF23428 | TREASURY SYSTEMS | BNKACCTA | 69 | 8 | 77 | 75 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF23442 | PAYROLL PROCESSING | PRCHKALL | 89 | 8 | 98 | 93 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF23920 | CORP REPORTING ANALYSIS & POLI | DIRCTELI | 32,744 | 3,899 | 36,643 | 36,643 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF239LA | CORP RPTNG ANALYSIS/POLICY EGS | DIRECTLG | 32,690 | 3,893 | 36,583 | 36,583 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF24910 | PROPERTY ACCOUNTING- FIXED ASS | ASSTLOCA | 59 | 7 | 67 | 60 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF26910 | REVENUE ACCOUNTING ANALYSIS | CUSEGALL | 40 | 5 | 45 | 38 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF72271 | DATA WAREHOUSE | GENLEDAL | 67 | 6 | 74 | 69 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF72670 | GENERAL ACCOUNTING SYSTEM MAIN | GENLEDAL | 823 | 76 | 899 | 847 | 52 | - | 1 | 53 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF72901 | MOBILE DATA TERMINAL BASELOAD | CUSTEGOP | 5 | 1 | 6 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF73027 | BUDGET SYSTEM MAINTENANCE | GENLEDAL | 153 | 14 | 168 | 158 | 10 | - | 0 | 10 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF73901 | AM/FM BASELOAD (SUPPORT) | DIRECTTX | 3 | 0 | 3 | - | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF74195 | TRANSMISSION APPLICATION SUPPO | TRSBLNOP | 161 | 19 | 180 | 159 | 21 | - | 0 | 22 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF74341 | ISB MAINT | LOADWEPI | 5 | 1 | 5 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF74344 | GENERATION PLANNING & DISPATCH | LOADOPCO | 20 | 2 | 22 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF74515 | FOSSIL MAINTENANCE MANAGEMENT | CAPAOPCO | 40 | 5 | 45 | 40 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF74585 | FOSSIL APPLICATION SUPPORT | CAPAOPCO | 43 | 5 | 48 | 42 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCF99182 | RECORDS MANAGEMENT | RECDMGNT | 11 | 1 | 12 | 10 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 9,149 | 282 | 9,431 | 8,386 | 1,045 | (73) | (436) | 536 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFAPWHS | POWERHOUSE OPERATIONS | EMPLOYAL | 123 | - | 123 | 117 | 6 | - | (6) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFBLREG | BELOW THE LINE- REGULATED | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCPO01 | CHIEF PROCUREMENT OFFICER | SCPSPALL | 8,175 | 980 | 9,155 | 8,049 | 1,106 | - | 23 | 1,128 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCQEAI | ENTERPRISE APPLICATION INTEGRA | APPSUPAL | 292 | 32 | 323 | 274 | 49 | - | 1 | 50 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCQEXC | EXCHANGE | PCNUMALL | 312 | 26 | 338 | 325 | 13 | - | 0 | 14 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCQMVS | MAINFRAME | APPSMVSX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCQNTS | NT SERVERS | APPSWINT | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFCQUNX | UNIX SERVERS | APPSUNIX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFEXETR | EXECUTIVE ADVISORY SERVICES - | DIRCTETR | 44,620 | 5,822 | 50,442 | 50,442 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX2770 | HR SERVICE CENTER SUPPORT | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX2815 | EDMS PRODUCT LINE SUPPORT | EMPLOYAL | 60 | 6 | 66 | 63 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX2850 | SECRETARIAT LEGAL SUPPORT | ASSTSALL | 4 | 0 | 5 | 4 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3265 | POWERBUILDER FRAMEWORK BASELOA | APPSUPAL | 5 | 0 | 5 | 4 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3275 | WEB INFRASTRUCTURE MAINTENANCE | PCNUMALL | 9 | 1 | 10 | 9 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3290 | IT BUSINESS PLANNING AND GOVER | ITSPENDA | 3,818 | 470 | 4,288 | 4,002 | 285 | - | 6 | 291 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3350 | A/R & BILLING SUPPORT | ARTRNALL | 72 | 8 | 80 | 71 | 9 | - | 0 | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3355 | Property Software Support | GENLEDAL | 3 | 0 | 3 | 3 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3450 | CORPORATE REPORTING SYSTEM SUP | GENLEDAL | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3620 | MMIS MATERIALS MAINT MGMNT INF | DIRCTESI | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3625 | SUPPLY CHAIN - CDW SYSTEMS SUP | SCDSPALL | 4 | 0 | 4 | 3 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3640 | WHITE AMBER & ITILITI SUPPORT | SCMATRAN | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3650 | WEB PAGE SUPPORT - CORPORATE | EMPLOYAL | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3670 | CORPORATE COMMUNICATIONS WEB S | DIRCTETR | 4 | 0 | 4 | 4 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3675 | BARCODING SYSTEMS SUPPORT | SCDSPALL | 2 | 0 | 2 | 1 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3690 | PEARL SUPPORT | APTRNALL | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3695 | ATPR SUPPORT | APTRNALL | 61 | 6 | 67 | 61 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3785 | ORG, JES, BATS, ACBM SUPPORT | GENLEDAL | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX3790 | ESTER SUPPORT | PRCHKALL | 96 | 9 | 105 | 99 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCFX5555 | DATA WAREHOUSE TOOLS SUPPORT | APPSUPAL | 25 | 3 | 28 | 24 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 686,476 | 70,426 | 756,902 | 756,902 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 552,734 | 57,006 | 609,740 | 609,740 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCH60959 | EXECUTIVE FACILITIES SERVICES | DIRCTETR | 348 | - | 348 | 348 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRCALL | HR SVCS- CUST SERV SUPT- ALL C | EMPLOCSS | 196 | - | 196 | 181 | 15 | - | - | 15 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRDCSS | HR- FRANCHISE OPNS (DIST) SUPT | EMPLFRAN | 481 | - | 481 | 414 | 66 | - | - | 66 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRFOSS | HR FOSSIL SUPPORT- ALL COS | EMPLOFOS | 537 | - | 537 | 488 | 48 | - | - | 48 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRPRES | HR PRESIDENT/ CEO SUPPORT- ALL | EMPLPRES | 7 | - | 7 | 6 | 1 | - | - | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRSALL | HR SERVICES- ALL COMPANIES | EMPLOYAL | 317,117 | 33,482 | 350,598 | 333,715 | 16,883 | - | (72) | 16,812 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRSDUT | HR SVCS - ESI DOMESTIC UTILITY | DIRCTESI | 8 | - | 8 | 8 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCHRTRAN | HUMAN RESOURCE SVCS - TRANSMIS | EMPLTRAN | 115 | - | 115 | 106 | 9 | - | - | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCMCMSOM | MATERIALS & CONTRACTS MGT MT SY | SCMATXNU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20520 | WORK MANAGEMENT SYSTEM (WMS) M | DIRCTEOI | 25 | 3 | 28 | 28 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20521 | IDEAS MAINTENANCE | DIRCTEOI | 76 | 9 | 86 | 86 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20522 | PCRS MAINTENANCE | DIRCTEOI | 133 | 16 | 149 | 149 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20527 | NUCLEAR IT QUICK RESPONSE TEAM | DIRCTEOI | 44 | 5 | 49 | 49 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20528 | ERD SUPPORT (MAINTENANCE) | DIRCTEOI | 617 | 74 | 691 | 691 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCN20858 | NUCLEAR IT QUICK RESPONSE TEAM | DIRCTEOI | 2 | 0 | 3 | 3 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR40085 | ENTERGY CORPORATION COMMUNICAT | DIRCTETR | 10,500 | - | 10,500 | 10,500 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR40118 | UTILITY COMMUNICATIONS | CUSTEGOP | 83,560 | - | 83,560 | 72,040 | 11,521 | - | (118) | 11,403 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR40430 | EMPLOYEE COMM (REGULATED COMPA | EMPLOREG | 71,944 | - | 71,944 | 67,408 | 4,535 | - | - | 4,535 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR40500 | EMPLOYEE COMM (REG + UNREG COM | EMPLOYAL | 4 | 0 | 5 | 5 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR53095 | HEADQUARTER'S CREDIT & COLLECT | CUSTEGOP | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR53291 | ESI REMITTANCE PROCESSING | CUSEOPCO | 151 | 18 | 170 | 145 | 25 | - | 1 | 26 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR73326 | CUSTOMER SERVICE CENTER SUPPOR | CUSTCALL | 130 | 16 | 146 | 130 | 16 | - | 0 | 16 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR73380 | CREDIT SYSTEMS | CUSTEGOP | 40 | 5 | 44 | 38 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCR93300 | NORTHEAST NONREG NUCLEAR EXTRN | DIRCTENU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCRM1021 | AUDIT: ESI INFORMATION TECHNO | DIRCTESI | 3 | - | 3 | 3 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 771,530 | 96 | 771,625 | 657,743 | 113,883 | - | 4 | 113,887 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 105,291 | 8 | 105,299 | 90,781 | 14,518 | - | (10) | 14,508 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCT29320 | SKILLS TRAINING CUST. SERV- HE | CUSEOPCO | 163 | - | 163 | 139 | 24 | - | - | 24 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCT29400 | OPERATIONS SAFETY - HEADQUARTE | CUSTEGOP | 689,509 | 74,343 | 763,852 | 658,206 | 105,647 | 512 | 1,807 | 107,966 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCT29406 | OPERATIONS SAFETY - TEXAS DIST | DIRECTTX | 15,773 | - | 15,773 | - | 15,773 | - | - | 15,773 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCT54052 | Trans Regulatory Support/Polic | TRSBLNOP | 9,442 | 868 | 10,310 | 9,099 | 1,211 | - | 24 | 1,235 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCT54065 | OPNS OF PURCHASING & CONT-DCS | SCMATRAN | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTBLLPL | BELOW THE LINE - LPL | DIRCTELI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTDDS26 | CUSTOMER SERVICE SUPPORT - O&M | CUSTEGOP | 120 | - | 120 | 103 | 17 | - | - | 17 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTDPQ01 | DISTR POWER QUALITY ESI | CUSEOPCO | 3 | 0 | 3 | 2 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTDS010 | PROCESS & SKILLS TRAINING ADMI | EMPLFRAN | 120,567 | 14,007 | 134,574 | 115,628 | 18,946 | - | 389 | 19,335 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTDTR08 | SKILLS TRAINING - LOUISIANA EL | DIRCTELI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS12 | TRANSMISSION LINES O&M EXPENS | TRALINOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS17 | Substation Maintenance EGSI LA | DIRECTLG | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS19 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTEAI | 10,322 | - | 10,322 | 10,322 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS21 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTELI | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS22 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTEMI | 7,620 | - | 7,620 | 7,620 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS23 | Substation Maintenance - Texas | DIRECTTX | 15,773 | - | 15,773 | - | 15,773 | - | - | 15,773 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS24 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTENO | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS27 | DISTRIBUTION O&M EXPENSE -EAI | DIRCTEAI | 13,605 | - | 13,605 | 13,605 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS28 | DISTRIBUTION O&M EXPENSE -EMI | DIRCTEMI | 11,088 | 376 | 11,464 | 11,464 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS29 | DISTRIBUTION O&M EXPENSE -ELI | DIRCTELI | 9,001 | 708 | 9,709 | 9,709 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS30 | DISTRIBUTION O&M EXPENSE - EGSI | DIRECTLG | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS31 | DISTRIBUTION O&M EXPENSE - ENO | DIRCTENO | 1,596 | - | 1,596 | 1,596 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS38 | TRANSMISSION O&M MGMT/SUPPORT | TRSBLNOP | 1,871,582 | 4,636 | 1,876,218 | 1,655,755 | 220,463 | (17) | 90 | 220,536 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS46 | DISTRIBUTION O&M EXP - METRO E | CUSEMETR | 159 | - | 159 | 159 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS47 | DISTR O&M EXPENSE - LOUISIANA | CUSTELLA | 943 | - | 943 | 943 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS71 | TRANSMISSION MANAGEMENT/SUPPOR | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCW29607 | POWER SYSTEM ACCOUNTING | LOADWEPI | 3 | 0 | 4 | 3 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCW29608 | TRANSMISSION POWER SYSTEM OPER | LOADOPCO | 6,950 | 639 | 7,589 | 6,456 | 1,133 | - | 22 | 1,155 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCW55555 | VP FOSSIL GENERATION | CAPAOPCO | 14,414 | 1,850 | 16,265 | 14,506 | 1,758 | - | 32 | 1,791 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCWE0063 | EMO APPLICATION SUPPORT | LOADOPCO | 17 | 2 | 19 | 16 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCWE0073 | FOSSIL INFORMATION TECHNOLOGY | CAPAOPCO | 3 | 0 | 3 | 3 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | 964 | 108 | 1,072 | 1,072 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCWE0187 | FOSSIL IT SUPPORT FOR 2003-200 | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCWS0327 | SAIC LABOR CHARGES TO PMDC | CAPAOPCO | 53 | 6 | 60 | 53 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 1,119,964 | 119,476 | 1,239,440 | 1,239,440 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCZU1603 | LP&L/LPSC EARNINGS REVIEW; DOC | DIRCTELI | 2,335 | 298 | 2,633 | 2,633 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Domino, Joe

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PP1E2EPM | End-to-End Process Mgmt | LVLSVCAL | 3,230 | 407 | 3,637 | 3,291 | 347 | - | 7 | 354 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PP4R9886 | TRITIUM DETECTION INVESTIGATIO | DIRECT72 | 23,182 | 2,309 | 25,491 | 25,491 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PP6HHOST | ENNE Hosting/server support/SO | DIRCTENU | 135 | 16 | 151 | 151 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PP6HINDS | Indus Passport | DIRCTENU | 339 | 41 | 379 | 379 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPAMISTG | AMI Strategy Expense | CUSEOPCO | 223 | 27 | 250 | 213 | 37 | - | 1 | 38 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | (192) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPBLANCO | Project White | DIRCTETR | 38,891 | 5,003 | 43,894 | 43,894 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPC31258 | CEO MEETINGS WITH EMPLOYEES | EMPLOYAL | 350 | - | 350 | 334 | 16 | - | - | 16 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPCAO001 | Chief Administrative Officer | ASSTSALL | 1,431,497 | 145,499 | 1,576,996 | 1,421,598 | 155,398 | (769) | (6,899) | 147,730 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPCCS010 | Climate Consulting Services | ASSTSALL | 289,337 | 31,693 | 321,030 | 289,415 | 31,615 | - | 547 | 32,162 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPCOO001 | CHIEF OPERATING OFFICER | ASSTSALL | 582,384 | 63,085 | 645,469 | 581,811 | 63,658 | (3) | (2,115) | 61,540 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPCPMUTL | CORPORATE PERFORMANCE MGMT UTL | EMPXRTNC | 19,531 | 1,594 | 21,126 | 19,133 | 1,992 | - | 40 | 2,032 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10115 | Dist Work Mgmt O&M-DIS/DSS/ADS | CUSTEGOP | 176 | 21 | 197 | 170 | 27 | - | 1 | 28 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10116 | Dist Work Mgmt O&M-LAMP Street | CUSEOPCO | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10119 | Dist Work Mgmt O&M-CTS Contrac | CUSTEGOP | 23 | 3 | 26 | 22 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10120 | Dist Oper Appl O&M-AM/FM Suppo | CUSTEGOP | 269 | 32 | 302 | 260 | 42 | - | 1 | 42 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10121 | Dist Oper Appl O&M-AutoCAD | CUSEOPCO | 12 | 1 | 14 | 12 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10123 | Dist Oper Appl O&M-EPO&SAISO S | CUSEOPCO | 21 | 3 | 24 | 20 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10124 | Dist Oper Appl O&M-PDD/ECOS Sp | CUSTEGOP | 8 | 1 | 9 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10128 | ARCS/Itron/MV90 Support | CUSTEGOP | 73 | 9 | 82 | 71 | 11 | - | 0 | 12 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10129 | Billing Determinate Proc/Major | CUSTEGOP | 56 | 7 | 62 | 54 | 9 | - | 0 | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10130 | Customer Care System Interface | CUSEGXTX | 98 | 12 | 109 | 109 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10131 | CIS/AIS & Core Support | DIRECTTX | 805 | 97 | 902 | - | 902 | - | 19 | 921 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10132 | Electronic Data Interchange Su | CUSEOPCO | 20 | 2 | 23 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10133 | Internet Bill Presentment & Pm | CUSEGXTX | 15 | 2 | 17 | 17 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10134 | MAB Load Research Support | CUSTEGOP | 19 | 2 | 22 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10137 | Bill Delivery Support | CUSEGXTX | 482 | 58 | 539 | 539 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10139 | Mobius Support | CUSTEGOP | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10140 | Large Power Billing System for | CUSEOPCO | 23 | 3 | 25 | 22 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10141 | CIMS Support | CUSEGXTX | 2 | 0 | 2 | 2 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10142 | Customer Service Field Applica | CUSTEGOP | 11 | 1 | 12 | 10 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10146 | Dist Work Mgmt-Cyndrus Support | VEHCLALL | 8 | 1 | 9 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10150 | TaxWare Support | CUSTEGOP | 50 | 6 | 56 | 48 | 8 | - | 0 | 8 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10158 | CCS Agent Care System | CUSEGXTX | 46 | 6 | 52 | 52 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPD10161 | ePlus (Web Self Service) Suppo | CUSTEGOP | 146 | 17 | 163 | 141 | 22 | - | 0 | 23 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPE9974S | Utl ECI Continuing Improve ESI | CUSEOPCO | 233,026 | 23,604 | 256,630 | 218,728 | 37,902 | - | 387 | 38,289 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPE9981A | Integrated Energy Mgmt EAI | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPE9981S | Integrated Energy Mgmt ESI | CUSEOPCO | 15,986 | 1,847 | 17,834 | 15,206 | 2,628 | - | 8 | 2,636 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPEGSFRP | EGSI LPSC Formula Rate Plan Fi | DIRECTLG | 686 | 77 | 763 | 763 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPELEGAS | ENO Elec & ENO EGS Gas Expense | CUSENLGG | (9,627) | (2,615) | (12,242) | (12,242) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPENOCEO | ENO CEO Electric and Gas Expen | DIRCTENO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPENOFRP | ENO Annual FRP Filing 2010-12 | DIRCTENO | 2,739 | 312 | 3,051 | 3,051 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPEPI001 | Environmental Programs & Infra | CAPAOPCO | (179) | - | (179) | (160) | (19) | - | (1) | (20) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETEGSL | Executive Timesheets- EGSL | DIRECTLG | 2,215 | 216 | 2,430 | 2,430 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETENOI | Executive Timesheet- ENOI | DIRCTENO | 61,975 | 1,967 | 63,943 | 63,943 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETRNUC | Executive Timesheets- Reg Nuc | DIRCTEOI | 17,530 | 1,880 | 19,410 | 19,410 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSEAI | Executives Time and Expenses-E | DIRCTEAI | 35,047 | 3,609 | 38,656 | 38,656 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSELI | Executive Timesheets- ELI | DIRCTELI | 83,570 | 2,603 | 86,173 | 86,173 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSEMI | Executive Timesheets- EMI | DIRCTEMI | 17,613 | 1,500 | 19,113 | 19,113 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSETI | Executive Time and Expenses-ET | DIRECTTX | 36,090 | 3,510 | 39,601 | - | 39,601 | - | 765 | 40,365 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSETR | Executive Timesheets-ETR | DIRCTETR | 737,895 | 97,043 | 834,938 | 834,938 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSNRG | Executive Timesheets- Non Reg | DIRCTENU | 10,307 | 595 | 10,902 | 10,902 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPETSREG | Executive Timesheets- Reg Co's | CUSTEGOP | 12,783 | 865 | 13,648 | 11,767 | 1,882 | - | 29 | 1,911 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPF15115 | FGA-VP/General Office | CUSTEGOP | 199 | - | 199 | 171 | 28 | (28) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPF72700 | Cognos Reporting Support | GENLEDAL | 22 | 2 | 24 | 23 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPFRM127 | OCRO - Bus Cont Plan Managemen | LBRBILAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPFX3259 | Inventory Planning System Supp | SCTDSPAL | 34 | 4 | 38 | 25 | 12 | - | 0 | 13 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPFX3685 | Supply Chain Applications Supp | SCMATRAN | 61 | 7 | 68 | 58 | 10 | - | 0 | 10 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPFX5307 | Compliance Software System Sup | ASSTSALL | 38 | 5 | 42 | 38 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPFXOPMO | IT Enterprise Program Manageme | ITSPENDA | 22 | 2 | 25 | 23 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPGRSP10 | EGSL RATE STABLIZATN (TY 2009/ | DIRECTLG | 88 | 10 | 98 | 98 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPHIPPO1 | Project X | DIRCTETR | 34,735 | 5,181 | 39,916 | 39,916 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-B
2011 TX Rate Case
Page 5 of 6

2011 ETI Rate Case

3-51

| | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPHRSSPC | HR SVS - ESI SUPPLY CHAIN | DIRCTESI | 18 | - | 18 | 18 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPHRTFMN | HR Transformation - O&M Costs | EMPLOYAL | 91,155 | 9,889 | 101,043 | 96,167 | 4,877 | - | 100 | 4,976 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPN20535 | P3E Scheduling Software Mainte | DIRCTEOI | 162 | 19 | 182 | 182 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPN20536 | INDUS Software Maintenance | DIRCTEOI | 288 | 34 | 322 | 322 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPN20713 | ESI Nuclear - Site Split | SNUCSITE | 81,152 | 10,163 | 91,314 | 91,314 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPNPM008 | Wholesale C B 50/50 Split - Pi | DIRNG000 | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPNXRECR | Enexus Recurring | DIRECTNI | (2,989) | - | (2,989) | (2,989) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPPCS001 | Critical Infrastructure Protec | CAPAOPCO | 1,644,835 | 151,796 | 1,796,631 | 1,602,395 | 194,236 | - | 2,391 | 196,626 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPPGA010 | PGA Audit 2010 | DIRECTLG | 430 | 50 | 480 | 480 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPPMUPGR | Performance Management Sys Upg | CUSEOPCO | 3 | 0 | 4 | 3 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPRC2008 | ENOI 2008 RATE CASE | DIRCTENO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPRES001 | Regulated Utility Electric Rel | CUSEOPCO | 1,993 | 223 | 2,216 | 1,889 | 327 | - | 7 | 333 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPSCOUT1 | Project Scout (VY Litigation A | DIRECT72 | 15 | - | 15 | 15 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 2,871 | 350 | 3,221 | 2,740 | 481 | - | 10 | 491 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 543 | 70 | 614 | 614 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 905 | 111 | 1,016 | 847 | 169 | - | (169) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PCTTDS38 | TRANSMISSION O&M MGMT/SUPPORT | TRSBLNOP | - | - | - | - | - | - | (215,886) | (215,886) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWCBEAM | Wholesale Commodity Business - | DIRECTXU | 56,322 | 6,557 | 62,878 | 62,878 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWCBEPM | Wholesale Commodity Business - | DIRNG000 | 350 | - | 350 | 350 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWCBETC | Wholesale Commodity Business - | DIRECT66 | 56,322 | 6,557 | 62,879 | 62,879 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWCBNNE | Wholesale Commodity Business - | SENUCALL | 994,973 | 80,212 | 1,075,184 | 1,075,184 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 278 | 38 | 316 | 263 | 52 | - | 1 | 53 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0375 | SAIC Designated Srv for Fossil | CAPAOPCO | 10 | 1 | 11 | 10 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0504 | M0000 - CIP Walkdown | DIRCTEMI | 2,970 | 209 | 3,179 | 3,179 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0505 | N0000 - CIP Walkdown | DIRCTENO | 2,404 | 213 | 2,617 | 2,617 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0506 | A0000 - CIP Walkdown | DIRCTEAI | 825 | - | 825 | 825 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWE0507 | L0000 - CIP Walkdown | DIRCTELI | 5,220 | 481 | 5,701 | 5,701 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F3PPWEOSGN | General System-ENG-Tech Suppor | CAPAOPCO | 1,102 | 80 | 1,182 | 1,054 | 128 | - | 1 | 129 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F4PPEGS148 | Mutual Assist EGSL GAS NMGC 2/ | DIRECTLG | 829 | 100 | 929 | 929 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F4PPENG134 | Mutual Assist ENOI Gas NMGC 2/ | DIRCTENO | 966 | 117 | 1,083 | 1,083 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCD10093 | WEB DEVELOPMENT SUPPORT | CUSTEGOP | 15 | 2 | 17 | 15 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCD10108 | CCS REMEDY TESTING | CUSEGXTX | 0 | 0 | 1 | 1 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCDG0168 | GAS EMPLOYEE DEVELOPMENT PROGR | CUSGOPCO | 19 | - | 19 | 19 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCE13601 | GENERAL LITIGATION-ELI | DIRCTELI | 271 | - | 271 | 271 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCE13751 | GENERAL LITIGATION- EGSI-LA | DIRECTLG | 271 | - | 271 | 271 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 90 | - | 90 | 90 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCF96930 | BENCHMARKING PHASE II | LOADWEOI | 4,020 | 551 | 4,571 | 3,817 | 754 | - | 16 | 770 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCLAWELL | LA WELLNESS PROGRAM PILOT | CUSTELLA | 328 | - | 328 | 328 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCLIHPPC | CONSUMER EDUCATION PROGRAMS | CUSEOPCO | 3 | - | 3 | 3 | 1 | - | - | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCMCMSCL | PASSPORT- SC MATERIALS MANAGEM | SCMATRAN | 257 | 31 | 288 | 245 | 43 | (43) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 82,056 | 5,482 | 87,538 | 87,538 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 2,504 | - | 2,504 | 2,504 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCTTDS70 | TRANS MAINTENANCE: LINES & SUB | TRSBLNOP | 475,946 | 54,604 | 530,550 | 468,094 | 62,456 | 4,130 | 1,099 | 67,685 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 813 | - | 813 | 785 | 28 | - | (19) | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZCONOP | CONTRIBUTION OPERATIONS - BELO | ASSTSALL | 1 | 0 | 1 | 1 | 0 | - | (0) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZECDEV | ECONOMIC DEVELOPMENT - BELOW T | CUSEOPCO | 2 | 0 | 2 | 1 | 0 | - | (0) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZFCLSR | VOICE & VIDEO LOCAL SERVICE | TELXGENS | 492 | - | 492 | 463 | 29 | - | - | 29 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZFDSER | DESKTOP SERVICES | PCNUMALL | 15 | 1 | 16 | 16 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | 19,736 | 2,153 | 21,889 | 21,889 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZU1573 | REGULATORY AFFAIRS -- 100% EGS | DIRCTTX | 11,275 | - | 11,275 | - | 11,275 | - | - | 11,275 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZU5400 | LA GOVERNMENTAL AFFAIRS-100% E | DIRCTELI | 185 | - | 185 | 185 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZU5402 | LOUISIANA GOVERNMENTAL AFFAIRS | CUSELGLA | 87,279 | 10,527 | 97,805 | 97,805 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZU5403 | LOUISIANA GOVERNMENTAL AFFAIRS | CUSTELLA | 922,728 | 95,302 | 1,018,030 | 1,018,030 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZUSETR | TRANSITION TO COMPETITION - ET | DIRCTETR | 79,500 | - | 79,500 | 79,500 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZUSGSL | TRANS TO COMPETITION -EGSI LA- | DIRECTLG | 127,095 | - | 127,095 | 127,095 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZUSLPL | TRANS TO COMPETITION -ELI- BEL | DIRCTELI | 142,455 | - | 142,455 | 142,455 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZZ0150 | SHAREHOLDER/DIRECTOR EXPENSES | ASSTSALL | 502 | - | 502 | 451 | 51 | - | - | 51 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 1,614 | - | 1,614 | 1,614 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PCZZI04R | WORKER'S COMPENSATION- RESERVE | DIRCTESI | 115,736 | - | 115,736 | 115,736 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 78,782 | - | 78,782 | 78,782 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPCIPUNC | General Unclassified CIP Costs | LOADOPCO | 7,719 | 709 | 8,428 | 7,170 | 1,258 | - | 25 | 1,283 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPD10154 | MDT Wireless Telecom Serv | CUSTEGOP | 811 | 34 | 845 | 729 | 117 | - | (72) | 45 |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

**EXHIBIT JFD-B**
**2011 TX Rate Case**
**Page 6 of 6**

**2011 ETI Rate Case**

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Total Billings Support | (B) Total Billings Service Company Recipient | (C) Total Billings Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPD10156 | Dist. Work Mgmt - DriveCam Sup | CUSTELLA | 5 | 1 | 5 | 5 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPD10162 | Util Ops Cust Data Warehouse S | CUSTEGOP | 45 | 5 | 50 | 43 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | 4,970 | 94 | 5,064 | 4,820 | 244 | (5) | 1 | 240 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 148 | - | 148 | - | 148 | - | (148) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPFALCON | Project Falcon | DIRECTNI | 208,516 | 4,160 | 212,676 | 212,676 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPGEFBUS | Gas Operations Efficient Busin | CUSGOPCO | 45,084 | 5,479 | 50,562 | 50,562 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 46,517 | - | 46,517 | 41,790 | 4,727 | - | (4,727) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPLRSOLT | System Officer Labor Team | EMPLOYAL | 2,871 | 282 | 3,153 | 2,998 | 155 | - | 3 | 158 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPORGSSP | ESI Direct Enexus Org Costs | DIRECTNI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPSAFTEL | SAFETY TRAINING LOADER ELEC LA | CUSTELLA | 698 | 78 | 776 | 776 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 1,454 | 167 | 1,621 | 1,352 | 269 | - | (269) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPSUPICT | Support of ICT | LOADOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPTHMPSN | Norwood Thompson Park Playgrou | DIRCTETR | 3,514 | 465 | 3,980 | 3,980 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPTRISTE | Project Blue | DIRCTETR | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPTVPPRO | Voluntary Protection Program | TRSBLNOP | 698 | 78 | 776 | 685 | 91 | - | 2 | 93 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONAR | EAI Contributions - BELOW THE | DIRCTEAI | 54,405 | - | 54,405 | 54,405 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONLA | ELI Contributions - BELOW THE | DIRECTELI | 39,524 | - | 39,524 | 39,524 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONLS | EGSI-LA Contrib - BELOW THE LI | DIRECTLG | 32,595 | - | 32,595 | 32,595 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONMS | EMI Contributions - BELOW THE | DIRCTEMI | 39,120 | - | 39,120 | 39,120 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONNO | ENOI Contributions - BELOW THE | DIRCTENO | 19,456 | - | 19,456 | 19,456 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZCONTG | EGSI-TX Contrib - BELOW THE LI | DIRECTTX | 23,251 | - | 23,251 | - | 23,251 | (23,251) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 3,503 | 346 | 3,849 | 3,660 | 189 | - | (44) | 145 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SAPCP25910 | PC&R OVERHEAD POOL CHARGES | CEAOUTAL | 0 | - | 0 | 0 | 0 | (0) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SDPCT30070 | CAPITAL SUSPENSE, DISTR WIRES, | DIRECTELI | 676 | 75 | 751 | 751 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 713,582 | 85,639 | 799,221 | 799,221 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 452,571 | 54,724 | 507,296 | 507,296 | - | - | - | - |
| | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | Total ESI | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | | | |
| Total UTILITY & EXECUTIVE MANAGEMENT | | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | | | |
| Total Domino, Joe | | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-C
2011 TX Rate Case
Page 1 of 11

2011 ETI Rate Case

3-53

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | - | (2) | (2) | (2) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 796 | 96 | 892 | 892 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 834 | 95 | 928 | 928 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | C6PPWS0534 | System Planning Pet Coke Repow | DIRCTELI | 274 | 31 | 305 | 305 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 10,566 | 1,170 | 11,736 | 9,984 | 1,752 | - | 37 | 1,789 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCE99750 | PRES- ENT. LA-GEN'L OPS-ELI/EG | CUSELGLA | 1,086,097 | 67,986 | 1,154,084 | 1,154,084 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCE99751 | SPECIAL PROJECTS - LA STATE PR | CUSELGLA | 71 | - | 71 | 71 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 3,054 | 356 | 3,410 | 2,940 | 470 | - | 10 | 480 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCF21600 | CORP RPTG ANALYSIS & POLICY AL | GENLEDAL | 4,616 | 418 | 5,035 | 4,717 | 317 | - | 7 | 324 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCF23033 | GENERAL ACCOUNTING - ESI | LVLSVCAL | 977 | 135 | 1,112 | 1,007 | 105 | - | 2 | 107 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCF23920 | CORP REPORTING ANALYSIS & POLI | DIRCTELI | 32,744 | 3,899 | 36,643 | 36,643 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCF239LA | CORP RPTNG ANALYSIS/POLICY EGS | DIRECTLG | 32,690 | 3,893 | 36,583 | 36,583 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 1,019 | - | 1,019 | 905 | 113 | - | - | 113 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 823 | 96 | 919 | 783 | 135 | - | 4 | 140 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCTBLLPL | BELOW THE LINE - LPL | DIRCTELI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | 964 | 108 | 1,072 | 1,072 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PCZU1603 | LP&L/LPSC EARNINGS REVIEW; DOC | DIRCTELI | 2,335 | 298 | 2,633 | 2,633 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PPEGSFRP | EGSI LPSC Formula Rate Plan Fi | DIRECTLG | 686 | 77 | 763 | 763 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 2,871 | 350 | 3,221 | 2,740 | 481 | - | 10 | 491 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 543 | 70 | 614 | 614 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 278 | 38 | 316 | 263 | 52 | - | 1 | 53 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCE13601 | GENERAL LITIGATION-ELI | DIRCTELI | 271 | - | 271 | 271 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCE13751 | GENERAL LITIGATION- EGSI-LA | DIRECTLG | 271 | - | 271 | 271 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCLAWELL | LA WELLNESS PROGRAM PILOT | CUSTELLA | 328 | - | 328 | 328 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 2 | - | 2 | 2 | 0 | - | - | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCZFCLSR | VOICE & VIDEO LOCAL SERVICE | TELXGENS | 492 | - | 492 | 463 | 29 | - | - | 29 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | 19,736 | 2,153 | 21,889 | 21,889 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PCZUSETR | TRANSITION TO COMPETITION - ET | DIRCTETR | 79,500 | - | 79,500 | 79,500 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 5,979 | - | 5,979 | 5,371 | 607 | - | (607) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 45 | 484 | 460 | 24 | - | 0 | 24 |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE122 | Total | | | 1,289,256 | 81,310 | 1,370,566 | 1,366,479 | 4,086 | - | (536) | 3,551 |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F3PPELEGAS | ENO Elec & ENO EGS Gas Expense | CUSENLGG | (19,654) | - | (19,654) | (19,654) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F3PPENOCEO | ENO CEO Electric and Gas Expen | DIRCTENO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F3PPRC2008 | ENOI 2008 RATE CASE | DIRCTENO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE12F | Total | | | (19,654) | - | (19,654) | (19,654) | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 26 | - | 26 | 26 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 686 | - | 686 | 613 | 73 | (73) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F3PCTTDS46 | DISTRIBUTION O&M EXP - METRO E | CUSEMETR | 159 | - | 159 | 159 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F3PCTTDS47 | DISTR O&M EXPENSE - LOUISIANA | CUSTELLA | 943 | - | 943 | 943 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 42 | - | 42 | 42 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCZU5400 | LA GOVERNMENTAL AFFAIRS-100% E | DIRCTELI | 185 | - | 185 | 185 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCZU5402 | LOUISIANA GOVERNMENTAL AFFAIRS | CUSELGLA | 87,279 | 10,527 | 97,805 | 97,805 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCZU5403 | LOUISIANA GOVERNMENTAL AFFAIRS | CUSTELLA | 922,728 | 95,302 | 1,018,030 | 1,018,030 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCZUSGSL | TRANS TO COMPETITION -EGSI LA- | DIRECTLG | 127,095 | - | 127,095 | 127,095 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PCZUSLPL | TRANS TO COMPETITION -ELI- BEL | DIRCTELI | 142,455 | - | 142,455 | 142,455 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | 93 | 8 | 101 | 96 | 5 | (5) | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CE179 | Total | | | 1,281,690 | 105,837 | 1,387,527 | 1,387,448 | 78 | (78) | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONAR | EAI Contributions - BELOW THE | DIRCTEAI | 54,405 | - | 54,405 | 54,405 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONLA | ELI Contributions - BELOW THE | DIRCTELI | 39,524 | - | 39,524 | 39,524 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONLS | EGSI-LA Contrib - BELOW THE LI | DIRECTLG | 32,595 | - | 32,595 | 32,595 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONMS | EMI Contributions - BELOW THE | DIRCTEMI | 39,120 | - | 39,120 | 39,120 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONNO | ENOI Contributions - BELOW THE | DIRCTENO | 19,456 | - | 19,456 | 19,456 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | F5PPZCONTG | EGSI-TX Contrib - BELOW THE LI | DIRECTTX | 23,251 | - | 23,251 | - | 23,251 | (23,251) | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP015 | Total | | | 208,351 | - | 208,351 | 185,100 | 23,251 | (23,251) | - | - |

Amounts may not add or tie to other schedules due to rounding.

Domino, Joe

EXHIBIT JFD-C
Page 1 of 11

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-C
2011 TX Rate Case
Page 2 of 11

**2011 ETI Rate Case**

**3-54**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP027 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP027 | | Total | | | | | | | | | |
| | | | | | | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCC14900 | EXPENSES-CHAIRMAN ENTERGY | DIRCTETR | 448,364 | 56,234 | 504,599 | 504,599 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCC31255 | OPERATIONS-OFFICE OF THE CEO | ASSTSALL | 3,036,304 | 193,032 | 3,229,335 | 2,909,321 | 320,015 | (645) | (4,828) | 314,542 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCC31256 | LEADERSHIP CONFERENCE | EMPLOYAL | 186,861 | - | 186,861 | 178,151 | 8,711 | - | - | 8,711 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCC31257 | EVENTS ADMINISTRATION | DIRCTETR | 814,340 | - | 814,340 | 814,340 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCCE0155 | BELOW THE LINE-C ENVIRONMENTAL | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCCEP001 | CORPORATE ENVIRONMENTAL POLICY | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCE14987 | FGA-Climate/Environmental | ASSTSALL | 47,580 | - | 47,580 | 42,787 | 4,793 | (4,793) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCE99750 | PRES- ENT. LA-GEN'L OPS-ELI/EG | CUSELGLA | 28,711 | 2,769 | 31,480 | 31,480 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCF22511 | IR - GENERAL, INQUIRIES & MAIL | DIRCTETR | 404 | - | 404 | 404 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCF22514 | MEETINGS ANALYSTS/INVESTORS/SH | DIRCTETR | 5,306 | - | 5,306 | 5,306 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 359 | 29 | 388 | 343 | 45 | - | 1 | 46 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCFEXETR | EXECUTIVE ADVISORY SERVICES - | DIRCTETR | 22,703 | 2,858 | 25,562 | 25,562 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCH60959 | EXECUTIVE FACILITIES SERVICES | DIRCTETR | 348 | - | 348 | 348 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCHRSALL | HR SERVICES- ALL COMPANIES | EMPLOYAL | 85,865 | 8,419 | 94,288 | 89,655 | 4,628 | - | 96 | 4,724 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PCR40085 | ENTERGY CORPORATION COMMUNICAT | DIRCTETR | 10,500 | - | 10,500 | 10,500 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PP1E2EPM | End-to-End Process Mgmt | LVLSVCAL | 3,230 | 407 | 3,637 | 3,291 | 347 | - | 7 | 354 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPBLANCO | Project White | DIRCTETR | 38,891 | 5,003 | 43,894 | 43,894 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPC31258 | CEO MEETINGS WITH EMPLOYEES | EMPLOYAL | 350 | - | 350 | 334 | 16 | - | - | 16 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPCAO001 | Chief Administrative Officer | ASSTSALL | 11,990 | - | 11,990 | 10,770 | 1,220 | - | (1,048) | 172 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPETENOI | Executive Timesheet- ENOI | DIRCTENO | 5,995 | - | 5,995 | 5,995 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPETSELI | Executive Timesheets- ELI | DIRCTELI | 5,995 | - | 5,995 | 5,995 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPETSETI | Executive Time and Expenses-ET | DIRECTTX | 6,980 | 641 | 7,621 | - | 7,621 | - | 164 | 7,785 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPETSETR | Executive Timesheets-ETR | DIRCTETR | 408,416 | 55,057 | 463,472 | 463,472 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPHIPPO1 | Project X | DIRCTETR | 34,735 | 5,181 | 39,916 | 39,916 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F3PPHRTFMN | HR Transformation - O&M Costs | EMPLOYAL | 32,084 | 3,203 | 35,288 | 33,559 | 1,728 | - | 36 | 1,764 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 190 | - | 190 | 184 | 6 | - | - | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PCZCONOP | CONTRIBUTION OPERATIONS - BELO | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PCZZI0150 | SHAREHOLDER/DIRECTOR EXPENSES | ASSTSALL | 502 | - | 502 | 451 | 51 | - | - | 51 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PCZZI04R | WORKER'S COMPENSATION- RESERVE | DIRCTESI | 115,736 | - | 115,736 | 115,736 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PPFALCON | Project Falcon | DIRCTNI | 30,097 | 4,160 | 34,257 | 34,257 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 15,000 | - | 15,000 | 13,474 | 1,526 | - | (1,526) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PPLRSOLT | System Officer Labor Team | EMPLOYAL | 2,871 | 282 | 3,153 | 2,998 | 155 | - | 3 | 158 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | (61) | - | (61) | (58) | (3) | - | (0) | (3) |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP040 | | Total | | 5,400,646 | 337,276 | 5,737,922 | 5,387,064 | 350,858 | (5,438) | (7,095) | 338,326 |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | E1PPNXCRP1 | Unwind - Employee | DIRECTNI | 21,844 | 3,253 | 25,096 | 25,096 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PC6H0026 | NORTHEAST MGMT OVERSITE IP2/IP | SPL77N7A | 24,988 | - | 24,988 | 24,988 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PC6HENNE | ENN EQUAL SPLIT | DIRCTENU | 588 | - | 588 | 588 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PCR93300 | NORTHEAST NONREG NUCLEAR EXTRN | DIRCTENU | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PP4R9886 | TRITIUM DETECTION INVESTIGATIO | DIRECT72 | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPCOO001 | CHIEF OPERATING OFFICER | ASSTSALL | 11,998 | - | 11,998 | 10,777 | 1,221 | - | (712) | 509 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPF15115 | FGA-VP/General Office | CUSTEGOP | 199 | - | 199 | 171 | 28 | (28) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPN20713 | ESI Nuclear - Site Split | SNUCSITE | 981 | - | 981 | 981 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPNPM008 | Wholesale C B 50/50 Split - Pi | DIRNG000 | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPNXRECR | Enexus Recurring | DIRECTNI | (2,989) | - | (2,989) | (2,989) | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPSCOUT1 | Project Scout (VY Litigation A | DIRECT72 | 15 | - | 15 | 15 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPWCBEAM | Wholesale Commodity Business - | DIRECTXU | 56,322 | 6,557 | 62,878 | 62,878 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPWCBEPM | Wholesale Commodity Business - | DIRNG000 | 350 | - | 350 | 350 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPWCBETC | Wholesale Commodity Business - | DIRECT66 | 56,322 | 6,557 | 62,879 | 62,879 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F3PPWCBNNE | Wholesale Commodity Business - | SENUCALL | 994,973 | 80,212 | 1,075,184 | 1,075,184 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F5PPFALCON | Project Falcon | DIRECTNI | 178,778 | - | 178,778 | 178,778 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 3,400 | - | 3,400 | 3,054 | 346 | - | (346) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F5PPORGSSP | ESI Direct Enexus Org Costs | DIRECTNI | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | F5PPTRISTE | Project Blue | DIRCTETR | - | - | - | - | - | - | - | |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP050 | | Total | | 1,347,769 | 96,578 | 1,444,347 | 1,442,753 | 1,594 | (28) | (1,058) | 509 |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | C7PPSJ1244 | STORM DL ARK DIST EAI 1/7/11 I | DIRCTEAI | 98 | 13 | 111 | 111 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | C7PPSJ2462 | STORM DMG LA DIST ELL 1/8/11 I | DIRCTELI | 1,422 | 231 | 1,654 | 1,654 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | C7PPSJ3198 | EMI Storm Distr Ops 1/7/11Wint | DIRCTEMI | 1,062 | 144 | 1,206 | 1,206 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

**EXHIBIT JFD-C**
**2011 TX Rate Case**
**Page 3 of 11**

2011 ETI Rate Case

3-55

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPLG11DA | Logistics Jan 2011 DIST Ark | DIRCTEAI | 0 | (2) | (2) | (2) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPLG11DL | Logistics Jan 2011 DIST ELL | DIRCTELI | 0 | (15) | (15) | (15) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPLG11DM | Logistics Jan 2011 DIST Miss | DIRCTEMI | 0 | (25) | (25) | (25) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPLG11TL | Logistics Jan 2011 TRN ELL | DIRCTELI | - | (0) | (0) | (0) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPLG11TM | Logistics Jan 2011 TRN Miss | DIRCTEMI | - | (1) | (1) | (1) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPSJ2447 | T-Grid Storm O&M ELL 1/7/201 I | DIRCTELI | 11 | 2 | 13 | 13 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | E2PPSJ3188 | T-Grid Storm Damage EMI 1/7/11 | DIRCTEMI | 28 | 4 | 31 | 31 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | F3PCE99741 | Utl Ops ECI & 6-Sigma Improve | CUSEOPCO | 249 | - | 249 | 212 | 37 | - | - | 37 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | F3PPE9974S | Utl ECI Continuing Improve ESI | CUSEOPCO | 221,118 | 23,536 | 244,654 | 208,517 | 36,137 | - | 479 | 36,615 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CP083 | Total | | | 223,988 | 23,886 | 247,874 | 211,700 | 36,173 | - | 479 | 36,652 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 2,881 | 254 | 3,135 | 2,784 | 350 | - | 7 | 357 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | F3PCFEXETR | EXECUTIVE ADVISORY SERVICES - | DIRCTETR | 21,917 | 2,963 | 24,880 | 24,880 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | F3PCHRSALL | HR SERVICES- ALL COMPANIES | EMPLOYAL | 230,926 | 25,032 | 255,958 | 243,721 | 12,238 | - | (168) | 12,069 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | F3PPETSETR | Executive Timesheets-ETR | DIRCTETR | 8,835 | 1,266 | 10,101 | 10,101 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | F3PPHRTFMN | HR Transformation - O&M Costs | EMPLOYAL | 58,251 | 6,624 | 64,875 | 61,770 | 3,105 | - | 63 | 3,168 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCA5 | Total | | | 322,809 | 36,140 | 358,949 | 343,256 | 15,693 | - | (98) | 15,595 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | F3PPCAO001 | Chief Administrative Officer | ASSTSALL | 1,419,507 | 145,499 | 1,565,006 | 1,410,828 | 154,178 | (769) | (5,851) | 147,559 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | F3PPELEGAS | ENO Elec & ENO EGS Gas Expense | CUSENLGG | 10,027 | (2,615) | 7,412 | 7,412 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 171 | - | 171 | 171 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | 325 | - | 325 | 309 | 16 | - | - | 16 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 4,308 | - | 4,308 | 3,871 | 437 | - | (437) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPCAO | Total | | | 1,434,339 | 142,884 | 1,577,223 | 1,422,591 | 154,631 | (769) | (6,288) | 147,574 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | C6PPWGP516 | SBC CIP Compliance | DIRECTTX | 12,289 | 1,679 | 13,968 | - | 13,968 | (13,968) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PCT54052 | Trans Regulatory Support/Polic | TRSBLNOP | 9,442 | 868 | 10,310 | 9,099 | 1,211 | - | 24 | 1,235 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PCW29608 | TRANSMISSION POWER SYSTEM OPER | LOADOPCO | 6,950 | 639 | 7,589 | 6,456 | 1,133 | - | 22 | 1,155 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPPCS001 | Critical Infrastructure Protec | CAPAOPCO | 1,639,281 | 151,034 | 1,790,314 | 1,596,762 | 193,553 | - | 2,377 | 195,930 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPWE0504 | M0000 - CIP Walkdown | DIRCTEMI | 2,970 | 209 | 3,179 | 3,179 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPWE0505 | N0000 - CIP Walkdown | DIRCTENO | 2,404 | 213 | 2,617 | 2,617 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPWE0506 | A0000 - CIP Walkdown | DIRCTEAI | 825 | - | 825 | 825 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPWE0507 | L0000 - CIP Walkdown | DIRCTELI | 5,220 | 481 | 5,701 | 5,701 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F3PPWEOSGN | General System-ENG-Tech Suppor | CAPAOPCO | 598 | - | 598 | 533 | 65 | - | - | 65 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 90 | - | 90 | 90 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 78 | - | 78 | 78 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 1,399 | - | 1,399 | 1,399 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F5PPCIPUNC | General Unclassified CIP Costs | LOADOPCO | 7,719 | 709 | 8,428 | 7,170 | 1,258 | - | 25 | 1,283 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 177 | 18 | 194 | 185 | 10 | - | 0 | 10 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP7 | Total | | | 1,689,442 | 155,849 | 1,845,292 | 1,634,094 | 211,197 | (13,968) | 2,448 | 199,678 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | C1PPFI5207 | Payroll Time & Labor - Phase I | EMPLOYAL | (24) | (2) | (27) | (26) | (1) | 0 | 1 | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | C1PPHR8800 | PS HCM (Human Cap Mgmt) Upgrd | EMPLOYAL | (9) | (1) | (10) | (10) | (0) | 0 | 0 | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | C6PPAMBSGN | AMI:BASE Non-Incremental, EGSL | DIRCTLG | (53) | (7) | (60) | (60) | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | C6PPWS0783 | Ninemile 6 Development | DIRCTELI | 8,423 | 1,072 | 9,495 | 9,495 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | E1PCD10064 | DISTR WK MGMT-SUBST AOR/COS/SF | CUSEOPCO | 1 | 0 | 1 | - | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCC08500 | Executive VP, Operations | ASSTSALL | 17,701 | 951 | 18,652 | 16,787 | 1,864 | - | (96) | 1,768 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCC31257 | EVENTS ADMINISTRATION | DIRCTETR | 11,990 | - | 11,990 | 11,990 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCCEP001 | CORPORATE ENVIRONMENTAL POLICY | CAPAOPCO | 2,196,785 | - | 2,196,785 | 1,959,288 | 237,496 | - | - | 237,496 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | 2,768 | 372 | 3,140 | 2,824 | 316 | - | 7 | 323 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCCSE060 | SAFETY & ENVIRONMENTAL SUPPORT | EMPLOYAL | 747 | 62 | 810 | 770 | 40 | - | 1 | 41 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 17,102 | 2,200 | 19,302 | 16,340 | 2,962 | - | 61 | 3,022 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCD10006 | FIELD DEVELOPMENT | CUSTEGOP | 6 | 1 | 7 | 6 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCD10010 | PROGRAM MANAGEMENT - O&M | CUSTEGOP | 9 | 1 | 10 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCD10033 | SSS PRELIMINARY PLANNING, SCOP | CUSTEGOP | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCD10049 | REGULATED RETAIL SYSTEMS - O&M | CUSTEGOP | 25 | 3 | 28 | 24 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCD10077 | REGULATORY AFFAIRS WORLDOX IMP | DIRCTENO | 4 | 1 | 5 | 5 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCE13100 | CUSTOMER CARE SYSTEM SUPPORT | CUSEGXTX | 83 | 10 | 93 | 93 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCE13100 | GEN CORP. LEGAL ENTERGY CORP. | DIRCTETR | 3,792 | 552 | 4,344 | 4,344 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCE13321 | ESI GENERAL LEGAL ADVICE | LVLSVCAL | 3,792 | 552 | 4,344 | 3,931 | 413 | - | 8 | 421 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 6,572 | 804 | 7,376 | 6,359 | 1,017 | - | 21 | 1,038 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF10414 | ESI TAX SERVICES | LVLSVCAL | 24 | 3 | 27 | 24 | 3 | - | 0 | 3 |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF10445 | ENTERGY CONSOLIDATED TAX SERVI | ASSTSALL | 2 | 0 | 2 | 2 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF15260 | IT - BUSINESS & PROJECT SUPPOR | CAPAOPCO | 5 | 1 | 5 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF23425 | ACCOUNTS PAYABLE PROCESSING | APTRNALL | 190 | 17 | 207 | 188 | 19 | - | 0 | 19 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF23428 | TREASURY SYSTEMS | BNKACCTA | 69 | 8 | 77 | 75 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF23442 | PAYROLL PROCESSING | PRCHKALL | 89 | 8 | 98 | 93 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF24910 | PROPERTY ACCOUNTING- FIXED ASS | ASSTLOCA | 59 | 7 | 67 | 60 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF26910 | REVENUE ACCOUNTING ANALYSIS | CUSEGALL | 40 | 5 | 45 | 38 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF72271 | DATA WAREHOUSE | GENLEDAL | 67 | 6 | 74 | 69 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF72670 | GENERAL ACCOUNTING SYSTEM MAIN | GENLEDAL | 823 | 76 | 899 | 847 | 52 | - | 1 | 53 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF72901 | MOBILE DATA TERMINAL BASELOAD | CUSTEGOP | 5 | 1 | 6 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF73027 | BUDGET SYSTEM MAINTENANCE | GENLEDAL | 153 | 14 | 168 | 158 | 10 | - | 0 | 10 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF73901 | AM/FM BASELOAD (SUPPORT) | DIRECTTX | 3 | 0 | 3 | - | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF74195 | TRANSMISSION APPLICATION SUPPO | TRSBLNOP | 161 | 19 | 180 | 159 | 21 | - | 0 | 22 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF74341 | ISB MAINT | LOADWEPI | 5 | 1 | 5 | 5 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF74344 | GENERATION PLANNING & DISPATCH | LOADOPCO | 20 | 2 | 22 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF74515 | FOSSIL MAINTENANCE MANAGEMENT | CAPAOPCO | 40 | 5 | 45 | 40 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF74585 | FOSSIL APPLICATION SUPPORT | CAPAOPCO | 43 | 5 | 48 | 42 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCF99182 | RECORDS MANAGEMENT | RECDMGNT | 11 | 1 | 12 | 10 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCPO01 | CHIEF PROCUREMENT OFFICER | SCPSPALL | 8,175 | 980 | 9,155 | 8,049 | 1,106 | - | 23 | 1,128 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCQEAI | ENTERPRISE APPLICATION INTEGRA | APPSUPAL | 292 | 32 | 323 | 274 | 49 | - | 1 | 50 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCQEXC | EXCHANGE | PCNUMALL | 312 | 26 | 338 | 325 | 13 | - | 0 | 14 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCQMVS | MAINFRAME | APPSMVSX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCQNTS | NT SERVERS | APPSWINT | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFCQUNX | UNIX SERVERS | APPSUNIX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX2770 | HR SERVICE CENTER SUPPORT | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX2815 | EDMS PRODUCT LINE SUPPORT | EMPLOYAL | 60 | 6 | 66 | 63 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX2850 | SECRETARIAT LEGAL SUPPORT | ASSTSALL | 4 | 0 | 5 | 4 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3265 | POWERBUILDER FRAMEWORK BASELOA | APPSUPAL | 5 | 0 | 5 | 4 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3275 | WEB INFRASTRUCTURE MAINTENANCE | PCNUMALL | 9 | 1 | 10 | 9 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3290 | IT BUSINESS PLANNING AND GOVER | ITSPENDA | 3,818 | 470 | 4,288 | 4,002 | 285 | - | 6 | 291 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3350 | A/R & BILLING SUPPORT | ARTRNALL | 72 | 8 | 80 | 71 | 9 | - | 0 | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3355 | Property Software Support | GENLEDAL | 3 | 0 | 3 | 3 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3450 | CORPORATE REPORTING SYSTEM SUP | GENLEDAL | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3620 | MMIS MATERIALS MAINT MGMT INF | DIRCTESI | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3625 | SUPPLY CHAIN - CDW SYSTEMS SUP | SCDSPALL | 4 | 0 | 4 | 3 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3640 | WHITE AMBER & ITILITI SUPPORT | SCMATRAN | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3650 | WEB PAGE SUPPORT - CORPORATE | EMPLOYAL | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3670 | CORPORATE COMMUNICATIONS WEB S | DIRCTETR | 4 | 0 | 4 | 4 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3675 | BARCODING SYSTEMS SUPPORT | SCDSPALL | 2 | 0 | 2 | 1 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3690 | PEARL SUPPORT | APTRNALL | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3695 | ATPR SUPPORT | APTRNALL | 61 | 6 | 67 | 61 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3785 | ORG, JES, BATS, ACBM SUPPORT | GENLEDAL | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX3790 | ESTER SUPPORT | PRCHKALL | 95 | 9 | 104 | 99 | 5 | - | 0 | 5 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCFX5555 | DATA WAREHOUSE TOOLS SUPPORT | APPSUPAL | 25 | 3 | 28 | 24 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCHRFOSS | HR FOSSIL SUPPORT- ALL COS | EMPLOFOS | 537 | - | 537 | 488 | 48 | - | - | 48 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCHRSALL | HR SERVICES- ALL COMPANIES | EMPLOYAL | 326 | 31 | 357 | 339 | 17 | - | 0 | 18 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCHRTRAN | HUMAN RESOURCE SVCS - TRANSMIS | EMPLTRAN | 115 | - | 115 | 106 | 9 | - | - | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCMCMSOM | MATERIALS & CONTRACTS MGMT SY | SCMATXNU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20520 | WORK MANAGEMENT SYSTEM (WMS) M | DIRCTEOI | 25 | 3 | 28 | 28 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20521 | IDEAS MAINTENANCE | DIRCTEOI | 76 | 9 | 86 | 86 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20522 | PCRS MAINTENANCE | DIRCTEOI | 133 | 16 | 149 | 149 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20527 | NUCLEAR IT QUICK RESPONSE TEAM | DIRCTEOI | 44 | 5 | 49 | 49 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20528 | ERD SUPPORT (MAINTENANCE) | DIRCTEOI | 617 | 74 | 691 | 691 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCN20858 | NUCLEAR IT QUICK RESPONSE TEAM | DIRCTEOI | 2 | 0 | 3 | 3 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCR40500 | EMPLOYEE COMM (REG + UNREG COM | EMPLOYAL | 4 | 0 | 5 | 5 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCR53095 | HEADQUARTER'S CREDIT & COLLECT | CUSTEGOP | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCR53291 | ESI REMITTANCE PROCESSING | CUSEOPCO | 151 | 18 | 170 | 145 | 25 | - | 1 | 26 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCR73326 | CUSTOMER SERVICE CENTER SUPPOR | CUSTCALL | 130 | 16 | 146 | 130 | 16 | - | 0 | 16 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCR73380 | CREDIT SYSTEMS | CUSTEGOP | 40 | 5 | 44 | 38 | 6 | - | 0 | 6 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCRM1021 | AUDIT: ESI INFORMATION TECHNO | DIRCTESI | 3 | - | 3 | 3 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCT54065 | OPNS OF PURCHASING & CONT-DCS | SCMATRAN | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCTDPQ01 | DISTR POWER QUALITY ESI | CUSEOPCO | 3 | 0 | 3 | 2 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCTTDS38 | TRANSMISSION O&M MGMT/SUPPORT | TRSBLNOP | 1,871,437 | 4,636 | 1,876,073 | 1,655,627 | 220,446 | - | 90 | 220,536 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCW29607 | POWER SYSTEM ACCOUNTING | LOADWEPI | 3 | 0 | 4 | 3 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCW55555 | VP FOSSIL GENERATION | CAPAOPCO | 14,414 | 1,850 | 16,265 | 14,506 | 1,758 | - | 32 | 1,791 |

Amounts may not add or tie to other schedules due to rounding.

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Total Billings Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCWE0063 | EMO APPLICATION SUPPORT | LOADOPCO | 17 | 2 | 19 | 16 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCWE0073 | FOSSIL INFORMATION TECHNOLOGY | CAPAOPCO | 3 | 0 | 3 | 3 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCWE0187 | FOSSIL IT SUPPORT FOR 2003-200 | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCWS0327 | SAIC LABOR CHARGES TO PMDC | CAPAOPCO | 53 | 6 | 60 | 53 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PP4R9886 | TRITIUM DETECTION INVESTIGATIO | DIRECT72 | 23,182 | 2,309 | 25,491 | 25,491 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PP6HHOST | ENNE Hosting/server support/SO | DIRCTENU | 135 | 16 | 151 | 151 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PP6HINDS | Indus Passport | DIRCTENU | 339 | 41 | 379 | 379 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPAMISTG | AMI Strategy Expense | CUSEOPCO | 222 | 27 | 249 | 212 | 37 | - | 1 | 37 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPCCS010 | Climate Consulting Services | ASSTSALL | 289,337 | 31,693 | 321,030 | 289,415 | 31,615 | - | 547 | 32,162 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPCOO001 | CHIEF OPERATING OFFICER | ASSTSALL | 570,386 | 63,085 | 633,471 | 571,034 | 62,437 | (3) | (1,403) | 61,032 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10115 | Dist Work Mgmt O&M-DIS/DSS/ADS | CUSTEGOP | 176 | 21 | 197 | 170 | 27 | - | 1 | 28 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10116 | Dist Work Mgmt O&M-LAMP Street | CUSEOPCO | 1 | 0 | 1 | 1 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10119 | Dist Work Mgmt O&M-CTS Contrac | CUSTEGOP | 23 | 3 | 26 | 22 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10120 | Dist Oper Appl O&M-AM/FM Suppo | CUSTEGOP | 269 | 32 | 302 | 260 | 42 | - | 1 | 42 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10121 | Dist Oper Appl O&M-AutoCAD | CUSEOPCO | 12 | 1 | 14 | 12 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10123 | Dist Oper Appl O&M-EPO&SAISO S | CUSEOPCO | 21 | 3 | 24 | 20 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10124 | Dist Oper Appl O&M-PDD/ECOS Sp | CUSTEGOP | 8 | 1 | 9 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10128 | ARCS/Itron/MV90 Support | CUSTEGOP | 73 | 9 | 82 | 71 | 11 | - | 0 | 12 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10129 | Billing Determinate Proc/Major | CUSTEGOP | 56 | 7 | 62 | 54 | 9 | - | 0 | 9 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10130 | Customer Care System Interface | CUSEGXTX | 98 | 12 | 109 | 109 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10131 | CIS/AIS & Core Support | DIRECTTX | 805 | 97 | 902 | - | 902 | - | 19 | 921 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10132 | Electronic Data Interchange Su | CUSEOPCO | 20 | 2 | 23 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10133 | Internet Bill Presentment & Pm | CUSEGXTX | 15 | 2 | 17 | 17 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10134 | MAB Load Research Support | CUSTEGOP | 19 | 2 | 22 | 19 | 3 | - | 0 | 3 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10137 | Bill Delivery Support | CUSEGXTX | 482 | 58 | 539 | 539 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10139 | Mobius Support | CUSTEGOP | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10140 | Large Power Billing System for | CUSEOPCO | 23 | 3 | 25 | 22 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10141 | CIMS Support | CUSEGXTX | 2 | 0 | 2 | 2 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10142 | Customer Service Field Applica | CUSTEGOP | 11 | 1 | 12 | 10 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10146 | Dist Work Mgmt-Cyndrus Support | VEHCLALL | 8 | 1 | 9 | 8 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10150 | TaxWare Support | CUSTEGOP | 50 | 6 | 56 | 48 | 8 | - | 0 | 8 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10158 | CCS Agent Care System | CUSEGXTX | 46 | 6 | 52 | 52 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPD10161 | ePlus (Web Self Service) Suppo | CUSTEGOP | 146 | 17 | 163 | 141 | 22 | - | 0 | 23 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPEPI001 | Environmental Programs & Infra | CAPAOPCO | (179) | | (179) | (160) | (19) | - | (1) | (20) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPETRNUC | Executive Timesheets- Reg Nuc | DIRCTEOI | 17,530 | 1,880 | 19,410 | 19,410 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPETSETR | Executive Timesheets-ETR | DIRCTETR | 320,645 | 40,720 | 361,365 | 361,365 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPETSNRG | Executive Timesheets- Non Reg | DIRCTENU | 10,307 | 595 | 10,902 | 10,902 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPETSREG | Executive Timesheets- Reg Co's | CUSTEGOP | 12,783 | 865 | 13,648 | 11,767 | 1,882 | - | 29 | 1,911 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPF72700 | Cognos Reporting Support | GENLEDAL | 22 | 2 | 24 | 23 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPFRM127 | OCRO - Bus Cont Plan Managemen | LBRBILAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPFX3259 | Inventory Planning System Supp | SCTDSPAL | 34 | 4 | 38 | 25 | 12 | - | 0 | 13 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPFX3685 | Supply Chain Applications Supp | SCMATRAN | 61 | 7 | 68 | 58 | 10 | - | 0 | 10 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPFX5307 | Compliance Software System Sup | ASSTSALL | 38 | 5 | 42 | 38 | 4 | - | 0 | 4 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPFXOPMO | IT Enterprise Program Manageme | ITSPENDA | 22 | 2 | 25 | 23 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPHRSSPC | HR SVS - ESI SUPPLY CHAIN | DIRCTESI | 18 | - | 18 | 18 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPN20535 | P3E Scheduling Software Mainte | DIRCTEOI | 162 | 19 | 182 | 182 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPN20536 | INDUS Software Maintenance | DIRCTEOI | 288 | 34 | 322 | 322 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPN20713 | ESI Nuclear - Site Split | SNUCSITE | 80,170 | 10,163 | 90,333 | 90,333 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPPCS001 | Critical Infrastructure Protec | CAPAOPCO | 5,554 | 762 | 6,316 | 5,633 | 683 | - | 14 | 697 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPPMUPGR | Performance Management Sys Upg | CUSEOPCO | 3 | 0 | 4 | 3 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPRES001 | Regulated Utility Electric Rel | CUSEOPCO | 1,993 | 223 | 2,216 | 1,889 | 327 | - | 7 | 333 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PCTTDS38 | TRANSMISSION O&M MGMT/SUPPORT | TRSBLNOP | - | - | - | - | - | - | (215,886) | (215,886) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPWE0375 | SAIC Designated Srv for Fossil | CAPAOPCO | 10 | 1 | 11 | 10 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F3PPWEOSGN | General System-ENG-Tech Suppor | CAPAOPCO | 504 | 80 | 584 | 521 | 63 | - | 1 | 64 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCD10093 | WEB DEVELOPMENT SUPPORT | CUSTEGOP | 15 | 2 | 17 | 15 | 2 | - | 0 | 2 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCD10108 | CCS REMEDY TESTING | CUSEGXTX | 0 | 0 | 1 | 1 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCMCMSCL | PASSPORT- SC MATERIALS MANAGEM | SCMATRAN | 257 | 31 | 288 | 245 | 43 | (43) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 4 | - | 4 | 4 | 0 | - | - | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCZCONOP | CONTRIBUTION OPERATIONS - BELO | ASSTSALL | 1 | 0 | 1 | 1 | 0 | - | (0) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCZECDEV | ECONOMIC DEVELOPMENT - BELOW T | CUSEOPCO | 2 | 0 | 2 | 1 | 0 | - | (0) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PCZFDSER | DESKTOP SERVICES | PCNUMALL | 15 | 1 | 16 | 16 | 1 | - | 0 | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPD10154 | MDT Wireless Telecom Serv | CUSTEGOP | 286 | 34 | 321 | 276 | 44 | - | 1 | 45 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPD10156 | Dist. Work Mgmt - DriveCam Sup | CUSTELLA | 5 | 1 | 5 | 5 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPD10162 | Util Ops Cust Data Warehouse S | CUSTEGOP | 45 | 5 | 50 | 43 | 7 | - | 0 | 7 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPFALCON | Project Falcon | DIRECTNI | (358) | - | (358) | (358) | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Domino, Joe

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 7,102 | - | 7,102 | 6,380 | 722 | - | (722) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 1,176 | 129 | 1,305 | 1,088 | 217 | - | (217) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | SAPCP25910 | PC&R OVERHEAD POOL CHARGES | CEAOUTAL | 0 | - | 0 | 0 | 0 | (0) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CPOP8 | Total | | | 5,517,075 | 167,988 | 5,685,063 | 5,117,844 | 567,219 | (45) | (217,446) | 349,728 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CSODW | E1PCR56025 | CUSTOM SALES & SERVICE UNIT- M | DIRCTELI | 688 | - | 688 | 688 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | CSODW | Total | | | 688 | - | 688 | 688 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | E1PCR56226 | Sales & Mktg - ALL JURIS | MACCTALL | 8,197 | 920 | 9,118 | 7,935 | 1,183 | - | 20 | 1,202 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | 1,194,449 | 142,420 | 1,336,870 | 1,205,015 | 131,855 | - | (74) | 131,781 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 479 | 74 | 553 | 477 | 76 | - | 1 | 77 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PP1E2EPM | End-to-End Process Mgmnt | LVLSVCAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PPCPMUTL | CORPORATE PERFORMANCE MGMT UTL | EMPXRTNC | 19,531 | 1,594 | 21,126 | 19,133 | 1,992 | - | 40 | 2,032 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PPHRTFMN | HR Transformation - O&M Costs | EMPLOYAL | 819 | 61 | 880 | 837 | 43 | - | 1 | 44 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 905 | 111 | 1,016 | 847 | 169 | - | (169) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PCF96930 | BENCHMARKING PHASE II | LOADWEOI | 4,020 | 551 | 4,571 | 3,817 | 754 | - | 16 | 770 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 28 | - | 28 | 27 | 1 | - | - | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 278 | 38 | 317 | 264 | 53 | - | (53) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PPTHMPSN | Norwood Thompson Park Playgrou | DIRCTETR | 3,514 | 465 | 3,980 | 3,980 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 999 | 87 | 1,086 | 1,033 | 53 | - | 1 | 54 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | FN086 | Total | | | 1,233,220 | 146,323 | 1,379,544 | 1,243,365 | 136,178 | - | (218) | 135,961 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6G | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 1,183 | - | 1,183 | 1,183 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6G | Total | | | 1,183 | - | 1,183 | 1,183 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | | | | 80 | - | 80 | 80 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 43,653 | 3,334 | 46,987 | 46,987 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 13,465 | - | 13,465 | 13,465 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 7,610 | - | 7,610 | 7,610 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 10,786 | 739 | 11,525 | 11,525 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 215 | - | 215 | 215 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F5PPD10154 | MDT Wireless Telecom Serv | CUSTEGOP | 525 | - | 525 | 452 | 73 | - | (73) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 240,285 | 28,421 | 268,706 | 268,706 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 113,137 | 13,677 | 126,814 | 126,814 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAF6P | Total | | | 429,757 | 46,171 | 475,927 | 475,855 | 73 | - | (73) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | | | | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCDG0004 | OPERATOR QUAL DEVELOP & TRAIN | DIRCTENO | 226 | - | 226 | 226 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 98 | - | 98 | 87 | 11 | - | (11) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCFAPWHS | POWERHOUSE OPERATIONS | EMPLOYAL | 123 | - | 123 | 117 | 6 | - | (6) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 455,541 | 48,381 | 503,922 | 503,922 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 446,592 | 47,126 | 493,718 | 493,718 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 25 | - | 25 | 25 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 5,570 | 806 | 6,376 | 6,376 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 1,060 | - | 1,060 | 1,060 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 318 | - | 318 | 305 | 13 | - | (13) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 427 | 43 | 470 | 447 | 23 | - | (23) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 42,644 | 5,218 | 47,862 | 47,862 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 42,510 | 5,202 | 47,713 | 47,713 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAFH6 | Total | | | 995,135 | 106,776 | 1,101,911 | 1,101,858 | 53 | - | (53) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | C5PP449606 | Gas Serv Storm Rebuild Replace | DIRCTENO | 36,405 | 4,363 | 40,768 | 40,768 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 934 | - | 934 | 831 | 104 | - | (104) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 56,490 | 4,045 | 60,535 | 60,535 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 47,226 | 4,429 | 51,654 | 51,654 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 190,744 | 19,573 | 210,317 | 210,317 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | - | - | - | - | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F4PPENG134 | Mutual Assist ENOI Gas NMGC 2/ | DIRCTENO | 138 | 17 | 154 | 154 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F5PCDG0168 | GAS EMPLOYEE DEVELOPMENT PROGR | CUSGOPCO | 19 | - | 19 | 19 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 33,725 | 1,205 | 34,930 | 34,930 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 285 | - | 285 | 285 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | F5PPGEFBUS | Gas Operations Efficient Busin | CUSGOPCO | 45,084 | 5,479 | 50,562 | 50,562 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | SDPCT30070 | CAPITAL SUSPENSE, DISTR WIRES, | DIRCTELI | 676 | 75 | 751 | 751 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 69,440 | 8,391 | 77,830 | 77,830 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 69,433 | 8,390 | 77,823 | 77,823 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2E | Total | | | 550,596 | 55,966 | 606,562 | 606,458 | 104 | - | (104) | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 930 | - | 930 | 827 | 103 | - | (103) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 44,059 | 4,862 | 48,922 | 48,922 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 41,423 | 4,773 | 46,196 | 46,196 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 82,739 | 9,065 | 91,804 | 91,804 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F4PPEGS148 | Mutual Assist EGSL GAS NMGC 2/ | DIRECTLG | 829 | 100 | 929 | 929 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F4PPENG134 | Mutual Assist ENOI Gas NMGC 2/ | DIRCTENO | 829 | 100 | 929 | 929 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 6,872 | 775 | 7,647 | 7,647 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 269 | - | 269 | 269 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 45 | 484 | 460 | 24 | - | (24) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 57,962 | 6,941 | 64,902 | 64,902 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 60,438 | 7,218 | 67,656 | 67,656 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG2U | Total | | | 296,789 | 33,879 | 330,668 | 330,541 | 127 | - | (127) | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | F3PCCDVETR | CORP DEV-ANALYSIS STRATEGIC ME | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 85,531 | 9,803 | 95,334 | 95,334 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 5,877 | - | 5,877 | 5,877 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | (192) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 17,545 | 1,247 | 18,792 | 18,792 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 113,573 | 13,702 | 127,275 | 127,275 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAG7F | Total | | | 226,639 | 24,752 | 251,391 | 251,199 | 192 | - | (192) | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | F3PCDG0004 | OPERATOR QUAL DEVELOP & TRAIN | DIRCTENO | 22,082 | 2,217 | 24,299 | 24,299 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | F3PCDG0005 | OPERATOR QUAL DEVELOP & TRAIN | DIRECTLG | 84,690 | 8,908 | 93,598 | 93,598 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 3,585 | 678 | 4,264 | 4,264 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 2,794 | - | 2,794 | 2,794 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAH2H | Total | | | 113,151 | 11,803 | 124,955 | 124,955 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2J | C7PPSJ3198 | EMI Storm Distr Ops 1/7/11Wint | DIRCTEMI | 1,060 | 196 | 1,256 | 1,256 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2J | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2J | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 130,972 | 13,473 | 144,445 | 144,445 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2J | Total | | | 132,031 | 13,670 | 145,701 | 145,701 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | C5PC449602 | GAS FAILURES BLANKET | DIRCTENO | 35,953 | - | 35,953 | 35,953 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | C7PPSJ2462 | STORM DMG LA DIST ELL 1/8/11 I | DIRCTELI | 153 | 28 | 181 | 181 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCDG0004 | OPERATOR QUAL DEVELOP & TRAIN | DIRCTENO | 4,811 | - | 4,811 | 4,811 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCDG0005 | OPERATOR QUAL DEVELOP & TRAIN | DIRECTLG | 4,811 | - | 4,811 | 4,811 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 94 | - | 94 | 84 | 10 | - | (10) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 415 | - | 415 | 415 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 415 | - | 415 | 415 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 149,109 | 14,184 | 163,294 | 163,294 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 2,739 | 98 | 2,837 | 2,837 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 369 | - | 369 | 369 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | SGPCG59006 | GAS DISTRIBUTION ENOI O/H GAS | DIRCTENO | 26,092 | 3,146 | 29,238 | 29,238 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 3,499 | 419 | 3,918 | 3,918 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ2K | Total | | | 228,461 | 17,876 | 246,337 | 246,326 | 10 | - | (10) | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | C5PP449606 | Gas Serv Storm Rebuild Replace | DIRCTENO | 72,953 | 8,794 | 81,747 | 81,747 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | F3PCCDVCCN | PROJECT GUMBO | CUSGOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 31,354 | 3,770 | 35,124 | 35,124 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 1,274 | 161 | 1,435 | 1,435 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Domino, Joe

**ENTERGY TEXAS, INC.**
**Affiliate Billings -  by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-C
2011 TX Rate Case
Page 8 of 11

2011 ETI Rate Case

3-60

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | SGPCG59006 | GAS DISTRIBUTION ENOI  O/H GAS | DIRCTENO | 51,505 | 6,205 | 57,711 | 57,711 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 51,505 | 6,205 | 57,710 | 57,710 | | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | GAJ3K | Total | | | 208,592 | 25,135 | 233,726 | 233,726 | - | - | - | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | E1PCR56226 | Sales & Mktg - ALL JURIS | MACCTALL | 294 | 36 | 330 | 287 | 43 | - | (43) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCCDVCCN | PROJECT GUMBO | CUSGOPCO | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 1,975 | - | 1,975 | 1,759 | 216 | - | (216) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCG10345 | GAS DIVISION DIRECTOR - ENOI E | DIRCTENO | 786 | - | 786 | 786 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCG10347 | GAS DIVISION DIRECTOR - EGSI E | DIRECTLG | 28 | - | 28 | 28 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 62 | 8 | 70 | 60 | 10 | - | (10) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PCZGASAG | GAS ADMINISTRATIVE | CUSGOPCO | 517,556 | 59,411 | 576,967 | 576,967 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PPE9974S | Utl ECI Continuing Improve ESI | CUSEOPCO | 552 | 68 | 620 | 529 | 92 | - | (92) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PPENOFRP | ENO Annual FRP Filing 2010-12 | DIRCTENO | 2,739 | 312 | 3,051 | 3,051 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PPGRSP10 | EGSL RATE STABLIZATN (TY 2009/ | DIRECTLG | 88 | 10 | 98 | 98 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F3PPGA010 | PGA Audit 2010 | DIRECTLG | 430 | 50 | 480 | 480 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F5PCSAFTEG | SAFTEY TRAINING LOADER GAS CUS | CUSGOPCO | 3,545 | 452 | 3,997 | 3,997 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 98 | - | 98 | 98 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 211 | - | 211 | 205 | 6 | - | (6) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 3,500 | - | 3,500 | 3,144 | 356 | - | (356) | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | SGPCG59006 | GAS DISTRIBUTION ENOI  O/H GAS | DIRCTENO | 112,081 | 13,617 | 125,697 | 125,697 | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | SGPCR79008 | GAS DISTRIBUTION EGSI O/H-CHAR | DIRECTLG | 112,048 | 13,613 | 125,661 | 125,661 | - | - | - | |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SGG2D | Total | | | 755,995 | 87,575 | 843,570 | 842,847 | 723 | - | (723) | - |
| | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | C1PPFI5207 | Payroll Time & Labor - Phase I | EMPLOYAL | (0) | - | (0) | (0) | (0) | 0 | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | C1PPHR8800 | PS HCM (Human Cap Mgmt) Upgrd | EMPLOYAL | (0) | - | (0) | (0) | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | C6PPAMBSGN | AMI:BASE Non-Incremental, EGSL | DIRECTLG | (1) | - | (1) | (1) | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PC6H0026 | NORTHEAST MGMT OVERSITE IP2/IP | SPL77N7A | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCD10006 | FIELD DEVELOPMENT | CUSTEGOP | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCD10049 | REGULATED RETAIL SYSTEMS - O&M | CUSTEGOP | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCD10077 | REGULATORY AFFAIRS WORLDOX IMP | DIRCTENO | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCD10105 | CUSTOMER CARE SYSTEM SUPPORT | CUSEGXTX | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCE99750 | PRES- ENT. LA-GEN'L OPS-ELI/EG | CUSELGLA | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCE99795 | GROUP PRES - UTILITY OPERATION | CUSTEGOP | 1,997,434 | 130,481 | 2,127,915 | 1,833,530 | 294,385 | (373) | (3,718) | 290,294 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF10414 | ESI TAX SERVICES | LVLSVCAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF23425 | ACCOUNTS PAYABLE PROCESSING | APTRNALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF23428 | TREASURY SYSTEMS | BNKACCTA | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF23442 | PAYROLL PROCESSING | PRCHKALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF26910 | REVENUE ACCOUNTING ANALYSIS | CUSEGALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF72271 | DATA WAREHOUSE | GENLEDAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF72670 | GENERAL ACCOUNTING SYSTEM MAIN | GENLEDAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF72901 | MOBILE DATA TERMINAL BASELOAD | CUSTEGOP | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF73027 | BUDGET SYSTEM MAINTENANCE | GENLEDAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF73901 | AM/FM BASELOAD (SUPPORT) | DIRECTTX | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF74195 | TRANSMISSION APPLICATION SUPPO | TRSBLNOP | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF74344 | GENERATION PLANNING & DISPATCH | LOADOPCO | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF74515 | FOSSIL MAINTENANCE MANAGEMENT | CAPAOPCO | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF74585 | FOSSIL APPLICATION SUPPORT | CAPAOPCO | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCF99182 | RECORDS MANAGEMENT | RECDMGNT | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFCQEAI | ENTERPRISE APPLICATION INTEGRA | APPSUPAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFCQEXC | EXCHANGE | PCNUMALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFCQMVS | MAINFRAME | APPSMVSX | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFCQNTS | NT SERVERS | APPSWINT | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFCQUNX | UNIX SERVERS | APPSUNIX | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX2815 | EDMS PRODUCT LINE SUPPORT | EMPLOYAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3275 | WEB INFRASTRUCTURE MAINTENANCE | PCNUMALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3290 | IT BUSINESS PLANNING AND GOVER | ITSPENDA | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3350 | A/R & BILLING SUPPORT | ARTRNALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3625 | SUPPLY CHAIN - CDW SYSTEMS SUP | SCDSPALL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3640 | WHITE AMBER & ITILITI SUPPORT | SCMATRAN | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3650 | WEB PAGE SUPPORT - CORPORATE | EMPLOYAL | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3670 | CORPORATE COMMUNICATIONS WEB S | DIRCTETR | - | - | - | - | - | - | - | |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3690 | PEARL SUPPORT | APTRNALL | - | - | - | - | - | - | - | |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-C
2011 TX Rate Case
Page 9 of 11

2011 ETI Rate Case

3-61

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX3790 | ESTER SUPPORT | PRCHKALL | 0 | - | 0 | 0 | 0 | - | - | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCFX5555 | DATA WAREHOUSE TOOLS SUPPORT | APPSUPAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCHRCALL | HR SVCS- CUST SERV SUPT- ALL C | EMPLOCSS | 196 | - | 196 | 181 | 15 | - | - | 15 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCHRDCSS | HR- FRANCHISE OPNS (DIST) SUPT | EMPLFRAN | 481 | - | 481 | 414 | 66 | - | - | 66 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCHRPRES | HR PRESIDENT/ CEO SUPPORT- ALL | EMPLPRES | 7 | - | 7 | 6 | 1 | - | - | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCHRSALL | HR SERVICES- ALL COMPANIES | EMPLOYAL | 0 | - | 0 | 0 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCHRSDUT | HR SVCS - ESI DOMESTIC UTILITY | DIRCTESI | 8 | - | 8 | 8 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCMCMSOM | MATERIALS & CONTRACTS MGTMT SY | SCMATXNU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCN20520 | WORK MANAGEMENT SYSTEM (WMS) M | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCN20521 | IDEAS MAINTENANCE | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCN20522 | PCRS MAINTENANCE | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCN20527 | NUCLEAR IT QUICK RESPONSE TEAM | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCN20528 | ERD SUPPORT (MAINTENANCE) | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR40118 | UTILITY COMMUNICATIONS | CUSTEGOP | 83,560 | - | 83,560 | 72,040 | 11,521 | - | (118) | 11,403 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR40430 | EMPLOYEE COMM (REGULATED COMPA | EMPLOREG | 71,944 | - | 71,944 | 67,408 | 4,535 | - | - | 4,535 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR40500 | EMPLOYEE COMM (REG + UNREG COM | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR53291 | ESI REMITTANCE PROCESSING | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR73326 | CUSTOMER SERVICE CENTER SUPPOR | CUSTCALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCR73380 | CREDIT SYSTEMS | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCRM1021 | AUDIT: ESI INFORMATION TECHNO | DIRCTESI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 770,707 | - | 770,707 | 656,959 | 113,747 | - | - | 113,747 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCWE0063 | EMO APPLICATION SUPPORT | LOADOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCWE0187 | FOSSIL IT SUPPORT FOR 2003-200 | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PCWS0327 | SAIC LABOR CHARGES TO PMDC | CAPAOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PP6HHOST | ENNE Hosting/server support/SO | DIRCTENU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PP6HINDS | Indus Passport | DIRCTENU | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPAMISTG | AMI Strategy Expense | CUSEOPCO | 1 | - | 1 | 1 | 0 | - | - | 0 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10115 | Dist Work Mgmt O&M-DIS/DSS/ADS | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10119 | Dist Work Mgmt O&M-CTS Contrac | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10120 | Dist Oper Appl O&M-AM/FM Suppo | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10121 | Dist Oper Appl O&M-AutoCAD | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10123 | Dist Oper Appl O&M-EPO&SAISO S | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10124 | Dist Oper Appl O&M-PDD/ECOS Sp | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10128 | ARCS/Itron/MV90 Support | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10129 | Billing Determinate Proc/Major | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10130 | Customer Care System Interface | CUSEGXTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10131 | CIS/AIS & Core Support | DIRCTTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10132 | Electronic Data Interchange Su | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10133 | Internet Bill Presentment & Pm | CUSEGXTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10134 | MAB Load Research Support | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10137 | Bill Delivery Support | CUSEGXTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10140 | Large Power Billing System for | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10141 | CIMS Support | CUSEGXTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10142 | Customer Service Field Applica | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10146 | Dist Work Mgmt-Cyndrus Support | VEHCLALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10150 | TaxWare Support | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10158 | CCS Agent Care System | CUSEGXTX | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPD10161 | ePlus (Web Self Service) Suppo | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPE9974S | Utl ECI Continuing Improve ESI | CUSEOPCO | 11,356 | - | 11,356 | 9,682 | 1,674 | - | - | 1,674 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETEGSL | Executive Timesheets- EGSL | DIRCTLG | 2,215 | 216 | 2,430 | 2,430 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETENOI | Executive Timesheet- ENOI | DIRCTENO | 55,980 | 1,967 | 57,948 | 57,948 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETSEAI | Executives Time and Expenses-E | DIRCTEAI | 35,047 | 3,609 | 38,656 | 38,656 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETSELI | Executive Timesheets- ELI | DIRCTELI | 77,575 | 2,603 | 80,178 | 80,178 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETSEMI | Executive Timesheets- EMI | DIRCTEMI | 17,613 | 1,500 | 19,113 | 19,113 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPETSETI | Executive Time and Expenses-ET | DIRCTTX | 29,110 | 2,869 | 31,979 | - | 31,979 | - | 601 | 32,580 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPF72700 | Cognos Reporting Support | GENLEDAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPFX5307 | Compliance Software System Sup | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPFXOPMO | IT Enterprise Program Manageme | ITSPENDA | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPN20535 | P3E Scheduling Software Mainte | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPN20536 | INDUS Software Maintenance | DIRCTEOI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F3PPPMUPGR | Performance Management Sys Upg | CUSEOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCD10093 | WEB DEVELOPMENT SUPPORT | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCLIHPPC | CONSUMER EDUCATION PROGRAMS | CUSEOPCO | 3 | - | 3 | 3 | 1 | - | - | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCMCMSCL | PASSPORT- SC MATERIALS MANAGEM | SCMATRAN | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 131 | - | 131 | 131 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 60 | - | 60 | 59 | 2 | - | - | 2 |

Amounts may not add or tie to other schedules due to rounding.

Domino, Joe

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT JFD-C
2011 TX Rate Case
Page 10 of 11

2011 ETI Rate Case

3-62

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI BIlling Method | (A) Support | (B) Total Billings — Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCZCONOP | CONTRIBUTION OPERATIONS - BELO | ASSTSALL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PCZFDSER | DESKTOP SERVICES | PCNUMALL | | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 78,782 | - | 78,782 | 78,782 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PPD10154 | MDT Wireless Telecom Serv | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PPD10156 | Dist. Work Mgmt - DriveCam Sup | CUSTELLA | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PPD10162 | Util Ops Cust Data Warehouse S | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | 7,227 | - | 7,227 | 6,495 | 733 | - | (733) | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | F5PPSUPICT | Support of ICT | LOADOPCO | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU084 | Total | | | 3,239,437 | 143,246 | 3,382,683 | 2,924,024 | 458,659 | (373) | (3,967) | 454,318 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU085 | F3PCE99795 | GROUP PRES - UTILITY OPERATION | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SU085 | Total | | | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C1PPFIRGTL | Regulated Time-LBR & Absence M | EMPOPCPE | 1,786 | 246 | 2,032 | 1,853 | 179 | (179) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ1214 | WINTER STORM DL EAI DIST 01/26 | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ1250 | STORM DL EAI DIST 4/19/11-4/24 | DIRCTEAI | 2,890 | 433 | 3,323 | 3,323 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ1251 | TORNADOES DL EAI DIST 4/25/11 | DIRCTEAI | 5,554 | 861 | 6,416 | 6,416 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ2474 | STORM Dmg ELL 4/25 to 4/27/11 | DIRCTELI | 100 | 12 | 112 | 112 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ3183 | EMI 04/24/10 Tornadoes Distr O | DIRCTEMI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ3198 | EMI Storm Distr Ops 1/7/11Wint | DIRCTEMI | 18,147 | 2,392 | 20,539 | 20,539 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C7PPSJ3204 | EMI StormTornadoes DistrOps 4/ | DIRCTEMI | 100 | 12 | 112 | 112 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | C8PPTL5496 | Replace Storm Damages | DIRCTEAI | 20,682 | 3,097 | 23,779 | 23,779 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | E2PPSJ1255 | T-Grid Storm Tornadoes EAI 4/2 | DIRCTEAI | 315 | 44 | 359 | 359 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCFACALL | FACILITIES SVCS- ALL COS | SQFTALLC | 172 | - | 172 | 153 | 19 | - | - | 19 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCFAPWHS | POWERHOUSE OPERATIONS | EMPLOYAL | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCT29320 | SKILLS TRAINING CUST. SERV- HE | CUSEOPCO | 163 | - | 163 | 139 | 24 | - | - | 24 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCT29400 | OPERATIONS SAFETY - HEADQUARTE | CUSTEGOP | 689,509 | 74,343 | 763,852 | 658,206 | 105,647 | 512 | 1,807 | 107,966 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCT29406 | OPERATIONS SAFETY - TEXAS DIST | DIRECTTX | 15,773 | - | 15,773 | - | 15,773 | - | - | 15,773 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTDDS26 | CUSTOMER SERVICE SUPPORT - O&M | CUSTEGOP | 120 | - | 120 | 103 | 17 | - | - | 17 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTDS010 | PROCESS & SKILLS TRAINING ADMI | EMPLFRAN | 120,567 | 14,007 | 134,574 | 115,628 | 18,946 | - | 389 | 19,335 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTDTR08 | SKILLS TRAINING - LOUISIANA EL | DIRCTELI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS12 | TRANSMISSION LINES O&M EXPENS | TRALINOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS17 | Substation Maintenance EGSI LA | DIRECTLG | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS19 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTEAI | 10,322 | - | 10,322 | 10,322 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS21 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTELI | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS22 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTEMI | 7,620 | - | 7,620 | 7,620 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS23 | Substation Maintenance - Texas | DIRECTTX | 15,773 | - | 15,773 | - | 15,773 | - | - | 15,773 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS24 | SUBSTATION/SYSTEM PROT MAINT - | DIRCTENO | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS27 | DISTRIBUTION O&M EXPENSE -EAI | DIRCTEAI | 13,605 | - | 13,605 | 13,605 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS28 | DISTRIBUTION O&M EXPENSE -EMI | DIRCTEMI | 11,088 | 376 | 11,464 | 11,464 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS29 | DISTRIBUTION O&M EXPENSE -ELI | DIRCTELI | 9,001 | 708 | 9,709 | 9,709 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS30 | DISTRIBUTION O&M EXPENSE -EGSI | DIRECTLG | 1,540 | - | 1,540 | 1,540 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS31 | DISTRIBUTION O&M EXPENSE - ENO | DIRCTENO | 1,596 | - | 1,596 | 1,596 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS38 | TRANSMISSION O&M MGMT/SUPPORT | TRSBLNOP | 145 | - | 145 | 128 | 17 | (17) | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS71 | TRANSMISSION MANAGEMENT/SUPPOR | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F3PCTTDS70 | TRANS MAINTENANCE: LINES & SUB | TRSBLNOP | 475,946 | 54,604 | 530,550 | 468,094 | 62,456 | 4,130 | 1,099 | 67,685 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F5PPERG100 | Systemwide Ergonomics Initiati | EMPLOYAL | 4,552 | 85 | 4,638 | 4,414 | 224 | - | 1 | 224 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F5PPSAFTEL | SAFETY TRAINING LOADER ELEC LA | CUSTELLA | 698 | 78 | 776 | 776 | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F5PPTVPPRO | Voluntary Protection Program | TRSBLNOP | 698 | 78 | 776 | 685 | 91 | - | 2 | 93 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,083 | 109 | 1,192 | 1,134 | 58 | - | 1 | 59 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SULSY | Total | | | 1,434,169 | 151,485 | 1,585,654 | 1,366,430 | 219,224 | 4,446 | 3,300 | 226,970 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUOS | F3PCE99795 | GROUP PRES - UTILITY OPERATION | CUSTEGOP | 14,122 | - | 14,122 | 12,175 | 1,947 | - | - | 1,947 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUOS | Total | | | 14,122 | - | 14,122 | 12,175 | 1,947 | - | - | 1,947 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F3PCFBLREG | BELOW THE LINE- REGULATED | CUSTEGOP | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 105,229 | - | 105,229 | 90,721 | 14,508 | - | - | 14,508 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F3PPE9981A | Integrated Energy Mgmt EAI | DIRCTEAI | - | - | - | - | - | - | - | - |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F3PPE9981S | Integrated Energy Mgmt ESI | CUSEOPCO | 15,986 | 1,847 | 17,834 | 15,206 | 2,628 | - | 8 | 2,636 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F5PCZU1573 | REGULATORY AFFAIRS -- 100% EGS | DIRECTTX | 11,275 | - | 11,275 | - | 11,275 | - | - | 11,275 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 148 | - | 148 | - | 148 | - | (148) | - |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | SUUS1 | Total | | | | 132,639 | 1,847 | 134,487 | 105,927 | 28,560 | - | (141) | 28,420 |
| | | | | | | | | | | | | | | |
| UTILITY & EXECUTIVE MANAGEMENT | Total ESI | | | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | | | | | |
| Total UTILITY & EXECUTIVE MANAGEMENT | | | | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | | | | | |
| Total Domino, Joe | | | | | | | 28,688,315 | 2,014,250 | 30,702,565 | 28,491,933 | 2,210,631 | (39,503) | (231,900) | 1,939,228 |
| | | | | | | | | | | | | | | |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**



This page has been intentionally left blank.

**ENTERGY TEXAS, INC.**
**Affiliate Billings - Pro Forma Summary - By Witness, Class, & Pro Forma**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

**EXHIBIT JFD-D**
**2011 TX Rate Case**
**Page 1 of 1**

| Class | Billing Entity | Pro Forma Number | Pro Forma Description | Supporting Witness | Pro Forma |
|---|---|---|---|---|---|
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ16 | Remove MISO Costs | Considine, Michael P | (216,324) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-01 | Remove Company Aircraft Costs | Barrilleaux, Chris | (1,589) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-03 | Remove Rate Case Support Costs | Considine, Michael P | (148) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-05 | Remove Ticket Costs | Barrilleaux, Chris | (20,554) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-07 | Remove Non-Recoverable Costs | Barrilleaux, Chris | (13,637) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-08 | Remove costs from the Gas Operations organization. | Barrilleaux, Chris | (1,281) |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ21-11 | Correct Capital Projects | Tumminello, Stephanie B | 1 |
| UTILITY & EXECUTIVE MANAGEMENT | ESI | AJ22 | Affiliate Portion of Employee Changes and Wage Increases | Considine, Michael P | 21,631 |
| | ESI | | | | (231,900) |
| UTILITY & EXECUTIVE MANAGEMENT | Total | | | | (231,900) |
| Total | | | | | (231,900) |

Amounts may not add or tie to other schedules due to rounding.

**Domino, Joe**



This page has been intentionally left blank.

DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | PUBLIC UTILITY COMMISSION |
| TEXAS, INC. FOR AUTHORITY | § | |
| TO CHANGE RATES AND | § | OF TEXAS |
| RECONCILE FUEL COSTS | § | |

DIRECT TESTIMONY

OF

ROBERT R. COOPER

ON BEHALF OF

ENTERGY TEXAS, INC.

NOVEMBER 2011

ENTERGY TEXAS, INC.
DIRECT TESTIMONY OF ROBERT R. COOPER
2011 RATE CASE

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction and Purpose | 1 |
| II. | The Entergy System Planning Principles and Objectives | 4 |
| III. | Resources Acquired through Planning Analysis Processes in this Reconciliation Period | 11 |
| | A. Resources Acquired Through an RFP Process | 12 |
| | B. Resources Acquired Through Bilateral Negotiations | 16 |
| IV. | Determination of Allocation for Power Purchases | 18 |

## EXHIBITS

Exhibit RRC-1     PPR Capacity Costs (**Highly Sensitive)**

I.    INTRODUCTION AND PURPOSE

Q.    PLEASE STATE YOUR NAME AND CURRENT BUSINESS ADDRESS.

A.    My name is Robert R. Cooper.  My business address is Parkwood II Bldg., Suite 300, 10055 Grogans Mill Road, The Woodlands, Texas 77380.

Q.    BY WHOM ARE YOU EMPLOYED AND IN WHAT CAPACITY?

A.    I am employed by Entergy Services, Inc. ("ESI"), the service company for the Entergy Operating Companies ("Operating Companies"), as Manager, Generation Planning & Models.  In that capacity, among other activities, I provide resource planning services to the Operating Companies, which include Entergy Texas, Inc. ("ETI" or "the Company"), Entergy Gulf States Louisiana, L.L.C. ("EGSL"), Entergy Arkansas, Inc. ("EAI"), Entergy Louisiana, LLC ("ELL"), Entergy Mississippi, Inc. ("EMI"), and Entergy New Orleans, Inc. ("ENOI").  These six Operating Companies, along with ESI, acting as agent, are collectively referred to as the "System."  I work in the System Planning and Operations ("SPO") department, which is an organization within ESI.

Q.    PLEASE DESCRIBE YOUR CURRENT JOB RESPONSIBILITIES.

A.    My current job responsibilities include long-term supply-side resource planning for the Operating Companies, including ETI.  In this function, I direct a staff that performs engineering and economic analyses of the

power and fuel supply requirements of the System in order to provide a reliable and economical resource portfolio.

Q.  PLEASE DESCRIBE YOUR EDUCATION AND BUSINESS EXPERIENCE.

A.  I have a Masters Degree in Business Administration from the University of New Orleans and a Bachelor of Science Degree in Engineering from Southern Illinois University.  After receiving my Bachelor's degree, I worked for four years with Illinois Power Company in Decatur, Illinois, as a Planning Engineer in the Load Management Research Department.  I began working for Entergy in 1984 as a Research Analyst in the Forecasting department of Middle South Services, Inc., where I performed economic analyses of end-use energy consumption.  I have worked for Entergy Services, Inc., or its predecessors, in various planning capacities over the last 27 years.  In the ensuing years, I progressed into positions of increasing responsibility in roles that involved engineering, economic and market analysis.  In 1996, I was promoted to Segment Manager responsible for the development, implementation and measurement of demand-side programs for small business markets.  In July of 1999, I took the position as Manager of Generation Planning in the Energy Management Organization.  In February of 2004, that position was expanded to include responsibility for the activities, staff and planning models of production cost analysis.

Q.   ON WHOSE BEHALF ARE YOU FILING THIS DIRECT TESTIMONY?

A.   I am filing this Direct Testimony on behalf of ETI.

Q.   WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A.   My testimony provides the following:

- A description of the planning principles and objectives utilized by the System in determining the resources that were necessary to meet its load requirements, and how the selected products fulfill those objectives;

- A discussion of the types of resources that were acquired in furtherance of the System's planning principles to meet the System's incremental resource needs since the Company's last base rate case.[1]  As a part of this discussion, I describe the evaluation process that was conducted for the formal Requests for Proposals ("RFPs") that were issued for the System during the Reconciliation Period.  I also identify resources acquired through bilateral negotiations resulting from unsolicited offers;

- A discussion of the allocation among the Operating Companies of the purchased power resources included in this reconciliation filing;

- The identification and quantification of capacity costs the Company requests be recovered through a Purchased Power Recovery

---

[1]   In the Company's last base rate case, Docket No. 37744, I discussed resources that became effective during the rate year for that case (July 2009 through June 2010), which period is included in the current fuel reconciliation period.

Rider. As part of this discussion, I discuss new contracts beginning after the Test Year and effective during the Rate Year.

## II. THE ENTERGY SYSTEM PLANNING PRINCIPLES AND OBJECTIVES

Q. WILL YOU PLEASE PROVIDE A SUMMARY OF THE ENTERGY SYSTEM'S PLANNING PRINCIPLES AND OBJECTIVES?

A. The System's planning principles, planning objectives, and resource supply strategies are applied by the Operating Committee with the intent to produce a portfolio of resources to match the needs of the customers of the Operating Companies. They include the following six basic resource supply objectives:

- Reliability – Provide adequate resources to meet customer peak demands with adequate reliability.

- Production Cost – Baseload Supply Requirements – Provide low-cost baseload resources to serve baseload requirements (the load level that is expected to be exceeded for at least 85% of all hours of the year).

- Production Cost – Load-following Supply Requirements – Provide efficient, dispatchable load-following resources to serve the time-varying load shape levels that are above the baseload requirement load levels.

- <u>Generation Portfolio Enhancement</u> – Improve the efficiency of the generation portfolio and avoid an over-reliance on aging resources.

- <u>Risk Mitigation – Price Stability</u> – Mitigate the effects on production costs of price volatility associated with uncertainties in fuel and purchased power costs.

- <u>Risk Mitigation – Supply Diversity</u> – Mitigate the effects on production costs of major supply disruptions that could occur from concentrated or systematic risks, for example outages of a single generation facility.

Q. WILL YOU PLEASE DESCRIBE THE BACKGROUND FOR THE ENTERGY SYSTEM'S RESOURCE SUPPLY STRATEGY?

A. The generation and bulk transmission facilities of the Operating Companies are planned and operated as a single, integrated electric system, pursuant to the Entergy System Agreement ("System Agreement"), which has been approved by the Federal Energy Regulatory Commission ("FERC"). When planning for the System, the Operating Committee is guided by the System's current planning principles, planning objectives, and resource supply strategies for short- and long-term planning. The System Agreement charges the Operating Committee with the responsibility for, among other things, determining generation addition or acquisition plans that provide capacity to meet System load projections and reliable service to customers at a reasonable cost consistent with

sound business practice and operational constraints. Consistent with the System Agreement, the resource supply plans that serve as the basis for acquisition of the resources must necessarily address the System needs as a whole.

The current planning objectives and principles were approved initially by the Operating Committee in June 2002 and subsequently refined and adopted in January 2003 as the Strategic Supply Resource Plan. Guided by these principles and objectives, the Operating Committee periodically approves updates to the resource plan developed by the SPO organization which address the current and future needs of the Operating Companies' retail customers. Beginning in 2009, the Strategic Supply Resource Plan was renamed the Strategic Resource Plan ("SRP") in order to more accurately reflect the full scope of the planning effort; however, the basic set of principles and objectives that guide long-term portfolio design remains unchanged.

Q.   WILL YOU PLEASE EXPLAIN HOW THE SRP GUIDES THE TYPES OF PURCHASES MADE BY SPO?

A.   The SRP is a set of principles and processes that gives SPO guidance on the mix of owned generation and different types of power purchases that best meet customers' needs for reliable service at a reasonable cost. The SRP includes three major planning horizons:  strategic (20-year horizon), tactical (3-year horizon), and annual (1-year horizon). First, my group, the

SPO Planning Analysis Group, periodically assesses the capability of the generating resources available to the System. This group also develops a load forecast, which is updated periodically or when significant changes occur to the System. A comparison of the load forecast and the resource capability is used to identify the needs of the System and guide the planning processes for obtaining additional resources. As provided in the SRP, the additional resource needs are initially met through the strategic planning process with the solicitation of proposals for long-term resources. The results of the strategic planning process influence the quantity and type of resources solicited in the next phase, the tactical planning process. The tactical planning process solicits proposals for "limited-term" products that meet the criteria set to satisfy the System's needs for this horizon. After these limited-term products have been secured, the remainder of the System's needs is met through the annual planning process, with short-term power purchases of one year or less. The use of these different planning processes is designed to result in a diversified portfolio of reliable resources at a reasonable cost.

Q. WHY DOES THE SYSTEM NEED A MIX OF GENERATION TYPES?

A. The planning process seeks to provide a portfolio of resources that, in total, achieve the planning objectives in a balanced and cost effective manner. Because the cost and performance characteristics of technologies differ, no single technology or generation type economically

meets the diverse planning objectives of the SRP. For example, baseload resources typically cost more to construct on a per-megawatt ("MW") basis than peaking resources but operate with relatively low variable cost. Despite its relatively high construction cost, a base load resource can be the most economic alternative to serve the base load supply role, because the resource is expected to operate in most hours at high utilization levels due to its relatively lower fuel cost. Consequently, the capital cost of a base load resource is spread over many megawatt hours ("MWh") of output, resulting in a relatively low total production cost on a $/MWh basis. Conversely, a peaking unit is expected to operate at low capacity utilization levels. As such, the most economic alternatives for peaking and reserve capacity would be units with a relatively low capital cost, even if their variable costs were higher. In both cases, the unique cost structure of a resource allows it to be the lowest reasonable cost alternative for the particular supply role that the unit will fulfill. This is why the SRP seeks to match generation supply to customer load shape requirements.

Q. HOW DOES THE SYSTEM DETERMINE THE CAPABILITY OF ITS GENERATION RESOURCES FOR THE SRP PLANNING PROCESSES?

A. The System uses seasonal ratings for its generating units to reflect the fact that the output of units may vary depending on the season of the year and the condition of the generating unit. In the heat of the summer, the output of a unit on the System may not be equal to the Maximum

Demonstrated Capability of that unit. The seasonal capability of the System's units is reassessed semi-annually. In addition to resources owned by the Operating Companies, the System includes in its planning assumptions any commitments for resources resulting from wholesale transactions that commenced prior to the applicable SRP planning process. This includes, for example, East Texas Electric Cooperative Inc.'s ("ETEC") approximately 230 MW of generating resources that ETI obtains as part of the partial requirements agreement between ETEC and ETI.

Q. PLEASE DESCRIBE THE PROCESS THAT THE SYSTEM USES TO DEVELOP THE LOAD FORECAST FOR THE SRP PLANNING PROCESSES.

A. The load forecasting process used by the System is designed to forecast hourly data for each study year, jurisdiction, and customer class. Metrix LT is used to prepare the load forecast, using numerous sources of input data. The sources of input data that are used in the Metrix LT model include an energy sales forecast, historical weather data, historical load shape data, historical curtailment information for curtailable/interruptible customers, and transmission loss estimates. The load forecast also

includes a projection of the amount of load that is expected to be served under full or partial requirements wholesale customers, such as ETEC.[2]

Q. WHAT IS THE NET EFFECT THAT ETEC LOAD PLACES ON ETI'S SYSTEM NEED AT THE SAME TIME ETEC PROVIDES RESOURCES TO ETI?

A. ETEC's partial requirements load is netted against the ETEC resources credited to ETI and placed under the control of the Entergy System Operator. ETEC's incremental partial requirements demand is projected to be less than the 150 MW minimum billing demand under the partial requirements contract, which is further discussed by Company witness Phillip May.

Q. BASED ON THE ASSESSMENT OF LOAD REQUIREMENTS AND GENERATING CAPABILITY, WHAT IS THE COMPANY'S NET RESOURCE NEED?

A. In addition to owned resources as well as resources currently under contract and the resources I discuss in my testimony, ETI projects an incremental need of 260 MW in 2012 and 504 MW in 2013.

---

[2] ETEC's partial requirements contract with ETI provides for a minimum billing demand of 150 MW.

III. RESOURCES ACQUIRED THROUGH PLANNING ANALYSIS PROCESSES IN THIS RECONCILIATION PERIOD

Q. HOW IS THIS SECTION OF YOUR TESTIMONY ORGANIZED?

A. The System generally acquires the resources necessary to satisfy the forecasted load requirements of the System either through some type of RFP process to solicit competitive bids for resources or bi-lateral negotiations when the System receives unsolicited offers. Accordingly, I have divided the resources discussed in this section into those acquired through an RFP process and those acquired through bilateral negotiations following an unsolicited offer.

Q. WOULD SPO ACQUIRE A RESOURCE THOUGH BILATERAL NEGOTIATIONS RATHER THAN AN RFP PROCESS?

A. Yes. As a practical matter, SPO cannot control whether an interested party makes an unsolicited offer outside the context of an RFP or the timing of such an offer. It is appropriate that such offers be evaluated in the context of the needs of the System. SPO generally employs the same criteria as that used in an RFP to determine the need for the resource and the reasonableness of the price.

Q.    OTHER THAN YOUR TESTIMONY, DOES THE COMPANY'S FILING INCLUDE OTHER SUPPORT FOR THE TRANSACTIONS YOU DISCUSS IN YOUR TESTIMONY?

A.    Yes.   The workpapers to Schedule I-15 includes portions of Entergy Operating Committee minutes and attachments that support the resources discussed and the allocation of those resources among the Operating Companies.   My workpapers, discussed below, also provide support for the selection of these resources.

### A.    Resources Acquired Through an RFP Process

Q.    PLEASE PROVIDE AN OVERVIEW OF THE ACQUISITION OF RESOURCES THROUGH THE RFP PROCESS.

A.    The formal RFP process begins with the identification of the resource needs for the System, as I discussed above, which results in the determination of which products the RFP will request.  SPO then oversees the design, development, and implementation of the RFP.  As further described below, an Independent Monitor is typically involved with this process.  The objectives, products sought, process and other details unique to each RFP are reduced to writing and publicly posted on ESI's RFP website, and interested parties are notified of the posting.  I include in my workpapers the Main Body of the RFP conducted during the Reconciliation Period and discussed in my testimony.

Once the proposals have been received, the Planning Analysis group evaluates the proposals under strict confidentiality protocols, and recommends to the Operating Committee which proposals should be placed on the short list for further negotiation. After the Operating Committee approves the proposals to be included on the short list, SPO's Supply Procurement group manages the negotiations with the short-listed bidders. The resource planning principles, planning objectives, and resource supply strategies that the Operating Committee adopted to guide the overall planning process were described in detail in each formal RFP issued by ESI on behalf of the Operating Companies.

Q. WHAT IS THE ROLE OF AN INDEPENDENT MONITOR (IM) IN THE RFP PROCESS?

A. ESI's RFP process typically involves the retention of an IM to ensure that the RFP is conducted in a fair and impartial manner. The IM (1) oversees the design and implementation of the RFP solicitation, evaluation, selection, and contract negotiations process to ensure that it will be impartial and objective, and (2) provides an objective, third-party perspective concerning ESI's efforts to ensure that all proposals are treated in a consistent fashion and that no undue preference is provided to any Bidder. The IM's responsibilities for each RFP are set out in a Scope of Work made available on the Company's RFP website. The Main Body of the RFP discussed in my testimony and the IM report corresponding to

that RFP is made part of my workpapers.  Although I have attached these IM reports as workpapers, it is important to note that the content of that report is solely the work of the IM, who is entirely independent of the Company and not a consultant to the Company.

Q.    IN GENERAL, HOW ARE RFP PROPOSALS EVALUATED?

A.    For the RFP, the evaluation process considers the effect of each of the proposals on the overall expected production costs of the System.  The evaluation of life-of-unit ("LOU") and day-ahead MUCCO and MUCPA proposals include production cost simulations to account for the fact that each of the resources has different characteristics, such as cost, availability, and duration.[3]  The objective of the production costing evaluation process is to identify the resources that produced the lowest reasonable total System production cost for each incremental kilowatt added.

Qualitative evaluations of various non-economic factors are also performed.  As the field of viable candidates narrowed, further negotiations with bidders are held to secure the most favorable terms possible.

---

[3]    A MUCCO is a Multi-year Unit-Contingent Call Option.  A MUCPA is a Multi-year Unit-Contingent Purchase Agreement for a generating resource.

Generally, the evaluation of day-ahead MUCCO and dispatchable MUCPA products, the two most prevalent RFP products requested, use a process that included the following three major steps:

1.  initial individual proposal screening and production cost analysis which result in individual candidate proposal selection, and individual candidate proposal deliverability evaluation;

2.  verification of individual candidate proposals considering deliverability evaluation; and

3.  portfolio identification, portfolio production cost analysis, portfolio deliverability evaluation, and portfolio selection.

Q.  WHAT ROLE DOES THE OPERATING COMMITTEE SERVE IN THE DETERMINATION OF WHICH RFP OFFERS ARE ACCEPTED?

A.  As Company witness Patrick J. Cicio testifies, the Operating Committee has been delegated the authority through the System Agreement to determine which resources should be acquired for the System to meet its load obligations and serve its customers at a reasonable cost. As such, the Operating Committee determines which RFP offers are accepted once they have been evaluated through the RFP process.

Q.  DID ESI CONDUCT AN RFP DURING THE RECONCILIATION PERIOD OR TEST YEAR THAT RESULTED IN THE ACQUISITION OR PROCUREMENT OF RESOURCES OR CONTRACTS THAT WERE ALLOCATED TO ETI?

A.  Yes.  During 2009 and 2010, ESI conducted the Summer 2009 Request for Proposals for Long-Term Supply-Side Resources ("Summer 2009 RFP"), seeking combined-cycle gas turbine ("CCGT"), combustion turbine ("CT"), and solid fuel resources.  The Summer 2009 RFP resulted in a ten-year power purchase agreement ("PPA") between Calpine Energy Services, L.P. ("Calpine") and ETI for the purchase of 485 megawatts ("MW") of capacity and energy from Calpine's Carville Energy Center in St. Gabriel, Louisiana (the "Carville Contract").  Purchases pursuant to the Carville Contract will begin during the Rate Year, on June 1, 2012, and will be discussed in Section V of my testimony.

B.  <u>Resources Acquired Through Bilateral Negotiations</u>

Q.  WHAT RESOURCES WERE ACQUIRED THROUGH BI-LATERAL NEGOTIATIONS OUTSIDE OF A FORMAL RFP PROCESS?

A.  The following resources were acquired through bi-lateral negotiations in the Reconciliation Period and Test Year:

- a 75 MW one-year call option between ETI and NRG for capacity and energy from the Exxon facility in Beaumont, Texas, with a delivery period that began on March 1, 2011; and

- a 100 MW MUCCO between ETI and Dow Pipeline for capacity and energy from the Dow Pipeline facility in Iberville Parish, Louisiana with a three-year delivery term that began in April 1, 2011.

In addition, as discussed later in my testimony, ETI contracted with Sam Rayburn Municipal Power Agency ("SRMPA") for 225 MW of SRMPA system resources for a delivery term of twenty-five years. Deliveries are scheduled to begin on December 1, 2011.

Q. PLEASE DISCUSS GENERALLY THE DECISIONS TO ENTER INTO THESE BILATERAL PURCHASES.

A. The 75 MW purchase from NRG resulted from SPO's ongoing communications with generators in the ETI service area regarding opportunities to address ETI's continuing need for capacity. The 100 MW purchase from Dow Pipeline was an extension of a then-existing contract for the same level of capacity that first began on January 1, 2008. The 225 MW purchase from SRMPA will provide benefits to ETI as a source of much-needed long-term base load capacity at an economically attractive price.

IV.    DETERMINATION OF ALLOCATION FOR POWER PURCHASES

Q.    HOW DOES THE ENTERGY SYSTEM DETERMINE THE ALLOCATION OF NEW RESOURCES AMONG THE OPERATING COMPANIES?

A.    As discussed in Company witness Cicio's Direct Testimony, the System Agreement (Section 4.02) allows the Operating Committee to allocate certain power purchases on a System-wide basis to all the Operating Companies by their responsibility ratios, or to directly assign a purchase to less than all of the Operating Companies, and do so on a basis other than responsibility ratio. The following factors have been considered by the Operating Committee in recent resource allocation decisions:

- Relative Total Production Costs – Long-term total production cost trends among the Operating Companies.

- Peak Load + 10% Capacity Deficit – Each Operating Company's resource capability position relative to its peak load plus a minimum reserve level of 10%.

- Supply Role Capacity Deficit – Each Operating Company's resource position with regard to its capacity requirements by supply role.

- Responsibility Ratio – Each Operating Company's resource position relative to its responsibility ratio.

- Supply Risks – Each Operating Company's supply risks associated with generation unit availability and price volatility.

Q.   WHAT IS ETI'S ALLOCATION OF THE CONTRACTS YOU IDENTIFY ABOVE?

A.   The contracts were allocated by the Operating Committee to ETI as follows:

- the 485 MW Carville Contract was allocated 50% to ETI and 50% to EGSL, pursuant to ETI's sale of 50% of the associated capacity and energy to EGSL under Service Schedule MSS-4 of the Entergy System Agreement;[4]

- the 75 MW purchase from NRG was allocated 100% to ETI;

- the 100 MW purchase from Dow Pipeline was allocated 50% to ETI; and

- the 225 MW purchase from SRMPA was allocated 100% to ETI.

As discussed previously, the allocation decisions associated with these transactions are recorded in Minutes from the Entergy Operating Committee meetings, which minutes and attachment are included in the workpapers to Schedule I-15 of the filing.

V.   PURCHASED POWER RECOVERY RIDER

Q.   WHAT IS THE PURPOSE OF THIS SECTION OF YOUR TESTIMONY?

A.   As described in the testimony of Phillip R. May, the Company is requesting that all purchased capacity costs, including Service Schedule

---

[4] Company witness Cicio describes the Entergy System Agreement and its associated schedules.

MSS-1 payments, be removed from base rates and instead recovered through a Purchased Power Recovery Rider ("PPR"). This section of my testimony addresses the following:

- I provide an adjusted Test Year level of purchased capacity expense for which the Company requests authority to recover through the PPR.

- My update of the Test Year purchased capacity costs includes a description of new purchased power contracts that become effective after the Test Year and will be effective during the Rate Year.

As explained by Company witness May, if the PPR is not approved by the Commission, the Company requests that the adjusted Test Year amounts be included for recovery in base rates.

Q. WHAT ARE THE ADJUSTED TEST YEAR PURCHASED CAPACITY COSTS TO BE RECOVERED IN THE PPR?

A. The total adjusted Test Year purchased capacity costs for the Company is roughly $276 million. This level of expense represents Test Year costs adjusted for known and measurable changes that will occur in the Rate Year. Highly Sensitive Exhibit RRC-1, attached hereto, provides a break down of this amount. The exhibit separates capacity costs into four categories: (1) third-party contracts, (2) legacy affiliate contracts (or Service Schedule MSS-4 agreements), (3) other affiliate contracts, and (4)

Service Schedule MSS-1 costs. The term "legacy affiliate contracts" refers to those affiliate contracts resulting from the December 31, 2007 jurisdictional separation of Entergy Gulf States, Inc. ("EGSI") into ETI and EGSL, pursuant to which ETI purchases its allocated share of natural gas power plants located in Louisiana and owned by EGSL as a result of the separation. "Other affiliate contracts" refers to all other affiliate contracts whereby ETI purchases capacity and associated energy from another Entergy Operating Company.

Q. PLEASE DISCUSS THE NEW THIRD-PARTY CONTRACTS THAT WERE NOT IN PLACE DURING THE TEST YEAR, BUT WILL BE IN PLACE DURING THE RATE YEAR.

A. The following new third-party contracts are included in this category:

- The 485 MW Carville Contract—As discussed previously, this ten-year PPA resulted from the Summer 2009 RFP and is allocated 50% to ETI. Purchases under the Carville Contract will begin on June 1, 2012. ETI participates in the Carville Contract as the only counterparty to Calpine for the full level of capacity and associated energy supplied under the contract. ETI then sells EGSL 50% of the capacity and energy for the full term of the contract in return for EGSL paying ETI half of all costs under the contract, pursuant to Service Schedule MSS-4 of the Entergy System Agreement. ETI (along with EGSL) previously received capacity and energy from

the Carville Energy Center pursuant to a one-year contract from June 1, 2008 through May 31, 2009.

- A twenty-five year PPA between SRMPA and ETI for 225 MW of capacity and associated energy. Deliveries under the SRMPA PPA are scheduled to begin on December 1, 2011. SRMPA is a joint powers agency composed of the municipalities of Liberty, Livingston and Jasper, Texas and the City of Vinton, Louisiana. In a recent filing at FERC, SRMPA indicated that it restructured its long-term supply portfolio (some of which is obtained from affiliates of ETI) so that it could reduce its annual debt service obligations, which restructuring left SRMPA with additional resources that it offered to ETI.[5] The SRMPA PPA will be a "system contingent" transaction, meaning SRMPA is required to deliver energy from its system resources to the extent its resources are available.

Q.  WHAT ARE THE SERVICE SCHEDULE MSS-1 COSTS INCLUDED IN THE EXHIBIT RRC-1?

A.  As described by Company witness Cicio, ETI's MSS-1 (Reserve Equalization) costs are a function of the level of resources owned or controlled by ETI relative to its share of System load. The MSS-1 costs included in Highly Sensitive Exhibit RRC-1 reflect the known and

---

[5]  *Entergy Services, Inc.*, Docket No. ER11-4415. *See also EWO Marketing, Inc.*, Docket No. ER11-4410.

measurable changes to ETI's resources as discussed above relative to ETI's projected share of System load for the same time period.

Q.   DO THE PPAS YOU HAVE DISCUSSED ABOVE HELP SATISFY IDENTIFIED RELIABILITY NEEDS OF THE SYSTEM, INCLUDING ETI?

A.   Yes, for the reasons discussed above and as further set out in the presentations to the Operating Committee contained in the workpapers to Schedule I-15.

Q.   DOES ETI EXPECT TO PLACE A SIGNIFICANT RELIANCE ON PURCHASED POWER RESOURCES BEYOND THE RATE YEAR?

A.   Yes.   My Exhibit RRC-1 demonstrates that ETI's current resource mix places a significant reliance on purchased power, more than doubling the amount of third-party capacity purchases reflected in the rate year for ETI's last rate case (rate year of July 2010 – June 2011), for an increase of more than $36 million.   I expect that consideration of and reliance on third-party purchases will continue.

Q.   DO THE COMPANY'S RECENT RESOURCE COMMITMENTS TAKE INTO CONSIDERATION ENVIRONMENTAL INTEGRITY?

A.   Yes.  For example, two recent long-term transactions resulting from RFPs include express terms requiring the seller's compliance with all applicable

environmental laws, including compliance with changes in environmental laws and regulations.

Q.    ARE THE PPAS EXPECTED TO IMPROVE SERVICE OR LOWER COSTS TO CUSTOMERS?

A.    Yes.  As discussed above, the purchases are intended to help meet the Company's (and the System's) reliability needs, including those of ETI, at a cost lower than other alternatives.  RFPs and negotiations conducted on behalf of the Company and the other Entergy Operating Companies are designed specifically to realize that objective.  As a typical Entergy Operating Company RFP puts it:  a primary objective of the RFP is "to solicit competitive proposals to…meet customer's needs in a reliable and economical manner."  The evaluation process is designed "to…select proposals that meet ESI's resource planning and risk management objectives at the lowest reasonable cost."  The primary objective of the economic evaluation is to "procure resources that balance the System's objectives, including reliability, lowest reasonable cost."  This process includes a net System Benefits analysis that "relies on production cost modeling to assess the effects of each proposal, or combination of…proposals on total System cost."  Based on this production cost analysis, a portion of the energy from the resources described above is expected to displace energy from higher cost system-owned generation.  These objectives and analyses guided the procurement of the resources

described previously in my testimony—whether obtained through RFP solicitation and or bilateral (unsolicited) negotiations.

Q.    DOES THIS CONCLUDE YOUR TESTIMONY?

A.    Yes.

This page has been intentionally left blank.

This exhibit contains information that is confidential and will be provided under the terms of the terms of the Protective Order (Confidentiality Disclosure Agreement) entered in this case.

This page has been intentionally left blank.

DOCKET NO. 39896

| APPLICATION OF ENTERGY | § | PUBLIC UTILITY COMMISSION |
| TEXAS, INC. FOR AUTHORITY | § | |
| TO CHANGE RATES AND | § | OF TEXAS |
| RECONCILE FUEL COSTS | § | |

DIRECT TESTIMONY

OF

PATRICK J. CICIO

ON BEHALF OF

ENTERGY TEXAS, INC.

NOVEMBER 2011

ENTERGY TEXAS, INC.
DIRECT TESTIMONY OF PATRICK J. CICIO
2011 RATE CASE


TABLE OF CONTENTS

Page

I.    Introduction                                                                    1

II.   costs associated with The Entergy System Agreement                             5

      A.    Summary                                                                   5

      B.    The Entergy System Agreement                                             6

      C.    Billing for Entergy System Agreement-Related Revenues and
            Costs                                                                   31

III.  The Energy and Fuel Management Class of Costs                                 37

      A.    The SPO Organization                                                    39

      B.    Overview of Costs – Energy and Fuel Management Class                    43

      C.    Necessity of Services                                                   48

      D.    Reasonableness of Energy and Fuel Management Charges                    58

      E.    Billing of Energy and Fuel Management Charges                           64

      F.    Summary of SPO Capital Charges                                          71

IV.   Conclusion                                                                    75

## EXHIBITS

Exhibit PJC-1     Entergy System Agreement

Exhibit PJC-2     July 2008 Intra-System Bill

Exhibit PJC-3     Families and Functions Chart

Exhibit PJC-4     Functions and Classes Chart

Exhibit PJC-5     SPO Organization Chart

Exhibit PJC-6     Summary of SPO Capital Charges


Exhibit PJC-A     Affiliate Billings by Witness, Class and Department

Exhibit PJC-B     Affiliate Billings by Witness, Class and Project

Exhibit PJC-C     Affiliate Billings by Witness, Class, Department and Project

Exhibit PJC-D     Pro Forma Summary

I.        INTRODUCTION

Q.      PLEASE STATE YOUR NAME AND CURRENT BUSINESS ADDRESS.

A.      My name is Patrick J. Cicio.  My business address is Parkwood II Bldg.,
Suite 100, 10055 Grogan's Mill Road, The Woodlands, Texas 77380.

Q.      ON WHOSE BEHALF ARE YOU PROVIDING THIS TESTIMONY?

A.      I am testifying on behalf of Entergy Texas, Inc. ("ETI" or the "Company").

Q.      BY WHOM ARE YOU EMPLOYED AND IN WHAT CAPACITY?

A.      I am Director, Regulatory Affairs and Energy Settlements for the System
Planning and Operations ("SPO") organization of Entergy Services, Inc.
("ESI"),[1] the service company affiliate of the Entergy Operating
Companies, which coordinate, plan, and operate their electric generation
and bulk transmission facilities as a single, integrated electric system (the
"Entergy System" or the "System").[2]  As Director, Regulatory Affairs and
Energy Settlements, I am responsible for administering the Intra-System
Billing associated with the Entergy System Agreement, overseeing fuel

---

[1]    ESI is the services company affiliate of the Entergy Operating Companies that provides
engineering, planning, accounting, technical, regulatory, and other administrative support
services to each of the Entergy Operating Companies.

[2]    In addition to ETI, the Entergy Operating Companies are Entergy Arkansas, Inc. ("EAI");
Entergy Mississippi, Inc. ("EMI"); Entergy New Orleans, Inc. ("ENO"); Entergy Gulf States
Louisiana, L.L.C. ("EGSL"); and Entergy Louisiana, LLC ("ELL"). On December 19, 2005, EAI
gave notice that it will terminate its participation in the System Agreement effective December
18, 2013.   Entergy Mississippi provided similar notice to the Operating Companies on
November 8, 2007 that it would terminate its participation effective November 7, 2015.

and power settlements and reporting, as well as compliance with the electric reliability standards, directing the department budgets, and giving guidance to the Regulatory Affairs Group which coordinates the SPO regulatory support function.

Q. PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND AND PROFESSIONAL EXPERIENCE.

A. I joined Gulf States Utilities Company (subsequently, Entergy Gulf States, Inc. ("EGSI")) in June 1981 as an accountant. In April 1983, I was transferred to the Regulatory Affairs Department and held a variety of positions from September 1986 until December 1993, including Supervisor, Rate Regulation; Director, Technical and Administrative Support; Director, Regulation-Louisiana. In January 1994, I joined ESI as Manager, Regulations where I was responsible for coordinating merger-related human resource issues and for ensuring the timely and consistent implementation of related policies. I also provided oversight to all merger-related proceedings. In May 1996, I became a Senior Lead Analyst in the Plant Operations Business Support group where I was responsible for preparing financial analyses and performing other business support functions for the Plant Operations organization. In January 1997, I moved to the SPO as a Senior Staff Analyst in the Resource Planning Department. In that role, I was responsible for coordinating all regulatory activities (rate filings, requests for information,

etc.). In December 1998, I became the Manager – Planning Models and Analysis, where I was responsible for producing production costing studies and load and energy forecasts for the Entergy Operating Companies. In February 2004, I became the Manager – Energy Analysis and Reporting, where I was responsible for the preparation of the intra-system bill and the settlement of gas, oil and power transactions for all Entergy Operating Companies. In February 2008, I became the Director of Supply Procurement and Asset Optimization, where I was responsible for the preparation of long-term requests for proposals and the negotiation of long-term purchased power contracts and power plant acquisitions. In February 2010, I became the Director of Compliance and Business Support, where I was responsible for compliance with the electric reliability standards, and SPO's budget and information technology departments. In February 2011 I accepted my current role. I graduated from Texas A&M University in 1981 with a Bachelor of Business Administration degree in Finance. I am a Certified Public Accountant in the State of Texas, Certificate Number 49910.

Q.    WHAT IS THE PURPOSE OF YOUR TESTIMONY?

A.    My testimony has two major purposes: (1) I support the costs and revenues associated with ETI's participation in the Entergy System Agreement during the test year of July 1, 2010 to June 30, 2011 (the "Test Year") and during the fuel-related Reconciliation Period (July 2009 through

June 2011); and (2) I present the Energy and Fuel Management Class of affiliate costs that were billed to ETI during the Test Year. In the first part of my testimony, I discuss how ETI coordinates its generation and bulk transmission functions with the other Entergy Operating Companies via the Entergy System Agreement, a Federal Energy Regulatory Commission ("FERC")-approved tariff that includes seven FERC-approved rate schedules. I will also explain the various Service Schedules and provisions referenced in the Entergy System Agreement. In general, this part of my testimony addresses the box labeled "Intra-System Bill" on Figure MHT-3 of Company witness Michelle H. Thiry's testimony.

With respect to the second part of my testimony, I demonstrate that costs included in the Energy and Fuel Management Class of affiliate costs that were billed to ETI during the Test Year are necessary and reasonable; that the price charged to ETI for these affiliate services is not higher than the prices charged by ESI for the same item or class of items to other affiliates or non-affiliates; and that these costs represent the actual cost of these services. I also sponsor certain capital costs associated with the services of the SPO from July 2009 through the end of the Test Year (June 30, 2011).

II.   COSTS ASSOCIATED WITH THE ENTERGY SYSTEM AGREEMENT

A.   Summary

Q.   PLEASE SUMMARIZE THE COSTS AND REVENUES INCURRED PURSUANT TO THE ENTERGY SYSTEM AGREEMENT THAT ARE INCLUDED IN THIS PROCEEDING.

A.   Costs allocated to ETI pursuant to the terms of the Entergy System Agreement relate to the following three components of the Company's filing:

- Reconciliation of Past Costs: With respect to the Company's fuel factor, the Company will be reconciling costs incurred under Service Schedules MSS-3 and MSS-4,[3] costs allocated to ETI from Joint Account Purchases, and the net balance from Joint Account Sales under the terms of Service Schedule MSS-5.

- Purchased Power Rider: Company witness Phillip R. May sponsors the Company's request for going-forward recovery of capacity costs through a Purchased Power Rider ("PPR"). Among other capacity costs included in the rider are adjusted test year amounts incurred under Service Schedules MSS-1 and MSS-4.

- Base Rates: The Company requests base rate recovery of the Test Year amount of Service Schedule MSS-2 costs. Additionally, in the event the Commission does not approve the PPR, Service

_____

[3] I describe each of these service schedules in more detail later in my testimony.

Schedule MSS-1 and MSS-4 costs that would have been included in the PPR would be included in the Company's base rates.

### B.    The Entergy System Agreement

Q.    WHAT IS THE ENTERGY SYSTEM AGREEMENT?

A.    The Entergy System Agreement is a FERC-approved tariff which mandates that the Operating Companies operate as a single, integrated System.  As stated in Section 3.01 of the Entergy System Agreement, its purpose is "to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities of the Operating Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment."  The Entergy System Agreement also provides a basis for the equalization among the Operating Companies of any imbalances of costs arising from the construction, ownership, or operation of facilities that are used for the collective benefit of all the Operating Companies.

Consistent with the above discussion, the Commission has characterized the Entergy System Agreement as:

the tariff approved by the FERC that provides the basis for the operation and planning of the Entergy System, including the [then] five Operating Companies.  The System Agreement governs the wholesale-power transactions among the Operating Companies by providing for joint

operation and establishing the bases for equalization among the Operating Companies, the costs associated with the construction ownership and operation of the Entergy System facilities.[4]

The current version of the Entergy System Agreement was entered into on April 23, 1982, and, as subsequently amended, is among ESI and each of the Operating Companies. It was initially approved by the FERC on June 13, 1985, in Opinion No. 234, Middle South Energy, Inc., 31 FERC (C.C.H.) ¶ 61,305 (1985). Exhibit PJC-1 is a copy of the current version of the Entergy System Agreement.

Q. WHAT ENTITY ADMINISTERS THE ENTERGY SYSTEM AGREEMENT?

A. The tariff states that the overall administration of the Entergy System Agreement is to be carried out by the Entergy Operating Committee. During the Reconciliation Period and Test Year, ETI's operations were represented on the Operating Committee by Mr. Joseph F. Domino, the President and CEO of Entergy Texas. During the Reconciliation Period and Test Year, the daily administration of the Entergy System Agreement was carried out by the SPO under the direction of the Operating Committee. The SPO was also responsible for the administration of billings between the Operating Companies in accordance with certain Service Schedules of the Entergy System Agreement.

---

[4] Docket No. 32710, Order on Rehearing at 8 (Finding of Fact 39).

Q.   WHAT ARE THE DUTIES OF THE OPERATING COMMITTEE?

A.   Section 5.06 of the Entergy System Agreement sets forth the duties of the Operating Committee.  In part, those duties include being responsible for the day-to-day administration of the Entergy System Agreement, making decisions with respect to the installation of generation and bulk power transmission facilities, determining the amount and timing of generating reserves sufficient to ensure the reliable supply of capacity and energy to the Operating Companies' customers, providing supervision for the System Operator, studying and determining additions and changes in facilities necessary to keep abreast of the production and transmission requirements of the System, and coordinating arrangements to procure or sell power outside of the System.  The Entergy System Agreement empowers the Operating Committee to make the key decisions regarding the acquisition and allocation of generating resources and electric energy for the Operating Companies.

Q.   WHY DO THE OPERATING COMPANIES JOINTLY PLAN AND OPERATE THEIR ELECTRIC SYSTEMS?

A.   By jointly planning and operating their electric systems, the Operating Companies are able to aggregate their loads and jointly dispatch their resources to serve that aggregated load.  The Entergy System resources are economically dispatched, subject to reliability and operating constraints that exist at any given time, to achieve the lowest cost of

energy for the combined System as a whole. The aggregation of load and resources into a single system means that the combined resources of the Operating Companies can be optimally dispatched, allowing each Operating Company's load to be supplied with the most economical resources available to the System. In addition, the Operating Companies experience increased reliability on both a planning and an operating basis as a result of coordinated operations. Through the combined reliance on many diverse generating units, fuel sources, and bulk power interconnections, each Operating Company is better protected from service interruptions or disturbances caused by the loss of generating units, fuel supply disruptions, and/or transmission outages or constraints.

The FERC recognized the benefits of System-wide planning and operations in its Opinion 234-A (Order Denying Rehearing and Granting Interventions), wherein the FERC held:

> We reaffirm that the Middle South [now Entergy] companies appropriately approach power planning on a systemwide basis, whereby the individual companies' needs are the component parts of the System power plan. Implementation of the System plan, however, requires that the individual companies' needs be subsumed by the greater interest of the entire system.[5]

This finding by the FERC was quoted with approval by the United States Supreme Court.[6] This confirms that planning and operating

---

[5] 32 F.E.R.C. ¶ 61,425 at 61,958 (1985).

[6] *Miss. Power & Light v. Miss. Ex. Rel. Moore*, 487 U.S. 354, 376,108 S.Ct. 2428, 2441 (1988).

decisions were and are to be made on a system-wide basis for the benefit of the System as a whole, recognizing the fact that such system-wide basis for decisions might cause the interests of an individual Operating Company in a particular decision to be outweighed by the overall good of the System over time.

Q.    PLEASE EXPLAIN HOW THE COSTS OF PROVIDING AND TRANSMITTING THE ELECTRICITY TO SERVE THE AGGREGATED SYSTEM'S LOAD ARE ALLOCATED AMONG THE OPERATING COMPANIES.

A.    These costs are allocated pursuant to the terms of the Entergy System Agreement and its Service Schedules, which I describe below.  The Supreme Court has held that FERC's exclusive jurisdiction applies to power allocations that affect wholesale rates.  It is my understanding that these allocations are binding on States, and States must treat those allocations as fair and reasonable when determining retail rates.[7]

---

[7]    *See Entergy Louisiana, Inc. v. Louisiana Public Service Commission*, 539 U.S. 39, 123 S. Ct. 2050 (2003); *Mississippi Power v. Miss. Ex. Rel. Moore*, 487 U.S. 354, 371, 108 S. Ct. 2428, 2441 (1988).

Q. WHAT ARE THE SERVICE SCHEDULES ASSOCIATED WITH THE ENTERGY SYSTEM AGREEMENT?

A. There are seven Service Schedules, each of which is a FERC-filed rate schedule, associated with the Entergy System Agreement. They are:

MSS-1 - Reserve Equalization;

MSS-2 - Transmission Equalization;

MSS-3 - Exchange of Electric Energy Among the Companies;

MSS-4 - Unit Power Purchase;

MSS-5 - Distribution of Revenue from Sales Made for the Joint Account of All Companies;

MSS-6 - Distribution of Operating Expenses of System Operations Center; and

MSS-7 - Merger Fuel Protection Procedure.

Q. PLEASE DESCRIBE SERVICE SCHEDULE MSS-1.

A. Service Schedule MSS-1 (which is called "Reserve Equalization" in the Entergy System Agreement) prescribes a method for sharing some of the fixed costs of generating capability among Operating Companies. One of the benefits of participating in a pooling arrangement such as the Entergy System Agreement is the ability to rely on System reserves. (The term "reserves" in this context refers to the difference between MW of capability and MW of peak load; it can be measured either for the System or for an Operating Company.) Each Operating Company owns or controls its own

capability, but all Companies can draw upon the aggregate capability of the System in determining the adequacy of reserves. However, some Operating Companies own more than their share of the System's total capability relative to their load, and thus own more than their share of System reserves. Other Companies own less than their share. These Operating Companies are known as "long" and "short" Operating Companies, respectively. "Long" Companies are those with more generation capability, relative to their monthly peak load. "Short" Companies are those with less generation relative to their monthly peak load. A company's position and the extent to which it is "long" or "short" can change over time. The Service Schedule MSS-1 formula provides for payments by "short" Companies to "long" Companies.

Q. WHAT IS THE BASIS FOR DETERMINING AN OPERATING COMPANY'S SHARE OF SYSTEM RESERVES?

A. An Operating Company's share of System reserves is determined using a concept defined in the Entergy System Agreement as "Responsibility Ratio," which is an allocator that reflects the relative contribution of each Operating Company to the System's coincident peak load – in other words, an Operating Company's coincident peak load divided by the System peak load, calculated on a rolling twelve-month average. An Operating Company's share of System reserves is the product of that

Operating Company's Responsibility Ratio and the total level of System reserves.

Q.  HOW ARE MSS-1 PAYMENTS DETERMINED?

A.  A short Company makes a payment only for the MW by which it is "short." The payments are computed monthly by multiplying the Company's MW shortfall times a $/MW rate for the cost of owning reserve capability. The rate is based on the fixed operating cost of certain oil- and gas-fired generating units owned by the "long" Companies .

Q.  ARE RESERVE EQUALIZATION PAYMENTS DISCRETIONARY AMONG THE OPERATING COMPANIES?

A.  No. The FERC-approved Entergy System Agreement mandates that the Operating Companies make and receive Reserve Equalization payments in accordance with Service Schedule MSS-1.

In a prior ETI reconciliation case, the Commission found:

By approving Service Schedule MSS-1, the FERC has approved the method by which the Operating Companies share the cost of maintaining sufficient reserves to provide reliability for the Entergy System as a whole. [8]

---

[8] Docket No. 32710, Order on Rehearing at 9 (Finding of Fact 42).

Q.   DOES ETI PAY ANY MORE FOR RESERVE EQUALIZATION PAYMENTS MADE PURSUANT TO SERVICE SCHEDULE MSS-1 THAN ANY OTHER OPERATING COMPANY?

A.   No.  Service Schedule MSS-1 is a formula rate, and ETI's payments or receipts in any particular month will be the same as any other similarly situated Operating Company.  In any given month, all of the Operating Companies that are "short" and which must make MSS-1 payments will pay the same rate, based on a weighted average of the rates for each of the "long" Operating Companies, for each MW of capability for which it is responsible.

Q.   DO RESERVE EQUALIZATION PAYMENTS RESULT FROM RESOURCES REQUIRED TO MEET THE ENTERGY SYSTEM'S LOAD REQUIREMENTS?

A.   Yes.  As I explained above, the Entergy System is planned and operated as a single, integrated electric system to satisfy the combined load requirements of the Operating Companies.  An essential element of providing reliable and efficient delivery of electricity to customers is maintaining an adequate level of capability through ownership or control of generation.  ETI's Reserve Equalization payments reflect its allocated share of the cost of maintaining adequate capability for the System as a whole.

Q.    WHERE ARE SERVICE SCHEDULE MSS-1 AMOUNTS IDENTIFIED IN
THIS PROCEEDING?

A.    Amounts allocated pursuant to Service Schedule MSS-1 are shown in
Schedule H-12.4 a-g. Mr. Cooper, in his Exhibit RRC-1, identifies the total
rate year amount of Service Schedule MSS-1 costs sought to be included
in rates.

Q.    PLEASE DESCRIBE SERVICE SCHEDULE MSS-2.

A.    Service Schedule MSS-2 prescribes the method for equalizing the
ownership costs associated with certain transmission systems facilities
owned and operated by each Operating Company. Service Schedule
MSS-2 determines each Operating Company's Transmission
Responsibility by summing the System's Net Inter-Transmission
Investments and multiplying that total by each Operating Company's
Responsibility Ratio.

Q.    HOW ARE THE PAYMENT AMOUNTS FOR SERVICE SCHEDULE
MSS-2 DETERMINED?

A.    Each Operating Company's Net Inter-Transmission Investment is
subtracted from its Transmission responsibility. The result is multiplied by
the System Average Ownership Cost ("AOC") in order to calculate the
amount that each Operating Company should pay or receive each month.
The AOC develops ownership costs of certain transmission investments.

Q.    HOW IS THE AOC DETERMINED?

A.    The AOC rate consists of capital costs, federal and state income tax rates, and operating expenses scaled by investment costs. Section 20.06 of the Entergy System Agreement shows the AOC formula. This formula uses financial factors similar to those used in the Service Schedule MSS-1 calculation.[9]

Q.    ARE TEST YEAR SERVICE SCHEDULE MSS-2 EXPENSES INCLUDED IN ETI'S COST OF SERVICE?

A.    Yes. ETI's MSS-2 expenses are identified in Schedule A as discussed by Company witness Michael P. Considine.

Q.    HAS THE COMMISSION PREVIOUSLY CONSIDERED SERVICE SCHEDULE MSS-2 PAYMENTS?

A.    Yes. In its Second Order on Rehearing dated October 13, 1998, in Docket No. 16705, Finding of Fact No. 96N, the Commission stated:

> The FERC has approved the relevant parts of the ESA (Entergy System Agreement) as amended to reflect the inclusion of EGS. In Opinion No. 385, the FERC expressly accepted an amendment to the ESA which added Gulf States to the ESA as an operating subsidiary. EGS' MSS-2 expenses are therefore mandated by the FERC.

---

[9] Service Schedule MSS-2 billing parameters are in effect from June 1 to the succeeding May 31 based on the preceding year's results.

Furthermore, as the Commission ordered in Docket No. 16705, Conclusion of Law No. 11D, "under *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 369-370, 108 S.Ct. 2428 (1988), a state utility commission must treat FERC-mandated system agreement payments as reasonably incurred operating expenses for the purpose of setting retail rates." The Commission went on to say that *Mississippi Power & Light Co.* preempts the Commission from disallowing Service Schedule MSS-2 expenses.

Q. PLEASE DESCRIBE SERVICE SCHEDULE MSS-3.

A. Service Schedule MSS-3 serves two functions. It first mandates how energy will be allocated and priced among the Operating Companies. The second function is to provide for payments and receipts in accordance with the provisions of Opinion Nos. 480 and 480-A.

Q. IS THERE A FUNDAMENTAL PRINCIPLE AT WORK BEHIND THE OPERATION OF SERVICE SCHEDULE MSS-3 AS IT RELATES TO ENERGY ALLOCATION?

A. Yes. The fundamental principle of the Entergy System Agreement is that, subject to the operational and reliability constraints imposed on the System, the lowest-cost resources available to the System Dispatcher are the first resources used to meet the aggregate System load, without regard to which Operating Company owns the resource or which

Operating Company's load is being served. Although the economic dispatch of the entire System will result in total System generation output matching total System load, in any given hour the generating output of some Operating Companies will be greater than their individual load, and the generating output of other Operating Companies will be less than their individual load. Therefore, after the System is economically dispatched, an energy accounting process is conducted to, in effect, have the Operating Companies that are "short" on energy in an hour compensate the "long" Companies for the energy that was used to meet the short Companies' needs.

Because this calculation is performed for each hour, in any given hour, an Operating Company may either be taking exchange energy or supplying exchange energy, but not both. This exchange energy accounting is set out in Service Schedule MSS-3.

Q. HOW DOES SERVICE SCHEDULE MSS-3 WORK WITH RESPECT TO THE OPERATIONS OF EXCHANGE ACCOUNTING?

A. Service Schedule MSS-3 allocates all of the System's energy resources among the Operating Companies. Under MSS-3, an Operating Company retains the energy (and the associated costs) actually produced from its lowest-cost resources if those resources are needed to meet the loads of its customers. Only after the needs of an Operating Company's own customers have been met will the excess energy that the Operating

Company generated in a particular hour, and the associated costs, be allocated to other Operating Companies. This allocation of excess energy pursuant to Service Schedule MSS-3 is referred to as "Exchange Energy" or "Pool Energy." Operating Companies whose resources provided an amount of energy that was greater than their load in an hour furnish energy to the Entergy Energy Exchange (the "Exchange"), and Companies whose load is greater than the amount of energy provided by their resources in an hour are allocated energy from the Exchange. However, it is important to note that, in total, MSS-3 is a zero-sum game. The sum of the MSS-3 payments and receipts for all of the Operating Companies for any individual hour is zero.

Q.    HOW IS THE MSS-3 ACCOUNTING PERFORMED?

A.    Service Schedule MSS-3 is an automated, after-the-fact allocation mechanism. That allocation of energy and associated costs required by the System Agreement is performed within a computer program known as the Intra-System Bill. For a more detailed discussion of the ISB, see the next section.

The process that is used to allocate System energy is sometimes known as a "stacking" process. An example of the stacking process is shown in the following Figure PJC-1. As may be seen in that example, the underlying process is to stack the amount of energy produced by each Operating Company's resources from lowest cost to highest cost in

separate stacks for each Operating Company. Then, again within each hour, the amount of energy resources within each Operating Company's stack is compared to the amount of energy consumed by its customers. If, for an individual company, the amount of energy produced is greater than the amount of energy used by its customers, the energy (and associated costs) at the top end of the stack (in essence, above the level needed for that Company's own customers) is allocated to the Exchange. A Company whose resources produced less energy than the amount of energy its own customers used is allocated the deficit amount of energy from the Exchange. Each of these transactions occurs at cost. Operating Companies that have excess energy that is allocated to the Exchange receive a payment, as defined in Section 30.08 of the Entergy System Agreement, that is based on average fuel costs (plus an O&M- and $SO_2$-based adder), and the Companies that have energy allocated to them from the Exchange pay the weighted average cost of all of the energy allocated to the Exchange in that hour.

**Figure PJC - 1**
**MSS - 3 EXCHANGE ENERGY ACCOUNTING EXAMPLE**
**ILLUSTRATIVE**



Q. HAS THE COMMISSION PREVIOUSLY ADDRESSED WHETHER COSTS INCURRED BY ETI UNDER SERVICE SCHEDULE MSS-3 ARE REASONABLE?

A. Yes. In its Order on Rehearing in Docket No. 15102, the Commission addressed costs incurred under Service Schedule MSS-3 in the following Findings of Fact:

202. Schedule MSS-3 of the ESA (Entergy System Agreement) determined the pricing and exchange of energy among EGS and the affiliate EOCs (Entergy Operating Companies) during the reconciliation period.

203. By approving Schedule MSS-3 and the ESA, the Federal Energy Regulatory Commission (FERC) has determined how the EOCs will be reimbursed for energy sold to the exchange pool and how the EOCs, including EGS, will purchase energy from the exchange pool.

207. The FERC has determined that the ESA and Schedule MSS-3 is a just and reasonable way of allocating energy costs and revenues among the EOCs, including EGS, and has determined that the charges imposed on EGS by operation of the ESA are fair and reasonable in comparison to the charges imposed on the other EOCs.

As these Findings of Fact demonstrate, the Commission has already concluded that costs incurred pursuant to Service Schedule MSS-3 are reasonable.[10]

---

[10] *See also* Docket No. 15102, Proposal for Decision at 94-96; Docket No. 16705, Second Order on Rehearing at 138 (Conclusion of Law 11D); Docket No. 32710, Order at 9 (Finding of Fact 43).

Q.   ARE THE COSTS THAT ETI INCURS UNDER SERVICE SCHEDULE MSS-3 ANY MORE THAN THE COSTS INCURRED BY ANY OTHER ENTERGY OPERATING COMPANY UNDER THAT SERVICE SCHEDULE?

A.   No.  ETI incurs the exact same cost per kWh for energy from the Service Schedule MSS-3 Exchange pool as does any other Entergy Operating Company that is allocated energy from the Service Schedule MSS-3 Exchange in the same hour.

Q.   ARE SERVICE SCHEDULE MSS-3 EXPENSES INCLUDED IN THIS CASE?

A.   Yes.  Service Schedule MSS-3 Exchange revenue and expense is identified in Schedules H-12.4 a-g and H-12.5 b-e.

Q.   ARE ANY OTHER TRANSFERS OF ENERGY GOVERNED BY SERVICE SCHEDULE MSS-3?

A.   Yes. The allocation of energy for sales to off-system companies made for the joint account of all the Operating Companies (Joint Account Sales) is made pursuant to Service Schedule MSS-3.  According to Service Schedule MSS-3, any costs incurred by the Operating Companies whose sources supplied the sale are paid out of the gross revenue received for such sales.  Then, the remaining revenue from such sales (the "net

balance") is divided among the Operating Companies in accordance with Service Schedule MSS-5.

Q. PLEASE DESCRIBE SERVICE SCHEDULE MSS-4.

A. Service Schedule MSS-4 prescribes a method for determining the payment for a unit power purchase between Operating Companies and/or the sale of power purchased by another Operating Company. A unit power purchase is defined as the purchase of a portion of a Designated Generating Unit's capability, which entitles the purchaser to receive each hour that portion of the total energy generated by that unit.

Q. PLEASE EXPLAIN HOW AFFILIATED POWER PURCHASES ARE MADE PURSUANT TO SERVICE SCHEDULE MSS-4.

A. An Operating Company may enter into a resource-specific power transaction with another Operating Company pursuant to Service Schedule MSS-4. Service Schedule MSS-4 is a cost-based formula rate that bills the buyer a monthly per-kilowatt rate relating to the non-fuel cost and a per kWh rate relating to the actual energy cost for the participating unit subject to the transaction. During the term of a Service Schedule MSS-4 transaction, the resource is considered to be under the control of the purchasing Operating Company for purposes of cost responsibility and allocation of energy under the Entergy System Agreement.

Q.    HAS THE COMMISSION ADDRESSED SERVICE SCHEDULE MSS-4

COSTS?

A.    Yes.  The Commission previously recognized:

> Service Schedule MSS-4 of the System Agreement sets forth the method for determining the payment for unit power purchases between Operating Companies.  By approving Service Schedule MSS-4, the FERC has approved the methodology for pricing Inter-Operating Company unit power purchases.[11]

Q.    ARE THE RATES PAID BY ETI UNDER SERVICE SCHEDULE MSS-4

ANY MORE THAN THE RATES CHARGED TO ANY OTHER ENTERGY

OPERATING COMPANY UNDER THAT SERVICE SCHEDULE?

A.    No.  Service Schedule MSS-4 is a cost-based formula rate.  That same formula rate is applied to each Service Schedule MSS-4 transaction between Operating Companies.  The cost structure for the underlying resource will be unique to each resource, but the rate charged is the same for all Operating Companies.

Q.    ARE SERVICE SCHEDULE MSS-4 AMOUNTS ADDRESSED IN THIS

PROCEEDING?

A.    Yes.  Service schedule MSS-4 energy and capacity costs are identified in Schedule H-12.4 a-g.  For purposes of this proceeding MSS-4 contracts

---

[11]    Docket No. 32710, Order at 9 (Finding of Fact 44).

have been labeled as either "legacy" (those transactions involving the purchase of power from generating resources owned by ETI's predecessor, Entergy Gulf States, Inc.), or "other" (all other MSS-4 transactions).

Q. PLEASE DESCRIBE SERVICE SCHEDULE MSS-5.

A. Service Schedule MSS-5 prescribes the method for distributing the net balance from Joint Account Sales, which are wholesale sales to third parties made by the System on behalf of all of the Operating Companies. The System makes such sales when they can be made at a price that is expected to exceed the System's incremental cost. As mentioned above, in accordance with Service Schedule MSS-3, any costs associated with these Joint Account Sales first are deducted from the gross revenue received for such sales and distributed to the Operating Companies whose sources supplied the sale. Service Schedule MSS-5 provides that the remainder of the revenues or deficit in revenues (the "Net Balance") is distributed among the Operating Companies in proportion to the Responsibility Ratio of each Operating Company.

Q. ARE SERVICE SCHEDULE MSS-5 REVENUES INCLUDED IN THIS CASE?

A. Yes. Those revenues shown in Schedule H-12.5 b-e are credited to ETI's fuel balance as revenues from off-system sales.

Q.    PLEASE DESCRIBE SERVICE SCHEDULE MSS-6.

A.    Service Schedule MSS-6 sets forth a method by which the costs incurred in providing and operating the System Operations Center may be distributed among the Entergy Operating Companies. During the Test Year, these costs were included in the ESI affiliate billings.

Q.    PLEASE DESCRIBE SERVICE SCHEDULE MSS-7.

A.    Service Schedule MSS-7 is entitled "Merger Fuel Protection Procedure" and resulted from the merger between Gulf States Utilities Company and Entergy.[12] This service schedule expired by its own terms prior to the Reconciliation Period.

Q.    DOES THE ENTERGY SYSTEM AGREEMENT PERMIT PURCHASES OF POWER FROM THE WHOLESALE MARKET?

A.    Yes. In particular, the Entergy System Agreement addresses wholesale market purchases in Sections 5.06(p), 4.02 and 4.03. Section 5.06(p) of the Entergy System Agreement requires the Operating Committee to coordinate the procurement of power for one or more of the Operating Companies for either reliability or economic purposes.

---

[12] Gulf States Utilities Company was renamed Entergy Gulf States, Inc. and was subsequently separated into EGSL and ETI.

Section 4.02 of the Entergy System Agreement, entitled "Purchased Capacity and Energy," empowers the Operating Committee to specify the conditions under which one or more individual Operating Companies can purchase capacity for their own account, which is then treated as a resource included in the purchasing Company's (or Companies') capacity as if it was an owned resource. Generally, as described in more detail in Company witness Robert R. Cooper's testimony, the Operating Committee has adopted a broad set of planning principles and objectives that drive the resource allocation process. However, the factors that the Operating Committee considers when evaluating the allocation of limited or long-term resources – such as System reliability, relative production costs, and the match between an Operating Company's load profile and the mix of supply types – are rooted in the requirements of, among others, Sections 3.01 and 3.05 of the Entergy System Agreement. All of the power purchase agreements discussed in Company witness Cooper's testimony were purchased pursuant to Section 4.02 of the Entergy System Agreement.

Section 4.03, "Energy Purchased by Services," of the Entergy System Agreement dictates when and how ESI may make purchases from third parties on behalf of the Operating Companies. It provides that ESI "may purchase energy under economic dispatch or emergency conditions for the joint account of all the Operating Companies. The energy purchased shall be allocated to each Operating Company in proportion to

its Responsibility Ratio in effect at the end of the preceding month." Most of the purchases described in the testimony of Company witness Michelle H. Thiry, especially those purchases with a term of one month or less, are such purchases that are made for the benefit of the System when ESI, who is delegated the authority under the Entergy System Agreement to make the purchases, deems such purchases economical or necessary. When such purchases are made for the joint account of all the Operating Companies, ETI is allocated its Responsibility Ratio share of all of those purchases in each hour.

Q. DOES THE ENTERGY SYSTEM AGREEMENT PROVIDE THE OPERATING COMPANIES ANY DISCRETION IN ACCEPTING AN ALLOCATED PORTION OF PURCHASES?

A. No. The Operating Companies are required to take their respective allocated share of purchased power because those purchases arise out of the joint economic dispatch of the System. Each Operating Company must bear responsibility for its share of purchases made for the benefit of the System. Moreover, the joint planning obligations of the Entergy System Agreement require each Operating Company to accept its allocated share of purchased capacity and energy, when so allocated by the Operating Committee.

Q.   ARE THE PURCHASES ALLOCATED TO ETI ALWAYS USED TO SERVE ETI'S CUSTOMERS' NEEDS?

A.   No, not necessarily.  ETI's allocated share of purchases is considered an ETI source for the purposes of allocating energy and costs under Service Schedule MSS-3.  Therefore, in any given hour, if ETI has resources in excess of its needs and a wholesale power purchase is among the lowest cost resources, that purchase stays with ETI's customers for that hour.  However, if ETI has resources in excess of its needs and its allocated share of a purchase is more costly than other ETI resources, ETI's allocated share of the purchase is assigned to the Exchange for that hour, for which ETI is compensated.

Q.   CAN ETI EVER RECEIVE MORE THAN ITS ALLOCATED SHARE OF A PURCHASE?

A.   No, not directly.  However, as described above, purchases are treated as an Operating Company resource under Service Schedule MSS-3.  Therefore, if ETI's needs were in excess of its resources in any given hour and thus ETI was purchasing energy from the Exchange, it may receive some purchased energy that was originally allocated to another Entergy Operating Company that later flowed through the Exchange.  However, under the terms of the Entergy System Agreement, such allocations are considered to be from the Exchange and are not considered a Joint Account Purchase allocation.

C.    Billing for Entergy System Agreement-Related Revenues and Costs

Q.    HOW ARE OPERATING COMPANIES BILLED FOR THE COSTS INCURRED PURSUANT TO THE ENTERGY SYSTEM AGREEMENT?

A.    The Operating Companies are billed through a monthly Intra-System Bill ("ISB").[13]

Q.    WHAT IS THE ISB?

A.    The ISB is a program that creates inter-company invoices prepared by ESI. The ISB details the costs to be paid and revenues to be received by each Operating Company for the transactions that occurred pursuant to the Entergy System Agreement.

Q.    HOW IS THE ISB PREPARED?

A.    The ISB is prepared by a custom computer program that incorporates the algorithms specified in the Entergy System Agreement. On an hourly and/or daily basis, fuel cost, unit generation, Operating Company load, and wholesale transactions data are collected and compiled into the ISB's database records.

_____

[13]   The Intra-System Bill is distinct from the intra-system affiliate billing process discussed in the Direct Testimony of Company witness Stephanie B. Tumminello.

Q.    HOW IS THE MONTHLY ISB ORGANIZED?

A.    The monthly ISB is divided into attachments, with each attachment containing multiple pages, if necessary.   These are the current attachments, as of July 2010:

- Attachment 1 - kWh Disposition by Operating Company, Joint Account Purchases and Individual Company Purchases by Operating Company;

- Attachment 2 - Exchange Energy (to/from), Unit power Purchases, AECC Excess Energy;

- Attachment 3 - Joint Account Sales and Net Balance;

- Attachment 4 - Peak Load Data and Responsibility Ratios;

- Attachment 5 – Owned or Contracted Capacity, Reserve & Transmission Equalization;

- Attachment 6 - Operating Company Summaries and System Total;

- Attachment 11 – Summary of Joint Account Purchases and Individual Company Purchases; and

- Attachment 12 - Fiber Optics Equalization.

Q.    PLEASE  BRIEFLY  DESCRIBE  EACH  ATTACHMENT  OF  THE MONTHLY ISB.

A.    Attachment 1 shows the monthly totals of energy allocated to each Operating Company by source and the disposition of that energy.

This attachment shows the allocation of kWh from each Operating Company's own sources (net generation and off-system purchases) to each Operating Company's net area, to the Exchange, to inadvertent energy or to sales. It also shows Joint Account Purchases allocated to each Operating Company based on Responsibility Ratios. Toward the end of Attachment 1 is a one-page summary of the allocation of the total kWh for each Operating Company and for the total System and a summary listing the allocation to each Operating Company of purchases made during the month.

Attachment 2 is a summary, by Operating Company, of the kWh and the associated cost of the sources furnishing energy to the Exchange during that month. Only Operating Companies furnishing Exchange energy during the month are included in this section of Attachment 2. Following the summary of sources by each Operating Company furnishing energy to the Exchange is a summary, by Operating Company, of the allocations of energy from the Exchange during the month. This page lists each Operating Company, the kWh allocated to it during the month, the total dollars charged for those allocations, and the average cost of the kWh allocated. Each Operating Company that is allocated Exchange energy in a given hour pays the same price per kWh for that energy; however, this summary is prepared on a monthly basis, so the dollars per kWh paid by each Operating Company will necessarily be different. For

example, consider the following data contained in Attachment 2 in the July 2010 ISB that is attached as Exhibit PJC-2.

| Figure PJC-2 July 2010 | | | |
|---|---|---|---|
| Company | KWh | Charge ($) | Average Charge (mills/KWh) |
| EAI | 131,563,443 | 8,545,539.76 | 64.95 |
| ELL | 42,272,082 | 2,134,170.65 | 50.49 |
| EMI | 165,417,337 | 10,587,664.98 | 64.01 |
| ENOI | 45,025,369 | 2,623,552.75 | 58.27 |
| EGSL | 8,681,301 | 328,900.36 | 37.89 |
| ETI | 328,392,353 | 19,143,734.58 | 58.30 |
| **Total** | 721,351,885 | 43,363,563.08 | 60.11 |

Note:  Dollars may not add due to rounding.

As may be seen, the use of averages can be misleading.  The average cost for the total of all of the Operating Companies for this month is $60.11/MWh.  ELL, ENOI, EGSL, and ETI pay less than the average cost, but EAI and EMI pay more.  However, in each of the hours comprising the average, each Operating Company allocated energy from the Exchange paid exactly the same price for that energy.

The next page shows the energy amounts sold to each Operating Company under service schedule MSS-4.  At the end of Attachment 2 is a summary of the kWh and dollars allocated to each Operating Company from the Arkansas Electric Cooperative Corporation ("AECC") excess energy purchase.  The kWh from this purchase are allocated using the previous month's responsibility ratio, as specified in the Entergy System Agreement.

Attachment 3 relates to off-system Joint Account Sales. Attachment 3 lists the purchasing entity, type of sale, total kWh sold, total dollars charged, and the average cost for each sale. Next is a listing of the sources used by each Operating Company to supply the off-system Joint Account Sales during the month, the kWh supplied, and the cost that the Operating Companies were credited for having supplied the energy. Next is a summary of the off-system Joint Account Sales, sources supplying the sales. The next page reflects revenue from the sales and the calculated net balance, profit or loss, from the sales.

Attachment 4 shows the monthly coincident peak loads for the previous twelve months and shows the calculation of responsibility ratios.

Attachment 5 reflects the owned or contracted MW ratings for each Operating Company. These ratings are approved by Entergy's Operating Committee for the purpose of calculating Reserve Equalization (MSS-1).

Attachment 6 is a summary of transactions for each of the Operating Companies. It shows the Purchases and Sales from Associated Companies, including Exchange energy and dollars and Unit Power Purchases, Sales to Non-Associated Companies (Joint Account Sales), Purchases from Non-Associated Companies (Joint Account Purchases), and Other Revenues or Costs, including Transmission Service Revenue.

Attachment 11 is a monthly summary of the joint account purchases by Seller and Contract Name/Type indicating the net payable

for each Operating Company. Each entry shows the breakdown of energy, dollars, and an average cost of the purchase(s) by Operating Company. Attachment 11 also shows the allocation of capacity charges for purchased power contracts by contract and by Operating Company.

Attachment 12 is a summary of the fiber optics equalization. Billings under this Attachment are not part of the Entergy System Agreement, and are included in the ISB only as a convenience.

Q.   IS IT YOUR OPINION THAT THE ISB PROPERLY IMPLEMENTS THE ALLOCATION OF COSTS PURSUANT TO THE ENTERGY SYSTEM AGREEMENT?

A.   Yes, the ISB properly implements the FERC-approved allocation of costs among the Operating Companies as specified in the Entergy System Agreement.

Q.   CAN THE COSTS ALLOCATED THROUGH THE ISB BE REVISED SOLELY FOR THE BENEFIT OF A SINGLE OPERATING COMPANY OR JURISDICTION?

A.   Any revision to the allocation of energy and/or costs reflected in an ISB will necessarily affect the other Operating Companies. It is my understanding that FERC is the only regulatory authority with jurisdiction to review the multi-jurisdictional effects of such a revision.

## III.   THE ENERGY AND FUEL MANAGEMENT CLASS OF COSTS

Q.   WHAT IS THE RELATIONSHIP BETWEEN THE SPO ORGANIZATION AND THE ENERGY AND FUEL MANAGEMENT CLASS OF SERVICES THAT YOU SPONSOR?

A.   Exhibits PJC-3 and PJC-4 show the division of affiliate classes.   The Generation Function is one of the Functions in the Operations Family of affiliate services (Exhibit PJC-3) and the Energy and Fuel Management Class falls within the Generation Function (Exhibit PJC-4).   Within ESI's organizational structure, all of the Test Year expenses relating to the Energy and Fuel Management Class of services relate to tasks performed by the SPO organization.   Furthermore, the SPO is the only organization within ESI or Entergy that performs the services included in this class.

Q.   DO YOU SPONSOR ANY OF ETI'S NON-AFFILIATE COSTS?

A.   Not with respect to the Operations & Maintenance ("O&M") services and costs that I sponsor.   Those services, the personnel performing those services, and the associated costs are entirely associated with ESI.   ETI does not provide or contract on its own for any of the services I describe; rather, ETI and the other EOCs receive these services solely from ESI and, more specifically, from the SPO organization.  The capital costs that I sponsor contain affiliate costs as well as non-affiliate costs, which the SPO organization procures for ETI.

Q. WILL YOU BE ADDRESSING THE COSTS OF THE FUEL, ENERGY AND CAPACITY PRODUCTS PROCURED BY THE SPO ORGANIZATION ON BEHALF OF ETI?

A. No. My testimony addresses only the services provided by SPO for ETI (and certain capital expenditures associated with those services), which services, as described below, include the procurement of energy, fuel and capacity products for the EOCs (including ETI); however, the reasonableness of the costs for such energy, fuel and capacity products is addressed by other witnesses.

Q. PLEASE EXPLAIN HOW THE REMAINING PARTS OF YOUR TESTIMONY ADDRESSING AFFILIATE COSTS ARE ORGANIZED.

A. Section III.A of my testimony provides a brief description of the SPO organization. In Section III.B, I summarize the total O&M affiliate charges for the Energy and Fuel Management Class. In Section III.C, I explain why the costs in this class are necessary. Section III.D explains why these affiliate costs are reasonable, why they meet the "not higher than" standard, and why they represent the actual cost of providing these services. Section III.E addresses the Energy and Fuel Management-related Capital Additions.

A.     The SPO Organization

Q.     WHERE DOES THE SPO FIT INTO ENTERGY'S UTILITY GROUP OPERATIONS?

A.     System Planning & Operations is one of several operating departments that compose the Utility Operations Group. During the Test Year, the SPO, led by the Vice President, System Planning and Operations, was staffed by 117 ESI employees who provided services to the EOCs.

Q.     PLEASE PROVIDE AN OVERVIEW OF THE PURPOSE AND ORGANIZATION OF THE SPO.

A.     All employees of the SPO organization, which provides the services associated with the Energy and Fuel Management Class of services, are employed to accomplish three distinct, but interrelated tasks.

First, the SPO acquires fuel and fuel transportation services for the EOCs' fossil-fueled generating units. The SPO also procures wholesale purchased power for the EOCs. The fuel purchasing task is one that any utility which operates generating facilities must perform—someone must negotiate for and buy fuel and then arrange for its delivery to the power plants. The SPO performs that function for the Entergy System. Similarly, every utility has the choice of generating power for itself or buying it from others, and if the choice is to purchase power, someone must negotiate the terms and conditions of power contracts and arrange for the delivery of the purchased power. The SPO performs these functions as agent for the

EOCs. Related to these very broad tasks are a variety of complex sub-tasks such as selling excess power when available and ensuring that invoices for power sales are issued and invoices for fuel and power purchases are paid and that contract terms and conditions are fulfilled. The SPO performs these tasks as well.

Second, the SPO dispatches the generation in the Entergy Control Area.[14] Every utility system is required by the North American Electric Reliability Council ("NERC") operating guidelines to either operate a Control Area or make arrangements to be included in a Control Area or a regional transmission organization. The Entergy System currently operates its own Control Area that consists of the service areas of all of the EOCs. The task of dispatching the generation (nuclear and non-nuclear) within Entergy's Control Area is performed by the SPO.

Third, the SPO plans for the future resource requirements of the Entergy System, and manages the procurement of limited and long-term resources pursuant to those plans. Every utility must consider future system requirements and determine the kinds of resources that it will need in order to meet its prospective obligation to provide reliable and economic power to its customers, and then must procure the supplemental resources identified in the plan. Additionally, regulators and other

---

[14] The control area is defined to be the geographic area over which the responsible agent is required to match supply to total electric demand at every instant of time, within a tolerance set by the NERC.

governmental organizations frequently require electrical utility systems to provide detailed information about their future plans. Someone must develop and implement resource plans and then prepare the documentation, supporting studies and related regulatory filings that are required. The SPO also performs these functions for the EOCs. All three tasks are distinct, but highly interrelated.

In order to accomplish these tasks, during the Test Year, the SPO was divided into seven groups, which are indicated in the organizational chart presented in Exhibit PJC-5. The individuals in charge of each of these groups report directly to the Vice President in charge of the SPO. The seven groups within the SPO, and a brief description of the services performed by each, are:

(1)  Energy Management Organization ("EMO"), which is responsible for planning for and procurement of short-term fuel and purchased power resources to meet customers' needs, and the dispatch of the entire Entergy Control Area generation fleet to provide reliable, economic electric service;

(2)  Asset Operations  group, which is responsible for the procurement of limited- and long-term supply resources to meet the electric utility needs of the Entergy System and the  responsibility for coal commodity and transportation contracts for  the System's coal plants;

(3)   Planning Analysis group, which is responsible for long-term planning and analysis in support of additional resources required to provide reliable and economic electric service to the EOCs' customers;

(4)   Regulatory Affairs and Energy Settlements group, which is responsible for providing business, compliance and regulatory support services to the SPO, developing and managing SPO's budget and cost control initiatives, ensuring that SPO's activities are compliant with the Sarbanes-Oxley Act, and administering the Intra-System Bill associated with the Entergy System Agreement;

(5)   Project and Performance Management group, which is responsible for coordinating the development of SPO's business plan and key performance measures, managing the Entergy Continuous Improvement initiative for SPO, overseeing internal approval processes for major SPO projects, and performing special projects as needed;

(6)   Strategic Initiatives group, which is primarily responsible for activities associated with SPO's evaluation of future operating environments, including the benefits of participating in an RTO and now, membership in and the transition of the Entergy System to MISO; and

(7)   Power Delivery and Technical Services group which is responsible for managing the SPO's evaluation of transmission deliverability

associated with existing or new generating facilities, and managing the SPO's transmission service agreements.

A more detailed description of the services provided by each of these groups and their necessity to ETI's responsibilities as a bundled electric utility are further described below.

B.    Overview of Costs – Energy and Fuel Management Class

Q.    WHAT ARE THE TOTAL ETI ADJUSTED TEST YEAR CHARGES FOR THE ENERGY AND FUEL MANAGEMENT CLASS THAT YOU SPONSOR?

A.    As shown in Table 1 below, the total affiliate charges for the Energy and Fuel Management Class that I sponsor are $3,742,314.  The table shows the following information:

| | |
|---|---|
| **Total Billings** | Dollar amount of total Test Year billings from ESI to all Entergy companies, plus the dollar amount of all other affiliate charges that originated from any Entergy company.  This is the amount from Column (C) of the cost exhibits PJC-A, PJC -B, and PJC -C. |
| **Total ETI Adjusted** | ETI's adjusted amount for electric cost of service after pro forma adjustments and exclusions. |
| **% Direct Billed** | The percentage of the ETI adjusted Test Year amount that was billed 100% to ETI. |
| **% Allocated** | The percentage of the ETI adjusted Test Year amount that was allocated to ETI. |

**Table 1:  Total ETI Affiliate Charges for the Energy and Fuel
Management Class for July 1, 2010-June 30, 2011**

| Class | Total Billings | Total ETI Adjusted | | |
|---|---|---|---|---|
| | | Amount | % Direct Billed | % Allocated |
| Energy and Fuel Management Class | $25,253,856 | $3,742,314 | 8.70% | 91.30% |

Q.      WHAT ARE THE MAJOR COST COMPONENTS OF THE CHARGES

FOR THE ENERGY AND FUEL MANAGEMENT CLASS?

A.      The major cost components are reflected in Table 2 below.

**Table 2:  Major Components of ETI Affiliate Charges for the Energy
and Fuel Management Class for July 1, 2010-June 30, 2011**

| Cost Component | Total ETI Adjusted | % of Total |
|---|---|---|
| Payroll and Employee Benefits | $2,901,624 | 77.5% |
| Outside Services | $300,650 | 8.0% |
| Office & Employee Expenses | $286,221 | 7.6% |
| Service Company Recipient | $254,236 | 6.8% |
| Other | $(417) | 0.0% |
| Total | $3,742,314 | 100% |

Q.      WHAT IS THE PURPOSE OF THIS TABLE AND ITS COST

CATEGORIES?

A.      I directly sponsor the costs shown in this table because they comprise the

Total ETI Adjusted amount for the Energy and Fuel Management Class for

the Test Year.  This breakout of costs provides an additional "view" of the

components of this class.  I also identify other witnesses in this case who

also support these costs because they address the corporate structures

and practices that underlie these costs. For example, the table demonstrates that 77.5% of the costs in the Energy and Fuel Management Class are labor-related costs (Payroll and Employee Benefits). Company witness Kevin G. Gardner discusses ESI's overall payroll and benefits-related structure and practices. "Outside Services" reflect the services provided by non-Entergy employees and firms, such as the independent monitors overseeing resource procurement processes. "Office and Employee Expenses" includes: office and general expenses (*e.g.*, paper, postage, and other general office expenses); employee expenses (*e.g.*, car mileage, local travel expenses, training and business travel airfare); moving and relocation expenses (*e.g.*, costs to relocate new and/or existing employees to new job locations); telecommunications expenses (*e.g.*, long distance telephone charges, conference calls, and cellular phone expenses); and rent expenses for ETI. These types of costs are addressed in more detail by Company witness Thomas C. Plauché. Finally, the costs for "Service Company Recipient," which are services that ESI provides to itself, are in turn spread to all affiliates that receive ESI services. Company witness Stephanie B. Tumminello explains this service company recipient process. Other miscellaneous costs and credits are included in the "Other" cost components. My testimony addresses the necessity and reasonableness of the amounts for these costs.

Q. PLEASE DESCRIBE THE EXHIBITS THAT SUPPORT THE INFORMATION INCLUDED IN TABLE 1 HEREIN.

A. Attached to my direct testimony are exhibits showing the calculation of the Total ETI Adjusted amount for the Energy and Fuel Management Class. In Exhibit PJC-A, the information is shown broken down by the departments comprising the class. Exhibit PJC-B shows the same information broken down by project code and by the billing method assigned to each project code. Exhibit PJC-C shows the information by class, department and project code. For each exhibit, the amounts in the columns represent the following information:

| Column (A) – Support | Dollar amount of total Test Year billings and charges from ESI to all Entergy Business Units, plus the dollar amount of all other affiliate charges to ETI that originated from any Entergy Business Unit. |
|---|---|
| Column (B) – Service Company Recipient | Dollar amount that was included in the service company recipient allocation. Service company recipient charges are the cost of services that ESI provides to itself, which in turn are charged to affiliates that receive those services. The service company recipient allocation process is described in the testimony of Company witness Tumminello. |
| Column (C) – Total | Represents the sum of Columns (A) and (B). |
| Column (D) – All Other Business Units | That portion of Column (C) that was billed and charged to Business Units other than ETI. |
| Column (E) – ETI Per Books | Represents the difference between Columns (C) and (D). |

| | |
|---|---|
| Column (F) – Exclusions | Represents amounts that are excluded from ETI electric cost of service. The exclusions are described in the testimony of Company witness Tumminello. |
| Column (G) – Pro Forma Amount | Pro Forma Amounts include adjustments for known and measurable changes, and corrections. |
| Column (H) – Total ETI Adjusted | ETI adjusted amount requested for recovery in this case for this class (Column (E) plus Columns (F) and (G)). |

In her direct testimony, Ms. Tumminello describes the calculations that take the dollars of support services in Column (E) to the Total ETI Adjusted Numbers shown in Column (H).

Q.     PLEASE DESCRIBE THE "EXCLUSIONS" COLUMN SHOWN IN YOUR EXHIBITS PJC -A, PJC -B, and PJC -C.

A.     This column includes items charged to capital accounts, below the line accounts and other balance sheet accounts. These excluded amounts are discussed in the direct testimony of Company witness Tumminello.

Q.     ARE THERE ANY PRO FORMA ADJUSTMENTS APPLICABLE TO THIS AFFILIATE CLASS?

A.     Yes. Pro Formas and their sponsoring witnesses are shown in Exhibit PJC-D.

Q. PLEASE DESCRIBE THE TYPES OF SERVICES PROVIDED BY THE SPO AND INCLUDED IN THE ENERGY AND FUEL MANAGEMENT CLASS OF SERVICES.

A. Generally, the SPO provides services related to making, accounting for, and defending decisions regarding the procurement of new generation, decisions regarding which System generating units are to be committed and operated, how those units are operated, and how much wholesale energy and fuel is purchased.

As previously discussed, seven major groups comprise the SPO: EMO; Asset Operations; Planning Analysis; Regulatory Affairs and Energy Settlements; Power Delivery and Technical Services; Project and Performance Management; and Strategic Initiatives.

### C.   Necessity of Services

Q. WHAT DOES THE EMO DO?

A. The EMO is responsible for planning for and procuring short-term resources to meet customers' needs, and the dispatch of the entire Entergy Control Area generation fleet to provide reliable, economic electric service. The EMO includes the following major sections and functions:

- The Operations Planning section, which is responsible for the development of monthly, weekly and daily energy plans, as well as the development of generating unit commitment plans, and

maintenance schedules, to ensure that reliable and economic supplies of energy are available to the System on a daily basis.

- The Gas, Oil, and Wholesale Power sections, which deal with gas and oil procurement and ensures that the utility's gas and fuel oil supply and transportation agreements are administered in an effective and efficient manner. This section purchases natural gas and fuel oil for delivery to the Entergy System's generating plants that consume natural gas and/or fuel oil. During the Test Year, the Gas and Oil Supply section procured 151.3 million MMBtus of natural gas for ETI's generating plants.[15]

  The Wholesale Power section also continuously monitors bulk power markets in order to purchase short term energy when such power is available at a lower cost than the cost of self-generation and to seek opportunities to sell energy off-system for all time periods other than the current 24 hours, which is the responsibility of the Generation Dispatch and Current Day Marketing function. During the Test Year, the Power Marketing section supported the procurement of over 27.7 million MWh of wholesale power on behalf of ETI.[16]

---

[15]   See Schedule I-16.1.

[16]   See Schedule H-12.4a-g.

- The Power Transactions & Dispatch section, which is responsible for meeting projected electric demand reliably and at the lowest reasonable cost. Specifically, this section dispatches available generation capacity and other resources to meet the Entergy System's real-time electric demand. This section is also responsible for marketing of excess generation and purchasing additional resources on a real-time basis.

  During the Test Year, the Power Transactions & Dispatch section was responsible for the commitment and dispatch of approximately 3,500 MW of ETI-owned or ETI-allocated capacity on a coordinated basis with the capacity owned by the other EOCs.

- The Operations Support section, which provides support of various planning and regulatory issues that affect real-time dispatch and operations.

Q. ARE THE SERVICES PROVIDED BY THE EMO NECESSARY?

A. Yes. It is common practice for those utilities that operate a Control Area or procure electric energy from wholesale resources to employ a short term planning function, a dispatch function and a power marketing function in order to achieve the goal of meeting such utility's projected electric demand reliably and at the lowest reasonable cost. Furthermore, it is also common practice for those utilities that operate gas- and oil-fired power plants to have a gas and oil supply function in order to meet their

projected gas and oil demand and to ensure that such utility's gas and fuel oil supply and transportation agreements are administered in an effective and efficient manner.

Q.    WHAT DOES THE ASSET OPERATIONS GROUP DO?

A.    This group is responsible for the procurement of limited- and long-term fuel and generation resources to meet the electric utility needs of the Entergy System.  The Asset Operations group is responsible for the formal Requests for Proposals ("RFP") process by which the Entergy System solicits proposals for purchased power agreements or acquires new or existing power plants.  This group also negotiates bi-lateral purchased power agreements when such opportunities arise.  Finally, the group also has the responsibility for dealing with issues under the fuel provisions of the Joint Ownership and Operating Agreement governing the Big Cajun II, Unit 3 generating unit.

During the Test Year, the Asset Operations group was responsible for executed agreements procuring 660 MW of limited- and long-term wholesale power which was allocated either in whole or in part to ETI. Additionally, the Asset Operations group was also responsible for significant activity outside of the Test Year that affected power purchases during the Test Year, as discussed in the testimony of Company witness Robert R. Cooper.

The Asset Operations group is also responsible for the procurement of coal for the EOCs' coal-fired power plants, administering coal supply contracts and managing the maintenance of the rail car fleet leased by EGSL and EAI, including the transportation of coal to the Roy S. Nelson Power Plant near Lake Charles, Louisiana (in which ETI is a co-owner), and to the two other coal-fired power plants on the System – the Independence Steam Electric Station and the White Bluff Steam Electric Station in Arkansas.

During the Test Year, this group procured the coal supply and arranged the transportation of approximately 2.4 million tons of coal that were delivered to the Roy S. Nelson plant. Comparably, it also received approximately 1.0 million tons of coal during the Test Year for ETI and EGSL's share of the output of Big Cajun II, Unit 3.

Q.    ARE THESE SERVICES NECESSARY?

A.    Yes. Integrated utilities procure limited- and long-term resources to meet the electric utility needs of their customers. It is common practice for utilities to utilize a competitive solicitation process when procuring purchased power or acquiring new or existing power plants to facilitate the utility's procurement of the resource at a reasonable price. It is also common practice for those utilities that operate coal-fired power plants to have a coal supply function in order to meet their projected coal demand and to ensure that such utility's coal supply, railcar maintenance, and coal

transportation agreements are administered in an effective and efficient manner.

Q.   WHAT DOES THE PLANNING ANALYSIS GROUP DO?

A.   The Planning Analysis group is responsible for planning for the long-term resource requirements necessary to provide reliable and economic electric service to the EOCs' customers.  That group ensures that the utility's generation and wholesale transactions resources are planned pursuant to consistent and accepted planning criteria.  Specifically, this group is responsible for the development of long-term Strategic Resource Plans, which result in the matching of the Entergy System's long-term projected load and resources.  In addition to the analysis of potential resource acquisitions, the Planning Analysis group performs long-term fuels planning and analysis, peak load forecasting and production cost forecasting.

During the Test Year, the Planning Analysis group developed capacity and energy plans that support ETI's objective to achieve the lowest reasonable energy costs for its customers consistent with the Entergy System Agreement and known and reasonably anticipated System conditions.

Q.   ARE THE SERVICES PROVIDED BY THE PLANNING ANALYSIS GROUP NECESSARY?

A.   Yes.  It is common practice for those utilities that have an obligation to provide reliable generation supplies to customers to employ a long-term planning and analysis function in order to achieve the goal of meeting such utility's projected electric demand at a reasonable cost and to ensure that such utility's generation and wholesale transactions resources are planned pursuant to consistent and accepted planning criteria.

Q.   WHAT DOES THE REGULATORY AFFAIRS AND ENERGY SETTLEMENTS GROUP DO?

A.   The Regulatory Affairs and Energy Settlements group is responsible for providing business and regulatory support services to the SPO, and, in turn, for the EOCs.  These services include bulk power energy accounting, administering the Intra-System Bill associated with the Entergy System Agreement and the administration and accounting related to wholesale energy and fuel invoices.

During the Test Year, fuel and electricity-related invoices totaling approximately $2.7 billion, were verified and processed by the Energy Analysis and Reporting section to ensure proper payment and/or billing. The group prepared numerous reports required by federal and state administrative agencies and assisted in the preparation of monthly estimated and actual accounting entries for ETI.  These services provide

benefits to ETI's customers by providing to internal and external groups accurate and timely fuel and energy data and invoice processing in a cost effective manner.

The Regulatory Affairs and Energy Settlements group also supports the filing requirements of various state and federal regulators, develops and manages SPO's budget, including the monitoring of related activities and costs, and identifies and implements cost control initiatives. Lastly, the Regulatory Affairs and Energy Settlements group monitors compliance with the electric reliability standards for SPO and ensures that SPO's activities are compliant with the Sarbanes-Oxley Act.

Q.   ARE THE SERVICES PROVIDED BY THE REGULATORY AFFAIRS AND ENERGY SETTLEMENTS GROUP NECESSARY?

A.   Yes. It is common practice for those utilities that operate power plants, buy and sell electricity, and operate in a multi-jurisdictional and multi-utility environment as part of a larger combined system concept, to maintain an organization to provide: (1) business and regulatory support services; (2) bulk power energy accounting; (3) administration of billing associated with the combined system; (4) administration and accounting related to wholesale energy and fuel invoices, for the purpose of enhancing the efficiency and effectiveness of the other fuel, energy and dispatch related functions and (5) a compliance function to ensure compliance with the electric reliability standards.

As part of the overall management of SPO's fuel and energy management activities the budgeting and cost control measures provided by the SPO Regulatory Affairs and Settlements group helps ensure the reasonableness and necessity of the costs incurred and that such expenditures are managed within the approved budget.

Q.    WHAT DOES THE PROJECT AND PERFORMANCE MANAGEMENT GROUP DO?

A.    The Project and Performance Management group is responsible for

- coordination of the development of SPO's business plan and key performance measures; and

- oversight of the internal approval processes for major SPO projects and performing special projects as needed.

This group is also responsible for overseeing the Entergy Continuous Improvement ("ECI") initiative for SPO that I discuss later in my testimony.

Q.    ARE THESE SERVICES NECESSARY?

A.    Yes.  The efficient and cost effective performance of the necessary fuel and energy management activities enumerated earlier in my testimony requires attention to the performance measures provided by the SPO Project and Performance Management group.

Q.    WHAT DOES THE STRATEGIC INITIATIVES GROUP DO?

A.    This group was formed for the purpose of focusing on and supporting several key initiatives facing the regulated Operating Companies, primarily the activities related to the evaluation of future operating environments, including the benefits of participating in an RTO, and now, membership in and the transition of the Entergy System to MISO.

Q.    ARE THESE SERVICES NECESSARY?

A.    Yes. The System's decision to join an RTO – specifically, MISO – has far-reaching implications for how the Operating Companies will plan and operate their generation systems. The Strategic Initiatives group is responsible for evaluating issues and situations that will affect future operations, and the Strategic Initiatives group will play a key role in ensuring ETI's future operations are consistent with reliable and economic service.

Q.    WHAT DOES THE POWER DELIVERY AND TECHNICAL SERVICES DO?

A.    The Power Delivery and Technical Services group is responsible for managing the SPO's evaluation of transmission deliverability associated with existing or new generating facilities, and managing the SPO's transmission service agreements.

Q.    ARE THESE SERVICES NECESSARY?

A.    Yes.  The separation of the merchant and transmission functions directed by the FERC requires that the SPO have the ability to study and manage transmission service associated with the System's existing and proposed generating resources.


      D.    Reasonableness of Energy and Fuel Management Charges

Q.    PLEASE DESCRIBE THE STAFFING LEVELS ASSOCIATED WITH THE ENERGY AND FUEL MANAGEMENT CLASS OVER THE PERIOD 2008 THROUGH THE TEST YEAR.

A.    SPO's staffing levels for 2008, 2009. 2010 and the Test Year is reflected in Table 3 below.  The increase in Test Year staffing levels over 2008 and 2009 is consistent with the addition of the new Strategic Initiatives group as well as the addition of a dispatcher position in the EMO group, required by an increased workload in the Power Transactions and Dispatch section.

**Table 3:  SPO Headcount**

| **2008** | **2009** | **2010** | **Test Year** |
|----------|----------|----------|---------------|
| 110      | 115      | 116      | 118           |

Q.   HAS SPO PERFORMED ANY BENCHMARKING TO SUPPORT THE REASONABLENESS OF ITS COSTS?

A.   No, but as discussed by Company witness Jeanne F. Kenney, the Company has provided benchmarking analysis of both non-production O&M costs, including A&G costs, which include SPO costs. This high level view further supports the reasonableness of costs in the Energy and Fuel Management Class.

Q.   WHAT WERE THE ACTUAL COST TRENDS FOR THE ENERGY AND FUEL MANAGEMENT CLASS FOR THE LAST THREE YEARS AS COMPARED TO THE TEST YEAR?

A.   Table 4 below presents the total affiliate O&M costs for the class as a whole for the last three years and the Test Year.

**Table 4: ESI Energy and Fuel Management Cost Trends**

| 2008 | 2009 | 2010 | Test Year |
|---|---|---|---|
| $3,072,925 | $3,527,979 | $3,140,089 | $3,736,054 |

Q.   DO THE FIGURES IN THIS COST TREND TABLE INCLUDE ALL COSTS INCURRED BY ESI FOR THE ENERGY AND FUEL MANAGEMENT CLASS DURING THE LISTED PERIODS?

A.   No. The ESI O&M cost trend figures have been adjusted primarily to exclude certain costs incurred by ESI to support efforts to spin off

Entergy's non-regulated nuclear operations because such costs are not representative of ESI's ongoing cost of supporting ETI utility service. Company witness Tumminello provides further explanation regarding the adjustments to the cost trend data in her direct testimony.

Q.    WHAT DO THESE COST TRENDS REFLECT?

A.    These cost trends reflect a reasonable increase in overall costs for the class from 2008 through the Test Year. The increase in Test Year costs over previous annual periods largely reflects new or increased costs associated with: (1) the new Strategic Initiatives group, including the addition of a new Vice President position to lead that group; (2) the considerable increase in compliance activity—required by federal law—for which SPO is responsible; and (3) the addition of a dispatcher position addressed above. In summary, Table 4 reflects a reasonable increase in SPO costs over recent years and a reasonable level of costs in the Test Year.

Q.    PLEASE DESCRIBE THE WORKLOAD FACED BY THE SPO.

A.    SPO workload continues to increase significantly and is appropriate to consider when evaluating the reasonableness of its overall costs. Efforts continue with respect to the transformation of the EOCs' generation portfolios and the procurement of additional resources. Since the last rate case, SPO has initiated and completed, or is in the process of conducting,

three RFPs—the Summer 2009 RFP, the 2010 Renewable RFP and, more recently, the ongoing 2011 Western Region RFP, which seeks a resource for 2017, already pre-allocated to ETI by the Entergy Operating Committee. Further, the Planning Analysis group currently forecasts the need to obtain even additional resources to serve the Western Region in 2020. Moreover, additional complexities continue to be added to SPO's functions due to the planned exit of EAI and EMI from the System Agreement, effective 2013 and 2015, and the recent announcement that the Entergy System will join MISO. Both of these future events require SPO's planning teams to consider and plan for a wider array of possible outcomes while the overall SPO organization prepares to incorporate new structures and processes. Finally, as is the case with other similarly situated utilities, SPO continues to face and respond to increases in regulatory compliance requirements and significant changes in environmental laws and regulations. This increasing workload further supports the reasonableness of costs in this class.

Q.   DOES THE SPO HAVE IN PLACE A BUDGETING PROCESS TO CONTROL COSTS?

A.   Yes. The SPO undergoes an extensive annual budget preparation and review process. Within this process, a proposed budget is finalized for the following year. As an input to the budget, the SPO is allocated a certain percentage increase in wages for the organization's employees. This

allows for the flexibility to reward individual performance in any given year, but also ensures that total labor costs continue to track labor market conditions. Further, non-labor costs are reviewed for necessity and cost effectiveness. Annual budgets are prepared within SPO, approved by SPO executive management, corporate management and, ultimately, the board of directors of Entergy Corporation.

Q. IS COMPLIANCE WITH THE BUDGET MONITORED?

A. Yes. SPO management continually monitors incurred expenses against budget, and frequently approves expenses prior to expenses being incurred. For example, the SPO management generally pre-approves employee training (*e.g.*, seminars, travel) prior to an employee's registration for such training. Likewise, most employee business travel is also discussed and approved by SPO management prior to travel costs being incurred. Additionally, on a monthly basis, the SPO expenditures are reviewed by executive management to ensure that they are on track with the annual budget. To the extent that there are deviations within the budget year, discretionary projects may either be advanced or postponed, with the approval of the SPO executive management, to ensure that the SPO expenditures are reasonable.

Q.   ARE SPO EMPLOYEES HELD ACCOUNTABLE FOR DEVIATIONS FROM BUDGET?

A.   Most employee expenses are pre-approved by the appropriate level of SPO management.   Any significant unbudgeted cost must be pre-approved by the Vice President, System Planning and Operations. Adherence to budget is a priority for all SPO staff.   Compliance with approved budgets is also included in the performance goals of the employees.

Q.   HAS SPO UNDERTAKEN OTHER MEASURES OR INITIATIVES TO ENSURE THAT ITS COSTS ARE REASONABLE?

A.   SPO, on an ongoing basis, actively seeks to discover new ways to improve processes within the organization through the Entergy Continuous Improvement ("ECI") initiative, a process which also is overseen by the Project and Performance Management group and which encourages employees to seek out areas where practices, processes and procedures related to their organizations can be improved upon to enhance effectiveness and efficiency.   Improvements identified through the ECI process often result in reduced costs.  During the Test Year, SPO, given its focus on buying both fuel and power for the EOCs, was successful in discovering and implementing a number of improvements that resulted in fuel and purchased power cost reductions, as presented in Schedule I-21. SPO also streamlined and automated a number of regular

work processes, allowing labor redeployment and reducing or delaying the need to increase O&M expenses to keep up with the increasingly demanding workload that I discussed earlier in my testimony.

E.      Billing of Energy and Fuel Management Charges

Q.    HOW ARE SPO'S COSTS BILLED TO ETI?

A.    Please refer to Exhibits PJC-B and PJC-C.  These exhibits show all the costs included in the Energy and Fuel Management Class by project code and reflect the ESI billing method assigned to each project code.

The affiliate billing process is explained by Company witness Tumminello. Where appropriate, costs are billed directly to ETI and other affiliates.  Costs that are billed directly to ETI reflect the fact that certain Energy and Fuel Management Class activities are for the specific benefit of ETI.  Only when incurred costs benefit more than one of the EOCs are such costs billed through an allocation.  With respect to the Energy and Fuel Management Class, some costs are billed to ETI through an allocation, which reflects the fact that more than one of the EOCs benefited from the services delivered.  Therefore, ESI costs are billed to ETI both directly and through various allocation methods.

Q.    ON WHAT BASIS ARE COSTS OF THESE ENERGY AND FUEL MANAGEMENT SERVICES BILLED?

A.    Each ESI affiliate class of service, including the Energy and Fuel Management Class, comprises one or more project codes. As Company witness Tumminello explains, only one billing method is assigned to each project code. Several organizations may bill to a single project code. However, the billing method for each project code remains the same, regardless of which organization charges to that project code. A billing method is selected based on cost causation. This procedure ensures that the price charged to ETI for the services is no higher than the price charged to other affiliates for the same or similar services, and represents the actual cost of the services.

Q.    PLEASE EXPLAIN WHAT IS REFERRED TO BY COSTS BEING "BILLED DIRECTLY" OR "ALLOCATED?"

A.    Affiliate charges are incurred by ETI when ESI employees or employees of other affiliate companies provide services to ETI. Affiliate costs are charged to ETI through one of two methods. The costs are either billed directly to ETI or the costs are allocated to ETI based on the primary cost driver of the activity or project. The SPO function has consolidated, on a system-wide basis, those activities that are common to all EOCs for which scale and scope efficiencies can be realized. I will use the example of Planning Analysis to explain whether an ESI charge will be billed directly

to ETI or allocated to ETI. If a Planning Analysis employee is working on a specific ETI project, such as a Texas fuel reconciliation, then ETI is the only EOC that benefits from this regulatory activity and all of the resulting costs will be billed directly to ETI. Conversely, if the same Planning Analysis employee was working on the Strategic Resource Plan for the Entergy System, all EOCs would benefit and the resulting costs would be allocated based on the primary cost driver – in this case, the load responsibility ratio. These rules apply to all of the work performed by SPO employees.

Q.   HOW DID SPO DETERMINE WHICH ENTITY SHOULD BE BILLED?

A.   As a necessary part of accurately apportioning costs to the various Entergy affiliates, a billing method is assigned to each project code that first identifies the entities to which the cost is to be apportioned. When a project code is established, a billing method is selected by SPO based on the factors driving SPO to incur the expense; these factors are frequently referred to as "cost drivers." The billing method that is initially assigned by the staff member is reviewed for appropriateness by SPO management. In addition, billing methods assigned to project codes also are reviewed periodically by budget coordinators and SPO management for appropriateness. Each SPO project code has only one billing method assigned to it and the billing method is selected to ensure that every affiliate receiving service receives the appropriate allocation. Therefore,

the costs of all services performed under a project code are allocated among the EOCs using the same criteria, at cost without profit or markup. The use of a single billing method for each project code ensures that all EOCs causing costs to be incurred and benefiting from the service pay an appropriate proportion of the costs. It also ensures that the EOCs are, in total, charged no more and no less than one hundred percent of the costs for services provided under the project code. Finally, the use of a single billing method, which is assigned based on cost causation principles, ensures that each EOC is paying the same price for the same service, and, that the prices charged to ETI are no higher than the prices charged by ESI to the other EOCs for similar services.

Q. PLEASE DESCRIBE THE PREDOMINANT BILLING METHODS EMPLOYED IN THE ENERGY AND FUEL MANAGEMENT CLASS OF SERVICES.

A. The predominant billing methods for the Energy and Fuel Management Class are "LOADOPCO" (Responsibility Ratio), "DIRECTTX" (100% to ETI), and "CAPXCOPC" (System Capacity without Coal). These three billing methods make up 94.49% of the billings to ETI for the Energy and Fuel Management Class. "LOADOPCO" makes up 81.12%; "DIRECTTX" makes up 8.70%; and "CAPXCOPC" makes up 4.67%. Of these three billing methods, "LOADOPCO" and "CAPXCOPC" allocate (rather than direct bill) costs to ETI through the allocation method.

Q.    WHY IS BILLING METHOD "LOADOPCO" APPROPRIATE FOR CERTAIN ENERGY AND FUEL MANAGEMENT EXPENSES ALLOCATED TO ETI?

A.    The majority of SPO services relate to the procurement, planning, commitment, and dispatch of the Entergy System's generating resources and its wholesale power transactions.  The need for SPO's services is driven by the necessity to obtain resources for the Entergy System as a whole and each EOC's need for such services is a part of and relative to the Entergy System's need for such services.  Accordingly, for the majority of SPO's services, it is appropriate to apportion the corresponding cost in a manner that relates the need of the EOC for resources to the need of the Entergy System as a whole.  "LOADOPCO," which is based upon the Responsibility Ratio (the ratio of each EOC's load at the time of the Entergy System peak load to the Entergy System's peak load),[17] accomplishes this.  For instance, Project Code F3PCW15830 captures cost associated with planning activities performed for the Entergy System and the EOCs.  Associated costs are driven by the load responsibility ration of each of the System's generating plants.  Accordingly, "LOADOPCO," which apportions cost based on load responsibility ratio, is an appropriate billing method for this type of project.

---

[17]    Responsibility Ratio is a defined allocator in the Entergy System Agreement.

Q. WHY IS BILLING METHOD "DIRECTTX" APPROPRIATE FOR THE ENERGY AND FUEL MANAGEMENT EXPENSES ALLOCATED TO ETI?

A. "DIRECTTX" bills cost 100% to ETI and is appropriate when the services performed relate directly to and benefit only ETI. For example, Project Code F3PPWET306 captures costs associated with the 2011 Western Region RFP as part of the resource planning process for ETI. The associated costs are caused by and are directly related to ETI, and are therefore assigned to ETI, pursuant to billing method DIRECTTX.

Q. WHY IS BILLING METHOD "CAPXCOPC" APPROPRIATE FOR CERTAIN ENERGY AND FUEL MANAGEMENT EXPENSES ALLOCATED TO ETI?

A. "CAPXCOPC" is based on the power level, in kilowatts, that could be achieved if all non-coal and non-nuclear generating units were operating at maximum capability simultaneously. It is appropriate to use this billing method when the cost for SPO services relate to an EOC's ownership of non-coal and non-nuclear generation. For instance, Project Code F3PCW18100 captures costs associated with payroll and office expenses incurred in the planning and purchase of gas and oil for operating the System's natural gas and oil-fired power plants. Billing Method "CAPXCOPC" was selected for this project code because the corresponding costs related to SPO's services under this project are driven by the amount of natural gas and oil capacity owned by an EOC.

Q.  YOU HAVE ADDRESSED THE DIRECT COSTS AND ALLOCATED COSTS USED TO BILL 94.49% OF THE TOTAL ETI ADJUSTED AMOUNT ASSOCIATED WITH THE ENERGY AND FUEL MANAGEMENT CLASS. WHY HAVE YOU NOT SPECIFICALLY ADDRESSED THE REMAINING 5.51% OF THE COSTS OF THIS CLASS?

A.  The remaining costs are billed through a number of other project codes and billing methods. Given the number of billing methods, project codes and relative dollar amounts, I have not gone into detail in this discussion in an effort to keep the discussion at a manageable level. However, the project codes and billing methods used to bill the remaining 5.51% of the costs in this class are provided in my Exhibits PJC-B and PJC-C. A reader may reference these exhibits and then refer to the specific project code summary contained in exhibits to the testimony of Company witness Tumminello for a discussion of the particular billing method used and the cost drivers for the activities captured in the particular project code.

Q.  HAVE YOU DETERMINED THAT THE COSTS REFLECTED IN THE REMAINING 5.51% OF COSTS ASSOCIATED WITH THIS CLASS HAVE BEEN BILLED APPROPRIATELY?

A.  Yes, I have reviewed each of the project codes and the associated billing methods used to bill the remaining 5.51% of the costs of this class. The cost drivers reflected in the billing method used to bill the costs of each

project code are consistent with and reflect the cost drivers of the services captured in each respective project code. Therefore, the costs billed to ETI reasonably reflect the costs of the services received by ETI and are no higher than the costs charged to other EOCs for the same or similar types of services.

Q. DO ANY OTHER ENTITIES DUPLICATE THE ENERGY AND FUEL MANAGEMENT CLASS OF SERVICES?

A. No. The SPO is the only group within Entergy that provides the Energy and Fuel Management Class of services. ETI does not duplicate these services.

### F.    Summary of SPO Capital Charges

Q. ARE YOU SUPPORTING ANY CAPITAL ADDITIONS INCLUDED IN THE COMPANY'S REQUEST IN THIS PROCEEDING?

A. Yes. I am supporting the Company's request for $219,406 in capital charges associated with SPO-related services. These capital projects were closed to plant in service during the period July 2009 through June 2011 and are reasonable and necessary costs incurred for projects that are used and useful in providing electric service. A detail of these charges and the corresponding projects to which these charges were assigned, are listed on Exhibit PJC-6, which reflects the following information:

| Column A | Project Code Number |
|---|---|
| Column B | Project Code Description |
| Column C | Asset Class |
| Column D | In-service Date |
| Column E | Asset Location Description |
| Column F | State Location |
| Column G | Business Unit ("BU") |
| Column H | Non-Affiliate Charges Excluding Capital Suspense and Reimbursements |
| Column I | Reimbursements |
| Column J | Represents capital suspense overhead costs associated with administrators, engineers and supervisors to the capital projects for which they provide services. Each function charges their capital suspense to a "Capital Suspense" project, which is then allocated out to the appropriate capital projects. Capital Suspense costs and the subsequent allocation is separated by BU and function combination to more accurately match such costs on the actual projects worked on for each function within a BU. |
| Column K | Represents the portion of capital suspense overhead costs (in Column J) from an affiliate. |
| Column L | Represents the portion of capital suspense overhead costs (in Column J) that are charged to the project by ETI employees. |
| Column M | Represents charges incurred by the ESI service company and allocated out to the appropriate BUs based on the ESI billing method assigned to the project plus loaned resource charges incurred at one BU and charged to another BU for services rendered on behalf of that BU. |

Column N        Represents the total affiliate portion of the charges included in Column O, and is the total of Columns K, and M.

Column O        Represents the total amount of capital additions closed to plant in service.

All of these costs relate to the capitalization of IT projects and research and data services and modeling tools that support SPO's activities.

Q.    PLEASE DESCRIBE THE CAPITAL PROJECTS THAT YOU SPONSOR AS PART OF THE ENERGY AND FUEL MANAGEMENT CLASS.

A.    The 11 Project Codes shown on Exhibit PJC-6 are all IT capital projects and research and data services and modeling tools that are related to dispatch and operations.

These capital projects relate to and support EMO's dispatch and operation responsibilities to meet projected electric demand reliably and at the lowest reasonable cost, including, for example, enhancements to various data systems and the development of tools to maintain compliance with the Sarbanes-Oxley Act.

Q.    ARE ANY AFFILIATE COSTS INCLUDED IN THE REQUESTED CAPITAL CHARGES?

A.    Yes, the necessary affiliate costs totaled $125,383 for SPO capital projects shown in Column N of Exhibit PJC-6.

Q.    WHY ARE AFFILIATE COSTS NECESSARY IN THE DEVELOPMENT OF SPO IT APPLICATIONS?

A.    These costs are the result of employees of ESI (or an outside contractor of ESI) providing design, implementation and project management services for the various SPO IT capital projects. These charges are necessary in order to design and implement IT systems that meet the needs of Entergy System customers, including customers of ETI.

Q.    WHAT TYPES OF COSTS ARE INCURRED FOR THESE CAPITAL PROJECTS?

A.    Expenses incurred as part of a capital project include equipment, software, materials, supplies and any labor required to complete the project. All costs are subject to the budget and cost control processes I describe above. The ESI labor costs are generally similar to those incurred as O&M expense except that the labor is directly related to the capital project, and the cost is capitalized as part of the total project cost. These affiliate charges are reasonable for the same reasons discussed above, are billed to ETI pursuant to the same principles and practices previously discussed in my testimony and are at cost and are no higher than the charges made to other affiliates for the same or similar services.

IV.    <u>CONCLUSION</u>

Q.    DOES THIS CONCLUDE YOUR DIRECT TESTIMONY?

A.    Yes.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 1
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

# ENTERGY
## System Agreement

### Agreement Among:

Entergy Arkansas, Inc.
Entergy Gulf States Louisiana, L.L.C.
Entergy Louisiana, LLC
Entergy Mississippi, Inc.
Entergy New Orleans, Inc.
Entergy Texas, Inc.
Entergy Services, Inc.



| | | | |
|---|---|---|---|
| Issued by: | Kimberly Despeaux | Effective: | November 22, 2008 |
| | Associate General Counsel | | |
| Issued on: | November 21, 2008 | | |

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94      Original Sheet No. 2
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

AGREEMENT

Among

ENTERGY ARKANSAS, INC.
ENTERGY GULF STATES LOUISIANA, L.L.C.
ENTERGY LOUISIANA, LLC
ENTERGY MISSISSIPPI, INC.
ENTERGY NEW ORLEANS, INC.
ENTERGY TEXAS, INC.
ENTERGY SERVICES, INC.

Issued by:     Kimberly Despeaux                        Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 3
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## INDEX

                                                                        Sheet No.

Preface.................................................................................................................. 4

Article I            Term of Agreement................................................................ 6

Article II           Definitions ........................................................................... 7

Article III          Objectives .......................................................................... 13

Article IV           Obligations ........................................................................ 16

Article V            Composition and Duties of the Operating Committee ..... 23

Article VI           System Operations Center ................................................ 27

Signatory            ........................................................................................... 29

Service Schedule MSS-1
                     Reserve Equalization ........................................................ 30

Service Schedule MSS-2
                     Transmission Equalization................................................. 38

Service Schedule MSS-3
                     Exchange of Electric Energy Among the Companies........ 44

Service Schedule MSS-4
                     Unit Power Purchase.......................................................... 61

Service Schedule MSS-5
                     Distribution of Revenue from Sales Made for the Joint Account
                     of All Companies ............................................................... 71

Service Schedule MSS-6
                     Distribution of Operating Expenses of System Operations Center .. 74

Service Schedule MSS-7
                     Merger Fuel Protection Procedure ..................................... 76

Issued by:      Kimberly Despeaux                    Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 4
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## AGREEMENT

### Among

### ENTERGY ARKANSAS, INC.
### ENTERGY GULF STATES LOUISIANA, L.L.C.
### ENTERGY LOUISIANA, LLC
### ENTERGY MISSISSIPPI, INC.
### ENTERGY NEW ORLEANS, INC.
### ENTERGY TEXAS, INC.
### ENTERGY SERVICES, INC.

THIS AGREEMENT, first made and entered into on the 23rd day of April 1982, and subsequently amended, is by and among Entergy Arkansas, Inc., herein-after called EAI; Entergy Gulf States Louisiana, L.L.C., herein-after called EGSL or Gulf States Louisiana; Entergy Louisiana, LLC, hereinafter called ELL; Entergy Mississippi Inc., hereinafter called EMI; Entergy New Orleans Inc., hereinafter called ENOI; Entergy Texas Inc., hereinafter called ETI, and Entergy Services, Inc., hereinafter called Services, all of whose common stock is wholly owned by Entergy Corporation, hereinafter called Parent Company.

### WITNESSETH

0.01 WHEREAS, EAI, EGSL, ELL, EMI, ENOI, and ETI hereinafter called Companies, are the owners and operators of electric generation, transmission and distribution facilities with which they are engaged in the business of generating, transmitting and selling electric energy to the general public and to other electric distributing agencies; and

| | | | |
|---|---|---|---|
| Issued by: | Kimberly Despeaux | Effective: | November 22, 2008 |
| | Associate General Counsel | | |
| Issued on: | November 21, 2008 | | |

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 5
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

0.02 WHEREAS, Services is an associated Service Company acting as the Agent for the Companies under the terms of the Middle South Utilities System Agency Agreement and the Middle South Utilities System Agency Coordination Agreement dated the 11th day of December 1970; and

0.03 WHEREAS, the Companies have been achieving substantial benefits for their customers by operating within the framework of an interconnection agreement dated April 11, 1973; and

0.04 WHEREAS, the individual Companies are interconnected by transmission lines and operated as a coordinated system from a central dispatching center; and

0.05 WHEREAS, technological progress and changed economic conditions have necessitated the updating of the aforementioned interconnection agreement to continue to obtain the maximum benefits for them and their respective customers;

NOW THEREFORE, the Parties hereto mutually understand and agree as follows:

Issued by:        Kimberly Despeaux                         Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 6
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## ARTICLE I

## TERM OF AGREEMENT

1.01 This Agreement shall become effective on <u>August 1, 1982,</u> or such later date as may be fixed by any requisite regulatory approval or acceptance for filing and shall continue in full force and effect until terminated by mutual agreement of the Companies. Notwithstanding this, any Company may terminate its participation in this Agreement by ninety-six (96) months written notice to the other Companies hereto; and effective upon and after the date of implementation of retail open access in Texas, ETI shall terminate its participation in this Agreement, except as to Service Schedule MSS-2 (Transmission Equalization), consistent with Section 2.02 below.

1.02 This Agreement shall supersede the agreement listed below: Agreement among Arkansas Power & Light Company, Arkansas-Missouri Power Company, Louisiana Power & Light Company, Mississippi Power & Light Company, New Orleans Public Service Inc. and Middle South Services, Inc. dated the 16th day of April 1973 in FPC Docket No. E-8130 as amended in FERC Docket No. ER79-277, FERC Docket No. ER80-366, and FERC Docket No. ER 81-405.

1.03 This Agreement will be reviewed periodically by the Operating Committee to determine whether revisions are necessary to meet changing conditions.  In the event that revisions are made by the parties hereto, and after requisite approval or acceptance for filing by the appropriate regulatory authorities, the Operating Committee will thereafter, for the purpose of ready reference to a single document, prepare for distribution to the Companies an amended document reflecting all changes in and additions to this Agreement with notations thereon of the date amended.

Issued by:     Kimberly Despeaux                    Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                     Original Sheet No. 7
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## ARTICLE II

## DEFINITIONS

For the purpose of this Agreement and of the Service schedules which are a part hereof, the following definitions shall apply:

2.01 Agreement shall be this Agreement together with all attachments and service schedules applying thereto and any amendments made hereafter.

2.02 Company shall be one of the Entergy System Operating Companies (EAI, ELL, EMI, ENOI, EGSL, ETI).

2.03 Parent Company shall be Entergy Corporation.

2.04 Agent shall be Entergy Services, Inc. which shall act as Agent for one or more of the Companies whenever appropriate.

2.05 System shall be the interconnected coordinated systems of the Companies.

2.06 Operating Committee shall be the administrative organization created under this Agreement to administer its provisions.

2.07 Generating Unit shall be an electric generator, together with its prime mover and all auxiliary and appurtenant devices and equipment designed to be operated as a unit for the production of electric power and energy or as otherwise determined by the Operating Committee.

Issued by:        Kimberly Despeaux                        Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 8
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

2.08 Base Generating Units - shall be all generating units included in FERC accounts 310 through 316 and whose fuel supply is coal and all generating units included in FERC accounts 320 through 325 whose fuel supply is nuclear respectively, and such other generating units as may be designated from time to time by the Operating Committee.

2.09 Intermediate Generating Units - shall be all generating units included in FERC accounts 310 through 316 and whose fuel supply is gas or oil and such other generating units as may be designated from time to time by the Operating Committee.

2.10 Peaking Generating Units - shall be all generating units included in FERC accounts 340 through 346 and such other generating units as may be designated from time to time by the Operating Committee.

2.11 Hydraulic Production Units - shall be all generating units included in FERC accounts 330 through 336.

2.12 Qualified Cogeneration Capacity shall be any capacity available from a cogeneration facility that qualifies under Subpart B of Part 292 of the Regulations of the FERC, 18 C.F.R. § 292.201, et seq., as amended, or any successor provisions issued pursuant to Section 3(18)(B)of the Federal Power Act, and which, in accordance with Section 4.08 of this Agreement is under the control of the System Operator, to the extent practicable, and where the State or local regulatory body having jurisdiction over any Company which establishes the rate for a particular purchase also determines that the purchase will permit non-qualifying facility capacity costs to be avoided or, in the absence of such determination, to the extent that the Operating Committee determines that, in accordance with Section 4.01 of this Agreement and pursuant to Section 292.304 of the FERC Regulations or any successor provision, the capacity will be employed to postpone generation that would otherwise be installed and thereby benefit the customers of all Companies. Individual Qualified Cogeneration Capacity below 10 mW will not be considered as

Issued by:      Kimberly Despeaux                        Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 9
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

a power or energy source to any party to the System Agreement but will be considered as a negative load.

      2.13 <u>Qualified Small Power Production Capacity</u> shall be any capacity available from a small power production facility that qualifies under Subpart B of Part 292 of the FERC Regulations, 18 C.F.R. § 292.201, <u>et seq.</u>, as amended, or any successor provisions issued pursuant to Section 3(17)(C) of the Federal Power Act, and which, in accordance with Section 4.08 of this Agreement, is under the control of the System Operator, to the extent practicable, and where the State or local regulatory body having jurisdiction over any Company which establishes the rate for a particular purchase also determines that the purchase will permit non-qualifying facility capacity costs to be avoided or, in the absence of such determination, to the extent that the Operating Committee determines that, in accordance with Section 4.01 of this Agreement and pursuant to Section 292.304 of the FERC Regulations or any successor provision, the capacity will be employed to postpone generation that would otherwise be installed and thereby benefit the customers of all Companies.  Individual Qualified Small Power Production Capacity below 10 mW will not be considered as a power or energy source to any party to the System Agreement but will be considered as a negative load.

      2.14 <u>Capability</u> shall be the net output in megawatts that can be produced by a generating unit under conditions specified by the Operating Committee, that is devoted to serving System load but excluding that portion of any unit the output of which has been sold to another Company (other than through MSS-3), or the input in megawatts available under contract from a supplying source, excluding the portion of such supply that has been sold to another Company (other than through MSS-3), including any capacity determined in Sections 2.12 or 2.13 above, plus the contractual amount of firm purchases with reserves available during the month from other systems adjusted upward by the ratio of Seller's Capability and Seller's Load Responsibility as determined in Section 10.02C.

Issued by:     Kimberly Despeaux           Effective:     November 22, 2008
            Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94           Original Sheet No. 10
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

2.15 <u>System Capability</u> shall be the arithmetical sum in megawatts of the individual Company Capabilities.

2.16 <u>Company Load Responsibility</u> shall be determined as follows:

(a)  To be used in conjunction with Service Schedules MSS-2 and MSS-6:

(i)  The average of the sum of the Company's twelve monthly hourly loads coincident with the System's monthly peak hour load for the period ended with the current month measured in megawatts. Each demand shall represent the simultaneous hourly input from all sources into the system of a Company, less the sum of the simultaneous hourly outputs to the systems of other interconnected utilities.

(ii)  Less the power supplied to others as sales for the joint account of all Companies.

(b)  As of April 1, 2004,* to be used in conjunction with Service Schedules MSS-1 and MSS-5 and in conjunction with the allocation of a purchase of capacity and energy for the joint account of all Companies under Section 4.02:

(i)  The average of the sum of the Company's twelve monthly hourly loads coincident with the System's monthly peak hour load for the period ended with the current month measured in megawatts.
Each demand shall represent the simultaneous hourly input from all sources into the system of a Company, less the sum of the simultaneous hourly outputs to the systems of other interconnected utilities.

(ii)  Less the power supplied to others as sales for the joint account of all Companies.

*  In the calculation pursuant to Section 2.16(b)(iii), the full amount of the interruptible load has been removed as of April 1, 2004 (as opposed to phased-in over a twelve month period).

Issued by:      Kimberly Despeaux                        Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 11
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(iii)    Less loads served under interruptible tariffs or contracts, where the interruptible load excluded at the time of the system's monthly peak hour load (which does not include the excludable interruptible load determined herein) is to be that load that, pursuant to said tariff or contract, is subject to interruption. To the extent practical the determination of what loads are interruptible shall be based on actual data and if it is not practical, shall be based on reasonable estimates.

2.17 <u>System Load Responsibility:</u>

(a)    To be used in conjunction with Service Schedules MSS-2 and MSS-6 shall be the arithmetical sum in megawatts of the individual Company Load Responsibilities derived pursuant to Section 2.16(a).

(b)    As of April 1, 2004, to be used in conjunction with Service Schedules MSS-1 and MSS-5 and in conjunction with the allocation of a purchase of capacity and energy for the joint account of all Companies under Section 4.02 shall be the arithmetical sum in megawatts of the individual Company Load Responsibilities derived pursuant to Section 2.16(b).

2.18 <u>Responsibility Ratio</u> of a Company shall be the ratio obtained by dividing the load responsibility of that company by the System Load Responsibility.

2.19 <u>Capability Responsibility</u> of a Company shall be the System Capability multiplied by the Responsibility Ratio for that Company.

2.20 <u>Pool Energy</u> shall be the energy generated by a Company in excess of its own requirements, or acquired by any Company under economic dispatch or as directed by the System Operator, that goes to supply requirements of other Companies. Such energy shall in all cases be nonfirm, that is, it has no guaranteed or assured availability.

Issued by:      Kimberly Despeaux                          Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94    Original Sheet No. 12
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

   2.21 <u>Cogeneration or Small Power Production Energy</u> shall be the energy acquired by any Company from qualified facilities whether or not acquired under economic dispatch.

   2.22 <u>Transmission Responsibility</u> of a Company shall be the System Net Inter-Transmission Investment multiplied by the Responsibility Ratio for that Company.

   2.23 <u>System Net Inter-Transmission Investment</u> shall be the arithmetical sum of the individual Company Net Inter-Transmission Investments.

\*    2.24 * Typographical error - 2.24 not used in numbering of definitions.

   2.25 <u>Day</u> shall be a continuous 24-hour period beginning at midnight CST, or such other time as may be agreed upon by the Operating Committee.

   2.26 <u>Month</u> shall be a calendar month.

   2.27 <u>Year</u> shall be calendar year.

   2.28 <u>Power</u> shall be the rate of doing work and shall be expressed in kilowatts (kW), megawatts (mW), or gigawatts (gW).

   2.29 <u>Energy</u> shall be work and shall be expressed in kilowatt hours (kWh), megawatt-hours (mWh), or gigawatt-hours (gWh).

| | | | |
|---|---|---|---|
| Issued by: | Kimberly Despeaux | Effective: | November 22, 2008 |
| | Associate General Counsel | | |
| Issued on: | November 21, 2008 | | |

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**           9-90

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 13
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

# ARTICLE III
## OBJECTIVES

3.01 The purpose of this Agreement is to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities of the Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment. This Agreement also provides a basis for equalizing among the Companies any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the Companies.

3.02 It is recognized by the Companies that economies of scale and integrated operations require that the planning, construction and operation of the bulk power supply and related facilities of the Companies be on a coordinated basis.

3.03 It is recognized that the Companies have traditionally used natural gas as their primary boiler fuel and that curtailments by suppliers have necessitated a conversion to oil as boiler fuel. Minimizing current and future costs of electricity and reducing energy dependence on oil and gas require the Companies to move toward a new fuel base of coal and nuclear.

3.04 It is recognized that these new coal and nuclear units will be Base Generating Units as defined in 2.08 and will be units of the larger ratings in generating stations of large size, strategically located with regard to fuel, water supply and electric load.

3.05 It is the long term goal of the Companies that each Company have its proportionate share of Base Generating Units available to serve its customers either by ownership or purchase.

Issued by:        Kimberly Despeaux                          Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 14
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

Any Company which has generating capacity above its requirements, which desires to sell all or any portion of such excess generating capacity and associated energy, shall offer the right of first refusal for this capacity and associated energy to the other Companies under Service Schedule MSS-4 Unit Power Purchase.

3.06 It is recognized that the installation of large base generating stations at locations, in many cases necessarily remote from major load centers, will require the installation of additional major high voltage and extra high voltage transmission lines and substations to connect these large generating stations to the major load centers in a manner to assure the highest practicable reliability of service.

3.07 It is recognized that reliability of service and economy of operation require that the energy supply to the system be controlled, to the extent practicable, from a centralized dispatching office and that this will require adequate communication facilities and the provision of economic dispatch computer facilities and automatic controls of generation.

3.08 By jointly planning on a systemwide basis for the construction and operation of these major facilities:

(a)     The combined loads of the Companies can be supplied with less aggregate installed capacity; and

(b)     Installations of additional capacity can be made at lower cost per kW because of the large unit sizes; and

(c)     The new installations will be more economical and require less operating labor and maintenance per kW because of the larger unit sizes; and

(d)     The strengthened transmission system will make possible a fuller utilization of the capability of the lower cost generating units of the System; and

Issued by:      Kimberly Despeaux                          Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94               Original Sheet No. 15
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

     (e)    Emergency conditions in any part of the System or other systems in adjacent areas can be met with less probability of impairment of service to the general public.

    3.09 It is intended that each Company shall be willing and able to provide its portion of the major facilities determined to be necessary and each Company shall share in the benefits and pay its share of the costs of coordinated operations as agreed upon in accordance with Service Schedules to be attached hereto from time to time and made a part hereof.

Issued by:    Kimberly Despeaux           Effective:      November 22, 2008
              Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                            9-93

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94        Original Sheet No. 16
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## ARTICLE IV

## OBLIGATIONS

4.01 <u>Production Facilities</u>

Each Company shall normally own, or have available to it under contract, such generating capability and other facilities as are necessary to supply all of the requirements of its own customers.

Each Company shall furnish the Operating Committee, at the time and in the manner designated, estimates of its annual peak load for the next succeeding 10-year period, or such period as may be required, together with estimates of its capability available from generating units in operation, under construction or already approved, capability available from other sources under contract and Qualified Cogeneration Capacity or Qualified Small Power Production Capacity in accordance with Sections 2.12 and 2.13 of this Agreement.

The Operating Committee shall then determine a generation addition plan to provide capacity for the projected system load and furnish reliable service to customers at the lowest cost consistent with sound business practice. Any anticipated large blocks of power sales not previously submitted to the Operating Committee shall be submitted to the Operating Committee as soon as load information is available so that appropriate capacity can be scheduled into the generation addition plan.

Each Company that installs a Generating Unit will make the necessary financial arrangements and promptly proceed with the design and construction of the unit to meet the "in-service" date of the generation addition plan.

Any Capability in excess of the Capability Responsibility of a Company that may exist in the system of one or more Companies as a result of installation of facilities in accordance with the provisions of the generation addition plan shall be equalized among the Companies in accordance with the provisions of the applicable Service Schedule.

Issued by:      Kimberly Despeaux             Effective:        November 22, 2008
                 Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94           Original Sheet No. 17
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

4.02 <u>Purchased Capacity & Energy</u>

The Companies, with the consent of or under conditions specified by the Operating Committee, may agree to a contract by one or more of them, for the purchase of capacity and/or energy from outside sources for the account of a Company or Companies.

If purchased by a Company for its own account, the capacity shall be included by the purchasing Company in its Capability to the extent provided by the applicable Service Schedule. The energy purchased shall be considered as part of the purchasing Company's energy supply.

If purchased by a Company for the joint account of less than all of the Companies, the capacity and energy shall be allocated among the purchasing Companies in any manner mutually agreeable to them.

If purchased by a Company for the joint account of all the Companies, the capacity and energy shall be allocated to each Company in proportion to its Responsibility Ratio based on Sections 2.16(b) and 2.17(b) in effect at the end of the preceding month. Each Company shall include its allocated portion of the capacity, so purchased, in its Capability to the extent provided by the applicable Service Schedule and shall include its portion of the energy so purchased in its energy supply. Each Company shall pay for capacity and energy allocated to it hereunder at the rates paid by the Company making the purchase.

4.03 <u>Energy Purchased by Services</u>

Services, through the System Operations Center, may purchase energy under economic dispatch or emergency conditions, in accordance with Article VI paragraph 6.02 of this Agreement, for the joint account of all the Companies. The energy purchased shall be allocated to each Company in proportion to its Responsibility Ratio in effect at the end of the preceding month.

Issued by:    Kimberly Despeaux           Effective:    November 22, 2008
            Associate General Counsel

Issued on:    November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94         Original Sheet No. 18
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

4.04 <u>Capacity and Energy Exchanged with Outside Systems</u>

Capacity and energy may be delivered to or received from an outside system under agreements providing for a return in kind. The accounting for such deliveries and receipts shall be as follows:

(a)      If the System supplies first, the obligations to supply shall be prorated to each Company, in proportion to its Responsibility Ratio in effect as of the preceding October 31st, and the capacity and energy which each Company is entitled to receive in return shall be equal to the obligation to supply.

(b)      If the System receives first, the capacity and energy to be received shall be prorated to each Company in proportion to its Responsibility Ratio in effect as of the preceding October 31st, and each Company shall be obligated to supply in return the amount of capacity and energy that it was entitled to receive.

4.05 <u>Sales to Others for the Joint Account of All the Companies</u>

Sales of capacity and energy to others for which any Company does not wish to assume sole responsibility, shall, with the consent of or under conditions specified by the Operating Committee, be made by the Company having direct connection with such others, for the joint account of all the Companies, and the net balance derived from such sales shall be divided among the Companies as provided in the applicable Service Schedule.

4.06 <u>Transmission Facilities</u>

The Companies own and operate extensive transmission systems traversing their operating areas and interconnecting with each other, as well as with the transmission systems of adjacent utilities.

It is agreed that portions of each Company's bulk power transmission system shall be equalized in accordance with the applicable Service Schedule so that the ownership costs of those transmission facilities shall be distributed equitably among the Companies.

Issued by:      Kimberly Despeaux                          Effective:        November 22, 2008
                    Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 19
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

The Operating Committee shall make studies of bulk power transmission facilities and agree upon the facilities that will be required to transmit the power supply from generating or other sources to the load centers. The facilities agreed upon shall be built to comply with a time schedule determined by the Operating Committee and shall be adequate to provide the bulk power transmission system requirements with due allowances for contingencies that may reasonably be expected. The Operating Committee shall agree on the general routes of bulk power transmission lines, the voltages and conductor sizes, and the location of substations which are covered by this Agreement.

### 4.07 Communication and Other Facilities

The Companies shall provide communication and other facilities, determined by the Operating Committee to be necessary for metering, control, protection and dispatch of the production and transmission facilities, and for such other purposes as may be necessary or desirable for the operation of the Companies' Systems.

### 4.08 Dispatch

Under general direction of the Operating Committee, Services will operate a centralized operations center properly equipped and staffed to dispatch the capacity and energy capability of the Companies, in the efficient, economical, and reliable manner as provided in this Agreement. All generating units, included in System Capability under this Agreement, presently in operation or installed in the future, shall be equipped with such controls as may be determined by the Operating Committee to be necessary to accomplish such centralized economic dispatch.

It is recognized by the Companies that, because of such economic dispatch, a Company may not, at all times, be supplying the energy requirements of its system, but may be taking energy from the resources of the other Companies or supplying energy to the other Companies. The payments or charges for such energy exchange shall be as provided in the applicable Service Schedule.

Issued by:      Kimberly Despeaux                    Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 20
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

4.09 Records and Reports

Services shall keep such records as may be necessary for the efficient administration of the Agreement, and shall make such records available to any Company on request.  Each Company shall make all reports requested by the Operating Committee within the time prescribed.

4.10 Regulatory Authorization

This Agreement is subject to certain regulatory approvals and each Company shall diligently seek all necessary regulatory authorization for this Agreement and the performance of its obligations thereunder.

4.11 Effect on Other Agreements

This Agreement shall not modify the obligations of any Company under any Agreement between that Company and others not parties to this Agreement in effect at the date of this Agreement.

4.12 Service Schedules

The basis of compensation for the use of facilities and for the capacity and energy provided or supplied by a Company to another Company or Companies under this Agreement shall be in accordance with arrangements agreed upon from time to time among the Companies. Such arrangements shall be in the form of Service Schedules, each of which, when signed by the parties hereto, and approved or accepted for filing by appropriate regulatory authority shall be attached to and become a part of this Agreement.

Each Company reserves the right to unilaterally seek amendments or changes in the terms and conditions of service and increases or decreases in the rates and charges provided in any of the Service Schedules from any regulatory body having or acquiring jurisdiction thereover.

Issued by:     Kimberly Despeaux                        Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94           Original Sheet No. 21
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

4.13 <u>Measurements</u>

All capacity and energy measurements, such as between the systems of the Companies, shall be made at or corrected to the points of interconnection unless otherwise agreed to by the Operating Committee.

4.14 <u>Billings</u>

Bills for services rendered hereunder shall be calculated in accordance with applicable Service Schedules, and shall be issued on the fifth working day of the month following that in which such service was rendered and shall be payable on or before the 15th day of such month. After the 20th day, interest shall accrue on any balance due at the rate as determined in Section 35.19a(2)iii of the FERC Regulations, or at such other rate established by the Operating Committee.

4.15 <u>Waivers</u>

Any waiver at any time by a Company of its rights with respect to a default by any other Company under this Agreement, shall not be deemed a waiver with respect to any subsequent default.

4.16 <u>Successors and Assigns</u>

This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the respective Companies here to, but shall not be assignable by any Company without the written consent of the other Companies, except upon foreclosure of a mortgage or deed of trust.

4.17 <u>Amendment</u>

This Agreement may be changed, amended, or supplemented, only by an instrument in writing, signed by all the Companies.

Issued by:    Kimberly Despeaux                    Effective:        November 22, 2008
               Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 22
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

4.18 Independent Contractors

It is agreed among the Companies that by entering into this Agreement providing for the coordinated planning, construction and operation of power production, transmission, communications and other facilities of the Companies, the Companies shall not become partners, but as to each other and to third persons, the Companies shall remain independent contractors in all matters relating to this Agreement.

4.19 Responsibility for Loss or Damage

Each Company shall defend, indemnify, and save harmless the other Companies, against liability, loss, costs and expenses on account of any injury or damage to persons or property occurring on or in connection with its facilities on its side of any of the points of interconnection, except to the extent such injury or damage was caused by the sole or contributory negligence of another Company, its agent or employees.

Issued by:          Kimberly Despeaux                          Effective:          November 22, 2008
                    Associate General Counsel

Issued on:          November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 23
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## ARTICLE V

## COMPOSITION AND DUTIES OF THE OPERATING COMMITTEE

5.01 Operating Committee

An Operating Committee shall be the administrative organization of this Agreement and shall consist of members designated by the chief executive officers of each Company and by the chief executive officer of the Parent Company. Such designation shall be by written notice to the Secretary of the Operating Committee with copies to each of the other Companies. The Companies and the Parent Company may change its designated members at any time by written notice to the Secretary of the Operating Committee and each of the other Companies.

5.02 Officers of the Operating Committee

The Operating Committee shall have the following officers with duties as designated:

(a)    Chairman - The Chairman shall issue calls for and shall preside at meetings of the Operating Committee. He shall have responsibility for the general coordination of the Operating Committee functions among the various members.

(b)    Vice Chairman - The Vice Chairman shall perform the duties of the Chairman in his absence or incapacity.

(c)    Secretary - The Secretary shall be responsible for keeping the minutes of the meetings of the Operating Committee and for preparing copies thereof and for distributing them to the Companies. The Secretary shall be responsible for obtaining written approval from the Companies for any acts or decisions of the Operating Committee which may require such written approval, and shall be responsible for distributing copies of such approvals to the Companies.

The Chairman and Vice Chairman shall be elected from the members by majority vote at the first meeting held in each calendar year and shall take office immediately upon being elected.

The Secretary shall be designated by the Operating Committee.

Issued by:      Kimberly Despeaux                    Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                           9-101

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 24
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

5.03 <u>Meeting Dates</u>

The Operating Committee shall hold meetings at least quarterly and at any time upon the request of a member, and shall keep minutes of its proceedings.

5.04 <u>Decisions</u>

All decisions of the Operating Committee shall be by a majority vote. For the purposes of voting, the Parent Company shall have twenty (20) percent of the vote and the remaining eighty (80) percent shall be divided among the Companies in proportion to each Company's Responsibility Ratio in effect as of the preceding December 31st.

5.05 <u>Attendance at Meetings</u>

Each Company and the Parent Company shall be represented at each Operating Committee meeting by their members on the Committee or a proxy designated by the member or chief executive officer. Such proxy member need not be an employee of the Company represented.

5.06 <u>Duties</u>

The Operating Committee shall:

(a)     Be responsible for the day-to-day administration of the Agreement and for the filing of this Agreement and any amendments thereto with the Federal Energy Regulatory Commission for approval or acceptance for filing and for distributing copies of such filings to the Companies.

(b)     Make the studies required to fulfill the obligations agreed to in the Article IV of this Agreement, and its decisions shall become the basis for the installation of generation, bulk power transmission, communication, and other facilities necessary for the supply of capacity and energy to the System.

Issued by:     Kimberly Despeaux                          Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                                  Original Sheet No. 25
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

    (c)      Determine the amount of and require installation of adequate reserves of System Capability to assure, insofar as practicable, the continuous supply of capacity and energy to the major load centers of the System.

    (d)      Establish safe loading criteria for generating units, transmission lines and any other facilities necessary for the supply of power and energy to the major load centers of the System.

    (e)      Promulgate whatever standards may be required for the safe and reliable operation of the System.

    (f)      Consult with and provide general supervision for Services in employing and supervising a System Operator and provide for such assistance as needed.

    (g)      Determine the need for and generally supervise the keeping of records and the making of such reports as are deemed necessary or appropriate.

    (h)      Determine the need for and generally supervise communications, interchange and automatic generation control, metering, economic dispatch and relaying facilities necessary for the purpose of this Agreement.

    (i)      Make any determinations required for the purpose of administering any schedules subject to its administration.

    (j)      Study and determine from time to time additions or changes in facilities necessary to keep abreast of the production and transmission requirements of the System.

    (k)      Provide for and coordinate safe dispatching, switching and other routine procedures.

    (l)      Provide for proper distribution of spinning reserves and the supply of reactive kVa.

Issued by:      Kimberly Despeaux            Effective:      November 22, 2008
               Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                                                            9-103

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 26
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(m)     Establish, amend, supplement or terminate from time to time rules, procedures or practices as necessary to insure functioning of the System within the scope of this Agreement.

(n)     Coordinate negotiations with others from time to time for interchange and sale of power and energy.

(o)     Coordinate arrangements for the sale and delivery to others on a profitable basis, of power and energy not required for System purposes.

(p)     Coordinate arrangements from time to time to procure for the Companies, or for their account, such power and energy from external sources as may be required or will result in savings to the Companies.

(q)     Keep abreast of all environmental factors as they affect the operation of the System in order to comply with all established criteria for minimizing pollution.

(r)     Undertake any other duties that may from time to time be assigned to it or deemed appropriate.

5.07 Employment of Consultants

The Operating Committee, in the performance of its duties, may employ such technical and consulting services as warranted.

5.08 Expenses of Committee

Each Company (except the Parent Company) shall pay the expenses of its representatives on the Operating Committee. The expenses of the representatives of the Parent Company shall be paid by Services. Any other expenses of the Committee shall be prorated among the Companies as determined by the Operating Committee.

Issued by:      Kimberly Despeaux                          Effective:        November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 27
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

# ARTICLE VI

## SYSTEM OPERATIONS CENTER

6.01 <u>System Operations Center</u>

The operation of the System shall be controlled by the System Operations Center which is operated by Services.

6.02 <u>Duties</u>

Services through the System Operations Center shall:

(a)     Determine the most effective scheduling of sources for the reliable supply of power and energy on an economical basis to the Companies.

(b)     Supervise the operation and maintenance of computer facilities specified by the Operating Committee for the following purposes:

1. Economic system dispatch,

2. Determination of billing information, and

3. Determination of other data required by the Operating Committee.

(c)     Supervise safe switching procedures and other routine procedures in the system.

(d)     Determine the availability of energy for purchase from or sale to outside systems on an economical basis under effective contracts and arrange for and schedule such transactions.

(e)     Coordinate the operation of communication facilities owned or leased by the Companies to provide the communication essential to the safe, reliable and economical operation of the System.

(f)     Maintain such records and prepare such reports as the Operating Committee designates.

Issued by:     Kimberly Despeaux                    Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 28
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

6.03 Expenses

All expenses of the Systems Operations Center shall be paid by Services and billed monthly to each Company in accordance with the applicable Service Schedule.

Issued by:   Kimberly Despeaux                                    Effective:   November 22, 2008
             Associate General Counsel

Issued on:   November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 29
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

IN WITNESS WHEREOF each of the Companies has caused these presents to be signed in its name and on its behalf by its President, attested by its Secretary, both being duly authorized.

| Attest | ARKANSAS POWER & LIGHT COMPANY |
|---|---|
| Original signed by | Original signed by |
| R. J. Estrada | Jerry Maulden |
| Assistant Secretary | President |

| Attest | LOUISIANA POWER & LIGHT COMPANY |
|---|---|
| Original signed by | Original signed by |
| W. H. Talbot | J. M. Wyatt |
| Secretary | President |

| Attest | MISSISSIPPI POWER & LIGHT COMPANY |
|---|---|
| Original Signed by | Original signed by |
| R. J. Estrada | D. C. Lutken |
| Assistant Secretary | President |

| Attest | NEW ORLEANS PUBLIC SERVICE INC. |
|---|---|
| Original signed by | Original signed by |
| William C. Nelson | James M. Cain |
| Secretary | President |

| Attest | MIDDLE SOUTH SERVICES, INC. |
|---|---|
| Original signed by | Original signed by |
| D. E. Stapp | Frank G. Smith |
| Secretary | President |

Issued by:     Kimberly Despeaux            Effective:       November 22, 2008
              Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 30
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-1
## RESERVE EQUALIZATION

10.01 <u>Purpose</u>

The purpose of this Service Schedule is to provide the basis for equalizing the capability and ownership cost incidental to such capability among the Companies in such a manner that the capability and reserves of each Company after equalization shall be equal to its Capability Responsibility.

10.02 <u>Company Capability</u>

A Company's Capability shall be determined monthly and shall be the sum of available owned or leased generating units, purchases and seasonal or other energy exchange from demonstrated reliable sources as follows:

(a)    The total capability of available generating units owned, operated under Operating Agreements for its own benefit, or leased by such Company, devoted to serving System load but excluding that portion of any unit owned or leased by such Company that has been sold or leased to another Company (other than through MSS-3). Such units shall be included at their demonstrated net output measured in megawatts under conditions established by the Operating Committee. A unit is considered available to the extent the capability can be demonstrated and (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling, or (3) is in extended reserve shutdown (ERS) with the intent of returning the unit to service at a future date in order to meet Entergy System requirements. The Operating Committee's decision to consider an ERS unit to be available to meet future System requirements shall be evidenced in the minutes of the Operating Committee and shall be based on consideration of current and future resource needs, the projected length of time the unit would be in ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service. A unit is considered unavailable if in the judgment

Issued by:    Kimberly Despeaux                    Effective:        November 22, 2008
              Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 31
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

of the Operating Committee it is of insufficient value in supplying system loads because of (1) obsolescence, (2) physical condition, (3) reliability, (4) operating cost, (5) start-up time required, or (6) lack of due-diligence in effecting repairs or nuclear refueling in the event of a scheduled or unscheduled outage.

The generating units of Gulf States that were in extended reserve shutdown on the date of the merger of Entergy and Gulf States, shall not be considered available for the purpose of determining Capability in the Service Schedule MSS-1 Reserve Equalization calculation until the units are brought into service.

If, as part of a settlement or judgment adverse to Gulf States in Cajun Electric Power Cooperative, Inc. v. Gulf States Utilities Co., Civil Action No. 89-474-B (M.D. La.) and/or Southwest Louisiana Electric Membership Corp. and Dixie Electric Membership Corp. v. Gulf States Utilities Co., Civil Action No. 92-2129 (W.D. La.), Gulf States acquires Cajun Electric Power Cooperative, Inc.'s 30 percent share of the River Bend Nuclear Generating Facility (River Bend) (or any portion thereof), then the net output in megawatts associated with such share shall not be considered available for the purpose of determining Capability in the Service Schedule MSS-1 Reserve Equalization calculation.

(b)    The contract quantity of capacity in megawatts purchased without reserves by the Company.

(c)    The contract quantity of firm capacity in megawatts purchased plus an additional amount as developed from the following formula:

$$A = \frac{FP \times SC}{(SL - FP)} - FP$$

where:

A =    Amount, in megawatts (mW), to be added to contract quantity of firm capacity purchased.

Issued by:    Kimberly Despeaux                         Effective:    November 22, 2008
              Associate General Counsel

Issued on:    November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 32
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

FP = Amount of firm purchase in Mw

SL = Seller's load responsibility in mW, determined by calculating the average of the Seller's monthly hour peak loads for the twelve month period ending with the current month. Each such peak load shall represent the simultaneous hourly input from all sources into the Seller's system, less the sum of the simultaneous hourly outputs to the systems of other interconnected utilities.

SC = Seller's total capability which shall be determined monthly and shall be the sum of the net demonstrated capabilities of Seller's owned or leased generating units and the contract quantity of capacity purchased by Seller, all measured in mW.

(d) That portion of the contract quantity of capacity in megawatts purchased with or without reserves, for the joint account of all the Companies as allocated to the Company on the basis of Section 4.02.

(e) That portion of the contract quantity of capacity in megawatts received under any seasonal or other exchange with outside suppliers for the joint account of all Companies, as allocated to the Company on the basis of its Responsibility Ratio.

(f) Cogeneration or Small Power Production Capacity in accordance with Sections 2.12 and 2.13. The Operating Committee shall have the authority to allocate any such capacity to one or more of the Companies in accordance with FERC Opinion Nos. 246 and 246-A.

10.03 Basis of Reserve Equalization

Company Capability in excess of the Capability Responsibility of any Company shall be allocated among the Companies so that the resultant capability and reserves of each Company shall be equal to its Capability Responsibility.

$$ER = CC - SC \times \frac{CLR}{SLR}$$

Issued by:     Kimberly Despeaux                          Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 33
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

where:

ER  = Equalized Reserve

CC  = Company Capability          (Section 2.14)

SC  = System Capability          (Section 2.15)

CLR = Company Load Responsibility          (Section 2.16 (b))

SLR = System Load Responsibility          (Section 2.17 (b))

If more than one Company has Company Capability in excess of its Capability Responsibility, the excess of each such Company from its Intermediate Generating Units, as defined in Section 2.09 shall be allocated to each deficient Company in the ratio of such Company's deficiency to the sum of the deficiencies of the deficient Companies.

10.04 Reserve Equalization Payment

For the reserve allocated in accordance with Section 10.03, the Company or Companies having an excess shall receive, from the Company or Companies having a deficiency, an equalization payment, determined in accordance with the method hereinafter described, for such reserve so allocated each month.

10.05 Investment in Intermediate Reserve Generating Units

The generating units to be reflected in determining the costs to be billed under this Service Schedule are those that serve as reserves to the System and shall be defined by reference to their average annual heat rate.  The Reserve Generating Units for each Party (based on Federal Energy Regulatory Commission's Uniform System of Accounts Prescribed for Public Utilities and Licensees) shall be those gas- and oil-fired units that had an annual average heat rate in the preceding calendar year of at least 10,000 Btu per kilowatt=hour.  For Reserve Generating Units that were not in commercial operation for all of the preceding calendar year, the heat rate used to determine eligibility under this provision shall be specified by the Operating Committee.  The

Issued by:          Kimberly Despeaux                    Effective:          November 22, 2008
                    Associate General Counsel

Issued on:          November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                     Original Sheet No. 34
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

investment in such Reserve Generating Units shall be determined as follows:

    (a)    The cost includable for all such units in Accounts 310, 311, 312, 313, 314, 315 and 316.

    (b)    The cost of step-up transformers, circuit breakers, and switching equipment etc. included in Account 353 and required to connect all such units to the transmission system.

10.06 <u>Determination of Monthly Billing Charge</u>

The Monthly Charge (MC) per kW for billings under Reserve Equalization shall be determined for each Company based upon the previous year's operating results. The MC will be based on the average of all units included as Intermediate Generating Units as included in Sections 10.05 (a) and (b).

$$MC = (1/12) \; \frac{RB \times (CM + F) + D + PT + I + FT + OM}{C}$$

where:

CM =     the weighted average cost of capital as determined in the following manner:

CM =     (DR x i) + (PR x p) + (ER x c)

C =   The sum of capacity in kW for the generating units in RB

DR = Ratio of Debt Capital at Dec. 31 of the previous year

PR = Ratio of Preferred Stock at Dec. 31 of the previous year

ER = Ratio of Common Stock at Dec. 31 of the previous year

i =   Average embedded cost of debt capital outstanding at Dec. 31 of the previous year

p =   Average embedded cost of preferred stock outstanding at Dec. 31 of the previous year

c =   Return on Common Equity at 11.0%

Issued by:    Kimberly Despeaux            Effective:    November 22, 2008
            Associate General Counsel

Issued on:    November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 35
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

D = The amount of depreciation for the preceding year as reported on page 429 of the Company FERC Form No. 1 report as related to Intermediate Generating Units and associated equipment required to connect generating equipment to the transmission system.

F = Federal and State Income Taxes determined from the following formulae:

$$F = \frac{T}{(1 - T)} \times (CM - DR \times i)$$

where:

T = f + s - fs when federal tax is not deductible in computing state tax, and

$$T = \frac{(f + s - 2fs)}{(1 - fs)} \text{ when federal tax is deductible in computing state tax, and}$$

f = Federal Income Tax Rate

s = State Income Tax Rate

RB = The amount as of December 31, of the preceding year reflected in Plant Accounts 310, 311, 312, 313, 314, 315 and 316 for gas or oil fired Steam Production Plants, plus an amount included in Account 353 which represents the investment in step-up transformers, circuit breakers, and switching equipment, etc. required to connect all such units to the transmission system, less the accumulated provision for depreciation for the gas or oil fired units in the Steam Production plants and the accumulated provision for depreciation associated with the equipment included in Account 353 described above, and less the proportionate amount of Account 282 Accumulated Deferred Income Taxes.

I = Preceding year insurance premium for Intermediate Generating Units included in RB

PT = Ad Valorem taxes for the preceding year for Intermediate Generating Units Included in RB

FT = Applicable Corporation Franchise Tax for the preceding year for Intermediate Generating Units included in RB

Issued by:      Kimberly Despeaux                          Effective:        November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                                                    9-113

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 36
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

OM = Operation and maintenance expenses plus the applicable general and administrative expenses. These combined expenses will be determined annually by taking the applicable accounts for each Company related to their owned generating capacity, together with the applicable general and administrative expenses, proportioned to the direct labor expenses.

Fossil Fueled Units

Direct - Accounts 500, 502, 503, 504, 505, 506, 507, 510, 511, 512, 513 and 514.

Allocable - Accounts 920, 921, 922, 923, 924, 925, 926, 927, 928, 929, 930, 931 and 932.

10.07 Adjustment for Tax Changes

The Reserve Equalization Payment as determined above shall be adjusted to reflect the imposition of any applicable new taxes not included in the above formula, or for any increase or decrease in taxes included as of the date of this Agreement.

10.08 Billing Procedure

The billing parameters will be in effect from June 1 to the succeeding May 31 based on the preceding year's results.

Issued by:     Kimberly Despeaux                    Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 37
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

This Service Schedule MSS-1 shall be attached to and become a part of the Agreement dated the  23rd  day of  April , 1982  and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.

Attest                                              ARKANSAS POWER & LIGHT COMPANY

Original signed by                                  Original signed by
R.J. Estrada                                        Jerry Maulden
Assistant Secretary                                 President

Attest                                              LOUISIANA POWER & LIGHT COMPANY

Original signed by                                  Original signed by
W. H. Talbot                                        J. M. Wyatt
Secretary                                           President

Attest                                              MISSISSIPPI POWER & LIGHT COMPANY

Original signed by                                  Original signed by
R. J. Estrada                                       D. C. Lutken
Assistant Secretary                                 President

Attest                                              NEW ORLEANS PUBLIC SERVICE INC.

Original signed by                                  Original signed by
William C. Nelson                                   James M. Cain
Secretary                                           President

Issued by:       Kimberly Despeaux              Effective:       November 22, 2008
                 Associate General Counsel

Issued on:       November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 38
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-2
## TRANSMISSION EQUALIZATION

20.01 Purpose

The purpose of this Service Schedule is to provide the basis for equalizing among the Companies the ownership costs associated with Inter-Transmission Investment in such a manner that each Company will bear a portion of these costs proportional to its Responsibility Ratio.


20.02 Inter-Transmission Investment

A Company's Inter-Transmission Investment for the purpose of this schedule shall consist of:

(a)     All of the investment in transmission lines operated at 230 kV or higher voltage to the extent that such investment is not included in billings under other agreements.

(b)     Investment in transmission substations with three or more lines operated at a voltage of 230 kV or higher to the extent that such investment is not included in billings under other agreements.  Investment in such substations shall include facilities down to but not including the high side disconnecting device of the transformer, 50% of common facilities, and other facilities as approved by the Operating Committee.  Common substation facilities are those facilities not directly associated with any of the major power supplying voltages of the substation.  They include but are not limited to land, roadway, lighting, control house, fill, fencing, supervisory equipment, etc.

(c)     All lines 115 kV and higher from the owning Company's last substation to the connecting point of another Company (either Entergy System Company or nonsystem Company) not included in (a), or not included in billings under other agreements.

The investment in a generating unit step-up transformer and associated switchgear, necessary to connect the generating unit to the lines or all buses, shall not be included in subsection (b).


Issued by:     Kimberly Despeaux                              Effective:          November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 39
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

In determining the investments above referred to under subsections (a) and (c), only those transmission line costs includable in Accounts 350, 352, 354, 355, 356, 357, 358 and 359 of the Federal Energy Regulatory Commission's Uniform System of Accounts Prescribed for Public Utilities and Licensees.

The investments above referred to under subsection (b) are amounts includable in the accounts listed in the preceding paragraph plus Account 353.

The investment in new transmission facilities included under this Service Schedule shall be added to a Company's Inter-Transmission Investment on the first day of the month following the "in service" date of the facilities. Each Company's Inter-Transmission Investment shall be revised as of the end of each month to adjust for any additions or retirements.

20.03 Company Net Inter-Transmission Investment - Company Net Inter-Transmission Investment shall be the sum of the Company Inter-Transmission Investments reduced for the Accumulated Provision for Depreciation and Deferred Taxes as adjusted at each December 31.

20.04 Transmission Responsibility - A Company's Transmission Responsibility shall be the sum of the System Net Inter-Transmission Investments multiplied by that Company's Responsibility Ratio.

20.05 Transmission Equalization Payments - Each Company shall pay or receive each month, as appropriate, an amount in dollars determined by the following formula:

$$\text{Dollars (\$)} = 1/12 \ (TR - TI) \ (AOC)$$

where:

TR = The Company's Transmission Responsibility as defined in Section 20.04

TI = The Company's Net Inter-Transmission Investment as defined in Section 20.03

AOC = System Average Annual Ownership Cost

Issued by:     Kimberly Despeaux                          Effective:       November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 40
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

20.06 <u>Development of Company's Annual Ownership Cost</u> - ($AOC_c$) - The Annual Ownership Cost, expressed as a decimal, shall be determined as follows:

$$AOC_c = (CM + F) + \left| \frac{D + I + PT + FT + OM}{K} \right|$$

where:

CM = the weighted average cost of capital determined as follows:

$$CM = (DR \times i) + (PR \times p) + (ER \times c)$$

DR = Ratio of Debt Capital at Dec. 31 of the previous year

PR = Ratio of Preferred Stock at Dec. 31 of the previous year
ER = Ratio of Common Stock at Dec. 31 of the previous year
i = Average embedded cost of debt capital outstanding at Dec. 31 of the previous year
p = Average embedded cost of preferred stock outstanding at Dec. 31 of the previous year
c = Return on common equity at 11.0%

F = Federal and State Income Taxes as determined from the formulas:

$$F = \frac{T}{(1-T)} \times [CM - DR \times i]$$

$T = f + s - fs$ when federal tax is not deductible in computing state tax, and

$T = \dfrac{f + s - 2fs}{1 - fs}$ when federal tax is deductible in computing state tax, and

f = Federal Income Tax Rate

s = State Income Tax Rate weighted on prior year jurisdictional revenues if two or more state jurisdictions are served

K = The ratio of a Company's Net Inter-Transmission Investment and Inter-Transmission Investment (i.e., Section 20.03 ÷ Section 20.02)

D = Book depreciation as used by each Company expressed as a decimal of Inter-Transmission Investment (Section 20.02).

Issued by:      Kimberly Despeaux             Effective:      November 22, 2008
            Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 41
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

I =     Annual insurance cost expressed as a decimal of Inter-Transmission Investment (Section 20.02).

PT =     Average ad valorem taxes based on preceding year's tax rates and assessments for the Inter-Transmission Investment expressed as a decimal of Inter-Transmission Investment (Section 20.02).

FT =     Corporate Franchise Tax based on preceding year's Inter-Transmission Investment expressed as a decimal of Inter-Trans-mission Investment (Section 20.02).

OM =     Operating and maintenance expenses plus the applicable general and administrative expenses expressed as a decimal of Inter-Transmission Investment (Section 20.02). These combined expenses will be determined annually by taking the applicable accounts for each Company, related to their total transmission investment, together with the applicable general and administrative expenses and proportioned to the direct labor expenses.

Direct - Accounts 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572 and 573

Allocable - Accounts 920, 921, 922, 923, 924, 925, 926, 927, 928, 929, 930, 931 and 932

20.07 <u>Development of System Average Annual Ownership Cost</u>

The System Average Annual Ownership Cost to be applied to this Service Schedule shall be developed from the following formula:

$$AOC = \frac{(A \times AOC_A)+(G \times AOC_G)+(L \times AOC_L)+(M \times AOC_M)+(N \times AOC_N) + (T \times AOC_T)}{A + G + L + M + N + T}$$

where:

AOC = System Average Annual Ownership Cost

A = EAI Net Inter-Transmission Investment

G = EGSL Net Inter-Transmission Investment

L = ELL Net Inter-Transmission Investment

Issued by:     Kimberly Despeaux          Effective:     November 22, 2008
             Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 42
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

$M$ = EMI Net Inter-Transmission Investment

$N$ = ENOI Net Inter-Transmission Investment

$T$ = ETI Net Inter-Transmission Investment

$AOC_A$ = EAI - Annual Ownership Cost

$AOC_G$ = EGSL - Annual Ownership Cost

$AOC_L$ = ELL - Annual Ownership Cost

$AOC_M$ = EMI - Annual Ownership Cost

$AOC_N$ = ENOI - Annual Ownership Cost

$AOC_T$ = ETI - Annual Ownership Cost

20.08 Adjustment for Tax Changes

The Transmission Equalization Payment as determined in Section 20.05 shall be adjusted to reflect the imposition of any applicable new taxes not included in the above formula, or for any increase or decrease in taxes included as of the date of this Agreement.

20.09 Billing Procedure

The billing parameters will be in effect from June 1 to the succeeding May 31, based on the preceding year's results.

Issued by:       Kimberly Despeaux                                    Effective:        November 22, 2008
                 Associate General Counsel

Issued on:       November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 43
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181


This Service Schedule MSS-2 shall be attached to and become a part of the Agreement dated the   23rd   day of April, 1982 and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.


Attest                                         ARKANSAS POWER & LIGHT COMPANY



Original signed by                             Original signed by
R. J. Estrada                                  Jerry Maulden
Assistant Secretary                            President


Attest                                         LOUISIANA POWER & LIGHT COMPANY



Original signed by                             Original signed by
W. H. Talbott                                  J. M. Wyatt
Secretary                                      President


Attest                                         MISSISSIPPI POWER & LIGHT COMPANY



Original signed by                             Original signed by
R. J. Estrada                                  D. C. Lutken
Assistant Secretary                            President


Attest                                         NEW ORLEANS PUBLIC SERVICE INC.



Original signed by                             Original signed by
William C. Nelson                              James M. Cain
Secretary                                      President


Issued by:     Kimberly Despeaux              Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 44
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-3

## EXCHANGE OF ELECTRIC ENERGY AMONG THE COMPANIES

30.01 Purpose

The purpose of this Service Schedule is to provide the method of pricing energy exchanged among the Companies and to provide for payments and receipts in accordance with the provisions of Opinion Nos. 480 and 480-A.

30.02 Scheduling of Energy Sources

The System Capability shall be operated as scheduled and/or controlled by the System Operator to obtain the lowest reasonable cost of energy to all the Companies consistent with the requirements of daily operating generation reserve, voltage control, electrical stability, loading of facilities and continuity of service to the customers of each Company.

In no event shall the remaining margin payment obligations of ETI to Southwestern Electric Power Corporation under Section 9.1 of the Restated and Amended Interconnection Agreement between ETI and Southwestern Electric Power Company, be included, considered or otherwise taken into account by the System Operator under Section 30.02 of the System Agreement, except for the circumstance where the lowest reasonable cost energy available to the System Operator is identical in price to that offered to ETI under such Section 9.1.

30.03 Allocation of Energy

The energy from the lowest cost source available and scheduled as in Section 30.02 above shall be allocated on an hourly basis, in the order of the following priorities:

(a)     first to the loads of the Company having such sources available, except that in the case of energy generated by a Designated Generating Unit, each Company to which a portion of the Capability of the Designated Generating Unit as defined in Section 40.02 has been sold shall be entitled to receive each hour that portion of the total energy generated by the Designated Generating Unit that the capability sold to the Company bears to the total capability of the Designated Generating Unit.

Issued by:     Kimberly Despeaux          Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94               Original Sheet No. 45
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

    (b)     second to supply the requirements of the other Companies' Loads (Pool Energy).

30.04 <u>Energy for Sales to Others</u>

Energy used to supply others will be provided in accordance with rate schedules on file with the Federal Energy Regulatory Commission. A Company will be reimbursed for the current estimated cost of fuel used by the specific unit or units supplying the energy together with the adder determined in Section 30.08(f) on an hour by hour basis.

30.05 <u>Unscheduled Energy</u>

Energy produced by generating units not scheduled for system energy requirements but operated at the request of a Company beyond what is deemed necessary for overall system purposes by the System Operator, shall not be considered as part of Sections 30.03 or 30.04 above, but shall be for the use, and at the expense of the Company requesting the operation of such generating units.

30.06 <u>Fuel Contract Energy</u>

Energy produced by generating units for system energy requirements shall be allocated as follows:

    (a)     When operated to satisfy "take or pay" minimums under fuel contracts negotiated for System benefit as approved by the Operating Committee shall be shared by all companies in proportion to their current Responsibility Ratio.

    (b)     When operated with fuel acquired for the benefit of two or more of the Companies shall be shared in proportion to their participation in such contracts.

    (c)     When operated pursuant to fuel purchases negotiated for System benefit as approved by the Operating Committee, the Company owning the units utilizing the fuel has a one-time option to either assume responsibility for purchase of the fuel for its own account or to allow the fuel to be purchased for the System's joint account in accordance with 30.06(a) or (b) as appropriate.

Issued by:    Kimberly Despeaux                  Effective:      November 22, 2008
            Associate General Counsel

Issued on:    November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94　　　　　　　　　　Original Sheet No. 46
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

30.07 Cogeneration or Small Power Production Energy

Energy received by any Company from Cogeneration or Small Power Production Sources that is included as a part of Inter-Company billings shall be priced under this Agreement in accordance with rates established by the appropriate regulatory authority. The Operating Committee shall have the authority to allocate such energy to one or more of the Companies or to determine that the energy is for the use, and at the expense of, the Company making the purchase from such Source in accordance with FERC Opinion Nos. 246 and 246-A.

30.08 Payments to be Received for Energy Supplied

Each Company shall receive, for energy furnished in accordance with Sections 30.03 (a),(b) and 30.04 in excess of its load requirements, on an hourly basis:

(a)　　For each kWh generated as short term purchase energy from a Designated Generating Unit in accordance with Section 30.03(a), whether or not taken by the Company or Companies making the purchase, the cost of fuel consumed.

(b)　　For each kWh generated by use of fossil fuel, in accordance with Sections 30.03(b) and 30.04, the cost of fuel consumed plus an adder as determined in Section 30.08 (f).

(c)　　For each kWh generated as Fuel Contract Energy, in accordance with Section 30.06, the cost of fuel consumed plus an adder as determined in Section 30.08(f).

(d)　　For purchased energy, the actual cost of such purchased energy. The "actual cost" of purchased energy for ETI shall not include the remaining margin payment obligation of ETI to Southwestern Electric Power Company, under Section 9.1 of the Restated and Amended Interconnection Agreement between ETI and Southwestern Electric Power Company.

(e)　　For each kWh received as Cogeneration or Small Power Production energy in accordance with Section 30.07, the price established in Section 30.07.

Issued by:　　Kimberly Despeaux　　　　　　　　　　　　　Effective:　　　November 22, 2008
　　　　　　　Associate General Counsel

Issued on:　　November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**　　　　　　　　　　　　　　　　　　　　　　　　　　　　9-124

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          First Revised Sheet No. 47
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181      Superseding Original Sheet No. 47
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(f)     The adder for Sections 30.08(b) and 30.08(c) shall be determined pursuant to the following formula.

$$Adder = A + B + C$$

where:

$$A = .5563 \quad \frac{O\&M \text{ (current)} \div NSGC}{O\&M \text{ (base)} \div NSGB} \quad \text{where,}$$

| | |
|---|---|
| A = | O&M adder in mills/kWh adjusted annually |
| O&M = | Accounts 500, 502, 503, 504, 505, 506, 507, 510, 511, 512, 513 and 514 |
| Current = | Three years ending with preceding year |
| NSGC = | Net steam generation in kWh for the three years ending with preceding year |
| Base = | Three years of 1978, 1979 and 1980 |
| NSGB = | Net steam generation in kWh for 1978, 1979 and 1980 base period |
| .5563 = | The amount applicable at the date of this agreement |

$$\therefore \quad O\&M \text{ (base)} \div NSGB = 1.6724$$

$$B = AC \times HR \times (SR/2,000,000) \text{ where,}$$

| | |
|---|---|
| B = | Incremental replacement $SO_2$ cost (in mills/kWh) for the particular generating unit, adjusted weekly |
| AC = | allowance cost (in $/allowance), adjusted weekly based on the average cost of purchasing an emission allowance from an index accepted by FERC within a test block approximately equal to the amount of emission allowances needed to support wholesale transactions under this System Agreement and power sales arrangements between the Companies and others. |
| HR = | heat rate (in Btu/kWh) |
| SR = | $SO_2$ rate for fuel (in lb $SO_2$/MMBtu) |

Issued by:    Kimberly Despeaux                Effective:      July 1, 2009
                  Associate General Counsel

Issued on:    May 1, 2009

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94            Original Sheet No. 47A
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

$C = NC \times HR \times (NR/2,000,000)$ where,

$C =$ incremental replacement $NO_x$ cost (in mills/kWh) for the particular generating unit, adjusted weekly

$NC =$ allowance cost (in \$/allowance), adjusted weekly based on the average cost of purchasing a $NO_x$ emission allowance from an index accepted by FERC within a test block approximately equal to the amount of emission allowances needed to support wholesale transactions under this System Agreement and power sales arrangements between the Companies and others.

$HR =$ heat rate (in Btu/kWh)

$NR =$ $NO_x$ rate for fuel (in lb $NO_x$/MMBtu)

Issued by:      Kimberly Despeaux                 Effective:      July 1, 2009
                 Associate General Counsel

Issued on:      May 1, 2009

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 48
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

30.09 <u>Payments Made for Energy</u>

(a)     Each Company shall pay for energy allocated to it from a Designated Generating Unit as purchased energy the cost of fuel consumed per kWh.

(b)     Each Company shall pay for energy received from the energy allocated in accordance with the provisions of Section 30.03(b) above, the weighted average cost per kWh of energy, as provided under Section 30.08(b) above, accumulated and distributed on a hourly basis.

(c)     Each Company shall pay for energy received from the energy allocated in accordance with the provisions of Section 30.06 above, the cost per kWh of energy as provided under Section 30.08(c) above, accumulated and distributed on a hourly basis.

(d)     Each Company shall pay or receive funds to the extent required to maintain Rough Production Cost Equalization in accordance with the provisions of Sections 30.11 through 30.14 below.

30.10 <u>Cost of Fuel Per kWh</u>

Cost of fuel per kWh shall be determined for each generating unit by multiplying the BTU consumed per kWh of net generation during the preceding calendar year by the current estimated cost per BTU of the fuel used as furnished by each Company monthly. For the first year of operation of a new unit, BTU consumed per kWh of net generation shall be based on the design heat rate at 60% of full load capability at anticipated average annual back pressure.

Issued by:     Kimberly Despeaux                      Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                      Original Sheet No. 49
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

30.11 <u>Rough Production Cost Equalization</u>

To maintain Rough Production Cost Equalization (RPCE) among the Companies, each Company's actual Production Cost (PC) as determined in accordance with Section 30.12, shall be compared to its respective allocation of the System Average Production Cost (APC), as determined in accordance with Section 30.13, to determine if a Company's PC deviates from its APC by more than +/-11%.

where:

Paying Company(ies) is a Company or Companies with a negative Disparity that could make payments under this provision;

Receiving Company(ies) is a Company or Companies with a positive Disparity that could receive payments under this provision; and,

Disparity (D) equals the ratio of PC to APC expressed in terms of the divergence from 100%

$$D = (^{PC}/_{APC} - 1) * 100\%$$

(a)   If one or more Companies has a positive Disparity greater than eleven percent (11%), but no Company(ies) has a negative Disparity greater than 11%, then a payment shall be made by the Paying Company(ies) to the Receiving Company(ies) such that the positive Disparity of any Receiving Company(ies) after reflecting such payment is equal to 11% and the negative Disparity of any Paying Company(ies) after reflecting such payment is no less than the negative Disparity of any other Paying Company.

(b)   If one or more Companies has a negative Disparity greater than 11%, but no Company has a positive Disparity greater than 11%, then a payment shall be made by the Paying Company(ies) to the Receiving Company(ies) such that after reflecting such payment, any Paying Company(ies) has a negative Disparity equal to 11% and that the positive Disparity of any Receiving Company(ies), after reflecting such payment, is no less than another Receiving Company.

Issued by:        Kimberly Despeaux                          Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 50
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(c)     If one or more Receiving Companies has a positive Disparity greater than 11% and one or more Companies has a negative Disparity greater than 11%, then a payment shall be made by the Paying Company(ies) with a negative Disparity greater than 11% to the Receiving Company(ies) with a positive Disparity greater than 11% such that after reflecting such payments, all Receiving Company(ies) will not have a Disparity exceeding 11% and the payment obligation shall be distributed among Paying Companies such that no Company that will be making payments has a negative Disparity after reflecting such payments less than that of any other Paying Company.  In the event that the payments made reduce the positive Disparity of a Receiving Company(ies) to 11% but that one or more Paying Companies has a negative Disparity after reflecting such payments that is greater than 11%, then payments shall be made such that no Paying Company has a negative Disparity that is greater than 11% and that the positive Disparity of any Receiving Company, after reflecting such payments, is no less than another Receiving Company.

Issued by:     Kimberly Despeaux                    Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 51
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

30.12 <u>Actual Production Cost</u>

The actual production cost (PC) is the sum of the actual variable production cost (VPC) and the actual fixed production cost (FPC) and shall be determined for each Company.[1]  The formula for developing the actual production cost is as follows:

PC =   VPC + FPC

where:

VPC = Variable Production Cost
    = VPRB * (CM + F) + VPX

where:

VPRB = Variable Production Rate Base [2]
     = NPP – NAD – (ADIT * NPPR)
     NPP =   Nuclear Production Plant in Service as recorded in FERC Plant Accounts 320 through 325 and FERC Account 101.1 excluding Asset Retirement Obligations (ARO) recorded in FERC Plant Account 326, if any

---

[1] All Rate Base, Revenue and Expense items shall be based on the actual amounts on the Company's books for the twelve months ended December 31 of the previous year as reported in FERC Form 1 or such other supporting data as may be appropriate for each Company; and shall include certain retail regulatory adjustments pursuant to the production cost methodology set forth in Exhibit ETR-26/ETR-28 filed in Docket No. EL01-88-001, including but not limited to: (1) the Deregulated Asset Plan adjustment for EGSL, (2) the regulated portion (70%) of River Bend for EGSL, (3) repricing of energy associated with the Vidalia purchase power contract for ELL based on the average annual Service Schedule MSS-3 rate paid by ELL, including the exclusion of the income tax savings of the Vidalia purchase power contract from ADIT and reflecting the reversal of the Vidalia capital transaction, and the debt rate associated with the Waterford 3 Sale/Leaseback for ELL, (4) exclusion of the EAI and EMI retail approved Grand Gulf Accelerated Recovery Tariff effects on purchased power on EAI's and EMI's production cost and (5) exclusion of any increased costs resulting from the amended Toledo Bend Power Sales Agreement accepted for filing in Docket No. ER07-984.

[2] Rate Base values shall be based on the actual balances on the Company's books as of December 31 of the previous year except for Fuel Inventory, Materials & Supplies and Prepayments which shall be based on the average of the beginning and ending actual balances on the Company's books.

Issued by:        Kimberly Despeaux                              Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 52
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

NAD = Nuclear Accumulated Provision for Depreciation and Amortization excluding ARO associated with NPP above, as recorded in FERC Accounts 108 and 111 (consistent with the accounting relating to Statement of Financial Accounting Standards (SFAS) 143 approved by the retail regulator having jurisdiction over the Company, unless the FERC determines otherwise)

ADIT = Net Accumulated Deferred Income Taxes (ADIT) recorded in FERC Accounts 190, 281 and 282 (as reduced by amounts not generally and properly includable for FERC cost of service purposes, including but not limited to, SFAS 109 ADIT amounts and ADIT amounts arising from retail ratemaking decisions) plus Accumulated Deferred Income Tax Credit-3% portion only recorded in FERC Account 255

NPPR = Ratio of Nuclear Production Plant excluding Waterford 3 Capital Lease to Total Plant excluding Intangible Plant and Waterford 3 Capital Lease [3]

= NPPXW3L / PXIW3L

where:

NPPXW3L = Nuclear Production Plant in Service excluding Waterford 3 Capital Lease as recorded in FERC Account 101.1

PXIW3L = Electric Plant in Service which includes the sum of the Company's Production, Transmission, Distribution and General Plant in Service recorded in FERC Plant Accounts 310 through 399, Property under Capital Lease excluding Waterford 3 Capital Lease as recorded in FERC Account 101.1 and Completed Construction not yet Classified as recorded in FERC Account 106 excluding ARO, if any

_____

[3] Plant ratios shall be determined based on plant in service balances exclusive of associated ARO as of December 31 of the previous year.

Issued by:     Kimberly Despeaux                  Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94        Original Sheet No. 53
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

CM =     The weighted average cost of capital determined as follows:

=     $(DR * i) + (PR * p) + (ER * c)$

where:

DR =     Ratio of Debt Capital and Preferred Stock with tax deductible dividends (QUIPS) at Dec. 31 of the previous year

PR =     Ratio of Preferred Stock without tax deductible dividends at Dec. 31 of the previous year

ER =     Ratio of Common Stock at Dec. 31 of the previous year

i =     Average embedded cost of debt capital and preferred stock with tax deductible dividends (QUIPS) outstanding at Dec. 31 of the previous year

p =     Average embedded cost of preferred stock outstanding at Dec. 31 of the previous year

c =     Simple average of the Companies' approved retail return on common equity rates at Dec. 31 of the previous year

F =     Federal and State Income Taxes determined from the following:

=     $T / (1-T) * (CM - DR * i)$

where:

T =     $f + s - fs$ when federal tax is not deductible in computing state tax, and

T =     $(f + s - 2fs) / 1 - (fs)$ when federal tax is deductible in computing state tax, and

f =     Federal Income Tax Rate

s =     State Income Tax Rate

VPX =     Variable Production Expense

=     $NPOMNF + FE + PURP - RC + NDE$

where:

NPOMNF = Nuclear Production Operation and Maintenance (O&M) Non-Fuel Expense, recorded in FERC Accounts 517 through 532 excluding Nuclear Fuel in FERC Account 518

Issued by:     Kimberly Despeaux               Effective:        November 22, 2008
                   Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                               9-132

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          First Revised Sheet No. 54
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

FE =     Production O&M Fuel Expense recorded in FERC Accounts 501, 518 and 547

PURP =     Purchased Power Expense recorded in FERC Account 555, but excluding payments made pursuant to Section 30.09(d) of this Service Schedule and excluding the effects, debits and credits, resulting from a regulatory decision that causes the deferral of the recovery of current year costs or the amortization of previously deferred costs

RC =     Revenue Credits resulting from revenue received from customers outside the Company's Net Area for Production Service recorded in FERC Account 447, but excluding receipts received pursuant to Section 30.09(d) of this Service Schedule

NDE =     Nuclear Depreciation and Amortization Expense associated with (NPP) as recorded in Accounts 403 and 404 and Decommissioning Expense, as approved by Retail Regulators, unless the jurisdiction for determining the depreciation and/or decommissioning rate is vested in the FERC under otherwise applicable law

FPC = Fixed Production Cost

$$= FPRB * (CM + F) + FPX - [(ITC / TX) * PPR]$$

where:

FPRB = Fixed Production Rate Base

$$= PPXN + CME - ADXN + FI - (ADIT * PPRXN) + [(GP - GAD + IP - IAA) * PLR] + (MS + P) * PPREG$$

where:

PPXN =     Production Plant in Service excluding Nuclear Plant recorded in FERC Plant Accounts 310 through 317, Accounts 330 through 346, and FERC Account 101.1 excluding ARO recorded in FERC Plant Accounts 317 and 337, if any

CME =     Coal Mining Equipment in FERC Plant Account 399 owned by the Company

Issued by:     Kimberly Despeaux            Effective:     May 31, 2009
            Associate General Counsel

Issued on:     May 21, 2009

**2011 ETI Rate Case**                                                9-133

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 55
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

ADXN = Accumulated Provision for Depreciation and Amortization associated with PPXN and CME above, as recorded in FERC Accounts 108 and 111, excluding ARO associated with PPXN and CME, if any, (consistent with the accounting relating to SFAS 143 approved by the retail regulator having jurisdiction over the Company, unless the FERC determines otherwise)

FI = Fuel Inventory recorded in FERC Account 151

ADIT = Net Accumulated Deferred Income Taxes plus Accumulated Deferred Income Tax Credit

PPRXN = Ratio of Production Plant in Service excluding Nuclear Plant to Total Plant excluding Intangible Plant and Waterford 3 Capital Lease

= PPXN / PXIW3L

GP = General Plant in Service recorded in FERC Plant Accounts 389 through 398 excluding ARO, if any

GAD = General Plant Accumulated Provision for Depreciation, as recorded in FERC Account 108 excluding ARO associated with GP above, if any, (consistent with the accounting relating to SFAS 143 approved by the retail regulator having jurisdiction over the Company, unless the FERC determines otherwise)

IP = Intangible Plant in Service recorded in FERC Plant Accounts 301 through 303

IAA = Intangible Plant Accumulated Provision for Amortization associated with IP above recorded in FERC Account 111

Issued by:     Kimberly Despeaux                          Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 56
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

PLR =     Ratio of Production Labor to Total Labor excluding A&G Labor[4]

=     PL / LXAG

where:

PL =     Production Labor charged to O&M Expense

LXAG =     Total Labor charged to O&M Expense excluding A&G Labor

MS =     Materials and Supplies recorded in FERC Account 154

P =     Prepayments as recorded in FERC Account 165

PPREG =     Ratio of Production Plant in Service to Electric and Gas Plant in Service excluding Intangible Plant

=     PP / EGPXI

where:

PP =     Production Plant in Service as recorded in FERC Plant Accounts 310 through 346 and FERC Account 101.1 excluding ARO recorded in FERC Plant Accounts 317, 326 and 337, if any

EGPXI =     Electric and Gas Plant in Service defined as PXIW3L above plus Waterford 3 Capital Lease as recorded in FERC Account 101.1 and Gas Plant as recorded in FERC Account 118 excluding ARO, if any

---

[4] Labor ratios shall be determined based on the payroll expense for each Operating Company, including those payroll expenses billed to it by EOI and ESI, for the twelve months ended December 31 of the previous year.

Issued by:     Kimberly Despeaux          Effective:     November 22, 2008
            Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 57
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

FPX = Fixed Production Expense

= NFPOMXN + DEXN + [(AG + GDX + IAX) * PLR] +  OT * PPR

where:

NFPOMXN=Non-Fuel Production O&M Expense excluding Nuclear; i.e. costs recorded in FERC Accounts 500 through 514 plus Accounts 535 through 554 plus Account 556 less Accounts 501 and 547

DEXN = Depreciation and Amortization Expense associated with the plant investment in PPXN as recorded in FERC Accounts 403 and 404, as approved by Retail Regulators unless the jurisdiction for determining the depreciation rate is vested in the FERC under otherwise applicable law.

AG = Administrative and General (A&G) O&M Expense recorded in FERC Accounts 920 through 935 excluding Storm Accrual Expense recorded in FERC Account 924

GDX = General Plant Depreciation Expense recorded in FERC Account 403

IAX = Intangible Plant Amortization Expense recorded in FERC Account 404

OT = Other Tax Expense recorded in FERC Account 408

PPR = Ratio of Production Plant to Total Plant excluding Intangible Plant

= PP / PXI

PXI = Electric Plant in Service defined as PXIW3L above plus Waterford 3 Capital Lease as recorded in FERC Account 101.1, excluding ARO, if any

ITC = Investment Tax Credit Amortization recorded in FERC Account 411

TX = Composite Corporate After Tax Income Tax Rate

= (1-T)

Issued by:     Kimberly Despeaux                        Effective:        November 22, 2008
                  Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                          Original Sheet No. 58
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

30.13 Average Production Cost

Each Company's share of System Average Variable and Fixed Production Cost shall be determined based on its respective Annual Energy Ratio (Energy Ratio) and Load Responsibility Ratio (Demand Ratio), respectively. The formula for determining each Company's share of System Average Production Cost is as follows:

APC = Average Production Cost

= AVPC + AFPC

where:

AVPC = Company's Allocation of the System's Variable Production Cost

= SVPC * ER

where:

SVPC = Sum of the Companies' Actual Variable Production Cost

ER = Each Company's Annual Energy (Net Area Requirements less Non-Requirements Sales for Resale defined as Total Disposition of Energy (FERC Form 1 Page 401a, Line 28) less Non-Requirements Sales for Resale (FERC Form 1 Page 401a, Line 24) less Net Transmission for Others (FERC Form 1 Page 401a, Line 18)) Divided by the Sum of all Companies Annual Energy (Energy Ratio)

AFPC = Company's Allocation of the System's Fixed Production Cost

= SFPC * DR

where:

SFPC = Sum of the Companies' Actual Fixed Production Cost

DR = The ratio for each Company of its 12 CP loads divided by the sum of all Companies' 12 CP loads as defined in Section 2.16(a) (Demand Ratio)

Issued by:        Kimberly Despeaux                                  Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94            Original Sheet No. 59
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

      30.14   Billing Procedure for Section 30.09(d)

      The billing parameters will be in effect from June 1 to the succeeding December 31 based on the preceding year's results. Any amounts payable pursuant to Section 30.09(d) shall be paid on a monthly basis based on dividing the amount payable by seven. All amounts paid shall be recorded by each Company in FERC Account 555 – Purchased Power and all amounts received shall be recorded by each Company in FERC Account 447 – Sales for Resale. This billing procedure shall be effective June 1, 2007.

Issued by:      Kimberly Despeaux                      Effective:       November 22, 2008
               Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                  Original Sheet No. 60
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

This Service Schedule MSS-3 shall be attached to and become a part of the Agreement dated the  23rd  day of   April  ,  1982  and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.

Attest                                          ARKANSAS POWER & LIGHT COMPANY

Original signed by                              Original signed by
R. J. Estrada                                   Jerry Maulden
Assistant Secretary                             President

Attest                                          LOUISIANA POWER & LIGHT COMPANY

Original signed by                              Original signed by
W. H. Talbot                                    J. M. Wyatt
Secretary                                       President

Attest                                          MISSISSIPPI POWER & LIGHT COMPANY

Original signed by                              Original signed by
R. J. Estrads                                   D. C. Lutken
Assistant Secretary                             President

Attest                                          NEW ORLEANS PUBLIC SERVICE INC.

Original signed by                              Original signed by
William C. Nelson                               James M. Cain
Secretary                                       President

Issued by:     Kimberly Despeaux                        Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                          9-139

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 61
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-4
## UNIT POWER PURCHASE

40.01  Purpose

The purpose of this Service Schedule is to provide the basis for making a unit power purchase between Companies and/or the sale of power purchased by another Company, unless an alternative basis is agreed to by the parties subject to the approval of the Commission and the regulatory agencies of the purchasing and selling Companies under otherwise applicable law and which provides a lower monthly capacity charge than the charge determined pursuant to Section 40.06 or Section 40.09 of this Service Schedule MSS-4.

40.02  Designated Generating Unit

(a) A Designated Generating Unit shall be any generating unit from which the unit power purchase is made under Section 40.01 that is mutually agreed upon by the purchaser and the seller.

(b) Any Company that makes a Unit Power Purchase of a portion of capability shall be entitled to receive each hour, the same portion of the total energy generated by the Designated Generating Unit. Such energy shall be purchased at the cost of fuel consumed per kWh in accordance with Section 30.08(a) and will be treated in the same manner as any other energy available to the purchasing Company.

40.03  Capability Payment

For the capability purchased in accordance with Section 40.02, the Company making the sale shall receive, from the Company making the purchase, a monthly payment determined in accordance with the method described in Section 40.06 hereinafter.

Issued by:      Kimberly Despeaux                 Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 62
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

The monthly capability payment to be received by a Company shall be determined by multiplying the kW of capability sold from its Designated Generating Unit by a charge per kW–month as defined below.

40.04  Investment in Designated Generating Unit (DGURB)

For the purpose of calculating the Monthly Charge under Section 40.06, the investment in the Designated Generating Unit (based on the Federal Energy Regulatory Commission's Uniform System of Accounts prescribed for the Public Utilities and Licensees) shall be:

$$DGURB = \text{Designated Generating Unit Rate Base}$$
$$DGURB = DGUPTPLT + DGUCME - DGUDR + DGUFINV - DGUADIT + [(GPLT - GDR + IPLT - IAA) * (DGUL / LXAG)] + [(MS + PP) * (DGUPLT / PLT)]$$

(a)   The cost of the Designated Generating Unit included in FERC Plant Accounts 310 through 346; the cost for step-up transformers, circuit breakers, switching equipment, etc. included in FERC Plant Account 353 which are required to connect the Designated Generating Unit to the transmission system (DGUPTPLT),

(b)   Plus Coal Mining Equipment in FERC Plant Account 399 directly associated with the Designated Generating Unit (DGUCME),

(c)   Less the Accumulated Provision for Depreciation (consistent with the accounting relating to Statement of Financial Accounting Standards (SFAS) 143 approved by the retail regulator having jurisdiction over the Designated Generating Unit, unless the FERC determines otherwise) associated with items (a) and (b) above, as recorded in FERC Account 108, excluding Nuclear Decommissioning Trust Fund Balances, if applicable (DGUDR),

Issued by:       Kimberly Despeaux                              Effective:       November 22, 2008
                 Associate General Counsel

Issued on:       November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94            Original Sheet No. 63
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(d)     Plus Fuel Inventory for the Designated Generating Unit, if applicable, in FERC Accounts 151 and 152 (DGUFINV),

(e)     Less net Accumulated Deferred Income Taxes recorded in FERC Accounts 190, 281, 282 and 283 and Accumulated Deferred Investment Tax Credit – 3% portion only recorded in FERC Account 255 (DGUADIT) directly associated with the Designated Generating Unit if known; otherwise, an allocation of the plant-related balances in FERC Accounts 190, 281, 282 and 283, as reduced by amounts not generally and properly includable for FERC cost of service purposes, including, but not limited to, SFAS 109 ADIT amounts and ADIT amounts arising from retail ratemaking decisions, and Accumulated Deferred Investment Tax Credit – 3% portion only recorded in FERC Account 255 based on the proportion of gross Plant in Service for the Designated Generating Unit (DGUPLT), where DGUPLT is the sum of the investment pursuant to Section 40.04 (a) above plus the calculated General and Intangible plant pursuant to Sections 40.04 (f) and (h) below, to the Company's total gross Plant in Service (PLT), where PLT is the sum of Production, Transmission, Distribution, General and Intangible Plant in Service,

(f)     Plus an allocation of General Plant recorded in FERC Plant Accounts 389 through 398 (GPLT) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding Administrative and General ("A&G") Labor (LXAG),

(g)     Less an allocation of Accumulated Provision for Depreciation (consistent with the accounting relating to SFAS 143 approved by the retail regulator having jurisdiction over the Designated Generating Unit, unless the FERC determines otherwise) associated with item (f) above as recorded in FERC Account 108 (GDR) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG),

Issued by:      Kimberly Despeaux                Effective:      November 22, 2008
              Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                           9-142

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 64
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

    (h)    Plus an allocation of Miscellaneous Intangible Plant recorded in FERC Plant Account 303 (IPLT) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG),

    (i)    Less an allocation of Accumulated Provision for Amortization associated with item (h) above recorded in FERC Account 111 (IAA) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG),

    (j)    Plus an allocation of Materials & Supplies and Stores Expense Undistributed recorded in FERC Accounts 154 and 163, respectively, (MS) based on the proportion of Plant in Service for the Designated Generating Unit (DGUPLT) to the Company's total Plant in Service (PLT), and

    (k)    Plus an allocation of Prepayments recorded in FERC Account 165 (PP) based on the proportion of Plant in Service for the Designated Generating Unit (DGUPLT) to the Company's total Plant in Service (PLT).

The Investment in the Designated Generating Unit (Designated Generating Unit Rate Base) shall be based on the actual balances on the seller's books as of the end of the month immediately preceding the service month.

If the Designated Generating Unit is one of a multi-unit station, its costs shall include an allocation of the amounts in the above plant accounts, which are allocable to all the generating units in the station, such allocation to be in the ratio of the capability of the Designated Generating Unit to the total capability of all generating units installed in the station for the service month.

Issued by:    Kimberly Despeaux          Effective:    November 22, 2008
             Associate General Counsel

Issued on:    November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 65
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

40.05   Expenses associated with Designated Generating Unit (OXP)

For the purpose of calculating the Monthly Charge under Section 40.06, expenses associated with Designated Generating Unit shall be the following:

OXP = Operating Expense
OXP = DGUPOM + [SEOM * (DGUSEPLT / SEPLT)] + DGUDE + DGUI + DGUPT + DGUAG + [(GDX + OT + INDX) * (DGUL / LXAG)] + [FT * (DGUPLT / PLT)]

(a)     The Designated Generating Unit Production Operation and Maintenance Expense ("O&M") Expense, included in FERC Accounts 500 through 554 excluding fuel in Accounts 501, 518 and 547 (DGUPOM),

(b)     Plus an allocation of O&M associated with Designated Generating Unit step-up transformers and related transmission investment recorded in FERC Accounts 562 and 570 (SEOM) based on the proportion of the Designated Generating Unit Step-up Transformer Plant recorded in Plant Account 353 (DGUSEPLT) to the Company's total Transformer Station Equipment Plant recorded in Plant Account 353 (SEPLT),

(c)     Plus any Depreciation Expense associated with the plant investment in Designated Generating Unit referred to in Section 40.04 items (a) and (b) (as recorded in Account 403) and Decommissioning Expense, as approved by Retail Regulators, directly assigned to the Designated Generating Unit, if applicable (DGUDE) unless the jurisdiction for determining the depreciation and/or decommissioning rate is vested in the FERC under otherwise applicable law,

(d)     Plus Property Insurance Expense recorded in FERC Account 924 directly assigned to the Designated Generating Unit (DGUI),

(e)     Plus Ad Valorem Taxes recorded in FERC Account 408 directly assigned to the Designated Generating Unit (DGUPT),

Issued by:      Kimberly Despeaux                         Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94  Original Sheet No. 66
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

(f)  Plus A&G Expense (DGUAG) directly associated with a nuclear-fueled Designated Generating Unit recorded in FERC Accounts 920 through 935, excluding property insurance in Account 924; otherwise, an allocation of A&G Expense recorded in FERC Accounts 920 through 935 excluding property insurance in Account 924 based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total labor charged to O&M Expense excluding EOI and A&G labor,

(g)  Plus an allocation of General Plant Depreciation Expense recorded in FERC Account 403 (GDX) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG),

(h)  Plus an allocation of Payroll Taxes recorded in FERC Account 408 (OT) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG),

(i)  Plus an allocation of Miscellaneous Intangible Plant Amortization Expense recorded in FERC Account 404 (INDX) based on the proportion of labor for the Designated Generating Unit (DGUL) to the Company's total Labor charged to O&M Expense excluding A&G Labor (LXAG), and

(j)  Plus an allocation of Corporate Franchise Taxes recorded in FERC Account 408 (FT) based on the proportion of Plant in Service for the Designated Generating Unit (DGUPLT) to the Company's total Plant in Service (PLT).

The expenses shall be based on transactions recorded on the seller's books for the service month.

Issued by:  Kimberly Despeaux                Effective:     November 22, 2008
            Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 67
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

If the Designated Generating Unit is one of a multi-unit station, expenses relating to the common plant shall be allocated to the Designated Generating Units in the station based on the ratio of the capability of the Designated Generating Unit to the total capability of all generating units installed in the station for the service month.

40.06  Determination of Monthly Capacity Charge

For the purpose of calculating the Monthly Capacity Charge (MC) per kW for billings under Capability Payment for each unit, the following formula shall be followed:

**MONTHLY CAPACITY CHARGE**

MC =  Monthly Capacity Charge ($/kW-Month)

MC =  $[DGURB * ((CM + F)/12) + OXP - ITC/(1-T)] / CP$
Where:
  DGURB = Designated Generating Unit Rate Base per Section 40.04

  CM = The weighted average cost of capital consistent with the procedures used by each Operating Company to calculate its AFUDC rate, determined as follows:

  CM = $(DR * i) + (PR * p) + (ER * c)$, where

  DR = Ratio of Debt Capital and Preferred Stock with tax deductible dividends (QUIPS) at the last day of the month immediately preceding the current service month
  PR = Ratio of Preferred Stock without tax deductible dividends at the last day of the month immediately preceding the current service month
  ER = Ratio of Common Stock at the last day of the month immediately preceding the current service month
   i = Average embedded cost of debt capital outstanding at the last day of the month immediately preceding the current service month
   p = Average embedded cost of preferred stock outstanding at the last day of the month immediately preceding the current service month
   c = Return on common equity at 11.0%
   F = Federal and State Income Tax as determined from the following:
   F = $T /(1 - T)* (CM – DR * i)$

  Where:

Issued by:        Kimberly Despeaux                          Effective:        November 22, 2008
                  Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 68
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

$T = f + s - fs$ when federal tax is not deductible in computing state tax, and

$T = (f + s - 2fs) / (1-fs)$ when federal tax is deductible in computing state tax, and

$f$ = Federal Income Tax Rate

$s$ = State Income Tax Rate

OXP = Operating Expense per Section 40.05

ITC = ITC Amortization recorded in FERC Account 411 directly associated with the Designated Generating Unit if known; otherwise, an allocation of ITC Amortization recorded in FERC Account 411 based on a gross plant-related balance ratio

CP = Capability for the Designated Generating Unit as defined in Section 2.14 of the Entergy System Agreement for the service month

General Notes:

(a) Labor ratios shall be determined based on the sum of the payroll expenses for the owner of the DGU, including those payroll expenses billed to it by EOI and ESI, for the service month.

(b) Plant ratios shall be determined based on plant in service balances as of the end of the month immediately preceding the service month.

40.07   Adjustment for Tax Changes

The Capability Payment as determined above shall be adjusted to reflect the imposition of any applicable new taxes not included in the above formula or for any increase or decrease in taxes included as of the date of this Agreement.

Issued by:      Kimberly Despeaux             Effective:      November 22, 2008
            Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 69
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

40.08   Billings Procedure

Bills for services rendered under Section 40.06 shall be issued within 45 days following the end of the service month and shall be payable within 10 days of receipt. Five days after such bill is due, interest shall accrue on any balance due at the rate as determined in Section 35.19a(2)iii of the FERC Regulations. The billing provisions under Section 4.14 of the Entergy System Agreement shall not apply to billings under Section 40.06 of this Service Schedule MSS-4.

40.09   Designated Power Purchase

(a)     A Designated Power Purchase shall be any portion of a power purchase contract the sale and purchase of which is made pursuant to Section 40.01 hereof, which is mutually agreed upon by the purchaser and the seller. Any resale of a power purchase from the Grand Gulf nuclear unit pursuant to Section 40.09 shall be subject to the approval of the Commission and the regulatory agency of the purchasing company.

(b)     Any Company that makes a Designated Power Purchase of a portion of the capability of the power purchase contract from which the sale and purchase is made shall be entitled to receive each hour, the same portion of the total energy purchased pursuant to the Designated Power Purchase subject to review by the FERC.

(c)     Sales to one Company of power purchased by another Company shall be priced at the delivered cost of said purchase incurred by the selling Company as recorded in FERC Accounts 555 and 565, excluding all timing effects on such costs due to retail ratemaking decisions on a monthly basis, and shall be billed pursuant to Section 4.14 of the Entergy System Agreement subject to review by the FERC.

Issued by:      Kimberly Despeaux                          Effective:       November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 70
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

This Service Schedule MSS-4 shall be attached to and become a part of the Agreement dated the ___23rd___ day of ___April___, _1982_ and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.

Attest                                         ARKANSAS POWER & LIGHT COMPANY

Original signed by                             Original signed by
R. J. Estrada                                  Jerry Maulden
Assistant Secretary                            President

Attest                                         LOUISIANA POWER & LIGHT COMPANY

Original signed by                             Original signed by
W. H. Talbot                                   J. M. Wyatt
Secretary                                      President

Attest                                         MISSISSIPPI POWER & LIGHT COMPANY

Original signed by                             Original signed by
R. J. Estrada                                  D. C. Lutken
Assistant Secretary                            President

Attest                                         NEW ORLEANS PUBLIC SERVICE INC.

Original signed by                             Original signed by
William C. Nelson                              James M. Cain
Secretary                                      President

Issued by:     Kimberly Despeaux                    Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 71
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-5

## DISTRIBUTION OF REVENUE FROM SALES
## MADE FOR THE JOINT ACCOUNT
## OF ALL THE COMPANIES

50.01 Purpose

The purpose of this Schedule is to provide a basis for the distribution among the Companies of the net balance received from sales to others for the joint account of all the Companies.

50.02 Revenue Deductions

From the gross revenue received for such sales there shall be deducted the cost of the sales determined by taking the sum of:

(a)     Any direct tax imposed on the sale of capacity or energy or revenue derived there from.

(b)     Any appropriate adjustment for losses in the system of the Company providing the connection.

(c)     The cost of energy determined under the provisions of Section 30.04 of Service Schedule MSS-3.

(d)     The Ownership Costs for the specific connecting facilities not equalized elsewhere.  For this purpose, Ownership Costs shall be computed at the rate developed for the connecting Company's Annual Ownership Cost under Service Schedule MSS-2 on the facilities provided by the Company and approved by the Operating Committee.

Issued by:      Kimberly Despeaux                        Effective:        November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 72
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

50.03 <u>Distribution of Net Balance</u>

The net balance remaining after the deductions provided for in 50.02 shall be distributed among the Companies in proportion to the Responsibility Ratio of each based on Sections 2.16(b) and 2.17(b). Provided, however, that EGSL and ETI shall not share in the distribution of the net revenue balance from sales to others for the joint account of all the Companies received from contracts entered by EAI, ELL, EMI, ENOI or Services prior to the merger. The net balance remaining after the deductions provided for in 50.02 for pre-merger sales shall be distributed among EAI, ELL, EMI and ENOI in proportion to the Company Load Responsibility of each divided by the sum of their Company Load Responsibilities based on Sections 2.16(b) and 2.17(b). EGSL and ETI shall participate pursuant to MSS-5 in any future sales, but shall only participate in the incremental portion of any extensions or expansions of existing contracts.

Issued by:      Kimberly Despeaux             Effective:       November 22, 2008
               Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 73
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

This Service Schedule MSS-5 shall be attached to and become a part of the Agreement dated the  23rd  day of    April   ,  1982  and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.

Attest                                    ARKANSAS POWER & LIGHT COMPANY

Original signed by                        Original signed by
R. J. Estrada                             Jerry Maulden
Assistant Secretary                       President

Attest                                    LOUISIANA POWER & LIGHT COMPANY

Original signed by                        Original signed by
W. H. Talbot                              J. M. Wyatt
Secretary                                 President

Attest                                    MISSISSIPPI POWER & LIGHT COMPANY

Original signed by                        Original signed by
R. J. Estrada                             D. C. Lutken
Assistant Secretary                       President

Attest                                    NEW ORLEANS PUBLIC SERVICE INC.

Original signed by                        Original signed by
William C. Nelson                         James M. Cain
Secretary                                 President

Issued by:     Kimberly Despeaux                    Effective:        November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 74
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-6

## DISTRIBUTION OF OPERATING EXPENSES OF
## SYSTEM OPERATIONS CENTER

60.01 Purpose

The purpose of this Schedule is to provide a basis for the distribution among the Companies of the costs incurred by Services in providing and operating the System Operations Center.

60.02 Costs

Costs for the purpose of this Schedule shall include such items as salaries, wages, rentals, the cost of materials and supplies, interest, taxes, depreciation, transportation, travel expenses, consulting and other professional services, and other costs incurred by Services in providing, maintaining, and operating the System Operations Center in accordance with budget approved by the Operating Committee.

60.03 Distribution of Costs

All costs of the Center shall be paid by Services. All normal costs shall be billed by Services to the Companies in proportion to the Responsibility Ratio of each. However, if the System Operations Center makes a study or performs a service in which all Companies are not proportionately interested, any resulting cost shall be distributed to the interested parties in accordance with the standard procedures of Services as outlined in their application declaration as filed with the Securities and Exchange Commission.

Issued by:      Kimberly Despeaux                         Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 75
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

This Service Schedule MSS-6 shall be attached to and become a part of the Agreement dated the  23rd  day of   April  ,  1982  and shall be effective with said Agreement or at such later date as may be fixed by any requisite regulatory approval or acceptance for filing.

Attest                                         ARKANSAS POWER & LIGHT COMPANY


Original signed by                             Original signed by
R. J. Estrada                                  Jerry Maulden
Assistant Secretary                            President


Attest                                         LOUISIANA POWER & LIGHT COMPANY


Original signed by                             Original signed by
W. H. Talbot                                   J. M. Wyatt
Secretary                                      President


Attest                                         MISSISSIPPI POWER & LIGHT COMPANY


Original signed by                             Original signed by
R. J. Estrada                                  D. C. Lutken
Assistant Secretary                            President


Attest                                         NEW ORLEANS PUBLIC SERVICE INC.


Original signed by                             Original signed by
William C. Nelson                              James M. Cain
Secretary                                      President


Issued by:      Kimberly Despeaux              Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 76
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

## SERVICE SCHEDULE MSS-7

## MERGER FUEL PROTECTION PROCEDURE

70.01  Purpose

This Service Schedule provides a procedure for protecting the participating

Companies from incurring higher fuel and purchased power costs as a result of the merger

with Gulf States.  For a Company which incurs an increase in its fuel costs as a result of

the merger, the increase in cost will be transferred back to the companies obtaining fuel

savings in proportion to those savings, in accordance with the following provisions.

70.02  Participating Companies

Companies covered by this Service Schedule shall include Gulf States and any other

Company notifying the Operating Committee prior to the first calculation performed

pursuant to 70.03 of its intent to participate and that its participation has the approval of the

regulatory agency with jurisdiction over the Company's retail rates.  Any Company directed

to participate by its retail regulator shall do so.

70.03  Calculation Procedure of Fuel Cost Changes

Each year after the effective date of the Entergy-Gulf States Merger (Merger),

merger-related fuel cost changes (MRFC) will be Calculated for each Company in

accordance with 70.05.  The MRFC will be used to calculate a Cumulative Fuel Change

Balance (CFCB) for each Company, as follows:

Year ending CFCB = (Year beginning CFCB x (1 + i)) + MRFC

where: i =  the average yield on ten-year U.S. Treasury Notes for

the year just ended.

Issued by:          Kimberly Despeaux                    Effective:          November 22, 2008
                    Associate General Counsel

Issued on:          November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April
22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 77
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

At the end of each of the years prior to the final year, if the CFCB is negative for one or more Companies and positive for one or more Companies, then 50 percent of the Company's positive CFCB (i.e., higher fuel costs due to the merger) shall be transferred to the CFCB of the Company or Companies with a negative balance. At the end of the tenth year (or such shorter period of time as set forth in Section 70.04) of this procedure, the above procedure will apply except that the full amount (100%) of a positive CFCB will be transferred subject to the limitation that such transfer does not cause the CFCB to become positive for another Company. For the Companies receiving the transferred amount, the transfer shall be allocated in proportion to each Company's percentage of the total of the negative balances of the participating companies.

Any year after a positive amount is transferred from a Company's CFCB and that Company's CFCB subsequently becomes negative, then such previous transfers will be reversed to the extent the reversals do not cause the Company's CFCB to become positive.

70.04  Limitation of Term

This procedure shall apply for the shorter of: (1) the ten years following the effective date of the merger, or (2) the period between the effective date of the merger and the date of implementation of retail access in a jurisdiction in which one of the Companies operate.

70.05  Fuel Cost Change Measurement Procedure

Merger-related fuel cost changes (MRFC) for each Company are measured annually as the difference between estimated stand-alone fuel costs (SAFC) and estimated merger fuel costs (MFC), where:

Issued by:      Kimberly Despeaux                    Effective:      November 22, 2008
                Associate General Counsel

Issued on:      November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 78
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

SAFC =     The estimated annual cost of fuel and purchased energy incurred to serve the Company's net area dispatch, as determined by a simulation of the dispatch of generating units and system operations under stand-alone (non-combined) operation of the Gulf States and Entergy System (excluding Gulf States) using Entergy's most current delivery of the PROMOD III production cost model and the input assumptions set forth in 70.06.

MFC =     The estimated annual cost of fuel and purchased energy incurred to serve a Company's net area requirements as determined by a simulation of the dispatch of generating units and system operations under merged operation (combined) of the system using Entergy's most current delivery of the PROMOD III production cost model and the input assumptions set forth in 70.06.

70.06  Input Assumptions for Production Cost Simulations

Customer Loads

Actual hourly net area load, without off-system sales transactions, will be used as hourly load inputs.

Resources

The Gulf States and Entergy resources available to meet customer loads shall be those reflected in Entergy's most recent Business Plan applicable to that year.

Generating Unit Efficiency

The heat rate data shall be the then current data used in Entergy's Bulk Power Management system (BPMS).

Generating Unit Availability

Generating unit availability data (available MW's for each generating unit) shall be those reflected in the BPMS data for that time period.

Issued by:     Kimberly Despeaux                    Effective:     November 22, 2008
               Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94                    Original Sheet No. 79
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

### System Operating Constraints

All generating unit constraints, fuel constraints, and transmission constraints as represented in Entergy's most current Business Plan applicable to that year will be reflected in the input assumptions.  However, the transmission constraint known as Amite South shall be changed after the end of the fifth post merger year in the Entergy stand-alone analysis to that contained in the merger analysis for the remaining time period.

### Fuel Costs

Nuclear          -- Actual monthly fuel cost as used in the Intra-System Billing (ISB) program will be used as the nuclear fuel cost input.

Coal             -- Actual monthly fuel cost as used in the ISB program will be used as the coal fuel cost input except that the stand-alone fuel cost for North Antelope coal shall be multiplied by the ratio of the stand-alone cost of North Antelope coal to the merger cost of North Antelope coal for each Entergy coal unit as reflected in 70.08.

Gas/Oil          -- Fuel cost for each gas/oil unit will be based on actual weighted average fuel cost for each unit as calculated from fuel cost inputs to the ISB program.

### Off System Economy Purchases

The simulations will reflect the off-system economy sources listed in 70.09.  For the stand-alone simulations, these sources will be allocated to Gulf States and Entergy based on the most current year ending load responsibility ratios.  The pricing of these transactions will be based on the actual monthly average on-peak and off-peak price of economy energy purchases, as determined by the ISB, plus a $2/MWH markup for each transaction for which Gulf States would require wheeling service from Entergy.

Issued by:       Kimberly Despeaux                        Effective:      November 22, 2008
                 Associate General Counsel

Issued on:       November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                             9-158

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94              Original Sheet No. 80
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

In addition, the Gulf States stand-alone simulation will also reflect a 300 MW off-peak source to be priced at the actual average monthly off-peak price of economy energy purchases as determined by the ISB. The available capacity for each Entergy stand-alone off-system economy source, as determined above, will be increased (to reflect economy energy not taken in the Gulf States stand-alone simulation) by the following method:

> IMW =       Monthly on-peak and off-peak increase for each Entergy stand-alone off-system economy source rounded at the nearest whole MW.
>
> =   AMW x (1-CF)

where:

> AMW =       The available capacity (MW) for the off-system economy source in the Gulf States stand-alone.
>
> CF =       Monthly on-peak or off-peak capacity factor at which energy is taken in the Gulf States stand-alone simulation for the off-system economy source.

Operating Reserves

An operating reserve level of 6 percent of annual peak will be reflected in the input assumptions.

70.07   PROMOD Benchmark

A benchmark of PROMOD based on the actual 1992 and 1997 operating data will be made to verify the reasonableness of the model.

Issued by:      Kimberly Despeaux                    Effective:         November 22, 2008
               Associate General Counsel

Issued on:        November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94          Original Sheet No. 81
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

70.08  North Antelope Coal Prices

The following ratios will be used to increase the actual North Antelope coal prices used in the stand-alone simulation case:

| Year | Stand Alone ($/MMBtu) | Combined ($/MMBtu) | Ratio |
|------|-----------------------|--------------------|-------|
| 1994 | 1.8261 | 1.7910 | 1.0196 |
| 1995 | 1.8997 | 1.8500 | 1.0269 |
| 1996 | 1.9423 | 1.9190 | 1.0122 |
| 1997 | 2.0918 | 2.0240 | 1.0335 |
| 1998 | 2.2096 | 2.1760 | 1.0155 |
| 1999 | 2.2556 | 2.2160 | 1.0179 |
| 2000 | 2.3466 | 2.2960 | 1.0221 |
| 2001 | 2.4274 | 2.3800 | 1.0199 |
| 2002 | 2.5114 | 2.4830 | 1.0114 |
| 2003 | 2.6041 | 2.5690 | 1.0137 |

70.09  Joint Dispatch Economy Purchase Capacities

The following off-system economy resources will be used in the PROMOD simulations, with the figures below being capacity in MW:

Issued by:       Kimberly Despeaux                    Effective:        November 22, 2008
                 Associate General Counsel

Issued on:       November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

Entergy Arkansas, Inc., Third Revised Rate Schedule FERC No. 94            Original Sheet No. 82
Entergy Gulf States Louisiana, L.L.C., Rate Schedule FERC No. 181
Entergy Louisiana, LLC, Third Revised Rate Schedule FERC No. 69
Entergy Mississippi, Inc., Third Revised Rate Schedule FERC No. 262
Entergy New Orleans, Inc., Third Revised Rate Schedule FERC No. 8
Entergy Texas, Inc., Rate Schedule FERC No. 181

| Company | Type of Purchase | Month | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---------|------------------|-------|------|------|------|------|------|------|------|------|------|------|
| AECI | On Peak & Off Peak | Year Round | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Cajun | On Peak & Off Peak | Jan. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Feb. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Mar. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Apr. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | May | 110 | 95 | 80 | 120 | 100 | 160 | 160 | 160 | 160 | 160 |
| Cajun | On Peak & Off Peak | Jun. | 110 | 95 | 80 | 120 | 100 | 160 | 160 | 160 | 160 | 160 |
| Cajun | On Peak & Off Peak | Jul. | 110 | 95 | 80 | 120 | 100 | 160 | 160 | 160 | 160 | 160 |
| Cajun | On Peak & Off Peak | Aug. | 110 | 95 | 80 | 120 | 100 | 160 | 160 | 160 | 160 | 160 |
| Cajun | On Peak & Off Peak | Sep. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Oct. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Nov. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Cajun | On Peak & Off Peak | Dec. | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Empire | On Peak & Off Peak | Year Round | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Oklahoma | On Peak Only | Year Round | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Oklahoma | On Peak & Off Peak | Year Round | 250 | 150 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Southern | On Peak & Off Peak | Year Round | 75 | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 50 | 50 |
| SWEPCO | On Peak & Off Peak | Year Round | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| SWEPCO | On Peak Only | Year Round | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| TVA | On Peak & Off Peak | Year Round | 1,000 | 1,000 | 1,000 | 750 | 500 | 500 | 500 | 500 | 500 | 500 |
| Union EL | On Peak & Off Peak | Year Round | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |

Issued by:     Kimberly Despeaux                          Effective:     November 22, 2008
                      Associate General Counsel

Issued on:     November 21, 2008

Filed to comply with unpublished letter order of the Federal Energy Regulatory Commission, Docket No. ER08-460, issued April 22, 2008.

**2011 ETI Rate Case**                                                              9-161

This page has been intentionally left blank.

Entergy Electric System      Date range - 20100701 through 20100731      **Attachment 1**

Intra-System Billing-201007RA      KWH Log Sheet Reconciliation - Entergy Arkansas, Inc.      **Page 1**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AECC LOSS IN | 2,995,170 | 2,995,170 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC PURCH LOSSES IN | 131,000 | 131,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC SALE LOSSES IN | 121,000 | 121,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP./MINDEN PAYBACK | (521,404) | (521,404) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL IN | 269,838 | 269,838 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (493) | (493) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses N | 189,395 | 189,395 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC SALE LOSS N | 744,000 | 744,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 258,860 | 258,860 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (269,531) | (269,531) | 0 | 0 | 0 | 0 | 0 | 0 |
| PP Sale Losses N | 1,772,931 | 1,772,931 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss IN | 418 | 418 | 0 | 0 | 0 | 0 | 0 | 0 |
| JBO LOSS IN | 3,790,000 | 3,790,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| K RBYV LLE IMBAL IN | 128,602 | 128,602 | 0 | 0 | 0 | 0 | 0 | 0 |
| K RBYV LLE IMBAL OT | (1,332) | (1,332) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 206,611 | 206,611 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (130) | (130) | 0 | 0 | 0 | 0 | 0 | 0 |
| SPA AECC PP IMBAL IN | 3,528,000 | 3,528,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SPA AECC PP IMBAL OT | (5,902,000) | (5,902,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| SWPA/B/DG EXCHANG | (28,495,000) | (28,495,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1 | 86,421,339 | 0 | 86,421,339 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 536,659,661 | 536,659,661 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2 | 102,307,792 | 0 | 102,307,792 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 635,309,208 | 635,309,208 | 0 | 0 | 0 | 0 | 0 | 0 |
| BLAKLY 1/Aux | (71,000) | (71,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| BLAKLY 1/HYDRO | 14,898,000 | 14,898,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| BLAKLY 2/Aux | (3,000) | (3,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| BLAKLY 2/HYDRO | 5,811,000 | 5,811,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARPTR 1/Aux | (110,000) | (110,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| CARPTR 1/HYDRO | 2,011,000 | 2,011,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARPTR 2/Aux | (12,000) | (12,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| CARPTR 2/HYDRO | 8,856,000 | 8,856,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| COUCH 1/Aux | (57,000) | (57,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| COUCH 2/CEGT E | 19,368,107 | 7,913,041 | 0 | 9,781,627 | 1,673,230 | 0 | 0 | 209 |
| COUCH 2/CENTERPO NT I | 168,893 | 129,859 | 0 | 17,362 | 21,672 | 0 | 0 | 0 |
| DEGRAY 1/HYDRO | 8,560,000 | 8,560,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| DEGRAY 2/Aux | (113,000) | (113,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| G.GULF 1/NUCLEAR | 201,820,133 | 201,820,133 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RET | 66,088,728 | 0 | 66,088,728 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 32,499,259 | 0 | 32,499,259 | 0 | 0 | 0 | 0 | 0 |
| NDEPN 1 | 24,696,343 | 0 | 24,696,343 | 0 | 0 | 0 | 0 | 0 |
| L.CATH 3/Aux | (219,000) | (219,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| L.CATH 4/Aux | (729,000) | (729,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| L.CATH 4/CEGT E | 22,337,765 | 14,391,650 | 0 | 7,839,611 | 105,794 | 0 | 710 | 0 |
| L.CATH 4/CENTERPOINT I | 3,592,235 | 2,174,843 | 0 | 1,399,984 | 17,408 | 0 | 0 | 0 |
| LYNCH 3/Aux | (26,000) | (26,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| LYNCH 3/CEGT E | 10,201,913 | 7,109,876 | 0 | 2,936,490 | 154,920 | 0 | 0 | 627 |
| LYNCH 3/CENTERPOINT I | 2,144,087 | 1,475,204 | 0 | 659,947 | 8,936 | 0 | 0 | 0 |
| LYNCH IC/#2 OIL | 2,000 | 0 | 0 | 2,000 | 0 | 0 | 0 | 0 |
| MABELV T/CEGT E | 2,423,998 | 2,032,336 | 0 | 2,000 | 389,662 | 0 | 0 | 0 |
| MABELV T/CENTERPO NT I | 1,245,002 | 1,166,995 | 0 | 0 | 78,007 | 0 | 0 | 0 |
| OUACHITA 1/SIGCO I | 13,400,626 | 13,160,723 | 0 | 234,880 | 5,023 | 0 | 0 | 0 |
| OUACHITA 1/SIGPL E | 24,862,374 | 21,315,758 | 0 | 3,527,779 | 18,837 | 0 | 0 | 0 |
| OUACHITA 2/SIGCO I | 7,138,433 | 7,138,433 | 0 | 0 | 0 | 0 | 0 | 0 |
| OUACHITA 2/SIGPL E | 27,493,567 | 26,561,557 | 0 | 910,452 | 21,558 | 0 | 0 | 0 |
| REMMEL 1/HYDRO | 1,613,000 | 1,613,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| REMMEL 2/HYDRO | 1,508,000 | 1,508,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| REMMEL 3/Aux | (13,000) | (13,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| REMMEL 3/HYDRO | 1,451,000 | 1,451,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| RITCHE 1/Aux | (28,000) | (28,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1 | 45,314,539 | 0 | 45,314,539 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2 | 38,134,556 | 0 | 38,134,556 | 0 | 0 | 0 | 0 | 0 |
| NDEPN 1/COAL | 153,487,079 | 153,487,079 | 0 | 0 | 0 | 0 | 0 | 0 |
| NDEPN 2/COAL | 6,410 | 6,410 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 281,394,779 | 255,052,371 | 0 | 25,833,205 | 509,203 | 0 | 0 | 0 |
| WH.BLF 2/Aux | (10,260) | (10,260) | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 236,808,729 | 234,500,243 | 0 | 2,103,620 | 204,866 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 50,110 | 19,387 | 0 | 30,723 | 0 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 14,445 | 0 | 0 | 14,445 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 3,294,648 | 2,328,767 | 0 | 952,753 | 13,128 | 0 | 0 | 0 |
| AECC Excess WH.BLF 1 | 1,487,454 | 562,317 | 0 | 914,776 | 10,361 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 7,262,197 | 4,021,499 | 0 | 3,188,988 | 51,710 | 0 | 0 | 0 |
| CONWAY Excess WH.BLF 1 | 49,300 | 49,300 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONWAY Excess WH.BLF 2 | 287,280 | 287,280 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC Excess INDEPN 2 | 166,582 | 166,582 | 0 | 0 | 0 | 0 | 0 | 0 |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**            9-163

**Entergy Electric System**  
**Intra-System Billing-201007RA**

Date range - 20100701 through 20100731  
KWH Log Sheet Reconciliation - Entergy Arkansas, Inc.

**Attachment 1**  
**Page 2**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| JONESBORO Excess INDEPN 2 | 2,986,600 | 1,764,678 | 0 | 1,221,922 | 0 | 0 | 0 | 0 |
| JONESBORO Excess WH BLF 1 | 4,868,500 | 3,114,865 | 0 | 1,744,400 | 9,235 | 0 | 0 | 0 |
| JONESBORO Excess WH BLF 2 | 9,850,050 | 7,159,003 | 0 | 2,670,122 | 20,925 | 0 | 0 | 0 |
| OSCEOLA Excess INDEPN 1 | 142,645 | 142,645 | 0 | 0 | 0 | 0 | 0 | 0 |
| OSCEOLA Excess INDEPN 2 | 2,225,615 | 2,225,615 | 0 | 0 | 0 | 0 | 0 | 0 |
| WEST MEMPHIS Excess WH.BLF 1 | 56,440 | 56,440 | 0 | 0 | 0 | 0 | 0 | 0 |
| WEST MEMPHIS Excess WH.BLF 2 | 454,030 | 454,030 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP A | 499,659 | 214,488 | 0 | 275,334 | 9,837 | 0 | 0 | 0 |
| AECI/WSPP B | 4,176,000 | 3,393,000 | 0 | 783,000 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 9,620,460 | 6,726,581 | 0 | 2,837,035 | 53,556 | 0 | 3,288 | 0 |
| AEP SERVICE CORP /WSPP A | 626,400 | 369,543 | 0 | 254,973 | 1,884 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 167,040 | 156,600 | 0 | 10,440 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY  NC. (AE) ACTING | 501,120 | 353,129 | 0 | 145,951 | 0 | 0 | 2,040 | 0 |
| Ameren Energy Marketing Company/WSPP | 10,440 | 10,440 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 41,760 | 41,760 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 803,671 | 770,263 | 0 | 33,408 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 2,789,568 | 2,537,516 | 0 | 236,639 | 0 | 0 | 15,413 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 349,740 | 349,740 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY  NC/WSPP A | 50,112 | 39,672 | 0 | 10,440 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 1,048,172 | 627,636 | 0 | 317,798 | 19,334 | 0 | 83,404 | 0 |
| CONSTELLATION ENERGY | 37,584 | 26,463 | 0 | 0 | 11,121 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 1,135,245 | 929,399 | 0 | 204,354 | 807 | 0 | 685 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 41,619 | 34,000 | 0 | 7,619 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 10,037 | 7,926 | 0 | 2,111 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 438,669 | 386,586 | 0 | 51,457 | 626 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 2,541 | 2,541 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 290,367 | 209,453 | 0 | 80,914 | 0 | 0 | 0 | 0 |
| CROSS O L/QF | 209,394 | 132,508 | 0 | 76,886 | 0 | 0 | 0 | 0 |
| CYPRES/EXS50 | 3,999 | 3,999 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 219 | 219 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 26,430 | 26,430 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 21,593,680 | 18,492,782 | 0 | 2,901,191 | 87,866 | 0 | 111,632 | 209 |
| DUKE ENERGY HINDS/EXS50 | 23,661 | 23,661 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 17,266 | 11,684 | 0 | 5,582 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 180,827 | 168,938 | 0 | 11,889 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 29,273 | 29,253 | 0 | 20 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 17,619 | 16,912 | 0 | 700 | 7 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 152,741 | 150,477 | 0 | 2,264 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 156 | 156 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 283,965 | 282,765 | 0 | 0 | 0 | 0 | 1,200 | 0 |
| ENDURE ENERGY/WSPP B | 13,572 | 0 | 0 | 13,572 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 244,298 | 244,298 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 19,524,239 | 15,079,121 | 0 | 4,361,740 | 52,602 | 0 | 30,776 | 0 |
| J ARON & COMPANY/WSPP B | 4,984,056 | 4,353,549 | 0 | 599,915 | 18,710 | 0 | 11,882 | 0 |
| J.P. MORGAN VENTURES ENERGY | 13,990 | 13,990 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 1,019,989 | 900,488 | 0 | 0 | 3,268 | 0 | 116,233 | 0 |
| JBO/WSPP A | 2,019,305 | 1,537,630 | 0 | 217,449 | 0 | 0 | 264,226 | 0 |
| JBO/WSPP B | 2,168,386 | 1,840,823 | 0 | 275,382 | 0 | 0 | 52,181 | 0 |
| KANSAS CITY POWER & LIGHT | 300,881 | 300,881 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 3,545 | 3,545 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 164,007 | 128,342 | 0 | 35,561 | 104 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 901,963 | 556,965 | 0 | 344,998 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 4,846 | 4,846 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 977 | 977 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 34,261 | 34,261 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 40,521,612 | 34,559,147 | 0 | 5,621,170 | 110,134 | 0 | 231,161 | 0 |
| MORGAN STANLEY/WSPP A | 51,366 | 29,859 | 0 | 21,507 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 6,217,020 | 3,363,918 | 0 | 2,773,777 | 79,325 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 38,603,785 | 33,443,893 | 0 | 4,613,037 | 159,901 | 0 | 386,954 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 1,740,348 | 1,515,609 | 0 | 212,817 | 5,681 | 0 | 6,241 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 1,189,742 | 859,931 | 0 | 241,196 | 23,113 | 0 | 65,502 | 0 |
| PINE BLUFF ENERGY/QF | 70,109,200 | 38,424,118 | 0 | 31,414,407 | 270,675 | 0 | 0 | 0 |
| RAINBOW ENERGY MARKETING | 2,907,333 | 2,746,765 | 0 | 154,939 | 5,629 | 0 | 0 | 0 |
| SMEPA/WSPP B | 626,400 | 601,514 | 0 | 0 | 19,675 | 0 | 5,211 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 114,840 | 52,200 | 0 | 62,640 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 2,213,280 | 1,811,139 | 0 | 0 | 120,558 | 0 | 281,583 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 1,808,208 | 1,630,717 | 0 | 177,491 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 11,804,928 | 10,673,972 | 0 | 1,049,490 | 18,284 | 0 | 63,182 | 0 |
| TEA/WSPP A | 233,021 | 204,833 | 0 | 28,188 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 17,152 | 17,152 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 13,458 | 9,788 | 0 | 3,670 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 218,226 | 177,130 | 0 | 40,595 | 501 | 0 | 0 | 0 |
| TENASKA/WSPP A | 490,888 | 484,557 | 0 | 0 | 0 | 0 | 6,331 | 0 |
| TENASKA/WSPP B | 4,812,638 | 4,317,828 | 0 | 449,719 | 14,162 | 0 | 30,929 | 0 |
| UNION POWER PARTNERS/WSPP A | 39,672 | 36,096 | 0 | 3,576 | 0 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**　　　　**RunID: 17029**　　　　**Billing Snapshot: 20100826175238**

**Entergy Electric System**        **Date range - 20100701 through 20100731**        **Attachment 1**
**Intra-System Billing-201007RA**        **KWH Log Sheet Reconciliation - Entergy Arkansas, Inc.**        **Page 3**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| UNION POWER PARTNERS/WSPP B | 34,397,079 | 30,983,289 | 0 | 3,127,518 | 145,624 | 0 | 140,230 | 418 |
| WESTAR ENERGY  NC/WSPP A | 1,447,817 | 1,005,766 | 0 | 420,854 | 21,197 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP B | 6,170,038 | 4,937,510 | 0 | 1,228,584 | 1,632 | 0 | 2,312 | 0 |
| WESTAR ENERGY  NC/WSPP C | 167,040 | 156,600 | 0 | 10,440 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 7,745 | 7,745 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 169,805 | 167,905 | 0 | 1,900 | 0 | 0 | 0 | 0 |
| YAZOO CITY/EXS90 | 1,101 | 1,101 | 0 | 0 | 0 | 0 | 0 | 0 |
| Un-accounted In | 4,036 | 4,036 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 131,563,443 | 131,547,746 | 0 | 0 | 13,186 | 0 | 0 | 2,511 |
| INADVERTENT  N | 3,196,726 | 3,196,726 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **3,068,221,822** | **2,534,515,289** | **395,462,556** | **131,743,223** | **4,583,474** | **0** | **1,913,306** | **3,974** |

**Attachment Snapshot: 20100826181933**        **RunID: 17029**        **Billing Snapshot: 20100826175238**

**Entergy Electric System**    **Date range - 20100701 through 20100731**    **Attachment 1**

**Intra-System Billing-201007RA**   **KWH Log Sheet Reconciliation - Entergy Louisiana, LLC**    **Page 4**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AEP SERVICE CORP /MINDEN PAYBACK | (625,318) | (625,318) | 0 | 0 | 0 | 0 | 0 | 0 |
| BURAS TEMP | 131,908 | 0 | 0 | 45,238 | 0 | 0 | 86,670 | 0 |
| CALDWELL IMBAL IN | 325,038 | 325,038 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (592) | (592) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses  N | 228,116 | 228,116 | 0 | 0 | 0 | 0 | 0 | 0 |
| EPI-ISES ELI     IN | 35,090,137 | 35,090,137 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 311,804 | 311,804 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (323,377) | (323,377) | 0 | 0 | 0 | 0 | 0 | 0 |
| IPP Sale Losses  N | 2,135,618 | 2,135,618 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss  N | 503 | 503 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL IN | 154,924 | 154,924 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL OT | (1,596) | (1,596) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 248,837 | 248,837 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (154) | (154) | 0 | 0 | 0 | 0 | 0 | 0 |
| ACADIA POWER PARTNERS, LLC/WSPP | 59,708,320 | 0 | 59,708,320 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 24,991,859 | 24,991,859 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 29,534,318 | 29,534,318 | 0 | 0 | 0 | 0 | 0 | 0 |
| G.GULF 1/NUCLEAR | 116,825,380 | 116,825,380 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RET | 19,691,908 | 19,691,908 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 9,494,456 | 9,494,456 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 1/BRDGLN E | 5,159,508 | 5,159,508 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 1/EVANG(LT) M | 42,028,954 | 33,569,285 | 0 | 7,913,583 | 545,584 | 0 | 0 | 502 |
| L.GPSY 1/EVG/CG I | 2,715,643 | 2,669,294 | 0 | 46,349 | 0 | 0 | 0 | 0 |
| L.GPSY 1/GSPL M | 815,895 | 815,895 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 2/Aux | (575,000) | (575,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 2/BRDGLN E | 2,381,479 | 1,275,111 | 0 | 1,045,351 | 61,017 | 0 | 0 | 0 |
| L.GPSY 2/CGT M | 441,540 | 402,937 | 0 | 25,995 | 12,608 | 0 | 0 | 0 |
| L.GPSY 2/EVANG(LT) M | 45,103,438 | 19,275,826 | 0 | 25,320,605 | 507,007 | 0 | 0 | 0 |
| L.GPSY 2/EVG/CG I | 3,083,544 | 898,936 | 0 | 2,135,948 | 48,660 | 0 | 0 | 0 |
| L.GPSY 2/GSPL M | 2,511,999 | 2,128,198 | 0 | 346,715 | 37,086 | 0 | 0 | 0 |
| L.GPSY 3/BRDGLN E | 56,921,780 | 56,920,943 | 0 | 0 | 0 | 0 | 837 | 0 |
| L.GPSY 3/CGT E | 18,834,369 | 18,834,369 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 3/CGT M | 56,529,560 | 56,529,560 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 3/EVANG(LT) M | 21,210,502 | 18,405,512 | 0 | 2,662,097 | 142,642 | 0 | 0 | 251 |
| L.GPSY 3/EVG/CG I | 4,340,255 | 4,340,255 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 3/GSPL E | 7,924,740 | 7,924,740 | 0 | 0 | 0 | 0 | 0 | 0 |
| L.GPSY 3/GSPL M | 30,570,794 | 30,570,794 | 0 | 0 | 0 | 0 | 0 | 0 |
| MURRAY 1/HYDRO | 110,159,000 | 110,159,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 3/Aux | (30,000) | (30,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 3/EVANG(LT) M | 13,804,559 | 7,722,572 | 0 | 5,982,602 | 99,385 | 0 | 0 | 0 |
| N NEMI 3/EVG/CG I | 1,470,441 | 515,670 | 0 | 905,754 | 49,017 | 0 | 0 | 0 |
| N NEMI 4/Aux | (1,006,000) | (1,006,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/BRDGLN E | 18,726,728 | 18,726,728 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/CGT E | 1,635,542 | 1,635,542 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/CGT M | 4,245,923 | 4,245,923 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/EVANG(LT) M | 62,673,146 | 59,118,809 | 0 | 3,228,244 | 323,984 | 0 | 603 | 1,506 |
| N NEMI 4/EVANG(SP) E | 3,730,147 | 3,730,147 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/EVG/CG I | 7,083,201 | 7,081,977 | 0 | 1,224 | 0 | 0 | 0 | 0 |
| N NEMI 4/GSPL E | 446,596 | 446,596 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/GSPL M | 803,482 | 803,482 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 4/LGS E | 2,134,235 | 2,134,235 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/Aux | (141,000) | (141,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/BRDGLN E | 90,282,967 | 90,234,151 | 0 | 0 | 0 | 0 | 48,816 | 0 |
| N NEMI 5/CGT E | 26,968,843 | 26,968,843 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/CGT M | 84,111,485 | 84,111,485 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/EVANG(LT) M | 99,312,226 | 97,761,791 | 0 | 1,193,561 | 356,623 | 0 | 0 | 251 |
| N NEMI 5/EVANG(SP) E | 336,710 | 336,710 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/EVG/CG I | 8,282,375 | 8,282,375 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/GSPL E | 3,393,948 | 3,393,948 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/GSPL M | 8,258,057 | 8,258,057 | 0 | 0 | 0 | 0 | 0 | 0 |
| N NEMI 5/LGS E | 5,155,389 | 5,155,389 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1 | 194,914,500 | 0 | 194,914,500 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/Aux | (18,000) | (18,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN E | 52,512,761 | 52,512,761 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN I | 5,888,462 | 5,888,462 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TEXAS GAS E | 6,570,277 | 6,570,277 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 2/Aux | (4,571,000) | (4,571,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| RVRBND 1/NUCLEAR | 139,555,800 | 139,555,800 | 0 | 0 | 0 | 0 | 0 | 0 |
| STERLN 6/Aux | (213,000) | (213,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| TOLEDO 1/HYDRO | 2,246,500 | 2,246,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| WATERF 1/Aux | (62,000) | (62,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WATERF 1/BRDGLN E | 2,728,053 | 1,820,443 | 0 | 843,299 | 64,311 | 0 | 0 | 0 |
| WATERF 1/CGT M | 613,149 | 254,658 | 0 | 356,988 | 1,503 | 0 | 0 | 0 |
| WATERF 1/EVANG(LT) M | 68,159,274 | 18,545,667 | 0 | 47,727,893 | 1,884,710 | 0 | 0 | 1,004 |
| WATERF 1/EVG/CG I | 4,491,524 | 789,096 | 0 | 3,677,054 | 25,374 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**    **RunID: 17029**    **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**    9-166

| Entergy Electric System | Date range - 20100701 through 20100731 | | | | Attachment 1 | | | |
|---|---|---|---|---|---|---|---|---|
| Intra-System Billing-201007RA | KWH Log Sheet Reconciliation - Entergy Louisiana, LLC | | | | Page 5 | | | |

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| WATERF 2/#6 OIL | 352,500 | 50,000 | 0 | 302,500 | 0 | 0 | 0 | 0 |
| WATERF 2/BRDGLN E | 44,477,948 | 35,025,366 | 0 | 9,002,954 | 448,624 | 0 | 0 | 1,004 |
| WATERF 2/CGT E | 14,257,818 | 12,473,477 | 0 | 1,648,800 | 135,541 | 0 | 0 | 0 |
| WATERF 2/CGT M | 44,130,973 | 34,623,561 | 0 | 8,938,269 | 568,892 | 0 | 0 | 251 |
| WATERF 2/EVANG(LT) M | 11,514,423 | 8,153,222 | 0 | 3,286,637 | 74,564 | 0 | 0 | 0 |
| WATERF 2/EVG/CG I | 2,407,338 | 1,023,375 | 0 | 1,383,963 | 0 | 0 | 0 | 0 |
| WATERF 3/NUCLEAR | 866,024,000 | 866,024,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| WATERF 4/#2 OIL | 46,000 | 0 | 0 | 46,000 | 0 | 0 | 0 | 0 |
| INDEPN 1/COAL | 7,145,175 | 7,145,175 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 13,440,805 | 13,440,805 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 10,706,289 | 10,706,289 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 60,190 | 60,190 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 17,399 | 17,399 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 3,968,328 | 3,825,779 | 0 | 126,981 | 15,568 | 0 | 0 | 0 |
| AECC Excess WH.BLF 1 | 1,791,648 | 1,791,648 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 8,747,321 | 8,747,321 | 0 | 0 | 0 | 0 | 0 | 0 |
| ACADIA POWER PARTNERS, LLC/WSPP | 119,416,680 | 119,351,055 | 0 | 0 | 0 | 0 | 65,625 | 0 |
| AECI/WSPP A | 601,840 | 601,840 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP B | 5,030,000 | 5,030,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 11,587,863 | 10,886,516 | 0 | 678,098 | 19,289 | 0 | 3,960 | 0 |
| AEP SERVICE CORP /WSPP A | 754,500 | 754,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 201,200 | 201,200 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY  NC. (AE) ACTING | 603,600 | 601,142 | 0 | 0 | 0 | 0 | 2,458 | 0 |
| Ameren Energy Marketing Company/WSPP | 12,575 | 12,575 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 50,300 | 50,300 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 968,024 | 968,024 | 0 | 0 | 0 | 0 | 0 | 0 |
| BP-ALLIANCE/QF | 12,189,947 | 12,189,947 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 3,360,048 | 3,341,476 | 0 | 0 | 0 | 0 | 18,572 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 421,265 | 421,265 | 0 | 0 | 0 | 0 | 0 | 0 |
| CII CARBON CALCINER/QF | 7,833,120 | 7,833,120 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY  NC/WSPP A | 60,361 | 60,361 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 1,262,618 | 1,027,846 | 0 | 132,197 | 2,103 | 0 | 100,472 | 0 |
| CONSTELLATION ENERGY | 45,271 | 45,271 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 1,367,406 | 1,366,580 | 0 | 0 | 0 | 0 | 826 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 50,135 | 50,135 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 12,102 | 12,102 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 528,321 | 528,321 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 3,060 | 3,060 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 349,743 | 349,743 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS50 | 4,816 | 4,816 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 264 | 264 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 31,833 | 31,833 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 26,009,688 | 25,875,218 | 0 | 0 | 0 | 0 | 134,470 | 0 |
| DUKE ENERGY HINDS/EXS50 | 28,499 | 28,499 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 20,807 | 20,807 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 217,804 | 217,804 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 35,260 | 35,260 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 21,226 | 21,226 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 183,983 | 183,983 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 189 | 189 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 342,048 | 316,207 | 0 | 24,396 | 0 | 0 | 1,445 | 0 |
| ENDURE ENERGY/WSPP B | 16,348 | 16,348 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 294,260 | 294,260 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 23,517,077 | 23,479,999 | 0 | 0 | 0 | 0 | 37,078 | 0 |
| GEORGIA GULF CORP/QF | 7,269,980 | 7,269,980 | 0 | 0 | 0 | 0 | 0 | 0 |
| J ARON & COMPANY/WSPP B | 6,003,359 | 5,862,580 | 0 | 126,465 | 0 | 0 | 14,314 | 0 |
| J.P. MORGAN VENTURES ENERGY | 16,851 | 16,851 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 1,228,582 | 1,046,116 | 0 | 38,670 | 3,790 | 0 | 140,006 | 0 |
| JBO/WSPP A | 2,432,270 | 834,360 | 0 | 1,258,817 | 20,805 | 0 | 318,288 | 0 |
| JBO/WSPP B | 2,611,868 | 2,268,140 | 0 | 262,779 | 18,079 | 0 | 62,870 | 0 |
| KANSAS CITY POWER & LIGHT | 362,411 | 362,411 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 4,270 | 4,270 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 197,598 | 197,598 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 1,086,406 | 1,086,406 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 5,838 | 5,838 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 1,178 | 1,178 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 41,256 | 41,256 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 48,808,429 | 48,529,987 | 0 | 0 | 0 | 0 | 278,442 | 0 |
| MORGAN STANLEY/WSPP A | 61,868 | 61,868 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 7,488,413 | 7,111,163 | 0 | 377,250 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 46,498,600 | 45,526,626 | 0 | 500,863 | 5,000 | 0 | 466,111 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 2,096,255 | 2,063,587 | 0 | 25,150 | 0 | 0 | 7,518 | 0 |
| OCCIDENTAL CHEM CORP/QF | 48,338,250 | 48,338,250 | 0 | 0 | 0 | 0 | 0 | 0 |
| OCCIDENTAL POWER SERVICES/BASE | 219,380,000 | 219,158,027 | 0 | 0 | 0 | 0 | 221,973 | 0 |
| OCCIDENTAL POWER SERVICES/DAY- | 50,188,000 | 50,182,559 | 0 | 0 | 0 | 0 | 5,441 | 0 |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                                 9-167

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Entergy Electric System** | | **Date range - 20100701 through 20100731** | | | | | **Attachment 1** | |
| **Intra-System Billing-201007RA** | | **KWH Log Sheet Reconciliation - Entergy Louisiana, LLC** | | | | | **Page 6** | |

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| OCCIDENTAL POWER SERVICES/ NTRA- | 9,090,000 | 9,049,131 | 0 | 0 | 0 | 0 | 40,869 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 1,433,048 | 1,292,647 | 0 | 49,866 | 11,631 | 0 | 78,904 | 0 |
| RAINBOW ENERGY MARKETING | 3,501,908 | 3,501,908 | 0 | 0 | 0 | 0 | 0 | 0 |
| SMEPA/WSPP B | 754,504 | 0 | 0 | 748,227 | 0 | 0 | 6,277 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 138,325 | 138,325 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 2,665,900 | 0 | 0 | 2,326,731 | 0 | 0 | 339,169 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 2,178,009 | 2,178,009 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 14,219,068 | 14,142,961 | 0 | 0 | 0 | 0 | 76,107 | 0 |
| TEA/WSPP A | 280,677 | 280,677 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 20,660 | 20,660 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 16,210 | 16,210 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 262,868 | 262,868 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA/WSPP A | 591,278 | 583,653 | 0 | 0 | 0 | 0 | 7,625 | 0 |
| TENASKA/WSPP B | 5,796,845 | 5,382,881 | 0 | 361,244 | 15,459 | 0 | 37,261 | 0 |
| UNION CARBIDE CORP/QF | 40,452,720 | 40,452,720 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP A | 47,786 | 47,786 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP B | 41,431,444 | 41,262,525 | 0 | 0 | 0 | 0 | 168,919 | 0 |
| WESTAR ENERGY  NC/WSPP A | 1,743,909 | 1,743,909 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP B | 7,431,833 | 7,429,047 | 0 | 0 | 0 | 0 | 2,786 | 0 |
| WESTAR ENERGY  NC/WSPP C | 201,200 | 201,200 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 9,333 | 9,333 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 204,509 | 204,509 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAZOO CITY/EXS90 | 1,324 | 1,324 | 0 | 0 | 0 | 0 | 0 | 0 |
| Un-accounted In | 4,843 | 4,843 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 42,272,082 | 42,272,082 | 0 | 0 | 0 | 0 | 0 | 0 |
| INADVERTENT  N | 3,850,516 | 3,850,516 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **3,491,820,106** | **3,093,813,592** | **254,622,820** | **135,105,357** | **5,498,856** | **0** | **2,774,712** | **4,769** |

Attachment Snapshot: 20100826181933                    RunID: 17029                    Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                                                     9-168

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Log Sheet Reconciliation - Entergy Mississippi, Inc.**  **Page 7**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AECCISES - MDEA | 37,000 | 37,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI - MDEA | 1,380,000 | 1,380,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /MINDEN PAYBACK | (348,600) | (348,600) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL IN | 180,158 | 180,158 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (330) | (330) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses  N | 126,412 | 126,412 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOWCHEM - MDEA | 751,000 | 751,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - MDEA | 1,018,000 | 1,018,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 172,809 | 172,809 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (180,160) | (180,160) | 0 | 0 | 0 | 0 | 0 | 0 |
| HYDRO2 - MDEA | 18,000 | 18,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| IPP Sale Losses  N | 1,183,669 | 1,183,669 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss  N | 279 | 279 | 0 | 0 | 0 | 0 | 0 | 0 |
| JBOISES - MDEA | 302,000 | 302,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL IN | 85,867 | 85,867 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL OT | (890) | (890) | 0 | 0 | 0 | 0 | 0 | 0 |
| LAFA - MDEA | 10,000 | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| LAGN - MDEA | 17,989,000 | 17,989,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNETCOVE - MDEA | 1,322,000 | 1,322,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA LOAD      OT | (36,877,000) | (36,877,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| MEAM CANTON 1    IN | 73,000 | 64,137 | 0 | 0 | 0 | 0 | 8,863 | 0 |
| MEAM CANTON 2    IN | 83,000 | 74,000 | 0 | 0 | 1,000 | 0 | 8,000 | 0 |
| MEAM CANTON 3    IN | 84,000 | 75,000 | 0 | 0 | 1,000 | 0 | 8,000 | 0 |
| MEAM CANTON 4    IN | 84,000 | 75,000 | 0 | 0 | 989 | 0 | 8,011 | 0 |
| MEAM CANTON 5    IN | 82,000 | 70,378 | 0 | 0 | 1,622 | 0 | 10,000 | 0 |
| MEAM HENDERSON 10 IN | 58,000 | 51,751 | 0 | 0 | 1,249 | 0 | 5,000 | 0 |
| MEAM HENDERSON 11 IN | 59,000 | 47,450 | 0 | 0 | 3,550 | 0 | 8,000 | 0 |
| MEAM HENDERSON 2  IN | 524,000 | 412,807 | 0 | 0 | 42,277 | 0 | 68,916 | 0 |
| MEAM HENDERSON 4  IN | 72,000 | 49,000 | 0 | 0 | 9,142 | 0 | 13,858 | 0 |
| MEAM HENDERSON 5  IN | 72,000 | 48,810 | 0 | 0 | 9,024 | 0 | 14,166 | 0 |
| MEAM HENDERSON 6  IN | 73,000 | 45,124 | 0 | 0 | 12,876 | 0 | 15,000 | 0 |
| MEAM HENDERSON 7  IN | 76,000 | 43,120 | 0 | 0 | 13,721 | 0 | 19,159 | 0 |
| MEAM HENDERSON 8  IN | 74,000 | 37,250 | 0 | 0 | 12,000 | 0 | 24,750 | 0 |
| MEAM HENDERSON 9  IN | 54,000 | 25,257 | 0 | 0 | 5,521 | 0 | 23,222 | 0 |
| MEAM IMBALANCE    IN | 4,082,291 | 4,082,291 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEAM IMBALANCE    OT | (4,381) | (4,381) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 137,943 | 137,943 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (86) | (86) | 0 | 0 | 0 | 0 | 0 | 0 |
| PLUM - MDEA | 31,000 | 31,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| PPG - MDEA | 28,000 | 28,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABCOGEN - MDEA | 895,000 | 895,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SWPP - MDEA | 13,514,000 | 13,514,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| TVA - MDEA | 723,000 | 723,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| ANDRUS 1/Aux | (660,000) | (660,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| ANDRUS 1/TENN E | 155,006,673 | 152,213,418 | 0 | 2,659,523 | 106,471 | 0 | 27,261 | 0 |
| ANDRUS 1/TENN I | 16,394,504 | 15,647,456 | 0 | 716,204 | 30,499 | 0 | 345 | 0 |
| ANDRUS 1/TGT E | 69,484,823 | 68,929,469 | 0 | 500,938 | 54,416 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 11,975,579 | 11,975,579 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 14,206,469 | 14,206,469 | 0 | 0 | 0 | 0 | 0 | 0 |
| ATTALA 1/Aux | (456,000) | (456,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| ATTALA 1/TETCO E | 158,162,196 | 158,162,196 | 0 | 0 | 0 | 0 | 0 | 0 |
| ATTALA 1/TETCO I | 20,360,804 | 20,360,804 | 0 | 0 | 0 | 0 | 0 | 0 |
| B.WLSN 1/COLUMBIA MAINLINE I | 80,752 | 80,752 | 0 | 0 | 0 | 0 | 0 | 0 |
| B.WLSN 1/COLUMBIA ML E | 129,355,248 | 129,305,896 | 0 | 38,457 | 9,513 | 0 | 1,382 | 0 |
| B.WLSN 2/COLUMBIA MAINLINE I | 6,972,555 | 6,834,693 | 0 | 137,442 | 0 | 0 | 0 | 420 |
| B.WLSN 2/COLUMBIA ML E | 162,519,445 | 140,255,044 | 0 | 21,706,585 | 548,970 | 0 | 8,426 | 420 |
| DELTA5 1/Aux | (35,000) | (35,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| DELTA5 2/Aux | (42,000) | (42,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| G.GULF 1/NUCLEAR | 275,374,110 | 275,374,110 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RET | 8,775,642 | 8,775,642 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 4,440,083 | 4,440,083 | 0 | 0 | 0 | 0 | 0 | 0 |
| REX BR 1/Aux | (76,000) | (76,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| REX BR 3/Aux | (73,000) | (73,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| REX BR 4/GSPL E | 20,874,591 | 13,534,553 | 0 | 5,393,054 | 1,946,844 | 0 | 0 | 140 |
| REX BR 4/GSPL I | 1,463,409 | 1,163,408 | 0 | 201,384 | 98,617 | 0 | 0 | 0 |
| REX BR 5/#2 O L | 5,000 | 2,580 | 0 | 0 | 2,420 | 0 | 0 | 0 |
| REX BR 5/Aux | (3,000) | (3,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| INDEPN 1/COAL | 144,835,585 | 144,835,585 | 0 | 0 | 0 | 0 | 0 | 0 |
| INDEPN 2/Aux | (199,500) | (199,500) | 0 | 0 | 0 | 0 | 0 | 0 |
| INDEPN 2/COAL | 120,547,500 | 120,547,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 6,292,389 | 6,292,389 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 5,295,338 | 5,295,338 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 33,336 | 32,919 | 0 | 417 | 0 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 9,643 | 9,643 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 2,199,527 | 2,084,823 | 0 | 114,704 | 0 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**          **RunID: 17029**          **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**          9-169

**Entergy Electric System**     **Date range - 20100701 through 20100731**     **Attachment 1**
**Intra-System Billing-201007RA**     **KWH Log Sheet Reconciliation - Entergy Mississippi, Inc.**     **Page 8**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AECC Excess WH.BLF 1 | 993,060 | 993,060 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 4,848,407 | 4,848,407 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP A | 333,584 | 333,584 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP B | 2,788,000 | 2,788,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 6,422,855 | 6,420,661 | 0 | 0 | 0 | 0 | 2,194 | 0 |
| AEP SERVICE CORP /WSPP A | 418,200 | 418,200 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 111,520 | 111,520 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY  NC. (AE) ACTING | 334,560 | 333,199 | 0 | 0 | 0 | 0 | 1,361 | 0 |
| Ameren Energy Marketing Company/WSPP | 6,970 | 6,970 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 27,880 | 27,880 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 536,551 | 536,551 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 1,862,384 | 1,852,091 | 0 | 0 | 0 | 0 | 10,293 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 233,494 | 233,494 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY  NC/WSPP A | 33,456 | 33,456 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 699,790 | 543,971 | 0 | 97,617 | 2,518 | 0 | 55,684 | 0 |
| CONSTELLATION ENERGY | 25,092 | 25,092 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 757,918 | 757,460 | 0 | 0 | 0 | 0 | 458 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 27,787 | 27,787 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 6,703 | 6,703 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 292,830 | 292,830 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 1,696 | 1,696 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 193,858 | 193,858 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS50 | 2,669 | 2,669 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 146 | 146 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 17,648 | 17,648 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 14,416,465 | 14,341,940 | 0 | 0 | 0 | 0 | 74,525 | 0 |
| DUKE ENERGY HINDS/EXS50 | 15,797 | 15,797 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 11,523 | 11,523 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 120,648 | 120,648 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 19,538 | 19,538 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 11,762 | 11,762 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 101,969 | 101,969 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 105 | 105 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 189,589 | 188,788 | 0 | 0 | 0 | 0 | 801 | 0 |
| ENDURE ENERGY/WSPP B | 9,061 | 9,061 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 163,098 | 163,098 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 13,034,879 | 13,014,333 | 0 | 0 | 0 | 0 | 20,546 | 0 |
| J ARON & COMPANY/WSPP B | 3,327,478 | 3,203,622 | 0 | 83,328 | 32,597 | 0 | 7,931 | 0 |
| J.P. MORGAN VENTURES ENERGY | 9,340 | 9,340 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 680,969 | 603,370 | 0 | 0 | 0 | 0 | 77,599 | 0 |
| JBO/WSPP A | 1,348,137 | 1,148,057 | 0 | 23,631 | 43 | 0 | 176,406 | 0 |
| JBO/WSPP B | 1,447,671 | 1,322,239 | 0 | 90,177 | 0 | 0 | 34,835 | 420 |
| KANSAS CITY POWER & LIGHT | 200,875 | 200,875 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 2,366 | 2,366 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 109,555 | 109,555 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 602,169 | 602,169 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 3,235 | 3,235 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 653 | 653 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 22,867 | 22,867 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 27,053,226 | 26,898,900 | 0 | 0 | 0 | 0 | 154,326 | 0 |
| MISS CHEM NITROGEN/QF | 29,448 | 29,448 | 0 | 0 | 0 | 0 | 0 | 0 |
| MORGAN STANLEY/WSPP A | 34,292 | 34,292 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 4,150,635 | 4,150,635 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 25,772,818 | 25,421,212 | 0 | 57,038 | 36,234 | 0 | 258,334 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 1,161,899 | 1,157,732 | 0 | 0 | 0 | 0 | 4,167 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 794,302 | 695,710 | 0 | 54,861 | 0 | 0 | 43,731 | 0 |
| RAINBOW ENERGY MARKETING | 1,941,010 | 1,941,010 | 0 | 0 | 0 | 0 | 0 | 0 |
| SMEPA/WSPP B | 418,200 | 414,721 | 0 | 0 | 0 | 0 | 3,479 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 76,670 | 76,670 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 1,477,640 | 1,209,063 | 0 | 0 | 80,583 | 0 | 187,994 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 1,207,204 | 1,207,204 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 7,881,251 | 7,839,067 | 0 | 0 | 0 | 0 | 42,184 | 0 |
| TEA/WSPP A | 155,570 | 155,570 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 11,451 | 11,451 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 8,985 | 8,985 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 145,651 | 145,651 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA/WSPP A | 327,729 | 317,683 | 0 | 5,820 | 0 | 0 | 4,226 | 0 |
| TENASKA/WSPP B | 3,213,034 | 3,046,016 | 0 | 146,370 | 0 | 0 | 20,648 | 0 |
| UNION POWER PARTNERS/WSPP A | 26,486 | 26,486 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP B | 22,964,343 | 22,870,721 | 0 | 0 | 0 | 0 | 93,622 | 0 |
| WESTAR ENERGY  NC/WSPP A | 966,608 | 966,608 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP B | 4,119,252 | 4,117,709 | 0 | 0 | 0 | 0 | 1,543 | 0 |
| WESTAR ENERGY  NC/WSPP C | 111,520 | 111,520 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 5,171 | 5,171 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 113,362 | 113,362 | 0 | 0 | 0 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**     **RunID: 17029**     **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**     9-170

**Entergy Electric System**　　　　　　　　**Date range - 20100701 through 20100731**　　　　　　　　**Attachment 1**
**Intra-System Billing-201007RA**　　　**KWH Log Sheet Reconciliation - Entergy Mississippi, Inc.**　　　　　　　**Page 9**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| YAZOO CITY/EXS90 | 734 | 734 | 0 | 0 | 0 | 0 | 0 | 0 |
| Un-accounted In | 2,701 | 2,701 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 165,417,337 | 165,416,077 | 0 | 0 | 0 | 0 | 0 | 1,260 |
| INADVERTENT  N | 2,134,214 | 2,134,214 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **1,669,714,232** | **1,633,071,080** | **0** | **32,027,550** | **3,063,696** | **0** | **1,549,246** | **2,660** |

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Log Sheet Reconciliation - Entergy New Orleans, Inc.**  **Page 10**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AEP SERVICE CORP /MINDEN PAYBACK | (111,056) | (111,056) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL IN | 58,420 | 58,420 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (104) | (104) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses N | 40,983 | 40,983 | 0 | 0 | 0 | 0 | 0 | 0 |
| EPI-ISES ENOI IN | 34,395,193 | 34,395,193 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 56,025 | 56,025 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (57,568) | (57,568) | 0 | 0 | 0 | 0 | 0 | 0 |
| IPP Sale Losses N | 383,783 | 383,783 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss N | 90 | 90 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL IN | 27,836 | 27,836 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL OT | (285) | (285) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 44,723 | 44,723 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (28) | (28) | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 16,947,775 | 16,947,775 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 19,989,454 | 19,989,454 | 0 | 0 | 0 | 0 | 0 | 0 |
| G.GULF 1/NUCLEAR | 141,859,390 | 141,859,390 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RET | 13,799,542 | 13,799,542 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 6,514,363 | 6,514,363 | 0 | 0 | 0 | 0 | 0 | 0 |
| MICHOD 1/Aux | (208,000) | (208,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| MICHOD 2/BRDGLN E | 17,595,495 | 17,411,762 | 0 | 62,252 | 116,111 | 0 | 5,370 | 0 |
| MICHOD 2/GSPL E | 56,709,373 | 56,651,579 | 0 | 0 | 45,575 | 0 | 12,219 | 0 |
| MICHOD 2/NOPSI I | 4,140,132 | 4,140,132 | 0 | 0 | 0 | 0 | 0 | 0 |
| MICHOD 3/Aux | (1,663,000) | (1,663,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| MICHOD 3/BRDGLN E | 22,612,059 | 11,393,866 | 0 | 11,056,337 | 161,677 | 0 | 0 | 179 |
| MICHOD 3/GSPL E | 51,216,272 | 39,608,973 | 0 | 11,458,320 | 148,934 | 0 | 0 | 45 |
| MICHOD 3/NOPSI I | 10,702,389 | 5,463,663 | 0 | 5,187,011 | 51,715 | 0 | 0 | 0 |
| MICHOD 3/SIGPL E | 2,789,280 | 2,447,344 | 0 | 337,959 | 3,977 | 0 | 0 | 0 |
| RVRBND 1/NUCLEAR | 69,777,900 | 69,777,900 | 0 | 0 | 0 | 0 | 0 | 0 |
| INDEPN 1/COAL | 4,846,579 | 4,846,579 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 8,494,462 | 8,494,462 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 7,753,353 | 7,753,353 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 10,790 | 8,280 | 0 | 980 | 1,530 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 3,127 | 3,127 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 713,178 | 383,473 | 0 | 315,602 | 14,103 | 0 | 0 | 0 |
| AECC Excess WH.BLF 1 | 322,001 | 322,001 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 1,572,080 | 1,572,080 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP A | 108,163 | 108,163 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP B | 904,000 | 904,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 2,082,590 | 1,473,723 | 0 | 608,021 | 134 | 0 | 712 | 0 |
| AEP SERVICE CORP /WSPP A | 135,600 | 135,600 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 36,160 | 36,160 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY NC. (AE) ACTING | 108,480 | 88,921 | 0 | 18,080 | 1,038 | 0 | 441 | 0 |
| Ameren Energy Marketing Company/WSPP | 2,260 | 2,260 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 9,040 | 9,040 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 173,975 | 135,621 | 0 | 38,354 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 603,872 | 600,536 | 0 | 0 | 0 | 0 | 3,336 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 75,710 | 75,710 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY NC/WSPP A | 10,848 | 10,848 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 226,908 | 123,535 | 0 | 76,004 | 9,320 | 0 | 18,049 | 0 |
| CONSTELLATION ENERGY | 8,136 | 8,136 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 245,753 | 245,605 | 0 | 0 | 0 | 0 | 148 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 9,005 | 9,005 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 2,169 | 2,169 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 94,934 | 94,934 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 550 | 550 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 62,864 | 62,864 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS50 | 866 | 866 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 48 | 48 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 5,724 | 5,724 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 4,674,492 | 4,554,768 | 0 | 95,558 | 0 | 0 | 24,166 | 0 |
| DUKE ENERGY HINDS/EXS50 | 5,123 | 5,123 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 3,726 | 3,726 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 39,071 | 39,071 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 6,334 | 6,334 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 3,804 | 3,804 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 33,061 | 33,061 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 33 | 33 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 61,475 | 52,943 | 0 | 8,272 | 0 | 0 | 260 | 0 |
| ENDURE ENERGY/WSPP B | 2,938 | 2,938 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 52,882 | 52,882 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 4,226,539 | 4,219,874 | 0 | 0 | 0 | 0 | 6,665 | 0 |
| J ARON & COMPANY/WSPP B | 1,078,924 | 859,802 | 0 | 213,035 | 3,516 | 0 | 2,571 | 0 |
| J.P. MORGAN VENTURES ENERGY | 3,028 | 3,028 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 220,801 | 150,854 | 0 | 34,369 | 10,418 | 0 | 25,160 | 0 |
| JBO/WSPP A | 437,129 | 72,048 | 0 | 268,090 | 39,665 | 0 | 57,191 | 135 |

**Attachment Snapshot: 20100826181933**   **RunID: 17029**   **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**   9-172

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Log Sheet Reconciliation - Entergy New Orleans, Inc.**  **Page 11**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| JBO/WSPP B | 469,404 | 240,761 | 0 | 217,346 | 0 | 0 | 11,297 | 0 |
| KANSAS CITY POWER & LIGHT | 65,133 | 65,133 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 767 | 767 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 35,498 | 35,498 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 195,248 | 195,248 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 1,052 | 1,052 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 212 | 212 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 7,416 | 7,416 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 8,771,914 | 8,721,872 | 0 | 0 | 0 | 0 | 50,042 | 0 |
| MORGAN STANLEY/WSPP A | 11,118 | 11,118 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 1,345,830 | 1,278,030 | 0 | 67,800 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 8,356,751 | 7,962,176 | 0 | 280,383 | 30,425 | 0 | 83,767 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 376,742 | 304,422 | 0 | 70,969 | 0 | 0 | 1,351 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 257,550 | 182,926 | 0 | 40,184 | 20,217 | 0 | 14,178 | 45 |
| RAINBOW ENERGY MARKETING | 629,363 | 629,363 | 0 | 0 | 0 | 0 | 0 | 0 |
| SMEPA/WSPP B | 135,600 | 0 | 0 | 134,472 | 0 | 0 | 1,128 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 24,860 | 24,860 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 479,120 | 0 | 0 | 418,166 | 0 | 0 | 60,954 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 391,432 | 391,432 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 2,555,470 | 2,541,792 | 0 | 0 | 0 | 0 | 13,678 | 0 |
| TEA/WSPP A | 50,443 | 50,443 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 3,714 | 3,714 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 2,912 | 2,912 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 47,232 | 47,232 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA/WSPP A | 106,266 | 104,270 | 0 | 0 | 626 | 0 | 1,370 | 0 |
| TENASKA/WSPP B | 1,041,808 | 480,385 | 0 | 554,729 | 0 | 0 | 6,694 | 0 |
| UNION POWER PARTNERS/WSPP A | 8,588 | 8,588 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP B | 7,446,119 | 7,415,760 | 0 | 0 | 0 | 0 | 30,359 | 0 |
| WESTAR ENERGY  NC/WSPP A | 313,419 | 313,419 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP B | 1,335,662 | 1,335,162 | 0 | 0 | 0 | 0 | 500 | 0 |
| WESTAR ENERGY  NC/WSPP C | 36,160 | 10,120 | 0 | 25,251 | 789 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 1,675 | 1,675 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 36,734 | 36,734 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAZOO CITY/EXS90 | 237 | 237 | 0 | 0 | 0 | 0 | 0 | 0 |
| Un-accounted In | 865 | 865 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 45,025,369 | 44,705,819 | 0 | 0 | 319,102 | 0 | 0 | 448 |
| INADVERTENT  N | 692,014 | 692,014 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **587,352,718** | **554,353,844** | **0** | **31,587,544** | **978,872** | **0** | **431,606** | **852** |

Attachment Snapshot: 20100826181933  RunID:  17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-173

**Entergy Electric System**                        Date range - 20100701 through 20100731                                    **Attachment 1**
**Intra-System Billing-201007RA   KWH Log Sheet Reconciliation - Entergy Gulf States Louisiana, LLC**                        **Page 12**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| AEP SERVICE CORP /MINDEN PAYBACK | (471,276) | (471,276) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL IN | 247,500 | 247,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (446) | (446) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE  A BASE  IN | 137,098,200 | 137,098,200 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE  B BASE  IN | 98,223,400 | 98,142,376 | 0 | 71,559 | 9,465 | 0 | 0 | 0 |
| CALP NE  C BASE  IN | 5,787,100 | 5,787,100 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE B RAMP IN | 1,973,300 | 1,973,300 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE C RAMP IN | 34,100 | 34,100 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE EXCESS  N | 422,000 | 422,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLEC - RICHARDLOSSES | 279,000 | 279,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/TOLEDO BEND | (1,206,925) | (1,206,925) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses  N | 173,685 | 173,685 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 237,396 | 237,396 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (243,779) | (243,779) | 0 | 0 | 0 | 0 | 0 | 0 |
| IPP Sale Losses  N | 1,625,895 | 1,625,895 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss  N | 383 | 383 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL IN | 117,953 | 117,953 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL OT | (1,205) | (1,205) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 189,491 | 189,491 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (116) | (116) | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 15,851,160 | 15,851,160 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 18,809,417 | 18,809,417 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 1 | 4,690,725 | 0 | 4,690,725 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 1/Aux | (332,000) | (332,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 1/GSPL E | 5,798,159 | 1,980,749 | 0 | 3,714,474 | 102,936 | 0 | 0 | 0 |
| CALCAS EU 1/GSPL I | 548,116 | 0 | 0 | 548,116 | 0 | 0 | 0 | 0 |
| CALCAS EU 2 | 5,250,450 | 0 | 5,250,450 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 2/GSPL E | 7,103,550 | 4,163,301 | 0 | 2,906,170 | 34,079 | 0 | 0 | 0 |
| GGULF RET | 11,616,357 | 11,616,357 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 5,876,574 | 5,876,574 | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 1/COPANO E | 4,754,332 | 2,871,914 | 0 | 1,879,528 | 2,890 | 0 | 0 | 0 |
| LEWIS CREEK 1/COPANO M | 27,587,139 | 16,462,009 | 0 | 10,925,536 | 184,068 | 0 | 15,337 | 189 |
| LEWIS CREEK 1/TETCO E | 6,385,297 | 4,739,291 | 0 | 1,521,741 | 117,176 | 0 | 6,900 | 189 |
| LEWIS CREEK 1/TETCO I | 2,320,478 | 1,154,988 | 0 | 1,157,040 | 8,450 | 0 | 0 | 0 |
| LEWIS CREEK 1/TETCO M | 17,169,779 | 13,456,160 | 0 | 3,647,410 | 64,331 | 0 | 1,878 | 0 |
| LEWIS CREEK 2/COPANO E | 6,018,572 | 5,010,477 | 0 | 926,721 | 81,364 | 0 | 10 | 0 |
| LEWIS CREEK 2/COPANO M | 6,495,036 | 2,992,409 | 0 | 3,483,050 | 18,869 | 0 | 519 | 189 |
| LEWIS CREEK 2/TEJAS E | 1,084,656 | 942,834 | 0 | 141,822 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 2/TETCO E | 27,574,206 | 26,009,942 | 0 | 1,536,278 | 15,490 | 0 | 12,307 | 189 |
| LEWIS CREEK 2/TETCO I | 8,137,353 | 6,515,658 | 0 | 1,582,353 | 37,936 | 0 | 1,239 | 167 |
| LEWIS CREEK 2/TETCO M | 16,415,552 | 10,969,861 | 0 | 5,315,248 | 116,297 | 0 | 13,767 | 379 |
| NELSON 3 | 5,192,225 | 0 | 5,192,225 | 0 | 0 | 0 | 0 | 0 |
| NELSON 3/Aux | (443,000) | (443,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| NELSON 3/TARGA E | 284,050 | 71,574 | 0 | 211,896 | 580 | 0 | 0 | 0 |
| NELSON 3/TENN M | 2,091,290 | 322,313 | 0 | 1,700,865 | 68,112 | 0 | 0 | 0 |
| NELSON 3/TETCO E | 346,150 | 13,227 | 0 | 310,513 | 22,410 | 0 | 0 | 0 |
| NELSON 3/TETCO M | 4,303,285 | 113,170 | 0 | 4,149,185 | 40,930 | 0 | 0 | 0 |
| NELSON 4 | 62,280,775 | 0 | 62,280,775 | 0 | 0 | 0 | 0 | 0 |
| NELSON 4/Aux | (1,398,000) | (1,398,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| NELSON 4/FLORIDA E | 8,300,163 | 1,243,147 | 0 | 7,000,169 | 56,847 | 0 | 0 | 0 |
| NELSON 4/TARGA E | 19,008,705 | 4,409,283 | 0 | 14,524,924 | 74,498 | 0 | 0 | 0 |
| NELSON 4/TENN E | 16,820,496 | 4,323,987 | 0 | 12,398,148 | 98,361 | 0 | 0 | 0 |
| NELSON 4/TENN M | 12,742,940 | 1,116,094 | 0 | 11,564,685 | 61,325 | 0 | 836 | 0 |
| NELSON 4/TETCO E | 850,947 | 154,177 | 0 | 673,803 | 22,967 | 0 | 0 | 0 |
| NELSON 4/TETCO I | 4,447,488 | 342,815 | 0 | 4,071,417 | 33,255 | 0 | 1 | 0 |
| NELSON 4/TETCO M | 22,091,486 | 1,025,802 | 0 | 20,958,943 | 86,765 | 0 | 19,976 | 0 |
| NELSON 6/GSU COAL | 151,437,989 | 151,437,989 | 0 | 0 | 0 | 0 | 0 | 0 |
| OUACHITA 3/SIGCO I | 7,773,099 | 7,773,099 | 0 | 0 | 0 | 0 | 0 | 0 |
| OUACHITA 3/SIGPL E | 33,557,901 | 33,557,901 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1 | 82,838,753 | 0 | 82,838,753 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN E | 90,584,771 | 90,584,771 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN I | 10,157,373 | 10,157,373 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TEXAS GAS E | 11,333,603 | 11,333,603 | 0 | 0 | 0 | 0 | 0 | 0 |
| RVRBND 1 | 416,923,129 | 0 | 416,923,129 | 0 | 0 | 0 | 0 | 0 |
| RVRBND 1/Aux | (636,000) | (636,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| RVRBND 1/NUCLEAR | 280,855,871 | 280,855,871 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/CENTANA#3 E | 1,991,296 | 1,428,431 | 0 | 528,309 | 34,556 | 0 | 0 | 0 |
| SABINE 1/CENTANA#3 M | 14,139,569 | 2,927,977 | 0 | 11,158,610 | 52,407 | 0 | 575 | 0 |
| SABINE 1/ENBRIDGE E | 7,109,237 | 4,073,972 | 0 | 2,981,642 | 53,617 | 0 | 6 | 0 |
| SABINE 1/ENBRIDGE M | 19,334,191 | 5,734,266 | 0 | 13,526,870 | 59,310 | 0 | 13,745 | 0 |
| SABINE 1/HPL/CH E | 2,454,586 | 1,411,802 | 0 | 988,225 | 54,559 | 0 | 0 | 0 |
| SABINE 1/STORAGE I | 3,963,609 | 2,456,407 | 0 | 1,426,945 | 80,257 | 0 | 0 | 0 |
| SABINE 1/TEJAS E | 132,959 | 11,300 | 0 | 121,659 | 0 | 0 | 0 | 0 |
| SABINE 1/TEJAS M | 2,020,803 | 1,063,465 | 0 | 947,156 | 10,182 | 0 | 0 | 0 |
| SABINE 2/CENTANA#3 E | 1,067,826 | 975,918 | 0 | 91,908 | 0 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**                        **RunID:  17029**                        **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**                                                                                        9-174

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 1**
**Intra-System Billing-201007RA  KWH Log Sheet Reconciliation - Entergy Gulf States Louisiana, LLC**  **Page 13**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| SABINE 2/CENTANA#3 M | 1,640,764 | 962,855 | 0 | 664,972 | 12,937 | 0 | 0 | 0 |
| SABINE 2/ENBRIDGE E | 18,075,411 | 17,296,375 | 0 | 692,152 | 71,934 | 0 | 14,950 | 0 |
| SABINE 2/ENBRIDGE M | 15,307,706 | 8,209,508 | 0 | 7,036,036 | 60,197 | 0 | 1,398 | 567 |
| SABINE 2/STORAGE I | 10,780,443 | 10,735,018 | 0 | 44,850 | 0 | 0 | 575 | 0 |
| SABINE 2/TEJAS M | 3,689,900 | 2,689,320 | 0 | 908,661 | 91,919 | 0 | 0 | 0 |
| SABINE 3/CENTANA#3 E | 2,359,458 | 1,271,924 | 0 | 1,060,597 | 26,937 | 0 | 0 | 0 |
| SABINE 3/CENTANA#3 M | 26,532,333 | 10,193,621 | 0 | 16,217,549 | 117,137 | 0 | 4,026 | 0 |
| SABINE 3/ENBRIDGE E | 11,275,875 | 8,080,644 | 0 | 3,103,193 | 91,859 | 0 | 179 | 0 |
| SABINE 3/ENBRIDGE M | 26,260,809 | 13,818,877 | 0 | 12,241,869 | 199,424 | 0 | 71 | 568 |
| SABINE 3/HPL/CH E | 1,994,197 | 1,664,112 | 0 | 326,498 | 3,587 | 0 | 0 | 0 |
| SABINE 3/STORAGE I | 61,879 | 51,555 | 0 | 10,324 | 0 | 0 | 0 | 0 |
| SABINE 3/TEJAS E | 2,651,427 | 1,706,812 | 0 | 925,496 | 18,930 | 0 | 0 | 189 |
| SABINE 3/TEJAS M | 8,961,522 | 1,724,865 | 0 | 7,186,222 | 49,860 | 0 | 575 | 0 |
| SABINE 4/CENTANA#3 M | 9,048,063 | 8,594,274 | 0 | 453,221 | 568 | 0 | 0 | 0 |
| SABINE 4/ENBRIDGE E | 28,033,463 | 25,240,374 | 0 | 2,601,263 | 191,251 | 0 | 575 | 0 |
| SABINE 4/ENBRIDGE M | 19,827,303 | 17,470,401 | 0 | 2,257,273 | 99,607 | 0 | 0 | 22 |
| SABINE 4/HPL/CH E | 1,071,225 | 923,196 | 0 | 123,231 | 24,798 | 0 | 0 | 0 |
| SABINE 4/STORAGE I | 13,195,044 | 12,757,477 | 0 | 354,533 | 83,034 | 0 | 0 | 0 |
| SABINE 4/TEJAS M | 4,992,852 | 4,447,031 | 0 | 540,521 | 5,300 | 0 | 0 | 0 |
| SABINE 5/CENTANA#3 M | 14,674,847 | 1,675,960 | 0 | 12,993,537 | 5,338 | 0 | 12 | 0 |
| SABINE 5/ENBRIDGE E | 4,577,833 | 961,570 | 0 | 3,605,523 | 10,551 | 0 | 0 | 189 |
| SABINE 5/ENBRIDGE M | 3,761,796 | 42,310 | 0 | 3,707,371 | 12,115 | 0 | 0 | 0 |
| SABINE 5/HPL/CH E | 2,185,515 | 119,242 | 0 | 2,059,458 | 6,815 | 0 | 0 | 0 |
| SABINE 5/TEJAS E | 1,859,403 | 210,670 | 0 | 1,643,812 | 4,921 | 0 | 0 | 0 |
| SABINE 5/TEJAS M | 43,874,331 | 4,833,677 | 0 | 38,907,022 | 133,443 | 0 | 0 | 189 |
| TOLEDO 1/HYDRO | 3,875,207 | 3,875,207 | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 1 | 5,445,950 | 0 | 5,445,950 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 1/Aux | (8,000) | (8,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 1/BL HOLDINGS E | 7,368,050 | 282,945 | 0 | 7,061,062 | 24,043 | 0 | 0 | 0 |
| WILLOW GLEN 2 | 10,391,250 | 0 | 10,391,250 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 2/Aux | (313,000) | (313,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 2/BL HOLDINGS E | 14,058,750 | 747,921 | 0 | 13,042,792 | 265,448 | 0 | 2,589 | 0 |
| WILLOW GLEN 3/Aux | (218,000) | (218,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 4 | 77,447,750 | 0 | 77,447,750 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 4/Aux | (193,000) | (193,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 4/BL HOLDINGS E | 104,782,250 | 35,620,086 | 0 | 68,607,715 | 551,523 | 0 | 2,358 | 568 |
| WILLOW GLEN 5/Aux | (203,000) | (203,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| INDEPN 1/COAL | 4,526,010 | 4,526,010 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 8,331,086 | 8,331,086 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 7,011,078 | 7,011,078 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 46,025 | 20,538 | 0 | 24,335 | 1,152 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 13,248 | 13,248 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 3,021,702 | 211,103 | 0 | 2,792,163 | 18,436 | 0 | 0 | 0 |
| AECC Excess WH.BLF 1 | 1,364,211 | 1,364,211 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 6,660,472 | 6,660,472 | 0 | 0 | 0 | 0 | 0 | 0 |
| ACADIA POWER PARTNERS, LLC/WSPP | 59,708,320 | 59,675,508 | 0 | 0 | 0 | 0 | 32,812 | 0 |
| AECI/WSPP A | 458,259 | 458,259 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP B | 3,830,000 | 3,830,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 8,823,362 | 5,646,503 | 0 | 3,173,844 | 0 | 0 | 3,015 | 0 |
| AEP SERVICE CORP /WSPP A | 574,500 | 574,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 153,200 | 153,200 | 0 | 0 | 0 | 0 | 0 | 0 |
| AGRILECTRIC/QF | 5,310,500 | 5,297,791 | 0 | 12,709 | 0 | 0 | 0 | 0 |
| AIR LIQUIDE AMERICA/QF | 512,000 | 512,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY  NC. (AE) ACTING | 459,600 | 153,200 | 0 | 304,529 | 0 | 0 | 1,871 | 0 |
| Ameren Energy Marketing Company/WSPP | 9,575 | 9,575 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 38,300 | 38,300 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 737,083 | 675,803 | 0 | 61,280 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 2,558,432 | 2,343,869 | 0 | 193,011 | 7,415 | 0 | 14,137 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 320,760 | 320,760 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY  NC/WSPP A | 45,959 | 45,959 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 961,242 | 49,715 | 0 | 830,943 | 4,096 | 0 | 76,488 | 0 |
| CONOCOPH LLIPS COMPANY /INTRA- | 1,969,375 | 287,500 | 0 | 1,681,875 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 34,469 | 34,469 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 1,041,185 | 1,040,557 | 0 | 0 | 0 | 0 | 628 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 38,172 | 38,172 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 9,218 | 9,218 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 402,325 | 402,325 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 2,330 | 2,330 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 266,318 | 266,318 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS50 | 3,667 | 3,667 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 201 | 201 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 24,238 | 24,238 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 19,804,486 | 17,993,200 | 0 | 1,654,147 | 54,752 | 0 | 102,387 | 0 |
| DOW CHEMICAL/QF | 227,204,450 | 227,080,662 | 0 | 123,788 | 0 | 0 | 0 | 0 |
| DOW P PELINE COMPANY/INTRA-DAY | 2,127,500 | 0 | 0 | 2,116,638 | 0 | 0 | 10,862 | 0 |

Attachment Snapshot: 20100826181933  RunID: 17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-175

**Entergy Electric System**      **Date range - 20100701 through 20100731**      **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Log Sheet Reconciliation - Entergy Gulf States Louisiana, LLC**      **Page 14**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| DUKE ENERGY HINDS/EXS50 | 21,701 | 21,701 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 15,831 | 15,831 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 165,827 | 165,827 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 26,842 | 26,842 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 16,148 | 16,148 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 140,121 | 140,121 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 144 | 144 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 260,432 | 224,289 | 0 | 35,043 | 0 | 0 | 1,100 | 0 |
| ENDURE ENERGY/WSPP B | 12,447 | 12,447 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 224,050 | 224,050 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 17,906,524 | 17,818,311 | 0 | 53,551 | 6,436 | 0 | 28,226 | 0 |
| EXXON ENCO/QF | 21,120,565 | 21,120,565 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXXON ESSO/QF | 7,447,850 | 7,447,850 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXXON EXXON/QF | 5,300,520 | 5,300,520 | 0 | 0 | 0 | 0 | 0 | 0 |
| FORMOSA PLASTICS/QF | 1,778,370 | 1,778,370 | 0 | 0 | 0 | 0 | 0 | 0 |
| GAPACIFIC/QF | 165,150 | 165,150 | 0 | 0 | 0 | 0 | 0 | 0 |
| J ARON & COMPANY/WSPP B | 4,571,051 | 2,465,103 | 0 | 2,095,052 | 0 | 0 | 10,896 | 0 |
| J.P. MORGAN VENTURES ENERGY | 12,830 | 12,830 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 935,473 | 0 | 0 | 828,870 | 0 | 0 | 106,603 | 0 |
| JBO/WSPP A | 1,851,983 | 0 | 0 | 1,609,650 | 0 | 0 | 242,333 | 0 |
| JBO/WSPP B | 1,988,687 | 803,309 | 0 | 1,137,518 | 0 | 0 | 47,860 | 0 |
| KANSAS CITY POWER & LIGHT | 275,952 | 275,952 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 3,251 | 3,251 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 150,472 | 150,472 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 827,228 | 827,228 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 4,443 | 4,443 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 896 | 896 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 31,427 | 31,427 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 37,164,138 | 36,370,473 | 0 | 513,751 | 67,902 | 0 | 212,012 | 0 |
| MORGAN STANLEY/WSPP A | 47,110 | 47,110 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG CAJUN 3/CAJUN 3 | 95,955,425 | 95,955,425 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 5,701,912 | 5,414,662 | 0 | 287,250 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 35,405,012 | 31,125,729 | 0 | 3,866,468 | 57,925 | 0 | 354,890 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 1,596,150 | 1,014,374 | 0 | 576,051 | 0 | 0 | 5,725 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 1,091,166 | 162,610 | 0 | 860,110 | 8,372 | 0 | 60,074 | 0 |
| PPG INDUSTR ES/QF | 169,586,800 | 169,586,800 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAINBOW ENERGY MARKETING | 2,666,424 | 2,649,436 | 0 | 16,988 | 0 | 0 | 0 | 0 |
| SHELL WOODSTOCK/QF | 13,180,862 | 13,165,150 | 0 | 0 | 15,712 | 0 | 0 | 0 |
| SMEPA/WSPP B | 574,496 | 0 | 0 | 569,717 | 0 | 0 | 4,779 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 105,325 | 105,325 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES  INC. | 2,029,900 | 0 | 0 | 1,771,646 | 0 | 0 | 258,254 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 1,658,371 | 1,658,371 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 10,826,823 | 10,663,125 | 0 | 87,489 | 18,262 | 0 | 57,947 | 0 |
| TEA/WSPP A | 213,711 | 213,711 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 15,731 | 15,731 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 12,343 | 12,343 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 200,195 | 200,195 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA/WSPP A | 450,215 | 190,542 | 0 | 253,868 | 0 | 0 | 5,805 | 0 |
| TENASKA/WSPP B | 4,413,862 | 1,602,890 | 0 | 2,782,607 | 0 | 0 | 28,365 | 0 |
| UNION POWER PARTNERS/WSPP A | 36,384 | 36,384 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP B | 31,547,047 | 30,407,933 | 0 | 993,273 | 17,226 | 0 | 128,615 | 0 |
| Un-accounted In | 3,652 | 3,652 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP A | 1,327,853 | 1,327,853 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY  NC/WSPP B | 5,658,817 | 5,558,739 | 0 | 97,958 | 0 | 0 | 2,120 | 0 |
| WESTAR ENERGY  NC/WSPP C | 153,200 | 0 | 0 | 153,200 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 7,107 | 7,107 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 155,716 | 155,716 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAZOO CITY/EXS90 | 1,011 | 1,011 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 8,681,301 | 8,681,301 | 0 | 0 | 0 | 0 | 0 | 0 |
| INADVERTENT  N | 2,931,814 | 2,931,814 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **3,103,786,681** | **2,038,635,428** | **670,461,007** | **388,628,993** | **4,145,451** | **0** | **1,912,208** | **3,594** |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**      

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| **Entergy Electric System** | **Date range - 20100701 through 20100731** | | | | | | **Attachment 1** | |
| **Intra-System Billing-201007RA** | **KWH Log Sheet Reconciliation - Entergy Texas, Inc** | | | | | | **Page 15** | |
| AEP SERVICE CORP /MINDEN PAYBACK | (412,346) | (412,346) | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL IN | 211,422 | 211,422 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALDWELL IMBAL OT | (390) | (390) | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/TOLEDO BEND | (892,075) | (892,075) | 0 | 0 | 0 | 0 | 0 | 0 |
| COG Sale Losses N | 148,409 | 148,409 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRESS - ETEC | 1,057,000 | 1,057,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - CLEC | (774,000) | (774,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - CNWY | (10,000) | (10,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - DERS | (10,000) | (10,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - MDEA | (1,018,000) | (1,018,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - SOCO | (78,000) | (78,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| EPMCNELSON6 - SWPP | (3,294,000) | (3,294,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC EXCESS-CONTRAOT | (4,937) | (4,937) | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC EXCESS-HRSNHRDN | 4,937 | 4,937 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETI SALE TO ETEC IN | 87,385,599 | 87,385,599 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON FRONT ER 10YR | 93,424,000 | 93,424,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance IN | 202,815 | 202,815 | 0 | 0 | 0 | 0 | 0 | 0 |
| GIS Imbalance OT | (213,386) | (213,386) | 0 | 0 | 0 | 0 | 0 | 0 |
| HARDIN | 9,029,000 | 9,029,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| INTERNAL LOAD    IN | 21,576,000 | 21,576,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| IPP Sale Losses N | 1,389,104 | 1,389,104 | 0 | 0 | 0 | 0 | 0 | 0 |
| JAS loss N | 327 | 327 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL IN | 100,758 | 100,758 | 0 | 0 | 0 | 0 | 0 | 0 |
| KIRBYVILLE IMBAL OT | (1,053) | (1,053) | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL IN | 161,878 | 161,878 | 0 | 0 | 0 | 0 | 0 | 0 |
| NEWTON IMBAL OT | (102) | (102) | 0 | 0 | 0 | 0 | 0 | 0 |
| RSCOGEN - SRMPA | 8,470,000 | 8,470,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN JACINTO 1 | 5,722,000 | 5,722,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN JACINTO 2 | 5,612,000 | 5,612,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| SR ACT LOAD    OT | (208,678,469) | (208,678,469) | 0 | 0 | 0 | 0 | 0 | 0 |
| SR ACT LOAD IN ETI | 27,893,256 | 27,893,256 | 0 | 0 | 0 | 0 | 0 | 0 |
| SRMA LOAD    OT | (37,747,524) | (37,747,524) | 0 | 0 | 0 | 0 | 0 | 0 |
| SWPP - ETEC | 20,505,000 | 20,505,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 1/NUCLEAR | 16,654,966 | 16,654,966 | 0 | 0 | 0 | 0 | 0 | 0 |
| ARK.NU 2/NUCLEAR | 19,768,134 | 19,768,134 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 1/GSPL E | 4,285,611 | 4,285,611 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 1/GSPL I | 405,114 | 405,114 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCAS EU 2/GSPL E | 5,250,450 | 5,250,450 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RET | 12,205,279 | 12,205,279 | 0 | 0 | 0 | 0 | 0 | 0 |
| GGULF RP | 6,173,783 | 6,173,783 | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 1 | 58,217,025 | 0 | 58,217,025 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 1/COPANO E | 3,513,838 | 3,513,838 | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 1/COPANO M | 20,390,449 | 20,379,112 | 0 | 0 | 0 | 0 | 11,337 | 0 |
| LEWIS CREEK 1/TETCO E | 4,719,555 | 4,714,455 | 0 | 0 | 0 | 0 | 5,100 | 0 |
| LEWIS CREEK 1/TETCO I | 1,715,190 | 1,715,190 | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 1/TETCO M | 12,690,943 | 12,689,556 | 0 | 0 | 0 | 0 | 1,387 | 0 |
| LEWIS CREEK 2 | 65,725,375 | 0 | 65,725,375 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 2/Aux | (9,000) | (9,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 2/COPANO E | 4,448,495 | 4,448,487 | 0 | 0 | 0 | 0 | 8 | 0 |
| LEWIS CREEK 2/COPANO M | 4,800,621 | 4,800,236 | 0 | 0 | 0 | 0 | 385 | 0 |
| LEWIS CREEK 2/TEJAS E | 801,683 | 801,683 | 0 | 0 | 0 | 0 | 0 | 0 |
| LEWIS CREEK 2/TETCO E | 20,380,744 | 20,371,648 | 0 | 0 | 0 | 0 | 9,096 | 0 |
| LEWIS CREEK 2/TETCO I | 6,014,580 | 6,013,664 | 0 | 0 | 0 | 0 | 916 | 0 |
| LEWIS CREEK 2/TETCO M | 12,133,502 | 12,123,325 | 0 | 0 | 0 | 0 | 10,177 | 0 |
| NELSON 3/TARGA E | 209,950 | 207,485 | 0 | 0 | 2,465 | 0 | 0 | 0 |
| NELSON 3/TENN M | 1,545,767 | 1,401,589 | 0 | 0 | 144,178 | 0 | 0 | 0 |
| NELSON 3/TETCO E | 255,850 | 101,536 | 0 | 0 | 154,314 | 0 | 0 | 0 |
| NELSON 3/TETCO M | 3,180,658 | 2,478,395 | 0 | 0 | 702,263 | 0 | 0 | 0 |
| NELSON 4/FLORIDA E | 6,135,214 | 6,087,711 | 0 | 47,337 | 0 | 0 | 0 | 166 |
| NELSON 4/TARGA E | 14,050,111 | 13,926,196 | 0 | 121,380 | 2,535 | 0 | 0 | 0 |
| NELSON 4/TENN E | 12,432,537 | 12,414,755 | 0 | 17,782 | 0 | 0 | 0 | 0 |
| NELSON 4/TENN M | 9,418,739 | 9,253,513 | 0 | 57,443 | 107,165 | 0 | 618 | 0 |
| NELSON 4/TETCO E | 628,945 | 626,428 | 0 | 0 | 2,517 | 0 | 0 | 0 |
| NELSON 4/TETCO I | 3,287,176 | 3,287,175 | 0 | 0 | 0 | 0 | 1 | 0 |
| NELSON 4/TETCO M | 16,328,053 | 15,846,269 | 0 | 177,010 | 290,009 | 0 | 14,765 | 0 |
| NELSON 6/GSU COAL | 224,805,011 | 224,805,011 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN E | 66,954,359 | 66,954,359 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TENN I | 7,507,634 | 7,507,634 | 0 | 0 | 0 | 0 | 0 | 0 |
| PERVIL 1/TEXAS GAS E | 8,376,760 | 8,376,760 | 0 | 0 | 0 | 0 | 0 | 0 |
| RVRBND 1/NUCLEAR | 207,589,429 | 207,589,429 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1 | 51,146,250 | 0 | 51,146,250 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/Aux | (183,000) | (183,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/CENTANA#3 E | 1,471,820 | 1,471,820 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/CENTANA#3 M | 10,450,916 | 10,449,828 | 0 | 0 | 0 | 0 | 425 | 663 |
| SABINE 1/ENBRIDGE E | 5,254,580 | 5,254,575 | 0 | 0 | 0 | 0 | 5 | 0 |

**Attachment Snapshot: 20100826181933**          **RunID: 17029**          **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**          9-177

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Log Sheet Reconciliation - Entergy Texas, Inc**  **Page 16**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| SABINE 1/ENBRIDGE M | 14,290,597 | 14,280,438 | 0 | 0 | 0 | 0 | 10,159 | 0 |
| SABINE 1/HPL/CH E | 1,814,305 | 1,814,305 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/STORAGE I | 2,929,631 | 2,929,631 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/TEJAS E | 98,285 | 98,285 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 1/TEJAS M | 1,493,616 | 1,493,616 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 2 | 50,562,050 | 0 | 50,562,050 | 0 | 0 | 0 | 0 | 0 |
| SABINE 2/CENTANA#3 E | 789,282 | 789,282 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 2/CENTANA#3 M | 1,212,690 | 1,212,690 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 2/ENBRIDGE E | 13,360,029 | 13,348,979 | 0 | 0 | 0 | 0 | 11,050 | 0 |
| SABINE 2/ENBRIDGE M | 11,314,406 | 11,313,373 | 0 | 0 | 0 | 0 | 1,033 | 0 |
| SABINE 2/STORAGE I | 7,968,187 | 7,967,762 | 0 | 0 | 0 | 0 | 425 | 0 |
| SABINE 2/TEJAS M | 2,727,356 | 2,727,356 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3 | 80,097,500 | 0 | 80,097,500 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3/CENTANA#3 E | 1,743,891 | 1,743,891 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3/CENTANA#3 M | 19,610,652 | 19,607,345 | 0 | 0 | 0 | 0 | 2,976 | 331 |
| SABINE 3/ENBRIDGE E | 8,334,248 | 8,334,115 | 0 | 0 | 0 | 0 | 133 | 0 |
| SABINE 3/ENBRIDGE M | 19,410,359 | 19,410,307 | 0 | 0 | 0 | 0 | 52 | 0 |
| SABINE 3/HPL/CH E | 1,473,991 | 1,473,991 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3/STORAGE I | 45,749 | 45,749 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3/TEJAS E | 1,959,750 | 1,959,750 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 3/TEJAS M | 6,623,860 | 6,623,435 | 0 | 0 | 0 | 0 | 425 | 0 |
| SABINE 4 | 76,167,950 | 0 | 76,167,950 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/Aux | (510,000) | (510,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/CENTANA#3 M | 6,687,645 | 6,687,645 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/ENBRIDGE E | 20,720,155 | 20,719,730 | 0 | 0 | 0 | 0 | 425 | 0 |
| SABINE 4/ENBRIDGE M | 14,655,058 | 14,655,058 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/HPL/CH E | 791,784 | 791,784 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/STORAGE I | 9,753,002 | 9,753,002 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 4/TEJAS M | 3,690,406 | 3,690,406 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5 | 70,933,725 | 0 | 70,933,725 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5/CENTANA#3 M | 10,846,322 | 10,846,314 | 0 | 0 | 0 | 0 | 8 | 0 |
| SABINE 5/ENBRIDGE E | 3,383,577 | 3,383,577 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5/ENBRIDGE M | 2,780,434 | 2,780,434 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5/HPL/CH E | 1,615,404 | 1,615,404 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5/TEJAS E | 1,374,341 | 1,374,341 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE 5/TEJAS M | 32,429,197 | 32,423,416 | 0 | 0 | 5,781 | 0 | 0 | 0 |
| SAMRAY 1_2/Aux | (134,000) | (134,000) | 0 | 0 | 0 | 0 | 0 | 0 |
| SAMRAY 1_2/HYDRO | 8,333,000 | 8,333,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOLEDO 1/HYDRO | 2,864,293 | 2,864,293 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOWN B 1/HYDRO | 3,105,000 | 3,105,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| WILLOW GLEN 1/BL HOLDINGS E | 5,445,950 | 5,291,095 | 0 | 0 | 154,855 | 0 | 0 | 0 |
| WILLOW GLEN 2/BL HOLDINGS E | 10,391,250 | 8,907,191 | 0 | 569,266 | 912,881 | 0 | 1,912 | 0 |
| WILLOW GLEN 4/BL HOLDINGS E | 77,447,750 | 77,445,013 | 0 | 0 | 0 | 0 | 1,742 | 995 |
| INDEPN 1/COAL | 4,757,472 | 4,757,472 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 1/COAL | 8,755,797 | 8,755,797 | 0 | 0 | 0 | 0 | 0 | 0 |
| WH.BLF 2/COAL | 7,368,498 | 7,368,498 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess BAILEY 1 | 39,312 | 39,312 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess INDEPN 2 | 11,318 | 11,318 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess MCCLEL 1 | 2,581,467 | 2,581,467 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 1 | 1,165,458 | 1,165,458 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECC Excess WH.BLF 2 | 5,690,108 | 5,690,108 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP A | 391,495 | 391,495 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP B | 3,272,000 | 3,272,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| AECI/WSPP C SYSTEM FIRM | 7,537,870 | 7,445,246 | 0 | 43,518 | 46,531 | 0 | 2,575 | 0 |
| AEP SERVICE CORP /WSPP A | 490,800 | 490,800 | 0 | 0 | 0 | 0 | 0 | 0 |
| AEP SERVICE CORP /WSPP C | 130,880 | 130,880 | 0 | 0 | 0 | 0 | 0 | 0 |
| AIR LIQUIDE MAGNOLIA/QF | 202,615 | 202,615 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMEREN ENERGY  NC. (AE) ACTING | 392,640 | 391,043 | 0 | 0 | 0 | 0 | 1,597 | 0 |
| Ameren Energy Marketing Company/WSPP | 8,180 | 8,180 | 0 | 0 | 0 | 0 | 0 | 0 |
| BASF CORPORATION/QF | 4,486,070 | 4,486,070 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 32,720 | 32,720 | 0 | 0 | 0 | 0 | 0 | 0 |
| BNP PARIBAS ENERGY TRADING | 629,696 | 629,696 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALP NE ENERGY SERVICES L.P./WSPP | 2,185,696 | 2,173,624 | 0 | 0 | 0 | 0 | 12,072 | 0 |
| CARGILL POWER MARKETS LLC/WSPP A | 274,031 | 274,031 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARROLLSTPARK/QF | 91,582,450 | 91,582,450 | 0 | 0 | 0 | 0 | 0 | 0 |
| CITIGROUP ENERGY  NC/WSPP A | 39,264 | 39,264 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLECO/WSPP B | 821,270 | 742,128 | 0 | 0 | 13,803 | 0 | 65,339 | 0 |
| CONOCOPH LLIPS COMPANY /INTRA- | 1,575,625 | 1,575,625 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 29,448 | 29,448 | 0 | 0 | 0 | 0 | 0 | 0 |
| CONSTELLATION ENERGY | 889,493 | 888,956 | 0 | 0 | 0 | 0 | 537 | 0 |
| COTTONWOOD ENERGY CO/EXS50 | 32,612 | 32,612 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS75 | 7,868 | 7,868 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXS90 | 343,686 | 343,686 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSS50 | 1,990 | 1,990 | 0 | 0 | 0 | 0 | 0 | 0 |
| COTTONWOOD ENERGY CO/EXSSTSH | 227,513 | 227,513 | 0 | 0 | 0 | 0 | 0 | 0 |

**Attachment Snapshot: 20100826181933**  **RunID: 17029**  **Billing Snapshot: 20100826175238**

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 1**
**Intra-System Billing-201007RA**  KWH Log Sheet Reconciliation - Entergy Texas, Inc  **Page 17**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | Sys Sales | Unacct |
|---|---|---|---|---|---|---|---|---|
| CYPRES/EXS50 | 3,133 | 3,133 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS75 | 172 | 172 | 0 | 0 | 0 | 0 | 0 | 0 |
| CYPRES/EXS90 | 20,708 | 20,708 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB ENERGY TRAD NG LLC/WSPP B | 16,919,189 | 16,831,732 | 0 | 0 | 0 | 0 | 87,457 | 0 |
| DOW P PELINE COMPANY/INTRA-DAY | 1,572,500 | 1,281,171 | 0 | 274,685 | 8,616 | 0 | 8,028 | 0 |
| DUKE ENERGY HINDS/EXS50 | 18,538 | 18,538 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS75 | 13,524 | 13,524 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKE ENERGY HINDS/EXS90 | 141,631 | 141,631 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS50 | 22,927 | 22,927 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS75 | 13,806 | 13,806 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/EXS90 | 119,726 | 119,726 | 0 | 0 | 0 | 0 | 0 | 0 |
| DUKEENERGY HOTSPRING/FREE | 123 | 123 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENDURE ENERGY/WSPP A | 222,491 | 221,552 | 0 | 0 | 0 | 0 | 939 | 0 |
| ENDURE ENERGY/WSPP B | 10,634 | 10,634 | 0 | 0 | 0 | 0 | 0 | 0 |
| ENG. CARBONS NC/QF | 2,020,069 | 2,020,069 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETEC/WSPP B | 191,412 | 191,412 | 0 | 0 | 0 | 0 | 0 | 0 |
| EXELON GENERATION COMPANY | 15,297,742 | 15,273,636 | 0 | 0 | 0 | 0 | 24,106 | 0 |
| GOODYEAR TIRE/QF | 577,318 | 577,318 | 0 | 0 | 0 | 0 | 0 | 0 |
| HUNTSMAN P.N./QF | 74,401 | 74,401 | 0 | 0 | 0 | 0 | 0 | 0 |
| J ARON & COMPANY/WSPP B | 3,905,132 | 3,895,829 | 0 | 0 | 0 | 0 | 9,303 | 0 |
| J.P. MORGAN VENTURES ENERGY | 10,961 | 10,961 | 0 | 0 | 0 | 0 | 0 | 0 |
| J.P. MORGAN VENTURES ENERGY | 799,186 | 708,121 | 0 | 0 | 0 | 0 | 91,065 | 0 |
| JBO/WSPP A | 1,582,176 | 1,025,309 | 0 | 75,631 | 274,237 | 0 | 206,999 | 0 |
| JBO/WSPP B | 1,698,984 | 1,502,028 | 0 | 111,406 | 44,672 | 0 | 40,878 | 0 |
| KANSAS CITY POWER & LIGHT | 235,748 | 235,748 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS75 | 2,777 | 2,777 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXS90 | 128,521 | 128,521 | 0 | 0 | 0 | 0 | 0 | 0 |
| MAGNET COVE/EXSSTSH | 706,713 | 706,713 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS50 | 3,797 | 3,797 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS75 | 768 | 768 | 0 | 0 | 0 | 0 | 0 | 0 |
| MDEA CROSSROADS/EXS90 | 26,848 | 26,848 | 0 | 0 | 0 | 0 | 0 | 0 |
| MERRILL LYNCH COMMODITIES | 31,749,681 | 31,568,580 | 0 | 0 | 0 | 0 | 181,101 | 0 |
| MORGAN STANLEY/WSPP A | 40,246 | 40,246 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG CAJUN 3/CAJUN 3 | 70,923,575 | 70,923,575 | 0 | 0 | 0 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP A | 4,871,190 | 4,638,871 | 0 | 225,360 | 6,959 | 0 | 0 | 0 |
| NRG POWER MARKETING LLC./WSPP B | 30,247,034 | 29,856,229 | 0 | 0 | 87,663 | 0 | 303,142 | 0 |
| NRG POWER MARKETING LLC./WSPP C | 1,363,606 | 1,353,747 | 0 | 0 | 4,971 | 0 | 4,888 | 0 |
| OCCIDENTAL POWER SERVICES/WSPP | 932,192 | 828,673 | 0 | 32,720 | 19,494 | 0 | 51,305 | 0 |
| PREMCR/QF | 376,760 | 376,760 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAINBOW ENERGY MARKETING | 2,277,962 | 2,277,962 | 0 | 0 | 0 | 0 | 0 | 0 |
| SABINE COGEN L P./QF | 35,724,878 | 35,724,878 | 0 | 0 | 0 | 0 | 0 | 0 |
| SMEPA/WSPP B | 490,800 | 310,404 | 0 | 167,697 | 8,616 | 0 | 4,083 | 0 |
| SOUTHERN COMPANY SERVICES INC. | 89,980 | 89,980 | 0 | 0 | 0 | 0 | 0 | 0 |
| SOUTHERN COMPANY SERVICES INC. | 1,734,160 | 1,111,805 | 0 | 322,527 | 79,204 | 0 | 220,624 | 0 |
| SRW COGENERATION/QF | 49,808,910 | 49,808,910 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP A | 1,416,776 | 1,416,776 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUEZ Energy Marketing NA Inc./WSPP B | 9,249,460 | 9,199,959 | 0 | 0 | 0 | 0 | 49,501 | 0 |
| TEA/WSPP A | 182,578 | 182,578 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS50 | 13,439 | 13,439 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS75 | 10,544 | 10,544 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA FRONTIER/EXS90 | 170,975 | 170,975 | 0 | 0 | 0 | 0 | 0 | 0 |
| TENASKA/WSPP A | 384,624 | 364,212 | 0 | 15,456 | 0 | 0 | 4,956 | 0 |
| TENASKA/WSPP B | 3,770,813 | 3,682,588 | 0 | 0 | 63,999 | 0 | 24,226 | 0 |
| UNION POWER PARTNERS/WSPP A | 31,084 | 31,084 | 0 | 0 | 0 | 0 | 0 | 0 |
| UNION POWER PARTNERS/WSPP B | 26,950,968 | 26,841,101 | 0 | 0 | 0 | 0 | 109,867 | 0 |
| Un-accounted In | 3,203 | 3,203 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY NC/WSPP A | 1,134,394 | 1,134,394 | 0 | 0 | 0 | 0 | 0 | 0 |
| WESTAR ENERGY NC/WSPP B | 4,834,398 | 4,832,588 | 0 | 0 | 0 | 0 | 1,810 | 0 |
| WESTAR ENERGY NC/WSPP C | 130,880 | 130,880 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS75 | 6,069 | 6,069 | 0 | 0 | 0 | 0 | 0 | 0 |
| WRIGHTSVILE POWER/EXS90 | 133,010 | 133,010 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAZOO CITY/EXS90 | 863 | 863 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exchange | 328,392,353 | 327,900,434 | 0 | 0 | 490,923 | 0 | 0 | 996 |
| INADVERTENT N | 2,504,716 | 2,504,716 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **2,373,774,114** | **1,913,442,261** | **452,849,875** | **2,259,218** | **3,628,651** | **0** | **1,590,958** | **3,151** |

Attachment Snapshot: 20100826181933       RunID: 17029       Billing Snapshot: 20100826175238

**2011 ETI Rate Case**       9-179

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 1**
**Intra-System Billing-201007RA**  **KWH Energy Summary**  **Page 18**

| Company | Net Gen | To Area | UPP | Exchange | Inadvertent | Firm Sales | System Sales | Unaccounted |
|---------|---------|---------|-----|----------|-------------|------------|--------------|-------------|
| AR | 3,068,221,822 | 2,534,515,289 | 395,462,556 | 131,743,223 | 4,583,474 | 0 | 1,913,306 | 3,974 |
| LA | 3,491,820,106 | 3,093,813,592 | 254,622,820 | 135,105,357 | 5,498,856 | 0 | 2,774,712 | 4,769 |
| MS | 1,669,714,232 | 1,633,071,080 | 0 | 32,027,550 | 3,063,696 | 0 | 1,549,246 | 2,660 |
| NO | 587,352,718 | 554,353,844 | 0 | 31,587,544 | 978,872 | 0 | 431,606 | 852 |
| EGSL | 3,103,786,681 | 2,038,635,428 | 670,461,007 | 388,628,993 | 4,145,451 | 0 | 1,912,208 | 3,594 |
| ETI | 2,373,774,114 | 1,913,442,261 | 452,849,875 | 2,259,218 | 3,628,651 | 0 | 1,590,958 | 3,151 |
| **Totals** | **14,294,669,673** | **11,767,831,494** | **1,773,396,258** | **721,351,885** | **21,899,000** | **0** | **10,172,036** | **19,000** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Entergy Electric System** | **Date range - 20100701 through 20100731** | | | | | **Attachment 1** | |
| **Intra-System Billing-201007RA** | **Joint Account Purchases - KWH** | | | | | **Page 19** | |
| **Description** | **System** | **AR** | **LA** | **MS** | **NO** | **EGSL** | **ETI** |
| AECI/WSPP A | 2,393,000 | 499,659 | 601,840 | 333,584 | 108,163 | 458,259 | 391,495 |
| AECI/WSPP B | 20,000,000 | 4,176,000 | 5,030,000 | 2,788,000 | 904,000 | 3,830,000 | 3,272,000 |
| AECI/WSPP C SYSTEM FIRM | 46,075,000 | 9,620,460 | 11,587,863 | 6,422,855 | 2,082,590 | 8,823,362 | 7,537,870 |
| AEP SERVICE CORP /WSPP A | 3,000,000 | 626,400 | 754,500 | 418,200 | 135,600 | 574,500 | 490,800 |
| AEP SERVICE CORP /WSPP C | 800,000 | 167,040 | 201,200 | 111,520 | 36,160 | 153,200 | 130,880 |
| AMEREN ENERGY NC. (AE) ACTING /WSPP C | 2,400,000 | 501,120 | 603,600 | 334,560 | 108,480 | 459,600 | 392,640 |
| AMEREN ENERGY MARKETING COMPANY/WSPP A | 50,000 | 10,440 | 12,575 | 6,970 | 2,260 | 9,575 | 8,180 |
| BNP PARIBAS ENERGY TRADING GP/WSPP A | 200,000 | 41,760 | 50,300 | 27,880 | 9,040 | 38,300 | 32,720 |
| BNP PARIBAS ENERGY TRADING GP/WSPP B | 3,849,000 | 803,671 | 968,024 | 536,551 | 173,975 | 737,083 | 629,696 |
| CALP NE ENERGY SERVICES L.P./WSPP B | 13,360,000 | 2,789,568 | 3,360,048 | 1,862,384 | 603,872 | 2,558,432 | 2,185,696 |
| CARGILL POWER MARKETS LLC/WSPP A | 1,675,000 | 349,740 | 421,265 | 233,494 | 75,710 | 320,760 | 274,031 |
| CITIGROUP ENERGY NC/WSPP A | 240,000 | 50,112 | 60,361 | 33,456 | 10,848 | 45,959 | 39,264 |
| CLECO/WSPP B | 5,020,000 | 1,048,172 | 1,262,618 | 699,790 | 226,908 | 961,242 | 821,270 |
| CONSTELLATION ENERGY COMMODITIES GROUP | 180,000 | 37,584 | 45,271 | 25,092 | 8,136 | 34,469 | 29,448 |
| CONSTELLATION ENERGY COMMODITIES GROUP | 5,437,000 | 1,135,245 | 1,367,406 | 757,918 | 245,753 | 1,041,185 | 889,493 |
| COTTONWOOD ENERGY CO/EXS50 | 199,330 | 41,619 | 50,135 | 27,787 | 9,005 | 38,172 | 32,612 |
| COTTONWOOD ENERGY CO/EXS75 | 48,097 | 10,037 | 12,102 | 6,703 | 2,169 | 9,218 | 7,868 |
| COTTONWOOD ENERGY CO/EXS90 | 2,100,765 | 438,669 | 528,321 | 292,830 | 94,934 | 402,325 | 343,686 |
| COTTONWOOD ENERGY CO/EXSSS50 | 12,167 | 2,541 | 3,060 | 1,696 | 550 | 2,330 | 1,990 |
| COTTONWOOD ENERGY CO/EXSSTSH | 1,390,663 | 290,367 | 349,743 | 193,858 | 62,864 | 266,318 | 227,513 |
| CYPRES/EXS50 | 19,150 | 3,999 | 4,816 | 2,669 | 866 | 3,667 | 3,133 |
| CYPRES/EXS75 | 1,050 | 219 | 264 | 146 | 48 | 201 | 172 |
| CYPRES/EXS90 | 126,581 | 26,430 | 31,833 | 17,648 | 5,724 | 24,238 | 20,708 |
| DB ENERGY TRAD NG LLC/WSPP B | 103,418,000 | 21,593,680 | 26,009,688 | 14,416,465 | 4,674,492 | 19,804,486 | 16,919,189 |
| DUKE ENERGY HINDS/EXS50 | 113,319 | 23,661 | 28,499 | 15,797 | 5,123 | 21,701 | 18,538 |
| DUKE ENERGY HINDS/EXS75 | 82,677 | 17,266 | 20,807 | 11,523 | 3,726 | 15,831 | 13,524 |
| DUKE ENERGY HINDS/EXS90 | 865,808 | 180,827 | 217,804 | 120,648 | 39,071 | 165,827 | 141,631 |
| DUKEENERGY HOTSPRING/EXS50 | 140,174 | 29,273 | 35,260 | 19,538 | 6,334 | 26,842 | 22,927 |
| DUKEENERGY HOTSPRING/EXS75 | 84,365 | 17,619 | 21,226 | 11,762 | 3,804 | 16,148 | 13,806 |
| DUKEENERGY HOTSPRING/EXS90 | 731,601 | 152,741 | 183,983 | 101,969 | 33,061 | 140,121 | 119,726 |
| DUKEENERGY HOTSPRING/FREE | 750 | 156 | 189 | 105 | 33 | 144 | 123 |
| ENDURE ENERGY/WSPP A | 1,360,000 | 283,965 | 342,048 | 189,589 | 61,475 | 260,432 | 222,491 |
| ENDURE ENERGY/WSPP B | 65,000 | 13,572 | 16,348 | 9,061 | 2,938 | 12,447 | 10,634 |
| ETEC/WSPP B | 1,170,000 | 244,298 | 294,260 | 163,098 | 52,882 | 224,050 | 191,412 |
| EXELON GENERATION COMPANY LLC/DA LY CALL | 93,507,000 | 19,524,239 | 23,517,077 | 13,034,879 | 4,226,539 | 17,906,524 | 15,297,742 |
| J ARON & COMPANY/WSPP B | 23,870,000 | 4,984,056 | 6,003,359 | 3,327,478 | 1,078,924 | 4,571,051 | 3,905,132 |
| J.P. MORGAN VENTURES ENERGY | 67,000 | 13,990 | 16,851 | 9,340 | 3,028 | 12,830 | 10,961 |
| J.P. MORGAN VENTURES ENERGY | 4,885,000 | 1,019,989 | 1,228,582 | 680,969 | 220,801 | 935,473 | 799,186 |
| JBO/WSPP A | 9,671,000 | 2,019,305 | 2,432,270 | 1,348,137 | 437,129 | 1,851,983 | 1,582,176 |
| JBO/WSPP B | 10,385,000 | 2,168,386 | 2,611,868 | 1,447,671 | 469,404 | 1,988,687 | 1,698,984 |
| KANSAS CITY POWER & LIGHT COMPANY/WSPP A | 1,441,000 | 300,881 | 362,411 | 200,875 | 65,133 | 275,952 | 235,748 |
| MAGNET COVE/EXS75 | 16,976 | 3,545 | 4,270 | 2,366 | 767 | 3,251 | 2,777 |
| MAGNET COVE/EXS90 | 785,651 | 164,007 | 197,598 | 109,555 | 35,498 | 150,472 | 128,521 |
| MAGNET COVE/EXSSTSH | 4,319,727 | 901,963 | 1,086,406 | 602,169 | 195,248 | 827,228 | 706,713 |
| MDEA CROSSROADS/EXS50 | 23,211 | 4,846 | 5,838 | 3,235 | 1,052 | 4,443 | 3,797 |
| MDEA CROSSROADS/EXS75 | 4,684 | 977 | 1,178 | 653 | 212 | 896 | 768 |
| MDEA CROSSROADS/EXS90 | 164,075 | 34,261 | 41,256 | 22,867 | 7,416 | 31,427 | 26,848 |
| MERRILL LYNCH COMMODITIES INC/WSPP B | 194,069,000 | 40,521,612 | 48,808,429 | 27,053,226 | 8,771,914 | 37,164,138 | 31,749,681 |
| MORGAN STANLEY/WSPP A | 246,000 | 51,366 | 61,868 | 34,292 | 11,118 | 47,110 | 40,246 |
| NRG POWER MARKETING LLC./WSPP A | 29,775,000 | 6,217,020 | 7,488,413 | 4,150,635 | 1,345,830 | 5,701,912 | 4,871,190 |
| NRG POWER MARKETING LLC./WSPP B | 184,884,000 | 38,603,785 | 46,498,600 | 25,772,818 | 8,356,751 | 35,405,012 | 30,247,034 |
| NRG POWER MARKETING LLC./WSPP C | 8,335,000 | 1,740,348 | 2,096,255 | 1,161,899 | 376,742 | 1,596,150 | 1,363,606 |
| OCCIDENTAL POWER SERVICES/WSPP B | 5,698,000 | 1,189,742 | 1,433,048 | 794,302 | 257,550 | 1,091,166 | 932,192 |
| RAINBOW ENERGY MARKETING CORP/WSPP A | 13,924,000 | 2,907,333 | 3,501,908 | 1,941,010 | 629,363 | 2,666,424 | 2,277,962 |
| SMEPA/WSPP B | 3,000,000 | 626,400 | 754,504 | 418,200 | 135,600 | 574,496 | 490,800 |
| SOUTHERN COMPANY SERVICES INC. AS AGENT | 550,000 | 114,840 | 138,325 | 76,670 | 24,860 | 105,325 | 89,980 |
| SOUTHERN COMPANY SERVICES INC. AS AGENT | 10,600,000 | 2,213,280 | 2,665,900 | 1,477,640 | 479,120 | 2,029,900 | 1,734,160 |
| SUEZ ENERGY MARKETING NA NC /WSPP A | 8,660,000 | 1,808,208 | 2,178,009 | 1,207,204 | 391,432 | 1,658,371 | 1,416,776 |
| SUEZ ENERGY MARKETING NA NC /WSPP B | 56,537,000 | 11,804,928 | 14,219,068 | 7,881,251 | 2,555,470 | 10,826,823 | 9,249,460 |
| TEA/WSPP A | 1,116,000 | 233,021 | 280,677 | 155,570 | 50,443 | 213,711 | 182,578 |
| TENASKA FRONTIER/EXS50 | 82,147 | 17,152 | 20,660 | 11,451 | 3,714 | 15,731 | 13,439 |
| TENASKA FRONTIER/EXS75 | 64,452 | 13,458 | 16,210 | 8,985 | 2,912 | 12,343 | 10,544 |
| TENASKA FRONTIER/EXS90 | 1,045,147 | 218,226 | 262,868 | 145,651 | 47,232 | 200,195 | 170,975 |
| TENASKA/WSPP A | 2,351,000 | 490,888 | 591,278 | 327,729 | 106,266 | 450,215 | 384,624 |
| TENASKA/WSPP B | 23,049,000 | 4,812,638 | 5,796,845 | 3,213,034 | 1,041,808 | 4,413,862 | 3,770,813 |
| UNION POWER PARTNERS/WSPP A | 190,000 | 39,672 | 47,786 | 26,486 | 8,588 | 36,384 | 31,084 |
| UNION POWER PARTNERS/WSPP B | 164,737,000 | 34,397,079 | 41,431,444 | 22,964,343 | 7,446,119 | 31,547,047 | 26,950,968 |
| WESTAR ENERGY NC/WSPP A | 6,934,000 | 1,447,817 | 1,743,909 | 966,608 | 313,419 | 1,327,853 | 1,134,394 |
| WESTAR ENERGY NC/WSPP B | 29,550,000 | 6,170,038 | 7,431,833 | 4,119,252 | 1,335,662 | 5,658,817 | 4,834,398 |
| WESTAR ENERGY NC/WSPP C | 800,000 | 167,040 | 201,200 | 111,520 | 36,160 | 153,200 | 130,880 |
| WRIGHTSVILE POWER/EXS75 | 37,100 | 7,745 | 9,333 | 5,171 | 1,675 | 7,107 | 6,069 |
| WRIGHTSVILE POWER/EXS90 | 813,136 | 169,805 | 204,509 | 113,362 | 36,734 | 155,716 | 133,010 |
| YAZOO CITY/EXS90 | 5,270 | 1,101 | 1,324 | 734 | 237 | 1,011 | 863 |
| **Totals** | **1,112,801,073** | **232,352,897** | **279,870,424** | **155,124,383** | **50,298,464** | **213,100,660** | **182,054,245** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                                                      9-181

**Entergy Electric System**      **Date range - 20100701 through 20100731**      **Attachment 1**
**Intra-System Billing-201007RA**      **Individual Company Purchases - KWH**      **Page 20**

| Description | System | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|---|
| ACADIA POWER PARTNERS, LLC/WSPP B | 179,125,000 | 0 | 179,125,000 | 0 | 0 | 0 | 0 |
| BURAS TEMP | 131,908 | 0 | 131,908 | 0 | 0 | 0 | 0 |
| CALP NE  A BASE   IN | 137,098,200 | 0 | 0 | 0 | 0 | 137,098,200 | 0 |
| CALP NE  B BASE   IN | 98,223,400 | 0 | 0 | 0 | 0 | 98,223,400 | 0 |
| CALP NE  C BASE   IN | 5,787,100 | 0 | 0 | 0 | 0 | 5,787,100 | 0 |
| CALP NE B RAMP IN | 1,973,300 | 0 | 0 | 0 | 0 | 1,973,300 | 0 |
| CALP NE C RAMP IN | 34,100 | 0 | 0 | 0 | 0 | 34,100 | 0 |
| CALP NE EXCESS  N | 422,000 | 0 | 0 | 0 | 0 | 422,000 | 0 |
| CONOCOPH LLIPS COMPANY /INTRA-DAY CALL | 3,425,000 | 0 | 0 | 0 | 0 | 1,969,375 | 1,455,625 |
| CONOCOPH LLIPS COMPANY /INTRA-DAY CALL | 120,000 | 0 | 0 | 0 | 0 | 0 | 120,000 |
| DOW P PELINE COMPANY/INTRA-DAY CALL OPTION | 3,700,000 | 0 | 0 | 0 | 0 | 2,127,500 | 1,572,500 |
| EPI-ISES ELI     IN | 35,090,137 | 0 | 35,090,137 | 0 | 0 | 0 | 0 |
| EPI-ISES ENOI IN | 34,395,193 | 0 | 0 | 0 | 34,395,193 | 0 | 0 |
| ETEC EXCESS-HRSNHRDN | 4,937 | 0 | 0 | 0 | 0 | 0 | 4,937 |
| EXELON FRONT ER 10YR | 93,424,000 | 0 | 0 | 0 | 0 | 0 | 93,424,000 |
| HARDIN | 9,029,000 | 0 | 0 | 0 | 0 | 0 | 9,029,000 |
| MEAM CANTON 1     IN | 73,000 | 0 | 0 | 73,000 | 0 | 0 | 0 |
| MEAM CANTON 2     IN | 83,000 | 0 | 0 | 83,000 | 0 | 0 | 0 |
| MEAM CANTON 3     IN | 84,000 | 0 | 0 | 84,000 | 0 | 0 | 0 |
| MEAM CANTON 4     IN | 84,000 | 0 | 0 | 84,000 | 0 | 0 | 0 |
| MEAM CANTON 5     IN | 82,000 | 0 | 0 | 82,000 | 0 | 0 | 0 |
| MEAM HENDERSON 10 IN | 58,000 | 0 | 0 | 58,000 | 0 | 0 | 0 |
| MEAM HENDERSON 11 IN | 59,000 | 0 | 0 | 59,000 | 0 | 0 | 0 |
| MEAM HENDERSON 2  IN | 524,000 | 0 | 0 | 524,000 | 0 | 0 | 0 |
| MEAM HENDERSON 4  IN | 72,000 | 0 | 0 | 72,000 | 0 | 0 | 0 |
| MEAM HENDERSON 5  IN | 72,000 | 0 | 0 | 72,000 | 0 | 0 | 0 |
| MEAM HENDERSON 6  IN | 73,000 | 0 | 0 | 73,000 | 0 | 0 | 0 |
| MEAM HENDERSON 7  IN | 76,000 | 0 | 0 | 76,000 | 0 | 0 | 0 |
| MEAM HENDERSON 8  IN | 74,000 | 0 | 0 | 74,000 | 0 | 0 | 0 |
| MEAM HENDERSON 9  IN | 54,000 | 0 | 0 | 54,000 | 0 | 0 | 0 |
| OCCIDENTAL POWER SERVICES/BASE CAPACITY | 219,380,000 | 0 | 219,380,000 | 0 | 0 | 0 | 0 |
| OCCIDENTAL POWER SERVICES/DAY-AHEAD CALL | 50,188,000 | 0 | 50,188,000 | 0 | 0 | 0 | 0 |
| OCCIDENTAL POWER SERVICES/ NTRA-DAY CALL | 9,090,000 | 0 | 9,090,000 | 0 | 0 | 0 | 0 |
| SAN JACINTO 1 | 5,722,000 | 0 | 0 | 0 | 0 | 0 | 5,722,000 |
| SAN JACINTO 2 | 5,612,000 | 0 | 0 | 0 | 0 | 0 | 5,612,000 |
| **Totals** | **893,443,275** | **0** | **493,005,045** | **1,468,000** | **34,395,193** | **247,634,975** | **116,940,062** |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**     

| Entergy Electric System | Date range - 20100701 through 20100731 | Attachment 2 |
| Intra-System Billing-201007RA | Energy Sold to Exchange - Entergy Arkansas, Inc. | Page 21 |

| Source | KWH | Mills per KWH | Cost |
|--------|-----|---------------|------|
| AECC Excess BAILEY 1 | 30,723 | 59.282297 | 1,821.33 |
| AECC Excess INDEPN 2 | 14,445 | 21.739702 | 314.03 |
| AECC Excess MCCLEL 1 | 952,753 | 61.531173 | 58,624.01 |
| AECC Excess WH.BLF 1 | 914,776 | 21.867474 | 20,003.84 |
| AECC Excess WH.BLF 2 | 3,188,988 | 22.097709 | 70,469.33 |
| AECI/WSPP A | 275,334 | 26.304343 | 7,242.48 |
| AECI/WSPP B | 783,000 | 38.000000 | 29,754.00 |
| AECI/WSPP C SYSTEM FIRM | 2,837,035 | 34.875139 | 98,941.99 |
| AEP SERVICE CORP /WSPP A | 254,973 | 29.310241 | 7,473.32 |
| AEP SERVICE CORP /WSPP C | 10,440 | 49.000000 | 511.56 |
| AMEREN ENERGY INC. (AE) ACTING /WSPP C | 145,951 | 30.098663 | 4,392.93 |
| BNP PARIBAS ENERGY TRADING GP/WSPP B | 33,408 | 52.000120 | 1,737.22 |
| CALP NE ENERGY SERVICES L.P./WSPP B | 236,639 | 53.867663 | 12,747.19 |
| CITIGROUP ENERGY INC/WSPP A | 10,440 | 29.000000 | 302.76 |
| CLECO/WSPP B | 317,798 | 63.178623 | 20,078.04 |
| CONSTELLATION ENERGY COMMODITIES | 204,354 | 39.196982 | 8,010.06 |
| COTTONWOOD ENERGY CO/EXS50 | 7,619 | 22.040950 | 167.93 |
| COTTONWOOD ENERGY CO/EXS75 | 2,111 | 30.127901 | 63.60 |
| COTTONWOOD ENERGY CO/EXS90 | 51,457 | 35.798434 | 1,842.08 |
| COTTONWOOD ENERGY CO/EXSSTSH | 80,914 | 37.536026 | 3,037.19 |
| COUCH 2/CEGT E | 9,781,627 | 75.576540 | 739,261.52 |
| COUCH 2/CENTERPOINT I | 17,362 | 70.389356 | 1,222.10 |
| CROSS O L/QF | 76,886 | 37.393414 | 2,875.03 |
| DB ENERGY TRAD NG LLC/WSPP B | 2,901,191 | 51.582105 | 149,649.54 |
| DUKE ENERGY HINDS/EXS75 | 5,582 | 29.681118 | 165.68 |
| DUKE ENERGY HINDS/EXS90 | 11,889 | 37.935066 | 451.01 |
| DUKEENERGY HOTSPRING/EXS50 | 20 | 22.000000 | 0.44 |
| DUKEENERGY HOTSPRING/EXS75 | 700 | 29.671429 | 20.77 |
| DUKEENERGY HOTSPRING/EXS90 | 2,264 | 39.553887 | 89.55 |
| ENDURE ENERGY/WSPP B | 13,572 | 26.000589 | 352.88 |
| EXELON GENERATION COMPANY LLC/DA LY | 4,361,740 | 39.438912 | 172,022.28 |
| J ARON & COMPANY/WSPP B | 599,915 | 50.452247 | 30,267.06 |
| JBO/WSPP A | 217,449 | 71.165607 | 15,474.89 |
| JBO/WSPP B | 275,382 | 48.699370 | 13,410.93 |
| JONESBORO Excess INDEPN 2 | 1,221,922 | 24.163605 | 29,526.04 |
| JONESBORO Excess WH BLF 1 | 1,744,400 | 24.848733 | 43,346.13 |
| JONESBORO Excess WH BLF 2 | 2,670,122 | 25.411835 | 67,852.70 |
| L.CATH 4/CEGT E | 7,839,611 | 58.044036 | 455,042.66 |
| L.CATH 4/CENTERPOINT I | 1,399,984 | 57.172289 | 80,040.29 |
| LYNCH 3/CEGT E | 2,936,490 | 74.911340 | 219,976.40 |
| LYNCH 3/CENTERPOINT I | 659,947 | 70.499298 | 46,525.80 |
| LYNCH IC/#2 OIL | 2,000 | 159.310000 | 318.62 |
| MABELV T/CEGT E | 2,000 | 77.685000 | 155.37 |
| MAGNET COVE/EXS90 | 35,561 | 34.416636 | 1,223.89 |
| MAGNET COVE/EXSSTSH | 344,998 | 35.709888 | 12,319.84 |
| MERRILL LYNCH COMMODITIES INC/WSPP B | 5,621,170 | 44.051592 | 247,621.49 |
| MORGAN STANLEY/WSPP A | 21,507 | 22.999954 | 494.66 |
| NRG POWER MARKETING LLC./WSPP A | 2,773,777 | 23.000003 | 63,796.88 |
| NRG POWER MARKETING LLC./WSPP B | 4,613,037 | 53.167872 | 245,265.36 |
| NRG POWER MARKETING LLC./WSPP C | 212,817 | 40.363881 | 8,590.12 |
| OCCIDENTAL POWER SERVICES/WSPP B | 241,196 | 63.464402 | 15,307.36 |
| OUACHITA 1/SIGCO I | 234,880 | 41.043256 | 9,640.24 |
| OUACHITA 1/SIGPL E | 3,527,779 | 38.975406 | 137,496.62 |
| OUACHITA 2/SIGPL E | 910,452 | 37.911828 | 34,516.90 |
| PINE BLUFF ENERGY/QF | 31,414,407 | 37.351724 | 1,173,382.27 |
| RAINBOW ENERGY MARKETING CORP/WSPP A | 154,939 | 39.856524 | 6,175.33 |
| SOUTHERN COMPANY SERVICES INC. AS | 62,640 | 38.000000 | 2,380.32 |
| SUEZ Energy Marketing NA Inc./WSPP A | 177,491 | 37.581568 | 6,670.39 |
| SUEZ Energy Marketing NA Inc./WSPP B | 1,049,490 | 44.543045 | 46,747.48 |
| TEA/WSPP A | 28,188 | 23.110898 | 651.45 |
| TENASKA FRONTIER/EXS75 | 3,670 | 31.572207 | 115.87 |
| TENASKA FRONTIER/EXS90 | 40,595 | 34.643183 | 1,406.34 |
| TENASKA/WSPP B | 449,719 | 62.669200 | 28,183.53 |
| UNION POWER PARTNERS/WSPP A | 3,576 | 35.000000 | 125.16 |
| UNION POWER PARTNERS/WSPP B | 3,127,518 | 48.726594 | 152,393.30 |
| WESTAR ENERGY INC/WSPP A | 420,854 | 29.662876 | 12,483.74 |
| WESTAR ENERGY INC/WSPP B | 1,228,584 | 36.666341 | 45,047.68 |
| WESTAR ENERGY INC/WSPP C | 10,440 | 62.000000 | 647.28 |
| WH.BLF 1/COAL | 25,833,205 | 21.377925 | 552,260.31 |
| WH.BLF 2/COAL | 2,103,620 | 21.350173 | 44,912.65 |
| WRIGHTSVILE POWER/EXS90 | 1,900 | 35.321053 | 67.11 |
| **Totals** | **131,743,223** | **39.967947** | **5,265,506.15** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                                 9-183

**Entergy Electric System**       Date range - 20100701 through 20100731       **Attachment 2**
**Intra-System Billing-201007RA**       Energy Sold to Exchange - Entergy Louisiana, LLC       **Page 22**

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| AECC Excess MCCLEL 1 | 126,981 | 61.531095 | 7,813.28 |
| AECI/WSPP C SYSTEM FIRM | 678,098 | 66.741784 | 45,257.47 |
| BURAS TEMP | 45,238 | 260.515054 | 11,785.18 |
| CLECO/WSPP B | 132,197 | 71.855337 | 9,499.06 |
| ENDURE ENERGY/WSPP A | 24,396 | 68.000082 | 1,658.93 |
| J ARON & COMPANY/WSPP B | 126,465 | 69.758668 | 8,822.03 |
| J.P. MORGAN VENTURES ENERGY | 38,670 | 68.000000 | 2,629.56 |
| JBO/WSPP A | 1,258,817 | 71.820749 | 90,409.18 |
| JBO/WSPP B | 262,779 | 73.000049 | 19,182.88 |
| L.GPSY 1/EVANG(LT) M | 7,913,583 | 65.067524 | 514,917.25 |
| L.GPSY 1/EVG/CG I | 46,349 | 62.358627 | 2,890.26 |
| L.GPSY 2/BRDGLN E | 1,045,351 | 72.682793 | 75,979.03 |
| L.GPSY 2/CGT M | 25,995 | 69.795730 | 1,814.34 |
| L.GPSY 2/EVANG(LT) M | 25,320,605 | 76.863691 | 1,946,235.15 |
| L.GPSY 2/EVG/CG I | 2,135,948 | 77.639226 | 165,833.35 |
| L.GPSY 2/GSPL M | 346,715 | 71.005754 | 24,618.76 |
| L.GPSY 3/EVANG(LT) M | 2,662,097 | 61.674045 | 164,182.29 |
| N NEMI 3/EVANG(LT) M | 5,982,602 | 78.343928 | 468,700.54 |
| N NEMI 3/EVG/CG I | 905,754 | 79.255449 | 71,785.94 |
| N NEMI 4/EVANG(LT) M | 3,228,244 | 63.765917 | 205,851.94 |
| N NEMI 4/EVG/CG I | 1,224 | 61.078431 | 74.76 |
| N NEMI 5/EVANG(LT) M | 1,193,561 | 60.638794 | 72,376.10 |
| NRG POWER MARKETING LLC./WSPP A | 377,250 | 84.000000 | 31,689.00 |
| NRG POWER MARKETING LLC./WSPP B | 500,863 | 78.088499 | 39,111.64 |
| NRG POWER MARKETING LLC./WSPP C | 25,150 | 65.000000 | 1,634.75 |
| OCCIDENTAL POWER SERVICES/WSPP B | 49,866 | 65.000000 | 3,241.29 |
| SMEPA/WSPP B | 748,227 | 89.186383 | 66,731.66 |
| SOUTHERN COMPANY SERVICES  INC. AS | 2,326,731 | 127.999992 | 297,821.55 |
| TENASKA/WSPP B | 361,244 | 66.072654 | 23,868.35 |
| WATERF 1/BRDGLN E | 843,299 | 73.709028 | 62,158.75 |
| WATERF 1/CGT M | 356,988 | 72.433695 | 25,857.96 |
| WATERF 1/EVANG(LT) M | 47,727,893 | 79.757661 | 3,806,665.12 |
| WATERF 1/EVG/CG I | 3,677,054 | 79.147478 | 291,029.55 |
| WATERF 2/#6 OIL | 302,500 | 121.708562 | 36,816.84 |
| WATERF 2/BRDGLN E | 9,002,954 | 66.117939 | 595,256.76 |
| WATERF 2/CGT E | 1,648,800 | 64.400734 | 106,183.93 |
| WATERF 2/CGT M | 8,938,269 | 65.179773 | 582,594.34 |
| WATERF 2/EVANG(LT) M | 3,286,637 | 71.768790 | 235,877.96 |
| WATERF 2/EVG/CG I | 1,383,963 | 69.682672 | 96,438.24 |
| WATERF 4/#2 OIL | 46,000 | 236.132391 | 10,862.09 |
| **Totals** | **135,105,357** | **75.690241** | **10,226,157.06** |

Attachment Snapshot: 20100826181933       RunID:  17029       Billing Snapshot: 20100826175238

**Entergy Electric System**         Date range - 20100701 through 20100731       **Attachment 2**
**Intra-System Billing-201007RA**     **Energy Sold to Exchange - Entergy Mississippi, Inc.**     **Page 23**

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| AECC Excess BAILEY 1 | 417 | 59.280576 | 24.72 |
| AECC Excess MCCLEL 1 | 114,704 | 61.529851 | 7,057.72 |
| ANDRUS 1/TENN E | 2,659,523 | 59.401915 | 157,980.76 |
| ANDRUS 1/TENN I | 716,204 | 63.247231 | 45,297.92 |
| ANDRUS 1/TGT E | 500,938 | 59.031856 | 29,571.30 |
| B.WLSN 1/COLUMBIA ML E | 38,457 | 55.997348 | 2,153.49 |
| B.WLSN 2/COLUMBIA MAINLINE I | 137,442 | 62.881579 | 8,642.57 |
| B.WLSN 2/COLUMBIA ML E | 21,706,585 | 60.407527 | 1,311,241.12 |
| CLECO/WSPP B | 97,617 | 62.407368 | 6,092.02 |
| J ARON & COMPANY/WSPP B | 83,328 | 59.500048 | 4,958.02 |
| JBO/WSPP A | 23,631 | 70.000000 | 1,654.17 |
| JBO/WSPP B | 90,177 | 72.999989 | 6,582.92 |
| NRG POWER MARKETING LLC./WSPP B | 57,038 | 62.625267 | 3,572.02 |
| OCCIDENTAL POWER SERVICES/WSPP B | 54,861 | 64.510490 | 3,539.11 |
| REX BR 4/GSPL E | 5,393,054 | 80.026983 | 431,589.84 |
| REX BR 4/GSPL I | 201,384 | 84.433470 | 17,003.55 |
| TENASKA/WSPP A | 5,820 | 63.049828 | 366.95 |
| TENASKA/WSPP B | 146,370 | 62.000000 | 9,074.94 |
| **Totals** | **32,027,550** | **63.895088** | **2,046,403.14** |

Attachment Snapshot: 20100826181933       RunID: 17029       Billing Snapshot: 20100826175238

**2011 ETI Rate Case**       9-185

| Entergy Electric System<br>Intra-System Billing-201007RA | Date range - 20100701 through 20100731<br>Energy Sold to Exchange - Entergy New Orleans, Inc. | | Attachment 2<br>Page 24 |
|---|---|---|---|

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| AECC Excess BAILEY 1 | 980 | 59.336735 | 58.15 |
| AECC Excess MCCLEL 1 | 315,602 | 61.530789 | 19,419.24 |
| AECI/WSPP C SYSTEM FIRM | 608,021 | 64.528742 | 39,234.83 |
| AMEREN ENERGY INC. (AE) ACTING /WSPP C | 18,080 | 61.000000 | 1,102.88 |
| BNP PARIBAS ENERGY TRADING GP/WSPP B | 38,354 | 60.000000 | 2,301.24 |
| CLECO/WSPP B | 76,004 | 65.476159 | 4,976.45 |
| DB ENERGY TRAD NG LLC/WSPP B | 95,558 | 60.088742 | 5,741.96 |
| ENDURE ENERGY/WSPP A | 8,272 | 68.000484 | 562.50 |
| J ARON & COMPANY/WSPP B | 213,035 | 63.098599 | 13,442.21 |
| J.P. MORGAN VENTURES ENERGY | 34,369 | 67.999942 | 2,337.09 |
| JBO/WSPP A | 268,090 | 72.038718 | 19,312.86 |
| JBO/WSPP B | 217,346 | 72.039283 | 15,657.45 |
| MICHOD 2/BRDGLN E | 62,252 | 56.774722 | 3,534.34 |
| MICHOD 3/BRDGLN E | 11,056,337 | 60.606405 | 670,084.84 |
| MICHOD 3/GSPL E | 11,458,320 | 59.604617 | 682,968.77 |
| MICHOD 3/NOPSI I | 5,187,011 | 61.884854 | 320,997.42 |
| MICHOD 3/SIGPL E | 337,959 | 59.764912 | 20,198.09 |
| NRG POWER MARKETING LLC./WSPP A | 67,800 | 84.000000 | 5,695.20 |
| NRG POWER MARKETING LLC./WSPP B | 280,383 | 65.790544 | 18,446.55 |
| NRG POWER MARKETING LLC./WSPP C | 70,969 | 65.000070 | 4,612.99 |
| OCCIDENTAL POWER SERVICES/WSPP B | 40,184 | 66.828588 | 2,685.44 |
| SMEPA/WSPP B | 134,472 | 89.186745 | 11,993.12 |
| SOUTHERN COMPANY SERVICES  INC. AS | 418,166 | 127.999981 | 53,525.24 |
| TENASKA/WSPP B | 554,729 | 64.464883 | 35,760.54 |
| WESTAR ENERGY INC/WSPP C | 25,251 | 61.999921 | 1,565.56 |
| **Totals** | **31,587,544** | **61.929948** | **1,956,214.96** |

Entergy Electric System Date range - 20100701 through 20100731 Attachment 2
Intra-System Billing-201007RA Energy Sold to Exchange - Entergy Gulf States Louisiana, LLC Page 25

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| AECC Excess BAILEY 1 | 24,335 | 59.272242 | 1,442.39 |
| AECC Excess MCCLEL 1 | 2,792,163 | 61.531042 | 171,804.70 |
| AECI/WSPP C SYSTEM FIRM | 3,173,844 | 63.794610 | 202,474.14 |
| AGRILECTRIC/QF | 12,709 | 44.799748 | 569.36 |
| AMEREN ENERGY INC. (AE) ACTING /WSPP C | 304,529 | 61.000003 | 18,576.27 |
| BNP PARIBAS ENERGY TRADING GP/WSPP B | 61,280 | 60.000000 | 3,676.80 |
| CALCAS EU 1/GSPL E | 3,714,474 | 59.468127 | 220,892.81 |
| CALCAS EU 1/GSPL I | 548,116 | 61.952069 | 33,956.92 |
| CALCAS EU 2/GSPL E | 2,906,170 | 59.035428 | 171,566.99 |
| CALP NE  B BASE   IN | 71,559 | 38.740759 | 2,772.25 |
| CALP NE ENERGY SERVICES L.P./WSPP B | 193,011 | 54.830346 | 10,582.86 |
| CLECO/WSPP B | 830,943 | 63.194395 | 52,510.94 |
| CONOCOPH LLIPS COMPANY /INTRA-DAY CALL | 1,681,875 | 60.305136 | 101,425.70 |
| DB ENERGY TRAD NG LLC/WSPP B | 1,654,147 | 57.964353 | 95,881.56 |
| DOW CHEMICAL/QF | 123,788 | 44.948056 | 5,564.03 |
| DOW P PELINE COMPANY/INTRA-DAY CALL | 2,116,638 | 62.456778 | 132,198.39 |
| ENDURE ENERGY/WSPP A | 35,043 | 67.999600 | 2,382.91 |
| EXELON GENERATION COMPANY LLC/DA LY | 53,551 | 42.891449 | 2,296.88 |
| J ARON & COMPANY/WSPP B | 2,095,052 | 62.638798 | 131,231.54 |
| J.P. MORGAN VENTURES ENERGY | 828,870 | 68.000024 | 56,363.18 |
| JBO/WSPP A | 1,609,650 | 71.438574 | 114,991.10 |
| JBO/WSPP B | 1,137,518 | 70.893981 | 80,643.18 |
| LEWIS CREEK 1/COPANO E | 1,879,528 | 56.584988 | 106,353.07 |
| LEWIS CREEK 1/COPANO M | 10,925,536 | 57.084223 | 623,675.73 |
| LEWIS CREEK 1/TETCO E | 1,521,741 | 55.948581 | 85,139.25 |
| LEWIS CREEK 1/TETCO I | 1,157,040 | 56.793741 | 65,712.63 |
| LEWIS CREEK 1/TETCO M | 3,647,410 | 56.295626 | 205,333.23 |
| LEWIS CREEK 2/COPANO E | 926,721 | 55.342859 | 51,287.39 |
| LEWIS CREEK 2/COPANO M | 3,483,050 | 56.566756 | 197,024.84 |
| LEWIS CREEK 2/TEJAS E | 141,822 | 54.865254 | 7,781.10 |
| LEWIS CREEK 2/TETCO E | 1,536,278 | 55.145833 | 84,719.33 |
| LEWIS CREEK 2/TETCO I | 1,582,353 | 54.986530 | 87,008.10 |
| LEWIS CREEK 2/TETCO M | 5,315,248 | 55.780833 | 296,488.96 |
| MERRILL LYNCH COMMODITIES INC/WSPP B | 513,751 | 52.752150 | 27,101.47 |
| NELSON 3/TARGA E | 211,896 | 73.711255 | 15,619.12 |
| NELSON 3/TENN M | 1,700,865 | 72.146243 | 122,711.02 |
| NELSON 3/TETCO E | 310,513 | 74.583769 | 23,159.23 |
| NELSON 3/TETCO M | 4,149,185 | 72.377696 | 300,308.45 |
| NELSON 4/FLORIDA E | 7,000,169 | 61.712570 | 431,998.42 |
| NELSON 4/TARGA E | 14,524,924 | 61.566255 | 894,245.17 |
| NELSON 4/TENN E | 12,398,148 | 61.183407 | 758,560.93 |
| NELSON 4/TENN M | 11,564,685 | 62.458012 | 722,307.24 |
| NELSON 4/TETCO E | 673,803 | 62.029837 | 41,795.89 |
| NELSON 4/TETCO I | 4,071,417 | 60.797956 | 247,533.83 |
| NELSON 4/TETCO M | 20,958,943 | 62.744334 | 1,315,054.91 |
| NRG POWER MARKETING LLC./WSPP A | 287,250 | 84.000000 | 24,129.00 |
| NRG POWER MARKETING LLC./WSPP B | 3,866,468 | 63.031477 | 243,709.19 |
| NRG POWER MARKETING LLC./WSPP C | 576,051 | 61.175903 | 35,240.44 |
| OCCIDENTAL POWER SERVICES/WSPP B | 860,110 | 64.057109 | 55,096.16 |
| RAINBOW ENERGY MARKETING CORP/WSPP A | 16,988 | 45.500353 | 772.96 |
| SABINE 1/CENTANA#3 E | 528,309 | 58.315891 | 30,808.81 |
| SABINE 1/CENTANA#3 M | 11,158,610 | 60.270426 | 672,534.18 |
| SABINE 1/ENBRIDGE E | 2,981,642 | 59.069701 | 176,124.70 |
| SABINE 1/ENBRIDGE M | 13,526,870 | 59.643680 | 806,792.30 |
| SABINE 1/HPL/CH E | 988,225 | 59.296527 | 58,598.31 |
| SABINE 1/STORAGE I | 1,426,945 | 55.129616 | 78,666.93 |
| SABINE 1/TEJAS E | 121,659 | 59.397414 | 7,226.23 |
| SABINE 1/TEJAS M | 947,156 | 60.289340 | 57,103.41 |
| SABINE 2/CENTANA#3 E | 91,908 | 56.319798 | 5,176.24 |
| SABINE 2/CENTANA#3 M | 664,972 | 56.811565 | 37,778.10 |
| SABINE 2/ENBRIDGE E | 692,152 | 55.256562 | 38,245.94 |
| SABINE 2/ENBRIDGE M | 7,036,036 | 56.249057 | 395,770.39 |
| SABINE 2/STORAGE I | 44,850 | 51.999108 | 2,332.16 |
| SABINE 2/TEJAS M | 908,661 | 56.809272 | 51,620.37 |
| SABINE 3/CENTANA#3 E | 1,060,597 | 59.090201 | 62,670.89 |
| SABINE 3/CENTANA#3 M | 16,217,549 | 58.704064 | 952,036.04 |
| SABINE 3/ENBRIDGE E | 3,103,193 | 58.061200 | 180,175.11 |
| SABINE 3/ENBRIDGE M | 12,241,869 | 58.110576 | 711,382.06 |
| SABINE 3/HPL/CH E | 326,498 | 58.477785 | 19,092.88 |
| SABINE 3/STORAGE I | 10,324 | 53.748547 | 554.90 |
| SABINE 3/TEJAS E | 925,496 | 59.023659 | 54,626.16 |
| SABINE 3/TEJAS M | 7,186,222 | 58.774696 | 422,368.01 |
| SABINE 4/CENTANA#3 M | 453,221 | 54.745257 | 24,811.70 |
| SABINE 4/ENBRIDGE E | 2,601,263 | 53.583790 | 139,385.53 |
| SABINE 4/ENBRIDGE M | 2,257,273 | 54.260118 | 122,479.90 |

Attachment Snapshot: 20100826181933 RunID: 17029 Billing Snapshot: 20100826175238

**Entergy Electric System**        **Date range - 20100701 through 20100731**        **Attachment 2**
**Intra-System Billing-201007RA**    **Energy Sold to Exchange - Entergy Gulf States Louisiana, LLC**    **Page 26**

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| SABINE 4/HPL/CH E | 123,231 | 53.774943 | 6,626.74 |
| SABINE 4/STORAGE I | 354,533 | 52.808342 | 18,722.30 |
| SABINE 4/TEJAS M | 540,521 | 54.799166 | 29,620.10 |
| SABINE 5/CENTANA#3 M | 12,993,537 | 60.726777 | 789,055.62 |
| SABINE 5/ENBRIDGE E | 3,605,523 | 60.124634 | 216,780.75 |
| SABINE 5/ENBRIDGE M | 3,707,371 | 60.131940 | 222,931.41 |
| SABINE 5/HPL/CH E | 2,059,458 | 61.208420 | 126,056.17 |
| SABINE 5/TEJAS E | 1,643,812 | 61.391668 | 100,916.36 |
| SABINE 5/TEJAS M | 38,907,022 | 60.796120 | 2,365,395.96 |
| SMEPA/WSPP B | 569,717 | 89.186491 | 50,811.06 |
| SOUTHERN COMPANY SERVICES  INC. AS | 1,771,646 | 128.000001 | 226,770.69 |
| SUEZ Energy Marketing NA Inc./WSPP B | 87,489 | 53.713153 | 4,699.31 |
| TENASKA/WSPP A | 253,868 | 62.640624 | 15,902.45 |
| TENASKA/WSPP B | 2,782,607 | 64.098886 | 178,362.01 |
| UNION POWER PARTNERS/WSPP B | 993,273 | 55.584890 | 55,210.97 |
| WESTAR ENERGY INC/WSPP B | 97,958 | 56.092203 | 5,494.68 |
| WESTAR ENERGY INC/WSPP C | 153,200 | 62.000000 | 9,498.40 |
| WILLOW GLEN 1/BL HOLDINGS E | 7,061,062 | 62.406062 | 440,653.07 |
| WILLOW GLEN 2/BL HOLDINGS E | 13,042,792 | 71.414827 | 931,448.74 |
| WILLOW GLEN 4/BL HOLDINGS E | 68,607,715 | 59.777690 | 4,101,210.69 |
| **Totals** | **388,628,993** | **60.953251** | **23,688,200.69** |

Attachment Snapshot: 20100826181933        RunID: 17029        Billing Snapshot: 20100826175238

**Entergy Electric System**                  **Date range - 20100701 through 20100731**                  **Attachment 2**
**Intra-System Billing-201007RA**            **Energy Sold to Exchange - Entergy Texas, Inc**            **Page 27**

| Source | KWH | Mills per KWH | Cost |
|---|---|---|---|
| AECI/WSPP C SYSTEM FIRM | 43,518 | 62.999908 | 2,741.63 |
| DOW P PELINE COMPANY/INTRA-DAY CALL | 274,685 | 63.636784 | 17,480.07 |
| JBO/WSPP A | 75,631 | 70.000000 | 5,294.17 |
| JBO/WSPP B | 111,406 | 73.000018 | 8,132.64 |
| NELSON 4/FLORIDA E | 47,337 | 62.611065 | 2,963.82 |
| NELSON 4/TARGA E | 121,380 | 62.737354 | 7,615.06 |
| NELSON 4/TENN E | 17,782 | 62.358002 | 1,108.85 |
| NELSON 4/TENN M | 57,443 | 62.438939 | 3,586.68 |
| NELSON 4/TETCO M | 177,010 | 62.728942 | 11,103.65 |
| NRG POWER MARKETING LLC./WSPP A | 225,360 | 84.000000 | 18,930.24 |
| OCCIDENTAL POWER SERVICES/WSPP B | 32,720 | 66.000000 | 2,159.52 |
| SMEPA/WSPP B | 167,697 | 98.509812 | 16,519.80 |
| SOUTHERN COMPANY SERVICES  INC. AS | 322,527 | 128.000012 | 41,283.46 |
| TENASKA/WSPP A | 15,456 | 63.049948 | 974.50 |
| WILLOW GLEN 2/BL HOLDINGS E | 569,266 | 72.351045 | 41,186.99 |
| **Totals** | **2,259,218** | **80.152106** | **181,081.08** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                                                  9-189

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 2**
**Intra-System Billing-201007RA**  **Energy Sold to Exchange**  **Page 28**

| Company | KWH | Mills per KWH | Cost |
|---|---|---|---|
| Entergy Arkansas, Inc. | 131,743,223 | 39.967947 | 5,265,506.15 |
| Entergy Louisiana, LLC | 135,105,357 | 75.690241 | 10,226,157.06 |
| Entergy Mississippi, Inc. | 32,027,550 | 63.895088 | 2,046,403.14 |
| Entergy New Orleans, Inc. | 31,587,544 | 61.929948 | 1,956,214.96 |
| Entergy Gulf States Louisiana, LLC | 388,628,993 | 60.953251 | 23,688,200.69 |
| Entergy Texas, Inc | 2,259,218 | 80.152106 | 181,081.08 |
| **Totals** | **721,351,885** | **60.114299** | **43,363,563.08** |

**Attachment Snapshot: 20100826181933**  **RunID: 17029**  **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**  9-190

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 2**
**Intra-System Billing-201007RA**  **Energy Purchased from Exchange**  **Page 29**

| Company | KWH | Mills per KWH | Cost |
|---|---|---|---|
| Entergy Arkansas, Inc. | 131,563,443 | 64.953756 | 8,545,539.76 |
| Entergy Louisiana, LLC | 42,272,082 | 50.486528 | 2,134,170.65 |
| Entergy Mississippi, Inc. | 165,417,337 | 64.005776 | 10,587,664.98 |
| Entergy New Orleans, Inc. | 45,025,369 | 58.268323 | 2,623,552.75 |
| Entergy Gulf States Louisiana, LLC | 8,681,301 | 37.886068 | 328,900.36 |
| Entergy Texas, Inc | 328,392,353 | 58.295312 | 19,143,734.58 |
| **Totals** | **721,351,885** | **60.114299** | **43,363,563.08** |

**Attachment Snapshot: 20100826181933**   **RunID: 17029**   **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**   9-191

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 2**
**Intra-System Billing-201007RA**  **Unit Power Purchases - KWH**  **Page 30**

| Generating Unit | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| ACADIA POWER PARTNERS, | 0 | 0 | 0 | 0 | 59,708,320 | 0 |
| ARK.NU 1 - UPP from AR | 0 | 24,991,859 | 11,975,579 | 16,947,775 | 15,851,160 | 16,654,966 |
| ARK.NU 2 - UPP from AR | 0 | 29,534,318 | 14,206,469 | 19,989,454 | 18,809,417 | 19,768,134 |
| CALCAS EU 1 - UPP from EGSL | 0 | 0 | 0 | 0 | 0 | 4,690,725 |
| CALCAS EU 2 - UPP from EGSL | 0 | 0 | 0 | 0 | 0 | 5,250,450 |
| GGULF RET - UPP from AR | 0 | 19,691,908 | 8,775,642 | 13,799,542 | 11,616,357 | 12,205,279 |
| GGULF RP - UPP from AR | 0 | 9,494,456 | 4,440,083 | 6,514,363 | 5,876,574 | 6,173,783 |
| INDEPN 1 - UPP from AR | 0 | 7,145,175 | 3,421,107 | 4,846,579 | 4,526,010 | 4,757,472 |
| LEWIS CREEK 1 - UPP from ETI | 0 | 0 | 0 | 0 | 58,217,025 | 0 |
| LEWIS CREEK 2 - UPP from ETI | 0 | 0 | 0 | 0 | 65,725,375 | 0 |
| NELSON 3 - UPP from EGSL | 0 | 0 | 0 | 0 | 0 | 5,192,225 |
| NELSON 4 - UPP from EGSL | 0 | 0 | 0 | 0 | 0 | 62,280,775 |
| PERV L 1 - UPP from EGSL | 0 | 0 | 0 | 0 | 0 | 82,838,753 |
| PERV L 1 - UPP from LA | 0 | 0 | 0 | 0 | 194,914,500 | 0 |
| RVRBND 1 - UPP from EGSL | 0 | 139,555,800 | 0 | 69,777,900 | 0 | 207,589,429 |
| SABINE 1 - UPP from ETI | 0 | 0 | 0 | 0 | 51,146,250 | 0 |
| SABINE 2 - UPP from ETI | 0 | 0 | 0 | 0 | 50,562,050 | 0 |
| SABINE 3 - UPP from ETI | 0 | 0 | 0 | 0 | 80,097,500 | 0 |
| SABINE 4 - UPP from ETI | 0 | 0 | 0 | 0 | 76,167,950 | 0 |
| SABINE 5 - UPP from ETI | 0 | 0 | 0 | 0 | 70,933,725 | 0 |
| WH.BLF 1 - UPP from AR | 0 | 13,440,805 | 6,292,389 | 8,494,462 | 8,331,086 | 8,755,797 |
| WH.BLF 2 - UPP from AR | 0 | 10,706,289 | 5,295,338 | 7,753,353 | 7,011,078 | 7,368,498 |
| WILLOW GLEN 1 - UPP from | 0 | 0 | 0 | 0 | 0 | 5,445,950 |
| WILLOW GLEN 2 - UPP from | 0 | 0 | 0 | 0 | 0 | 10,391,250 |
| WILLOW GLEN 4 - UPP from | 0 | 0 | 0 | 0 | 0 | 77,447,750 |
| **Totals** | **0** | **254,560,610** | **54,406,607** | **148,123,428** | **779,494,377** | **536,811,236** |

Attachment Snapshot: 20100826181933  RunID: 17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-192

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 2**
**Intra-System Billing-201007RA**  **AECC Excess Energy**  **Page 31**

| Company | KWH | Mills per KWH | Cost |
|---|---|---|---|
| Entergy Arkansas, Inc. | 12,108,854 | 32.952174 | 399,013.07 |
| Entergy Louisiana, LLC | 14,584,886 | 32.951794 | 480,598.16 |
| Entergy Mississippi, Inc. | 8,083,973 | 32.951544 | 266,379.39 |
| Entergy New Orleans, Inc. | 2,621,176 | 32.951442 | 86,371.53 |
| Entergy Gulf States Louisiana, LLC | 11,105,658 | 32.952414 | 365,958.24 |
| Entergy Texas, Inc | 9,487,663 | 32.952434 | 312,641.59 |
| **Totals** | **57,992,210** | **32.952046** | **1,910,961.98** |

**Attachment Snapshot: 20100826181933**  **RunID: 17029**  **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**  9-193

| Entergy Electric System | Date range - 20100701 through 20100731 | | | Attachment 3 |
| Intra-System Billing-201007RA | Joint Account Deliveries | | | Page 32 |

| Company / Type | KWH | Mills per KWH | Charge |
|---|---|---|---|
| AECC/1-NON F RM | 60,000 | 53.000000 | 3,180.00 |
| AECI/WSPP A | 750,000 | 41.773333 | 31,330.00 |
| AEP SERVICE CORP./SPP ASSIST | 135,000 | 65.750074 | 8,876.26 |
| AEP SERVICE CORP./WSPP A | 850,000 | 30.352941 | 25,800.00 |
| BNP PAR BAS ENERGY TRADING GP/WSPP A | 150,000 | 68.000000 | 10,200.00 |
| BOARD OF PUBLIC UTILITIES/SPP ASSIST | 15,000 | 66.000000 | 990.00 |
| CITIGROUP ENERGY  NC/WSPP A | 208,000 | 57.442308 | 11,948.00 |
| CLECO/SPP ASSIST | 260,000 | 68.860923 | 17,903.84 |
| CONSTELLATION ENERGY COMM/SPP ASSIST | 5,000 | 77.000000 | 385.00 |
| CONSTELLATION ENERGY COMMOD/SPP ASSIST (W | 15,000 | 64.162000 | 962.43 |
| CONSTELLATION ENERGY COMMODIT /SPP ASSIST | 71,000 | 75.745070 | 5,377.90 |
| CONSTELLATION ENERGY COMMODIT E/SWPP ASSIST | 15,000 | 61.259333 | 918.89 |
| CONSTELLATION ENERGY COMMODIT ES GR/WSPP C | 300,000 | 59.270000 | 17,781.00 |
| CONSTELLATION ENERGY COMMODIT ES GROUP /1- | 24,000 | 51.625000 | 1,239.00 |
| CONSTELLATION ENERGY COMMODIT ES/SPP ASSIST | 8,000 | 72.875000 | 583.00 |
| COTTONWOOD ENERGY CO/DEF110 | 642,523 | 74.096678 | 47,608.82 |
| CYPRES/DEF110 | 528,066 | 80.697167 | 42,613.43 |
| DUKE ENERGY H NDS/DEF110 | 190,414 | 62.675066 | 11,934.21 |
| DUKEENERGY HOTSPR NG/DEF110 | 214,680 | 71.472098 | 15,343.63 |
| GRDA/SPP ASSIST | 79,000 | 58.944937 | 4,656.65 |
| KANSAS CITY POWER & LIGHT COMPANY/SPP ASSIST | 488,000 | 70.980246 | 34,638.36 |
| KANSAS CITY POWER & LIGHT COMPANY/WSPP A | 100,000 | 63.000000 | 6,300.00 |
| MAGNET COVE/DEF110 | 648,504 | 67.715326 | 43,913.66 |
| MDEA CROSSROADS/DEF110 | 63,959 | 78.770306 | 5,038.07 |
| MISSOURI PUBLIC SERVICE/SPP ASSIST | 489,000 | 69.808732 | 34,136.47 |
| NPPD/SPP ASSIST | 177,000 | 55.965480 | 9,905.89 |
| NRG POWER MARKETING LLC./1-NON FIRM | 275,000 | 42.000000 | 11,550.00 |
| NRG POWER MARKETING LLC./SPP ASSIST | 149,000 | 74.895973 | 11,159.50 |
| NRG POWER MARKETING LLC./WSPP C DAMAGES | 1,200,000 | 65.258125 | 78,309.75 |
| OCCIDENTAL CHEM CORP/DEF110 | 17,810 | 69.602471 | 1,239.62 |
| OG&E/SPP ASSIST | 306,000 | 77.899608 | 23,837.28 |
| PPG INDUSTRIES/DEF110 | 28,405 | 80.299947 | 2,280.92 |
| RS COGEN LLC/DEF110 | 108 | 81.388889 | 8.79 |
| SPS/SPP ASSIST | 58,000 | 55.541379 | 3,221.40 |
| SRW COGENERATION/DEF110 | 54,784 | 79.191917 | 4,338.45 |
| SUNFLOWER/SPP ASSIST | 6,000 | 69.300000 | 415.80 |
| SUNFLOWER/SWPP ASSIST | 124,000 | 58.196129 | 7,216.32 |
| SWPA/SPP ASSIST | 85,000 | 65.334000 | 5,553.39 |
| TENASKA FRONTIER/DEF110 | 328,937 | 68.567780 | 22,554.48 |
| TENASKA/WSPP A | 50,000 | 36.000000 | 1,800.00 |
| WESTAR ENERGY  NC/SPP ASSIST | 93,000 | 69.512903 | 6,464.70 |
| WESTAR ENERGY  NC/WSPP A | 150,000 | 35.000000 | 5,250.00 |
| WESTAR ENERGY  NC/WSPP C DAMAGES | 412,000 | 70.000000 | 28,840.00 |
| WESTERN FARMERS/SPP ASSIST | 15,000 | 68.200000 | 1,023.00 |
| WRIGHTSVILE POWER/DEF110 | 315,742 | 78.991582 | 24,940.96 |
| YAZOO CITY/DEF110 | 16,104 | 91.066816 | 1,466.54 |
| **Totals** | **10,172,036** | **62.429528** | **635,035.41** |

| Entergy Electric System | Date range - 20100701 through 20100731 | Attachment 3 |
| Intra-System Billing-201007RA | Joint Account Delivery Sources - Entergy Arkansas, Inc. | Page 33 |

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| AECI/WSPP C SYSTEM FIRM | 3,288 | 62.858881 | 206.68 |
| AMEREN ENERGY  NC. (AE) ACTING /WSPP C | 2,040 | 61.000000 | 124.44 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 15,413 | 54.792059 | 844.51 |
| CLECO/WSPP B | 83,404 | 63.829672 | 5,323.65 |
| CONSTELLATION ENERGY COMMODIT ES | 685 | 45.328467 | 31.05 |
| DB ENERGY TRADING LLC/WSPP B | 111,632 | 54.443529 | 6,077.64 |
| ENDURE ENERGY/WSPP A | 1,200 | 52.000000 | 62.40 |
| EXELON GENERATION COMPANY LLC/DAILY | 30,776 | 40.569925 | 1,248.58 |
| J ARON & COMPANY/WSPP B | 11,882 | 56.502272 | 671.36 |
| J.P. MORGAN VENTURES ENERGY | 116,233 | 68.000052 | 7,903.85 |
| JBO/WSPP A | 264,226 | 70.911228 | 18,736.59 |
| JBO/WSPP B | 52,181 | 70.734367 | 3,690.99 |
| L.CATH 4/CEGT E | 710 | 45.464789 | 32.28 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 231,161 | 50.663737 | 11,711.48 |
| NRG POWER MARKETING LLC./WSPP B | 386,954 | 60.796374 | 23,525.40 |
| NRG POWER MARKETING LLC./WSPP C | 6,241 | 65.000801 | 405.67 |
| OCCIDENTAL POWER SERVICES/WSPP B | 65,502 | 66.050808 | 4,326.46 |
| SMEPA/WSPP B | 5,211 | 98.508923 | 513.33 |
| SOUTHERN COMPANY SERVICES  INC. AS | 281,583 | 128 000021 | 36,042.63 |
| SUEZ Energy Marketing NA Inc./WSPP B | 63,182 | 51.789275 | 3,272.15 |
| TENASKA/WSPP A | 6,331 | 60.830832 | 385.12 |
| TENASKA/WSPP B | 30,929 | 63.290439 | 1,957.51 |
| UNION POWER PARTNERS/WSPP B | 140,230 | 52.566783 | 7,371.44 |
| WESTAR ENERGY  NC/WSPP B | 2,312 | 49.247405 | 113.86 |
| **Totals** | **1,913,306** | **70.338498** | **134,579.07** |

| | | | |
|---|---|---|---|
| **Entergy Electric System** | **Date range - 20100701 through 20100731** | | **Attachment 3** |
| **Intra-System Billing-201007RA** | **Joint Account Delivery Sources - Entergy Louisiana, LLC** | | **Page 34** |

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| ACADIA POWER PARTNERS, LLC/WSPP B | 65,625 | 39.956419 | 2,622.14 |
| AECI/WSPP C SYSTEM FIRM | 3,960 | 62.858586 | 248.92 |
| AMEREN ENERGY  NC. (AE) ACTING /WSPP C | 2,458 | 61.000814 | 149.94 |
| BURAS TEMP | 86,670 | 260 515403 | 22,578.87 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 18,572 | 54.790545 | 1,017.57 |
| CLECO/WSPP B | 100,472 | 63.829326 | 6,413.06 |
| CONSTELLATION ENERGY COMMODIT ES | 826 | 45.326877 | 37.44 |
| DB ENERGY TRADING LLC/WSPP B | 134,470 | 54.443816 | 7,321.06 |
| ENDURE ENERGY/WSPP A | 1,445 | 52.000000 | 75.14 |
| EXELON GENERATION COMPANY LLC/DAILY | 37,078 | 40.569610 | 1,504.24 |
| J ARON & COMPANY/WSPP B | 14,314 | 56.502725 | 808.78 |
| J.P. MORGAN VENTURES ENERGY | 140,006 | 67.999871 | 9,520.39 |
| JBO/WSPP A | 318,288 | 70.911376 | 22,570.24 |
| JBO/WSPP B | 62,870 | 70.734054 | 4,447.05 |
| L.GPSY 3/BRDGLN E | 837 | 47.849462 | 40.05 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 278,442 | 50.664124 | 14,107.02 |
| NINEMI 4/EVANG(LT) M | 603 | 47.877280 | 28.87 |
| NINEMI 5/BRDGLN E | 48,816 | 46.392371 | 2,264.69 |
| NRG POWER MARKETING LLC./WSPP B | 466,111 | 60.796184 | 28,337.77 |
| NRG POWER MARKETING LLC./WSPP C | 7,518 | 65.001330 | 488.68 |
| OCCIDENTAL POWER SERVICES/BASE | 221,973 | 35.759034 | 7,937.54 |
| OCCIDENTAL POWER SERVICES/DAY-AHEAD | 5,441 | 41.705569 | 226.92 |
| OCCIDENTAL POWER SERVICES/INTRA-DAY | 40,869 | 52.705474 | 2,154.02 |
| OCCIDENTAL POWER SERVICES/WSPP B | 78,904 | 66.050771 | 5,211.67 |
| SMEPA/WSPP B | 6,277 | 98.510435 | 618.35 |
| SOUTHERN COMPANY SERVICES  INC. AS | 339,169 | 128 000024 | 43,413.64 |
| SUEZ Energy Marketing NA Inc./WSPP B | 76,107 | 51.789717 | 3,941.56 |
| TENASKA/WSPP A | 7,625 | 60.828852 | 463.82 |
| TENASKA/WSPP B | 37,261 | 63.290572 | 2,358.27 |
| UNION POWER PARTNERS/WSPP B | 168,919 | 52.566733 | 8,879.52 |
| WESTAR ENERGY  NC/WSPP B | 2,786 | 49.249821 | 137.21 |
| **Totals** | **2,774,712** | **72.052321** | **199,924.44** |

| Entergy Electric System | Date range - 20100701 through 20100731 | | Attachment 3 |
| Intra-System Billing-201007RA | Joint Account Delivery Sources - Entergy Mississippi, Inc. | | Page 35 |

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| AECI/WSPP C SYSTEM FIRM | 2,194 | 62.857794 | 137.91 |
| AMEREN ENERGY NC. (AE) ACTING /WSPP C | 1,361 | 61.006613 | 83.03 |
| ANDRUS 1/TENN E | 27,261 | 43.250064 | 1,179.04 |
| ANDRUS 1/TENN I | 345 | 46.550725 | 16.06 |
| B.WLSN 1/COLUMBIA ML E | 1,382 | 46.714906 | 64.56 |
| B.WLSN 2/COLUMBIA ML E | 8,426 | 46.840731 | 394.68 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 10,293 | 54.793549 | 563.99 |
| CLECO/WSPP B | 55,684 | 63.829825 | 3,554.30 |
| CONSTELLATION ENERGY COMMODIT ES | 458 | 45.327511 | 20.76 |
| DB ENERGY TRADING LLC/WSPP B | 74,525 | 54.443744 | 4,057.42 |
| ENDURE ENERGY/WSPP A | 801 | 51.997503 | 41.65 |
| EXELON GENERATION COMPANY LLC/DAILY | 20,546 | 40.570427 | 833.56 |
| J ARON & COMPANY/WSPP B | 7,931 | 56.498550 | 448.09 |
| J.P. MORGAN VENTURES ENERGY | 77,599 | 67.999974 | 5,276.73 |
| JBO/WSPP A | 176,406 | 70.911307 | 12,509.18 |
| JBO/WSPP B | 34,835 | 70.733458 | 2,464.00 |
| MEAM CANTON 1      N | 8,863 | 120 910527 | 1,071.63 |
| MEAM CANTON 2      N | 8,000 | 120 910000 | 967.28 |
| MEAM CANTON 3      N | 8,000 | 120 910000 | 967.28 |
| MEAM CANTON 4      N | 8,011 | 120 909999 | 968.61 |
| MEAM CANTON 5      N | 10,000 | 120 910000 | 1,209.10 |
| MEAM HENDERSON 10 IN | 5,000 | 120 910000 | 604.55 |
| MEAM HENDERSON 11 IN | 8,000 | 120 910000 | 967.28 |
| MEAM HENDERSON 2  IN | 68,916 | 120 907627 | 8,332.47 |
| MEAM HENDERSON 4  IN | 13,858 | 120 909944 | 1,675.57 |
| MEAM HENDERSON 5  IN | 14,166 | 120 909925 | 1,712.81 |
| MEAM HENDERSON 6  IN | 15,000 | 120 910000 | 1,813.65 |
| MEAM HENDERSON 7  IN | 19,159 | 120 910277 | 2,316.52 |
| MEAM HENDERSON 8  IN | 24,750 | 120 909899 | 2,992.52 |
| MEAM HENDERSON 9  IN | 23,222 | 120 910344 | 2,807.78 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 154,326 | 50.663660 | 7,818.72 |
| NRG POWER MARKETING LLC./WSPP B | 258,334 | 60.796604 | 15,705.83 |
| NRG POWER MARKETING LLC./WSPP C | 4,167 | 65.003600 | 270.87 |
| OCCIDENTAL POWER SERVICES/WSPP B | 43,731 | 66.052228 | 2,888.53 |
| SMEPA/WSPP B | 3,479 | 98.511066 | 342.72 |
| SOUTHERN COMPANY SERVICES  INC. AS | 187,994 | 128 000043 | 24,063.24 |
| SUEZ Energy Marketing NA Inc./WSPP B | 42,184 | 51.789304 | 2,184.68 |
| TENASKA/WSPP A | 4,226 | 60.828206 | 257.06 |
| TENASKA/WSPP B | 20,648 | 63.290391 | 1,306.82 |
| UNION POWER PARTNERS/WSPP B | 93,622 | 52.566811 | 4,921.41 |
| WESTAR ENERGY NC/WSPP B | 1,543 | 49.254699 | 76.00 |
| **Totals** | **1,549,246** | **77.384670** | **119,887.89** |

Attachment Snapshot:  20100826181933                    RunID:  17029                    Billing Snapshot:  20100826175238

**2011 ETI Rate Case**                                                                                                   9-197

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 3**
**Intra-System Billing-201007RA**  **Joint Account Delivery Sources - Entergy New Orleans, Inc.**  **Page 36**

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| AECI/WSPP C SYSTEM FIRM | 712 | 62.837079 | 44.74 |
| AMEREN ENERGY  NC. (AE) ACTING /WSPP C | 441 | 61.020408 | 26.91 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 3,336 | 54.805156 | 182.83 |
| CLECO/WSPP B | 18,049 | 63.829575 | 1,152.06 |
| CONSTELLATION ENERGY COMMODIT ES | 148 | 45.337838 | 6.71 |
| DB ENERGY TRADING LLC/WSPP B | 24,166 | 54.441364 | 1,315.63 |
| ENDURE ENERGY/WSPP A | 260 | 52.000000 | 13.52 |
| EXELON GENERATION COMPANY LLC/DAILY | 6,665 | 40.565641 | 270.37 |
| J ARON & COMPANY/WSPP B | 2,571 | 56.503306 | 145.27 |
| J.P. MORGAN VENTURES ENERGY | 25,160 | 68.000000 | 1,710.88 |
| JBO/WSPP A | 57,191 | 70.911157 | 4,055.48 |
| JBO/WSPP B | 11,297 | 70.733823 | 799.08 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 50,042 | 50.664842 | 2,535.37 |
| MICHOD 2/BRDGLN E | 5,370 | 40.242086 | 216.10 |
| MICHOD 2/GSPL E | 12,219 | 44.370243 | 542.16 |
| NRG POWER MARKETING LLC./WSPP B | 83,767 | 60.795898 | 5,092.69 |
| NRG POWER MARKETING LLC./WSPP C | 1,351 | 65.011103 | 87.83 |
| OCCIDENTAL POWER SERVICES/WSPP B | 14,178 | 66.055156 | 936.53 |
| SMEPA/WSPP B | 1,128 | 98.510638 | 111.12 |
| SOUTHERN COMPANY SERVICES  INC. AS | 60,954 | 128 000295 | 7,802.13 |
| SUEZ Energy Marketing NA Inc./WSPP B | 13,678 | 51.788273 | 708.36 |
| TENASKA/WSPP A | 1,370 | 60.832117 | 83.34 |
| TENASKA/WSPP B | 6,694 | 63.288019 | 423.65 |
| UNION POWER PARTNERS/WSPP B | 30,359 | 52.566949 | 1,595.88 |
| WESTAR ENERGY  NC/WSPP B | 500 | 49.260000 | 24.63 |
| **Totals** | **431,606** | **69.237383** | **29,883.27** |

| Entergy Electric System | Date range - 20100701 through 20100731 | | Attachment 3 |
| Intra-System Billing-201007RA  Joint Account Delivery Sources - Entergy Gulf States Louisiana, LLC | | | Page 37 |

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| ACADIA POWER PARTNERS, LLC/WSPP B | 32,812 | 39.956114 | 1,311.04 |
| AECI/WSPP C SYSTEM FIRM | 3,015 | 62.855721 | 189.51 |
| AMEREN ENERGY  NC. (AE) ACTING /WSPP C | 1,871 | 60.999466 | 114.13 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 14,137 | 54.792389 | 774.60 |
| CLECO/WSPP B | 76,488 | 63.829620 | 4,882.20 |
| CONSTELLATION ENERGY COMMODIT ES | 628 | 45.318471 | 28.46 |
| DB ENERGY TRADING LLC/WSPP B | 102,387 | 54.443728 | 5,574.33 |
| DOW PIPELINE COMPANY/INTRA-DAY CALL | 10,862 | 63.936660 | 694.48 |
| ENDURE ENERGY/WSPP A | 1,100 | 52.000000 | 57.20 |
| EXELON GENERATION COMPANY LLC/DAILY | 28,226 | 40.569333 | 1,145.11 |
| J ARON & COMPANY/WSPP B | 10,896 | 56.502386 | 615.65 |
| J.P. MORGAN VENTURES ENERGY | 106,603 | 67.999869 | 7,248.99 |
| JBO/WSPP A | 242,333 | 70.911391 | 17,184.17 |
| JBO/WSPP B | 47,860 | 70.733180 | 3,385.29 |
| LEWIS CREEK 1/COPANO M | 15,337 | 44.627372 | 684.45 |
| LEWIS CREEK 1/TETCO E | 6,900 | 43.344928 | 299.08 |
| LEWIS CREEK 1/TETCO M | 1,878 | 42.923323 | 80.61 |
| LEWIS CREEK 2/COPANO E | 10 | 43.000000 | 0.43 |
| LEWIS CREEK 2/COPANO M | 519 | 43.757225 | 22.71 |
| LEWIS CREEK 2/TETCO E | 12,307 | 45.314049 | 557.68 |
| LEWIS CREEK 2/TETCO I | 1,239 | 42.695722 | 52.90 |
| LEWIS CREEK 2/TETCO M | 13,767 | 43.846154 | 603.63 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 212,012 | 50.663972 | 10,741.37 |
| NELSON 4/TENN M | 836 | 43.277512 | 36.18 |
| NELSON 4/TETCO I | 1 | 40.000000 | 0.04 |
| NELSON 4/TETCO M | 19,976 | 44.455346 | 888.04 |
| NRG POWER MARKETING LLC./WSPP B | 354,890 | 60.796219 | 21,575.97 |
| NRG POWER MARKETING LLC./WSPP C | 5,725 | 65.002620 | 372.14 |
| OCCIDENTAL POWER SERVICES/WSPP B | 60,074 | 66.051370 | 3,967.97 |
| SAB NE 1/CENTANA#3 M | 575 | 44.921739 | 25.83 |
| SAB NE 1/ENBRIDGE E | 6 | 46.666667 | 0.28 |
| SAB NE 1/ENBRIDGE M | 13,745 | 45.014187 | 618.72 |
| SAB NE 2/ENBRIDGE E | 14,950 | 44.728428 | 668.69 |
| SAB NE 2/ENBRIDGE M | 1,398 | 46.108727 | 64.46 |
| SAB NE 2/STORAGE I | 575 | 46.852174 | 26.94 |
| SAB NE 3/CENTANA#3 M | 4,026 | 46.395926 | 186.79 |
| SAB NE 3/ENBRIDGE E | 179 | 46.145251 | 8.26 |
| SAB NE 3/ENBRIDGE M | 71 | 47.464789 | 3.37 |
| SAB NE 3/TEJAS M | 575 | 46.121739 | 26.52 |
| SAB NE 4/ENBRIDGE E | 575 | 44.886957 | 25.81 |
| SAB NE 5/CENTANA#3 M | 12 | 48.333333 | 0.58 |
| SMEPA/WSPP B | 4,779 | 98.510149 | 470.78 |
| SOUTHERN COMPANY SERVICES  INC. AS | 258,254 | 127.999992 | 33,056.51 |
| SUEZ Energy Marketing NA Inc./WSPP B | 57,947 | 51.789739 | 3,001.06 |
| TENASKA/WSPP A | 5,805 | 60.830319 | 353.12 |
| TENASKA/WSPP B | 28,365 | 63.289970 | 1,795.22 |
| UNION POWER PARTNERS/WSPP B | 128,615 | 52.566886 | 6,760.89 |
| WESTAR ENERGY  NC/WSPP B | 2,120 | 49.245283 | 104.40 |
| WILLOW GLEN 2/BL HOLDINGS E | 2,589 | 44.998069 | 116.50 |
| WILLOW GLEN 4/BL HOLDINGS E | 2,358 | 45.979644 | 108.42 |
| **Totals** | **1,912,208** | **68.251733** | **130,511.51** |

| | | | | |
|---|---|---|---|---|
| **Entergy Electric System** | | **Date range - 20100701 through 20100731** | | **Attachment 3** |
| **Intra-System Billing-201007RA** | | **Joint Account Delivery Sources - Entergy Texas, Inc** | | **Page 38** |

| Source | KWH | Mills per KWH | Charge |
|---|---:|---:|---:|
| AECI/WSPP C SYSTEM FIRM | 2,575 | 62.854369 | 161.85 |
| AMEREN ENERGY NC. (AE) ACTING /WSPP C | 1,597 | 60.989355 | 97.40 |
| CALPINE ENERGY SERVICES L.P./WSPP B | 12,072 | 54.773857 | 661.23 |
| CLECO/WSPP B | 65,339 | 63.829413 | 4,170.55 |
| CONSTELLATION ENERGY COMMODIT ES | 537 | 45.307263 | 24.33 |
| DB ENERGY TRADING LLC/WSPP B | 87,457 | 54.444241 | 4,761.53 |
| DOW PIPELINE COMPANY/INTRA-DAY CALL | 8,028 | 63.937469 | 513.29 |
| ENDURE ENERGY/WSPP A | 939 | 52.002130 | 48.83 |
| EXELON GENERATION COMPANY LLC/DAILY | 24,106 | 40.568738 | 977.95 |
| J ARON & COMPANY/WSPP B | 9,303 | 56.492529 | 525.55 |
| J.P. MORGAN VENTURES ENERGY | 91,065 | 68.000000 | 6,192.42 |
| JBO/WSPP A | 206,999 | 70.911116 | 14,678.53 |
| JBO/WSPP B | 40,878 | 70.731689 | 2,891.37 |
| LEWIS CREEK 1/COPANO M | 11,337 | 44.627326 | 505.94 |
| LEWIS CREEK 1/TETCO E | 5,100 | 43.345098 | 221.06 |
| LEWIS CREEK 1/TETCO M | 1,387 | 42.927181 | 59.54 |
| LEWIS CREEK 2/COPANO E | 8 | 42.500000 | 0.34 |
| LEWIS CREEK 2/COPANO M | 385 | 43.740260 | 16.84 |
| LEWIS CREEK 2/TETCO E | 9,096 | 45.313325 | 412.17 |
| LEWIS CREEK 2/TETCO I | 916 | 42.696507 | 39.11 |
| LEWIS CREEK 2/TETCO M | 10,177 | 43.846910 | 446.23 |
| MERR LL LYNCH COMMODITIES INC/WSPP B | 181,101 | 50.663884 | 9,175.28 |
| NELSON 4/TENN M | 618 | 43.284790 | 26.75 |
| NELSON 4/TETCO I | 1 | 40.000000 | 0.04 |
| NELSON 4/TETCO M | 14,765 | 44.453099 | 656.35 |
| NRG POWER MARKETING LLC./WSPP B | 303,142 | 60.796096 | 18,429.85 |
| NRG POWER MARKETING LLC./WSPP C | 4,888 | 64.989771 | 317.67 |
| OCCIDENTAL POWER SERVICES/WSPP B | 51,305 | 66.044440 | 3,388.41 |
| SAB NE 1/CENTANA#3 M | 425 | 44.941176 | 19.10 |
| SAB NE 1/ENBRIDGE E | 5 | 48.000000 | 0.24 |
| SAB NE 1/ENBRIDGE M | 10,159 | 45.018210 | 457.34 |
| SAB NE 2/ENBRIDGE E | 11,050 | 44.729412 | 494.26 |
| SAB NE 2/ENBRIDGE M | 1,033 | 46.098742 | 47.62 |
| SAB NE 2/STORAGE I | 425 | 46.847059 | 19.91 |
| SAB NE 3/CENTANA#3 M | 2,976 | 46.387769 | 138.05 |
| SAB NE 3/ENBRIDGE E | 133 | 46.090226 | 6.13 |
| SAB NE 3/ENBRIDGE M | 52 | 47.307692 | 2.46 |
| SAB NE 3/TEJAS M | 425 | 46.117647 | 19.60 |
| SAB NE 4/ENBRIDGE E | 425 | 44.894118 | 19.08 |
| SAB NE 5/CENTANA#3 M | 8 | 47.500000 | 0.38 |
| SMEPA/WSPP B | 4,083 | 98.508450 | 402.21 |
| SOUTHERN COMPANY SERVICES INC. AS | 220,624 | 127.999855 | 28,239.84 |
| SUEZ Energy Marketing NA Inc./WSPP B | 49,501 | 51.789459 | 2,563.63 |
| TENASKA/WSPP A | 4,956 | 60.831316 | 301.48 |
| TENASKA/WSPP B | 24,226 | 63.290267 | 1,533.27 |
| UNION POWER PARTNERS/WSPP B | 109,867 | 52.567377 | 5,775.42 |
| WESTAR ENERGY NC/WSPP B | 1,810 | 49.248619 | 89.14 |
| WILLOW GLEN 2/BL HOLDINGS E | 1,912 | 45.000000 | 86.04 |
| WILLOW GLEN 4/BL HOLDINGS E | 1,742 | 45.975890 | 80.09 |
| **Totals** | **1,590,958** | **68.949463** | **109,695.70** |

**Entergy Electric System**          **Date range - 20100701 through 20100731**                        **Attachment 3**
**Intra-System Billing-201007RA**    **Joint Account Delivery Sources - Summary**                      **Page 39**

| Source | KWH | Mills per KWH | Charge |
|---|---|---|---|
| Entergy Arkansas, Inc. | 1,913,306 | 70.338498 | 134,579.07 |
| Entergy Louisiana, LLC | 2,774,712 | 72.052321 | 199,924.44 |
| Entergy Mississippi, Inc. | 1,549,246 | 77.384670 | 119,887.89 |
| Entergy New Orleans, Inc. | 431,606 | 69.237383 | 29,883.27 |
| Entergy Gulf States Louisiana, LLC | 1,912,208 | 68.251733 | 130,511.51 |
| Entergy Texas, Inc | 1,590,958 | 68.949463 | 109,695.70 |
| **Totals** | **10,172,036** | **71.222898** | **724,481.88** |

**Attachment Snapshot: 20100826181933**          **RunID: 17029**          **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**          9-201

**Entergy Electric System**　　　　Date range - 20100701 through 20100731　　　　**Attachment 3**
**Intra-System Billing-201007RA**　　　　Joint Account Deliveries　　　　**Page 40**

|  | KWH | Cost |
|---|---|---|
| Total Energy Supplied for<br>Other Joint Account Sales | 10,172,036 | 724,481.88 |
| Cost to System for<br>Other Joint Account Sales |  | 724,481.88 |
| Total Billing to<br>Other Joint Account Sales |  | 635,035.41 |
| Net Balance From<br>Other Joint Account Sales |  | (89,446.47) |
| Total Net Balance |  | (89,446.47) |
| Total Net Balance - Demand |  | 0.00 |
| Total Net Balance - Energy |  | (89,446.47) |

### Apportioning of Adjusted Net Balance from Joint Account Sales

| Company | Resp. Ratio |  |  |  | Net Balance |
|---|---|---|---|---|---|
| Entergy Arkansas, Inc. | 0 2093 | X | (89,446.47) | = | (18,721.14) |
| Entergy Louisiana, LLC | 0 2511 | X | (89,446.47) | = | (22,460.01) |
| Entergy Mississippi, Inc. | 0.1399 | X | (89,446.47) | = | (12,513.56) |
| Entergy New Orleans, Inc. | 0 0447 | X | (89,446.47) | = | (3,998.26) |
| Entergy Gulf States Louisiana, LLC | 0.1893 | X | (89,446.47) | = | (16,932.22) |
| Entergy Texas, Inc | 0.1657 | X | (89,446.47) | = | (14,821.28) |
| | **1.0000** | | | | **(89,446.47)** |

### Apportioning of Adjusted Net Balance - Demand and Energy

| Company | Demand | Energy | Total |
|---|---|---|---|
| Entergy Arkansas, Inc. | 0 00 | (18,721.14) | (18,721.14) |
| Entergy Louisiana, LLC | 0 00 | (22,460.01) | (22,460.01) |
| Entergy Mississippi, Inc. | 0 00 | (12,513.56) | (12,513.56) |
| Entergy New Orleans, Inc. | 0 00 | (3,998.26) | (3,998.26) |
| Entergy Gulf States Louisiana, LLC | 0 00 | (16,932.22) | (16,932.22) |
| Entergy Texas, Inc | 0 00 | (14,821.28) | (14,821.28) |
| **System** | **0.00** | **(89,446.47)** | **(89,446.47)** |

Attachment Snapshot: 20100826181933　　　　RunID: 17029　　　　Billing Snapshot: 20100826175238

**Entergy Electric System**
**Intra-System Billing-201007RA**

Date range - 20100701 through 20100731
Coincident Peaks

**Attachment 4**
**Page 41**

### Full Load (including interruptible customers)

| Year | Month | Day | Hour | System | AR | LA | MS | NO | EGSL | ETI |
|------|-------|-----|------|--------|-----|-----|-----|-----|------|-----|
| 2009 | 7 | 2 | 16 | 20,266,591 | 4,076,854 | 5,207,236 | 2,960,570 | 960,099 | 3,864,047 | 3,197,785 |
| 2009 | 8 | 4 | 16 | 20,101,486 | 4,324,348 | 4,993,585 | 2,920,053 | 905,162 | 3,857,302 | 3,101,036 |
| 2009 | 9 | 8 | 16 | 17,789,153 | 3,869,828 | 4,425,469 | 2,654,403 | 762,423 | 3,416,026 | 2,661,004 |
| 2009 | 10 | 8 | 17 | 17,406,013 | 3,253,525 | 4,712,375 | 2,334,228 | 855,958 | 3,496,830 | 2,753,097 |
| 2009 | 11 | 17 | 19 | 13,100,671 | 3,023,242 | 3,553,282 | 1,773,843 | 558,074 | 2,316,730 | 1,875,500 |
| 2009 | 12 | 4 | 19 | 15,501,240 | 3,136,408 | 4,106,356 | 1,991,288 | 704,068 | 3,021,804 | 2,541,316 |
| 2010 | 1 | 8 | 8 | 18,693,431 | 3,945,217 | 4,824,812 | 2,386,441 | 857,848 | 3,136,742 | 3,542,371 |
| 2010 | 2 | 25 | 8 | 16,411,849 | 3,546,185 | 4,165,035 | 2,070,332 | 726,106 | 2,961,626 | 2,942,565 |
| 2010 | 3 | 3 | 7 | 15,338,210 | 3,137,824 | 4,034,685 | 1,929,748 | 712,963 | 2,858,148 | 2,664,842 |
| 2010 | 4 | 29 | 17 | 14,125,067 | 3,062,959 | 3,802,850 | 1,743,982 | 598,277 | 2,756,644 | 2,160,355 |
| 2010 | 5 | 24 | 15 | 18,755,924 | 3,909,082 | 5,001,840 | 2,640,718 | 858,007 | 3,356,689 | 2,989,588 |
| 2010 | 6 | 21 | 16 | 21,056,833 | 4,673,598 | 5,191,088 | 3,163,850 | 877,645 | 3,602,175 | 3,548,477 |
| Total | | | | 0 | 43,959,070 | 54,018,613 | 28,569,456 | 9,376,630 | 38,644,763 | 33,977,936 |
| 12-Month Average | | | | | 3,663,255 | 4,501,551 | 2,380,788 | 781,385 | 3,220,396 | 2,831,494 |
| Responsibility Ratio | | | | | 0.2108 | 0.2590 | 0.1370 | 0 0450 | 0.1853 | 0.1629 |

### Load Excluding Interruptible Customers

| Year | Month | Day | Hour | System | AR | LA | MS | NO | EGSL | ETI |
|------|-------|-----|------|--------|-----|-----|-----|-----|------|-----|
| 2009 | 7 | 2 | 16 | 19,757,681 | 3,948,568 | 4,918,012 | 2,960,570 | 929,369 | 3,856,647 | 3,144,515 |
| 2009 | 8 | 4 | 16 | 19,684,363 | 4,238,659 | 4,759,049 | 2,920,053 | 883,034 | 3,834,101 | 3,049,467 |
| 2009 | 9 | 8 | 16 | 17,330,307 | 3,750,282 | 4,155,695 | 2,647,732 | 743,406 | 3,384,270 | 2,648,922 |
| 2009 | 10 | 8 | 17 | 17,055,723 | 3,223,627 | 4,459,097 | 2,329,371 | 841,486 | 3,469,237 | 2,732,905 |
| 2009 | 11 | 30 | 20 | 12,842,330 | 2,926,002 | 3,295,668 | 1,772,797 | 508,186 | 2,385,320 | 1,954,357 |
| 2009 | 12 | 4 | 19 | 15,184,415 | 3,136,164 | 3,881,283 | 1,967,199 | 683,654 | 2,998,563 | 2,517,552 |
| 2010 | 1 | 8 | 19 | 18,315,622 | 3,641,573 | 4,666,900 | 2,466,992 | 879,520 | 3,150,301 | 3,510,336 |
| 2010 | 2 | 25 | 7 | 16,157,950 | 3,426,523 | 4,006,582 | 2,070,845 | 703,193 | 2,989,430 | 2,961,377 |
| 2010 | 3 | 3 | 7 | 15,002,144 | 3,135,491 | 3,788,194 | 1,929,748 | 684,009 | 2,858,148 | 2,606,554 |
| 2010 | 4 | 29 | 17 | 13,729,642 | 2,925,536 | 3,610,881 | 1,743,982 | 577,503 | 2,729,585 | 2,142,155 |
| 2010 | 5 | 24 | 16 | 18,381,604 | 3,776,637 | 4,758,960 | 2,614,298 | 825,064 | 3,382,890 | 3,023,755 |
| 2010 | 6 | 21 | 16 | 20,563,419 | 4,569,484 | 4,921,567 | 3,124,114 | 860,795 | 3,570,306 | 3,517,153 |
| Total | | | | 0 | 42,698,546 | 51,221,888 | 28,547,701 | 9,119,219 | 38,608,798 | 33,809,048 |
| 12-Month Average | | | | | 3,558,212 | 4,268,490 | 2,378,975 | 759,934 | 3,217,399 | 2,817,420 |
| Responsibility Ratio | | | | | 0.2093 | 0.2511 | 0.1399 | 0 0447 | 0.1893 | 0.1657 |

Attachment Snapshot: 20100826181933     RunID: 17029     Billing Snapshot: 20100826175238

**2011 ETI Rate Case**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Entergy Electric System | | Date range - 20100701 through 20100731 | | | | Attachment 5 | |
| Intra-System Billing-201007RA | | Service Schedule MSS - 1 / Reserve Equalization | | | | Page 42 | |

| Source | System | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|---|
| **Owned Capability (A)** | | | | | | | |
| ANDRUS | 712 000 | 0.000 | 0.000 | 712 000 | 0.000 | 0.000 | 0.000 |
| ANO | 1,835 000 | 1,580.486 | 73.533 | 35.308 | 49.812 | 46.742 | 49.119 |
| ATTALA | 455 000 | 0.000 | 0.000 | 455 000 | 0.000 | 0.000 | 0.000 |
| BAXTER WILSON | 1,176 000 | 0.000 | 0.000 | 1,176 000 | 0.000 | 0.000 | 0.000 |
| BIG CAJUN | 247 000 | 0.000 | 0.000 | 0 000 | 0.000 | 142.025 | 104.975 |
| BURAS | 12 000 | 0.000 | 12.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| CALCASIEU | 310 000 | 0.000 | 0.000 | 0 000 | 0.000 | 178.250 | 131.750 |
| CARPENTER & REMMEL | 74 000 | 74.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| COUCH | 123 000 | 123.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| DELTA | 177 000 | 0.000 | 0.000 | 177 000 | 0.000 | 0.000 | 0.000 |
| INDEPENDENCE | 682 840 | 226.815 | 10.563 | 424 561 | 7.163 | 6 699 | 7.039 |
| LAKE CATHERINE | 712 000 | 712.000 | 0.000 | 0 000 | 0.000 | 0 000 | 0.000 |
| LEWIS CREEK | 460 000 | 0.000 | 0.000 | 0 000 | 0.000 | 264.500 | 195.500 |
| LITTLE GYPSY | 1,170 000 | 0.000 | 1,170.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| LYNCH | 115 000 | 115.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| MABELVALE | 56 000 | 56.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| MICHOUD | 748 000 | 0.000 | 0.000 | 0 000 | 748.000 | 0.000 | 0.000 |
| MOSES | 134 000 | 134.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| NELSON | 988 000 | 0.000 | 0.000 | 0 000 | 0.000 | 568.100 | 419.900 |
| NINEMILE PT. | 1,599 000 | 0.000 | 1,599.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| OUACHITA | 771 000 | 513.000 | 0.000 | 0 000 | 0.000 | 258 000 | 0.000 |
| PERRYVILLE | 691 000 | 0.000 | 172.750 | 0 000 | 0.000 | 297 995 | 220.255 |
| REX BROWN | 289 000 | 0.000 | 0.000 | 289 000 | 0.000 | 0.000 | 0.000 |
| RITCHIE | 16 000 | 16.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| RIVERBEND | 681 800 | 0.000 | 0.000 | 0 000 | 0.000 | 392.035 | 289.765 |
| SAB NE | 1,814 000 | 0.000 | 0.000 | 0 000 | 0.000 | 1,043.050 | 770.950 |
| STERLINGTON | 174 000 | 0.000 | 174.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| WATERFORD | 2,021 000 | 0.000 | 2,021.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| WHITE BLUFF | 945 631 | 814.471 | 37.845 | 18.213 | 25.645 | 24.114 | 25.343 |
| WILLOW GLEN | 817 000 | 0.000 | 0.000 | 0 000 | 0.000 | 469.775 | 347.225 |
| **Subtotal Owned Capability (A)** | **20,006.271** | **4,364.772** | **5,270.691** | **3,287.082** | **830.620** | **3,691.285** | **2,561.821** |
| | | | | | | | |
| **Capacity Purch. w/o (B)** | | | | | | | |
| ACADIAPOWERPARTNERS | 580 000 | 0.000 | 386.667 | 0 000 | 0.000 | 193 333 | 0.000 |
| BLAKELY-ADD. | 11 000 | 11.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| CALPINE CARVILLE | 485 000 | 0.000 | 0.000 | 0 000 | 0.000 | 485.000 | 0.000 |
| CONOCOPHIL PS-100 | 100 000 | 0.000 | 0.000 | 0 000 | 0.000 | 57.500 | 42.500 |
| CONOCOPHIL PS-SRW | 100 000 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 100.000 |
| DEGRAY-ADD. | 10 000 | 10.000 | 0.000 | 0 000 | 0.000 | 0.000 | 0.000 |
| DOW PIPELINE | 100 000 | 0.000 | 0.000 | 0 000 | 0.000 | 57.500 | 42.500 |
| EPI ISES2 | 121 000 | 0.000 | 61.105 | 0 000 | 59.895 | 0 000 | 0.000 |
| ETEC HARD N | 146 000 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 146.000 |
| ETEC HARRISON | 50 000 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 50.000 |
| ETEC SAM RAYBURN | 34 667 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 34.667 |
| ETEC SAN JACINTO | 146 000 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 146.000 |
| ETEC W LLIS | 1 244 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 1.244 |
| EXELON FRONTIER 10YR | 150 000 | 0.000 | 0.000 | 0 000 | 0.000 | 0.000 | 150.000 |
| GRAND GULF #1 | 992 878 | 272.302 | 157.626 | 371 550 | 191.400 | 0 000 | 0.000 |
| GRAND GULF #1(RET/RP) | 133 023 | 0.000 | 39.380 | 17.831 | 27.408 | 23.603 | 24.801 |
| MEAM | 84 000 | 0.000 | 0.000 | 84.000 | 0.000 | 0.000 | 0.000 |
| MURRAY HYDRO | 100 910 | 0.000 | 100.910 | 0 000 | 0.000 | 0.000 | 0.000 |
| OCCIDENTAL-OXYTAFT | 480 000 | 0.000 | 480.000 | 0 000 | 0.000 | 0 000 | 0.000 |
| RIVERBEND 30 | 292 200 | 0.000 | 194.800 | 0 000 | 97.400 | 0.000 | 0.000 |
| TOLEDO BEND | 69 000 | 0.000 | 23.000 | 0 000 | 0.000 | 26.450 | 19.550 |
| **Subtotal Capacity Purch. w/o (B)** | **4,186.922** | **293.302** | **1,443.488** | **473.381** | **376.103** | **843.386** | **757.262** |
| | | | | | | | |
| **Contract Capacity (D)** | | | | | | | |
| EXELON-150 | 150 000 | 31.320 | 37.725 | 20.910 | 6.780 | 28.725 | 24.540 |
| **Subtotal Contract Capacity (D)** | **150.000** | **31.320** | **37.725** | **20.910** | **6.780** | **28.725** | **24.540** |
| | | | | | | | |
| **Totals** | **24,343.193** | **4,689.394** | **6,751.904** | **3,781.373** | **1,213.503** | **4,563.396** | **3,343.623** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 5**
**Intra-System Billing-201007RA**  **Service Schedule MSS - 1 / Reserve Equalization**  **Page 43**

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| A. Total Investment (Reserve Basis) | (9 225500) | 32.030600 | 41.588200 | (17.393100) | (10 568500) | 64.834900 |
| B. Cost of Capital | | | | | | |
| Debt Ratio | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| x Bond Cost | 0 061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0 075100 |
| + Preferred Ratio | 0 039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| x Preferred Cost | 0 059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| + Common Ratio | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0 516500 |
| x Common Cost | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital | 0 084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0 093126 |
| E. Summary ($/KW) | | | | | | |
| 1. Cost of Money | (0.783872) | 2.810813 | 3.483137 | (1.471300) | (0 906820) | 6 037815 |
| 2. Depreciation | 4 392930 | 5.463640 | 3.185940 | 7.406280 | 4.376400 | 5 651380 |
| 3. Income Tax | (0 331149) | 1.082090 | 1.296845 | (0.619351) | (0 369380) | 1 983494 |
| 4. Insurance | 0.473440 | 1.712090 | 1.516810 | 2.206730 | 0.485550 | 0 375450 |
| 5. Property Tax | 0.764290 | 1.219660 | 4.398050 | 2.406210 | 2.067020 | 1 890110 |
| 6. Franchise Tax | 0 031400 | | 0.194550 | 0.426430 | | 0.197930 |
| 7. Operations & Maintenance + Overhead | 21.271470 | 22.889030 | 24.841370 | 34.298770 | 14.459670 | 24.806290 |
| Annual Cost per KW | 25.818509 | 35.177323 | 38.916702 | 44.653769 | 20.112440 | 40.942469 |
| Monthly Cost per KW | 2.151542 | 2.931444 | 3.243059 | 3.721147 | 1.676037 | 3.411872 |
| Monthly Cost $/MW | 2,152 | 2,931 | 3,243 | 3,721 | 1,676 | 3,412 |
| System Capability (SC) | 24,343.193 | | | | | |
| Company Capability (CC) | 4,689.394 | 6,751.904 | 3,781 373 | 1,213.503 | 4,563 396 | 3,343.623 |
| Required Capability (SC x CLR/SLR) | 5,095.062 | 6,112.120 | 3,406.493 | 1,088.162 | 4,607 046 | 4,034.310 |
| Equalization Reserve (ER = CC - SC x CLR/SLR) | (405.668) | 639.784 | 374 880 | 125.341 | (43.650) | (690.687) |
| Allocation Factor | 0.3558 | | | | 0.0383 | 0 6059 |
| **Receipts** | | | 1,875,205.93 | 1,215,735.84 | 466,393.86 | |
| **Payments** | 1,265,700.02 | | | | 136,245.95 | 2,155,389.66 |

Attachment Snapshot: 20100826181933   RunID: 17029   Billing Snapshot: 20100826175238

**2011 ETI Rate Case**

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 5**
**Intra-System Billing-201007RA**  **Service Schedule MSS - 2 / Transmission Equalization**  **Page 44**

| | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|
| Total Investment | 414,292,644.47 | 516,998,737.69 | 270,282,974.70 | 26,290,825 51 | 332,286,730.47 | 246,384,445.14 |
| Deferred Taxes | 37,430,361.00 | 58,063,215.00 | 30,006,678.00 | 3,089,864.00 | 25,629,920 00 | 19,783,447 00 |
| Depreciation Reserve | 162,587,708.00 | 186,714,652.00 | 98,019,787.00 | 14,138,861 00 | 167,174,252.00 | 61,398,531 00 |
| Net Transmission Investment | 214,274,575.47 | 272,220,870.69 | 142,256,509.70 | 9,062,100.51 | 139,482,558.47 | 165,202,467.14 |
| **Cost of Capital** | | | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 | 0.491300 | 0.483500 |
| Bond Cost (i) | 0.061600 | 0.067100 | 0.063400 | 0.060700 | 0.060900 | 0 075100 |
| Preferred Ratio (PR) | 0.039300 | 0.019900 | 0.031800 | 0.047700 | 0.003200 | |
| Preferred Cost (p) | 0.059900 | 0.075500 | 0.056900 | 0.048200 | 0.087100 | |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 | 0.505500 | 0 516500 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0.084968 | 0.087754 | 0.083753 | 0.084591 | 0.085804 | 0 093126 |
| Tax Rate (F) | 0.035895 | 0.033783 | 0.031183 | 0.035609 | 0.034951 | 0 030593 |
| **Operating Expenses** | | | | | | |
| Depreciation Factor (D) | 0.0153010 | 0 0271140 | 0.0229240 | 0.0277360 | 0.0202970 | 0.0197710 |
| Insurance Expense (I) | 0.0038030 | 0 0011480 | 0.0038520 | | 0.0021750 | 0.0018310 |
| Property Tax (PT) | 0.0043820 | 0 0082710 | 0.0166890 | 0.0121940 | 0.0067670 | 0.0074320 |
| Franchise Tax (FT) | 0.0001530 | | 0.0010110 | 0.0020450 | | 0.0008500 |
| Operations & Maintenance (OM) | 0.0351800 | 0 0374620 | 0.0356540 | 0.0424620 | 0.0448010 | 0.0263850 |
| Total Operating Expenses | 0.0588190 | 0 0739950 | 0.0801300 | 0.0844370 | 0.0740400 | 0.0562690 |
| Net Investment Ratio (K) | 0.517206 | 0.526541 | 0.526324 | 0.344687 | 0.419766 | 0 670507 |
| Annual Ownership Cost | 0.234587 | 0.262067 | 0.267180 | 0.365167 | 0.297138 | 0 207639 |
| Net Transmission Investment * AOC | 50,266,030.00 | 71,340,107.00 | 38,008,094.00 | 3,309,180.00 | 41,445,568 00 | 34,302,475 00 |
| System Average Annual Ownership Cost | 238,671,454.00 / | | 942,499,081.98 | = | 0.2532326 | |
| System Average Monthly Ownership Cost | | | 0.2532326 | / 12 | 0.0211027 | |
| Responsibility Ratio | 0.2108 | 0.2590 | 0.1370 | 0.0450 | 0.1853 | 0.1629 |
| Transmission Responsibility | 198,678,806.48 | 244,107,262.23 | 129,122,374.23 | 42,412,458 69 | 174,645,079.89 | 153,533,100.45 |
| Investment Difference | 15,595,768.99 | 28,113,608.46 | 13,134,135.47 | (33,350,358.18) | (35,162,521.42) | 11,669,366 69 |
| **Payments** | | | | 703,783.04 | 742,024.61 | |
| **Receipts** | 329,113.04 | 593,273.42 | 277,165.89 | | | 246,255.30 |

Attachment Snapshot: 20100826181933  RunID: 17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-206

**Entergy Electric System**　　　　Date range - 20100701 through 20100731　　　　**Attachment 6-AR**
**Intra-System Billing-201007RA**　　Company Summary - Entergy Arkansas, Inc.　　　　**Page 45**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 131,743,223 | 131,563,443 | 5,265,506.15 | 8,545,539.76 |
| Tele. AECC Excess Energy | 45,883,356 | 0 | 1,511,948.91 | 0.00 |
| ARK.NU 1 Desig. Energy | 86,421,339 | 0 | 0.00 | 0.00 |
| ARK.NU 2 Desig. Energy | 102,307,792 | 0 | 0.00 | 0.00 |
| GGULF RET Desig. Energy | 66,088,728 | 0 | 0.00 | 0.00 |
| GGULF RP Desig. Energy | 32,499,259 | 0 | 0.00 | 0.00 |
| INDEPN 1 Desig. Energy | 24,696,343 | 0 | 0.00 | 0.00 |
| WH.BLF 1 Desig. Energy | 45,314,539 | 0 | 0.00 | 0.00 |
| WH.BLF 2 Desig. Energy | 38,134,556 | 0 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 0.00 | 1,265,700.02 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | (329,113.04) |
| Fiber Optic Equalization | 0 | 0 | 0.00 | 45,958.19 |
| Bandwidth Pymt/Receipt-Opinion Nos. 480 & 480-A | 0 | 0 | 0.00 | 3,905,000.00 |
| **Subtotal Purchases and Sales - Associated Companies** | **573,089,135** | **131,563,443** | **6,777,455.06** | **13,433,084.93** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (18,721.14) | 0.00 |
| Energy Supp. for Sales | 1,913,306 | 0 | 134,579.07 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| CENTRAL LA ELEC CO ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 4,911.95 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 8,479.13 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 3,671.18 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 8,791.81 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.05) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.03 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 1,740.09 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 744.10 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.04 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.05) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 1,164.71 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.51 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 682.53 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 3,280.86 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 2,093.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 4,452.16 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 2.49 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **1,913,306** | **0** | **168,430.41** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| AECI RE Energy | 0 | 14,296,119 | 0.00 | 610,073.17 |
| AEP SERVICE CORP. RE Energy | 0 | 793,440 | 0.00 | 27,039.59 |
| AMEREN ENERGY  NC. (AE) ACTING  RE Energy | 0 | 501,120 | 0.00 | 24,554.89 |
| Ameren Energy Marketing Company RE Energy | 0 | 10,440 | 0.00 | 334.08 |
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 845,431 | 0.00 | 45,316.99 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 2,789,568 | 0.00 | 146,243.56 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 349,740 | 0.00 | 9,888.24 |
| CITIGROUP ENERGY  NC RE Energy | 0 | 50,112 | 0.00 | 1,681.88 |
| CLECO RE Energy | 0 | 1,048,172 | 0.00 | 66,267.70 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 1,172,829 | 0.00 | 48,758.64 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 783,233 | 0.00 | 30,180.30 |
| CYPRES RE Energy | 0 | 30,648 | 0.00 | 1,267.50 |
| DB ENERGY TRAD NG LLC RE Energy | 0 | 21,593,680 | 0.00 | 1,102,783.95 |
| DUKE ENERGY HINDS RE Energy | 0 | 221,754 | 0.00 | 8,431.92 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 199,789 | 0.00 | 7,436.91 |
| ENDURE ENERGY RE Energy | 0 | 297,537 | 0.00 | 13,904.44 |
| ETEC RE Energy | 0 | 244,298 | 0.00 | 10,993.46 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 19,524,239 | 0.00 | 809,340.37 |

Attachment Snapshot: 20100826181933　　　　RunID: 17029　　　　Billing Snapshot: 20100826175238

**2011 ETI Rate Case**　　　　　　　　　　9-207

**Entergy Electric System**      **Date range - 20100701 through 20100731**      **Attachment 6-AR**
**Intra-System Billing-201007RA**      **Company Summary - Entergy Arkansas, Inc.**      **Page 46**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| J ARON & COMPANY RE Energy | 0 | 4,984,056 | 0.00 | 256,121.06 |
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 1,033,979 | 0.00 | 69,555.14 |
| JBO RE Energy | 0 | 4,187,691 | 0.00 | 275,806.37 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 300,881 | 0.00 | 8,339.06 |
| MAGNET COVE RE Energy | 0 | 1,069,515 | 0.00 | 39,180.42 |
| MDEA CROSSROADS RE Energy | 0 | 40,084 | 0.00 | 1,700.80 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 40,521,612 | 0.00 | 1,994,933.07 |
| MORGAN STANLEY RE Energy | 0 | 51,366 | 0.00 | 1,223.18 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 46,561,153 | 0.00 | 2,253,552.56 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 1,189,742 | 0.00 | 75,381.01 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 2,907,333 | 0.00 | 93,375.97 |
| SMEPA RE Energy | 0 | 626,400 | 0.00 | 55,914.95 |
| SOUTHERN COMPANY SERVICES  INC. AS AGENT FO RE Energy | 0 | 2,328,120 | 0.00 | 287,663.83 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 13,613,136 | 0.00 | 646,652.75 |
| TEA RE Energy | 0 | 233,021 | 0.00 | 6,829.44 |
| TENASKA FRONTIER RE Energy | 0 | 248,836 | 0.00 | 9,376.03 |
| TENASKA RE Energy | 0 | 5,303,526 | 0.00 | 318,688.60 |
| UNION POWER PARTNERS RE Energy | 0 | 34,436,751 | 0.00 | 1,728,653.96 |
| WESTAR ENERGY  NC RE Energy | 0 | 7,784,895 | 0.00 | 270,527.41 |
| WRIGHTSVILE POWER RE Energy | 0 | 177,550 | 0.00 | 7,503.15 |
| YAZOO CITY RE Energy | 0 | 1,101 | 0.00 | 48.70 |
| ENG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.01) |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 343,658.70 |
| EXELON GENERATION COMPANY LLC ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.01) |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.07) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.15) |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.20) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.21) |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.04) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.16) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.20 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 626.40 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 152.23 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.10) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **232,352,897** | **0.00** | **11,709,961.63** |
| **Totals** | **575,002,441** | **363,916,340** | **6,945,885.47** | **25,143,046.56** |
| **ESI Receivable from Entergy Arkansas, Inc.** | | | | **18,197,161.09** |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**     

**Entergy Electric System**      Date range - 20100701 through 20100731      **Attachment 6-LA**
**Intra-System Billing-201007RA**      Company Summary - Entergy Louisiana, LLC      **Page 47**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 135,105,357 | 42,272,082 | 10,226,157.06 | 2,134,170.65 |
| Tele. AECC Excess Energy | 0 | 14,584,886 | 0.00 | 480,598.16 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 24,991,859 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 29,534,318 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 19,691,908 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 9,494,456 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 7,145,175 | 0.00 | 0.00 |
| RVRBND 1 - UPP from EGSL Desig. Energy | 0 | 139,555,800 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 13,440,805 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 10,706,289 | 0.00 | 0.00 |
| ACADIA POWER PARTNERS, LLC/WSPP B Desig. Energy | 59,708,320 | 0 | 0.00 | 0.00 |
| PERVIL 1 Desig. Energy | 194,914,500 | 0 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 1,875,205.93 | 0.00 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | (593,273.42) |
| Fiber Optic Equalization | 0 | 0 | 0.00 | 13,548.63 |
| Bandwidth Pymt/Receipt-Opinion Nos. 480 & 480-A | 0 | 0 | 1,843,000.00 | 0.00 |
| **Subtotal Purchases and Sales - Associated Companies** | **389,728,177** | **311,417,578** | **13,944,362.99** | **2,035,044.02** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (22,460.01) | 0.00 |
| Energy Supp. for Sales | 2,774,712 | 0 | 199,924.44 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| CENTRAL LA ELEC CO ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 5,892.94 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 10,172.52 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 4,404.37 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 10,547.65 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.06) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.04 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 2,087.62 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 892.70 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.05 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.06) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 1,397.32 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.62 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| SOUTHWEST POWER ADMN ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 818.84 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 3,936.09 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 2,511.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 5,341.31 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 2.99 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **2,774,712** | **0** | **240,536.35** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| ACADIA POWER PARTNERS, LLC RE Energy | 0 | 179,125,000 | 0.00 | 6,106,961.20 |
| AECI RE Energy | 0 | 17,219,703 | 0.00 | 734,834.42 |
| AEP SERVICE CORP. RE Energy | 0 | 955,700 | 0.00 | 32,569.33 |
| AMEREN ENERGY NC. (AE) ACTING RE Energy | 0 | 603,600 | 0.00 | 29,576.40 |
| Ameren Energy Marketing Company RE Energy | 0 | 12,575 | 0.00 | 402.40 |
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 1,018,324 | 0.00 | 54,584.38 |
| BURAS TEMP RE Energy | 0 | 131,908 | 0.00 | 34,364.05 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 3,360,048 | 0.00 | 176,151.06 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 421,265 | 0.00 | 11,910.49 |
| CITIGROUP ENERGY NC RE Energy | 0 | 60,361 | 0.00 | 2,025.87 |
| CLECO RE Energy | 0 | 1,262,618 | 0.00 | 79,826.20 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 1,412,677 | 0.00 | 58,730.23 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 943,361 | 0.00 | 36,350.30 |
| CYPRES RE Energy | 0 | 36,913 | 0.00 | 1,526.56 |

Attachment Snapshot: 20100826181933      **RunID: 17029**      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                        

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 6-LA**
**Intra-System Billing-201007RA**  Company Summary - Entergy Louisiana, LLC  **Page 48**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| DB ENERGY TRAD NG LLC RE Energy | 0 | 26,009,688 | 0.00 | 1,328,308.08 |
| DUKE ENERGY HINDS RE Energy | 0 | 267,110 | 0.00 | 10,156.10 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 240,658 | 0.00 | 8,957.84 |
| ENDURE ENERGY RE Energy | 0 | 358,396 | 0.00 | 16,748.60 |
| ETEC RE Energy | 0 | 294,260 | 0.00 | 13,241.70 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 23,517,077 | 0.00 | 974,855.35 |
| J ARON & COMPANY RE Energy | 0 | 6,003,359 | 0.00 | 308,501.05 |
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 1,245,433 | 0.00 | 83,779.48 |
| JBO RE Energy | 0 | 5,044,138 | 0.00 | 332,212.21 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 362,411 | 0.00 | 10,044.40 |
| MAGNET COVE RE Energy | 0 | 1,288,274 | 0.00 | 47,194.28 |
| MDEA CROSSROADS RE Energy | 0 | 48,272 | 0.00 | 2,048.17 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 48,808,429 | 0.00 | 2,402,903.87 |
| MORGAN STANLEY RE Energy | 0 | 61,868 | 0.00 | 1,473.28 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 56,083,268 | 0.00 | 2,714,420.29 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 280,091,048 | 0.00 | 10,465,221.67 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 3,501,908 | 0.00 | 112,472.37 |
| SMEPA RE Energy | 0 | 754,504 | 0.00 | 67,350.01 |
| SOUTHERN COMPANY SERVICES  INC. AS AGENT FO RE Energy | 0 | 2,804,225 | 0.00 | 346,491.54 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 16,397,077 | 0.00 | 778,895.88 |
| TEA RE Energy | 0 | 280,677 | 0.00 | 8,226.15 |
| TENASKA FRONTIER RE Energy | 0 | 299,738 | 0.00 | 11,293.95 |
| TENASKA RE Energy | 0 | 6,388,123 | 0.00 | 383,862.17 |
| UNION POWER PARTNERS RE Energy | 0 | 41,479,230 | 0.00 | 2,082,171.87 |
| WESTAR ENERGY  NC RE Energy | 0 | 9,376,942 | 0.00 | 325,851.13 |
| WRIGHTSVILE POWER RE Energy | 0 | 213,842 | 0.00 | 9,036.81 |
| YAZOO CITY RE Energy | 0 | 1,324 | 0.00 | 58.57 |
| ACADIA POWER PARTNERS ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 14.83 |
| ACADIA PPA - 580 MW - CAP CHG | 0 | 0 | 0.00 | 714,364.24 |
| ACADIA PPA - 580 MW -START CHG | 0 | 0 | 0.00 | 930,785.87 |
| ACADIA PPA - 580 MW -VOM CHG | 0 | 0 | 0.00 | 199,376.00 |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 413,937.56 |
| EXELON GENERATION COMPANY LLC ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.01) |
| JAP - ACADIA ENG CHG | 0 | 0 | 0.00 | (0.62) |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.08) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.18) |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.25) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.26) |
| JAP - OXY ENG CHG | 0 | 0 | 0.00 | (4.79) |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.05) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.20) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.24 |
| OCCIDENTAL POWER SERVICES  NC. - STARTUP CHG - 0 | 0 | 0 | 0.00 | 231,750.00 |
| OCCIDENTAL POWER SERVICES NC. ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.29) |
| OCCIDENTIAL - 480MW - CAP CHG | 0 | 0 | 0.00 | 3,399,552.43 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 754.50 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 183.36 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.11) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **737,785,332** | **0.00** | **36,096,301.90** |

| Transmission Service | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| CLECO TRAN SERV CHG | 0 | 0 | 0.00 | 104,767.78 |
| **Subtotal Transmission Service** | **0** | **0** | **0.00** | **104,767.78** |
| **Totals** | **392,502,889** | **1,049,202,910** | **14,184,899.34** | **38,236,113.70** |
| **ESI Receivable from Entergy Louisiana, LLC** | | | | **24,051,214.36** |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                  9-210

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 6-MS**
**Intra-System Billing-201007RA**  Company Summary - Entergy Mississippi, Inc.  **Page 49**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 32,027,550 | 165,417,337 | 2,046,403.14 | 10,587,664.98 |
| Tele. AECC Excess Energy | 0 | 8,083,973 | 0.00 | 266,379.39 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 11,975,579 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 14,206,469 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 8,775,642 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 4,440,083 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 3,421,107 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 6,292,389 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 5,295,338 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 1,215,735.84 | 0.00 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | (277,165.89) |
| Fiber Optic Equalization | 0 | 0 | 0.00 | (77,957.98) |
| Bandwidth Pymt/Receipt-Opinion Nos. 480 & 480-A | 0 | 0 | 2,062,000.00 | 0.00 |
| **Subtotal Purchases and Sales - Associated Companies** | **32,027,550** | **227,907,917** | **5,324,138.98** | **10,498,920.50** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (12,513.56) | 0.00 |
| Energy Supp. for Sales | 1,549,246 | 0 | 119,887.89 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 3,283.24 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 5,667.60 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 2,453.89 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 5,876.61 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.04) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.02 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 1,163.11 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 497.37 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.03 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.04) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 778.51 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.34 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 456.21 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 2,192.99 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 1,399.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 2,975.90 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 1.67 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **1,549,246** | **0** | **142,514.74** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| AECI RE Energy | 0 | 9,544,439 | 0.00 | 407,299.61 |
| AEP SERVICE CORP. RE Energy | 0 | 529,720 | 0.00 | 18,052.30 |
| AMEREN ENERGY NC. (AE) ACTING RE Energy | 0 | 334,560 | 0.00 | 16,393.44 |
| Ameren Energy Marketing Company RE Energy | 0 | 6,970 | 0.00 | 223.04 |
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 564,431 | 0.00 | 30,254.63 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 1,862,384 | 0.00 | 97,635.84 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 233,494 | 0.00 | 6,601.61 |
| CITIGROUP ENERGY NC RE Energy | 0 | 33,456 | 0.00 | 1,122.87 |
| CLECO RE Energy | 0 | 699,790 | 0.00 | 44,242.50 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 783,010 | 0.00 | 32,552.49 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 522,874 | 0.00 | 20,147.91 |
| CYPRES RE Energy | 0 | 20,463 | 0.00 | 846.28 |
| DB ENERGY TRAD NG LLC RE Energy | 0 | 14,416,465 | 0.00 | 736,245.05 |
| DUKE ENERGY HINDS RE Energy | 0 | 147,968 | 0.00 | 5,625.85 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 133,374 | 0.00 | 4,964.61 |
| ENDURE ENERGY RE Energy | 0 | 198,650 | 0.00 | 9,283.31 |
| ETEC RE Energy | 0 | 163,098 | 0.00 | 7,339.39 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 13,034,879 | 0.00 | 540,336.52 |
| J ARON & COMPANY RE Energy | 0 | 3,327,478 | 0.00 | 170,992.64 |

**Attachment Snapshot: 20100826181933**  **RunID: 17029**  **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**  9-211

**Entergy Electric System**                    Date range - 20100701 through 20100731                    **Attachment 6-MS**
**Intra-System Billing-201007RA**              **Company Summary - Entergy Mississippi, Inc.**              **Page 50**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 690,309 | 0.00 | 46,436.66 |
| JBO RE Energy | 0 | 2,795,808 | 0.00 | 184,135.12 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 200,875 | 0.00 | 5,567.35 |
| MAGNET COVE RE Energy | 0 | 714,090 | 0.00 | 26,159.84 |
| MDEA CROSSROADS RE Energy | 0 | 26,755 | 0.00 | 1,135.26 |
| MEAM CANTON 1    IN RE Energy | 0 | 73,000 | 0.00 | 8,826.43 |
| MEAM CANTON 2    IN RE Energy | 0 | 83,000 | 0.00 | 10,035.53 |
| MEAM CANTON 3    IN RE Energy | 0 | 84,000 | 0.00 | 10,156.44 |
| MEAM CANTON 4    IN RE Energy | 0 | 84,000 | 0.00 | 10,156.44 |
| MEAM CANTON 5    IN RE Energy | 0 | 82,000 | 0.00 | 9,914.62 |
| MEAM HENDERSON 10 IN RE Energy | 0 | 58,000 | 0.00 | 7,012.78 |
| MEAM HENDERSON 11 IN RE Energy | 0 | 59,000 | 0.00 | 7,133.69 |
| MEAM HENDERSON 2  IN RE Energy | 0 | 524,000 | 0.00 | 63,355.61 |
| MEAM HENDERSON 4  IN RE Energy | 0 | 72,000 | 0.00 | 8,705.52 |
| MEAM HENDERSON 5  IN RE Energy | 0 | 72,000 | 0.00 | 8,705.52 |
| MEAM HENDERSON 6  IN RE Energy | 0 | 73,000 | 0.00 | 8,826.43 |
| MEAM HENDERSON 7  IN RE Energy | 0 | 76,000 | 0.00 | 9,189.16 |
| MEAM HENDERSON 8  IN RE Energy | 0 | 74,000 | 0.00 | 8,947.34 |
| MEAM HENDERSON 9  IN RE Energy | 0 | 54,000 | 0.00 | 6,529.14 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 27,053,226 | 0.00 | 1,331,865.81 |
| MORGAN STANLEY RE Energy | 0 | 34,292 | 0.00 | 816.61 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 31,085,352 | 0.00 | 1,504,525.39 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 794,302 | 0.00 | 50,326.31 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 1,941,010 | 0.00 | 62,340.08 |
| SMEPA RE Energy | 0 | 418,200 | 0.00 | 37,330.24 |
| SOUTHERN COMPANY SERVICES  INC. AS AGENT FO RE Energy | 0 | 1,554,310 | 0.00 | 192,051.39 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 9,088,455 | 0.00 | 431,720.89 |
| TEA RE Energy | 0 | 155,570 | 0.00 | 4,559.48 |
| TENASKA FRONTIER RE Energy | 0 | 166,087 | 0.00 | 6,258.00 |
| TENASKA RE Energy | 0 | 3,540,763 | 0.00 | 212,764.09 |
| UNION POWER PARTNERS RE Energy | 0 | 22,990,829 | 0.00 | 1,154,092.08 |
| WESTAR ENERGY  NC RE Energy | 0 | 5,197,380 | 0.00 | 180,610.47 |
| WRIGHTSVILE POWER RE Energy | 0 | 118,533 | 0.00 | 5,009.24 |
| YAZOO CITY RE Energy | 0 | 734 | 0.00 | 32.46 |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 229,434.98 |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.04) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.10) |
| JAP - MEAM ENG CHG | 0 | 0 | 0.00 | (2.03) |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.14) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.14) |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.02) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.11) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.13 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 418.20 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 101.63 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.06) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **156,592,383** | **0.00** | **7,995,343.61** |
| | | | | |
| **Totals** | **33,576,796** | **384,500,300** | **5,466,653.72** | **18,494,264.11** |
| | | | | |
| **ESI Receivable from Entergy Mississippi, Inc.** | | | | **13,027,610.39** |

**Entergy Electric System**      Date range - 20100701 through 20100731     **Attachment 6-NO**
**Intra-System Billing-201007RA**     Company Summary - Entergy New Orleans, Inc.     **Page 51**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 31,587,544 | 45,025,369 | 1,956,214.96 | 2,623,552.75 |
| Tele. AECC Excess Energy | 0 | 2,621,176 | 0.00 | 86,371.53 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 16,947,775 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 19,989,454 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 13,799,542 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 6,514,363 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 4,846,579 | 0.00 | 0.00 |
| RVRBND 1 - UPP from EGSL Desig. Energy | 0 | 69,777,900 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 8,494,462 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 7,753,353 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 466,393.86 | 0.00 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | 703,783.04 |
| Fiber Optic Equalization | 0 | 0 | 0.00 | 18,451.16 |
| **Subtotal Purchases and Sales - Associated Companies** | **31,587,544** | **195,769,973** | **2,422,608.82** | **3,432,158.48** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (3,998.26) | 0.00 |
| Energy Supp. for Sales | 431,606 | 0 | 29,883.27 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 1,049.04 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 1,810.88 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 784.05 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 1,877.66 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.01 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 371.63 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 158.92 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.01 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 248.75 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.11 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 145.76 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 700.69 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 447.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 950.84 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 0.53 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **431,606** | **0** | **37,112.87** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| AECI RE Energy | 0 | 3,094,753 | 0.00 | 132,065.67 |
| AEP SERVICE CORP. RE Energy | 0 | 171,760 | 0.00 | 5,853.40 |
| AMEREN ENERGY  NC. (AE) ACTING  RE Energy | 0 | 108,480 | 0.00 | 5,315.53 |
| Ameren Energy Marketing Company RE Energy | 0 | 2,260 | 0.00 | 72.32 |
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 183,015 | 0.00 | 9,809.91 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 603,872 | 0.00 | 31,658.15 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 75,710 | 0.00 | 2,140.56 |
| CITIGROUP ENERGY  NC RE Energy | 0 | 10,848 | 0.00 | 364.09 |
| CLECO RE Energy | 0 | 226,908 | 0.00 | 14,346.26 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 253,889 | 0.00 | 10,555.07 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 169,522 | 0.00 | 6,532.24 |
| CYPRES RE Energy | 0 | 6,638 | 0.00 | 274.46 |
| DB ENERGY TRAD NG LLC RE Energy | 0 | 4,674,492 | 0.00 | 238,724.80 |
| DUKE ENERGY HINDS RE Energy | 0 | 47,920 | 0.00 | 1,821.89 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 43,232 | 0.00 | 1,609.44 |
| ENDURE ENERGY RE Energy | 0 | 64,413 | 0.00 | 3,010.19 |
| ETEC RE Energy | 0 | 52,882 | 0.00 | 2,379.67 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 4,226,539 | 0.00 | 175,202.96 |
| J ARON & COMPANY RE Energy | 0 | 1,078,924 | 0.00 | 55,443.44 |

Attachment Snapshot: 20100826181933     **RunID: 17029**     Billing Snapshot: 20100826175238

**2011 ETI Rate Case**            9-213

**Entergy Electric System**   **Date range - 20100701 through 20100731**   **Attachment 6-NO**
**Intra-System Billing-201007RA**   **Company Summary - Entergy New Orleans, Inc.**   **Page 52**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 223,829 | 0.00 | 15,056.82 |
| JBO RE Energy | 0 | 906,533 | 0.00 | 59,705.32 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 65,133 | 0.00 | 1,805.19 |
| MAGNET COVE RE Energy | 0 | 231,513 | 0.00 | 8,481.26 |
| MDEA CROSSROADS RE Energy | 0 | 8,680 | 0.00 | 368.22 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 8,771,914 | 0.00 | 431,852.92 |
| MORGAN STANLEY RE Energy | 0 | 11,118 | 0.00 | 264.74 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 10,079,323 | 0.00 | 487,837.23 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 257,550 | 0.00 | 16,318.15 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 629,363 | 0.00 | 20,213.51 |
| SMEPA RE Energy | 0 | 135,600 | 0.00 | 12,104.24 |
| SOUTHERN COMPANY SERVICES  INC. AS AGENT FO RE Energy | 0 | 503,980 | 0.00 | 62,272.05 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 2,946,902 | 0.00 | 139,984.20 |
| TEA RE Energy | 0 | 50,443 | 0.00 | 1,478.40 |
| TENASKA FRONTIER RE Energy | 0 | 53,858 | 0.00 | 2,029.38 |
| TENASKA RE Energy | 0 | 1,148,074 | 0.00 | 68,987.77 |
| UNION POWER PARTNERS RE Energy | 0 | 7,454,707 | 0.00 | 374,211.01 |
| WESTAR ENERGY  NC RE Energy | 0 | 1,685,241 | 0.00 | 58,562.31 |
| WRIGHTSVILE POWER RE Energy | 0 | 38,409 | 0.00 | 1,623.20 |
| YAZOO CITY RE Energy | 0 | 237 | 0.00 | 10.49 |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 74,393.55 |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.01) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.03) |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.04) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.05) |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.01) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.04) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.04 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 135.60 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 32.95 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.02) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **50,298,464** | **0.00** | **2,534,908.40** |
| **Totals** | **32,019,150** | **246,068,437** | **2,459,721.69** | **5,967,066.88** |
| **ESI Receivable from Entergy New Orleans, Inc.** | | | | **3,507,345.19** |

**Attachment Snapshot:** 20100826181933          **RunID:  17029**          **Billing Snapshot:** 20100826175238

**2011 ETI Rate Case**                                                            9-214

| Entergy Electric System | Date range - 20100701 through 20100731 | Attachment 6-EGSL |
|---|---|---|
| Intra-System Billing-201007RA | Company Summary - Entergy Gulf States Louisiana, LLC | Page 53 |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 388,628,993 | 8,681,301 | 23,688,200.69 | 328,900.36 |
| Tele. AECC Excess Energy | 0 | 11,105,658 | 0.00 | 365,958.24 |
| ACADIA POWER PARTNERS, LLC/WSPP B - UPP from LA Desig. Energy | 0 | 59,708,320 | 0.00 | 0.00 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 15,851,160 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 18,809,417 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 11,616,357 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 5,876,574 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 4,526,010 | 0.00 | 0.00 |
| LEWIS CREEK 1 - UPP from ETI Desig. Energy | 0 | 58,217,025 | 0.00 | 0.00 |
| LEWIS CREEK 2 - UPP from ETI Desig. Energy | 0 | 65,725,375 | 0.00 | 0.00 |
| PERVIL 1 - UPP from LA Desig. Energy | 0 | 194,914,500 | 0.00 | 0.00 |
| SABINE 1 - UPP from ETI Desig. Energy | 0 | 51,146,250 | 0.00 | 0.00 |
| SABINE 2 - UPP from ETI Desig. Energy | 0 | 50,562,050 | 0.00 | 0.00 |
| SABINE 3 - UPP from ETI Desig. Energy | 0 | 80,097,500 | 0.00 | 0.00 |
| SABINE 4 - UPP from ETI Desig. Energy | 0 | 76,167,950 | 0.00 | 0.00 |
| SABINE 5 - UPP from ETI Desig. Energy | 0 | 70,933,725 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 8,331,086 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 7,011,078 | 0.00 | 0.00 |
| CALCAS EU 1 Desig. Energy | 4,690,725 | 0 | 0.00 | 0.00 |
| CALCAS EU 2 Desig. Energy | 5,250,450 | 0 | 0.00 | 0.00 |
| NELSON 3 Desig. Energy | 5,192,225 | 0 | 0.00 | 0.00 |
| NELSON 4 Desig. Energy | 62,280,775 | 0 | 0.00 | 0.00 |
| PERVIL 1 Desig. Energy | 82,838,753 | 0 | 0.00 | 0.00 |
| RVRBND 1 Desig. Energy | 416,923,129 | 0 | 0.00 | 0.00 |
| WILLOW GLEN 1 Desig. Energy | 5,445,950 | 0 | 0.00 | 0.00 |
| WILLOW GLEN 2 Desig. Energy | 10,391,250 | 0 | 0.00 | 0.00 |
| WILLOW GLEN 4 Desig. Energy | 77,447,750 | 0 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 0.00 | 136,245.95 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | 742,024.61 |
| **Subtotal Purchases and Sales - Associated Companies** | **1,059,090,000** | **799,281,336** | **23,688,200.69** | **1,573,129.16** |

| **Non-Associated Companies - Joint Account Sales** | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| Net Balance for Sales | 0 | 0 | (16,932.22) | 0.00 |
| Energy Supp. for Sales | 1,912,208 | 0 | 130,511.51 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| CENTRAL LA ELEC CO ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 4,442.59 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 7,668.89 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 3,320.38 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 7,951.70 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.05) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.03 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 1,573.82 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 672.99 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.04 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.05) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 1,053.41 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.47 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 617.31 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 2,967.35 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 1,893.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 4,026.72 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 2.25 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **1,912,208** | **0** | **161,128.13** | **0.00** |

| **Non-Associated Companies - Joint Account Purchases** | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| ACADIA POWER PARTNERS, LLC RE Energy | 0 | 0 | 0.00 | (0.01) |
| AECI RE Energy | 0 | 13,111,621 | 0.00 | 559,525.81 |

Attachment Snapshot: 20100826181933     RunID: 17029     Billing Snapshot: 20100826175238

**Entergy Electric System**      Date range - 20100701 through 20100731      **Attachment 6-EGSL**
**Intra-System Billing-201007RA**      Company Summary - Entergy Gulf States Louisiana, LLC      **Page 54**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| AEP SERVICE CORP. RE Energy | 0 | 727,700 | 0.00 | 24,799.18 |
| AMEREN ENERGY NC. (AE) ACTING RE Energy | 0 | 459,600 | 0.00 | 22,520.40 |
| Ameren Energy Marketing Company RE Energy | 0 | 9,575 | 0.00 | 306.40 |
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 775,383 | 0.00 | 41,562.12 |
| CALP NE A BASE IN RE Energy | 0 | 137,098,200 | 0.00 | 4,886,179.84 |
| CALP NE B BASE IN RE Energy | 0 | 98,223,400 | 0.00 | 3,779,830.92 |
| CALP NE C BASE IN RE Energy | 0 | 5,787,100 | 0.00 | 275,641.39 |
| CALP NE B RAMP IN RE Energy | 0 | 1,973,300 | 0.00 | 75,957.00 |
| CALP NE C RAMP IN RE Energy | 0 | 34,100 | 0.00 | 1,317.79 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 2,558,432 | 0.00 | 134,126.16 |
| CALP NE EXCESS N RE Energy | 0 | 422,000 | 0.00 | 14,994.68 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 320,760 | 0.00 | 9,068.87 |
| CITIGROUP ENERGY NC RE Energy | 0 | 45,959 | 0.00 | 1,542.49 |
| CLECO RE Energy | 0 | 961,242 | 0.00 | 60,771.75 |
| CONOCOPH LLIPS COMPANY RE Energy | 0 | 1,969,375 | 0.00 | 117,903.00 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 1,075,654 | 0.00 | 44,718.46 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 718,363 | 0.00 | 27,680.48 |
| CYPRES RE Energy | 0 | 28,106 | 0.00 | 1,162.40 |
| DB ENERGY TRAD NG LLC RE Energy | 0 | 19,804,486 | 0.00 | 1,011,410.14 |
| DOW P PELINE COMPANY RE Energy | 0 | 2,127,500 | 0.00 | 132,892.87 |
| DUKE ENERGY HINDS RE Energy | 0 | 203,359 | 0.00 | 7,732.15 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 183,255 | 0.00 | 6,821.62 |
| ENDURE ENERGY RE Energy | 0 | 272,879 | 0.00 | 12,752.13 |
| ETEC RE Energy | 0 | 224,050 | 0.00 | 10,082.27 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 17,906,524 | 0.00 | 742,280.74 |
| J ARON & COMPANY RE Energy | 0 | 4,571,051 | 0.00 | 234,897.47 |
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 948,303 | 0.00 | 63,791.79 |
| JBO RE Energy | 0 | 3,840,670 | 0.00 | 252,951.97 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 275,952 | 0.00 | 7,648.14 |
| MAGNET COVE RE Energy | 0 | 980,951 | 0.00 | 35,935.90 |
| MDEA CROSSROADS RE Energy | 0 | 36,766 | 0.00 | 1,560.00 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 37,164,138 | 0.00 | 1,829,640.85 |
| MORGAN STANLEY RE Energy | 0 | 47,110 | 0.00 | 1,121.82 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 42,703,074 | 0.00 | 2,066,821.42 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 1,091,166 | 0.00 | 69,135.39 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 2,666,424 | 0.00 | 85,638.22 |
| SMEPA RE Energy | 0 | 574,496 | 0.00 | 51,281.84 |
| SOUTHERN COMPANY SERVICES INC. AS AGENT FO RE Energy | 0 | 2,135,225 | 0.00 | 263,829.55 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 12,485,194 | 0.00 | 593,072.66 |
| TEA RE Energy | 0 | 213,711 | 0.00 | 6,263.48 |
| TENASKA FRONTIER RE Energy | 0 | 228,269 | 0.00 | 8,601.20 |
| TENASKA RE Energy | 0 | 4,864,077 | 0.00 | 292,282.06 |
| UNION POWER PARTNERS RE Energy | 0 | 31,583,431 | 0.00 | 1,585,423.12 |
| WESTAR ENERGY NC RE Energy | 0 | 7,139,870 | 0.00 | 248,112.40 |
| WRIGHTSVILE POWER RE Energy | 0 | 162,823 | 0.00 | 6,880.95 |
| YAZOO CITY RE Energy | 0 | 1,011 | 0.00 | 44.72 |
| CALP NE-CARVILLE - STARTUP CHG - 0 | 0 | 0 | 0.00 | 196,850.41 |
| CARVILLE - 485 MW - CAP CHG | 0 | 0 | 0.00 | 2,430,000.00 |
| CONOCO PHIL PS - 100 MW - CAP CHG | 0 | 0 | 0.00 | 94,875.00 |
| DOW - 100 MW - CAP CHG | 0 | 0 | 0.00 | 86,250.00 |
| DOW P PELINE COMPANY ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.29 |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 315,185.06 |
| JAP - ACADIA ADJ ENG CHG | 0 | 0 | 0.00 | 0.01 |
| JAP - CONOCO ENG CHG | 0 | 0 | 0.00 | (0.05) |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.06) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.14) |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.19) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.20) |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.03) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.15) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.18 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 574.50 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 139.61 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.09) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **460,735,635** | **0.00** | **22,832,390.15** |
| | | | | |
| **Totals** | **1,061,002,208** | **1,260,016,971** | **23,849,328.82** | **24,405,519.31** |
| | | | | |
| **ESI Receivable from Entergy Gulf States Louisiana, LLC** | | | | **556,190.49** |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**     

**Entergy Electric System**  Date range - 20100701 through 20100731  **Attachment 6-ETI**
**Intra-System Billing-201007RA**  **Company Summary - Entergy Texas, Inc**  **Page 55**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 2,259,218 | 328,392,353 | 181,081.08 | 19,143,734.58 |
| Tele. AECC Excess Energy | 0 | 9,487,663 | 0.00 | 312,641.59 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 16,654,966 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 19,768,134 | 0.00 | 0.00 |
| CALCAS EU 1 - UPP from EGSL Desig. Energy | 0 | 4,690,725 | 0.00 | 0.00 |
| CALCAS EU 2 - UPP from EGSL Desig. Energy | 0 | 5,250,450 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 12,205,279 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 6,173,783 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 4,757,472 | 0.00 | 0.00 |
| NELSON 3 - UPP from EGSL Desig. Energy | 0 | 5,192,225 | 0.00 | 0.00 |
| NELSON 4 - UPP from EGSL Desig. Energy | 0 | 62,280,775 | 0.00 | 0.00 |
| PERVIL 1 - UPP from EGSL Desig. Energy | 0 | 82,838,753 | 0.00 | 0.00 |
| RVRBND 1 - UPP from EGSL Desig. Energy | 0 | 207,589,429 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 8,755,797 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 7,368,498 | 0.00 | 0.00 |
| WILLOW GLEN 1 - UPP from EGSL Desig. Energy | 0 | 5,445,950 | 0.00 | 0.00 |
| WILLOW GLEN 2 - UPP from EGSL Desig. Energy | 0 | 10,391,250 | 0.00 | 0.00 |
| WILLOW GLEN 4 - UPP from EGSL Desig. Energy | 0 | 77,447,750 | 0.00 | 0.00 |
| LEWIS CREEK 1 Desig. Energy | 58,217,025 | 0 | 0.00 | 0.00 |
| LEWIS CREEK 2 Desig. Energy | 65,725,375 | 0 | 0.00 | 0.00 |
| SABINE 1 Desig. Energy | 51,146,250 | 0 | 0.00 | 0.00 |
| SABINE 2 Desig. Energy | 50,562,050 | 0 | 0.00 | 0.00 |
| SABINE 3 Desig. Energy | 80,097,500 | 0 | 0.00 | 0.00 |
| SABINE 4 Desig. Energy | 76,167,950 | 0 | 0.00 | 0.00 |
| SABINE 5 Desig. Energy | 70,933,725 | 0 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 0.00 | 2,155,389.66 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | (246,255.30) |
| **Subtotal Purchases and Sales - Associated Companies** | **455,109,093** | **874,691,252** | **181,081.08** | **21,365,510.53** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (14,821.28) | 0.00 |
| Energy Supp. for Sales | 1,590,958 | 0 | 109,695.70 | 0.00 |
| AIR LIQUIDE AMERICA - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| BASF CORPORATION - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| CENTRAL LA ELEC CO ENG CHG ADJ - REVENUE | 0 | 0 | (0.01) | 0.00 |
| COTTONWOOD ENERGY CO - GEN REG | 0 | 0 | 3,888.73 | 0.00 |
| CYPRES - GEN REG | 0 | 0 | 6,712.81 | 0.00 |
| DOW CHEMICAL - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 2,906.42 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 6,960.36 | 0.00 |
| FORMOSA PLASTICS - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| GRAND RIVER DAM AUTHORITY ENG CHG ADJ - REVENUE | 0 | 0 | (0.04) | 0.00 |
| HUNTSMAN P.N. - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| KANSAS CITY POWER & LIGHT COMP ENG CHG ADJ - REVENUE | 0 | 0 | 0.03 | 0.00 |
| MAGNET COVE - GEN REG | 0 | 0 | 1,377.61 | 0.00 |
| MDEA CROSSROADS - GEN REG | 0 | 0 | 589.09 | 0.00 |
| MISSOURI PUBLIC SERVICE ENG CHG ADJ - REVENUE | 0 | 0 | 0.03 | 0.00 |
| NEBRASKA PUBLIC POWER DISTRICT ENG CHG ADJ - REVENUE | 0 | 0 | (0.04) | 0.00 |
| OCCIDENTAL CHEM CORP - GEN REG | 0 | 0 | 922.08 | 0.00 |
| PINE BLUFF ENERGY - GEN REG | 0 | 0 | 0.41 | 0.00 |
| PPG INDUSTR ES - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| SRW COGENERATION - GEN REG | 0 | 0 | 540.35 | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 2,597.42 | 0.00 |
| UNION CARBIDE CORP - ANN FEE | 0 | 0 | 1,657.00 | 0.00 |
| WRIGHTSVILE POWER - GEN REG | 0 | 0 | 3,524.71 | 0.00 |
| YAZOO CITY - GEN REG | 0 | 0 | 1.97 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **1,590,958** | **0** | **136,495.35** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| AECI RE Energy | 0 | 11,201,365 | 0.00 | 478,007.57 |
| AEP SERVICE CORP. RE Energy | 0 | 621,680 | 0.00 | 21,186.20 |
| AMEREN ENERGY  NC. (AE) ACTING  RE Energy | 0 | 392,640 | 0.00 | 19,239.34 |
| Ameren Energy Marketing Company RE Energy | 0 | 8,180 | 0.00 | 261.76 |

Attachment Snapshot: 20100826181933  RunID: 17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-217

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 6-ETI**
**Intra-System Billing-201007RA**  **Company Summary - Entergy Texas, Inc**  **Page 56**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| BNP PARIBAS ENERGY TRADING GP RE Energy | 0 | 662,416 | 0.00 | 35,506.97 |
| CALP NE ENERGY SERVICES L.P. RE Energy | 0 | 2,185,696 | 0.00 | 114,585.23 |
| CARGILL POWER MARKETS LLC RE Energy | 0 | 274,031 | 0.00 | 7,747.73 |
| CITIGROUP ENERGY  NC RE Energy | 0 | 39,264 | 0.00 | 1,317.80 |
| CLECO RE Energy | 0 | 821,270 | 0.00 | 51,922.59 |
| CONOCOPH LLIPS COMPANY  RE Energy | 0 | 1,575,625 | 0.00 | 94,510.83 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 918,941 | 0.00 | 38,203.61 |
| COTTONWOOD ENERGY CO RE Energy | 0 | 613,669 | 0.00 | 23,646.38 |
| CYPRES RE Energy | 0 | 24,013 | 0.00 | 993.07 |
| DB ENERGY TRAD NG LLC RE Energy | 0 | 16,919,189 | 0.00 | 864,058.62 |
| DOW P PELINE COMPANY RE Energy | 0 | 1,572,500 | 0.00 | 98,225.13 |
| DUKE ENERGY HINDS RE Energy | 0 | 173,693 | 0.00 | 6,603.99 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 156,582 | 0.00 | 5,828.80 |
| ENDURE ENERGY RE Energy | 0 | 233,125 | 0.00 | 10,894.33 |
| ETEC EXCESS-HRSNHRDN RE Energy | 0 | 4,937 | 0.00 | 176.69 |
| ETEC RE Energy | 0 | 191,412 | 0.00 | 8,613.51 |
| EXELON FRONT ER 10YR RE Energy | 0 | 93,424,000 | 0.00 | 3,266,581.59 |
| EXELON GENERATION COMPANY LLC RE Energy | 0 | 15,297,742 | 0.00 | 634,138.34 |
| HARDIN RE Energy | 0 | 9,029,000 | 0.00 | 488,396.52 |
| J ARON & COMPANY RE Energy | 0 | 3,905,132 | 0.00 | 200,676.84 |
| J.P. MORGAN VENTURES ENERGY CORPORATION RE Energy | 0 | 810,147 | 0.00 | 54,498.11 |
| JBO RE Energy | 0 | 3,281,160 | 0.00 | 216,101.01 |
| KANSAS CITY POWER & LIGHT COMPANY RE Energy | 0 | 235,748 | 0.00 | 6,533.86 |
| MAGNET COVE RE Energy | 0 | 838,011 | 0.00 | 30,699.64 |
| MDEA CROSSROADS RE Energy | 0 | 31,413 | 0.00 | 1,332.85 |
| MERRILL LYNCH COMMODITIES INC RE Energy | 0 | 31,749,681 | 0.00 | 1,563,079.13 |
| MORGAN STANLEY RE Energy | 0 | 40,246 | 0.00 | 958.37 |
| NRG POWER MARKETING LLC. RE Energy | 0 | 36,481,830 | 0.00 | 1,765,715.06 |
| OCCIDENTAL POWER SERVICES RE Energy | 0 | 932,192 | 0.00 | 59,062.49 |
| RAINBOW ENERGY MARKETING CORP RE Energy | 0 | 2,277,962 | 0.00 | 73,162.10 |
| SAN JACINTO 1 RE Energy | 0 | 5,722,000 | 0.00 | 353,399.75 |
| SAN JACINTO 2 RE Energy | 0 | 5,612,000 | 0.00 | 346,601.58 |
| SMEPA RE Energy | 0 | 490,800 | 0.00 | 43,810.72 |
| SOUTHERN COMPANY SERVICES  INC. AS AGENT FO RE Energy | 0 | 1,824,140 | 0.00 | 225,391.64 |
| SUEZ Energy Marketing NA Inc. RE Energy | 0 | 10,666,236 | 0.00 | 506,668.80 |
| TEA RE Energy | 0 | 182,578 | 0.00 | 5,351.05 |
| TENASKA FRONTIER RE Energy | 0 | 194,958 | 0.00 | 7,346.06 |
| TENASKA RE Energy | 0 | 4,155,437 | 0.00 | 249,700.11 |
| UNION POWER PARTNERS RE Energy | 0 | 26,982,052 | 0.00 | 1,354,443.71 |
| WESTAR ENERGY  NC RE Energy | 0 | 6,099,672 | 0.00 | 211,965.28 |
| WRIGHTSVILE POWER RE Energy | 0 | 139,079 | 0.00 | 5,877.43 |
| YAZOO CITY RE Energy | 0 | 863 | 0.00 | 38.17 |
| CONOCO PHIL PS - 100 MW - CAP CHG | 0 | 0 | 0.00 | 70,125.00 |
| DOW - 100 MW - CAP CHG | 0 | 0 | 0.00 | 63,750.00 |
| DOW P PELINE COMPANY ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.21 |
| ETEC - STARTUP CHG - 0 | 0 | 0 | 0.00 | 46,121.40 |
| ETEC - STARTUP CHG - 1 | 0 | 0 | 0.00 | 39,203.19 |
| ETEC SAN JAC- 146 MW - CAP CHG | 0 | 0 | 0.00 | 985,500.00 |
| EXELON 150 10YR- CAP CHG | 0 | 0 | 0.00 | 1,527,900.00 |
| EXELON 150 1YR- CAP CHG | 0 | 0 | 0.00 | 269,265.15 |
| EXELON GENERATION COMPANY LLC - STARTUP CHG - 0 | 0 | 0 | 0.00 | 70,880.00 |
| JAP - CONOCO ENG CHG | 0 | 0 | 0.00 | (0.03) |
| JAP - DB ENERGY ENG CHG | 0 | 0 | 0.00 | (0.05) |
| JAP - EXELON ENG CHG | 0 | 0 | 0.00 | (0.12) |
| JAP - HARDIN ENG CHG | 0 | 0 | 0.00 | 0.01 |
| JAP - MLCI ENG CHG | 0 | 0 | 0.00 | (0.16) |
| JAP - NRG ENG CHG | 0 | 0 | 0.00 | (0.17) |
| JAP - SAN JAC ENG CHG | 0 | 0 | 0.00 | 0.05 |
| JAP - SUEZ ENG CHG | 0 | 0 | 0.00 | (0.03) |
| JAP - UNION ENG CHG | 0 | 0 | 0.00 | (0.13) |
| MERRILL LYNCH COMMODITIES ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | 0.16 |
| SWPP RESER - CAP CHG | 0 | 0 | 0.00 | 490.80 |
| SWPP TARIFF CHG | 0 | 0 | 0.00 | 119.27 |
| UNION POWER PARTNERS LP ENG CHG ADJ - EXPENSE | 0 | 0 | 0.00 | (0.07) |
| **Subtotal Non-Associated Companies - Joint Account Purchases** | **0** | **298,994,307** | **0.00** | **16,626,414.84** |
| | | | | |
| **Totals** | **456,700,051** | **1,173,685,559** | **317,576.43** | **37,991,925.37** |
| | | | | |
| **ESI Receivable from Entergy Texas, Inc** | | | | **37,674,348.94** |

**Attachment Snapshot: 20100826181933**  **RunID:  17029**  **Billing Snapshot: 20100826175238**

**2011 ETI Rate Case**  9-218

**Entergy Electric System**  **Date range - 20100701 through 20100731**  **Attachment 6-System**
**Intra-System Billing-201007RA**  **System Summary**  **Page 57**

| | |
|---|---|
| Net Receivable from Entergy Arkansas, Inc. | 18,197,161.09 |
| Net Receivable from Entergy Louisiana, LLC | 24,051,214.36 |
| Net Receivable from Entergy Mississippi, Inc. | 13,027,610.39 |
| Net Receivable from Entergy New Orleans, Inc. | 3,507,345.19 |
| Net Receivable from Entergy Gulf States Louisiana, LLC | 556,190.49 |
| Net Receivable from Entergy Texas, Inc | 37,674,348.94 |
| **Net Receivable from System Companies** | **97,013,870.46** |
| **Net Payable to Outside Companies** | **(97,013,870.46)** |

Attachment Snapshot: 20100826181933  RunID: 17029  Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-219

**Entergy Electric System**　　　　　　　Date range - 20100701 through 20100731　　　　　　　**Attachment 11**
**Intra-System Billing-201007RA**　　　　　Joint Account / Individual Company Purchases　　　　　　**Page 58**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| **ACADIA POWER PARTNERS, LLC/WSPP B** | | | |
| LA | 179,125,000 | 34 0933 | 6,106,961.20 |
| **Total** | **179,125,000** | **34.0933** | **6,106,961.20** |
| | | | |
| **AECI/WSPP A** | | | |
| AR | 499,659 | 28 6147 | 14,297.61 |
| LA | 601,840 | 28 6147 | 17,221.49 |
| MS | 333,584 | 28 6147 | 9,545.41 |
| NO | 108,163 | 28 6147 | 3,095 05 |
| EGSL | 458,259 | 28 6147 | 13,112.93 |
| ETI | 391,495 | 28 6147 | 11,202.51 |
| **Total** | **2,393,000** | **28.6147** | **68,475.00** |
| | | | |
| **AECI/WSPP B** | | | |
| AR | 4,176,000 | 38 0000 | 158,688 00 |
| LA | 5,030,000 | 38 0000 | 191,140 00 |
| MS | 2,788,000 | 38 0000 | 105,944 00 |
| NO | 904,000 | 38 0000 | 34,352.00 |
| EGSL | 3,830,000 | 38 0000 | 145,540 00 |
| ETI | 3,272,000 | 38 0000 | 124,336 00 |
| **Total** | **20,000,000** | **38.0000** | **760,000.00** |
| | | | |
| **AECI/WSPP C SYSTEM FIRM** | | | |
| AR | 9,620,460 | 45.4331 | 437,087 56 |
| LA | 11,587,863 | 45.4331 | 526,472 93 |
| MS | 6,422,855 | 45.4331 | 291,810 20 |
| NO | 2,082,590 | 45.4331 | 94,618.62 |
| EGSL | 8,823,362 | 45.4331 | 400,872 88 |
| ETI | 7,537,870 | 45.4331 | 342,469 06 |
| **Total** | **46,075,000** | **45.4331** | **2,093,331.25** |
| | | | |
| **AEP SERVICE CORP./WSPP A** | | | |
| AR | 626,400 | 30.1000 | 18,854.63 |
| LA | 754,500 | 30.1000 | 22,710.45 |
| MS | 418,200 | 30.1000 | 12,587.82 |
| NO | 135,600 | 30.1000 | 4,081 56 |
| EGSL | 574,500 | 30.1000 | 17,292.46 |
| ETI | 490,800 | 30.1000 | 14,773.08 |
| **Total** | **3,000,000** | **30.1000** | **90,300.00** |
| | | | |
| **AEP SERVICE CORP./WSPP C** | | | |
| AR | 167,040 | 49 0000 | 8,184 96 |
| LA | 201,200 | 49 0000 | 9,858 88 |
| MS | 111,520 | 49 0000 | 5,464.48 |
| NO | 36,160 | 49 0000 | 1,771 84 |
| EGSL | 153,200 | 49 0000 | 7,506.72 |
| ETI | 130,880 | 49 0000 | 6,413.12 |
| **Total** | **800,000** | **49.0000** | **39,200.00** |
| | | | |
| **AMEREN ENERGY INC. (AE) ACTING /WSPP C SYSTEM FIRM** | | | |
| AR | 501,120 | 49 0000 | 24,554.89 |
| LA | 603,600 | 49 0000 | 29,576.40 |
| MS | 334,560 | 49 0000 | 16,393.44 |
| NO | 108,480 | 49 0000 | 5,315 53 |
| EGSL | 459,600 | 49 0000 | 22,520.40 |
| ETI | 392,640 | 49 0000 | 19,239.34 |
| **Total** | **2,400,000** | **49.0000** | **117,600.00** |
| | | | |
| **AMEREN ENERGY MARKETING COMPANY/WSPP A** | | | |
| AR | 10,440 | 32 0000 | 334 08 |
| LA | 12,575 | 32 0000 | 402.40 |
| MS | 6,970 | 32 0000 | 223 04 |
| NO | 2,260 | 32 0000 | 72.32 |
| EGSL | 9,575 | 32 0000 | 306.40 |
| ETI | 8,180 | 32 0000 | 261.76 |
| **Total** | **50,000** | **32.0000** | **1,600.00** |
| | | | |
| **BNP PAR BAS ENERGY TRAD NG GP/WSPP A** | | | |
| AR | 41,760 | 35 5000 | 1,482.48 |
| LA | 50,300 | 35 5000 | 1,785 65 |
| MS | 27,880 | 35 5000 | 989.74 |
| NO | 9,040 | 35 5000 | 320 92 |
| EGSL | 38,300 | 35 5000 | 1,359 65 |

**Entergy Electric System**      Date range - 20100701 through 20100731      **Attachment 11**
**Intra-System Billing-201007RA**      Joint Account / Individual Company Purchases      **Page 59**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| ETI | 32,720 | 35 5000 | 1,161 56 |
| **Total** | **200,000** | **35.5000** | **7,100.00** |
| | | | |
| BNP PAR BAS ENERGY TRAD NG GP/WSPP B | | | |
| AR | 803,671 | 54 5427 | 43,834.51 |
| LA | 968,024 | 54 5427 | 52,798.73 |
| MS | 536,551 | 54 5427 | 29,264.89 |
| NO | 173,975 | 54 5427 | 9,488 99 |
| EGSL | 737,083 | 54 5427 | 40,202.47 |
| ETI | 629,696 | 54 5427 | 34,345.41 |
| **Total** | **3,849,000** | **54.5427** | **209,935.00** |
| | | | |
| BURAS TEMP | | | |
| LA | 131,908 | 260 5153 | 34,364.05 |
| **Total** | **131,908** | **260.5153** | **34,364.05** |
| | | | |
| CALPINE  A BASE   N | | | |
| EGSL | 137,098,200 | 35 6400 | 4,886,179.84 |
| **Total** | **137,098,200** | **35.6400** | **4,886,179.84** |
| | | | |
| CALPINE  B BASE   N | | | |
| EGSL | 98,223,400 | 38.4820 | 3,779,830.92 |
| **Total** | **98,223,400** | **38.4820** | **3,779,830.92** |
| | | | |
| CALPINE  C BASE   IN | | | |
| EGSL | 5,787,100 | 47 6303 | 275,641 39 |
| **Total** | **5,787,100** | **47.6303** | **275,641.39** |
| | | | |
| CALPINE B RAMP IN | | | |
| EGSL | 1,973,300 | 38.4924 | 75,957.00 |
| **Total** | **1,973,300** | **38.4924** | **75,957.00** |
| | | | |
| CALPINE C RAMP IN | | | |
| EGSL | 34,100 | 38 6449 | 1,317.79 |
| **Total** | **34,100** | **38.6449** | **1,317.79** |
| | | | |
| CALPINE ENERGY SERVICES L P /WSPP B | | | |
| AR | 2,789,568 | 52.4251 | 146,243 56 |
| LA | 3,360,048 | 52.4251 | 176,151 06 |
| MS | 1,862,384 | 52.4251 | 97,635.84 |
| NO | 603,872 | 52.4251 | 31,658.15 |
| EGSL | 2,558,432 | 52.4251 | 134,126.16 |
| ETI | 2,185,696 | 52.4251 | 114,585 23 |
| **Total** | **13,360,000** | **52.4251** | **700,400.00** |
| | | | |
| CALPINE EXCESS IN | | | |
| EGSL | 422,000 | 35 5324 | 14,994.68 |
| **Total** | **422,000** | **35.5324** | **14,994.68** |
| | | | |
| CARGILL POWER MARKETS LLC/WSPP A | | | |
| AR | 349,740 | 28 2731 | 9,888 24 |
| LA | 421,265 | 28 2731 | 11,910.49 |
| MS | 233,494 | 28 2731 | 6,601 61 |
| NO | 75,710 | 28 2731 | 2,140 56 |
| EGSL | 320,760 | 28 2731 | 9,068 87 |
| ETI | 274,031 | 28 2731 | 7,747.73 |
| **Total** | **1,675,000** | **28.2731** | **47,357.50** |
| | | | |
| CITIGROUP ENERGY INC/WSPP A | | | |
| AR | 50,112 | 33 5625 | 1,681 88 |
| LA | 60,361 | 33 5625 | 2,025 87 |
| MS | 33,456 | 33 5625 | 1,122 87 |
| NO | 10,848 | 33 5625 | 364 09 |
| EGSL | 45,959 | 33 5625 | 1,542.49 |
| ETI | 39,264 | 33 5625 | 1,317 80 |
| **Total** | **240,000** | **33.5625** | **8,055.00** |
| | | | |
| CLECO/WSPP B | | | |
| AR | 1,048,172 | 63 2225 | 66,267.70 |
| LA | 1,262,618 | 63 2225 | 79,826.20 |
| MS | 699,790 | 63 2225 | 44,242.50 |
| NO | 226,908 | 63 2225 | 14,346.26 |
| EGSL | 961,242 | 63 2225 | 60,771.75 |
| ETI | 821,270 | 63 2225 | 51,922.59 |
| **Total** | **5,020,000** | **63.2225** | **317,377.00** |

Attachment Snapshot: 20100826181933      **RunID: 17029**      Billing Snapshot: 20100826175238

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| **CONOCOPHILLIPS COMPANY / NTRA-DAY CALL OPTION** | | | |
| EGSL | 1,969,375 | 59 9193 | 117,903 00 |
| ETI | 1,575,625 | 59 9193 | 94,510.83 |
| **Total** | **3,545,000** | **59.9193** | **212,413.83** |
| | | | |
| **CONSTELLATION ENERGY COMMODITIES GROUP INC/WSPP A** | | | |
| AR | 37,584 | 30.7500 | 1,155.70 |
| LA | 45,271 | 30.7500 | 1,392 08 |
| MS | 25,092 | 30.7500 | 771 58 |
| NO | 8,136 | 30.7500 | 250.19 |
| EGSL | 34,469 | 30.7500 | 1,059 92 |
| ETI | 29,448 | 30.7500 | 905 53 |
| **Total** | **180,000** | **30.7500** | **5,535.00** |
| | | | |
| **CONSTELLATION ENERGY COMMODITIES GROUP INC/WSPP C** | | | |
| AR | 1,135,245 | 41 9319 | 47,602.94 |
| LA | 1,367,406 | 41 9319 | 57,338.15 |
| MS | 757,918 | 41 9319 | 31,780.91 |
| NO | 245,753 | 41 9319 | 10,304.88 |
| EGSL | 1,041,185 | 41 9319 | 43,658.54 |
| ETI | 889,493 | 41 9319 | 37,298.08 |
| **Total** | **5,437,000** | **41.9319** | **227,983.50** |
| | | | |
| **COTTONWOOD ENERGY CO/EXS50** | | | |
| AR | 41,619 | 20 8668 | 868.44 |
| LA | 50,135 | 20 8668 | 1,046.16 |
| MS | 27,787 | 20 8668 | 579 81 |
| NO | 9,005 | 20 8668 | 187 93 |
| EGSL | 38,172 | 20 8668 | 796 52 |
| ETI | 32,612 | 20 8668 | 680 51 |
| **Total** | **199,330** | **20.8668** | **4,159.37** |
| | | | |
| **COTTONWOOD ENERGY CO/EXS75** | | | |
| AR | 10,037 | 30.4381 | 305.49 |
| LA | 12,102 | 30.4381 | 368 39 |
| MS | 6,703 | 30.4381 | 204 00 |
| NO | 2,169 | 30.4381 | 65.99 |
| EGSL | 9,218 | 30.4381 | 280 59 |
| ETI | 7,868 | 30.4381 | 239 52 |
| **Total** | **48,097** | **30.4381** | **1,463.98** |
| | | | |
| **COTTONWOOD ENERGY CO/EXS90** | | | |
| AR | 438,669 | 40 3917 | 17,718.60 |
| LA | 528,321 | 40 3917 | 21,339.80 |
| MS | 292,830 | 40 3917 | 11,828.07 |
| NO | 94,934 | 40 3917 | 3,834 55 |
| EGSL | 402,325 | 40 3917 | 16,250.50 |
| ETI | 343,686 | 40 3917 | 13,882.01 |
| **Total** | **2,100,765** | **40.3917** | **84,853.53** |
| | | | |
| **COTTONWOOD ENERGY CO/EXSSS50** | | | |
| AR | 2,541 | 18 5781 | 47.21 |
| LA | 3,060 | 18 5781 | 56.85 |
| MS | 1,696 | 18 5781 | 31.51 |
| NO | 550 | 18 5781 | 10.22 |
| EGSL | 2,330 | 18 5781 | 43.28 |
| ETI | 1,990 | 18 5781 | 36.97 |
| **Total** | **12,167** | **18.5781** | **226.04** |
| | | | |
| **COTTONWOOD ENERGY CO/EXSSTSH** | | | |
| AR | 290,367 | 38.7115 | 11,240.56 |
| LA | 349,743 | 38.7115 | 13,539.10 |
| MS | 193,858 | 38.7115 | 7,504 52 |
| NO | 62,864 | 38.7115 | 2,433 55 |
| EGSL | 266,318 | 38.7115 | 10,309.59 |
| ETI | 227,513 | 38.7115 | 8,807 37 |
| **Total** | **1,390,663** | **38.7115** | **53,834.69** |
| | | | |
| **CYPRES/EXS50** | | | |
| AR | 3,999 | 25 0501 | 100.18 |
| LA | 4,816 | 25 0501 | 120 64 |
| MS | 2,669 | 25 0501 | 66.86 |
| NO | 866 | 25 0501 | 21.69 |
| EGSL | 3,667 | 25 0501 | 91.86 |

**Entergy Electric System**
**Intra-System Billing-201007RA**

Date range - 20100701 through 20100731
Joint Account / Individual Company Purchases

**Attachment 11**
**Page 61**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| ETI | 3,133 | 25 0501 | 78.48 |
| **Total** | **19,150** | **25.0501** | **479.71** |
| | | | |
| CYPRES/EXS75 | | | |
| AR | 219 | 37 5714 | 8 23 |
| LA | 264 | 37 5714 | 9 92 |
| MS | 146 | 37 5714 | 5.48 |
| NO | 48 | 37 5714 | 1 80 |
| EGSL | 201 | 37 5714 | 7 56 |
| ETI | 172 | 37 5714 | 6.46 |
| **Total** | **1,050** | **37.5714** | **39.45** |
| | | | |
| CYPRES/EXS90 | | | |
| AR | 26,430 | 43 8542 | 1,159 09 |
| LA | 31,833 | 43 8542 | 1,396 00 |
| MS | 17,648 | 43 8542 | 773 94 |
| NO | 5,724 | 43 8542 | 250 97 |
| EGSL | 24,238 | 43 8542 | 1,062 98 |
| ETI | 20,708 | 43 8542 | 908.13 |
| **Total** | **126,581** | **43.8542** | **5,551.11** |
| | | | |
| DB ENERGY TRADING LLC/WSPP B | | | |
| AR | 21,593,680 | 51 0697 | 1,102,783.95 |
| LA | 26,009,688 | 51 0697 | 1,328,308.08 |
| MS | 14,416,465 | 51 0697 | 736,245 05 |
| NO | 4,674,492 | 51 0697 | 238,724 80 |
| EGSL | 19,804,486 | 51 0697 | 1,011,410.14 |
| ETI | 16,919,189 | 51 0697 | 864,058 62 |
| **Total** | **103,418,000** | **51.0697** | **5,281,530.64** |
| | | | |
| DOW PIPELINE COMPANY/INTRA-DAY CALL OPTION | | | |
| EGSL | 2,127,500 | 62.4643 | 132,892 87 |
| ETI | 1,572,500 | 62.4643 | 98,225.13 |
| **Total** | **3,700,000** | **62.4643** | **231,118.00** |
| | | | |
| DUKE ENERGY HINDS/EXS50 | | | |
| AR | 23,661 | 20 8211 | 492 65 |
| LA | 28,499 | 20 8211 | 593 37 |
| MS | 15,797 | 20 8211 | 328 92 |
| NO | 5,123 | 20 8211 | 106 67 |
| EGSL | 21,701 | 20 8211 | 451 87 |
| ETI | 18,538 | 20 8211 | 385 95 |
| **Total** | **113,319** | **20.8211** | **2,359.43** |
| | | | |
| DUKE ENERGY HINDS/EXS75 | | | |
| AR | 17,266 | 31 3792 | 541 80 |
| LA | 20,807 | 31 3792 | 652 91 |
| MS | 11,523 | 31 3792 | 361 59 |
| NO | 3,726 | 31 3792 | 116 93 |
| EGSL | 15,831 | 31 3792 | 496.77 |
| ETI | 13,524 | 31 3792 | 424 34 |
| **Total** | **82,677** | **31.3792** | **2,594.34** |
| | | | |
| DUKE ENERGY HINDS/EXS90 | | | |
| AR | 180,827 | 40 9076 | 7,397.47 |
| LA | 217,804 | 40 9076 | 8,909 82 |
| MS | 120,648 | 40 9076 | 4,935 34 |
| NO | 39,071 | 40 9076 | 1,598 29 |
| EGSL | 165,827 | 40 9076 | 6,783 51 |
| ETI | 141,631 | 40 9076 | 5,793.70 |
| **Total** | **865,808** | **40.9076** | **35,418.13** |
| | | | |
| DUKEENERGY HOTSPRING/EXS50 | | | |
| AR | 29,273 | 19 2460 | 563.40 |
| LA | 35,260 | 19 2460 | 678 64 |
| MS | 19,538 | 19 2460 | 376 00 |
| NO | 6,334 | 19 2460 | 121 89 |
| EGSL | 26,842 | 19 2460 | 516 59 |
| ETI | 22,927 | 19 2460 | 441 27 |
| **Total** | **140,174** | **19.2460** | **2,697.79** |
| | | | |
| DUKEENERGY HOTSPRING/EXS75 | | | |
| AR | 17,619 | 29 9495 | 527 68 |
| LA | 21,226 | 29 9495 | 635.70 |
| MS | 11,762 | 29 9495 | 352 26 |

Entergy Electric System  Date range - 20100701 through 20100731  **Attachment 11**
Intra-System Billing-201007RA  Joint Account / Individual Company Purchases  **Page 62**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| NO | 3,804 | 29 9495 | 113 89 |
| EGSL | 16,148 | 29 9495 | 483 64 |
| ETI | 13,806 | 29 9495 | 413 52 |
| **Total** | **84,365** | **29.9495** | **2,526.69** |
| | | | |
| DUKEENERGY HOTSPRING/EXS90 | | | |
| AR | 152,741 | 41 5455 | 6,345 83 |
| LA | 183,983 | 41 5455 | 7,643 50 |
| MS | 101,969 | 41 5455 | 4,236 35 |
| NO | 33,061 | 41 5455 | 1,373 66 |
| EGSL | 140,121 | 41 5455 | 5,821 39 |
| ETI | 119,726 | 41 5455 | 4,974 01 |
| **Total** | **731,601** | **41.5455** | **30,394.74** |
| | | | |
| DUKEENERGY HOTSPRING/FREE | | | |
| AR | 156 | 0 0000 | 0 00 |
| LA | 189 | 0 0000 | 0 00 |
| MS | 105 | 0 0000 | 0 00 |
| NO | 33 | 0 0000 | 0 00 |
| EGSL | 144 | 0 0000 | 0 00 |
| ETI | 123 | 0 0000 | 0 00 |
| **Total** | **750** | **0.0000** | **0.00** |
| | | | |
| ENDURE ENERGY/WSPP A | | | |
| AR | 283,965 | 47.7228 | 13,551.56 |
| LA | 342,048 | 47.7228 | 16,323.56 |
| MS | 189,589 | 47.7228 | 9,047.72 |
| NO | 61,475 | 47.7228 | 2,933 80 |
| EGSL | 260,432 | 47.7228 | 12,428.51 |
| ETI | 222,491 | 47.7228 | 10,617.85 |
| **Total** | **1,360,000** | **47.7228** | **64,903.00** |
| | | | |
| ENDURE ENERGY/WSPP B | | | |
| AR | 13,572 | 26 0000 | 352 88 |
| LA | 16,348 | 26 0000 | 425 04 |
| MS | 9,061 | 26 0000 | 235 59 |
| NO | 2,938 | 26 0000 | 76.39 |
| EGSL | 12,447 | 26 0000 | 323 62 |
| ETI | 10,634 | 26 0000 | 276.48 |
| **Total** | **65,000** | **26.0000** | **1,690.00** |
| | | | |
| EPI-ISES ELI     IN | | | |
| LA | 35,090,137 | 18.7385 | 657,536.48 |
| **Total** | **35,090,137** | **18.7385** | **657,536.48** |
| | | | |
| EPI-ISES ENOI IN | | | |
| NO | 34,395,193 | 18.7385 | 644,515 01 |
| **Total** | **34,395,193** | **18.7385** | **644,515.01** |
| | | | |
| ETEC EXCESS-HRSNHRDN | | | |
| ETI | 4,937 | 35.7889 | 176 69 |
| **Total** | **4,937** | **35.7889** | **176.69** |
| | | | |
| ETEC/WSPP B | | | |
| AR | 244,298 | 45 0000 | 10,993.46 |
| LA | 294,260 | 45 0000 | 13,241.70 |
| MS | 163,098 | 45 0000 | 7,339 39 |
| NO | 52,882 | 45 0000 | 2,379 67 |
| EGSL | 224,050 | 45 0000 | 10,082.27 |
| ETI | 191,412 | 45 0000 | 8,613 51 |
| **Total** | **1,170,000** | **45.0000** | **52,650.00** |
| | | | |
| EXELON FRONTIER 10YR | | | |
| ETI | 93,424,000 | 34 9651 | 3,266,581.59 |
| **Total** | **93,424,000** | **34.9651** | **3,266,581.59** |
| | | | |
| EXELON GENERATION COMPANY LLC/DAILY CALL OPTION | | | |
| AR | 19,524,239 | 41.4531 | 809,340 37 |
| LA | 23,517,077 | 41.4531 | 974,855 35 |
| MS | 13,034,879 | 41.4531 | 540,336 52 |
| NO | 4,226,539 | 41.4531 | 175,202 96 |
| EGSL | 17,906,524 | 41.4531 | 742,280.74 |
| ETI | 15,297,742 | 41.4531 | 634,138 34 |
| **Total** | **93,507,000** | **41.4531** | **3,876,154.28** |

Attachment Snapshot: 20100826181933          RunID:  17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**  9-224

Entergy Electric System     Date range - 20100701 through 20100731     **Attachment 11**
Intra-System Billing-201007RA     Joint Account / Individual Company Purchases     **Page 63**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| HARD N | | | |
| ETI | 9,029,000 | 54 0920 | 488,396 52 |
| **Total** | **9,029,000** | **54.0920** | **488,396.52** |
| | | | |
| J ARON & COMPANY/WSPP B | | | |
| AR | 4,984,056 | 51 3880 | 256,121 06 |
| LA | 6,003,359 | 51 3880 | 308,501 05 |
| MS | 3,327,478 | 51 3880 | 170,992 64 |
| NO | 1,078,924 | 51 3880 | 55,443.44 |
| EGSL | 4,571,051 | 51 3880 | 234,897.47 |
| ETI | 3,905,132 | 51 3880 | 200,676 84 |
| **Total** | **23,870,000** | **51.3880** | **1,226,632.50** |
| | | | |
| J.P. MORGAN VENTURES ENERGY CORPORATION/WSPP A | | | |
| AR | 13,990 | 14 0000 | 195 86 |
| LA | 16,851 | 14 0000 | 235 91 |
| MS | 9,340 | 14 0000 | 130.76 |
| NO | 3,028 | 14 0000 | 42.39 |
| EGSL | 12,830 | 14 0000 | 179 62 |
| ETI | 10,961 | 14 0000 | 153.46 |
| **Total** | **67,000** | **14.0000** | **938.00** |
| | | | |
| J.P. MORGAN VENTURES ENERGY CORPORATION/WSPP B | | | |
| AR | 1,019,989 | 68 0000 | 69,359.28 |
| LA | 1,228,582 | 68 0000 | 83,543.57 |
| MS | 680,969 | 68 0000 | 46,305.90 |
| NO | 220,801 | 68 0000 | 15,014.43 |
| EGSL | 935,473 | 68 0000 | 63,612.17 |
| ETI | 799,186 | 68 0000 | 54,344.65 |
| **Total** | **4,885,000** | **68.0000** | **332,180.00** |
| | | | |
| JBO/WSPP A | | | |
| AR | 2,019,305 | 71 3696 | 144,116 87 |
| LA | 2,432,270 | 71 3696 | 173,590 05 |
| MS | 1,348,137 | 71 3696 | 96,215.96 |
| NO | 437,129 | 71 3696 | 31,197.70 |
| EGSL | 1,851,983 | 71 3696 | 132,175 27 |
| ETI | 1,582,176 | 71 3696 | 112,919.15 |
| **Total** | **9,671,000** | **71.3696** | **690,215.00** |
| | | | |
| JBO/WSPP B | | | |
| AR | 2,168,386 | 60.7315 | 131,689 50 |
| LA | 2,611,868 | 60.7315 | 158,622.16 |
| MS | 1,447,671 | 60.7315 | 87,919.16 |
| NO | 469,404 | 60.7315 | 28,507.62 |
| EGSL | 1,988,687 | 60.7315 | 120,776.70 |
| ETI | 1,698,984 | 60.7315 | 103,181 86 |
| **Total** | **10,385,000** | **60.7315** | **630,697.00** |
| | | | |
| KANSAS CITY POWER & LIGHT COMPANY/WSPP A | | | |
| AR | 300,881 | 27.7155 | 8,339 06 |
| LA | 362,411 | 27.7155 | 10,044.40 |
| MS | 200,875 | 27.7155 | 5,567 35 |
| NO | 65,133 | 27.7155 | 1,805.19 |
| EGSL | 275,952 | 27.7155 | 7,648.14 |
| ETI | 235,748 | 27.7155 | 6,533 86 |
| **Total** | **1,441,000** | **27.7155** | **39,938.00** |
| | | | |
| MAGNET COVE/EXS75 | | | |
| AR | 3,545 | 35 2498 | 124 96 |
| LA | 4,270 | 35 2498 | 150 52 |
| MS | 2,366 | 35 2498 | 83.40 |
| NO | 767 | 35 2498 | 27.04 |
| EGSL | 3,251 | 35 2498 | 114 59 |
| ETI | 2,777 | 35 2498 | 97.89 |
| **Total** | **16,976** | **35.2498** | **598.40** |
| | | | |
| MAGNET COVE/EXS90 | | | |
| AR | 164,007 | 38 6344 | 6,336 37 |
| LA | 197,598 | 38 6344 | 7,634 03 |
| MS | 109,555 | 38 6344 | 4,232 55 |
| NO | 35,498 | 38 6344 | 1,371 51 |
| EGSL | 150,472 | 38 6344 | 5,813 28 |
| ETI | 128,521 | 38 6344 | 4,965.45 |
| **Total** | **785,651** | **38.6344** | **30,353.19** |

Attachment Snapshot: 20100826181933     **RunID: 17029**     Billing Snapshot: 20100826175238

**2011 ETI Rate Case**     9-225

Entergy Electric System      Date range - 20100701 through 20100731      **Attachment 11**
Intra-System Billing-201007RA      Joint Account / Individual Company Purchases      **Page 64**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| MAGNET COVE/EXSSTSH | | | |
| AR | 901,963 | 36 2754 | 32,719.09 |
| LA | 1,086,406 | 36 2754 | 39,409.73 |
| MS | 602,169 | 36 2754 | 21,843.89 |
| NO | 195,248 | 36 2754 | 7,082.71 |
| EGSL | 827,228 | 36 2754 | 30,008.03 |
| ETI | 706,713 | 36 2754 | 25,636.30 |
| **Total** | **4,319,727** | **36.2754** | **156,699.75** |
| | | | |
| MDEA CROSSROADS/EXS50 | | | |
| AR | 4,846 | 24 3350 | 117 93 |
| LA | 5,838 | 24 3350 | 142 08 |
| MS | 3,235 | 24 3350 | 78.73 |
| NO | 1,052 | 24 3350 | 25.58 |
| EGSL | 4,443 | 24 3350 | 108.12 |
| ETI | 3,797 | 24 3350 | 92.40 |
| **Total** | **23,211** | **24.3350** | **564.84** |
| | | | |
| MDEA CROSSROADS/EXS75 | | | |
| AR | 977 | 36.1678 | 35.34 |
| LA | 1,178 | 36.1678 | 42.61 |
| MS | 653 | 36.1678 | 23.63 |
| NO | 212 | 36.1678 | 7 66 |
| EGSL | 896 | 36.1678 | 32.40 |
| ETI | 768 | 36.1678 | 27.77 |
| **Total** | **4,684** | **36.1678** | **169.41** |
| | | | |
| MDEA CROSSROADS/EXS90 | | | |
| AR | 34,261 | 45.1687 | 1,547 53 |
| LA | 41,256 | 45.1687 | 1,863.48 |
| MS | 22,867 | 45.1687 | 1,032 90 |
| NO | 7,416 | 45.1687 | 334 98 |
| EGSL | 31,427 | 45.1687 | 1,419.48 |
| ETI | 26,848 | 45.1687 | 1,212 68 |
| **Total** | **164,075** | **45.1687** | **7,411.05** |
| | | | |
| MEAM CANTON 1   IN | | | |
| MS | 73,000 | 120 9100 | 8,826.43 |
| **Total** | **73,000** | **120.9100** | **8,826.43** |
| | | | |
| MEAM CANTON 2   IN | | | |
| MS | 83,000 | 120 9100 | 10,035.53 |
| **Total** | **83,000** | **120.9100** | **10,035.53** |
| | | | |
| MEAM CANTON 3   IN | | | |
| MS | 84,000 | 120 9100 | 10,156.44 |
| **Total** | **84,000** | **120.9100** | **10,156.44** |
| | | | |
| MEAM CANTON 4   IN | | | |
| MS | 84,000 | 120 9100 | 10,156.44 |
| **Total** | **84,000** | **120.9100** | **10,156.44** |
| | | | |
| MEAM CANTON 5   IN | | | |
| MS | 82,000 | 120 9100 | 9,914 62 |
| **Total** | **82,000** | **120.9100** | **9,914.62** |
| | | | |
| MEAM HENDERSON 10  N | | | |
| MS | 58,000 | 120 9100 | 7,012.78 |
| **Total** | **58,000** | **120.9100** | **7,012.78** |
| | | | |
| MEAM HENDERSON 11  N | | | |
| MS | 59,000 | 120 9100 | 7,133 69 |
| **Total** | **59,000** | **120.9100** | **7,133.69** |
| | | | |
| MEAM HENDERSON 2  IN | | | |
| MS | 524,000 | 120 9077 | 63,355.61 |
| **Total** | **524,000** | **120.9077** | **63,355.61** |
| | | | |
| MEAM HENDERSON 4  IN | | | |
| MS | 72,000 | 120 9100 | 8,705 52 |
| **Total** | **72,000** | **120.9100** | **8,705.52** |
| | | | |
| MEAM HENDERSON 5  IN | | | |
| MS | 72,000 | 120 9100 | 8,705 52 |

Attachment Snapshot: 20100826181933      **RunID: 17029**      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**      9-226

Entergy Electric System     Date range - 20100701 through 20100731     **Attachment 11**
Intra-System Billing-201007RA     Joint Account / Individual Company Purchases     **Page 65**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| **Total** | **72,000** | **120.9100** | **8,705.52** |
| | | | |
| MEAM HENDERSON 6  IN | | | |
| MS | 73,000 | 120 9100 | 8,826.43 |
| **Total** | **73,000** | **120.9100** | **8,826.43** |
| | | | |
| MEAM HENDERSON 7  IN | | | |
| MS | 76,000 | 120 9100 | 9,189.16 |
| **Total** | **76,000** | **120.9100** | **9,189.16** |
| | | | |
| MEAM HENDERSON 8  IN | | | |
| MS | 74,000 | 120 9100 | 8,947 34 |
| **Total** | **74,000** | **120.9100** | **8,947.34** |
| | | | |
| MEAM HENDERSON 9  IN | | | |
| MS | 54,000 | 120 9100 | 6,529.14 |
| **Total** | **54,000** | **120.9100** | **6,529.14** |
| | | | |
| MERRILL LYNCH COMMODIT ES  NC/WSPP B | | | |
| AR | 40,521,612 | 49 2313 | 1,994,933.07 |
| LA | 48,808,429 | 49 2313 | 2,402,903.87 |
| MS | 27,053,226 | 49 2313 | 1,331,865.81 |
| NO | 8,771,914 | 49 2313 | 431,852 92 |
| EGSL | 37,164,138 | 49 2313 | 1,829,640.85 |
| ETI | 31,749,681 | 49 2313 | 1,563,079.13 |
| **Total** | **194,069,000** | **49.2313** | **9,554,275.65** |
| | | | |
| MORGAN STANLEY/WSPP A | | | |
| AR | 51,366 | 23 8130 | 1,223.18 |
| LA | 61,868 | 23 8130 | 1,473 28 |
| MS | 34,292 | 23 8130 | 816 61 |
| NO | 11,118 | 23 8130 | 264.74 |
| EGSL | 47,110 | 23 8130 | 1,121 82 |
| ETI | 40,246 | 23 8130 | 958 37 |
| **Total** | **246,000** | **23.8130** | **5,858.00** |
| | | | |
| NRG CAJUN 3/CAJUN 3 | | | |
| EGSL | 95,955,425 | 19 5172 | 1,872,781.39 |
| ETI | 70,923,575 | 19 5172 | 1,384,231.31 |
| **Total** | **166,879,000** | **19.5172** | **3,257,012.70** |
| | | | |
| NRG POWER MARKET NG LLC /WSPP A | | | |
| AR | 6,217,020 | 26 2779 | 163,370 39 |
| LA | 7,488,413 | 26 2779 | 196,780.76 |
| MS | 4,150,635 | 26 2779 | 109,070 04 |
| NO | 1,345,830 | 26 2779 | 35,365.61 |
| EGSL | 5,701,912 | 26 2779 | 149,833.47 |
| ETI | 4,871,190 | 26 2779 | 128,004.73 |
| **Total** | **29,775,000** | **26.2779** | **782,425.00** |
| | | | |
| NRG POWER MARKET NG LLC /WSPP B | | | |
| AR | 38,603,785 | 52 0823 | 2,010,574.87 |
| LA | 46,498,600 | 52 0823 | 2,421,752.09 |
| MS | 25,772,818 | 52 0823 | 1,342,307.42 |
| NO | 8,356,751 | 52 0823 | 435,238.73 |
| EGSL | 35,405,012 | 52 0823 | 1,843,976.61 |
| ETI | 30,247,034 | 52 0823 | 1,575,336.23 |
| **Total** | **184,884,000** | **52.0823** | **9,629,185.95** |
| | | | |
| NRG POWER MARKET NG LLC /WSPP C | | | |
| AR | 1,740,348 | 45.7422 | 79,607.30 |
| LA | 2,096,255 | 45.7422 | 95,887.44 |
| MS | 1,161,899 | 45.7422 | 53,147.93 |
| NO | 376,742 | 45.7422 | 17,232.89 |
| EGSL | 1,596,150 | 45.7422 | 73,011.34 |
| ETI | 1,363,606 | 45.7422 | 62,374.10 |
| **Total** | **8,335,000** | **45.7422** | **381,261.00** |
| | | | |
| OCC DENTAL POWER SERVICES/BASE CAPACITY | | | |
| LA | 219,380,000 | 35.7590 | 7,844,813.12 |
| **Total** | **219,380,000** | **35.7590** | **7,844,813.12** |
| | | | |
| OCC DENTAL POWER SERVICES/DAY-AHEAD CALL OPTION | | | |
| LA | 50,188,000 | 41 0872 | 2,062,086.80 |
| **Total** | **50,188,000** | **41.0872** | **2,062,086.80** |

**2011 ETI Rate Case**                            9-227

| Entergy Electric System | Date range - 20100701 through 20100731 | Attachment 11 |
|---|---|---|
| Intra-System Billing-201007RA | Joint Account / Individual Company Purchases | Page 66 |

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| **OCC DENTAL POWER SERVICES/INTRA-DAY CALL OPTION** | | | |
| LA | 9,090,000 | 51.4329 | 467,525.10 |
| **Total** | **9,090,000** | **51.4329** | **467,525.10** |
| | | | |
| **OCC DENTAL POWER SERVICES/WSPP B** | | | |
| AR | 1,189,742 | 63 3591 | 75,381.01 |
| LA | 1,433,048 | 63 3591 | 90,796.65 |
| MS | 794,302 | 63 3591 | 50,326.31 |
| NO | 257,550 | 63 3591 | 16,318.15 |
| EGSL | 1,091,166 | 63 3591 | 69,135.39 |
| ETI | 932,192 | 63 3591 | 59,062.49 |
| **Total** | **5,698,000** | **63.3591** | **361,020.00** |
| | | | |
| **RAINBOW ENERGY MARKETING CORP/WSPP A** | | | |
| AR | 2,907,333 | 32.1174 | 93,375.97 |
| LA | 3,501,908 | 32.1174 | 112,472 37 |
| MS | 1,941,010 | 32.1174 | 62,340.08 |
| NO | 629,363 | 32.1174 | 20,213.51 |
| EGSL | 2,666,424 | 32.1174 | 85,638.22 |
| ETI | 2,277,962 | 32.1174 | 73,162.10 |
| **Total** | **13,924,000** | **32.1174** | **447,202.25** |
| | | | |
| **SAN JAC NTO 1** | | | |
| ETI | 5,722,000 | 61.7616 | 353,399.75 |
| **Total** | **5,722,000** | **61.7616** | **353,399.75** |
| | | | |
| **SAN JAC NTO 2** | | | |
| ETI | 5,612,000 | 61.7608 | 346,601 58 |
| **Total** | **5,612,000** | **61.7608** | **346,601.58** |
| | | | |
| **SMEPA/WSPP B** | | | |
| AR | 626,400 | 89 2640 | 55,914.95 |
| LA | 754,504 | 89 2640 | 67,350.01 |
| MS | 418,200 | 89 2640 | 37,330.24 |
| NO | 135,600 | 89 2640 | 12,104.24 |
| EGSL | 574,496 | 89 2640 | 51,281.84 |
| ETI | 490,800 | 89 2640 | 43,810.72 |
| **Total** | **3,000,000** | **89.2640** | **267,792.00** |
| | | | |
| **SOUTHERN COMPANY SERVICES   NC. AS AGENT FO/WSPP A** | | | |
| AR | 114,840 | 38 0000 | 4,363 92 |
| LA | 138,325 | 38 0000 | 5,256 35 |
| MS | 76,670 | 38 0000 | 2,913.46 |
| NO | 24,860 | 38 0000 | 944 68 |
| EGSL | 105,325 | 38 0000 | 4,002 35 |
| ETI | 89,980 | 38 0000 | 3,419 24 |
| **Total** | **550,000** | **38.0000** | **20,900.00** |
| | | | |
| **SOUTHERN COMPANY SERVICES   NC. AS AGENT FO/WSPP B** | | | |
| AR | 2,213,280 | 128 0000 | 283,299 91 |
| LA | 2,665,900 | 128 0000 | 341,235.19 |
| MS | 1,477,640 | 128 0000 | 189,137 93 |
| NO | 479,120 | 128 0000 | 61,327.37 |
| EGSL | 2,029,900 | 128 0000 | 259,827 20 |
| ETI | 1,734,160 | 128 0000 | 221,972.40 |
| **Total** | **10,600,000** | **128.0000** | **1,356,800.00** |
| | | | |
| **SUEZ ENERGY MARKETING NA INC./WSPP A** | | | |
| AR | 1,808,208 | 39 6552 | 71,705.05 |
| LA | 2,178,009 | 39 6552 | 86,369.35 |
| MS | 1,207,204 | 39 6552 | 47,871.99 |
| NO | 391,432 | 39 6552 | 15,522.47 |
| EGSL | 1,658,371 | 39 6552 | 65,762.74 |
| ETI | 1,416,776 | 39 6552 | 56,182.58 |
| **Total** | **8,660,000** | **39.6552** | **343,414.18** |
| | | | |
| **SUEZ ENERGY MARKETING NA INC./WSPP B** | | | |
| AR | 11,804,928 | 48.7041 | 574,947.70 |
| LA | 14,219,068 | 48.7041 | 692,526 53 |
| MS | 7,881,251 | 48.7041 | 383,848 90 |
| NO | 2,555,470 | 48.7041 | 124,461.73 |
| EGSL | 10,826,823 | 48.7041 | 527,309 92 |
| ETI | 9,249,460 | 48.7041 | 450,486 22 |
| **Total** | **56,537,000** | **48.7041** | **2,753,581.00** |

| Attachment Snapshot: 20100826181933 | RunID: 17029 | Billing Snapshot: 20100826175238 |
|---|---|---|

**2011 ETI Rate Case**

| | | | |
|---|---|---|---|
| **Entergy Electric System** | **Date range - 20100701 through 20100731** | | **Attachment 11** |
| **Intra-System Billing-201007RA** | **Joint Account / Individual Company Purchases** | | **Page 67** |

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| **TEA/WSPP A** | | | |
| AR | 233,021 | 29 3082 | 6,829.44 |
| LA | 280,677 | 29 3082 | 8,226.15 |
| MS | 155,570 | 29 3082 | 4,559.48 |
| NO | 50,443 | 29 3082 | 1,478.40 |
| EGSL | 213,711 | 29 3082 | 6,263.48 |
| ETI | 182,578 | 29 3082 | 5,351 05 |
| **Total** | **1,116,000** | **29.3082** | **32,708.00** |
| **TENASKA FRONTIER/EXS50** | | | |
| AR | 17,152 | 21 3697 | 366 54 |
| LA | 20,660 | 21 3697 | 441.49 |
| MS | 11,451 | 21 3697 | 244.70 |
| NO | 3,714 | 21 3697 | 79.37 |
| EGSL | 15,731 | 21 3697 | 336.17 |
| ETI | 13,439 | 21 3697 | 287.19 |
| **Total** | **82,147** | **21.3697** | **1,755.46** |
| **TENASKA FRONTIER/EXS75** | | | |
| AR | 13,458 | 32 0598 | 431.45 |
| LA | 16,210 | 32 0598 | 519 69 |
| MS | 8,985 | 32 0598 | 288 06 |
| NO | 2,912 | 32 0598 | 93.37 |
| EGSL | 12,343 | 32 0598 | 395.71 |
| ETI | 10,544 | 32 0598 | 338 04 |
| **Total** | **64,452** | **32.0598** | **2,066.32** |
| **TENASKA FRONTIER/EXS90** | | | |
| AR | 218,226 | 39 3082 | 8,578 04 |
| LA | 262,868 | 39 3082 | 10,332.77 |
| MS | 145,651 | 39 3082 | 5,725 24 |
| NO | 47,232 | 39 3082 | 1,856 64 |
| EGSL | 200,195 | 39 3082 | 7,869 32 |
| ETI | 170,975 | 39 3082 | 6,720 83 |
| **Total** | **1,045,147** | **39.3082** | **41,082.84** |
| **TENASKA/WSPP A** | | | |
| AR | 490,888 | 59 9025 | 29,405.41 |
| LA | 591,278 | 59 9025 | 35,419.00 |
| MS | 327,729 | 59 9025 | 19,631.77 |
| NO | 106,266 | 59 9025 | 6,365 63 |
| EGSL | 450,215 | 59 9025 | 26,969.02 |
| ETI | 384,624 | 59 9025 | 23,039.97 |
| **Total** | **2,351,000** | **59.9025** | **140,830.80** |
| **TENASKA/WSPP B** | | | |
| AR | 4,812,638 | 60.1091 | 289,283.19 |
| LA | 5,796,845 | 60.1091 | 348,443.17 |
| MS | 3,213,034 | 60.1091 | 193,132 32 |
| NO | 1,041,808 | 60.1091 | 62,622.14 |
| EGSL | 4,413,862 | 60.1091 | 265,313 04 |
| ETI | 3,770,813 | 60.1091 | 226,660.14 |
| **Total** | **23,049,000** | **60.1091** | **1,385,454.00** |
| **UNION POWER PARTNERS/WSPP A** | | | |
| AR | 39,672 | 33.1579 | 1,315.44 |
| LA | 47,786 | 33.1579 | 1,584.49 |
| MS | 26,486 | 33.1579 | 878 22 |
| NO | 8,588 | 33.1579 | 284.76 |
| EGSL | 36,384 | 33.1579 | 1,206.41 |
| ETI | 31,084 | 33.1579 | 1,030 68 |
| **Total** | **190,000** | **33.1579** | **6,300.00** |
| **UNION POWER PARTNERS/WSPP B** | | | |
| AR | 34,397,079 | 50 2176 | 1,727,338.52 |
| LA | 41,431,444 | 50 2176 | 2,080,587.38 |
| MS | 22,964,343 | 50 2176 | 1,153,213.86 |
| NO | 7,446,119 | 50 2176 | 373,926 25 |
| EGSL | 31,547,047 | 50 2176 | 1,584,216.71 |
| ETI | 26,950,968 | 50 2176 | 1,353,413.03 |
| **Total** | **164,737,000** | **50.2176** | **8,272,695.75** |
| **WESTAR ENERGY INC/WSPP A** | | | |
| AR | 1,447,817 | 32.4570 | 46,991.85 |

| | | |
|---|---|---|
| Attachment Snapshot: 20100826181933 | RunID: 17029 | Billing Snapshot: 20100826175238 |

**2011 ETI Rate Case**

| Description | KWH | Mills per KWH | Charge |
|---|---|---|---|
| LA | 1,743,909 | 32.4570 | 56,602.16 |
| MS | 966,608 | 32.4570 | 31,373.20 |
| NO | 313,419 | 32.4570 | 10,172.73 |
| EGSL | 1,327,853 | 32.4570 | 43,098.05 |
| ETI | 1,134,394 | 32.4570 | 36,819.01 |
| **Total** | **6,934,000** | **32.4570** | **225,057.00** |
| | | | |
| WESTAR ENERGY INC/WSPP B | | | |
| AR | 6,170,038 | 34 5507 | 213,179 08 |
| LA | 7,431,833 | 34 5507 | 256,774 57 |
| MS | 4,119,252 | 34 5507 | 142,323 03 |
| NO | 1,335,662 | 34 5507 | 46,147.66 |
| EGSL | 5,658,817 | 34 5507 | 195,515 95 |
| ETI | 4,834,398 | 34 5507 | 167,031.71 |
| **Total** | **29,550,000** | **34.5507** | **1,020,972.00** |
| | | | |
| WESTAR ENERGY INC/WSPP C | | | |
| AR | 167,040 | 62 0000 | 10,356.48 |
| LA | 201,200 | 62 0000 | 12,474.40 |
| MS | 111,520 | 62 0000 | 6,914 24 |
| NO | 36,160 | 62 0000 | 2,241 92 |
| EGSL | 153,200 | 62 0000 | 9,498.40 |
| ETI | 130,880 | 62 0000 | 8,114 56 |
| **Total** | **800,000** | **62.0000** | **49,600.00** |
| | | | |
| WRIGHTSVILE POWER/EXS75 | | | |
| AR | 7,745 | 36 3604 | 281 61 |
| LA | 9,333 | 36 3604 | 339 34 |
| MS | 5,171 | 36 3604 | 188 00 |
| NO | 1,675 | 36 3604 | 60.91 |
| EGSL | 7,107 | 36 3604 | 258.42 |
| ETI | 6,069 | 36 3604 | 220 69 |
| **Total** | **37,100** | **36.3604** | **1,348.97** |
| | | | |
| WRIGHTSVILE POWER/EXS90 | | | |
| AR | 169,805 | 42 5289 | 7,221 54 |
| LA | 204,509 | 42 5289 | 8,697.47 |
| MS | 113,362 | 42 5289 | 4,821 24 |
| NO | 36,734 | 42 5289 | 1,562 29 |
| EGSL | 155,716 | 42 5289 | 6,622 53 |
| ETI | 133,010 | 42 5289 | 5,656.74 |
| **Total** | **813,136** | **42.5289** | **34,581.81** |
| | | | |
| YAZOO CITY/EXS90 | | | |
| AR | 1,101 | 44 2334 | 48.70 |
| LA | 1,324 | 44 2334 | 58.57 |
| MS | 734 | 44 2334 | 32.46 |
| NO | 237 | 44 2334 | 10.49 |
| EGSL | 1,011 | 44 2334 | 44.72 |
| ETI | 863 | 44 2334 | 38.17 |
| **Total** | **5,270** | **44.2334** | **233.11** |

**Entergy Electric System**      Date range - 20100701 through 20100731      **Attachment 11**
**Intra-System Billing-201007RA**      **Purchase Capacity and Reserve Sharing Charges - Dollars**      **Page 69**

| Description | System | AR | LA | MS | NO | EGSL | ETI |
|---|---|---|---|---|---|---|---|
| ACADIA PPA - 580 MW - CAP CHG | 714,364 | 0 | 714,364 | 0 | 0 | 0 | 0 |
| CARVILLE - 485 MW - CAP CHG | 2,430,000 | 0 | 0 | 0 | 0 | 2,430,000 | 0 |
| CONOCO PHILIPS - 100 MW - CAP | 165,000 | 0 | 0 | 0 | 0 | 94,875 | 70,125 |
| DOW - 100 MW - CAP CHG | 150,000 | 0 | 0 | 0 | 0 | 86,250 | 63,750 |
| ETEC SAN JAC- 146 MW - CAP CHG | 985,500 | 0 | 0 | 0 | 0 | 0 | 985,500 |
| EXELON 150 10YR- CAP CHG | 1,527,900 | 0 | 0 | 0 | 0 | 0 | 1,527,900 |
| EXELON 150 1YR- CAP CHG | 1,645,875 | 343,659 | 413,938 | 229,435 | 74,394 | 315,185 | 269,265 |
| OCC DENTIAL - 480MW - CAP CHG | 3,399,552 | 0 | 3,399,552 | 0 | 0 | 0 | 0 |
| SWPP RESER - CAP CHG | 3,000 | 626 | 754 | 418 | 136 | 574 | 491 |
| **Totals** | **11,021,192** | **344,285** | **4,528,609** | **229,853** | **74,529** | **2,926,885** | **2,917,031** |

Attachment Snapshot: 20100826181933      RunID: 17029      Billing Snapshot: 20100826175238

**2011 ETI Rate Case**      9-231

**Entergy Electric System**          Date range - 20100701 through 20100731                **Attachment 12**
**Intra-System Billing-201007RA**          **Fiber Optic Equalization Report**                **Page 70**

| | AR | LA | MS | NO |
|---|---|---|---|---|
| Inter-Company Circuits(ICC)-Number | 5.50 | 8.34 | 4.00 | 4.16 |
| Inter-Company Circuits(ICC)-Percent | 25 0000 | 37.9091 | 18.1818 | 18.9091 |
| System Operations Circuits(SOC)-Number | 62.50 | 46.34 | 26.50 | 14.66 |
| System Operations Circuits(SOC)-Percent | 41 6667 | 30.8933 | 17.6667 | 9.7733 |
| Tele-Processing Circuits(TPC)-Number | 64.00 | 58.24 | 26.00 | 23.76 |
| Tele-Processing Circuits(TPC)-Percent | 37 2093 | 33.8605 | 15.1163 | 13.8140 |
| Total Circuits-Number | 132.00 | 112.92 | 56.50 | 42.58 |
| Total Circuits-Percent | 38 3721 | 32.8256 | 16.4244 | 12.3779 |
| | | | | |
| Total Allocations | 0 358248 | 0.343196 | 0.154639 | 0.143917 |

| | ICC | SOC | TPC | |
|---|---|---|---|---|
| Total Percent | 6 3953 | 43.6047 | 50.0000 | |
| Equalization Percent | 11 3402 | 0.0000 | 88.6598 | |

| | AR | LA | MS | NO |
|---|---|---|---|---|
| Cost of Capital | | | | |
| Debt Ratio (DR) | 0.476500 | 0.502800 | 0.527000 | 0.455600 |
| Bond Cost (i) | 0 061600 | 0.067100 | 0.063400 | 0 060700 |
| Preferred Ratio (PR) | 0 039300 | 0.019900 | 0.031800 | 0 047700 |
| Preferred Cost (p) | 0 059900 | 0.075500 | 0.056900 | 0 048200 |
| Common Ratio (ER) | 0.484200 | 0.477400 | 0.441200 | 0.496700 |
| Common Cost (c) | 0.110000 | 0.110000 | 0.110000 | 0.110000 |
| Total Cost of Capital (CM) | 0 084968 | 0.087754 | 0.083753 | 0 084591 |
| | | | | |
| Tax Rate (F) | 0 035895 | 0.033783 | 0.031183 | 0 035609 |
| | | | | |
| Operating Expenses | | | | |
| Depreciation Factor (D) | 0.0285710 | 0.0285710 | 0.0285710 | 0.0285710 |
| Insurance Expense (I) | 0.0040898 | 0.0012272 | 0.0040751 | |
| Property Tax (PT) | 0.0045996 | 0.0090891 | 0.0168837 | 0.0124608 |
| Franchise Tax (FT) | 0.0001604 | | 0.0010224 | 0.0021793 |
| Operations & Maintenance (OM) | 0.1539117 | 0.1111532 | 0.0465445 | 0.0486027 |
| Total Operating Expenses | 0.1913325 | 0.1500405 | 0.0970967 | 0.0918138 |
| | | | | |
| Net Fiber Investment | 4,893,907.00 | 5,459,070.00 | 6,916,494.00 | 1,399,554.00 |
| less SOC Investment | 3,391,907.86 | 2,514,891.44 | 1,438,170.49 | 795,602 56 |
| Credited Investment | 1,501,999.14 | 2,944,178.56 | 5,478,323.51 | 603,951.44 |
| Annual Ownership Cost | 0 312196 | 0.271578 | 0.212033 | 0 212014 |
| Net Annual Ownership Cost | 468,917.37 | 799,572.65 | 1,161,583.73 | 128,046 04 |

System Average Annual Ownership cost                2,558,119.79 / 18,669,025.00 = 0.2429721
System Average Monthly Ownership cost                                0.2429721 / 12 = 0.0202477

| | AR | LA | MS | NO |
|---|---|---|---|---|
| Company Responsibilities | 3,771,797.11 | 3,613,322.84 | 1,628,109.39 | 1,515,223.32 |
| Investment Difference | 2,269,797.97 | 669,144.28 | (3,850,214.12) | 911,271 88 |
| | | | | |
| **Payments** | **45,958.19** | **13,548.63** | | **18,451.16** |
| **Receipts** | | | **77,957.98** | |

Attachment Snapshot: 20100826181933          RunID: 17029          Billing Snapshot: 20100826175238

**2011 ETI Rate Case**                                                9-232

# Families and Functions



Exhibit PJC-3
2011 TX Rate Case
Page 1 of 1


This page has been intentionally left blank.

# Corporate Support Functions & Classes ($ Total ETI Adjusted)



| | | | | | |
|---|---|---|---|---|---|
| Finance | Corporate | Accounting Entries | Human Resources & Administration | Information Technology | Supply Chain |

**Finance**
- Treasury Operations
  S McNeal
  $811,510
- Financial Services
  D Doucet
  $3,529,673
- Tax Services
  P Galbraith
  $2,033,445

**Corporate**
- Federal PRG Affairs
  W Ferguson
  $521,454
- Utility & Executive Management
  J Domino
  $1,939,228
- Internal & External Communications
  C Herrington
  $332,317
- Legal Services
  R Sloan
  $6,691,561
- Regulatory Services
  P May
  $3,965,085

**Accounting Entries**
- Depreciation
  S Tumminello
  $1,777,986
- Other Expenses
  S Tumminello
  $1,756,009
- Service Company Recipient Offsets
  S Tumminello
  $0
- Income Tax Expense
  R Roberts
  $510,800

**Human Resources & Administration**
- Human Resources
  K Gardner
  $9,365,982
- Administration
  T Plauche
  $644,557

**Information Technology**
- Information Technology
  J Brown
  $6,620,998

**Supply Chain**
- Supply Chain
  J Hunter
  $1,424,411

Exhibit PJC-4
2011 TX Rate Case
Page 1 of 2

# Operations Functions & Classes ($ Total ETI Adjusted)

Domestic Regulated Utility Operations Group



Exhibit PJC-4
2011 TX Rate Case
Page 2 of 2

# SPO Leadership Team and Areas of Responsibility



Exhibit PJC-5
2011 TX Rate Case
Page 1 of 1


This page has been intentionally left blank.

Entergy Texas, Inc.
Dollars Closed to Plant in Service Including Affiliate Component
July 1, 2009 - June 30, 2011

| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) | (L) | (M) | (N) | (O) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Project Code | Project Code Description | Asset Class | In Service Date | Asset Location Description | State | Business Unit | Non-Affiliate Charges Excluding Cap Susp and Reimbursements | Reimbursements | Capital Suspense Charges | Affiliate Capital Suspense | Capital Suspense Charges excluding Affiliate | Non-Capital Suspense Affiliate Charges | Total Affiliate Charges | Dollars Closed to Plant |
| C1PPWS0889 | SPO IT 2008 | General Plant | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 7,529.57 | 0.00 | 162.51 | 121.36 | 41.15 | 97,923.69 | 98,045.05 | 105,615.77 |
| C1PPWS0909 | SPO Corporate PC Refresh | General Plant | 31-Dec-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 1,393.83 | 0.00 | 8.30 | 6.20 | 2.10 | 8,304.03 | 8,310.23 | 9,706.16 |
| C1PPWS0664E | SPO 2007 Server Refresh | General Plant | 30-Jun-08 | CBLE - Capital Billed to LEs | Multi-State | ETI | 812.32 | 0.00 | 96.76 | 72.26 | 24.50 | 4,305.73 | 4,377.99 | 5,214.81 |
| C1PPWS0774E | SPO Gas Telemetry Migration | General Plant | 31-Dec-08 | CBLE - Capital Billed to LEs | Multi-State | ETI | 299.48 | 0.00 | 6.63 | 4.95 | 1.68 | 1,327.26 | 1,332.21 | 1,633.37 |
| | | **General Plant Total** | | | | | **10,035.20** | **0.00** | **274.20** | **204.77** | **69.43** | **111,860.71** | **112,065.48** | **122,170.11** |
| C1PPWS0907 | Operations Planning Model Develpmnt | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 24,129.39 | 0.00 | 75.99 | 56.75 | 19.24 | 3,764.55 | 3,821.30 | 27,969.93 |
| C1PPWS0883 | SPO ECI Project Support 2008 | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 17,161.91 | 0.00 | 18.58 | 13.88 | 4.70 | 2,553.88 | 2,567.76 | 19,734.37 |
| C1PPWS0911 | SPO Add NOxCost to Dispatch Process | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 12,888.60 | 0.00 | 47.00 | 35.10 | 11.90 | 2,121.47 | 2,156.57 | 15,057.07 |
| C1PPWS0884 | SPO Weekly Procurement Process 2008 | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 9,701.76 | 0.00 | 0.00 | 0.00 | 0.00 | 1,488.10 | 1,488.10 | 11,189.86 |
| C1PPWS0913 | SPO Automated Confirmation Engine | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 8,970.67 | 0.00 | 64.94 | 48.50 | 16.44 | 1,444.10 | 1,492.60 | 10,479.71 |
| C1PPWS0912 | SPO Deal Eval Redevelopment | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 7,413.87 | 0.00 | 7.01 | 5.23 | 1.78 | 1,174.95 | 1,180.18 | 8,595.83 |
| C1PPWS0910 | SPO Document Retention Alignment | Intangible | 30-Oct-09 | CBLE - Capital Billed to LEs | Multi-State | ETI | 3,591.52 | 0.00 | 27.21 | 20.32 | 6.89 | 590.35 | 610.67 | 4,209.08 |
| | | **Intangible Total** | | | | | **83,857.72** | **0.00** | **240.73** | **179.77** | **60.96** | **13,137.40** | **13,317.17** | **97,235.85** |
| | | **Grand Total** | | | | | **93,892.92** | **0.00** | **514.93** | **384.54** | **130.39** | **124,998.11** | **125,382.65** | **219,405.96** |


This page has been intentionally left blank.

ENTERGY TEXAS, INC.
Affiliate Billings - by Witness, Class, and Department
For the Twelve Months Ended June 30, 2011
Amounts in Dollars

| Class | Billing Entity | Dept | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Total Billings | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | 1,545,092 | 45,658 | 1,590,750 | 1,373,069 | 217,681 | - | 1,282 | 218,963 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | 670,285 | 52,421 | 722,706 | 608,009 | 114,697 | - | (1,424) | 113,273 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | 1,056,752 | 88,917 | 1,145,669 | 967,710 | 177,959 | - | 3,154 | 181,114 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | 1,076,761 | 52,798 | 1,129,559 | 1,037,552 | 92,007 | (392) | 2,445 | 94,059 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP236 | 89 | - | 89 | 75 | 14 | - | - | 14 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | 971 | - | 971 | 812 | 159 | (30) | 30 | 159 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | 868,238 | 71,263 | 939,501 | 707,570 | 231,931 | (382) | 3,043 | 234,592 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | 1,062,402 | 67,150 | 1,129,552 | 951,196 | 178,356 | - | 1,328 | 179,684 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | 808,223 | 69,511 | 877,734 | 866,107 | 11,627 | (923) | (1,263) | 9,442 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | 1,238,559 | 91,322 | 1,329,881 | 1,125,393 | 204,488 | (812) | (2,507) | 201,168 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | 567,647 | 51,472 | 619,119 | 521,181 | 97,938 | (51) | 1,392 | 99,280 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | 1,084,977 | 1,551 | 1,086,528 | 916,884 | 169,644 | - | (106) | 169,538 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | 1,525,041 | 137,574 | 1,662,615 | 1,403,471 | 259,144 | - | 4,105 | 263,250 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKC | 491 | - | 491 | 491 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | 1,338,433 | 107,239 | 1,445,672 | 1,283,449 | 162,223 | (581) | 3,539 | 165,181 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | 1,250,562 | 78,031 | 1,328,594 | 1,120,970 | 207,624 | (2,563) | 2,163 | 207,224 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | 1,336,569 | 118,596 | 1,455,165 | 1,220,425 | 234,741 | (570) | (5,187) | 228,983 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKG | 659 | - | 659 | 550 | 109 | - | - | 109 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | 1,765,397 | 152,163 | 1,917,560 | 1,594,341 | 323,219 | (212) | 1,476 | 324,483 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | 2,966,567 | 246,827 | 3,213,393 | 2,706,497 | 506,896 | - | 9,480 | 516,376 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | 854,394 | 71,339 | 925,732 | 772,863 | 152,869 | (99) | (23,673) | 129,098 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | 999,442 | 92,955 | 1,092,397 | 941,814 | 150,582 | - | 2,851 | 153,434 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | 830,292 | 75,667 | 905,959 | 763,656 | 142,303 | (398) | 2,726 | 144,631 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | 373,117 | 32,386 | 405,504 | 345,786 | 59,718 | (9) | 712 | 60,421 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLC | 508 | - | 508 | 427 | 81 | - | - | 81 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLE | 1,076 | - | 1,076 | 914 | 162 | - | - | 162 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | 299,128 | 27,344 | 326,472 | 279,563 | 46,909 | (7) | 692 | 47,594 |
| ENERGY AND FUEL MANAGEMENT | Total ESI | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| Total ENERGY AND FUEL MANAGEMENT | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| Total for Witness Cicio, Patrick | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |

Amounts may not add or tie to other schedules due to rounding.

**Cicio, Patrick**



This page has been intentionally left blank.

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT PJC-B
2011 TX Rate Case
Page 1 of 4

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | C1PCN70859 | RIVER BEND EXTENDED POWER UPRA | DIRCTEOI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C1PPRNE010 | New Nuclear -Regulatory Filing | NWDVRBGG | (9,843) | (774) | (10,617) | (10,617) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C1PPRTOSOF | RTO Implement Software ALLCOS | LOADOPCO | 13,959 | 1,480 | 15,439 | 12,876 | 2,563 | (2,563) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (174,936) | (7,788) | (182,724) | (182,724) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 15,927 | 1,458 | 17,385 | 17,385 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PCN70858 | RIVER BEND EXTENDED POWER UPRA | DIRCTLG | 3,104 | 283 | 3,386 | 3,386 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRECTLG | 6,813 | 537 | 7,350 | 7,350 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 8,823 | 695 | 9,518 | 9,518 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPMN0020 | New Nuclear Reg Filing EMI Ong | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPN66876 | Cladding Failure Root Cause & | DIRCTWF3 | 5,748 | 545 | 6,293 | 6,293 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPRN0002 | New Nuclear - Entergy | DIRCTR1 | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPRN0010 | New Nuclear - Regulatory Filin | DIRCTR1 | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 143,114 | 4,441 | 147,555 | 147,555 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0029 | SPO Evange ine | DIRCTELI | 41,666 | 2,947 | 44,613 | 44,613 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0030 | SPO Ouachita Fuel Meter Common | DIRCTEAI | 539 | 45 | 584 | 584 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 381,462 | 11,378 | 392,839 | 392,839 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0045 | SPO Real Time Calcasieu RTU | DIRECTLG | 25,835 | 156 | 25,991 | 25,991 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 414,076 | 11,232 | 425,307 | 425,307 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPWGP516 | SBC CIP Compliance | DIRECTTX | 120 | - | 120 | - | 120 | (120) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPWS0534 | System Planning Pet Coke Repow | DIRCTELI | 374 | 11 | 384 | 384 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPWS0628 | SPO W-WOTAB CT Development Spe | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPWS0783 | Ninemile 6 Development | DIRCTELI | 34,977 | 3,274 | 38,251 | 38,251 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | C6PPWS0984 | SPO EGSL Purchase of Ouach ta | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | E1PPEFF003 | EAI ENERGY EFFCNCY NON-INCREME | DIRCTEAI | 11,515 | 1,145 | 12,660 | 12,660 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPEAI | SYSTEM PLANNING - EAI | DIRCTEAI | 33,801 | 3,163 | 36,965 | 36,965 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPEEI | SYSTEM PLANNING - NONREG - EEI | ASSTNREG | 548 | 48 | 596 | 596 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPELI | SYSTEM PLANNING - ELI | DIRCTELI | 30,852 | 2,782 | 33,634 | 33,634 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPEMI | SYSTEM PLANNING - EMI | DIRCTEMI | 3,103 | 276 | 3,379 | 3,379 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPENO | SYSTEM PLANNING - ENOI | DIRCTENO | 34,626 | 3,063 | 37,689 | 37,689 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPGSL | SYSTEM PLANNING - EGSI-LA | DIRECTLG | 15,257 | 1,350 | 16,607 | 16,607 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPGST | SYSTEM PLANNING - EGSI-TX | DIRECTTX | 22,828 | 2,070 | 24,898 | - | 24,898 | - | 515 | 25,413 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPSYS | SYSTEM PLANNING AND STRATEGIC | ASSTSALL | 290,004 | 525 | 290,529 | 261,342 | 29,187 | - | 13 | 29,199 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 2,778,700 | 170,067 | 2,948,767 | 2,487,717 | 461,050 | - | 5,541 | 466,591 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 19,919 | 1,638 | 21,556 | 21,556 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCE14423 | REGULATORY AFFAIRS - EMI | DIRCTEMI | 8,233 | 760 | 8,993 | 8,993 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 16,968 | 1,166 | 18,135 | 15,634 | 2,500 | - | 37 | 2,537 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCF21600 | CORP RPTG ANALYSIS & POLICY AL | GENLEDAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCFBLETR | BELOW THE LINE EXPENSES -ETR | DIRCTETR | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCFBLFOS | BELOW THE LINE - FOSSIL OPERAT | CAPAOPCO | 7,368 | - | 7,368 | 6,571 | 797 | (797) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCFF1003 | BOARD SUPPORT | ASSTSALL | 5,434 | 377 | 5,812 | 5,233 | 578 | - | 8 | 587 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCFVARAS | ADMIN SUPRT - VARIBUS CORPORAT | DIRECTLG | 41,139 | 3,778 | 44,917 | 44,917 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 381,179 | 30,815 | 411,994 | 351,119 | 60,875 | - | 1,599 | 62,474 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 2,691 | 265 | 2,956 | 2,546 | 410 | - | 13 | 423 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW15822 | RESOURCE PLANNING COORDINATOR | LOADOPCO | 122,890 | 11,496 | 134,385 | 113,301 | 21,085 | - | 694 | 21,779 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 1,726,349 | 155,656 | 1,882,005 | 1,586,195 | 295,809 | - | 5,726 | 301,535 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW15840 | PLANNING MODELING & ANALYSIS G | LOADOPCO | 295,253 | 26,854 | 322,107 | 271,607 | 50,501 | - | 960 | 51,461 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW18100 | OPNS-GAS SUPPLY | CAPXCOPC | 1,150,758 | 104,642 | 1,255,400 | 1,083,837 | 171,563 | - | 3,266 | 174,829 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW18200 | OPNS-OIL SUPPLY | OWNISFI | 137,062 | 12,761 | 149,823 | 149,823 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | 770,795 | 66,064 | 836,859 | 836,859 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | 1,620,269 | 116,517 | 1,736,786 | 1,462,875 | 273,911 | - | 5,282 | 279,193 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW19502 | WHOLESALE TRXN - EAI CUSTOMERS | DIRCTEAI | 56 | - | 56 | 56 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW19510 | ENERGY MANAGEMENT OPERATIONS | LOADOPCO | 2,469,933 | 219,678 | 2,689,611 | 2,264,551 | 425,060 | - | 7,958 | 433,019 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW19511 | ENERGY MANAGEMENT OPERATIONS P | LOADOPCO | 1,548,975 | 133,113 | 1,682,089 | 1,416,167 | 265,922 | - | 4,977 | 270,899 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | 1,015,950 | 90,454 | 1,106,404 | 931,546 | 174,858 | - | 3,336 | 178,195 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW29607 | POWER SYSTEM ACCOUNTING | LOADWEPI | 420,638 | 38,815 | 459,453 | 387,423 | 72,031 | - | 1,389 | 73,419 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW51400 | SFI FUEL OIL O&M | DIRCTSFI | 251 | 27 | 278 | 278 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | 1,073,545 | 310 | 1,073,855 | 905,703 | 168,152 | - | 8 | 168,160 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0012 | 1998 FUELS MANAGEMENT TELEMETR | CAPAOPCO | 140,071 | - | 140,071 | 124,928 | 15,143 | - | - | 15,143 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0034 | DIRECTOR - PLANT SUPPORT | CAPAOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 29,487 | 2,456 | 31,943 | 18,773 | 13,169 | - | 265 | 13,435 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 11,430 | 1,572 | 13,003 | 11,042 | 1,961 | - | 43 | 2,004 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT PJC-B
2011 TX Rate Case
Page 2 of 4

2011 ETI Rate Case

9-244

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | 327,588 | 28,335 | 355,923 | 299,950 | 55,973 | - | 1,019 | 56,992 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0092 | EMS OPERATIONS & MAINTENANCE S | LOADOPCO | 89,299 | - | 89,299 | 74,476 | 14,823 | - | 279 | 15,102 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0133 | EMO INFORMATION TECHNOLOGY SUP | LOADOPCO | 7,521 | - | 7,521 | 6,273 | 1,248 | - | - | 1,248 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | 4,929 | 463 | 5,392 | 5,392 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0138 | POWER CONTRACTS | LOADOPCO | 508 | - | 508 | 427 | 81 | - | - | 81 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0140 | EMO REGULATORY AFFAIRS | LOADOPCO | 447,019 | 40,575 | 487,594 | 411,164 | 76,430 | - | 1,862 | 78,292 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCWE0151 | FOSSIL DIVERSITY INITIATIVE - | CAPAOPCO | 68 | 5 | 73 | 65 | 8 | - | 0 | 8 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCZU1571 | EGSI TX FUEL RELATED MATTERS | DIRECTTX | 67 | - | 67 | - | 67 | - | - | 67 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PCZU1582 | EGSI LA 3RD EARNINGS REVIEW | DIRECTLG | (43) | - | (43) | (43) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPADSENT | Analytic/Decision Support-Ente | ASSTSALL | 614 | - | 614 | 555 | 58 | - | - | 58 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPADTFL9 | ELL Fuel Audit 2005-2009 | DIRCTELI | 1,541 | 141 | 1,682 | 1,682 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 22,486 | - | 22,486 | 21,430 | 1,056 | - | - | 1,056 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPAPSCLG | APSC Complaint - FERC Investig | CUSEOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPDOWPPA | Dow 3 Year PPA (2011-2014) | DIRECTLG | 1,622 | 151 | 1,773 | 1,773 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPDSMALL | DSM/Energy Efficiency -All Jur | CUSTEGOP | 3,059 | 258 | 3,318 | 2,858 | 460 | - | (460) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPE14432 | EAI SPP RTO Study | DIRCTEAI | 3,545 | 366 | 3,910 | 3,910 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 17,270 | 1,376 | 18,646 | 18,646 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPE14435 | EAI POST SYS AGMT NON-INCREMEN | DIRCTEAI | 2,616 | 270 | 2,886 | 2,886 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPE14436 | EAI MISO RTO STUDY | DIRCTEAI | 1,103 | 93 | 1,196 | 1,196 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEAI011 | EAI 2011 Rate Filing | DIRCTEAI | 1,337 | 141 | 1,479 | 1,479 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 39,150 | 3,057 | 42,207 | 42,207 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEAIPAT | Maintain EAI Paths 2 and 3 RTO | DIRCTEAI | 7,481 | 565 | 8,046 | 8,046 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEGSLMI | MISO Transition EGSL costs | DIRECTLG | 235 | - | 235 | 235 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPELLMIS | MISO Transition ELL costs | DIRCTELI | 235 | - | 235 | 235 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEMI381 | EMI-2010 PMR Docket 2008-UN-38 | DIRCTEMI | 1,048 | 109 | 1,157 | 1,157 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEMI884 | EMI-2010 ECR Docket 2008-UN-88 | DIRCTEMI | 1,365 | 139 | 1,504 | 1,504 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPEMIMIS | MISO Transition EMI costs | DIRCTEMI | 1,299 | 84 | 1,382 | 1,382 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPENOIMI | MISO Transition ENOI costs | DIRCTENO | 47 | 4 | 50 | 50 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPETIMIS | MISO Transition ETI costs | DIRECTTX | 358 | 27 | 385 | - | 385 | - | (385) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 18,258 | 1,510 | 19,768 | 16,851 | 2,917 | - | 77 | 2,994 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPISP717 | Integration Planning Studies 7 | LOADOPCO | 40,136 | 3,855 | 43,991 | 36,925 | 7,066 | - | 149 | 7,215 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPMSEE10 | MS Docket2010-AD-02 Ergy Effic | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPMSFA10 | 2010 EMI Fuel Aud t | DIRCTEMI | 27,307 | 2,651 | 29,959 | 29,959 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPPGA010 | PGA Audit 2010 | DIRECTLG | 3,163 | 301 | 3,463 | 3,463 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPR56620 | WHOLESALE - EGSI LA | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | 2,404 | 229 | 2,633 | 2,633 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE002 | SPO 2009 Renewable RFI Expense | LOADOPCO | 10,073 | 983 | 11,056 | 9,405 | 1,651 | - | 34 | 1,685 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 146,425 | 14,002 | 160,427 | 136,260 | 24,168 | - | 358 | 24,526 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE004 | SPO Summer09RFP IM&PropslSubmt | LOADOPCO | 269,064 | - | 269,064 | 227,046 | 42,018 | - | - | 42,018 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE006 | SPO ISES Mining Asset Evaluati | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE007 | SPO July 2009 Flexible Baseloa | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE008 | SPO July 09 Flex Baseld RFP IM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE010 | SPO Diversity Initiative | LOADOPCO | 4,168 | 253 | 4,422 | 3,725 | 697 | - | (4) | 693 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 28,482 | 2,396 | 30,879 | 30,879 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE013 | SPO PROMOD License for LPSC | CUSELGLA | 70,620 | - | 70,620 | 70,620 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE015 | SPO Compliance and Business Su | LOADOPCO | 860,093 | 78,087 | 938,180 | 789,566 | 148,614 | - | 2,649 | 151,263 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE016 | Addendum-WE0418 Summer 08 IM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 80,022 | 3,874 | 83,896 | 71,371 | 12,525 | - | 141 | 12,666 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE018 | SPO VP of Strategic Initiative | LOADOPCO | 371,895 | 34,263 | 406,158 | 343,181 | 62,977 | - | 1,120 | 64,097 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE019 | SPO IT Infrastructure Maint. | LOADOPCO | 100,713 | - | 100,713 | 83,996 | 16,718 | - | - | 16,718 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE020 | SPO SOFTWARE SUPPORT/LICENSING | LOADOPCO | 24,665 | - | 24,665 | 20,571 | 4,094 | - | - | 4,094 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE022 | SPO Communications Infrastruct | LOADOPCO | 52,135 | - | 52,135 | 43,481 | 8,654 | - | - | 8,654 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE024 | SPO Power De ivery & Tech Serv | LOADOPCO | 348,447 | 30,104 | 378,551 | 318,892 | 59,659 | - | 1,130 | 60,789 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 7,915 | 26,865 | 34,780 | 34,780 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE028 | SPO CIP Expense | LOADOPCO | 85,786 | - | 85,786 | 71,547 | 14,240 | - | - | 14,240 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE038 | SPO Pwr Del & Tech Svcs - EMI | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 245,805 | 11,722 | 257,526 | 257,526 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE045 | PMO Support Initiative - EAI | DIRCTEAI | 2,817 | 234 | 3,051 | 3,051 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE047 | SPO Telecommunications | LOADOPCO | 6,086 | - | 6,086 | 5,075 | 1,010 | - | - | 1,010 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE048 | SPO Cottonwood Expense | LOADOPCO | 486 | 37 | 522 | 435 | 87 | - | 2 | 89 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPE049 | SPO 2011 EAI RFP | DIRCTEAI | 4,968 | 318 | 5,286 | 5,286 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPSENI | Strategic Planning SVCS-ENI | DIRCTENU | 497 | 39 | 536 | 536 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPSENT | Strategic Planning SVCS-Enterg | ASSTSALL | 16,152 | 1,416 | 17,568 | 15,832 | 1,736 | - | 37 | 1,774 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPSPSREG | Strategic Planning SVCS-Utilit | ASSTSREG | 5,833 | 459 | 6,292 | 5,352 | 939 | - | 20 | 960 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPTCGS11 | TX Docket Competitive Generati | DIRECTTX | 2,870 | 267 | 3,137 | - | 3,137 | - | 66 | 3,203 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 271,962 | 19,669 | 291,631 | 244,380 | 47,250 | - | 1,014 | 48,265 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 122,670 | 8,589 | 131,259 | 109,471 | 21,788 | - | (21,788) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPTDHY11 | Transmission Compliance FERC A | TRSBLNOP | 144 | 15 | 159 | 140 | 19 | - | 1 | 19 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPUD0802 | ENO Integrated Resource Plan | DIRCTENO | 6,267 | 462 | 6,729 | 6,729 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPUTLDER | Util ty Derivatives Compliance | LOADOPCO | 2,881 | 261 | 3,142 | 2,620 | 521 | - | 11 | 533 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 319,863 | 27,284 | 347,147 | 291,842 | 55,305 | - | 952 | 56,258 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0315 | Dir. Southeast Region-TXT_ELI | CAPASTHN | 18,259 | 1,717 | 19,976 | 19,976 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0402 | SPO Regulatory Compliance | LOADOPCO | 545,842 | 47,326 | 593,168 | 499,258 | 93,910 | - | 1,882 | 95,792 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0403 | SPO Performance Mngmnt/Special | LOADOPCO | 437,200 | 36,298 | 473,498 | 398,296 | 75,202 | - | 1,619 | 76,821 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0420 | SPO EGSL-SupplyProcuremt/Asset | DIRECTLG | 4,225 | 356 | 4,581 | 4,581 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0432 | SPOManagement of Sys IRP Activ | LOADOPCO | 1,286 | 107 | 1,393 | 1,177 | 216 | - | 7 | 223 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0437 | SPO Expense KGen Hinds | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0438 | SPO Expense KGen Hot Springs | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0478 | Parkwood II Safety Team | CAPAOPCO | 8,234 | - | 8,234 | 7,343 | 890 | - | (147) | 743 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWE0516 | EPA Section 114 Request for In | DIRCTEAI | 3,836 | 365 | 4,201 | 4,201 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET300 | SPO 2008 Western Region RFP-Te | DIRECTTX | 473 | 39 | 512 | - | 512 | - | 11 | 523 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET301 | SPO ETI-SupplyProcuremt/AssetM | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | 4,218 | 388 | 4,607 | - | 4,607 | - | 91 | 4,698 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET303 | SPO2008WinterWestnRegionRFP-IM | DIRECTTX | 4,200 | - | 4,200 | - | 4,200 | - | - | 4,200 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | 88 | 7 | 95 | - | 95 | - | 2 | 97 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET305 | SPO WWOTAB Expense | DIRECTTX | - | - | - | - | - | - | (0) | (0) |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 87,224 | 5,621 | 92,845 | - | 92,845 | - | 1,563 | 94,408 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET307 | SPO2011WestnRegionRFP-IM&PropS | DIRECTTX | 19,469 | - | 19,469 | - | 19,469 | - | - | 19,469 |
| ENERGY AND FUEL MANAGEMENT | ESI | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 86,588 | 8,357 | 94,945 | - | 94,945 | - | 1,996 | 96,941 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PC25116F | ELI FUEL AUDIT 2001 | DIRCTELI | 1,394 | 117 | 1,511 | 1,511 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCE13611 | GENERAL LITIGATION-ENOI | DIRCTENO | 2,733 | 257 | 2,990 | 2,990 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCE13751 | GENERAL LITIGATION- EGSI-LA | DIRECTLG | 4,399 | 388 | 4,787 | 4,787 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCE13759 | JENKINS CLASS ACTION SUIT | DIRECTTX | 34,881 | 2,988 | 37,870 | | 37,870 | - | 1,007 | 38,876 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 495 | - | 495 | 495 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCGSL351 | ELI 2001 SYSTEM AGREEMENT CASE | DIRCTELI | 1,234 | 125 | 1,359 | 1,359 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCGSL500 | EGS FUEL AUDIT | DIRECTLG | 1,794 | 102 | 1,896 | 1,896 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 4,799 | - | 4,799 | 4,799 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 15,051 | 1,317 | 16,368 | 15,927 | 441 | - | 10 | 451 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | 10,036 | 985 | 11,021 | 11,021 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1424 | REGULATORY AFFAIRS - NOPSI | DIRCTENO | 37,547 | 3,228 | 40,775 | 40,775 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | 566 | 58 | 624 | 624 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1573 | REGULATORY AFFAIRS -- 100% EGS | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 33,986 | 2,760 | 36,745 | - | 36,745 | - | 719 | 37,464 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZU1579 | REGULATORY AFFAIRS -- 100% EGS | DIRECTLG | 5,045 | 439 | 5,485 | 5,485 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZUDEPX | DEPRECIATION AND AMORTIZATION | ESIDEPRE | 1,450 | - | 1,450 | 1,450 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZXNLDW | NEW LEADERSHIP DEVELOPMENT WOR | EMPLOREG | 35 | - | 35 | 33 | 2 | - | - | 2 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 191 | - | 191 | 191 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 169,027 | 14,225 | 183,252 | 183,252 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PP27836P | ELI/EGS Purchase of Perryville | DIRCTELI | 14 | - | 14 | 14 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PP4RFERC | FERC Audit | LVLSVCAL | 1,999 | 187 | 2,185 | 1,975 | 210 | - | 7 | 217 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPBCNAVF | Avian Flu Contingency Planning | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPBULKPW | Minimize of Bulk Power Supply | LOADOPCO | 58,303 | 4,996 | 63,299 | 52,958 | 10,341 | - | 210 | 10,551 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPDOEETR | DOE-Dept of Energy Studies Coo | LOADOPCO | 458 | 186 | 644 | 544 | 100 | - | 7 | 106 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPE14427 | Regulatory Info RFIs-EAI-Dock | DIRCTEAI | 6,118 | 543 | 6,660 | 6,660 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 15,273 | 1,828 | 17,101 | - | 17,101 | (3,549) | (13,552) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPETX011 | 2011 Texas Rate Case Support | DIRECTTX | 222 | 25 | 247 | - | 247 | - | 8 | 255 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPFALCON | Project Falcon | DIRCTNI | 4,987 | 382 | 5,370 | 5,370 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPFERCCM | FERC Compliance Program | EMPLOREG | 67 | - | 67 | 63 | 4 | - | - | 4 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPLEGRB3 | Regulatory Filings - River Ben | CUSELGLA | 176 | - | 176 | 176 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPMSFA09 | 2009 EMI Fuel Aud t Horne Grou | DIRCTEMI | 1,113 | 98 | 1,210 | 1,210 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPMSFA9A | 2009 EMI Fuel Aud t McFadden G | DIRCTEMI | 518 | 57 | 575 | 575 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPPAPDIS | Paper Barrier Case | DIRCTEAI | - | - | - | - | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

ENTERGY TEXAS, INC.
Affiliate Billings - by Witness, Class and Project
For the Twelve Months Ended June 30, 2011
Amounts in Dollars

**EXHIBIT PJC-B**
**2011 TX Rate Case**
**Page 4 of 4**

| Class | Billing Entity | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Billings | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 74,598 | 6,137 | 80,735 | 67,333 | 13,401 | - | (13,401) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPSPPCBA | ICT/RTO Cost Benefit Analysis | LOADOPCO | 34,464 | 3,240 | 37,704 | 31,745 | 5,958 | - | (5,958) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPSUPICT | Support of ICT | LOADOPCO | 71,151 | 6,083 | 77,234 | 64,739 | 12,495 | - | 247 | 12,742 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPWE0485 | 2010 EPA Request for Informati | CAPAOPCO | 45 | 4 | 48 | 43 | 5 | - | 0 | 5 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 11,227 | 840 | 12,068 | 11,478 | 590 | - | 13 | 603 |
| ENERGY AND FUEL MANAGEMENT | ESI | F5PPZZ580B | REGULATORY AFFAIRS-A&G | CUSTEGOP | 1,064 | 82 | 1,146 | 988 | 158 | - | 3 | 161 |
| | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | Total ESI | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| | | | | | | | | | | | | |
| Total ENERGY AND FUEL MANAGEMENT | | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| | | | | | | | | | | | | |
| Total Cicio  Patrick | | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings -  by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | E1PPEFF003 | EAI ENERGY EFFCNCY NON-INCREME | DIRCTEAI | 11,515 | 1,145 | 12,660 | 12,660 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PCCSPGST | SYSTEM PLANNING - EGSI-TX | DIRCTTX | 1,032 | 105 | 1,137 | - | 1,137 | - | 24 | 1,161 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PCCSPSYS | SYSTEM PLANNING AND STRATEGIC | ASSTSALL | 257,660 | 151 | 257,811 | 231,925 | 25,886 | - | 4 | 25,890 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 1,189,449 | 43,430 | 1,232,879 | 1,042,896 | 189,983 | - | 1,714 | 191,697 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 2,599 | 149 | 2,748 | 2,748 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PPAMPDEV | Advanced Mgmt Dev  Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | - | 192 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PPDSMALL | DSM/Energy Efficiency -A l Jur | CUSTEGOP | 3,059 | 258 | 3,318 | 2,858 | 460 | - | (460) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PPEAI011 | EAI 2011 Rate Fi ing | DIRCTEAI | 1,337 | 141 | 1,479 | 1,479 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PPSPE013 | SPO PROMOD License for LPSC | CUSELGLA | 70,620 | - | 70,620 | 70,620 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F3PPUD0802 | ENO Integrated Resource Plan | DIRCTENO | 1,377 | 84 | 1,461 | 1,461 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F5PPE14427 | Regulatory Info RFIs-EAI-Dock | DIRCTEAI | 1,891 | 159 | 2,050 | 2,050 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 36 | 475 | 451 | 23 | - | 0 | 24 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CP204 | Total | | | 1,545,092 | 45,658 | 1,590,750 | 1,373,069 | 217,681 | - | 1,282 | 218,963 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C1PPRNE010 | New Nuclear -Regulatory Fi ing | NWDVRBGG | (1,445) | (114) | (1,559) | (1,559) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (4,441) | (471) | (4,911) | (4,911) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 3,459 | 313 | 3,772 | 3,772 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRECTLG | 723 | 57 | 779 | 779 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 723 | 57 | 779 | 779 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPRN0002 | New Nuclear - Entergy | DIRCTR1 | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 2,359 | 179 | 2,537 | 2,537 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPSP0029 | SPO Evange ine | DIRCTELI | 236 | 20 | 256 | 256 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 6,126 | 595 | 6,721 | 6,721 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 6,719 | 678 | 7,397 | 7,397 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPWS0628 | SPO W-WOTAB CT Development Spe | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 1,501 | 153 | 1,654 | 1,654 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCCSPSYS | SYSTEM PLANNING AND STRATEGIC | ASSTSALL | 2,282 | - | 2,282 | 2,050 | 232 | - | - | 232 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 510,111 | 41,302 | 551,413 | 464,460 | 86,954 | - | 101 | 87,055 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 3,378 | 203 | 3,582 | 3,088 | 494 | - | 7 | 501 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCF21600 | CORP RPTG ANALYSIS & POLICY AL | GENLEDAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCFF1003 | BOARD SUPPORT | ASSTSALL | 4,920 | 377 | 5,297 | 4,771 | 526 | - | 9 | 535 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 2,906 | 236 | 3,142 | 2,679 | 463 | - | 11 | 475 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCW19510 | ENERGY MANAGEMENT OPERATIONS | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | 57 | - | 57 | 48 | 8 | - | - | 8 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 551 | 93 | 644 | 548 | 96 | - | 2 | 98 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCWE0092 | EMS OPERATIONS & MAINTENANCE S | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | (88) | - | (88) | (88) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PCWE0140 | EMO REGULATORY AFFAIRS | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPADSENT | Analytic/Decision Support-Ente | ASSTSALL | 614 | - | 614 | 555 | 58 | - | - | 58 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 239 | 26 | 266 | 266 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 1,961 | 171 | 2,131 | 1,817 | 314 | - | 6 | 320 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 887 | 77 | 964 | 964 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 151 | - | 151 | 128 | 23 | - | (2) | 21 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 4,591 | 383 | 4,974 | 4,974 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 7,022 | 629 | 7,651 | 6,509 | 1,142 | - | 24 | 1,167 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 2,816 | 188 | 3,004 | 3,004 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 9,358 | 869 | 10,227 | 10,227 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPSENI | Strategic Planning SVCS-ENI | DIRCTENU | 497 | 39 | 536 | 536 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPSENT | Strategic Planning SVCS-Enterg | ASSTSALL | 16,152 | 1,416 | 17,568 | 15,832 | 1,736 | - | 37 | 1,774 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPSPSREG | Strategic Planning SVCS-Utilit | ASSTSREG | 5,833 | 459 | 6,292 | 5,352 | 939 | - | 20 | 960 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 27,888 | 2,375 | 30,263 | 25,372 | 4,891 | - | 94 | 4,985 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 2,778 | 199 | 2,977 | 2,483 | 494 | - | (494) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWE0402 | SPO Regulatory Compliance | LOADOPCO | 24,145 | - | 24,145 | 20,137 | 4,008 | - | - | 4,008 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWE0437 | SPO Expense KGen Hinds | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWE0438 | SPO Expense KGen Hot Springs | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWET300 | SPO 2008 Western Region RFP-Te | DIRECTTX | 473 | 39 | 512 | - | 512 | - | 11 | 523 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | 2,630 | 227 | 2,857 | - | 2,857 | - | 55 | 2,912 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWET305 | SPO WWOTAB Expense | DIRECTTX | - | - | - | - | - | - | (0) | (0) |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 1,628 | 119 | 1,748 | - | 1,748 | - | 38 | 1,786 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 2,004 | 176 | 2,180 | - | 2,180 | - | 42 | 2,222 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | (88) | - | (88) | (88) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 2,881 | 253 | 3,134 | - | 3,134 | - | 67 | 3,202 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Total Billings Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PCZU1579 | REGULATORY AFFAIRS -- 100% EGS | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PCZUDEPX | DEPRECIATION AND AMORTIZATION | ESIDEPRE | 1,450 | - | 1,450 | 1,450 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 986 | 39 | 1,025 | 1,025 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 473 | 39 | 512 | - | 512 | - | (512) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PPFALCON | Project Falcon | DIRECTNI | 4,987 | 382 | 5,370 | 5,370 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PPHREXEC | HR Executive Financial Counsel | ASSTSALL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 5,279 | 442 | 5,721 | 4,771 | 950 | - | (950) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | F5PPSUPICT | Support of ICT | LOADOPCO | 2,576 | 193 | 2,768 | 2,344 | 425 | - | 7 | 432 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP218 | Total | | | 670,285 | 52,421 | 722,706 | 608,009 | 114,697 | - | (1,424) | 113,273 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C1PPRNE010 | New Nuclear -Regulatory Fi ing | NWDVRBGG | (3,593) | (282) | (3,876) | (3,876) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 10,060 | 928 | 10,988 | 10,988 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRCTELG | 2,904 | 231 | 3,135 | 3,135 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 2,903 | 231 | 3,135 | 3,135 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPN66876 | Cladding Failure Root Cause & | DIRCTWF3 | 5,748 | 545 | 6,293 | 6,293 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPRN0002 | New Nuclear - Entergy | DIRCTR1 | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 1,826 | 175 | 2,001 | 2,001 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 6,260 | 619 | 6,880 | 6,880 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 12,482 | 1,158 | 13,640 | 13,640 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPWS0534 | System Planning Pet Coke Repow | DIRCTELI | 374 | 11 | 384 | 384 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 13,723 | 1,274 | 14,997 | 14,997 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPEAI | SYSTEM PLANNING - EAI | DIRCTEAI | 8,526 | 729 | 9,255 | 9,255 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPEEI | SYSTEM PLANNING - NONREG - EEI | ASSTNREG | 548 | 48 | 596 | 596 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPELI | SYSTEM PLANNING - ELI | DIRCTELI | 26,965 | 2,403 | 29,368 | 29,368 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPEMI | SYSTEM PLANNING - EMI | DIRCTEMI | 2,182 | 182 | 2,364 | 2,364 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPENO | SYSTEM PLANNING - ENOI | DIRCTENO | 26,340 | 2,267 | 28,607 | 28,607 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPGSL | SYSTEM PLANNING - EGSI-LA | DIRECTLG | 12,199 | 1,068 | 13,266 | 13,266 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPGST | SYSTEM PLANNING - EGSI-TX | DIRECTTX | 19,618 | 1,785 | 21,402 | - | 21,402 | - | 441 | 21,843 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPSYS | SYSTEM PLANNING AND STRATEGIC | ASSTSALL | 1,220 | 49 | 1,269 | 1,144 | 125 | - | 1 | 126 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 740,225 | 60,509 | 800,734 | 674,202 | 126,531 | - | 2,492 | 129,023 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 1 | - | 1 | 1 | 0 | - | - | 0 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 28,138 | 2,350 | 30,489 | 25,937 | 4,552 | - | 81 | 4,633 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 1,972 | 314 | 2,286 | 1,945 | 341 | - | 6 | 347 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 85,008 | 7,809 | 92,817 | 92,817 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 8,107 | 791 | 8,897 | 8,897 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 2,220 | 168 | 2,388 | 1,992 | 396 | - | (396) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPUD0802 | ENO Integrated Resource Plan | DIRCTENO | 3,466 | 261 | 3,726 | 3,726 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 10,562 | 882 | 11,445 | - | 11,445 | - | 250 | 11,695 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 11,630 | 1,095 | 12,726 | - | 12,726 | - | 270 | 12,996 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 89 | - | 89 | 89 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | F5PCZCDEPT | SUPERVISION & SUPPORT - CORPOR | LBRCORPT | 15,051 | 1,317 | 16,368 | 15,927 | 441 | - | 10 | 451 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP227 | Total | | | 1,056,752 | 88,917 | 1,145,669 | 967,710 | 177,959 | - | 3,154 | 181,114 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C1PCN70859 | RIVER BEND EXTENDED POWER UPRA | DIRCTEOI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (103,294) | (2,027) | (105,321) | (105,321) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PCN70858 | RIVER BEND EXTENDED POWER UPRA | | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 33,913 | 2,091 | 36,004 | 36,004 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 256,430 | 5,319 | 261,749 | 261,749 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 309,730 | 5,627 | 315,357 | 315,357 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPWGP516 | SBC CIP Compliance | DIRECTTX | 120 | - | 120 | - | 120 | (120) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPWS0628 | SPO W-WOTAB CT Development Spe | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 342 | 36 | 378 | 378 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 324 | - | 324 | 271 | 53 | - | (17) | 35 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | 8,363 | 743 | 9,106 | 9,106 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | (47) | - | (47) | (40) | (7) | - | (0) | (7) |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCW29607 | POWER SYSTEM ACCOUNTING | LOADWEPI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCWE0034 | DIRECTOR - PLANT SUPPORT | CAPAOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 15,342 | 1,291 | 16,632 | 9,775 | 6,857 | - | 139 | 6,996 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | 5,017 | 463 | 5,480 | 5,480 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPDOWPPA | Dow 3 Year PPA (2011-2014) | DIRECTLG | 497 | 52 | 549 | 549 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 2,856 | 259 | 3,115 | 3,115 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 1,932 | 82 | 2,014 | 1,717 | 297 | - | 2 | 299 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

ENTERGY TEXAS, INC.
Affiliate Billings - by Witness, Class, Department and Project
For the Twelve Months Ended June 30, 2011
Amounts in Dollars

EXHIBIT PJC-C
2011 TX Rate Case
Page 3 of 11

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI BIlling Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 334 | 28 | 362 | 362 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE002 | SPO 2009 Renewable RFI Expense | LOADOPCO | 9,446 | 928 | 10,373 | 8,825 | 1,549 | - | 32 | 1,581 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 35,551 | 3,363 | 38,914 | 33,097 | 5,817 | - | (3) | 5,814 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 1,101 | 93 | 1,194 | 1,194 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE015 | SPO Compliance and Business Su | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 5,690 | 454 | 6,144 | 5,226 | 917 | - | 18 | 935 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 34,620 | 3,254 | 37,874 | 37,874 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 138,034 | 2,789 | 140,823 | 140,823 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPSPE048 | SPO Cottonwood Expense | LOADOPCO | 486 | 37 | 522 | 435 | 87 | - | 2 | 89 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 1,912 | 176 | 2,088 | 1,744 | 344 | - | 7 | 351 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 959 | 72 | 1,032 | 861 | 171 | - | (171) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 292,780 | 25,337 | 318,116 | 267,550 | 50,566 | - | 878 | 51,444 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWE0420 | SPO EGSL-SupplyProcuremt/Asset | DIRECTLG | 1,026 | 93 | 1,119 | 1,119 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | 1,286 | 129 | 1,415 | - | 1,415 | - | 30 | 1,444 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWET305 | SPO WWOTAB Expense | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 8,778 | 726 | 9,504 | - | 9,504 | - | 209 | 9,714 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 11,407 | 1,128 | 12,535 | - | 12,535 | - | 266 | 12,801 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 2,264 | 203 | 2,467 | - | 2,467 | - | 82 | 2,549 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F5PP27836P | ELI/EGS Purchase of Perryville | DIRCTELI | 14 | - | 14 | 14 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | (728) | 29 | (699) | - | (699) | (272) | 971 | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F5PPMSFA09 | 2009 EMI Fuel Audit Horne Grou | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 278 | 23 | 301 | 286 | 15 | - | 0 | 15 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP235 | Total | | | 1,076,761 | 52,798 | 1,129,559 | 1,037,552 | 92,007 | (392) | 2,445 | 94,059 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP236 | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 89 | - | 89 | 75 | 14 | - | - | 14 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP236 | Total | | | 89 | - | 89 | 75 | 14 | - | - | 14 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (48,165) | (2,955) | (51,120) | (51,120) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 46 | - | 46 | 46 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 75 | - | 75 | 43 | 31 | - | - | 31 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PCWE0135 | NEL. 6 JOINT OWNERSHIP PART. A | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE002 | SPO 2009 Renewable RFI Expense | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 239 | - | 239 | 203 | 36 | - | - | 36 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE004 | SPO Summer09RFP IM&PropslSubmt | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE008 | SPO July 09 Flex BaseId RFP IM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 494 | - | 494 | 421 | 74 | - | - | 74 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 48,165 | 2,955 | 51,120 | 51,120 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 117 | - | 117 | 99 | 18 | - | - | 18 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPWE0420 | SPO EGSL-SupplyProcuremt/Asset | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPWET300 | SPO 2008 Western Region RFP-Te | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | - | - | - | - | - | (30) | 30 | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP237 | Total | | | 971 | - | 971 | 812 | 159 | (30) | 30 | 159 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (11,335) | (1,509) | (12,844) | (12,844) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 843 | 74 | 918 | 918 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 7,071 | 620 | 7,692 | 7,692 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPSP0029 | SPO Evange ine | DIRCTELI | 7,696 | 653 | 8,348 | 8,348 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPSP0030 | SPO Ouachita Fuel Meter Common | DIRCTEAI | 539 | 45 | 584 | 584 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 33,847 | 3,185 | 37,032 | 37,032 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 34,195 | 3,386 | 37,582 | 37,582 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 937 | 96 | 1,033 | 1,033 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | C6PPWS0984 | SPO EGSL Purchase of Ouachita | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCCPM001 | CORPORATE PERFORMANCE MANAGEME | ASSTSALL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 1,293 | 98 | 1,390 | 1,390 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | | (A) | (B) Total Billings Service Company Recipient | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCF07300 | CORP PLANNING & ANALYSIS- REGU | CUSTEGOP | 13,590 | 963 | 14,553 | 12,547 | 2,007 | - | 30 | 2,036 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 8,581 | 704 | 9,285 | 7,744 | 1,541 | - | 31 | 1,572 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | 699 | 64 | 764 | 764 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCW19511 | ENERGY MANAGEMENT OPERATIONS P | LOADOPCO | 13,071 | 1,208 | 14,279 | 12,040 | 2,239 | - | 43 | 2,283 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 687 | 88 | 775 | 450 | 325 | - | 6 | 331 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PCWE0140 | EMO REGULATORY AFFAIRS | LOADOPCO | 1,893 | 157 | 2,050 | 1,735 | 315 | - | 7 | 322 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | - | 192 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 2,964 | 311 | 3,274 | 3,274 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | 2,796 | 229 | 3,026 | 3,026 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE002 | SPO 2009 Renewable RFI Expense | LOADOPCO | 627 | 56 | 683 | 581 | 102 | - | 2 | 104 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 22,332 | 2,157 | 24,488 | 20,833 | 3,656 | - | 76 | 3,732 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE004 | SPO Summer09RFP IM&PropslSubmt | LOADOPCO | 269,064 | - | 269,064 | 227,046 | 42,018 | - | - | 42,018 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE008 | SPO July 09 Flex Baseld RFP IM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | 1,619 | 140 | 1,759 | 1,483 | 276 | - | (8) | 268 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 15,565 | 1,324 | 16,889 | 16,889 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE016 | Addendum-WE0418 Summer 08 IM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 61,600 | 2,221 | 63,820 | 54,293 | 9,528 | - | 82 | 9,610 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | (185,612) | 9,242 | (176,370) | (176,370) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 30,539 | 3,149 | 33,688 | 33,688 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPSPE049 | SPO 2011 EAI RFP | DIRCTEAI | 2,593 | 196 | 2,789 | 2,789 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 508 | 38 | 546 | 455 | 91 | - | 3 | 94 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 30 | - | 30 | 25 | 5 | - | (5) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWE0403 | SPO Performance Mngmnt/Special | LOADOPCO | 434,710 | 36,063 | 470,773 | 396,023 | 74,750 | - | 1,609 | 76,359 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | 303 | 33 | 335 | - | 335 | - | 7 | 342 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET303 | SPO2008WinterWestnRegionRFP-IM | DIRECTTX | 4,200 | - | 4,200 | - | 4,200 | - | - | 4,200 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 25,766 | 2,245 | 28,011 | - | 28,011 | - | 597 | 28,608 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET307 | SPO2011WestnRegionRFP-IM&PropS | DIRECTTX | 19,469 | - | 19,469 | - | 19,469 | - | - | 19,469 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 28,791 | 2,794 | 31,584 | - | 31,584 | - | 668 | 32,253 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 9,627 | 881 | 10,508 | - | 10,508 | - | 223 | 10,731 |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 328 | 130 | 457 | - | 457 | (382) | (75) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 1,403 | 132 | 1,535 | 1,280 | 255 | - | (255) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,298 | 92 | 1,389 | 1,321 | 68 | - | 1 | 69 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CP23K | Total | | | 868,238 | 71,263 | 939,501 | 707,570 | 231,931 | (382) | 3,043 | 234,592 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (1,901) | (196) | (2,097) | (2,097) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 749 | 65 | 814 | 814 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PCN70858 | RIVER BEND EXTENDED POWER UPRA | | 3,104 | 283 | 3,386 | 3,386 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 84,812 | 209 | 85,022 | 85,022 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 58,180 | 443 | 58,622 | 58,622 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 47,758 | 69 | 47,827 | 47,827 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PPWS0628 | SPO W-WOTAB CT Development Spe | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 3,133 | 191 | 3,324 | 3,324 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PCCSPSYS | SYSTEM PLANNING AND STRATEGIC | ASSTSALL | 28,841 | 325 | 29,166 | 26,223 | 2,943 | - | 8 | 2,951 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 335,569 | 24,721 | 360,290 | 303,252 | 57,038 | - | 1,245 | 58,283 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PCFBLETR | BELOW THE LINE EXPENSES -ETR | DIRCTETR | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPISP717 | Integration Planning Studies 7 | LOADOPCO | 23,997 | 2,510 | 26,507 | 22,313 | 4,193 | - | 86 | 4,279 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 18,973 | 1,594 | 20,567 | 17,294 | 3,274 | - | 71 | 3,344 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 2,666 | 218 | 2,883 | 2,453 | 430 | - | 9 | 440 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE024 | SPO Power Delivery & Tech Serv | LOADOPCO | 347,682 | 30,035 | 377,718 | 318,197 | 59,520 | - | 1,127 | 60,648 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 17,258 | 1,407 | 18,665 | 18,665 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 1,901 | 196 | 2,097 | 2,097 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE045 | PMO Support Initiative - EAI | DIRCTEAI | 2,817 | 234 | 3,051 | 3,051 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPSPE049 | SPO 2011 EAI RFP | DIRCTEAI | 758 | - | 758 | 758 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPTCGS11 | TX Docket Competitive Generati | DIRECTTX | 2,786 | 259 | 3,046 | - | 3,046 | - | 64 | 3,110 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 18,139 | 1,368 | 19,507 | 16,276 | 3,231 | - | 59 | 3,290 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 4,880 | 369 | 5,249 | 4,378 | 871 | - | (871) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 5,502 | - | 5,502 | 4,627 | 876 | - | - | 876 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET301 | SPO ETI-SupplyProcuremt/AssetM | DIRECTTX | - | - | - | - | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

EXHIBIT PJC-C
2011 TX Rate Case
Page 5 of 11

2011 ETI Rate Case

9-251

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET305 | SPO WWOTAB Expense | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 37,953 | 1,440 | 39,394 | - | 39,394 | - | 408 | 39,802 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 612 | 61 | 673 | - | 673 | - | 14 | 688 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 65 | - | 65 | 65 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F5PPBULKPW | Minimize of Bulk Power Supply | LOADOPCO | 10,688 | 868 | 11,556 | 9,638 | 1,918 | - | 39 | 1,957 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 5,161 | 455 | 5,615 | 4,683 | 932 | - | (932) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 319 | 26 | 344 | 327 | 17 | - | 0 | 17 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLG | Total | | | 1,062,402 | 67,150 | 1,129,552 | 951,196 | 178,356 | - | 1,328 | 179,684 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (4,709) | (485) | (5,194) | (5,194) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 4,635 | 346 | 4,981 | 4,981 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 2,460 | 245 | 2,704 | 2,704 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | 761,242 | 65,256 | 826,498 | 826,498 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 12,126 | 969 | 13,095 | 7,700 | 5,395 | - | 109 | 5,504 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPSPE006 | SPO ISES Mining Asset Evaluati | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 50 | - | 50 | 50 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | (78) | - | (78) | (67) | (12) | - | (0) | (12) |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 3,697 | 373 | 4,071 | 4,071 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 4,810 | 493 | 5,303 | 5,303 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F3PPWE0292 | System Planning Asset Manageme | LOADOPCO | 21,464 | 1,948 | 23,412 | 19,566 | 3,846 | - | 74 | 3,920 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 2,042 | 327 | 2,369 | - | 2,369 | (923) | (1,446) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F5PPPAPDIS | Paper Barrier Case | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F5PPWE0485 | 2010 EPA Request for Informati | CAPAOPCO | 45 | 4 | 48 | 43 | 5 | - | 0 | 5 |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 36 | 475 | 451 | 23 | - | 0 | 24 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | CPSLQ | Total | | | 808,223 | 69,511 | 877,734 | 866,107 | 11,627 | (923) | (1,263) | 9,442 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C1PPRNE010 | New Nuclear -Regulatory Fi ing | NWDVRBGG | (4,804) | (378) | (5,182) | (5,182) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (105) | (40) | (145) | (145) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRECTLG | 2,402 | 189 | 2,591 | 2,591 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 3,041 | 241 | 3,282 | 3,282 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPMN0020 | New Nuclear Reg Filing EMI Ong | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPRN0010 | New Nuclear - Regulatory Fi in | DIRCTR1 | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 7,328 | 660 | 7,988 | 7,988 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPWS0534 | System Planning Pet Coke Repow | DIRCTELI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 217 | 23 | 240 | 240 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 15,842 | 1,373 | 17,216 | 17,216 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCE14423 | REGULATORY AFFAIRS - EMI | DIRCTEMI | 7,187 | 678 | 7,865 | 7,865 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCFF1003 | BOARD SUPPORT | ASSTSALL | 514 | - | 514 | 462 | 52 | - | (0) | 52 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 252,418 | 20,096 | 272,514 | 232,235 | 40,279 | - | 1,118 | 41,397 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 2,615 | 257 | 2,871 | 2,473 | 398 | - | 13 | 411 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCW15822 | RESOURCE PLANNING COORDINATOR | LOADOPCO | 122,890 | 11,496 | 134,385 | 113,301 | 21,085 | - | 694 | 21,779 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | 50,737 | (9,302) | 41,435 | 34,558 | 6,878 | - | 236 | 7,114 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | 3,049 | - | 3,049 | 2,574 | 474 | - | - | 474 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCWE0140 | EMO REGULATORY AFFAIRS | LOADOPCO | 444,824 | 40,418 | 485,242 | 409,175 | 76,067 | - | 1,855 | 77,923 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PCZU1571 | EGSI TX FUEL RELATED MATTERS | DIRECTTX | 67 | - | 67 | - | 67 | - | - | 67 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPADTFL9 | ELL Fuel Audit 2005-2009 | DIRCTELI | 1,541 | 141 | 1,682 | 1,682 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPDOWPPA | Dow 3 Year PPA (2011-2014) | DIRECTLG | 1,125 | 99 | 1,224 | 1,224 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 4,725 | 357 | 5,082 | 5,082 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPEMI381 | EMI-2010 PMR Docket 2008-UN-38 | DIRCTEMI | 1,048 | 109 | 1,157 | 1,157 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPEMI884 | EMI-2010 ECR Docket 2008-UN-88 | DIRCTEMI | 1,058 | 108 | 1,166 | 1,166 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 11,929 | 1,107 | 13,036 | 11,111 | 1,925 | - | 64 | 1,989 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPMSEE10 | MS Docket2010-AD-02 Ergy Effic | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 4,023 | 359 | 4,382 | 4,382 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPPGA010 | PGA Audit 2010 | DIRECTLG | 3,163 | 301 | 3,463 | 3,463 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPR56620 | WHOLESALE - EGSI LA | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPSPE010 | SPO Divers ty In itiative | LOADOPCO | 396 | 39 | 435 | 366 | 69 | - | 1 | 70 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 2,171 | 171 | 2,342 | 2,342 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 1,993 | 201 | 2,195 | 2,195 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 108,613 | 7,240 | 115,852 | 97,008 | 18,845 | - | 435 | 19,279 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 18,016 | 1,003 | 19,019 | 15,862 | 3,157 | - | (3,157) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F3PPWE0432 | SPOManagement of Sys IRP Activ | LOADOPCO | 1,286 | 107 | 1,393 | 1,177 | 216 | - | 7 | 223 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

EXHIBIT PJC-C
Page 5 of 11

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PC25116F | ELI FUEL AUDIT 2001 | DIRCTELI | 1,394 | 117 | 1,511 | 1,511 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCE13751 | GENERAL LITIGATION- EGSI-LA | DIRCTLG | 4,125 | 364 | 4,489 | 4,489 | | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCE13759 | JENKINS CLASS ACTION SUIT | DIRCTTX | 23,848 | 2,024 | 25,872 | - | 25,872 | - | 773 | 26,645 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 45 | - | 45 | 45 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCGSL351 | ELI 2001 SYSTEM AGREEMENT CASE | DIRCTELI | 1,234 | 125 | 1,359 | 1,359 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCGSL500 | EGS FUEL AUDIT | DIRCTLG | 1,794 | 102 | 1,896 | 1,896 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 675 | - | 675 | 675 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | 8,668 | 829 | 9,498 | 9,498 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1424 | REGULATORY AFFAIRS - NOPSI | DIRCTENO | 35,320 | 3,047 | 38,366 | 38,366 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | 654 | 58 | 712 | 712 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1573 | REGULATORY AFFAIRS -- 100% EGS | DIRCTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRCTTX | 1,596 | 145 | 1,741 | - | 1,741 | - | 58 | 1,799 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PCZU1579 | REGULATORY AFFAIRS -- 100% EGS | DIRCTLG | 2,045 | 185 | 2,230 | 2,230 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 65,919 | 5,576 | 71,495 | 71,495 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PP4RFERC | FERC Audit | LVLSVCAL | 1,999 | 187 | 2,185 | 1,975 | 210 | - | 7 | 217 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPE14427 | Regulatory Info RFIs-EAI-Dock | DIRCTEAI | 4,227 | 383 | 4,610 | 4,610 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPETX009 | 2009 Texas Rate Case Support | DIRCTTX | 5,001 | 437 | 5,439 | - | 5,439 | (812) | (4,626) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPETX011 | 2011 Texas Rate Case Support | DIRCTTX | 222 | 25 | 247 | - | 247 | - | 8 | 255 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPLEGRB3 | Regulatory Filings - River Ben | CUSELGLA | 176 | - | 176 | 176 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPMSFA09 | 2009 EMI Fuel Audit Horne Grou | DIRCTEMI | 648 | 54 | 702 | 702 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | - | - | - | | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 142 | - | 142 | 118 | 24 | - | (24) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPSUPICT | Support of ICT | LOADOPCO | 8,380 | 535 | 8,915 | 7,531 | 1,384 | - | 30 | 1,414 |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,138 | 78 | 1,216 | 1,157 | 59 | - | 1 | 61 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SE08B | Total | | | 1,238,559 | 91,322 | 1,329,881 | 1,125,393 | 204,488 | (812) | (2,507) | 201,168 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 343 | 38 | 381 | 318 | 63 | - | 1 | 65 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 798 | 60 | 858 | 511 | 347 | - | 7 | 354 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 797 | 108 | 905 | 770 | 135 | - | 3 | 138 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PCWE0140 | EMO REGULATORY AFFAIRS | LOADOPCO | 303 | - | 303 | 254 | 48 | - | - | 48 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 2,772 | 210 | 2,982 | 2,982 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | (28) | 12 | (16) | (14) | (2) | - | (0) | (3) |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPSPE015 | SPO Compliance and Business Su | LOADOPCO | 38,521 | 3,536 | 42,057 | 35,327 | 6,730 | - | 131 | 6,861 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 399 | 34 | 433 | 433 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 980 | 76 | 1,056 | 881 | 175 | - | (175) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F3PPWE0402 | SPO Regulatory Compliance | LOADOPCO | 521,697 | 47,326 | 569,024 | 479,121 | 89,902 | - | 1,882 | 91,784 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | - | - | - | | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F5PPETX009 | 2009 Texas Rate Case Support | DIRCTTX | 471 | 37 | 508 | - | 508 | (51) | (457) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F5PPFERCCM | FERC Compliance Program | EMPLOREG | 67 | - | 67 | 63 | 4 | - | - | 4 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 527 | 34 | 561 | 534 | 27 | - | 1 | 28 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESEE | Total | | | 567,647 | 51,472 | 619,119 | 521,181 | 97,938 | (51) | 1,392 | 99,280 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 9 | - | 9 | 7 | 1 | - | - | 1 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | 4 | - | 4 | 4 | 1 | - | - | 1 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | 1,067,079 | 310 | 1,067,389 | 900,287 | 167,103 | - | 8 | 167,111 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 9,047 | 1,241 | 10,288 | 8,732 | 1,556 | - | 33 | 1,589 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | 604 | - | 604 | 510 | 94 | - | - | 94 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | F3PPWE0478 | Parkwood II Safety Team | CAPAOPCO | 8,234 | - | 8,234 | 7,343 | 890 | - | (147) | 743 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKA | Total | | | 1,084,977 | 1,551 | 1,086,528 | 916,884 | 169,644 | - | (106) | 169,538 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 1,371 | 105 | 1,477 | 1,477 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 5,642 | 1,001 | 6,643 | 5,664 | 979 | - | 25 | 1,004 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCSYSRAS | SYSTEM REGULATORY AFFAIRS-STAT | CUSTEGOP | 76 | 8 | 84 | 72 | 12 | - | 0 | 12 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 18 | - | 18 | 16 | 3 | - | - | 3 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCW18200 | OPNS-OIL SUPPLY | OWNISFI | 3,198 | 318 | 3,516 | 3,516 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | - | - | - | | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | 1,012,944 | 90,454 | 1,103,399 | 929,008 | 174,390 | - | 3,337 | 177,727 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCW29607 | POWER SYSTEM ACCOUNTING | LOADWEPI | 420,638 | 38,815 | 459,453 | 387,423 | 72,031 | - | 1,389 | 73,419 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | 1,228 | - | 1,228 | 1,038 | 190 | - | - | 190 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCWE0151 | FOSSIL DIVERSITY INITIATIVE - | CAPAOPCO | 68 | 5 | 73 | 65 | 8 | - | 0 | 8 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PCZU1582 | EGSI LA 3RD EARNINGS REVIEW | DIRCTLG | (43) | - | (43) | (43) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 6,037 | - | 6,037 | 5,747 | 289 | - | - | 289 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 3,214 | 243 | 3,457 | 3,457 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

ENTERGY TEXAS, INC.
Affiliate Billings - by Witness, Class, Department and Project
For the Twelve Months Ended June 30, 2011
Amounts in Dollars

EXHIBIT PJC-C
2011 TX Rate Case
Page 7 of 11

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 20,663 | 2,060 | 22,723 | 22,723 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PCE13759 | JENKINS CLASS ACTION SUIT | DIRCTTX | 9,520 | 851 | 10,371 | - | 10,371 | - | 203 | 10,574 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 45 | - | 45 | 45 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 336 | - | 336 | 336 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | 1,408 | 156 | 1,564 | 1,564 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PCZU1579 | REGULATORY AFFAIRS -- 100% EGS | DIRECTLG | 3,000 | 255 | 3,255 | 3,255 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 29,566 | 2,744 | 32,310 | 32,310 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PPMSFA09 | 2009 EMI Fuel Audit Horne Grou | DIRCTEMI | 465 | 44 | 508 | 508 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | 518 | 57 | 575 | 575 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 4,691 | 422 | 5,113 | 4,264 | 849 | - | (849) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 36 | 475 | 451 | 23 | - | 0 | 24 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKB | Total | | | 1,525,041 | 137,574 | 1,662,615 | 1,403,471 | 259,144 | - | 4,105 | 263,250 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKC | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (22) | - | (22) | (22) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKC | F3PCW18300 | OPNS-COAL SUPPLY | COALARGS | 491 | - | 491 | 491 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKC | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 22 | - | 22 | 22 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKC | Total | | | 491 | - | 491 | 491 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 114 | 10 | 124 | 124 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | C6PPSP0029 | SPO Evange ine | DIRCTELI | 26,099 | 1,749 | 27,848 | 27,848 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 7,009 | 5 | 7,013 | 7,013 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 56 | 5 | 61 | 61 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 171 | 18 | 189 | 189 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCFBLFOS | BELOW THE LINE - FOSSIL OPERAT | CAPAOPCO | 3,684 | - | 3,684 | 3,286 | 398 | (398) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCFVARAS | ADMIN SUPRT - VARIBUS CORPORAT | DIRECTLG | 40,766 | 3,739 | 44,505 | 44,505 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCW18100 | OPNS-GAS SUPPLY | CAPXCOPC | 984,445 | 88,994 | 1,073,438 | 926,742 | 146,696 | - | 2,795 | 149,491 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCW18200 | OPNS-OIL SUPPLY | OWNISFI | 133,587 | 12,416 | 146,004 | 146,004 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCW19512 | ENERGY MGMT - FUEL & ENERGY AN | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCW51400 | SFI FUEL OIL O&M | DIRCTSFI | 108 | 11 | 119 | 119 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | 83 | - | 83 | 71 | 12 | - | - | 12 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PCWE0012 | 1998 FUELS MANAGEMENT TELEMETR | CAPAOPCO | 140,071 | - | 140,071 | 124,928 | 15,143 | - | - | 15,143 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F3PPUTLDER | Utility Derivatives Compliance | LOADOPCO | 2,881 | 261 | 3,142 | 2,620 | 521 | - | 11 | 533 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | (83) | - | (83) | (83) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | (580) | 30 | (550) | - | (550) | (183) | 733 | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 23 | 1 | 24 | 23 | 1 | - | 0 | 1 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKD | Total | | | 1,338,433 | 107,239 | 1,445,672 | 1,283,449 | 162,223 | (581) | 3,539 | 165,181 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | C1PPRTOSOF | RTO Implement Software ALLCOS | LOADOPCO | 13,959 | 1,480 | 15,439 | 12,876 | 2,563 | (2,563) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | C6PPSP0045 | SPO Real Time Calcasieu RTU | DIRECTLG | 25,835 | 156 | 25,991 | 25,991 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 2,572 | 273 | 2,845 | 2,845 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PCWE0046 | PLANT SUPPORT SERVICES - BIG C | ASSTTXLG | 459 | 48 | 507 | 294 | 214 | - | 4 | 218 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 319 | 40 | 359 | 305 | 54 | - | 1 | 55 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PCWE0092 | EMS OPERATIONS & MAINTENANCE S | LOADOPCO | 89,299 | - | 89,299 | 74,476 | 14,823 | - | 279 | 15,102 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PCWE0133 | EMO INFORMATION TECHNOLOGY SUP | LOADOPCO | 7,521 | - | 7,521 | 6,273 | 1,248 | - | - | 1,248 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPEGSLMI | MISO Transition EGSL costs | DIRECTLG | 235 | - | 235 | 235 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPELLMIS | MISO Transition ELL costs | DIRCTELI | 235 | - | 235 | 235 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 74 | - | 74 | 63 | 11 | - | - | 11 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | (449) | - | (449) | (449) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE010 | SPO Divers ip In tiative | LOADOPCO | 804 | - | 804 | 671 | 134 | - | - | 134 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE015 | SPO Compliance and Business Su | LOADOPCO | 821,572 | 74,551 | 896,124 | 754,239 | 141,884 | - | 2,518 | 144,402 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE019 | SPO IT Infrastructure Maint. | LOADOPCO | 100,713 | - | 100,713 | 83,996 | 16,718 | - | - | 16,718 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE020 | SPO SOFTWARE SUPPORT/LICENSING | LOADOPCO | 24,665 | - | 24,665 | 20,571 | 4,094 | - | - | 4,094 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE022 | SPO Communications Infrastruct | LOADOPCO | 52,135 | - | 52,135 | 43,481 | 8,654 | - | - | 8,654 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE024 | SPO Power Delivery & Tech Serv | LOADOPCO | 125 | 12 | 137 | 114 | 23 | - | 0 | 23 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE028 | SPO CIP Expense | LOADOPCO | 85,786 | - | 85,786 | 71,547 | 14,240 | - | - | 14,240 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE038 | SPO Pwr Del & Tech Svcs - EMI | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 1,286 | 113 | 1,399 | 1,399 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPSPE047 | SPO Telecommunications | LOADOPCO | 6,086 | - | 6,086 | 5,075 | 1,010 | - | - | 1,010 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 2,288 | 179 | 2,466 | 2,057 | 409 | - | 9 | 419 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 2,217 | 167 | 2,384 | 1,989 | 396 | - | (396) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PCE13611 | GENERAL LITIGATION-ENOI | DIRCTENO | 2,733 | 257 | 2,990 | 2,990 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PCE13751 | GENERAL LITIGATION- EGSI-LA | DIRECTLG | 274 | 24 | 297 | 297 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 45 | - | 45 | 45 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 412 | - | 412 | 412 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 161 | 14 | 175 | - | 175 | - | 4 | 179 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 2,917 | 287 | 3,204 | 3,204 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 1,681 | - | 1,681 | 1,402 | 279 | - | (279) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PPSUPICT | Support of ICT | LOADOPCO | 3,501 | 344 | 3,845 | 3,206 | 638 | - | 21 | 659 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,104 | 87 | 1,190 | 1,132 | 58 | - | 1 | 60 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKE | Total | | | 1,250,562 | 78,031 | 1,328,594 | 1,120,970 | 207,624 | (2,563) | 2,163 | 207,224 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | 0 | (5) | (5) | (5) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PCN32144 | GRAND GULF EXTENDED POWER UPRA | DIRCTSER | 816 | 77 | 893 | 893 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRECTLG | 324 | 25 | 349 | 349 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 324 | 25 | 349 | 349 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 725 | 66 | 791 | 791 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 2 | 0 | 2 | 2 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 2 | 0 | 2 | 2 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 3,543 | 329 | 3,872 | 3,872 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CCSPEAI | SYSTEM PLANNING - EAI | DIRCTEAI | 568 | 47 | 616 | 616 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CCSPELI | SYSTEM PLANNING - ELI | DIRCTELI | 1,088 | 106 | 1,194 | 1,194 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CCSPENO | SYSTEM PLANNING - ENOI | DIRCTENO | 1,088 | 106 | 1,194 | 1,194 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CCSPGSL | SYSTEM PLANNING - EGSI-LA | DIRECTLG | 3,058 | 282 | 3,340 | 3,340 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 976 | 67 | 1,042 | 869 | 173 | - | 4 | 177 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PCE14423 | REGULATORY AFFAIRS - EMI | DIRCTEMI | 1,046 | 82 | 1,128 | 1,128 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3CSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 8,214 | 702 | 8,916 | 7,593 | 1,323 | - | 32 | 1,355 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 906,526 | 79,321 | 985,847 | 830,499 | 155,348 | - | 3,013 | 158,361 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PCW15840 | PLANNING MODELING & ANALYSIS G | LOADOPCO | 294,177 | 26,854 | 321,031 | 270,703 | 50,328 | - | 960 | 51,288 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 319 | 40 | 359 | 305 | 54 | - | 1 | 55 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPE14432 | EAI SPP RTO Study | DIRCTEAI | 1,053 | 109 | 1,162 | 1,162 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 1,563 | 118 | 1,681 | 1,681 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPEMI884 | EMI-2010 ECR Docket 2008-UN-88 | DIRCTEMI | 307 | 32 | 338 | 338 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPISP717 | Integration Planning Studies 7 | LOADOPCO | 1,653 | 145 | 1,798 | 1,499 | 298 | - | 6 | 305 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 200 | 21 | 221 | 221 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 10,932 | 1,416 | 12,348 | 10,499 | 1,850 | - | 35 | 1,885 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | 581 | 64 | 645 | 548 | 96 | - | 2 | 98 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE024 | SPO Power Delivery & Tech Serv | LOADOPCO | 640 | 57 | 697 | 581 | 116 | - | 2 | 118 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 513 | 46 | 559 | 559 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 626 | 65 | 690 | 690 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPTCGS11 | TX Docket Competitive Generati | DIRECTTX | 84 | 7 | 91 | - | 91 | - | 2 | 93 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 12,659 | 1,123 | 13,782 | 11,638 | 2,144 | - | 46 | 2,189 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 13,372 | 1,010 | 14,382 | 11,995 | 2,387 | - | (2,387) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPWE0516 | EPA Section 114 Request for In | DIRCTEAI | 3,836 | 365 | 4,201 | 4,201 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 3,131 | 301 | 3,432 | - | 3,432 | - | 72 | 3,505 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 90 | - | 90 | 90 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 40 | - | 40 | 40 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 866 | - | 866 | 866 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPBULKPW | Minimize of Bulk Power Supply | LOADOPCO | 47,615 | 4,128 | 51,743 | 43,320 | 8,423 | - | 171 | 8,594 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPDOEETR | DOE-Dept of Energy Studies Coo | LOADOPCO | 458 | 186 | 644 | 544 | 100 | - | 7 | 106 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 7,009 | 645 | 7,654 | - | 7,654 | (570) | (7,084) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPSPPCBA | ICT/RTO Cost Benefit Analysis | LOADOPCO | 527 | 54 | 581 | 494 | 87 | - | (87) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPSUPICT | Support of ICT | LOADOPCO | 4,664 | 464 | 5,129 | 4,363 | 766 | - | 16 | 781 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,357 | 116 | 1,472 | 1,400 | 72 | - | 2 | 74 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKF | Total | | | 1,336,569 | 118,596 | 1,455,165 | 1,220,425 | 234,741 | (570) | (5,187) | 228,983 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKG | F3PCW15840 | PLANNING MODELING & ANALYSIS G | LOADOPCO | 659 | - | 659 | 550 | 109 | - | - | 109 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKG | Total | | | 659 | - | 659 | 550 | 109 | - | - | 109 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | C1PPSP0008 | SPO ELL&ENOI Purchase Option I | OWNISES2 | (964) | (100) | (1,064) | (1,064) | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 2,931 | 241 | 3,171 | 3,171 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 266 | 24 | 290 | 290 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 353 | 35 | 388 | 388 | - | - | - | - |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI Billing Method | (A) Support | (B) Total Billings Service Company Recipient | (C) Total | (D) All Other BU's | (E) ETI Per Books | (F) Exclusions | (G) Pro Forma Amount | (H) Total ETI Adjusted |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCFVARAS | ADMIN SUPRT - VARIBUS CORPORAT | DIRECTLG | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCW19510 | ENERGY MANAGEMENT OPERATIONS | LOADOPCO | 144,037 | 13,246 | 157,282 | 131,852 | 25,430 | - | 491 | 25,921 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCW19511 | ENERGY MANAGEMENT OPERATIONS P | LOADOPCO | 1,506,076 | 129,082 | 1,635,158 | 1,376,511 | 258,647 | - | 4,838 | 263,485 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PCWE0058 | AWARDS & RECOGNITIONS PROGRAM | LOADOPCO | 398 | 50 | 448 | 382 | 67 | - | 2 | 69 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPAMPDEV | Advanced Mgmt Dev  Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | - | 192 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 563 | 60 | 623 | 530 | 93 | - | 2 | 95 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | 30 | - | 30 | 26 | 4 | - | - | 4 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 486 | 40 | 527 | 527 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPSPE027 | SPO ESI Project Houston PPA | DIRCTESI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPSPE042 | SPO Expense ISES Purchase Opti | OWNISES2 | 964 | 100 | 1,064 | 1,064 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 10,491 | 949 | 11,439 | 9,541 | 1,899 | - | 40 | 1,939 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 20,788 | 1,664 | 22,453 | 18,726 | 3,727 | - | (3,727) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPWE0420 | SPO EGSL-SupplyProcuremt/Asset | DIRECTLG | 3,199 | 263 | 3,462 | 3,462 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPWET304 | SPO Frontier 10 Year PPA | DIRECTTX | 88 | 7 | 95 | - | 95 | - | 2 | 97 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F3PPWET308 | SPO Calpine PPA/Project Housto | DIRECTTX | 29,013 | 2,801 | 31,814 | - | 31,814 | - | 663 | 32,477 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 653 | - | 653 | 653 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PCZU1424 | REGULATORY AFFAIRS - NOPSI | DIRCTENO | 923 | 73 | 995 | 995 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 155 | - | 155 | 155 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 27,194 | 2,447 | 29,641 | 29,641 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPBCNAVF | Avian Flu Contingency Planning | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | (1,125) | - | (1,125) | - | (1,125) | (212) | 1,337 | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 12,129 | 980 | 13,109 | 10,933 | 2,176 | - | (2,176) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPSUPICT | Support of ICT | LOADOPCO | (119) | - | (119) | (101) | (18) | - | (0) | (18) |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 1,988 | 142 | 2,131 | 2,026 | 104 | - | 2 | 106 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | F5PPZZ580B | REGULATORY AFFAIRS-A&G | CUSTEGOP | 769 | 59 | 828 | 714 | 114 | - | 2 | 117 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKH | Total | | | 1,765,397 | 152,163 | 1,917,560 | 1,594,341 | 323,219 | (212) | 1,476 | 324,483 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | 626,065 | 39,537 | 665,602 | 560,815 | 104,787 | - | 1,982 | 106,769 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F3PCW19510 | ENERGY MANAGEMENT OPERATIONS | LOADOPCO | 2,324,822 | 206,432 | 2,531,254 | 2,131,786 | 399,469 | - | 7,468 | 406,936 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F3PCW19511 | ENERGY MANAGEMENT OPERATIONS P | LOADOPCO | 8,802 | 845 | 9,647 | 8,046 | 1,601 | - | 31 | 1,632 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F3PCW54035 | VICE PRESIDENT OF ENERGY MANAG | LOADOPCO | 6,325 | - | 6,325 | 5,297 | 1,028 | - | - | 1,028 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 135 | - | 135 | 135 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 233 | - | 233 | 233 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PCZXNLDW | NEW LEADERSHIP DEVELOPMENT WOR | EMPLOREG | 35 | - | 35 | 33 | 2 | - | - | 2 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PPBCNAVF | Avian Flu Contingency Planning | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 149 | 12 | 161 | 154 | 8 | - | 0 | 8 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKJ | Total | | | 2,966,567 | 246,827 | 3,213,393 | 2,706,497 | 506,896 | - | 9,480 | 516,376 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 60 | - | 60 | 51 | 9 | - | - | 9 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCE14420 | REGULATORY AFFAIRS - EAI | DIRCTEAI | 184 | 18 | 203 | 203 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 99,830 | 7,752 | 107,582 | 91,701 | 15,881 | - | 373 | 16,254 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 1,417 | 136 | 1,552 | 1,319 | 233 | - | 4 | 238 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCW18200 | OPNS-OIL SUPPLY | OWNISFI | 277 | 27 | 304 | 304 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | 935 | - | 935 | 787 | 148 | - | - | 148 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPE14432 | EAI SPP RTO Study | DIRCTEAI | 2,491 | 257 | 2,748 | 2,748 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPE14434 | EAI POST SYS AGMT INCREMENTAL | DIRCTEAI | 8,439 | 569 | 9,008 | 9,008 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPE14435 | EAI POST SYS AGMT NON-INCREMEN | DIRCTEAI | 2,616 | 270 | 2,886 | 2,886 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 19,544 | 1,268 | 20,813 | 20,813 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPEMIMIS | MISO Transition EMI costs | DIRCTEMI | 1,299 | 84 | 1,382 | 1,382 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPENOIMI | MISO Transition ENOI costs | DIRCTENO | 47 | 4 | 50 | 50 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPETIMIS | MISO Transition ETI costs | DIRECTTX | 358 | 27 | 385 | - | 385 | - | (385) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPINVDOJ | DOJ Anti Trust Investigation | CUSEOPCO | 2,362 | 151 | 2,513 | 2,142 | 370 | - | 6 | 376 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 184 | 20 | 205 | 205 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE001 | SPO NISCO JOPOA MANAGEMENT EXP | DIRECTLG | 56 | - | 56 | 56 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE010 | SPO Divers ty In tiative | LOADOPCO | 135 | 11 | 146 | 121 | 24 | - | 1 | 25 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 4,861 | 414 | 5,275 | 5,275 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 154 | - | 154 | 131 | 23 | - | - | 23 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| | | | Activity / Project Code | | ESI BIlling Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| Class | Billing Entity | Dept | | Activity / Project Description | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE018 | SPO VP of Strategic Initiative | LOADOPCO | 371,895 | 34,263 | 406,158 | 343,181 | 62,977 | - | 1,120 | 64,097 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 505 | 48 | 553 | 553 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 88,884 | 6,164 | 95,049 | 79,752 | 15,297 | - | 319 | 15,615 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 53,896 | 3,669 | 57,565 | 48,010 | 9,555 | - | (9,555) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPWE0403 | SPO Performance Mngmnt/Special | LOADOPCO | 2,491 | 234 | 2,725 | 2,273 | 452 | - | 10 | 462 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F3PPWET306 | SPO 2011 Western Region RFP | DIRECTTX | 2,536 | 208 | 2,743 | - | 2,743 | - | 61 | 2,804 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PCE13759 | JENKINS CLASS ACTION SUIT | DIRCTTX | 1,513 | 114 | 1,627 | - | 1,627 | - | 30 | 1,657 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 226 | - | 226 | 226 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | 43 | - | 43 | 43 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PCZU1424 | REGULATORY AFFAIRS - NOPSI | DIRCTENO | 551 | 50 | 601 | 601 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRCTTX | 16,506 | 1,180 | 17,686 | | 17,686 | - | 265 | 17,951 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 37,874 | 2,841 | 40,715 | 40,715 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 2,238 | 143 | 2,382 | - | 2,382 | (99) | (2,283) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PPSPE044 | PMO Support Initiative-System- | LOADOPCO | 44,113 | 3,705 | 47,818 | 39,881 | 7,937 | - | (7,937) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PPSPPCBA | ICT/RTO Cost Benefit Analysis | LOADOPCO | 33,937 | 3,185 | 37,123 | 31,251 | 5,872 | - | (5,872) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | F5PPSUPICT | Support of ICT | LOADOPCO | 51,936 | 4,526 | 56,462 | 47,197 | 9,266 | - | 173 | 9,438 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKQ | Total | | | 854,394 | 71,339 | 925,732 | 772,863 | 152,869 | (99) | (23,673) | 129,098 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPGN0020 | New Nuclear Reg Filing EGSL On | DIRECTLG | 461 | 35 | 496 | 496 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPLN0020 | New Nuclear Reg Filing ELL Ong | DIRCTELI | 461 | 35 | 496 | 496 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 1,592 | 155 | 1,747 | 1,747 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPSP0038 | SPO Project Lamar Transaction | DIRCTEAI | 8,708 | 842 | 9,550 | 9,550 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPSP0046 | SPO Project Burnet Transaction | DIRCTEMI | 322 | 28 | 351 | 351 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 7,794 | 768 | 8,562 | 8,562 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPEAI | SYSTEM PLANNING - EAI | DIRCTEAI | 24,707 | 2,387 | 27,094 | 27,094 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPELI | SYSTEM PLANNING - ELI | DIRCTELI | 2,799 | 273 | 3,073 | 3,073 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPEMI | SYSTEM PLANNING - EMI | DIRCTEMI | 922 | 94 | 1,015 | 1,015 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPENO | SYSTEM PLANNING - ENOI | DIRCTENO | 7,197 | 690 | 7,887 | 7,887 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPGST | SYSTEM PLANNING - EGSI-TX | DIRECTTX | 2,178 | 180 | 2,358 | - | 2,358 | - | 51 | 2,409 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCCSPUTI | SYSTEM PLANNING & STRATEGIC AD | LOADOPCO | 1,554 | - | 1,554 | 1,322 | 232 | - | - | 232 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | 12,170 | 1,027 | 13,197 | 11,247 | 1,950 | - | 40 | 1,990 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCW15830 | SYSTEM GENERATION PLANNING | LOADOPCO | 809,798 | 75,495 | 885,293 | 746,610 | 138,683 | - | 2,677 | 141,360 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PCW15840 | PLANNING MODELING & ANALYSIS G | LOADOPCO | 417 | - | 417 | 354 | 63 | - | - | 63 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPE14436 | EAI MISO RTO STUDY | DIRCTEAI | 1,103 | 93 | 1,196 | 1,196 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPEAIMIS | MISO Transition EAI Path 1 cos | DIRCTEAI | 10,103 | 1,071 | 11,174 | 11,174 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPEAIPAT | Maintain EAI Paths 2 and 3 RTO | DIRCTEAI | 7,481 | 565 | 8,046 | 8,046 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPISP717 | Integration Planning Studies 7 | LOADOPCO | 14,486 | 1,200 | 15,686 | 13,112 | 2,574 | - | 57 | 2,631 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 27,286 | 2,859 | 30,145 | 25,645 | 4,501 | - | 92 | 4,592 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPSPE007 | SPO July 2009 Flexible Baseloa | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPSPE017 | SPO 2010 Renewable RFP | LOADOPCO | 503 | 40 | 542 | 461 | 81 | - | 2 | 83 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPSPE025 | SPO 2010 Renewable RFP - LA on | CUSELGLA | 48,223 | 4,424 | 52,647 | 52,647 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPSPE049 | SPO 2011 EAI RFP | DIRCTEAI | 1,617 | 122 | 1,739 | 1,739 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 388 | 29 | 418 | 348 | 69 | - | (69) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPUD0802 | ENO Integrated Resource Plan | DIRCTENO | 1,424 | 118 | 1,542 | 1,542 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPWET300 | SPO 2008 Western Region RFP-Te | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F3PPWET302 | SPO 2008 Winter Western Region | DIRECTTX | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PCEDIVER | DIVERSITY TRAINING | DIRCTESI | 135 | - | 135 | 135 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 210 | - | 210 | 210 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PCZU1424 | REGULATORY AFFAIRS - NOPSI | DIRCTENO | 754 | 58 | 812 | 812 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PCZZ4070 | IMPACT AWARDS | DIRCTESI | 36 | - | 36 | 36 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | 3,705 | 291 | 3,996 | 3,996 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PPSUPICT | Support of ICT | LOADOPCO | 212 | 22 | 234 | 199 | 35 | - | 1 | 36 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 696 | 51 | 747 | 711 | 36 | - | 1 | 37 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESKU | Total | | | 999,442 | 92,955 | 1,092,397 | 941,814 | 150,582 | - | 2,851 | 153,434 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F3PCFBLFOS | BELOW THE LINE - FOSSIL OPERAT | CAPAOPCO | 3,684 | - | 3,684 | 3,286 | 398 | (398) | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | 824,308 | 75,638 | 899,946 | 758,065 | 141,882 | - | 2,726 | 144,607 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F5PCSVCAWD | SERVICE AWARDS | DIRCTESI | 1,861 | - | 1,861 | 1,861 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 439 | 29 | 468 | 445 | 23 | - | 0 | 23 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick

**ENTERGY TEXAS, INC.**
**Affiliate Billings - by Witness, Class, Department and Project**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

| | | | | | | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Billings | | | | | | |
| Class | Billing Entity | Dept | Activity / Project Code | Activity / Project Description | ESI BIlling Method | Support | Service Company Recipient | Total | All Other BU's | ETI Per Books | Exclusions | Pro Forma Amount | Total ETI Adjusted |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLA | Total | | | 830,292 | 75,667 | 905,959 | 763,656 | 142,303 | (398) | 2,726 | 144,631 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | C6PPSP0029 | SPO Evange ine | DIRCTELI | 161 | 17 | 178 | 178 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | C6PPWS0783 | Ninem le 6 Development | DIRCTELI | 1,045 | 111 | 1,156 | 1,156 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PCSYSAGR | SYSTEM AGREEMENT-2001 | CUSEOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PCW19502 | WHOLESALE TRXN - EAI CUSTOMERS | DIRCTEAI | 56 | - | 56 | 56 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PCW19511 | ENERGY MANAGEMENT OPERATIONS P | LOADOPCO | 21,026 | 1,979 | 23,005 | 19,571 | 3,434 | - | 65 | 3,499 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | 325,424 | 28,335 | 353,759 | 298,125 | 55,634 | - | 1,019 | 56,653 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | 4,112 | - | 4,112 | 3,921 | 192 | - | - | 192 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PPAPSCLG | APSC Complaint - FERC Investig | CUSEOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PPTDERSD | MISO Transition ALL OPCO | LOADOPCO | 2,144 | 162 | 2,306 | 1,923 | 383 | - | (383) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F3PPWE0315 | Dir. Southeast Region-TXT_ ELI | CAPASTHN | 18,259 | 1,717 | 19,976 | 19,976 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PCZU1422 | REGULATORY AFFAIRS - LP&L | DIRCTELI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PP10011U | Show Cause Docket No. 10-011-U | DIRCTEAI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPBCNAVF | Avian Flu Contingency Planning | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | - | - | - | - | - | (9) | 9 | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPSUPICT | Support of ICT | LOADOPCO | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | 595 | 43 | 638 | 607 | 31 | - | 1 | 32 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | F5PPZZ580B | REGULATORY AFFAIRS-A&G | CUSTEGOP | 296 | 23 | 318 | 274 | 44 | - | 1 | 45 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLB | Total | | | 373,117 | 32,386 | 405,504 | 345,786 | 59,718 | (9) | 712 | 60,421 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLC | F3PCWE0138 | POWER CONTRACTS | LOADOPCO | 508 | - | 508 | 427 | 81 | - | - | 81 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLC | Total | | | 508 | - | 508 | 427 | 81 | - | - | 81 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLE | F3PCW19510 | ENERGY MANAGEMENT OPERATIONS | LOADOPCO | 1,074 | - | 1,074 | 912 | 162 | - | - | 162 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLE | F3PCWE0064 | LONG TERM ENERGY | LOADOPCO | 1 | - | 1 | 1 | 0 | - | - | 0 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLE | F5PPZUWELL | Entergy Wellness Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLE | Total | | | 1,076 | - | 1,076 | 914 | 162 | - | - | 162 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | C6PPSP0012 | SPO Project Gator Transact/Tra | DIRCTELI | 398 | 34 | 431 | 431 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | C6PPSP0029 | SPO Evange ine | DIRCTELI | 7,474 | 509 | 7,983 | 7,983 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PCFVARAS | ADMIN SUPRT - VARIBUS CORPORAT | DIRECTLG | 373 | 40 | 413 | 413 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PCW18100 | OPNS-GAS SUPPLY | CAPXCOPC | 166,313 | 15,649 | 181,962 | 157,095 | 24,867 | - | 471 | 25,338 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PCW19501 | WHOLESALE PURCHASING & SALES | LOADOPCO | 119,159 | 10,643 | 129,802 | 109,438 | 20,364 | - | 339 | 20,703 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PCW51400 | SFI FUEL OIL O&M | DIRCTSFI | 144 | 15 | 159 | 159 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPAMPDEV | Advanced Mgmt Dev Program | EMPLOYAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPMSFA10 | 2010 EMI Fuel Audit | DIRCTEMI | 1,016 | 85 | 1,102 | 1,102 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPSPE003 | SPO Summer 2009 RFP Expense | LOADOPCO | 2,288 | 190 | 2,479 | 2,109 | 370 | - | 6 | 376 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPSPE011 | SPO NISCO Contract | DIRECTLG | 144 | 12 | 156 | 156 | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPTDERSC | Entergy Regional State Committ | LOADOPCO | 582 | 57 | 639 | 538 | 101 | - | 2 | 103 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F3PPTDHY11 | Transmission Comp iance FERC A | TRSBLNOP | 144 | 15 | 159 | 140 | 19 | - | 1 | 19 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F5PCZU1425 | REGULATORY COORDINAT.-ELI & EG | CUSELPSC | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F5PCZU1574 | REGULATORY AFFAIRS - 100% TX G | DIRECTTX | 951 | 83 | 1,034 | - | 1,034 | - | 20 | 1,054 |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F5PP4RFERC | FERC Audit | LVLSVCAL | - | - | - | - | - | - | - | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F5PPETX009 | 2009 Texas Rate Case Support | DIRECTTX | 144 | 11 | 155 | - | 155 | (7) | (148) | - |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | F5PPMSFA9A | 2009 EMI Fuel Audit McFadden G | DIRCTEMI | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | ESI | SESLT | Total | | | 299,128 | 27,344 | 326,472 | 279,563 | 46,909 | (7) | 692 | 47,594 |
| | | | | | | | | | | | | | |
| ENERGY AND FUEL MANAGEMENT | Total ESI | | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| | | | | | | | | | | | | | |
| Total ENERGY AND FUEL MANAGEMENT | | | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |
| | | | | | | | | | | | | | |
| Total Cicio Patrick | | | | | | 23,521,673 | 1,732,183 | 25,253,856 | 21,510,774 | 3,743,083 | (7,029) | 6,260 | 3,742,314 |

Amounts may not add or tie to other schedules due to rounding.

Cicio, Patrick


This page has been intentionally left blank.

**ENTERGY TEXAS, INC.**
**Affiliate Billings - Pro Forma Summary - By Witness, Class, & Pro Forma**
**For the Twelve Months Ended June 30, 2011**
**Amounts in Dollars**

**EXHIBIT PJC-D**
**2011 TX Rate Case**
**Page 1 of 1**

| Class | Billing Entity | Pro Forma Number | Pro Forma Description | Supporting Witness | Pro Forma |
|---|---|---|---|---|---|
| ENERGY AND FUEL MANAGEMENT | ESI | AJ16 | Remove MISO Costs | Considine, Michael P | (41,533) |
| ENERGY AND FUEL MANAGEMENT | ESI | AJ21-03 | Remove Rate Case Support Costs | Considine, Michael P | (13,552) |
| ENERGY AND FUEL MANAGEMENT | ESI | AJ21-04 | PwC - Changes in Billing Methods | Tumminello, Stephanie B | (147) |
| ENERGY AND FUEL MANAGEMENT | ESI | AJ21-05 | Remove Ticket Costs | Barrilleaux, Chris | (344) |
| ENERGY AND FUEL MANAGEMENT | ESI | AJ21-07 | Remove Non-Recoverable Costs | Barrilleaux, Chris | (2,705) |
| ENERGY AND FUEL MANAGEMENT | ESI | AJ22 | Affiliate Portion of Employee Changes and Wage Increases | Considine, Michael P | 64,541 |
| | ESI | | | | 6,260 |
| ENERGY AND FUEL MANAGEMENT | Total | | | | 6,260 |
| Total | | | | | 6,260 |

Amounts may not add or tie to other schedules due to rounding.

**Cicio, Patrick**



This page has been intentionally left blank.

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | |
| TEXAS, INC. FOR AUTHORITY TO | § | BEFORE THE |
| CHANGE RATES, RECONCILE | § | STATE OFFICE OF |
| FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |
| TREATMENT | § | |

REBUTTAL TESTIMONY

OF

MICHAEL P. CONSIDINE

ON BEHALF OF

ENTERGY TEXAS, INC.

APRIL 2012

1

ENTERGY TEXAS, INC.
REBUTTAL TESTIMONY OF MICHAEL P. CONSIDINE
PUC DOCKET NO. 39896


TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1 |
| | A. Introduction and Qualifications | 1 |
| II. | Rebuttal Issues | 2 |
| | A. Spindletop Gas Storage Facility | 2 |
| | B. MISO Transition Expenses | 5 |
| | C. Hurricane Rita Regulatory Asset | 16 |
| | D. Pension Asset in Rate Base | 22 |
| | E. Property Insurance Reserve | 25 |
| | F. Payroll and Incentive Compensation | 29 |
| | G. DSM Costs | 35 |
| | H. MSS-2 Costs | 36 |
| | I. Nuclear Decommissioning | 38 |
| | J. Depreciation | 40 |
| | K. Fully Accrued Depreciation | 43 |
| | L. Net Salvage | 48 |
| | M. Accounting For Removal Costs | 51 |

EXHIBITS

| | |
|---|---|
| Exhibit MPC-R-1 | MISO Transition Expenses for the Nine Months Ended March 2012 |
| Exhibit MPC-R-2 | Rita Regulatory Asset Calculation |
| Exhibit MPC-R-3 | Company Response to Cities 6-2 RFI |
| Exhibit MPC-R-4 | 1995 Storm Damage Policy |
| Exhibit MPC-R-5 | ETI Payroll Adjustment |
| Exhibit MPC-R-6 | ESI Payroll Adjustment |
| Exhibit MPC-R-7 | Full Time Equivalent Calculation |
| Exhibit MPC-R-8 | ETI Direct Costs of Incentive Comp Adjustment |
| Exhibit MPC-R-9 | ESI Allocated Costs of Incentive Comp Adjustment |
| Exhibit MPC-R-10 | March 2012 MSS-2 Bill to ETI |
| Exhibit MPC-R-11 | Railroad Commission of Texas PFDs and Orders |

## I.    INTRODUCTION

### A.    Introduction and Qualifications

Q.    PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A.    My name is Michael P. Considine.  My business address is 425 West Capitol Avenue, Little Rock, Arkansas  72201.

Q.    DID YOU PREVIOUSLY FILE DIRECT TESTIMONY ON BEHALF OF ENTERGY TEXAS, INC. ("ETI" OR "THE COMPANY") IN THIS PROCEEDING?

A.    Yes.

Q.    WHAT IS THE PURPOSE OF THIS TESTIMONY?

A.    The purpose of my Rebuttal Testimony is to respond to various issues raised in Staff and Intervenor Direct Testimonies.

Q.    DO YOU SPONSOR ANY EXHIBITS?

A.    Yes.  I sponsor the exhibits listed in the Table of Contents to this testimony.

II.     REBUTTAL ISSUES

A.     Spindletop Gas Storage Facility

Q.     WHAT ISSUES DO YOU ADDRESS IN THIS SECTION OF YOUR REBUTTAL TESTIMONY?

A.     I will address certain aspects of Cities' witness Karl J. Nalepa's recommendation regarding the Spindletop Gas Storage Facility ("Spindletop") and I will address Staff witness Anna Givens recommendation to remove an Electric Plant Acquisition asset related to Spindletop from rate base.

Mr. Nalepa recommends removing Spindletop costs from base rates and also recommends removing variable non-gas operating costs from eligible fuel expense because he believes the supply reliability and swing flexibility provided by Spindletop can be obtained elsewhere at a lower cost. Company witness Karen M. McIlvoy will address Mr. Nalepa's concerns regarding supply reliability and swing flexibility. I will address his recommendation to remove the costs from base rates and eligible fuel expense.

Q.     PLEASE DISCUSS MR. NALEPA'S RECOMMENDATION TO REMOVE SPINDLETOP FROM RATES.

A.     Mr. Nalepa recommends that Spindletop be removed from rates and he recommends selling the facility or removing it from regulated service if

necessary.[1] He has prepared a Total Cost Impact table,[2] which shows what he claims to be the total annual costs of operating the facility. He further claims that ETI's customers pay 100% of the costs of operating Spindletop.[3]

Q. DO YOU AGREE WITH MR. NALEPA'S ANALYSIS AND HIS CLAIM THAT ETI'S CUSTOMERS PAY 100% OF THE COSTS OF OPERATING SPINDLETOP?

A. No. Mr. Nalepa's calculation fails to recognize that 57.50% of the costs associated with Spindletop are billed to Entergy Gulf States Louisiana, Inc. ("EGSL") as part of the MSS-4 billing process between ETI and EGSL for its "legacy" plants (that is, the generation-related facilities now owned separately by either ETI or EGSL that, prior to the jurisdictional separation, were owned by Entergy Gulf States, Inc.). Mr. Nalepa's recommendation as it is currently proposed is to remove all of the Spindletop costs from rates and to leave the MSS-4 revenues in rates, thereby creating a windfall for customers. Mr. Nalepa's recommendation also fails to address what ETI should do if it were to sell or de-regulate the facility as he suggests or what to do with the gas inventory that is currently in Spindletop.

---

[1] Nalepa Direct at 5, line 18 and at 27, line 2.
[2] *Id*. at 19, Table 9.
[3] *Id.* at 19, line 3.

Q.   WHAT IS YOUR RECOMMENDATION REGARDING MR. NALEPA'S SPINDLETOP ADJUSTMENT?

A.   The Commission should reject Mr. Nalepa's Spindletop adjustment. He has failed to consider all of the impacts associated with his adjustment and, as discussed by Company witness McIlvoy, the Spindletop facility continues to provide customers with supply reliability and swing flexibility. It should also be noted that ever since and including Docket No. 10894, the Commission has consistently allowed the Company to recover its costs associated with the Spindletop Facility because it is a used and useful gas storage facility that provides benefits to ratepayers.

Q.   ON PAGE 35 OF 36, LINES 8-13, MS. GIVENS REMOVES AN ELECTRIC PLANT ACQUISITION ASSET FROM THE RATE BASE OF ETI. WHAT ARE THE FACTS REGARDING THE ORIGINATION OF THAT ELECTRIC PLANT ACQUISITION ASSET?

A.   The acquisition asset represents the incurred closing costs of $211,209 and legal and internal costs of $916,568 the Company incurred in acquiring the Spindletop gas storage facility. Prior to December 2009 those amounts were included in the Electric Plant in Service (FERC Account 101). Furthermore, these amounts were included in the Company's filed rate base amounts in PUCT Docket Nos. 34800 and 37744. On January 11, 2010, the FERC issued Opinion No. 505 in FERC Docket No. ER07-956-001. The FERC ordered the Company to transfer

the amounts above from Account 101 to FERC Account 114, Electric Plant Acquisition Adjustments.

Q. SHOULD THIS AMOUNT BE REMOVED FROM THE COMPANY'S RATE BASE?

A. No. The Company incurred this cost in conjunction with the purchase of a viable asset that benefits its retail customers. The amount has previously been included in the Company rate base. The only thing that has changed is that the amount is in a different account. It would be inappropriate to penalize the Company because of an accounting technicality.

### B. MISO Transition Expenses

Q. WHAT ISSUES DO YOU ADDRESS IN THIS SECTION OF YOUR REBUTTAL TESTIMONY?

A. I will address various concerns regarding ETI's MISO transition expenses expressed by Cities' witnesses James Z. Brazell and Mark E. Garrett and TIEC witness Jeffry Pollock and Staff witness Joe Luna. Company witnesses Jay A. Lewis and Bret R. Perlman also address certain aspects of their recommendations.

Q. WHAT IS MR. BRAZELL'S CONCERN REGARDING ETI'S MISO TRANSITION EXPENSES?

A. Mr. Brazell has expressed a concern that the Company has not been clear with the Commission and the other parties in this case regarding its request related to MISO transition expenses. [4]

Q. WHAT IS THE COMPANY'S PRIMARY REQUEST REGARDING MISO TRANSITION EXPENSES?

A. The Company's primary request regarding MISO transition expenses is that the Commission issue an accounting order permitting it to defer all MISO-related transition O&M expenses incurred on or after January 1, 2011 as a Regulatory Asset. This is clearly explained in the filing the Company made in Docket No. 39741 (which has been consolidated with the instant docket) and in the supplemental direct testimony of Company witness Lewis in this Docket.

Q. WHAT IS THE COMPANY'S ALTERNATIVE REQUEST REGARDING MISO TRANSITION EXPENSES?

A. The Company's alternative request is that it be allowed to include $4 million of O&M expenses in base rates for costs associated with these MISO transition expenses. This is explained in my direct testimony starting on page 21, line 29 through page 22, line 7, in Mr. Lewis'

---

[4] Brazell Direct at 23, line 12.

9

supplemental direct testimony starting on page 4, line 16 through page 5, line 7 and in Company Adjustment 16L, WP/P AJ 16.20 through WP/P AJ 16.23.

Q.   WHY DOES MR. BRAZELL BELIEVE THAT THE COMPANY HAS NOT BEEN CLEAR REGARDING ITS PROPOSED AND ALTERNATIVE TREAMENT OF MISO TRANSITION EXPENSES?

A.   Mr. Brazell states that he was unaware that the Company's $111.8 million rate increase request included the $4 million amortization of MISO transition expenses until my deposition.[5]  He states that he has reviewed various documents, including the documents I reference above, which discuss MISO transition expenses but was not made fully aware of the Company's proposed and alternative recommendations regarding MISO transition expenses.[6]

Contrary to Mr. Brazell's testimony, my direct testimony and workpapers make clear that the $4 million for MISO transition expenses is included in the Company's proposed rate increase, but will be withdrawn in the event that deferred accounting is allowed.  My direct testimony sets out that all the "adjustments" therein represent items that are either included in or excluded from the Company's cost of service.[7]   Adjustment 16, to include an amortized recovery of MISO transition expense, is

---

[5]   *Id.* at 22, line 13.
[6]   *Id.* at 20, lines 15-20 and at 22 lines 1-14.
[7]   Considine Direct at 13, lines 11-16.

therefore defined in my testimony as part of the Company's request. This is further supported by the explanatory discussion of the adjustment, which states that the adjustment will be "withdrawn" if deferred accounting is authorized.[8]

Q.    PLEASE DISCUSS MR. BRAZELL'S CONCERN THAT THE COMPANY "HAS BEEN LESS THAN FORTHCOMING"[9] WHEN ADDRESSING ITS REQUEST RELATED TO MISO TRANSITION EXPENSES.

A.    Mr. Brazell refers to what he characterizes as a footnote in the workpaper to Schedule P, Adjustment 16L of the Rate Filing Package, and includes a quote in his testimony as if it is directly from this "footnote." [10]   His quote states "ETI is not seeking **base rate** recovery of these costs in this filing because all the costs have not yet been incurred."[11]   From this quote, Mr. Brazell concludes that ETI expressly represented that it was not including the MISO transition expenses in its request.

The quote Mr. Brazell is referring to is included in the Company's explanatory description of the adjustment included on page WP/P AJ 16.23 in the filing package, and takes the form of full text discussion, not a footnote.  The actual quote from the workpaper reads: "The Company is not seeking **rate base** treatment of these costs in this filing because all the costs have not yet been incurred."   Mr. Brazell inverted the words "rate"

---

[8]    RF Page WP/P AJ 16.23.
[9]    Brazell Direct at 23, line 13.
[10]   *Id.* at 23, line 14.
[11]   *Id.* at 23, line 15.

and "base," which completely and erroneously alters the intent and meaning of the Company's explanation.

The difference between the use of the words **base rate** and **rate base** is significant. The proposed treatment in this filing (which will be withdrawn upon grant of deferred accounting) allows the Company to recover most of these costs as they are being incurred.[12] The Company made clear that it is not seeking "rate base" treatment (i.e., include the unamortized balance of MISO transition expenses in rate base and earn a return) because under this alternative treatment the Company would be recovering most of the expenses as they are incurred, such that it would be reasonable to forgo the recovery of carrying costs on the unamortized balance. This explanation is fully consistent with the inclusion of the MISO expense in the Company's proposed base rate increase.

Q. HAVE YOUR READ MR. BRAZELL'S DEPOSITION THAT WAS TAKEN APRIL 4, 2012 IN THIS DOCKET?

A. Yes.

---

[12] WP/P AJ 16.23, SCHED_COS_WP_7-139.

Q. DID HE MAKE ANY ACKNOWLEDGEMENTS OR CONCESSIONS DURING HIS DEPOSITION REGARDING THE COMPANY'S MISO ADJUSTMENT?

A. Yes. Mr. Brazell acknowledged a number of issues in his deposition that are pertinent to his discussion of the Company's MISO transition adjustment. First, he acknowledged that he had not reviewed my direct testimony.[13] Second, he acknowledges that adjustments included in Schedule A-3 either include or exclude expenses from the cost of service.[14] Third, he acknowledges that he made an error in using the term "base rate" instead of "rate base" in his discussion of the Company's Adjustment 16L.[15] Lastly, he acknowledges that if the Company had not included the $4 million alternative amortization in its initial rate filing that it could not have included it in the cost-of service after the initial rate filing had been made.[16]

---

[13] Brazell deposition at 91, lines 11-16.
[14] Brazell deposition at 91, line 17 through page 92 line 24.
[15] Brazell deposition at 95, line 25.
[16] Brazell deposition at 100, lines 17-21.

Q. DID ANY OF THE OTHER INTERVENOR OR STAFF WITNESSES EXPRESS MR. BRAZELL'S CONCERN THAT THE COMPANY'S REQUEST REGARDING MISO TRANSITION EXPENSES WAS NOT CLEAR?

A. No. Mr. Garrett, to whom Mr. Brazell refers,[17] does not express this concern and in fact his testimony accurately describes the Company's proposed and alternative request regarding MISO transition expenses.[18] Mr. Pollock and Mr. Joe Luna also accurately describe the Company's request in their direct testimony.[19]

Q. CAN YOU ADDRESS MR. GARRETT'S AND MR. POLLOCK'S RECOMMENDATION REGARDING THE COMPANY'S ALTERNATIVE MISO TRANSITION EXPENSE ADJUSTMENT SHOULD THE COMMISSION DENY THE COMPANY'S REQUEST FOR DEFERRED ACCOUNTING?

A. Both Mr. Garrett and Mr. Pollock recommend that ETI be allowed to include only the test year level of expenses related to MISO transition expenses. The primary reason for their recommendation of the test year level of expenses is because they do not believe that the MISO transition costs are known and measurable.

---

[17] Brazell Direct at 24, line 9.
[18] Garrett Direct at 61, line 15 through 62, line 9.
[19] Pollock Direct at 45, line 7 through 46, line 9.

These costs are known and measurable. The $4 million that the Company has included in this filing is a conservative estimate of the amount of costs that the Company will incur during its transition to MISO. During the nine months since the end of the test year through March 2012, the Company has incurred approximately $3.6 million in MISO transition expenses as shown on Exhibit MPC-R-1. On an annualized basis, this would be $4.8 million. Mr. Lewis will further address the issue of future MISO transition expenses in his rebuttal testimony.

Q. PLEASE ADDRESS MR. LUNA'S RECOMMENDATIONS IN THIS DOCKET.

A. Mr. Luna indicated that his direct testimony would address issues 6, 7 and 8 that were identified in the Commission's Preliminary Order, dated December 19, 2011 in this docket.[20] He is not providing testimony on the Company's request to defer MISO transition expenses. I will address issues 6 through 8 and Mr. Luna's recommendation regarding each of these issues below.

Issue 6 - What amount of expenses, if any, related to analyzing and planning for a transition to a regional transmission organization is included in Entergy's requested cost of service? If an amount is included, how is Entergy proposing to recover these costs? If so, should such expenses be recovered in Entergy's base rates?

The Company's primary request is that it be allowed to defer costs related to analyzing and planning for a transition to a regional transmission

---

[20] Luna Direct at 4, lines 15 through Page 5, line 4.

organization ("MISO transition expenses") it has incurred on or after January 1, 2011. The mechanics of any transition expense recovery is proposed to be determined in a future rate proceeding. Company witnesses Lewis and Perlman further discuss this deferral issue in their testimonies.

In the alternative, should the Commission deny the Company's deferred accounting request, the Company has included MISO transition expenses in its requested cost-of-service ("COS"). The Company's alternative recommendation regarding MISO transition expenses incurred on or after January 1, 2011, has included $4 million in COS expenses related to MISO transition expenses that are estimated to be incurred over a three-year period beginning January 1, 2011.[21]

The Company has also included in COS expense, amortization of $52,782 in MISO transition expenses and $137,232 in rate base for capitalized MISO transition expenses incurred during the time period July 1, 2010 through December 31, 2010 (the first six months of the test year).[22] In the Company's instant application it is seeking to defer these MISO related transition expenses incurred during the first six months of the test year and to recover them over a five-year period.[23]

The Company is proposing to include the MISO transition expenses incurred on or after January 1, 2011 in base rates should the Commission

---

[21] RF Page WP/P AJ 16.23.
[22] $211,126 in MISO transition expenses less $73,894 in deferred Federal Income Taxes.
[23] RF Page WP/P AJ 16.21 – WP/P AJ 16.22.

deny the Company's proposed deferred accounting. The Company's MISO transition expenses incurred during the first six months of the test year are requested to be included in base rates as part of the instant proceeding.

This is the only issue that Mr. Luna addresses in his direct testimony. He recommends removing all of the amounts discussed above from the COS. He has not proposed a recovery mechanism for these expenses and his recommendation in effect disallows the Company any opportunity to recover these expenses should the Commission deny the Company's deferral request. He does not discuss the reasonableness or necessity of these expenses and he does not express an explicit opinion as to whether or not MISO transition expenses should be recovered through base rates or through some other mechanism.

At a minimum, Mr. Luna should have included the Company's test year level of expenses in base rates should the Commission deny the Company's request for deferred accounting.

Issue 7 – What amount, if any, related to analyzing and planning for a transition to a regional transmission organization were in Entergy's books during the test year? Were any such amounts removed from the test year, and if so what were those amounts? Are any such amounts included in the costs for which Entergy seeks deferral in Docket No. 39741?

During the test year, the Company recorded $916,535 on its books for MISO related transition expenses.[24]

---

[24] See WP/P AJ 16.21.

The $916,535 was removed from the test year expenses. See discussion above regarding Issue 6 for a further description of how the Company is requesting to treat pre- and post- January 1, 2011, transition expenses.

$652,627 of the $916,535 identified above is included in the costs for which Entergy seeks deferral in Docket No. 39741.[25]

Issue 8 – Has Entergy made any adjustments for costs related to analyzing and planning for a transition to a regional transmission organization incurred outside of the test year, and if so, what is the amount and how is Entergy proposing to recover such costs?

As discussed above in Issue 6, the Company's primary request is to defer costs related to MISO transition expenses incurred on or after January 1, 2011. Should the Commission deny the Company's deferred accounting request, the Company's alternative recommendation includes these costs in base rates through an amortization of transition expenses which will be incurred during the transition period. The Company has included $3,347,373 in the COS for expenses incurred outside of the test year through its $4 million amortization adjustment.[26] As noted above, Exhibit MPC-R-1 shows that the Company has incurred approximately $3.6 million in MISO transition expenses in the nine months since the end of the test year.

---

[25] See WP/P AJ 16.21 ($32,173+$620,454=$652,627).
[26] ($4,000,000-$652,627=$3,347,373).

Q.    PLEASE SUMMARIZE YOUR RESPONSE TO THE CONCERNS ABOUT MISO TRANSITION EXPENSES EXPRESSED BY THE VARIOUS PARTIES.

A.    The Company's proposed deferred accounting treatment and its proposed alternative recommendation regarding MISO transition expenses are clearly set out in this filing.  This concern expressed by Mr. Brazell regarding the MISO transition expenses should not be given any weight by the Commission when reviewing the Company's deferred accounting request.  Should the Commission deny the Company's proposed deferred accounting request, then it is appropriate to include the Company's proposed alternative recommendation to include $4 million in MISO transition expenses in its rate request as a known and measurable adjustment to test year expense.

### C.    Hurricane Rita Regulatory Asset

Q.    WHAT ISSUES DO YOU ADDRESS IN THIS SECTION OF YOUR REBUTTAL TESTIMONY?

A.    I will address concerns regarding ETI's Hurricane Rita Regulatory Asset expressed by Mr. Garrett and Ms. Givens.

Q. HAVE YOU REVIEWED MR. GARRETT'S TESTIMONY REGARDING THE HURRICANE RITA REGULATORY ASSET AS DESCRIBED ON PAGES 11 AND 12 OF HIS DIRECT TESTIMONY?

A. Yes. Mr. Garrett claims that ETI was required to amortize the regulatory balance presented in the Company's last rate case, Docket No. 37744. As a result, he contends that the asset should be reduced from its current level of $26,229,627 to $10,714,557 effectively requiring the Company to write off the difference of $15,515,070.

Q. DO YOU AGREE WITH MR. GARRETT'S POSITION REGARDING THE REGULATORY ASSET?

A. No. There was no instruction in the Stipulation and Settlement Agreement or the Final Order filed in Docket No. 37744 that states that ETI was to begin amortizing this Rita Regulatory Asset, or otherwise directing the treatment of the asset. Furthermore, the settlement agreement in Docket No. 32097 (the case in which the level of recoverable Hurricane Rita costs was identified) provided that the level of insurance credited against these costs would be "trued up to reflect the difference between the $65.7 million credited and all insurance payments actually received by the Company related to Hurricane Rita for Texas Retail." Moreover, this settlement provided that carrying costs would apply to the true-up amount "until such trued-up amount (plus associated carrying costs at the rate of 7.9% per annum) is recovered in base rates." ETI's request to include the full

Hurricane Rita regulatory asset in base rates here is consistent with the provisions of the settlement that specifically apply to it.

Q. REGARDLESS OF THE FACT THAT YOU DISAGREE WITH MR. GARRETT'S OPINION ON THE AMORTIZATION OF THE REGULATORY ASSET, HAVE YOU REVIEWED THE PROPOSED CALCULATION MR. GARRETT SUPPORTS IN EXHIBIT MG2.3?

A. Yes.

Q. DO YOU HAVE ANY CORRECTIONS OR CONCERNS WITH MR. GARRETT'S CALCULATION IN EXHIBIT MG2.3?

A. In the event that his position were to prevail, which it should not, I have two corrections to Mr. Garrett's calculation. First, Mr. Garrett has incorrectly assumed that the $26,229,627 Regulatory Asset does not include the $5,678,960 the Company received in additional Hurricane Rita insurance proceeds since the Docket No. 37744 filing. The $5,678,960 the Company received in additional Hurricane Rita insurance proceeds since Docket No. 37744 is included in the $46,013,904 shown on WP/P AJ 15.3 and the Company's rate filing package (referring to WP/P AJ 15.3) clearly shows that the $46,013,904 of insurance proceeds received is a component of the $26,229,627. Mr. Garrett's adjustment for this $5.6 million would remove the amount a second time from the regulatory asset

balance. Accordingly, this amount should not be removed a second time as Mr. Garrett does on Line 9 of Exhibit MG-2.3.

Secondly, even if Mr. Garrett's assumption that the Company was required to amortize this balance were true, the Company would not have incurred 22.5 months of amortization at the time of the filing. Mr. Garrett calculates the amortization period to be from the time rates went into effect as a result of Docket No. 37744 (August 15, 2010) through the time revised rates are to go into effect in this docket (June 30, 2012). Effectively, Mr. Garrett is making post-test year adjustments for rate base items. Again, assuming Mr. Garrett's assumption that the Company was allowed to amortize this Regulatory Asset were true, it would be appropriate to amortize the Asset for 10.5 months only (August 15, 2010 through June 30, 2011). These two corrections adjust Mr. Garrett's Exhibit MG2.3 remaining regulatory asset balance from $10,714,557 to $21,805,940. Please see my Exhibit MPC-R-2.

Q. DOES ANY OTHER WITNESS DISCUSS MR. GARRETT'S CALCULATION OF THE HURRICANE RITA REGULATORY ASSET?

A. Yes. Cities' witness Mr. Jacob Pous is recommending that the balance be added to and amortized in the storm reserve over twenty years.

Q.   DO YOU AGREE WITH THIS RECOMMENDATION?

A.   No.  Securitization, which is the explicit reason for the creation of the Regulatory Asset, is intended to provide the Company with cost recovery in an expedited manner.  Mr. Pous' recommendation would extend the recovery over a twenty year period, which is clearly contrary to the objective of securitization.

Q.   PLEASE DISCUSS MS. GIVENS' TESTIMONY WITH REGARD TO THE HURRICANE RITA REGULATORY ASSET?

A.   Ms. Givens testifies that it is reasonable to assume that the Hurricane Rita regulatory asset was considered as part of the settlement in Docket No. 37744 and because PURA 36.402(c) requires the Company to request recovery in its next base rate proceeding, Docket No. 37744, the Company isn't allowed to do so in this proceeding.  She recommends that the entire regulatory asset be removed from rate base.

Q.   DO YOU AGREE WITH MS. GIVENS' OPINION?

A.   No.  As I explained above, there was no instruction in the Stipulation and Settlement Agreement or the Final Order filed in Docket No. 37744 that states that ETI was to begin amortizing this Hurricane Rita Regulatory Asset, or otherwise directing the treatment of the asset.  Moreover, as previously explained, the Docket No. 32907 settlement does specifically address the treatment of this asset and supports the Company's position.

Finally, PURA § 36.402(c) does not apply to Hurricane Rita costs. The securitization provisions for Hurricane Rita are found in Chapter 39, Subchapter J of PURA, not Chapter 36.[27]

Moreover, even erroneously assuming that Docket No. 37744 somehow resolved the recovery of the Hurricane Rita regulatory asset as it was presented at that time, it still makes no sense to disallow the entire asset. ETI did not seek recovery of the entire asset all at once at that time, but instead recovery over a period of years through amortization. At most, Ms. Givens' erroneous reading of the settlement could relate to the portion of the amortization that would result from Docket No. 37744, not the entire amount of the asset.

Q. SHOULD THE FACT THAT ETI DID NOT AMORTIZE THE REGULATORY ASSET FOLLOWING DOCKET NO. 37744 PRECLUDE ETI FROM BEING ALLOWED TO RECOVER THESE COSTS?

A. No.

---

[27] *See*, for example, PURA § 39.459(a)(1) (defining "hurricane reconstruction costs" as those related to Hurricane Rita).

D. Pension Asset in Rate Base

Q. MR. GARRETT STATES THAT ETI'S PENSION CONTRIBUTIONS IN EXCESS OF SFAS 87 COSTS ARE DISCRETIONARY PAYMENTS.[28] IS THAT A TRUE STATEMENT?

A. No. ETI has made contributions to the pension fund in accordance with contribution guidelines established by the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code of 1986, as amended. These contributions were fully within the range of contributions deductible for tax purposes.

Q. IS THERE ANY OTHER GUIDANCE ETI USES TO DETERMINE THE PENSION CONTRIBUTIONS?

A. Yes. The required pension contributions are also affected by guidance pursuant to the Pension Protection Act of 2006 rules, effective beginning with the 2008 plan year.

Q. MR. GARRETT IMPLIES THAT RATEPAYER BENEFITS ARE LIMITED TO THE LEVEL PROVIDED BY THE ACTUAL PENSION FUND EARNINGS. DO YOU AGREE?

A. No. Ratepayers benefit from contributions made to the pension fund. ASC 715-30 (formerly FAS 87) pension cost included in COS includes the expected rate of return on assets. The expected long-term rate of return

---

[28] Garrett at 8, Line 5.

is 8.5%, not the actual earnings as implied by Mr. Garrett. While there are market fluctuations that affect the value of the pension assets, Mr. Garrett's reference to the performance of the pension assets over the last five years simply points out that the customer is receiving a benefit from pension contributions 6 times greater (8.5% compared to 1.37% according to Mr. Garrett) than the actual return on the funds during that period, and Mr. Garrett's proposed adjustment to increase expenses to reflect the benefit to customers from the return on these funds should similarly be increased by a factor of more than 6.

Q. DOES THE COMPANY'S RATE BASE TREATMENT OF THE CONTRIBUTIONS TO THE PENSION FUND IN EXCESS OF FAS 87 COST REPRESENT COMPANY-SUPPLIED FUNDS OR CUSTOMER-SUPPLIED FUNDS?

A. The debit balance in the pension liability account represents the excess of Company supplied funds above the amount of ASC 715-30 (formerly FAS 87) cost assumed to be recovered from customers and should earn the Company's requested return on rate base. This balance is no different than other prepayments, which are included in rate base and earn a full return on rate base. Furthermore, the Company would be allowed to earn a full return on rate base had the Company invested these same dollars in Plant in Service, but the Company in this case used funds to contribute to a still under-funded pension plan and at the same time provided a timely

reduction to ASC 715-30 (formerly FAS 87) annual pension cost immediately benefitting ratepayers.

Q.    DO YOU HAVE ANY OTHER COMMENTS REGARDING THIS ISSUE?

A.    Yes.  Should the Commission reject the Company's position and instead apply in this case the previous Commission ruling that distinguishes the portion of the pension asset related to Construction Work in Progress ("CWIP") from the remainder of the asset, it should fully apply the effect of that precedent.  In Docket No. 33309, Finding of Fact 32, the Commission concluded that "the pension prepayment asset of $112.4 million, less the $22.79 million portion included in CWIP, should be included in rate base."[29]  However, following court litigation regarding the issue, the courts reversed the Commission's ruling and the Commission altered its treatment on remand.  In the remand proceeding, Docket No. 38772,[30] the Commission modified its treatment of the CWIP-related portion of the asset, ruling in Finding of Fact 15A: "in accordance with P.U.C. SUBST. R. 25.72(g) the portion of the pension prepayment asset included in CWIP shall accrue allowance for funds used during construction beginning as of the date of the changed rates in this docket."  The CWIP-related portion of the Company's pension asset ($25,311,236 out of the total asset) should receive the same treatment, should the Commission reject the Company's

---

[29]    *Application of AEP Texas Central Co. for Authority to Change Rates.*
[30]    *Remand of Docket No. 33309 (Application of AEP Texas Central Company For Authority to Change Rates.*

primary position that the entire asset should be included in rate base as Company supplied capital that reduces the pension costs otherwise included in customer rates.

E.     Property Insurance Reserve

Q.     MR. POUS HAS RECOMMENDED SEVERAL REDUCTIONS TO RATE BASE FOR THE PROPERTY INSURANCE RESERVE. DO YOU AGREE WITH HIS RECOMMENDATIONS?

A.     No. Company witness Shawn Corkran will address Mr. Pous' claims regarding the 1997 ice storm; Company witness Greg Wilson addresses the requested level of the storm accrual. I will address the balance of Mr. Pous' recommendations for reductions to the storm reserve balance.

Q     MR. POUS OBJECTS TO THE $12,498,325 STORM RESERVE RECLASSIFICATION AS A RESULT OF THE JURISDICTIONAL SEPARATION OF EGSI INTO ETI AND EGSL. PLEASE EXPLAIN THIS RECLASSIFICATION.

A.     An analysis of the storm reserve charges was performed prior to the jurisdictional separation to determine if the storm charges were incurred for Louisiana or Texas property. The reclassification was made as a result of this analysis to properly reflect the state in which the storm charges were incurred. See page 25 of Exhibit MPC-R-3 for this analysis.

Q.    MR. POUS RECOMMENDS A $10.95 MILLION REDUCTION TO THE RESERVE BALANCE FOR WHAT HE DEEMS TO BE A $50,000 DEDUCTIBLE, WHICH HE RETROACTIVELY APPLIED TO PAST STORMS.  IS THIS REDUCTION APPROPRIATE?

A.    No.  The $50,000 threshold has been consistently used by the Company to designate a storm that will accumulate costs to be charged to the storm reserve.  A storm whose total costs are estimated to be less than $50,000 would be treated as normal O&M costs and not charged to the reserve.  This was never intended to be a "deductible" amount and is called "Major Storm Damage Threshold" in Entergy's current storm damage policy.  That policy is provided in the Company's response to Cities' RFI 6-2, attached as my Exhibit MPC-R-3.  The fact that these costs have been charged to the reserve and not to O&M means these costs have never been reflected in base rates.  To retroactively make this adjustment as proposed by Mr. Pous would be inconsistent with past base rate case treatment and result in a permanent disallowance of these storms costs.  If such a policy change from a threshold to a deductible should be made, it would need to be made on a prospective basis so that the amounts charged to reserve and normal O&M would be reflected in the on-going cost level.

Q.    HAVE YOU REVIEWED MR. POUS' DEPOSITION IN THIS DOCKET?

A.    Yes.  During the line of questions asked of Mr. Pous regarding Docket No. 16705 and the rationale for adjusting for 219 storms since that time.  Mr. Pous seems to imply that the Company has a different storm damage policy than was in place during the Docket No. 16705 test year.[31]

Q.    CAN YOU PROVIDE EVIDENCE THAT THE SAME $50,000 THRESHOLD WAS A COMPONENT OF THE STORM DAMAGE POLICY IN EFFECT FOR THE ENTIRE DOCKET NO. 16705 TEST YEAR?

A.    Yes.  Please refer to Exhibit MPC-R-4.

Q.    DOES ANY ENTERGY COMPANY HAVE A DEDUCTIBLE?

A.    Yes.  Entergy Mississippi moves the first $250,000 charged to the reserve each year to O&M expense as outlined in the "Storm Damage Deductible" section of Entergy's storm damage policy.

Q.    MR. POUS CONTENDS THAT BY NOT HAVING A DEDUCTIBLE, ENTERGY IS DOUBLE RECOVERING THE AMOUNTS.  IS THIS TRUE?

A.    No.  The costs that are charged to the reserve are only recovered once through the storm damage accrual.  They are not also charged to O&M expense to be recovered twice.

---

[31]    Pous, Docket No. 39896 deposition at 93-95.

Q.    MR. POUS RECOMMENDS RAISING THE MINIMUM THRESHOLD FOR STORM RESERVE CHARGES TO $500,000 FROM $50,000. DO YOU AGREE WITH MR. POUS' RECOMMENDATION?

A.    No. As I note above, the $50,000 storm minimum has been consistently applied by the Company and there is no basis for a change. Furthermore, the storm reserve charges at issue should be recovered in either O&M or through the storm reserve. Mr. Pous' recommendation, however, would result in the recovery through neither of these avenues. If Mr. Pous' recommendation is adopted, then more of the Company's storm costs will be charged to normal O&M instead of the storm reserve. Mr. Pous does not recommend the necessary increase to normal O&M for those storm costs that are less than $500,000. By failing to do so, he is, again, recommending no recovery at all of reasonable, actual storm-related costs.

Q.    HOW MUCH WOULD NORMAL O&M HAVE TO BE INCREASED TO REFLECT MR. POUS' RECOMMENDATION?

A.    The test year level of storms under $500,000 that would be charged to normal O&M instead of the storm reserve is $1,532,000. If Mr. Pous' recommended $500,000 minimum is adopted, O&M would need to increase by $1,532,000.

Q.   MR. POUS AND OPUC WITNESS NATHAN BENEDICT BOTH SAY ETI SHOULD HAVE REASONABLY ANTICIPATED THESE STORM COSTS. DO YOU AGREE?

A.   No.   As shown on Exhibit MPC-R-3, the annual expenditures are extremely variable.   Moreover, they are unpredictable as to timing.   As such, the level of expenses could not reasonably be anticipated.

Q.   MR. BENEDICT SAYS THAT SOME LEVEL OF MAINTENANCE EXPENSE IS INCLUDED IN BASE RATES AND ONLY INCREMENTAL AMOUNTS SHOULD BE CHARGED TO THE RESERVE.   DO YOU AGREE?

A.   No.  The Company has been consistent in charging all costs related to major storm work to the storm reserve.  Base rates reflected only costs charged to normal O&M in a test year.  This would not include the costs charged to the storm reserve in the test year.  If the costs related to major storm work had not been charged to the storm reserve, base rates for normal O&M expense would have been higher.

### F.   Payroll and Incentive Compensation

Q.   WHAT ISSUES DO YOU ADDRESS IN THIS SECTION OF YOUR REBUTTAL TESTIMONY?

A.   I will address issues raised by Mr. Garrett and Ms. Givens regarding payroll.

Q. PLEASE COMMENT FIRST ON MR. GARRETT'S PAYROLL ADJUSTMENT.

A. Mr. Garrett states the Company's proposed adjustment includes a wage increase nine months after the test year but omits workforce changes and changes in salary mix. The Company's requested level of payroll began with the test year payroll and was increased for known and measurable changes in compliance with PUCT Substantive Rule 25.231(b). These changes were for known wage increases stipulated in the bargaining contracts and for a board approved non-bargaining wage increase effective April 1, 2012. Rather than simply adjusting for known and measurable changes to the Company's test year historical expense, Mr. Garrett also proposes applying a productivity statistic to determine recoverable payroll expense.

Q. DOES MR. GARRETT'S PRODUCTIVITY ADJUSTMENT COMPLY WITH SUBSTANTIVE RULE 25.231(b)?

A. No. His productivity adjustment is not a known and measurable change specific to the Company's test year payroll.

Q. WHY IS IT NOT KNOWN AND MEASURABLE TO THE COMPANY?

A. Mr. Garrett quotes national averages for productivity indices and assumes they are reasonable and representative of the Company's productivity. By

the very nature of averages, some companies are much above and some are much below the average.

Q. DOES MR. GARRETT PROVIDE ANY STUDIES THAT CONFIRM HIS 2.1% PRODUCTIVITY ADJUSTMENT IS APPLICABLE IN THIS CASE?

A. No. He has not provided any study to show that his percentage in any way applies to the Company in this case.

Q. MR. GARRETT STATES THE COMPANY CHOSE TO UPDATE PAYROLL FOR THE APRIL 1, 2012 INCREASE BUT DID NOT UPDATE THE FILING FOR OTHER ITEMS SUCH AS ACCUMULATED DEPRECIATION AND ACCUMULATED DEFERRED INCOME TAX. DO YOU AGREE?

A. No. The Company has adjusted for known and measurable changes. Rate base items such as those he references cannot, by rule, be updated past the test year.

Q. DOES MR. GARRETT PROPOSE ANY OTHER CHANGES TO THE COMPANY'S PAYROLL?

A. Yes. Mr. Garrett cites the Company's response to Cities' RFI 18-8(b), which shows the 2010 base salary is 1.8% above the market median. Based on this, he reduces the test year base payroll by 1.8%.

Q. DO YOU AGREE WITH THIS ADJUSTMENT?

A. No. Company witness Kevin G. Gardner states on page 23 of his direct testimony that "Towers Watson provides competitive analysis of the Entergy Companies' executive compensation to the market and support for the Entergy Companies' approach that a value between 90% and 110% of the median level of compensation is "at market." In fact, Towers Watson stated in its 2010 Competitive Compensation Analysis that because of differing job duties, individual characteristics, and experience levels, Towers Watson believes that a company's pay levels are competitive if they fall between 85% and 115% of the marketplace". Mr. Garrett ignores the fact that Towers Watson considers "at market" to be a 10-15% spread from median. ETI was well within this spread and, therefore, Mr. Garrett's adjustment is not appropriate.

Q. DO YOU AGREE WITH MR. GARRETT'S PROPOSED PAYROLL ADJUSTMENTS?

A. The Company's payroll adjustment is the more appropriate approach to establishing test year payroll expense, and Mr. Garrett's recommendations should be rejected.

Q. PLEASE COMMENT ON MS. GIVENS' PAYROLL ADJUSTMENT.

A. I have reviewed her adjustment and, for the most part, I agree with her findings. However, Ms. Givens used different headcounts for the end of

the test year for ETI and ESI than are appropriate and included in my payroll adjustment. The Company's payroll adjustment reduced ETI headcount to 675 and ESI headcount to 3,054. Ms. Givens' adjustment begins with end of the test year ETI headcount of 678 and ESI headcount of 3,055 which caused a double counting of three ETI and one ESI employee. These four employees are already reflected in my adjustment. I also corrected an error in the ESI benefits calculation. Ms. Givens inadvertently used the ETI percentage in the calculation rather than the ESI percentage shown on her exhibit. I also do not agree with the calculation of the savings plan adjustment or the calculation of the full time equivalents.

Q.    PLEASE EXPLAIN WHY YOU DO NOT AGREE WITH THE SAVINGS PLAN LOADER CALCULATION.

A.    Ms. Givens inappropriately applied both the benefits and savings plan loader percentages to the headcount adjustment.

Q.    HOW SHOULD THE SAVINGS PLAN LOADER BE CALCULATED?

A.    The savings plan loader should not be calculated on the headcount change because it is already included in the benefits loader rate and should not be applied to the headcount change again.

Q.   HOW WOULD YOU CHANGE THE FULL TIME EQUIVALENT CALCULATION?

A.   Ms. Givens assumed that part time employee's average salary is 50% of the full time average salary.  Responses to Cities' RFI 12-6 and 12-7 allow for the calculation of the actual part time average salary by providing the test year wages and monthly headcounts.   Ms. Givens relied on Staff RFI 7-4 for part time headcount, which consists of part time headcount of 35 and temporary employee headcount of 39 for a total of 74 instead of 73. Exhibit MPC-R-3 is a correct calculation of full time equivalents.

Q.   HOW DO THESE CHANGES AFFECT MS. GIVENS' ADJUSTMENT?

A.   Her ETI headcount adjustment (AG-7) has overstated her O&M payroll reduction by $224,217.   Her ESI headcount adjustment (AG-7) has understated her O&M payroll increase by $37,531.   Exhibit MPC-R-1 shows the ETI calculation and Exhibit MPC-R-2 shows ESI calculation.

Q.   DO YOU AGREE WITH MS. GIVENS' INCENTIVE COMPENSATION PAYROLL TAX ADJUSTMENT?

B.   No.   She calculated FICA at 7.65% on the Staff adjustments to all incentive plans.  The executive plans (Executive Annual Incentive Plan, Restricted Stock Incentive, Long-Term Incentive Plan, Restricted Share and Equity Awards) include only highly compensated executives that are

predominantly over the limit for the social security portion of FICA and are only subject to the 1.45% Medicare component of FICA.

Q. HAVE YOU REVISED MS. GIVENS' PAYROLL TAX ADJUSTMENT CALCULATIONS?

A. Yes. I applied the entire 7.65% FICA rate to the non-executive incentive plans (Management Incentive Plan, Exempt Incentive Plan, Teamshare Incentive Plan, and the Teamshare Bargaining Incentive Plan) and only the Medicare component (1.45%) on the executive plans. Ms. Givens' ETI payroll tax adjustment is overstated by $15,933 and is summarized in Exhibit MPC-R-4. Ms. Givens' ESI payroll tax adjustment is overstated by $269,362 and is summarized in Exhibit MPC-R-5.

## G. DSM Costs

Q. OPUC WITNESS DR. CAROL SZERSZEN RECOMMENDS DISALLOWING ONE HALF ($171,032) OF ETI's PROJECT CODE F3PPE9981S TEST YEAR COSTS BECAUSE SHE STATES THAT SHE WAS UNABLE TO DETERMINE HOW MUCH OF THIS PROJECT'S COSTS PERTAINED TO ENERGY EFFICIENCY, DSM, AND SUPPLY SIDE INITIATIVES, WHICH SHE ASSERTS SHOULD BE RECOVERED THROUGH THE COMPANY'S ENERGY EFFICIENCY COST RECOVERY FACTOR RIDER ("EECRF"). DO YOU AGREE WITH THIS ADJUSTMENT?

A.     No. As addressed in Company witness Phillip R. May's rebuttal testimony, this project code captures the cost of general activities of the Company's Integrated Energy Management department and are not included in the Company's EECRF rider.  Because these are not costs that must be, or are currently being recovered through the EECRF, they are not double recovered and should be included in the Company's cost of service.

### H.     MSS-2 Costs

Q.     PLEASE COMMENT ON CITIES' WITNESS DENNIS W. GOINS' MSS-2 ADJUSTMENT.

A.     Mr. Goins recommends that the MSS-2 expense level in this docket be set to the twelve months ended December 31, 2011 level of $4,370,600 and then adjusted for load growth.[32]  Company witness Pat Cicio will discuss the load growth adjustment that Mr. Goins proposes.  I will address the appropriate level of MSS-2 expense only.

Q.     DO YOU AGREE WITH MR. GOINS' MSS-2 ADJUSTMENT?

A.     No.   Mr. Goins' recommended expense level is based on the twelve months ended December 31, 2011 expense and as such does not recognize a full year's effect of ongoing equalizable transmission investment or the change in responsibility ratios.

---

[32]   Goins HSPM WP/MSS-2-dg.xls.

Q. IS THERE ANY OTHER INFORMATION THAT SUPPORTS YOUR OPINION THAT THE TWELVE MONTHS ENDED DECEMBER 31, 2011 EXPENSE IS NOT APPROPRIATE TO USE IN CALCULATING THE RATE YEAR LEVEL OF MSS-2 EXPENSE?

A. Yes. Mr. Goins' own workpapers show that the monthly MSS-2 expense has increased over 62% between January 2011 ($235,205) and December 2011 ($624,352). This fact supports that the twelve months leading up to the December 2011 expense level do not reflect a reasonable MSS-2 expense level to include in the cost of service.

Q. HAVE YOU CALCULATED A MORE APPROPRIATE EXPENSE LEVEL ASSUMING THE COMMISSION DOES NOT AGREE WITH THE COMPANY'S PRO FORMA ADJUSTMENT FOR RATE YEAR MSS-2 EXPENSE?

A. Yes. It is more appropriate to set the MSS-2 expense level based on the most current month's expense times twelve, assuming the Commission does not grant the Company's original request. The February 2012 Intra-System Bill ("ISB") indicates that ETI had monthly MSS-2 expense of $698,290; therefore, the annual MSS-2 expense that should be included in the cost of service is $8,379,480.

Q.   IS THE COMPANY RECOMMENDING THE $8,379,480 MSS-2 EXPENSE LEVEL YOU HAVE CALCULATED?

A.   No. It is appropriate to set the MSS-2 expense level in the docket to the rate year level. As further explained by Company witness Mark McCulla, this level is based on known and measurable equalizable transmission investments that are appropriately included in the calculation of projected MSS-2 expense and should be approved.

I.   Nuclear Decommissioning

Q.   PLEASE COMMENT ON MR. GARRETT'S RECOMMENDATION TO REDUCE THE ANNUAL REVENUE REQUIREMENT FOR THE 70% REGULATED RIVER BEND NUCLEAR STATION FROM $2,019,000 TO $1,126,000 AS PROVIDED IN THE COMPANY'S RESPONSE TO CITIES' RFI 10-22. DO YOU AGREE WITH THIS ADJUSTMENT?

A.   No. First, the $2,019,000 stipulated in the Commission's Final Order for Docket No. 37744 was approved quite recently, on December 13, 2010. Secondly, Mr. Garrett notes that PUCT Substantive Rule 25.231(b)(F)(i) states that the annual cost of decommissioning for ratemaking purposes must be determined and expressly included in the COS established by the Commission's order. Staff witness Slade Cutter's testimony, however, correctly points out that the Company is in compliance with this rule.[33] The Company submits that the current $2,019,000 level of annual

---

[33]   Cutter Direct at 6.

decommissioning expense represents the most current information reasonably available, based upon the August 9, 2011 Nuclear Regulatory Commission letter (included in my direct testimony as Exhibit MPC-2), which approves that amount as meeting the required minimum funding criteria based on current funding level, length of time remaining on the license, expected earnings on the trust fund, and future collections to the trust fund. It should not be the policy of the Commission to inject volatility into the rate of decommissioning expense recovery, which can impact the minimum funding level based on fluctuations of calculation factors over short periods of time.

Q. WHY DO YOU SAY THAT IT SHOULD NOT BE THE COMMISSION'S POLICY TO INJECT VOLATILITY INTO THE ANNUAL RATE OF DECOMMISSIONING EXPENSE RECOVERY?

A. Substantive Rule 25.231(b)(F)(iii) & (iv) notes that in the event a utility does not file a rate case within a five year period (which the Company has), the utility must perform a study or redetermination of the previous study and file it with the Commission. The Company submits that this five year requirement reflects the Commission's recognition that a normalization of decommissioning expense recovery over a reasonable extended period of time is in the best interest of the customer by normalizing the swings that otherwise might occur in more frequent decommissioning expense requirement calculations.

Q. WHAT DOES THE COMPANY RECOMMEND THE COMMISSION ORDER REGARDING THIS MATTER?

A. Consistent with the position of Commission Staff, the Company recommends that the Commission reject Mr. Garrett's recommendation and approve that the most recent Commission-approved level of annual decommissioning expense remain unchanged at $2,019,000.

### J. Depreciation

Q. WHAT DEPRECIATION ISSUES WILL YOU ADDRESS IN THIS SECTION OF YOUR REBUTTAL TESTIMONY?

A. I will address certain contentions presented by Mr. Pous in Section IV of his direct testimony;

1. pages 7-8 regarding generating unit life span,

2. pages 39-45 regarding fully accrued depreciation,

3. pages 14-15 regarding positive net salvage on power plants, and

4. pages 25-26 regarding suggested problems with the Company's accounting procedure for the booking of cost of removal.

Plant Lives

Q. WHAT IS MR. POUS' POSITION REGARDING GENERATING UNIT LIFE SPAN?

A. Mr. Pous insinuates on page 7, lines 1-9 of his direct testimony that the Company has routinely attempted to misstate the life expectancy of its generating units. Mr. Pous bases his opinion on his representation of the Company's position in two rate cases.[34]

Q. IS MR. POUS WRONG IN HIS REPRESENTATION?

A. Yes. The Company has always attempted to present its best estimate of when generating units would be retired based on the facts and circumstances every time it has filed a depreciation study with a rate proceeding. In those situations where no depreciation study is presented by the Company, it reports the retirement dates underlying the depreciation rates in the case as last approved. There is nothing nefarious in the Company's practice in either regard. The Company respects Mr. Pous' ability to make his determinations of his estimated life spans. It is unfair of Mr. Pous to not pay the Company the same due respect regarding life spans, as it is always a contentious issue in every regulatory proceeding without regard to the basis of either position.

Finally, the Company has proposed different plant retirement dates for depreciation purposes in this proceeding than those previously

---

[34] PUCT Docket Nos. 16705 and 37744.

proposed. For some units, the depreciation retirement dates are sooner than previously presented, and for others the depreciation retirement dates are further out that previously presented. None of the information presented in this proceeding represents an attempt by the Company to "underestimate the life spans for its various generating units".[35] What it does represent is the Company's best estimate of a responsible and reasonable estimate of an uncertain event for a determination of when depreciation expense should cease to be accrued on an asset. Mr. Pous opposed only one of the several plant life spans proposed by the Company (relating to the Sabine Plant Units 4 and 5).

Q. WHO IS PRESENTING INFORMATION TO SUBSTANTIATE THE COMPANY'S PROPOSED RETIREMENT DATES FOR DEPRECIATION PURPOSES?

A. An explanation of the basis for the Sabine Units' retirement date and impact of operating and maintaining generating units on the life span of the Sabine Units is discussed in the rebuttal testimony of Company witnesses Winfred W. Garrison and Cooper and their testimony supports the Company's position regarding the expected life span of the Sabine Units for the determination of depreciation accruals.

---

[35] Exhibit JP-1 at 7, line 3.

### K. Fully Accrued Depreciation

Q. WHAT IS MR. POUS' POSITION REGARDING FULLY ACCRUED DEPRECIATION?

A. As I understand it, Mr. Pous has presented a new regulatory theory claiming that there must be an exact matching of the level of depreciation expenses recovered under previously authorized electric utility rates and current revenues. His theory is that depreciation expenses, unlike other expense items originally included in the determination of utility rates, are in some way a permanent component of revenues from the moment electric utility rates are set until such rates are re-determined in some future rate case and if any item in plant in service remains in plant in service beyond the point that its service value is fully amortized, depreciation expense should continue to be accrued. Another way of stating his position could be that Mr. Pous has determined that the setting of rates creates an exact recovery mechanism that requires periodic true up. It is difficult to determine which theory he is espousing. Regardless, Mr. Pous ultimately erroneously concludes that ETI has reset its approved depreciation rates to zero without regulatory approval.

What Mr. Pous has failed to recognize is that time passes and that all costs change, as do all other factors that initially formed the determination of historical electric utility rates. In addition, Mr. Pous has presented an opinion that is not in concert with the Uniform System of Accounts ("USoA") as it is written.

Q.   WHY IS MR. POUS' THEORY IN ERROR?

A.   Depreciation is calculated and designed to reflect an asset's loss in service value over time.  Ideally, that time period is the life span of the asset being depreciated and the asset would neither be under-accrued at the time it is retired nor over-accrued prior to its retirement.  Estimates are imperfect by their very nature.  It is virtually impossible to precisely determine what date units will be retired and what the cost of retirement will be at that time.  As such, estimates must be employed and periodically revised as more information becomes available.

Q.   WHAT IS SERVICE VALUE?

A.   Service value is defined in the USoA as the original cost of plant less net salvage.  Net salvage is defined in the USoA the cost of removing plant from service ("cost of removal") less any proceeds realized upon its disposition ("salvage").  When cost of removal exceeds salvage, net salvage is negative, and when salvage exceeds cost of removal, net salvage is positive.  Once that service value has been fully amortized through the application of the depreciation rate(s) most recently approved by the regulator, there is no further loss in service value to be recognized unless and until the regulator determines that other factors require further evaluation.  The other factors would be the incurred cost of removal

versus the cost of removal underlying the depreciation rate and the realized salvage versus the salvage underlying the depreciation rate.

Q. ARE THERE OTHER CONSIDERATIONS?

A. Yes. The Company constantly adds, removes, retires, and replaces various assets and components of assets between rate cases. It does not, however, defer the depreciation expense on the new plant additions for future recovery, nor does it "unilaterally" continue to recognize depreciation on assets where the service value has been fully depreciated. Neither accounting procedure is appropriate for purposes of recording depreciation expense.

Q. HAS THE COMPANY CONSISTENTLY ADHERED TO THE PRINCIPLE THAT DEPRECIATION CEASES ONCE THE SERVICE VALUE OF ASSETS ARE FULLY AMORTIZED?

A. Yes. That has been the Company's policy for as long as I am aware.

Q. DO ANY OF ENTERGY'S OTHER REGULATORS ADHERE TO MR. POUS' POSITION ON THIS ITEM?

A. Not that I am aware of. In fact, APSC General Staff witness Ms. Gayle Freier stated on page 24, lines 3 through 5 of her direct testimony in the recent APSC Docket No. 09-084-U, "For ratemaking purposes, depreciation expense should not be calculated on any account with a

reserve ratio equal to or exceeding 100% unless the account has a negative salvage value." In that section of her testimony she was discussing the calculation of depreciation expense on 22 accounts that were fully amortized. Of the 22 accounts Ms. Freier identified, Entergy Arkansas had stopped depreciating 20 prior to the date of filing (some as early as 2005).

Q. WHAT RECENT EVENTS HAVE OCCURRED TO MAKE THIS ISSUE RELEVANT TO ETI?

A. Two things have occurred. First, ESI put into place a new fixed-asset accounting system in 2005 that enables ESI and the Entergy Operating Companies to automate processes previously handled manually, such as stopping the recording of depreciation expense when service value is fully amortized. The second thing that occurred is that three accounts became fully amortized since ETI's last rate case. Neither of these things is abnormal, nor do they change any company policy concerning depreciation.

Q. ARE THE COMPANY'S ACTIONS IN ANY MANNER CONTRARY TO ANY ORDERS OR REQUIREMENTS OF THE PUCT?

A. Not at all. The Company has continued at all times to observe the Commission approved depreciation rates and to accrue depreciation expense consistent with Commission rules and the FERC USoA.

Q.    IS THERE ANYTHING ELSE THE COMMISSION SHOULD CONSIDER ON THIS MATTER?

A.    Yes.  First, depreciation expense accruals are only suspended so long as the account is fully amortized.  In other words, if a subsequent addition occurs to the account in the future, depreciation will begin to be accrued anew even though that item is not "in base rates" through the application of approved depreciation rates.  The Company does not defer that depreciation until the next rate case.  Second, the Company's depreciation accounting is subject to independent external audit, and the Company's external auditors would not allow the Company to "unilaterally cease" depreciation expense accrual if such action required regulatory approval; nor would they allow ETI to "unilaterally" continue to accrue depreciation, as suggested by Mr. Pous, without specific expressed regulatory approval.

Q.    WHY WOULD THE COMPANY'S EXTERNAL AUDITORS REJECT AN ATTEMPT BY THE COMPANY TO CONTINUE TO ACCRUE DEPRECIATION EXPENSE ON FULLY DEPRECIATED ACCOUNTS?

A.    It would be a violation of Generally Accepted Accounting Principles ("GAAP") to continue to record depreciation expense on items which are fully depreciated.  The external auditors must also present a CPA Certification Statement at the beginning of the Company's FERC Form 1 which should:

a) Attest to the conformity, in all material aspects, of the below listed (schedules and pages) with the Commission's applicable Uniform System of Accounts (including applicable notes relating thereto and the Chief Accountant's published accounting releases).[36]

Q. HAS THE COMPANY VIOLATED ANY REGULATORY PRINCIPLE AS SUGGESTED BY MR. POUS?

A. No. However, the refund of under-accrued depreciation expense as Mr. Pous recommends would constitute retroactive ratemaking.

## L. Net Salvage

Q. WHAT IS MR. POUS' POSITION REGARDING NET SALVAGE OF EXISTING GENERATING UNITS?

A. Mr. Pous has suggested that negative salvage is inappropriate for existing generating facilities. His recommendation is contrary to long standing practice of the PUCT to provide for a negative salvage value that represents terminal salvage of regulated utility generating units. I will not address the general issue of negative salvage as that will be addressed by Company witness Dane A. Watson. What I will address is the suggestion in Mr. Pous' testimony on pages 14-15 that the Company received a "substantial positive net salvage"[37] due to the retirement of Neches Station and Nelson Generating Units 1 and 2 and those transactions are a reasonable representation of probable future events.

---

[36] Instructions for filing FERC Form Nos. 1 and 3-Q, Paragraph III, (d) a).
[37] Direct Testimony of Mr. Pous, page 14 line 24.

Q.  HAS MR. POUS PROVIDED ANY INFORMATION REGARDING THE EVENTS SURROUNDING THE NECHES STATION GENERATING UNITS?

A.  He has not.  Mr. Pous cites Neches Station on page 14, lines 24 and 25 of his direct testimony but presents no specific information regarding the facts surrounding that facility.  A discussion of those specific facts, however, is essential to understanding why the salvage associated with the Neches Station provides no support for Mr. Pous' position.

Q.  WHAT ARE THE FACTS REGARDING THE FACILITY?

A.  Neches Station was a generating station in Beaumont, Texas that was built between 1926 (Unit 1) and 1959 (Unit 8).  Units 1 and 2 (total capacity 57 MW) were retired and dismantled in 1966 at no additional cost to the customer or to the Company.  The boiler for Unit 7 exploded in 1983.  The Company subsequently retired that unit as a result of that incident.  The Company received an insurance reimbursement for that facility.  The insurance reimbursement was in excess of the net book value of the entire station.  The benefit of that insurance reimbursement above the original cost of Neches Unit 7 was refunded to the customer through a subsequent rate action.  The remaining generating units were placed in long term storage in 1985.  The remaining units were demolished in 2002 and 2003 at a net cost of $14.491 million.  The Company sought recovery

of the negative salvage costs through amortization in PUCT Docket No. 34800.

Q. DOES THIS FACT PATTERN SUPPORT MR. POUS' CONTENTION?

A. No. It is unreasonable to predicate a positive salvage value based on a boiler explosion, particularly when customers received the benefit of the excess insurance reimbursement, and the Company ultimately incurred a considerable cost for dismantling the Neches Station facility. These facts are obviously quite unique and atypical, and not indicative of normally recurring retirement activity.

Q. WHAT ARE THE FACTS REGARDING NELSON UNITS 1 AND 2?

A. Nelson Units 1 and 2 were situated adjacent to an industrial complex, and thus uniquely situated to enable industrial customers near the site to form a joint venture that would acquire two of the units at Nelson Station (83% depreciated at the time) to convert into a co-generation facility. Those facilities were substantially reconfigured (converted to a Fluidized Bed Combustion heat source) at the cost of the industrial participants in the Joint Venture. The gain on the transaction was passed through to customers in subsequent rate actions.

Q. WOULD THIS UNIQUE SITUATION BE LIKELY TO OCCUR AGAIN?

A. I do not know. However, such a unique set of circumstances has not repeated itself at any of ETI's facilities in the last 24 years. Nor has such a set of circumstances ever occurred at any Entergy Operating Company facility other than the two Nelson units. Lastly, what I do know from internal discussions is that the units were largely depreciated and inoperable without significant modification (such as the modification performed by the Joint Venture participants) and that most of the benefits of the transaction were passed on to customers. It would be wrong in my opinion to suggest that the Nelson situation is likely to recur or suggest that it is reasonable to base a decision on whether to reflect negative salvage in the production depreciation rates on the unique circumstances of the Nelson 1 and 2 generating units.

## M. Accounting For Removal Costs

Q. WOULD YOU SUMMARIZE YOUR UNDERSTANDING OF MR. POUS' STATEMENTS ON PAGES 25-25 OF HIS DIRECT TESTIMONY?

A. Mr. Pous is suggesting that the Company's books and records inappropriately reflect the amounts of cost of removal incurred due to the removal of distribution assets on projects where both additions to and removals from plant in service are the purpose of the project.

Q.    HOW DOES THE COMPANY RECORD COST OF REMOVAL OF DISTRIBUTION FACILITIES ON ITS BOOKS AND RECORDS WHEN PROJECTS INCLUDE BOTH ADDITIONS TO AND REMOVALS FROM PLANT IN SERVICE?

A.    The Company allocates the incurred costs of such projects between installation and removal based upon estimates prepared by engineers using the Company's Distribution Information System ("DIS"). The process of developing those estimates, including the development of "as built" estimates is discussed in the rebuttal testimony of Company witness Corkran.

Q.    HOW DOES THE ALLOCATION PROCESS WORK?

A.    Costs are aggregated on work orders in the Company's accounting systems and allocated between cost of removal and installation based on the original estimated cost of the project until the project's completion. This ensures that the costs are reasonably reflected on the books in FERC Accounts 107 (CWIP) and 108 (Accumulated Provision for Depreciation as Retirement Work in Progress ("RWIP")). Upon completion of the work request, the construction department enters field changes into DIS's AsBuilt screen after which DIS runs the final estimate which the accountants refer to as an "as built estimate" that reflects actual items installed and a standard cost of adding and removing the particular items added and removed. The reason it is an estimate is because, primarily

due to timing, the per unit rates in the estimate may not reflect the actual hourly labor rates, transportation rates, or material costs. For instance, the hourly labor rate standard may be $30 per hour whereas the individual who performed the work would be a higher or lower rate than the standard.

Upon completion and receipt of the as built estimate into the Company's PowerPlant accounting system, the Company reflects a final allocation of the actual non-material costs to installation and removal, using the allocation percentages provided by the estimated non-material costs. Material amounts and indirect costs such as AFUDC, Store Costs, and Construction overheads are added to the amount of non-material costs allocated to installation, and the installation costs are then closed to plant in service. The residual calculated amount composed of direct labor, labor loaders, transportation and transportation loaders is added to remaining indirect costs accrued in RWIP and transferred to the reserve by plant account. For instance, the estimated non-material costs on the project discussed in the testimony of Company witness Corkran resulted in a final ratio of the costs of roughly 86% to installation and 14% to removal. This is before assignment of indirect costs such as construction overheads, AFUDC, and Store Costs and Associated Stock (FERC Account 163) or the inclusion of material costs in the total CWIP amount. The final result was as follows:

As built estimate:

CWIP    $48,081    93%

RWIP    $3,410    7%

Actual Cost including overheads:

CWIP    $54,552    96%

RWIP    $2,546    4%

The slight differences are driven by the addition of construction overheads and AFUDC.

Q.    DO THE DIFFERENCES SUGGEST TO YOU THAT SOME FLAW EXISTS IN THE PROCEDURE FOR ALLOCATION OF COSTS BETWEEN INSTALLATION AND REMOVAL?

A.    No. The differences between the as built estimate provided by the DIS and the final amounts booked to the Company's property accounts reflect the addition of AFUDC and other construction overhead allocation amounts. Those would be difficult to determine with any degree of accuracy in a construction estimating system and would not drive the results Mr. Pous suggests in his testimony. The process is driven by experts in estimating the activities for installing and removing distribution utility property and there is no reason to believe that the accounting process would result in amounts that were not representative of the actual costs to remove distribution utility property.

Q.   DOES THIS CONCLUDE YOUR REBUTTAL TESTIMONY?

A.   Yes.

**Entergy Texas, Inc.**
**MISO Transition Expenses**
**July 2011 through March 2012**

**Expenses by Account**

| Account and Description | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| 4031AM - Deprec Exp billed from Serv Co | 12,584 | 17,439 | (759) | 5,274 | 7,248 | 7,931 | 3,065 | 7,192 | 6,904 | 66,879 |
| 408110 - Employment Taxes | 7,042 | 5,127 | 4,574 | 5,353 | 4,470 | 5,582 | 3,888 | 4,884 | 5,887 | 46,808 |
| 500000 - Oper Supervision & Engineerin | 773 | 962 | 1,062 | 386 | (128) | 516 | (11) | (115) | 171 | 3,616 |
| 506000 - Misc Steam Power Expenses | 1,001 | 1,836 | | | | 569 | | | | 3,406 |
| 556000 - System Control & Load Disp. | 267 | 1,292 | 1,066 | 115 | 3 | 34 | 146 | | 7 | 2,784 |
| 557000 - Other Expenses | 31 | (9) | 749 | 36 | 276 | 435 | 50 | (261) | (99) | 1,305 |
| 560000 - Oper Super & Engineering | 2,553 | | 367 | 81 | 715 | 130 | | (63) | 124 | 3,955 |
| 561000 - Load Dispatching | | | | | | | 138 | (270) | 134 | 2 |
| 561200 - Load Dispatch - transm system | 1,943 | (730) | 1,129 | 472 | 531 | 152 | 518 | (171) | 488 | 4,331 |
| 561300 - Load disptch-transm serv & sch | 334 | | | 4 | 64 | 146 | | | | 548 |
| 566000 - Misc. Transmission Expenses | 728 | 6,018 | (169) | | 74 | 1,460 | 4,768 | (3,863) | 240 | 9,257 |
| 575100 - Regional Energy Mkts-Oper Supv | (16,713) | (888) | 0 | | (35) | 17 | (78) | | 2 | (17,583) |
| 909000 - Information & Instruct Adv Ex | | | 103 | 90 | | 745 | | (670) | 304 | 458 |
| 920000 - Adm & General Salaries | 128,451 | 83,682 | 76,235 | 90,436 | 73,950 | 119,792 | 62,735 | 86,326 | 92,317 | 813,925 |
| 921000 - Office Supplies And Expenses | 16,869 | 26,316 | (5,178) | 9,024 | 16,083 | 16,989 | 2,732 | 3,096 | 4,664 | 90,594 |
| 923000 - Outside Services Employed | 384,449 | 264,867 | 80,933 | 428,767 | (112,530) | 1,059,754 | (4,757) | 72,756 | 78,906 | 2,253,145 |
| 924000 - Property Insurance Expense | 3,313 | (398) | | | | (0) | | | | 2,915 |
| 926000 - Employee Pension & Benefits | 50,975 | 30,600 | 27,857 | 30,403 | 28,107 | 41,683 | 18,669 | 30,508 | 32,455 | 291,257 |
| 928000 - Regulatory Commission Expense | 4,023 | 5,326 | 1,375 | 766 | 1,860 | 20,906 | 819 | (3,228) | 39 | 31,885 |
| 930100 - General Advertising Expenses | 4,596 | 6,120 | 551 | 838 | 242 | 135 | | | | 12,482 |
| 930200 - Miscellaneous General Expense | | | | | 34 | | | | | 34 |
| Totals | 603,221 | 447,559 | 189,894 | 572,044 | 20,964 | 1,276,976 | 92,681 | 196,121 | 222,544 | 3,622,005 |

**Expenses by Project**

| Project and Description | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| F3PPETIMIS - MISO Transition ETI costs | 156,365 | 145,437 | 101,245 | 89,188 | 44,993 | 320,545 | (32,977) | 62,528 | 50,690 | 938,014 |
| F3PPRTOICE - O&M ICT Transition Costs | | | | | | | | 2,556 | 17,957 | 20,512 |
| F3PPSPE018 - SPO VP of Strategic Initiatives | 3,379 | 4,412 | 4,039 | 1,827 | 1,297 | 3,654 | 214 | (74) | 79 | 18,826 |
| F3PPTDERSD - MISO Transition ALL OPCO | 471,149 | 297,712 | 84,283 | 481,029 | (25,326) | 952,680 | 125,444 | 131,111 | 153,804 | 2,671,886 |
| F5PPSPE044 - PMO Support Initiative-System-wide | (30,244) | (1) | (40) | | | 0 | | | | (30,284) |
| F5PPSPPCBA - ICT/RTO Cost Benefit Analysis Sty | 2,572 | | 367 | | | 98 | | | 15 | 3,051 |
| Totals | 603,221 | 447,559 | 189,894 | 572,044 | 20,964 | 1,276,976 | 92,681 | 196,121 | 222,544 | 3,622,005 |

The above costs are Entergy Texas, Inc. MISO transition expenses which have been incurred and recorded on the books for the nine months since the end of the June 30, 2011 Test Year in in Docket No. 39896.

**ENTERGY TEXAS, INC.**
**ADJUSTMENT TO RITA REGULATORY COSTS IN RATE BASE**
TEST YEAR ENDED JUNE 30, 2011
DOCKET NO. 39896

| LINE | DESCRIPTION | REF. | | AMOUNT |
|------|-------------|------|---|--------|
| 1 | Rita Regulatory Asset Balance in Pro Forma Rate Base (Docket 39896) | Sch P, P.19, L.23 | $ | 26,229,627 |
| 2 | Annual Amortization in Cost of Service | AJ15.2 Sch P, P.27, L.4 | $ | 5,245,925 |
| 3 | Rita Regulatory Asset Balance in Pro Forma Rate Base (Docket 37744) | AJ15.8 | $ | 25,278,210 |
| 4 | Amount Amortized after Dk. 37744 (Aug 15, 2010 - June 30, 2011) | 10.5 Months | $ | 4,423,687 |
| 5 | Remaining Balance after Amortization | [Line 1 - Line 4] | $ | 21,805,940 |

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
SOAH DOCKET NO. 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
PUC DOCKET NO. 39896 - 2011 ETI Rate Case

Response of: Entergy Texas, Inc.   Prepared By: Steve Bridges
to the Sixth Set of Data Requests  Sponsoring Witness: Michael P. Considine
of Requesting Party: Cities    Beginning Sequence No.
            Ending Sequence No.

---

Question No.: Cities 6-2     Part No.:    Addendum:

Question:

In reference to Schedule B-1, line 7, Property Insurance Reserve, $59,799,744, please provide the following information:

a. The annual Property Insurance Reserve balance by year for the period 2000 through 2010;

b. The amount of Hurricane Ike charges included in the Property Insurance Reserve;

c. A copy of the Company's current written policy explaining when costs may be charged to the Property Insurance Reserve;

d. A list of all charges, showing amounts and date of charges, made to the Property Insurance Reserve as a result of the implementation of the Jurisdictional Separation Plan, along with a complete explanation as to why such charges should be made to the Property Insurance Reserve.

---

Response:

a. Please see the attached schedule of reserve balances and activity from June 30, 1996 to June 30, 2011.

b. The Hurricane Ike charges in the storm reserve as of June 30, 2011 are ($6,054,297).

c. Please see the attached.

d. Please see the attached schedule.

**39896**              **CITIES 6-2 BB272**

ENTERGY TEXAS, INC.
DOCKET NO. 39896   ETI COS 6/30/11
CITIES 6TH SET QUESTION 2 (a)
STORM RESERVE ACTIVITY AND BALANCES FROM 6/30/96 - 6/30/11

Exhibit MPC-R-3
Docket No. 39896
Page 2 of 25

| DATE | BEGINNING BALANCE | ACCRUALS | CHARGES | ORDERED ADJUSTMENTS NOTE 5 | OTHER | NOTE | ENDING BALANCE |
|---|---|---|---|---|---|---|---|
| 6/30/96 | | | | | | | (12,074,581) |
| 7/1/96-12/31/96 | (12,074,581) | (1,374,246) | (421,088) | | (66) | 4 | (13,869,981) |
| 1997 | (13,869,981) | (2,748,492) | 13,470,336 | | 294,332 | 4 | (2,853,805) |
| 1998 | (2,853,805) | (2,748,492) | 9,473,714 | 2,834,702 | (47,499) | 4 | 6,658,620 |
| 1999 | 6,658,620 | (1,650,996) | 1,943,786 | | 10,867 | 4 | 6,962,277 |
| 2000 | 6,962,277 | (1,650,996) | 2,525,929 | | (4) | 4 | 7,837,205 |
| 2001 | 7,837,205 | (1,650,996) | 3,572,550 | | 145,560 | 4 | 9,904,319 |
| 2002 | 9,904,319 | (1,650,996) | 3,611,751 | | 17,127 | 4 | 11,882,201 |
| 2003 | 11,882,201 | (1,650,996) | 2,224,744 | | 928 | 4 | 12,456,877 |
| 2004 | 12,456,877 | (1,650,996) | 1,914,249 | | 329 | 4 | 12,720,459 |
| 2005 | 12,720,459 | (1,650,996) | 181,422,456 | | | | 192,491,919 |
| 2006 | 192,491,919 | (1,650,996) | 55,695,163 | | (205,518,030) | 2 | 41,018,056 |
| 2007 | 41,018,056 | (1,650,996) | 24,724,965 | | (11,901,675) | 2 | 52,190,350 |
| 2008 | 52,190,350 | (1,650,996) | 266,962,880 | | 12,498,325 | 1 | 330,000,559 |
| 2009 | 330,000,559 | (3,699,996) | 96,050,815 | | (362,068,336) | 6 | 60,283,043 |
| 2010 | 60,283,043 | (3,699,996) | (368,762) | | 3,457,091 | 3 | 59,671,376 |
| 1/1/11-6/30/11 | 59,671,376 | (1,849,998) | 1,978,366 | | | | 59,799,744 |

NOTE 1:  Correction of state balances due to analysis during JSP split.
NOTE 2:  Adjustments to remove Storm Securitization and Insurance recoveries from the reserve.
NOTE 3:  Adjustment to Insurance recoveries recorded in 2009.
NOTE 4:  Other adjustments.
NOTE 5:  Docket 16705 ordered reserve accrual adjustment back to 6/1/96
                         (6/1/96-12/31/98--31mos * 91,442)        2,834,702
NOTE 6:  Adjustments to remove Storm Securitization and Insurance recoveries from the reserve for ($355,289,136)
             and to record the effects of the Texas Storm Securitization Settlement booked in August 2009 for ($6,779,200) for IKE.

# I.  POLICY SUMMARY

- This Policy provides rules for the reporting of major storm damage expenditures for Entergy's regulated Legal Entities including the corporate functions supporting them.

- All employees, agents and contractors of Entergy shall immediately report known, suspected or potential violations of this Policy by following the procedures described in the Reporting Violations Policy.

- **Please refer to the following detailed Policy for further information.**

# II.  DETAILED POLICY

## 1.0  PURPOSE AND APPLICABILITY

The purpose of this Policy is to establish a uniform set of rules for the reporting of major storm damage expenditures for the Entergy Corporation regulated Legal Entities (i.e., EAI, EGSL, ELL, EMI, ENOI, & ETI) with significant production, transmission, distribution, general plant, and/or related information technology (IT) facilities.  This Policy will also provide the framework to ensure that storm project charges and storm reserve charges are accurate and that the appropriate internal accountabilities are established.

This Policy applies to any and all employees of any Entergy System Company, unless otherwise expressly excluded, as well as agents and contractors of any Entergy System Company.  For purposes of this paragraph, Entergy System Company shall mean Entergy Corporation and all of its subsidiaries and affiliates in which Entergy Corporation has a direct or indirect majority ownership in such subsidiary or affiliate.

For employees covered by a collective bargaining agreement, the applicable collective bargaining agreement will govern to the extent it conflicts with this Policy.

Nothing contained in this Policy should be construed to suggest that employees of a particular subsidiary or affiliate of Entergy Corporation are also employees of Entergy Corporation or any other affiliate or subsidiary of Entergy Corporation. Moreover, this Policy does not create any employment relationship between any person and any Entergy System Company.

## 2.0  REFERENCES & CROSS REFERENCES

**2.1** The following policies should be read in conjunction with this Policy:

**2.1.1** Entergy Accounting Policies

- Capital Funding Project Approval Policy
- External Job Order Policy

**2.1.2** Entergy System Policies

- Code of Entegrity
- Reporting Violations

## 3.0 <u>DEFINITIONS</u>

**3.1** **Incremental Costs –** For EMI only, defined by the Mississippi Public Service Commission as, "those costs incurred for restoring service….that are beyond the normal costs the Company would have incurred absent the event." Incremental Costs include incremental labor, transportation, and material costs. Normal costs would include, for example, compensation for normal workdays, including normal overtime, for those working on restoration, their transportation costs, and meals. Loaned Labor from other Legal Entities to EMI is considered incremental labor.

**3.2** **Legal Entity**– Refers to Entergy's direct and indirect subsidiaries. The term is equivalent to PeopleSoft's standard term "business unit" for accounting purposes.

**3.3** **Major Storm Damage Threshold** – A Storm Event with combined O&M and capital repair costs estimated to be $50,000 or more per occurrence for a particular Legal Entity, except for EMI (see Section 3.6). Also, for ENOI, there are additional requirements that will be reported and maintained by Property Accounting. (The details of these requirements can be obtained by request from Property Accounting.) When storm damage is sustained to production, distribution, transmission, general

plant, and/or related IT facilities, a combined cost for all functions within the Legal Entity affected should be used to estimate the $50,000 threshold amount.

3.4     **Policy** – this Storm Damage Policy.

3.5     **Property Insurance Account For Storm Damage** – Account at each Legal Entity that is used to capture the approved regulatory accrual for storm damage expenses (also known as the Storm Damage Reserve). The offset for the accrual is captured in a Property Insurance expense account (i.e., FERC Account 924).

3.6     **Storm Damage Deductible** – For EMI only, on an annual basis the initial $250,000 of incremental storm damage costs that will be absorbed by the Company.  Once the annual deductible has been met, EMI incremental storm damage costs may be applied against the Property Insurance Account for Storm Damage

3.7     **Storm Damage Work Order -** Term used to refer to Storm Work Orders and Storm Expense Work Orders collectively.

3.8     **Storm Expense Work Order** – A Work Order used to accumulate all O&M costs for all functions other than distribution lines (e.g. transmission, gas, substations, IT).

3.9     **Storm Event** – Hurricanes, floods, tornadoes, ice storms, high winds or any other act of nature that causes extensive damage to Entergy's production, transmission, distribution, general plant, and/or related Information Technology facilities in a particular Legal Entity (i.e., EAI, EGSL, ELL, EMI, ENOI, & ETI).

3.10    **Capital Storm Work Order** – A Work Order used to accumulate all costs (both O&M and Capital) for distribution lines storm damage and capital costs only for all other functions (e.g. transmission, gas, substations, IT).  For Distribution Lines, Property Accounting will perform a monthly allocation to move O&M costs to the Property Insurance Account for Storm.

**3.11 Work Order –** The accounting code block element or chart field for projects used to accumulate costs.

**3.12 Catastrophic Event –** A sudden event which causes significant damage to facilities in Entergy's service territory (e.g. damage of the magnitude experienced by Hurricane Katrina, Hurricane Rita, and significant ice storms). This would include several storm project codes per function and typically would include more than one Legal Entity. This classification of an event would be implemented at the discretion of the Chief Accounting Officer.

**3.13 Resource Manager –** Jurisdictional manager in charge of managing manpower and material resources for a jurisdiction.

**3.14 Material Financial Impact –** Storm impacting more than 5% of customers and/or having a repair estimate of $5 million or more in any jurisdiction. Items of material financial impact do not necessarily have to involve specifics related to finance. For example, an initial message reporting outage of the number of customers could require pre-approval of the CAO.

**3.15 Storm Escrow Account –** A dedicated "lock-box" account which is held in escrow for future storm events. Funds removed from this account may be used to reimburse Entergy for storm expenditures. The rules for when funds may be drawn vary by legal entity.

**4.0 RESPONSIBILITIES-** Attachment A has a comprehensive chart of accountabilities.

**4.1** The **Storm Incident Commander** is responsible for making the decision to implement the storm process.

**4.2** The **Chief Accounting Officer** is responsible for any external filings necessary related to the storm, sign off on any estimates for the event

67

**39896** **CITIES 6-2 BB278**

released externally, and sign off on any internal and external financial communications that directly or indirectly include a material financial impact related to storm. Other accountabilities of the CAO include: determining if a storm event will be classified as a catastrophic event, approving this policy and determining any exceptions to this policy.

4.3 The **Distribution Operations Area (DOA) Director** and the appropriate **transmission, substation, general plant and IT managers** are responsible for coordinating and providing the initial dollar estimate of the Storm Event in order to determine the need for Storm Damage Work Orders. They are also responsible for all related Work Orders.

4.4 **Resource Managers** are responsible for overseeing the review of Distribution charges to Storm Work Orders to determine the accuracy of these charges and to correct inaccurate charges.

4.5 **Transmission, Substation, and IT managers** are responsible for overseeing the review of their charges to their own Storm Damage Work Order as well as to Distribution Storm Work Orders, and for making corrections to charges, when appropriate.

4.6 **Budget Analysts** are responsible for obtaining chargeable Storm Damage Work Orders when the estimated dollar amount is expected to meet the Major Storm Damage Threshold. They are also responsible for monitoring charges to Storm Damage Work Orders and the timely closing of Storm Damage Work Orders for their respective groups.

4.7 The **Property Accounting** group is responsible for:

- issuing Storm Damage Work Orders and activating these work orders for charges when notified by Budget Analysts;
- monitoring and reviewing the storm damage charges prior to

68

moving the charges from the Storm Damage Work Order to the Property Insurance Account for Storm Damage;

- reversing any non-qualifying charges to appropriate expense accounts;

- providing reporting tools to the functional areas to assist in monitoring of storm charges;

- providing the Tax Department with storm damage losses for use in tax-return preparation and tax planning;

- application of the annual Storm Damage Deductible to EMI's Incremental Costs;

- running the monthly allocation for Distribution Lines to split costs between the reserve and capital;

- accounting for reimbursement or recovery of storm damage charges, both capital and expense.

4.8 **Jurisdictional Finance Directors** are responsible for monitoring reserve expense accruals to ensure accuracy, for providing internal reporting of reserve balance information upon request and for providing annual budget to Legal Entity cost managers.

4.9 The **Tax Department** is responsible for the reporting of storm damage casualty losses based on information provided by **Property Accounting** and the **DOA Directors** to ensure proper recovery of tax benefits associated with storm damage.

4.10 **Jurisdictional Finance Directors,** in conjunction with the **DOA Directors**, **Resource Managers** and **Budget Analysts,** are responsible for training the appropriate functional area personnel in these policies and procedures. They are also responsible for forwarding and coordinating estimates on an as needed basis for storm estimates during a catastrophic event in conjunction with the **Storm Incident Commander**.

**4.11** **External Reporting** is responsible for recording the storm reserve accruals to the **Property Insurance Account for Storm Damage**.

**4.12** **Corporate Reporting** is responsible for quarterly reporting requirements relating to large Storm Events that have a material impact on quarterly financial statements. They are also responsible for monitoring reserve accruals and reserve balances in conjunction with **Regulatory Accounting**, **Jurisdictional Business Managers** and **Property Accounting.** For EMI only, quarterly reports summarizing the accruals and charges to the Property Insurance Account for Storm Damage should be furnished to Regulatory Affairs for filing with the Mississippi Public Utilities Staff**.**

**5.0** **DETAILS**

**5.1** **Charging Guidelines for typical storm**

**5.1.1** **Project Codes-** In the event of a storm, project codes typically will be distributed by each functional business unit. When setup, project codes should include the name of the storm. Property Accounting will then fill out the storm name in the major storm field in PowerPlant as part of the approval process. This will be the basis for all storm reporting.

**5.1.2** **Activity Codes-** Attachment B has a listing of approved activity codes to be used during a storm. This attribute will only be used for internal tracking purposes.

**5.1.3** Storm Work Orders and Storm Expense Work Orders should only be issued for the accumulation of cost associated with the restoration of storm damage when the total cost is expected to meet the Major Storm Damage Threshold. Should storm damage

be incurred which will not meet the Major Storm Damage Threshold, the total cost should be charged against the responsible organization's normal project codes (both capital and O&M, as appropriate). Damage costs are generally related to repair and replacement work associated with production, distribution, transmission, substations, general plant, and/or related IT facilities.

Examples of <u>valid</u> storm damage charges include:

- All labor and material costs directly related to the restoration of production, distribution, transmission, general plant, and communication facilities, whether by replacement or repair.
- All food, lodging, fuel and travel expenses associated with the restoration effort.
- All Customer Service Center (CSC), Transmission Operations Center (TOC), Distribution Operations Center (DOC), and Transportation Department costs, above normal operating expenses, directly associated with the restoration effort.
- Communications cost associated with the restoration effort.
- Public safety announcements associated with the restoration effort.
- Tool, equipment, and vehicle repair costs directly attributable to the restoration effort.
- All incidental costs directly associated with the restoration effort.

Examples of <u>invalid</u> storm damage charges include:

- Alcoholic beverages and tobacco products.
- Purchases of any tools or equipment not specifically required for the restoration effort that will be used beyond the restoration effort unless these tools were purchased to replace tools or equipment lost in the storm.

**39896**                                                                    **CITIES 6-2 BB282**

- Purchases of personal clothing, except under extraordinary circumstances.
- Ramp up and mobilization costs when an event does not meet the major storm damage threshold amount.
- Facility upgrades not specifically required for the restoration effort such as new carpeting on the second floor of a building with flooding on the first floor only.
- Vegetation removal not specifically required for the restoration effort unless mandated by municipal or governmental authority.
- Replacement labor cost for any operating area that has supplied construction and support personnel to the restoration effort.

5.1.4 Costs incurred for advance preparation of a Storm Event should be charged to the Legal Entity or entities expected to benefit from this advance preparation, including CSC charges. Storm Damage Work Orders should be credited with unused materials returned to the storerooms.

5.1.5 For all legal entities, valid charges may be recorded to the Storm Damage Work Order in order to meet the Major Storm Damage Threshold (or in the case of EMI the $250,000 annual Storm Damage Deductible). However, for EMI, only Incremental Costs may be applied against the Property Insurance Account for Storm Damage once the deductible has been met. This includes incremental labor, transportation, and non-capitalized material costs. For EAI, non-incremental straight-time payroll and payroll loaders may not be applied against the Property Insurance Account for Storm Damage. For all other legal entities, all valid O&M charges may be applied against the Property Insurance Account for Storm Damage once the threshold has been met. If the Major

Storm Damage Threshold is not met, valid charges to the Storm Damage Work Order should be reversed and recorded against normal project codes (both capital and O&M, as appropriate). For EMI and EAI Distribution, budget analysts will work with Property Accounting to make any non-incremental cost adjustments needed.

**5.2** Charging Guidelines for Catastrophic Event

**5.2.1 Project Codes-** In the event of a catastrophic event, all communications will occur via the IE StormNet, Inside Entergy, and any other communication avenue activated. When setup, project codes are to include the name of the catastrophic event. Property Accounting will then fill out the storm name in the major storm field in PowerPlant as part of the approval process. This will be the basis for all storm reporting.

**5.2.2 Activity Codes-** Attachment B has a listing of approved activity codes to be used during a storm. This attribute will only be used for internal tracking purposes.

**5.2.3 Storm Restoration Activities –** Storm Work Orders and Storm Expense Work Orders should only be issued for the accumulation of cost associated with the restoration of storm damage when the total cost is expected to meet the Major Storm Damage Threshold. Should storm damage be incurred which will not meet the Major Storm Damage Threshold, the total cost should be charged against the responsible organization's normal operating budgets (both capital and O&M, as appropriate). Damage costs are generally related to repair and replacement work associated with Production, distribution, transmission, substations, general plant, and/or related IT facilities.

Examples of <u>valid</u> storm damage charges include:

- All labor and material costs directly related to the restoration of production, distribution, transmission, general plant, and communication facilities, whether by replacement or repair.
- All food, lodging, fuel and travel expenses associated with the restoration effort; unless a Logistics code exists for the event.
- All Customer Service Center (CSC) costs, Transmission Operations Center (TOC), Distribution Operations Center (DOC), and Transportation Department above normal operating expenses, directly associated with the restoration effort.
- Communications cost associated with the restoration effort.
- Public safety announcements associated with the restoration effort.
- Tool, equipment, and vehicle repair costs directly attributable to the restoration effort.
- All incidental costs directly associated with the restoration effort.

Examples of invalid storm damage charges include:
- Alcoholic beverages and tobacco products.
- Purchases of any tools or equipment not specifically required for the restoration effort that will be used beyond the restoration effort unless these tools were purchased to replace tools or equipment lost in the storm.
- Purchases of personal clothing, except under extraordinary circumstances.
- Ramp up and mobilization costs when an event does not meet the major storm damage threshold amount except under extraordinary circumstances approved by the Chief Accounting Officer.
- Facility upgrades not specifically required for the restoration

effort such as new carpeting on the second floor of a building with flooding on the first floor only.

- Vegetation removal not specifically required for the restoration effort unless mandated by municipal or governmental authority.
- Replacement labor cost for any operating area that has supplied construction and support personnel to the restoration effort.

**5.2.4 Logistic Costs during a Catastrophic Event-** Due to the complexity and high volume of costs during a Catastrophic Event, logistic costs will be tracked in one established project code per Legal Entity. Detailed records must be maintained for these costs. The setup of these project codes will be completed by Distribution and communicated via the IE StormNet.

Examples of valid Logistics Costs include:
- Hotel rooms for restoration crews from other Entergy Legal Entities or contractors
- Costs of tent cities
- Costs of meals provided in bulk for restoration crews
- Labor related to logistics coordination

Examples of invalid Logistic Costs include:
- Materials and supplies related to restoring service or Business Continuity
- Labor related to restoring service
- Costs of lodging for corporate employees working on a corporate function not related to restoring service or organizing logistics

**5.2.5 Non-Productive time related to storm-** Employees on "release"

that are not able to perform any business functions due to the storm must charge their time to Paid Time Off-Bad Weather. Rest time for union employees should be charged to normal paid time off codes.

**5.2.6 Normal Activities -** Work performing normal tasks (albeit under difficult or different circumstances), not related to storm restoration, should be charged to typical charge codes.

**5.2.7 Business Continuity Costs during a Catastrophic Event**- The costs of reestablishing business operations for any function relocated during a Catastrophic Event should be charged to established Business Continuity Codes. Examples include planning efforts by the Business Continuity Team, temporary relocation of functions to provide business continuity, procurement of temporary office space and lodging when mandated by employee's supervisor in conjunction with returning to work. Time specifically spent on Business Continuity related tasks should be charged to established Business Continuity Codes. This includes planning sessions held within functions to return to business. Any approved employee expenses related to redeployment should be charged to this code. Charges for expenses for release employees will be the responsibility of the employee and not Entergy (e.g. lodging and meals). Entergy will not reimburse costs until an employee is given an assignment by his or her supervisor.

**5.3 Contractor Invoice approvals and documentation during a Catastrophic Event-** Most storm invoices will need to be approved through the Contractor Invoice Processing Team. Documentation must be received from the vendor to support costs billed.

**6.0 PROCEDURES**

**6.1** **Storm Work Orders and Storm Expense Work Orders**

**6.1.1** **Storm Work Order Setup** **–** The responsible functional representative determines the need for Storm Work Order or Storm Expense Work Order based on the Major Storm Damage Threshold definition in Section 2.0. This may involve some coordination with other groups if their facilities have been impacted by the same Storm Event. Budget Analysts are then required to obtain an approved Storm Work Order or Storm Expense Work Order. Storm Work Orders are required for damage to Distribution Lines (Expense and Capital damage), and for Capital damage to production facilities, substations, transmission, gas distribution, general plant, and/or related IT facilities. Storm Expense Work Orders are required for Expense damage to production facilities, substations, transmission, gas distribution, general plant, and/or related IT facilities. At a minimum, there should be one Storm Work Order or Storm Expense Work Order set up for each Legal Entity meeting the threshold requirements. Storm Damage Work Orders must also include a Work Order (WO) estimate**.**

**6.1.2** **Storm Preparation Costs** – The responsible director and budget analysts should notify Property Accounting of the need for Storm Damage Work Orders for an impending Storm Event. Also, any supplemental resources (e.g., labor) needed to prepare for the Storm Event should be agreed upon in advance and the responsible parties notified as to the appropriate Storm Damage Work Order to use. The Legal Entity expected to benefit from the storm preparation will be charged with these costs.

**6.1.3** **Maintenance of Storm Project Codes** – Budget Analysts should periodically review the need for reserving additional Storm Damage

Work Orders and work with Property Accounting to set up the appropriate number of Storm Damage Work Order numbers. Budget Analysts may also be required to setup additional Storm Damage Work Orders for approved late charges (e.g. delayed contractor invoices).

### 6.2 Review/Monitor Storm Damage Process

**6.2.1 Storm Charges** – Budget Analysts, Resource Managers, Construction & Design (C&D) Managers, Jurisdictional Finance Directors, and Property Accounting should review and monitor all open Storm Damage Work Orders for accuracy and appropriateness from a storm project and jurisdictional perspective.

**6.2.2 Storm Damage Reserve Balances** – Storm Damage Reserve balances will be reviewed periodically by Property Accounting in order to determine the accuracy of the reserve expense accruals and the transfer of expense charges from Storm Damage Work Orders. Property Accounting will provide a reserve balance analysis to the Chief Accounting Officer (CAO), Vice President - CFO Utility, and Regulatory Accounting on a monthly basis. Property Accounting will meet quarterly with the CAO and the Vice President - CFO Utility to review the most recent monthly reserve balance analysis and to discuss any reserve balance issues. The CAO and Vice President - CFO Utility will approve changes to reserve balances.

**6.2.3 Threshold Validation** – Storm Damage Work Orders should be reviewed periodically by Budget Analysts and Property Accounting to determine if they are in compliance with the Major Storm Damage Threshold for each Legal Entity. Property Accounting will make the appropriate journal entry reversals to expense should the

**39896**                                                                                    **CITIES 6-2 BB289**

Storm Damage Work Order not meet the threshold test.

**6.2.4** **Monitor/Review/Close Storm Damage Work Order** – Resource Managers and Budget Analysts are accountable to monitor the transactions being charged to the Storm Damage Work Orders and review the appropriateness of all transactions and that the correct project code was used. Responsible functional area management is responsible for providing in-service dates for Storm Damage Work Orders when storm restoration activities are completed. Storm Damages Work Orders can remain in-service until all charges are received, which is not expected to exceed 90 to 120 days after restoration activities are completed except for catastrophic events, to facilitate the acceptance of late charges, but should be closed as soon as feasible by entering a completion date. Late charges that cause a project to be re-opened should be approved by the Resource Manager and/or the appropriate production, transmission, substation, general plant, IT and System Crew Procurement Manager for that project, as well as the Jurisdictional Finance Director for that Legal Entity.

**6.3** **Billing of Storm Damage Charges**

**6.3.1** **Work Performed by Entergy for Others** – When Entergy personnel assist in storm restoration efforts outside of the Entergy service territory, an External Job Order (EJO) must be set up to record and ultimately bill charges to the external entity. (See Entergy's EJO Policy for more information regarding the use of External Job Orders.)

**6.3.2** **Work Performed by Others for Entergy** – When other parties (e.g., contractors, other utilities, etc.) perform storm restoration work at Entergy's request, the costs, upon billing to Entergy, should

be charged to the Storm Damage Work Order for that Storm Event. The invoice from the external party should be reviewed and approved by the System Crew Procurement Manager for that Storm Damage Work Order, prior to payment to the external party. Any discrepancies or questions relating to the bill should be reviewed and resolved with the external party prior to payment. Depending on the type of storm, the payment processing will be handled by the Contractor Invoice Payment Team (See paragraph 5.3 above.)

## 6.4     Other Accounting Processes

**6.4.1   O&M/Capital Methodology** – Property Accounting, in conjunction with Distribution functional area personnel, is responsible for determining the O&M versus Capital allocation methodology used to classify the Distribution Storm Work Order charges to the reserve or to Distribution capital accounts.  This determination will be based on retirement-unit classification and existing capitalization policies.  Charges from all other functions' Storm Expense Work Orders will be transferred in total to the reserve, since these Work Orders should contain only O&M expense charges.

**6.4.2   Reserve Balance Adjustments** – As part of the normal regulatory filing process, Regulatory Accounting is responsible for requesting the appropriate jurisdictional storm damage reserve accrual. Regulatory Accounting shall review and obtain CAO agreement of proposed storm-damage-reserve accrual amounts prior to filing with jurisdictional regulatory bodies.   When new amounts are approved by jurisdictional regulatory bodies, Regulatory Accounting is responsible for notifying Property Accounting and Corporate Reporting of these and other approved adjustments to the reserve balance or accrual level, after consultation with and final approval

by the CAO.

**6.4.3** **Monthly Reporting Requirements** –Property Accounting will record the monthly storm damage accrual for each Legal Entity, as well as the accumulation of charges for open Work Orders and the charges to the Property Insurance Account for Storm Damage.

**6.4.4** **Quarterly Reporting Requirements** – Corporate Reporting is responsible for the reporting of major storms that have a material impact on quarterly financial statements. This includes coordinating the recording of any necessary expense or capital accruals to Storm Damage Work Orders.

**6.4.5** **Reimbursement and Recovery Accounting** – Property Accounting credits capital and the reserve account for amounts received through reimbursement (CDBG, insurance) or recovery (Securitization) as authorized by regulators.

**6.4.6** **Storm Escrow Accounting** – Property Accounting credits the reserve account when funds are drawn from a Legal Entity's storm escrow account.

## 7.0   GUIDANCE CONTACTS

**7.1**   Questions regarding the use and applicability of these policies and procedures should be directed to the appropriate Function Budget Analyst and/or the subject matter expert identified at the beginning of this Policy.

**8.0 ATTACHMENTS**

**Attachment A : Summary of Accountabilities and Responsibilities**

| Activity | Person and/or Group Responsible |
|---|---|
| Responsible for making the decision to implement the storm process for system event | Storm Incident Commander |
| Responsible for any external filings necessary related to the storm including a Form 8-K | CAO |
| Approval of any estimates for the event released externally | CAO |
| Approval of any communications related to storm including those made by Regulatory and Investor Relations | CAO |
| Release pre-approved project codes in advance of a storm | Functional Budget Coordinators |
| Approve project codes in advance of a storm | Property Accounting |
| Responsible for ensuring coding of storms for ENOI with alerts from National Weather Service | Property Accounting |
| Classification of storm as storm event, catastrophic event, or an event that doesn't meet threshold for storm accounting | CAO and/or Property Accounting Manager |
| Provide estimate to ensure that the threshold has been reached for Storm Event to appropriate JFD's and VP CFO of Domestic Utility. This effort will be coordinated by CAO or Property Accounting Manager. | Distribution Operations Area (DOA) Director and the appropriate transmission, substation, general plant and IT managers (For a systemwide event, this responsibility would be completed partially by the System Command Center.) |
| Determine that a project code(s) is needed for an event and setup and approve project codes needed on an emergency basis as needed | Functional Budget Coordinators and Property Accounting Manager |
| Providing pertinent information to CAO and VP CFO of Domestic Utility | JFD's |

| Activity | Person and/or Group Responsible |
|---|---|
| Ensure that information is funneled into the Present Estimate Process | CAO, JFD's, and Business Unit CFO's |
| Communicate project codes for a typical storm within functional area | Functional Budget Coordinators and Outage Management |
| Communicate project codes for a catastrophic event via IE StormNet and Inside Entergy | Property Accounting Manager and Corporate Communications |
| Code transactions/ source documents with proper coding for storm events (i.e. timesheets, invoices, and PassPort transactions) | Transaction originator or assigned accountable employee |
| Ensure that proper documentation obtained for storm transactions for processing | Transaction originator or assigned accountable employee |
| Reviewing and approving contractor storm invoices in a catastrophic event or in any storm event that the team is deemed necessary including documentation | Contractor Invoice Processing Team |
| Review and approve the coding of other transactions/source documents as proper for storm events (i.e. timesheets, invoices, and PassPort transactions) that are routed to Supervisor for approval | Supervisor of employee recording transaction |
| Review storm transactions to ensure the proper coding at a summary level | Functional Budget Coordinators |
| Work with operational teams to process any necessary corrections | Functional Budget Coordinators |
| Monitoring of charges to Project Codes | Business Unit CFO's, Jurisdictional Finance Directors, Functional Budget Coordinators, and Property Accounting Manager |

| Activity | Person and/or Group Responsible |
|---|---|
| Monitoring and reviewing the storm damage charges prior to moving the charges from the Storm Damage Work Order to the Property Insurance Account for Storm Damage | Property Accounting |
| Application of the annual Storm Damage Deductible to EMI's Incremental Costs | Property Accounting |
| Recording the storm reserve accruals to the Property Insurance Account for Storm Damage | External Reporting |
| Reconciling Storm Damage related accounts | Property Accounting |
| Responsible for monitoring reserve expense accruals to ensure accuracy, for providing internal reporting of reserve balance information upon request and for providing annual budget to Legal Entity cost managers. | Jurisdictional Finance Directors |
| Responsible for approving the policy and determining any exceptions to the policy | CAO |
| Responsible for training the appropriate functional area personnel in these policies and procedures | JFD's, DOA Directors, Resource Managers, Property Accounting, and Budget Analysts |
| Providing reports for catastrophic events | Cost Reporting and Analysis (Diane Bryars and Bert Fisher) |
| Answering questions on the proper coding of transactions or transaction processing | Functional Budget Coordinators with assistance from Property Accounting Manager |

ENTERGY TEXAS, INC.
DOCKET NO. 39896  ETI COS 6/30/11
CITIES 6TH SET QUESTION 2 (d)
JSP STORM RESERVE CORRECTIONS BY PROJECT

| Project | Project name | ETI JSP STORM RESERVE ADJUSTMENT 1/1/08 | ORIGIONAL EGSL AMOUNT @12/31/07 | ORIGIONAL ETI AMOUNT @12/31/07 | TOTAL | REASON |
|---|---|---|---|---|---|---|
| C7PCSJ8001 | STORM DAMAGE DL EGSI SW TX 10/24/97 | 52,507 | 52,507 | 75,482 | 127,989 | Move charges on TX project from LA. |
| C7PCSJ8009 | STORM DAMAGE DL SOUTHWEST FRAN 11/2 | 57,692 | 57,692 | 86,637 | 144,329 | Move charges on TX project from LA. |
| C7PCSJ8010 | STORM DAMAGE DL SOUTHWEST FRAN 12/3 | 93,831 | 93,831 | 12,358 | 106,189 | Move charges on TX project from LA. |
| C7PPSJ8011 | STORM DAMAGE DL SOUTHWEST FRAN 12/3 | 39,537 | 39,537 | (13,381) | 26,156 | Move charges on TX project from LA. |
| C7PPSJ8013 | STORM DAMAGE DL SOUTHWEST FRAN 12/8 | 64,190 | 64,190 | 19,955 | 84,145 | Move charges on TX project from LA. |
| C7PPSJ8014 | STORM DAMAGE DL SOUTHWEST FRAN 1/6/ | 86,584 | 86,584 | 112,061 | 198,645 | Move charges on TX project from LA. |
| C7PCSJ8017 | STORM DAMAGE DL SOUTHWEST FRAN 1/21 | 204,369 | 204,369 | 114,571 | 318,940 | Move charges on TX project from LA. |
| C7PCSJ8021 | STORM DAMAGE DL SOUTHWEST FRAN 2/10 | 25,090 | 25,090 | 1,520 | 26,610 | Move charges on TX project from LA. |
| C7PCSJ8025 | STORM DAMAGE DL SOUTHWEST FRAN 2/26 | 362,039 | 362,039 | (37) | 362,002 | Move charges on TX project from LA. |
| C7PCSJ8030 | STORM DAMAGE DL SOUTHWEST FRAN 3/16 | 23,718 | 23,718 | (10,162) | 13,556 | Move charges on TX project from LA. |
| C7PCSJ8041 | STORM DAMAGE DL SOUTHWEST FRAN 6/5/ | 49,088 | 49,088 | (12,677) | 36,412 | Move charges on TX project from LA. |
| C7PCSJ8101 | STORM DL SOUTH FRAN EGSI 5-10-99 | (53,386) | 129,632 | 53,386 | 183,018 | Move charges on LA project from TX. |
| C7PCT91743 | STORM DAMAGE DL SOUTH FRAN EGSI 7/7 | 27,593 | 27,593 | - | 27,593 | Move charges on project from LA because owner dept is a TX department. |
| C7PPSJ8262 | Storm Dmg Dist Texas EGSI 5/11/04 | 92,571 | 92,571 | 312,452 | 405,023 | Move charges on TX project from LA. |
| C7PPSJ8263 | Storm Dmg Dist Texas EGSI 6/4/04 | 19,662 | 19,662 | 45,247 | 64,909 | Move charges on TX project from LA. |
| C8PPKATRNA | Katrina Storm Accrual Project | 1,307,046 | 1,611,980 | (1,307,046) | 304,934 | To zero out TX credit balance |
| E2PCSJ8012 | STORM DAMAGE TL S/WEST 12/7/97 | 26,244 | 26,244 | 8,253 | 34,497 | Move charges on TX project from LA. |
| E2PCSJ8085 | GSU-LA SOUTH GRID TL STORM DAMAGE 1 | (86,485) | (27,352) | 86,485 | 59,133 | Move charges on LA project from TX. |
| E2PCSJ8228 | HURRICANE LILI-EGSI-LA GRID 9/30/02 | (94,565) | 11,252,175 | 94,565 | 11,346,740 | Move charges on LA project from TX. |
| E2PCT90530 | GSU STORM DAMAGE 1/13/95 | 36,675 | 36,675 | - | 36,675 | Move charges on project from LA because owner dept is a TX department. |
| E2PCT90542 | STORM DAMAGE SUBSTATION | 28,521 | 28,521 | - | 28,521 | Move charges on project from LA because owner dept is a TX department. |
| E2PCT91726 | STORM DAMAGE DL EGSI SOUTHWEST TX | (2,380,424) | (2,380,424) | 14,587,931 | 12,207,506 | Move credit charges on TX project from LA. |
| E2PPCPSJOM | Katrina Storm O&M for Corp Support | 1,694,626 | 3,034,588 | 2,467,733 | 5,502,321 | Split based on Billing Method of project. |
| E2PPN09192 | HURRICANE KATRINA (RBS) - 2005 | (67,749) | 74,132 | 67,749 | 141,881 | Move charges on LA project from TX. |
| E2PPSJ8274 | Trans. Storm EGSI-TX 5/29/05 | (12,739) | 20,425 | 12,739 | 33,164 | Move charges on LA project from TX. |
| E2PPSJ8279 | Trans. Storm EGSI-TX on 1/13/2005 | 20,508 | 20,508 | 17,492 | 38,001 | Move charges on TX project from LA. |
| E2PPSJ8284 | EGSI-TX Storm on 6/15/2005-Trans | 67,325 | 67,325 | 57,291 | 124,616 | Move charges on TX project from LA. |
| E2PPSJ8291 | Trans EGSI-TX Hurrican Rita 9-24-05 | 10,652,130 | 10,652,130 | (4,859,002) | 5,793,128 | Move charges on TX project from LA. |
| E2PPSJ8296 | Trans. Hurricane Katrina - EGSI-La | (461,934) | 629,996 | 461,934 | 1,091,930 | Move charges on LA project from TX. |
| E2PPSJ8302 | Trans EGSI-LA Hurrican Rita 9-24-05 | (1,407,114) | 1,957,840 | 1,407,114 | 3,364,954 | Move charges on LA project from TX. |
| E2PPSJ8313 | Trans. Storm EGSI-TX 10/19/2006 | (16,134) | 18,333 | 16,134 | 34,467 | Move charges on LA project from TX. |
| E2PPSJ8354 | Trans Hurr Humberto EGSI-TX 9/12/07 | 744,037 | 744,037 | 681,062 | 1,425,099 | Move charges on TX project from LA. |
| E2PPSJITG1 | IT O&M STORM Rita | 225,704 | 225,704 | (158,912) | 66,792 | Move credit charges on LA project from TX. |
| E2PPWJ0055 | EGSI Storm Damage and Prep 2004 | (10,276) | 11,450 | 10,276 | 21,726 | Move charges on LA project from TX. |
| E2PPWJ0065 | EGSI Storm Prep &damage '05 Katrina | (25,223) | 27,050 | 25,223 | 52,273 | Move charges on LA project from TX. |
| E2PPWJ0080 | Humberto Restoration - TX | 129,694 | 129,694 | 119,385 | 249,079 | Move charges on TX project from LA. |
| F3PPN09179 | RBS FO 06-03 FEEDWATER VALVES(1006) | 23,644 | 23,644 | (23,644) | - | Move credit charges on LA project from TX. |
| F5PCZZI06P | CASUALTY AND SURITY BONDS | (73,849) | (73,849) | 73,849 | - | Move charges to zero out project. |
| F5PPCDBGWO | Hurricane Project for CDBG Funds | 276,465 | 223,433 | 119,946 | 343,379 | Project split based on analysis of detail charges. At 12/31/07 all securization proceeds were LA. |
| F5PPRTARPT | Storm Cost Processing & Review Rita | 721,931 | 521,129 | 194,013 | 715,142 | Project split based on analysis of detail charges. At 12/31/07 all securization proceeds were LA. |
| VARIOUS PROJECTS | | 35,183 | | | | Project split based on analysis of detail charges. |
| | TOTAL TEXAS CORRECTION | 12,498,325 | 30,183,491 | 14,957,984 | 45,141,474 | |

Date:       February 27, 1995

To:         Distribution List

From:       Donald R. Willis

Subject:    Storm Damage Accounting Procedures

Attached is the current Entergy Storm Damage Accounting procedures. The procedures will be incorporated in the Systemwide Emergency Response Plan soon. We are sending the procedures through cc:Mail to insure that the people directly involved in the storm damage process receive a copy.

Should you have any questions, please refer to the contacts listed on Page 6.

DRW/jlw
Attachments
cc:         Lee Randall

## Storm Damage Accounting Procedures
## Distribution List

| | | | |
|---|---|---|---|
| Delbert Zimmerly | John Scott | James Milton | Bennie Daigle |
| Gary Lamkin | Mike Simoneaux | Bill Compton | Ron Rowland |
| Larry Fincher | Vincent Frisella | Donna Childers | Charles Davis |
| Don Newell | Gordon Miano | Brent Forte | Ronnie Teague |
| Al Grille | Oscar A. Meyer | Debra Dodson | Jim Wilbanks |
| Harry Keller | Gary Bazile | Carol Brady | Clyde Reeves |
| Randy Helmick | Sammy Rawls | Mark Russo | Phillip Moore |
| David Sermons | Orville Bratschi | Edwin Berger | |
| John Sherrod | Duane Sistrunk | Daniel Pruhomme | |
| Danny Taylor | Tommy Castleberry | Belinda Welch | |
| John Zemanek | Peter Nienaber | Marcia Ross | |
| Don Schaeffer | Dewey Evans | Michael J. Murray | |
| Charlotte Tisdale | Paul Leist | | |
| Adrian Greene | Lester Lewis | | |
| Dianne Cochran | Robert Glach | | |
| Alan Oswalt | Randy Hebert | | |
| James Dixon | Alfred (Joe) Gertsch | | |
| Sarah Davis | | | |
| David Stevens | | | |

cc:

| | | | |
|---|---|---|---|
| Lee W. Randall | Janie Tucker | Sandra Wilson | Bobbie Jackson |
| Steve Pisciotta | Karen Collins | Phil Gillam | Gerri Ringgold |
| Mark Madere | Margaret Heuston | Karen Allen | Sue Merritt |
| Brian Burns | John Hollingshead | Dowell Harlan | |
| | Sharon Reed | | |

## ENTERGY CORPORATION
## STORM DAMAGE ACCOUNTING PROCEDURES

### I. PURPOSE

To establish a uniform procedure for (1) the reporting of major storm damage maintenance repair expenses and (2) the reporting of plant replacement costs associated with major storm damages to plant facilities.

Storm Damage casualty losses are reported for income tax purposes. The accounting procedures set forth in this document are necessary for accurate reporting of these costs.

### II. RESPONSIBILITY

Property Accounting Managers, Distribution and Transmission Lines and Substations

### III. DEFINITIONS

Major Storm Damage - A storm with O&M repair costs estimated to be $50,000 or more per legal entity for AP&L, GSU, LP&L, and NOPSI. Major storm damage for MP&L shall be defined as a storm with total costs (O&M and Capital) of $50,000 or more. When storm damage is sustained to both distribution and transmission facilities, a combined cost for all functions should be used to estimate the $50,000 limit.

Minor Storm Damage - A storm with O&M repair costs estimated to be less than $50,000 per legal entity for AP&L, GSU, LP&L, and NOPSI. Minor storm damage for MP&L shall be defined as a storm with total costs (O&M and Capital) less than $50,000.

### IV. MAJOR STORM DAMAGE - DISTRIBUTION LINES

For Major Distribution Lines storm damage, region personnel shall request from Property Accounting a Job Order number for each storm for the applicable legal entity. Property Accounting will issue one job order number per legal entity and region that will be used to accumulate all costs, Capital and O&M. Therefore, when storm damage is sustained by two regions within the same legal entity, one job order number will be issued for each region affected. In the case of GSU and the Southwest Region, one job order number will be issued for each state.



Page 1 of 6

88

## ENTERGY CORPORATION
## STORM DAMAGE ACCOUNTING PROCEDURES

### IV. MAJOR STORM DAMAGE - DISTRIBUTION LINES (continued)

**Authority for Distribution Line Facilities:**

*The E&O Director shall be responsible for authorizing the request of a storm damage job order by Region personnel. Within seven days of issuance of a storm damage job order, the E&O Director shall provide written notification to the Property Accounting Manager, Distribution Lines specifying the date of the storm, type of storm, and locations involved. This written notification must include an estimate of the total cost of the storm detailed by Capital and O&M as well as the overall Capital and O&M percentages.*

When storm damage is sustained to two regions within the same legal entity, the E&O Directors for both regions shall be responsible for coordinating to determine if the combined repair cost meets the $50,000 limit and warrants issuance of a storm damage job order. The paperwork and information referenced above shall be required from all regions affected.

*All charges to storm damage job orders should be coded to Account 174.1 and the appropriate responsible location.*

**Job Order Review and Cost Allocation:**

Property Accounting will review storm damage job orders for Capital & O&M costs. The capital costs associated with a major storm will be transferred to a Capital Expenditure Authorization (CEA) on the appropriate responsibility budgets for all Operating Companies. Capital costs less than $50,000 will be transferred to a blanket CEA. Property Accounting will request a Long Form CEA from the E&O Director if capital costs for an individual storm exceed $50,000. The Long Form CEA for major storm damage should be routed for approvals according to SBU guidelines and returned to Property Accounting within 60 days of the storm's occurrence.

The O&M costs associated with a major storm will be transferred to the Property Insurance Reserve for AP&L, GSU, LP&L, and NOPSI. The MP&L Eastern Region Support department shall review the O&M costs on a major storm for MP&L to determine incremental costs. The incremental costs will be transferred to the Property Insurance Reserve. Non-incremental costs will be charged to normal O&M accounts on the appropriate responsibility budgets.

## IV. MAJOR STORM DAMAGE - DISTRIBUTION LINES (continued)

### Retirements Processing:
Retirements associated with a major storm will be handled on a one-for-one basis for Distribution Lines. Property Accounting will record one retirement for each unit of property installed on a storm. The E&O Director shall notify Property Accounting if significant re-routes or other complications occurred during the storm restoration to make this methodology unreasonable.

### Completion Reporting:
Upon completion of storm damage restoration work, the Property Accounting Manager, Distribution Lines shall be given written notification of the date of completion of the repairs. Storm damage job orders shall be closed to source system charges 60 days after the completion date provided to Property Accounting. All Service Requests (discussed in Section VI) and Intercompany Job Orders (discussed in Section X) that were established in direct support of a storm shall also be closed at that time.

## V. MAJOR STORM DAMAGE - SUBSTATIONS & TRANSMISSION LINES

For major storm damage to Substations and Transmission Lines, field personnel should request from Property Accounting a Job Order number to accumulate O&M costs and a CEA number to accumulate capital costs for each storm. An emergency CEA number shall be issued by Property Accounting for each Transmission Line and for each Substation property section with estimated capital costs exceeding $50,000. Field personnel must submit a completed Long Form CEA to Property Accounting within 60 days of the storm's occurrence. The Long Form CEA for major storm damage should be routed for approvals according to SBU guidelines. The Short Form CEA should be used if the capital charges are less than $50,000.

### Job Order Review and Cost Allocation:
The O&M costs associated with a major storm will be transferred to the Property Insurance Reserve for AP&L, GSU, LP&L, and NOPSI. The MP&L Eastern Region Support department shall review the O&M costs on a major storm for MP&L to determine incremental costs. The incremental costs will be transferred to the Property Insurance Reserve. Non-incremental costs will be charged to normal O&M accounts on the appropriate Responsibility budgets.

### Retirements Processing:
Units of property destroyed by a major storm for Substations and Transmission Lines must be specifically identified and retired.





**ENTERGY CORPORATION
STORM DAMAGE ACCOUNTING PROCEDURES**

## V. MAJOR STORM DAMAGE - SUBSTATIONS & TRANSMISSION LINES (continued)

### Completion Reporting:

Upon completion of storm damage O&M repair work, the Property Accounting Managers, Transmission Lines and Substations shall be given written notification of the date of completion of the repairs. Storm damage job orders shall be closed to source system charges 60 days after the completion date provided to Property Accounting. All Service Requests (discussed in Section VI) and Intercompany Job Orders (discussed in Section VI) that were established in direct support of a storm shall also be closed at that time. Page 3 of the CEA Long form shall be used to report completion of capital work associated with major storm damage to Substations and Transmission Lines.

## VI. ESI EXPENDITURES

When ESI employees provide assistance in storm damage restoration work, a Service Request (SR) should be requested from Property Accounting. The SR shall be used to accumulate ESI payroll and other employee expenses and to bill these costs to the appropriate Operating Company. Property Accounting should be informed of the ESI locations providing the assistance and the Operating Company locations and functions that will receive the benefit of these services.

## VII. SCOPE OF STORM DAMAGE CHARGES

The use of Storm Damage Job Orders is confined to repair work associated with distribution and transmission lines and substations. These job orders should primarily be used to accumulate costs directly associated with the repair of these systems. Examples of valid storm damage charges include, but are not limited to, the following:

– Installing and removing units of property for Distribution Lines
– Clearing lines of brush and debris
– Splicing, retying, and resagging of existing conductors
– Straightening and transferring existing facilities
– Replacing fuses
– Repairing transmission towers not constituting replacement of a unit of property
– Repairing tower foundations



Page 4 of 6

91

**ENTERGY CORPORATION
STORM DAMAGE ACCOUNTING PROCEDURES**

## VII. SCOPE OF STORM DAMAGE CHARGES (continued)

Storm damage job orders should also be used to accumulate costs incurred by Company personnel in direct support of storm restoration efforts. Business Office clerical personnel when working on storm related procedures, such as answering the telephone, posting payroll, etc., should charge their time to storm damage job orders. Any General Office personnel who provide support in storm damage activity should charge their time and other expense to storm damage job orders.

Field personnel should contact the applicable Property Accounting Manager should additional clarification on the appropriateness of storm damage charges be required.

## VIII. GENERAL OFFICE EQUIPMENT

A specific CEA should be obtained from Property Accounting for any General Plant type property, such as fax machines and radio equipment, etc., purchased during a major storm that should be capitalized under the General Plant Capitalization Criteria. The purchaser of such equipment shall be responsible for requesting a CEA. An emergency CEA number can be issued by Property Accounting if time does not permit the preparation of detailed paperwork and definitive estimates. A completed CEA Form routed for approvals according to SBU guidelines should be submitted to Property Accounting within 30 days after the issuance of the emergency CEA number.

## IX. MINOR STORM DAMAGE - ALL FUNCTIONS

For Minor storm damage, maintenance expenses should be handled through the normal process. For capital costs associated with a minor storm, the Short Form CEA may be used for each Transmission Line and Substation Property Section. The Distribution Lines Improvement Blanket CEA shall be used for capital costs associated with a minor storm affecting Mass Distribution.

## X. ASSISTANCE TO OTHER ENTERGY COMPANIES

For work performed for a different legal entity, a separate job order should be requested from Property Accounting to facilitate the intercompany billing process.


92



## ENTERGY CORPORATION
## STORM DAMAGE ACCOUNTING PROCEDURES

### XI. CONTACTS

Please contact the following Property Accounting personnel for storm damage related assistance:

**Distribution Lines:**

| | | |
|---|---|---|
| Don Willis | Manager | 501-377-5788 |
| Sandra Wilson | AP&L, GSU, LP&L, NOPSI, MP&L | 501-377-5679 |

**Transmission Lines:**

| | | |
|---|---|---|
| Phil Gillam | Manager | 501-377-5785 |
| Karen Allen | MP&L, LP&L, NOPSI | 501-377-5787 |
| Dowell Harlan | AP&L, GSU | 501-377-5675 |

**Substations:**

| | | |
|---|---|---|
| Janie Tucker | Manager | 501-377-5721 |
| Karen Collins | GSU | 501-377-5685 |
| Margaret Heuston | AP&L | 501-377-5717 |
| John Hollingshead | MP&L, NOPSI | 501-377-5713 |
| Sharon Reed | LP&L | 501-377-5703 |

**General Plant:**

| | | |
|---|---|---|
| Janie Tucker | Manager | 501-377-5721 |
| Bobbie Jackson | AP&L, LP&L, NOPSI | 501-377-5662 |
| Gerri Ringgold | GSU, MP&L | 501-377-5671 |

2-24-95

ENTERGY TEXAS INC
DOCKET NO. 39896
TYE: 6/30/2011

ETI PAYROLL ADJUSTMENT

| | | | |
|---|---|---|---:|
| Test Year End Headcount Proformed to by ETI | WP/P AJ 22.13 | | 675 |
| February 2012 Headcount | Staff 13-16 | | 660 |
| Decrease | | | (15) |
| | | | |
| Annual Salary | WP/P AJ 22.13 | $ | 78,575 |
| Payroll Decrease | | $ | (1,178,625) |
| | | | |
| O&M Percentage | WP/P AJ 22.13 | | 55.01% |
| Total O&M Decrease | | $ | (648,362) |

| | | | |
|---|---|---|---:|
| Other Payroll Related Expenses | | | |
| Benefits | 38.95% WP/P AJ 22.13 | | (252,537) |
| FICA | 7.65% WP/P AJ 22.13 | | (49,600) |
| FUTA | 0.08% WP/P AJ 22.13 | | (519) |
| SUTA | 1.03% WP/P AJ 22.13 | | (6,678) |
| Total Payroll Related Increase | | $ | (309,333) |
| | | | |
| Total ETI Labor Decrease | | $ | (957,695) |
| Total Staff ETI Payroll Adjustment (Exhibit AG-7) | | $ | (1,181,912) |
| Change to Staff's Adjustment | | $ | 224,217 |

ENTERGY TEXAS INC
DOCKET NO. 39896
TYE: 6/30/2011

ESI PAYROLL ADJUSTMENT

| | | | |
|---|---|---|---|
| Test Year End Headcount part time | EXHIBIT MPC-R-7 | | 74 |
| December 2011 Headcount part time | Staff 7-4 | | 48 |
| Decrease in part time | | | (26) |
| | | | |
| Factor to convert part time to full time equivalen | EXHIBIT MPC-R-7 | | 41% |
| Full Time Equivalent Decrease | | | (10.66) |
| | | | |
| Test Year End Headcount full time | WP/P AJ 22.24 | | 3054 |
| December 2011 Headcount full time | Staff 7-4 | | 3089 |
| Increase in full time | | | 35 |
| | | | |
| Increase in Full time | | | 35 |
| Less: Part time as Full time equivalent | | | (10.66) |
| Net Full time equivalent change | | | 24.34 |
| | | | |
| Annual Salary | WP/P AJ 22.24 | $ | 97,580 |
| Payroll Increase | | $ | 2,375,097 |
| | | | |
| Percentage to ETI | WP/P AJ 22.24 | | 9.33% |
| Payroll Increase to ETI | | $ | 221,597 |
| | | | |
| O&M Percentage | WP/P AJ 22.24 | | 81.02% |
| Total O&M Increase | | $ | 179,538 |

Other Payroll Related Expenses

| | | | |
|---|---|---|---|
| Benefits | 46.33% WP/P AJ 22.24 | | 83,180 |
| FICA | 7.65% WP/P AJ 22.24 | | 13,735 |
| FUTA | 0.08% WP/P AJ 22.24 | | 144 |
| SUTA | 1.03% WP/P AJ 22.24 | | 1,849 |
| Total Payroll Related Increase | | $ | 98,907 |
| | | | |
| Total ETI Labor Increase from ESI | | $ | 278,445 |
| Total Staff ESI Payroll Adjustment (Exhibit AG-7) | | $ | 240,914 |
| Change to Staff's Adjustment | | $ | 37,531 |

ENTERGY TEXAS INC
DOCKET NO. 39896
TYE: 6/30/2011

FACTOR TO CONVERT PART TIME TO FULL TIME EQUIVALENTS

| | Part-Time Employees Cities 12-6 | Temporary Employees Cities 12-7 | Total Part Time |
|---|---|---|---|
| Jul-10 | 35 | 41 | 76 |
| Aug-10 | 36 | 26 | 62 |
| Sep-10 | 36 | 23 | 59 |
| Oct-10 | 35 | 25 | 60 |
| Nov-10 | 35 | 25 | 60 |
| Dec-10 | 35 | 21 | 56 |
| Jan-11 | 37 | 21 | 58 |
| Feb-11 | 36 | 22 | 58 |
| Mar-11 | 34 | 21 | 55 |
| Apr-11 | 35 | 20 | 55 |
| May-11 | 35 | 33 | 68 |
| Jun-11 | 35 | 39 | 74 |
| Test Year Average Part Time Employees | | | 61.75 |

| | |
|---|---|
| Test Year Part Time Pay Cities 12-6 | 1,355,752 |
| Test Year Temporary Pay Cities 12-7 | 1,121,683 |
| | 2,477,435 |

| | |
|---|---|
| Average Part Time Pay | 40,120 |
| Full Time Annual Salary WP/P AJ 22.24 | 97,580 |
| Part Time % of Full Time Salary | 41% |

ENTERGY TEXAS INC
DOCKET NO. 39896
TYE: 6/30/2011

ETI Direct Costs of Incentive Compensation Adjustment based on Financial Goals

|  |  | ETI REQUEST | STAFF ADJUSTMENT | STAFF RECOMMENDED |
|---|---|---|---|---|
| **Non-Executive Compensation Plans** |  |  |  |  |
| Management Incentive Plan | Staff 10-1 | $ 1,184,198 | $ (166,972) | $ 1,017,226 |
| Exempt Incentive Plan | Staff 10-1 | $ 983,868 | $ (138,725) | $ 845,143 |
| Teamshare Incentive Plan | Staff 10-1 | $ 71,465 | $ (10,077) | $ 61,388 |
| Teamshare Bargaining Incentive Plar | Staff 10-1 | $ 384,883 | $ (54,269) | $ 330,614 |
| Total |  | $ 2,624,414 | $ (370,042) | $ 2,254,372 |
| Payroll Taxes at 7.65% |  |  | $ (28,308) |  |
| **Executive Compensation Plans** |  |  |  |  |
| Executive Annual Incentive Plan | Staff 10-1 | $ 185,414 | $ (26,143) | $ 159,271 |
| Restricted Share | Staff 10-1 | $ - | $ - | $ - |
| Restricted Stock Incentive | Staff 10-1 | $ 20,993 | $ (20,993) | $ - |
| Long-Term Incentive Plan | Staff 10-1 | $ 16,652 | $ (16,652) | $ - |
| Equity Awards | Cities 10-9 | $ 193,187 | $ (193,187) | $ - |
| Total |  | $ 5,665,074 | $ (256,975) | $ 4,668,014 |
| Payroll Taxes at 1.45% (Medicare Portion Only) |  |  | $ (3,726) |  |
| Total Payroll Taxes |  |  | $ (32,034) |  |
| Staff Payroll Taxes at 7.65% (All Plans) |  |  | $ (47,967) |  |
| Change to Staff's Adjustment |  |  | 15,933 |  |

ENTERGY TEXAS INC
DOCKET NO. 39896
TYE: 6/30/2011

ESI Allocated Costs of Incentive Compensation Adjustment based on Financial Goals

| | | ETI REQUEST | | STAFF ADJUSTMENT | | STAFF RECOMMENDED | |
|---|---|---|---|---|---|---|---|
| **Non-Executive Compensation Plans** | | | | | | | |
| Management Incentive Plan | Staff 10-1 | $ | 3,564,996 | $ | (502,664) | $ | 3,062,332 |
| Exempt Incentive Plan | Staff 10-1 | $ | 874,472 | $ | (123,301) | $ | 751,171 |
| Teamshare Incentive Plan | Staff 10-1 | $ | 81,983 | $ | (11,560) | $ | 70,423 |
| Total | | $ | 4,521,451 | $ | (637,525) | $ | 3,883,926 |
| Payroll Taxes at 7.65% | | | | $ | (48,771) | | |
| | | | | | | | |
| **Executive Compensation Plans** | | | | | | | |
| Executive Annual Incentive Plan | Staff 10-1 | $ | 1,298,037 | $ | (183,023) | $ | 1,115,014 |
| Restricted Stock Incentive | Staff 10-1 | $ | 135,242 | $ | (135,242) | $ | - |
| Long-Term Incentive Plan | Staff 10-1 | $ | 213,003 | $ | (213,003) | $ | - |
| Restricted Share | Staff 10-1 | $ | 346,256 | $ | (346,256) | $ | - |
| Equity Awards | Cities 10-9 | $ | 3,467,026 | $ | (3,467,026) | $ | - |
| Total | | $ | 5,459,564 | $ | (4,344,550) | $ | 1,115,014 |
| Payroll Taxes at 1.45% (Medicare Portion Only) | | | | $ | (62,996) | | |
| Total Payroll Taxes | | | | $ | (111,767) | | |
| Staff Payroll Taxes at 7.65% (All Plans) | | | | $ | (381,129) | | |
| Change to Staff's Adjustment | | | | | 269,362 | | |

98

**Entergy Electric System**
**Intra-System Billing-201202RA**

Date range - 20120201 through 20120229
Company Summary - Entergy Texas, Inc

**Attachment 6-ETI**
**Page 48**

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Purchases and Sales - Associated Companies** | | | | |
| Exchange Energy | 21,585,809 | 88,305,013 | 915,278.42 | 2,627,526.97 |
| AECC Excess Energy | 0 | 7,687,494 | 0.00 | 209,869.14 |
| ARK.NU 1 - UPP from AR Desig. Energy | 0 | 15,933,310 | 0.00 | 0.00 |
| ARK.NU 2 - UPP from AR Desig. Energy | 0 | 18,830,541 | 0.00 | 0.00 |
| CALCASIEU 1 - UPP from EGSL Desig. Energy | 0 | 7,651,700 | 0.00 | 0.00 |
| CALCASIEU 2 - UPP from EGSL Desig. Energy | 0 | 6,691,200 | 0.00 | 0.00 |
| GGULF RET - UPP from AR Desig. Energy | 0 | 7,107,427 | 0.00 | 0.00 |
| GGULF RP - UPP from AR Desig. Energy | 0 | 3,595,189 | 0.00 | 0.00 |
| INDEPN 1 - UPP from AR Desig. Energy | 0 | 4,157,524 | 0.00 | 0.00 |
| NELSON 4 - UPP from EGSL Desig. Energy | 0 | 57,569,650 | 0.00 | 0.00 |
| PERVIL 1 - UPP from EGSL Desig. Energy | 0 | 42,371,487 | 0.00 | 0.00 |
| RVRBND 1 - UPP from EGSL Desig. Energy | 0 | 204,378,222 | 0.00 | 0.00 |
| WH.BLF 1 - UPP from AR Desig. Energy | 0 | 7,177,453 | 0.00 | 0.00 |
| WH.BLF 2 - UPP from AR Desig. Energy | 0 | 7,375,179 | 0.00 | 0.00 |
| WILLOW GLEN 1 - UPP from EGSL Desig. Energy | 0 | 4,754,050 | 0.00 | 0.00 |
| WILLOW GLEN 4 - UPP from EGSL Desig. Energy | 0 | 17,572,900 | 0.00 | 0.00 |
| LEWIS CREEK 1 Desig. Energy | 34,239,525 | 0 | 0.00 | 0.00 |
| SABINE 1 Desig. Energy | 7,107,000 | 0 | 0.00 | 0.00 |
| SABINE 2 Desig. Energy | 23,850,425 | 0 | 0.00 | 0.00 |
| SABINE 3 Desig. Energy | 37,222,050 | 0 | 0.00 | 0.00 |
| SABINE 5 Desig. Energy | 24,519,725 | 0 | 0.00 | 0.00 |
| Equalized Res. Charge | 0 | 0 | 0.00 | 1,367,258.30 |
| Trans. Equal. Charge | 0 | 0 | 0.00 | 698,289.82 |
| Rev 1st QTR - AECC Excess Purchases | 0 | 0 | 0.00 | (1.37) |
| Rev 1st QTR - AECC Excess Purchases KWH | 0 | (36) | 0.00 | 0.00 |
| Rev 1st QTR - Exch Energy Purchases | 0 | 0 | 0.00 | (87,690.56) |
| Rev 1st QTR - Exch Energy Purchases KWH | 0 | (2,769,637) | 0.00 | 0.00 |
| Rev 1st QTR - Exch Energy Sales | 0 | 0 | 240,856.44 | 0.00 |
| Rev 1st QTR - Exch Energy Sales KWH | 6,320,297 | 0 | 0.00 | 0.00 |
| Rev 1st QTR - Reserve Equalization ETI | 0 | 0 | 0.00 | 3,308.05 |
| Rev 1st QTR - Transmission Equalization ETI | 0 | 0 | 0.00 | 2,317.68 |
| Reverse MSS-1 Revision Estimate Other Prod Units 2005-2011 | 0 | 0 | 0.00 | (162,768.87) |
| Reverse MSS-2 Dec 2011 Revision Entries | 0 | 0 | 0.00 | (3,141,688.52) |
| Revise MSS-1 Other Prod Units 2005-2011 | 0 | 0 | 0.00 | 162,756.25 |
| Revise MSS-2 1996-2011 | 0 | 0 | 0.00 | 3,140,796.09 |
| **Subtotal Purchases and Sales - Associated Companies** | **154,844,831** | **498,388,666** | **1,156,134.86** | **4,819,972.98** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Sales** | | | | |
| Net Balance for Sales | 0 | 0 | (29,300.71) | 0.00 |
| Energy Supp. for Sales | 4,469,712 | 0 | 190,214.01 | 0.00 |
| CENTRAL LA ELEC CO ENG CHG ADJ - REVENUE | 0 | 0 | (0.05) | 0.00 |
| DOW CHEMICAL - GEN REG | 0 | 0 | 82.70 | 0.00 |
| DUKE ENERGY HINDS - GEN REG | 0 | 0 | 1,602.22 | 0.00 |
| DUKEENERGY HOTSPRING - GEN REG | 0 | 0 | 3,088.58 | 0.00 |
| Rev 1st QTR - Net Balance - ETI Demand Sales | 0 | 0 | (3.52) | 0.00 |
| Rev 1st QTR - Net Balance - ETI Energy Sales | 0 | 0 | (1,436.89) | 0.00 |
| Rev 1st QTR - Off-System Sales ETI | 0 | 0 | (10,740.30) | 0.00 |
| Rev 1st QTR - Off-System Sales ETI KWH | (200,466) | 0 | 0.00 | 0.00 |
| Rev 1st QTR - Sales ETI Ann Fee | 0 | 0 | (1,440.75) | 0.00 |
| Rev 1st QTR - Sales ETI Gen Reg | 0 | 0 | (2,344.02) | 0.00 |
| TENASKA FRONTIER - GEN REG | 0 | 0 | 571.71 | 0.00 |
| **Subtotal Non-Associated Companies - Joint Account Sales** | **4,269,246** | **0** | **150,292.98** | **0.00** |

| | Sales(KWH) | Purchases(KWH) | Revenue($) | Expense($) |
|---|---|---|---|---|
| **Non-Associated Companies - Joint Account Purchases** | | | | |
| AECI RE Energy | 0 | 597,490 | 0.00 | 22,200.35 |
| CALPINE ENERGY SERVICES L.P. RE Energy | 0 | 889,366 | 0.00 | 27,953.66 |
| CONOCOPHILLIPS COMPANY  RE Energy | 0 | 2,500,000 | 0.00 | 82,950.00 |
| CONSTELLATION ENERGY COMMODITIES GROUP INC RE Energy | 0 | 8,475 | 0.00 | 110.17 |
| Caldwell RE Energy | 0 | 511,269 | 0.00 | 26,779.85 |
| DOW PIPELINE COMPANY RE Energy | 0 | 1,445,500 | 0.00 | 49,803.09 |
| DUKE ENERGY HINDS RE Energy | 0 | 19,672 | 0.00 | 371.45 |
| DUKEENERGY HOTSPRING RE Energy | 0 | 15,235 | 0.00 | 337.79 |
| ETEC EXCESS-HRSNHRDN RE Energy | 0 | 167,816 | 0.00 | 3,490.73 |

RAILROAD COMMISSION OF TEXAS

OFFICE OF GENERAL COUNSEL

GAS UTILITIES SECTION

| | | |
|---|---|---|
| STATEMENT OF INTENT TO CHANGE | § | |
| THE CITY-GATE RATE OF TXU LONE | § | |
| STAR PIPELINE, FORMERLY KNOWN | § | GAS UTILITIES DOCKET NO. 8976 |
| AS LONE STAR PIPELINE COMPANY | § | |
| ESTABLISHED IN GUD NO. 8664 | § | |

---

### REVISED PROPOSAL FOR DECISION

---

Gene Montes
Hearings Examiner

Issued: June 16, 2000

e.      Fully Accrued Accounts

(1)      *Applicant's Position*

The Company admits to over-collection of depreciation expense for four accounts.[375] At issue here is whether the over-collection was handled appropriately and what, if any, adjustments are necessary. TXU LSP asserts they were following the Generally Accepted Accounting Principles (GAAP) when they zeroed out the depreciation account for the subject accounts instead of continuing to accrue amounts on the books.[376] In addition, the Applicant asserts any type of "refund" associated with these accounts represents retroactive ratemaking, which is strictly prohibited in the Texas Utilities Code. The Company claims that there is a self-correcting mechanism embedded in its structure to adjust for any over or under accrual expense and that no action is necessary.[377]

In its Exceptions, TXU LSP notes that in *State v. Public Utility Comm'n of Texas*, 883 S.W.2d 190, 198 (Tex. 1994) the Texas Supreme Court held that the rule against retroactive ratemaking "prohibits a utility commission from making a retrospective inquiry to determine whether a prior rate was reasonable and imposing a surcharge when rates are too low or a refund when rates are too high." TXU LSP argues that recommending amortization of over-collected depreciation expense violates the rule against retroactive ratemaking. TXU LSP also notes that any over or under recovery will be carried forward and the net, if any, of the original investment, less salvage, less any accumulated reserve, will begin to be recovered under the new and future rate structure.[378]

(2)      *Aligned Cities' Position*

The Aligned Cities argue that the Applicant's claim that it "suspended collection of depreciation expense on these accounts as they became fully accrued" is misleading. As Mr. Watson testified that TXU LSP continued to collect rates reflecting the depreciation rates established by the Commission in GUD No. 8664.[379] What was "suspended" was the booking of depreciation to the accumulated reserve.[380]. In short, the Applicant continued to charge rates reflecting depreciation expense allowed by the Commission in the last case, but quit crediting the amounts collected to the accumulated depreciation reserve. Consequently, the Aligned Cities argue that the result is a windfall for TXU LSP.

Mr. Pous asserts that the notion that there is "no supporting authority" for the proposition that TXU LSP may not, without Commission approval, change its rates to conform to some unidentified accounting principle is ludicrous.[381] While TXU LSP stopped booking depreciation for these accounts, the Applicant continued to collect depreciation expense as part of their

---

[375] TXU LSP's Ex. 12, pp. 16-17; TXU LSP's Ex. 54, Exhibit DAW-6.
[376] TXU LSP's Initial Brief, p. 113-115.
[377] TXU LSP's Ex. 54, p. 19.
[378] TXU LSP Exceptions, pp. 41-43,
[379] Tr. Vol. 6, p. 83.
[380] Tr. Vol. 6, pp. 80-81; Aligned Cities' Ex. 41, p. 46.
[381] TXU LSP's Initial Brief, p. 114.

GUD NO. 8976          REVISED PROPOSAL FOR DECISION          PAGE 88 OF 131

Commission-approved rates from GUD No. 8664. If TXU LSP had not unilaterally changed rates. the depreciation expense would have been booked to accumulated depreciation which serves as an offset to rate base.[382] By changing depreciation rates without Commission approval. the Applicant has deprived customers of the accumulated depreciation and retained a windfall for itself.

Mr. Pous notes that TXU LSP is required to keep its books and records "accurately and faithfully in the manner and form prescribed by the Railroad Commission." according to Section 102.101(c)(1) of the Texas Utilities Code. The depreciation account is to be kept in accordance with the rates and methods prescribed by the Commission.[383] It is the Commission's duty, not the Applicant's. to establish "proper and adequate rates and methods of depreciation. amortization. or depletion for each class of property."[384] Pursuant to this duty. the Commission adopted specific depreciation rates resulting in a specific depreciation expense in GUD No. 8664. Second Order on Rehearing. November 25. 1997. Conclusions of Law 11 and 14. The Applicant is bound by the Commission's Order. There is nothing in GURA requiring TXU LSP to comply with "GAAP." The Company does not have the authority to unilaterally change depreciation rates in the name of "accounting principles."[385]

### (3)    *Examiner's Analysis and Recommendation*

The Examiner recommends that the proposed adjustment made by the Aligned Cities be rejected. The total gas plant investment. which is a part of the calculation of rate base. reflected in TXU LSP's Schedule M1.0 is $710.696.702. Rate base is offset by total accumulated depreciation. Total accumulated depreciation. reflected in Schedule O1.0 is $331,132,383. The Aligned Cities argue that. if TXU LSP had continued to book depreciation for the fully accrued accounts. the total accumulated depreciation would be higher and the corresponding rate base would be lower. If depreciation is an accounting system that spreads the expense of the item over the life of the item. applying over-accrued depreciation to rate base does not make sense. Once an account is fully accrued no further expense can be deducted from that account.

The Examiner does not agree with the Aligned Cities that an over-accrued amount should be adjusted from rate base or adjusted retroactively. The key issue in resolving this matter is the requirements of GUD No. 8664. Nothing in GUD 8664 required the continued booking of an expense for depreciation for an account that was fully accrued. Accordingly, the Examiner recommends that the proposal by the Aligned Cities to adjust depreciation expense by $1,449,890 and $221,917 be rejected.

---

[382] Aligned Cities' Ex. 141, p. 46.
[383] Tex. Util. Code Ann. § 102.152.
[384] Tex. Util. Code Ann. § 104.054.
[385] In their reply to TXU LSP's Exceptions. the Aligned Cities note that GAAP were never introduced into evidence making it impossible for the Examiners or the Commission to determine GAPP's requirements. Aligned Cities' Reply to Exceptions. p. 42.

102

<u>RAILROAD COMMISSION OF TEXAS</u>                    <u>BULLETIN NO. 655</u>

**SECTION 5**
**ORDERS OF THE COMMISSION**
RAILROAD COMMISSION OF TEXAS

| | |
|---|---|
| **STATEMENT OF INTENT TO CHANGE** | § |
| **THE CITY-GATE RATE OF TXU LONE** | § |
| **STAR PIPELINE, FORMERLY KNOWN** | § **GAS UTILITIES DOCKET NO. 8976** |
| **AS LONE STAR PIPELINE COMPANY** | § |
| **ESTABLISHED IN GUD NO. 8664** | § |

FINAL ORDER

<u>**Procedure and Notice**</u>

1.   On October 29, 1999, TXU Lone Star Pipeline (TXU LSP) filed its Statement of Intent to change the transportation and storage rates charged for gas transported for subsequent distribution to residential and commercial users. That rate filing was based on a test year from July 1, 1998 through June 30, 1999.

2.   On October 29, 1999, TXU LSP sent a copy of the Statement of Intent by certified mail to each incorporated municipality served by TXU Gas-Distribution.

3.   On November 5, 1999, TXU LSP filed with the Commission a copy of the Statement of Intent Errata.

4.   TXU LSP published notice for four successive weeks in a newspaper having general circulation in each county affected by the proposed increase. In Examiners' Letter No. 8, issued November 24, 1999, the Examiners approved the Public Notice of Application to Increase the Rates.

5.   On November 16, 1999, the Commission ordered that the rates proposed in TXU LSP=s application be suspended for 150 days from the date the rates would otherwise go into effect.

6.   The Examiners held prehearing conferences on November 15 and 22, December 14 and 22, 1999, and January 4, 10, and 18, and February 1 and 8, 2000.

7.   Intervening in the case were 103 cities (Aligned Cities); the Staff of the Commission (Staff); the State of Texas (State); Brazos Electric Cooperative; SEI Texas, L.P.; Southern Company Energy Marketing, L.P.; Brazos Fuel Company, Inc.; and CoServ Gas, Ltd. (CoServ). Under TEX. UTIL. CODE ANN. § 103.023 (Vernon 1998), the Examiners aligned all of the intervening cities (Aligned Cities) for the purpose of conducting discovery, presenting evidence, and cross-examination. The State, Staff, CoServ Gas, Ltd., and the "Southern/Brazos Group" (*i.e.*, Brazos Electric Cooperative, SEI Texas, L.P., Southern Company Energy Marketing, L.P., and Brazos Fuel Company, Inc.) remained as independent parties in the case. The Southern/Brazos Group did not actively participate in this docket. CoServ's participation was limited to the open access issues raised by CoServ and the alleged discriminatory rate structure. On December 6, 1999, the parties began discovery.

8.   On December 8, 1999, TXU LSP extended the proposed effective date of its Statement of Intent from December 2, 1999 to January 2, 2000. On March 10, 2000, before the close of the hearing on the record, TXU LSP and the intervenors requested that the effective date of TXU LSP's Statement of Intent, for purposes of Texas Utilities Code § 104.102(a), be extended further so that the 185-day statutory deadline date in this case would become June 23, 2000. The Examiners granted the request.

9.   · On January 19, 2000, the Office of Public Utility Counsel (OPC) filed a *Motion to Intervene*. The Examiners denied the *Motion to Intervene* on February 3, 2000, but granted OPC's request to file an amicus closing brief, which OPC filed on March 24, 2000.

3

| RAILROAD COMMISSION OF TEXAS | BULLETIN NO. 655 |
|---|---|

10. On January 27, 2000, Aligned Cities and CoServ filed direct testimony. On February 4, 2000, the Staff filed direct testimony. The State did not present direct evidence. On February 11, 14, and 16, 2000, TXU LSP filed its rebuttal to the direct testimony of Aligned Cities, CoServ, and Staff.

11. On February 14, 2000, the Aligned Cities filed a *Motion to Sever the Final Calculation of Lone Star's Merger Savings from this Docket and Request for an Order Directing Lone Star to File Full Documentation of All Merger Savings on an Appropriate Date (Motion to Sever)*. The Examiners denied the *Motion to Sever* on February 22, 2000.

12. On February 16, 2000, the hearing on the merits convened and continued through March 10, 2000.

13. On March 24, 2000, the parties filed their initial briefs; replies were filed on March 31, 2000. TXU LSP and the Aligned Cities also voluntarily filed proposed findings of fact and conclusions of law for consideration by the Examiners on April 25, 2000.

14. On April 14, 2000, rate case expense documentation was filed, and on April 17, 2000, a brief hearing was held to accept evidence of the parties on rate case expenses. On April 25, 2000, the parties filed their agreement with respect to supplementing their rate case expense documentation to reflect expenses incurred after the hearing and a recovery mechanism for rate case expenses. On June 14-16, 2000, supplements to rate case expense documentation were filed.

15. On May 19, 2000, the Examiners issued the original Proposal for Decision (PFD). On May 26, 2000, the parties filed their exceptions to the PFD. On June 13, 2000, the parties filed their replies to exceptions.

16. On May 31, 2000, Technical Examiner Mimi Winetroub officially withdrew from the case, and the parties were notified of this action by letter dated June 6, 2000.

17. On June 6, 2000, Hearings Examiner Gene Montes presented the PFD to the Commission. On June 8, 2000, the parties presented oral arguments to the Commission.

18. On June 16, 2000, the Hearings Examiner issued the Revised Proposal for Decision; on June 22, 2000, prior to the entry of the Final Order by the Commission, the Examiner issued a memo to the Commission which contained supplements and errata to the Revised PFD and which recommended that TXU LSP's requested corrections to the hearing transcript be approved.

19. On June 20, 2000, the Commissioners considered the Hearings Examiner's Revised Proposal for Decision at open conference.

**TXU LSP's Organizational Structure**

20. Texas Utilities Company, a Texas corporation doing business as TXU Corp., is a holding company whose principal United States operations are conducted through TXU Electric Company (formerly known as Texas Utilities Company), TXU Gas Company (formerly known as ENSERCH Corporation), and Texas Energy Industries, Inc.

21. TXU LSP is an unincorporated division of TXU Gas Company.

22. In August 1997, ENSERCH Corporation merged with Texas Utilities Company. The effective date of the merger was August 5, 1997.

23. The rates that are the subject of this docket were last considered by the Commission in Gas Utilities Docket (GUD) No. 8664; the applicants in that docket were Lone Star Pipeline Company, Lone Star Gas-Transmission, and Ensat Pipeline Company (ENSAT). All of the pipeline assets of ENSAT became part of Lone Star Pipeline Company subsequent to GUD No. 8664.

24. Lone Star Gas-Transmission (now TXU Gas Distribution-Transmission) is an operating unit of TXU Gas-Distribution (formerly Lone Star Gas Company) and acts as the gas supply organization by purchasing gas, arranging for the transportation and storage of gas, and administering the gas supply and transportation contracts for TXU Gas-Distribution, which performs the gas distribution function in over 440 incorporated towns and cities in Texas and related distribution functions in the environs of those towns and cities.

4

104

| RAILROAD COMMISSION OF TEXAS | BULLETIN NO. 655 |
|---|---|

25.    Prior to the merger, TXU LSP (then known as Lone Star Pipeline Company) was operated as an unincorporated division of ENSERCH Corporation. Following the merger, TXU LSP maintained its status as an unincorporated division of ENSERCH Corporation. In addition, TXU LSP, TXU Fuel (formerly Texas Utilities Fuel Company), and TXU Processing Company were grouped together in the APipeline Business Unit,@ for functional management purposes.

26.    TXU Fuel is a Texas Corporation whose primary function is to serve as a fuel supply line to electric generation plants.

27.    During the entire test year used in this docket, TXU LSP operated as an unincorporated division of TXU Gas Company. Following the close of the test year, there have been no changes in the corporate structure of TXU LSP.

**Merger Savings**

28.    The Commission's Order in GUD No. 8664 (Commission Order 8664) required TXU LSP to file a statement of intent three years after the effective date of the merger.

29.    Commission Order 8664 required TXU LSP=s filing to include full and complete documentation of all merger savings but did not determine the methodology to be used by TXU LSP to report merger savings.

30.    Commission Order 8664 found that ordering TXU LSP to file a statement of intent three years after the effective date of the merger for consideration of the changes in the cost of service established in GUD No. 8664 would allow TXU LSP to prepare a statement of intent using a full test year of post-merger data.

31.    Commission Order 8664 does not specifically preclude the filing of a statement of intent by TXU LSP prior to August 2000; however, the Order does contemplate that the subsequent case would fully incorporate all merger saving into the cost of service calculation of the utility.

32.    TXU LSP did not wait a full year after the effective date of the merger to begin collecting test year data. The test year in this case began eleven months after the merger.

33.    TXU LSP filed this docket October 29, 1999, two years and three months after the effective date of the merger.

34.    All merger savings that have been realized to date were sufficiently identified and documented by TXU LSP during the hearing in this case.

35.    TXU LSP originally anticipated that it would take three years after the effective date of the merger for all savings to be accomplished.

36.    Studies performed by TXU Corp. and Enserch Corporation indicated that substantial savings would occur two to three years after the merger.

37.    The number of full-time employees for both TXU LSP and TXU Pipeline Services continued to decline after the end of the test year due to the effect of the merger.

38.    TXU LSP did not establish that all originally anticipated merger savings have been realized. It is reasonable to believe that TXU LSP will achieve further merger savings in the future.

39.    TXU LSP and TXU Fuel merged most of their operations within TXU Pipeline Services and TXU Business Services.

40.    TXU LSP examined further merger opportunities between TXU LSP and TXU Fuel.

41.    TXU LSP reasonably determined that further merger savings could not reasonably be accomplished by further merging operations of TXU LSP and TXU Fuel.

42.    Ninety percent of the operations of TXU LSP and TXU Fuel have been combined. Though TXU Fuel and TXU LSP field operations are merged, the companies are treated as separate entities because of the still-separate marketing and gas control operations.

5

105

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

43.  Approximately ninety percent of TXU LSP=s and TXU Fuel=s operations and corporate support activities have been combined.  The entities were organized under common executive management; furthermore, staff and corporate support services, field operations, construction services, measurement and laboratory services, and engineering reservoir services for the two companies were consolidated into TXU Pipeline Services, which now provides services to both TXU LSP and TXU Fuel.

44.  TXU LSP considered the effect of a full integration of TXU LSP and TXU Fuel and made reasonable decisions regarding the consolidations that should be effected.  Insufficient evidence was presented to justify a Commission-ordered study of this issue.

**Affiliate charges**

45.  TXU Business Services is a separately incorporated affiliate of TXU LSP which specializes in providing consolidated corporate support services, including accounting, financial, information technology, regulatory, and human resources services to TXU Corporation's affiliates.

46.  During the test year, TXU Business Services charged TXU LSP a total amount of $13,399,560.

47.  TXU Business Services billed TXU LSP a total of $1,454,205 for an activity classified as Corporate Oversight through an aggregated methodology in the first six months of the test year.  In the second six months of the test year, TXU Business Services disaggregated the Corporate Oversight activity and billed TXU LSP only $384,857.

48.  The aggregated billing methodology is unreasonable because it resulted in an allocation to TXU LSP more than triple the allocation under the disaggregated methodology.  Only $384,857 was shown to be reasonable for each six-month period for Corporate Oversight, resulting in a disallowance of $1,069,348 for the first six-month period.

49.  TXU LSP failed to prove $3,070 in shareholder services is a reasonable and necessary expense to provide service to city gate customers; TXU LSP has no outside investors.

50.  TXU LSP failed to prove $425,603 classified as regulatory services did not consist of nonrecurring regulatory case expenses, including this case; the projects that comprised the original expense amount as testified to by TXU LSP=s witness included at least $113,659 in rate case charges, and TXU LSP did not establish that it had thoroughly reviewed the remainder of the expenses to isolate any non-recurring rate case expenses.

51.  Advertising charges of $102,863 are not reasonable and necessary expenses because TXU LSP does not need to advertise to serve or retain its one customer, TXU Gas-Distribution. Although some of the expenses were spent on pipeline safety issues, a reasonable and necessary activity, TXU LSP did not separately identify those amounts; therefore it is reasonable to disallow the entire amount.  Additionally, TXU LSP failed to prove that the advertising charges are no higher than charges to other affiliates.

52.  Charges totaling $103,152 for credit and collections are not reasonable and necessary to providing city gate service because TXU LSP has only one city gate service customer, TXU Gas-Distribution, and the charges relate exclusively to third party transportation customers.

53.  Aviation charges totaling $74,110 are not reasonable and necessary to provide service to city gate customers; the charges consist of private airplane charges, which are considerably more expensive than commercial airline charges, and TXU LSP did not demonstrate that the costs were reasonable or that travel by private airplane was necessary to serve its customer.

54.  Charges of $483,177 for Y2K services by TXU Business Services to LSP should be disallowed as non-recurring expenses; TXU LSP failed to document the amount of historical Y2K costs that will recur in the form of future technology services, and it failed to produce any evidence of the cost of future projects.

55.  Charges of $46,018 for Employee Communication Services should be disallowed because TXU LSP failed to prove that its affiliate, TXU Business Services, billed other affiliates equally for this service.

6

| RAILROAD COMMISSION OF TEXAS | BULLETIN NO. 655 |
|---|---|

56. TXU Pipeline Services is an unincorporated affiliate of TXU LSP that provides field operations, operations support, measurement and laboratory services, engineering, and reservoir services to various TXU affiliates.

57. During the test year, TXU Pipeline Services was an operating unit of TXU LSP until April 1999; after that time, it was an operating unit of TXU Gas Company. Until April 1999, TXU LSP provided pipeline services to other affiliates and reduced its books by amounts associated with those services. After April 1999, TXU Pipeline Services charged TXU LSP and other affiliates such as TXU Fuel for services.

58. During the test year, TXU Pipeline Services charged TXU LSP a total of $35,958,563, of which $4,688,545 was a flow-through of TXU Business Services charges to TXU LSP. The flowed-through charges are assigned based on the overall time reported by TXU Pipeline Services employees for providing service to TXU LSP.

59. With the exception of one transaction category, the charges by TXU Business Services which flow through to TXU LSP were shown to be reasonable and necessary charges which were distributed on an equal basis among affiliates.

60. Charges from TXU Business Services to TXU Pipeline Services of $522 for aviation services should be disallowed. TXU LSP did not demonstrate that the costs were reasonable or that travel by private airplane was necessary to serve its customers. This amount is included in the $74,110 amount stated in Finding of Fact No. 53.

**Rate Base**

61. TXU LSP requested a cash working capital allowance of $2,369,164 in rate base.

62. The Aligned Cities proposed a cash working capital allowance of negative $2,413,848.

63. A lead lag-study is the proper tool to measure TXU LSP's cash working capital requirement.

64. The failure of TXU LSP to match revenues and expenses in its lead-lad study is a fundamental error since the purpose of a lead-lag study is to net the revenue lag and expense leads associated with expenses not included in rate base.

65. Electric and gas utilities typically match revenues and expenses in performing lead-lag studies.

66. TXU LSP overstated its cash working capital needs by more than $1 million by including over $9 million in revenues not associated with any expense component of the lead-lag study.

67. TXU LSP's lead-lag study included revenues associated with return and depreciation.

68. Depreciation and return revenue needs are non-cash items that should not be included in a lead-lag study.

69. TXU LSP's requested federal income tax lead days assume that federal income taxes are incurred ratably each quarter throughout the year, but TXU LSP's federal income tax payments are not made in four equal installments.

70. TXU LSP's lead-lag study fails to measure the time between when TXU LSP incurred a federal income tax liability and when the tax liability was paid.

71. Neither TXU LSP nor the Aligned Cities presented a reliable lead-lag study. In the absence of a reliable lead-lag study, it is reasonable to deny TXU LSP's requested cash working capital component of rate base.

72. Based on Findings of Fact Nos. 61-71, cash working capital of zero for TXU LSP is reasonable.

73. TXU LSP has not requested any funds for construction work in progress.

74. TXU LSP has not requested any funds for retired work in progress.

75. Materials and supply inventory in the amount of $1,671,123 and prepayments in the amount of $378,304 are reasonable.

7

RAILROAD COMMISSION OF TEXAS                                BULLETIN NO. 655

76. Accumulated deferred federal income taxes of $53,929,913 and a net unrestored investment tax credit of $8,869,292 are reasonable.

77. Net gas plant investment of $379,564,319 is reasonable.

**Rate of Return**

78. TXU LSP's capital structure should be based on the average capital structure of a proxy group of local distribution companies (LDCs).

79. A cost of debt for TXU LSP of 7.42% is reasonable.

80. A cost of preferred stock for TXU LSP of 6.58% is reasonable.

81. A cost of equity of 11% is reasonable and based on a constant growth discounted cash flow (DCF) analysis.

82. An overall rate of return of 9.223% is reasonable.

83. A reduction of $1,982,143 to reflect the return described in previous findings is reasonable and should be adopted.

**Revenues**

84. City gate test year volumes should be weather-normalized.

85. Weather normalized city gate deliveries are 134,166,644 MMBtus.

86. The Maximum Daily Quantities, in MMBtus, for the test year are as follows:

| | |
|---|---|
| January | 2,050,857 |
| February | 2,094,065 |
| March | 1,538,577 |
| April | 794,862 |
| May | 353,958 |
| June | 348,843 |
| July | 319,176 |
| August | 299,739 |
| September | 312,015 |
| October | 728,368 |
| November | 1,375,925 |
| December | 2,150,330 |

87. No customer growth adjustment to revenues is necessary.

88. During the test year, LSP received lease revenues of $3,620,891 from Meridian Oil Storage, Inc. for use of LSP pipeline facilities.

89. TXU LSP's lease with Meridian Oil Storage, Inc. will expire October 11, 2000 and will not be renewed.

90. The Aligned Cities, through their witness, proposed to credit (*i.e.*, reduce) TXU LSP's total cost of service by $3.6 million in transportation revenues that TXU LSP received during the test year from Meridian Oil Storage, Inc., a transportation customer. Aligned Cities' proposed adjustment is not reasonable and should be denied.

91. It is reasonable to require TXU LSP to notify the Gas Services Division of the Railroad Commission of Texas of the status of the lease between October 11, 2000 and November 11, 2000.

8

108

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

92. TXU LSP provides new services for parking, lending, and pooling.

93. Aligned Cities recommended that projected budget revenue for various new services should be used to reduce total TXU LSP cost of service.

94. Revenues from parking, lending, and pooling are speculative at this time.

95. It is reasonable to require TXU LSP to provide an annual accounting of revenues received from new services (including, but not limited to, parking, lending, and pooling), as part of its annual report to the Gas Services Division. It is also reasonable to require TXU LSP to disaggregate its annual report and provide a separate report for TXU LSP from that for TXU Gas-Distribution and TXU Gas Distribution-Transmission.

96. LSP received stand-by fee revenues of $2,481,922 in the test year.

97. Stand-by service is supported by TXU LSP's excess storage capacity.

98. In GUD No. 8664, the Railroad Commission of Texas required TXU Gas-Distribution to book the revenue as storage revenue to TXU LSP.

99. On January 1, 2000, TXU LSP began booking the revenues to TXU Gas-Distribution.

100. The stand-by service revenues are not attributable to TXU Gas-Distribution.

101. Stand-by service revenues of $2,481,922 should be credited to TXU LSP's transportation cost of service as other revenues.

102. TXU LSP sold its Pike's Peak Plant and Gathering System for a gain of $2,096,227.

103. There is no associated depreciation expense or return associated with Pikes Peak facilities in TXU LSP's proposed cost of service in this docket.

104. Pikes Peak had been fully depreciated in prior years for federal income tax purposes.

105. ENSERCH CORPORATION's shareholders absorbed a $12 million write-down of the Pike Peak assets in 1997.

106. No adjustment is necessary for the sale of the Pikes Peak facility.

107. As discussed further in Findings of Fact Nos. 108 through 114, TXU LSP is selling EPI and its assets to Canterra Resources, including assets transferred by TXU LSP to EPI at net book value.

**Expenses**

108. TXU LSP transferred certain assets to TXU Processing, previously known as EPI, after the test year.

109. TXU Processing was sold to Canterra Resources after the test year.

110. TXU LSP witnesses did not take into account the asset transfer from TXU LSP to TXU Processing as a known and measurable change to the test year.

111. TXU LSP's attorney told the Examiners that TXU Processing was being sold to Canterra Resources, pending due diligence, during the last days of this hearing.

112. The four assets, with a net book value of $1,868,831 at the time of the transfer, were transferred to a separate legal entity that is an affiliate of TXU LSP.

9

109

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

113. There is not enough information in the record to determine the reasonableness of this transaction and how the benefits, if any, should be assigned.

114. The sale of TXU Processing occurred after the end of the test year in this case. Any adjustment to rate base will be accounted for in a subsequent proceeding.

115. TXU LSP's proposed test-year expense annualization was not contested by any party, is reasonable, and should be adopted.

116. TXU LSP's proposed normalization of test year expense, with the exception of payroll expense, was not contested by any party, is reasonable, and should be adopted.

117. The Aligned Cities' proposed payroll test-year expense normalization, based on November 1999 payroll data, is reasonable and should be adopted.

118. Testimony indicated that an executive's salary is being split between TXU LSP and another TXU LSP affiliate.

119. An adjustment of $10,834 to test year payroll expenses for the split salary is reasonable.

120. Payroll expenses for TXU LSP include expenses for payroll from TXU Pipeline Services.

121. TXU Pipeline Services provides services to TXU LSP and other affiliates.

122. TXU Pipeline Services proposed to allocate 18.8% of its labor costs to affiliates other than TXU LSP based upon hours.

123. Allocating labor costs, which may vary among employees, based upon hours is not just and reasonable.

124. It is reasonable to allocate labor costs for TXU Pipeline Services based on actual dollars paid for labor.

125. The Aligned Cities calculated that TXU Pipeline Services allocated 29.63% of its overtime labor costs for a three-month period to affiliates other than TXU LSP.

126. An allocation factor of 29.63% to allocate TXU Pipeline Services payroll expenses to other affiliates is appropriate because it best reflects the actual allocation of payroll dollars and is closer to the allocator used for allocation of TXU Pipeline Services' charges from TXU Business Services to other affiliates than is TXU LSP's proposed allocator of 18.8%.

127. An adjustment to payroll in the amount of $2,495,258 is just and reasonable.

128. An adjustment that reduces employee benefits and workers' compensation expenses proposed by TXU LSP by $701,737 is appropriate to reflect the adjustment to payroll expense made in the Finding above.

129. TXU LSP's storage expenses of $5,071,147 are reasonable, and should be adopted.

130. The annual depreciation expense included by TXU LSP in its cost of service was $15,717,236; this amount is unreasonable and should not be adopted.

131. With the exception of Account 367, Transmission Mains, TXU LSP's proposed depreciation rates are reasonable and should be adopted.

132. A 60-year service life for TXU LSP's Account 367, Transmission Mains, is reasonable and should be adopted.

133. Adoption of a 60-year service life for TXU LSP Account 367 results in an adjustment to TXU LSP's proposed depreciation expense of $768,000.

134. The Equal Life Group (ELG) depreciation method used by TXU LSP is reasonable and should be retained.

135. TXU LSP's proposed net salvage level of 0% for the Underground Storage function is reasonable.

10

| RAILROAD COMMISSION OF TEXAS | BULLETIN NO. 655 |
|---|---|

136. TXU LSP's proposed net salvage level of 0% for the Transmission City-Gate function is reasonable.

137. TXU LSP's proposed net salvage level of 0% for the Transmission Compressor function is reasonable.

138. It is reasonable to adjust TXU LSP's rate base to remove depreciation associated with setting the net salvage levels at 0% for those accounts identified in Findings of Fact Nos.135-137; the amount of depreciation associated with zero net salvage values, as opposed to 5% net salvage values, is $1,107,000.

139. It was appropriate for TXU LSP to remove merger-related relocation and severance expenses in its initial filing, errata, and rebuttal testimony.

140. Relocation and severance expenses relating to the merger are non-recurring expenses that should not be included in cost of service.

141. Office relocation expense of $105,650, which was not removed by TXU LSP in its filings, was a non-recurring expense that should be removed from cost of service as a disallowed expense.

142. TXU LSP's proposed post-employment benefits expenses were not contested, are reasonable, and should be adopted.

143. TXU LSP's proposed pensions and other employee benefits loading rate was not contested, are reasonable, and should be adopted.

144. TXU LSP's proposed expenses included $112,510 for association dues to organizations engaged in lobbying activities.

145. TXU LSP's did not show that the association dues paid did not include an amount for legislative advocacy.

146. It is reasonable to disallow $112,510 for association dues since TXU LSP was unable to establish what portion of that amount was dedicated to legislative advocacy.

147. TXU LSP's proposed expenses included $18,588 in expense for researching customer loyalty.

148. TXU LSP has only one customer, TXU Gas-Distribution, which is both a related company division and a loyal customer; customer loyalty research expense in the amount of $18,588 is an unnecessary expense.

149. TXU LSP failed to establish that an expense for researching customer loyalty was reasonable or necessary.

150. It is reasonable to disallow $18,588 for research related to customer loyalty.

151. An adjustment that reduces payroll taxes proposed by TXU LSP by $220,890 is appropriate to reflect the adjustment to payroll expense made in Findings of Fact above.

152. An adjustment to property taxes proposed by TXU LSP that reduces that tax amount by $24,279 to reflect plant balances during the 1998 and 1999 months in the test year is reasonable and should be adopted.

153. The $245,169 total adjustment to Other Taxes results in a total amount for this category of $6,063,452. This amount is reasonable and should be adopted.

Functionalization

154. In GUD No. 8664, the Commission approved the functionalization of TXU LSP's services into transportation and storage.

155. The current functionalization into transportation and storage provides an accurate separation of costs associated with the facilities.

11

111

RAILROAD COMMISSION OF TEXAS                                                BULLETIN NO. 655

156.    Further functionalizing transportation costs into area network and mainline does not increase the accuracy of the cost allocation process.

## Classification

157.    Fixed and variable costs are treated differently in the cost allocation process.

158.    It is reasonable to separate costs into those that are required for the overall operation of the system and that do not vary with the throughput on the system (Fixed costs) and those that do vary with throughput on the system (Variable costs).

159.    TXU LSP's method of assigning Labor costs as Fixed for Gathering, Other Gas Supply Expenses, and Transmission expenses is reasonable and should be adopted.

160.    TXU LSP's method of assigning S & E/Other expenses for Gathering, Other gas Supply Expenses, and Transmission is reasonable and should be adopted.

161.    TXU LSP's method of assigning pension and benefits as fixed for General and Administrative expenses is reasonable and should be adopted.

162.    TXU LSP's classification for all general and administrative expenses as fixed was not reasonable.

163.    In the short term, General and Administrative expenses vary depending on throughput.

164.    It is reasonable to assign all General and Administrative expenses except for direct labor equally between Fixed and Variable classification.

165.    It is reasonable to classify $76,197,451 of the total transportation cost of service as Fixed, and $11,382,005 as Variable.

166.    It is reasonable to classify $14,725,352 of total storage costs as Fixed and $2,340,845 of total storage costs as Variable.

## Cost of Service and Allocation

167.    A total cost of service of $87,579,456 for Transportation is reasonable.

168.    A total gathering expense of $1,734,355 for Transportation is reasonable.

169.    A total transmission expense of $20,288,151 for Transportation is reasonable.

170.    A total general and administrative expense of $18,123,413 for Transportation is reasonable.

171.    Total depreciation expense of $13,253,967 for Transportation is reasonable.

172.    Taxes "other than income" expenses in the amount of $5,510,796 for Transportation are reasonable.

173.    A rate of return expense of $24,183,635 for Transportation is reasonable.

174.    Total federal income taxes of $8,066,495 for Transportation are reasonable.

175.    Total other revenues credits in the amount of $3,581,356 for Transportation are reasonable.

176.    A fixed cost allocation factor of 46.18 % for transportation appropriately ascribes costs to the class of customer for whose benefits those costs are incurred.

177.    Total TXU LSP Transportation fixed costs allocated to the city gate service of $35,361,638 are reasonable.

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

178.   A variable cost allocation factor of 23.43% for transportation appropriately ascribes costs to the class of customer for whose benefits those costs are incurred.

179.   Total TXU LSP Transportation variable costs allocated to the city gate service of $3,121,907 are reasonable.

180.   A total cost of service of $17,066,198 for Storage is reasonable.

181.   Total underground storage expenses of $5,071,147 for Storage are reasonable.

182.   Total General and Administrative expenses of $2,587,169 for Storage are reasonable.

183.   Total depreciation expenses of $1,773,483 for Storage are reasonable.

184.   Total taxes, other than income, of $974,281 for Storage are reasonable.

185.   A total return of $5,117,515 for Storage is reasonable.

186.   Total federal income taxes of $1,706,956 for Storage are reasonable.

187.   A total revenue credit of $164,354 for Storage is reasonable.

188.   An allocation factor for capacity costs of 79.50% for storage appropriately ascribes costs to the class of customer for whose benefits those costs are incurred.

189.   Total TXU LSP Storage capacity costs allocated to the city gate service of $5,882,594 are reasonable.

190.   An allocation factor for deliverability costs of 85.73% for storage appropriately ascribes costs to the class of customer for whose benefits those costs are incurred.

191.   Total TXU LSP Storage deliverability costs allocated to the city gate service of $6,343,583 are reasonable.

192.   An allocation factor for variable costs of 66.00% for storage appropriately ascribes costs to the class of customer for whose benefits those costs are incurred.

193.   Total TXU LSP Storage variable costs of $1,552,683 allocated to the city gate are reasonable.

**Rate Design**

194.   A demand-volumetric rate design for Transportation cost of service is reasonable.

195.   The demand cost is calculated by dividing one-half of fixed costs for transportation by twelve months.

196.   A demand charge per month of $1,473,402 is fair and equitable.

197.   The volume charge is derived by adding total transportation variable costs plus one-half of the fixed costs and dividing by normalized annual city gate deliveries.

198.   A volumetric charge per MMBtu of 15.5 cents is fair and equitable.

199.   A deliverability-capacity rate design for Storage cost of service is reasonable.

200.   The deliverability charge per month of $1,268,717 covers the costs classified as deliverability-related and would be charged during the months of November through March.

201.   The capacity charge per month, $619,606, recovers the costs classified as capacity-related and would be charged every month.

13

113

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

**CoServ Issues**

202.    CoServ and the State of Texas challenged the language of TXU LSP's proposed tariffs as discriminatory because the tariff language proposed by TXU LSP limits its applicability to only one customer, TXU Gas-Distribution.

203.    CoServ and the State of Texas asserted that the tariff approved in this docket should be available to other city gate customers on TXU LSP's system. CoServ's proposed changes to the language of the tariff to make it applicable to other city gate customers.

204.    CoServ's proposal could have statewide implications for all utilities and is more appropriately addressed outside the confines of this contested rate case proceeding.

**Rate Case Expenses**

205.    TXU LSP's rate case expenses in the amount of $3,066,382.50 are reasonable. Those expenses include the following:

   a.    TXU LSP's requested rate case expenses of $2,857,488 for actual work through May 30, 2000, minus $115,105.50 addressed in Findings of Fact Nos. 206 through 208 below;

   b.    TXU LSP's projected future rate case expenses of $324,000 for work performed after May 31, 2000.

206.    It is reasonable to disallow TXU LSP's expenses for preparation of the cash working capital (CWC) study, in the amount of $72,798, because the CWC study failed to provide any additional information beyond what was recommended in GUD No. 8664 and TXU LSP failed to provide a reliable lead-lag study.

207.    It is reasonable to disallow TXU LSP's expenses for resisting discovery related to the discovery dispute surrounding the Ragsdale Model, in the amount of $22,307.50 for the following reasons:

   a.    The requested information involving the Ragsdale Model was the type of information encompassed by the Aligned Cities' discovery request.

   b.    TXU spent $22,307.50 in resisting the Motion to Compel; and

   c.    It was not reasonable for TXU LSP to resist disclosure of this information.

208.    It is reasonable to disallow $20,000 as a discovery sanction for the following reasons:

   a.    TXU LSP's withholding the information involving the Ragsdale Model had a detrimental effect on the efficiency of the proceeding; and

   b.    The information regarding the Ragsdale Model should have been included with TXU LSP's initial rate-filing package, or in response to the Aligned Cities' initial Request for Information on the subject.

209.    The Aligned Cities' rate case expenses of $1,401,267 are reasonable. Those expenses include the following:

   a.    The Aligned Cities' requested rate case expenses of $923,356 for actual work completed through May 31, 2000, minus $18,294 addressed in Finding of Fact 211 below;

   b.    Projected future rate case expenses of the Aligned Cities in the Amount of $496,205 for work performed after May 31, 2000.

210.    As part of the amount included in Finding of Fact No. 209 above, it is reasonable to allow the Aligned Cities the $21,815.75 they spent in prosecuting their Motion to Compel Discovery regarding the Ragsdale Model.

14

114

RAILROAD COMMISSION OF TEXAS          BULLETIN NO. 655

211. It is reasonable to disallow $18,294 of the Aligned Cities' rate case expenses, because it represents a 12.2% mark-up on invoices for affiliated consultants in order to cover internal costs associated with the use of those independent consultants, and includes a cost of money attributable to the lag between payment to the consultant and reimbursement from the client.

212. It is reasonable to allow TXU LSP to recover its rate case expenses allowed herein, and those approved amounts of the Aligned Cities' rate case expenses, other than the $21,815.75 described in Finding of Fact No. 211 above, which TXU LSP reimburses to the Aligned Cities as provided herein, through a surcharge on its rates over two years, by amortizing the total expense using two times the normalized annual city gate delivery volume approved in this docket as the denominator in deriving the surcharge. It is reasonable to allow TXU LSP to revise the recovery factor quarterly for additional incurred expenses that are consistent with the Commission-approved $820,205 ($324,000 for TXU LSP plus $496,205 for Aligned Cities) in estimated expenses for work to be performed after May 31, 2000. It is reasonable to allow TXU LSP to true-up the amounts actually recovered with the rate case expenses authorized herein, at the end of the two-year period.

213. It is reasonable to require TXU LSP to reimburse the Aligned Cities for the incurred portion of their approved rate case expenses, which total $905,062, within 30 days after the date of this Order. It is also reasonable to require TXU LSP to reimburse additional incurred and approved expenses of the Aligned Cities within 30 days of the day the Aligned Cities submit documentation to TXU LSP that those expenses have been incurred.

## CONCLUSIONS OF LAW

1. TXU Lone Star Pipeline (TXU LSP) is a gas utility as defined in the Texas Utilities Code (TUC). TEX. UTIL. CODE ANN. §§ 101.003(7) and 121.001 (Vernon Supp. 2000).

2. TXU LSP is subject to the jurisdiction of the Railroad Commission of Texas pursuant to the TUC. TEX. UTIL. CODE ANN. § 102.001 (Vernon 1998).

3. TXU LSP's filing and its public notice complied with the requirements of Section 104.102 and 104.103 of the TUC. TEX. UTIL. CODE ANN. §§ 104.102 & 104.103 (Vernon 1998).

4. TXU LSP failed to meet its burden of proof on the elements of its requested rate increase identified in this order. TEX. UTIL. CODE ANN. § 104.008 (Vernon 1998).

5. As established in the findings of fact, TXU LSP has not established that it has accounted for all originally anticipated merger related savings as required by GUD No. 8664. Tex. R.R. Comm'n, *Statement of Intent of Lone Star Gas Company and Lone Star Pipeline Company, Divisions of Enserch Corporation, And ENSAT Pipeline Company to Increase the Intra-Company City Gate Rate,* G.U.D. No. 8664 (Gas Utils. Div. November 25, 1997) (Second Order on Rehearing Nunc Pro Tunc).

6. Under the TUC, payments to affiliates are excluded from TXU LSP's rate base or operating expenses unless the Railroad Commission of Texas specifically finds each item or class of items reasonable and necessary and finds that the price to TXU LSP is not higher than the prices charged by the supplying affiliate to its other affiliates or divisions or to a nonaffiliated person for the same item or class of items. TEX. UTIL. CODE. ANN. § 104.055(b) (Vernon 1998).

7. Transactions between unincorporated divisions of the same corporate entity are not affiliate transactions subject to the requirements of Section 104.055(b) of the TUC.

8. Under TUC § 104.055(b), payments to affiliates are not presumed to be reasonable.

9. Under TUC § 104.055(b), the TXU Business Services, Inc. charges to TXU LSP through TXU Pipeline Services are affiliate transactions subject to the requirements of the TUC.

10. TXU LSP has meet its burden of establishing that transactions charged to TXU LSP from TXU Business Services, Inc., through TXU Pipeline Services, are reasonable and necessary and TXU LSP does not pay more than the price charged to other affiliates or divisions or to a non-affiliated person for the same item or class of items.

11. Although Commission Rule 7.56 permits inclusion of some advertising expenses, a utility is required to meet the statutory

15

115

RAILROAD COMMISSION OF TEXAS                              BULLETIN NO. 655

affiliate transaction standards under TUC § 104.055(b) in order to include the expenses if they are incurred by an affiliate. 16 Tex. Admin. 7.56.

12.  TXU LSP failed to meet its burden of proof that certain charges as described in the Findings of Fact Nos. 45-60 meet the standard for affiliate transactions under TUC § 104.055(b).

13.  TXU LSP's overall revenues as established by the findings of fact and attached schedules are sufficient to permit it a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses, as required by TUC § 104.051.

14.  The issue raised by CoServ and the State of Texas of the possibility of discrimination regarding the tariff language proposed by TXU LSP which limits application of the approved rates to TXU Gas-Distribution should be severed from this proceeding and considered in a separate docket.

15.  The rates and rate design reflected in the findings of fact and attached schedules are just and reasonable, not unreasonably preferential, prejudicial, or discriminatory, but are sufficient, equitable, and consistent in application to each class of consumers, in compliance with TUC § 104.003.

16.  Each party seeking reimbursement for its rate case expenses has the burden to prove the reasonableness of such rate case expenses by a preponderance of the evidence, under 16 TEX. ADMIN. CODE § 7.57.

17.  The Rate case expenses of $3,066,382.50 for TXU LSP and $1,401,267 for the Aligned Cities enumerated in the findings of fact, are reasonable and comply with 16 TEX. ADMIN. CODE § 7.57.

18.  The Commission has the authority to allow TXU LSP to recover rate case expenses through a surcharge on its rates, under TEX. UTIL. CODE. ANN. § 104.051 (Vernon 1998).

19.  It is reasonable for the Commission to order TXU LSP to pay the Aligned Cities' incurred reasonable rate case expenses within 30 days of the date of this Order, under TEX. UTIL. CODE. ANN. § 103.022 (Vernon 1998).

**IT IS THEREFORE ORDERED** that TXU LSP's requested revenue increase and rate are **DENIED.**

**IT IS FURTHER ORDERED** that the rates and rate design reflected in the findings of fact and conclusions of law and in the Schedules are **APPROVED.**

**IT IS FURTHER** ORDERED that TXU LSP shall be required to file an Addendum to the General Annual Report it is required to file with the Commission. The Audit Section of the Gas Services Division shall provide the form for the addendum and TXU LSP shall be required to use that form. TXU LSP is also hereby required to separate the financial activities of TXU Gas Company (dba TXU Gas-Distribution), TXU Gas Distribution-Transmission, and TXU Gas Company (dba TXU Lone Star Pipeline). The report shall include an accounting of all revenues from the Meridian Oil Storage, Inc., lease and any revenues from new services, including but not limited to, parking, lending, and end-user pooling services.

**IT IS FURTHER ORDERED** that consideration of the issues raised by CoServ and the State of Texas (*i.e.*, whether discrimination results from the proposed TXU LSP tariff language which restricts the application of the approved rates to TXU Gas-Distribution) is hereby severed into a separate proceeding and docketed as GUD No. 9155.

**IT IS FURTHER ORDERED** that TXU LSP shall file tariffs incorporating rates consistent with this Order within thirty days of the date of this Order.

**IT IS FURTHER ORDERED** that the TXU LSP is authorized to recover a surcharge on its rates charged to ratepayers, over two years, to recover TXU LSP's rate case expenses as approved herein and the approved rate case expenses that TXU LSP is required to pay to the Aligned Cities as set out in Finding of Fact No. 213. TXU LSP shall calculate the surcharge by amortizing the total expense using two times the normalized annual city gate delivery volume approved in this docket as the denominator in deriving the surcharge. TXU LSP may revise the recovery factor quarterly for additional incurred expenses that are consistent with the Commission-approved $820,205 in estimated expenses for work to be performed after May 31, 2000. At the end of the two-year

16

RAILROAD COMMISSION OF TEXAS                    BULLETIN NO. 655

period, TXU LSP may true-up the amounts actually recovered with the rate case expenses authorized herein. The surcharge authorized herein shall be included in TXU Gas-Distribution's billings to its residential and commercial customers.

IT IS FURTHER ORDERED that TXU LSP shall reimburse the Aligned Cities their incurred rate case expenses as approved herein within 30 days after the date of this Order.

IT IS FURTHER ORDERED that the hearing transcript corrections requested by TXU LSP and recommended by the Examiner in his June 22, 2000 memorandum to the Commission are hereby approved.

IT IS FURTHER ORDERED that this order shall not be final and effective until twenty days after a party is notified of the Commission's order. Pursuant to TEX. GOV'T CODE § 2001.142(c), a party shall be presumed to have been notified of the Commission's order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled or, if rehearing is granted, this order shall be subject to further action by the Commission.

IT IS FURTHER ORDERED that all proposed findings of fact and conclusions of law not specifically adopted herein are DENIED. IT IS ALSO ORDERED that each exception to the Examiner's Revised Proposal for Decision not expressly granted herein is overruled and all pending motions and requests for relief not previously granted or granted herein are hereby denied.

Signed this 22nd day of June, 2000.

RAILROAD COMMISSION OF TEXAS
/s/_____
TONY GARZA
COMMISSIONER

I disagree with the allocation methodology and percentages adopted by the Commission.

/s/_____
MICHAEL L. WILLIAMS
CHAIRMAN

I disagree with the decision not to require TXU LSP to file a rate case within the next three years. I also disagree with Findings of Fact Nos. 135-137, which adopt TXU LSP's proposed net salvage level of zero percent. I believe the salvage value for the listed accounts should be five percent.

/s/_____
CHARLES R. MATTHEWS
COMMISSIONER

ATTEST:
/s/ Kim Williamson_____
SECRETARY

## SECTION 6
## MISCELLANEOUS

### STEVE PITNER, GAS SERVICES DIVISION DIRECTOR

1.    **OFFICE OF THE DIRECTOR**

    A.    **Publications**

        1.    Texas Utilities Code Titles 3 and 4. Special Rules of Practice and Procedure and Substantive Rules -

17

117

ƆLL  TXU LSP GUD NO. 8976  JST
EXPENSE ADJUSTMENT DETAILS BY CATEGORY

ATTACHMENT I

Sec. 1  General & Administrative Adjustments

Affiliate Expenses

| category | | adjustment | cost classification assigned to | treatment |
|---|---|---|---|---|
| advertising | $ | (102,863) | G & A | 50/50 fixed and variable |
| corporate oversight | $ | (1,069,347) | G & A | 50/50 fixed and variable |
| credit & collections | $ | (103,152) | G & A | 50/50 fixed and variable |
| Shareholder Services | $ | (3,070) | G & A | 50/50 fixed and variable |
| Regulatory Services | $ | (425,603) | G & A | 50/50 fixed and variable |
| Aviation Services | $ | (522) | G & A | 50/50 fixed and variable |

| | | | | |
|---|---|---|---|---|
| Total G & A adj. | $ | (1,704,557) | | |
| assigned to: | | storage | transportation | |
| | $ | (213,070) $ | (1,491,487) | |
| storage fixed | $ | (106,535) | trans fixed | ($745,743.69) |
| storage variable | $ | (106,535) | trans variable | ($745,743.69) |

Sec. 2  Transmission Adjustments

| category | adjustment | | assigned to | treatment |
|---|---|---|---|---|
| payroll & labor norm | $ | (2,495,258) | Labor | labor to fixed |
| employee benefits & wc | $ | (701,737) | Labor | labor to fixed |
| newsletter | $ | (46,018) | Labor | labor to fixed |
| aviation expenses | $ | (73,588) | Labor | labor to fixed, S & E/Other to variable |
| Y2K Expenses | $ | (483,177) | Labor | labor to fixed, S & E/Other to variable |
| disallowed expense | $ | (282,795) | S & E/Other | 50/50 fixed and variable |

| | | | | |
|---|---|---|---|---|
| Total Transmission Adj. | $ | (4,082,573) | total fixed | ($3,941,175.27) |
| assigned to: | transportation | | total variable | ($141,398) |
| | $ | (4,082,573) | total | ($4,082,573) |

Sec. 3  Depreciation Adjustments

| category | adjustment | | reference |
|---|---|---|---|
| over-accrued depreciation | $ | - | |
| over-accrued net salvage | $ | - | |
| Life Analysis - Acc 332 | $ | - | |
| Life Analysis - Acc 367 | $ | (768,000) | |
| Net Salv. Und. Stor. | $ | - | |
| Net Salv. Trans City | $ | - | |
| Net Salv. Trans Com. | $ | - | |
| Change ELG to ALG | $ | - | |

| | | | | |
|---|---|---|---|---|
| Total Depreciation Adj. | $ | (768,000) | | |
| assigned to: | | storage | transportation | |
| | $ | - $ | (768,000) | |

Sec. 4  Taxes Other Than Income Taxes Adjustments

| category | adjustment | | reference |
|---|---|---|---|
| Property Taxes | | ($24,279) | TXU LSP Ex. 60 at 29-31, Ex MEF-R-4 (Florence Reb.) |
| Payroll Taxes | $ | (220,890) | Aligned Cities, Ex. 143, EB-2, p. 3 revised. |

| | | | | |
|---|---|---|---|---|
| Property Taxes assigned: | | storage | transportation | TXU LSP Rev. Sch. J3.0, Lines 1-2 |
| | $ | (4,233) $ | (20,046) | |
| Payroll Taxes assigned | | storage | transportation | TXU LSP Rev. Sch. J3.0, Lines 4-5 |
| | $ | (26,693) $ | (194,198) | |

Sec. 5  Return Adjustments
See Schedules for Adjusted Working Capital, Adjusted Rate Base, WACC, and Functionalized Return

Sec. 6  Federal Income Tax Adjustments
See Schedule for Federal Income Taxes on Return on Rate Base

Sec. 7  Other Revenues (Credited) Adjustments

| category | | reference |
|---|---|---|
| Standby Fees = $2,481,922 per 6(e) on Schedule | | See TXU LSP Rev. Sch K2.4 |
| Replace Standby Fees TXU LSP adjusted out of Other Revenues | | |
| assigned to: | transportation | storage |
| | $ | (2,481,922) $ | - |

fixed: ($2,481,922)
variable: $0

RAILROAD COMMISSION OF TEXAS

| | | |
|---|---|---|
| APPEAL OF TXU GAS | § | |
| DISTRIBUTION FROM THE ACTION | § | |
| OF THE CITY OF DALLAS, CITY OF | § | |
| UNIVERSITY PARK, AND THE | § | |
| TOWN OF HIGHLAND PARK, | § | GAS UTILITIES DOCKET NOS. 9145- |
| TEXAS AND THE STATEMENT OF | § | 9148 |
| INTENT FILED BY TXU GAS | § | |
| DISTRIBUTION TO INCREASE | § | |
| RATES CHARGED IN THE | § | |
| ENVIRONS OF THE CITY OF | § | |
| DALLAS | § | |

## PROPOSAL FOR DECISION

### I.   Introduction

This is an appeal, filed by TXU Gas Distribution, of a decision by the City of Dallas brought pursuant to Texas Utilities Code (TUC) Section 103.054. The initial rate request was filed with the City of Dallas on August 27, 1999. The case filed with the City of Dallas was based on a test year ending December 31, 1998, and requested a $6,244,301 annual increase in revenues. This request was based, in part, on an increase in the Applicant's cost of service, which allegedly resulted from $52.8 million in capital expenditures. As originally filed with the Railroad Commission of Texas, TXU Gas Distribution requested that, instead of a $6,244,301 increase, a $12,578,717 increase was required due to its increased cost of service.[1] TXU Gas Distribution subsequently updated its request through December 31, 1999, for known and measurable changes. The revised filing reflected an increase in the cost of service of $9,128,996. Due to changes made before and during the hearing, the estimated cost of service was revised to reflect an increase of $8,098,030.

The City of Dallas intervened in this case and argued that, instead of the $6,244,301 increase requested at the city level, or the revised $8,098,030 increase requested in the appeal, TXU Gas Distribution has experienced a reduction in its cost of service which should result in a $5,513,335 decrease to its cost of service. The Examiners' recommendation contained in this Proposal for Decision (PFD) indicates that TXU Gas Distribution's cost of service has increased $1,300,505.

---

[1] TXU Gas Distribution Ex. 3, Primary Exhibits, p. 1.

GUD NO. 9145-9148          PROPOSAL FOR DECISION          PAGE 81

However, the Applicant has not made any cost-of-service adjustment associated with this proposal. Mr. Pous argues that, once the Applicant determined that no further depreciation should be associated with these accounts, TXU Gas Distribution should have made an adjustment to the operations and maintenance expense included in this case. The City of Dallas argues that the Applicant's cost of service reflects approximately $246,000 of clearing accounts related to depreciation expense for these accounts.[305]

(c)     Examiners' Analysis and Recommendation

The Examiners recommend that the Intervenor's proposed adjustment be rejected. The Applicant has clarified that these accounts were not clearing accounts during the test year. Accordingly, no adjustment is necessary.

ii.     Retroactive Rate Issues

**Issue: Should a retroactive adjustment to depreciation be made to TXU Gas Distribution's treatment of fully accrued accounts?**

**Examiners' Recommendation: No. TXU Gas Distribution's treatment of fully accrued accounts does not violate the Texas Utilities Code.**

| Applicant | Intervenor | Examiners |
|---|---|---|
| No adjustment | $722,259 adjustment to rate base. | No adjustment |

The City of Dallas argues that the Applicant has exceeded its authority by changing the depreciation rate to zero for the three clearing accounts.[306] On each of these accounts, the Applicant has suspended depreciation accruals. Accruals were suspended in 1999 for the transportation and power-operated equipment accounts, and in 2000 for communication equipment.[307]

(a)     Applicant's Position

Mr. Watson argues that the Applicant must adhere to Generally Accepted Accounting Principles (GAAP). GAAP rules state that the Applicant should not continue to accrue depreciation expense on accounts that are fully depreciated. He argues that any suggestion to

---

[305] City of Dallas, Ex. 29, pp. 77-79.
[306] City of Dallas, Ex. 29, p. 80 & Ex. 30 pp. 1-8.
[307] TXU Gas Distribution, Ex. 47, p. 45

require continued accrual would be in violation of GAAP. Furthermore, he explains that no additional depreciation expense should be recovered to correct under-accrued accounts, nor should depreciation expense be refunded on those accounts that are over-accrued. Any over/under recovery will be carried forward and the net (if any) of the original investment less net salvage less any accumulated reserve will begin to be recovered under the new and future rate structure.[308]

Finally, in response to an assertion by Mr. Pous that negative depreciation rates are supported by industry practice, Mr. Watson states that no natural gas utility LDC or transmission company shows negative depreciation rates in the 1997-1998 EEI/AGA Survey of Depreciation Statistics Report. He concludes that Mr. Pous' clearing account adjustment is inconsistent with industry practice and is based on an erroneous assumption concerning the manner in which the Applicant handled clearing accounts during the test year.[309]

### (b)          Intervenor's Position

The City of Dallas argues that the Applicant does not have the authority to unilaterally change its depreciation rates and that any "true-up" mechanism that may have existed was eliminated by the Applicant. Mr. Pous explains that depreciation expense is obtained by multiplying the gross plant balance by the approved depreciation rate. The depreciation expense is then booked into the Account 108. This account is an offset to rate base. He further clarifies that in the establishment of revenue requirements in a rate case, a utility company is allowed to earn a reasonable return on rate base. If a utility can unilaterally change depreciation rates, it destroys the only "true-up" mechanism in the depreciation process. Further, it will artificially and inappropriately increase rate base.

### (c)          Examiners' Analysis and Recommendation

The Examiners recommend that no adjustment be made for the clearing accounts. The statute cited by Mr. Pous states that the Railroad Commission of Texas "shall establish proper and adequate rates and methods of depreciation, amortization, or depletion for each class of property of a gas utility or municipally owned utility." TXU Gas Distribution's treatment of fully-accrued accounts does not violate this statute. The statute is silent on how to treat fully-accrued accounts. The statute does not address any "true-up" mechanism that may, or may not, exist. If the adjustment proposed by the City of Dallas is made, then a retroactive adjustment must be made for any new investment made after rates are set in this case. Rates set in this case may or may not be adequate to recover any new expenditures. The correction occurs when a new rate is set. Finally, the Examiners agree with Mr. Watson that the there is no evidence in the record that the Applicant has not charged the rate it was authorized to charge.

3.          Pensions, Benefits, and OPEB's: SFAS-106.

In December 1990, the Financial Accounting Standards Board adopted Statement of Financial Accounting Standard 106 (SFAS-106), altering the way in which companies accounted

---

[308] TXU Gas Distribution, Ex. 47, p. 46.
[309] TXU Gas Distribution, Ex. 47, p. 48.

RAILROAD COMMISSION OF TEXAS

| | |
|---|---|
| APPEAL OF TXU GAS DISTRIBUTION § <br> FROM THE ACTION OF THE CITY OF § <br> DALLAS, CITY OF UNIVERSITY PARK, § <br> AND THE TOWN OF HIGHLAND PARK, § <br> TEXAS AND THE STATEMENT OF § <br> INTENT FILED BY TXU GAS § <br> DISTRIBUTION TO INCREASE RATES § <br> CHARGED IN THE ENVIRONS OF THE § <br> CITY OF DALLAS § <br> § | GAS UTILITIES DOCKET NOS. <br> 9145-9148 |

### FINAL ORDER

Notice of Open Meeting to consider this order was duly posted with the Secretary of State within the time period provided by law, pursuant to Tex. Gov't Code Ann., Chapter 551 et seq. (Vernon 1994 & Supp. 2000). The Railroad Commission of Texas adopts the following findings of fact and conclusions of law and orders as follows:

This matter was duly considered following notice and hearing by hearings examiners who filed a Proposal for Decision containing findings of fact and conclusions of law in accordance with 16 TEX. ADMIN. CODE § 1.141 (West 2000). The Proposal for Decision was properly served on all parties, and all parties were given an opportunity to file exceptions and replies as part of the record as authorized under 16 TEX. ADMIN. CODE § 1.142 (West 2000). The Railroad Commission of Texas, after review and due consideration of the Proposal for Decision, adopts the following findings of fact and conclusions of law and orders as follows:

### FINDINGS OF FACT

**Procedural History**

1.  TXU Gas Distribution owns and operates a distribution system serving approximately 236,598 customers in the City of Dallas, University Park, Cockrell Hill, and the Town of Highland Park.

2.  On August 27, 1999, TXU Gas Distribution filed a Statement of Intent with the City of Dallas, University Park, Cockrell Hill, and the Town of Highland Park.

3.  On February 23, 2000, the City of Dallas denied the proposed rate increase.

4.  TXU Gas Distribution filed a Motion for Rehearing with the Dallas City Council on February 28, 2000.

122

GUD Nos. 9145-9148                    **FINAL ORDER**                    **PAGE 2**

5.  On March 8, 2000, the Dallas City Council issued a final order denying the requested rate change.

6.  On March 21, 2000, the City of University Park denied the requested rate change.

7.  On March 28, 2000, Cockrell Hill approved a negotiated rate based on the Statement of Intent.

8.  TXU Gas Distribution filed an appeal to the Railroad Commission of Texas on April 7, 2000, pursuant to Texas Utilities Code §§ 103.051 & 103.054.

9.  TXU Gas Distribution filed its Statement of Intent to Increase Rates in the Environs of the City of Dallas on April 7, 2000.

10. On May 2, 2000, the Commission ordered that the rates proposed by TXU Gas Distribution for the Environs of the City of Dallas be suspended 150 days from the date the rates would otherwise go into effect.

11. The Examiners held pre-hearing conferences on April 17, 2000, April 25, 2000, May 2, 2000, June 12, 2000, July 11, 2000, May 24, 2000, and July 18, 2000.

12. On May 3, 2000, the parties filed a joint procedural schedule in this case. The parties agreed to extend the proposed effective date of its Statement of Intent and the statutory deadline in this case from October 9, 2000, to November 21, 2000.

13. The City of Dallas intervened on April 14, 2000.

14. TXU Gas Distribution updated its rate-filing package for known and measurable changes through December 31, 1999, on May 24, 2000.

15. The City of Dallas filed its direct testimony on July 12, 2000, the Applicant filed rebuttal testimony on July 31, 2000, and the hearing was held beginning August 1, 2000, and ending August 10, 2000.

16. Initial Briefs were filed on August 25, 2000, and Replies were filed on September 1, 2000. The Proposal for Decision was issued on October 10, 2000. Exceptions were filed on October 25, 2000, and Replies were filed on November 3, 2000.

**Structure of TXU Gas Distribution**

17. The parities filed a Joint Stipulation regarding Rate Case Expenses on September 25, 2000.

18. Texas Utilities Company, a Texas corporation doing business as TXU Corp., is a holding company whose principal United States operations are conducted through TXU Electric

123

Company (formerly known as Texas Utilities Company) TXU Gas Company (formerly known as ENSERCH Corporation), and Texas Energy Industries, Inc.

19. In August 1997, ENSERCH Corporation merged with Texas Utilities Company.

20. TXU Gas Company is an integrated company engaged in gathering, processing, transmission, and distribution of natural gas, and marketing of gas. TXU Gas Distribution is an unincorporated division of TXU Gas Company.

21. TXU Gas Distribution is a gas utility, providing gas utility service to the Dallas Distribution System. The Dallas Distribution System is an integrated local gas distribution system.

22. The distribution system is comprised of approximately 236,598 customers in Dallas, Highland Park, University Park, and Cockrell Hill.

23. The Dallas Distribution System customer base is comprised of approximately 211,897 residential customers, 24,513 commercial customers, and 188 industrial and transportation customers. There are approximately 211 customers within the environs of the City of Dallas.

24. TXU Gas Distribution's last proposed rate increase for the Dallas System was filed in September of 1995 and was based upon data for the test year ending December 31, 1994. TXU Gas Distribution and the City of Dallas agreed to an annual increase of $5.0 million or 2.64%. The rate increase became effective in January 1996.

## Rate Base

25. A portion of TXU Gas Distribution's cost for General Plant, Retirement Work in Progress (RWIP), Materials and Supplies, and Prepayments is assigned to the Dallas Distribution System.

26. The Applicant requested assignment of General Plant, RWIP, Materials and Supplies, and Prepayments to the Dallas Distribution System on the basis of total number of customers.

27. Total customers for TXU Gas Distribution are 1,384,515. Total customers for the Dallas Distribution System are 236,598.

28. The ratio of total TXU Gas Distribution customers to Dallas Distribution System customers is 0.171479.

29. The City of Dallas requested assignment of General Plant, RWIP, Materials and Supplies, and Prepayments to the Dallas Distribution System on the basis of gross distribution plant.

124

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 4

30. The total gross cost of the distribution system plant of TXU Gas Distribution is $1,226,345,903. The total gross cost of the distribution system plant of the Dallas Distribution System is $195,224,132.

31. The ratio of total TXU Gas Distribution distribution plant to Dallas Distribution System distribution plant is 0.15919.

32. General Plant, RWIP, Materials and Supplies, and Prepayments support and follow distribution plant investment.

33. General Plant, RWIP, Materials and Supplies, and Prepayments are allocated *within* the Dallas Distribution System on the basis of distribution plant investment.

34. It is reasonable and consistent to allocate TXU Gas Distribution costs for General Plant, RWIP, Material and Supplies, and Prepayments on the basis of total Distribution Plant.

35. Total Net General Plant for TXU Gas Distribution is $59,746,895.

36. Total Net General Plant for the Dallas Distribution System is $9,511,103.

37. RWIP expenses for TXU Gas Distribution are negative $1,452,876.

38. RWIP expenses for the Dallas Distribution System are negative $231,283.

39. Material and Supplies expenses for TXU Gas Distribution are $1,863,506.

40. Material and Supplies expenses for Dallas Distribution System are $296,652.

41. Prepayment expenses for TXU Gas Distribution are $4,205,613.

42. Prepayment expenses for the Dallas Distribution System are $625,003.

**Rate Base: Cash Working Capital**

43. The Applicant initially testified that a Cash Working Capital of $1,793,456 was required.

44. In supplemental testimony, the Applicant testified that a Cash Working Capital requirement of $1,704,484 was required.

45. In rebuttal testimony, the Applicant modified its request for a Cash Working Capital requirement to a negative $3,704,404.

46. The City of Dallas argued that the Cash Working Capital requirement should be a negative $8,295,117.

47.    A lead-lag study is a proper tool to measure TXU Gas Distribution's Cash Working Capital requirement for the Dallas Distribution System.

48.    The Applicant's Cash Working Capital request is based on a lead-lag study.

49.    A revenue lag of 1.488 days for check clearing is reasonable and a total revenue lag of 30.289 days is reasonable.

50.    The Applicant requested a payroll lead days of 13.177.

51.    The Applicant did not include a separate analysis for vacation leave working capital requirements.

52.    It is not reasonable to calculate a payroll lead day without performing an analysis of the different service periods associated with vacation pay.

53.    A payroll lead day of 25.097 takes into consideration the vacation leave working capital requirements.

54.    The Applicant requested pensions and benefits lead days of 22.181.

55.    The Applicant calculated the pre-qualification period for new employees only.

56.    The City of Dallas calculated a pre-qualification period for all employees.

57.    It is unreasonable to calculate the pre-qualification period for all employees.

58.    The Applicant did not measure the lead days between when an employee makes a claim for a benefit and the time that the Applicant must honor that claim.

59.    Calculating lead days for pension and benefits should measure the lead days between when an employee makes a claim for a benefit and the time that the Applicant must honor that claim.

60.    The appropriate lead days associated with the calculation of benefits is 22.679.

61.    The Applicant requested 32.845 lead days for Other Operations and Maintenance.

62.    Based on the evidence presented the invoice date is the closest approximation to the date that the Applicant actually received the product or service.

63.    Based on the evidence presented the due date on the invoice, or the date that the Applicant actually paid, if it was later than the due date on the invoice, is the closest approximation to the date that the Applicant actually paid for the product or service.

64.    43.651 lead days are reasonable for Operations and Maintenance expenses.

GUD Nos. 9145-9148                    FINAL ORDER                        PAGE 6

65.   The Applicant proposed using a composite lead day for revenue related taxes of 20.055 lead days.

66.   It is reasonable to use actual tax payments in calculating the lead days associated with local gross receipt taxes whenever available.

67.   84.704 lead days are reasonable for revenue related taxes.

68.   The Applicant proposed 37 lead days for Federal Income Taxes.

69.   The Intervenor proposed adoption of an expense lead day for Federal Income Taxes calculated in GUD No. 8976.

70.   Adoption of an expense lead day calculation developed in another case is not reasonable.

71.   The Applicant's proposed expense lead day of 37 days is reasonable.

72.   TXU Gas Distribution's lead-lag study included revenues associated with Return, Depreciation, and Deferred Federal Income Taxes.

73.   Return, Depreciation, and Deferred Federal Income Taxes are non-cash items that should not be included in a lead lag study.

74.   TXU Gas Distribution requested an allowance of $276,031 for Average Daily Bank balances.

75.   The lead-lag study shows that TXU Gas Distribution's shareholders may not be supplying the working cash that the Applicant needs to operate the Dallas Distribution System; ratepayers should not be required to compensate shareholders for interest on funds they did not provide.

76.   TXU Gas Distribution has requested a negative $4,756 for Working Funds and Other.

77.   The Intervenor requested that sales taxes be removed from the calculation of Working Funds and Other.

78.   The Applicant has demonstrated that sales taxes were removed from the calculation of Working Funds and Other. A Cash Working Capital requirement of a negative $4,756 is reasonable for Working Funds and Other.

79.   Based on findings of fact 47 to 78 a Cash Working Capital requirement of a negative $7,034,750 is reasonable.

80.   TXU Gas Distribution has not requested any funds for Construction Work In Progress for Cash Working Capital.

127

81. TXU Gas Distribution has not requested any funds for Retired Work In Progress for Cash Working Capital.

## Rate of Return

82. TXU Gas Distribution is unincorporated and does not sell stock directly to the public.

83. TXU Gas Distribution's capital structure should be based on the average capital structure of a proxy group of local distribution companies (LDCs).

84. Based on an analysis of the proxy group a capital structure of 47.1 percent long-term debt, 1.7 percent preferred stock, and 51.2 percent common equity is reasonable.

85. A cost of debt for TXU Gas Distribution of 7.34% is reasonable.

86. A cost of preferred stock for TXU Gas Distribution of 5.54% is reasonable.

87. A cost of equity of 12.1% based on a discounted cash flow (DCF) analysis is reasonable.

88. A cost of equity of 12.1% is within the range of reasonableness predicted by the risk premium analysis.

89. An overall rate of return of 9.75% is reasonable.

## Revenues and Expenses

90. Since 1994, TXU Gas Distribution sold forty-two separate assets and reported a realized net profit of $3,219,341 on the sale of land related to a portion of these assets.

91. Ratepayers have not paid any depreciation expense related to the land that was sold.

92. The City of Dallas did not establish that ratepayers undertook any risk associated with the ownership or sale of land.

93. All the property referenced in finding of fact 90 above was sold outside of the test year.

94. Based on findings of fact 90-93 it is reasonable that the ratepayers not receive a credit related to the sale of assets.

95. Weather has an impact on the sale of gas which in turn affects revenues.

96. In determining a utility's revenue deficiency or surplus, it is necessary to use weather-normalized sales.

97. TXU Gas Distribution has correctly calculated the weather-normalized adjustment.

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 8

98.   The evidence in the record does not suggest that a consumption pattern normalization adjustment is necessary.

99.   All data indicates that Mcf per customer usage has consistently declined since 1994. There is insufficient evidence in the record to conclude that the trend will reverse.

100.  The present rates include a base city gate rate of $4.02 per Mcf.

101.  The current gas cost is $2.7535 per Mcf.

102.  It is reasonable to use the current city gate cost in calculating the revenue requirement.

103.  TXU Gas Distribution provides transportation service to its affiliate, TXU Lone Star Pipeline.

104.  The cost of service for the Dallas Distribution System is allocated to all customers.

105.  Based on findings of fact 103 & 104 it is not reasonable to credit any transportation revenues collected from TXU Lone Star Pipeline to the cost of service of the Dallas Distribution System.

106.  Transportation rates between TXU Gas Distribution and TXU Lone Star Pipeline were not set in GUD No. 8976.

107.  Labor expense declined after the close of the test year and some of the labor costs were shifted to supplies and expenses.

108.  The use of an out of the test year adjustment factor to reflect a decreasing trend in the costs of labor is not reasonable in this case.

109.  TXU Gas Distribution allocates labor fringe benefits to the Dallas Distribution System on the basis of total number of customers.

110.  TXU Gas Distribution reasonably allocated the labor expenses to the Dallas Distribution System. .

111.  The Equal Life Group (ELG) depreciation method used by TXU Gas Distribution is reasonable.

112.  A 60-year average service life with a corresponding Iowa Curve of R2.5, for Account 376.3, Mains-Plastic, is reasonable and should be adopted.

113.  A 45-year average service life with a corresponding Iowa Curve of R4 for Account 376.4, Mains-Valves, is reasonable and should be adopted.

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 9

114. A 60-year average service life and a corresponding Iowa Curve of R2 for Account 376.5, Main-Steel Mill Wrapped/Bare, is reasonable and should be adopted.

115. A 33-year average service life for Account 380 with a corresponding Iowa Curve of R2, Services, is reasonable and should be adopted.

116. A 5-year average service life with a corresponding Iowa Curve of R5, for Account 398, Computers, is reasonable and should be adopted.

117. Based on the evidence presented, a negative 30% net salvage for the distribution function is reasonable and should be adopted.

118. An adjustment for clearing accounts is not reasonable because TXU Gas Distribution stated that the accounts at issue were not clearing accounts during the test year.

119. A retroactive adjustment to depreciation is not reasonable because TXU Gas Distribution's treatment of fully accrued accounts is appropriate.

120. A $7,124,173 provision for total system depreciation and a $5,872,379 provision for Residential and Commercial customers depreciation is reasonable.

121. A five percent medical trend used in the calculation of the SFAS-106 expense is reasonable.

122. TXU Gas Distribution's decision not to establish an external fund is unreasonable.

123. It is reasonable to establish an external fund for SFAS-106.

124. TXU Gas Distribution has demonstrated that its affiliate expenditures are reasonable and necessary.

125. TXU Gas Distribution has demonstrated that the price charged by affiliates to TXU Gas Distribution is not higher than the prices charged to other affiliates or to non-affiliated persons.

126. Merger related expenses in the amount of $584,664 and Y2K expenses in the amount of $63,386 should be disallowed. TXU Gas Distribution has not established that Y2K expenses and merger related expenses are recurring.

127. Total system labor expenses of $8,288,046 are reasonable.

128. Total system operation and maintenance supplies and expenses of $18,431,473 are reasonable.

129. Total system un-collectible accounts of $508,051 are reasonable.

130

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 10

130.    Total system property related taxes of $1,388,410 are reasonable.

131.    Total system payroll related taxes of $639,900 are reasonable.

132.    Total system interest on customer deposits and advances of $327,021 is reasonable.

**Revenue Requirement**

133.    TXU Gas Distribution requested a total revenue requirement for the residential and commercial customers in the Dallas Distribution System in the amount of $144,968,857, exclusive of service charges revenues.

134.    The proposed total revenue requirement for the residential and commercial customers in the Dallas Distribution System is $139,477,946, exclusive of service charges revenues.

135.    The total revenue requirement proposed by TXU Gas Distribution includes revenue-related taxes of $8,632,895. These revenue-related taxes are not included in the base rate.

136.    The proposed total revenue requirement includes revenue-related taxes of $8,305,906. These revenue-related taxes are not included in the base rate.

137.    The service charges attached as Appendix A to this order are reasonable.

138.    TXU Gas Distribution requested revenues for service charges to residential and commercial customers in the amount of $1,463,896 and this amount is reasonable.

**Rate Design**

139.    Residential rates consisting of a customer charge of $7.50, a volumetric charge per Mcf of $3.4019, and an off peak discount of $0.25 for each Mcf in excess of 8 Mcf for each of the billing months of May through October are reasonable.

140.    Commercial rates consisting of a customer charge of $13.50, and three different blocks of volumetric charges; $3.5884 for the first 20 Mcf, $3.2976 for the next 30 Mcf, and $3.1521 for all consumption over 50 Mcf are reasonable.

141.    The residential and commercial rates summarized in Appendix B are reasonable.

142.    The weather normalization adjustment described in Appendix C is reasonable.

143.    A purchased gas adjustment proposed by TXU Gas Distribution and attached in Appendix B, is reasonable.

144.    TXU Gas Distribution has not met its burden of proof in establishing that a plant investment cost adjustment is reasonable.

131

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 11

145.  TXU Gas Distribution has not met its burden of proof in establishing that a cost of service adjustment clause is reasonable.

146.  TXU Gas Distribution has not met its burden of proof in establishing that the proposed line extension policy is reasonable. The proposed line extension policy does not specify the specific fee per foot.

147.  The tax adjustment clause proposed by TXU Gas Distribution, and attached in Appendix B, is reasonable.

148.  TXU Gas Distribution must include revenue-related taxes as a specific line item on the customer's bills.

**Allocation**

149.  TXU Gas Distribution has not established that it is reasonable to divide the Dallas Distribution System for cost allocation purposes.

150.  TXU Gas Distribution established that the cost of installing the minimum system required to serve all customers would cost $11,743,983.

151.  Based on the evidence presented, an allocation factor for customer-related costs based on total number of customers is reasonable.

152.  Based on the evidence presented, an allocation factor for demand-related costs based exclusively on a winter peak day demand usage is not reasonable.

153.  An allocation factor that averages peak demand usage with annual throughput is reasonable.

154.  Operations and Maintenance labor expenses allocated to residential and commercial customers of $7,376,636 is reasonable.

155.  Operations and Maintenance supplies and expenses allocated to residential and commercial customers of $16,431,453 are reasonable.

156.  Property related taxes in the amount of $1,144,451 allocated to residential and commercial customers are reasonable.

157.  Payroll-related taxes in the amount of $569,532 allocated to residential and commercial customers are reasonable.

158.  Provision for depreciation in the amount of $5,872,379 allocated to residential and commercial customers is reasonable.

159.  Provision for interest on customer deposits and advances of $327,021 is reasonable.

132

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 12

## Rate Case Expenses

160. TXU Gas Distribution's rate case expenses in the amount of $1,537,937.40 are reasonable. Those expenses include the following:

   a. TXU Gas Distribution's requested rate case expenses of $1,288,937.40 for actual work through August 31, 2000.

   b. TXU Gas Distribution's projected future rate case expenses of $249,000 for work performed after September 1, 2000, for completion of the case before the Railroad Commission of Texas and for any appeal of the Final Order.

161. The rate case expenses of the City of Dallas in the amount of $721,869.04 are reasonable. Those expenses include the following:

   a. City of Dallas' requested rate case expenses of $531,869.04 for actual work through August 31, 2000.

   b. City of Dallas's projected future rate case expenses of $200,000 for work performed after September 1, 2000, for completion of the case before the Railroad Commission of Texas and for any appeal of the Final Order.

162. It is reasonable to disallow the City of Dallas's expenses for resisting discovery in the amount of $10,000 for the following reasons.

   a. Details requested regarding expert witnesses were within the requirements of the Texas Rules of Civil Procedure.

   b. Failing to make documents available for inspection as required by the procedural schedule.

133

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 13

## CONCLUSIONS OF LAW

1.    TXU Gas Distribution is a gas utility as defined in the Texas Utilities Code (TUC). TEX. UTIL. CODE ANN. §§ 101.003(7) and 121.001 (Vernon Supp. 2000).

2.    TXU Gas Distribution is subject to the jurisdiction of the Railroad Commission of Texas pursuant to the TUC. TEX. UTIL. CODE ANN. § 102.001. (Vernon 1998).

3.    TXU Gas Distribution's filing and its public notice complied with the requirements of Section 104.102 and 104.103 of the TUC. TEX. UTIL. CODE ANN. §§ 104.102 & 104.103 (Vernon 1998).

4.    TXU Gas Distribution's filing of its *Petition for Review of Municipal Rate Decisions* comply with the requirements of TEX. UTIL. CODE ANN. § 103.054 (Vernon 1998).

5.    The overall revenue requirement established in this Order will permit TXU Gas Distribution a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses under TEX. UTIL. CODE ANN. § 104.051 (Vernon 1998).

6.    TXU Gas Distribution failed to meet its burden of proof on the elements of its requested rate increase identified in this order. TEX. UTIL. CODE ANN. § 104.008 (Vernon 1998).

7.    Pursuant to TUC, payments to affiliates are excluded from TXU Gas Distribution's rate base or operating expenses unless the Railroad Commission of Texas specifically finds each item or class of items reasonable and necessary and finds that the price to TXU Gas Distribution is not higher than the prices charged by the supplying affiliate to its other affiliates or division or to a nonaffiliated person for the same item or class of items. TEX. UTIL. CODE ANN. § 104.055(b) (Vernon 1998).

8.    The rates established in this Order will not yield more than a fair return on the adjusted value of the invested capital used and useful in providing service to the public, under TEX. UTIL. CODE ANN. § 104.052 (Vernon 1998).

9.    The Commission is required to establish proper and adequate rates and methods of depreciation for each class of property of a gas utility, under TEX. UTIL. CODE ANN. § 104.054(a) (Vernon 1998).

10.   Book depreciation and amortization for ratemaking purposes must be computed on a straight-line basis over the useful life expectancy of the item of property or facility in question, under 16 TEX. ADMIN. CODE § 7.51(a) (West 2000).

11.   The rates and rate design reflected in the findings of fact are just and reasonable, not unreasonably preferential, prejudicial, or discriminatory, but are sufficient, equitable, and

consistent in application to each class of consumers, under TEX. UTIL. CODE ANN. § 104.003 (Vernon 1998).

12.    Each party seeking reimbursement for its rate case expenses has the burden to prove the reasonableness of such rate case expenses by a preponderance of the evidence, under 16 TEX. ADMIN. CODE § 7.57 (West 2000).

13.    The rate case expenses enumerated in the findings of fact herein are reasonable and comply with 16 TEX. ADMIN. CODE ANN. § 7.57 (West 2000).

14.    The Commission has the authority to allow TXU Gas Distribution to recover rate case expenses through a surcharge on its rates, under TEX. UTIL. CODE ANN. § 104.051 (Vernon 1998).

15.    It is reasonable for the Commission to order TXU Gas Distribution to pay the Non-Settling Cities' incurred rate case expenses, and estimated rate case expenses pursuant to the stipulation between the parties, under TEX. UTIL. CODE ANN. § 103.022 (Vernon 1998).

**IT IS THEREFORE ORDERED** that TXU Gas Distribution's requested rates are **DENIED.**

**IT IS FURTHER ORDERED** that the rates and rate design reflected in the findings of fact, in the Schedules attached at Appendix D, and conclusions of law are **APPROVED.**

**IT IS FURTHER ORDERED** that TXU Gas Distribution shall file tariffs incorporating rates consistent with this Order within thirty days of the date of this Order.

**IT IS FURTHER ORDERED** that TXU Gas Distribution is authorized to recover a surcharge on its rates charged to ratepayers in the City of Dallas, the City of University Park, and the Town of Highland Park, and the environs of the City of Dallas calculated on an Mcf basis over a period of twenty-four (24) months, commencing on the date rates set in this docket become effective. As estimated expenses are actually incurred, TXU Gas Distribution is authorized to add to the amount subject to surcharge up to the total of estimated expenses for TXU Gas Distribution and the City of Dallas contained in this order. **IT IS ALSO ORDER** that TXU Gas Distribution shall file a quarterly report informing the Railroad Commission of the balance of the surcharge with the Director of the Gas Services Division.

**IT IS FURTHER ORDERED** that TXU Gas Distribution shall reimburse the City of Dallas its incurred rate case expenses approved herein, and estimated rate case expenses pursuant to the stipulation between the parties, up to the amount authorized herein.

**IT IS FURTHER ORDERED** that this Order shall not be final and effective until twenty days after a party is notified of the Commission's Order. Under TEX. GOV'T CODE § 2001.142(c), a party shall be presumed to have been notified of the Commission's Order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is

GUD Nos. 9145-9148                    FINAL ORDER                    PAGE 15

filed by any party at interest, this Order shall not become final and effective until such motion is overruled or, if granted, this Order shall be subject to further action by the Commission.

**IT IS FURTHER ORDERED** that the proposed findings of fact and conclusions of law not specifically adopted herein are **DENIED. IT IS ALSO ORDERED** that each exception to the Examiner's Proposal for Decision not expressly granted herein is overruled and all pending motions and requests for relief not previously granted herein are hereby denied.

Signed this 20th day of November, 2000.

RAILROAD COMMISSION OF TEXAS

MICHAEL L. WILLIAMS
CHAIRMAN

TONY GARZA
COMMISISONER

I disagree with the decision reflected in Finding of Fact Nos. 87 & 88 to set cost of equity at 12.1%. I would adopt the Examiners' revised recommendation that cost of equity be set at 11.85%, resulting in an overall rate of return of 9.59%, instead of the 9.75% reflected in Finding of Fact No. 89.

CHARLES R. MATTHEWS
COMMISSIONER

ATTEST:

SECRETARY

136

SOAH DOCKET NO. 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
DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | |
| TEXAS, INC. FOR AUTHORITY TO | § | BEFORE THE |
| CHANGE RATES, RECONCILE | § | STATE OFFICE OF |
| FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |
| TREATMENT | § | |

REBUTTAL TESTIMONY

OF

ROBERT R. COOPER

ON BEHALF OF

ENTERGY TEXAS, INC.

APRIL 2012

1

ENTERGY TEXAS, INC.
REBUTTAL TESTIMONY OF ROBERT R. COOPER
PUC DOCKET NO. 39896


TABLE OF CONTENTS

Page

I.      Introduction                                                                                        1

II.     Purpose of Rebuttal Testimony                                                      1

III.    Rate Year Purchased Power                                                           2

        A.      Intervenor Adjustments to Rate Year Purchased Power
                are Not Supported by the Facts of This Case                      3

        B.      Adjustments to Affiliate Purchases                                      14

        C.      Adjustments to the 2013 EAI-WBL MSS-4 PPA                 15

IV.     Depreciation and Life of Plant                                                        20

EXHIBITS


Exhibit RRC-R-1          2013 EAI-ETI WBL MSS-4 Agreement

Exhibit RRC-R-2          Operating Committee Minutes Pertaining to 2013
                         EAI-WBL **Highly Sensitive**

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

## I. INTRODUCTION

Q. PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A. My name is Robert R. Cooper. My business address is Entergy Services, Inc., Parkwood II Building, Suite 300, 10055 Grogan's Mill Road, The Woodlands, Texas 77380.

Q. ARE YOU THE ROBERT R. COOPER WHO FILED DIRECT TESTIMONY IN THIS CASE ON NOVEMBER 30, 2011?

A. Yes, I am.

## II. PURPOSE OF REBUTTAL TESTIMONY

Q. WHAT IS THE PURPOSE OF THIS TESTIMONY?

A. I provide Rebuttal Testimony on behalf of ETI responding to intervenor testimony on the subjects set forth below:

- Company's rate year Purchased Power Expenses – The Direct Testimony of Cities witnesses Dr. Dennis W. Goins and Karl J. Nalepa and Texas Industrial Energy Consumers witness Jeffry Pollock recommending adjustments to rate year purchased power expense;[1] and

---

[1] Direct Testimony of Dr. Dennis Goins at pp. 13-19; Direct Testimony of Karl Nalepa at pp. 7-18; and Direct Testimony of Jeffry Pollock at pp. 21-27.

- Depreciation, Life of Plant — The Direct Testimony of Cities witness Jacob Pous on the service life for the Sabine Units 4 and 5.[2]

With respect to Mr. Pollock's disallowance of costs associated with the 2013 EAI-WBL MSS-4, I provide as Exhibit RRC-R-1, attached to my rebuttal testimony, a signed copy of that PPA, not available at the time of the filing of my Direct Testimony on November 30, 2011.

## III. RATE YEAR PURCHASED POWER

Q. DO YOU HAVE AN OVERARCHING COMMENT ON THE COMPANY'S RATE YEAR PURCHASED POWER EXPENSE PRIOR TO ADDRESSING EACH OF THE INTERVENORS' RECOMMENDATIONS ON THIS SUBJECT?

A. Yes. The intervenors' proposed disallowances should be rejected. My Direct Testimony demonstrates that the capacity costs reflected in Exhibit RRC-1 (revised) that are associated with the three new contracts entered into since the test year (with Calpine Energy Services, L.P. [485 MW], Sam Rayburn Municipal Power Agency [225 MW] and Entergy Arkansas, Inc. for its Wholesale Baseload resources [186 MW]) are known and measurable post-test year expenses. Power will be taken under those contracts during the rate year and ETI customers will obtain the production

---

[2] Direct Testimony of Jacob Pous at pp. 5-9.

4

cost savings and reliability benefits afforded by those contracts. Additionally, no intervenor witness has challenged the Company's need for these new rate year contracts. Neither has any intervenor witness challenged the processes that resulted in these contracts or the reasonableness of the prices reflected in these contracts. Nevertheless, the intervenors' and Staff's positions regarding the Company's rate year capacity costs range from no disallowance by the Staff to $33.1 million by Cities witnesses Goins and Nalepa, and $39.4 million by TIEC witness Pollock. The proposed disallowances produce the anomalous result of denying the Company cost recovery even though the prudence of the underlying contracts has not been challenged and the benefits of those contracts will flow exclusively to ETI's customers.

A. <u>Intervenor Adjustments to Rate Year Purchased Power are Not Supported by the Facts of This Case</u>

Q. TURNING TO INTERVENORS' LOAD GROWTH ARGUMENTS,[3] DOES YOUR REBUTTAL TESTIMONY RELATE TO TESTIMONY THAT WILL BE FILED BY OTHER REBUTTAL WITNESSES FOR THE COMPANY?

A. Yes. Company witness Phillip R. May addresses intervenors' load growth arguments in greater detail than I do here. My testimony supports

---

[3] Direct Testimony of Dennis Goins at pp. 15-19; Direct Testimony of Karl Nalepa at p. 8 *et seq.*; Direct Testimony of Jeffry Pollock at p. 23.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

Mr. May's Rebuttal Testimony; specifically, I confirm that ETI is, indeed, short of capacity to serve its existing as well as its projected load.

The intervenors' load growth arguments are based on a fundamental premise that the difference in unit volume between test year capacity purchases and rate year capacity purchases directly correlates to growth in load served.[4] If that premise were correct, one would expect the level of resources acquired for the rate year to exceed the test year capacity requirements (*i.e.,* load plus reserves).[5] In fact, that situation does not exist. Intervenors' underlying premise for their positions is not supported by the facts of this case, causing their load growth arguments to be fatally flawed.

Q. PLEASE EXPLAIN HOW THE PREMISE OF THE INTERVENORS' LOAD GROWTH ARGUMENTS IS NOT SUPPORTED BY THE FACTS OF THIS CASE.

A. During the test year System peak, ETI controlled 3,344 MW of resources; however, its capacity requirement was 4,060 MW, resulting in a deficit of over 700 MW. During the rate year, ETI will control approximately 3,900 MW of resources; however, its capacity requirement will be approximately 4,300 MW reflecting a capacity deficit of approximately 400 MW. Thus,

---

[4] *E.g.,* Direct Testimony of Jeffry Pollock at p. 23: "Rate year purchases reflect the fact that ETI is projecting to serve additional load during the Rate Year."

[5] Also referred to as Capability Responsibility in the System Agreement.

the resources that ETI will control during the rate year (3,900 MW), including the new PPAs I address in my Direct Testimony, are insufficient to cover both ETI's test year capacity requirement (4,060 MW) and its rate year capacity requirement (4,300 MW). This means that ETI would need to acquire additional capacity for the rate year regardless of any potential growth in load. The intervenors' intimation that ETI is acquiring post-test year capacity simply to serve anticipated new loads is just wrong.

In summary, ETI is currently short of capacity and would need the rate year purchases enumerated in my Exhibit RRC-1 even if ETI load did not grow from the test year to the rate year.

Q. WHAT ARE THE REASONS FOR THE COMPANY'S SHORT POSITION, REQUIRING IT TO ACQUIRE NEW CONTRACTS TO SERVE EXISTING LOAD?

A. There are two main reasons. First, the Company has historically experienced load growth in its service territory. Second, this load growth occurred during a period of time—including much of the last thirteen years—when the Company was under a regulatory directive to position

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

itself for retail competition.[6] That directive resulted in the Company foregoing long-term resource procurement. Thus, a shortfall in resources developed as the Company's load grew, but ETI relied on the resources of other Entergy Operating Companies (through Service Schedule MSS-1), as well as short-term and limited-term purchases to meet that growing demand. After the obligation to prepare for retail competition was lifted in 2009, ETI began the process of adding resources to fill the shortfall that had developed over the years. That process has been undertaken pursuant to the Entergy System's planning principles and objectives – discussed in my Direct Testimony – to develop a robust portfolio of resources. The fact of the matter is that ETI, while it has added resources, still does not own or control sufficient resources to serve its capacity requirements.

Q. ARE THERE OTHER REASONS WHY THE DIFFERENCE IN VOLUME BETWEEN TEST YEAR CAPACITY PURCHASES AND RATE YEAR CAPACITY PURCHASES IS NOT REFLECTIVE OF GROWTH IN LOAD?

---

[6] *See* PURA Ch. 39 requiring retail competition in 2002 (adopted 1999); *Staff's Petition to Determine Readiness for Retail Competition in the Portions of Texas within the Southeastern Reliability Council*, Docket No. 24469 (Dec. 20, 2001) (delaying and setting conditions on the Company's transition to retail competition); *Application of Entergy Gulf States, Inc. for Certification of an Independent Organization for the Entergy Settlement Area in Texas,* Docket No. 28818 (July 12, 2004) (further delaying and setting conditions on the Company's transition to retail competition; PURA Ch. 39, Subchapter J (deferring the Company's transition to retail competition in 2005 and lifting the obligation to continue the transition to retail competition in 2009).

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

A.   Yes. Consistent with the Strategic Resource Plan discussed in my Direct Testimony, the Company's long-term resource procurement strategy, sometimes referred to as the "Portfolio Transformation Strategy,"[7] seeks to develop a more diverse, modern, and efficient portfolio of generation supply resources to meet customer needs. This strategy is not limited to procurement of resources necessary to serve growth in load. Rather, this strategy is designed to transform the System's portfolio of resources used to serve existing loads as well as future demand. Specifically, this strategy is implemented to align both the amount of resources needed to serve load with the type of resources that can most economically serve load. The type of resource used to serve load is determined by customer load shape requirements, and the objective is to obtain a mix of resources that can economically serve a variety of supply roles. In addition, the strategy seeks to maintain the existing generation and power supply resources of the Entergy Operating Companies to meet the capability needs of the System, when economically justified. The resulting portfolio will meet planning objectives in a balanced manner by providing reliable, cost effective, and more stably-priced power, while providing the operational flexibility to follow load and respond to operating constraints and supply contingencies.

---

[7]   The Portfolio Transformation Strategy is discussed in the current Strategic Resource Plan, which was provided to parties in response to TIEC 1-18, provided again as WP/RRC-R/3. *See* pp. 1-3 and 11-1.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

Thus, consistent with the Portfolio Transformation Strategy, new resources can be added to better serve existing loads. The Company's new rate year contracts achieve these objectives to more economically serve loads by providing lower-cost energy, which energy savings are passed through to customers via reduced fuel costs.[8]

Q.  WHAT IS YOUR UNDERSTANDING OF MR. POLLOCK'S ADJUSTMENT TO THE COMPANY'S PURCHASED POWER EXPENSE?

A.  In each of the categories of purchased power (Third Party purchases, Affiliate purchases, Reserve Equalization), Mr. Pollock ignores the increase in the amount of MW procured between the test year and the rate year. Instead, he holds the amount (using a megawatts per month metric) the same and adjusts only the rate for purchased power, applying the rate year unit cost rate to the test year number of units.

Q.  DO YOU AGREE WITH THIS ADJUSTMENT?

A.  No. As discussed above, his adjustments are based on the faulty assumption that incremental MWs purchased are reflective of growth in load. As I have explained above, the new contracts are not sufficient to

---

[8]  *See* the cost/benefit analyses supporting the rate year contracts presented in Schedule I-15 – Entergy Operating Committee Minutes for 2/26/2010; 6/18/2010; 10/15/2010; 3/18/2011; 4/19/2011; s*ee also* Highly Sensitive Exhibit RRC-R-2.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

meet ETI's existing capacity requirements and they were not contracted for the sole purpose of satisfying potential growth in load.

Also, as noted above, the prudence of these contracts has not been challenged. Mr. Pollock's adjustment results in ETI's customers receiving the production cost and reliability benefits provided by the full level of MW associated with the new contracts (because they have been contracted for), but does not reflect the attendant capacity costs associated with the full level of MWs that provide benefits customers will obtain.

Additionally, Mr. Pollock assumes that the distribution of costs between third-party purchases, affiliate purchases and reserve equalization purchases would remain the same regardless of the known and measurable changes in the purchase agreements. This approach ignores the fact that the new lower energy cost third-party contracts and affiliate contracts will make up a greater portion of ETI's supply mix (again, because they have been contracted for), which has the effect of reducing the Company's reliance on Reserve Equalization. Even if the total level of MWs purchased remained the same as in the test year, the allocation of purchases between resources must reflect the amounts contracted (*i.e.,* there will be more MW controlled by contract and less reliance on Reserve Equalization). Just this change in the allocation of costs would reduce Mr. Pollock's adjustment by $12,688,000.[9]

---

[9] *See* WP/RRC-R/1, which is a modified Exhibit JP-1.

Q.   WHAT DO MR. POLLOCK'S LOAD GROWTH NUMBERS REPRESENT?

A.   Mr. Pollock represents "load growth" in megawatts per month ("MW-Mo") of purchased capacity.  This metric that he has developed appears to be intended to represent the amount of capacity that has been purchased by the Company for each month of the year plus the amount of Reserve Equalization capacity that is required each month to meet the Company's capacity requirement.

Q.   IS AN INCREASE IN CAPACITY PURCHASES MEASURED IN MR. POLLOCK'S TERMS OF MW-MO A VALID REPRESENTATION OF LOAD GROWTH?

A.   No.  The volume of purchases in terms of MW-Mo is only reflective of the type and quantity of purchases needed to fill ETI's minimum monthly capacity requirement and is not directly reflective of load growth.  Changes in the MW-Mo volume of purchases can be caused by a number of factors that are unrelated to load growth such as changes in owned capability and changes in the timing, type and mix of purchases.  For example, ETI could derate a unit for an extended period for operational reasons and replace that capacity with a purchase, thereby creating more MW-Mo of purchases per Mr. Pollock.  In that situation, Mr. Pollock would assume that such purchase would be representative of load growth even though no such growth occurred.

Mr. Pollock's application of his MW-Mo metric to Reserve Equalization also demonstrates the flaw in that metric. The amount of Reserve Equalization purchases in the mix of total purchases has a particularly large effect on the total MW-Mo volume. This is due to the fact that Reserve Equalization capacity purchases vary by month based on the monthly System capability and load responsibility. That variation in Reserve Equalization can occur even though there is no change in ETI's load. For example, another Operating Company may add a new resource that has the effect of lowering that Operating Company's "short" position and increasing ETI's "short" position. In that situation, ETI's Reserve Equalization payments would increase, and Mr. Pollock would identify more MW-Mo and attribute the increase in MW-Mo to load growth even though there was no change in ETI's load.

In sum, Mr. Pollock's MW-Mo metric appears to be one that he has fabricated to support his theory on the effect of load growth. I have demonstrated that his metric grossly oversimplifies and misrepresents the Company's position with respect to loads and resources. It should not be relied on to support adjustments to the Company's purchased power expense.

13

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

Q.    DO YOU AGREE WITH MR. NALEPA'S ADJUSTMENT TO RATE YEAR PURCHASED POWER EXPENSE?

A.    No.  While Mr. Nalepa uses a recognized metric (kW) in his analysis, he employs the same faulty assumption that each incremental kW purchased above the test year level is associated with an increment of load above that in the test year.[10]  As I discuss above, that is not the case.

Also, like Mr. Pollock, Mr. Nalepa proposes to limit the volume (MW) of purchases to a test year level even though he uses a rate year average cost.  As I explained above, this would have the effect of providing the capacity benefit of the purchases to customers, including production cost benefits, associated with the full volume of purchases. However, customers would only bear a portion of the costs necessary to obtain those benefits.

Q.    MR. NALEPA ADVOCATES THAT THE COMPANY'S ADJUSTMENTS TO TEST YEAR PURCHASED POWER EXPENSES FOR KNOWN AND MEASURABLE RATE YEAR CONTRACTS SHOULD BE REJECTED BECAUSE NOT ALL ATTENDANT IMPACTS ARE REFLECTED.[11]  IS MR. NALEPA CONSISTENT IN HIS ADVOCACY?

---

[10]    Direct Testimony of Karl Nalepa at pp. 9-10 and 11 "The Company is contracting for capacity resources to meet future demand."

[11]    Direct Testimony of Karl Nalepa at p. 12.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

A.    No. Mr. Nalepa recommends that rate year purchased power costs for third-party purchases and the 2013 EAI-WBL be reduced to reflect test year levels. At the same time, he recommends that the Commission approve the rate year level of Reserve Equalization costs (MSS-1), which is a reduction compared to the test year.[12] Thus, Mr. Nalepa opposes cost increases associated with the rate year but favors cost decreases associated with the rate year. Mr. Nalepa fails to acknowledge that the reduction in Reserve Equalization costs from the test year to the rate year is an attendant impact of the increase in third-party and the 2013 EAI-WBL purchases during the rate year. This is because ETI relies less on the resources of other Operating Companies through Reserve Equalization when it adds to the resources it controls (*i.e.,* ETI becomes less "short"). Thus, if Mr. Nalepa recommends that the Commission not recognize the addition of resources in the rate year, he should have been consistent with his principle of reflecting attendant impacts and recognized a greater reliance on the resources of other Operating Companies consistent with the test year level of Reserve Equalization expense (*i.e.,* a larger "short" position).

---

[12]  *Id.* at pp. 16-17.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

### B. Adjustments to Affiliate Purchases

Q. DR. GOINS ADJUSTED THE HISTORICAL TIME PERIOD FOR DETERMINING MSS-4 PPA COSTS FOR ETI'S AFFILIATE CONTRACTS, AS COMPARED TO YOUR DETERMINATION OF THOSE COSTS FOR EXHIBIT RRC-1. PLEASE DESCRIBE HIS ADJUSTMENT.

A. As discussed in my Direct Testimony, my Exhibit RRC-1 included affiliate contracts (both "legacy" and "other"), by which ETI purchased capacity and energy from a generating resource owned or controlled by another Operating Company. Such sales from one Entergy Operating Company to another are provided for and governed under Service Schedule MSS-4 of the Entergy System Agreement. For the purpose of projecting capacity costs reflected in Exhibit RRC-1, I used an average of the capacity costs for the most recent 12-month period for these contracts, which was the period September 2010 through August 2011. Dr. Goins updated the historical 12-month period for determining capacity costs to the period of November 2010 through October 2011. His adjustments purportedly resulted in a reduction of $4.7 million to the requested amount for Legacy Affiliate contracts.

Q. DO YOU AGREE WITH DR. GOINS' UPDATED ADJUSTMENTS?

A. No. Dr. Goins erred in his calculations. For example, Dr. Goins' adjustments do not take into account the amounts for nuclear

16

decommissioning associated with River Bend Station. He has also simply added the wrong numbers with respect to Willow Glen 2. In his workpaper, Dr. Goins added the "date" line and mischaracterized the results of that calculation as capacity costs. The "date" line only indicates the month and year in which the costs were incurred. It does not reflect the level of capacity costs incurred.

C.     Adjustments to the 2013 EAI-WBL MSS-4 PPA

Q.     DO YOU AGREE WITH MR. NALEPA'S NORMALIZATION OF THE 2013 EAI-WBL MSS-4 PPA OVER A THREE-YEAR PERIOD?

A.     No. Mr. Nalepa proposes that half the EAI-WBL rate year expense be included in rates based on his speculation the 2013 EAI-WBL agreement "will expire half way through the expected period that the rates will be [in] effect . . . "[13] I cannot validate Mr. Nalepa's speculation, as I have no way of knowing how long the proposed rates will be in effect. However, I can say that Mr. Nalepa's conclusion that his adjustment "ensures that the Company collects in rates only the capacity expenses that it actually incurs"[14] is plain wrong because that conclusion fails to account for the outcome of prudent procurement practices. Mr. Nalepa fails to recognize that ETI continues to be short of resources and must secure new resources as the terms of existing purchased resources expire. Upon its

---

[13] Direct Testimony of Karl Nalepa at p. 16.

[14] *Id.*

17

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

expiration in December 2013, the 2013 EAI-WBL MSS-4 PPA will be replaced by other resources or a concomitant increase in Reserve Equalization charges. Thus, ETI will incur capacity costs for replacement resources after the 2013 EAI-WBL contract expires. If, on the other hand, Mr. Nalepa expects that ETI will secure replacement resources when the 2013 EAI-WBL expires, his adjustment has the effect of assuming that ETI will be able to substitute resources of equivalent capacity for half the cost of the rate year amount, which is an unreasonable and unsupported assumption. Furthermore, under his approach, ETI rates will be set at a level that realizes the full MSS-1 benefit of the EAI-WBL resources (*i.e.,* reduced reliance on the resources of other Operating Companies and a relatively smaller "short" position), while only shouldering a portion of the costs necessary to obtain the benefit.

Q. WHAT IS MR. POLLOCK'S TESTIMONY WITH RESPECT TO THE 2013 EAI-WBL MSS-4 PPA?

A. Mr. Pollock's recommendation is that the 2013 EAI WBL MSS-4 PPA should not be included for recovery in rates set in this case, because "ETI has not yet submitted a new EAI-WBL PPA for Commission review, and Commission review is essential to determine whether this agreement is prudent."[15]

---

[15] Direct Testimony of Jeffry Pollock at *26.*

Mr. Pollock ultimately provides an alternative adjusted amount for this contract which I address below.

Q. HOW DO YOU RESPOND TO MR. POLLOCK'S RECOMMENDATION TO IGNORE 2013 EAI-WBL MSS-4 PPA?

A. Mr. Pollock's recommendation lacks merit. In its first addendum to the response to TIEC 5-1, produced on March 7, 2012, ETI provided the minutes to the March 2, 2012 Entergy Operating Committee meeting, which included, and attached, a presentation regarding this purchase, setting forth the case for EAI and ETI entering into the contract, as well as the information regarding the costs for this purchase to ETI. See Highly Sensitive Exhibit RRC-R-2. Those minutes note that the Operating Committee approved the material terms of the proposed transaction. Notably, Mr. Pollock did not challenge the prudence of the contract. Apparently, however, Mr. Pollock is complaining that the actual signed MSS-4 contract document had not been made part of the filing in this docket (even though the necessity to have a contract in place to file as a rate schedule with the Federal Energy Regulatory Commission has not yet arisen). I consider this form over substance, in that the Entergy Operating Committee had approved the 2013 EAI-WBL MSS-4 PPA, and EAI and ETI had agreed to the substantive terms of that transaction. Additionally, the signed contract provides no more information regarding its terms than

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

was included in the documents previously produced to the parties. Be that as it may, I am attaching as my Exhibit RRC- R-1 a signed copy of the 2013 EAI WBL MSS-4 PPA, which addresses the concerns raised by Mr. Pollock.

Q. PLEASE ADDRESS MR. POLLOCK'S QUANTIFICATION OF HIS RECOMMENDATION TO DISALLOW THE ENTIRETY OF THE 2013 EAI-WBL MSS-4 PPA.

A. Similar to Mr. Pollock's adjustment for all purchased power costs, discussed above, his adjustment for the 2013 EAI-WBL MSS-4 PPA, as reflected in his Exhibit JP-2, incorporates a quantity for MW-months which is less than that provided for in that contract. Mr. Pollock's proposed adjustment is in error in that he incorrectly removes the 2013 EAI-WBL contract for seven months during the rate year, where only five months (January through May) are in the rate year and are therefore subject to the new EAI WBL agreement for that period of time. This results in a $3,059,000 error in Mr. Pollock's recommended disallowance.[16] However, this issue alone only addresses an error in his calculation. As discussed above, I disagree with the substance of his recommendation.

---

[16]  *See* WP/RRC-R/2, which is a modified Exhibit JP-2.

Q.  DO YOU HAVE CONCERNS WITH MR. POLLOCK'S ALTERNATIVE RECOMMENDATION[17] TO DISALLOW ONLY A PORTION OF THE 2013 EAI-WBL MSS-4 PPA?

A.  Yes.  In this alternative, Mr. Pollock also carries forward his error concerning the term of the EAI-WBL agreement, and calculates a seven-month potential disallowance for the rate year.  This causes a $1,679,000 error in the calculation of his alternative recommendation.[18]

Q.  DO YOU HAVE ANY OTHER CONCERNS WITH MR. POLLOCK'S ALTERNATIVE RECOMMENDATION TO DISALLOW A PORTION OF THE 2013 EAI-WBL MSS-4 PPA?

A.  Yes.  Mr. Pollock inexplicably uses a quantity reflecting the lower amount of MW provided in the existing EAI-WBL contract and does not reflect the full value the new contract for the period of January through May 2013.  His adjustments take credit for the lower per-unit costs of the new agreement while ignoring the increased volume.  Mr. Pollock should reflect the full volume of the contract in his calculations, or he should reflect the full costs of the previous contract.  He cannot rationally or reasonably pick and choose among the elements of the contracts he likes while casting out those elements he doesn't like.

---

[17]  Direct Testimony of Jeffry Pollock at p. 27, Footnote 10.

[18]  *See* WP/RRC-R/2.

Entergy Texas, Inc.
Rebuttal Testimony of Robert R. Cooper
Docket No. 39896

## IV. DEPRECIATION AND LIFE OF PLANT

Q. AT PAGE 6 OF HIS TESTIMONY, CITIES WITNESS POUS CLAIMS THAT ETI HAS NO BASIS FOR THE PROPOSED SIXTY-YEAR DEPRECIABLE LIFE FOR SABINE UNITS 4 AND 5. WHAT IS YOUR RESPONSE?

A. Mr. Pous is incorrect. The sixty-year expected lives for Sabine Units 4 and 5 are consistent with current system and ETI resource planning principles and parameters.[19] The sixty-year life for these units was provided to Mr. Watson by ESI resource planning personnel, based on the Entergy System Fossil Deactivation Schedule. This schedule reflects an assessment that, based on "a variety of considerations, including age, operational role, level of funding, unit condition, and operational risk," sixty years constitutes a reasonable "basic threshold" life. In other words, it is reasonable to expect that these plants will be retired no earlier than the age of sixty.[20] The Fossil Deactivation Schedule, however, also states that "[t]his is a long-term planning assumption and does not represent a retirement schedule. These units could possibly migrate to a

---

[19] While Mr. Pous is correct that I did not personally provide the Sabine life information to Company witness Watson, Mr. Pous also recognizes Mr. Watson's statement in his deposition that the information may well have been provided by generation department personnel, without identifying a particular member of that department. Pous Testimony at p. 6, line 21.

[20] The plant lives provided by ESI resource planning personnel are reproduced in Appendix D-1, page 1 of 1, to Mr. Watson's depreciation study.

non-operational status in the next 20 years…. The actual timing of deactivation is uncertain and will likely change."

I would further note that Mr. Pous' assessment of the Sabine Units' depreciable lives assumes a precision in the estimation of such matters that is not reasonably achievable, given how far off the retirement dates are at this point in time. The sixty-year life for Sabine, however, is a reasonable estimate for present purposes. Mr. Pous has not shown otherwise; he has simply chosen a somewhat longer life. Moreover, the difference in lifespans between the Sabine Units and Lewis Creek is fully supported by the fact that a major repair program is planned for the latter, but not the former, as discussed by Company witness Winfred W. Garrison. This distinction is expressly noted in the rationale provided to Mr. Watson supporting the longer life for the Lewis Creek Units.[21]

Q. DOES THIS CONCLUDE YOUR REBUTTAL TESTIMONY?

A. Yes.

---

[21] *Id.*

## AGREEMENT

This Agreement is dated as of April 11, 2012, between Entergy Arkansas, Inc. ("EAI" or "Seller"), and Entergy Texas, Inc. ("ETI" or "Buyer").

WHEREAS, EAI has agreed to make a unit power sale from the designated units set forth on Attachment A (individually a "Designated Unit" and collectively "Designated Units") to ETI; and

WHEREAS, the Agreement among EAI, Entergy Gulf States, Inc. ("EGS"), Entergy Louisiana, LLC, Entergy Mississippi, Inc., Entergy New Orleans, Inc. and Entergy Services, Inc. (hereinafter referred to as the "System Agreement"), was filed with the FERC on April 30, 1982, and became effective on January 1, 1983, and amended to incorporate EGS in 1993 and further amended in 2008 to split EGS into Entergy Gulf States Louisiana, L.L.C., and Entergy Texas, Inc.; and

WHEREAS, by Order dated July 20, 2007, the FERC approved the addition of Entergy Gulf States Louisiana, L.L.C., and ETI as parties to the System Agreement; and

WHEREAS, the System Agreement contains a Service Schedule MSS-4 providing the basis for making a unit power purchase between the Companies that are participants in that Agreement; and

WHEREAS, the parties herein wish to execute this Agreement to provide for a unit power purchase by ETI under Service Schedule MSS-4 from the Designated Units.

THEREFORE, the parties agree as follows:

1.      Unit Power Purchase. Throughout the delivery term set forth in paragraph 2 below, EAI agrees to sell and ETI agrees to purchase that quantity of generating capacity and associated energy from the Designated Units equivalent to the percentage (the "Allocated

1

24

Percentage") of EAI's baseload capacity in each such Designated Unit set forth on Attachment A.

2.    Term. Purchases and sales of capacity and energy under this Agreement shall commence at the beginning of January 1, 2013, and shall continue thereafter through the end of December 18, 2013.

3.    Pricing. The pricing of the capacity and energy to be sold and purchased pursuant to paragraph 1 above shall be as specified in Service Schedule MSS-4 of the System Agreement.

4.    Energy Entitlement. ETI is entitled to receive on an hourly basis the Allocated Percentage of the energy generated by each of the Designated Units.

5.    Termination. Neither party shall have the right to terminate the unit power purchase and sale required by this Agreement without the express written consent of the other party.

6.    Condition Precedent. This Agreement shall be conditioned upon Buyer receiving all regulatory approvals required by Buyer for this Agreement no later than August 1, 2012.

7.    Notices. Unless specifically stated otherwise herein, any notice to be given hereunder shall be sent by Registered Mail, postage prepaid, to the party to be notified at the address set forth below, and shall be deemed given when so mailed.

|  |  |
|---|---|
| To EAI: | Entergy Arkansas, Inc.<br>425 West Capitol Avenue<br>Little Rock, AR 72201<br>ATTN: Chief Executive Officer |
| To ETI: | Entergy Texas, Inc.<br>350 Pine Street<br>Beaumont, TX 77701<br>ATTN: Chief Executive Officer. |

2

25

8.    Nonwaiver. The failure of either party to insist upon or enforce, in any instance, strict performance by the other of any of the terms of this Agreement or to exercise any rights herein conferred or otherwise available to it shall not be considered a waiver or relinquishment to any extent of its rights to assert or rely upon any such terms or rights on any future occasion.

9.    Amendments. No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of both parties (except for waivers, which require the signature of a duly authorized representative of only the waiving party).

10.    Entire Agreement. This Agreement, which is entered into in accordance with the authority of Service Schedule MSS-4 of the System Agreement, constitutes the entire agreement and supersedes all previous and collateral agreements or understandings between the parties with respect to the subject matter hereof.

11.    Severability. It is agreed that if any clause or provision of this Agreement is held by the courts to be illegal or void, the validity of the remaining portions and provisions of the Agreement shall not be affected, and the rights and obligations of the parties shall be enforced as if the Agreement did not contain such illegal or void clauses or provisions.

ENTERGY ARKANSAS, INC.

BY: _____

TITLE: Pres & CEO, EAI

ENTERGY TEXAS, INC.

BY: _____

TITLE: PRES & CEO, ETI

3

26

ATTACHMENT A

SALE OF CAPACITY AND ENERGY

BY ENTERGY ARKANSAS, INC. TO ENTERGY TEXAS, INC.

During the period, January 1, 2013 through December 18, 2013, the capacity and energy amount is as follows:

| DESIGNATED UNITS | EAI's BASELOAD CAPACITY* | EAI's AVAILABLE BASELOAD CAPACITY* | BUYER'S ALLOCATED CAPACITY* | | BUYER'S ALLOCATED PERCENTAGE |
|---|---|---|---|---|---|
| ANO Unit 2 | 989.00 | 84 | 84 | | 100% |
| White Bluff Unit 1 | 465.00 | 39 | 39 | 100% | |
| White Bluff Unit 2 | 481.00 | 41 | 41 | | 100% |
| Independence Unit 1 | 263.00 | 22 | 22 | | 100% |
| TOTAL | | 186 | 186 | | 100% |

*Expressed in megawatts. Whenever and to the extent "EAI's Baseload Capacity" for a Designated Unit increases or decreases, "Buyer's Allocated Capacity" for such Designated Unit shall automatically adjust correspondingly based on Buyer's Allocated Percentage of EAI's Baseload Capacity.

4

27

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
SOAH DOCKET NO. 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
PUC DOCKET NO. 39896 - 2011 ETI Rate Case

Response of:  Entergy Texas, Inc.                   Prepared By:  Counsel
to the Fifth Set of Data Requests              Sponsoring Witness:  Robert R. Cooper
of Requesting Party:  Texas Industrial Energy   Beginning Sequence No.
Consumers

                                                Ending Sequence No.

Question No.:  TIEC 5-1                Part No.:            Addendum:  2

Question:

**Purchased Power Capacity Costs**

ETI's response to TIEC 1-7 stated that "The EAI WBL limited term power purchase agreement was assumed to continue through 2013 based on ETI's need for base load resources and an offer from EAI to extend the terms of the agreement for one year."

a.    Please provide a copy of EAI's offer, including price, terms, and conditions.

b.    How would the economics of the offer be changed when EAI exits the Entergy System Agreement?

c.    Please provide all documents provided to the Operating Committee surrounding EAI's offer.

d.    Please provide any minutes of meetings with the Operating Committee where EAI's offer was discussed.

e.    Please state the status of ETI's evaluation of EAI's offer, including whether any other base load alternatives were considered.

f.    Please provide any formal or informal solicitation or other market analysis comparing EAI's offer to other base load resources.

g.    Please provide a timeline for ETI reaching a decision about the EAI offer.

h.    Please provide a copy of the signed agreement documenting ETI's acceptance of EAI's offer.

Response:

a.    ETI objects on the basis that documents responsive to this RFI (1) may reflect privileged attorney-client communications or work-product, and (2) may be highly sensitive protected materials under the Protective Order issued in this docket. Subject to the objection, the Company has not located a document or documents that include terms of an offer to extend the current "EAI WBL limited term power purchase agreement" referred to in the RFI. ESI is proceeding with the evaluation of the potential purchase by the Entergy System of capacity and energy from certain resources included in EAI's WBL group of resources pursuant to the terms of Service Schedule MSS-4 of the Entergy System Agreement, to begin in January 2013, which, if authorized by the Entergy Operating Committee, could be allocated in whole or in part to ETI.

b, c, d, e, f, g, and h.

See response to subsection a.

**Addendum 1:**

The Company objects to this request on grounds that the responsive materials are highly sensitive protected ("highly sensitive") materials. Specifically, the responsive materials are protected pursuant to Texas Government Code Sections 552.101, 552.104 and/or 552.110. Highly sensitive materials will be provided pursuant to the terms of the Protective Order in this docket.

Please see the attached.

**Addendum 2:**

The Company objects to this request on grounds that the responsive materials are highly sensitive protected ("highly sensitive") materials. Specifically, the responsive materials are protected pursuant to Texas Government Code Sections 552.101, 552.104 and/or 552.110. Highly sensitive materials will be provided pursuant to the terms of the Protective Order in this docket.

Please see the attached CD containing the February 17, 2012 highly sensitive presentation to the Entergy Operating Committee. The minutes of the Entergy Operating Committee (and the associated presentation) reflecting the Operating Committee's decision regarding the 2013 Wholesale Baseload transaction have been previously produced.

This exhibit contains information that is highly sensitive and will be provided under the terms of the Protective Order (Confidentiality Disclosure Agreement) entered in this case.

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | |
| TEXAS, INC. FOR AUTHORITY TO | § | BEFORE THE |
| CHANGE RATES, RECONCILE | § | STATE OFFICE OF |
| FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |
| TREATMENT | § | |

REBUTTAL TESTIMONY

OF

HEATHER G. LEBLANC

ON BEHALF OF

ENTERGY TEXAS, INC.

APRIL 2012

1

ENTERGY TEXAS, INC.
REBUTTAL TESTIMONY OF HEATHER G. LEBLANC
DOCKET NO. 39896


<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Introduction                                                                    1

      A.    Introduction and Qualifications                              1

      B.    Purpose of Rebuttal Testimony                             1

II.   Cost of Service                                                             2

      A.    Municipal Franchise Fees and Miscellaneous Gross
            Receipt Taxes                                                      2

      B.    COS "Flaw"                                                          3

      C.    Updated Schedule P to include PPR in Base Rates      4

      D.    Allocation and Disallowance of Specific Project Codes
            or Accounts                                                         4

      E.    Rebuttal COS Study                                              7

III.  Renewable Energy Credit Rider                                    8

IV.   Transmission Cost Recovery Factor and Distribution Cost
      Recovery Factor                                                        13

V.    Conclusion                                                              14

<u>EXHIBITS</u>

Exhibit HGL-R-1      Company Response to Staff 17-1

Exhibit HGL-R-2      Rebuttal Summary Cost of Service

Exhibit HGL-R-3      Rebuttal Cost of Service Adjustments

Exhibit HGL-R-4      Renewable Energy Credit Rider

## I.     INTRODUCTION

### A.     Introduction and Qualifications

Q.   PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A.   My name is Heather G. LeBlanc.  My business address is 5564 Essen Lane, Baton Rouge, LA 70809. Since filing my direct testimony, my business address has changed.

Q.   DID YOU PREVIOUSLY FILE DIRECT TESTIMONY ON BEHALF OF ENTERGY TEXAS, INC. ("ETI" OR "THE COMPANY") IN THIS PROCEEDING?

A.   Yes, I did.

Q.   DO YOU SPONSOR ANY EXHIBITS OR SCHEDULES IN THIS FILING?

A.   I sponsor the Exhibits listed in the Table of Contents.

### B.     Purpose of Rebuttal Testimony

Q.   WHAT IS THE PURPOSE OF THIS TESTIMONY?

A.   The purpose of my rebuttal testimony is to address several issues in response to Intervernor and Staff direct testimony.  First, I will address issues pertaining to the cost of service (COS) model as raised by Intervenor witnesses Pollock, Chriss, and Szerszen as well as discuss and sponsor the Company's rebuttal COS Study.  Secondly, I will address issues about the Company's Renewable Energy Credit ("REC") Rider as

discussed by Intervenor witnesses Pevoto, Nalepa, and Benedict and Staff witness Abbott. Next, I will address the establishment of the Transmission Cost Recovery Factor ("TCRF") and the Distribution Cost Recovery Factor ("DCRF") as discussed by Mr. Chriss and Cities witness Mr. Brazell.

## II. COST OF SERVICE

### A. Municipal Franchise Fees and Miscellaneous Gross Receipt Taxes

Q. MR. POLLOCK, ON BEHALF OF TIEC, MAKES SEVERAL RECOMMENDATIONS REGARDING TWO ALLEGED "FLAWS" IN THE COMPANY'S COST OF SERVICE STUDY WHEN ALLOCATING MUNICIPAL FRANCHISE FEES AND MISCELLANEOUS GROSS RECEIPTS TAXES (PAGES 51-62). DO YOU AGREE WITH HIS RECOMMENDATIONS?

A. I do not agree with Mr. Pollock's recommendation to allocate these costs using a "Direct" method to only customers inside the city limits. It is the Company's position that these costs should be allocated to the rate classes according to cost of service practices to ensure overall consistent treatment of these costs.

4

Q.   WHY SHOULD THESE COSTS BE ALLOCATED ACROSS ALL RETAIL RATE CLASSES?

A.   Because these costs, regardless of their physical location, benefit all customers within a given jurisdiction.  Customers outside of a cities' limits benefit from the services (and streets and other facilities) provided within the city limits because they invariably use those facilities when they travel to the cities to use services (e.g., grocery stores, banks, shopping centers, etc.) within the city limits.

## B.    COS "Flaw"

Q.   MR. POLLOCK VAGUELY MENTIONS A THIRD "FLAW" IN A FOOTNOTE ON PAGE 52 OF HIS TESTIMONY.  DO YOU AGREE WITH HIS ALLEGATION?

A.   No, and his testimony presents a confusing analysis on the issue.  In that footnote, Mr. Pollock states: "I am not addressing a third flaw: the failure to classify any distribution network investment as customer-related.  The reasons for doing so are discussed in Appendix C."  Mr. Pollock states that he is not going to address the perceived "flaw," but then continues by adding a five page appendix to discuss this issue.  However, after reviewing Appendix C, Mr. Pollock does indeed agree with the Company's classification of distribution costs.  Mr. Pollock states: "Customer-related costs vary directly with the number of customers and include expenses such as meters, service drops, billing, and customer service" (pg 102,

lines 1-3, Appendix C). The Company has classified all of these costs as customer-related. There is no "flaw" in classifying distribution network investment. The Company has produced a properly conducted class cost of service study in accordance with industry accepted principles as well as previous regulatory filings with the PUCT.

### C. Updated Schedule P to include PPR in Base Rates

Q. MR. CHRISS, ON BEHALF OF WAL-MART, STATES THAT THE COMPANY'S SCHEDULE P REQUIRES UPDATING IN ORDER TO COMPLY WITH THE SUPPLEMENTAL PRELIMINARY ORDER REGARDING THE PURCHASE POWER RIDER (PG 4). PLEASE ADDRESS HIS CONTENTION.

A. In response to Staff RFI 17-1, the Company presented a Summary of Schedule P that includes the purchased capacity costs included in base rates. I have attached that response and its attachments as my Exhibit HGL-R-1. ETI, therefore, has presented a summary that addresses Mr. Chriss' concerns.

### D. Allocation and Disallowance of Specific Project Codes or Accounts

Q. DOES ANY WITNESS PROPOSE TO DIRECTLY ASSIGN SPECIFIC COSTS TO SPECIFIC RATE CLASSES?

A. Yes, OPUC witness Szerszen, at pages 44-45 of her direct testimony, recommends that affiliate costs associated with larger industrial and

commercial sales, marketing, customer services, and other expenses should be directly assigned to general service, large general service, industrial and lighting classes.

Q.  DOES DR. SZERSZEN MAKE ANY OTHER RECOMMENDATIONS CONCERNING SPECIFIC PROJECT CODES?

A.  Yes.  On her pages 73 – 74, Dr. Szerszen claims that the retail customers were inappropriately charged certain wholesale costs and these costs should be disallowed.

Q.  WHAT IS THE COMPANY'S POSITION REGARDING DR. SZERSZEN'S RECOMMENDATIONS OF DIRECTLY ASSIGNING AND DISALLOWING THESE COSTS?

A.  These issues should be addressed together as they both pertain to the same cost of service guidelines.  The approach that Dr. Szerszen took is often referred to as "cherry-picking" of costs.  She has taken a limited sample of costs and deemed them as being allocated inappropriately.  An approach such as Dr. Szerszen's would be appropriate if an analysis of all project codes was conducted to determine which individual projects should be assigned to particular rate classes.  However, to directly assign a handful of costs is not feasible or appropriate.

The cost of service study generally allocates costs at the FERC account level.  There are instances where project codes within an account

are looked at on an individual basis. One example is FERC account 928, Regulatory Commission Expense. The project codes charged to this particular account can be clearly designated to specific functions and / or rate classes. However, to do this detailed of an analysis on every FERC account within the cost of service study would be more precise, but also extremely tedious and manpower intensive, and would not guarantee a reallocation away from the residential rate class, as appears to be Dr. Szerszen's objective. Moreover, there are numerous project codes within each FERC account. There will be some project codes that are clearly noted as Retail Only that will have portions allocated to the Wholesale jurisdiction. For these reasons, the Company disagrees with Dr. Szerszen's cherry-picking approach to directly allocate or disallow specific project codes.

Q. STAFF WITNESS ABBOTT RECOMMENDS DIFFERENT ALLOCATION FACTORS FOR 408.152 FRANCHISE TAX STATE, 408.154 FRANCHISE TAX LOCAL, AND 408.163 – STREET RENTAL ON PAGE 22 OF HIS DIRECT TESTIMONY. DO YOU AGREE WITH HIS RECOMMENDATION?

A. No, the Company believes that these FERC accounts are allocated properly and in accordance with past filings made at the PUCT.

## E.    Rebuttal COS Study

Q.    IS THE COMPANY FILING A REBUTTAL COST OF SERVICE?

A.    Yes.  The Company is filing a Summary of Schedule P.

Q.    PLEASE EXPLAIN THE RESULTS OF THIS STUDY.

A.    The summary cost of service study presented in Exhibit-R-HGL-2 indicates that the annual retail base rate schedule revenue requirement, excluding eligible fuel and purchase power expenses is $732 million.  This represents a $103.6 million retail revenue deficiency under the Company's currently effective rates, as shown on Exhibit-R-HGL-2, line 20, page 1.  But this revenue requirement does not include the Renewable Energy Credit Rider.  Including those expenses results in an overall retail revenue deficiency of $104.8 million.

Q.    PLEASE LIST THE ADJUSTMENTS AND SPONSORING WITNESS FOR EACH ADJUSTMENT MADE TO THE COST OF SERVICE FROM THE FILED BASE CASE.

A.    The adjustments and their sponsoring witnesses are listed in Table 1 below.

Table 1

| Description | Witness | Adjustment Number |
|---|---|---|
| Rate Schedule Revenues | LeBlanc & Talkington | AJ 1 |
| Rate Case Expense | Severed per agreement with parties | AJ 11 |
| Depreciation Expense | Watson | AJ 14 |
| Non-Affiliate Executive Perks | Accepting proposed adjustment | AJ 16E |
| Affiliate Expense | Tumminello | AJ 21 |
| PPR Rider | Cooper | AJ 24 |
| Cash Working Capital | Joyce | AJ 6 |
| Interest Synchronization | Considine | AJ 17 |

The incremental dollar amounts and line items affected are listed in Exhibit-HGL-R-3.

Q.    PLEASE EXPLAIN THE ADJUSTMENT YOU ARE CO-SPONSORING.

A.    In Adjustment 1, the Rate Schedule Revenues were adjusted to $628,441,841 in order to include the Interruptible Service Credit of $5,672,401 in Rate Schedule Revenues.

### III.    RENEWABLE ENERGY CREDIT RIDER

Q.    IS AN UPDATE TO THE COMPANY'S RENEWABLE ENERGY CREDIT ("REC") COSTS APPROPRIATE?

A.    Yes.    Intervenors and Staff have recommended changes to the Company's REC Rider proposal.  If any changes are to be considered, then updating the REC costs to reflect most current data available should be considered as well.

Q. PLEASE DISCUSS THE UPDATE YOU PROPOSE FOR THE REC RIDER.

A. Events following the Company's initial filing in November 2011 caused the costs associated with the renewable energy credits to increase. Therefore, it is appropriate to update the REC Rider to the appropriate level. The updated amount is $1,145,043. Applying the revenue-related expense factor of 1.0137 yields an updated revenue requirement of $1,160,008. This amount is then divided by all non-transmission level kWh sales from RFP Schedule Q-7, as provided by Company witness Talkington. The resulting rate is reflected in Attachment A of Exhibit HGL-R-4.

Q. GIVEN THE UPDATED AMOUNTS, SHOULD THESE COSTS STILL BE RECOVERED THROUGH A RIDER MECHANISM?

A. Yes. The updated amounts further support the Company's position that REC costs are volatile. In a little over four months since ETI filed this case in November 2011, these costs have almost doubled. Table 2 below shows the annual REC costs that were incurred by or on behalf of ETI over the past six years (RFI State 4-10, updated for 2011).

Table 2

| Year | Amount |
|------|--------|
| 2006 | 323,561 |
| 2007 | 390,864 |
| 2008 | 873,064 |
| 2009 | 691,116 |
| 2010 | 378,469 |
| 2011 | 1,145,043 |

Table 2 proves the volatility of these costs. If in the current rate case, the Company is ordered to move $1,160,008 associated with REC costs into base rates, this could be detrimental to customers when compared to a year such as 2010 when the costs were roughly one-fourth of the amount that would be in base rates.

Q.   DO INTERVENOR AND STAFF WITNESSES RAISE SOME COMMON OBJECTIONS TO ETI'S PROPOSED REC RIDER?

A.   Yes. Intervenor witnesses Pevoto, Nalepa, and Benedict, and Staff witness Abbott, all request that the REC Rider be denied because it represents "piecemeal ratemaking." I disagree with their positions and for the reasons stated above and in my direct testimony, these costs are best recovered through a rider. The costs in this rider are costs that ETI cannot control – they are mandated through statute and the REC calculation

mechanism established by the PUCT. Cities witness Brazell even conceded in his deposition in this docket that these types of costs—costs not within the control of the Company—are appropriate for recovery through a rider mechanism. See pages 79-80 of Mr. Brazell's April 4 deposition in this docket.

Q. ARE THERE ANY OTHER COMMONALITIES AMONG THE WITNESSES?

A. Yes. Both Staff witness Abbott (page 12) and State witness Pevoto (page 9) state that if the costs are moved into a rider, then there is a potential to for "double counting" or "over recovery".

Q. WHAT IS YOUR OPINION ON "DOUBLE COUNTING" OR "OVER RECOVERY"?

A. I disagree that "double counting" or "over recovery" could potentially exist if these costs are moved to a rider. I believe the greater risk for over recovery is if these costs are kept in base rates. As shown in Table 2 on page 10, years 2010 and 2011 are excellent examples of why these costs should be moved into the REC Rider.

Q.  INTERVENOR WITNESS BENEDICT AT HIS PAGE 38 INDICATES THAT THE USE OF RIDERS "REDUCES THE INCENTIVE OF THE UTILITY TO CONSTRAIN COSTS." DO YOU AGREE?

A.  No. Even with the proposed REC Rider, the Company is only allowed to recover its reasonable and necessary costs. Accordingly, the Company has and will continue to be incented to be mindful of the costs incurred and is aware that these costs and any savings could be passed to the customers.

Q.  ON PAGE 15 OF HIS TESTIMONY, MR. ABBOTT RECOMMENDS THAT THE PREVIOUS YEAR'S ACTUAL REC COST SHOULD BE ALLOCATED TO EACH CUSTOMER CLASS BASED UPON EACH CLASS'S ACTUAL ENERGY USAGE OVER THE TIME PERIOD FOR WHICH THE RECS WERE ACQUIRED. DO YOU HAVE ANY ISSUE WITH THIS RECOMMENDATION?

A.  I'm not sure exactly what is being recommended but I do not have an issue with his recommendation if he means over the year in which the obligation to purchase RECs is generated and not when they are actually purchased to satisfy that obligation. Substantive rule 25.173 (d)(1) and (h) shows that the obligation to procure RECs is based on the historical usage during the compliance year so the energy use during that period seems logical. The REC purchases typically are not ratable over the year nor do they even have to be in the same year as the obligation is imposed so that doesn't seem to be the best allocation methodology.

IV.  TRANSMISSION COST RECOVERY FACTOR AND DISTRIBUTION COST RECOVERY FACTOR

Q.  INTERVENOR WITNESS CHRISS (PAGE 7) STATES THAT IMPLEMENTATION OF TCRF AND DCRF WOULD MOVE APPROXIMATELY $238 MILLION OF ETI'S REVENUE REQUIREMENT FROM BASE RATES TO EXACT RECOVER RIDERS.  IS THIS A TRUE STATEMENT?

A.  No, it is not.

Q.  PLEASE EXPLAIN THE INTENT OF THE COMPANY'S PROPOSAL REGARDING THE TCRF AND DCRF.

A.  ETI is asking the Commission to establish in this docket the baseline values that will be used to calculate ETI's transmission cost recovery factor and distribution cost recovery factor in future dockets.  This is exactly the issue the Commission identified in its Supplemental Preliminary Order as an issue to be addressed in this proceeding.

Q.  CITIES WITNESS BRAZELL AND STAFF WITNESS ABBOTT STATE THAT IT WOULD BE REASONABLE TO DETERMINE THE BASELINE VALUES DURING THE COMPLIANCE PHASE OF THIS HEARING.  WHAT IS THE COMPANY'S POSITION?

A.  ETI agrees that the baseline values can be established during the compliance phase, however there are some concerns.  Depending on the

nature of the final agreement this may or may not be possible. If there is lack of specificity in the PFD or in a settlement, then there is not a clear way to determine what costs will be adjusted to reach the settled revenue requirement. To reach a true compliance cost of service, which is the basis for these costs, a full list of adjustments would be needed.

## V. <u>CONCLUSION</u>

Q. DOES THIS CONCLUDE YOUR REBUTTAL TESTIMONY?

A. Yes.

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
SOAH DOCKET NO. 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
PUC DOCKET NO. 39896 - 2011 ETI Rate Case

Response of: Entergy Texas, Inc.   Prepared By: Heather G. LeBlanc
to the Seventeenth Set of Data Requests Sponsoring Witness: Heather G. LeBlanc
of Requesting Party: Commission Staff  Beginning Sequence No.
               Ending Sequence No.

Question No.: Staff 17-1     Part No.:    Addendum:

Question:

  By FERC account and subaccounts in the Schedule P format, please provide all costs included in the Company's original request for a Purchased Power Recovery Rider which the Company is now seeking to be recovered through base rates. For each cost, also provide the Company's requested allocation factor along with the allocated dollar amounts to each requested customer class.

Response:

This request has been modified be agreement between PUCT Staff and the Company.

Please see the attached CD for the following files:

Staff 17-1 - SCH_P_Summary_of_Results-2012-0320.xls
Staff 17-1 - Alloc of Line Item Adjustments to include PPR.xlsx

**Entergy Texas, Inc.**
Rate Case
**Summary Model Results - Revenue Requirement Calculation**
ETICOS0611 - Analyst1_v2 - Electric
For the Test Year Ended June 30, 2011

## SUMMARY OF RESULTS

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| 1 RATE BASE | RBTOA | 1,279,186,389 | 457,511,540 | 1,736,697,930 | 1,714,972,039 | 986,918,408 | 54,907,193 |
| REVENUES | | | | | | | |
| 2 RATE SCHEDULE REVENUE | RSRTOA | 1,239,877,095 | (591,857,546) | 648,019,550 | 634,114,242 | 325,744,455 | 22,562,013 |
| 3 OTHER SALES FOR RESALE | RSORTOA | 314,299,128 | (255,623,968) | 58,675,159 | 55,966,597 | 27,841,011 | 1,231,592 |
| 4 TOTAL SALES REVENUES (L2 + L3) | RSTOA | 1,554,176,223 | (847,481,514) | 706,694,709 | 690,080,839 | 353,585,466 | 23,793,605 |
| 5 OTHER OPERATING REVENUES | ROTOA | 33,511,398 | 14,660,594 | 48,171,991 | 47,809,873 | 25,549,679 | 1,268,006 |
| 6 PROVISION FOR RATE REFUND | PROVRRTOA | 672,315 | (672,315) | 0 | 0 | 0 | 0 |
| 7 TOTAL REVENUES (L4 + L5 + L6) | RTOA | 1,588,359,936 | (833,493,235) | 754,866,701 | 737,890,713 | 379,135,145 | 25,061,611 |
| 8 TOTAL OPERATING EXPENSES | OETOA | 1,466,927,253 | (787,915,619) | 679,011,634 | 659,867,023 | 345,805,968 | 20,546,474 |
| 9 TOTAL OPERATING INCOME (L7 - L8) | OITOA | 121,432,682 | (45,577,616) | 75,855,067 | 78,023,689 | 33,329,177 | 4,515,137 |
| 10 EARNED RATE OF RETURN ON RATE BASE (L9 / L1) | EROR | | | 4.37% | 4.55% | 3.38% | 8.22% |
| REVENUE REQUIREMENT DETERMINATION | | | | | | | |
| 11 REQUIRED RATE OF RETURN | ROR | | | 8.67% | 8.67% | 8.67% | 8.67% |
| 12 REQUIRED OPERATING INCOME (L1 * L11) | ROI | | | 150,542,128 | 148,658,863 | 85,549,015 | 4,759,518 |
| REVENUE CONVERSION FACTORS | | | | | | | |
| 13 INCOME TAX REVENUE CONVERSION FACTOR | REVCOFIT | | | 53.85% | 53.85% | 53.85% | 53.85% |
| 14 REVENUE RELATED TAX REVENUE CONVERSION FACTOR | REVCOFRT | | | 1.03% | 1.03% | 1.03% | 1.03% |
| 15 REVCOFBD-BAD DEBT REVENUE CONVERSION FACTOR | REVCOFBD | | | 0.41% | 0.43% | 0.53% | 0.21% |
| REVENUE DEFICIENCY | | | | | | | |
| 16 OPERATING INCOME DEFICIENCY (L12 - L9) | OIDEF | | | 74,687,061 | 70,635,174 | 52,219,838 | 244,381 |
| 17 INCREMENTAL INCOME TAX (L16 * L13) | ITDEF | | | 40,216,110 | 38,034,325 | 28,118,374 | 131,590 |
| 18 INCREMENTAL REVENUE RELATED TAX (L16 + L17 + L19) * L14 | RTDEF | | | 1,186,860 | 1,122,736 | 830,874 | 3,876 |
| 19 INCREMENTAL BAD DEBT EXPENSE (L16 + L17 + L18) * L15 | BDDEF | | | 474,506 | 474,506 | 433,118 | 805 |
| 20 TOTAL REVENUE DEFICIENCY/(EXCESS) (SUM OF L16 - L19) | REVDEF | | | 116,564,538 | 110,266,741 | 81,602,204 | 380,653 |
| 21 % INCREASE/(DECREASE) (L20 / L2) | REVDEFPCT | | | 17.99% | 17.39% | 25.05% | 1.69% |
| 22 RATE SCHEDULE REVENUE REQUIREMENT (L2 + L20) | REVREQ | | | 764,584,087 | 744,380,983 | 407,346,659 | 22,942,666 |

18

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue Requirement Calculation**
**ETICOS0611 - Analyst1_v2 - Electric**
**For the Test Year Ended June 30, 2011**

## SUMMARY OF RESULTS

| | LINE ITEM NAME | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|
| 1 | RATE BASE | RBTOA | 354,952,484 | 119,866,792 | 178,557,355 | 19,769,808 | 21,725,890 | 21,725,890 |
| | REVENUES | | | | | | | |
| 2 | RATE SCHEDULE REVENUE | RSRTOA | 135,404,167 | 42,430,160 | 100,482,959 | 7,490,488 | 13,905,308 | 13,905,308 |
| 3 | OTHER SALES FOR RESALE | RSORTOA | 10,576,726 | 4,153,849 | 11,993,261 | 170,158 | 2,708,563 | 2,708,563 |
| 4 | TOTAL SALES REVENUES (L2 + L3) | RSTOA | 145,980,893 | 46,584,009 | 112,476,220 | 7,660,646 | 16,613,870 | 16,613,870 |
| 5 | OTHER OPERATING REVENUES | ROTOA | 9,722,781 | 3,587,550 | 7,401,304 | 280,553 | 362,118 | 362,118 |
| 6 | PROVISION FOR RATE REFUND | PROVRRTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | TOTAL REVENUES (L4 + L5 + L6) | RTOA | 155,703,673 | 50,171,559 | 119,877,524 | 7,941,199 | 16,975,988 | 16,975,988 |
| 8 | TOTAL OPERATING EXPENSES | OETOA | 129,565,415 | 44,904,223 | 111,422,608 | 7,622,337 | 19,144,610 | 19,144,610 |
| 9 | TOTAL OPERATING INCOME (L7 - L8) | OITOA | 26,138,259 | 5,267,337 | 8,454,917 | 318,863 | (2,168,622) | (2,168,622) |
| 10 | EARNED RATE OF RETURN ON RATE BASE (L9 / L1) | EROR | 7.36% | 4.39% | 4.74% | 1.61% | -9.98% | -9.98% |
| | REVENUE REQUIREMENT DETERMINATION | | | | | | | |
| 11 | REQUIRED RATE OF RETURN | ROR | 8.67% | 8.67% | 8.67% | 8.67% | 8.67% | 8.67% |
| 12 | REQUIRED OPERATING INCOME (L1 * L11) | ROI | 30,768,334 | 10,390,409 | 15,477,881 | 1,713,706 | 1,883,265 | 1,883,265 |
| | REVENUE CONVERSION FACTORS | | | | | | | |
| 13 | INCOME TAX REVENUE CONVERSION FACTOR | REVCOFIT | 53.85% | 53.85% | 53.85% | 53.85% | 53.85% | 53.85% |
| 14 | REVENUE RELATED TAX REVENUE CONVERSION FACTOR | REVCOFRT | 1.03% | 1.03% | 1.03% | 1.03% | 1.03% | 1.03% |
| 15 | REVCOFBD-BAD DEBT REVENUE CONVERSION FACTOR | REVCOFBD | 0.07% | 0.02% | 0.00% | 1.59% | 0.00% | 0.00% |
| | REVENUE DEFICIENCY | | | | | | | |
| 16 | OPERATING INCOME DEFICIENCY (L12 - L9) | OIDEF | 4,630,076 | 5,123,072 | 7,022,964 | 1,394,843 | 4,051,887 | 4,051,887 |
| 17 | INCREMENTAL INCOME TAX (L16 * L13) | ITDEF | 2,493,118 | 2,758,577 | 3,781,596 | 751,069 | 2,181,785 | 2,181,785 |
| 18 | INCREMENTAL REVENUE RELATED TAX (L16 + L17 + L19) * L14 | RTDEF | 73,323 | 81,090 | 111,144 | 22,429 | 64,124 | 64,124 |
| 19 | INCREMENTAL BAD DEBT EXPENSE (L16 + L17 + L18) * L15 | BDDEF | 4,729 | 1,339 | 0 | 34,514 | 0 | 0 |
| 20 | TOTAL REVENUE DEFICIENCY/(EXCESS) (SUM OF L16 - L19) | REVDEF | 7,201,246 | 7,964,079 | 10,915,704 | 2,202,856 | 6,297,796 | 6,297,796 |
| 21 | % INCREASE/(DECREASE) (L20 / L2) | REVDEFPCT | 5.32% | 18.77% | 10.86% | 29.41% | 45.29% | 45.29% |
| 22 | RATE SCHEDULE REVENUE REQUIREMENT (L2 + L20) | REVREQ | 142,605,413 | 50,394,239 | 111,398,663 | 9,693,344 | 20,203,104 | 20,203,104 |

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Rate Base**
**ETICOS0611 - Analyst1_v2 - Electric**
**For the Test Year Ended June 30, 2011**

### RATE BASE SUMMARY

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| 1 | PLANT IN SERVICE — PLTOA | 3,521,368,187 | (251,512,491) | 3,269,855,696 | 3,214,655,566 | 1,822,148,430 | 99,550,493 |
| 2 | ACCUMULATED DEPRECIATION / AMORTIZATION — ADTOA | (1,417,946,172) | 148,061,290 | (1,269,884,882) | (1,237,578,961) | (671,739,109) | (35,984,479) |
| 3 | NET PLANT — NPSUM | 2,103,422,015 | (103,451,201) | 1,999,970,814 | 1,977,076,605 | 1,150,409,322 | 63,566,014 |
| 4 | WORKING CASH — WCTOA | 0 | (6,412,426) | (6,412,426) | (6,333,831) | (3,644,842) | (202,781) |
| 5 | FUEL INVENTORY — FITOA | 53,759,975 | 0 | 53,759,975 | 51,659,936 | 18,378,438 | 1,024,050 |
| 6 | MATERIALS AND SUPPLIES EXCLUDING ALLOWANCES — MSXATOA | 29,252,574 | 0 | 29,252,574 | 28,757,611 | 16,235,399 | 870,236 |
| 7 | PREPAYMENTS — PPTOA | 7,366,433 | (148,396) | 7,218,037 | 7,189,330 | 3,770,893 | 250,952 |
| 8 | PROPERTY INSURANCE RESERVE — PIRTOA | 0 | 59,799,744 | 59,799,744 | 59,799,744 | 35,480,832 | 2,023,572 |
| 9 | INJURIES & DAMAGES RESERVES — IDRTOA | (5,569,243) | 0 | (5,569,243) | (5,416,100) | (3,033,169) | (209,183) |
| 10 | COAL CAR MAINTENANCE RESERVE — CCMRTOA | 1,400,350 | 0 | 1,400,350 | 1,345,648 | 478,725 | 26,675 |
| 11 | UNFUNDED PENSION — PENTOA | (53,715,841) | 109,689,386 | 55,973,545 | 54,434,394 | 30,484,797 | 2,102,391 |
| 12 | ALLOWANCES — AINTOA | 68,914 | 0 | 68,914 | 67,750 | 38,403 | 2,098 |
| 13 | COMMERCIAL LITIGATION — APCLTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | ENVIRONMENTAL RESERVES — ERTOA | 3,412,379 | (4,474,569) | (1,062,190) | (1,045,604) | (636,741) | (38,360) |
| 15 | CUSTOMER DEPOSITS — CDTOA | (35,872,476) | 0 | (35,872,476) | (35,872,476) | (20,615,725) | (1,147,023) |
| 16 | ACCUMULATED DEFERRED INCOME TAXES — ADITTOA | (824,338,691) | 369,967,144 | (454,371,547) | (448,802,444) | (258,266,098) | (14,368,648) |
| 17 | ACCUMULATED DEFERRED ITC — ADITCTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | RATE CASE EXPENSES — RCETOA | 0 | 6,175,000 | 6,175,000 | 6,175,000 | 3,172,097 | 219,709 |
| 19 | REGULATORY ASSETS AND LIABILITIES — REGASSLIABTOA | 0 | 26,366,859 | 26,366,859 | 25,936,479 | 14,666,077 | 787,491 |
| 20 | **RATE BASE** — RBTOA | 1,279,186,389 | 457,511,540 | 1,736,697,930 | 1,714,972,039 | 986,918,408 | 54,907,193 |

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Rate Base**
**ETICOS0611 - Analyst1_v2 - Electric**
**For the Test Year Ended June 30, 2011**

### RATE BASE SUMMARY

| # | LINE ITEM NAME | | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|---|
| 1 | PLTOA | PLANT IN SERVICE | 654,061,437 | 224,673,016 | 377,286,581 | 36,935,609 | 55,200,130 | 55,200,130 |
| 2 | ADTOA | ACCUMULATED DEPRECIATION / AMORTIZATION | (243,142,466) | (87,152,791) | (184,605,312) | (14,954,805) | (32,305,921) | (32,305,921) |
| 3 | NPSUM | NET PLANT | 410,918,971 | 137,520,225 | 192,681,269 | 21,980,804 | 22,894,209 | 22,894,209 |
| 4 | WCTOA | WORKING CASH | (1,310,915) | (442,703) | (659,588) | (73,002) | (78,595) | (78,595) |
| 5 | FITOA | FUEL INVENTORY | 10,698,216 | 4,957,497 | 16,347,084 | 254,651 | 2,100,040 | 2,100,040 |
| 6 | MSXATOA | MATERIALS AND SUPPLIES EXCLUDING ALLOWANCES | 5,912,135 | 2,039,395 | 3,402,831 | 297,614 | 494,963 | 494,963 |
| 7 | PPTOA | PREPAYMENTS | 1,509,688 | 481,613 | 1,085,699 | 90,485 | 28,708 | 28,708 |
| 8 | PIRTOA | PROPERTY INSURANCE RESERVE | 12,726,075 | 4,156,236 | 4,608,099 | 804,929 | 0 | 0 |
| 9 | IDRTOA | INJURIES & DAMAGES RESERVES | (893,064) | (300,039) | (796,855) | (183,790) | (153,142) | (153,142) |
| 10 | CCMRTOA | COAL CAR MAINTENANCE RESERVE | 278,669 | 129,134 | 425,812 | 6,633 | 54,702 | 54,702 |
| 11 | PENTOA | UNFUNDED PENSION | 8,975,716 | 3,015,531 | 8,008,777 | 1,847,182 | 1,539,151 | 1,539,151 |
| 12 | AINTOA | ALLOWANCES | 13,785 | 4,735 | 7,951 | 778 | 1,163 | 1,163 |
| 13 | APCLTOA | COMMERCIAL LITIGATION | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | ERTOA | ENVIRONMENTAL RESERVES | (224,741) | (69,318) | (59,250) | (17,194) | (16,586) | (16,586) |
| 15 | CDTOA | CUSTOMER DEPOSITS | (7,420,226) | (2,508,469) | (3,770,974) | (410,059) | 0 | 0 |
| 16 | ADITTOA | ACCUMULATED DEFERRED INCOME TAXES | (92,888,750) | (31,369,042) | (46,737,103) | (5,172,803) | (5,569,102) | (5,569,102) |
| | ADITCTOA | ACCUMULATED DEFERRED ITC | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | RCETOA | RATE CASE EXPENSES | 1,318,565 | 413,185 | 978,502 | 72,942 | 0 | 0 |
| 19 | REGASSLIABTOA | REGULATORY ASSETS AND LIABILITIES | 5,338,361 | 1,838,812 | 3,035,101 | 270,637 | 430,380 | 430,380 |
| 20 | RBTOA | RATE BASE | 354,952,484 | 119,866,792 | 178,557,355 | 19,769,808 | 21,725,890 | 21,725,890 |

21

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue/Expenses**
**ETICOS0611 - Analyst1_v2 - Electric**
**For the Test Year Ended June 30, 2011**

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| 1 SALES REVENUES | RSTOA | 1,554,176,223 | (847,481,514) | 706,694,709 | 690,080,839 | 353,585,466 | 23,793,605 |
| 2 OTHER OPERATING REVENUES | ROTOA | 33,511,398 | 14,660,594 | 48,171,991 | 47,809,873 | 25,549,679 | 1,268,006 |
| 3 PROVISION FOR RATE REFUND | PROVRRTOA | 672,315 | (672,315) | 0 | 0 | 0 | 0 |
| 4 **TOTAL REVENUES** | RTOA | 1,588,359,936 | (833,493,235) | 754,866,701 | 737,890,713 | 379,135,145 | 25,061,611 |
| **OPERATING EXPENSES** | | | | | | | |
| O & M EXPENSE | | | | | | | |
| 5 PRODUCTION EXPENSES | OMPTOA | 1,125,799,286 | (796,127,791) | 329,671,495 | 314,874,032 | 153,643,756 | 6,884,606 |
| 6 TRANSMISSION EXPENSES | OMTTOA | 20,129,762 | 9,578,390 | 29,708,152 | 29,708,152 | 15,211,581 | 672,973 |
| 7 REGIONAL MARKET EXPENSES | | | | | | | |

22

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue/Expenses**
ETICOS0611 - Analyst1_v2 - Electric
For the Test Year Ended June 30, 2011

| | LINE ITEM NAME | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|
| | **REVENUES** | | | | | | |
| 1 | SALES REVENUES RSTOA | 145,980,893 | 46,584,009 | 112,476,220 | 7,660,646 | 16,613,870 | 16,613,870 |
| 2 | OTHER OPERATING REVENUES ROTOA | 9,722,781 | 3,587,550 | 7,401,304 | 280,553 | 362,118 | 362,118 |
| 3 | PROVISION FOR RATE REFUND PROVRRTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | **TOTAL REVENUES** RTOA | 155,703,673 | 50,171,559 | 119,877,524 | 7,941,199 | 16,975,988 | 16,975,988 |
| | **OPERATING EXPENSES** | | | | | | |
| | O & M EXPENSE | | | | | | |
| 5 | PRODUCTION EXPENSES OMPTOA | 59,917,175 | 23,846,510 | 69,583,655 | 998,330 | 14,797,463 | 14,797,463 |
| 6 | TRANSMISSION EXPENSES OMTTOA | 5,779,533 | 2,269,972 | 5,681,126 | 92,967 | 0 | 0 |
| 7 | REGIONAL MARKET EXPENSES OMRTOTOA | 809,392 | 317,898 | 726,182 | 13,020 | 3,424 | 3,424 |
| 8 | DISTRIBUTION EXPENSES OMDTOA | 6,581,316 | 1,900,391 | 922,834 | 1,866,491 | 294,962 | 294,962 |
| 9 | CUSTOMER ACCOUNTING EXPENSES OMCATOA | 1,120,648 | 91,700 | 1,186,772 | 225,254 | 761,839 | 761,839 |
| 10 | CUSTOMER SERVICES EXPENSES OMCSTOA | 190,364 | 3,587 | 328,180 | 16,692 | 0 | 0 |
| 11 | SALES EXPENSES OMSTOA | 225,134 | 77,492 | 127,620 | 11,453 | 18,243 | 18,243 |
| 12 | ADMINISTRATIVE & GENERAL EXPENSES OMAGTOA | 13,465,718 | 4,614,565 | 11,648,151 | 2,246,027 | 2,177,391 | 2,177,391 |
| 13 | OPERATION & MAINTENANCE EXPENSE OMTOA | 88,089,280 | 33,122,116 | 90,204,519 | 5,470,235 | 18,053,321 | 18,053,321 |
| 14 | GAINS FROM DISP OF ALLOWANCES GFDATOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | REGULATORY DEBITS AND CREDITS RDCTOA | 945,625 | 371,380 | 1,072,272 | 15,213 | 242,162 | 242,162 |
| 16 | INTEREST ON CUSTOMER DEPOSITS ICDTOA | 14,270 | 4,824 | 7,252 | 789 | 0 | 0 |
| 17 | DEPRECIATION AND AMORTIZATION EXPENSE DXTOA | 19,448,711 | 6,373,998 | 9,904,303 | 1,299,833 | 1,531,353 | 1,531,353 |
| 18 | TAXES OTHER THAN INCOME TOTOA | 12,628,896 | 4,159,983 | 8,441,856 | 804,987 | 638,529 | 638,529 |
| | CURRENT INCOME TAXES | | | | | | |
| 19 | FEDERAL INCOME TAX FTTOA | 5,840,131 | (18,333) | 85,908 | (234,027) | (1,719,958) | (1,719,958) |
| 20 | STATE INCOME TAX STTOA | (6,051) | (2,033) | (5,399) | (1,245) | (1,038) | (1,038) |
| 21 | CURRENT INCOME TAXES CITTOA | 5,834,080 | (20,366) | 80,509 | (235,272) | (1,720,995) | (1,720,995) |
| | PROVISION FOR DEFERRED INCOME TAXES | | | | | | |
| 22 | PROVISION FOR DEFERRED INCOME TAXES - FEDERAL DTFTOA | 2,923,786 | 1,002,149 | 1,891,714 | 282,472 | 425,839 | 425,839 |
| 23 | PROVISION FOR DEFERRED INCOME TAXES - STATE DTSTOA | 13,526 | 4,544 | 12,068 | 2,784 | 2,319 | 2,319 |
| 24 | PROVISION FOR DEFERRED INCOME TAXES DTTOA | 2,937,312 | 1,006,693 | 1,903,783 | 285,256 | 428,159 | 428,159 |
| 25 | INVESTMENT TAX CREDITS A/C 411 ITCTOA | (332,760) | (114,406) | (191,888) | (18,704) | (27,919) | (27,919) |
| 26 | **TOTAL OPERATING EXPENSES** OETOA | 129,565,415 | 44,904,223 | 111,422,608 | 7,622,337 | 19,144,610 | 19,144,610 |

Entergy Texas, Inc.
RFI Staff 17-1

| Line Item Description | Proformed Amount | |
|---|---:|---|
| OMP555IOD-555  INELIGIBLE - OTHER DEMAND (PG/DD/TO) | 69,061,200 | Exhibit RRC-1 (revised) |
| OMP555IOD-555  INELIGIBLE - OTHER DEMAND (PG/DD/NJ) | 5,672,401 | Interruptible Services (WP/P AJ 1.2) |
| | 74,733,601 | |
| | | |
| OMP555IR-555  INELIGIBLE - RES EQUAL - PROD DEMAND | 18,317,367 | Exhibit RRC-1 (revised) |
| | | |
| OMP555IRE-555  INELIGIBLE - RESOURCE PLAN | 188,430,917 | Exhibit RRC-1 (revised) |
| **OMP555ITOA-NON-RECOVERABLE** | **281,481,885** | |
| | | |
| | | |
| Total Exhibit RRC-1 (revised) | 275,809,484 | |
| Total Interruptible Services (WP/P AJ 1.2) | 5,672,401 | |
| | 281,481,885 | |

**WCTO-WORKING CASH**                         **(4,398,506)**

CUBE:
cos_model:test_case     ETiCOS0611
cos_model:version     Analyst1_v2
cos_model:adjustment_name     Total_All
cos_model:books     balance
cos_model:cos_line_item_m     model_adjustments

cos_model:cos_line_item

| | | | | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | 69,061,200 | 65,873,197 | 32,769,125 | 1,449,595 |
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | NJ-Non-Jurisdictional | 5,672,401 | 5,672,401 | 2,878,579 | 127,345 |
| OMP555IR-555 INELIGIBLE - RES EQUAL - PROD DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | 18,317,367 | 17,471,801 | 8,691,481 | 384,482 |
| OMP555IRE-555 INELIGIBLE - RESOURCE PLAN | PG-Production/Generation | DD-Demand | TO-Total All Customers | 188,430,917 | 179,732,569 | 89,409,340 | 3,955,165 |

25

CUBE:
cos_model:test_case
cos_model:version — ETiCOS0611
cos_model:adjustment_name — Analyst1_v2
cos_model:books — Total_All
cos_model:cos_line_item_m — balance
model_adjustments

cos_model:cos_line_item

| | | | | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING |
|---|---|---|---|---|---|---|---|
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | 12,448,903 | 4,889,119 | 14,116,178 | 200,277 |
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | NJ-Non-Jurisdictional | 1,093,707 | 429,565 | 1,125,609 | 17,596 |
| OMP555IR-555 INELIGIBLE - RES EQUAL - PROD DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | 3,301,870 | 1,296,760 | 3,744,088 | 53,120 |
| OMP555IRE-555 INELIGIBLE - RESOURCE PLAN | PG-Production/Generation | DD-Demand | TO-Total All Customers | 33,966,369 | 13,339,778 | 38,515,468 | 546,450 |

26

CUBE:
cos_model:test_case          ETICOS0611
cos_model:version            Analyst1_v2
cos_model:adjustment_name    Total_All
cos_model:books              balance
cos_model:cos_line_item_m    model_adjustments

cos_model:cos_line_item

| | | | | | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | | 3,188,003 | 3,188,003 |
| OMP555IOD-555 INELIGIBLE - OTHER DEMAND | PG-Production/Generation | DD-Demand | NJ-Non-Jurisdictional | | - | - |
| OMP555IR-555 INELIGIBLE - RES EQUAL - PROD DEMAND | PG-Production/Generation | DD-Demand | TO-Total All Customers | | 845,566 | 845,566 |
| OMP555IRE-555 INELIGIBLE - RESOURCE PLAN | PG-Production/Generation | DD-Demand | TO-Total All Customers | | 8,698,348 | 8,698,348 |

27

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue Requirement Calculation**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

Exhibit-HGL-R-2

## SUMMARY OF RESULTS

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| 1 RATE BASE | RBTOA | 1,279,186,389 | 456,696,198 | 1,735,882,587 | 1,714,106,482 | 986,717,865 | 54,862,854 |
| REVENUES | | | | | | | |
| 2 RATE SCHEDULE REVENUE | RSRTOA | 1,239,877,095 | (597,529,947) | 642,347,149 | 628,441,841 | 322,865,876 | 22,434,668 |
| 3 OTHER SALES FOR RESALE | RSORTOA | 314,299,128 | (255,623,968) | 58,675,159 | 55,966,597 | 27,841,011 | 1,231,592 |
| 4 TOTAL SALES REVENUES (L2 + L3) | RSTOA | 1,554,176,223 | (853,153,915) | 701,022,308 | 684,408,438 | 350,706,887 | 23,666,260 |
| 5 OTHER OPERATING REVENUES | ROTOA | 33,511,398 | 14,660,594 | 48,171,991 | 47,809,873 | 25,549,995 | 1,268,671 |
| 6 PROVISION FOR RATE REFUND | PROVRRTOA | 672,315 | (672,315) | 0 | 0 | 0 | 0 |
| 7 TOTAL REVENUES (L4 + L5 + L6) | RTOA | 1,588,359,936 | (839,165,636) | 749,194,300 | 732,218,312 | 376,256,882 | 24,934,931 |
| 8 TOTAL OPERATING EXPENSES | OETOA | 1,466,927,253 | (797,912,908) | 669,014,346 | 649,997,682 | 340,815,183 | 20,320,177 |
| 9 TOTAL OPERATING INCOME (L7 - L8) | OITOA | 121,432,682 | (41,252,728) | 80,179,954 | 82,220,630 | 35,441,699 | 4,614,754 |
| 10 EARNED RATE OF RETURN ON RATE BASE (L9 / L1) | EROR | | | 4.62% | 4.80% | 3.59% | 8.41% |
| REVENUE REQUIREMENT DETERMINATION | | | | | | | |
| 11 REQUIRED RATE OF RETURN | ROR | | | 8.67% | 8.67% | 8.67% | 8.67% |
| 12 REQUIRED OPERATING INCOME (L1 * L11) | ROI | | | 150,471,451 | 148,583,834 | 85,531,631 | 4,755,675 |
| REVENUE CONVERSION FACTORS | | | | | | | |
| 13 INCOME TAX REVENUE CONVERSION FACTOR | REVCOFIT | | | 53.85% | 53.85% | 53.85% | 53.85% |
| 14 REVENUE RELATED TAX REVENUE CONVERSION FACTOR | REVCOFRT | | | 1.03% | 1.03% | 1.03% | 1.03% |
| 15 REVCOFBD-BAD DEBT REVENUE CONVERSION FACTOR | REVCOFBD | | | 0.42% | 0.44% | 0.53% | 0.21% |
| REVENUE DEFICIENCY | | | | | | | |
| 16 OPERATING INCOME DEFICIENCY (L12 - L9) | OIDEF | | | 70,291,497 | 66,363,204 | 50,089,932 | 140,921 |
| 17 INCREMENTAL INCOME TAX (L16 * L13) | ITDEF | | | 37,849,268 | 35,734,033 | 26,971,502 | 75,881 |
| 18 INCREMENTAL REVENUE RELATED TAX (L16 + L17 + L19) * L14 | RTDEF | | | 1,117,092 | 1,054,924 | 796,985 | 2,235 |
| 19 INCREMENTAL BAD DEBT EXPENSE (L16 + L17 + L18) * L15 | BDDEF | | | 454,560 | 454,560 | 415,453 | 464 |
| 20 TOTAL REVENUE DEFICIENCY/(EXCESS) (SUM OF L16 - L19) | REVDEF | | | 109,712,417 | 103,606,721 | 78,273,871 | 219,501 |
| 21 % INCREASE/(DECREASE) (L20 / L2) | REVDEFPCT | | | 17.08% | 16.49% | 24.24% | 0.98% |
| 22 RATE SCHEDULE REVENUE REQUIREMENT (L2 + L20) | REVREQ | | | 752,059,566 | 732,048,562 | 401,139,747 | 22,654,169 |

1160008

28

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue Requirement Calculation**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

Exhibit-HGL-R-2

## SUMMARY OF RESULTS

| | LINE ITEM NAME | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|
| 1 RATE BASE | RBTOA | 354,742,597 | 119,820,292 | 178,204,064 | 19,758,809 | 21,776,105 | 21,776,105 |
| REVENUES | | | | | | | |
| 2 RATE SCHEDULE REVENUE | RSRTOA | 134,310,460 | 42,000,595 | 99,357,350 | 7,472,892 | 13,905,308 | 13,905,308 |
| 3 OTHER SALES FOR RESALE | RSORTOA | 10,576,726 | 4,153,849 | 11,993,261 | 170,158 | 2,708,563 | 2,708,563 |
| 4 TOTAL SALES REVENUES (L2 + L3) | RSTOA | 144,887,186 | 46,154,444 | 111,350,611 | 7,643,050 | 16,613,870 | 16,613,870 |
| 5 OTHER OPERATING REVENUES | ROTOA | 9,723,830 | 3,587,103 | 7,399,279 | 280,995 | 362,118 | 362,118 |
| 6 PROVISION FOR RATE REFUND | PROVRRTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 TOTAL REVENUES (L4 + L5 + L6) | RTOA | 154,611,016 | 49,741,548 | 118,749,890 | 7,924,044 | 16,975,988 | 16,975,988 |
| 8 TOTAL OPERATING EXPENSES | OETOA | 127,638,111 | 44,146,730 | 109,511,019 | 7,566,462 | 19,016,664 | 19,016,664 |
| 9 TOTAL OPERATING INCOME (L7 - L8) | OITOA | 26,972,905 | 5,594,818 | 9,238,871 | 357,583 | (2,040,676) | (2,040,676) |
| 10 EARNED RATE OF RETURN ON RATE BASE (L9 / L1) | EROR | 7.60% | 4.67% | 5.18% | 1.81% | -9.37% | -9.37% |
| REVENUE REQUIREMENT DETERMINATION | | | | | | | |
| 11 REQUIRED RATE OF RETURN | ROR | 8.67% | 8.67% | 8.67% | 8.67% | 8.67% | 8.67% |
| 12 REQUIRED OPERATING INCOME (L1 * L11) | ROI | 30,750,141 | 10,386,378 | 15,447,257 | 1,712,752 | 1,887,617 | 1,887,617 |
| REVENUE CONVERSION FACTORS | | | | | | | |
| 13 INCOME TAX REVENUE CONVERSION FACTOR | REVCOFIT | 53.85% | 53.85% | 53.85% | 53.85% | 53.85% | 53.85% |
| 14 REVENUE RELATED TAX REVENUE CONVERSION FACTOR | REVCOFRT | 1.03% | 1.03% | 1.03% | 1.03% | 1.03% | 1.03% |
| 15 REVCOFBD-BAD DEBT REVENUE CONVERSION FACTOR | REVCOFBD | 0.07% | 0.02% | 0.00% | 1.59% | 0.00% | 0.00% |
| REVENUE DEFICIENCY | | | | | | | |
| 16 OPERATING INCOME DEFICIENCY (L12 - L9) | OIDEF | 3,777,236 | 4,791,560 | 6,208,386 | 1,355,170 | 3,928,293 | 3,928,293 |
| 17 INCREMENTAL INCOME TAX (L16 * L13) | ITDEF | 2,033,896 | 2,580,071 | 3,342,977 | 729,707 | 2,115,235 | 2,115,235 |
| 18 INCREMENTAL REVENUE RELATED TAX (L16 + L17 + L19) * L14 | RTDEF | 59,817 | 75,843 | 98,252 | 21,792 | 62,168 | 62,168 |
| 19 INCREMENTAL BAD DEBT EXPENSE (L16 + L17 + L18) * L15 | BDDEF | 3,858 | 1,253 | 0 | 33,532 | 0 | 0 |
| 20 TOTAL REVENUE DEFICIENCY/(EXCESS) (SUM OF L16 - L19) | REVDEF | 5,874,807 | 7,448,727 | 9,649,615 | 2,140,200 | 6,105,696 | 6,105,696 |
| 21 % INCREASE/(DECREASE) (L20 / L2) | REVDEFPCT | 4.37% | 17.73% | 9.71% | 28.64% | 43.91% | 43.91% |
| 22 RATE SCHEDULE REVENUE REQUIREMENT (L2 + L20) | REVREQ | 140,185,267 | 49,449,322 | 109,006,965 | 9,613,092 | 20,011,004 | 20,011,004 |

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Rate Base**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-2**

**RATE BASE SUMMARY**

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| 1 | PLTOA — PLANT IN SERVICE | 3,521,368,187 | (251,512,491) | 3,269,855,696 | 3,214,655,566 | 1,822,148,430 | 99,550,493 |
| 2 | ADTOA — ACCUMULATED DEPRECIATION / AMORTIZATION | (1,417,946,172) | 148,061,290 | (1,269,884,882) | (1,237,578,961) | (671,739,109) | (35,984,479) |
| 3 | NPSUM — NET PLANT | 2,103,422,015 | (103,451,201) | 1,999,970,814 | 1,977,076,605 | 1,150,409,322 | 63,566,014 |
| 4 | WCTOA — WORKING CASH | 0 | (3,214,019) | (3,214,019) | (3,174,516) | (1,827,345) | (101,603) |
| 5 | FITOA — FUEL INVENTORY | 53,759,975 | 0 | 53,759,975 | 51,659,936 | 18,378,438 | 1,024,050 |
| 6 | MSXATOA — MATERIALS AND SUPPLIES EXCLUDING ALLOWANCES | 29,252,574 | 0 | 29,252,574 | 28,757,611 | 16,235,399 | 870,236 |
| 7 | PPTOA — PREPAYMENTS | 7,366,433 | (148,396) | 7,218,037 | 7,189,330 | 3,771,213 | 251,627 |
| 8 | PIRTOA — PROPERTY INSURANCE RESERVE | 0 | 59,799,744 | 59,799,744 | 59,799,744 | 35,480,832 | 2,023,572 |
| 9 | IDRTOA — INJURIES & DAMAGES RESERVES | (5,569,243) | 0 | (5,569,243) | (5,416,100) | (3,033,169) | (209,183) |
| 10 | CCMRTOA — COAL CAR MAINTENANCE RESERVE | 1,400,350 | 0 | 1,400,350 | 1,345,648 | 478,725 | 26,675 |
| 11 | PENTOA — UNFUNDED PENSION | (53,715,841) | 109,689,386 | 55,973,545 | 54,434,394 | 30,484,797 | 2,102,391 |
| 12 | AINTOA — ALLOWANCES | 68,914 | 0 | 68,914 | 67,750 | 38,403 | 2,098 |
| 13 | APCLTOA — COMMERCIAL LITIGATION | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | ERTOA — ENVIRONMENTAL RESERVES | 3,412,379 | (4,474,569) | (1,062,190) | (1,045,604) | (636,741) | (38,360) |
| 15 | CDTOA — CUSTOMER DEPOSITS | (35,872,476) | 0 | (35,872,476) | (35,872,476) | (20,621,797) | (1,146,675) |
| 16 | ADITTOA — ACCUMULATED DEFERRED INCOME TAXES | (824,338,691) | 372,128,394 | (452,210,297) | (446,652,317) | (257,106,288) | (14,295,478) |
| 17 | ADITCTOA — ACCUMULATED DEFERRED ITC | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | RCETOA — RATE CASE EXPENSES | 0 | 0 | 0 | 0 | 0 | 0 |
| 19 | REGASSLIABTOA — REGULATORY ASSETS AND LIABILITIES | 0 | 26,366,859 | 26,366,859 | 25,936,479 | 14,666,077 | 787,491 |
| 20 | **RBTOA — RATE BASE** | 1,279,186,389 | 456,696,198 | 1,735,882,587 | 1,714,106,482 | 986,717,865 | 54,862,854 |

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Rate Base**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-2**

## RATE BASE SUMMARY

| | LINE ITEM NAME | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|
| 1 | PLANT IN SERVICE — PLTOA | 654,061,437 | 224,673,016 | 377,286,581 | 36,935,609 | 55,200,130 | 55,200,130 |
| 2 | ACCUMULATED DEPRECIATION / AMORTIZATION — ADTOA | (243,142,466) | (87,152,791) | (184,605,312) | (14,954,805) | (32,305,921) | (32,305,921) |
| 3 | NET PLANT — NPSUM | 410,918,971 | 137,520,225 | 192,681,269 | 21,980,804 | 22,894,209 | 22,894,209 |
| 4 | WORKING CASH — WCTOA | (656,973) | (221,909) | (330,099) | (36,587) | (39,503) | (39,503) |
| 5 | FUEL INVENTORY — FITOA | 10,698,216 | 4,957,497 | 16,347,084 | 254,651 | 2,100,040 | 2,100,040 |
| 6 | MATERIALS AND SUPPLIES EXCLUDING ALLOWANCES — MSXATOA | 5,912,135 | 2,039,395 | 3,402,831 | 297,614 | 494,963 | 494,963 |
| 7 | PREPAYMENTS — PPTOA | 1,510,752 | 481,160 | 1,083,646 | 90,933 | 28,708 | 28,708 |
| 8 | PROPERTY INSURANCE RESERVE — PIRTOA | 12,726,075 | 4,156,236 | 4,608,099 | 804,929 | 0 | 0 |
| 9 | INJURIES & DAMAGES RESERVES — IDRTOA | (893,064) | (300,039) | (796,855) | (183,790) | (153,142) | (153,142) |
| 10 | COAL CAR MAINTENANCE RESERVE — CCMRTOA | 278,669 | 129,134 | 425,812 | 6,633 | 54,702 | 54,702 |
| 11 | UNFUNDED PENSION — PENTOA | 8,975,716 | 3,015,531 | 8,008,777 | 1,847,182 | 1,539,151 | 1,539,151 |
| 12 | ALLOWANCES — AINTOA | 13,785 | 4,735 | 7,951 | 778 | 1,163 | 1,163 |
| 13 | COMMERCIAL LITIGATION — APCLTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | ENVIRONMENTAL RESERVES — ERTOA | (224,741) | (69,318) | (59,250) | (17,194) | (16,586) | (16,586) |
| 15 | CUSTOMER DEPOSITS — CDTOA | (7,419,579) | (2,508,761) | (3,765,636) | (410,028) | 0 | 0 |
| 16 | ACCUMULATED DEFERRED INCOME TAXES — ADITTOA | (92,435,726) | (31,222,407) | (46,444,666) | (5,147,752) | (5,557,980) | (5,557,980) |
| 17 | ACCUMULATED DEFERRED ITC — ADITCTOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | RATE CASE EXPENSES — RCETOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 19 | REGULATORY ASSETS AND LIABILITIES — REGASSLIABTOA | 5,338,361 | 1,838,812 | 3,035,101 | 270,637 | 430,380 | 430,380 |
| 20 | **RATE BASE** — RBTOA | 354,742,597 | 119,820,292 | 178,204,064 | 19,758,809 | 21,776,105 | 21,776,105 |

31

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue/Expenses**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-2**

| | LINE ITEM NAME | PER BOOK | ADJMT | TOTAL COMPANY ADJUSTED | TOTAL RETAIL | RES | SMALL GEN SERVICE |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| 1 SALES REVENUES | RSTOA | 1,554,176,223 | (853,153,915) | 701,022,308 | 684,408,438 | 350,706,887 | 23,666,260 |
| 2 OTHER OPERATING REVENUES | ROTOA | 33,511,398 | 14,660,594 | 48,171,991 | 47,809,873 | 25,549,995 | 1,268,671 |
| 3 PROVISION FOR RATE REFUND | PROVRRTC | 672,315 | (672,315) | 0 | 0 | 0 | 0 |
| 4 **TOTAL REVENUES** | RTOA | 1,588,359,936 | (839,165,636) | 749,194,300 | 732,218,312 | 376,256,882 | 24,934,931 |
| **OPERATING EXPENSES** | | | | | | | |
| **O & M EXPENSE** | | | | | | | |
| 5 PRODUCTION EXPENSES | OMPTOA | 1,125,799,286 | (801,800,192) | 323,999,094 | 309,201,631 | 150,765,177 | 6,757,261 |
| 6 TRANSMISSION EXPENSES | OMTTOA | 20,129,762 | 9,578,390 | 29,708,152 | 29,708,152 | 15,211,581 | 672,973 |
| 7 REGIONAL MARKET EXPENSES | OMRTOTOA | 59,235 | 4,035,230 | 4,094,465 | 4,091,040 | 2,130,302 | 94,246 |
| 8 DISTRIBUTION EXPENSES | OMDTOA | 30,897,632 | 100,452 | 30,998,085 | 30,703,123 | 18,100,956 | 1,331,134 |
| 9 CUSTOMER ACCOUNTING EXPENSES | OMCATOA | 15,861,111 | 2,173,290 | 18,034,401 | 17,272,562 | 13,524,809 | 1,123,379 |
| 10 CUSTOMER SERVICES EXPENSES | OMCSTOA | 13,419,093 | (8,997,635) | 4,421,457 | 4,421,457 | 3,574,589 | 308,046 |
| 11 SALES EXPENSES | OMSTOA | 1,097,967 | 13,865 | 1,111,832 | 1,093,589 | 618,643 | 33,247 |
| 12 ADMINISTRATIVE & GENERAL EXPENSES | OMAGTOA | 84,420,629 | (8,417,345) | 76,003,284 | 74,013,785 | 41,366,155 | 2,759,029 |
| 13 OPERATION & MAINTENANCE EXPENSE | OMTOA | 1,291,684,715 | (803,313,946) | 488,370,769 | 470,505,340 | 245,292,212 | 13,079,314 |
| 14 GAINS FROM DISP OF ALLOWANCES | GFDATOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 REGULATORY DEBITS AND CREDITS | RDCTOA | (6,784,608) | 12,030,533 | 5,245,925 | 5,003,763 | 2,489,160 | 110,112 |
| 16 INTEREST ON CUSTOMER DEPOSITS | ICDTOA | 0 | 68,985 | 68,985 | 68,985 | 39,657 | 2,205 |
| 17 DEPRECIATION AND AMORTIZATION EXPENSE | DXTOA | 76,072,458 | 20,173,155 | 96,245,613 | 94,722,100 | 55,345,207 | 3,320,046 |
| 18 TAXES OTHER THAN INCOME | TOTOA | 63,023,906 | (888,799) | 62,135,106 | 61,496,577 | 33,403,296 | 2,062,259 |
| **CURRENT INCOME TAXES** | | | | | | | |
| 19 FEDERAL INCOME TAX | FTTOA | (23,407,031) | 27,003,780 | 3,596,750 | 5,248,899 | (2,847,271) | 1,347,818 |
| 20 STATE INCOME TAX | STTOA | (127,519) | 89,787 | (37,732) | (36,694) | (20,550) | (1,417) |
| 21 CURRENT INCOME TAXES | CITTOA | (23,534,549) | 27,093,567 | 3,559,018 | 5,212,205 | (2,867,821) | 1,346,401 |
| **PROVISION FOR DEFERRED INCOME TAXES** | | | | | | | |
| 22 PROVISION FOR DEFERRED INCOME TAXES - FEDERAL | DTFTOA | 67,051,463 | (52,089,274) | 14,962,189 | 14,536,371 | 7,989,323 | 446,813 |
| 23 PROVISION FOR DEFERRED INCOME TAXES - STATE | DTSTOA | 812,265 | (727,918) | 84,347 | 82,027 | 45,938 | 3,168 |
| 24 PROVISION FOR DEFERRED INCOME TAXES | DTTOA | 67,863,727 | (52,817,192) | 15,046,536 | 14,618,399 | 8,035,261 | 449,981 |
| 25 INVESTMENT TAX CREDITS A/C 411 | ITCTOA | (1,611,177) | (46,429) | (1,657,606) | (1,629,687) | (921,789) | (50,141) |
| 26 **TOTAL OPERATING EXPENSES** | OETOA | 1,466,927,253 | (797,912,908) | 669,014,346 | 649,997,682 | 340,815,183 | 20,320,177 |

**Entergy Texas, Inc.**
**Rate Case**
**Summary Model Results - Revenue/Expenses**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-2**

| | LINE ITEM NAME | GENERAL SERVICE | LARGE GEN SERVICE | LARGE INDUST PWR SERVICE | LIGHTING | TOTAL WHOLESALE | WHOLESALE |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| 1 SALES REVENUES | RSTOA | 144,887,186 | 46,154,444 | 111,350,611 | 7,643,050 | 16,613,870 | 16,613,870 |
| 2 OTHER OPERATING REVENUES | ROTOA | 9,723,830 | 3,587,103 | 7,399,279 | 280,995 | 362,118 | 362,118 |
| 3 PROVISION FOR RATE REFUND | PROVRRTC | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 TOTAL REVENUES | RTOA | 154,611,016 | 49,741,548 | 118,749,890 | 7,924,044 | 16,975,988 | 16,975,988 |
| **OPERATING EXPENSES** | | | | | | | |
| O & M EXPENSE | | | | | | | |
| 5 PRODUCTION EXPENSES | OMPTOA | 58,823,468 | 23,416,945 | 68,458,046 | 980,734 | 14,797,463 | 14,797,463 |
| 6 TRANSMISSION EXPENSES | OMTTOA | 5,779,533 | 2,269,972 | 5,681,126 | 92,967 | 0 | 0 |
| 7 REGIONAL MARKET EXPENSES | OMRTOTOA | 809,392 | 317,898 | 726,182 | 13,020 | 3,424 | 3,424 |
| 8 DISTRIBUTION EXPENSES | OMDTOA | 6,581,316 | 1,900,391 | 922,834 | 1,866,491 | 294,962 | 294,962 |
| 9 CUSTOMER ACCOUNTING EXPENSES | OMCATOA | 1,120,648 | 91,700 | 1,186,772 | 225,254 | 761,839 | 761,839 |
| 10 CUSTOMER SERVICES EXPENSES | OMCSTOA | 190,364 | 3,587 | 328,180 | 16,692 | 0 | 0 |
| 11 SALES EXPENSES | OMSTOA | 225,134 | 77,492 | 127,620 | 11,453 | 18,243 | 18,243 |
| 12 ADMINISTRATIVE & GENERAL EXPENSES | OMAGTOA | 12,679,346 | 4,293,876 | 10,688,480 | 2,226,899 | 1,989,498 | 1,989,498 |
| 13 OPERATION & MAINTENANCE EXPENSE | OMTOA | 86,209,201 | 32,371,862 | 88,119,240 | 5,433,511 | 17,865,429 | 17,865,429 |
| 14 GAINS FROM DISP OF ALLOWANCES | GFDATOA | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 REGULATORY DEBITS AND CREDITS | RDCTOA | 945,625 | 371,380 | 1,072,272 | 15,213 | 242,162 | 242,162 |
| 16 INTEREST ON CUSTOMER DEPOSITS | ICDTOA | 14,268 | 4,825 | 7,242 | 789 | 0 | 0 |
| 17 DEPRECIATION AND AMORTIZATION EXPENSE | DXTOA | 18,944,585 | 6,193,527 | 9,658,846 | 1,259,888 | 1,523,513 | 1,523,513 |
| 18 TAXES OTHER THAN INCOME | TOTOA | 12,633,927 | 4,157,843 | 8,432,152 | 807,101 | 638,529 | 638,529 |
| CURRENT INCOME TAXES | | | | | | | |
| 19 FEDERAL INCOME TAX | FTTOA | 6,291,988 | 157,042 | 514,670 | (215,348) | (1,652,149) | (1,652,149) |
| 20 STATE INCOME TAX | STTOA | (6,051) | (2,033) | (5,399) | (1,245) | (1,038) | (1,038) |
| 21 CURRENT INCOME TAXES | CITTOA | 6,285,938 | 155,009 | 509,272 | (216,593) | (1,653,187) | (1,653,187) |
| PROVISION FOR DEFERRED INCOME TAXES | | | | | | | |
| 22 PROVISION FOR DEFERRED INCOME TAXES - FEDERAL | DTFTOA | 2,923,802 | 1,002,145 | 1,891,815 | 282,473 | 425,817 | 425,817 |
| 23 PROVISION FOR DEFERRED INCOME TAXES - STATE | DTSTOA | 13,526 | 4,544 | 12,068 | 2,784 | 2,319 | 2,319 |
| 24 PROVISION FOR DEFERRED INCOME TAXES | DTTOA | 2,937,328 | 1,006,689 | 1,903,884 | 285,256 | 428,137 | 428,137 |
| 25 INVESTMENT TAX CREDITS A/C 411 | ITCTOA | (332,760) | (114,406) | (191,888) | (18,704) | (27,919) | (27,919) |
| 26 TOTAL OPERATING EXPENSES | OETOA | 127,638,111 | 44,146,730 | 109,511,019 | 7,566,462 | 19,016,664 | 19,016,664 |

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-3**

| Line No. | Description | Incremental Change Total | LeBlanc / Talkington Rate Schedule Revenues AJ01 | Severed Per Agreement Rate Case Expense AJ11 | Watson Depreciation Expense AJ14 | Accepting Proposed Adj Non-Affiliate Exec Perks AJ16E | Tumminello Affiliate AJ21 |
|---|---|---|---|---|---|---|---|
| | **Rate Base** | | | | | | |
| | **Working Cash** | | | | | | |
| 1 | WCTO-WORKING CASH | (1,608,315) | - | - | - | - | - |
| | **ADIT - Federal** | | | | | | |
| 2 | ADFIT283-283 - FEDERAL | 2,161,250 | - | 2,161,250 | - | - | - |
| | **Rate Case Expense** | | | | | | |
| 3 | RCETO-182 RATE CASE EXPENSES | (6,175,000) | - | (6,175,000) | - | - | - |
| 4 | **Total Rate Base** | **(5,622,065)** | **-** | **(4,013,750)** | **-** | **-** | **-** |
| | | | | | | | |
| | **Revenues** | | | | | | |
| | **Rate Schedule Revenues** | | | | | | |
| 5 | RSRRT-440-445 SALES-RETAIL | (5,672,401) | (5,672,401) | - | - | - | - |
| | | | | | | | |
| | **Expenses** | | | | | | |
| | **O&M Expense** | | | | | | |
| 6 | OMP555IRE-555 INELIGIBLE - RESOURCE PLAN | 188,430,917 | - | - | - | - | - |
| 7 | OMP555IR-555 INELIGIBLE - RES EQUAL - PROD DEMAND | 18,317,367 | - | - | - | - | - |
| 8 | OMP555IOD-555 INELIGIBLE - OTHER DEMAND | 69,061,200 | - | - | - | - | - |
| 9 | OMAG923-923 OUTSIDE SERVICES | (52,827) | - | - | - | (9,395) | (43,432) |
| 10 | OMAG926-926 PENSIONS & BENEFITS | (112,531) | - | - | - | - | (112,531) |
| 11 | OMAG928PL-928 REGULATORY COMMISSION EXP - PRODUCTION LABOR | (4,116,667) | - | (4,116,667) | - | - | - |
| 12 | OMAG9302-930.2 MISC GENERAL EXPENSES | (929) | - | - | - | - | (929) |
| 13 | **Total O&M Expense** | **271,526,530** | **-** | **(4,116,667)** | **-** | **(9,395)** | **(156,892)** |

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

| | | Cooper | Considine | Joyce |
|---|---|---|---|---|
| | | **PPR Rider** | **AJ_INT -** **Model Intr Sync** | **AJ_WC -** **Model Work Cash** |
| | | **AJ24** | **AJ 17** | **AJ 6** |
| **Line No.** | **Description** | | | |
| | **Rate Base** | | | |
| | **Working Cash** | | | |
| 1 | WCTO-WORKING CASH | - | - | (1,608,315) |
| | **ADIT - Federal** | | | |
| 2 | ADFIT283-283 - FEDERAL | - | - | - |
| | **Rate Case Expense** | | | |
| 3 | RCETO-182 RATE CASE EXPENSES | - | - | - |
| 4 | **Total Rate Base** | **-** | **-** | **(1,608,315)** |
| | | | | |
| | **Revenues** | | | |
| | **Rate Schedule Revenues** | | | |
| 5 | RSRRT-440-445 SALES-RETAIL | - | - | - |
| | | | | |
| | **Expenses** | | | |
| | **O&M Expense** | | | |
| 6 | OMP555IRE-555 INELIGIBLE - RESOURCE PLAN | 188,430,917 | - | - |
| 7 | OMP555IR-555 INELIGIBLE - RES EQUAL - PROD DEMAND | 18,317,367 | - | - |
| 8 | OMP555IOD-555 INELIGIBLE - OTHER DEMAND | 69,061,200 | - | - |
| 9 | OMAG923-923 OUTSIDE SERVICES | - | - | - |
| 10 | OMAG926-926 PENSIONS & BENEFITS | - | - | - |
| 11 | OMAG928PL-928 REGULATORY COMMISSION EXP - PRODUCTION LABOR | - | - | - |
| 12 | OMAG9302-930.2 MISC GENERAL EXPENSES | - | - | - |
| 13 | **Total O&M Expense** | **275,809,484** | **-** | **-** |

35

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-3**

| Line No. | Description | Incremental Change Total | LeBlanc / Talkington Rate Schedule Revenues AJ01 | Severed Per Agreement Rate Case Expense AJ11 | Watson Depreciation Expense AJ14 | Accepting Proposed Adj Non-Affiliate Exec Perks AJ16E | Tumminello Affiliate AJ21 |
|---|---|---|---|---|---|---|---|
| | **Depreciation Expense** | | | | | | |
| 1 | DXT3502-350.2 LAND EASEMENTS | (8,495) | - | - | (8,495) | - | - |
| 2 | DXT352-352 STRUCTURES & IMPROVEMENTS | (5,964) | - | - | (5,964) | - | - |
| 3 | DXT352C-352 STRUCTURES & IMPROVEMENTS - CONTRA | 71 | - | - | 71 | - | - |
| 4 | DXT353-353 STATION EQUIPMENT | (157,972) | - | - | (157,972) | - | - |
| 5 | DXT353C-353 STATION EQUIPMENT - CONTRA | 950 | - | - | 950 | - | - |
| 6 | DXT354-354 TOWERS & FIXTURES | (51,700) | - | - | (51,700) | - | - |
| 7 | DXT354C-354 TOWERS & FIXTURES - CONTRA | 1,614 | - | - | 1,614 | - | - |
| 8 | DXT355-355 POLES & FIXTURES | (913,008) | - | - | (913,008) | - | - |
| 9 | DXT355C-355 POLES & FIXTURES - CONTRA | 126,118 | - | - | 126,118 | - | - |
| 10 | DXT356-356 OVERHEAD CONDUCTORS & DEVICES | (367,597) | - | - | (367,597) | - | - |
| 11 | DXT356C-356 OVERHEAD CONDUCTORS & DEVICES - CONTRA | 31,481 | - | - | 31,481 | - | - |
| 12 | DXT358-358 UNDERGROUND CONDUCTORS & DEVICES | (37) | - | - | (37) | - | - |
| 13 | DXT359-359 ROADS & TRAILS | (128) | - | - | (128) | - | - |
| 14 | DXD3602-360.2 LAND RIGHTS | (1,494) | - | - | (1,494) | - | - |
| 15 | DXD361-361 STRUCTURES & IMPROVEMENTS | (727) | - | - | (727) | - | - |
| 16 | DXD362-362 STATION EQUIPMENT | (16,046) | - | - | (16,046) | - | - |
| 17 | DXD362C-362 STATION EQUIPMENT - CONTRA | 289 | - | - | 289 | - | - |
| 18 | DXD364-364 POLES, TOWERS, & FIXTURES | (435,736) | - | - | (435,736) | - | - |
| 19 | DXD364C-364 POLES, TOWERS, & FIXTURES - CONTRA | 64,561 | - | - | 64,561 | - | - |
| 20 | DXD365-365 OVERHEAD CONDUCTORS & DEVICES | (454,879) | - | - | (454,879) | - | - |
| 21 | DXD365C-365 OVRHD CONDUCTORS & DEVICES - CONTRA | 63,902 | - | - | 63,902 | - | - |
| 22 | DXD366-366 UNDERGROUND CONDUIT | (4,958) | - | - | (4,958) | - | - |
| 23 | DXD366C-366 UNDERGROUND CONDUIT - CONTRA | 2,066 | - | - | 2,066 | - | - |
| 24 | DXD367-367 UNDG CONDUCT & DEVICES | (188,049) | - | - | (188,049) | - | - |
| 25 | DXD367C-367 UNDG CONDUCT & DEVICES - CONTRA | 43,534 | - | - | 43,534 | - | - |
| 26 | DXD368-368 LINE TRANSFORMERS | (48,370) | - | - | (48,370) | - | - |
| 27 | DXD368C-368 LINE TRANSFORMERS - CONTRA | 5,167 | - | - | 5,167 | - | - |
| 28 | DXD3691-369.1 OVERHEAD SERVICES | (23,571) | - | - | (23,571) | - | - |
| 29 | DXD3691C-369.1 OVERHEAD SERVICES - CONTRA | 6,322 | - | - | 6,322 | - | - |
| 30 | DXD3692-369.2 UNDERGROUND SERVICES | (5,940) | - | - | (5,940) | - | - |
| 31 | DXD3692C-369.2 UNDERGROUND SERVICES - CONTRA | 2,056 | - | - | 2,056 | - | - |
| 32 | DXD370-370 METERS | (33,119) | - | - | (33,119) | - | - |
| 33 | DXD370C-370 METERS - CONTRA | 13,784 | - | - | 13,784 | - | - |
| 34 | DXD371L-371 INSTALL ON CUST PREMISES - LIGHTING | (9,824) | - | - | (9,824) | - | - |
| 35 | DXD371LC-371 INSTALL ON CUST PREMISES - LIGHTING - CONTRA | 3,994 | - | - | 3,994 | - | - |
| 36 | DXD371O-371 INSTALL ON CUST PREMISES - OTHER | (1,539) | - | - | (1,539) | - | - |
| 37 | DXD371OC-371 INSTALL ON CUST PREMISES - OTHER - CONTRA | 626 | - | - | 626 | - | - |
| 38 | DXD373NR-373 ST LIGHT & SIGNAL SYS - NON RDWAY | (3) | - | - | (3) | - | - |
| 39 | DXD373NRC-373 ST LIGHT & SIGNAL SYS - NON RDWAY - CONTRA | 7 | - | - | 7 | - | - |
| 40 | DXD373R-373 ST LIGHT & SIGNAL SYS - ROADWAY | (145,748) | - | - | (145,748) | - | - |
| 41 | DXD373RC-373 ST LIGHT & SIGNAL SYS - ROADWAY - CONTRA | 122,818 | - | - | 122,818 | - | - |
| 42 | **Total Depreciation Expense** | **(2,385,544)** | - | - | **(2,385,544)** | - | - |

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-3**

| | | Cooper | Considine | Joyce |
|---|---|---|---|---|
| | | PPR Rider | AJ_INT - Model Intr Sync | AJ_WC - Model Work Cash |
| Line No. | Description | AJ24 | AJ 17 | AJ 6 |
| | **Depreciation Expense** | | | |
| 1 | DXT3502-350.2 LAND EASEMENTS | - | - | - |
| 2 | DXT352-352 STRUCTURES & IMPROVEMENTS | - | - | - |
| 3 | DXT352C-352 STRUCTURES & IMPROVEMENTS - CONTRA | - | - | - |
| 4 | DXT353-353 STATION EQUIPMENT | - | - | - |
| 5 | DXT353C-353 STATION EQUIPMENT - CONTRA | - | - | - |
| 6 | DXT354-354 TOWERS & FIXTURES | - | - | - |
| 7 | DXT354C-354 TOWERS & FIXTURES - CONTRA | - | - | - |
| 8 | DXT355-355 POLES & FIXTURES | - | - | - |
| 9 | DXT355C-355 POLES & FIXTURES - CONTRA | - | - | - |
| 10 | DXT356-356 OVERHEAD CONDUCTORS & DEVICES | - | - | - |
| 11 | DXT356C-356 OVERHEAD CONDUCTORS & DEVICES - CONTRA | - | - | - |
| 12 | DXT358-358 UNDERGROUND CONDUCTORS & DEVICES | - | - | - |
| 13 | DXT359-359 ROADS & TRAILS | - | - | - |
| 14 | DXD3602-360.2 LAND RIGHTS | - | - | - |
| 15 | DXD361-361 STRUCTURES & IMPROVEMENTS | - | - | - |
| 16 | DXD362-362 STATION EQUIPMENT | - | - | - |
| 17 | DXD362C-362 STATION EQUIPMENT - CONTRA | - | - | - |
| 18 | DXD364-364 POLES, TOWERS, & FIXTURES | - | - | - |
| 19 | DXD364C-364 POLES, TOWERS, & FIXTURES - CONTRA | - | - | - |
| 20 | DXD365-365 OVERHEAD CONDUCTORS & DEVICES | - | - | - |
| 21 | DXD365C-365 OVRHD CONDUCTORS & DEVICES - CONTRA | - | - | - |
| 22 | DXD366-366 UNDERGROUND CONDUIT | - | - | - |
| 23 | DXD366C-366 UNDERGROUND CONDUIT - CONTRA | - | - | - |
| 24 | DXD367-367 UNDG CONDUCT & DEVICES | - | - | - |
| 25 | DXD367C-367 UNDG CONDUCT & DEVICES - CONTRA | - | - | - |
| 26 | DXD368-368 LINE TRANSFORMERS | - | - | - |
| 27 | DXD368C-368 LINE TRANSFORMERS - CONTRA | - | - | - |
| 28 | DXD3691-369.1 OVERHEAD SERVICES | - | - | - |
| 29 | DXD3691C-369.1 OVERHEAD SERVICES - CONTRA | - | - | - |
| 30 | DXD3692-369.2 UNDERGROUND SERVICES | - | - | - |
| 31 | DXD3692C-369.2 UNDERGROUND SERVICES - CONTRA | - | - | - |
| 32 | DXD370-370 METERS | - | - | - |
| 33 | DXD370C-370 METERS - CONTRA | - | - | - |
| 34 | DXD371L-371 INSTALL ON CUST PREMISES - LIGHTING | - | - | - |
| 35 | DXD371LC-371 INSTALL ON CUST PREMISES - LIGHTING - CONTRA | - | - | - |
| 36 | DXD371O-371 INSTALL ON CUST PREMISES - OTHER | - | - | - |
| 37 | DXD371OC-371 INSTALL ON CUST PREMISES - OTHER - CONTRA | - | - | - |
| 38 | DXD373NR-373 ST LIGHT & SIGNAL SYS - NON RDWAY | - | - | - |
| 39 | DXD373NRC-373 ST LIGHT & SIGNAL SYS - NON RDWAY - CONTRA | - | - | - |
| 40 | DXD373R-373 ST LIGHT & SIGNAL SYS - ROADWAY | - | - | - |
| 41 | DXD373RC-373 ST LIGHT & SIGNAL SYS - ROADWAY - CONTRA | - | - | - |
| 42 | **Total Depreciation Expense** | - | - | - |

37

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

Exhibit-HGL-R-3

| Line No. | Description | Incremental Change Total | LeBlanc / Talkington Rate Schedule Revenues AJ01 | Severed Per Agreement Rate Case Expense AJ11 | Watson Depreciation Expense AJ14 | Accepting Proposed Adj Non-Affiliate Exec Perks AJ16E | Tumminello Affiliate AJ21 |
|---|---|---|---|---|---|---|---|
|  | **Current Tax - Schedule M** |  |  |  |  |  |  |
| 1 | INTRADJ-INTEREST EXPENSE ADJUSTMENT | 189,845 | - | - | - | - | - |
| 2 | **Total Expense** | 269,330,831 | - | (4,116,667) | (2,385,544) | (9,395) | (156,892) |

**Entergy Texas, Inc.**
**Rate Case**
**Model Adjustments - Incremental Change**
**ETICOS0611 - Rebuttal - Electric**
**For the Test Year Ended June 30, 2011**

**Exhibit-HGL-R-3**

| Line No. | Description | Cooper<br>PPR Rider<br>AJ24 | Considine<br>AJ_INT -<br>Model Intr Sync<br>AJ 17 | Joyce<br>AJ_WC -<br>Model Work Cash<br>AJ 6 |
|---|---|---|---|---|
| | **Current Tax - Schedule M** | | | |
| 1 | INTRADJ-INTEREST EXPENSE ADJUSTMENT | - | 189,845 | - |
| 2 | **Total Expense** | **275,809,484** | **189,845** | **-** |

## SECTION III  RATE SCHEDULE

| | |
|---|---|
| **ENTERGY TEXAS, INC.**<br>Electric Service<br><br>SCHEDULE REC | Sheet No.:  110<br>Effective Date:  Proposed<br>Revision:  0<br>Supersedes:  New Schedule<br>Schedule Consists of: One Sheet Plus<br>                                   Attachments A and B |

### RENEWABLE ENERGY CREDIT RIDER

**I.      PURPOSE**

This Renewable Energy Credit Rider ("Rider REC") defines the procedure by which Entergy Texas, Inc. ("ETI" or "Company") shall implement and adjust rates for recovery of renewable energy credit costs.

**II.     APPLICABILITY**

This rider is applicable to electric service provided by the Company to all customers served under applicable retail rate schedules set forth in Attachment A to this Rider REC, whether metered or unmetered, subject to the jurisdiction of the Public Utility Commission of Texas ("PUCT").

**III.    RENEWABLE ENERGY CREDIT RATE**

The rate associated with Rider REC ("Renewable Energy Credit Rate") shall be as set forth in Attachment A by application of the formula set out in Attachment B to this Rider REC ("Renewable Energy Credit Rider Rate Development Formula").

N

The initial Renewable Energy Credit Rate shall be based on the renewable energy credit costs that the Company expects to incur on a Texas Retail basis for the twelve (12) months ending May 31, 2013.  The initial Renewable Energy Credit Rate shall become effective with the first billing cycle of the month following the date of the PUCT order approving this Rider REC if such order is received by the fifth (5th) day of the month, otherwise, the initial Renewable Energy Credit Rate shall become effective with the first (1st) billing cycle of the second subsequent month after the date of the PUCT order approving this Rider REC and shall remain in effect until superseded.

On or before May 1, beginning in 2013, the Company shall file a redetermination of the Renewable Energy Credit Rate, as set out in Attachment A by application of the formula set out in Attachment B to this Rider REC together with a set of workpapers sufficient to document fully the calculation of the redetermined Renewable Energy Credit Rate.  The redetermined Renewable Energy Credit Rate shall be based on the Renewable Energy Credit Costs that the Company expects to incur on a Texas Retail basis during the twelve (12) months beginning June 1 immediately following the applicable May filing and a true-up adjustment reflecting the Rider REC (Over) / Under Recovery Balance.  The Renewable Energy Credit Rate so determined shall be effective for bills rendered on and after the first (1st) billing cycle of July immediately following the May filing and shall remain in effect until superseded.

(Continued on reverse side)

For the initial redetermination, the true-up adjustment shall reflect the Cumulative Rider REC (Over)/Under Recovery balance for the period which shall commence on the date that the Renewable Energy Credit Rate is approved and becomes effective and shall end December 31, 2012.  For each subsequent redetermination beginning in 2014, the true-up period shall be the twelve-month billing period ended December of the prior calendar year.

Interest shall be calculated monthly on the Cumulative Rider REC (Over)/Under Recovery Balance at the interest rate established annually by the PUCT for overbilling and certain underbilling under P.U.C. SUBST. R. 25.28(c) and (d).  Interest cost shall be calculated based on the principles set out in P.U.C. SUBST. R. 25.236(e)(1).

N

## IV.    TERM

This Rider REC shall remain in effect until modified and will terminate upon the introduction of customer choice.  If this Rider REC is terminated by a future order of the PUCT, the Renewable Energy Credit Rate shall continue to be in effect until such costs are recovered through another mechanism or until new base rates reflecting the Renewable Energy Credit Costs are duly approved and implemented.

SCHEDULE REC

**Attachment A**

**ENTERGY TEXAS, INC.**

**RENEWABLE ENERGY CREDIT RATE**

**RIDER SCHEDULE REC**

**Net Monthly Rate**                                                                                                          N

The following Rate Adjustment will be added to the rates set out in the Net Monthly Bill for electric service billed under applicable retail rate schedules\* on file with the Public Utility Commission of Texas ("PUCT"). The Rate Adjustment shall be effective for bills rendered on and after the first billing cycle of June 2012 and shall remain in effect through the May 2013 Billing Month.  Amounts billed pursuant to this Rider REC are subject to State and local sales taxes.

Rate Adjustment:                                $0.000108 / kWh

\*Excluded Schedules:  EAPS, SMS and customers receiving service at transmission-level voltage that submit an opt-out notice to the PUCT and otherwise comply with the requirements of P.U.C. SUBST. R. 25.173(j).

**ENTERGY TEXAS, INC.**

**RENEWABLE ENERGY CREDIT RIDER**

**RATE DEVELOPMENT FORMULA**

| Ln No. | Description | Amount ($) |
|---|---|---|
| 1 | Texas Retail Renewable Energy Credit Costs (1) | $1,145,043 |
| 2 | Cumulative Rider REC (Over) / Under Recovery Balance (2) | $ 0 |
| 3 | Total Renewable Energy Credit Costs Before Revenue Related Expenses (Ln 1 + Ln 2) | $1,145,043 |
| 4 | Revenue Related Expense Factor (3) | 1.01307 |
| 5 | Total Texas Retail Revenue Requirement (Ln 3 * Ln 4) | $1,160,008 |
| 6 | All Non-Transmission Sales (kWh) (4) | 10,745,512,000 |
| 7 | Renewable Energy Credit Rate (Ln 5 / Ln 6) ($/kWh) | **$0.000108 / kWh** |

Notes:
(1) For the initial filing, Renewable Energy Credit Costs are to be based on the costs that the Company projects to incur during the twelve (12) months ending June 30, 2011. For subsequent redeterminations, Renewable Energy Credit Costs are to be based on Renewable Energy Credit Costs that the Company expects to incur on a Texas Retail basis during the twelve (12) months beginning June 1 immediately following the applicable May filing.

    N

(2) Attachment B, page 2, line 6
(3) Revenue Related Expense Factor = 1 / ((1-Texas Retail Bad Debt Rate) * (1-Texas Retail Revenue Related Tax Rate)). For the initial filing, the Revenue Related Expense Factor = 1/((1-0.2723% - 1.0182%) = 1.01307 where, Texas Retail Bad Debt Rate of 0.2723% is per WP/P MD 1.1, line 1, and Texas Retail Revenue Related Tax Rate of 1.0182% is per WP/P MD 1.1, line 3, in the RFP filed in the 2011 Rate Case. For subsequent redeterminations, the Texas Retail Bad Debt Rate and the Texas Retail Revenue Related Tax Rate shall be developed consistent with the methodology utilized for calculating them in the 2011 Rate Case and shall be based on the most recently available calendar year data at the time of filing.
(4) For the initial filing, Retail Billing Determinants (kWh) are based on data for the twelve (12) months ended June 30, 2011. See RFP Schedule Q-7, pages 1-11, filed in the 2011 Rate Case. For subsequent redetermination, the Retail Billing Determinants shall be based on data for the twelve (12) months ended December 31 immediately preceding the applicable May filing.

**ENTERGY TEXAS, INC.**

**RENEWABLE ENERGY CREDIT RIDER**

**RATE DEVELOPMENT FORMULA**

**(OVER) / UNDER RECOVERY BALANCE**

| Ln No. | Description | Amount (1) ($) |
|--------|-------------|----------------|
| 1 | Texas Retail Renewable Energy Credit Costs | $ 0 |
| 2 | Less Rider REC Revenue (2) | $ 0 |
| 3 | Prior Period (Over) / Under Recovery Balance (3) | $ 0 |
| 4 | (Over) / Under Recovery before Carrying Charges (Sum of Lns 1 thru 3) | $ 0 |
| 5 | Carrying Costs (4) | $ 0 |
| 6 | Cumulative Rider REC (Over) / Under Recovery Balance (Ln 4 + Ln 5) | $ 0 |

N

Notes:
(1)   For the initial filing, the (Over) / Under Recovery Balance is zero. For the initial redetermination, the number of months contained in the true-up period used to determine the Initial (Over) / Under Recovery Balance will depend upon the effective date of the initial Renewable Energy Credit Rate. For subsequent redeterminations, the true-up period used to determine the current (Over) / Under Recovery Balance shall be for the twelve (12) months ended December 31 of the immediately preceding calendar year.
(2)   For the initial redetermination, the number of months of Rider REC Revenue received will depend upon the effective date of the initial Renewable Energy Credit Rate. For subsequent redeterminations, Rider REC Revenue shall include Rider REC Revenue for the twelve (12) months ended December of the immediately preceding calendar year.
(3)   For the initial redetermination, the Prior Period (Over) / Under Recovery Balance shall be zero. For subsequent redeterminations, the Prior Period (Over) / Under Recovery Balance shall be equal to Cumulative (Over) / Under Recovery Balance (Attachment B, page 2, line 6) as filed in the immediately preceding annual Renewable Energy Credit filing.
(4)   Amounts are pursuant to Section IV of this Rider REC. Interest cost shall be calculated based on the principles set out in P.U.C. SUBST. R. 25.236(e)(1).

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | |
| TEXAS, INC. FOR AUTHORITY TO | § | BEFORE THE |
| CHANGE RATES, RECONCILE | § | STATE OFFICE OF |
| FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |
| TREATMENT | § | |

REBUTTAL TESTIMONY

OF

PHILLIP R. MAY

ON BEHALF OF

ENTERGY TEXAS, INC.

APRIL 2012

1

ENTERGY TEXAS, INC.
REBUTTAL TESTIMONY OF PHILLIP R. MAY
DOCKET NO. 39896

## TABLE OF CONTENTS

Page

I.    Introduction                                                                      1

      A.    Introduction and Qualifications                                    1

      B.    Purpose of Rebuttal Testimony                                      1

II.   Overall Requested Rate Increase                                         2

III.  Purchased Power Capacity Cost                                           9

IV.   The Company's Use of Riders                                             16

V.    Baseline Values for Transmission, Districution, and Purchased Power   20

VI.   Affiliate Cost                                                          25

VII.  Conclusion                                                              31

## EXHIBITS

Exhibit PRM-R-1     Comparison of Costs and Revenue Requirement for Docket
                    Nos. 34800, 37744, and 39896

## I.     INTRODUCTION

### A.     Introduction and Qualifications

Q.     PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A.     My name is Phillip R. May.  My business address is 639 Loyola Avenue, New Orleans, Louisiana  70113.

Q.     DID YOU PREVIOUSLY FILE DIRECT TESTIMONY ON BEHALF OF ENTERGY TEXAS, INC. ("ETI" OR "THE COMPANY") IN THIS PROCEEDING?

A.     Yes, I did.

Q.     DO YOU SPONSOR ANY EXHIBITS OR SCHEDULES IN THIS FILING?

A.     I sponsor the Exhibits listed in the Table of Contents.

### B.     Purpose of Rebuttal Testimony

Q.     WHAT IS THE PURPOSE OF THIS TESTIMONY?

A.     I will address certain comments and recommendations made by 1) Cities witnesses James Z. Brazell, Mark E. Garrett, Dennis W. Goins, and Karl J. Nalepa, 2) The Kroger Co. witness Kevin Higgins, 3) the Office of Public Utility Counsel ("OPUC") witness Carol Szerszen, 4) the State Agencies witness Kit Pevoto, and 5) Texas Industrial Energy Consumers witness Jeffry Pollock.

Specifically, the subjects I will address are:

- overall requested rate increase

- purchased power capacity cost and load growth,

- the Company's use of riders,

- establishment of baseline values for transmission, distribution, and purchased power cost, and

- certain affiliate costs disallowances proposed by OPUC.

## II.    OVERALL REQUESTED RATE INCREASE

Q.    ON PAGE 6, MR. BRAZELL STATES THAT THE COMPANY'S ADJUSTMENTS PROPOSED IN THIS CASE ARE THE SAME THAT IT TOOK IN ITS PRIOR RATE CASE, AND THAT THOSE "DISCREDITED CLAIMS" ULTIMATELY "FORCED' ETI TO SETTLE THAT CASE AT WELL BELOW ITS REQUEST.    DO YOU AGREE WITH HIS CHARACTERIZATIONS AND POSITION?

A.    No, Mr. Brazell's claims are completely without merit.  First, Mr. Brazell states that the Company was "ultimately forced to settle" for less than Company's initial request.  Settlements are not "forced" upon any party.  Each party has within its control the ability to either accept or reject a settlement offer.  Asserting that any party was "forced" to enter into settlement is simply not correct.  Also, Mr. Brazell's own forced logic would apply to the Cities' claims in Docket No. 37744.  In Docket No. 37744, the

Cities proposed a rate reduction of $6.6 million.[1]  Using Mr. Brazell's logic the Cities had similar discredited claims that "forced" the Cities to settle for $75 million more than their filed position.

Q.    ON PAGE 6, MR. BRAZELL CLAIMS THAT ETI HAS FILED THE SAME RATE CASE IN THIS DOCKET AS IT DID IN DOCKET NO. 37744.  DO YOU AGREE?

A.    No.  In fact Mr. Brazell's own analysis does not support his conclusion.

Q.    PLEASE EXPLAIN.

A.    The line item detail in Mr. Brazell's own Exhibit JZB-3 shows that ETI's net plant has actually grown by $138 million, or 7.5%, from Docket No. 37744 to Docket No. 39896.[2]  The line item detail in Mr. Brazell's Exhibit JZB-4 also shows that non-purchased power O&M has grown by $1.7 million, or 0.9%, from Docket No. 37744 to Docket No. 39896.[3]  The purchased power capacity cost presented on Mr. Brazell's Exhibit JZB-4 shows that purchased power capacity cost has increased by $12.1 million, or 4.8%, from Docket No. 37744 to Docket No. 39896.[4]  I also note that, in his

---

[1]    Docket No. 37744, Cities Garret direct testimony, page 5, line 13, filed June 9, 2010.

[2]    Exhibit JZB-3, line 1, Docket No. 39896 value of $1.977077 billion compared to Docket No. 37744 value of $1.839973 billion.

[3]    Exhibit JZB-4, line 1, Docket No. 39896 value of $211.215 million compared to Docket No. 37744 value of $209.555 million.

[4]    Exhibit JZB-4, line 16, Docket No. 39896 value of $267.641 million compared to Docket No. 37744 value of $255.492 million.

Exhibit JZB-4, Mr. Brazell labels this purchased power capacity cost as "Proposed Rider Revenues," but this cost is more appropriately included in O&M cost to ensure an "apples to apples" comparison, which Mr. Brazell did not do.[5]

Importantly, one of the largest changes in cost shown on his Exhibit JZB-4 is actually a decrease in cost for depreciation expense in this rate case compared to the prior filing. These types of changes can in no way be interpreted as the Company filing the same case. Moreover, as explained below, his exhibits understate the true differences.

Q. IN ADDITION TO THE POINTS YOU MAKE ABOVE, DO MR. BRAZELL'S EXHIBITS JZB-3 AND JZB-4 PROVIDE AN ACCURATE COMPARISON BETWEEN THESE RATE CASES?

A. No. Mr. Brazell also has failed to recognize that he is comparing total company values from Docket No. 37744 to retail values from Docket No. 39896.[6]

---

[5] See Brazell deposition page 34, line 23 through page 35, line 2. Mr. Brazell acknowledges that the values on line 16 of his Exhibit JZB-4 that he labels Proposed Rider Revenues are purchased power capacity costs.

[6] See Brazell deposition pages 42-43 where he acknowledged that he was not aware of and did not investigate whether these were total company or retail values.

Q.    HAVE YOU RESTATED MR. BRAZELL'S EXHIBITS JZB-3 AND JZB-4 TO REFLECT PROPER COMPARISONS?

A.    Yes.  Attached as my Exhibit PRM-R-1 is a restatement of Mr. Brazell's Exhibits JZB-3 and JZB-4.  In addition to the filed cases, my exhibit also shows a set of "adjusted" columns which reflect the Company's rebuttal cases.  Using the Company's rebuttal cases 1) corrects for the total company value in Docket No. 37744 versus retail in Docket No. 39896 issue because the Company's rebuttal case in Docket No. 37744 adjusted Docket No. 37744 to one that allocates to retail; and 2) corrects for those adjustments/corrections which the Company agreed to and therefore these adjusted columns are more appropriate for the type of comparison Mr. Brazell was attempting to do.

The first page of Exhibit PRM-R-1 shows the rate case detail for O&M expenses and net plant for these three rate cases.  Lines 1 and 10 of this exhibit show that O&M expenses have increased by $13 million since the last rate case.  Lines 11 and 19 of this exhibit show that net plant has increased by $180 million since the last rate case.  Page two of Exhibit PRM-R-1 shows the overall revenue requirement comparison for these rate cases.  Line 2, of Page 2 of this exhibit shows that Purchased Power Expense has increased by $32 million; Line 6 shows that depreciation expense has decreased by $29 million; and the overall requested revenue requirement has increased by $35 million in this rate case compared to the prior rate case.

Again, the scope and scale of changes can in no way be interpreted as the Company filing the same case and can't even be interpreted as the ETI filing for the same overall revenue requirement, given the $35 million increase mentioned above.

Q. ON PAGE 7, MR. BRAZELL STATES THAT ETI'S RETURN ON INVESTMENT HAS REMAINED RELATIVELY CONSTANT. PLEASE COMMENT.

A. As mentioned above, Exhibit PRM-R-1 shows that the Company's investment in net plant has grown by $180 million or 10% in the two years between the test years in ETI's 2009 rate case and the current 2011 rate cases. This increase in net plant is being offset by other changes. For example, the overall rate of return is less in this rate case compared to that proposed in Docket No. 37744.

Q. ON PAGE 9, MR. BRAZELL STATES THAT OPERATING EXPENSES HAVE NOT CHANGED SUBSTANTIALLY BETWEEN CASES. IS THIS CORRECT?

A. No. This fact is apparent even from Mr. Brazell's Exhibit JZB-4: the purchased power capacity cost, shown on line 16, has not been included in his calculation of the Company's operating expenses. As mentioned above, and as shown on Exhibit PRM-R-1, other O&M costs have increased by $13 million since the last rate case, and purchased power

cost has increased by $32 million since the last rate case. Even the Cities' own witness Nalepa states, contrary to Mr. Brazell, that ETI's purchased power capacity cost has increased by $31 million from the test year to rate year.[7]

Q. ON PAGE 12, MR. BRAZELL STATES THAT HE IS TROUBLED BY ETI RECEIVING $96 MILLION IN RATE INCREASES, AND IS TROUBLED THAT ETI CONSIDERS THAT IT IS AT LIBERTY TO FILE SUCCESSIVE RATE REQUESTS AT THE SAME LEVEL. PLEASE COMMENT.

A. Both Docket No. 34800 and Docket No. 37744 were settled cases and neither settlement imposed a rate freeze that would preclude the Company from filing a rate request at any time in the future. In addition, as discussed above, the Company is not filing the same rate request.

Q. WHY HAS THE COMPANY FILED SUCCESSIVE RATE CASES IN RECENT YEARS?

A. The Company has now filed its third rate increase request within the past six years because ETI's costs continue to grow and, as a result, it continues to under-recover its costs. A significant driver for these requests is ETI's purchased power capacity needs, which, under current Commission policy, can only be recovered through base rates.

---

[7] Nalepa Direct Testimony, page 11, line 2.

Mr. Brazell also refers to the "tremendous" cost of these proceedings on the Commission, parties and ratepayers. The Company certainly acknowledges that it incurs substantial costs and resources to prepare, file, and prosecute these cases. However, as noted above, the Company has no choice but to file such cases in an attempt to recover its costs.

Q. DO YOU HAVE ANY ADDITIONAL COMMENTS REGARDING WHAT MR. BRAZELL CLAIMS ON HIS PAGE 12 AS "TROUBLING"?

A. Yes. Due to ETI's relative scale, a cost increase of just $13 million can result in a 100 basis points reduction in the Company's earned Return on Equity (ROE). Unfortunately, Mr. Brazell's own analysis confirms that increases in third-party capacity purchases alone are many multiples of the $13 million. The fact is that ETI has very limited options other than filing successive rate cases in an effort to recover its costs. As noted above, purchased power capacity costs continue to be a significant driver for these requests. Alternative recovery mechanisms, such as a purchased capacity rider, would provide a more streamlined and efficient approach to cost recovery and would mitigate ETI's need to file successive rate increase requests.

However, it is rather amazing that in this same testimony, Mr. Brazell states that he is against further use of riders and does not want to establish a baseline for transmission, distribution, and purchased power

costs. Mr. Brazell's positions contradict themselves. It is disingenuous for him to bemoan the cost of a rate case and yet seek to erect barriers to the very things that could streamline the rate recovery process and mitigate the need for additional costly rate cases. I will discuss each of these topics further below.

III.    PURCHASED POWER CAPACITY COST AND LOAD GROWTH

Q.    ON PAGES 8 AND 18, CITIES WITNESS GOINS RECOMMENDS THAT ETI'S PURCHASED POWER CAPACITY COST BE REDUCED BY $35 MILLION DOLLARS. WHAT IS HIS BASIS FOR MAKING THIS RECOMMENDATION?

A.    He states the basis for this adjustment is 1) a reduction in costs for Legacy Affiliate Contracts to reflect more current pricing data; 2) a reduction for Other Affiliate Contracts and Reserve Equalization to reflect more recent contract pricing data and Cities recommended 50 percent reduction in EAI WBL contract; and 3) a reduction in purchased power capacity costs to reflect load growth forecasted to occur. Company witness Robert Cooper's rebuttal testimony will address the first two items. I will address the load growth issue.

Q.     ON PAGES 16 THROUGH 18, DR. GOINS SUGGESTS THAT THE COMPANY'S REQUESTED PURCHASED POWER CAPACITY COST SHOULD BE REDUCED TO REFLECT LOAD GROWTH.  HOW MUCH HAS DR. GOINS ESTIMATED AS THE LOAD GROWTH ADJUSTMENT?

A.     His estimated load growth adjustment is approximately $16 million of the overall $35 million adjustment (disallowance) proposed by Cities.

Q.     IS A LOAD GROWTH ADJUSTMENT FOR PURCHASED POWER COST APPROPRIATE?

A.     No.    The Company's filed case includes known and measurable purchased power expenses as allowed by Commission Substantive Rule 25.231(a).    The Company's filing has followed the Commission's requirements, and reflects known and measurable changes of costs, billing determinants, and present revenues, unlike the Cities proposal, which forecasts a load growth adjustment out to December 2013.  A distinct difference between the Company's filed case and the adjustments proposed by the Cities is that the Cities have proposed a load growth adjustment based on forecasted sales that are not known and measurable.  Their excuse for making this adjustment is based on ETI adjusting its purchased power capacity expenses to a rate year level.  The Company's adjustments to its purchased power capacity expense, however, reflect actual signed contracts with known and measurable cost levels and start dates as discussed by Company witness Cooper.  These

amounts are known and measurable; Cities' proposed sales adjustments are not.

Q. ON PAGE 17, DR. GOINS STATES THAT ETI IS IMPLICITLY ASKING THE COMMISSION TO IGNORE LOAD GROWTH AND SET RATES IN THIS CASE USING RATE YEAR PURCHASED CAPACITY POWER COSTS AND TEST YEAR BILLING DETERMINANTS. PLEASE COMMENT.

A. As discussed above, forecasted sales are not, and cannot, be considered known and measurable. This is very different from purchased power capacity costs for which contracts have been signed, which result in costs that are known and measurable. As discussed in the rebuttal testimony of Company witness Cooper, ETI is currently short of capacity and would need these rate-year purchases even if ETI load did not grow from the test-year to the rate-year. Therefore, these purchased power costs are clearly consistent with the test year load because they are needed to meet existing ETI load requirements. It is inappropriate to reduce ETI's purchased power costs by a load growth adjustment as suggested by Dr. Goins. The Commission should reject Dr. Goins' adjustment.

Q.   ON PAGE 22, DR. GOINS ALSO CALCULATES AND APPLIES A LOAD GROWTH ADJUSTMENT TO THE MSS-2 COSTS.   IS THIS APPROPRIATE?

A.   No.  As discussed above, a load growth adjustment is not known and measurable.  In addition as discussed by Company witness Pat Cicio and as demonstrated by Company witness Mark McCulla, the increase in ETI's MSS-2 related payments in the rate year is driven by changes in the Net Transmission Investment balances among the Operating Companies.  Specifically, changes in ETI's Net Transmission Investment in the rate year are relatively short versus the other Operating Companies.  As a result, ETI must make payments to the other Operating Companies in accordance with MSS-2.  This increase in MSS-2 payments is driven by transmission investment; changes in load have a *de minimis* effect.  It is wholly inappropriate to reduce ETI's MSS-2 expense by a load growth adjustment as suggested by Dr. Goins.  The Commission should reject Dr. Goins' adjustment.

Q.   ON PAGE 5 AND PAGES 7 THROUGH 18, CITIES WITNESS NALEPA SUGGESTS AN ALTERNATIVE TO DR. GOINS' ADJUSTMENT TO PURCHASED POWER CAPACITY OF $39 MILLION.   PLEASE COMMENT ON HIS RECOMMENDATION

A.   Initially, as discussed above, the Company's proposal for rate year cost (based on signed contracts) and test year billing determinants is

consistent with the statute and provides that both the cost and billing determinants reflect known and measurable effects and not a forecasted, unknown level of sales.

Q. ON PAGES 9 THROUGH 10, MR. NALEPA DISCUSSES AN EXAMPLE UTILITY AND CAPACITY COST SCENARIO. IS THIS DISCUSSION RELEVANT?

A. No. Mr. Nalepa's example is not relevant because ETI's situation is neither similar nor analogous to his hypothetical example. Mr. Nalepa assumes an existing utility has 100 kW of load and 100 kW of generation. This utility then grows by 50 kW of load and 50 kW of generation whereby the 50 kW of new generation has different unit costs than the original 100 kW. The distinctions between this example and the facts of the Company's filed case are that: 1) unlike his example, ETI is and has in the past few years been short on capacity, meaning that even a negative load growth would nevertheless necessitate ETI's continuing need to acquire additional capacity; 2) the additional 50 kW of generation in Mr. Nalepa's example may be a known event, however, there is an unknown price and uncertain outcomes, which is in contrast ETI's situation in that it has signed contracts with known price; and 3) the 50 kW of added load is a forecasted event that is not known to occur.

The primary problem with Mr. Nalepa's example is that he has assumed that the Company is acquiring this new generation for the sole

purpose of serving new load, but, as discussed in Company witness Cooper's testimony, this is not the case because ETI is currently short on capacity The Company's development of a rate year level of capacity cost is based on actual contracts signed and in place that are necessary to meet the Company's existing requirements.

Q. ON PAGE 11, MR. NALEPA STATES THAT THE COMPANY IS CONTRACTING FOR CAPACITY RESOURCES TO MEET FUTURE DEMAND BUT IS INTENDING TO RECOVER THIS COST FROM CURRENT CUSTOMERS. IS THIS STATEMENT ACCURATE?

A. No. As described above and in the testimony of Company witness Cooper, ETI is short of capacity now. It is not accurate to assume that capacity is being purchased solely to meet the requirements for future load. In fact, the Company's development of a rate year level of capacity cost reflects a level of resources that still requires ETI to purchase reserve capacity through MSS-1. In other words, the Company remains relatively short in the rate year.

Q. ON PAGE 23, TIEC WITNESS POLLOCK DISCUSSES LOAD GROWTH. WHAT DOES TIEC PROPOSE?

A. Rather than make a load growth adjustment as suggested by Cities, and discussed above, Mr. Pollock suggests: 1) make no load growth

adjustment, and 2) ignore the rate-year purchases and instead revert to test-year values.

Q. ON PAGE 23, MR. POLLOCK STATES THAT THE ADDITIONAL PURCHASED POWER COST IS DUE TO MEETING FUTURE LOADS. IS THIS STATEMENT CORRECT?

A. No. As discussed extensively above and in Company witness Cooper's rebuttal testimony, the Company's development of a rate year level of capacity cost reflects a level of resources that still requires ETI to purchase reserve capacity through MSS-1; it remains relatively short.

Q. ON PAGE 23, MR POLLOCK CLAIMS THAT ETI'S PROPOSAL HAS VIOLATED THE MATCHING PRINCIPLE. IS THIS STATEMENT CORRECT?

A. I disagree with Mr. Pollock, as discussed above, the Company's filing has followed the statutory requirements, and reflects known and measurable changes of costs, billing determinants, and present revenues. In any event, Mr. Pollock's arguments carry no weight. As also discussed above, these purchased power capacity costs are required to meet ETI's current load, not a future load.

## IV. THE COMPANY'S USE OF RIDERS

Q. ON PAGES 14 AND 15, MR. BRAZELL LISTS ETI'S CURRENT AND PROPOSED RIDERS AND STATES THAT ETI CURRENTLY RECOVERS A LARGE PORTION OF ITS COSTS THROUGH RIDERS. PLEASE COMMENT.

A. Mr. Brazell lists 11 riders. Of these 11, the Purchased Power Rider has been removed from this case and thus the list of riders is really only 10. Of these remaining 10, he agrees that some are necessary and appropriate, specifically the four energy efficiency and "storm" riders.[8] Energy efficiency would be Rider EECRF in his list in Table 3 on page 15, and storm riders are Riders HRC, SRC, and SCO. Of the remaining 6 riders: 1) Rider TTC was implemented and approved in accordance with PURA § 39.454 to recover ETI's (then Entergy Gulf States, Inc's Texas utility) transition to competition costs incurred prior to September 2005; 2) Rider RCE is the rider proposed in this docket for recovery of the Company's (and Cities') rate case expenses incurred in this docket; 3) Rider REC is proposed in this docket for recovery of the Company's renewable energy credit costs incurred pursuant to PURA § 39.904; 4) Rider IFFR is for recovery of incremental franchise fees incurred by ETI. It is a rider that was extended in accordance with the unopposed settlement agreement entered into and approved in Public Utility

---

[8] Brazell direct, page 15, line 4.

Commission of Texas ("PUCT") Docket No. 34800 and this rider is authorized by PURA § 39.456. The two remaining riders on Mr. Brazell's list ("TCRF" and "DCRF") pertain to transmission cost recovery and distribution cost recovery mechanisms, both authorized by PURA § 36.209 and PURA § 36.210, respectively, that have not yet been filed for or implemented by ETI. Rather, ETI has requested, and the Commission has agreed, that baseline values for these two future TCRF and DCRF riders be established in this docket so as to avoid needing to file a future rate case to establish these values (see discussion above regarding successive rate cases and discussion below regarding establishment of a baseline for TCRF and DCRF). These six riders (that is, not the EECRF or storm-related riders), only recover approximately $12 million annually. This in no way should be interpreted as an "expansive use of riders" as claimed by Mr. Brazell. These six riders are the sum of his complaint. It is not the $381 million listed in his table. These riders evolved from special circumstances, are approved by the Commission and implemented in accordance with rider-specific PURA provisions, PUCT rules, or ETI settlements agreed to by Cities. Mr. Brazell acknowledged in his deposition that his primary concern with riders in this

case was with the PPR rider.  He further acknowledged that the PPR rider is no longer an issue for the case.[9]

Q.   ON PAGES 16 AND 17, MR. BRAZELL ARGUES THAT ETI'S RIDERS (WHETHER IN EFFECT OR PROPOSED) VIOLATE "PIECEMEAL RATEMAKING" PRINCIPLES. DO YOU AGREE?

A.   No, I do not.  Piecemeal ratemaking is a term that opponents of alternative ratemaking often use to encompass any streamlined rate mechanism that departs from traditional rate-setting practice by allowing rate adjustments to specific cost components outside a full rate case.  Opponents often argue that "piecemeal ratemaking" is prohibited by statute. In fact, a number of different streamlined rate riders and cost recovery factors that might be viewed as piecemeal are expressly authorized under PURA and have been approved by the Commission over the last ten years.  For example, Riders TCRF and DCRF have been specifically authorized by this Commission, and timely recovery of purchased power capacity costs through a rider is currently subject to a rulemaking proceeding opened by the Commission.[10]

---

[9]   Brazell deposition page 61 through 62.  Brazell direct testimony page 18, line 3 through 7 he refers to PPR, TCRF and DCRF being his primary concern.

[10]  *Rulemaking Proceeding Concerning Recovery of Purchased Power Capacity Costs, Including Amendment of SUBST. R. § 25.238*, PUCT Project No. 39296 (initiated March 10, 2011).

Q.   ON PAGE 17, CITIES WITNESS NALEPA STATES THAT THE PURCHASED POWER BASELINE ESTABLISHED IN THIS RATE CASE SHOULD BE ON A $/KW BASIS. PLEASE COMMENT.

A.   It can be anticipated that the proper denominator and application of a $/kW baseline will be debated in the purchased power capacity rulemaking referenced above. Parties will likely argue whether the denominator should be load or the capability of purchases, and whether load growth should be reflected and, if so, how. The Company, along with all other parties, should not be precluded from making arguments they deem appropriate in that rulemaking proceeding by setting a $/kW value in this docket as suggested by Mr. Nalepa. Instead, to ensure that a purchased power capacity baseline developed in this docket can be used in the capacity recovery mechanism ultimately approved in the rulemaking proceeding, that baseline should be established on a dollar basis, with the appropriate measure and evaluation of changes in this baseline left to be set in that rulemaking proceeding.

V.      BASELINE VALUES FOR TRANSMISSION, DISTRIBUTION, AND
                    PURCHASED POWER

Q.      ON PAGES 18 AND 19, MR. BRAZELL STATES "INSTEAD OF ATTEMPTING TO FASHION BASELINES IN THIS CASE" THE COMPANY SHOULD INSTEAD BE REQUIRED TO FILE AN UPDATED SCHEDULED P AS PART OF A COMPLIANCE FILING AT THE END OF THIS PROCEEDING, AND THAT WOULD PROVIDE ANY INFORMATION RELEVANT TO "SETTING A POSSIBLE FUTURE TCRF OR DCRF." DO YOU AGREE?

A.      No. The Supplemental Preliminary Order issued in this docket on January 19, 2012, at pages 2-4, states that an issue to be addressed in this case is: "What are the baseline values that should be used for calculating Entergy's future transmission cost recovery factor and distribution cost recovery factor." This is a specific directive that the baselines be set in this docket.

As the Company explained in its briefing on threshold legal/policy issues in this case, ETI is not asking the Commission to establish values other than those that will be needed to implement a TCRF and DCRF in the future consistent with the applicable rules. In most rate cases, these baseline values would be embedded in the various memos or schedules that support the final order in the rate case. By specifically identifying the baseline values, the Commission will help the parties in future cases avoid disputes regarding how such memos and/or schedules should be

construed in determining the appropriate baseline values. Mr. Brazell acknowledged in his deposition that Schedule P would not be in sufficient detail to establish baseline values for certain FERC accounts anyway.[11] Therefore, Mr. Brazell's suggestions should be rejected and baseline values for purchased power, transmission, and distribution should be established in this docket in sufficient detail to facilitate future TCRF, DCRF, or purchased power filings (assuming the purchased power rulemaking establishes those procedures).

Q. ON PAGES 5 AND 16-17, STATE WITNESS PEVOTO RECOMMENDS THAT WHEN SETTING THE BASELINE FOR PURCHASED POWER COST IN THIS DOCKET, THE BASELINE SHOULD BE LIMITED TO PURCHASED CAPACITY COSTS ASSOCIATED WITH NON-AFFILIATED THIRD-PARTY CONTRACTS, AND NOT INCLUDE "LEGACY, AND OTHER AFFILIATE CONTRACTS AND RESERVE EQUALIZATION PURCHASES." WHAT IS YOUR UNDERSTANDING OF HER POINTS?

A. Ms. Pevoto states that the Company's affiliate-related purchased capacity contracts are essentially agreements "set up to share centralized planned generation capacity resources among Entergy Operating Companies" and are not market competitive contracts.

---

[11] Brazell deposition pages 69-73.

Q.   ARE MS. PEVOTO'S ASSERTIONS CORRECT?

A.   No.   Her comments do not fully reflect the current nature of these transactions.  The affiliate-related transactions are beneficial to ETI from both pricing and flexibility purposes, and therefore are beneficial to ETI's customers.  These transactions have been market-tested and should not be removed from a purchased capacity baseline.  For example, the Perryville and Calcasieu purchases are examples of capacity that was purchased on the open market as a result of a bidding process and are simply priced to ETI from EGSL using the MSS-4 service schedule.  A somewhat different example would be the Calpine-Carville purchase, described in the direct testimony of Company witness Cooper, whereby ETI is purchasing the capacity of this facility from an external non-affiliate third-party and is then selling 50% of this capacity to Entergy Gulf States Louisiana, LLC via an affiliate transaction using MSS-4.  It is unclear from Ms. Pevoto's recommendation whether she is suggesting that the full amount of the purchase be reflected in the baseline, but not the 50% sale to EGSL because it is an affiliate transaction.

Affiliate transactions and their pricing based on MSS-4 are simply being used by the Entergy System to maintain maximum flexibility and efficiency in the acquisition of capacity.  Ms. Pevoto's suggestion would imply that the Company should no longer seek any affiliate transaction and only negotiate purchases whereby ETI is the sole purchaser.  This is an unrealistic constraint on the flexibility of ETI to acquire capacity given

its relative small size and the inefficiency of forcing ETI to negotiate individual deals for itself that can instead be negotiated by ESI on behalf of all the Entergy Operating Companies. The Commission should not preclude the Company and its customers from seeking beneficial contracts just because they fit in a category of "affiliate purchases." In addition, it is my understanding that requiring ETI to only purchase capacity whereby it is the sole purchaser and no other affiliate is involved is in direct violation of the System Agreement.

Q. DOES THE STATE'S PROPOSAL TO DETERMINE IN THIS PROCEEDING THE SCOPE OF COSTS TO BE INCLUDED IN A FUTURE PPR RAISE ANY OTHER CONCERN?

A. Yes. It is inappropriate to bind parties to positions they may, or may not, take in the purchased power rulemaking at this time. If, on the other hand, the Commission wishes to consider these issues in this docket it is the Company's position that the best way to design a purchased power rider is to exclude all purchased power from base rates to ensure no over- or under- recovery of this cost through base rates. Thus, the Commission should reject the State's proposal.

Q.    DO YOU AGREE WITH INTERVENOR SUGGESTIONS TO STATE THE PURCHASED POWER BASE LINE VALUE ON A UNIT BASIS (*E.G.*, $/MW OR MW-MO)?[12]

A.    No.  The intervenors' use of a unit value for purchased power is part and parcel of their arguments on the effects of load growth.  Adoption of their proposal to use a unit value as a base line would pre-determine that load growth should be taken into account and how it should be taken into account in any future rider that may be adopted as part of the pending rulemaking on this subject.  That is a policy issue that must be considered by the Commission as part of the rulemaking, where all interested parties who may be affected by a proposed rule have an opportunity to weigh in on the appropriate policy to be adopted.   As to the purchased power base line, the purpose of this contested case proceeding is only to set a baseline that can be used in future proceedings to support a rider, not to determine how that baseline should be used in any future rider.  The ALJs and Commission can make base line findings on the total dollars for purchased power and, if necessary, the volume (MW) so that parties have sufficient information to advance their positions on the appropriate method to reflect load growth as part of a future proceeding.

---

[12]   Nalepa direct at page 17, lines 11-16.  Pollock direct at page 27, line 7.

## VI.   AFFILIATE COST

Q.   ON PAGE 48, OPUC WITNESS SZERSZEN ADJUSTS AFFILIATE COSTS BY $759,868 FOR PROJECTS F3PCSYSRAS AND F3PCSYSRAF.  PLEASE DESCRIBE THESE TWO PROJECT CODES.

A.   The affiliate charges to Project Codes F3PCSYSRAS and F3PCSYSRAF are directly associated with the issues and matters within the federal jurisdiction of the Federal Energy Regulatory Commission ("FERC") including but not limited to the Open Access Transmission Tariff ("OATT") as well as any other federal statutes, rules and regulations.  These are the result of issues and matters raised concerning the OATT, operations of the transmission system, requests for transmission service and interpretation of applicable provisions under the jurisdiction of FERC.  They are costs incurred on an Entergy System-wide basis that cannot be directly assigned to any one Operating Company, such as ETI.  Further, the affiliate test year issues and costs related to these project codes are reflective of typical issues and costs that the Company experiences on an ongoing basis.  These issues and matters, once resolved, do not result in the permanent conclusion of issues and matters.  Similar type of issues and matters, as well as new issues and matters, are commonly and repeatedly raised concerning operations and interpretations of applicable provisions under the jurisdiction of FERC.

Q. WHAT ARE THE REASONS GIVEN BY DR. SZERSZEN FOR DISALLOWING THESE COSTS?

A. Dr. Szerszen seems to base her proposal on three arguments: 1) that Texas is being allocated costs associated with FERC dockets that are not related to ETI electric operations and transmission issues; 2) that FERC dockets identified with project code F3PCSYSRAF are no longer active; and 3) the use of either a customer count or load responsibility ratio for allocation purposes to allocate this cost to ETI is not appropriate.

As to her first point, Dr. Szerszen states that there is "no evidence that Texas ratepayers are receiving any specific benefits from 'system' regulatory affairs costs in proportion to the allocated costs." That is simply not true. My testimony on the affiliate costs in my Regulatory Support Affiliate Class, as well as the affiliate testimony of all other ETI affiliate class witnesses, provides ample evidence of the reasonableness and necessity of these costs. In addition to the proof of reasonableness and necessity shown in the Company's affiliate case, ETI benefits because these are costs incurred by a centralized service company (ESI) to support all of the Entergy Operating Companies, rather than ETI bearing the costs of these services wholly on its own. In addition, ETI is required to participate in Entergy's OATT, routine filings of the OATT are required by the FERC, and Entergy's participation in these dockets protects the interest of ratepayers since the OATT revenues are credited to the retail revenue requirement.

Q. ON PAGE 48, DR. SZERZSEN REFERS TO ETI'S RESPONSE TO OPUC RFI 2-10 THAT LISTS 10 FERC-RELATED DOCKETS, WHICH SHE SAYS WERE ASSOCIATED WITH "MISCELLANEOUS FILINGS AT FERC" AND THAT ARE NO LONGER ACTIVE. WHAT IS YOUR RESPONSE?

A. First, Dr. Szerszen does not state that these costs were not incurred, or were incurred outside of the test year. These costs were actually incurred. Second, these affiliate charges are ordinary, necessary and similar in nature to issues and matters that occur, and cost that are incurred, on an annual basis. These issues and matters, once resolved, do not result in the permanent conclusion of issues and matters. These same issues (*e.g.*, FERC rulemakings or other filings), and similar types of issues and matters are commonly and repeatedly raised concerning operations and interpretations of applicable provisions under the jurisdiction of FERC. Dr. Szerszen's characterization of these cases answers her own concern with regard to these ten cases. They were "miscellaneous filings." Entergy Services, Inc., on behalf of all of the Entergy Operating Companies, makes numerous miscellaneous filings at the FERC every year throughout the year. These test year costs, therefore, are representative of the costs incurred and then allocated to ETI and all the other Entergy Operating Companies on an ongoing basis.

Any activity at FERC that would affect ETI, either directly or indirectly (*e.g.,* through ESI), is promptly identified and a plan of resolution

is developed. With respect to SYSRAF, coordination of regulatory strategy between the various state regulatory organizations ensures that efforts are efficiently expended toward a common goal. Further, the benefit to ETI involves a multitude of issues that are directly related to the jurisdiction of the FERC, including but not limited to any revisions to Service Schedules under the System Agreement that applies to all operating companies including ETI, power purchase agreements for cost-based, short-term power sales, and compliance with FERC by each Operating Company to the market-based rate tariff and cost-based rate tariff. The Entergy Operating Companies' market-based rate tariff and cost-based rate tariff are joint tariffs containing terms and conditions of service.

These costs, therefore, should not be disallowed and have been shown, through testimony, to meet the Commission's affiliate cost recovery standard.

Q.  PLEASE COMMENT ON THE BILLING ALLOCATION METHODOLOGY UTILIZED FOR THESE TWO PROJECT CODES.

A.  Project Code F3PCSYSRAF utilizes billing method "LOADOPCO" to allocate costs to each Entergy Operating Company. As discussed in my direct testimony, this billing method is based on the load responsibility of the regulated companies. Project Code F3PCSYSRAF captures costs associated with oversight of FERC activities for the Entergy Operating

Companies to ensure that the issues affecting, and interests of, the Companies and their customers at the FERC are adequately addressed. The primary activities associated with this project code include, but are not limited to: preparation of filings, testimony and other documents; response to requests for information in regulatory proceedings; meeting with FERC Staff; and oversight activities. What drives the cost of this project code are labor, employee expenses, consultants and other general operating expenses incurred for the benefit of the Entergy Operating Companies and their regulated customers. Therefore, a billing method based on load responsibility is appropriate for this type of project code.

Project Code F3PCSYSRAS utilizes billing method "CUSTEGOP" to allocate costs to each Operating Company. As discussed in my direct testimony, this billing method is based on the average number of electric and gas customers of the regulated companies. Project Code F3PCSYSRAS captures costs associated with general regulatory support work that is applicable across all of the jurisdictions. The primary activities associated in this project code include but are not limited to: special project work associated with system-wide regulatory matters, analysis of emerging state or national regulatory and accounting issues affecting the Entergy System, and internal process improvement work. What drives the cost of this project code is the average number of both electric and gas customers served because all such customers benefit from these services provided by ESI to ETI.

These billing methods appropriately assign costs to each Operating Company, including ETI, based on their responsibility. Dr. Szerszen has not suggested what billing method would be more appropriate and, even if she did, those that have been applied to these two project codes are appropriate for the reasons stated above.

Q. ON PAGES 69 AND 70, OPUC WITNESS SZERSZEN ADJUSTS AFFILIATE COSTS BY $171,032 FOR PROJECT CODE F3PPE9981S. PLEASE DESCRIBE THIS PROJECT CODE.

A. The primary products or deliverables of this project are the services of the Integrated Energy Management department, discussed in my direct testimony, to coordinate and deliver results of AMI, Smart Grid, energy efficiency, demand-side management, technology, renewables, climate change, and supply-side management.

Q. ON PAGE 70, OPUC WITNESS SZERSZEN SUGGESTS THAT ALL ETI ENERGY EFFICIENCY AND DSM ACTIVITY SHOULD BE RECOVERED IN RIDER EERC. HOW DO YOU RESPOND?

A. The Company has proposed recovery of these costs through base rates rather than through the EECRF Rider because these activities are not subject to an active ETI energy efficiency program. These activities are more in the nature of general research and development activities that help drive the Company's strategy on these topics, such as the timing of

implementing related programs. In the meantime, until these activities result in an actual program proposal, these are legitimate known and measurable costs that the Company has incurred and should then be recovered from retail customers. Therefore, the costs that Dr. Szerszen addresses on these pages are properly allocated and billed, are not in the EECRF, and, therefore, should be allowed.

## VII.     CONCLUSION

Q.     DOES THIS CONCLUDE YOUR REBUTTAL TESTIMONY?

A.     Yes.

ETI O&M EXPENSES, NET PLANT IN SERVICE COMPARISON
DOCKET NOS. 34800, 37744, 39896
(000)

| Line | Item | (a) Filed Docket # 34800 | (b) Filed Docket # 37744 | (c) Adjusted Docket # 37744 | (d) Increase to Docket # 37744 | (e) Filed Docket # 39896 | (f) Adjusted Docket # 39896 | (g) Increase to Docket # 39896 |
|---|---|---|---|---|---|---|---|---|
| 1 | O&M Expenses | $ 236,448 | $ 209,555 | $ 194,671 | $ (41,777) | $ 211,215 | $ 207,882 | $ 13,211 |
| 2 | Production | $ 65,683 | $ 47,933 | $ 44,698 | $ (20,985) | $ 46,124 | $ 46,124 | $ 1,426 |
| 3 | Transmission | $ 26,774 | $ 18,811 | $ 18,296 | $ (8,478) | $ 29,708 | $ 29,708 | $ 11,412 |
| 4 | Regional Market | $ - | $ - | $ - | $ - | $ 4,091 | $ 4,091 | $ 4,091 |
| 5 | Distribution | $ 31,399 | $ 36,870 | $ 36,681 | $ 5,282 | $ 30,703 | $ 30,703 | $ (5,978) |
| 6 | Customer Accounting | $ 20,214 | $ 19,260 | $ 18,320 | $ (1,894) | $ 17,273 | $ 17,273 | $ (1,047) |
| 7 | Customer Services | $ 4,199 | $ 5,600 | $ 5,600 | $ 1,401 | $ 4,421 | $ 4,421 | $ (1,179) |
| 8 | Sales | $ 143 | $ 1,108 | $ 1,074 | $ 931 | $ 1,094 | $ 1,094 | $ 20 |
| 9 | Administrative & General | $ 88,036 | $ 79,973 | $ 70,002 | $ (18,034) | $ 77,801 | $ 74,468 | $ 4,466 |
| 10 | | $ 236,448 | $ 209,555 | $ 194,671 | $ (41,777) | $ 211,215 | $ 207,882 | $ 13,211 |
| 11 | Net Plant in Service | $ 2,039,677 | $ 1,839,973 | $ 1,797,050 | $ (242,627) | $ 1,977,077 | $ 1,977,077 | $ 180,027 |
| 12 | Production | $ 702,930 | $ 299,705 | $ 277,828 | $ (425,102) | $ 295,575 | $ 295,575 | $ 17,747 |
| 13 | Transmission | $ 467,357 | $ 538,696 | $ 523,071 | $ 55,714 | $ 604,506 | $ 604,506 | $ 81,435 |
| 14 | Regional Market | $ - | $ 3,257 | $ 3,163 | $ 3,163 | $ 1,885 | $ 1,885 | $ (1,278) |
| 15 | Distribution | $ 780,981 | $ 890,975 | $ 889,283 | $ 108,302 | $ 964,109 | $ 964,109 | $ 74,826 |
| 16 | General Plant | $ 55,874 | $ 75,393 | $ 72,693 | $ 16,819 | $ 81,943 | $ 81,943 | $ 9,250 |
| 17 | Intangible Plant | $ 32,535 | $ 29,443 | $ 28,508 | $ (4,027) | $ 26,321 | $ 26,321 | $ (2,187) |
| 18 | Specific Assignment | $ - | $ 2,504 | $ 2,504 | $ 2,504 | $ 2,738 | $ 2,738 | $ 234 |
| 19 | | $ 2,039,677 | $ 1,839,973 | $ 1,797,050 | $ (242,627) | $ 1,977,077 | $ 1,977,077 | $ 180,027 |
| 20 | Net Plant in Service - Excluding Production | $ 1,336,747 | $ 1,540,268 | $ 1,519,222 | $ 182,475 | $ 1,681,502 | $ 1,681,502 | $ 162,280 |

34

ETI REVENUE REQUIREMENT COMPARISON
DOCKET NOS. 34800, 37744, 39896
(000)

| Line | Item | (a) Filed Docket # 34800 | (b) Filed Docket # 37744 | (c) Adjusted Docket # 37744 | (d) Increase to Docket # 37744 | (e) Filed Docket # 39896 | (f) Adjusted Docket # 39896 | (g) Increase to Docket # 39896 |
|---|---|---|---|---|---|---|---|---|
| 1 | O&M Expenses | $ 236,448 | $ 209,555 | $ 194,671 | $ (41,777) | $ 211,215 | $ 207,882 | $ 13,211 |
| 2 | O&M - Purchased Power Expenses | 52,420 | 254,864 | 231,360 | 178,940 | 266,934 | 263,078 | 31,718 |
| 3 | O&M - Renewable Energy Credit Expenses | - | 627 | - | - | 631 | 1,160 | 1,160 |
| 4 | Interest on Customer Deposits | 1,535 | 1,276 | 162 | (1,373) | 69 | 69 | (93) |
| 5 | Regulatory Debits & Credits | 2,035 | 5,056 | 4,750 | 2,715 | 5,004 | 5,004 | 254 |
| 6 | Depreciation & Amortization Expense | 86,576 | 126,968 | 123,518 | 36,942 | 97,100 | 94,722 | (28,796) |
| 7 | Decommissioning Expenses | 3,671 | - | - | (3,671) | - | - | - |
| 8 | Taxes Other Than Income | 47,238 | 55,436 | 54,589 | 7,351 | 59,852 | 62,552 | 7,963 |
| 9 | Current Income Taxes | 66,258 | 63,793 | 62,064 | (4,194) | 41,114 | 40,946 | (21,118) |
| 10 | Deferred Income Taxes | (4,918) | (4,197) | (4,331) | 587 | 14,618 | 14,618 | 18,949 |
| 11 | ITC Amortization | (2,574) | (1,609) | (1,560) | 1,014 | (1,630) | (1,630) | (70) |
| 12 | Total Expenses | $ 488,689 | $ 711,769 | $ 665,223 | $ 176,534 | $ 694,907 | $ 688,401 | $ 23,178 |
| 13 | Return Requested | 151,474 | 153,232 | 129,077 | (22,397) | 149,060 | 148,584 | 19,507 |
| 14 | Other Revenue/Sales Credits | (44,607) | (123,464) | (96,324) | (51,717) | (103,776) | (103,776) | (7,452) |
| 15 | Energy Efficiency Expenses | 3,944 | - | - | (3,944) | - | - | - |
| 16 | Miscellaneous Service Fees | 5,041 | - | - | (5,041) | - | - | - |
| 17 | Public Benefit Fund | 5,059 | - | - | (5,059) | - | - | - |
| 18 | Requested Revenue Requirement | $ 609,600 | $ 741,537 | $ 697,976 | $ 88,376 | $ 740,191 | $ 733,209 | $ 35,233 |

SOAH DOCKET NO. 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
PUC DOCKET NO. 39896

| | | |
|---|---|---|
| APPLICATION OF ENTERGY | § | |
| TEXAS, INC. FOR AUTHORITY TO | § | BEFORE THE |
| CHANGE RATES, RECONCILE | § | STATE OFFICE OF |
| FUEL COSTS, AND OBTAIN | § | ADMINISTRATIVE HEARINGS |
| DEFERRED ACCOUNTING | § | |
| TREATMENT | § | |

REBUTTAL TESTIMONY

OF

MARK F. MCCULLA

ON BEHALF OF

ENTERGY TEXAS, INC.

APRIL 2012

1

ENTERGY TEXAS, INC.
REBUTTAL TESTIMONY OF MARK F. MCCULLA
DOCKET NO. 39896


## TABLE OF CONTENTS

Page

I.      Introduction                                            1

        A.  Introduction and Qualifications                    1

        B.  Purpose of Rebuttal Testimony                      1

II.     Transmission Equalization                              2

III.    Affiliate Expenses                                     8

IV.     Conclusion                                            12

## EXHIBITS

Exhibit MFM-R-1     Projects Included in MSS-2 Projections for June 2012 – May 2013

Exhibit MFM-R-2     ETI's Response to OPUC 6-5 in PUCT Docket No. 37744

I.      INTRODUCTION

A.      Introduction and Qualifications

Q.    PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.

A.    My name is Mark F. McCulla.  My business address is 639 Loyola Avenue, New Orleans, Louisiana  70113.

Q.    DID YOU PREVIOUSLY FILE DIRECT TESTIMONY ON BEHALF OF ENTERGY TEXAS, INC. ("ETI" OR "THE COMPANY") IN THIS PROCEEDING?

A.    Yes, I did.

Q.    DO YOU SPONSOR ANY EXHIBITS IN THIS FILING?

A.    Yes, I sponsor the exhibits listed in the Table of Contents.

B.      Purpose of Rebuttal Testimony

Q.    WHAT IS THE PURPOSE OF THIS TESTIMONY?

A.    The purpose of my rebuttal testimony is to address opinions of Mr. Jeffry Pollock and Dr. Dennis Goins regarding the transmission equalization expenses proposed by ETI in this docket.  In addition, I address Dr. Carol Szerszen's erroneous conclusion regarding the affiliate charges for providing rental space on the Company's transmission poles.

II.  TRANSMISSION EQUALIZATION

Q.  WHAT AMOUNT HAS ETI PROPOSED FOR TRANSMISSION EQUALIZATION PAYMENTS FOR THE RATE YEAR?

A.  $10.697 million.

Q.  WHAT TRANSMISSION INVESTMENTS WERE INCLUDED IN DETERMINING ETI'S PROPOSED EQUALIZATION PAYMENTS?

A.  The proposed $10.697 million in transmission equalization payments is based on $184.9 million in additional transmission equalizable Total Investment across the Entergy Transmission System, including ETI's, for the period of June 2012 through May 2013.

Q.  WHAT PROJECTS ARE INCLUDED IN THE PROJECTED $184.9 MILLION OF TRANSMISSION EQUALIZABLE TOTAL INVESTMENT?

A.  Exhibit MFM-R-1 provides a summary of the six highest-cost projects included in the projected equalizable Total Investment.  These projects comprise $141.0 million of the total $184.9 million.  As seen in Exhibit MFM-R-1, funding for each of these projects has been approved, and each is progressing on schedule in the design or construction phase, with the latest in-service date scheduled for December 31, 2012.  In fact, one of these projects – the 230 kV line from Loblolly to Hammond – was put in service on December 16, 2011.

Q. WHAT PROJECTS ARE INCLUDED IN THE REMAINING $43.9 MILLION OF TRANSMISSION EQUALIZABLE TOTAL INVESTMENT?

A. The remaining $43.9 million is an estimate of the capital investment necessary to maintain equalizable transmission investments across the Entergy Transmission System. This estimate is based on the Entergy Operating Companies' projected budget and historical spending for maintenance of these facilities.

Q. MR. POLLOCK ASSERTS (PAGE 32) THAT ETI'S PROPOSED TRANSMISSION EQUALIZATION PAYMENTS ARE NOT RECOVERABLE IN THIS RATE CASE, IN PART, BECAUSE THE PROJECTED EQUALIZABLE INVESTMENTS ARE UNCERTAIN. DO YOU AGREE?

A. No. The six projects I identified above represent more than 76% of the Total Investment providing the basis for ETI's proposed transmission equalization payments. Each of these projects has received full funding approval and has either been constructed or is on schedule to be constructed before the end of the rate year. Moreover, these projects have resulted from a detailed and lengthy planning process that has demonstrated the need for these projects such that they were included in Entergy's Transmission Construction Plan.

Q.    YOU MENTIONED A DETAILED AND LENGTHY PLANNING PROCESS THAT DEVELOPED THESE PROJECTS.    CAN YOU EXPLAIN THIS PROCESS?

A.    Transmission facilities such as lines and substations are built as a result of an ongoing extensive planning process intended to ensure the Entergy Transmission System's continued reliable operation in accordance with industry reliability standards, and to meet all firm load requirements, including serving the loads of the Operating Companies' retail customers. As such, the Entergy Transmission System is planned considering expected load growth and long-term firm transmission service obligations over a ten-year horizon.  This planning process occurs annually to ensure that any changes to the Entergy Transmission System are analyzed in a timely manner.

Entergy's transmission planning group uses computer models to assess the adequacy and reliability of the Entergy Transmission System. The computer models used in this planning process include the transmission system topology (the configuration of transmission lines, substations, and other assets), forecasted load growth, available generating resources, and planned changes to the electric grid.  If the planning studies indicate a projected reliability deficiency (e.g., facility overload or undervoltage condition), projects are identified to address the deficiency.   Once projects are identified, they are considered and, if necessary, further refined by the project management and construction

group to ensure the most cost-effective and feasible solution is identified and included in Entergy's Transmission Construction Plan.

Q. IS ENTERGY'S TRANSMISSION CONSTRUCTION PLAN DEVELOPED WITH THE INPUT OF THE INDEPENDENT COORDINATOR OF TRANSMISSION ("ICT") AND STAKEHOLDERS?

A. Yes. The Construction Plan is developed with input from the ICT[1] and various stakeholders, such as retail regulators of the Entergy Operating Companies (including the Public Utility Commission of Texas) through the Entergy Regional State Committee ("E-RSC"). Prior to the finalization of the Entergy Construction Plan, Entergy presents its draft Construction Plan at various stakeholder forums including the annual Transmission Planning Summit, and solicits input from stakeholders and the ICT. Moreover, the ICT provides input to the Entergy Construction Plan through its development of the Base Plan.[2]

---

[1] Southwest Power Pool currently serves as the ICT for the Entergy Transmission System.

[2] Per Attachment T to the Entergy OATT, the ICT develops the Base Plan used for cost allocation. The Base Plan includes projects necessary to meet transmission reliability criteria, and for which construction is to be initiated within the next five years.

Q. WHAT OCCURS AFTER A PROJECT IS INCLUDED IN THE CONSTRUCTION PLAN?

A. Projects in the Construction Plan must be approved for funding prior to the start of construction. After funding is approved, the project construction process begins, including project design, material procurement, right-of-way procurement, and actual construction. The construction duration varies depending on the complexity and size of the project, but typically lasts between three and five years, with some projects finishing earlier based on extenuating circumstances. For example, the Loblolly to Hammond 230 kV line project took approximately three years to construct after funding was approved. This project required new transmission right-of-way. By comparison, the construction of the Entergy Gulf States Louisiana, L.L.C. ("EGSL") Nelson to Moss Bluff 230 kV project is projected to take approximately one year because EGSL owns the right-of-way.

Q. DO THE TOTAL INVESTMENT COSTS INCLUDED IN ETI'S PROPOSED TRANSMISSION EQUALIZATION PAYMENTS REPRESENT A REASONABLE FIGURE?

A. Yes, as part of the project planning process, a budget is developed by the project management team based on an analysis of all costs associated with the project. This budget is then used to develop the Total Investment figures that are used to project the Operating Companies' transmission

equalizable payment. The Hammond-Loblolly 230 kV line project provides an opportunity to evaluate the reasonableness of these budget estimates because it has already been put in service. For the proposed transmission equalization payments, this project represented $39.9 million of the projected Total Investment. To date, more than $45.3 million has been charged to this project.

Q. DR. GOINS ASSERTS (PAGE 20) THAT THE PROPOSED MSS-2 COSTS SHOULD NOT BE RECOVERED IN THIS RATE CASE, IN PART, BECAUSE THE PROPOSED ITC SPIN/MERGE TRANSACTION WAS NOT INCLUDED IN THE ANALYSIS. DO YOU AGREE?

A. No. As stated above, the proposed transmission equalization costs for ETI are based on projected investments for the period of June 2012 through May 2013. There is no proceeding seeking approval of the transaction with ITC pending before the PUCT or any other regulator that suggests ETI would not make transmission investments or not be subject to Service Schedule MSS-2 transmission equalization during that time period. Thus, it is not known that the ITC transaction would have any effect on the period at issue. Further, Dr. Goins has failed to recognize all the attendant impacts that would result even if such a change were to occur prior to the end of the rate year. When ETI no longer owns transmission assets and is no longer subject to Service Schedule MSS-2 transmission equalization, ETI will still incur transmission costs for another

type (*i.e.*, costs for transmission service provided by ITC transmission assets). Dr. Goins has failed to measure the full net effect of one type of transmission cost substituting for another. For these reasons, Dr. Goins has not demonstrated (and cannot demonstrate) that either (1) the ITC transaction presents a known and measureable change that can be accounted for in this proceeding or (2) he has properly accounted for all attendant impacts that would result from that change in transmission cost incurrence.

III. AFFILIATE EXPENSES

Q. ON PAGE 75 OF HER DIRECT TESTIMONY, DR. SZERSZEN ASSERTS THAT $42,698 SHOULD BE REMOVED FROM THE AFFILIATE EXPENSES BECAUSE THE COST OF PROVIDING RENTAL SPACE ON TRANSMISSION POLES EXCEEDS THE REVENUE RECEIVED FROM PROVIDING THAT RENTAL SPACE. DO YOU AGREE?

A. No.

Q. WHY NOT?

A. Dr. Szerszen's assertion is misplaced because she has confused the rental of space on transmission poles and the rental of space on distribution poles. In doing so, she has performed a cost-benefit analysis that erroneously compares the cost of providing rental space on

distribution poles with the income received solely from rental of space on transmission poles.

Q. IN PERFORMING HER COST-BENEFIT ANALYSIS, WHAT FIGURES DID DR. SZERSZEN USE FOR THE COST OF PROVIDING RENTAL SPACE ON POLES?

A. Dr. Szerszen states that "ETI was allocated $57,288 for costs associated with the rental of space on Entergy transmission poles and direct charged $9,886 for the same activities, including the costs of pole rental contract administration." In support of these figures, she cites two project codes – P3PCTJTUSE and F3PCTJUSE. I was unable to locate project code F3PCTJUSE, but I did identify the two project codes associated with pole rentals. These two project codes included total charges that match the monetary amounts cited by Dr. Szerszen – F3PCTJGUSE ($9,886) and F3PCTJTUSE ($57,288). I therefore assume that Dr. Szerszen relied on these two project codes in determining the expenses associated with pole rentals and that she meant to cite these two project codes in support of her testimony.

Q.  DO THESE PROJECT CODES CAPTURE THE COSTS ASSOCIATED WITH THE RENTAL OF SPACE ON ENTERGY TRANSMISSION POLES, AS DR. SZERSZEN SUGGESTS?

A.  No, a review of pages 743 and 744 of Exhibit SBT-E attached to the Direct Testimony of ETI witness Stephanie Tuminello shows that neither of these project codes includes any expenses from the transmission function. Indeed, Exhibit SBT-E shows that the only two functions that charged to these project codes were Distribution Operations and Human Resources, with the vast majority of charges coming from the Distribution Operations function. This means that these project codes have captured the costs of administering rental space on distribution poles. At the very least, it appears clear that these project codes do not capture solely the cost of administering rental space on transmission poles.

Q.  IN PERFORMING HER COST-BENEFIT ANALYSIS, WHAT FIGURE DID DR. SZERSZEN USE FOR THE REVENUES RECEIVED FROM RENTAL SPACE ON POLES?

A.  For the revenues used in her cost-benefit analysis, Dr. Szerszen relies solely on a response to the Commission Staff's request for information 1-11 ("Staff 1-11"), which I sponsored. The request asked for "any utility revenues from affiliates or third-parties for the use of the transmission facilities for any type of communication system (cell, Internet, cable)." ETI responded that the revenues "for the use of the transmission facilities for

any type of communication system totaled $24,476.30 for the test period." As stated in both the request and the response, the $24,476.30 in revenue related solely to the rental of space on *transmission* poles. This amount does not capture any of the revenues ETI received for the rental of distribution poles.

Q. HAS ETI RECEIVED ADDITIONAL REVENUE FOR THE RENTAL OF DISTRIBUTION POLES?

A. Yes. ETI reports the rental income it receives from the use of its electric property in FERC Account 454, which includes Rent from Electric Property (Account 454000) and Rent from Pole Attachments-Distribution Lines (Account 454100). The $24,476.30 identified in response to Staff 1-11 is recorded in Account 454000 as Rent from Electric Property. The revenue received from the rental of distribution poles, however, is recorded in Account 454100 as Rent from Pole Attachments-Distribution Lines.

The recording of this rental income from distribution poles in FERC Account 454100 was also identified by the Company in response to a request for information from the Office of Public Utility Counsel in the 2009 ETI Rate Case (Docket No. 37744). That response, which I have attached as Exhibit MFM-R-2, stated that ETI recovered $2,434,411 in revenue from the rental of distribution poles during that test year. In the test year for this rate case, the Company's revenue from the rental of distribution poles was $2,503,116, as identified in Schedule P (Cost of

Service work papers at Bates-numbered pages SCHED_COS_WP_6-108 to 6-111).

Q. AFTER REVIEWING THE ACTUAL EXPENSES AND REVENUES ASSOCIATED WITH POLE RENTALS, WHAT IS YOUR CONCLUSION REGARDING DR. SERZEN'S ASSERTION THAT $42,698 SHOULD BE REMOVED FROM AFFILIATE EXPENSES?

A. By failing to account for revenue ETI received from the rental of distribution poles, Dr. Szerszen has incorrectly assumed that ETI did not receive sufficient revenue to cover the administrative cost of providing those distribution pole rentals. Because ETI has received more than $2.5 million in revenue associated with distribution pole rentals, while incurring $67,174 in expenses for pole rentals, Dr. Szerszen's proposed disallowance is inappropriate.

IV. CONCLUSION

Q. DOES THIS CONCLUDE YOUR REBUTTAL TESTIMONY?

A. Yes.

**Projects Included in MSS-2 Projections for June 2012 – May 2013**

| | Project | Estimated Total Investment ($million) | Funding Status | Construction Status |
|---|---|---|---|---|
| 1 | Loblolly to Hammond 230 kV line | $39.9 | Approved | In service on December 16, 2011 |
| 2 | Acadiana Area Improvement Project Phase 2: Labbe to Sellers Road 230 kV line and 500 kV position for Cleco autotransformer | $25.3 | Approved | 500 kV position for Cleco autotransformer completed on March 19, 2012. Construction has begun on final 20 structures for Labbe to Sellers Road line with projected in-service date of June 29, 2012 |
| 3 | Southeast Louisiana Coastal Improvement Plan Phase 3: Oakville-Alliance 230 kV line and 230-114 kV autotransformer at Alliance substation | $23.1 | Approved | In the design/construction phase; projected in-service date of December 31, 2012 |
| 4 | Tillatoba to South Grenada 230 kV line | $20.6 | Approved | Under construction; projected in-service date of June 1, 2012 |
| 5 | Southeast Louisiana Coastal Improvement Plan Phase 2: Build Peters Road-Oakville 230 kV line and substation | $18.5 | Approved | In the design/construction phase; projected in-service date of September 20, 2012 |
| 6 | Nelson to Moss Bluff 230 kV Line | $13.6 | Approved | Under construction; projected in-service date of May 31, 2012 |
| | | **$141** | | |

ENTERGY TEXAS, INC.
PUBLIC UTILITY COMMISSION OF TEXAS
Docket No. 37744 - 2009 ETI Rate Case

Response of:  Entergy Texas, Inc.               Prepared By:  Joe Bennett
to the Sixth Set of Data Requests              Sponsoring Witness: Shawn B. Corkran
of Requesting Party:  Office of Public Utility  Beginning Sequence No.
Counsel

Ending Sequence No.

Question No.:  OPUC  6-5               Part No.:               Addendum:

Question:

   a.    Please provide all ETI test year rental income associated with the third
         party contracts discussed in project F3PCTJGUSC.

   b.    Where is rental income included in the RFP?

   c.    Provide all documentation supporting your response to (b) above.

Response:

Note:  This response assumes that the question intended to refer to Project Codes
**F3PCTJGUSE** and **F3PCTJTUSE**.  Project Code F3PCTJGUSC does not exist.

   a.  The services provided under Project Codes F3PCTJGUSE and F3PCTJTUSE are
       associated with pole attachment rentals.  The rental income for pole attachments
       during the test year was recorded in FERC Account 454 in the amount of
       $2,434,411.

   b.  See Schedule P, Cost of Service WPs (Vol. 1of 3), Volume Sched-WP_6, Bates
       pages SCHED_COS_WP_6-143 to 6-146.

   c.  See the Company's response to subpart (b) above.

**37744**                                      **OPUC 6-5 LR5304**

| ENTITY | COMPANY_NAME | CONTRACT_ID | CONTRACT_DESC | REFERENCE_NUM | BILLING_DT | BILLING PERIODS | AMOUNT_BILLED | AMT PAID | FREQUENCY | BILL_TYPE | INVOICE # | RESP_COORDINATOR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ETI | ALMEGA CABLE | 10117 | ANNUAL POLE REN | 100006683 | 3/10/2009 09:19:46 | Jan. 1, 2009 through Dec. 31, 2009 | 37054.41 | | Annual | Rental | 9602740 | chutche |
| ETI | ALMEGA CABLE | 10117 | ANNUAL POLE REN | 100007642 | 1/21/2010 15:35:02 | Jan 1, 2010 through Dec. 31, 2010 | 29359.67 | | Annual | Rental | 9603053 | chutche |
| ETI | BRIGHTER CABLE COMM\ | 10116 | ANNUAL POLE REN | 100006682 | 3/10/2009 09:18:10 | Jan. 1, 2009 through Dec. 31, 2009 | 769.54 | 769.54 | Annual | Rental | 9602739 | chutche |
| ETI | BRIGHTER CABLE COMM\ | 10116 | ANNUAL POLE REN | 100007551 | 1/19/2010 10:30:58 | Jan. 1, 2010 through Dec. 31, 2010 | 756.46 | | Annual | Rental | 9603052 | chutche |
| ETI | Cable One | 21 | ANNUAL POLE REN | 100000087 | 2/20/2001 15:14:31 | Jan. 1, 2001 through Dec. 31, 2001 | 335.35 | 335.35 | Annual | Rental | 1059771 | rpascua |
| ETI | Cable Texas, Inc | 23 | ANNUAL POLE REN | 100000075 | 2/15/2001 13:52:04 | Jan. 1, 2001 through Dec. 31, 2001 | 29620.23 | 29620.23 | Annual | Rental | 1059468 | rpascua |
| ETI | Carrell Communications | 10084 | ANNUAL POLE REN | 100003857 | 9/7/2006 14:58:50 | Jan. 1, 2006 through Dec. 31, 2006 | 46345.37 | | Annual | Rental | 9601887 | chutche |
| ETI | Carrell Communications | 10084 | ANNUAL POLE REN | 100004197 | 1/18/2007 07:46:04 | Jan. 1, 2007 through Dec. 31, 2007 | 46345.37 | | Annual | Rental | 9601956 | chutche |
| ETI | Carrell Communications | 10084 | ANNUAL POLE REN | 100005098 | 1/15/2008 14:51:56 | Jan. 1, 2008 through Dec. 31, 2008 | 46345.37 | | Annual | Rental | 9602260 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100000077 | 2/15/2001 13:56:21 | Jan. 1, 2001 through Dec. 31, 2001 | 804.84 | 804.84 | Annual | Rental | 1059469 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100000287 | 7/26/2001 06:43:04 | Jul.1, 2000 through Dec. 31, 2000 | 20043.34 | 20043.34 | Annual | Rental | 1066278 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100000386 | 12/6/2001 16:47:52 | Jan. 1, 2001 through Dec. 31, 2001 | 20043.34 | 20043.34 | Annual | Rental | 1072853 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100000493 | 1/16/2002 09:17:06 | Jan. 1, 2002 through Dec. 31, 2002 | 20043.34 | 20043.34 | Annual | Rental | 1075141 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100000494 | 1/16/2002 09:19:27 | Jan. 1, 2002 through Dec. 31, 2002 | 1885.02 | 1885.02 | Annual | Rental | 1075125 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100000726 | 1/13/2003 08:24:01 | Jan. 1, 2003 through Dec. 31, 2003 | 1885.02 | 1885.02 | Annual | Rental | 1092919 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100000740 | 1/13/2003 14:11:09 | Jan. 1, 2003 through Dec. 31, 2003 | 20043.34 | 20043.34 | Annual | Rental | 1092949 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100001557 | 1/28/2004 10:59:26 | Jan. 1, 2004 through Dec. 31, 2004 | 20964.67 | 20964.67 | Annual | Rental | 9601144 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100001558 | 1/28/2004 11:00:23 | Jan. 1, 2004 through Dec. 31, 2004 | 1885.02 | 1885.02 | Annual | Rental | 9601130 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100002377 | 1/13/2005 07:22:25 | Jan. 1, 2005 through Dec. 31, 2005 | 1885.02 | 1885.02 | Annual | Rental | 9601347 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100002378 | 1/13/2005 07:23:58 | Jan. 1, 2005 through Dec. 31, 2005 | 20964.67 | 20964.67 | Annual | Rental | 9601361 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100003197 | 1/11/2006 07:28:59 | Jan. 1, 2006 through Dec. 31, 2006 | 1885.02 | 1885.02 | Annual | Rental | 9601633 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100003198 | 1/11/2006 07:31:09 | Jan. 1, 2006 through Dec. 31, 2006 | 20964.67 | 20964.67 | Annual | Rental | 9601647 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100004697 | 7/18/2007 09:30:25 | Jan. 1, 2007 through Dec. 31, 2007 | 7084.71 | 7084.71 | Annual | Rental | 9602179 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100004699 | 7/18/2007 09:35:14 | Jan. 1, 2007 through Dec. 31, 2007 | 3805.34 | 3805.34 | Annual | Rental | 9602183 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100005099 | 1/15/2008 14:54:48 | Jan. 1, 2008 through Dec. 31, 2008 | 3805.34 | 3805.34 | Annual | Rental | 9602254 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100005100 | 1/15/2008 14:56:13 | Jan. 1, 2008 through Dec. 31, 2008 | 7084.71 | 7084.71 | Annual | Rental | 9602240 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100006477 | 2/6/2009 13:57:21 | Jan. 1, 2009 through Dec. 31, 2009 | 7084.71 | 7084.71 | Annual | Rental | 9602693 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100006490 | 2/6/2009 14:17:15 | Jan. 1, 2009 through Dec. 31, 2009 | 4236 | 4236 | Annual | Rental | 9602705 | chutche |
| ETI | Classic Cable | 33 | POLE RENTAL -DB/ | 100007537 | 1/19/2010 10:13:22 | Jan. 1, 2010 through Dec. 31, 2010 | 6964.29 | 6964.29 | Annual | Rental | 9603031 | chutche |
| ETI | Classic Cable | 10042 | POLE RENTAL - DB | 100007546 | 1/19/2010 10:26:34 | Jan. 1, 2010 through Dec. 31, 2010 | 4164 | 4164 | Annual | Rental | 9603044 | chutche |
| ETI | Comcast Cable Communcat | 10112 | ANNUAL POLE REN | 100006678 | 3/10/2009 09:14:22 | Jan. 1, 2009 through Dec. 31, 2009 | 13947.03 | 13947.03 | Annual | Rental | 9602735 | chutche |
| ETI | Comcast Cable Communcat | 10112 | ANNUAL POLE REN | 100007550 | 1/19/2010 10:29:58 | Jan. 1, 2010 through Dec. 31, 2010 | 13709.97 | | Annual | Rental | 9603049 | chutche |
| ETI | DAYBREAK COMMUNICA` | 10115 | ANNUAL POLE REN | 100006681 | 3/10/2009 09:17:18 | Jan. 1, 2009 through Dec. 31, 2009 | 11243.05 | | Annual | Rental | 9602738 | chutche |
| ETI | DAYBREAK COMMUNICA` | 10115 | ANNUAL POLE REN | 100007641 | 1/21/2010 15:34:19 | Jan. 1, 2010 through Dec. 31, 2010 | 11051.95 | | Annual | Rental | 9603051 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100000083 | 2/15/2001 15:09:23 | Jan. 1, 2001 through Dec. 31, 2001 | 12937.45 | 12937.45 | Annual | Rental | 1059470 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100000735 | 1/13/2003 08:47:33 | Jan. 1, 2003 through Dec. 31, 2003 | 4077.15 | 4077.15 | Annual | Rental | 1093102 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100001559 | 1/28/2004 11:01:12 | Jan. 1, 2004 through Dec. 31, 2004 | 6576.39 | 6576.39 | Annual | Rental | 9601131 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100002338 | 1/11/2005 07:34:22 | Jan. 1, 2005 through Dec. 31, 2005 | 6576.39 | 6576.39 | Annual | Rental | 9601348 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100003199 | 1/11/2006 07:34:33 | Jan. 1, 2006 through Dec. 31, 2006 | 6576.39 | 6576.39 | Annual | Rental | 9601634 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100004200 | 1/18/2007 07:52:35 | Jan. 1, 2007 through Dec. 31, 2007 | 6576.39 | 6576.39 | Annual | Rental | 9601937 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100005101 | 1/15/2008 14:58:45 | Jan. 1, 2008 through Dec. 31, 2008 | 6576.39 | 6576.39 | Annual | Rental | 9602241 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100006478 | 2/6/2009 14:01:50 | Jan. 1, 2009 through Dec. 31, 2009 | 6576.39 | 6576.39 | Annual | Rental | 9602694 | chutche |
| ETI | Eton Industries, Inc | 49 | ANNUAL POLE REN | 100007538 | 1/19/2010 10:15:12 | Jan 1, 2010 through Dec. 31, 2010 | 6464.61 | 6464.61 | Annual | Rental | 9603032 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100000074 | 2/15/2001 13:39:58 | Jan. 1, 2001 through Dec. 31, 2001 | 145658.39 | 145658.39 | Annual | Rental | 1059471 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100000495 | 1/16/2002 09:25:17 | Jan. 1, 2002 through Dec. 31, 2002 | 146784.46 | 146784.46 | Annual | Rental | 1075127 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100000725 | 1/13/2003 08:18:56 | Jul. 1, 2003 through Dec. 31, 2003 | 146784.46 | 146784.46 | Annual | Rental | 1092922 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100001560 | 1/28/2004 11:01:56 | Jan. 1, 2004 through Dec. 31, 2004 | 146787.99 | 146787.99 | Annual | Rental | 9601132 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100002379 | 1/13/2005 07:25:04 | Jan. 1, 2005 through Dec. 31, 2005 | 146787.99 | 141690.08 | Annual | Rental | 9601349 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100004698 | 7/18/2007 09:33:11 | Jan. 1, 2007 through Dec. 31, 2007 | 15027.21 | 15027.21 | Annual | Rental | 9602180 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100005102 | 1/15/2008 15:00:02 | Jan. 1, 2008 through Dec. 31, 2008 | 15027.21 | 15027.21 | Annual | Rental | 9602242 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100006479 | 2/6/2009 14:02:55 | Jan. 1, 2009 through Dec. 31, 2009 | 13685.22 | 13685.22 | Annual | Rental | 9602695 | chutche |
| ETI | Friendship Cable of TX | 57 | POLE RENTAL - DB | 100007637 | 1/21/2010 15:28:03 | Jan 1, 2010 through Dec. 31, 2010 | 16090.39 | 16090.39 | Annual | Rental | 9603033 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100000082 | 2/15/2001 14:37:58 | Jan. 1, 2001 through Dec. 31, 2001 | 5708.01 | 5708.01 | Annual | Rental | 1059472 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100000731 | 1/13/2003 08:39:46 | Jan. 1, 2003 through Dec. 31, 2003 | 6989.4 | 6989.4 | Annual | Rental | 1092923 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100001561 | 1/28/2004 11:02:42 | Jan. 1, 2004 through Dec. 31, 2004 | 6872.91 | 6872.91 | Annual | Rental | 9601133 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100002382 | 1/13/2005 07:30:06 | Jan. 1, 2005 through Dec. 31, 2005 | 6872.91 | 6872.91 | Annual | Rental | 9601350 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100003201 | 1/11/2006 07:38:06 | Jan. 1, 2006 through Dec. 31, 2006 | 6872.91 | 6872.91 | Annual | Rental | 9601636 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100004202 | 1/18/2007 07:55:42 | Jan. 1, 2007 through Dec. 31, 2007 | 6872.91 | 6872.91 | Annual | Rental | 9601939 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100005103 | 1/15/2008 15:03:52 | Jan. 1, 2008 through Dec. 31, 2008 | 6872.91 | 6872.91 | Annual | Rental | 9602243 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100006697 | 3/11/2009 08:47:16 | Jan. 1, 2009 through Dec. 31, 2009 | 6209.27 | 6209.27 | Annual | Rental | 9602741 | chutche |
| ETI | Galaxy Cablevision LP | 59 | POLE RENTAL | 100007539 | 1/19/2010 10:16:18 | Jan. 1, 2010 through Dec. 31, 2010 | 6103.73 | 6103.73 | Annual | Rental | 9603034 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100000078 | 2/15/2001 13:59:32 | Jan. 1, 2001 through Dec. 31, 2001 | 11288.94 | 11288.94 | Annual | Rental | 1059473 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100000497 | 1/16/2002 09:31:35 | Jan. 1, 2002 through Dec. 31, 2002 | 13791.71 | 13791.71 | Annual | Rental | 1075129 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100000727 | 1/13/2003 08:27:51 | Jan. 1, 2003 through Dec. 31, 2003 | 13791.71 | 13791.71 | Annual | Rental | 1092924 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100001562 | 1/28/2004 11:03:22 | Jan. 1, 2004 through Dec. 31, 2004 | 13791.71 | 13791.71 | Annual | Rental | 9601134 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100002380 | 1/13/2005 07:26:22 | Jan. 1, 2005 through Dec. 31, 2005 | 15231.95 | 15231.95 | Annual | Rental | 9601351 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100003202 | 1/11/2006 07:39:04 | Jan. 1, 2006 through Dec. 31, 2006 | 15281.37 | 15281.37 | Annual | Rental | 9601637 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100004701 | 7/18/2007 10:41:59 | Jan. 1, 2007 through Dec. 31, 2007 | 9047.39 | 9047.39 | Annual | Rental | 9602181 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100005104 | 1/15/2008 15:04:59 | Jan. 1, 2008 through Dec. 31, 2008 | 9047.39 | 9047.39 | Annual | Rental | 9602244 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100006480 | 2/6/2009 14:05:40 | Jan. 1, 2009 through Dec. 31, 2009 | 9047.39 | 9047.39 | Annual | Rental | 9602696 | chutche |
| ETI | Lakewood Cablevision | 78 | POLE RENTAL - DB | 100007757 | 2/2/2010 21:28:05 | Jan 1, 2010 through Dec. 31, 2010 | 8893.61 | 8893.61 | Annual | Rental | 9603035 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100000091 | 2/20/2001 15:33:10 | Jan. 1, 2001 through Dec. 31, 2001 | 3155.82 | 3155.82 | Annual | Rental | 1059688 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100000733 | 1/13/2003 08:43:18 | Jan. 1, 2003 through Dec. 31, 2003 | 3879.47 | 3879.47 | Annual | Rental | 1092926 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100001563 | 1/28/2004 11:04:03 | Jan. 1, 2004 through Dec. 31, 2004 | 914.27 | 914.27 | Annual | Rental | 9601135 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100002326 | 1/10/2005 10:40:20 | Jan. 1, 2005 through Dec. 31, 2005 | 914.27 | 914.27 | Annual | Rental | 9601352 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100003203 | 1/11/2006 07:40:05 | Jan. 1, 2006 through Dec. 31, 2006 | 914.27 | 914.27 | Annual | Rental | 9601638 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100004204 | 1/18/2007 07:58:03 | Jan. 1, 2007 through Dec. 31, 2007 | 914.27 | | Annual | Rental | 9601941 | chutche |
| ETI | North Texas Cablecomm | 89 | ANNUAL POLE REN | 100005105 | 1/15/2008 15:07:28 | Jan. 1, 2008 through Dec. 31, 2008 | 914.27 | | Annual | Rental | 9602245 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100000080 | 2/15/2001 14:28:12 | Jan. 1, 2001 through Dec. 31, 2001 | 42476.49 | 42476.49 | Annual | Rental | 1059480 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100000498 | 1/16/2002 09:37:28 | Jan. 1, 2002 through Dec. 31, 2002 | 44915.72 | 44915.72 | Annual | Rental | 1075140 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100000732 | 1/13/2003 08:41:14 | Jan. 1, 2003 through Dec. 31, 2003 | 44915.72 | 44915.72 | Annual | Rental | 1092948 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100001758 | 6/29/2004 09:29:49 | Jan. 1, 2004 through Dec. 31, 2004 | 44413.84 | 44413.84 | Annual | Rental | 9601203 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100002577 | 3/7/2005 08:55:44 | Jan. 1, 2005 through Dec. 31, 2005 | 44428.58 | 44428.58 | Annual | Rental | 9601496 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100002837 | 6/6/2005 15:04:40 | Back billing 2000 through 2001 | 39.12 | 39.12 | Annual | Rental | 9601513 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100003204 | 1/11/2006 07:45:00 | Jan. 1, 2006 through Dec. 31, 2006 | 44524.18 | 44524.18 | Annual | Rental | 9601646 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100004205 | 1/18/2007 08:00:31 | Jan. 1, 2007 through Dec. 31, 2007 | 44524.18 | 44485.06 | Annual | Rental | 9601949 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100005106 | 1/15/2008 15:08:45 | Jan. 1, 2008 through Dec. 31, 2008 | 44541.54 | 44541.54 | Annual | Rental | 9602253 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100006757 | 4/7/2009 15:24:11 | Jan. 1, 2009 through Dec. 31, 2009 | 41293.06 | 41293.06 | Annual | Rental | 9602746 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 100007638 | 1/21/2010 15:30:16 | Jan 1, 2010 through Dec. 31, 2010 | 39526.77 | | Annual | Rental | 9603043 | chutche |
| ETI | Northland Cable Propertie | 489 | ANNUAL POLE REN | 1029506 | 10/15/1998 00:00:00 | Jul. 1, 1998 through Dec. 31, 1998 | 14525.95 | 14525.95 | Annual | Rental | 1029506 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100000081 | 2/15/2001 14:29:26 | Jan. 1, 2001 through Dec. 31, 2001 | 12033.77 | 12033.77 | Annual | Rental | 1059474 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100000499 | 1/16/2002 09:38:39 | Jan. 1, 2002 through Dec. 31, 2002 | 12655.05 | 12655.05 | Annual | Rental | 1075131 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100000737 | 1/13/2003 08:52:42 | Jan. 1, 2003 through Dec. 31, 2003 | 12655.05 | 12655.05 | Annual | Rental | 1092927 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100001565 | 1/28/2004 11:05:42 | Jan. 1, 2004 through Dec. 31, 2004 | 12655.05 | 12655.05 | Annual | Rental | 9601136 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100002317 | 1/10/2005 09:06:41 | Jan. 1, 2005 through Dec. 31, 2005 | 12655.05 | 12655.05 | Annual | Rental | 9601353 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100003205 | 1/11/2006 07:47:18 | Jan. 1, 2006 through Dec. 31, 2006 | 12655.05 | 12655.05 | Annual | Rental | 9601639 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100004700 | 7/18/2007 09:43:08 | Jan. 1, 2007 through Dec. 31, 2007 | 5570.34 | 5570.34 | Annual | Rental | 9602182 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100005097 | 1/15/2008 14:50:12 | Jan. 1, 2008 through Dec. 31, 2008 | 5570.34 | 5570.34 | Annual | Rental | 9602246 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100006481 | 2/6/2009 14:06:59 | Jan. 1, 2009 through Dec. 31, 2009 | 6643.46 | 6643.46 | Annual | Rental | 9602697 | chutche |
| ETI | Northland Cable Televisior | 93 | ANNUAL POLE REN | 100007540 | 1/19/2010 10:17:29 | Jan 1, 2010 through Dec. 31, 2010 | 6530.54 | 6530.54 | Annual | Rental | 9603036 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100001837 | 7/12/2004 11:25:12 | Jan. 1, 2004 through Dec. 31, 2004 | 812.52 | 812.52 | Annual | Rental | 9601246 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100002318 | 1/10/2005 09:11:04 | Jan. 1, 2005 through Dec. 31, 2005 | 812.52 | 812.52 | Annual | Rental | 9601366 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100003206 | 1/11/2006 07:49:01 | Jan. 1, 2006 through Dec. 31, 2006 | 812.52 | 812.52 | Annual | Rental | 9601652 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100004207 | 1/18/2007 08:03:58 | Jan. 1, 2007 through Dec. 31, 2007 | 812.52 | | Annual | Rental | 9601955 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100005107 | 1/15/2008 15:09:50 | Jan. 1, 2008 through Dec. 31, 2008 | 812.52 | | Annual | Rental | 9602259 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100006618 | 2/20/2009 11:00:14 | Jan. 1, 2009 through Dec. 31, 2009 | 991.93 | | Annual | Rental | 9602733 | chutche |
| ETI | Oasis Communications LLC | 10071 | DBA JONES BROA[ | 100007644 | 1/21/2010 15:37:56 | Jan 1, 2010 through Dec. 31, 2010 | 975.07 | | Annual | Rental | 9603047 | chutche |
| ETI | PC One/J. Feeney & Assoc | 10109 | ANNUAL POLE REN | 100006677 | 3/10/2009 09:12:13 | Jan. 1, 2009 through Dec. 31, 2009 | 6113.96 | | Annual | Rental | 9602734 | chutche |
| ETI | PC One/J. Feeney & Assoc | 10109 | ANNUAL POLE REN | 100007639 | 1/21/2010 15:31:37 | Jan 1, 2010 through Dec. 31, 2010 | 6010.04 | | Annual | Rental | 9603048 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100000736 | 1/13/2003 08:51:17 | Jan. 1, 2003 through Dec. 31, 2003 | 423.6 | 423.6 | Annual | Rental | 1092951 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100001566 | 1/28/2004 11:06:25 | Jan. 1, 2004 through Dec. 31, 2004 | 3357.03 | 3357.03 | Annual | Rental | 9601147 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100002319 | 1/10/2005 09:13:47 | Jan. 1, 2005 through Dec. 31, 2005 | 4539.58 | 4539.58 | Annual | Rental | 9601364 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100003207 | 1/11/2006 07:50:21 | Jan. 1, 2006 through Dec. 31, 2006 | 6018.65 | 6018.65 | Annual | Rental | 9601650 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100004208 | 1/18/2007 08:05:00 | Jan. 1, 2007 through Dec. 31, 2007 | 6053.95 | 6053.95 | Annual | Rental | 9601953 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100005108 | 1/15/2008 15:10:46 | Jan. 1, 2008 through Dec. 31, 2008 | 6982.34 | 6982.34 | Annual | Rental | 9602257 | chutche |
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100006617 | 2/20/2009 10:58:12 | Jan. 1, 2009 through Dec. 31, 2009 | 7698.93 | 7698.93 | Annual | Rental | 9602732 | chutche |

37744

OPUC 6-5 LR5305

| ENTITY | COMPANY_NAME | CONTRACT_ID | CONTRACT_DESC | REFERENCE_NUM | BILLING_DT | BILLING PERIODS | AMOUNT_BILLED | AMT PAID | FREQUENCY | BILL_TYPE | INVOICE # | RESP_COORDINATOR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ETI | Phonoscope, LTD | 10061 | ANNUAL POLE REN | 100007549 | 1/19/2010 10:28:46 | Jan 1, 2010 through Dec. 31, 2010 | 7658.29 | 7658.29 | Annual | Rental | 9603046 | chutche |
| ETI | Rapid Acquisition Co LLC | 10095 | ANNUAL POLE REN | 100004702 | 7/18/2007 14:37:32 | Jan. 1, 2007 through Dec. 31, 2007 | 77952.99 | | Annual | Rental | 9602184 | chutche |
| ETI | Rapid Acquisition Co LLC | 10095 | ANNUAL POLE REN | 100005162 | 1/16/2008 13:58:55 | Jan. 1, 2008 through Dec. 31, 2008 | 77952.99 | | Annual | Rental | 9602261 | chutche |
| ETI | RB3 LLC & ARKLAOKTEX | 10113 | ANNUAL POLE REN | 100006780 | 5/18/2009 14:31:48 | Jan. 1, 2009 through Dec. 31, 2009 | 5580.93 | | Annual | Rental | 9602753 | chutche |
| ETI | Reveille Broadband | 10130 | ANNUAL POLE REN | 100007552 | 1/19/2010 10:31:54 | Jan 1, 2010 through Dec. 31, 2010 | 1741.94 | | Annual | Rental | 9603056 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100000089 | 2/20/2001 15:26:33 | Jan. 1, 2001 through Dec. 31, 2001 | 5951.58 | 5951.58 | Annual | Rental | 1059689 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100000500 | 1/16/2002 09:41:12 | Jan. 1, 2002 through Dec. 31, 2002 | 8934.43 | 8934.43 | Annual | Rental | 1075132 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100000739 | 1/13/2003 09:05:14 | Jan. 1, 2003 through Dec. 31, 2003 | 12390.3 | 12390.3 | Annual | Rental | 1092928 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100001567 | 1/28/2004 11:25:13 | Jan. 1, 2004 through Dec. 31, 2004 | 15355.5 | 15355.5 | Annual | Rental | 9601137 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100002320 | 1/10/2005 09:20:26 | Jan. 1, 2005 through Dec. 31, 2005 | 15500.23 | 15500.23 | Annual | Rental | 9601354 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100003208 | 1/11/2006 07:51:35 | Jan. 1, 2006 through Dec. 31, 2006 | 15510.82 | 15510.82 | Annual | Rental | 9601640 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100004209 | 1/18/2007 08:06:34 | Jan. 1, 2007 through Dec. 31, 2007 | 15510.82 | 15510.82 | Annual | Rental | 9601943 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100005109 | 1/15/2008 15:11:43 | Jan. 1, 2008 through Dec. 31, 2008 | 15510.82 | 15510.82 | Annual | Rental | 9602247 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100006482 | 2/6/2009 14:09:23 | Jan. 1, 2009 through Dec. 31, 2009 | 12545.62 | 12531.5 | Annual | Rental | 9602698 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 100007541 | 1/19/2010 10:18:29 | Jan 1, 2010 through Dec. 31, 2010 | 12332.38 | | Annual | Rental | 9603037 | chutche |
| ETI | Scott Cable Comm. | 99 | ANNUAL POLE REN | 1044685 | 11/2/2000 10:32:00 | Jan. 1, 2000 through Dec. 31, 2000 | 5951.58 | 5951.58 | Annual | Rental | 1044685 | chutche |
| ETI | Star Cable Associates | 105 | Annual pole rental f | 100000088 | 2/20/2001 15:17:38 | Jan. 1, 2001 through Dec. 31, 2001 | 20043.34 | 20043.34 | Annual | Rental | 1059689 | rpascua |
| ETI | Star Cable Associates | 105 | Annual pole rental f | 1044687 | 1/21/2000 00:00:00 | Jan. 1, 2000 through Dec. 31, 2000 | 30005 | 30005 | Annual | Rental | 1044687 | rpascua |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100000085 | 2/15/2001 15:27:19 | Jan. 1, 2001 through Dec. 31, 2001 | 136773.38 | 136773.38 | Annual | Rental | 1059475 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100000501 | 1/16/2002 09:42:54 | Jan. 1, 2002 through Dec. 31, 2002 | 136773.38 | 136773.38 | Annual | Rental | 1075135 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100000741 | 1/14/2003 07:34:39 | Jan. 1, 2003 through Dec. 31, 2003 | 137228.75 | 137228.75 | Annual | Rental | 1092935 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100001568 | 1/28/2004 11:26:01 | Jan. 1, 2004 through Dec. 31, 2004 | 131940.81 | 131940.81 | Annual | Rental | 9601138 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100002321 | 1/10/2005 09:58:07 | Jan. 1, 2005 through Dec. 31, 2005 | 133035.11 | 133035.11 | Annual | Rental | 9601355 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100003209 | 1/11/2006 07:52:46 | Jan. 1, 2006 through Dec. 31, 2006 | 133035.11 | 133035.11 | Annual | Rental | 9601641 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100004210 | 1/18/2007 08:07:25 | Jan. 1, 2007 through Dec. 31, 2007 | 133984.68 | 133984.68 | Annual | Rental | 9601944 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100005110 | 1/15/2008 15:12:40 | Jan. 1, 2008 through Dec. 31, 2008 | 134143.53 | 134143.53 | Annual | Rental | 9602248 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100006483 | 2/6/2009 14:10:20 | Jan. 1, 2009 through Dec. 31, 2009 | 134143.53 | 134143.53 | Annual | Rental | 9602699 | chutche |
| ETI | TCI Cablevision | 112 | ANNUAL POLE REN | 100007542 | 1/19/2010 10:19:45 | Jan 1, 2010 through Dec. 31, 2010 | 132224.35 | 132224.35 | Annual | Rental | 9603038 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100000079 | 2/15/2001 14:25:42 | Jan. 1, 2001 through Dec. 31, 2001 | 4084.21 | 4084.21 | Annual | Rental | 1059475 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100000502 | 1/16/2002 09:47:43 | Jan. 1, 2002 through Dec. 31, 2002 | 6152.79 | 6152.79 | Annual | Rental | 1075136 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100000730 | 1/13/2003 08:34:31 | Jan. 1, 2003 through Dec. 31, 2003 | 6152.79 | 4095.81 | Annual | Rental | 1092938 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100001569 | 1/28/2004 11:27:18 | Jan. 1, 2004 through Dec. 31, 2004 | 6145.73 | 5152.79 | Annual | Rental | 9601139 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100002322 | 1/10/2005 10:00:18 | Jan. 1, 2005 through Dec. 31, 2005 | 6145.73 | 6145.73 | Annual | Rental | 9601356 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100003210 | 1/11/2006 07:54:10 | Jan. 1, 2006 through Dec. 31, 2006 | 6145.73 | 6145.73 | Annual | Rental | 9601642 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100004211 | 1/18/2007 08:08:19 | Jan. 1, 2007 through Dec. 31, 2007 | 6145.73 | 6145.73 | Annual | Rental | 9601945 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100005111 | 1/15/2008 15:13:46 | Jan. 1, 2008 through Dec. 31, 2008 | 6145.73 | 4895.73 | Annual | Rental | 9602249 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100006484 | 2/6/2009 14:11:13 | Jan. 1, 2009 through Dec. 31, 2009 | 6279.87 | 279.87 | Annual | Rental | 9602700 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 100007543 | 1/19/2010 10:20:47 | Jan 1, 2010 through Dec. 31, 2010 | 6173.13 | | Annual | Rental | 9603039 | chutche |
| ETI | TCSI Huntsville, Inc | 117 | ANNUAL POLE REN | 1044689 | 1/21/2000 00:00:00 | Jan. 1, 2000 through Dec. 31, 2000 | 4038.32 | 4038.32 | Annual | Rental | 1044689 | chutche |
| ETI | Telecom Cable LLC | 10123 | ANNUAL POLE REN | 100006937 | 6/29/2009 17:09:38 | April 1, 2009 through March 31, 2010 | 1000 | 1000 | Annual | Rental | 9602761 | chutche |
| ETI | Telecom Cable LLC | 10123 | ANNUAL POLE REN | 100007718 | 1/27/2010 13:40:56 | Jan 1, 2010 through Dec. 31, 2010 | 818.96 | | Annual | Rental | 9603054 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100000389 | 12/6/2001 16:56:34 | Jan. 1, 2001 through Dec. 31, 2001 | 335.35 | 335.35 | Annual | Rental | 1072855 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100000729 | 1/13/2003 08:33:15 | Jan. 1, 2003 through Dec. 31, 2003 | 335.35 | 335.35 | Annual | Rental | 1093107 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100001571 | 1/28/2004 11:30:04 | Jan. 1, 2004 through Dec. 31, 2004 | 818.96 | 818.96 | Annual | Rental | 9601146 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100002323 | 1/10/2005 10:17:03 | Jan. 1, 2005 through Dec. 31, 2005 | 818.96 | 818.96 | Annual | Rental | 9601363 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100003211 | 1/11/2006 07:56:31 | Jan. 1, 2006 through Dec. 31, 2006 | 818.96 | 818.96 | Annual | Rental | 9601649 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100004212 | 1/18/2007 08:09:32 | Jan. 1, 2007 through Dec. 31, 2007 | 818.96 | 818.96 | Annual | Rental | 9601952 | chutche |
| ETI | Texas Telecable Inc | 10054 | ANNUAL POLE REN | 100005112 | 1/15/2008 15:14:48 | Jan. 1, 2008 through Dec. 31, 2008 | 818.96 | | Annual | Rental | 9602256 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100000090 | 2/20/2001 15:28:02 | Jan. 1, 2001 through Dec. 31, 2001 | 44305.03 | 44305.03 | Annual | Rental | 1059699 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100000503 | 1/16/2002 10:01:09 | Jan. 1, 2002 through Dec. 31, 2002 | 44343.86 | 44343.86 | Annual | Rental | 1075137 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100000728 | 1/13/2003 08:31:25 | Jan. 1, 2003 through Dec. 31, 2003 | 45339.32 | 45339.32 | Annual | Rental | 1093106 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100001572 | 1/28/2004 11:31:25 | Jan. 1, 2004 through Dec. 31, 2004 | 46437.15 | 46437.15 | Annual | Rental | 9601140 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100002324 | 1/10/2005 10:25:15 | Jan. 1, 2005 through Dec. 31, 2005 | 47552.63 | 47552.63 | Annual | Rental | 9601357 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100003212 | 1/11/2006 07:58:12 | Jan. 1, 2006 through Dec. 31, 2006 | 47990.35 | 47990.35 | Annual | Rental | 9601643 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100004213 | 1/18/2007 08:10:41 | Jan. 1, 2007 through Dec. 31, 2007 | 48173.91 | 48173.91 | Annual | Rental | 9601946 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100005113 | 1/15/2008 15:15:49 | Jan. 1, 2008 through Dec. 31, 2008 | 48851.67 | 48851.67 | Annual | Rental | 9602250 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100006485 | 2/6/2009 14:12:03 | Jan. 1, 2009 through Dec. 31, 2009 | 50768.46 | 50768.46 | Annual | Rental | 9602701 | chutche |
| ETI | Texas Telecable, Inc | 120 | ANNUAL POLE REN | 100007544 | 1/19/2010 10:23:59 | Jan 1, 2010 through Dec. 31, 2010 | 50082.51 | 50082.51 | Annual | Rental | 9603040 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100000084 | 2/15/2001 15:21:02 | Jan. 1, 2001 through Dec. 31, 2001 | 12294.99 | 12294.99 | Annual | Rental | 1059477 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100000504 | 1/16/2002 10:03:20 | Jan. 1, 2002 through Dec. 31, 2002 | 32123 | 32123 | Annual | Rental | 1075138 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100000734 | 1/13/2003 08:45:38 | Jan. 1, 2003 through Dec. 31, 2003 | 32137.12 | 32137.12 | Annual | Rental | 1092940 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100001658 | 5/19/2004 14:54:47 | Jan. 1, 2004 through Dec. 31, 2004 | 31653.51 | 31653.51 | Annual | Rental | 9601170 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100002325 | 1/10/2005 10:26:32 | Jan. 1, 2005 through Dec. 31, 2005 | 31653.51 | 31653.51 | Annual | Rental | 9601358 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100003213 | 1/11/2006 08:00:28 | Jan. 1, 2006 through Dec. 31, 2006 | 31653.51 | 31653.51 | Annual | Rental | 9601644 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100004214 | 1/18/2007 08:11:39 | Jan. 1, 2007 through Dec. 31, 2007 | 31653.51 | 31653.51 | Annual | Rental | 9601947 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100005114 | 1/15/2008 15:16:54 | Jan. 1, 2008 through Dec. 31, 2008 | 31653.51 | 31653.51 | Annual | Rental | 9602251 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100006486 | 2/6/2009 14:12:53 | Jan. 1, 2009 through Dec. 31, 2009 | 32959.61 | 32959.61 | Annual | Rental | 9602702 | chutche |
| ETI | Timberlake Cablevision | 121 | ANNUAL POLE REN | 100007717 | 1/27/2010 13:32:43 | Jan 1, 2010 through Dec. 31, 2010 | 32399.39 | | Annual | Rental | 9603041 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100000076 | 2/15/2001 13:54:05 | Jan. 1, 2001 through Dec. 31, 2001 | 44555.66 | 44555.66 | Annual | Rental | 1059478 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100000545 | 4/15/2002 16:03:43 | Jan. 1, 2002 through Dec. 31, 2002 | 44873.36 | 44873.36 | Annual | Rental | 1079126 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100000742 | 1/14/2003 07:36:01 | Jan. 1, 2003 through Dec. 31, 2003 | 44873.36 | 44873.36 | Annual | Rental | 1092942 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100001574 | 1/28/2004 11:32:59 | Jan. 1, 2004 through Dec. 31, 2004 | 42067.01 | 42067.01 | Annual | Rental | 9601142 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100002329 | 1/10/2005 10:53:19 | Jan. 1, 2005 through Dec. 31, 2005 | 42067.01 | 42067.01 | Annual | Rental | 9601359 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100003214 | 1/11/2006 08:02:40 | Jan. 1, 2006 through Dec. 31, 2006 | 42067.01 | 42067.01 | Annual | Rental | 9601645 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100004215 | 1/18/2007 08:12:43 | Jan. 1, 2007 through Dec. 31, 2007 | 42102.31 | 42102.31 | Annual | Rental | 9601948 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100005115 | 1/15/2008 15:18:11 | Jan. 1, 2008 through Dec. 31, 2008 | 42352.94 | 42352.94 | Annual | Rental | 9602252 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100006487 | 2/6/2009 14:14:00 | Jan. 1, 2009 through Dec. 31, 2009 | 42352.94 | 42352.94 | Annual | Rental | 9602703 | chutche |
| ETI | Time Warner Cable | 123 | ANNUAL POLE REN | 100007545 | 1/19/2010 10:25:14 | Jan 1, 2010 through Dec. 31, 2010 | 41775.33 | 41775.33 | Annual | Rental | 9603042 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100000416 | 12/10/2001 06:44:14 | Jan. 1, 2001 through Dec. 31, 2001 | 29620.23 | 29620.23 | Annual | Rental | 1072854 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100000743 | 1/14/2003 07:37:50 | Jan. 1, 2003 through Dec. 31, 2003 | 29620.23 | 29620.23 | Annual | Rental | 1092950 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100001575 | 1/28/2004 11:34:38 | Jan. 1, 2004 through Dec. 31, 2004 | 32581.9 | 32581.9 | Annual | Rental | 9601145 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100002328 | 1/10/2005 10:51:35 | Jan. 1, 2005 through Dec. 31, 2005 | 32581.9 | 32581.9 | Annual | Rental | 9601362 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100003215 | 1/11/2006 08:06:22 | Jan. 1, 2006 through Dec. 31, 2006 | 32581.9 | 32581.9 | Annual | Rental | 9601648 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100004216 | 1/18/2007 08:14:32 | Jan. 1, 2007 through Dec. 31, 2007 | 32581.9 | 32581.9 | Annual | Rental | 9601951 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100005116 | 1/15/2008 15:19:36 | Jan. 1, 2008 through Dec. 31, 2008 | 32641.91 | 32641.91 | Annual | Rental | 9602255 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100006489 | 2/6/2009 14:16:19 | Jan. 1, 2009 through Dec. 31, 2009 | 39592.48 | 39592.48 | Annual | Rental | 9602706 | chutche |
| ETI | Time Warner Cable | 10047 | POLE RENTAL | 100007547 | 1/19/2010 10:27:40 | Jan 1, 2010 through Dec. 31, 2010 | 39047.91 | 39047.91 | Annual | Rental | 9603045 | chutche |
| ETI | Time Warner Communicati | 10068 | ANNUAL POLE REN | 100001576 | 1/28/2004 11:35:57 | Jan. 1, 2004 through Dec. 31, 2004 | 9241.54 | 9241.54 | Annual | Rental | 9601148 | chutche |
| ETI | Time Warner Communicati | 10068 | ANNUAL POLE REN | 100002327 | 1/10/2005 10:46:58 | Jan. 1, 2005 through Dec. 31, 2005 | 9241.54 | 9241.54 | Annual | Rental | 9601365 | chutche |
| ETI | Time Warner Communicati | 10068 | ANNUAL POLE REN | 100003216 | 1/11/2006 08:08:19 | Jan. 1, 2006 through Dec. 31, 2006 | 9241.54 | 9241.54 | Annual | Rental | 9601651 | chutche |
| ETI | Time Warner Communicati | 10068 | ANNUAL POLE REN | 100004217 | 1/18/2007 08:16:27 | Jan. 1, 2007 through Dec. 31, 2007 | 9241.54 | 9241.54 | Annual | Rental | 9601954 | chutche |
| ETI | Time Warner Communicati | 10068 | ANNUAL POLE REN | 100005117 | 1/15/2008 15:20:51 | Jan. 1, 2008 through Dec. 31, 2008 | 9241.54 | 9241.54 | Annual | Rental | 9602258 | chutche |
| ETI | T-N-T CABLE | 10114 | ANNUAL POLE REN | 100006680 | 3/10/2009 09:16:32 | Jan. 1, 2009 through Dec. 31, 2009 | 5019.66 | | Annual | Rental | 9602737 | chutche |
| ETI | T-N-T CABLE | 10114 | ANNUAL POLE REN | 100007640 | 1/21/2010 15:33:22 | Jan 1, 2010 through Dec. 31, 2010 | 4934.34 | | Annual | Rental | 9603050 | chutche |
| ETI | Ultra Services of America | 10076 | ANNUAL POLE REN | 100002597 | 3/21/2005 09:23:06 | Jan. 1, 2005 through Dec. 31, 2005 | 1990.92 | 1990.92 | Annual | Rental | 9601500 | jcastil |
| ETI | Ultra Services of America | 10076 | ANNUAL POLE REN | 100003217 | 1/11/2006 08:10:34 | Jan. 1, 2006 through Dec. 31, 2006 | 1990.92 | 1990.92 | Annual | Rental | 9601653 | jcastil |
| ETI | Versalink Media LLC | 10129 | ANNUAL POLE REN | 100007643 | 1/21/2010 15:36:13 | Jan 1, 2010 through Dec. 31, 2010 | 10063 | | Annual | Rental | 9603055 | chutche |
| | TOTAL YEARS 2001-2010 | | | | | | $5,477,229.14 | $4,926,706.43 | | | | |

Data Source: 3- Attachment Data System - March 24, 2010

**SOAH DOCKET NO. 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**
**PUC DOCKET NO. 39896**

| | | |
|---|---|---|
| **APPLICATION OF ENTERGY TEXAS, INC. FOR AUTHORITY TO CHANGE RATES, RECONCILE FUEL COSTS, AND OBTAIN DEFERRED ACCOUNTING TREATMENT** | § § § § § § | **PUBLIC UTILITY** <br><br> **COMMISSION OF TEXAS** |

Direct Testimony and Exhibits

of

**JEFFRY POLLOCK**

On Behalf of

**Texas Industrial Energy Consumers**

REDACTED

**March, 2012**



J. POLLOCK
INCORPORATED

**SOAH DOCKET NO. 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**
**PUC DOCKET NO. 39896**

| | | |
|---|---|---|
| **APPLICATION OF ENTERGY TEXAS, INC. FOR AUTHORITY TO CHANGE RATES, RECONCILE FUEL COSTS, AND OBTAIN DEFERRED ACCOUNTING TREATMENT** | §<br>§<br>§<br>§<br>§<br>§ | **PUBLIC UTILITY**<br><br>**COMMISSION OF TEXAS** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ 2

EXHIBIT LIST................................................................................ 3

AFFIDAVIT OF JEFFRY POLLOCK.............................................. 4

LIST OF ACRONYMS ................................................................... 5

1. INTRODUCTION, QUALIFICATIONS AND SUMMARY ............ 6
    Summary.................................................................................8

2. REVENUE REQUIREMENT ISSUES.....................................15
    Test Year Versus Rate Year...................................................15
    Purchased Power Capacity Costs ..........................................21
    Transmission Equalization Payments.....................................27
    Depreciation Expense ............................................................33
    Property Tax Expense.............................................................39
    Incentive Compensation ........................................................41
    MISO Transition Costs ...........................................................45

3. CLASS COST-OF-SERVICE STUDY......................................51
    Municipal Franchise Fees.......................................................52
    Miscellaneous Gross Receipts Taxes.....................................59
    Revised Class Cost-of-Service Study .....................................60

4. CLASS REVENUE ALLOCATION...........................................63

5. RATE DESIGN.........................................................................68
    Schedule LIPS ........................................................................68
    Schedule SMS .........................................................................70
    Schedule AFC ..........................................................................81
    Fixed Fuel Factor .....................................................................85

APPENDIX A..................................................................................88

APPENDIX B..................................................................................90

APPENDIX C ................................................................................101



## EXHIBIT LIST

Exhibit JP-1: Derivation of Test Year Adjusted Purchased Power Capacity Costs

Exhibit JP-2: Pro-Forma Adjustment to Recognize the Expiration of the EAI-WBL Agreement

Exhibit JP-3: Schedule MSS-2 Equalization Calculation for May 2011

Exhibit JP-4: ETI's Response to Cities 3-3(g)

Exhibit JP-5: Comparison of Book Reserve and Theoretical Reserve By Function

Exhibit JP-6: Comparison of Book Reserve and Theoretical Reserve For the General Plant Accounts

Exhibit JP-7: Incentive Compensation Expense (Contains Highly Sensitive Information)

Exhibit JP-8: Year-To-Year Variation in Expenses By FERC Accounts in Which MISO Transition Costs are Being Booked

Exhibit JP-9: Municipal Franchise Fee Rate By City; Inside City kWh Sales; Municipal Franchise Fees By Customer Class

Exhibit JP-10: Allocation Factors for Miscellaneous Gross Receipts Taxes

Exhibit JP-11: Revised Texas Retail Class Cost-of-Service Study At Present Rates

Exhibit JP-12: ETI's Proposed Class Revenue Allocation

Exhibit JP-13: Recommended Class Revenue Allocation Based on TIEC's Revised Class Cost-of-Service Study

Exhibit JP-14: Schedule LIPS Rate Design

Exhibit JP-15: Derivation of Schedule SMS Charges

Exhibit JP-16: Schedule SMS Coincidence Ratio

Exhibit JP-17: Derivation of Option A Rider AFC Charge at ETI's Proposed Revenue Requirements

Exhibit JP-18: Derivation of Option B Rider AFC Charge at ETI's Proposed Revenue Requirements

Exhibit JP-19: Fixed Fuel Factor Loss Multipliers



**SOAH DOCKET NO. 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**
**PUC DOCKET NO. 39896**

| | | |
|---|---|---|
| **APPLICATION OF ENTERGY TEXAS, INC. FOR AUTHORITY TO CHANGE RATES, RECONCILE FUEL COSTS, AND OBTAIN DEFERRED ACCOUNTING TREATMENT** | §<br>§<br>§<br>§<br>§<br>§ | **PUBLIC UTILITY**<br><br>**COMMISSION OF TEXAS** |

## AFFIDAVIT OF JEFFRY POLLOCK

State of Missouri    )
                  ) SS
County of St. Louis   )

Jeffry Pollock, being first duly sworn, on his oath states:

1. My name is Jeffry Pollock. I am President of J. Pollock, Incorporated, 12655 Olive Blvd., Suite 335, St. Louis, Missouri 63141. We have been retained by Texas Industrial Energy Consumers to testify in this proceeding on its behalf;

2. Attached hereto and made a part hereof for all purposes is my Direct Testimony, Exhibits and Appendices A, B and C which have been prepared in written form for introduction into evidence in Public Utility Commission of Texas Docket No. 39896; and,

3. I hereby swear and affirm that my answers contained in the testimony are true and correct.

_____
Jeffry Pollock

Subscribed and sworn to before me this _____ day of March, 2012.

KITTY TURNER
Notary Public - Notary Seal
State of Missouri
Commissioned for Lincoln County
My Commission Expires: April 25, 2015
Commission Number: 11390610

_____
Kitty Turner, Notary Public
Commission #: 11390610

My Commission expires on April 25, 2015.



**J. POLLOCK**
INCORPORATED

**LIST OF ACRONYMS**

| Term | Definition |
|---|---|
| AFC | Additional Facilities Charge |
| Commission | Public Utility Commission of Texas |
| EAIP | Executive Annual Incentive Plan |
| EGSI | Entergy Gulf States, Inc. |
| EOP | Equity Ownership Plan |
| EPS | Earnings Per Share |
| ESA | Entergy System Agreement |
| ETI | Entergy Texas, Inc. |
| IS | Interruptible Service |
| kW | Kilowatt |
| kWh | Kilowatt Hour |
| kW-Month | Kilowatt-Month |
| LIPS | Large Industrial Power Service |
| LTIP | Long Term Incentive Plan |
| MFF | Municipal Franchise Fees |
| MGRT | Miscellaneous Gross Receipts Taxes |
| MISO | Midwest Independent System Operator |
| MW | Megawatt |
| O&M | Operation & Maintenance |
| PPA | Purchased Power Agreement |
| PPR | Purchased Power Rider |
| PURA | Public Utility Regulatory Act |
| PURPA | Public Utility Regulatory Policies Act |
| QF | Qualifying Facilities |
| ROR | Rate of Return |
| RROR | Relative Rate of Return |
| SMS | Standby and Maintenance Service |
| TIEC | Texas Industrial Energy Consumers |
| UCOS | Unbundled Cost-of-Service |



**J.POLLOCK**
**INCORPORATED**

**Direct Testimony of Jeffry Pollock**

# 1. INTRODUCTION, QUALIFICATIONS AND SUMMARY

**Q**  **PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

A  Jeffry Pollock; 12655 Olive Blvd., Suite 335, St. Louis, MO 63141.

**Q**  **WHAT IS YOUR OCCUPATION AND BY WHOM ARE YOU EMPLOYED?**

A  I am an energy advisor and President of J.Pollock, Incorporated (J.Pollock).

**Q**  **PLEASE STATE YOUR EDUCATIONAL BACKGROUND AND EXPERIENCE.**

A  I have a Bachelor of Science Degree in Electrical Engineering and a Masters in Business Administration from Washington University.  Since graduation in 1975, I have been engaged in a variety of consulting assignments, including energy procurement and regulatory matters in both the United States and several Canadian provinces.  I have participated in nearly every contested regulatory proceeding at the Public Utility Commission of Texas (Commission) involving Entergy Texas, Inc. (ETI) and its predecessor Entergy Gulf States, Inc. (EGSI).  My qualifications are documented in **Appendix A.**  A partial list of my appearances is provided in **Appendix B** to this testimony.

**Q**  **ON WHOSE BEHALF ARE YOU TESTIFYING IN THIS PROCEEDING?**

A  I am testifying on behalf of Texas Industrial Energy Consumers (TIEC).  TIEC members are customers of ETI, and they purchase electricity primarily under the





Large Industrial Power Service (LIPS), Interruptible Service (IS), Standby and Maintenance Service (SMS), and Experimental As-Available Power Service (EAPS) rate schedules.

**Q   WHAT ISSUES ARE YOU ADDRESSING?**

A   I am addressing various revenue requirement, cost allocation and rate design issues raised by ETI in this proceeding; specifically:

- Revenue Requirement Issues (Part 2):
  - Purchased Power Capacity Costs;
  - Transmission Equalization Payments;
  - Depreciation;
  - Property Taxes;
  - Incentive Compensation; and
  - MISO Transition Costs.
- Cost Allocation Issues:
  - Retail Class Cost-of-Service Study (Part 3); and
  - Class Revenue Allocation (Part 4).
- Rate Design Issues (Part 5):
  - Schedule LIPS;
  - Schedule SMS;
  - Schedule AFC; and
  - Fixed Fuel Factor Loss Multipliers.

The fact that I am not addressing other issues should not be interpreted as an endorsement of ETI's proposals on these issues.



**J.POLLOCK**
INCORPORATED

## Summary

**Q   PLEASE SUMMARIZE YOUR FINDINGS AND CONCLUSIONS.**

A   My findings and conclusions are as follows:

### *Revenue Requirements*

- Purchased Power Capacity Costs

ETI's proposed pro-forma adjustments to purchased power capacity costs were derived from cost projections for a future period, which ETI refers to as the "Rate Year." ETI substituted Rate Year estimates for Test Year costs. A Rate Year is not a Test Year. Substituting Rate Year costs for Test Year costs violates the Commission rules, which require that rates be set using an historical Test Year adjusted for known and measurable changes. In other words, a Test Year is used to set rates. Further, post-test year adjustments are allowed only when the utility also reflects all attendant effects. If a pro-forma adjustment assumes post-test year load growth, it should also reflect the additional revenues associated with load growth. Post-test year adjustments must also be consistent with the Matching Principle; that is, if rates are set using Test Year sales, the costs must also be based on the Test Year. ETI's proposal would set rates using Rate Year costs and Test Year sales, which would ignore increases in ETI's revenue caused by load growth from the Test Year to the Rate Year. Thus, ETI's proposal would violate the Matching Principle and the Commission's rules that require that rate and cost parameters be based on the same time period.



**J.POLLOCK**
INCORPORATED

For all of these reasons, the Commission should reject any post-test year adjustments that use Rate Year projections for Test Year costs as ETI has done. If the Commission were to make such post-test year adjustments, however, the proper adjusted amount of purchased power capacity costs is $236.89 million or $6.661 per kW-Month, which is a reduction of $39.350 million from ETI's request.[1] The $39.350 million reduction is based on re-pricing Test Year capacity purchases under the known PPAs.

- <u>Transmission Equalization Payments</u>

ETI's proposed post-test year adjustment to transmission equalization payments should be rejected because ETI has failed to demonstrate that the requested pro-forma adjustment is known and measurable. Transmission equalization payments are a function of three variables: inter-transmission investment, ownership costs and responsibility ratios. Estimating these variables is susceptible to a host of uncertainties, such as the timing of new transmission investment, the cost of money, operating expenses, taxes and load growth, which determines the responsibility ratios. Further complicating the analysis is that such estimates require specific assumptions not only for ETI, but for all Entergy Operating Companies. Should the Commission decide that a pro-forma adjustment is appropriate, a reasonable approach would be to annualize the average monthly transmission equalization payments incurred by ETI from January through June 2011

---

[1] All amounts are stated on a Total Company basis.



**J. POLLOCK**
**INCORPORATED**

(the last six months of the Test Year). This will reduce ETI's proposed transmission equalization expense by $8 million.

- Depreciation Expense

My recommendation on depreciation expense reflects two separate adjustments. First, no increase in the depreciation rates applicable to production plant accounts is warranted because ETI has accumulated a substantial surplus depreciation reserve. This would reduce ETI's proposed depreciation expense by $1.156 million. Second, it is unnecessary to amortize a $21.3 million deficiency in the general plant depreciation reserve as ETI proposed because the deficiency can be largely cured by reallocating the reserve from those general plant accounts that presently have a significant surplus. This reallocation of the depreciation reserve within the general plant accounts is consistent with accepted practice. The net effect of this adjustment is a reduction of $794,000. Thus, the combined adjustment for these two recommendations is to reduce ETI's requested depreciation expense by $1.95 million. I have not addressed issues related to salvage value and useful life.

- Property Taxes

ETI has failed to prove that any adjustment in property tax expense is warranted. ETI's proposed adjustment assumes that property tax rates are affected primarily by projected net operating income, rather than net plant in service. Further, ETI has assumed a 1% increase in tax rates that is not tied to any specific known changes. ETI's proposed $2.6 million increase to its Test Year property tax expense should be rejected.



- Incentive Compensation

I am recommending that all incentive compensation related to achieving financial goals ($6.2 million) be removed from ETI's revenue requirements. My recommendation is consistent with past Commission precedent.

- MISO Transition Costs

ETI's request for deferred accounting of transition expenses related to Entergy's proposal to join the Midwest Independent System Operator (MISO) should be rejected because there is no proof that deferred accounting is required for ETI to carry out various provisions of PURA. ETI is not required by law to join MISO, nor are the MISO costs of a substantial nature that would jeopardize ETI's financial integrity. Further, costs incurred of a similar nature (including ETI's request to join ERCOT) have not been subject to deferred accounting.

ETI's alternative proposal (*i.e.,* to remove all transition costs incurred during the Test Year, restate expenses to collect $4 million per year in MISO costs, and amortize costs incurred prior to 2011 over five years with a return) should also be rejected. The $4 million is not based on Test Year expenses (which were less than $1 million). Including future costs in rates is not only an impermissible post-test year adjustment, it would violate the Matching Principle. Even if Entergy (ETI's parent) could exactly estimate its total transition costs, ETI's share of these expenditures is based on an estimated responsibility ratio of 17%. However, the estimated responsibility ratio assumes post-test year load growth. Absent a specific adjustment to recognize additional revenues from post-test year load growth, ETI's pro-forma



adjustment would not take all attendant effects into account and should be rejected. Highlighting the uncertainty of these costs, ETI's estimate increased from $12 million to $17 million (a 40% increase) in the span of only three months. Thus, these costs are not known and measurable. Finally, the costs are immaterial relative to other similar expenses. The proper treatment of MISO transition expenses reduces ETI's request by $3.8 million.

### *Class Cost-of-Service Study*

ETI's class cost-of-service study should be revised so that the allocation of municipal franchise fees (MFF) and miscellaneous state gross receipts taxes (MGRT) reflect cost causation. ETI allocates these taxes on revenues. This is not consistent with cost causation. MFF are caused by kWh sales inside cities. Further, different cities charge different MFF rates, and class sales are not uniformly distributed by city. As a result, the weighted average MFF rate differs by class. This difference should be recognized. MGRT are caused by revenues inside city limits.

### *Class Revenue Allocation*

All rates should be moved to cost in this case. This is consistent with Commission policy, and it will promote rates that are equitable, efficient, provide stability (of net revenues) and encourage conservation.

### *Rate Design*

- Schedule LIPS

    Schedule LIPS should be revised to include a customer charge. Further,



because the non-fuel energy charges are already higher than non-fuel energy costs, if there is any additional increase allocated to the LIPS class, it should be applied to the demand charges. Any decrease (after taking into account additional customer charge revenues) should be applied to the energy charges.

- Schedule SMS

Schedule SMS should be redesigned to better reflect the cost characteristics of Standby and Maintenance power customers. Specifically, the demand charge for production/transmission-related costs should recognize that Standby service seldom occurs coincident with ETI's monthly summer peaks; that is, Standby power has a much lower coincidence factor than full-requirements power. Based on an analysis of Standby customers' historical usage characteristics, the Standby power production/transmission demand charge should be set at 12% (reflecting the ratio of Standby to LIPS coincidence factors) of the corresponding Schedule LIPS demand charges. There should also be a separate demand charge for distribution service, consistent with the current non-fuel energy charges. The energy charge should be the same as under Schedule LIPS except during on-peak hours. The on-peak energy charge should provide for recovery of additional demand-related costs not already recovered in the SMS demand charge. This will provide a strong incentive to minimize forced outages during on-peak hours while ensuring that an SMS customer pays no more than a full-requirements customer for similar service. This approach is consistent with system-wide costing principles because it recognizes the same cost causative factors used to allocate production and transmission demand-related



costs, and SMS customers would pay the same distribution and non-fuel energy charges as LIPS customers.

- Schedule AFC

Schedule AFC rates should be reduced consistent with ETI's Test Year ownership and operating costs associated with facilities that are directly assigned to specific customers. Specifically, the Option A rate should be 1.20% per month, while the Option B Monthly Recovery rates should also be reduced. Further, the Option B O&M (Operation and Maintenance) Rate should be reduced to 0.35%, consistent with the percent of O&M expenses related to transmission and distribution plant investment. The recommended rates should be correspondingly lower if adjustments are made to ETI's overall rate of return, distribution O&M expenses, or property taxes.

- Fixed Fuel Factor Loss Multipliers

ETI has revised its demand and energy losses in this proceeding. The revised losses are reflected in the jurisdictional and class cost-of-service studies. The same energy losses should also be used to reset the loss multipliers in the Fixed Fuel Factor.



**J.POLLOCK**
**INCORPORATED**

## 2. REVENUE REQUIREMENT ISSUES

**Q    WHAT REVENUE REQUIREMENT ISSUES ARE YOU ADDRESSING?**

A    I am addressing each of the following expenses:

- Purchased Power Capacity Costs;
- Transmission Equalization Payments;
- Depreciation;
- Property Taxes;
- Incentive Compensation; and
- MISO Transition Costs.

In this case, ETI is using the Test Year ended June 30, 2011. My analysis reveals that, with respect to purchased power capacity costs and transmission equalization payments, ETI has calculated an "adjusted test year" expense using projected expenditures for a future period, which ETI refers to as the "Rate Year." ETI's proposed Rate Year is the period from June 2012 through May 2013. As explained later, substituting Rate Year expenditures for Test Year adjusted expenses is seriously flawed, contrary to accepted ratemaking practice and this Commission's rules, and would result in rates that are neither just nor reasonable.

### Test Year Versus Rate Year

**Q    WHAT IS A TEST YEAR?**

A    The Commission's rules define a Test Year as:

> The most recent 12 months for which operating data for an electric utility, electric cooperative, or municipally-owned utility are available and shall commence with a calendar quarter or a fiscal



year quarter. [2]

**Q** **WHAT IS A RATE YEAR?**

**A** The Commission's rules define a Rate Year as:

> The 12-month period beginning with the first date that rates become effective. The first date that rates become effective may include, but is not limited to, the effective date for bonded rates or the effective dates for interim or temporary rates.[3]

**Q** **WHICH PERIOD IS USED TO SET RATES, A TEST YEAR OR A RATE YEAR?**

**A** The Commission's rules require the use of a Test Year to set rates. Specifically:

> (b) Allowable expenses. Only those expenses which are reasonable and necessary to provide service to the public shall be included in allowable expenses. In computing an electric utility's allowable expenses, ***only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered, except as provided for in any section of these rules dealing with fuel expenses.***[4] (emphasis added).

**Q** **DOES THE USE OF AN HISTORICAL TEST YEAR PRECLUDE A UTILITY FROM MAKING PRO-FORMA ADJUSTMENTS TO RECOGNIZE CHANGES IN COSTS THAT HAVE OCCURRED SUBSEQUENT TO THE TEST YEAR?**

**A** No. A utility can make pro-forma adjustments to actual Test Year expenses that are both known and measurable. A pro-forma adjustment is "known" if it can be anticipated with reasonable certainty. For example, if a utility enters into a new purchased power agreement (PPA) after the close of the Test Year, this is a known change, and it may be reasonable to reflect the new PPA in calculating adjusted Test

---

[2] P.U.C. SUBST. R. 25.5(134).

[3] *Id.* 25.5(102).

[4] *Id.* 25.231(b).



**J.POLLOCK**
**INCORPORATED**

Year expenses, assuming that all attendant impacts can be taken into account. A pro-forma adjustment is "measurable" if the impact of a known change can be quantified with reasonable certainty by restating expenses as if the change had occurred at the beginning of the Test Year.

**Q** **ARE THERE ANY OTHER REQUIREMENTS THAT GOVERN HOW KNOWN AND MEASURABLE CHANGES TO TEST YEAR RESULTS ARE QUANTIFIED?**

**A** Yes. First, a pro-forma adjustment should reflect all attendant effects. For example, if a utility installs a more efficient billing system and wants to recover the full cost of the system in rates it must also reflect any increase in productivity resulting from the new billing system. This might include reducing wages and benefits to recognize a lower employee count, or reducing working capital if the new billing system reduces the time required to render bills. Recognizing all attendant effects is also consistent with Commission's rules. Specifically, the Commission's rule for invested capital provides:

(F) Requirements for post test year adjustments.

(i)   Post test year adjustments for known and measurable rate base additions (increases) to historical test year data will be considered only as set out in subclauses (I)-(IV) of this clause.

* * *

(IV) *Where the attendant impacts on all aspects of a utility's operations (including but not limited to, revenue, expenses and invested capital) can with reasonable certainty be identified, quantified and matched.* Attendant impacts are those that

reasonably follow as a consequence of the post test year adjustment being proposed.[5] (emphasis added)

**Q   WHAT OTHER PRINCIPLE SHOULD BE RECOGNIZED IN MAKING PRO-FORMA ADJUSTMENTS TO TEST YEAR EXPENSES?**

A   A pro-forma adjustment must also recognize the "Matching Principle." The Matching Principle means using a consistent set of assumptions for all ratemaking components (*e.g.*, sales, revenues, invested capital and operating expenses). The fundamental premise behind the Matching Principle is the fact that rates are set as follows:

$$Rate \ = \ \frac{Adjusted\ Test\ Year\ Costs}{Adjusted\ Test\ Year\ Sales}$$

Thus, in order to set rates, the costs must be determined for the same test year as the corresponding sales. If costs are based on a future period when sales are projected to be 10% higher, but sales are based on an historical test year, the utility's rates would over-collect costs by 10%.

**Q   IS THE MATCHING PRINCIPLE RECOGNIZED IN THIS COMMISSION'S RULES?**

A   Yes. The Commission's rules state that:

> (b) Rates will be determined using revenues, billing and usage data for a historical test year adjusted for known and measurable changes, and costs of service as defined in §25.231 of this title (relating to Cost of Service).[6]

---

[5] P.U.C. SUBST. R. 25.231(c)(2)(F).

[6] P.U.C. SUBST. R. 25.234(b).



Q **PLEASE PROVIDE AN EXAMPLE TO ILLUSTRATE HOW THESE TWO FUNDAMENTAL PRINCIPLES ARE PROPERLY RECOGNIZED.**

A Let's assume that Utility A and Utility B both file rate cases in Dec. 2011 using a June 2011 Test Year and a May 2013 Rate Year. Also assume that when these cases were filed, it was known that a new PPA would become effective May 2013. Consider the following scenarios:

> *Utility A measures the impact of the new PPA by restating test year expenses as if the PPA had been in effect for the entire test year. This includes eliminating any expenses that would be affected by the new PPA, such as removing an expiring PPA and/or retiring generating capacity, provided that the total quantity of capacity resources in the test year is unchanged. All other test year assumptions are unchanged.*

> *Utility B measures the impact of the new PPA by simply estimating the additional expense over a future period in which the new PPA is in effect and then adding this estimated expense to test year expenses. No other adjustments are made.*

In this example, Utility A has reflected attendant effects (given that it is not seeking recovery of additional capacity costs to serve post-test year load growth), while using consistent Test Year assumptions to set rates. If the purpose of the new PPA is to allow Utility B to serve projected additional loads, Utility B failed to measure all attendant effects in the new PPA. Further, Utility B has violated the Matching Principle because adjusted Test Year purchased power capacity costs would, in part, reflect post Test Year load growth while the rate would reflect Test Year sales. The resulting rate would allow Utility B to over-recover costs.

J.POLLOCK
INCORPORATED

**Q** **WITH REGARD TO THE ABOVE EXAMPLE, WOULD ETI'S QUANTIFICATION OF PURCHASED POWER CAPACITY COSTS AND TRANSMISSION EQUALIZATION PAYMENTS MORE CLOSELY RESEMBLE UTILITY A OR UTILITY B?**

**A** Utility B. For this reason, it is necessary to adjust ETI's claimed expenses so that they reflect appropriate ratemaking practices and are consistent with this Commission's rules.

**Q** **WOULD PROPER APPLICATION OF THESE TWO FUNDAMENTAL CONCEPTS ENSURE THAT RATES ARE JUST AND REASONABLE?**

**A** Yes. When these two fundamental concepts (*i.e.,* reflect all attendant affects and recognize the Matching Principle) are correctly applied, pro-forma adjustments to Test Year expenses can provide a better representation of the costs that the utility will incur when new base rates are implemented.

**Q** **PLEASE SUMMARIZE YOUR DISCUSSION OF THE USE OF A TEST YEAR VERSUS A RATE YEAR IN SETTING RATES.**

**A** Proper ratemaking practice means establishing a utility's costs of providing a service for an historical Test Year adjusted for known and measurable changes. Any pro-forma adjustments to Test Year costs must be reasonably anticipated, reflect all attendant effects and use the same assumptions as are used in determining the utility's other costs and in developing rates (*i.e.* consistent with the Matching Principle). This requires that Test Year expenses be restated as if a known and measurable change had occurred at the beginning of the Test Year. It would not be

---

**2. Revenue Requirement Issues**



appropriate to substitute an expense derived from a future time period (*i.e.* the Rate Year) for Test Year expenses without making all appropriate adjustments.

**Purchased Power Capacity Costs**

**Q        WHAT ARE PURCHASED POWER CAPACITY COSTS?**

A        Purchased power capacity costs are expenses incurred under a PPA for the right to call on a specific amount of capacity.  They are typically comprised of demand charges and other option payments, which are generally fixed for a specified term and are not affected by the amount of kilowatt-hours (kWh) purchased.

**Q        WHY ARE PURCHASED POWER CAPACITY COSTS AN ISSUE IN THIS CASE?**

A        First, purchased power capacity costs are considered non-reconcilable; that is, a utility can only recover purchased power capacity costs in base rates.  Second, in its Supplemental Preliminary Order, the Commission decided that it would not address ETI's proposed Purchased Power Rider.[7]  Under the proposed Purchased Power Rider, ETI would have collected all purchased power capacity costs outside of base rates.  The Supplemental Preliminary Order also stated that the Commission needs to determine the amount of purchased power capacity costs to be recovered in base rates.  Because rates are defined on a per-unit basis, it would also be appropriate to state the allowable purchased power capacity costs on a per kilowatt-month (kW-Month) basis.

---

[7]  *Supplemental Preliminary Order* at 2 (Jan. 19, 2012).

**2.  Revenue Requirement Issues**



**Q    HAVE YOU ANALYZED ETI'S PROPOSAL TO RECOVER PURCHASED POWER CAPACITY COSTS IN BASE RATES?**

A    Yes.  ETI is proposing to recover $276 million of "adjusted test year" purchased power capacity costs in base rates.[8]

**Q    HOW WAS THE $276 MILLION DERIVED?**

A    ETI projected its capacity purchases under PPAs that would be in place during the Rate Year (June 2012-May 2013).  It then substituted these Rate Year expenses for the Test Year expenses in determining ETI's overall cost of service in this proceeding.

**Q    ARE ETI'S RATE YEAR PURCHASES BASED ON THE SAME ASSUMPTIONS AS ITS TEST YEAR POWER PURCHASES?**

A    No.  For example, the projected quantity of capacity purchases is clearly different in the Rate Year than during the Test Year as shown in the table below.

| Table 1: Rate Year vs. Test Year Quantities (MW-Months) | | |
|---|---|---|
| **Purchase** | **Test Year** | **Rate Year** |
| **Third Party Purchases** | 5,584 | 12,834 |
| **Affiliate Purchases** | 21,670 | 21,711 |
| **MSS-1 Payments** | 8,309 | 5,262 |
| **Total** | 35,563 | 39,807 |

---

[8]  *Direct Testimony of Robert R. Cooper* at 20.  Another ETI witness, Mr. Considine, stated that the amount of purchased power capacity costs ETI is seeking to recover are the costs that were removed from the Test Year.  However, $246.6 million of costs were removed from the Test Year (Considine at 26 and Adjustment No. 24).  This testimony is contradicted by Mr. Cooper's testimony.



As can be seen, ETI's Rate Year purchases (39,807 MW-Months) would be nearly 12% higher than the corresponding Test Year purchases (35,563 MW-Months).

**Q    WHY ARE RATE YEAR PURCHASES HIGHER THAN TEST YEAR PURCHASES?**

A    Rate year purchases reflect the fact that ETI is projecting to serve additional load during the Rate Year.  As discussed later, most of the $30 million spread between Rate Year ($276 million) and Test Year ($245 million) purchased power capacity costs is due to additional capacity purchases.  These additional purchases are primarily related to meeting future loads, while maintaining an appropriate reserve margin.

**Q    DID ETI MAKE ANY OTHER ADJUSTMENTS TO RATE YEAR PURCHASED POWER CAPACITY COSTS?**

A    No.  ETI did not recognize additional revenues from post-test year load growth.  Thus, ETI's post-test year adjustment fails to recognize all attendant effects.  Further, rates would be set using Rate Year costs and Test Year sales.  Thus, this approach would clearly violate the Matching Principle as previously discussed.

**Q    SHOULD ETI'S RATE YEAR PURCHASED POWER CAPACITY COSTS BE USED TO SET RATES IN THIS PROCEEDING?**

A    No.  ETI's use of Rate Year expenses is not consistent with accepted ratemaking practices or this Commission's rules.  For all of these reasons, ETI's proposed post-test year adjustments should be rejected.  Rates should be set using actual Test Year expenses.



**Q** **IF THE COMMISSION DETERMINES THAT AN ADJUSTMENT TO TEST YEAR EXPENSES IS APPROPRIATE, HOW SHOULD ADJUSTED TEST YEAR PURCHASED POWER CAPACITY COSTS BE QUANTIFIED?**

**A** Actual Test Year costs should be used as the starting point. Pro-forma adjustments should reflect the capacity costs associated with "known" PPAs. Further, consistent with the Matching Principle, only changes in per-unit capacity costs, and not changes in the quantity of power purchased, should be measured. This will ensure that the costs used to set rates are based on the same time period as the billing determinants.

**Q** **WHAT DO YOU MEAN BY "KNOWN" PURCHASED POWER AGREEMENTS?**

**A** Known PPAs are executed agreements that have been submitted for Commission review and have been found to be prudent. This could include PPAs where power may not have flowed during the Test Year but will commence during the Rate Year. However, it also means that a pro-forma adjustment should also be made to remove a PPA if it is reasonably anticipated that it will expire (*i.e.,* power will stop flowing) during the Rate Year.

**Q** **HAVE YOU QUANTIFIED ETI'S ADJUSTED TEST YEAR PURCHASED POWER CAPACITY COSTS?**

**A** Yes. This is shown in **Exhibit JP-1**. The starting point was ETI's actual Test Year expenses. As can be seen, these expenses were $245 million (line 2).[9] I then

---

[9] The $245 million excludes $1.6 million of costs associated with the Toledo Bend purchase. This is comparable with ETI's proposed $276 million.



quantified Test Year per-unit costs (column 3) by dividing the Test Year costs (column 1) by the corresponding amount of Test Year capacity purchases (column 2). Pro-forma adjustments were made solely to recognize changes in per-unit capacity costs associated with known PPAs. The pro-forma unit costs are based on analysis of all known PPAs (column 4).

**Q** **HOW DID YOU QUANTIFY THE PRO-FORMA ADJUSTMENTS?**

**A** First, I categorized ETI's PPAs into three separate groups:

- Third-Party Purchases (line 3);
- Affiliate Purchases (line 4); and
- Reserve Equalization Payments (line 5).

I then applied the unit costs of the known PPAs (column 4) to Test Year capacity purchases (column 2). This resulted in adjusted Test Year purchased power capacity costs of about $248 million (line 6). This is slightly higher than ETI's actual Test Year costs and about $28 million below ETI's proposed adjusted Test Year expense ($276 million- $248 million).

**Q** **SHOULD ANY FURTHER ADJUSTMENTS BE MADE TO TEST YEAR PURCHASED POWER CAPACITY COSTS?**

**A** Yes. It is currently known that the EAI-WBL PPA will expire at the end of 2012. To ensure that rates reflect ETI's going-forward costs, Test Year expenses should be adjusted to recognize this known change.

**Q    WHAT IS THE EAI-WBL AGREEMENT?**

A    The EAI-WBL (which is an acronym for Entergy Arkansas, Inc.-Wholesale Base Load) agreement is a firm capacity purchase of about 107 megawatts (MW) of power from a "pool" of wholesale generating resources.  The resources include both nuclear and coal plants owned by Entergy Arkansas, Inc. (EAI).  This capacity purchase was for a three-year term beginning in January 2010.  Thus, the EAI-WBL PPA will expire in December 2012, which is only five months after the jurisdictional deadline for this case.

**Q    HAVE YOU QUANTIFIED AN ADJUSTMENT TO REMOVE THE EAI-WBL PPA?**

A    Yes.  This adjustment is shown in **Exhibit JP-2**.  As can be seen, I have removed $13.86 million of expense, which represents the costs of EAI-WBL PPA for seven months of the Test Year.  It is reasonable to assume that ETI would make additional Reserve Equalization purchases for about the same quantity, or 746 MW-Months as shown on line 3.  These pro-forma unit costs of reserve equalization purchases is $3.659 per kW-Month (line 4).  Applying the pro-forma unit costs and the additional purchases would result in an offsetting adjustment of $2.73 million (line 5).  Thus, the net effect of removing the EAI-WBL PPA would be an $11.1 million (line 6) adjustment to Test Year purchased power capacity costs.

**Q    SHOULD ANY ADJUSTMENT BE MADE TO REFLECT A POTENTIAL NEW EAI-WBL PURCHASED POWER AGREEMENT?**

A    No.  Any adjustment would be inappropriate.  ETI has not yet submitted a new EAI-WBL PPA for Commission review, and Commission review is essential to determine



**2.  Revenue Requirement Issues**



whether this agreement is prudent. Until such time as the Commission has determined a new EAI-WBL PPA is prudent, no post-test year adjustment associated with such a potential contract should be made in setting base rates.[10]

**Q   PLEASE SUMMARIZE YOUR RECOMMENDATION ON ETI'S ADJUSTED TEST YEAR OF PURCHASED POWER CAPACITY COSTS.**

A   Test Year adjusted purchased power capacity costs should be set at $236.89 million, or $6.661 per kW-Month ($236.89 million ÷ 35,563 MW-Months ÷ 1,000) on a Total Company basis. This is based on Test Year capacity purchases, and it reflects changes in the per-unit costs under all known PPAs. It also reflects the expiration of the EAI-WBL PPA, which is currently scheduled to occur during the Rate Year. The $236.89 million represents a $39.350 million reduction in ETI's proposed adjusted Test Year expense.

**Transmission Equalization Payments**

**Q   WHAT ARE TRANSMISSION EQUALIZATION PAYMENTS?**

A   The Entergy System Agreement (ESA) requires that all Entergy Operating Companies equalize certain transmission costs. The equalization process is

---

[10] However, if an adjustment is to be made, it should not exceed $5.944 million, which is derived as follows:

| Line | Description | Amount | Source |
|------|-------------|--------|--------|
| 1 | Demand Charge Differential Between the Original and New EAI-WBL Agreements (per kW-Month) | ■■■ | Derived from ETI's Responses To TIEC 5-1 (Addendum 1). |
| 2 | EAI-WBL Purchases Removed (MW-Months) | 746 | Exhibit JP-2, line 2. |
| 3 | Adjustment (Millions) | $5.944 | Line 1 x Line 2. |

This would result in adjusted Test Year purchased power capacity costs of $242.080 million, which is a reduction of $34.162 million from ETI's request.

**2. Revenue Requirement Issues**



J.POLLOCK
INCORPORATED

accomplished through Schedule MSS-2. Schedule MSS-2 equalizes the ownership and operating costs associated with inter-transmission investment between Entergy Affiliates. Inter-transmission investment includes:

- All of the investment in transmission lines operated at 230 kV or higher voltage;

- Investment in transmission substations with three or more lines operated at a voltage of 230 kV or higher, including facilities down to, but not including, the high side disconnecting device at the transformer, 50% of common facilities, and other facilities as approved by the Operating Committee; and

- All lines 115 kV and higher from the owning company's last substation to the connecting point of another Company (either Entergy System Company, or nonsystem Company) not included in the above.[11]

**Q  WHAT LEVEL OF TRANSMISSION EQUALIZATION PAYMENTS IS ETI PROPOSING TO REFLECT IN SETTING RATES IN THIS PROCEEDING?**

A  ETI is proposing to collect $10.697 million of transmission equalization payments in setting rates for this proceeding.[12]

**Q  WHAT WAS THE BASIS FOR THE $10.697 MILLION OF TEST YEAR TRANSMISSION EQUALIZATION PAYMENTS?**

A  The $10.697 million was ETI's estimated Rate Year transmission equalization expense.[13]

---

[11] *Direct Testimony of Patrick J. Cicio* at Exhibit PJC-1 at 38.

[12] Schedule P, Adjustment 23.

[13] *Direct Testimony of Michael P. Considine* at 25.



**J. POLLOCK**
**INCORPORATED**

**Q**  **WHAT TRANSMISSION EQUALIZATION PAYMENTS WERE ACTUALLY INCURRED DURING THE TEST YEAR?**

**A**  ETI incurred $1.754 million of transmission equalization payments in the Test Year.[14] Thus, ETI is proposing a pro-forma adjustment of about $8.9 million to Test Year actual expense.

**Q**  **SHOULD ETI'S PROPOSED PRO-FORMA ADJUSTMENT TO TRANSMISSION EQUALIZATION PAYMENT BE ADOPTED?**

**A**  No.  As previously stated, the $10.697 million Test Year adjusted amount is based on the Rate Year June 2012 through May 2013.  That is, all components of the Schedule MSS-2 equalization process reflect Rate Year estimates, including future net inter-transmission investment, future ownership costs, and future responsibility ratios.  Further, ETI has failed to demonstrate that the requested pro-forma adjustment is known and measurable.  Transmission equalization payments are a function of three variables: inter-transmission investment, ownership/operating costs and responsibility ratios, which determine ETI's share of system investment.  Estimating these variables is susceptible to a host of uncertainties, such as the timing of new transmission investment, the cost of money, operating expenses, taxes and load growth.  Further complicating the analysis is that such estimates require specific assumptions not only for ETI, but for all Entergy Operating Companies.

---

[14]  ETI Response to Cities 3-3(g), which is enclosed as **Exhibit JP-4**.



**Q    PLEASE EXPLAIN.**

A    **Exhibit JP-3** provides an illustration showing how Schedule MSS-2 equalizes inter-transmission investment. The illustration is for the month of May 2011. The starting point is net inter-transmission investment for each Entergy Operating Company (lines 1-4). The next step is to quantify the ownership and operating costs associated with inter-transmission investment, which are the product of net investment (line 4) and the sum of the following cost components stated as a percentage of investment:

- Ownership costs, such as the cost of money (lines 5-11), state and federal income taxes (line 12) and depreciation expense (line 13); and

- Operating costs, including insurance, property tax, franchise tax, operation & maintenance and overheads (lines 14-18).

Total annual ownership/operating costs (line 20) are the sum of the individual cost components. They are translated into dollar amounts (line 21), which is the product of each operating company's net inter-transmission investment (line 4) and the annual ownership/operating cost percentage (line 20). Total system ownership/operating costs (column 2, line 22) and net inter-transmission investment (column 3, line 22) are the sum of the corresponding amounts for each operating company. Dividing the two amounts yields the system average ownership/operating costs shown in column 5, line 22 (annual) and line 23 (monthly).

Inter-transmission cost responsibility is then calculated for each operating company. It is the product of the total system net transmission investment (column 4, line 22) and each operating company's responsibility ratio (line 24). The difference between each operating company's inter-transmission cost responsibility (line 25) and its actual net transmission investment (line 4) represents the investment

**2.  Revenue Requirement Issues**

difference. A corresponding payment (receipt) under Schedule MSS-2 is the product of the investment difference (line 26) and the system monthly ownership costs (column 5, line 23).

As can be seen, for the month of May 2011, ETI would have paid the other Entergy Operating Companies $131,500 in transmission equalization payments.

**Q WHAT IS A RESPONSIBILITY RATIO?**

A The responsibility ratio measures each Entergy Operating Company's contribution to System load requirements. As can be seen in **Exhibit JP-3**, ETI's responsibility ratio for Schedule MSS-2 was 16.09% in May 2011.

**Q WHAT RESPONSIBILITY RATIO IS ETI ASSUMING IN ITS RATE YEAR CALCULATIONS?**

A ETI is assuming a responsibility ratio of about 17% for the Rate Year. This represents a significant increase over the Test Year responsibility ratios, which averaged about 15.4%.

**Q WHAT WOULD CAUSE ETI'S RESPONSIBILITY RATIO TO INCREASE?**

A An operating company's load responsibility reflects the actual monthly peak demands served by each operating company. Thus, increasing responsibility ratios mean that an operating company is expecting above-average load growth relative to the other operating companies.

**Q** **SHOULD ETI'S PROPOSED PRO-FORMA ADJUSTMENT TO TEST YEAR TRANSMISSION EQUALIZATION PAYMENTS BE ACCEPTED?**

**A** No. ETI's proposed pro-forma adjustment should be rejected because it requires speculation about a host of variables, including future transmission investment, ownership costs and load growth, not just for ETI, but for all Entergy Operating Companies. Thus, the adjustment is not known and measurable.

Further, ETI's proposal is an impermissible post-test year adjustment. That is, ETI is substituting a projected expense from a future period for the actual Test Year expense without reflecting all attendant adjustments, such as the additional revenues from post-test year load growth. This is the same problem as discussed previously with ETI's proposed purchased power capacity costs. Similarly, ETI is proposing to recover this inflated cost over adjusted Test Year sales. Thus, ETI's proposal also violates the Matching Principle.

**Q** **SHOULD THE COMMISSION DETERMINE THAT A PRO-FORMA ADJUSTMENT FOR TRANSMISSION EQUALIZATION PAYMENTS IS APPROPRIATE, HOW SHOULD THE ADJUSTMENT BE QUANTIFIED?**

**A** The determination should reflect the level of transmission equalization payments that ETI has incurred in the Test Year, adjusted for any known and measurable changes. As can be seen in **Exhibit JP-4**, ETI's Test Year payments were $1.754 million, which is roughly $146,200 per month. However, during the last six months of the Test Year (January-June 2011), ETI incurred $1.35 million of transmission equalization payments, which is roughly $225,000, or 1.5 times, the monthly average

Test Year expense.[15]  Recognizing the higher costs in the last six months of the Test Year, a pro-forma adjustment equal to twice the amount of transmission equalization payments incurred during the first six months of 2011 would be reasonable.  This results in an adjusted Test Year expense of $2.7 million.  This would reduce ETI's adjusted Test Year amount by about $8 million.

**Depreciation Expense**

**Q**  **HAVE YOU REVIEWED THE TESTIMONY CONCERNING DEPRECIATION AS FILED BY ETI IN THIS PROCEEDING?**

**A**  Yes.  ETI is proposing to increase Test Year depreciation expense by $16.2 million.[16]  The $16.2 million reflects changes in the depreciation rates applicable to most plant accounts as well as a $2.1 million per year "catch-up" adjustment to amortize a $21.3 million depreciation reserve deficiency in certain of its general plant accounts over ten years.[17]  I have not reviewed the reasonableness of ETI's proposed life spans and net salvage values.

**Q**  **DO YOU AGREE WITH ETI'S PROPOSED INCREASE IN TEST YEAR DEPRECIATION EXPENSE?**

**A**  No.  First, it would be inappropriate to increase depreciation rates for those functional accounts that currently have a significant surplus depreciation reserve.  This is the case for ETI's production plant accounts, for which ETI is proposing a $1.156 million

---

[15]  *Id.*

[16]  *Direct Testimony of Dane Watson* at 6-7.

[17]  In Errata No. 4, ETI filed a corrected depreciation study.  Based on this study, it is proposing a $13.9 million increase (Watson Revised Errata No. 4 at 7).  However, Errata No. 4 does not impact the two depreciation issues that are being addressed in this testimony.



**J.POLLOCK**
**INCORPORATED**

increase. Second, the proposed catch-up adjustment is unnecessary because it ignores the significant surplus that ETI has accumulated in certain general plant accounts, which can be used to offset most of the deficiency. Reallocating the reserve from the surplus to the deficit accounts is an accepted practice.

Q **WHAT DO YOU MEAN BY A SURPLUS DEPRECIATION RESERVE?**

A A surplus depreciation reserve occurs when actual book depreciation exceeds the "required" or "theoretical" reserve as determined in a recent depreciation study. The required reserves reflect the life span and net salvage assumptions that are critical to determining depreciation rates.

Q **HOW IS THE REQUIRED OR THEORETICAL DEPRECIATION RESERVE CALCULATED?**

A The required or theoretical reserve is derived in a depreciation study based on the estimated life spans, interim retirements and removal costs associated with each FERC Account and/or subaccount.

Q **HAS ETI PRESENTED A DEPRECIATION STUDY THAT QUANTIFIES THE ACTUAL BOOK DEPRECIATION AND THEORETICAL RESERVES?**

A Yes. ETI's depreciation study is provided in Schedule D-5. It is sponsored by Mr. Dane A. Watson.

Q **WHY ARE THE LIFE SPAN AND COST-OF-REMOVAL ASSUMPTIONS CRITICAL IN DETERMINING DEPRECIATION RATES?**

A Depreciation accounting provides for the recovery of the original cost of an asset



over its life span adjusted for net salvage. Under the PUC's Substantive Rules, depreciation rates are calculated using the straight-line method. The most commonly used straight-line method is the remaining life method. Remaining life depreciation rates are derived using the following formula:

$$Remaining\ Life\ Rate = \frac{100\% - Reserve\ \% - Avg.\,Future\ Net\ Salvage\ \%}{Avg.\,Remaining\ Life\ in\ Years}$$

Under the remaining life method, the un-depreciated portion of the plant in service, adjusted for net salvage, is recovered over the average remaining life of the asset or group of assets. Therefore, at the end of the useful life, the asset is fully depreciated.

As a result, it is critical that an appropriate average life span be used to develop the depreciation rates so that present and future ratepayers are treated equitably. In addition to capital recovery, depreciation rates also contain a provision for net salvage. Net salvage is the value of the scrap or reused materials less the removal cost of the asset being depreciated. A utility will reflect in its rates the net salvage over the useful life of the asset.

**Q HOW DOES ETI'S CALCULATED BOOK DEPRECIATION RESERVE COMPARE WITH THE THEORETICAL RESERVE?**

A The comparison is shown in **Exhibit JP-5**. It is based on the corrected depreciation study provided by Mr. Watson following his deposition. As can be seen, ETI currently has a $92.5 million surplus in its production accounts (line 1) and a $3.7 million surplus in its transmission accounts (line 2). The distribution plant and general plant accounts have reserve deficiencies of $98.8 million (line 3) and $4.1

---



million (line 6), respectively, based on the life spans and net salvage values assumed by ETI.

**Q    DOES ETI ACKNOWLEDGE THAT THERE CAN BE DIFFERENCES BETWEEN THE BOOK AND THEORETICAL DEPRECIATION RESERVES?**

A    Yes.  This fact is acknowledged by Mr. Watson, who states:

> With respect to ETI, my depreciation study demonstrates that there have been significant changes in the life of the property over the last 15 years.  These changes have created differences between the theoretical and the book reserve in each functional group that make the reallocation of the depreciation reserve appropriate in this instance.[18]

**Q    WOULD THE MAGNITUDE OF A DEPRECIATION RESERVE SURPLUS OR DEFICIENCY BE AFFECTED IF THE ASSUMED LIFE SPANS AND NET SALVAGE VALUES WERE ALTERED?**

A    Yes.  Changes in either assumption would affect the magnitude of a depreciation reserve surplus or deficiency.  Long life spans and/or higher net salvage values would result in a lower required or theoretical reserve, thereby increasing the surplus or reducing a deficit.

**Q    WHAT IS THE SIGNIFICANCE OF A DEPRECIATION RESERVE SURPLUS?**

A    Depreciation should occur ratably over the life of an asset.  This ensures that both present and future customers are treated equitably; that is, they pay only for the portion of the facilities that is used to provide electric service.  A depreciation surplus means that the current generation of customers has paid a disproportionate share of

---

[18]    *Direct Testimony of Dane Watson* at 10-11.



**J.POLLOCK**
**INCORPORATED**

the plant investment. Without an adjustment, future customers will not pay their appropriate share of the investment. Thus, a surplus depreciation reserve means that current customers are subsidizing future customers. In other words, there is inter-generational inequity.

**Q  WOULD THERE ALSO BE INTER-GENERATIONAL INEQUITY IF THE UTILITY HAS A SIGNIFICANT DEPRECIATION RESERVE DEFICIENCY?**

A  Yes.

**Q  HOW CAN INTER-GENERATIONAL EQUITY BE RESTORED?**

A  With respect to production plant, inter-generational equity can be partially restored by rejecting ETI's proposed increase in depreciation rates applicable to production plant accounts.

**Q  WHY IS THERE A SIGNIFICANT DEFICIENCY IN CERTAIN GENERAL PLANT RESERVE ACCOUNTS?**

A  ETI retired equipment (consisting mostly of computers) prior to end of the assumed life span of these assets. This resulted in a $21.3 million deficiency. ETI is proposing to amortize this deficiency over ten years so that the book reserve will eventually "catch-up" with the theoretical depreciation reserve for the deficient accounts.

**Q  IS IT NECESSARY FOR ETI TO AMORTIZE THE $21 MILLION DEFICIENCY?**

A  No. A catch up adjustment is unnecessary because the $21 million deficiency would be nearly offset by the depreciation surplus in other general plant accounts. This is

**2. Revenue Requirement Issues**



**J.POLLOCK**
**INCORPORATED**

shown in **Exhibit JP-6**. As can be seen, the overall general plant reserve has a small ($4.1 million) deficiency.

**Q CAN THE DEPRECIATION RESERVE BE REALLOCATED BETWEEN ACCOUNTS SO THAT ANY SURPLUS ACCOUNTS CAN BE USED TO OFFSET THE DEFICIENT ACCOUNTS?**

A Yes. It is common practice to reallocate the depreciation reserve from the surplus accounts to the deficient accounts within the same functional group, such as general plant.

**Q DOES ETI'S DEPRECIATION WITNESS CONCUR THAT THIS IS AN ACCEPTED PRACTICE?**

A Yes. In his testimony, Mr. Dane Watson, stated that:

> The practice of depreciation reserve reallocation is endorsed in the 1968 publication of "Public Utility Depreciation Practices," National Association of Regulatory Utility Commissioners ("NARUC"), which explains that reallocation of the depreciation reserve is appropriate "…where the change in the view concerning the life of property is so drastic as to indicate a serious difference between the theoretical and the book reserve." Additionally, the 1996 edition of the NARUC publication states that "theoretical reserve studies also have been conducted for the purpose of allocating an existing reserve among operating units or accounts."[19]

**Q WOULD ALLOCATING A DEPRECIATION RESERVE FROM THE SURPLUS TO THE DEFICIENT GENERAL PLANT ACCOUNTS REQUIRE ANY FURTHER ADJUSTMENT?**

A Yes. Allocating the surplus reserve from the depreciable general plant accounts to

---

[19] *Id.*



the deficient accounts will require a $1.3 million increase in the annual accruals to achieve full recovery over the remaining lives of the surplus accounts. Thus, the net impact of my recommended adjustments to ETI's Test Year depreciation expense would be $0.794, as shown in the following table.

| Table 2: Summary of Recommended Adjustments to Test Year Depreciation Expenses | | | |
|---|---|---|---|
| **Function** | **Amount ($ in Millions)** | | |
| | **Accruals As Filed** | **Adjusted Accruals** | **Difference** |
| General - Depreciable Accounts | $1,605 | $2,946 | $ 1,341 |
| General - Amortization Accounts | $5,947 | $5,947 | $ 0 |
| Deficient Reserve Amortization | $2,135 | $ 0 | ($2,135) |
| General Plant Total | $9,687 | $8,893 | ($ 794) |

**Q   PLEASE SUMMARIZE YOUR RECOMMENDED DEPRECIATION EXPENSE.**

A   The Commission should reject ETI's proposal to increase production depreciation rates at this time given that the production depreciation reserve has a considerable surplus. The Commission should also reject ETI's proposed general plant "catch-up" adjustment because the deficiency can largely be cured by reallocating the reserve from the surplus to the deficit general plant accounts. This recommendation reduces ETI's proposed depreciation expense by $1.950 million ($1,156,000 + $794,000) on a Total Company basis.

**Property Tax Expense**

**Q   IS ETI PROPOSING TO ADJUST PROPERTY TAX EXPENSES?**

A   Yes. ETI is proposing a $2.6 million pro-forma adjustment to Test Year expense.



**Q**  WHAT IS THE BASIS FOR ETI'S PROPOSED $2.6 MILLION PRO-FORMA ADJUSTMENT?

**A**  The $2.6 million pro-forma adjustment is based on an assumption that property taxes will increase by 10.81% over Test Year levels. The 10.81% increase is comprised of two components:

- Weighted average growth in taxable property (9.81%); and
- The annual tax rate "creep" (1%).

The growth in taxable property was based on the increase in net plant and net operating income from 2010-2011. ETI projected a 3.7% increase in net plant and an 11.33% increase in net operating income. Applying the 20%/80% weighting to these growth rates resulted in a weighted average growth rate of 9.81%. ETI then added the annual tax rate creep of 1% to arrive at the 10.81% growth rate.

**Q**  SHOULD ETI'S PROPOSED PRO-FORMA ADJUSTMENT BE ADOPTED?

**A**  No. Property taxes are assessed on valuation. For utility property, valuation is best reflected by the net investment, not by net operating income. Further, ETI has failed to explain why it weighted net plant only 20% while weighting net operating income by 80% in calculating the assumed growth rate of its taxable property. Finally, the 1% annual tax rate creep is not based on specific changes in property tax rates or assessments. Thus, it is not a known and measurable change.

**Q**  WHAT DO YOU RECOMMEND?

**A**  ETI has failed to adequately document the assumptions behind a 10.81% increase in Test Year property tax expense. Therefore, ETI's proposed pro-forma adjustment

---


**J.POLLOCK**
**INCORPORATED**

should be rejected.

**Incentive Compensation**

Q    **WHAT IS MEANT BY INCENTIVE COMPENSATION?**

A    Incentive compensation is the additional compensation paid to employees to encourage certain behavior and/or results.  It is paid as a reward for the individual and business group achieving pre-established goals and objectives.  Payment is contingent on the employee/business unit achieving the goals.

Q    **WHY IS INCENTIVE COMPENSATION AN ISSUE IN SETTING RATES?**

A    Not all incentive compensation is beneficial to ratepayers.  As I discuss below, incentive compensation based on achieving certain operational goals may be a reasonable and necessary expense which may benefit ratepayers.  However, incentive compensation that is targeted to achieve certain financial goals is only for the benefit of shareholders and provides little, if any, benefit to ratepayers.  Thus, the latter expenses should not be charged to ratepayers.

Q    **IS ETI PROPOSING TO RECOVER COSTS INCURRED UNDER VARIOUS INCENTIVE COMPENSATION PROGRAMS IN BASE RATES?**

A    Yes.   ETI has included $18.7 million of incentive compensation in the Test Year.  Of this amount, $14.2 million was expensed and $4.5 million was capitalized.

Q    **SHOULD ETI BE ALLOWED FULL RECOVERY OF ALL PROJECTED INCENTIVE COMPENSATION PAYMENTS?**

A    No.   Incentive compensation that is based on achieving certain financial goals of



Entergy, the parent of ETI, should be disallowed on the basis that it benefits only shareholders not customers. As discussed later, at least $6.2 million of expense was incurred to achieve financial objectives and should be disallowed. This includes incentive compensation associated with affiliate (*i.e.,* Entergy Services, Inc.) expenses.

**Q WHAT INCENTIVE COMPENSATION PLANS DOES ETI OFFER ITS EMPLOYEES?**

A ETI and ESI have two primary types of incentive compensation plans:

1. Annual; and
2. Long-Term.

These plans and proposed Test Year expenses are listed on **Exhibit JP-7**.

**Q WHAT ARE THE ANNUAL INCENTIVE COMPENSATION PLANS?**

A There are various annual incentive compensation plans including the Management Incentive Plan, Exempt Incentive Plan, Teamsharing Incentive Plan, Teamsharing Selected Bargaining Units Incentive Plan and Operational Incentive Plan. In addition, there is also an Executive Annual Incentive Plan ("EAIP") for Entergy Company officers. Q WHAT PERFORMANCE GOALS trigger additional payouts under THE ANNUAL PLANS?

A In general, the payouts under the Annual plans are based on cost control, operational and safety measures. In addition, ▋▋▋▋ of the ESI portion of the EAIP is related to financial measures such as earnings per share (EPS) and stock price.[20]

---

[20] Exhibit KGG-4 (Highly Sensitive).



**J.POLLOCK**
**INCORPORATED**

As can be seen in **Exhibit JP-7**, the Annual plans accounted for about $8.8 million of Test Year incentive expenses.

**Q    WHAT ARE THE LONG TERM INCENTIVE COMPENSATION PLANS?**

A    The Long-Term incentive plans include the Equity Ownership Plan (EOP) and various long term incentive plans (LTIP).  The LTIP include four programs, the Long Term Incentive Program, the Equity Awards Program, Restricted Shares Award Program, and the Restricted Stock Award Programs.  These LTIP plans are limited to only senior executives with the exception that Directors are eligible for the Restricted Stock Awards Program.

**Q    WHAT PERFORMANCE GOALS TRIGGER ADDITIONAL COMPENSATION UNDER THE LONG TERM PLANS?**

A    The payouts under all of the Long-Term plans are entirely related to financial measures such as stock price and shareholder earnings of the parent company, Entergy.  They are not tied to the results of the operating company, ETI.  As can be seen in **Exhibit JP-7**, the Long-Term plans accounted for about $5.4 million of Test Year incentive compensation expense.

**Q    WHAT PORTION OF THE TEST YEAR INCENTIVE COMPENSATION EXPENSE IS RELATED TO ACHIEVING FINANCIAL OBJECTIVES?**

A    As previously stated, ▮▮▮▮ of the EAIP and all of the Long-Term compensation plans are related to achieving financial objectives.  Together these account for $6.2 million of the $14.2 million of incentive compensation expensed during the Test Year.  The derivation of the $6.2 million is shown in column 5.

**2.  Revenue Requirement Issues**



**J.POLLOCK**
**INCORPORATED**

**Q    WHAT DO YOU RECOMMEND?**

A    I recommend that $6.2 million of incentive compensation expense be disallowed.

**Q    WHAT IS THE BASIS FOR YOUR RECOMMENDATION?**

A    My recommendation is consistent with past precedent.    In past cases the Commission has disallowed the portion of incentive compensation tied to corporate financial objectives.    Specifically, in the Final Order of Docket No. 28840 which involved AEP Central, the Commission allowed incentive compensation to the extent that it was tied to operational factors.    To the extent the compensation was the result of financial measures, the payment was viewed as beneficial to shareholders and not ratepayers and was disallowed.    In allowing some recovery of incentive compensation, the Commission found that:

169.    The financial measures are of more immediate benefit to shareholders, and the operating measures are of more immediate benefit to ratepayers.

170.    Incentives to achieve operational measures are necessary and reasonable to provide T&D utility services, but those to achieve financial measures are not.[21]

The Commission also confirmed this opinion in the Order on Rehearing of Docket No. 35717.  This order states:

92.    Incentive compensation based on financial measures or goals is of more immediate benefit to shareholders.

93.    Of the amount Oncor requested for incentive compensation, $5,082,326 should be removed because it is related to

---

[21]    *Application of AEP Texas Central Company for Authority to Change Rates*, Docket No. 28840, Final Order at FOF 169-170 (Aug. 15, 2005).

**2.  Revenue Requirement Issues**



financial measures that are unreasonable and unnecessary for the provision of T&D utility services.[22]

**Q    PLEASE SUMMARIZE YOUR RECOMMENDATION.**

A    All of the incentive compensation related to financial measures included in the Test Year should be excluded from the calculation of the rates in this proceeding, resulting in a total reduction of $6.2 million to incentive compensation.

## MISO Transition Costs

**Q    HOW IS ETI PROPOSING TO TREAT THE COSTS INCURRED TO SUPPORT THE TRANSITION THE MIDWEST INDEPENDENT SYSTEM OPERATOR (MISO)?**

A    ETI's primary proposal is to defer all MISO transition costs incurred after 2010. Specifically, it would create a regulatory asset, accumulate the transition costs as incurred, accrue carrying charges (at ETI's weighted average cost of capital) on the balance of the accrued transition costs, and seek recovery for all prudent and reasonable transition costs in a subsequent rate case. The pre-2011 Test Year expenses would be amortized and recovered over a five-year period.[23]

**Q    HAS ETI INCURRED TRANSITION COSTS DURING THE TEST YEAR?**

A    Yes. ETI has incurred nearly $1 million of transition costs during the Test Year as follows:

---

[22] *Application of Oncor Electric Delivery Company, LLC for Authority to Change Rates*, Docket No. 35717, Order on Rehearing at FOF 92-93 (Nov. 30, 2009).

[23] *Application Of Entergy Texas, Inc. For Authority To Defer Expenses Related To Its Proposed Transition To Membership In The Midwest Independent Transmission System Operator,* Docket No. 39741 at Application, and Docket No. 39896 at Schedule P Workpapers, Volume 2, Adjustment 16.20.



| Table 3: MISO Transition Costs Expensed During the Test Year | |
|---|---|
| **Period** | **Amount ($000)** |
| July-December, 2010 | $263.91 |
| January – June, 2011 | $652.63 |
| Project F3PPSPE018[24] | $ 81.09 |
| Total | $997.63 |

These costs would be removed from ETI's Test Year cost of service if the deferred accounting proposal is approved.

**Q HAS ETI PROPOSED AN ALTERNATIVE TREATMENT IF ITS DEFERRED ACCOUNTING PROPOSAL IS REJECTED?**

A Yes. In the alternative, ETI proposes to include $4 million of expense to reflect ETI's share of the projected MISO transition costs. The alternative proposal also includes recovery of pre-2011 expenses over five years. This would result in an annual expense of $52,800. The net effect would be a pro-forma adjustment to Test Year operating expenses to $3.8 million ($4 million - $263,900 + $52,800).[25]

**Q SHOULD ETI'S DEFERRED ACCOUNTING PROPOSAL BE APPROVED?**

A No. ETI asserts that deferred accounting is necessary to carry out the purposes of PURA, particularly PURA §§ 36.051, 36.003 and 31.001(c).[26] However, ETI has

---

[24] In its response to OPC 3-15, ETI stated that it had omitted the transition costs booked to this project, which reflects time spent by the SPO Vice President of Strategic Initiatives. The amount is shown in WP_G-6 (Set 1).

[25] *Supplemental Direct Testimony of Jay A. Lewis* at 4 and Adjustment No. 16.L.

[26] *Id.* at 2.



failed to demonstrate that deferred accounting is necessary to allow it to carry out these statutory provisions. There is no indication that deferred accounting treatment is necessary for ETI to earn a reasonable return on its invested capital in excess of its reasonable and necessary operating expense or that it would prevent ETI from having just and reasonable rates. Further, there is no evidence that a lack of deferred accounting treatment for ETI would somehow prevent Entergy from pursuing its MISO proposal.

Further, ETI has incurred other similar costs to carry out various purposes of PURA without deferred accounting. Since 2005, ETI has spent nearly $20 million pursuing various similar activities including transitioning to competition, investigating RTO options, examining changes to the Entergy System Agreement, and supporting the Entergy Open Access Transmission tariff.[27] The table below lists some of the more recent Commission proceedings involving various PURA requirements. In none of these cases was deferred accounting requested.

| Table 4: Entergy Matters Pertaining to Various PURA Requirements | |
| --- | --- |
| **Project/ Docket No.** | **Description** |
| **32217** | Entergy Gulf States Inc.'s Plan For Identifying Applicable Power Region Pursuant To PURA 39.452(f) |
| **33687** | Entergy Texas, Inc.'s Transition to Competition Plan |
| **38662** | Informational Project Relating To Filings By Entergy Texas At The Arkansas Public Service Commission Relating To The Entergy System Agreement And Possible Successor Arrangements |

---

[27] ETI's Response to TIEC 5-10, Addendum 1.



| Table 4: Entergy Matters Pertaining to Various PURA Requirements | |
|---|---|
| **38663** | Informational Project Relating To Filings By Entergy Texas At The Louisiana Public Service Commission Relating To The Entergy System Agreement And Possible Successor Arrangements |
| **38708** | Project To Investigate The Entergy Successor Arrangement |
| **37344** | Information Related To The Entergy Regional State Committee |
| **37378** | Commission Review Of Wholesale Market Issues Relating To Entergy Texas, Inc. |

**Q    WHY ELSE SHOULD ETI'S PROPOSED DEFERRED ACCOUNTING REQUEST BE DENIED?**

A    The projected transition costs are not material.  ETI is currently projecting to incur $17 million of transition costs.[28]  This equates to only $5.8 million per year, which is only 1% of ETI's Test Year operating revenues.  Even at this level, the MISO transition costs are easily subsumed in the normal variation in ETI's year-to-year expenses, as shown in **Exhibit JP-8**.

**Q    PLEASE EXPLAIN EXHIBIT JP-8.**

A    **Exhibit JP-8** measures the year-to-year variation in operating expenses booked to those FERC Accounts in which ETI is proposing to record the MISO transition costs. The year-to-year variation is calculated for 3 separate time periods:

1.  Calendar year 2009 versus year 2008;
2.  Calendar year 2010 versus year 2009; and
3.  Docket No. 39896 versus Docket No. 37744.

---

[28]    *Supplemental Direct Testimony of Jay Lewis* at 5.

**2.  Revenue Requirement Issues**



As can be seen, ETI's expenses in each of these time periods have varied by significantly greater than $5.8 million per year, which is the average amount of MISO transition costs that would be incurred over the next three years. Thus, these costs are immaterial and will not have a significant impact on ETI's earned rates of return. Therefore, deferred accounting is not required to allow ETI to maintain its financial integrity.

**Q   SHOULD ETI'S ALTERNATIVE TO DEFERRED ACCOUNTING BE ADOPTED?**

A    No. The alternative proposal (*i.e.,* $4 million adjustment) would allow ETI to recover primarily expenditures that did not occur during the Test Year. Further, as discussed later, these costs are not known and measurable. Thus, ETI's alternative treatment would not comport with accepted ratemaking practices, which require setting rates to recover operating expenses based on an historical Test Year adjusted for known and measurable changes.

**Q   WHY ELSE WOULD ETI'S ALTERNATIVE PROPOSAL BE UNREASONABLE?**

A    The estimated amount of transition costs is at best uncertain. Highlighting the uncertainty is that ETI's own estimate of its share of transition costs has drastically changed. When ETI filed its request for deferred accounting in Docket No. 39741, it estimated transition costs of $12 million. Now it is estimating $17 million. Thus, in the span of only three months (which is the length of time between the filing in Docket No. 39741 and this rate case), the estimated costs have increased by over 40%.



Further, ETI is basing its share of the estimated transition costs on the assumption of a 17% responsibility ratio.[29] However, as previously stated, ETI's future responsibility ratios are not known and measurable beyond the Test Year. This is because they are based on projected growth rates of ETI relative to the corresponding growth rates of the other Entergy Operating Companies. Thus, even if the precise amounts of transition costs were known on a system-wide basis, ETI's share cannot be appropriately measured because it would depend upon the actual responsibility ratios, which in turn depend upon post Test Year load growth.

**Q WHAT IS YOUR RECOMMENDATION?**

A The Commission should reject ETI's deferred accounting request because it is clearly not necessary to allow ETI to carry out the purposes of PURA. No similar treatment has been afforded to other expenses incurred to carry out the purposes of PURA, and the expenditures are minimal. Thus, they will not jeopardize ETI's financial integrity. Further, the Commission should not allow ETI to recover more than the actual Test Year expenses incurred in making the transition. For all of these reasons, the Commission should allow ETI to recover only Test Year transition costs, or approximately $997,600.

---

[29] *Id.* at 6.



## 3. CLASS COST-OF-SERVICE STUDY

**Q    WHAT IS A CLASS COST-OF-SERVICE STUDY?**

A    A cost-of-service study is an analysis used to determine each class's responsibility for the utility's costs.  Thus, it determines whether the revenues a class generates cover the class's cost-of-service.  A class cost-of-service study separates the utility's total costs into portions incurred on behalf of the various customer groups.  Most of a utility's costs are incurred to jointly serve many customers.  For purposes of rate design and revenue allocation, customers are grouped into homogeneous classes according to their usage patterns and service characteristics.  The procedures used in a cost-of-service study are described in more detail in **Appendix C.**

**Q    HAVE YOU REVIEWED THE CLASS COST-OF-SERVICE STUDY FILED BY ETI IN THIS PROCEEDING?**

A    Yes.

**Q    DOES ETI'S CLASS COST-OF-SERVICE STUDY COMPORT WITH ACCEPTED INDUSTRY PRACTICES?**

A    Yes, with a few exceptions.  ETI's class cost-of-service recognizes the different types of costs as well as the different ways electricity is used by various customers.

**Q    IN WHAT WAYS IS ETI'S PROPOSED COST-OF-SERVICE STUDY FLAWED?**

A    ETI's class cost-of-service study is flawed in two respects.  First, ETI improperly allocated municipal franchise fees (MFF) to customer classes. Second, ETI



improperly allocated miscellaneous gross receipts taxes (MGRT) to customer classes. These expenses were allocated on total revenues. This is not consistent with cost causation because MFF are caused by kWh sales within cities that levy MFF, and MGRT are caused by revenues collected by ETI from within cities. They are not caused by total revenues.[30]

**Q SHOULD ETI'S CLASS COST-OF-SERVICE STUDY BE REVISED TO REFLECT THE FLAWS NOTED ABOVE?**

A Yes. The allocations of MFF and MGRT should also be revised to reflect cost causation. I suggest changes to the class cost-of-service to address the appropriate allocation of MFF and MGRT.

**<u>Municipal Franchise Fees</u>**

**Q WHAT ARE MUNICIPAL FRANCHISE FEES?**

A MFF are taxes levied by municipalities based on the amount of electricity sold within the municipal boundaries. They are also referred to as street rental taxes. The MFF charged to ETI are based on ordinances passed by the elected representatives of the cities in which ETI makes retail sales. Different cities have enacted different levels of MFF on in-city kWh sales ranging from 0.0956¢ to as much as 0.2644¢ per kWh as shown in **Exhibit JP-9**, pages 1-2.

---

[30] I am not addressing a third flaw: the failure to classify any distribution network investment as customer-related. The reasons for doing so are discussed in **Appendix C**.

**3. Class Cost-of-Service Study**



**Q** **DO THE RATES SHOWN IN EXHIBIT JP-9 REFLECT THE ENTIRETY OF THE MUNICIPAL FRANCHISE FEES CHARGED BY CITIES IN ETI'S SERVICE AREA FOR ?**

**A** No. The rates shown in **Exhibit JP-9**, pages 1-2 are those MFF collected in base rates. Nineteen cities also charge MFF through separate "Incremental Franchise Fee Recovery" Riders. These incremental MFF are not included in ETI's proposed revenue requirements in this case.

**Q** **HOW IS ETI PROPOSING TO ALLOCATE MUNICIPAL FRANCHISE FEES RECOVERED IN BASE RATES?**

**A** ETI is proposing to allocate that portion of MFF to be collected in base rates relative to revenues.[31]

**Q** **IS ETI'S APPROACH CONSISTENT WITH COST CAUSATION?**

**A** No. MFF are not caused by total revenues. MFF are caused by the kWh delivered within incorporated municipalities that levy MFF costs, pursuant to PURA § 33.008.

**Q** **DO CUSTOMERS LOCATED OUTSIDE OF A CITY HAVE ANY CONTROL OVER THE AMOUNT OF MUNICIPAL FRANCHISE FEES THAT A CITY MAY CHARGE?**

**A** No. Unlike in-city customers who can vote on the representatives who set the MFF rates, customers located outside a city have no control over the level of the tax.

---

[31] Schedule P-13, page 10, lines 32-33; the allocation factor "RSRRTOA-Total" is rate schedule revenue.

**3. Class Cost-of-Service Study**



Q    DO ELECTRICITY SALES OR REVENUES TO CUSTOMERS LOCATED OUTSIDE OF A CITY AFFECT THE AMOUNT OF MUNICIPAL FRANCHISE FEES THAT ETI IS OBLIGATED TO PAY?

A    No.  Electricity sales to and revenues from customers located outside of a city do not have any effect on how much ETI must pay to the city.  Rather, the MFF incurred by ETI is directly caused by in-city kWh sales.

Q    IS ETI'S PROPOSED ALLOCATION OF BASE RATE MUNICIPAL FRANCHISE FEES CONSISTENT WITH THE INCREMENTAL FRANCHISE FEE RECOVERY RIDERS?

A    No.  For example, a typical Incremental Franchise Fee Recovery Rider states:

> The rate associated with this Surcharge Tariff shall be $0.0010137 *for every kilowatt-hour billed by the Company to its retail customers inside the city limits of Beaumont*.[32] (emphasis added)

Thus, incremental franchise fees are allocated and collected solely from retail customers within city limits.  This is clearly different from how ETI allocates the portion of MFF that it recovers in base rates, which is based on revenue.

Q    DOES THIS COMMISSION HAVE A CONSISTENT POLICY REGARDING THE ALLOCATION OF MUNICIPAL FRANCHISE FEES?

A    Yes.  The Commission's current policy was adopted in the unbundled cost-of-service (UCOS) cases in 2001 and affirmed in all delivery rate cases since.  Under this policy, MFF costs are allocated based on the classes within the assessing

---

[32] Entergy Texas, Inc., Section III Rate Schedule, *Incremental Beaumont Franchise Fee Recovery Rider*, Sheet No. 64, Revision 1 at 101.



J. POLLOCK
INCORPORATED

municipality's boundaries. This approach is referred to as the "Direct" method of allocation.

Although Commission policy varied widely prior to the UCOS cases (some utilities were allowed to recover MFF separately from in-city customers and others allocated MFF relative to total revenues), the Commission has consistently approved the Direct method of allocation in cases over the past eleven years. This issue was litigated in both the Reliant Energy (now CenterPoint Energy) and TXU (now Oncor) cases. Specifically, the Commission's Orders in the two cases included the following identical findings:

> The LGRT legislation requires the tax be based on the number of kWh delivered within the municipal boundaries in order to maintain sufficient revenue levels for the cities. To meet this revenue requirement, LGRT should be allocated using a direct allocation and employing the energy allocator.[33]

This same Direct method of allocating MFF was also adopted in Docket Nos. 28840 and 33309.

**Q   HOW SHOULD MFF EXPENSE BE ALLOCATED?**

A   Consistent with the ratemaking principle of cost causation and Commission precedent, MFF should be allocated using the Direct method, while also recognizing the widely varying MFF rates and class sales by city. The results of this allocation are shown in **Exhibit JP-9**.

---

[33] *Application of TXU Electric Company for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344,* Docket No. 22350, Order at FOF 156 (Oct. 4, 2001); *Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344,* Docket No. 22355, Order at FOF 222A (Oct. 4, 2001). Note: the term LGRT, or local gross receipts tax, was used synonymously with MFF.

---

**3.  Class Cost-of-Service Study**



**Q** **PLEASE EXPLAIN EXHIBIT JP-9.**

**A** The starting point for applying the Direct method is the current base rate MFF rates shown in pages 1-2 and the kWh sales by customer class by city shown on pages 3-4. As can be seen, there is no uniformity in both the MFF rates (pages 1-2) and the proportion of kWh sales by class (pages 3-4) by city. In general, those cities charging the lowest MFF rates also have a larger amount of kWh sales from Schedule LIPS customers. Cities with higher MFF rates generally have a larger proportion of kWh sales from residential customers.

The allocated MFF expense is the product of the MFF rates and the corresponding kWh sales by class by city. This calculation is shown in **Exhibit JP-9, pages 5-6.** The MFF allocation factor is shown on page 6, line 70. It is the result of summing the allocated MFF expenses (line 69) and expressing the total by class (columns 1-6) as a percent of total retail (column 7).

**Q** **IS THE ALLOCATION METHODOLOGY SHOWN IN EXHIBIT JP-9 CONSISTENT WITH COST CAUSATION?**

**A** Yes. The methodology recognizes that the level of MFF costs ETI incurs is a function of only two things: (1) the tax level set by the city, and (2) the usage of customers inside the city limits. There is nothing that an outside-city customer can do to influence either element. In-city customers, however, determine the tax rate through their elected representatives, and their usage determines the amount that ETI must pay the cities. It also recognizes that MFF rates and the proportion of kWh sales by class are not uniform by city. Customers should only be charged for the

MFF they cause. For this reason, it would not be appropriate to charge all customers the same average MFF rate when the rates for many cities (that also happen to serve more Schedule LIPS kWh sales) are below average.

**Q  HOW SHOULD MFF BE COLLECTED?**

A  Consistent with cost causation, MFF expense should be recovered from customers located within the municipalities that levy these taxes. This is referred to as the "Direct" method of collection. The Direct method would continue the link between the usage of a group of customers and the costs incurred. Allocating MFF to and collecting MFF from customers within the cities that levy such taxes is the only way to remain consistent with the principle of cost causation. Thus, customers located outside of tax-levying municipalities should pay zero MFF.

**Q  IS THERE ANY PRECEDENT FOR THE DIRECT METHOD OF COLLECTING MFF?**

A  Yes. As previously stated, several cities in ETI's service area have implemented Incremental Franchise Fee Recovery Riders that collect MFF only from retail customers in the city limits. Further, both Southwestern Public Service Company and Texas New Mexico Power Company use the Direct method in collecting MFF from transmission level customers.[34]

---

[34] Southwestern Public Service, Electric Tariff, *Large General Service – Transmission*, Section No. IV, Sheet No. IV-108, Revision No. 7 at 1; Texas-New Mexico Power Company, Tariff for Retail Delivery Service, *6.1.1.1.5 Transmission Service*, Revision 5 at 100.



**Q** **WOULD IT BE EQUITABLE TO CHARGE MUNICIPAL FRANCHISE FEES TO CUSTOMERS WHO TAKE SERVICE OUTSIDE CITY LIMITS?**

**A** No. This would be tantamount to "taxation without representation." Outside-city customers have no voice in determining either the level of MFF, or how the money is to be spent. By spreading MFF to all customers, cities that elect to raise the MFF rate would be able to force outside-city customers to pay for local expenses from which the customers receive no direct benefit. And by cushioning the impact on in-city residents, there would be little to prevent a city from raising its fees. Thus, charging MFF to outside-city customers is not only inequitable, it would weaken the incentive for cities (and city voters) to exercise appropriate fiscal discipline.

**Q** **HAS THIS ISSUE ALSO BEEN ADDRESSED IN OTHER STATES?**

**A** Yes. Regulators in several other states where municipalities levy such taxes have addressed this issue in contested cases and have ordered that MFF be allocated to, and collected from, the customers located inside the levying cities. These states include: Alaska, Arkansas, Colorado, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Missouri, Nevada, New Mexico, Pennsylvania, Virginia, Washington and West Virginia. Thus, this approach has gained wide acceptance.

**Q** **HOW DO YOU RECOMMEND THAT MFF BE ALLOCATED AND COLLECTED?**

**A** I recommend the Direct method of allocation and the Direct method of collection (*i.e.,* Direct/Direct) because this method is more consistent with cost causation.

**3. Class Cost-of-Service Study**



**J.POLLOCK**
**INCORPORATED**

**Miscellaneous Gross Receipts Taxes**

**Q**    **WHAT ARE MISCELLANEOUS GROSS RECEIPTS TAXES?**

A    Miscellaneous gross receipts taxes (MGRT) are state taxes imposed on each utility company's taxable gross receipts derived from sales in an incorporated city or town having a population of more than 1,000 according to the last Federal census preceding the filing of the report.[35]  Thus, like MFF, MGRT are levied only on inside-city sales.

**Q**    **HOW IS ETI PROPOSING TO ALLOCATE MGRT IN THIS PROCEEDING?**

A    ETI is proposing to allocate MGRT to all retail customer classes based on revenues.[36]

**Q**    **IS ETI'S APPROACH CONSISTENT WITH COST CAUSATION?**

A    No.  MGRT are not caused by total revenues.  MGRT are caused by taxable receipts (*i.e.,* revenues) from business done inside incorporated municipalities.  The tax rate is based on the population of the cities.

**Q**    **HOW SHOULD MISCELLANEOUS GROSS RECEIPTS TAXES BE ALLOCATED?**

A    MGRT should be allocated relative to inside-city revenues as shown in **Exhibit JP-10**.  Like my recommendation for MFF, I recommend the Direct method of allocation and the Direct method of collection (*i.e.,* Direct/Direct) because this method is more consistent with cost causation.

---

[35]  TEX. TAX. CODE ANN. § 182.022(a) (Vernon 2009).

[36]  Schedule P-13, page 10, line 34.



**Revised Class Cost-of-Service Study**

**Q** **WHAT IS THE IMPACT OF YOUR RECOMMENDED ALLOCATIONS OF MUNICIPAL FRANCHISE FEES AND MISCELLANEOUS GROSS RECEIPTS TAXES?**

**A** Residential, large industrial power service and lighting customers are all allocated a disproportionately large share of these expenses in ETI's class cost-of-service study. Correcting these allocations would reduce the costs allocated to these classes.

**Q** **HAVE YOU REVISED ETI'S CLASS COST-OF-SERVICE STUDY TO CORRECT THE ALLOCATIONS OF MUNICIPAL FRANCHISE FEES AND MISCELLANEOUS GROSS RECEIPT TAXES?**

**A** Yes. **Exhibit JP-11** is a summary of the revised cost-of-service study reflecting the above changes. It was modeled after ETI's class cost-of-service study, which is filed in Schedule P. The results are summarized below.

| Table 5: Summary of Revised Cost-of-Service Study | | | | |
|---|---|---|---|---|
| **Rate Class** | **Rate Of Return*** | **Relative Rate Of Return*** | **Required Non-Fuel Increase ($ Millions)** | **Percent** |
| Residential Service | 12.25% | 83 | $80,390 | 21.2% |
| Small General Service | 15.30% | 104 | 283 | 1.1% |
| General Service | 16.18% | 110 | 9,797 | 6.1% |
| Large General Service | 14.82% | 101 | 8,714 | 17.6% |
| Large Industrial Power Service | 26.05% | 177 | 9,862 | 9.5% |
| Lighting Service | 4.45% | 30 | 2,143 | 19.8% |
| Texas Retail | 14.69% | 100 | $111,189 | 15.2% |
| * The rates of return do not include purchased power capacity costs. These costs are reflected in the required non-fuel (dollar and percent) increases. | | | | |

**3. Class Cost-of-Service Study**

**Q    PLEASE EXPLAIN HOW THE COST-OF-SERVICE STUDY RESULTS ARE MEASURED.**

A    Rate of return (ROR) is the ratio of net operating income (revenues less allocated operating expenses) to the allocated rate base.  Net operating income is the difference between operating revenues at current rates and allocated operating expenses.  If a class is presently providing revenues sufficient to recover its cost-of-service (at the current system rate of return), it will have a rate of return equal to or greater than the total system return of 14.69%.

Relative rate of return (RROR) is the ratio of each class's rate of return to the Texas retail average rate of return.  A relative rate of return above 100 means that a class is providing a rate of return higher than the system average, while a relative rate of return below 100 indicates that a class is providing a below-system average rate of return.

The required increase is the base revenue change required to move each class to cost.  The amounts include the costs reflected in the revised class cost-of-service study as well as the costs that ETI had proposed to collect in Rider PPR.

**Q    WHAT DO THE REVISED COST-OF-SERVICE STUDY RESULTS DEMONSTRATE?**

A    There are wide disparities between customer classes. The wide disparity in relative rates of return shows that some classes are providing base revenues that are well below cost, while others are providing revenues well above actual cost.  Generally, below-cost classes are being subsidized and should receive above-average

**J.POLLOCK**
**INCORPORATED**

increases, while above-cost classes are subsidizing other classes and should receive below-average increases.



# 4. CLASS REVENUE ALLOCATION

**Q WHAT IS CLASS REVENUE ALLOCATION?**

A Class revenue allocation is the process of determining how any base revenue change approved by the Commission should be spread to each customer class served by the utility.

**Q HOW SHOULD ANY CHANGE IN BASE REVENUES APPROVED IN THIS DOCKET BE SPREAD AMONG THE VARIOUS CUSTOMER CLASSES SERVED BY ETI?**

A Base rate revenues should reflect the actual cost of providing service as closely as practical. As a general rule, rates should be set at cost. However, regulators sometimes limit the immediate movement to cost based on gradualism concerns and rate administration. *Gradualism* is a concept that is applied to prevent a class from receiving an overly-large rate increase. That is, the movement to cost-of-service should be made gradually rather than all at once. *Rate administration* is a concept that applies when the design of a rate may be tied to the design of other rates.

**Q WHY SHOULD THE RESULTS OF THE COST-OF-SERVICE STUDY BE THE PRIMARY FACTOR IN DETERMINING HOW ANY BASE REVENUE CHANGE SHOULD BE ALLOCATED?**

A Cost-based rates will send the proper price signals to customers. The other reasons for adhering to cost-of-service principles are equity, engineering efficiency (cost-minimization), stability and conservation.



**Q** **WHY ARE COST-BASED RATES EQUITABLE?**

**A** Rates which primarily reflect cost-of-service considerations are equitable because each customer pays what it actually *costs* the utility to serve the customer – no more and no less. If rates are not based on cost, then some customers must pay part of the cost of providing service to other customers, which is inequitable.

**Q** **HOW DO COST-BASED RATES PROMOTE ENGINEERING EFFICIENCY?**

**A** With respect to engineering efficiency, when rates are designed so that demand and energy charges are properly reflected in the rate structure, customers are provided with the proper incentive to minimize their costs which will, in turn, minimize the costs to the utility.

**Q** **HOW CAN COST-BASED RATES PROVIDE STABILITY?**

**A** When rates are closely tied to cost, the utility's earnings are stabilized because changes in customer use patterns result in parallel changes in revenues and expenses. If rates are not based on cost, then an increase in usage by subsidized classes or a decrease in usage by classes providing subsidies will adversely affect the utility's earnings.

**Q** **HOW DO COST-BASED RATES ENCOURAGE CONSERVATION?**

**A** By providing balanced price signals against which to make consumption decisions, cost-based rates encourage conservation (of both peak day and total usage), which is properly defined as the avoidance of wasteful or inefficient use (and not just *less use*). If rates are not based on a class cost-of-service study, then consumption


**J.POLLOCK**
**INCORPORATED**

choices are distorted. ETI's class cost-of-service study, with the amendments discussed herein, should be used to set rates in this proceeding.

**Q** **DOES THE COMMISSION'S STATED POLICY SUPPORT THE MOVEMENT OF UTILITY RATES TOWARD ACTUAL COST?**

**A** Yes. The Commission's support for cost-based rates is longstanding and unequivocal. For example, in a prior AEP Texas Central Company delivery rate case, for example, the Commission found that:

> 283. If TCC's rates are changed, then the T&D rates charged to each customer class should move to cost of service. Therefore, the Commission declines to adopt gradualism in this case.[37]

More recently, the Commission reaffirmed CenterPoint's proposal to use cost causation principles in its class cost-of-service study and align revenues for each class equal to the allocated costs:

> 175. In allocating costs, CenterPoint followed the principles of cost causation. Each of the retail delivery classes has been allocated revenues in line with the costs those classes generate.[38]

Therefore, moving ETI's rates to cost is consistent with Commission policy.

**Q** **HAVE YOU REVIEWED ETI'S PROPOSED CLASS REVENUE ALLOCATION?**

**A** Yes. **Exhibit JP-12** shows how ETI is proposing to allocate the proposed revenue increase. For purposes of this analysis I have combined the impact of the proposed riders with the proposed base rate increases.

---

[37] *Application of AEP Texas Central for Authority to Change Rates, Docket No. 28840,* Order at 50 (Aug. 15, 2005).

[38] *Application of CenterPoint Electric Delivery Company, LLC, for Authority to Change Rates, Docket No. 38339,* Order at 33 (May 12, 2011).



**Q** **HAVE YOU DEVELOPED A CLASS REVENUE ALLOCATION BASED ON THE RESULTS OF YOUR REVISED JURISIDICTIONAL AND CLASS COST-OF-SERVICE STUDIES?**

**A** Yes. My proposed class revenue allocation is shown in **Exhibit JP-13**. Page 1 assumes no other rate design changes. Page 2 assumes that my recommended designs of Schedules AFC and SMS are adopted. These changes are discussed in Part 5 of my testimony.

The non-fuel revenue increases are consistent with the revised class cost-of-service study presented in **Exhibit JP-11**. Specifically, those classes receiving above-average non-fuel increases are currently providing below-average rates of return, while those classes receiving below-average non-fuel increases are currently providing above-average rates of return. This is consistent with moving all rates to cost.

**Q** **HOW WOULD YOUR RECOMMENDED CLASS REVENUE ALLOCATION CHANGE IF YOUR RECOMMENDED RATE DESIGN CHANGES ARE ADOPTED?**

**A** As discussed later, I am recommending lower rates in both Schedules SMS and AFC to better reflect cost causation. This would reduce ETI's revenues by about $2 million. As a result, electric sales revenues would need to be increased by $2 million to offset the reductions in both Schedules SMS and AFC. **Exhibit JP-13**, page 2 accounts for these rate design changes. Specifically, I adjusted the recommended increases on page 1 by the amount of Schedule SMS/AFC revenues that were previously allocated to each class in the class cost-of-service study using the same

allocation factors that ETI used in its class cost-of-service study.

**Q     HOW SHOULD THE PROPOSED INCREASE BE ALLOCATED IN THE EVENT THAT ETI RECEIVES LESS THAN ITS FULL REQUEST IN THIS PROCEEDING?**

A     The Commission should direct that rates be set based on cost, as shown in **Exhibit JP-13**. To the extent that elements of ETI's rate request are disallowed, the class revenue allocation will be reduced in accordance with how such disallowed cost was allocated to each class.



# 5. RATE DESIGN

**Q    PLEASE DESCRIBE THE RATE DESIGN PROCESS.**

A    Once the amount of revenue to be collected from each rate class is developed, specific rates must be designed that will properly collect that amount of revenue.

**Q    WHAT RATE DESIGN ISSUES ARE YOU ADDRESSING?**

A    I am addressing:

- Schedule LIPS;
- Schedule SMS (Standby and Maintenance Service);
- Schedule AFC (Additional Facilities Charge); and,
- Fixed Fuel Factor

## Schedule LIPS

**Q    PLEASE DESCRIBE THE STRUCTURE OF ETI'S LIPS RATE.**

A    Schedule LIPS recovers base rates through a seasonally adjusted demand charge (per kW) and a two-step non-fuel energy charge (per kWh). The demand charges are also adjusted (either up or down) to reflect the differences in costs by delivery voltage. There is currently no customer charge.

**Q    WHAT CHANGES IS ETI PROPOSING TO SCHEDULE LIPS?**

A    In its initial filing, ETI removed all purchased power capacity costs from base rates and proposed recovering them through a Purchased Power Rider (PPR) as a demand charge. When it did so, the proposed demand charges were increased, but the proposed non-fuel energy charges were substantially reduced. Following the Supplemental Preliminary Order, which removed the PPR from further consideration,



ETI rolled these costs back into base rates. The resulting "rebundled" demand and energy charges would increase by about the same percentage.

**Q DO YOU AGREE WITH ETI'S PROPOSED CHANGES TO SCHEDULE LIPS?**

A No. The current structure of Schedule LIPS does not track costs as derived in ETI's class cost-of-service study. Specifically:

- There is no customer charge, despite the fact that the customer costs allocated to the LIPS class would translate into a monthly rate of over $6,000.
- The proposed non-fuel energy charges would recover a significant amount of demand -related costs.

**Q WHAT IS THE BASIS FOR YOUR STATEMENT THAT THE STRUCTURE OF SCHEDULE LIPS DOES NOT TRACK COST?**

A **Exhibit JP-14** provides an analysis of the costs allocated to the LIPS class separated between demand, customer, and energy components. Also shown are the corresponding per unit costs. As can be seen, production/transmission demand-related costs are $8.47 per kW (line 5). Distribution costs add another $0.99 per kW (line 6). The proposed LIPS demand charges are $7.07 per kW for transmission delivery and an additional $1.82 for distribution service. Thus, the proposed demand charges (given ETI's requested rate increase) are too low. By contrast, non-fuel energy costs are about 0.226¢ per kWh, while the proposed non-fuel energy charges would average over 0.6¢ (line 9).[39] Thus, they are 2.5 times higher than the non-fuel

---

[39] Schedule LIPS has a two-step energy charge. The first step applies for energy below 584 kWh per kW (*i.e.,* hours use), or up to an 80% (584 ÷ 730) load factor. The second step applies for energy above 584 kWh per kW (equal to or greater than an 80% load factor).

**5. Rate Design**



energy costs based on ETI's filing. Finally, as previously stated, there is no customer charge in Schedule LIPS.

**Q** **WHAT IS YOUR RECOMMENDATION?**

**A** First, any increase in Schedule LIPS should be used to create a customer charge. As shown in **Exhibit JP-14**, a cost-based customer charge would be about $6,050 per month (line 8). An initial customer charge of $6,000 per month would be appropriate. This would collect approximately $5.9 million ($6,000 x 984 bills). Any remaining increase not accounted for by the initial customer charge should be collected in the demand charges. The non-fuel energy charges should not be changed unless the LIPS class is allocated less than a $5.9 million increase. In that event, the non-fuel energy charges should be decreased. This will gradually correct the imbalance between the below-cost demand charges and above-cost energy charges.[40] Further, the delivery voltage adjustment applicable to distribution service should be retained so that the rate better reflects the cost.

## Schedule SMS

**Q** **WHAT IS SCHEDULE SMS?**

**A** Schedule SMS is applicable to customers that use self-generation to supply a portion of their electricity requirements. These customers contract for either Standby and/or Maintenance power service from ETI to replace capacity or energy normally generated by the customer's on-site generation.

---

[40] Should the LIPS class not receive an increase or if base rates are decreased, the Customer charge should be reduced proportionally. Any remaining revenue surplus should be applied to reduce the non-fuel energy charges to cost and then to reduce the demand charges.



**Q**    **WHAT IS STANDBY POWER?**

**A**    Standby (or Backup) power is electric energy or capacity supplied to replace energy or capacity that is unavailable due to an unscheduled or forced outage of the facility.[41]  Thus, Backup power must be available at any time.

**Q**    **WHAT IS MAINTENANCE POWER?**

**A**    Maintenance power is electric energy or capacity supplied during a scheduled outage.[42]

**Q**    **ARE BACKUP AND MAINTENANCE POWER THE SAME?**

**A**    No.  Unlike Backup power, Maintenance power must be arranged on a 24-hour prior notice only during such times and at such locations that, in ETI's sole opinion, will not result in adversely affecting or jeopardizing firm service to other customers, prior commitments or commitments to other utilities.[43]  In addition, the customer must make arrangements and schedule Maintenance power in writing in advance, and confirmed in writing by ETI.  The Company can also limit requests for Maintenance power and allocate and schedule available service, if requests are made from more than one customer.

Thus, Maintenance power is of a lower quality of service than Backup or standby power.  Because the Company can limit the amount of Maintenance power,

---

[41]  P.U.C. SUBST. R. 25.242(C)(2).

[42]  *Id.* at (c)(7).

[43]  Entergy Texas, Inc., *Tariff,* Section III Rate Schedules at 29.2.



**J.POLLOCK**
**INCORPORATED**

it is more likely that customers will prefer to schedule Maintenance power during the non-summer months.

**Q   IS ETI PROPOSING TO CHANGE SCHEDULE SMS?**

**A   No.**

**Q   HOW ARE STANDBY AND MAINTENANCE POWER PRICED?**

**A   SMS** customers pay a monthly demand (or billing load) charge of $1.12 per kW for Backup power.  The corresponding charges for Maintenance power are $1.12 per kW for outages during the summer months (May through October) and $0.84 per kW for outages during the non summer months.  Thus, the non-summer month charge is 75% of the summer month charge.  Energy is priced under an array of time-differentiated charges, as shown in the table below.

| Table 6: Current Schedule SMS Non-Fuel Energy Charges (¢ per kWh) | | |
|---|---|---|
| **Delivery Voltage** | **On-Peak** | **Off-Peak** |
| Distribution (less than 69KV) | 3.386¢ | 0.514¢ |
| Transmission (69KV and greater) | 2.334¢ | 0.211¢ |

On-peak hours are from 1:00 p.m. to 9:00 p.m., Monday through Friday of each week, beginning on May 15th and continuing through October 15th.  In addition, fuel charges are priced at avoided energy cost as calculated under Schedule LQF.

**Q   ARE THERE ANY SPECIAL RULES GOVERNING HOW STANDBY SERVICE SHOULD BE PRICED?**

**A   Yes,** the Commission's rules prescribe that:





(A)    Rates for sales to qualifying facilities shall be just and reasonable and in the public interest, and shall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility. Rates for standby or other supplementary service shall be based on the amount of capacity contracted for between the qualifying facility and the electric utility, and shall not penalize electric utilities that also purchase power from qualifying facilities. The need for and cost responsibility for special equipment or system modifications shall be determined by application of subchapter I of this chapter.

(B)    Rates for sales that are based on accurate data and consistent system-wide costing principles shall not be considered to discriminate against any qualifying facility to the extent that such rates apply to electric utility's other customers with similar load or other cost-related characteristics.[44]

Thus, cost-based standby rates are supposed to recognize system wide costing principles, and they must not be discriminatory.

**Q**    **ARE THE CURRENT SCHEDULE SMS PRICES COST-BASED?**

A    No. **Exhibit JP-15** shows the derivation of cost-based Schedule SMS charges. The starting points are ETI's proposed revenue requirement, class revenue allocation and Schedule LIPS rate design.

Referring to page 1, the SMS demand charges should be $0.82 per kW for delivery at transmission and $2.64 per kW for delivery at distribution. Cost-based energy charges would be as follows:

---

[44] P.U.C. SUBST. R. 25.242(K)(1).



| Table 7: Cost-Based Schedule SMS Non-Fuel Energy Charges (¢ per kWh) | | |
|---|---|---|
| **Delivery Voltage** | **On-Peak** | **Off-Peak** |
| Distribution (less than 69KV) | 0.955¢ | 0.639¢ |
| Transmission (69KV and greater) | 0.916¢ | 0.614¢ |

Q HOW DID YOU DETERMINE THE COST-BASED DEMAND CHARGES FOR STANDBY SERVICE?

A Cost-based demand charges are derived in **Exhibit JP-15** as follows:

| Table 8: Cost-Based Standby Demand Charges | |
|---|---|
| **Delivery Voltage** | **Cost Basis** |
| Transmission | Schedule LIPS Production/Transmission Demand-Related Cost x Coincidence Ratio |
| Distribution | Schedule LIPS Demand-Related Costs |

The starting point was the Schedule LIPS production/transmission demand-related costs from **Exhibit JP-14** or $7.07 per kW (**Exhibit JP-15,** line 1). On average, 7% of Schedule SMS billing demand was coincident with ETI's summer month system peaks. This compares to 74% for Schedule LIPS. Thus the ratio of the SMS to LIPS coincidence factors is 12% (line 2). The definition of coincidence factor and the derivation of the SMS and LIPS coincidence factors are discussed later. The resulting demand charge for transmission service is $0.82 per kW ($7.07 x 12%). The corresponding SMS distribution demand charge is the sum of the transmission charge and the Schedule LIPS distribution demand charge, or $2.64 per kW ($0.82 + $1.82).

Q WHY ARE YOU COMBINING PRODUCTION AND TRANSMISSION COSTS IN DERIVING A COST-BASED SCHEDULE SMS DEMAND CHARGE FOR TRANSMISSION DELIVERY?

A Both production and transmission demand-related costs are allocated to customer classes using the average and excess four coincident peak (A&E/4CP) method. This method recognizes that production/transmission plant is sized to meet the diversified summer peak demands of all ETI customers. That is, the 4CP demands are a primary driver of the costs of the power plants, PPAs, and transmission facilities.

Q WHAT IS A COINCIDENCE FACTOR?

A Coincidence factor (CF) is defined as follows:

$$CF = \frac{Coincident\ Demand}{Non-Coincident\ Demand\ or\ Billing\ Demand}$$

Thus, it measures how much of a customer's peak demand occurs coincident with the utility's system peak. A 100 MW class with 7% coincidence factor imposes about 7 MW of load coincident with the utility's system peak. The same size class with an 80% load factor imposes 80 MW of load coincident with the utility's system peak.

Q HOW DO DIFFERENCES IN COINCIDENCE FACTORS AFFECT RATE DESIGN?

A Differences in coincidence factors can have a significant impact on rate design, as illustrated below. There are three customers: Customer 1 has a 60% coincidence factor, Customer 2 has an 80% coincidence factor, and Customer 3 has a 5% coincidence factor.



| | | Billing or Non-Coincident Demand (kW) | | | |
|---|---|---|---|---|---|
| **Table 9: Relationship Between Coincidence Factor and Demand Charges** | | | | | |
| **Customer** | **Coincident Demand (kW)** | **Billing or Non-Coincident Demand (kW)** | **Coincidence Factor** | **Allocated Demand Costs** | **Demand Charge** |
| 1 | 1,000 | 2,000 | 50% | $10,000 | $5.00 |
| 2 | 1,000 | 1,250 | 80% | $10,000 | $8.00 |
| 3 | 1,000 | 20,000 | 5% | $10,000 | $0.50 |
| Source: | Assumptions | | Coincident Demand ÷ Billing Demand | Costs Allocated on Coincident Demand | Allocated Demand Costs ÷ Billing Demand |

Customers 1 and 2 are more typical of Schedule LIPS customers that purchase their entire electricity requirements from ETI (*i.e.,* full requirements service). Customer 3 is more typical of Schedule SMS customers that use self generation to supply their electricity needs and purchase electricity only during outages (*i.e.,* partial requirements service).

As can be seen, the resulting cost-based demand charge is linearly related to coincidence factor. For example, a cost-based demand charge for Customer 3, the self-generator with the lowest coincidence factor, is $0.50 per kW. This is also the lowest demand charge. The corresponding rate for Customer 1, which has a 50% coincidence factor, is $5.00 per kW. This is ten times higher than the cost-based demand charge for Customer 3. Stated differently, the coincidence factor ratio between Customer 3 and Customer 1 is 10%. Thus, a cost-based demand charge for Customer 3 is only 10% of the corresponding charge for Customer 1.

**5. Rate Design**

**Q   WHAT DOES THIS EXAMPLE DEMONSTRATE?**

A   The example demonstrates that a cost-based Schedule SMS demand charge should be only 12% of the corresponding demand charge for Schedule LIPS. The 12% ratio is derived in **Exhibit JP-16**.

**Q   HOW DID YOU DERIVE THE 12% COINCIDENCE RATIO?**

A   I analyzed the coincidence factor of Schedule SMS customers over a broad time period to determine the extent in which Standby power demands occurred coincident with ETI's summer month system peaks. This analysis was for calendar years 2007 through 2011. Because standby service is sporadic due to the random nature of forced outages, this should be a broad enough period to determine a representative coincidence factor. As can be seen, the Schedule SMS coincidence factor ranged from 3% to 12%, with an average of 7%. The corresponding Test Year coincidence factor was 9%, which falls within the range. The Schedule LIPS class had a 74% coincidence factor during the Test Year. The ratio of 9% to 74% is 12%.

**Q   WHY ARE YOU PROPOSING TO DIFFERENTIATE THE STANDBY DEMAND CHARGE BY DELIVERY VOLTAGE?**

A   Implementing voltage differentials in the demand charge more directly recognizes the different costs to provide service at transmission and distribution voltage. These differences are discussed later. This recommendation is consistent with the current Schedule SMS energy charges.



Q  WHY HAVE YOU NOT APPLIED THE 12% COINCIDENCE RATIO IN DETERMINING THE DISTRIBUTION-RELATED SCHEDULE SMS DEMAND CHARGE?

A  Distribution facilities are electrically closer to customers. Thus, a customer's peak demand determines how distribution facilities must be sized to ensure reliable service. ETI recognizes this driver by using maximum diversified demand (MDD) to allocate distribution demand-related costs. For this reason, Schedule SMS customers require the same amount of distribution capacity as a similarly sized Schedule LIPS customer. Thus, the Schedule SMS distribution demand charge should be the same as the corresponding Schedule LIPS demand charge.

Q  HOW DID YOU DERIVE COST-BASED ENERGY CHARGES?

A  This is shown in **Exhibit JP-15,** page 2. The Schedule SMS energy charge should reflect the composite Schedule LIPS energy charges, or 0.614¢ per kWh. During on-peak hours, a Schedule SMS customer should also pay additional demand charges. This recognizes that an SMS customer that purchases more energy during on-peak hours would more closely resemble a LIPS customer.

For this reason, cost-based on-peak energy charge should be a composite of the Schedule LIPS energy charge and the remaining demand charges (not collected in the SMS demand charge). The remaining demand charges are derived on Line 3. There are approximately 2,040 on-peak hours in a typical year. Dividing the remaining demand charges by 2,040 yields an additional on-peak energy charge of 0.303¢. This yields a total on-peak energy charge of 0.917¢ (line 9). Under this

structure, an SMS customer that experiences an outage would pay approximately the same for electricity as a LIPS customer.

**Q  PLEASE SUMMARIZE YOUR RECOMMENDED SCHEDULE SMS PRICING STRUCTURE.**

A  Schedule SMS should be reduced to more closely reflect the cost of providing standby service as follows:

| Table 10a: Cost-Based Schedule SMS Charges Based on ETI's Proposed Schedule LIPS Design | | |
|---|---|---|
| **Charge** | **Distribution (less than 69KV)** | **Transmission (69KV and greater)** |
| **Billing Load Charge ($/kW):** | | |
| Standby | $2.64 | $0.82 |
| Maintenance | $2.44 | $0.62 |
| **Non-Fuel Energy Charge (¢/kWh)** | | |
| On-Peak | 0.955¢ | 0.916¢ |
| Off-Peak | 0.639¢ | 0.614¢ |

**Q  HAVE YOU DEVELOPED A SCHEDULE SMS RATE DESIGN BASED ON YOUR RECOMMENDED SCHEDULE LIPS DESIGN?**

A  Yes. Using my recommended Schedule LIPS rate design, the Schedule SMS charges are shown in the table below. This is based on ETI's proposed revenue requirements and class revenue allocation. If the Schedule LIPS revenue requirement is reduced, the charges should be correspondingly reduced. As with my recommended Schedule LIPS rate design, I have added a customer charge. The customer charge should not apply if a Schedule SMS customer is also purchasing supplementary power under another applicable rate. This will avoid over-collecting

| Table 10b: Cost-Based Schedule SMS Charges Based on TIEC's Recommended Schedule LIPS Design | | |
|---|---|---|
| **Charge** | **Distribution (less than 69KV)** | **Transmission (69KV and greater)** |
| **Customer Charge (Stand-Alone)** | $6,000 | |
| **Billing Load Charge ($/kW):** | | |
| Standby | $2.46 | $0.79 |
| Maintenance | $2.27 | $0.60 |
| **Non-Fuel Energy Charge (¢/kWh)** | | |
| On-Peak | 0.881¢ | 0.846¢ |
| Off-Peak | 0.575¢ | 0.552¢ |

customer-related costs. The above recommendations are based on (and consistent with) the use of system wide costing principles.

**Q  HOW WERE THE MAINTENANCE POWER CHARGES DERIVED?**

A  I maintained the same relationship; that is, the current Maintenance power demand charge is 75% of the Standby power demand charge. The 75% should apply to the production/transmission component of the recommended Standby power demand charge because distribution costs are caused by maximum demands occurring at any time, as previously discussed. This would result in a $0.20 and $0.19 per kW differential based on ETI's proposed and my recommended Schedule LIPS designs, respectively. The recommended Maintenance power demand charges reflect the same differential.

J.POLLOCK
INCORPORATED

**Q    WOULD YOUR RECOMMENDED COSTING METHODOLOGY APPLIED ABOVE COMPORT WITH THE COMMISSION'S RULES REGARDING THE RATES FOR SALES OF BACKUP AND MAINTENANCE POWER?**

A    Yes.  The Commission's rules require that:

> The rates for sales of Backup or Maintenance power:
>
> (A)    shall not be based upon an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both; and
>
> (B)    shall take into account the extent to which scheduled outages of the qualifying facilities can be usefully coordinated with scheduled outages of the utility's facilities.[45]

My cost analysis comports with the Rule.  Specifically, Standby power is seldom provided coincident with ETI's summer peaks as evidenced by the much lower coincidence factor for Standby power than for requirements service provided in Schedule LIPS.  This clearly demonstrates that standby customers are different than full requirements customers and that these differences warrant a different rate for production and transmission services.  Further, I have also used system-wide costing principles to derive cost-based energy charges in Schedule SMS.

### Schedule AFC

**Q    WHAT IS SCHEDULE AFC?**

A    Schedule AFC is the mechanism for charging customers for the costs of transformers, breakers and lines directly to customers when those facilities provide service only to specific customers. ETI receives revenues from these customers,

---

[45]  P.U.C. SUBST. R. 25.242(K)(3).



which must be accounted for in ETI's cost study. Some of these facilities are booked to transmission accounts while others are booked to distribution accounts.

**Q   HOW IS SCHEDULE AFC STRUCTURED?**

A   Schedule AFC is applied as a percentage of the original (un-depreciated) cost of the facilities. The percentage is supposed to reflect ETI's costs of owning and operating the direct assigned facilities.

There are two separate pricing options. Under Option A, the charge is currently 1.49% per month. Option B applies when a customer elects to amortize the direct assigned facilities over a shorter term ranging from one to ten years. Thus, the Option B Monthly Recovery Term charge varies depending on the length of the amortization period of the direct assigned investment. There is also a 0.453% Monthly Post-Recovery term charge that applies after a facility has been fully depreciated.

**Q   IS ETI PROPOSING TO CHANGE EITHER THE OPTION A OR OPTION B CHARGES IN SCHEDULE AFC?**

A   No.

**Q   SHOULD THE OPTION A AND OPTION B CHARGES BE REVISED?**

A   Yes. The charges in Schedule AFC should be designed to reflect the cost of owning, operating, and maintaining the direct-assigned facilities. However, the current Option A and Option B charges are well in excess of ETI's ownership and operation & maintenance (O&M) costs. This is shown in **Exhibit JP-17** for Option A and

**Exhibit JP-18** for Option B. The analysis is summarized on page 1, while the detailed analysis is provided on page 2.

**Q    PLEASE EXPLAIN EXHIBIT JP-17.**

**A    Exhibit JP-17** provides a cost analysis of the Schedule AFC Option A charges. Referring to page 1, I have used two different methods to derive a cost-based rate:

    1. Levelized Cost Analysis (line 1); and

    2. Revenue Requirement Analysis (lines 2-4).

The levelized cost analysis assumes that an investment and associated costs is recovered ratably over its useful life. This detailed derivation of the levelized cost and the assumed cost parameters are shown on page 2. As can be seen on page 2, the assumed cost parameters are based on ETI's proposed rate of return (stated on a pre-tax basis to account for income taxes), depreciation rates, O&M expense and property taxes. The levelized cost analysis results in an Option A rate of 1.20% per month.

A revenue requirement analysis is derived from a cost-of-service study that shows the overall costs on a functional (*i.e.,* transmission, distribution) basis, such as in Schedules P-5 and P-6.1.2. Specifically, the functionalized revenue requirement (line 2) is expressed as a percent of gross plant investment (line 3). A separate analysis was conducted for transmission and distribution functions because Schedule AFC facilities are booked to both transmission and distribution accounts. The resulting fixed charges are 1.05% for transmission and 1.27% for distribution. Weighting the two functions by the amount of transmission and distribution-related

Schedule AFC revenues results in a weighted average rate of 1.18%.

**Q PLEASE EXPLAIN EXHIBIT JP-18.**

A Cost-based Option B charges are summarized in **Exhibit JP-18**, page 1. The detailed analysis is provided on page 2. It uses the same parameters as the Option A cost analysis. The Monthly Recovery Term Charges are based on a levelized cost analysis for each of the Option B amortization periods (lines 1 through 10). The ownership cost components (*i.e.,* return, taxes and depreciation) are also quantified on a levelized basis (columns 1 and 2). They are expressed as a percent of the original investment (column 5). The operating costs (O&M and property taxes) are shown in columns 3 and 4. They are based on the same Test Year parameters used by ETI as shown in **Exhibit JP-17**, page 2. The Monthly Recovery Term Charges (column 8) are the sum of each of the components (columns 5 through 7). This charge applies until the investment is depreciated. Thereafter, the Post Recovery Term charge applies.

**Q WHAT IS YOUR RECOMMENDATION?**

A The monthly charges in Schedule AFC should be reduced to reflect the actual cost-of-service established in this proceeding. The current 1.49% per month charge under Option A is much higher than the actual carrying costs on transmission and distribution investment, which would be 1.20% per month under ETI's proposed revenue requirements **(Exhibit JP-17)**. The proposed Option B Recovery Term charges should also be correspondingly lower as shown in **Exhibit JP-18**. The O&M charge under Option B should be 0.35% per month.



If the Commission approves a lower base revenue requirement than ETI has proposed, the recommended Schedule AFC charges (both Option A and Option B) should be reduced in proportion to any authorized reduction in ETI's proposed rate of return, O&M expense and property tax expense.

**Fixed Fuel Factor**

Q    SHOULD ANY CHANGE BE MADE TO THE FIXED FUEL FACTOR?

A    Yes.  The same loss multipliers have been used in ETI's Fixed Fuel Factor tariff for many years.  This case provides an opportunity to review the appropriateness of these loss multipliers.

Q    WHAT IS A LOSS MULTIPLIER?

A    A loss multiplier is a factor that restates the system average fuel costs into the corresponding delivered fuel costs by voltage (*e.g.,* secondary, primary, transmission).  This recognizes that delivered costs are inversely related to energy losses.  ETI incurs lower energy losses to serve a transmission customer than distribution (primary or secondary) customers.  Thus, the distribution loss multipliers are higher than the transmission loss multipliers.

For example, the current Texas retail fuel factor is 4.02739¢ per kWh.  A customer taking primary service has a loss multiplier of 1.004911.  Consequently, the fixed fuel factor applicable to primary service is the product of the Retail Fixed Fuel Factor and the primary loss multiplier, or 4.04717¢ (4.02739¢ X 1.004911).  This compares to 3.87806¢ (4.02739¢ X 0.962921) for a transmission customer taking service up to (but not including) 230 KV.

**5.  Rate Design**

**Q**    **HOW ARE LOSS MULTIPLIERS DERIVED?**

**A**    Loss multipliers are based on the energy losses incurred by ETI to deliver electricity at each of the various delivery voltages.  The energy losses, in turn, are derived from system loss studies, which analyze the components of the utility's delivery system to determine the amounts of energy lost in delivering electricity from the generators to customers' meters.

**Q**    **IS A LOSS STUDY USED ELSEWHERE IN DEVELOPING RATES?**

**A**    Yes.  The same loss study is used to develop both energy losses as well as peak demand losses.  Both sets of losses are then used to establish demand and energy allocation factors by customer class.  These allocation factors are then used in ETI's class cost-of-service study to determine each class's revenue requirements.  A summary of the demand and energy losses is provided in Schedule P-7.2.

**Q**    **HOW ARE THE ENERGY LOSSES USED TO DEVELOP A LOSS MULTIPLIER?**

**A**    The loss multipliers are derived using the following equation:

$$LM = \frac{(1 + EL_{DV})}{(1 + EL_{AVG})}$$

   Where: $EL$ =   Energy Losses
   $DV$ =   Delivery Voltage
   $AVG$ = System Average Energy Losses

Applying this equation yields the loss multiplier shown in **Exhibit JP-19,** columns 1 and 2.

---

**5.  Rate Design**



**J.POLLOCK**
**INCORPORATED**

**Q    HOW DO THE LOSS MULTIPLIERS DERIVED IN THIS CASE COMPARE WITH THE CURRENT LOSS MULTIPLIERS USED IN ETI'S FIXED FUEL FACTOR?**

A    The current loss multipliers are shown in column 3 of **Exhibit JP-19**. As can be seen, the new loss multipliers (column 2) are lower than the current multipliers (column 3). The most obvious change is that for Primary Service, the loss multiplier would decrease from an amount greater than 1.0 to a multiplier slightly below 1.0.

**Q    WHAT DO YOU RECOMMEND?**

A    The Fixed Fuel Factor loss multipliers should be revised based on the analysis presented in **Exhibit JP-19**, column 2. The revised loss multipliers would allow more accurate recovery of fuel costs by delivery voltage and align the cost recovery processes between base rates (which use the same energy losses) and the fuel factor.

**Q    DOES THIS CONCLUDE YOUR DIRECT TESTIMONY?**

A    Yes.

## APPENDIX A

### Qualifications of Jeffry Pollock

**Q PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

A Jeffry Pollock. My business mailing address is 12655 Olive Blvd., Suite 335, St. Louis, Missouri 63141.

**Q WHAT IS YOUR OCCUPATION AND BY WHOM ARE YOU EMPLOYED?**

A I am an energy advisor and President of J. Pollock, Incorporated.

**Q PLEASE STATE YOUR EDUCATIONAL BACKGROUND AND EXPERIENCE.**

A I have a Bachelor of Science Degree in Electrical Engineering and a Masters in Business Administration from Washington University. I have also completed a Utility Finance and Accounting course.

Upon graduation in June 1975, I joined Drazen-Brubaker & Associates, Inc. (DBA). DBA was incorporated in 1972 assuming the utility rate and economic consulting activities of Drazen Associates, Inc., active since 1937. From April 1995 to November 2004, I was a managing principal at Brubaker & Associates (BAI).

During my tenure at both DBA and BAI, I have been engaged in a wide range of consulting assignments including energy and regulatory matters in both the United States and several Canadian provinces. This includes preparing financial and economic studies of investor-owned, cooperative and municipal utilities on revenue requirements, cost of service and rate design, and conducting site evaluation. Recent engagements have included advising clients on electric restructuring issues,

assisting clients to procure and manage electricity in both competitive and regulated markets, developing and issuing requests for proposals (RFPs), evaluating RFP responses and contract negotiation. I was also responsible for developing and presenting seminars on electricity issues.

I have worked on various projects in over 20 states and several Canadian provinces, and have testified before the Federal Energy Regulatory Commission and the state regulatory commissions of Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Indiana, Illinois, Indiana, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, Ohio, Pennsylvania, Texas, Virginia, Washington, and Wyoming. I have also appeared before the City of Austin Electric Utility Commission, the Board of Public Utilities of Kansas City, Kansas, the Bonneville Power Administration, Travis County (Texas) District Court, and the U.S. Federal District Court. A partial list of my appearances is provided in **Appendix B**.

**Q    PLEASE DESCRIBE J. POLLOCK, INCORPORATED.**

A    J.Pollock assists clients to procure and manage energy in both regulated and competitive markets. The J.Pollock team also advises clients on energy and regulatory issues. Our clients include commercial, industrial and institutional energy consumers. Currently, J.Pollock has offices in St. Louis, Missouri and Austin, Texas. J.Pollock is a registered Class I aggregator in the State of Texas.

**J.POLLOCK**
**INCORPORATED**

## Testimony Filed in Regulatory Proceedings
## <u>by Jeffry Pollock</u>

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 91023 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 39851 | Supplemental Rebuttal | TX | Competitive Generation Service Issues | 2/24/2012 |
| 91203 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 39851 | Supplemental Direct | TX | Competitive Generation Service Issues | 2/10/2012 |
| 101101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 39722 | Direct | TX | Carrying Charge Rate Applicable to the Additional True-Up Balance and Tax Balances | 11/4/2011 |
| 110703 | GULF POWER COMPANY | Florida Industrial Power Users Group | 110138-EI | Direct | FL | Cost Allocation and Storm Reserve | 10/14/2011 |
| 90404 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 39504 | Direct | TX | Carrying Charge Rate Applicable to the Additional True-Up Balance and Taxes | 9/12/2011 |
| 101101 | AEP TEXAS NORTH COMPANY | Texas Industrial Energy Consumers | 39361 | Cross-Rebuttal | TX | Energy Efficiency Cost Recovery Factor | 8/10/2011 |
| 101101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 39360 | Cross-Rebuttal | TX | Energy Efficiency Cost Recovery Factor | 8/10/2011 |
| 100503 | ONCOR ELECTRIC DELIVERY COMPANY, LLC | Texas Industrial Energy Consumers | 39375 | Direct | TX | Energy Efficiency Cost Recovery Factor | 8/2/2011 |
| 90103 | ALABAMA POWER COMPANY | Alabama Industrial Energy Consumers | 31653 | Direct | AL | Renewable Purchased Power Agreement | 7/28/2011 |
| 101101 | AEP TEXAS NORTH COMPANY | Texas Industrial Energy Consumers | 39361 | Direct | TX | Energy Efficiency Cost Recovery Factor | 7/26/2011 |
| 101101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 36360 | Direct | TX | Energy Efficiency Cost Recovery Factor | 7/20/2011 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 39366 | Direct | TX | Energy Efficiency Cost Recovery Factor | 7/19/2011 |
| 90404 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 39363 | Direct | TX | Energy Efficiency Cost Recovery Factor | 7/15/2011 |
| 101201 | NORTHERN STATES POWER COMPANY | Xcel Large Industrials | E002/GR-10-971 | Direct | MN | Surplus Depreciation Reserve, Incentive Compensation, Non-Asset Trading Margin Sharing, Cost Allocation, Class Revenue Allocation, Rate Design | 4/5/2011 |
| 101202 | ROCKY MOUNTAIN POWER | Wyoming Industrial Energy Consumers | 20000-381-EA-10 | Direct | WY | 2010 Protocols | 2/11/2011 |
| 100802 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 38480 | Direct | TX | Cost Allocation, TCRF | 11/8/2010 |
| 90402 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Traditional Manufacturers Group | 31958 | Direct | GA | Alternate Rate Plan, Return on Equity, Riders, Cost-of-Service Study, Revenue Allocation, Economic Development | 10/22/2010 |
| 90404 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 38339 | Cross-Rebuttal | TX | Cost Allocation, Class Revenue Allocation | 9/24/2010 |
| 90404 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 38339 | Direct | TX | Pension Expense, Surplus Depreciation Reserve, Cost Allocation, Rate Design, Riders | 9/10/2010 |
| 100303 | NIAGARA MOHAWK POWER CORP. | Multiple Intervenors | 10-E-0050 | Rebuttal | NY | Multi-Year Rate Plan, Cost Allocation, Revenue Allocation, Reconciliation Mechanisms, Rate Design | 8/6/2010 |
| 100303 | NIAGARA MOHAWK POWER CORP. | Multiple Intervenors | 10-E-0050 | Direct | NY | Multi-Year Rate Plan, Cost Allocation, Revenue Allocation, Reconciliation Mechanisms, Rate Design | 0714/2010 |

## Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 91203 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 37744 | Cross Rebuttal | TX | Cost Allocation, Revenue Allocation, CGS Rate Design, Interruptible Service | 6/30/2010 |
| 91203 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 37744 | Direct | TX | Class Cost of Service Study, Revenue Allocation, Rate Design, Competitive Generation Services, Line Extension Policy | 6/9/2010 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 37482 | Cross Rebuttal | TX | Allocation of Purchased Power Capacity Costs | 2/3/2010 |
| 90402 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Traditional Manufacturers Group | 28945 | Direct | GA | Fuel Cost Recovery | 1/29/2010 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 37482 | Direct | TX | Purchased Power Capacity Cost Factor | 1/22/2010 |
| 90403 | VIRGINIA ELECTRIC AND POWER COMPANY | MeadWestvaco Corporation | PUE-2009-00081 | Direct | VA | Allocation of DSM Costs | 1/13/2010 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 37580 | Direct | TX | Fuel refund | 12/4/2009 |
| 90403 | VIRGINIA ELECTRIC AND POWER COMPANY | MeadWestvaco Corporation | PUE-2009-00019 | Direct | VA | Standby rate design; dynamic pricing | 11/9/2009 |
| 80601 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 37135 | Direct | TX | Transmission cost recovery factor | 10/22/2009 |
| 80703 | MID-KANSAS ELECTRIC COMPANY, LLC | Western Kansas Industrial Energy Consumers | 09-MKEE-969-RTS | Direct | KS | Revenue requirements, TIER, rate design | 10/19/2009 |
| 90601 | VARIOUS UTILITIES | Florida Industrial Power Users Group | 090002-EG | Direct | FL | Interruptible Credits | 10/2/2009 |
| 80505 | ONCOR ELECTRIC DELIVERY COMPANY | Texas Industrial Energy Consumers | 36958 | Cross Rebuttal | TX | 2010 Energy efficiency cost recovery factor | 8/18/2009 |
| 81001 | PROGRESS ENERGY FLORIDA | Florida Industrial Power Users Group | 90079 | Direct | FL | Cost-of-service study, revenue allocation, rate design, depreciation expense, capital structure | 8/10/2009 |
| 90404 | CENTERPOINT | Texas Industrial Energy Consumers | 36918 | Cross Rebuttal | TX | Allocation of System Restoration Costs | 7/17/2009 |
| 90301 | FLORIDA POWER AND LIGHT COMPANY | Florida Industrial Power Users Group | 080677 | Direct | FL | Depreciation; class revenue allocation; rate design; cost allocation; and capital structure | 7/16/2009 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 36956 | Direct | TX | Approval to revise energy efficiency cost recovery factor | 7/16/2009 |
| 90601 | VARIOUS UTILITIES | Florida Industrial Power Users Group | VARIOUS DOCKETS | Direct | FL | Conservation goals | 7/6/2009 |
| 90201 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 36931 | Direct | TX | System restoration costs under Senate Bill 769 | 6/30/2009 |
| 90502 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 36966 | Direct | TX | Authority to revise fixed fuel factors | 6/18/2009 |
| 80805 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 36025 | Cross-Rebuttal | TX | Cost allocatiion, revenue allocation and rate design | 6/10/2009 |
| 80805 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 36025 | Direct | TX | Cost allocation, revenue allocation, rate design | 5/27/2009 |
| 81201 | NORTHERN STATES POWER COMPANY | Xcel Large Industrials | 08-1065 | Surrebuttal | MN | Cost allocation, revenue allocation, rate design | 5/27/2009 |
| 90403 | VIRGINIA ELECTRIC AND POWER COMPANY | MeadWestvaco Corporation | PUE-2009-00018 | Direct | VA | Transmission cost allocation and rate design | 5/20/2009 |

## Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 90101 | NORTHERN INDIANA PUBLIC SERVICE COMPANY | Beta Steel Corporation | 43526 | Direct | IN | Cost allocation and rate design | 5/8/2009 |
| 81203 | ENTERGY SERVICES, INC | Texas Industrial Energy Consumers | ER008-1056 | Rebuttal | FERC | Rough Production Cost Equalization payments | 5/7/2009 |
| 81201 | NORTHERN STATES POWER COMPANY | Xcel Large Industrials | 08-1065 | Rebuttal | MN | Class revenue allocation and the classification of renewable energy costs | 5/5/2009 |
| 81201 | NORTHERN STATES POWER COMPANY | Xcel Large Industrials | 08-1065 | Direct | MN | Cost-of-service study, class revenue allocation, and rate design | 4/7/2009 |
| 81203 | ENTERGY SERVICES, INC | Texas Industrial Energy Consumers | ER08-1056 | Answer | FERC | Rough Production Cost Equalization payments | 3/6/2009 |
| 80901 | ROCKY MOUNTAIN POWER | Wyoming Industrial Energy Consumers | 20000-333-ER-08 | Direct | WY | Cost of service study; revenue allocation; inverted rates; revenue requirements | 1/30/2009 |
| 81203 | ENTERGY SERVICES | Texas Industrial Energy Consumers | ER08-1056 | Direct | FERC | Entergy's proposal seeking Commission approval to allocate Rough Production Cost Equalization payments | 1/9/2009 |
| 80505 | ONCOR ELECTRIC DELIVERY COMPANY & TEXAS ENERGY FUTURE HOLDINGS LTD | Texas Industrial Energy Consumers | 35717 | Cross Rebuttal | TX | Retail transformation; cost allocation, demand ratchet waivers, transmission cost allocation factor | 12/24/2008 |
| 70101 | GEORGIA POWER COMPANY | Georgia Industrial Group and Georgia Traditional Manufacturers Association | 27800 | Direct | GA | Cash Return on CWIP associated with the Plant Vogtle Expansion | 12/19/2008 |
| 80505 | ONCOR ELECTRIC DELIVERY COMPANY & TEXAS ENERGY FUTURE HOLDINGS LTD | Texas Industrial Energy Consumers | 35717 | Direct | TX | Revenue Requirement, class cost of service study, class revenue allocation and rate design | 11/26/2008 |
| 80802 | TAMPA ELECTRIC COMPANY | The Florida Industrial Power Users Group and Mosaic Company | 080317-EI | Direct | FL | Revenue Requirements, retail class cost of service study, class revenue allocation, firm and non firm rate design and the Transmission Base Rate Adjustment | 11/26/2008 |
| 80601 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 35763 | Supplemental Direct | TX | Recovery of Energy Efficiency Costs | 11/6/2008 |
| 80601 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 35763 | Cross-Rebuttal | TX | Cost Allocation, Demand Ratchet, Renewable Energy Certificates (REC) | 10/28/2008 |
| 80601 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 35763 | Direct | TX | Revenue Requirements, Fuel Reconciliation Revenue Allocation, Cost-of-Service and Rate Design Issues | 10/13/2008 |
| 50106 | ALABAMA POWER COMPANY | Alabama Industrial Energy Consumers | 18148 | Direct | AL | Energy Cost Recovery Rate (WITHDRAWN) | 9/16/2008 |
| 50701 | ENTERGY TEXAS, INC. | Texas Industrial Energy Consumers | 35269 | Direct | TX | Allocation of rough production costs equalization payments | 7/9/2008 |
| 70703 | ENTERGY GULF STATES UTILITIES, TEXAS | Texas Industrial Energy Consumers | 34800 | Direct | TX | Non-Unanimous Stipulation | 6/11/2008 |
| 50103 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 33672 | Supplemental Rebuttal | TX | Transmission Optimization and Ancillary Services Studies | 6/3/2008 |
| 50103 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 33672 | Supplemental Direct | TX | Transmission Optimization and Ancillary Services Studies | 5/23/2008 |
| 60104 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 33891 | Supplemental Direct | TX | Certificate of Convenience and Necessity | 5/8/2008 |

# Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 70703 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 34800 | Cross-Rebuttal | TX | Cost Allocation and Rate Design and Competitive Generation Service | 4/18/2008 |
| 70703 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 34800 | Direct | TX | Eligible Fuel Expense | 4/11/2008 |
| 70703 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 34800 | Direct | TX | Competitive Generation Service Tariff | 4/11/2008 |
| 70703 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 34800 | Direct | TX | Revenue Requirements | 4/11/2008 |
| 70703 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 34800 | Direct | TX | Cost of Service study, revenue allocation, design of firm, interruptible and standby service tariffs; interconnection costs | 4/11/2008 |
| 41229 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 35038 | Rebuttal | TX | Over $5 Billion Compliance Filing | 4/14/2008 |
| 60303 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Traditional Manufacturers Group | 26794 | Direct | GA | Fuel Cost Recovery | 4/15/2008 |
| 71202 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. | 07-00319-UT | Rebuttal | NM | Revenue requirements, cost of service study, rate design | 3/28/2008 |
| 61101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 35105 | Direct | TX | Over $5 Billion Compliance Filing | 3/20/2008 |
| 51101 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 32902 | Direct | TX | Over $5 Billion Compliance Filing | 3/20/2008 |
| 71202 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. | 07-00319-UT | Direct | NM | Revenue requirements, cost of service study (COS); rate design | 3/7/2008 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 34724 | Direct | TX | IPCR Rider increase and interim surcharge | 11/28/2007 |
| 70601 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Traditional Manufacturers Group | 25060-U | Direct | GA | Return on equity; cost of service study; revenue allocation; ILR Rider; spinning reserve tariff; RTP | 10/24/2007 |
| 70303 | ONCOR ELECTRIC DELIVERY COMPANY & TEXAS ENERGY FUTURE HOLDINGS LTD | Texas Industrial Energy Consumers | 34077 | Direct | TX | Acquisition; public interest | 9/14/2007 |
| 60104 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 33891 | Direct | TX | Certificate of Convenience and Necessity | 8/30/2007 |
| 61201 | ALTAMAHA ELECTRIC MEMBERSHIP CORPORATION | SP Newsprint Company | 25226-U | Rebuttal | GA | Discriminatory Pricing; Service Territorial Transfer | 7/17/2007 |
| 61201 | ALTAMAHA ELECTRIC MEMBERSHIP CORPORATION | SP Newsprint Company | 25226-U | Direct | GA | Discriminatory Pricing; Service Territorial Transfer | 7/6/2007 |
| 70502 | PROGRESS ENERGY FLORIDA | Florida Industrial Power Users Group | 070052-EI | Direct | FL | Nuclear uprate cost recovery | 6/19/2007 |
| 70603 | ELECTRIC TRANSMISSION TEXAS LLC | Texas Industrial Energy Consumers | 33734 | Direct | TX | Certificate of Convenience and Necessity | 6/8/2007 |
| 60601 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 32795 | Rebuttal Remand | TX | Interest rate on stranded cost reconciliation | 6/15/2007 |
| 60601 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 32795 | Remand | TX | Interest rate on stranded cost reconciliation | 6/8/2007 |
| 50103 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 33672 | Rebuttal | TX | CREZ Nominations | 5/21/2007 |
| 50701 | ENTERGY GULF STATES UTILITES, TEXAS | Texas Industrial Energy Consumers | 33687 | Direct | TX | Transition to Competition | 4/27/2007 |

## Testimony Filed in Regulatory Proceedings
### by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 50103 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 33672 | Direct | TX | CREZ Nominations | 4/24/2007 |
| 61101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 33309 | Cross-Rebuttal | TX | Cost Allocation,Rate Design, Riders | 4/3/2007 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 32710 | Cross-Rebuttal | TX | Fuel and Rider IPCR Reconciliation | 3/16/2007 |
| 61101 | AEP TEXAS NORTH COMPANY | Texas Industrial Energy Consumers | 33310 | Direct | TX | Cost Allocation,Rate Design, Riders | 3/13/2007 |
| 61101 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 33309 | Direct | TX | Cost Allocation,Rate Design, Riders | 3/13/2007 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 32710 | Direct | TX | Fuel and Rider IPCR Reconciliation | 2/28/2007 |
| 41219 | AEP TEXAS NORTH COMPANY | Texas Industrial Energy Consumers | 31461 | Direct | TX | Rider CTC design | 2/15/2007 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 33586 | Cross-Rebuttal | TX | Hurricane Rita reconstruction costs | 1/30/2007 |
| 60104 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 32898 | Direct | TX | Fuel Reconciliation | 1/29/2007 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 33586 | Direct | TX | Hurricane Rita reconstruction costs | 1/18/2007 |
| 60303 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 23540-U | Direct | GA | Fuel Cost Recovery | 1/11/2007 |
| 60503 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 32766 | Cross Rebuttal | TX | Cost allocation, Cost of service, Rate design | 1/8/2007 |
| 60503 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 32766 | Direct | TX | Cost allocation, Cost of service, Rate design | 12/22/2006 |
| 60503 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 32766 | Direct | TX | Revenue Requirements, | 12/15/2006 |
| 60503 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 32766 | Direct | TX | Fuel Reconcilation | 12/15/2006 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 32907 | Cross Rebuttal | TX | Hurricane Rita reconstruction costs | 10/12/06 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 32907 | Direct | TX | Hurricane Rita reconstruction costs | 10/09/06 |
| 60601 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 32795 | Cross Rebuttal | TX | Stranded Cost Reallocation | 09/07/06 |
| 60101 | COLQUITT EMC | ERCO Worldwide | 23549-U | Direct | GA | Service Territory Transfer | 08/10/06 |
| 60601 | TEXAS PUC STAFF | Texas Industrial Energy Consumers | 32795 | Direct | TX | Stranded Cost Reallocation | 08/23/06 |
| 60104 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 32672 | Direct | TX | ME-SPP Transfer of Certificate to SWEPCO | 8/23/2006 |
| 50503 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 32758 | Direct | TX | Rider CTC design and cost recovery | 08/24/06 |
| 60503 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 32685 | Direct | TX | Fuel Surcharge | 07/26/06 |
| 60301 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY | New Jersey Large Energy Consumers | 171406 | Direct | NJ | Gas Delivery Cost allocation and Rate design | 06/21/06 |
| 60303 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 22403-U | Direct | GA | Fuel Cost Recovery Allowance | 05/05/06 |

# Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 50503 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 32475 | Cross-Rebuttal | TX | ADFIT Benefit | 04/27/06 |
| 50503 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 32475 | Direct | TX | ADFIT Benefit | 04/17/06 |
| 41229 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 31994 | Cross-Rebuttal | TX | Stranded Costs and Other True-Up Balances | 3/16/2006 |
| 41229 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 31994 | Direct | TX | Stranded Costs and Other True-Up Balances | 3/10/2006 |
| 50303 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. Occidental Power Marketing | ER05-168-001 | Direct | NM | Fuel Reconciliation | 3/6/2006 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 31544 | Cross-Rebuttal | TX | Transition to Competition Costs | 01/13/06 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 31544 | Direct | TX | Transition to Competition Costs | 01/13/06 |
| 50601 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY AND EXELON CORPORATION | New Jersey Large Energy Consumers Retail Energy Supply Association | BPU EM05020106 OAL PUC-1874-05 | Surrebuttal | NJ | Merger | 12/22/2005 |
| 50705 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. Occidental Power Marketing | EL05-19-002; ER05-168-001 | Responsive | FERC | Fuel Cost adjustment clause (FCAC) | 11/18/2005 |
| 50601 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY AND EXELON CORPORATION | New Jersey Large Energy Consumers Retail Energy Supply Association | BPU EM05020106 OAL PUC-1874-05 | Direct | NJ | Merger | 11/14/2005 |
| 50102 | PUBLIC UTILITY COMMISSION OF TEXAS | Texas Industrial Energy Consumers | 31540 | Direct | TX | Nodal Market Protocols | 11/10/2005 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 31315 | Cross-Rebuttal | TX | Recovery of Purchased Power Capacity Costs | 10/4/2005 |
| 50701 | ENTERGY GULF STATES UTILITIES TEXAS | Texas Industrial Energy Consumers | 31315 | Direct | TX | Recovery of Purchased Power Capacity Costs | 9/22/2005 |
| 50705 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. Occidental Power Marketing | EL05-19-002; ER05-168-001 | Responsive | FERC | Fuel Cost Adjustment Clause (FCAC) | 9/19/2005 |
| 50503 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 31056 | Direct | TX | Stranded Costs and Other True-Up Balances | 9/2/2005 |
| 50705 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Occidental Periman Ltd. Occidental Power Marketing | EL05-19-00; ER05-168-00 | Direct | FERC | Fuel Cost adjustment clause (FCAC) | 8/19/2006 |
| 50203 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 19142-U | Direct | GA | Fuel Cost Recovery | 4/8/2005 |
| 41230 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 30706 | Direct | TX | Competition Transition Charge | 3/16/2005 |
| 41230 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 30485 | Supplemental Direct | TX | Financing Order | 1/14/2005 |
| 41230 | CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | Texas Industrial Energy Consumers | 30485 | Direct | TX | Financing Order | 1/7/2005 |
| 8201 | PUBLIC SERVICE COMPANY OF COLORADO | Colorado Energy Consumers | 04S-164E | Cross Answer | CO | Cost of Service Study, Interruptible Rate Design | 12/13/2004 |
| 8201 | PUBLIC SERVICE COMPANY OF COLORADO | Colorado Energy Consumers | 04S-164E | Answer | CO | Cost of Service Study, Interruptible Rate Design | 10/12/2004 |
| 8244 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 18300-U | Direct | GA | Revenue Requirements, Revenue Allocation, Cost of Service, Rate Design, Economic Development | 10/8/2004 |
| 8195 | CENTERPOINT, RELIANT AND TEXAS GENCO | Texas Industrial Energy Consumers | 29526 | Direct | TX | True-Up | 6/1/2004 |

## Testimony Filed in Regulatory Proceedings
### by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 8156 | GEORGIA POWER COMPANY/SAVANNAH ELECTRIC AND POWER COMPANY | Georgia Industrial Group | 17687-U/17688-U | Direct | GA | Demand Side Management | 5/14/2004 |
| 8148 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 29206 | Direct | TX | True-Up | 3/29/2004 |
| 8095 | CONECTIV POWER DELIVERY | New Jersey Large Energy Consumers | ER03020110 | Surrebuttal | NJ | Cost of Service | 3/18/2004 |
| 8111 | AEP TEXAS CENTRAL COMPANY | Texas Industrial Energy Consumers | 28840 | Rebuttal | TX | Cost Allocation and Rate Design | 2/4/2004 |
| 8095 | CONECTIV POWER DELIVERY | New Jersey Large Energy Consumers | ER03020110 | Direct | NJ | Cost Allocation and Rate Design | 1/4/2004 |
| 7850 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 26195 | Supplemental Direct | TX | Fuel Reconciliation | 9/23/2003 |
| 8045 | VIRGINIA ELECTRIC AND POWER COMPANY | Virginia Committee for Fair Utility Rates | PUE-2003-00285 | Direct | VA | Stranded Cost | 9/5/2003 |
| 8022 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 17066-U | Direct | GA | Fuel Cost Recovery | 7/22/2003 |
| 8002 | AEP TEXAS CENTRAL COMPANY | Flint Hills Resources, LP | 25395 | Direct | TX | Delivery Service Tariff Issues | 5/9/2003 |
| 7857 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY | New Jersey Large Energy Consumers | ER02050303 | Supplemental | NJ | Cost of Service | 3/14/2003 |
| 7850 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 26195 | Direct | TX | Fuel Reconciliation | 12/31/2002 |
| 7857 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY | New Jersey Large Energy Consumers | ER02050303 | Surrebuttal | NJ | Revenue Allocation | 12/16/2002 |
| 7836 | PUBLIC SERVICE COMPANY OF COLORADO | Colorado Energy Consumers | 02S-315EG | Answer | CO | Incentive Cost Adjustment | 11/22/2002 |
| 7857 | PUBLIC SERVICE ELECTRIC AND GAS COMPANY | New Jersey Large Energy Consumers | ER02050303 | Direct | NJ | Revenue Allocation | 10/22/2002 |
| 7863 | DOMINION VIRGINIA POWER | Virginia Committee for Fair Utility Rates | PUE-2001-00306 | Direct | VA | Generation Market Prices | 8/12/2002 |
| 7718 | FLORIDA POWER CORPORATION | Florida Industrial Power Users Group | 000824-EI | Direct | FL | Rate Design | 1/18/2002 |
| 7633 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 14000-U | Direct | GA | Cost of Service Study, Revenue Allocation, Rate Design | 10/12/2001 |
| 7555 | TAMPA ELECTRIC COMPANY | Florida Industrial Power Users Group | 010001-EI | Direct | FL | Rate Design | 10/12/2001 |
| 7658 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 24468 | Direct | TX | Delay of Retail Competition | 9/24/2001 |
| 7647 | ENTERGY GULF STATES, INC. | Texas Industrial Energy Consumers | 24469 | Direct | TX | Delay of Retail Competition | 9/22/2001 |
| 7608 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 23950 | Direct | TX | Price to Beat | 7/3/2001 |
| 7593 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 13711-U | Direct | GA | Fuel Cost Recovery | 5/11/2001 |
| 7520 | GEORGIA POWER COMPANY SAVANNAH ELECTRIC & POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 12499-U,13305-U, 13306-U | Direct | GA | Integrated Resource Planning | 5/11/2001 |
| 7303 | ENTERGY GULF STATES, INC. | Texas Industrial Energy Consumers | 22356 | Rebuttal | TX | Allocation/Collection of Municipal Franchise Fees | 3/31/2001 |

## Testimony Filed in Regulatory Proceedings
### by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 7309 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 22351 | Cross-Rebuttal | TX | Energy Efficiency Costs | 2/22/2001 |
| 7305 | CPL, SWEPCO, and WTU | Texas Industrial Energy Consumers | 22352, 22353, 22354 | Cross-Rebuttal | TX | Allocation/Collection of Municipal Franchise Fees | 2/20/2001 |
| 7423 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 13140-U | Direct | GA | Interruptible Rate Design | 2/16/2001 |
| 7305 | CPL, SWEPCO, and WTU | Texas Industrial Energy Consumers | 22352, 22353, 22354 | Supplemental Direct | TX | Transmission Cost Recovery Factor | 2/13/2001 |
| 7310 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 22349 | Cross-Rebuttal | TX | Rate Design | 2/12/2001 |
| 7308 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 22350 | Cross-Rebuttal | TX | Unbundled Cost of Service | 2/12/2001 |
| 7303 | ENTERGY GULF STATES, INC. | Texas Industrial Energy Consumers | 22356 | Cross-Rebuttal | TX | Stranded Cost Allocation | 2/6/2001 |
| 7308 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 22350 | Direct | TX | Rate Design | 2/5/2001 |
| 7303 | ENTERGY GULF STATES, INC. | Texas Industrial Energy Consumers | 22356 | Supplemental Direct | TX | Rate Design | 1/25/2001 |
| 7307 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 22355 | Cross-Rebuttal | TX | Stranded Cost Allocation | 1/12/2001 |
| 7303 | ENTERGY GULF STATES, INC. | Texas Industrial Energy Consumers | 22356 | Direct | TX | Stranded Cost Allocation | 1/9/2001 |
| 7307 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 22355 | Direct | TX | Cost Allocation | 12/13/2000 |
| 7375 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 22352 | Cross-Rebuttal | TX | CTC Rate Design | 12/1/2000 |
| 7375 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 22352 | Direct | TX | Cost Allocation | 11/1/2000 |
| 7308 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 22350 | Direct | TX | Cost Allocation | 11/1/2000 |
| 7308 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 22350 | Cross-Rebuttal | TX | Cost Allocation | 11/1/2000 |
| 7305 | CPL, SWEPCO, and WTU | Texas Industrial Energy Consumers | 22352, 22353, 22354 | Direct | TX | Excess Cost Over Market | 11/1/2000 |
| 7315 | VARIOUS UTILITIES | Texas Industrial Energy Consumers | 22344 | Direct | TX | Generic Customer Classes | 10/14/2000 |
| 7308 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 22350 | Direct | TX | Excess Cost Over Market | 10/10/2000 |
| 7315 | VARIOUS UTILITIES | Texas Industrial Energy Consumers | 22344 | Rebuttal | TX | Excess Cost Over Market | 10/1/2000 |
| 7310 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 22349 | Cross-Rebuttal | TX | Generic Customer Classes | 10/1/2000 |
| 7310 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 22349 | Direct | TX | Excess Cost Over Market | 9/27/2000 |
| 7307 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 22355 | Cross-Rebuttal | TX | Excess Cost Over Market | 9/26/2000 |
| 7307 | RELIANT ENERGY HL&P | Texas Industrial Energy Consumers | 22355 | Direct | TX | Excess Cost Over Market | 9/19/2000 |
| 7334 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 11708-U | Rebuttal | GA | RTP Petition | 3/24/2000 |

## Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 7334 | GEORGIA POWER COMPANY | Georgia Industrial Group/Georgia Textile Manufacturers Group | 11708-U | Direct | GA | RTP Petition | 3/1/2000 |
| 7232 | PUBLIC SERVICE COMPANY OF COLORADO | Colorado Industrial Energy Consumers | 99A-377EG | Answer | CO | Merger | 12/1/1999 |
| 7258 | TXU ELECTRIC COMPANY | Texas Industrial Energy Consumers | 21527 | Direct | TX | Securitization | 11/24/1999 |
| 7246 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 21528 | Direct | TX | Securitization | 11/24/1999 |
| 7089 | VIRGINIA ELECTRIC AND POWER COMPANY | Virginia Committee for Fair Utility Rates | PUE980813 | Direct | VA | Unbundled Rates | 7/1/1999 |
| 7090 | AMERICAN ELECTRIC POWER SERVICE CORPORATION | Old Dominion Committee for Fair Utility Rates | PUE980814 | Direct | VA | Unbundled Rates | 5/21/1999 |
| 7142 | SHARYLAND UTILITIES, L.P. | Sharyland Utilities | 20292 | Rebuttal | TX | Certificate of Convenience and Necessity | 4/30/1999 |
| 7060 | PUBLIC SERVICE COMPANY OF COLORADO | Colorado Industrial Energy Consumers Group | 98A-511E | Direct | CO | Allocation of Pollution Control Costs | 3/1/1999 |
| 7039 | SAVANNAH ELECTRIC AND POWER COMPANY | Various Industrial Customers | 10205-U | Direct | GA | Fuel Costs | 1/1/1999 |
| 6945 | TAMPA ELECTRIC COMPANY | Florida Industrial Power Users Group | 950379-EI | Direct | FL | Revenue Requirement | 10/1/1998 |
| 6873 | GEORGIA POWER COMPANY | Georgia Industrial Group | 9355-U | Direct | GA | Revenue Requirement | 10/1/1998 |
| 6729 | VIRGINIA ELECTRIC AND POWER COMPANY | Virginia Committee for Fair Utility Rates | PUE960036,PUE960296 | Direct | VA | Alternative Regulatory Plan | 8/1/1998 |
| 6713 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 16995 | Cross-Rebuttal | TX | IRR | 1/1/1998 |
| 6582 | HOUSTON LIGHTING & POWER COMPANY | Lyondell Petrochemical Company | 96-02867 | Direct | COURT | Interruptible Power | 1997 |
| 6758 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 17460 | Direct | TX | Fuel Reconciliation | 12/1/1997 |
| 6729 | VIRGINIA ELECTRIC AND POWER COMPANY | Virginia Committee for Fair Utility Rates | PUE960036,PUE960296 | Direct | VA | Alternative Regulatory Plan | 12/1/1997 |
| 6713 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 16995 | Direct | TX | Rate Design | 12/1/1997 |
| 6646 | ENTERGY TEXAS | Texas Industrial Energy Consumers | 16705 | Rebuttal | TX | Competitive Issues | 10/1/1997 |
| 6646 | ENTERGY TEXAS | Texas Industrial Energy Consumers | 16705 | Rebuttal | TX | Competition | 10/1/1997 |
| 6646 | ENTERGY TEXAS | Texas Industrial Energy Consumers | 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/16705 | Direct | TX | Rate Design | 9/1/1997 |
| 6646 | ENTERGY TEXAS | Texas Industrial Energy Consumers | 16705 | Direct | TX | Wholesale Sales | 8/1/1997 |
| 6744 | TAMPA ELECTRIC COMPANY | Florida Industrial Power Users Group | 970171-EU | Direct | FL | Interruptible Rate Design | 5/1/1997 |
| 6632 | MISSISSIPPI POWER COMPANY | Colonial Pipeline Company | 96-UN-390 | Direct | MS | Interruptible Rates | 2/1/1997 |
| 6558 | TEXAS-NEW MEXICO POWER COMPANY | Texas Industrial Energy Consumers | 15560 | Direct | TX | Competition | 11/11/1996 |
| 6508 | TEXAS UTILITIES ELECTRIC COMPANY | Texas Industrial Energy Consumers | 15195 | Direct | TX | Treatment of margins | 9/1/1996 |

**Testimony Filed in Regulatory Proceedings
by Jeffry Pollock**

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 6475 | TEXAS UTILITIES ELECTRIC COMPANY | Texas Industrial Energy Consumers | 15015 | DIRECT | TX | Real Time Pricing Rates | 8/8/1996 |
| 6449 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 14965 | Direct | TX | Quantification | 7/1/1996 |
| 6449 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 14965 | Direct | TX | Interruptible Rates | 5/1/1996 |
| 6449 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 14965 | Rebuttal | TX | Interruptible Rates | 5/1/1996 |
| 6523 | PUBLIC SERVICE COMPANY OF COLORADO | Multiple Intervenors | 95A-531EG | Answer | CO | Merger | 4/1/1996 |
| 6235 | TEXAS UTILITIES ELECTRIC COMPANY | Texas Industrial Energy Consumers | 13575 | Direct | TX | Competitive Issues | 4/1/1996 |
| 6435 | SOUTHWESTERN PUBLIC SERVICE COMMISSION | Texas Industrial Energy Consumers | 14499 | Direct | TX | Acquisition | 11/1/1995 |
| 6391 | HOUSTON LIGHTING & POWER COMPANY | Grace, W.R. & Company | 13988 | Rebuttal | TX | Rate Design | 8/1/1995 |
| 6353 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 14174 | Direct | TX | Costing of Off-System Sales | 8/1/1995 |
| 6157 | WEST TEXAS UTILITIES COMPANY | Texas Industrial Energy Consumers | 13369 | Rebuttal | TX | Cancellation Term | 8/1/1995 |
| 6391 | HOUSTON LIGHTING & POWER COMPANY | Grace, W.R. & Company | 13988 | Direct | TX | Rate Design | 7/1/1995 |
| 6157 | WEST TEXAS UTILITIES COMPANY | Texas Industrial Energy Consumers | 13369 | Direct | TX | Cancellation Term | 7/1/1995 |
| 6296 | GEORGIA POWER COMPANY | Georgia Industrial Group | 5601-U | Rebuttal | GA | EPACT Rate-Making Standards | 5/1/1995 |
| 6296 | GEORGIA POWER COMPANY | Georgia Industrial Group | 5601-U | Direct | GA | EPACT Rate-Making Standards | 5/1/1995 |
| 6278 | COMMONWEALTH OF VIRGINIA | VCFUR/ODCFUR | PUE940067 | Rebuttal | VA | Integrated Resource Planning | 5/1/1995 |
| 6295 | GEORGIA POWER COMPANY | Georgia Industrial Group | 5600-U | Supplemental | GA | Cost of Service | 4/1/1995 |
| 6063 | PUBLIC SERVICE COMPANY OF COLORADO | Multiple Intervenors | 94I-430EG | Rebuttal | CO | Cost of Service | 4/1/1995 |
| 6063 | PUBLIC SERVICE COMPANY OF COLORADO | Multiple Intervenors | 94I-430EG | Reply | CO | DSM Rider | 4/1/1995 |
| 6295 | GEORGIA POWER COMPANY | Georgia Industrial Group | 5600-U | Direct | GA | Interruptible Rate Design | 3/1/1995 |
| 6278 | COMMONWEALTH OF VIRGINIA | VCFUR/ODCFUR | PUE940067 | Direct | VA | EPACT Rate-Making Standards | 3/1/1995 |
| 6125 | SOUTHWESTERN PUBLIC SERVICE COMPANY | Texas Industrial Energy Consumers | 13456 | Direct | TX | DSM Rider | 3/1/1995 |
| 6235 | TEXAS UTILITIES ELECTRIC COMPANY | Texas Industrial Energy Consumers | 13575\|13749 | Direct | TX | Cost of Service | 2/1/1995 |
| 6063 | PUBLIC SERVICE COMPANY OF COLORADO | Multiple Intervenors | 94I-430EG | Answering | CO | Competition | 2/1/1995 |
| 6061 | HOUSTON LIGHTING & POWER COMPANY | Texas Industrial Energy Consumers | 12065 | Direct | TX | Rate Design | 1/1/1995 |
| 6181 | GULF STATES UTILITIES COMPANY | Texas Industrial Energy Consumers | 12852 | Direct | TX | Competitive Alignment Proposal | 11/1/1994 |
| 6061 | HOUSTON LIGHTING & POWER COMPANY | Texas Industrial Energy Consumers | 12065 | Direct | TX | Rate Design | 11/1/1994 |

## Testimony Filed in Regulatory Proceedings
## by Jeffry Pollock

| PROJECT | UTILITY | ON BEHALF OF | DOCKET | TYPE | REGULATORY JURISDICTION | SUBJECT | DATE |
|---|---|---|---|---|---|---|---|
| 5929 | CENTRAL POWER AND LIGHT COMPANY | Texas Industrial Energy Consumers | 12820 | Direct | TX | Rate Design | 10/1/1994 |
| 6107 | SOUTHWESTERN ELECTRIC POWER COMPANY | Texas Industrial Energy Consumers | 12855 | Direct | TX | Fuel Reconciliation | 8/1/1994 |
| 6112 | HOUSTON LIGHTING & POWER COMPANY | Texas Industrial Energy Consumers | 12957 | Direct | TX | Standby Rates | 7/1/1994 |
| 5698 | GULF POWER COMPANY | Misc. Group | 931044-EI | Direct | FL | Standby Rates | 7/1/1994 |
| 5698 | GULF POWER COMPANY | Misc. Group | 931044-EI | Rebuttal | FL | Competition | 7/1/1994 |
| 6043 | EL PASO ELECTRIC COMPANY | Phelps Dodge Corporation | 12700 | Direct | TX | Revenue Requirement | 6/1/1994 |
| 6082 | GEORGIA PUBLIC SERVICE COMMISSION | Georgia Industrial Group | 4822-U | Direct | GA | Avoided Costs | 5/1/1994 |
| 6075 | GEORGIA POWER COMPANY | Georgia Industrial Group | 4895-U | Direct | GA | FPC Certification Filing | 4/1/1994 |
| 6025 | MISSISSIPPI POWER & LIGHT COMPANY | MIEG | 93-UA-0301 | Comments | MS | Environmental Cost Recovery Clause | 1/1/1994 |
| 5971 | FLORIDA POWER & LIGHT COMPANY | Florida Industrial Power Users Group | 940042-EI | Direct | FL | Section 712 Standards of 1992 EPACT | 1/1/1994 |

## APPENDIX C

### Procedures for Conducting a Class Cost-of-Service Study

**Q** **WHAT PROCEDURES ARE USED IN A COST-OF-SERVICE STUDY?**

**A** The basic procedure for conducting a class cost-of-service study is fairly simple. First, we identify the different types of costs (functionalization), determine their primary causative factors (classification), and then apportion each item of cost among the various rate classes (allocation). Adding up the individual pieces gives the total cost for each class.

Identifying the utility's different levels of operation is a process referred to as functionalization. The utility's investments and expenses are separated into production, transmission, distribution, and other functions. To a large extent, this is done in accordance with the Uniform System of Accounts developed by the Federal Energy Regulatory Commission (FERC).

Once costs have been functionalized, the next step is to identify the primary causative factor (or factors). This step is referred to as classification. Costs are classified as demand-related, energy-related or customer-related. Demand (or capacity) related costs vary with peak demand, which is measured in kilowatts (or kW). This includes production, transmission, and some distribution investment and related fixed operation and maintenance (O&M) expenses. As explained later, peak demand determines the amount of capacity needed for reliable service. Energy-related costs vary with the production of energy, which is measured in kilowatt-hours (or kWh). Energy-related costs include fuel and

**Appendix C**



**J.POLLOCK**
**INCORPORATED**

variable O&M expense. Customer-related costs vary directly with the number of customers and include expenses such as meters, service drops, billing, and customer service.

Each functionalized and classified cost must then be allocated to the various customer classes. This is accomplished by developing allocation factors that reflect the percentage of the total cost that should be paid by each class. The allocation factors should reflect cost causation; that is, the degree to which each class caused the utility to incur the cost.

**Q WHAT KEY PRINCIPLES ARE RECOGNIZED IN A CLASS COST-OF-SERVICE STUDY?**

A A properly conducted class cost-of-service study recognizes two key cost causation principles. First, customers are served at different delivery voltages. This affects the amount of investment the utility must make to deliver electricity to the meter. Second, since cost causation is also related to how electricity is used, both the timing and rate of energy consumption (*i.e.*, demand) are critical. Because electricity cannot be stored for any significant time period, a utility must acquire sufficient generation resources and construct the required transmission facilities to meet the maximum projected demand, including a reserve margin as a contingency against forced and unforced outages, severe weather, and load forecast error. Customers that use electricity during the critical peak hours cause the utility to invest in generation and transmission facilities.

**Appendix C**



Q **WHAT FACTORS CAUSE THE PER-UNIT COSTS TO DIFFER AMONG CUSTOMER CLASSES?**

A Factors that affect the per-unit cost include whether a customer's usage is constant or fluctuating (load factor), whether the utility must invest in transformers and distribution systems to provide the electricity at lower voltage levels, the amount of electricity that a customer uses, and the quality of service (*e.g.,* firm or non-firm). In general, industrial consumers are less costly to serve on a per unit basis because they:

      1. Operate at higher load factors;

      2. Take service at higher delivery voltages; and

      3. Use more electricity per customer.

A customer that purchases non-firm or interruptible service is receiving a lower quality of service than firm service. Thus, non-firm service is less costly per unit than firm service for customers that otherwise have the same characteristics.

Finally, a customer that assumes price risk, such as the case under Gulf's Schedule RTP (Real Time Pricing), is also less costly to serve. An RTP customer pays the hourly incremental cost plus a contribution to fixed costs. The incremental cost is not known until 24 hours prior to the next day. Thus, RTP is unlike any other rate.

All of these factors explain why some customers pay lower average rates than others.

For example, the difference in the losses incurred to deliver electricity at the various delivery voltages is a reason why the per-unit energy cost to serve is

**Appendix C**


**J. POLLOCK**
**INCORPORATED**

not the same for all customers. More losses occur to deliver electricity at distribution voltage (either primary or secondary) than at transmission voltage, which is generally the level at which industrial customers take service. This means that the cost per kWh is lower for a transmission customer than a distribution customer. The cost to deliver a kWh at primary distribution, though higher than the per-unit cost at transmission, is lower than the delivered cost at secondary distribution.

In addition to lower losses, transmission customers do not use the distribution system. Instead, transmission customers construct and own their own distribution systems. Thus, distribution system costs are not allocated to transmission level customers who do not use that system. Distribution customers, by contrast, require substantial investments in these lower voltage facilities to provide service. Secondary distribution customers require more investment than do primary distribution customers. This results in a different cost to serve each type of customer.

Two other cost drivers are efficiency and size. These drivers are important because most fixed costs are allocated on either a demand or customer basis.

Efficiency can be measured in terms of load factor. Load factor is the ratio of average demand (*i.e.*, energy usage divided by the number of hours in the period) to peak demand. A customer that operates at a high load factor is more efficient than a lower load factor customer because it requires less capacity for the same amount of energy. For example, assume that two customers



purchase the same amount of energy, but one customer has an 80% load factor and the other has a 40% load factor. The 40% load factor customers would have twice the peak demand of the 80% load factor customers, and the utility would therefore require twice as much capacity to serve the 40% load factor customer as the 80% load factor. Said differently, the fixed costs to serve a high load factor customer are spread over more kWh usage than for a low load factor customer.



**J.POLLOCK**
**INCORPORATED**

**ENTERGY TEXAS, INC.**
**Derivation of Test Year Adjusted**
**Purchased Power Capacity Costs**
**Year Ended June 30, 2011**

| Line | Description | Test Year Cost | Amount (MW-Months) | Unit Cost ($/kW-Month) Actual | Pro-Forma | Cost ($000) |
|------|-------------|-----------|----------|----------|----------|----------|
| | | (1) | (2) | (3) | (4) | (5) |
| 1 | **ETI Proposed Expense** | | | | | $276,242 |
| 2 | **Test Year Actual Expense** | | | | | 245,433 |
| | **Pro-Forma Adjustments (a)** | | | | | |
| 3 | Third Party Purchases | $30,939 | 5,584 | $5.541 | $5.381 | (891) |
| 4 | Affiliate Purchases | 189,032 | 21,670 | 8.723 | 8.656 | (1,462) |
| 5 | Reserve Equalization | 25,461 | 8,309 | 3.064 | 3.659 | 4,944 |
| 6 | Total | $245,433 | 35,563 | $6.901 | $6.940 | 248,024 |
| 7 | **Adjust Unit Cost for Expiration of the EAI-WBL Contract (b)** | | | | | (11,132) |
| 8 | Test Year Adjusted | | | | | 236,893 |
| 9 | Adjustment to ETI's Proposal | | | | | ($39,350) |

(a)  Column 5 = (Column 4 - Column 3) x Column 2.

(b)  Exhibit JP-2.

**ENTERGY TEXAS, INC.**
**Pro-Forma Adjustment to Recognize**
**the Expiration of the EAI-WBL Agreement**
**Year Ended June 30, 2011**
**(Units and Dollar Amounts in Thousands)**

| Line | Description | Amount |
|------|-------------|--------|
| | | (1) |
| 1 | Remove EAI-WBL Purchase for 7 Months | ($13,860) |
| | Increase Reserve Equalization Purchases: | |
| 2 | Additional Purchase (kW-Months) | 746 |
| 3 | Pro-Forma Unit Cost ($/kW-Month) | $3.659 |
| 4 | Incremental Reserve Equalization Purchases | $2,729 |
| 5 | Adjustment | ($11,132) |

**ENTERGY TEXAS, INC.**
**Schedule MSS-2 Equalization Calculation for May 2011**

| Line | Description | Reference | AR | LA | MS | NO | EGSL | ETI |
|------|-------------|-----------|-----|-----|-----|-----|------|-----|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1 | **Total Investment** | Input | $411,217,204 | $515,213,188 | $270,079,412 | $27,048,703 | $331,270,198 | $222,210,474 |
| 2 | Deferred Taxes | Input | 36,427,497 | 58,284,456 | 31,434,045 | 3,238,453 | 28,094,818 | 19,886,865 |
| 3 | Depreciation Reserve | Input | 159,055,766 | 175,602,699 | 92,625,850 | 14,199,888 | 161,930,338 | 57,270,189 |
| 4 | Net Transmission Investment | Input | $215,733,941 | $281,326,033 | $146,019,517 | $9,610,362 | $141,245,042 | $145,053,420 |
| | **Cost of Money** | | | | | | | |
| 5 | Debt Ratio (DR) | Input | 47.78% | 49.71% | 48.48% | 45.31% | 47.89% | 48.64% |
| 6 | Bond Cost (i) | Input | 6.14% | 6.80% | 6.19% | 6.08% | 5.87% | 5.35% |
| 7 | Preferred Ratio (PR) | Input | 3.95% | 2.27% | 3.58% | 4.73% | 0.36% | |
| 8 | Preferred Cost (p) | Input | 5.99% | 7.58% | 5.69% | 4.82% | 8.71% | |
| 9 | Common Ratio (ER) | Input | 48.27% | 48.02% | 47.94% | 49.96% | 51.75% | 51.36% |
| 10 | Common Cost (c) | Input | 11.00% | 11.00% | 11.00% | 11.00% | 11.00% | 11.00% |
| 11 | Cost of Money (COM) | L5xL6+L7xL8 +L9xL10 | 8.48% | 8.83% | 8.48% | 8.48% | 8.53% | 8.25% |
| 12 | **Tax Rate (F)** | Input | 3.58% | 3.41% | 3.39% | 3.58% | 3.58% | 3.04% |
| | **Operating Expenses** | | | | | | | |
| 13 | Depreciation Factor (D) | Input | 1.487% | 2.803% | 2.258% | 2.823% | 1.982% | 2.000% |
| 14 | Insurance Expense (I) | Input | | 0.439% | 0.409% | | 0.629% | 0.084% |
| 15 | Property Tax (PT) | Input | 0.454% | 0.912% | 1.741% | 1.122% | 0.851% | 0.751% |
| 16 | Franchise Tax (FT) | Input | 0.005% | | 0.102% | 0.149% | -0.001% | 0.148% |
| 17 | Operations & Maintenance | Input | 3.779% | 4.207% | 3.517% | 4.755% | 5.095% | 3.433% |
| 18 | Total Operating Expenses | Sum L13-17 | 5.724% | 8.361% | 8.026% | 8.849% | 8.555% | 6.416% |
| 19 | **Net Investment Ratio** | L4÷L1 | 52.462% | 54.604% | 54.065% | 35.530% | 42.637% | 65.277% |
| 20 | Annual Ownership Cost % | L11+L12+ (L18÷L26) | 22.971% | 27.557% | 26.716% | 36.963% | 32.179% | 21.123% |
| 21 | Annual Ownership Cost $ | L4xL20 | $49,555,755 | $77,525,900 | $39,009,863 | $3,552,252 | $45,451,387 | $30,639,937 |
| 22 | **System Average Annual Ownership Cost** | | | $245,735,094 | $938,988,315 | 26.17% | | |
| 23 | **System Average Monthly Ownership Cost** | | | | | 2.18% | | |
| 24 | Responsibility Ratio | Input | 20.88% | 25.97% | 13.63% | 4.56% | 18.87% | 16.09% |
| 25 | Transmission Responsibility | L24x $938,988,315 | $196,060,760 | $243,855,265 | $127,984,107 | $42,817,867 | $177,187,095 | $151,083,220 |
| 26 | Investment Difference | L25-L4 | ($19,673,181) | ($37,470,767) | ($18,035,409) | $33,207,505 | $35,942,053 | $6,029,800 |
| 27 | **Payment (Receipt)** | L26x2.18% | ($429,043) | ($817,181) | ($393,325) | $724,206 | $783,842 | $131,501 |

Source: ETI Response to Cities 1-1.

PUCT Docket 39896
Cities 3-3 (g)

**Entergy Operating Companies MSS-2 payments/(receipts) for the years 2006 - 2011**
**Credits reflect revenue (receipts); Debits reflect expense (payments)**

| Year | EAI | EGSI | ELL | EGSL | EMI | ENOI | ETI |
|------|-----|------|-----|------|-----|------|-----|
| 2006 | $ 7,691,868 | $ (2,649,584) | $ (8,111,212) | | $ (1,971,870) | $ 5,040,797 | |
| 2007 | 2,204,469 | 5,882,997 | (6,856,050) | | (5,962,975) | 4,731,559 | |
| 2008 | (1,415,587) | | (7,837,669) | 11,762,725 | (5,653,578) | 5,804,604 | (2,660,494) |
| 2009 | (3,812,177) | | (7,896,585) | 9,427,916 | (3,532,269) | 6,773,517 | (960,402) |
| 2010 | (4,909,612) | | (7,424,245) | 7,377,010 | (3,835,941) | 8,233,158 | 559,630 |
| 2011* | (2,104,269) | | (1,691,230) | 1,515,163 | (3,400,589) | 4,331,993 | 1,348,932 |
| Grand Total | $ (2,345,309) | $ 3,233,413 | $ (39,816,991) | $ 30,082,815 | $ (24,357,222) | $ 34,915,628 | $ (1,712,334) |

*2011 includes January - June 2011

**Entergy Operating Companies MSS-2 payments/(receipts) for the test year July 2010 - June 2011**
**Credits reflect revenue (receipts); Debits reflect expense (payments)**

| | EAI | ELL | EGSL | EMI | ENOI | ETI |
|------|-----|-----|------|-----|------|-----|
| 7/2010 - 6/2011 | $ (4,169,001) | $ (4,738,043) | $ 3,955,371 | $ (5,329,599) | $ 8,527,476 | $ 1,753,797 |

5

Exhibit JP-4

**ENTERGY TEXAS, INC.**
**Comparison of Book Reserve and**
**Theoretical Reserve By Function**
**At December 31, 2010**
**(Amounts in $000)**

| Line | Function | Book Reserve | Theoretical Reserve | Surplus (Deficiency) |
|:---:|---|---:|---:|---:|
| | | **(1)** | **(2)** | **(3)** |
| 1 | Production | $585,706 | $493,168 | $92,537 |
| 2 | Transmission | 247,315 | 243,665 | 3,650 |
| 3 | Distribution | 275,487 | 374,326 | (98,839) |
| 4 | General | $60,053 | $64,196 | ($4,144) |

**Source:** Direct Testimony of Dane A. Watson, Appendix A-1.

**ENTERGY TEXAS, INC.**
Comparison of Book Reserve and Theoretical Reserve
For the General Plant Accounts
At December 31, 2010
(Amounts in $000)

| Line | FERC Account | Description | Book Reserve (1) | Theoretical Reserve (2) | Surplus (Deficiency) (3) |
|------|------|------|------|------|------|
| 1 | 390.0 | Structures and Improvements | $20,410 | $16,821 | $3,589 |
| 2 | 391.1 | Office Furniture & Equipment | (923) | 471 | (1,394) |
| 3 | 391.2 | Computer Equipment | (4,440) | 10,790 | (15,229) |
| 4 | 391.3 | Data Handling Equipment | 4,053 | 698 | 3,354 |
| 5 | 392.0 | Transportation Equipment | (449) | 2 | (451) |
| 6 | 393.0 | Stores Equipment | 976 | 2,091 | (1,116) |
| 7 | 394.0 | Tools, Shop & Garage Equipment | 2,813 | 3,469 | (656) |
| 8 | 395.0 | Laboratory Equipment | (2,345) | 128 | (2,473) |
| 9 | 396.0 | Power Operated Equipment | 348 | 398 | (49) |
| 10 | 397.1 | Communication Equipment | (597) | 2,001 | (2,598) |
| 11 | 397.2 | Microwave and Fiber Optic | 40,511 | 26,894 | 13,616 |
| 12 | 398.0 | Misc. Equipment | (304) | 433 | (736) |
| 13 | Total | | $60,053 | $64,196 | ($4,144) |

**Source:** Direct Testimony of Dane A. Watson, Appendix A-1.

**ENTERGY TEXAS, INC.**
**Incentive Compensation Expense**
**For Year Ended June 30, 2011**

| Line | Incentive Plan | Included in Test Year Expense | | | Expense Related to Achieving Financial Objectives | | Source |
|---|---|---|---|---|---|---|---|
| | | ETI | ESI | Total | Percent | Amount | |
| | | (1) | (2) | (3) | (4) | (5) | (6) |
| | **Annual** | | | | | | |
| 1 | Management Incentive Plan | $1,184,200 | $3,564,998 | $4,749,198 | 0.0% | $0 | Cities 10-5 |
| 2 | Exempt Incentive Plan | 983,867 | 874,470 | 1,858,337 | 0.0% | 0 | Cities 10-6 |
| 3 | Teamsharing Incentive Plan | 71,466 | 81,981 | 153,447 | 0.0% | 0 | Cities 10-7 |
| 4 | Teamsharing Selected Bargaining Units Incentive Plan | 384,878 | 0 | 384,878 | 0.0% | 0 | Cities 10-8 |
| 5 | Operational Incentive Plan | 60,272 | 121,190 | 181,462 | 0.0% | 0 | Cities 10-11 |
| 6 | Executive Annual Incentive Plan[1] | 185,409 | 1,298,038 | 1,483,447 | ███ | 819,062 | Cities 10-4 |
| 7 | **Total Annual Plans** | **$2,870,092** | **$5,940,677** | **$8,810,769** | | **$819,062** | |
| | **Long Term** | | | | | | |
| 8 | Equity Ownership Plan | 193,187 | 4,368,180 | 4,561,367 | 100.0% | 4,561,367 | Cities 10-9 |
| 9 | Long Term Incentive Program | 16,652 | 213,004 | 229,656 | 100.0% | 229,656 | |
| 10 | Equity Awards Program | 0 | 83,460 | 83,460 | 100.0% | 83,460 | Cities 10-10 |
| 11 | Restricted Share Awards Program | 0 | 346,256 | 346,256 | 100.0% | 346,256 | |
| 12 | Restricted Stock Awards Program | 20,994 | 135,242 | 156,236 | 100.0% | 156,236 | |
| 13 | **Total Long Term Plans** | **$230,833** | **$5,146,142** | **$5,376,975** | | **$5,376,975** | |
| 14 | **Total** | **$3,100,925** | **$11,086,819** | **$14,187,744** | | **$6,196,037** | |

1) Financial related percent listed applies to ESI incentives only and is from Exhibit KGG-4.

**ENTERGY TEXAS, INC.**
**Year-To-Year Variation in Expenses by FERC Accounts**
**in Which MISO Transition Costs are Being Booked**
**(Amounts in $000)**

| Line | FERC Account | Description | CY 2009 vs. CY 2008 | CY 2010 vs. CY 2009 | D39896 vs. D37744 |
|------|------|------|------|------|------|
| | | | (1) | (2) | (3) |
| 1 | 500,506, 556,557 | Production O&M Expense | $678.0 | $748.0 | ($1,716.8) |
| 2 | 560,566, 575 | Transmission O&M Expense | 1,204.0 | 208.0 | 4,393.7 |
| 3 | 920 | A&G Salaries | 1,205.0 | 2,009.0 | 2,445.2 |
| 4 | 921 | Office Supplies & Expenses | (357.0) | 130.0 | (188.8) |
| 5 | 923 | Outside Services Employed | 459.0 | 2,807.0 | (3,271.0) |
| 6 | 926 | Pensions & Benefits | 4,484.0 | 4,219.0 | 5,524.0 |
| 7 | 928 | Regulatory Commission Exp. | 2,186.0 | 3,823.0 | (1,753.1) |
| 8 | 930 | General Advertising Exp. | (77.0) | 19.0 | (17.7) |
| 8 | | All Other Applicable Accounts | 1,465.0 | 10,968.0 | (21,422.1) |
| 9 | | Total | $11,247.0 | $24,931.0 | ($16,006.6) |

**ENTERGY TEXAS, INC.**
**Municipal Franchise Fee Rate**
**By City**
**Year Ended June 30, 2011**

| Line | Municipality | MFF Fee Rate ($/kWh) |
|------|--------------|----------------------|
|      |              | (1) |
| 1 | AMES | $0.002451 |
| 2 | ANAHUAC | $0.002119 |
| 3 | ANDERSON | $0.002438 |
| 4 | BEAUMONT | $0.002152 |
| 5 | BEDIAS | $0.002438 |
| 6 | BEVIL OAKS | $0.002472 |
| 7 | BREMOND | $0.002458 |
| 8 | BRIDGE CITY | $0.002398 |
| 9 | CALDWELL | $0.001272 |
| 10 | CALVERT | $0.002520 |
| 11 | CHESTER | $0.002400 |
| 12 | CHINA | $0.002475 |
| 13 | CLEVELAND | $0.002331 |
| 14 | COLMESNEIL | $0.002557 |
| 15 | CONROE | $0.001756 |
| 16 | CORRIGAN | $0.002381 |
| 17 | CUT AND SHOOT | $0.002386 |
| 18 | DAISETTA | $0.002045 |
| 19 | DAYTON | $0.002277 |
| 20 | DEVERS | $0.001283 |
| 21 | FRANKLIN | $0.002466 |
| 22 | GROVES | $0.000956 |
| 23 | GROVETON | $0.002503 |
| 24 | HARDIN | $0.002507 |
| 25 | HOUSTON | $0.001622 |
| 26 | HUNTSVILLE | $0.001905 |
| 27 | IOLA | $0.002438 |
| 28 | KOSSE | $0.002540 |
| 29 | KOUNTZE | $0.002114 |
| 30 | LIBERTY | $0.001320 |
| 31 | LUMBERTON | $0.002417 |
| 32 | MADISONVILLE | $0.002333 |
| 33 | MIDWAY | $0.002517 |
| 34 | MONTGOMERY | $0.002190 |
| 35 | NAVASOTA | $0.002275 |
| 36 | NEDERLAND | $0.002369 |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**
**Municipal Franchise Fee Rate**
**By City**
**Year Ended June 30, 2011**

| Line | Municipality | MFF Fee Rate ($/kWh) |
|------|--------------|----------------------|
|      |              | (1) |
| 37 | NEW WAVERLY | $0.002462 |
| 38 | NOME | $0.002026 |
| 39 | NORMANGEE | $0.002524 |
| 40 | NORTH CLEVELAND | $0.002534 |
| 41 | OAK RIDGE | $0.002333 |
| 42 | ORANGE | $0.001987 |
| 43 | PANORAMA VILLAGE | $0.002344 |
| 44 | PATTON VILLAGE | $0.002505 |
| 45 | PINE FOREST | $0.002521 |
| 46 | PINEHURST | $0.002213 |
| 47 | PLUM GROVE | $0.002444 |
| 48 | PORT ARTHUR | $0.001617 |
| 49 | PORT NECHES | $0.002320 |
| 50 | RIVERSIDE | $0.002347 |
| 51 | ROMAN FOREST | $0.002293 |
| 52 | ROSE CITY | $0.002644 |
| 53 | ROSE HILL ACRES | $0.002423 |
| 54 | SHENANDOAH | $0.001767 |
| 55 | SHEPHERD | $0.002431 |
| 56 | SILSBEE | $0.002375 |
| 57 | SOMERVILLE | $0.002449 |
| 58 | SOURLAKE | $0.002347 |
| 59 | SPLENDORA | $0.001988 |
| 60 | TAYLOR LANDING | $0.002026 |
| 61 | TODD MISSION | |
| 62 | TRINITY | $0.002425 |
| 63 | VIDOR | $0.002252 |
| 64 | WEST ORANGE | $0.002435 |
| 65 | WILLIS | $0.002056 |
| 66 | WOODBRANCH VILLAGE | $0.002453 |
| 67 | WOODLOCH | $0.002219 |
| 68 | WOODVILLE | $0.002312 |
| 69 | Total | $0.001965 |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**

**Inside City kWh Sales**
**Year Ended June 30, 2011**

| Line | Municipality | Residential | Small General Service | General Service | Large General Service | Large Industrial Power Service | Lighting | Total |
|------|--------------|-------------|------------------------|-----------------|------------------------|---------------------------------|----------|-------|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1 | AMES | 6,157,021 | 206,883 | 301,282 | 1,999,200 | | 108,197 | 8,772,583 |
| 2 | ANAHUAC | 14,643,734 | 1,138,842 | 13,028,157 | | | 284,537 | 29,095,270 |
| 3 | ANDERSON | 1,705,821 | 521,261 | 3,824,958 | | | 37,461 | 6,089,501 |
| 4 | BEAUMONT | 739,593,355 | 36,207,717 | 624,423,833 | 218,485,664 | 64,621,396 | 18,332,978 | 1,701,664,943 |
| 5 | BEDIAS | 2,448,073 | 330,732 | 618,998 | | | 29,035 | 3,426,838 |
| 6 | BEVIL OAKS | 10,929,135 | 145,053 | 808,011 | | | 89,265 | 11,971,464 |
| 7 | BREMOND | 5,811,742 | 676,387 | 4,049,345 | | | 72,105 | 10,609,579 |
| 8 | BRIDGE CITY | 54,255,959 | 2,365,682 | 38,275,228 | 2,234,880 | | 623,076 | 97,754,825 |
| 9 | CALDWELL | 295,496 | 3,177 | 13,023 | | | 919 | 312,615 |
| 10 | CALVERT | 7,323,896 | 900,284 | 3,854,934 | | | 194,140 | 12,273,254 |
| 11 | CHESTER | 1,023,056 | 115,158 | 611,019 | | | 27,936 | 1,777,169 |
| 12 | CHINA | 11,439,162 | 1,546,098 | 1,639,188 | | | 113,125 | 14,737,573 |
| 13 | CLEVELAND | 38,674,992 | 4,830,930 | 41,530,606 | 17,136,056 | | 1,104,650 | 103,277,234 |
| 14 | COLMESNEIL | 3,185,102 | 256,410 | 2,079,153 | | | 61,064 | 5,581,729 |
| 15 | CONROE | 303,187,965 | 31,025,071 | 329,345,475 | 120,579,498 | 172,314,355 | 4,635,593 | 961,087,957 |
| 16 | CORRIGAN | 8,072,612 | 755,542 | 8,500,041 | | 46,732,336 | 271,397 | 64,331,928 |
| 17 | CUT AND SHOOT | 4,353,035 | 613,855 | 2,462,696 | 508,000 | | 120,266 | 8,057,852 |
| 18 | DAISETTA | 6,877,044 | 209,145 | 3,325,886 | 3,361,560 | | 104,579 | 13,878,214 |
| 19 | DAYTON | 43,893,366 | 3,553,043 | 34,167,421 | 12,855,600 | 52,296,920 | 684,609 | 147,450,959 |
| 20 | DEVERS | 2,802,857 | 289,972 | 1,171,681 | | | 36,077 | 4,300,587 |
| 21 | FRANKLIN | 9,714,801 | 1,024,375 | 9,830,777 | | | 158,449 | 20,728,402 |
| 22 | GROVES | 104,638,646 | 3,192,396 | 35,267,871 | 6,734,600 | 266,112,000 | 1,195,841 | 417,141,354 |
| 23 | GROVETON | 6,194,245 | 1,023,700 | 5,460,351 | | | 189,334 | 12,867,630 |
| 24 | HARDIN | 6,695,543 | 490,882 | 3,148,276 | | | 65,063 | 10,399,764 |
| 25 | HOUSTON | 15,019,693 | 2,926,202 | 30,347,202 | 13,814,000 | | 354,874 | 62,461,971 |
| 26 | HUNTSVILLE | 154,587,193 | 12,877,624 | 120,983,287 | 45,081,770 | 107,136,710 | 2,292,012 | 442,958,596 |
| 27 | IOLA | 2,152,582 | 270,022 | 1,412,372 | | | 14,075 | 3,849,051 |
| 28 | KOSSE | 3,087,571 | 428,273 | 1,706,604 | | | 47,270 | 5,269,718 |
| 29 | KOUNTZE | 14,304,369 | 1,337,112 | 11,153,925 | 1,583,640 | | 439,574 | 28,818,620 |
| 30 | LIBERTY | 6,220,811 | 450,195 | 2,320,437 | | | 77,233 | 9,068,676 |
| 31 | LUMBERTON | 90,711,776 | 3,931,661 | 31,476,995 | 7,225,040 | | 651,483 | 133,996,955 |
| 32 | MADISONVILLE | 25,155,651 | 2,461,356 | 24,906,844 | 1,811,520 | | 816,026 | 55,151,397 |
| 33 | MIDWAY | 2,031,621 | 295,724 | 751,005 | | | 24,831 | 3,103,181 |
| 34 | MONTGOMERY | 4,945,988 | 1,305,548 | 11,375,280 | 2,856,500 | | 98,217 | 20,581,533 |
| 35 | NAVASOTA | 37,902,545 | 2,714,620 | 32,056,026 | 1,897,536 | | 686,057 | 75,256,784 |
| 36 | NEDERLAND | 117,250,421 | 5,617,612 | 55,055,938 | 13,691,576 | | 1,576,895 | 193,192,442 |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**

**Inside City kWh Sales**
**Year Ended June 30, 2011**

| Line | Municipality | Residential | Small General Service | General Service | Large General Service | Large Industrial Power Service | Lighting | Total |
|------|--------------|-------------|------------------------|-----------------|------------------------|--------------------------------|----------|-------|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 37 | NEW WAVERLY | 6,186,635 | 893,095 | 8,458,378 | | | 167,035 | 15,705,143 |
| 38 | NOME | 4,274,651 | 267,434 | 1,075,381 | | 13,022,800 | 71,834 | 18,712,100 |
| 39 | NORMANGEE | 4,685,684 | 733,269 | 3,259,918 | | | 80,407 | 8,759,278 |
| 40 | NORTH CLEVELAND | 1,417,547 | 196,521 | 1,122,735 | | | 31,110 | 2,767,913 |
| 41 | OAK RIDGE | 15,512,527 | 1,109,742 | 8,622,905 | | | 178,742 | 25,423,916 |
| 42 | ORANGE | 121,902,452 | 5,330,361 | 73,936,098 | 32,951,351 | | 2,925,545 | 237,045,807 |
| 43 | PANORAMA VILLAGE | 16,815,453 | 172,616 | 1,876,527 | | | 110,436 | 18,975,032 |
| 44 | PATTON VILLAGE | 9,459,936 | 280,712 | 1,334,672 | | | 85,543 | 11,160,863 |
| 45 | PINE FOREST | 3,766,926 | 102,190 | 857,056 | | | 43,011 | 4,769,183 |
| 46 | PINEHURST | 14,428,609 | 1,851,303 | 18,031,115 | | | 272,397 | 34,583,424 |
| 47 | PLUM GROVE | 5,154,686 | 179,925 | 765,435 | | | 29,587 | 6,129,633 |
| 48 | PORT ARTHUR | 300,821,530 | 16,667,738 | 242,108,335 | 96,641,180 | 264,640,399 | 6,811,573 | 927,690,755 |
| 49 | PORT NECHES | 95,876,203 | 2,976,909 | 33,013,147 | 2,259,840 | 8,923,880 | 1,373,819 | 144,423,798 |
| 50 | RIVERSIDE | 3,882,672 | 710,918 | 2,628,445 | | | 62,506 | 7,284,541 |
| 51 | ROMAN FOREST | 11,272,220 | 161,513 | 1,342,823 | | | 70,717 | 12,847,273 |
| 52 | ROSE CITY | 3,894,546 | 891,367 | 3,433,309 | | | 196,318 | 8,415,540 |
| 53 | ROSE HILL ACRES | 3,574,730 | 24,623 | 7,027 | | | 30,295 | 3,636,675 |
| 54 | SHENANDOAH | 17,151,497 | 3,571,029 | 66,710,837 | 39,257,020 | | 129,183 | 126,819,566 |
| 55 | SHEPHERD | 9,663,780 | 1,200,889 | 7,036,184 | | | 169,837 | 18,070,690 |
| 56 | SILSBEE | 44,893,519 | 2,807,085 | 33,187,092 | 7,331,904 | | 908,734 | 89,128,334 |
| 57 | SOMERVILLE | 9,542,370 | 694,038 | 6,802,405 | | | 140,964 | 17,179,777 |
| 58 | SOURLAKE | 13,320,335 | 1,150,526 | 4,819,631 | | | 314,910 | 19,605,402 |
| 59 | SPLENDORA | 11,050,470 | 1,649,924 | 13,254,466 | | | 242,380 | 26,197,240 |
| 60 | TAYLOR LANDING | 2,520,441 | 10,643 | | | | 22,050 | 2,553,134 |
| 61 | TODD MISSION | 225,749 | 8,849 | | | | 840 | 235,438 |
| 62 | TRINITY | 16,729,022 | 1,881,546 | 12,391,053 | 2,062,320 | | 420,205 | 33,484,146 |
| 63 | VIDOR | 75,343,633 | 5,062,074 | 39,005,260 | 14,398,460 | | 1,075,229 | 134,884,656 |
| 64 | WEST ORANGE | 22,726,786 | 1,228,941 | 9,810,641 | 12,834,736 | | 398,808 | 46,999,912 |
| 65 | WILLIS | 24,461,874 | 3,036,888 | 21,232,340 | 4,944,280 | | 548,569 | 54,223,951 |
| 66 | WOODBRANCH VILLAGE | 10,520,890 | 118,035 | 463,194 | | | 69,823 | 11,171,942 |
| 67 | WOODLOCH | 1,879,191 | 43,548 | 241,443 | | | 880 | 2,165,062 |
| 68 | WOODVILLE | 15,831,159 | 1,912,493 | 18,557,179 | 5,196,504 | | 527,683 | 42,025,018 |
| 69 | Total | 2,766,074,601 | 182,965,286 | 2,126,669,153 | 689,734,231 | 995,800,791 | 53,129,207 | 6,814,373,283 |
| 70 | **Percent of Total** | **40.59%** | **2.68%** | **31.21%** | **10.12%** | **14.61%** | **0.78%** | |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**

**Municipal Franchise Fees By Customer Class**
**Year Ended June 30, 2011**

| Line | Municipality | Residential | Small General Service | General Service | Large General Service | Large Industrial Power Service | Lighting | Total |
|---|---|---|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1 | AMES | $15,090 | $507 | $738 | $4,900 | $0 | $265 | $21,501 |
| 2 | ANAHUAC | 31,027 | 2,413 | 27,604 | 0 | 0 | 603 | 61,647 |
| 3 | ANDERSON | 4,159 | 1,271 | 9,326 | 0 | 0 | 91 | 14,847 |
| 4 | BEAUMONT | 1,591,901 | 77,933 | 1,344,010 | 470,269 | 139,091 | 39,460 | 3,662,664 |
| 5 | BEDIAS | 5,969 | 806 | 1,509 | 0 | 0 | 71 | 8,355 |
| 6 | BEVIL OAKS | 27,018 | 359 | 1,998 | 0 | 0 | 221 | 29,595 |
| 7 | BREMOND | 14,285 | 1,663 | 9,953 | 0 | 0 | 177 | 26,078 |
| 8 | BRIDGE CITY | 130,107 | 5,673 | 91,785 | 5,359 | 0 | 1,494 | 234,418 |
| 9 | CALDWELL | 376 | 4 | 17 | 0 | 0 | 1 | 398 |
| 10 | CALVERT | 18,455 | 2,269 | 9,714 | 0 | 0 | 489 | 30,926 |
| 11 | CHESTER | 2,456 | 276 | 1,467 | 0 | 0 | 67 | 4,266 |
| 12 | CHINA | 28,314 | 3,827 | 4,057 | 0 | 0 | 280 | 36,479 |
| 13 | CLEVELAND | 90,136 | 11,259 | 96,791 | 39,937 | 0 | 2,574 | 240,698 |
| 14 | COLMESNEIL | 8,146 | 656 | 5,317 | 0 | 0 | 156 | 14,275 |
| 15 | CONROE | 532,428 | 54,483 | 578,364 | 211,750 | 302,601 | 8,141 | 1,687,767 |
| 16 | CORRIGAN | 19,220 | 1,799 | 20,238 | 0 | 111,265 | 646 | 153,168 |
| 17 | CUT AND SHOOT | 10,387 | 1,465 | 5,877 | 1,212 | 0 | 287 | 19,228 |
| 18 | DAISETTA | 14,061 | 428 | 6,800 | 6,873 | 0 | 214 | 28,375 |
| 19 | DAYTON | 99,945 | 8,090 | 77,799 | 29,272 | 119,080 | 1,559 | 335,746 |
| 20 | DEVERS | 3,596 | 372 | 1,503 | 0 | 0 | 46 | 5,518 |
| 21 | FRANKLIN | 23,958 | 2,526 | 24,244 | 0 | 0 | 391 | 51,118 |
| 22 | GROVES | 100,055 | 3,053 | 33,723 | 6,440 | 254,456 | 1,143 | 398,871 |
| 23 | GROVETON | 15,501 | 2,562 | 13,665 | 0 | 0 | 474 | 32,201 |
| 24 | HARDIN | 16,787 | 1,231 | 7,893 | 0 | 0 | 163 | 26,073 |
| 25 | HOUSTON | 24,356 | 4,745 | 49,211 | 22,401 | 0 | 575 | 101,288 |
| 26 | HUNTSVILLE | 294,473 | 24,531 | 230,461 | 85,876 | 204,085 | 4,366 | 843,792 |
| 27 | IOLA | 5,248 | 658 | 3,444 | 0 | 0 | 34 | 9,385 |
| 28 | KOSSE | 7,844 | 1,088 | 4,335 | 0 | 0 | 120 | 13,387 |
| 29 | KOUNTZE | 30,232 | 2,826 | 23,574 | 3,347 | 0 | 929 | 60,908 |
| 30 | LIBERTY | 8,212 | 594 | 3,063 | 0 | 0 | 102 | 11,972 |
| 31 | LUMBERTON | 219,272 | 9,504 | 76,087 | 17,465 | 0 | 1,575 | 323,902 |
| 32 | MADISONVILLE | 58,676 | 5,741 | 58,095 | 4,225 | 0 | 1,903 | 128,641 |
| 33 | MIDWAY | 5,113 | 744 | 1,890 | 0 | 0 | 62 | 7,810 |
| 34 | MONTGOMERY | 10,833 | 2,860 | 24,915 | 6,257 | 0 | 215 | 45,080 |
| 35 | NAVASOTA | 86,240 | 6,177 | 72,937 | 4,317 | 0 | 1,561 | 171,232 |
| 36 | NEDERLAND | 277,766 | 13,308 | 130,428 | 32,435 | 0 | 3,736 | 457,673 |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**

**Municipal Franchise Fees By Customer Class**
**Year Ended June 30, 2011**

| Line | Municipality | Residential | Small General Service | General Service | Large General Service | Large Industrial Power Service | Lighting | Total |
|---|---|---|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 37 | NEW WAVERLY | 15,228 | 2,198 | 20,820 | 0 | 0 | 411 | 38,658 |
| 38 | NOME | 8,659 | 542 | 2,178 | 0 | 26,379 | 146 | 37,904 |
| 39 | NORMANGEE | 11,829 | 1,851 | 8,229 | 0 | 0 | 203 | 22,112 |
| 40 | NORTH CLEVELAND | 3,591 | 498 | 2,844 | 0 | 0 | 79 | 7,013 |
| 41 | OAK RIDGE | 36,186 | 2,589 | 20,115 | 0 | 0 | 417 | 59,306 |
| 42 | ORANGE | 242,269 | 10,594 | 146,941 | 65,488 | 0 | 5,814 | 471,105 |
| 43 | PANORAMA VILLAGE | 39,415 | 405 | 4,399 | 0 | 0 | 259 | 44,477 |
| 44 | PATTON VILLAGE | 23,699 | 703 | 3,344 | 0 | 0 | 214 | 27,960 |
| 45 | PINE FOREST | 9,495 | 258 | 2,160 | 0 | 0 | 108 | 12,021 |
| 46 | PINEHURST | 31,932 | 4,097 | 39,905 | 0 | 0 | 603 | 76,537 |
| 47 | PLUM GROVE | 12,600 | 440 | 1,871 | 0 | 0 | 72 | 14,983 |
| 48 | PORT ARTHUR | 486,428 | 26,952 | 391,489 | 156,269 | 427,924 | 11,014 | 1,500,076 |
| 49 | PORT NECHES | 222,414 | 6,906 | 76,584 | 5,242 | 20,702 | 3,187 | 335,034 |
| 50 | RIVERSIDE | 9,113 | 1,669 | 6,169 | 0 | 0 | 147 | 17,098 |
| 51 | ROMAN FOREST | 25,845 | 370 | 3,079 | 0 | 0 | 162 | 29,457 |
| 52 | ROSE CITY | 10,296 | 2,356 | 9,076 | 0 | 0 | 519 | 22,247 |
| 53 | ROSE HILL ACRES | 8,663 | 60 | 17 | 0 | 0 | 73 | 8,813 |
| 54 | SHENANDOAH | 30,307 | 6,310 | 117,879 | 69,368 | 0 | 228 | 224,092 |
| 55 | SHEPHERD | 23,496 | 2,920 | 17,107 | 0 | 0 | 413 | 43,936 |
| 56 | SILSBEE | 106,604 | 6,666 | 78,806 | 17,410 | 0 | 2,158 | 211,644 |
| 57 | SOMERVILLE | 23,372 | 1,700 | 16,661 | 0 | 0 | 345 | 42,078 |
| 58 | SOURLAKE | 31,267 | 2,701 | 11,313 | 0 | 0 | 739 | 46,020 |
| 59 | SPLENDORA | 21,973 | 3,281 | 26,356 | 0 | 0 | 482 | 52,092 |
| 60 | TAYLOR LANDING | 5,105 | 22 | 0 | 0 | 0 | 45 | 5,172 |
| 61 | TODD MISSION | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 62 | TRINITY | 40,563 | 4,562 | 30,045 | 5,001 | 0 | 1,019 | 81,189 |
| 63 | VIDOR | 169,681 | 11,400 | 87,844 | 32,427 | 0 | 2,422 | 303,774 |
| 64 | WEST ORANGE | 55,331 | 2,992 | 23,885 | 31,247 | 0 | 971 | 114,426 |
| 65 | WILLIS | 50,299 | 6,244 | 43,658 | 10,166 | 0 | 1,128 | 111,495 |
| 66 | WOODBRANCH VILLAGE | 25,805 | 290 | 1,136 | 0 | 0 | 171 | 27,402 |
| 67 | WOODLOCH | 4,171 | 97 | 536 | 0 | 0 | 2 | 4,805 |
| 68 | WOODVILLE | 36,608 | 4,422 | 42,912 | 12,016 | 0 | 1,220 | 97,179 |
| 69 | Total | $5,653,887 | $373,792 | $4,290,189 | $1,356,969 | $1,605,583 | $108,965 | $13,389,386 |
| 70 | **Percent of Total** | **42.23%** | **2.79%** | **32.04%** | **10.13%** | **11.99%** | **0.81%** | **100.00%** |

**Source:** Response to TIEC 1-33 and 1-34.

**ENTERGY TEXAS, INC.**
**Allocation Factors for**
**Miscellaneous Gross Receipts Taxes**
**Test Year Ended June 30, 2011**
**(Dollar Amounts in 000's)**

| | | Inside City Revenues | |
| | | | Percent of |
| Line | Customer Class | Amount | Total |
| | | (1) | (2) |
| 1 | Residential Service | $313,368 | 49.90% |
| 2 | Small General Service | 20,935 | 3.33% |
| 3 | General Service | 181,122 | 28.84% |
| 4 | Large General Service | 51,284 | 8.17% |
| 5 | Large Industrial Power Service | 54,309 | 8.65% |
| 6 | Lighting Service | 7,006 | 1.12% |
| 7 | Total | $628,024 | 100.00% |

(1) Source: ETI's Response to TIEC 10-1.

**ENTERGY TEXAS, INC.**
**Revised Texas Retail Cost-of-Service Study at Present Rates**
**Excluding Purchased Power Capacity Costs**
**Test Year Ended June 30, 2011**
**(Dollar Amounts in 000's)**

| Line | Description | Texas Retail | Residential | Small General Service | General Service | Large General Service | Large Industrial Power Service | Lighting |
|---|---|---|---|---|---|---|---|---|
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1 | **Total Adjusted Rate Base** | $1,720,671 | $990,129 | $55,113 | $356,156 | $120,249 | $179,199 | $19,825 |
| | **Revenues** | | | | | | | |
| 2 | Total Adjusted Rate Schedule Revenues | 634,114 | 325,744 | 22,562 | 135,404 | 42,430 | 100,483 | 7,490 |
| 3 | Other Sales For Resale Revenues | 55,967 | 27,841 | 1,232 | 10,577 | 4,154 | 11,993 | 170 |
| 4 | Provision For Rate Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | Total Sales Revenue (L2 + L3 + L4) | 690,081 | 353,585 | 23,794 | 145,981 | 46,584 | 112,476 | 7,661 |
| 6 | Other Operating Revenues | 47,821 | 25,539 | 1,270 | 9,681 | 3,552 | 7,500 | 279 |
| 7 | Total Adjusted Revenues (L5 + L6) | 737,902 | 379,125 | 25,063 | 155,662 | 50,136 | 119,976 | 7,939 |
| 8 | **Total Adjusted Operating Expenses** | 485,122 | 257,784 | 16,633 | 98,034 | 32,314 | 73,301 | 7,057 |
| 9 | **Total Adjusted Operating Income (L7 - L8)** | $252,780 | $121,340 | $8,430 | $57,629 | $17,823 | $46,676 | $883 |
| 10 | **Rate Of Return (L9 ÷ L1)** | 14.69% | 12.25% | 15.30% | 16.18% | 14.82% | 26.05% | 4.45% |
| 11 | **Relative Rate of Return (L10 ÷ 14.69%)** | 100% | 83% | 104% | 110% | 101% | 177% | 30% |
| 12 | **Interclass Subsidy** | $0 | ($37,487) | $519 | $8,248 | $245 | $31,630 | ($3,154) |

**ENTERGY TEXAS, INC.**
**ETI's Proposed Class Revenue Allocation**
**Test Year Ended June 30, 2011**
**(Dollar Amounts in 000's)**

| Line | Rate Class | Present Non-Fuel Revenues | Proposed Base Revenue Increase | Percent Increase |
|---|---|---|---|---|
| | | (1) | (2) | (3) |
| 1 | Residential Service | $379,382 | $81,769 | 21.6% |
| 2 | Small General Service | 26,430 | 411 | 1.6% |
| 3 | General Service | 159,768 | 7,500 | 4.7% |
| 4 | Large General Service | 49,380 | 8,084 | 16.4% |
| 5 | Large Ind. Power Service | 104,308 | 11,226 | 10.8% |
| 6 | Lighting Service | 10,813 | 2,199 | 20.3% |
| 7 | Total | $730,080 | $111,189 | 15.2% |

**ENTERGY TEXAS, INC.**
**Recommended Class Revenue Allocation**
**Based on TIEC's Revised**
**Class Cost-of-Service Study**
**Test Year Ended June 30, 2011**
**(Dollar Amounts in 000's)**

| Line | Rate Class | Present Non-Fuel Revenues | Recommended Class Revenue Allocation Amount | Percent |
|------|------------|--------------------------:|--------------------------------------------:|--------:|
|      |            | (1) | (2) | (3) |
| 1 | Residential Service | $379,382 | $80,390 | 21.2% |
| 2 | Small General Service | 26,430 | 283 | 1.1% |
| 3 | General Service | 159,768 | 9,797 | 6.1% |
| 4 | Large General Service | 49,380 | 8,714 | 17.6% |
| 5 | Large Industrial Power Service | 104,308 | 9,862 | 9.5% |
| 6 | Lighting Service | 10,813 | 2,143 | 19.8% |
| 7 | Total | $730,080 | $111,189 | 15.2% |

**ENTERGY TEXAS, INC.**
**Recommended Class Revenue Allocation**
**Based on TIEC's Revised**
**Class Cost-of-Service Study**
**and Proposed Schedule SMS/AFC Rate Design**
**Test Year Ended June 30, 2011**
**(Dollar Amounts in 000's)**

| Line | Rate Class | Present Non-Fuel Revenues | Recommended Class Revenue Allocation | |
|---|---|---|---|---|
| | | | Amount | Percent |
| | | (1) | (2) | (3) |
| 1 | Residential Service | $379,382 | $81,500 | 21.5% |
| 2 | Small General Service | 26,430 | 340 | 1.3% |
| 3 | General Service | 159,768 | 10,205 | 6.4% |
| 4 | Large General Service | 49,380 | 8,860 | 17.9% |
| 5 | Large Industrial Power Service | 104,308 | 10,153 | 9.7% |
| 6 | Lighting Service | 10,813 | 2,160 | 20.0% |
| 7 | Total Rate Schedules | $730,080 | $113,218 | 15.5% |
| 8 | Schedule SMS/AFC Impacts | $13,816 | ($2,029) | -14.7% |
| 9 | Total Electricity Sales | $743,896 | $111,189 | 14.9% |

| | |
|---|---|
| Schedule SMS Impact | ($1,039) |
| Schedule AFC Impact | ($991) |

# ENTERGY TEXAS, INC.
## Schedule LIPS Rate Design
## Based on ETI's Proposed Revenue Requirement

| Line | Description | Revenue Requirement ($000) | Billing Units (000) | Unit Cost | Proposed Rates |
|------|-------------|---------------------------|---------------------|-----------|----------------|
| | | (1) | (2) | (3) | (4) |
| | **Demand-Related Costs** | | | | |
| 1 | Production: Generation | $13,198 | | | |
| 2 | Interruptible Credits | 1,126 | | | |
| 3 | Purchased Power Capacity | 56,456 | | | |
| 4 | Transmission | 20,629 | | | |
| 5 | Production/Transmission | 91,408 | 10,791.0 | $8.47 | $7.07 |
| 6 | Distribution | 744 | 748.8 | $0.99 | $1.82 |
| 7 | Total Demand-Related Costs | $92,152 | | | |
| 8 | **Customer-Related Costs** | 6,050 | 0.984 | $6,148 | $0 |
| 9 | **Energy-Related Costs** | $11,986 | 5,301,215 | $0.00226 | $0.00614 |

**Source:** Schedule P-6.2

**ENTERGY TEXAS, INC.**
**Derivation of Schedule SMS Charges**
**Based on ETI's Proposed Schedule LIPS Rate Design**
**(Amounts in Thousands)**

| Line | Description | Amount | Units | Source |
|------|-------------|--------|-------|--------|
|      |             | (1)    | (2)   | (3)    |
|      | **Billing Load Charge:** | | | |
| 1 | Schedule LIPS Production/Transmission Demand Charges | $7.07 | /kW | Exh. JP-14 |
| 2 | SMS/LIPS Coincidence Ratio | 12% | | Exh. JP-16 |
| 3 | Schedule SMS: Transmission Delivery | **$0.82** | /kW | L1 x L2 |
| 4 | Schedule LIPS Distribution Demand Charges | $1.82 | | Exh. JP-14 |
| 5 | Schedule SMS: Distribution Delivery | **$2.64** | /kW | L3 + L4 |
|   | **Energy Charges:** | | | |
| 6 | Schedule LIPS Non-Fuel Energy Charges | $0.00614 | /kWh | Exh. JP-14 |
| 7 | Relative Loss Factor: Transmission | 99.9% | | Note A |
| 8 | Off-Peak Energy Charge: Transmission | **$0.00614** | /kWh | L6 x L7 |
| 9 | Relative Loss Factor: Distribution | 104.1% | | Note A |
| 10 | Off-Peak Energy Charge: Distribution | **$0.00639** | /kWh | L6 x L9 |
| 11 | On-Peak Energy Charge | $0.00917 | | Page 2 |
| 12 | On-Peak Energy Charge: Transmission | **$0.00916** | /kWh | L11 x L7 |
| 13 | On-Peak Energy Charge: Distribution | **$0.00955** | /kWh | L12 x L7 |

| Note A | Energy Losses | Percent | Relative Losses |
|--------|---------------|---------|-----------------|
|        | Schedule LIPS | 1.8855% | |
|        | Transmission | 1.7700% | 99.9% |
|        | Distribution | 6.0428% | 104.1% |
|        | Source: P-7.2 Energy & Demand at Plant | | |

**ENTERGY TEXAS, INC.**
**Derivation of On-Peak Schedule SMS Energy Charge**
**Based on ETI's Proposed Schedule LIPS Rate Design**
**(Amounts in Thousands)**

| Line | Description | Amount | Units | Source |
|------|-------------|--------|-------|--------|
| | | (1) | | (2) |
| 1 | LIPS Demand Costs | $7.07 | /kW | |
| 2 | Demand Costs Recovered In Billing Load Charge | $0.89 | /kW | |
| 3 | Remaining Demand Costs to Collect in On-Peak Energy Charge | $6.18 | /kW | L1 - L2 |
| 4 | Weekdays Excluding Holidays | 255 | | |
| 5 | On-Peak Hours Per Day | 8 | | |
| 6 | On-Peak Hours | 2,040 | | |
| 7 | Additional On-Peak Energy Charge | $0.00303 | /kWh | L3 ÷ L6 |
| 8 | Schedule LIPS Non-Fuel Energy Costs | $0.00614 | /kWh | Exh. JP-14 |
| 9 | On-Peak Energy Charge | $0.00917 | /kWh | L7 + L8 |

## ENTERGY TEXAS, INC.
## Schedule SMS Coincidence Ratio

| Line | Period | Average 4CP Demand | Average Monthly Billing Demand | Coincidence Factor |
|------|--------|--------------------|--------------------------------|--------------------|
| | | (1) | (2) | (3) |
| 1 | 2007 | 47,600 | 441,154 | 11% |
| 2 | 2008 | 31,133 | 502,301 | 6% |
| 3 | 2009 | 25,017 | 516,532 | 5% |
| 4 | 2010 | 14,115 | 531,439 | 3% |
| 5 | 2011 | 57,468 | 497,199 | 12% |
| 6 | Test Year | 43,205 | 500,763 | 9% |
| 7 | Average 2007-2011 | | | 7% |
| 8 | LIPS | 668,467 | 899,246 | 74% |
| 9 | **Ratio of SMS to LIPS Coincidence Factor** | | | **12%** |

**Source:** Response to TIEC 6-3.

**ENTERGY TEXAS, INC.**
**Derivation of Option A Rider AFC Charge**
**At ETI's Proposed Revenue Requirements**

| Line | Description | Rate | Transmission | Distribution Demand |
|------|-------------|------|--------------|---------------------|
| | | (1) | (2) | (3) |
| 1 | **Method 1: Levelized Cost Analysis[1]** | 1.20% | | |
| | **Method 2: Revenue Requirement Analysis** | | | |
| 2 | Revenue Requirement ($000)[2] | | $114,237 | $177,594 |
| 3 | Plant in Service ($000)[3] | | $905,579 | $1,169,856 |
| 4 | Fixed Charge Rate[4] | 1.18% | 1.05% | 1.27% |
| 5 | **Recommendation** | 1.20% | | |

---

| | |
|---|---|
| 1 | Page 2. |
| 2 | Schedule P-6.1.2. |
| 3 | Schedule P-5. |
| 4 | Line 2 ÷ Line 3 ÷ 12 (Weighted 39% Transmission/61% Distribution). |

**ENTERGY TEXAS, INC.**
**Derivation of Option A Monthy Charge: Levelized Cost Analysis**

| Year | Facility Investment | Book Depreciation Expense | Accumulated Depreciation | Tax Depreciation Rates | ADIT | Net Rate Base | Rate Base Rev Req | O&M | Insurance & Property Tax | Total Annual Revenue Requirement Amount | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 1 | $1,000 | $33.33 | ($33.33) | 3.750% | ($1.46) | $965.21 | $111.17 | $31.90 | $9.76 | $186.17 | 18.62% |
| 2 | $1,000 | $33.33 | ($66.67) | 7.219% | ($15.06) | $918.28 | $105.76 | $31.90 | $9.76 | $180.76 | 18.08% |
| 3 | $1,000 | $33.33 | ($100.00) | 6.677% | ($26.76) | $873.24 | $100.58 | $31.90 | $9.76 | $175.57 | 17.56% |
| 4 | $1,000 | $33.33 | ($133.33) | 6.177% | ($36.71) | $829.95 | $95.59 | $31.90 | $9.76 | $170.59 | 17.06% |
| 5 | $1,000 | $33.33 | ($166.67) | 5.713% | ($45.04) | $788.29 | $90.79 | $31.90 | $9.76 | $165.79 | 16.58% |
| 6 | $1,000 | $33.33 | ($200.00) | 5.285% | ($51.87) | $748.13 | $86.17 | $31.90 | $9.76 | $161.16 | 16.12% |
| 7 | $1,000 | $33.33 | ($233.33) | 4.888% | ($57.31) | $709.35 | $81.70 | $31.90 | $9.76 | $156.70 | 15.67% |
| 8 | $1,000 | $33.33 | ($266.67) | 4.522% | ($61.48) | $671.86 | $77.38 | $31.90 | $9.76 | $152.38 | 15.24% |
| 9 | $1,000 | $33.33 | ($300.00) | 4.462% | ($65.43) | $634.57 | $73.09 | $31.90 | $9.76 | $148.09 | 14.81% |
| 10 | $1,000 | $33.33 | ($333.33) | 4.461% | ($69.37) | $597.29 | $68.79 | $31.90 | $9.76 | $143.79 | 14.38% |
| 11 | $1,000 | $33.33 | ($366.67) | 4.462% | ($73.32) | $560.01 | $64.50 | $31.90 | $9.76 | $139.50 | 13.95% |
| 12 | $1,000 | $33.33 | ($400.00) | 4.461% | ($77.27) | $522.73 | $60.21 | $31.90 | $9.76 | $135.20 | 13.52% |
| 13 | $1,000 | $33.33 | ($433.33) | 4.462% | ($81.22) | $485.45 | $55.91 | $31.90 | $9.76 | $130.91 | 13.09% |
| 14 | $1,000 | $33.33 | ($466.67) | 4.461% | ($85.17) | $448.17 | $51.62 | $31.90 | $9.76 | $126.62 | 12.66% |
| 15 | $1,000 | $33.33 | ($500.00) | 4.462% | ($89.12) | $410.88 | $47.32 | $31.90 | $9.76 | $122.32 | 12.23% |
| 16 | $1,000 | $33.33 | ($533.33) | 4.461% | ($93.06) | $373.60 | $43.03 | $31.90 | $9.76 | $118.03 | 11.80% |
| 17 | $1,000 | $33.33 | ($566.67) | 4.462% | ($97.01) | $336.32 | $38.74 | $31.90 | $9.76 | $113.73 | 11.37% |
| 18 | $1,000 | $33.33 | ($600.00) | 4.461% | ($100.96) | $299.04 | $34.44 | $31.90 | $9.76 | $109.44 | 10.94% |
| 19 | $1,000 | $33.33 | ($633.33) | 4.462% | ($104.91) | $261.76 | $30.15 | $31.90 | $9.76 | $105.15 | 10.51% |
| 20 | $1,000 | $33.33 | ($666.67) | 4.461% | ($108.86) | $224.48 | $25.85 | $31.90 | $9.76 | $100.85 | 10.09% |
| 21 | $1,000 | $33.33 | ($700.00) | 2.231% | ($105.00) | $195.00 | $22.46 | $31.90 | $9.76 | $97.46 | 9.75% |
| 22 | $1,000 | $33.33 | ($733.33) | | ($93.33) | $173.33 | $19.96 | $31.90 | $9.76 | $94.96 | 9.50% |
| 23 | $1,000 | $33.33 | ($766.67) | | ($81.67) | $151.67 | $17.47 | $31.90 | $9.76 | $92.47 | 9.25% |
| 24 | $1,000 | $33.33 | ($800.00) | | ($70.00) | $130.00 | $14.97 | $31.90 | $9.76 | $89.97 | 9.00% |
| 25 | $1,000 | $33.33 | ($833.33) | | ($58.33) | $108.33 | $12.48 | $31.90 | $9.76 | $87.48 | 8.75% |
| 26 | $1,000 | $33.33 | ($866.67) | | ($46.67) | $86.67 | $9.98 | $31.90 | $9.76 | $84.98 | 8.50% |
| 27 | $1,000 | $33.33 | ($900.00) | | ($35.00) | $65.00 | $7.49 | $31.90 | $9.76 | $82.49 | 8.25% |
| 28 | $1,000 | $33.33 | ($933.33) | | ($23.33) | $43.33 | $4.99 | $31.90 | $9.76 | $79.99 | 8.00% |
| 29 | $1,000 | $33.33 | ($966.67) | | ($11.67) | $21.67 | $2.50 | $31.90 | $9.76 | $77.49 | 7.75% |
| 30 | $1,000 | $33.33 | ($1,000.00) | | ($0.00) | $0.00 | $0.00 | $31.90 | $9.76 | $75.00 | 7.50% |
| Net Present Value | | $394.20 | | | | | $810.83 | $377.28 | $115.46 | $1,697.77 | |
| Levelized Payment | | $33.33 | | | | | $68.56 | $31.90 | $9.76 | $143.56 | |
| Levelized % (Annual) | | 3.33% | | | | | 6.86% | 3.19% | 0.98% | 14.36% | |
| **Levelized % (Monthly)** | | **0.28%** | | | | | **0.57%** | **0.27%** | **0.08%** | **1.20%** | |

| Inputs | Current | |
|---|---|---|
| Discount Rate | 7.49% | ETI proposed ROE and Capital Structure |
| Before-Tax Cost of Capital | 11.52% | |
| Depreciation Rate | 3.33% | 30 year life |
| Composite Income Tax Rate | 35.00% | |
| Annual O&M | $31.90 | Distribution O&M as a % of Gross Plant |
| Insurance & Property Tax | $9.76 | Expense as a % of Gross Plant Investment |
| O&M Ins & Prop Tax Growth Factor | 1.000 | |
| Assumed Investment | $1,000 | |

**Source: Response to TIEC 1-51 b,c,d**

**ENTERGY TEXAS, INC.**
**Derivation of Option B Rider AFC Charge**
**At ETI's Proposed Revenue Requirement**

| Line | Selected Recovery Term (Years) | Recovery Term Charge | Post Recovery Term Charge |
|------|------|------|------|
| | (1) | (2) | (3) |
| 1 | 1 | 10.88% | 0.35% |
| 2 | 2 | 5.39% | 0.35% |
| 3 | 3 | 3.92% | 0.35% |
| 4 | 4 | 3.20% | 0.35% |
| 5 | 5 | 2.76% | 0.35% |
| 6 | 6 | 2.48% | 0.35% |
| 7 | 7 | 2.28% | 0.35% |
| 8 | 8 | 2.14% | 0.35% |
| 9 | 9 | 1.97% | 0.35% |
| 10 | 10 | 1.94% | 0.35% |

See Page 2.

**ENTERGY TEXAS, INC.**

**Derivation of Option B Monthly Charges: Levelized Cost Analysis**

| | | Levelized Carrying Costs | | | | Monthly Charge | | | |
|---|---|---|---|---|---|---|---|---|---|
| Line | Recovery Term Years | Depreciation | Pretax Return | O & M | Property Tax & Insurance | Depreciation and Return | O & M | Property Tax & Insurance | Total |
| | | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 1 | 1 | $1,000.00 | $264.21 | $31.90 | $9.76 | 10.54% | 0.27% | 0.08% | 10.88% |
| 2 | 2 | $500.00 | $105.14 | $31.90 | $9.76 | 5.04% | 0.27% | 0.08% | 5.39% |
| 3 | 3 | $333.33 | $95.67 | $31.90 | $9.76 | 3.57% | 0.27% | 0.08% | 3.92% |
| 4 | 4 | $250.00 | $91.76 | $31.90 | $9.76 | 2.85% | 0.27% | 0.08% | 3.20% |
| 5 | 5 | $200.00 | $90.09 | $31.90 | $9.76 | 2.42% | 0.27% | 0.08% | 2.76% |
| 6 | 6 | $166.67 | $89.52 | $31.90 | $9.76 | 2.13% | 0.27% | 0.08% | 2.48% |
| 7 | 7 | $142.86 | $89.59 | $31.90 | $9.76 | 1.94% | 0.27% | 0.08% | 2.28% |
| 8 | 8 | $125.00 | $90.05 | $31.90 | $9.76 | 1.79% | 0.27% | 0.08% | 2.14% |
| 9 | 9 | $111.11 | $83.65 | $31.90 | $9.76 | 1.62% | 0.27% | 0.08% | 1.97% |
| 10 | 10 | $100.00 | $91.67 | $31.90 | $9.76 | 1.60% | 0.27% | 0.08% | 1.94% |
| 11 | Post Recovery | | | $31.90 | $9.76 | | 0.27% | 0.08% | 0.35% |

**ENTERGY TEXAS, INC.**
**Fixed Fuel Factor Loss Multiplier**
**Year Ended June 30, 2011**

| Line | Delivery Voltage | Energy Losses | New Loss Multiplier | Current Loss Multiplier | Percent Change |
|------|------------------|---------------|---------------------|-------------------------|----------------|
|      |                  | (1)           | (2)                 | (3)                     | (4)            |
| 1    | Secondary        | 8.8754%       | 1.023158            | 1.034603                | -1.1%          |
| 2    | Primary          | 6.0428%       | 0.996539            | 1.004911                | -0.8%          |
| 3    | Transmission < 230 KV | 2.3010%  | 0.961375            | 0.962921                | -0.2%          |
| 4    | Transmission >= 230 KV | 0.5774% | 0.945178           | 0.945741                | -0.1%          |
| 5    | System Average   | 6.4111%       |                     |                         |                |

| **Source:** | Schedule P-7.2. | Fixed Fuel Factor |
|-------------|-----------------|-------------------|

# ANDREWS
## ATTORNEYS KURTH LLP

RECEIVED

12 APR 30 PM 12: 04

PUBLIC UTILITY COMMISSION
FILING CLERK

111 Congress Avenue, Suite 1700
Austin, Texas 78701
512.320.9200 Phone
512.320.9292 Fax
andrewskurth.com

Meghan Griffiths
512.320.9214 Phone
512.320.9292 Fax
meghangriffiths@andrewskurth.com

April 30, 2012

Tracie Lowrey
Public Utility Commission of Texas
1701 N. Congress Ave.
Austin, Texas 78701

Re:   PUC Docket No. 39896, SOAH Docket No. 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, *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting* - **TIEC Errata to the Direct Testimony of Jeffry Pollock**

Dear Ms. Lowrey:

Texas Industrial Energy Consumers submits the attached errata to the Direct Testimony of Jeffry Pollock, which includes the revisions listed below. Please note that two pages of Mr. Pollock's testimony that are affected by the errata contain highly sensitive information. Corrected versions of the pages with highly sensitive information are attached separately and filed pursuant to the protective order in this docket. However, it should be noted that the highly sensitive information contained on those pages is not affected by the errata.

### Errata

- Page 9, lines 4-5

- Page 22, Table 1

- Page 23, line 2

- Page 25, lines 13-15

- Page 27, lines 6, 7, 12

- Page 39 - line 4

- Page 42, lines 17-18

- Page 48, Table 4

SOAH Docket No. 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
PUC Docket No. 39896

ENTERGY TEXAS, INC. RATE CASE

TIEC Exhibit No. 1D

Tracie Lowrey
April 30, 2012
Page 2

- Page 106, Exhibit JP-1

Very truly yours,

Meghan Griffiths

cc:    All parties of record

For all of these reasons, the Commission should reject any post-test year adjustments that use Rate Year projections for Test Year costs as ETI has done. If the Commission were to make such post-test year adjustments, however, the proper adjusted amount of purchased power capacity costs is $238.51 million or $6.651 per kW-Month, which is a reduction of $37.735 million from ETI's request.[1] The $37.735 million reduction is based on re-pricing Test Year capacity purchases under the known PPAs.

- Transmission Equalization Payments

ETI's proposed post-test year adjustment to transmission equalization payments should be rejected because ETI has failed to demonstrate that the requested pro-forma adjustment is known and measurable. Transmission equalization payments are a function of three variables: inter-transmission investment, ownership costs and responsibility ratios. Estimating these variables is susceptible to a host of uncertainties, such as the timing of new transmission investment, the cost of money, operating expenses, taxes and load growth, which determines the responsibility ratios. Further complicating the analysis is that such estimates require specific assumptions not only for ETI, but for all Entergy Operating Companies. Should the Commission decide that a pro-forma adjustment is appropriate, a reasonable approach would be to annualize the average monthly transmission equalization payments incurred by ETI from January through June 2011

---

[1] All amounts are stated on a Total Company basis.



Q HAVE YOU ANALYZED ETI'S PROPOSAL TO RECOVER PURCHASED POWER CAPACITY COSTS IN BASE RATES?

A Yes. ETI is proposing to recover $276 million of "adjusted test year" purchased power capacity costs in base rates.[8]

Q HOW WAS THE $276 MILLION DERIVED?

A ETI projected its capacity purchases under PPAs that would be in place during the Rate Year (June 2012-May 2013). It then substituted these Rate Year expenses for the Test Year expenses in determining ETI's overall cost of service in this proceeding.

Q ARE ETI'S RATE YEAR PURCHASES BASED ON THE SAME ASSUMPTIONS AS ITS TEST YEAR POWER PURCHASES?

A No. For example, the projected quantity of capacity purchases is clearly different in the Rate Year than during the Test Year as shown in the table below.

| Table 1: Rate Year vs. Test Year Quantities (MW-Months) | | |
|---|---|---|
| Purchase | Test Year | Rate Year |
| Third Party Purchases | 5,884 | 12,834 |
| Affiliate Purchases | 21,670 | 21,711 |
| MSS-1 Payments | 8,309 | 5,262 |
| Total | 35,863 | 39,807 |

---

[8] *Direct Testimony of Robert R. Cooper* at 20. Another ETI witness, Mr. Considine, stated that the amount of purchased power capacity costs ETI is seeking to recover are the costs that were removed from the Test Year. However, $246.6 million of costs were removed from the Test Year (Considine at 26 and Adjustment No. 24). This testimony is contradicted by Mr. Cooper's testimony.

2. Revenue Requirement Issues

J.POLLOCK
INCORPORATED

4

As can be seen, ETI's Rate Year purchases (39,807 MW-Months) would be nearly 11% higher than the corresponding Test Year purchases (35,863 MW-Months).

Q   WHY ARE RATE YEAR PURCHASES HIGHER THAN TEST YEAR PURCHASES?

A   Rate year purchases reflect the fact that ETI is projecting to serve additional load during the Rate Year. As discussed later, most of the $30 million spread between Rate Year ($276 million) and Test Year ($245 million) purchased power capacity costs is due to additional capacity purchases. These additional purchases are primarily related to meeting future loads, while maintaining an appropriate reserve margin.

Q   DID ETI MAKE ANY OTHER ADJUSTMENTS TO RATE YEAR PURCHASED POWER CAPACITY COSTS?

A   No. ETI did not recognize additional revenues from post-test year load growth. Thus, ETI's post-test year adjustment fails to recognize all attendant effects. Further, rates would be set using Rate Year costs and Test Year sales. Thus, this approach would clearly violate the Matching Principle as previously discussed.

Q   SHOULD ETI'S RATE YEAR PURCHASED POWER CAPACITY COSTS BE USED TO SET RATES IN THIS PROCEEDING?

A   No. ETI's use of Rate Year expenses is not consistent with accepted ratemaking practices or this Commission's rules. For all of these reasons, ETI's proposed post-test year adjustments should be rejected. Rates should be set using actual Test Year expenses.

---

2. Revenue Requirement Issues



J.POLLOCK
INCORPORATED

5

quantified Test Year per-unit costs (column 3) by dividing the Test Year costs (column 1) by the corresponding amount of Test Year capacity purchases (column 2). Pro-forma adjustments were made solely to recognize changes in per-unit capacity costs associated with known PPAs. The pro-forma unit costs are based on analysis of all known PPAs (column 4).

Q   HOW DID YOU QUANTIFY THE PRO-FORMA ADJUSTMENTS?

A   First, I categorized ETI's PPAs into three separate groups:

- Third-Party Purchases (line 3);
- Affiliate Purchases (line 4); and
- Reserve Equalization Payments (line 5).

I then applied the unit costs of the known PPAs (column 4) to Test Year capacity purchases (column 2). This resulted in adjusted Test Year purchased power capacity costs of about $250 million (line 6). This is slightly higher than ETI's actual Test Year costs and about $26 million below ETI's proposed adjusted Test Year expense ($276 million- $250 million).

Q   SHOULD ANY FURTHER ADJUSTMENTS BE MADE TO TEST YEAR PURCHASED POWER CAPACITY COSTS?

A   Yes. It is currently known that the EAI-WBL PPA will expire at the end of 2012. To ensure that rates reflect ETI's going-forward costs, Test Year expenses should be adjusted to recognize this known change.

---

2. Revenue Requirement Issues



J.POLLOCK
INCORPORATED

6

whether this agreement is prudent. Until such time as the Commission has determined a new EAI-WBL PPA is prudent, no post-test year adjustment associated with such a potential contract should be made in setting base rates.[10]

Q PLEASE SUMMARIZE YOUR RECOMMENDATION ON ETI'S ADJUSTED TEST YEAR OF PURCHASED POWER CAPACITY COSTS.

A Test Year adjusted purchased power capacity costs should be set at $238.51 million, or $6.651 per kW-Month ($238.51 million ÷ 35,863 MW-Months ÷ 1,000) on a Total Company basis. This is based on Test Year capacity purchases, and it reflects changes in the per-unit costs under all known PPAs. It also reflects the expiration of the EAI-WBL PPA, which is currently scheduled to occur during the Rate Year. The $238.51 million represents a $37.735 million reduction in ETI's proposed adjusted Test Year expense.

**Transmission Equalization Payments**

Q WHAT ARE TRANSMISSION EQUALIZATION PAYMENTS?

A The Entergy System Agreement (ESA) requires that all Entergy Operating Companies equalize certain transmission costs. The equalization process is

---

[10] However, if an adjustment is to be made, It should not exceed $5.944 million, which is derived as follows:

| Line | Description | Amount | Source |
|------|-------------|--------|--------|
| 1 | Demand Charge Differential Between the Original and New EAI-WBL Agreements (per kW-Month) | ■ | Derived from ETI's Responses To TIEC 5-1 (Addendum 1). |
| 2 | EAI-WBL Purchases Removed (MW-Months) | 746 | Exhibit JP-2, line 2. |
| 3 | Adjustment (Millions) | $5.944 | Line 1 x Line 2. |

This would result in adjusted Test Year purchased power capacity costs of $242.080 million, which is a reduction of $34.162 million from ETI's request.

**2. Revenue Requirement Issues**



J. POLLOCK
INCORPORATED

the deficient accounts will require a $1.3 million increase in the annual accruals to achieve full recovery over the remaining lives of the surplus accounts. Thus, the net impact of my recommended adjustments to ETI's Test Year depreciation expense would be $0.794 million, as shown in the following table.

| Table 2: Summary of Recommended Adjustments to Test Year Depreciation Expenses | | | |
|---|---|---|---|
| **Function** | **Amount ($ in Millions)** | | |
| | **Accruals As Filed** | **Adjusted Accruals** | **Difference** |
| General - Depreciable Accounts | $1,605 | $2,946 | $ 1,341 |
| General - Amortization Accounts | $5,947 | $5,947 | $ 0 |
| Deficient Reserve Amortization | $2,135 | $ 0 | ($2,135) |
| General Plant Total | $9,687 | $8,893 | ($ 794) |

**Q**   PLEASE SUMMARIZE YOUR RECOMMENDED DEPRECIATION EXPENSE.

**A**   The Commission should reject ETI's proposal to increase production depreciation rates at this time given that the production depreciation reserve has a considerable surplus. The Commission should also reject ETI's proposed general plant "catch-up" adjustment because the deficiency can largely be cured by reallocating the reserve from the surplus to the deficit general plant accounts. This recommendation reduces ETI's proposed depreciation expense by $1.950 million ($1,156,000 + $794,000) on a Total Company basis.

**Property Tax Expense**

**Q**   IS ETI PROPOSING TO ADJUST PROPERTY TAX EXPENSES?

**A**   Yes. ETI is proposing a $2.6 million pro-forma adjustment to Test Year expense.

---

2. Revenue Requirement Issues



**J. POLLOCK**
INCORPORATED

Entergy, the parent of ETI, should be disallowed on the basis that it benefits only shareholders not customers. As discussed later, at least $6.2 million of expense was incurred to achieve financial objectives and should be disallowed. This includes incentive compensation associated with affiliate (*i.e.,* Entergy Services, Inc.) expenses.

Q WHAT INCENTIVE COMPENSATION PLANS DOES ETI OFFER ITS EMPLOYEES?

A ETI and ESI have two primary types of incentive compensation plans:

1. Annual; and
2. Long-Term.

These plans and proposed Test Year expenses are listed on **Exhibit JP-7.**

Q WHAT ARE THE ANNUAL INCENTIVE COMPENSATION PLANS?

A There are various annual incentive compensation plans including the Management Incentive Plan, Exempt Incentive Plan, Teamsharing Incentive Plan, Teamsharing Selected Bargaining Units Incentive Plan and Operational Incentive Plan. In addition, there is also an Executive Annual Incentive Plan ("EAIP") for Entergy Company officers.

Q WHAT PERFORMANCE GOALS TRIGGER ADDITIONAL PAYOUTS UNDER THE ANNUAL PLANS?

A In general, the payouts under the Annual plans are based on cost control, operational and safety measures. In addition, ▮▮▮ of the ESI portion of the EAIP is related to financial measures such as earnings per share (EPS) and stock price.[20]

---

[20] Exhibit KGG-4 (Highly Sensitive).

2. Revenue Requirement Issues



J.POLLOCK
INCORPORATED

9

| Table 4. Entergy Matters Pertaining to Various PURA Requirements | |
|---|---|
| 38663 | Informational Project Relating To Filings By Entergy Texas At The Louisiana Public Service Commission Relating To The Entergy System Agreement And Possible Successor Arrangements |
| 38708 | Project To Investigate The Entergy Successor Arrangement |
| 37344 | Information Related To The Entergy Regional State Committee |
| 37338 | Commission Review Of Wholesale Market Issues Relating To Entergy Texas, Inc. |

Q    WHY ELSE SHOULD ETI'S PROPOSED DEFERRED ACCOUNTING REQUEST BE DENIED?

A    The projected transition costs are not material. ETI is currently projecting to incur $17 million of transition costs.[28] This equates to only $5.8 million per year, which is only 1% of ETI's Test Year operating revenues. Even at this level, the MISO transition costs are easily subsumed in the normal variation in ETI's year-to-year expenses, as shown in **Exhibit JP-8**.

Q    PLEASE EXPLAIN EXHIBIT JP-8.

A    **Exhibit JP-8** measures the year-to-year variation in operating expenses booked to those FERC Accounts in which ETI is proposing to record the MISO transition costs. The year-to-year variation is calculated for 3 separate time periods:

1. Calendar year 2009 versus year 2008;
2. Calendar year 2010 versus year 2009; and
3. Docket No. 39896 versus Docket No. 37744.

---

[28] *Supplemental Direct Testimony of Jay Lewis* at 5.



J. POLLOCK
INCORPORATED

## ENTERGY TEXAS, INC.
### Derivation of Test Year Adjusted
### Purchased Power Capacity Costs
### Year Ended June 30, 2011

| Line | Description | Test Year Cost | Amount (MW-Months) | Unit Cost ($/kW-Month) Actual | Unit Cost ($/kW-Month) Pro-Forma | Cost ($000) |
|------|-------------|---------|---------|--------|-----------|--------|
| | | (1) | (2) | (3) | (4) | (5) |
| 1 | **ETI Proposed Expense** | | | | | $276,242 |
| 2 | **Test Year Actual Expense** | | | | | 245,433 |
| | **Pro-Forma Adjustments (a)** | | | | | |
| 3 | Third Party Purchases | $30,939 | 5,884 | $5.258 | $5.381 | 723 |
| 4 | Affiliate Purchases | 189,032 | 21,670 | 8.723 | 8.656 | (1,462) |
| 5 | Reserve Equalization | 25,461 | 8,309 | 3.064 | 3.659 | 4,944 |
| 6 | Total | $245,433 | 35,863 | $6.844 | $6.940 | 249,638 |
| 7 | **Adjust Unit Cost for Expiration of the EAI-WBL Contract (b)** | | | | | (11,132) |
| 8 | Test Year Adjusted | | | | | 238,507 |
| 9 | Adjustment to ETI's Proposal | | | | | ($37,735) |

(a)   Column 5 = (Column 4 - Column 3) x Column 2.

(b)   Exhibit JP-2.

DOCKET NO. _32 901_

| APPLICATION OF ENTERGY | § | BEFORE THE |
|---|---|---|
| GULF STATES, INC. FOR | § | PUBLIC UTILITY COMMISSION |
| DETERMINATION OF HURRICANE | § | OF TEXAS |
| RECONSTRUCTION COSTS | § | |

2006 JUL -5 PM 2: 11

APPLICATION OF ENTERGY GULF STATES, INC.

FOR DETERMINATION OF

HURRICANE RECONSTRUCTION COSTS

JULY 5, 2006

Hurr Recon Costs                                                    1-001

This page intentionally left blank.

**ENTERGY GULF STATES, INC.**
**HURRICANE RECONSTRUCTION COSTS CASE**
**EXECUTIVE SUMMARY OVERVIEW**

Entergy Gulf States, Inc. ("EGSI" or the "Company") requests a determination by the Commission that its EGSI Texas retail-jurisdictional Hurricane Rita reconstruction costs of $393,236,384 were reasonable and necessary to enable EGSI to restore electric service to its Texas customers. With this determination, EGSI requests entry of a Commission order: (a) determining that such costs are eligible for recovery and securitization; (b) authorizing the Company to recover carrying costs; and (c) approving the manner in which hurricane reconstruction costs will be functionalized and allocated in a subsequent proceeding.

EGSI proves up the reasonableness and necessity of the $393.2 million by showing that, on a Total Company basis (that is, EGSI Texas and EGSI Louisiana combined), EGSI incurred $561.0 million in Hurricane Rita reconstruction costs based on the following functional cost classes:

| Class (Type) of Cost | Texas Retail Costs | Total Company Costs |
|---|---|---|
| Transmission | $36.7 million | $80.6 million |
| Generation | $5.1 million | $11.9 million |
| Other Plant/Support | $1.1 million | $2.4 million |
| Distribution-Texas | $350.3 million | $355.6 million |
| Distribution-Louisiana | -0- | $110.4 million |
| **Total** | **$393.2 million** | **$561.0 million** |

Sorted another way, the $393.2 million (Texas Retail) and the $561.0 million (Total Company) include the following categories of costs within the functional cost classes:

| Cost Category | Texas Retail Costs | Total Company Costs |
|---|---|---|
| Non-Entergy Contractors | $307.2 million | $428.3 million |
| EGSI Employee Expenses | $13.7 million | $19.3 million |
| EGSI Labor | $9.4 million | $15.6 million |
| Materials | $36.2 million | $55.1 million |
| Other Costs/Telecommunications/ Transportation | $18.1 million | $28.1 million |
| Affiliate Charges (ESI/Loaned Resources | $8.6 million | $14.5 million |
| **Total** | **$393.2 million** | **$561.0 million** |

1

Eleven witnesses support the Company's case. Their proof includes: detailed explanations of why and how the costs were incurred; the extraordinary scope of damage; cost controls, including oversight of contractors; reliance on pre-existing competitively-bid or negotiated contracts where possible; the need for quick and safe restoration; benchmarks comparing EGSI Texas' restoration efforts to other utilities; the cost recording, accounting, and review process; an independent third-party financial audit of the costs; affiliate cost proof discussion; potential insurance and grant payments; and a financial ratings agencies perspective.

Because of the 150-day processing timeline established by House Bill 163 for this case, and its unique nature, EGSI requests that the Commission hear this case directly.

The Commission's decision in this case concerning EGSI's reasonable and necessary costs associated with Hurricane Rita will define for the future the level of urgency a utility should employ in restoring service after a major weather event. The Commission should strive to create an incentive for Texas utilities to follow EGSI's example in taking all actions reasonably available to restore service as quickly as possible for the benefit of customers and the regional economy.

2

Hurr Recon Costs

1-004

| APPLICATION OF ENTERGY | § | BEFORE THE |
|---|---|---|
| GULF STATES, INC. FOR | § | PUBLIC UTILITY COMMISSION |
| DETERMINATION OF HURRICANE | § | OF TEXAS |
| RECONSTRUCTION COSTS | § | |

## APPLICATION OF ENTERGY GULF STATES, INC. FOR DETERMINATION OF HURRICANE RECONSTRUCTION COSTS

TO THE HONORABLE PUBLIC UTILITY COMMISSION OF TEXAS:

### I. EXECUTIVE SUMMARY

Entergy Gulf States, Inc. ("EGSI or the "Company") requests a determination by the Public Utility Commission of Texas ("Commission") that its EGSI Texas retail-jurisdictional Hurricane Rita reconstruction costs of $393,236,384, through March 31, 2006, were reasonable and necessary to enable EGSI to restore electric service to its Texas customers. With this determination, EGSI requests entry of a Commission order: (a) determining such costs are eligible for recovery and securitization; (b) authorizing the Company to recover carrying costs; and (c) approving the manner in which hurricane reconstruction costs will be functionalized and allocated in a subsequent proceeding.

Hurricane Rita was the most severe natural disaster ever to hit EGSI's service area in southeast Texas and southwest Louisiana. The storm severely damaged distribution and transmission facilities in Texas as well as causing damage to a majority of EGSI's generation resources. At the storm's peak, over 75% of the customers in EGSI's Texas service area were without service. Working with neighboring utilities, EGSI undertook significant efforts to restore service to its customers, managing to restore service to all customers who could receive service within 21 days. The costs of

1

Hurr Recon Costs                                                                    1-005

EGSI's reconstruction for both its Texas and Louisiana jurisdictions totaled almost $561 million through March 31, 2006. Of this amount, $393.2 million was incurred in Texas retail-jurisdictional costs for the same time period.

EGSI files this Application as authorized by House Bill 163, which the Texas Legislature passed and the Governor signed into law in May 2006. House Bill 163 states that EGSI is entitled to recover hurricane reconstruction costs consistent with the Bill. The Bill provides a detailed, specific definition of the term "hurricane reconstruction costs." Summarized, the "hurricane reconstruction costs" that EGSI is entitled to recover are: the reasonable and necessary costs, whether expensed, charged to the storm reserve, or capitalized, that EGSI incurred due to its own activities or activities conducted on its behalf by others, in connection with the restoration of service associated with electric power outages affecting EGSI's customers as a result of Hurricane Rita. The Bill states that these costs include costs for "mobilization, staging, and construction, reconstruction, replacement, or repair of electric generation, transmission, distribution, or general plant facilities." House Bill 163 also states that the hurricane reconstruction costs may include carrying charges, and that EGSI is enabled, through the Bill, to use securitization financing to obtain timely recovery of the reconstruction costs. EGSI requests the recovery of carrying costs on its Hurricane Rita expenditures and, in a future proceeding after the total Hurricane Rita reconstruction costs are determined in this docket, will request a securitization financing order to recover those costs.

EGSI's request for a determination of its Texas retail Hurricane Rita reconstruction costs incurred includes testimony and supporting exhibits sponsored by

2

Hurr Recon Costs

1-006

eleven witnesses. As is typical in cost-related applications filed by EGSI before the Commission, the majority of EGSI's witnesses focus on and support the Total Company costs: in this case, that is, the $561 million Total Company figure. The reason for this approach is that EGSI's books and records are maintained on a Total Company basis. The costs are recorded for the single legal entity — EGSI — rather than its two distinct internal functional operations — EGSI Texas and EGSI Louisiana. EGSI also presents witnesses who explain how to derive the Texas retail costs (the $393.2 million) from the Total Company $561 million Hurricane Rita costs.

Because of the 150-day processing timeline established by House Bill 163 for this case, and its unique nature, EGSI also requests that the Commission hear this case directly.

## A. Summary of Reconstruction Costs

At a summary level, the costs in this case are presented both by "class" of cost and by "category" of cost. In this Application, a class of cost is a distinct operational or functional grouping: transmission, generation, distribution, and "other plant/support." A "category" of cost is a different view that shows different types of activities or services that would be common to each of the classes — for example, external/third-party contractor costs; materials, telecommunications, etc. The following table shows the Hurricane Rita reconstruction costs, exclusive of carrying costs, by functional class at both the Texas Retail and at the Total Company levels:

3

| Class (Type) of Cost | Texas Retail Costs | Total Company Costs |
|---|---|---|
| Transmission | $36.7 million | $80.6 million |
| Generation | $5.1 million | $11.9 million |
| Other Plant/Support | $1.1 million | $2.4 million |
| Distribution Texas | $350.3 million | $355.6 million |
| Distribution Louisiana[1] | -0- | $110.4 million |
| **Total** | **$393.2 million** | **$561 million** |

The following table shows the *categories* of Hurricane Rita reconstruction costs at both the Texas Retail and the Total Company levels:

| Cost Category | Texas Retail Costs | Total Company Costs |
|---|---|---|
| Non-Entergy Contractors | $307.2 million | $428.3 million |
| EGSI Employee Expenses | $13.7 million | $19.3 million |
| EGSI Labor | $9.4 million | $15.6 million |
| Materials | $36.2 million | $55.1 million |
| Other Costs/Telecommunications/ Transportation | $18.1 million | $28.1 million |
| Affiliate Charges | $8.6 million | $14.5 million |
| **Total** | **$393.2 million** | **$561 million** |

The Company's presentation in this Application, however, is much more than simply dollar amounts segregated in different ways. The Company's witnesses provide detailed explanations as to:

- why Hurricane Rita was so destructive and thus costly;

- the unique issues faced by EGSI in the reconstruction; and

- the systems and practices in place or implemented in response to the storm to monitor, control, and reduce costs, while also expediting reconstruction in a safe and organized manner.

---

[1] EGSI Texas is not requesting recovery of any Distribution Louisiana costs; this amount is included in the $561 million Total Company figure as part of the Hurricane Rita reconstruction costs incurred by EGSI, but it is not in the $363.2 million specifically requested by EGSI Texas in this filing.

4

Hurr Recon Costs

1-008

## B.    Summary of Witnesses

In this Application, three witnesses directly support the reasonableness and necessity of the Hurricane Rita reconstruction costs based on the four functional cost classes:

- Joseph F. Domino, President and CEO of Entergy Texas, sponsors the Generation class and the Other Plant/Support class;

- Randall W. Helmick, Vice President for Transmission Services of Entergy Services, Inc. (ESI), sponsors the Transmission class; and

- John E. Mullins, Director of Distribution Operations for EGSI Texas sponsors the Distribution- Texas.

The following three Company witnesses explain the proposed regulatory treatment of the hurricane reconstruction costs, the detail to move from the $561 million in Total Company costs down to the $393.2 million in Texas retail costs, and then propose how those Texas costs should be functionalized and then allocated to the Texas retail customers:

- J. David Wright, Directory of Regulatory Accounting with ESI, addresses: accounting practices for identifying costs and deriving the Texas retail cost figure from the Total Company cost; regulatory asset treatment of the Texas retail cost; and request for carrying costs;

- Myra L. Talkington, Senior Staff Rate Analyst with ESI, addresses allocation of costs to the Texas retail jurisdiction and among the Texas retail jurisdiction rate classes and schedules; and

5

Hurr Recon Costs                                                    1-009

- Donald W. Peters, Manager, Revenue Requirements for ESI, addresses how the Company proposes to apply allocation methods and factors.

The remaining five EGSI witnesses provide further support for the reasonableness and necessity of the Hurricane Rita reconstruction costs as follows:

- Theodore H. Bunting, Jr., Vice President, CFO-Operations with ESI, addresses internal cost compilation, review, approval and recording practices; the "not higher than" and "at cost" prongs of the Texas affiliate cost recovery standard; and the status of potential insurance and grant payments;

- Michael A. Herman, a partner with PricewaterhouseCoopers, provides an external attestation review of the Company's storm reports;

- Steven M. Fetter, President of an external utility advisory firm, addresses credit ratings and how this proceeding can affect EGSI's credit ratings;

- John P. Hurstell, Vice President of Entergy Management, System Planning and Operations with ESI, describes the financial stress imposed by Hurricane Rita on EGSI, and the effect on EGSI's ability to transact with fuel and purchased power suppliers; and

- Grant L. Davies, CEO of Davies Consulting, Inc., provides an external assessment of the magnitude of Hurricane Rita, EGSI's performance prior to and during the Hurricane Rita reconstruction, and EGSI Texas' resource acquisition strategy.

### C.  Summary of Proof

The proof of why the Company's Hurricane Rita reconstruction costs were "reasonable and necessary" is led by the three cost class witness:  Messrs. Domino,

6

Hurr Recon Costs

1-010

Helmick, and Mullins. The bullet points below are derived primarily from the testimony and exhibits of those three witnesses. The remaining witnesses, however, are also crucial to the ultimate proof that the Company's claimed costs were, in fact and in law, reasonable and necessary.

- Hurricane Rita made landfall east of Sabine Pass in the early morning hours of September 24, 2005 and tracked northward along the Texas/Louisiana border, producing damaging and sustained hurricane and tropical storm force winds until the early hours of September 25.

- The Beaumont area, for example, experienced sustained winds of 81 mph and wind gusts of 105 mph with isolated reports up to 120 mph along with nine inches of rain during Hurricane Rita's life.

- At the peak of outages, 286,609 of EGSI's Texas customers were without electricity.

- Mr. Mullins testifies, based on his 21 years of experience as a first responder to several storm events, that Hurricane Rita cut one of the widest paths he had experienced, and that the damage was comparable to hundreds of tornadoes sweeping through southeast Texas.

- Despite Hurricane Rita being the most destructive storm to hit EGSI's Texas service territory in recent history, the Company, with the assistance of many outside contractors, was able to restore service to its entire system in only three weeks. This was achieved through pre-established plans and training, thoughtful deployment and reaction, and overall coordinated and management under EGSI's direction and control.

7

Hurr Recon Costs

1-011

- Before and during the storm, pre-established teams were mobilized to staging areas with initial materials to begin restoration as soon as safely possible. Internal communications and links with weather services and other first responders and officials were established. Company witness Domino, in particular, discusses the intensive communications established between EGSI, its customers, and the Commission and State government to coordinate and keep all parties informed and involved.

- During and immediately after the hurricane, a priority was to safely and timely mobilize our internal crews, and to secure outside crews from other utilities and third-party contractors, to restore service as soon as possible. In all, over 11,000 workers were mobilized and coordinated by EGSI to restore service and reconstruct its electric system as a result of the damage caused by Hurricane Rita.

- The initial reconstruction efforts were done in accordance with a pre-established storm plan that anticipates natural disasters such as Hurricane Rita. Training related to the storm plan and its execution is conducted at least annually as part of the Company's annual system storm drill.

- EGSI, on a daily basis throughout the reconstruction effort, determined the number of crews and resources needed throughout its Texas territory for the reconstruction effort. This effort was coordinated between the distribution and transmission functions to ensure that distribution reconstruction was taking place in areas where transmission would be available and could support load. Crews

8

were deployed and released as necessary to achieve the work needed without waste or duplicate efforts.

- A high priority was to re-establish the transmission grid so that power could flow to reconstruct the damaged substations, and then on to the distribution feeders as they were repaired.

- The crews faced significant reconstruction obstacles caused by: (1) the hurricane, such as downed trees and debris across roadways, rights-of-way, and work sites, and soft ground from the heavy rain and flooding, which prevented truck access; (2) the original location of now-damaged equipment and downed lines behind buildings or in alleys; and (3) operational obstacles, such as the availability and access to staging areas that were being occupied by different groups of first responders, and the logistics of EGSI managing the mobilization, feeding, and lodging of internal and external reconstruction crews.

- Reconstruction as quickly as possible, but also as safely as possible, was critical to get basic human services back up and running, such as hospitals, water and sewage facilities, the Department of Energy's Strategic Petroleum Reserve, petrochemical plants, and interstate natural gas pipeline pumping stations. Reconstruction costs could potentially have been reduced if service restoration had been prioritized on a slower track. But a slower track would have been detrimental to the local, State, and national economies, and was not favored by the local, State, and federal authorities.

- Company witnesses Domino, Helmick, and Mullins explain in detail what types of costs were incurred within their respective functional cost classes, and within the

9

Hurr Recon Costs

cost categories within their classes, and why these costs were incurred at the stated levels.

- Contract work provided by third-party independent contractors and non-Entergy utilities make up a majority of the reconstruction costs. Crews were brought in from as far away as New York State to assist in the effort, and this just a month after Hurricane Katrina had destroyed vast areas along the Gulf Coast and New Orleans.

- Independent (third-party) contractor companies were needed to assist in the emergency reconstruction. These contractors were needed to assist Company crews to: repair damaged electrical infrastructure, remove or trim back downed vegetation, provide emergency logistics support (including transportation, food and housing) and other emergency, short-term services. Many of the contracts with these vendors had been negotiated prior to the 2005 hurricane season and executed at pre-storm, competitive rates. Additional independent contractors who were not pre-signed with EGSI were needed for the reconstruction; their rates were also negotiated at competitive rates that took into account the contractors' skills, capabilities, work product, and safety practices.

- Utilities not affiliated with EGSI sent crews to assist in the reconstruction effort. The "mutual-aid" utilities services were paid for at the cost incurred by those utilities, without markup.

- EGSI's affiliated utilities also sent "loaned resource" crews to assist in the reconstruction effort. These affiliated crews (and others) were just coming off, or

10

14

being redeployed from, the restoration efforts from Hurricane Katrina. They were also reimbursed at their normal pay level with no markup.

- In addition to prudent contracting practices, EGSI was able to increase productivity and decrease restoration time by staging crews close to their designated repair sectors and engaging in night-time refueling and equipment maintenance.

- The Company's witnesses accurately refer to the combined groups of EGSI employees, affiliated utility employees, mutual aid utility employees, and third-party contractors as an "army." In this case, a specialized and competent, well organized and managed army that worked individual extended shifts of up to 16 hours per day.

- Company witness Davies provides an independent assessment of the EGSI's response to Hurricane Rita. Based on his experience and after-action review of the Company's response to the storm, Mr. Davies concludes that EGSI, among other things: brought in the appropriate number of off-system line and vegetation crews; responded to Hurricane Rita consistent with generally-accepted utility restoration practices; had consistently expended more than most of the comparable utilities in maintaining its transmission and distribution infrastructure, meaning that the resulting damage was caused by the storm, and not by inadequate prior maintenance practices.

- At the field level, the cost witnesses prove that the Hurricane Rita costs were reasonable and necessary because the Company anticipated and planned for

11

Hurr Recon Costs                                              1-015

the storm, organized and managed the reconstruction activities admirably under the circumstances, and did so quickly and safely.

- Invoices for reconstruction services and materials were reviewed, verified, and, if verified to be correct, approved for payment by EGSI personnel familiar with the work subject to the invoices. Invoices and charges were also reviewed and audited by internal accounting personnel for accuracy. Company witnesses Bunting and Herman, in particular, describe the internal and external audits of the Hurricane Rita costs to ensure accuracy of costs and the accounting system.

- Mr. Bunting also primarily describes the Company's internal accounting system and the process through which Hurricane Rita reconstruction costs were received and recorded into the Company's accounting system. His testimony, in part, verifies the accuracy and control of the accounting system to properly record the Hurricane Rita reconstruction costs.

- The affiliate cost portion of this case is a fraction of the total cost: less than 3% of the Total Company cost. The cost witnesses explain why theses affiliate costs, as distinct from the costs incurred directly by EGSI (the "non-affiliate" costs) meet the first two of four prongs of the affiliate cost recovery test: that is, the costs are (1) reasonable and (2) necessary. Company witness Bunting then explains why these affiliate costs satisfy the third and fourth prongs of that test: that the affiliate charges are (3) "not higher than" the charges by the affiliate to others; and (4) the affiliate charges "reasonably approximate the actual cost" of the affiliate's service.

12

- Company witnesses Fetter and Hurstell address financial issues that resulted from, or that can result from, a storm such as Hurricane Rita. Mr. Fetter addresses the financial credit ratings that apply to and affect EGSI, and how adverse ratings can affect a utility's cost of capital to the detriment of customers. He testifies as to the importance of the prompt and full recovery of reasonable and necessary costs incurred as a result of Hurricane Rita. He also explains why it is appropriate for EGSI to recover the time value of its Hurricane Rita expenditures. On a related point, Mr. Hurstell describes the financial stress that Hurricane Rita placed on EGSI, particularly the difficulties in procuring fuel and purchased power from suppliers concerned over EGSI's financial health resulting from the storm.

- Company witnesses Wright, Talkington, and Peters address the "rates" aspects of this filing. They explain how the Total Company costs are assigned or allocated from $561 million down to the $393.2 million Texas retail level; and how the resulting costs should be functionalized and then allocated among the Texas retail customer classes and schedules.

- Mr. Wright also specifically addresses the carrying charges that should be applied to the hurricane reconstruction costs. He explains that the carrying charge rate should be the Company's weighted average cost of capital from the date on which the cost was incurred until the date hurricane reconstruction bonds are issued pursuant to a financing order to be issued in a future docket.

13

Hurr Recon Costs

## D. Conclusion to Executive Summary

The Commission's decision in this case concerning EGSI's reasonable and necessary costs associated with Hurricane Rita will define for the future the level of urgency a utility should employ in restoring service after a major weather event. The Commission should strive to create an incentive for Texas utilities to follow EGSI's example in taking all actions reasonably available to restore service as quickly as possible for the benefit of customers and the regional economy.

## II. BUSINESS ADDRESS AND AUTHORIZED REPRESENTATIVES

The business address of the Company is:

Entergy Gulf States, Inc.
350 Pine Street
Beaumont, Texas 77701.

The business mailing address of the Company is:

Entergy Gulf States, Inc.
P.O. Box 2951
Beaumont, Texas 77704.

The business telephone number of the Company is (409) 838-6631.

14

Hurr Recon Costs

1-018

The authorized representatives of the Company in this proceeding are:

Jack Blakley
Vice President, Regulatory Affairs
Entergy Gulf States, Inc.
Suite 840
919 Congress Ave.
Austin, Texas 78701
512-487-3975
(Fax) 512-487-3998

L. Richard Westerburg, Jr.
Assistant General Counsel
Entergy Services, Inc.
Suite 701
919 Congress Ave.
Austin, Texas 78701
512-487-3957
(Fax) 512-487-3958

Inquiries and pleadings concerning this Application should be directed to the

following representative:

L. Richard Westerburg, Jr.
Assistant General Counsel
Entergy Services, Inc.
Suite 701
919 Congress Ave.
Austin, Texas 78701
512-487-3957
(Fax) 512-487-3958

## III.    JURISDICTION AND AFFECTED PARTIES

The Commission has jurisdiction over EGSI and the subject matter of this

Application by virtue of Section 32.001 of the Public Utility Regulatory Act (PURA) and

House Bill 163, codified into PURA primarily at §§ 39.458 - .463.  A copy of House Bill

163 is included as Attachment A to this Application.

15

Hurr Recon Costs                                                    1-019

The parties, classes of customers, and territories that would be affected by approval of this Application are all customers who currently take or will take retail electric service from EGSI in EGSI's Texas service territory.

## IV. NOTICE

House Bill 163, PURA § 39.462(e), explicitly states that "a rate proceeding under Chapter 36 is not required to determine the amount of recoverable hurricane reconstruction costs as provided by this section." Therefore, the notice requirements specified in P.U.C. PROC. R. 22.51, which apply to Chapter 36 proceedings, do not apply to this docket. Rather, P.U.C. PROC. R. 22.55 applies in this docket, which provides that the Presiding Officer may require a party to provide reasonable notice to affected persons. EGSI proposes the following with regard to public notice of this matter:[2]

1. the Company proposes to publish notice of this application by one-time publication in newspapers having general circulation in each county of the Company's Texas retail service area beginning as soon as practicable after filing this Application;

2. the Company will serve a copy of this filing on all active parties who intervened in the Company's last general base rate filing before the Commission: Docket No. 30123, *Application of Entergy Gulf States, Inc. for Authority to Change Rates and Reconcile Fuel Costs*; and

3. the form of the notice to be provided is included as Attachment B to this Application. The Company requests that the Commission find that the Company's proposed notice is sufficient.

---

[2] This proposed form of notice is the same type of notice and form approved in Docket No. 31544, *Application of Entergy Gulf States, Inc. for Recovery of Transition to Competition Costs.*

16

Hurr Recon Costs                                                    1-020

## V. CONFIDENTIAL INFORMATION AND PROTECTIVE ORDER

Certain information that may be provided through the course of this proceeding may contain confidential or highly-sensitive information. To facilitate evaluation of this information by the Commission Staff and other parties in this proceeding, the Company has prepared a Protective Order that is included as Attachment C. The proposed Protective Order duplicates the protective order approved in the Company's currently pending fuel reconciliation proceeding, Docket No. 32710.[3] EGSI requests that the Protective Order be adopted for use in this proceeding.

## VI. CONCLUSION TO APPLICATION AND RELIEF REQUESTED

Through this Application, Entergy Gulf States, Inc. respectfully requests that the Commission:

1. hear this case directly;

2. declare that notice of this filing is sufficient and authorized as provided in Section IV above;

3. adopt the Protective Order provided in Attachment C for use in this docket;

4. within 150 days of this filing:

a) find the Company's Texas retail-jurisdictional hurricane reconstruction costs of $393,236,384, through March 31, 2006, to be reasonable and necessary and issue an order determining that amount of hurricane reconstruction costs eligible for recovery and securitization;

b) authorize the Company to recover, in the financing proceeding to be filed subsequent to this docket, carrying costs on the approved hurricane

---

[3] *Application of Entergy Gulf States, Inc. for the Authority to Reconcile Fuel and Purchased Power Costs* (filed May 15, 2006).

17

Hurr Recon Costs

1-021

reconstruction costs at the Company's weighted average cost of capital from the date on which the cost was incurred until the date transition bonds are issued pursuant to a financing order issued in the financing proceeding; and

c) approve the manner in which hurricane reconstruction costs will be functionalized and the associated revenue requirement allocated in the future financing proceeding, as discussed in the testimonies of Company witnesses Wright, Talkington, and Peters attached to this Application; and

5.   grant such other relief to which EGSI shows itself entitled.

18

Hurr Recon Costs

Respectfully submitted,

L. Richard Westerburg, Jr.
Steven H. Neinast
ENTERGY SERVICES, INC.
919 Congress Ave.
Suite 701
Austin, Texas 78701
(512) 487-3957 telephone
(512) 487-3958 facsimile

By: _____
L. Richard Westerburg, Jr.
State Bar No. 21216950

Mark Strain
Scott Olson
Clark, Thomas & Winters
A Professional Corporation
300 West 6th Street, 15th Floor
Austin, Texas 78701
(512) 472-8800
(512) 474-1129 (Fax)

Stephen Fogel
5806 Sierra Madre
Austin, Texas 78759-3924
(512) 487-3946
(512) 996-0983 (Fax)

ATTORNEYS FOR
ENTERGY GULF STATES, INC.

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served on all active parties of record in Docket No. 30123 on July 5, 2006, by hand-delivery, first class mail, or overnight delivery.

_____
L. Richard Westerburg, Jr.

19

Hurr Recon Costs

1-023

23

| APPLICATION OF ENTERGY GULF | § | PUBLIC UTILITY COMMISSION |
| STATES, INC. FOR DETERMINATION | § | |
| OF HURRICANE RECONSTRUCTION | § | OF TEXAS |
| COSTS | § | |

## ORDER

This Order approves the application of Entergy Gulf States, Inc. (EGSI) as modified through an unopposed Settlement Agreement (Agreement) filed in this docket on November 17, 2006. EGSI, the Public Utility Commission of Texas's Staff (Commission Staff), the Cities of Beaumont, Conroe, Groves, Pine Forest, Nederland, Port Neches, Rose City and Silsbee (collectively, Cities), the City of Port Arthur (Port Arthur), the Office of Public Utility Counsel (OPC), Texas Industrial Energy Consumers (TIEC), and the State of Texas (State) (collectively, Signatories) support the Agreement and request that the Public Utility Commission of Texas (Commission) approve the Agreement without modification. The East Texas Cooperatives (ETC)[1] state that they neither oppose nor support the Agreement and that they do not request an evidentiary hearing in this docket. This docket was processed in accordance with applicable statutes and Commission rules. EGSI's application, consistent with the Agreement, is approved.

The Commission adopts the following findings of fact and conclusions of law:

## I. Findings of Fact

### *Procedural History*

1. On July 5, 2006, EGSI filed an application, under §§ 39.458-.463 of the Public Utility Regulatory Act,[2] for: (1) a determination that the Hurricane Rita reconstruction costs in the amount of $393,236,384, incurred through March 31, 2006, are eligible for recovery and securitization; (2) authority to recover carrying costs at EGSI's weighted average

---

[1] East Texas Electric Cooperative, Inc., Tex-La Electric Cooperative of Texas, Inc., and Sam Rayburn G&T Electric Cooperative, Inc., collectively the East Texas Cooperatives.

[2] Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 1998 & Supp. 2006) (PURA).

cost of capital on those hurricane reconstruction costs from the date the costs were incurred through the date that transition bonds are issued under a financing order issued in a future docket in which EGSI requests a financing order (financing order proceeding); and (3) approval of the manner in which the hurricane reconstruction costs will be functionalized and the associated revenue requirement allocated in the financing order proceeding.

2.     EGSI's application, filed on July 5, 2006, included the prefiled direct testimony, exhibits, and workpapers of eleven witnesses in support of EGSI's request.

3.     EGSI's witnesses, as a whole, provide testimony that EGSI contends supports EGSI's requests.

4.     On July 7, 2006, the Commission issued Order No. 1, which provided for a protective order applicable to this docket and required comment on the proposed notice.

5.     On July 28, 2006, the Commission issued Order Requesting List of Issues, which requested that parties file lists of issues that may be addressed in this docket.

6.     On July 31, 2006, the Commission issued Order No. 6, which, among other things, established a procedural schedule applicable to this docket, including dates for parties to file testimony, discovery deadlines, and a November 1, 2006 commencement date for the Open Meeting hearing on the merits.

7.     The intervention deadline established for this docket was August 31, 2006.

8.     On or before August 31, 2006, the following parties filed unopposed motions to intervene, and their motions were granted by the Commission: OPC; Cities; TIEC; State; ETC; and Port Arthur.

9.     On September 1, 2006, EGSI filed its proof of notice.

10. On September 8, 2006, the Commission issued its Preliminary Order in this docket.

11. Discovery on EGSI's direct case concluded on September 19, 2006.

12. On October 9, 2006, all intervenors, except ETC, filed testimony and supporting documents addressing EGSI's application and direct testimony, and State and Port Arthur also filed statements of position.

13. All intervenors that filed testimony recommended various adjustments to the Hurricane Rita reconstruction costs and proposed carrying costs, or to the proposed functionalization and allocation, requested by EGSI.

14. On October 12, 2006, State and TIEC filed cross-rebuttal testimony.

15. On October 16, 2006, Commission Staff filed its testimony and a statement of position, which, among other things, recommended a lower carrying cost rate than EGSI had requested.

16. On October 17, 2006, the Commission issued Order No. 9, which, among other things, directed parties not prefiling direct testimony but wishing to participate in the hearing on the merits to file a statement of position no later than October 24, 2006.

17. On October 23, 2006, EGSI filed rebuttal testimony and a statement of position.

18. On October 27, 2006, the Commission issued Order No. 12, which ruled on EGSI's objections and motion to strike various portions of the pre-filed testimony and supporting documents filed by the intervenors.

19. At a prehearing conference convened on October 30, 2006, the Commission admitted into evidence: (a) all of the parties' pre-filed testimony and supporting documents, except as

modified or stuck by Order No. 12 and the parties' errata to their pre-filed evidence; (b) the parties' cross-examination exhibits; and (c) the parties' optional completeness exhibits. The Commission took under advisement the admissibility of several proffered exhibits pending its review of motions filed in response to Order No. 12. In addition, under Order No. 9, the parties were to convene on November 1, 2006, before the start of the hearing on the merits, for a continuation of the prehearing conference to address any remaining exhibit items.

20. On October 30, 2006, after the prehearing conference was concluded, the Commission issued Order No. 13, which ruled on State's and EGSI's motions filed in response to Order No. 12, clarified which portions of pre-filed testimony and supporting documents were modified or struck by Order No. 12, and admitted additional cross-examination exhibits.

21. On November 1, 2006, at the prehearing conference convened before the start of the hearing on the merits, the parties present requested a delay in the start of the hearing on the merits to enable them to continue settlement talks. The Commission granted the request.

22. Later in the morning of November 1, 2006, the parties present announced that they had reached a settlement on all issues, stated that there was no need to conduct a hearing on the merits, and requested the opportunity to prepare a settlement agreement to file with the Commission. The Commission granted the request.

23. On November 17, 2006, EGSI filed the Agreement, which resolves all issues in this docket, on behalf of itself, Commission Staff, and all active parties. The filing stated on behalf of ETC that ETC neither supports nor objects to the Agreement.

## *The Agreement*

24. Under the Agreement, the amount of EGSI's reasonable and necessary hurricane reconstruction costs incurred through March 31, 2006, that is eligible for recovery and

securitization is $381,236,384 plus carrying costs, as set forth in findings of fact 26 through 35.

25. The Agreement does not reflect or determine resolution of any hurricane reconstruction costs that were charged to EGSI's books after March 31, 2006.

26. In addition to $381,236,384, the Agreement authorizes EGSI to include in hurricane reconstruction costs and to securitize carrying costs at the rate of 7.9% per annum as reflected in Attachment A to this Order,[3] from the later of October 15, 2005 or the date incurred until the issuance of securitization bonds. The balance upon which carrying costs are determined will be reduced by the amount of insurance payments when received as provided in findings of fact 27 through 30.[4]

27. The Agreement directs EGSI to credit $65.7 million in the manner described in finding of fact 35, reflecting EGSI's expectation that it will receive insurance payments in that amount attributable to Texas Retail.

28. Under the Agreement, carrying costs at the rate referenced in finding of fact 26 shall apply to: (1) any portion of the $65.7 million referenced in finding of fact 27 not actually received by EGSI, until EGSI actually receives such payments attributable to Texas Retail; and (2) the trued-up amount, as provided in finding of fact 29, until such trued-up amount (plus associated carrying costs at the rate of 7.9% per annum) is recovered in base rates.

29. The Agreement provides that after EGSI receives all insurance payments related to Hurricane Rita, the $65.7 million credited, as provided in finding of fact 27, shall be trued up to reflect the difference between the $65.7 million credited and all insurance

---

[3] Attachment A is a copy of Exhibit A to the Agreement.

[4] The insurance carriers include Oil Insurance Limited, Lloyd's and Hartford Steam Boiler Inspection and Insurance Company. EGSI expects to receive $65.7 million for the Texas retail allocation (Texas Retail) out of the total insurance payments. The total insurance payments would include amounts allocated to EGSI Louisiana as well as EGSI Texas.

payments actually received by EGSI related to Hurricane Rita attributable to Texas Retail.

30. Under the Agreement, in the event EGSI receives insurance payments related to Hurricane Rita attributable to Texas Retail in excess of $65.7 million after the Commission's issuance of a financing order in the financing order proceeding, such payments shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such payments at the rate of 7.9% per annum.

31. The Agreement directs EGSI to continue to pursue EGSI's application for proceeds from governmental grants.

32. With regard to the treatment of grant proceeds distributed prior to securitization, the Agreement provides as follows:

A. Any proceeds from governmental grants distributed directly to EGSI before the Commission issues a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be used to reduce the amount securitized. For illustrative purposes with respect to the preceding sentence, a reduction in the securitized amount is not considered consistent with the conditions and directions of the grant when, based on the cost allocation provided in the Agreement, such a reduction in the amount securitized would result in rates (transition charges) that would allocate the credit or reduction associated with the grant proceeds among customers or customer classes in a manner inconsistent with the conditions and instructions of the grant.

B. If a reduction of the securitized amount is not consistent with the conditions and directions of the grant as described in finding of fact 32, item A, and the grant does not prescribe carrying costs on the grant proceeds (either explicitly or implicitly, *e.g.*, by instructing that the proceeds be escrowed or treated similarly),

EGSI will reduce the securitized amount by the amount of carrying costs on the grant proceeds, calculated at 7.9 % per annum from EGSI's actual receipt of grant proceeds until the issuance of securitization bonds.

33. The Agreement provides that any proceeds from governmental grants distributed directly to EGSI after the Commission's issuance of a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such proceeds at the rate of 7.9% per annum.

34. In regard to the receipt of governmental grant proceeds as described in findings of fact 32 and 33, the Agreement further provides that, in any event, any reduction in rates associated with the receipt of governmental grant proceeds shall be no greater than the amount of such proceeds, subject to the calculation of carrying costs provided in findings of fact 32 and 33.

35. Under the Agreement, the total dollar amount eligible to be securitized in the financing order proceeding (as reflected in Attachment A to this Order) shall be: $381,236,384 plus carrying costs at the rate and for the time period specified in findings of fact 26 through 30, minus $65.7 million related to insurance, plus all other qualified costs, to be determined by the Commission in the financing order proceeding, provided for in PURA § 39.460(d).

36. The Agreement provides that the present value of the benefit, if any, of accumulated deferred federal income taxes and method of handling such benefit will be part of EGSI's presentation in the financing order proceeding and subject to the Commission's determination about how such benefit, if any, should be treated in the financing order or a subsequent proceeding.

7

37.      Under the Agreement: (a) the functionalization and allocation methodology proposed by EGSI in its filed case shall be utilized in the financing order proceeding; and (b) adjustments described in findings of fact 24 through 36 shall be functionalized and allocated pro rata in the same manner as proposed by EGSI in its filed case.

38.      The Agreement includes standard provisions regarding waiver, general terms and conditions, lack of precedential effect, and termination of the Agreement in the event the Commission does not accept the Agreement as presented.

39.      The Agreement resolves all issues of fact and law applicable to this docket.

40.      Approval of the Agreement is in the public interest.

## II. Conclusions of Law

1.      EGSI is a public utility as that term is defined in §§ 11.004 and 31.002 of PURA.

2.      The Commission has jurisdiction over this proceeding under PURA §§ 39.458-.463.

3.      EGSI provided appropriate notice of this proceeding in accordance with P.U.C. PROC. R. 22.55.

4.      EGSI's application was processed in accordance with PURA §§ 39.458-.463 and the Administrative Procedure Act, TEX. GOV'T CODE ANN. §§ 2001.001-.902 (Vernon 2000 & Supp. 2006).

5.      PURA §§ 39.458-.463 allow, among other things, EGSI to obtain timely recovery of reasonable and necessary Hurricane Rita reconstruction costs and to use securitization financing to recover those costs.



6.  The functionalization and allocation methodology proposed by EGSI in its filed case complies with PURA § 39.460(g).

7.  The evidentiary record, which includes testimony and exhibits filed by EGSI, Commission Staff, Cities, TIEC, OPC, and State, supports the Agreement.

8.  Because the Agreement is the result of an unopposed agreement among the parties, an adjudicatory hearing is not required to process EGSI's application in this docket.

## III. Ordering Paragraphs

1.  EGSI's request for a determination of the dollar amount of its Hurricane Rita reconstruction costs, incurred through March 31, 2006, plus carrying costs, that are eligible for recovery and securitization in the financing order proceeding, as described in finding of fact 35 and the Agreement, is approved.

2.  In the financing order proceeding, the hurricane reconstruction costs shall be functionalized and the associated revenue requirement allocated in the manner proposed by EGSI in its case filed on July 5, 2006.

3.  EGSI shall comply with the true-up provisions regarding insurance payments as set out in findings of fact 28 through 30.

4.  EGSI shall treat governmental grant proceeds in the manner set out in findings of fact 32 through 34.

5.  EGSI shall continue to pursue its application for proceeds from governmental grants.

6.  EGSI shall file, semi-annually from the date of this order, in Project No. 33560, *Compliance Report of Entergy Gulf States, Inc. in Response to Final Order in Docket No. 32907*, a report detailing all alternative sources of recovery of its hurricane reconstruction costs, including but not limited to insurance and grants.

7.    Entry of this Order does not indicate the Commission's endorsement or approval of any principle or methodology that may underlie the Agreement. Neither shall the entry of the Order be regarded as binding precedent as to the appropriateness of any principle underlying the Agreement.

8.    All other motions, requests for entry of specific findings of fact and conclusions of law, and any other request for general or specific relief, if not expressly granted herein, are denied.

**SIGNED AT AUSTIN, TEXAS the** _____1st_____ **day of December 2006.**

PUBLIC UTILITY COMMISSION OF TEXAS

PAUL HUDSON, CHAIRMAN

JULIE PARSLEY, COMMISSIONER

BARRY T. SMITHERMAN, COMMISSIONER

q:\cadm\orders\final\32000\32907 fo.doc



Entergy Gulf States, Inc.
Rita Storm Restoration Costs for TX
Estimate of Carrying Cost for TX Retail
For Costs Incurred September 2005 - March 2006
(Amounts in Dollars)

## TX Retail Carrying Cost

| Beginning Month of Carrying Cost | TX Retail Cost | Accrual Adjustment | Adjusted Cost Including Settlement | Carrying Cost | Balance for Carrying Costs | Settlement Adjustments | Estimated Insurance Payments |
|---|---|---|---|---|---|---|---|
| Sep 05 | 1,552,686 | - | 1,504,592 | | 1,504,592 | (48,093) | |
| Oct 05 | 66,174,846 | (475,471) | 63,649,651 | 219,419 | 65,373,662 | (2,049,724) | |
| Nov 05 | 82,799,332 | 147,669 | 80,382,344 | 694,968 | 146,450,974 | (2,564,657) | |
| Dec 05 | 58,598,197 | (361,211) | 56,421,944 | 1,149,858 | 204,022,776 | (1,815,042) | |
| Jan 06 | 34,649,048 | 626,801 | 34,202,617 | 1,455,734 | 239,681,126 | (1,073,232) | |
| Feb 06 | 55,318,008 | (134,812) | 53,469,755 | 1,753,905 | 294,904,786 | (1,713,440) | |
| Mar 06 | 88,324,964 | (35,544,631) | 50,044,523 | 2,106,186 | 347,055,496 | (2,735,810) | |
| Apr-06 | | 25,086,733 | 25,086,733 | 2,367,359 | 374,509,588 | | |
| May-06 | | 10,654,922 | 10,654,922 | 2,500,594 | 387,665,104 | | |
| Jun-06 | | | - | 2,552,129 | 390,217,232 | | |
| Jul-06 | | | - | 2,568,930 | 392,786,162 | | |
| Aug-06 | | | - | 2,585,842 | 383,228,245 | | (12,143,760) |
| Sep-06 | | | - | 2,522,919 | 385,751,164 | | |
| Oct-06 | | | - | 2,539,528 | 388,290,692 | | |
| Nov-06 | | | - | 2,556,247 | 390,846,940 | | |
| Dec-06 | | | - | 2,573,076 | 393,420,015 | | |
| Jan-07 | | | - | 2,590,015 | 396,010,030 | | |
| Feb-07 | | | - | 2,607,066 | 398,617,096 | | |
| Mar-07 | | | - | 2,624,229 | 401,241,326 | | |
| Apr-07 | | | - | 2,641,505 | 403,882,831 | | |
| May-07 | | | - | 2,658,895 | 406,541,726 | | |
| Sub-Totals | 387,417,080 | - | 375,417,080 | 43,268,406 | | (12,000,000) | (12,143,760) |

Less AFUDC
Sep 05 - Mar 06                          (5,819,304)

Total Carrying Costs                     37,449,102

### Summary

| | |
|---|---|
| TX Retail Costs Above | 375,417,080 |
| AFUDC | 5,819,304 |
| Total TX Retail Costs Per Exh JDW-2 Less Setl. Adj. | 381,236,384 |
| Total Carrying Costs | 37,449,102 |
| Total to Recover Assuming a June 1 Securitization | 418,685,486 |
| (Carrying costs to be calculated until issuance of bonds) | |
| Ins. to Remove for Securitization (TX Retail Amt.) | 65,700,000 |
| Total to Securitize Assuming a June 1 Securitization | 352,985,486 |

Notes:
TX Retail Cost excludes AFUDC.
Accruals Adjustment subtracts costs that are accrued but not yet paid. Accruals are assumed to be paid in full by May 2006.
Carrying Cost = (Current Month Adjusted Cost * 1/2 Month + Prior Month Balance to Recover) * Carrying Cost
Hurricane Rita tax benefits have not been realized as the Company is in a net operating loss carryforward position.
Amounts may not sum to totals due to rounding.
Plus all other qualified costs provided for in Section 39.460(d) of PURA.

Carrying Cost                                          7.90%

17

11

 *Entergy*

**Entergy Services, Inc.**
Legal Services
919 Congress Avenue
Suite 701
Austin, TX 78701

L. Richard Westerburg, Jr.
Assistant General Counsel
512-487-3944
512-487-3958

RECEIVED

2006 NOV 17 PM 2:34

PUBLIC UTILITY COMMISSION
FILING CLERK

November 17, 2006

Judge Andrew Kang
Administrative Law Judge
Public Utility Commission of Texas
1701 North Congress Avenue
Austin, Texas 78711

Re:     P.U.C. Docket No. 32907, *Application of Entergy Gulf States, Inc. for Determination of Hurricane Reconstruction Costs*

Dear Judge Kang:

Pursuant to Order No. 15, please find attached the Settlement Agreement and Proposed Order in Docket No. 32907 for consideration and decision at the Commission's December 1, 2006 Open Meeting. Also, pursuant to Order No. 1, the statutory deadline for the issuance of an order is December 2, 2006. Accordingly, Entergy Gulf States, Inc. requests the Order be signed by the Commission on December 1, 2006.

As reflected in the Settlement Agreement, the East Texas Cooperatives (ETC) (East Texas Electric Cooperative, Inc., Sam Rayburn G&T Electric Cooperative, Inc., and Tex-La Electric Cooperative of Texas, Inc.), who are intervenors in this docket, have authorized the Signatories to represent that ETC neither supports nor opposes this Agreement and that ETC does not request an evidentiary hearing in this docket.

Sincerely,

L. Richard Westerburg, Jr.

cc:     PUC Filing Clerk
        All Parties

| | | |
|---|---|---|
| APPLICATION OF ENTERGY GULF | § | BEFORE THE |
| STATES, INC. FOR | § | PUBLIC UTILITY COMMISSION |
| DETERMINATION OF HURRICANE | § | OF TEXAS |
| RECONSTRUCTION COSTS | § | |

## SETTLEMENT AGREEMENT

### 1. Preamble.

1.1. This Settlement Agreement (Agreement) is entered in this docket before the Public Utility Commission of Texas (Commission) by and among: Entergy Gulf States, Inc. (EGSI or Company); the Staff of the Public Utility Commission of Texas (Staff); the Cities of Beaumont, Conroe, Groves, Pine Forest, Nederland, Port Neches, Rose City and Silsbee (collectively, Cities); the City of Port Arthur (Port Arthur); the Office of Public Utility Counsel (OPC); Texas Industrial Energy Consumers (TIEC); and the State of Texas (State) (collectively, Signatories).[1]

1.2. On July 5, 2006, EGSI filed an application in Commission Docket No. 32907, under House Bill 163, for: (1) a determination that the Hurricane Rita reconstruction costs in the amount of $393,236,384 (Texas retail jurisdictional amount), incurred by EGSI through March 31, 2006, are eligible for recovery and securitization; (2) authority to recover carrying costs at the Company's weighted average cost of capital on those hurricane reconstruction costs from the date the costs were incurred through the date that transition bonds are issued under a

---

[1] The only other parties in the case—the East Texas Cooperatives (ETC) (East Texas Electric Cooperative, Inc., Sam Rayburn G&T Electric Cooperative, Inc. and Tex-La Electric Cooperative of Texas, Inc.)—authorize the Signatories to represent that ETC neither supports nor opposes this Agreement and that ETC does not request an evidentiary hearing in this docket.



financing order issued in a future docket in which the Company requests a financing order (financing order proceeding); and (3) approval of the manner in which the hurricane reconstruction costs will be functionalized and the associated revenue requirement allocated in the financing order proceeding. The Signatories filed direct and rebuttal testimony, and statements of position, stating their respective positions in this docket. The Signatories agree to the following terms in settlement of issues arising in this docket.

## 2. Reasonable and Necessary Hurricane Reconstruction Costs.

The amount of the Company's reasonable and necessary hurricane reconstruction costs determined, in this docket, to be eligible for recovery and securitization is $381,236,384 plus carrying costs, as set forth in paragraph nos. 3 through 6 of this Agreement. This Agreement does not reflect or determine resolution of any hurricane reconstruction costs that were charged to the Company's books after March 31, 2006.

## 3. Carrying Costs.

In addition to $381,236,384, the Company is authorized to include in hurricane reconstruction costs and securitize carrying costs at the rate of 7.9% per annum, as reflected in Exhibit A attached to this Agreement, from the later of October 15, 2005 or the date incurred until the issuance of securitization bonds. The balance upon which carrying costs are determined will be reduced by the amount of insurance payments when received, as provided in paragraph no. 4 to this Agreement.

## 4.    Insurance Proceeds.

The Company shall credit $65.7 million in the manner described in paragraph no. 6 to this Agreement, reflecting the Company's expectation that it will receive insurance payments in that amount (Texas Retail). Carrying costs at the rate referenced in paragraph no. 3 shall apply to: (1) any portion of the $65.7 million not actually received by the Company, until the Company actually receives (Texas Retail) such payments; and (2) the trued-up amount, as provided below, until such trued-up amount (plus associated carrying costs at the rate of 7.9% per annum) is recovered in base rates. Subsequent to the receipt of all insurance payments related to Hurricane Rita, the $65.7 million credited, as provided in this paragraph, shall be trued up to reflect the difference between the $65.7 million credited and all insurance payments actually received by the Company related to Hurricane Rita for Texas Retail. In the event the Company receives insurance payments related to Hurricane Rita for Texas Retail in excess of $65.7 million after the Commission's issuance of a financing order in the financing order proceeding, such payments shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such payments at the rate of 7.9% per annum.

**5. Proceeds from Governmental Grants.**

**A. Pursuit of Governmental Grants.**

5.1 The Company shall continue to pursue its application for proceeds from governmental grants.

**B. Treatment of grant proceeds distributed prior to securitization.**

5.2 Any proceeds distributed directly to the Company prior to the Commission's issuance of a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be used to reduce the amount securitized.

5.3 For illustrative purposes with respect to paragraph no. 5.2 of this Agreement, a reduction in the securitized amount is not considered consistent with the conditions and directions of the grant when, based on the cost allocation provided in this Agreement, such a reduction in the amount securitized would result in rates (transition charges) that would allocate the credit or reduction associated with the grant proceeds among customers or customer classes in a manner inconsistent with the conditions and instructions of the grant.

5.4 If a reduction of the securitized amount is not consistent with the conditions and directions of the grant as described in the paragraph no. 5.3 of this Agreement and the grant does not prescribe carrying costs on the grant proceeds (either explicitly or implicitly, *e.g.*, by instructing that the proceeds be escrowed or treated similarly), the Company will reduce the securitized amount by the amount of carrying costs on the grant proceeds, calculated at 7.9% per

annum from the Company's actual receipt of grant proceeds until the issuance of securitization bonds.

### C. Treatment of grant proceeds distributed after securitization.

5.5 Any proceeds distributed directly to the Company after the Commission's issuance of a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such proceeds at the rate of 7.9% per annum.

### D. Reduction in rates due to grant proceeds.

5.6 In any event, any reduction in rates associated with the receipt of grant proceeds, whether before or after securitization, shall be no greater than the amount of such proceeds, subject to the calculation of carrying costs provided in paragraph nos. 5.4 and 5.5 of this Agreement.

### 6. Amount to be Securitized.

The total amount eligible to be securitized in the financing order proceeding (as reflected in Exhibit A attached to this Agreement) shall be: $381,236,384 plus carrying costs at the rate and for the time period specified in paragraph no. 3, minus $65.7 million related to insurance, plus all other qualified costs, to be determined by the Commission in the financing order proceeding, as provided for in Section 39.460(d) of the Public Utility Regulatory Act, TEX. UTIL. CODE Title 2. The present value of the benefit, if any, of accumulated deferred federal income taxes and method of handling such benefit will be part of the

Company's presentation in the financing order proceeding and subject to the Commission's determination about how such benefit, if any, should be treated in the financing order or a subsequent proceeding.

## 7. Functionalization and Allocation.

The parties agree that the functionalization and allocation methodology proposed by EGSI in its filed case shall be utilized in the financing order proceeding. Adjustments described in the preceding paragraphs shall be functionalized and allocated pro rata in the same manner as proposed by EGSI in its filed case.

## 8. No Waiver.

Except as to matters determined in this Agreement, no Signatory, by entering into the Agreement, waives its right to take any position in any proceeding as to any issue(s) related to the Hurricane Rita reconstruction costs that may arise in any other docket, appeal, or any other matter. Each Signatory specifically reserves, and does not waive, its individual right to file any pleading, or to participate in, or to initiate any proceeding to assert or support such position, or to engage in any combination of these activities, except a pleading that is inconsistent with the settlement points described in this Agreement.

7

## 9.    Other Terms and Conditions.

After extensive negotiations, the Signatories have reached a compromise and settlement regarding each of the matters discussed in this Agreement. The Signatories agree that this Agreement is in the public interest and urge the Commission to adopt a final order consistent with all of its terms. Oral and written statements made during the course of the settlement negotiations shall not be used as an admission or concession of any sort or as evidence in this or any other proceeding. None of the Signatories agrees to the propriety of any regulatory theory or principle that may be said to underlie any of the issues resolved by this Agreement. Because this is a stipulated agreement, the Signatories recognized that no Signatory is under any obligation to take the same position as set out in this Agreement in any other docket, except as specifically required by this Agreement, whether or not that docket presents the same or similar circumstances.

## 10.   No Precedent.

Further, given that the matters resolved in this Agreement are resolved on the basis of compromise and settlement, the Signatories agree that nothing in this Agreement should be considered to be precedent in any other Commission proceeding, except a proceeding to enforce the terms of this Agreement. This Agreement reflects a compromise, settlement and accommodation among the Signatories, and the terms and conditions of this Agreement are interdependent. All actions by the Signatories contemplated or required by this Agreement are conditioned upon entry by the Commission of a final and appealable order

consistent with this Agreement. If the Commission does not accept this Agreement as presented and enters an order inconsistent with any term of this Agreement, any Signatory shall have the right to withdraw from this Agreement, which withdrawal shall render the Agreement null and void. Any Signatory electing to withdraw from this Agreement shall notify all other Signatories in writing of such withdrawal. After the withdrawal, a new hearing will be held, if requested, and the parties have the right to file new testimony. This Agreement is binding on each of the Signatories only for the purpose of settling the issues described in this Agreement and for no other purpose.

## 11. Authorization to Sign.

Each person executing this Agreement represents that (s)he is authorized to sign this Agreement on behalf of the party represented.

## 12. Countersigned Originals.

This document may be countersigned by each party on separate originals. Each signature shall be treated as if it is an original signature.

STAFF OF THE
PUBLIC UTILITY COMMISSION OF TEXAS

Date of Execution: November _17th_, 2006.

By: _Jeffry T Pender, Attorney for Staff_

OFFICE OF PUBLIC UTILITY COUNSEL

Date of Execution: November ____, 2006

By: _____

CITY OF PORT ARTHUR

Date of Execution: November ____, 2006

By: _____

ENTERGY GULF STATES, INC.

Date of Execution: November ____, 2006

By: _____

CITIES OF BEAUMONT, CONROE, GROVES,
NEDERLAND, PINE FOREST, PORT NECHES,
ROSE CITY, AND SILSBEE

Date of Execution: November ____, 2006

By: _____

STATE OF TEXAS,
OFFICE OF THE ATTORNEY GENERAL

Date of Execution: November ____, 2006

By: _____

TEXAS INDUSTRIAL ENERGY CONSUMERS

Date of Execution: November ____, 2006

By: _____

Docket No. 32907
Settlement Agreement
Page 9 of 10

**STAFF OF THE**
**PUBLIC UTILITY COMMISSION OF TEXAS**

Date of Execution: November ____, 2006.

By:_____

**OFFICE OF PUBLIC UTILITY COUNSEL**

Date of Execution: November 17, 2006

By: _Roger Stewart_____

**CITY OF PORT ARTHUR**

Date of Execution: November ____, 2006

By:_____

**ENTERGY GULF STATES, INC.**

Date of Execution: November ____, 2006

By:_____

**CITIES OF BEAUMONT, CONROE, GROVES,**
**NEDERLAND, PINE FOREST, PORT NECHES,**
**ROSE CITY, AND SILSBEE**

Date of Execution: November ____, 2006

By:_____

**STATE OF TEXAS,**
**OFFICE OF THE ATTORNEY GENERAL**

Date of Execution: November ____, 2006

By:_____

**TEXAS INDUSTRIAL ENERGY CONSUMERS**

Date of Execution: November ____, 2006

By:_____

STAFF OF THE
PUBLIC UTILITY COMMISSION OF TEXAS

Date of Execution: November _____, 2006.

By:_____

CITIES OF BEAUMONT, CONROE, GROVES,
NEDERLAND, PINE FOREST, PORT NECHES,
ROSE CITY, AND SILSBEE

Date of Execution: November _____, 2006

By:_____

OFFICE OF PUBLIC UTILITY COUNSEL

Date of Execution: November _____, 2006

By:_____

STATE OF TEXAS,
OFFICE OF THE ATTORNEY GENERAL

Date of Execution: November _____, 2006

By:_____

CITY OF PORT ARTHUR

Date of Execution: November _17_, 2006

By: _____ w/ permission

TEXAS INDUSTRIAL ENERGY CONSUMERS

Date of Execution: November _____, 2006

By:_____

ENTERGY GULF STATES, INC.

Date of Execution: November _____, 2006

By:_____

STAFF OF THE
PUBLIC UTILITY COMMISSION OF TEXAS

Date of Execution: November ____, 2006.

By:_____

CITIES OF BEAUMONT, CONROE, GROVES,
NEDERLAND, PINE FOREST, PORT NECHES,
ROSE CITY, AND SILSBEE

Date of Execution: November _17_, 2006

By:_____

OFFICE OF PUBLIC UTILITY COUNSEL

Date of Execution: November ____, 2006

By:_____

STATE OF TEXAS,
OFFICE OF THE ATTORNEY GENERAL

Date of Execution: November ____, 2006

By:_____

CITY OF PORT ARTHUR

Date of Execution: November ____, 2006

By:_____

TEXAS INDUSTRIAL ENERGY CONSUMERS

Date of Execution: November ____, 2006

By:_____

ENTERGY GULF STATES, INC.

Date of Execution: November ____, 2006

By:_____

13

STAFF OF THE
PUBLIC UTILITY COMMISSION OF TEXAS

Date of Execution: November _____, 2006.

By:_____

CITIES OF BEAUMONT, CONROE, GROVES,
NEDERLAND, PINE FOREST, PORT NECHES,
ROSE CITY, AND SILSBEE

Date of Execution: November _____, 2006

By:_____

OFFICE OF PUBLIC UTILITY COUNSEL

Date of Execution: November _____, 2006

By:_____

STATE OF TEXAS,
OFFICE OF THE ATTORNEY GENERAL

Date of Execution: November _17_, 2006

By:_____

CITY OF PORT ARTHUR

Date of Execution: November _____, 2006

By:_____

TEXAS INDUSTRIAL ENERGY CONSUMERS

Date of Execution: November _____, 2006

By:_____

ENTERGY GULF STATES, INC.

Date of Execution: November _____, 2006

By:_____

Docket No. 32907
Settlement Agreement
Page 9 of 10

STAFF OF THE
PUBLIC UTILITY COMMISSION OF TEXAS

Date of Execution: November _____, 2006.

By:_____


OFFICE OF PUBLIC UTILITY COUNSEL

Date of Execution: November _____, 2006

By:_____


CITY OF PORT ARTHUR

Date of Execution: November _____, 2006

By:_____


ENTERGY GULF STATES, INC.

Date of Execution: November _____, 2006

By:_____


CITIES OF BEAUMONT, CONROE, GROVES,
NEDERLAND, PINE FOREST, PORT NECHES,
ROSE CITY, AND SILSBEE

Date of Execution: November _____, 2006

By:_____


STATE OF TEXAS,
OFFICE OF THE ATTORNEY GENERAL

Date of Execution: November _____, 2006

By:_____


TEXAS INDUSTRIAL ENERGY CONSUMERS

Date of Execution: November 16, 2006

By:_____


/5

**STAFF OF THE**
**PUBLIC UTILITY COMMISSION OF TEXAS**

**CITIES OF BEAUMONT, CONROE, GROVES,**
**NEDERLAND, PINE FOREST, PORT NECHES,**
**ROSE CITY, AND SILSBEE**

Date of Execution: November ____, 2006.

Date of Execution: November ____, 2006

By:_____

By:_____


**OFFICE OF PUBLIC UTILITY COUNSEL**

**STATE OF TEXAS,**
**OFFICE OF THE ATTORNEY GENERAL**

Date of Execution: November ____, 2006

Date of Execution: November ____, 2006

By:_____

By:_____


**CITY OF PORT ARTHUR**

**TEXAS INDUSTRIAL ENERGY CONSUMERS**

Date of Execution: November ____, 2006

Date of Execution: November ____, 2006

By:_____

By:_____


**ENTERGY GULF STATES, INC.**

Date of Execution: November _17_, 2006

By:_____

Entergy Gulf States, Inc.
Rita Storm Restoration Costs for TX
Estimate of Carrying Cost for TX Retail
For Costs Incurred September 2005 - March 2006
(Amounts in Dollars)

**TX Retail Carrying Cost**

| Beginning Month of Carrying Cost | TX Retail Cost | Accrual Adjustment | Adjusted Cost Including Settlement | Carrying Cost | Balance for Carrying Costs | Settlement Adjustments | Estimated Insurance Payments |
|---|---|---|---|---|---|---|---|
| Sep 05 | 1,552,686 | - | 1,504,592 | | 1,504,592 | (48,093) | |
| Oct 05 | 66,174,846 | (475,471) | 63,649,651 | 219,419 | 65,373,662 | (2,049,724) | |
| Nov 05 | 82,799,332 | 147,669 | 80,382,344 | 694,968 | 146,450,974 | (2,564,657) | |
| Dec 05 | 58,598,197 | (361,211) | 56,421,944 | 1,149,858 | 204,022,776 | (1,815,042) | |
| Jan 06 | 34,649,048 | 626,801 | 34,202,617 | 1,455,734 | 239,681,126 | (1,073,232) | |
| Feb 06 | 55,318,008 | (134,812) | 53,469,755 | 1,753,905 | 294,904,786 | (1,713,440) | |
| Mar 06 | 88,324,964 | (35,544,631) | 50,044,523 | 2,106,186 | 347,055,496 | (2,735,810) | |
| Apr-06 | | 25,086,733 | 25,086,733 | 2,367,359 | 374,509,588 | | |
| May-06 | | 10,654,922 | 10,654,922 | 2,500,594 | 387,665,104 | | |
| Jun-06 | | | - | 2,552,129 | 390,217,232 | | |
| Jul-06 | | | - | 2,568,930 | 392,786,162 | | |
| Aug-06 | | | - | 2,585,842 | 383,228,245 | | (12,143,760) |
| Sep-06 | | | - | 2,522,919 | 385,751,164 | | |
| Oct-06 | | | - | 2,539,528 | 388,290,692 | | |
| Nov-06 | | | - | 2,556,247 | 390,846,940 | | |
| Dec-06 | | | - | 2,573,076 | 393,420,015 | | |
| Jan-07 | | | - | 2,590,015 | 396,010,030 | | |
| Feb-07 | | | - | 2,607,066 | 398,617,096 | | |
| Mar-07 | | | - | 2,624,229 | 401,241,326 | | |
| Apr-07 | | | - | 2,641,505 | 403,882,831 | | |
| May-07 | | | - | 2,658,895 | 406,541,726 | | |
| Sub-Totals | 387,417,080 | - | 375,417,080 | 43,268,406 | | (12,000,000) | (12,143,760) |

Less AFUDC
Sep 05 - Mar 06      (5,819,304)

Total Carrying Costs      37,449,102

**Summary**

| | |
|---|---|
| TX Retail Costs Above | 375,417,080 |
| AFUDC | 5,819,304 |
| Total TX Retail Costs Per Exh JDW-2 Less Setl. Adj. | 381,236,384 |
| Total Carrying Costs | 37,449,102 |
| Total to Recover Assuming a June 1 Securitization | 418,685,486 |
| (Carrying costs to be calculated until issuance of bonds) | |
| Ins. to Remove for Securitization (TX Retail Amt.) | 65,700,000 |
| Total to Securitize Assuming a June 1 Securitization | 352,985,486 |

Notes:
TX Retail Cost excludes AFUDC.
Accruals Adjustment subtracts costs that are accrued but not yet paid. Accruals are assumed to be paid in full by May 2006.
Carrying Cost = (Current Month Adjusted Cost * 1/2 Month + Prior Month Balance to Recover) * Carrying Cost
Hurricane Rita tax benefits have not been realized as the Company is in a net operating loss carryforward position.
Amounts may not sum to totals due to rounding.
Plus all other qualified costs provided for in Section 39.460(d) of PURA.

Carrying Cost      7.90%

17

| APPLICATION OF ENTERGY GULF | § | PUBLIC UTILITY COMMISSION |
| STATES, INC. FOR | § | |
| DETERMINATION OF HURRICANE | § | OF TEXAS |
| RECONSTRUCTION COSTS | § | |

**PROPOSED ORDER**

This Order approves the application of Entergy Gulf States, Inc. (EGSI), as modified through an unopposed Settlement Agreement (Agreement) filed in this docket on November 17, 2006. EGSI, the Public Utility Commission of Texas's Staff (Commission Staff), the Cities of Beaumont, Conroe, Groves, Pine Forest, Nederland, Port Neches, Rose City and Silsbee (collectively, Cities), the City of Port Arthur (Port Arthur), the Office of Public Utility Counsel (OPC), Texas Industrial Energy Consumers (TIEC), and the State of Texas (State) (collectively, Signatories) support the Agreement and request that the Public Utility Commission of Texas (Commission) approve the Agreement without modification. The East Texas Cooperatives (ETC)[1] state that they neither oppose nor support the Agreement and that they do not request an evidentiary hearing in this docket. This docket was processed in accordance with applicable statutes and Commission rules. EGSI's application, consistent with the Agreement, is approved.

The Commission adopts the following findings of fact and conclusions of law:

**I. Findings of Fact**

*Procedural History*

1. On July 5, 2006, EGSI filed an application, under §§ 39.458-.463 of the Public Utility Regulatory Act,[2] for: (1) a determination that the Hurricane Rita reconstruction costs in the amount of $393,236,384 (Texas retail jurisdictional amount), incurred through March 31, 2006, are eligible for recovery and securitization; (2) authority to recover carrying costs at EGSI's weighted average cost of capital on those hurricane reconstruction costs from the date the costs were incurred through the date that transition bonds are issued under a financing order issued in a future docket in which EGSI requests a financing

---

[1] East Texas Electric Cooperative, Inc., Tex-La Electric Cooperative of Texas, Inc., and Sam Rayburn G&T Electric Cooperative, Inc., collectively the East Texas Cooperatives (ETC).

[2] Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 1998 & Supp. 2006) (PURA).

*18*

order (financing order proceeding); and (3) approval of the manner in which the hurricane reconstruction costs will be functionalized and the associated revenue requirement allocated in the financing order proceeding.

2.    EGSI's July 5, 2006 application included the prefiled direct testimony, exhibits, and workpapers of eleven witnesses in support of EGSI's request.

3.    EGSI's witnesses, as a whole, provide testimony that EGSI contends supports EGSI's requests.

4.    On July 7, 2006, the Commission issued Order No. 1, which provided for a protective order applicable to this docket and required comment on the proposed notice.

5.    On July 28, 2006, the Commission issued Order Requesting List of Issues, which requested that parties file lists of issues that may be addressed in this docket.

6.    On July 31, 2006, the Commission issued Order No. 6, which, among other things, established a procedural schedule applicable to this docket, including dates for parties to file testimony, discovery deadlines, and a November 1, 2006 commencement date for the hearing on the merits.

7.    The intervention deadline established for this docket was August 31, 2006.

8.    On or before August 31, 2006, the following parties filed unopposed motions to intervene, and their motions were granted by the Commission: OPC; Cities; TIEC; State; ETC; and Port Arthur.

9.    On September 1, 2006, EGSI filed its proof of notice.

10.    On September 8, 2006, the Commission issued its Preliminary Order in this docket.

11.    Discovery on EGSI's direct case concluded on September 19, 2006.

/9

12.  On October 9, 2006, all intervenors, except ETC, filed testimony and supporting documents addressing EGSI's application and direct testimony, and State and Port Arthur also filed statements of position.

13.  All intervenors that filed testimony recommended various adjustments to the Hurricane Rita reconstruction costs and proposed carrying costs, or to the proposed functionalization and allocation, requested by EGSI.

14.  On October 12, 2006, State and TIEC filed cross-rebuttal testimony.

15.  On October 16, 2006, Commission Staff filed its testimony, which, among other things, recommended a lower carrying cost rate than EGSI had requested, and also filed a statement of position.

16.  On October 17, 2006, the Commission issued Order No. 9, which, among other things, directed parties not prefiling direct testimony but wishing to participate in the hearing on the merits to file a statement of position no later than October 24, 2006.

17.  On October 23, 2006, EGSI filed rebuttal testimony and a statement of position.

18.  On October 27, 2006, the Commission issued Order No. 12, which ruled on EGSI's objections and motion to strike various portions of the pre-filed testimony and supporting documents filed by the intervenors.

19.  At a prehearing conference convened on October 30, 2006, the Commission admitted into evidence: (a) all of the parties' pre-filed testimony and supporting documents, except as modified or stuck by Order No. 12 and the parties' errata to their pre-filed evidence; (b) the parties' cross-examination exhibits; and (c) the parties' optional completeness exhibits.  The Commission took under advisement the admissibility of several proffered exhibits pending its review of motions filed in response to Order No. 12.  In addition, under Order No. 9, the parties were to convene on November 1, 2006, before the start of

the hearing on the merits, for a continuation of the prehearing conference to address any remaining exhibit items.

20. On October 30, 2006, after the prehearing conference was concluded, the Commission issued Order No. 13, which ruled on State's and EGSI's motions filed in response to Order No. 12, clarified which portions of pre-filed testimony and supporting documents were modified or struck by Order No. 12, and admitted additional cross-examination exhibits.

21. On November 1, 2006, at the prehearing conference convened before the start of the hearing on the merits, the parties present requested a delay in the start of the hearing on the merits to enable them to continue settlement talks. The Commission granted the request.

22. Later in the morning of November 1, 2006, the parties present announced that they had reached a settlement on all issues, stated that there was no need to conduct a hearing on the merits, and requested the opportunity to prepare a settlement agreement to file with the Commission. The Commission granted the request.

23. On November 17, 2006, EGSI filed the Agreement, which resolves all issues in this docket, on behalf of itself, Commission Staff, and all active parties. The filing stated on behalf of ETC that ETC neither supports nor objects to the Agreement.

*The Agreement*

24. Under the Agreement, the amount of EGSI's reasonable and necessary hurricane reconstruction costs incurred through March 31, 2006 that is eligible for recovery and securitization is $381,236,384 plus carrying costs, as set forth in findings of fact 26 through 35.

25. The Agreement does not reflect or determine resolution of any hurricane reconstruction costs that were charged to EGSI's books after March 31, 2006.

21

26.    In addition to $381,236,384, the Agreement authorizes EGSI to include in hurricane reconstruction costs and securitize carrying costs at the rate of 7.9% per annum as reflected in Attachment A to this Order,[3] from the later of October 15, 2005 or the date incurred until the issuance of securitization bonds. The balance upon which carrying costs are determined will be reduced by the amount of insurance payments when received as provided in findings of fact 27 through 30.

27.    The Agreement directs EGSI to credit $65.7 million in the manner described in finding of fact 35, reflecting EGSI's expectation that it will receive insurance payments in that amount (Texas Retail).

28.    Under the Agreement, carrying costs at the rate referenced in finding of fact 26 shall apply to: (1) any portion of the $65.7 million referenced in finding of fact 27 not actually received by EGSI, until EGSI actually receives (Texas Retail) such payments; and (2) the trued-up amount, as provided in finding of fact 29, until such trued-up amount (plus associated carrying costs at the rate of 7.9% per annum) is recovered in base rates.

29.    The Agreement provides that after EGSI receives all insurance payments related to Hurricane Rita, the $65.7 million credited, as provided in finding of fact 27, shall be trued up to reflect the difference between the $65.7 million credited and all insurance payments actually received by EGSI related to Hurricane Rita for Texas Retail.

30.    Under the Agreement, in the event EGSI receives insurance payments related to Hurricane Rita for Texas Retail in excess of $65.7 million after the Commission's issuance of a financing order in the financing order proceeding, such payments shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such payments at the rate of 7.9% per annum.

31.    The Agreement directs EGSI to continue to pursue EGSI's application for proceeds from governmental grants.

---

[3] Attachment A is a copy of Exhibit A to the Agreement.

22

32.  With regard to the treatment of grant proceeds distributed prior to securitization, the Agreement provides as follows:

A.  Any proceeds from governmental grants distributed directly to EGSI before the Commission issues a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be used to reduce the amount securitized. For illustrative purposes with respect to the preceding sentence, a reduction in the securitized amount is not considered consistent with the conditions and directions of the grant when, based on the cost allocation provided in the Agreement, such a reduction in the amount securitized would result in rates (transition charges) that would allocate the credit or reduction associated with the grant proceeds among customers or customer classes in a manner inconsistent with the conditions and instructions of the grant.

B.  If a reduction of the securitized amount is not consistent with the conditions and directions of the grant as described in finding of fact 32, item A, and the grant does not prescribe carrying costs on the grant proceeds (either explicitly or implicitly, *e.g.*, by instructing that the proceeds be escrowed or treated similarly), EGSI will reduce the securitized amount by the amount of carrying costs on the grant proceeds, calculated at 7.9 % per annum from EGSI's actual receipt of grant proceeds until the issuance of securitization bonds.

33.  The Agreement provides that any proceeds from governmental grants distributed directly to EGSI after the Commission's issuance of a financing order shall be administered in a manner consistent with the conditions and directions of the grant, and, if consistent with the conditions and directions of the grant, shall be passed through to ratepayers in the form of a rider with carrying costs calculated on the unamortized balance of such proceeds at the rate of 7.9% per annum.

34.  In regard to the receipt of governmental grant proceeds as described in findings of fact 32 and 33, the Agreement further provides that, in any event, any reduction in rates

associated with the receipt of governmental grant proceeds shall be no greater than the amount of such proceeds, subject to the calculation of carrying costs provided in findings of fact 32 and 33.

35.     Under the Agreement, the total dollar amount eligible to be securitized in the financing order proceeding (as reflected in Attachment A to this Order) shall be: $381,236,384 plus carrying costs at the rate and for the time period specified in findings of fact 26 through 30, minus $65.7 million related to insurance, plus all other qualified costs, to be determined by the Commission in the financing order proceeding, provided for in PURA § 39.460(d).

36.     The Agreement provides that the present value of the benefit, if any, of accumulated deferred federal income taxes and method of handling such benefit will be part of EGSI's presentation in the financing order proceeding and subject to the Commission's determination about how such benefit, if any, should be treated in the financing order or a subsequent proceeding.

37.     Under the Agreement: (a) the functionalization and allocation methodology proposed by EGSI in its filed case shall be utilized in the financing order proceeding; and (b) adjustments described in findings of fact 24 through 36 shall be functionalized and allocated pro rata in the same manner as proposed by EGSI in its filed case.

38.     The Agreement includes standard provisions regarding waiver, general terms and conditions, lack of precedential effect, and termination of the Agreement in the event the Commission does not accept the Agreement as presented.

39.     The Agreement resolves all issues of fact and law applicable to this docket.

40.     Approval of the Agreement is in the public interest.

## II. Conclusions of Law

1. EGSI is a public utility as that term is defined in §§ 11.004 and 31.002 of PURA.

2. The Commission has jurisdiction over this proceeding under PURA §§ 39.458-.463.

3. EGSI provided appropriate notice of this proceeding in accordance with P.U.C. PROC. R. 22.55.

4. EGSI's application was processed in accordance with PURA §§ 39.458-.463 and the Administrative Procedure Act, TEX. GOV'T CODE ANN. §§ 2001.001-.902 (Vernon 2000 & Supp. 2006).

5. PURA §§ 39.458-.463 allow, among other things, EGSI to obtain timely recovery of reasonable and necessary Hurricane Rita reconstruction costs and to use securitization financing to recover those costs.

6. The functionalization and allocation methodology proposed by EGSI in its filed case complies with PURA § 39.460(g).

7. The evidentiary record, which includes testimony and exhibits filed by EGSI, Commission Staff, Cities, TIEC, OPC, and State, supports the Agreement.

8. Because the Agreement is the result of an unopposed agreement among the parties, an adjudicatory hearing is not required to process EGSI's application in this docket.

## III. Ordering Paragraphs

1. EGSI's request for a determination of the dollar amount of its Hurricane Rita reconstruction cost, incurred through March 31, 2006, plus carrying costs, that are eligible for recovery and securitization in the financing order proceeding, as described in finding of fact 35 and the Agreement, is approved.

25

2. In the financing order proceeding, the hurricane reconstruction costs shall be functionalized and the associated revenue requirement allocated in the manner proposed by EGSI in its case filed on July 5, 2006.

3. EGSI shall comply with the true-up provisions regarding insurance payments as set out in findings of fact 28 through 30.

4. EGSI shall treat governmental grant proceeds in the manner set out in findings of fact 32 through 34.

5. EGSI shall continue to pursue its application for proceeds from governmental grants.

6. Entry of this Order does not indicate the Commission's endorsement or approval of any principle or methodology that may underlie the Agreement. Neither shall the entry of the Order be regarded as binding precedent as to the appropriateness of any principle underlying the Agreement.

7. All other motions, requests for entry of specific findings of fact and conclusions of law, and any other request for general or specific relief, if not expressly granted herein, are denied.

**SIGNED AT AUSTIN, TEXAS the** _____ **day of** _____ **2006.**

**PUBLIC UTILITY COMMISSION OF TEXAS**

_____
**PAUL HUDSON, CHAIRMAN**

_____
**JULIE PARSLEY, COMMISSIONER**

_____
**BARRY T. SMITHERMAN, COMMISSIONER**

26

**Entergy Gulf States, Inc.**
**Rita Storm Restoration Costs for TX**
**Estimate of Carrying Cost for TX Retail**
**For Costs Incurred September 2005 - March 2006**
**(Amounts in Dollars)**

Docket No. 32907
Attachment A
Page 1 of 1

**TX Retail Carrying Cost**

| Beginning Month of Carrying Cost | TX Retail Cost | Accrual Adjustment | Adjusted Cost Including Settlement | Carrying Cost | Balance for Carrying Costs | Settlement Adjustments | Estimated Insurance Payments |
|---|---|---|---|---|---|---|---|
| Sep 05 | 1,552,686 | - | 1,504,592 | | 1,504,592 | (48,093) | |
| Oct 05 | 66,174,846 | (475,471) | 63,649,651 | 219,419 | 65,373,662 | (2,049,724) | |
| Nov 05 | 82,799,332 | 147,669 | 80,382,344 | 694,968 | 146,450,974 | (2,564,657) | |
| Dec 05 | 58,598,197 | (361,211) | 56,421,944 | 1,149,858 | 204,022,776 | (1,815,042) | |
| Jan 06 | 34,649,048 | 626,801 | 34,202,617 | 1,455,734 | 239,681,126 | (1,073,232) | |
| Feb 06 | 55,318,008 | (134,812) | 53,469,755 | 1,753,905 | 294,904,786 | (1,713,440) | |
| Mar 06 | 88,324,964 | (35,544,631) | 50,044,523 | 2,106,186 | 347,055,496 | (2,735,810) | |
| Apr-06 | | 25,086,733 | 25,086,733 | 2,367,359 | 374,509,588 | | |
| May-06 | | 10,654,922 | 10,654,922 | 2,500,594 | 387,665,104 | | |
| Jun-06 | | | - | 2,552,129 | 390,217,232 | | |
| Jul-06 | | | - | 2,568,930 | 392,786,162 | | |
| Aug-06 | | | - | 2,585,842 | 383,228,245 | | (12,143,760) |
| Sep-06 | | | - | 2,522,919 | 385,751,164 | | |
| Oct-06 | | | - | 2,539,528 | 388,290,692 | | |
| Nov-06 | | | - | 2,556,247 | 390,846,940 | | |
| Dec-06 | | | - | 2,573,076 | 393,420,015 | | |
| Jan-07 | | | - | 2,590,015 | 396,010,030 | | |
| Feb-07 | | | - | 2,607,066 | 398,617,096 | | |
| Mar-07 | | | - | 2,624,229 | 401,241,326 | | |
| Apr-07 | | | - | 2,641,505 | 403,882,831 | | |
| May-07 | | | - | 2,658,895 | 406,541,726 | | |
| Sub-Totals | 387,417,080 | - | 375,417,080 | 43,268,406 | | (12,000,000) | (12,143,760) |

Less AFUDC
Sep 05 - Mar 06     (5,819,304)

Total Carrying Costs     **37,449,102**

**Summary**

| | |
|---|---|
| TX Retail Costs Above | 375,417,080 |
| AFUDC | 5,819,304 |
| Total TX Retail Costs Per Exh JDW-2 Less Setl. Adj. | 381,236,384 |
| | |
| Total Carrying Costs | 37,449,102 |
| | |
| Total to Recover Assuming a June 1 Securitization | **418,685,486** |
| (Carrying costs to be calculated until issuance of bonds) | |
| | |
| Ins. to Remove for Securitization (TX Retail Amt.) | **65,700,000** |
| | |
| Total to Securitize Assuming a June 1 Securitization | **352,985,486** |

Notes:
TX Retail Cost excludes AFUDC.
Accruals Adjustment subtracts costs that are accrued but not yet paid. Accruals are assumed to be paid in full by May 2006.
Carrying Cost = (Current Month Adjusted Cost * 1/2 Month + Prior Month Balance to Recover) * Carrying Cost
Hurricane Rita tax benefits have not been realized as the Company is in a net operating loss carryforward position.
Amounts may not sum to totals due to rounding.
Plus all other qualified costs provided for in Section 39.460(d) of PURA.

Carrying Cost                **7.90%**



PUC DOCKET NO. 34800
SOAH DOCKET NO. 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

| APPLICATION OF ENTERGY | § | |
|---|---|---|
| GULF STATES, INC. FOR | § | PUBLIC UTILITY COMMISSION |
| AUTHORITY TO CHANGE RATES | § | |
| AND TO RECONCILE FUEL | § | OF TEXAS |
| COSTS | § | |

**ORDER**

This order addresses the application of Entergy Gulf States, Inc. (EGSI)[1] for authority to change rates and reconcile fuel costs. The docket was processed in accordance with applicable statutes and Public Utility Commission of Texas rules. EGSI, Commission Staff, the Office of Public Utility Counsel (OPC), the Community Associations of the Woodlands (CATW), the Entergy Texas, Inc. Service Area Cities' Steering Committee (Cities), the State of Texas, Texas Industrial Energy Consumers (TIEC), Texas Legal Services Center (TLSC), Texas Ratepayers' Organization to Save Energy (Texas ROSE), Wal-Mart Stores Texas, LLC , through their duly authorized representatives (Wal-Mart) (collectively, signatories) filed a stipulation and settlement agreement that resolves all of the issues in this proceeding. The Kroger Company and TX Energy, LLC did not sign the stipulation and do not oppose it. Consistent with the stipulation, EGSI's application is approved.

The Commission adopts the following findings of fact and conclusions of law:

## I. Findings of Fact

*Procedural History*

1. On September 26, 2007, EGSI filed an application for approval of: (1) base rate tariffs and riders designed to collect a total non-fuel revenue requirement for the

---

[1] On December 31, 2007, EGSI jurisdictionally separated pursuant to § 39.452(e) of the Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. Title 2 and Entergy Texas, Inc. (ETI) succeeded to EGSI's certificate of

2040

Texas retail jurisdiction of $605 million; (2) a set of proposed tariff schedules presented in the Electric Utility Rate Filing Package for Generating Utilities (RFP) accompanying EGSI's application; (3) a request for final reconciliation of EGSI's fuel and purchased power costs for the reconciliation period from January 1, 2006 to March 31, 2007, as well as deferred costs from prior proceedings; and (4) certain waivers to the instructions in RFP Schedule V accompanying EGSI's application.

2. The 12-month test year used in EGSI's application ended on March 31, 2007.

3. EGSI provided notice by publication for four consecutive weeks before the effective date of the proposed rate change in newspapers having general circulation in each county of EGSI's Texas service territory. EGSI also mailed notice of its proposed rate change to all of its customers. Additionally, EGSI timely served notice of its statement of intent to change rates on all municipalities retaining original jurisdiction over its rates and services.

4. The following parties were granted intervenor status in this docket: OPC, Alliance for Retail Markets (ARM), CATW, Cities, Kroger Company, State, TIEC, TLSC, Texas ROSE, TX Energy, LLC, and Wal-Mart.[2] Commission Staff was also a participant in this docket.

5. On October 1, 2007, the Commission referred this case to the State Office of Administrative Hearings (SOAH) for processing.

6. EGSI appealed the rate decisions adopted by the Cities of Chester, Woodville, Ames, Dayton, Devers, Liberty, New Waverly, Riverside, Trinity, Bedias, Bremond, Caldwell, Calvert, Franklin, Madisonville, Somerville, Patton Village, Cut and Shoot, Willis, Plum Grove, Shepherd, Oak Ridge North, Normangee, Daisetta, Hardin, Corrigan, Groveton, Anderson, Kosse, North Cleveland, Woodloch, Midway, Panorama Village, Taylor Landing, Rose Hill Acres, China, Hearne, Bevil Oaks, Colmesneil, Kountz, Nome, Lumberton, and Todd Mission.

---

convenience and necessity for its Texas retail jurisdiction. For continuity and ease of reference, EGSI, Commission Staff, and intervenors have continued to make reference to EGSI for purposes of pleadings in this docket.

[2] OPC, ARM, Cities, Kroger Company, State, and TIEC were granted party status on October 22, 2007. *See* Prehearing Conference Tr. at 6.

7.  As provided for in Order Nos. 3, 9, 12, 14, and 23, the SOAH administrative law judges (ALJs) consolidated EGSI's appeals of the rate decisions adopted by the cities in Finding of Fact No. 6.

8.  Cities participated in this case representing the Cities of Beaumont, Bridge City, Conroe, Groves, Houston, Huntsville, Navasota, Nederland, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Vidor, and West Orange. These municipalities have adopted rates consistent with the stipulation discussed below.

9.  The Commission established in its Order on Appeal of Order No. 8 an effective date for EGSI's proposed rate change of September 26, 2008.

10. On April 8, 2008, the State filed a motion for partial summary decision regarding the continued applicability of the 20% base rate discount for state institutions of higher education under § 36.351 of the Public Utility Regulatory Act, TEX. UTIL. CODE ANN. §§ 11.001-66.016 (Vernon 2007 & Supp. 2008) (PURA).

11. On July 16, 2008, the SOAH ALJs issued a proposal for decision (PFD) recommending that the Commission grant the State's April 18, 2008 motion for partial summary decision.

12. On August 15, 2008, the Commission entered an order adopting the PFD on the State's motion for partial summary decision.

13. The Commission entered an order on November 4, 2008, extending the effective date of EGSI's proposed rate change until November 27, 2008.

14. Commission Staff, State, and TIEC filed a non-unanimous stipulation (NUS) on May 19, 2008. EGSI and certain other parties filed a separate NUS on May 20, 2008.[3] The EGSI NUS was opposed by Commission Staff, State, and TIEC. A hearing was held on both NUSs on June 23 through July 2, 2008.

15. At Open Meetings on October 23 and November 5, 2008, the Commission considered a PFD from the SOAH ALJs which recommended resolution of the rate

case through adoption of the EGSI NUS. On November 7, 2008, the Commission issued its order on remand rejecting the PFD and remanding the docket to SOAH for a hearing on the merits of EGSI's original application.

16. During the November 5, 2008 Open Meeting, EGSI agreed to extend the statutory jurisdictional deadline in this docket to March 2, 2009. EGSI subsequently agreed to extend the statutory jurisdictional deadline to March 16, 2009.[4]

17. The SOAH ALJs granted ARM's motion to withdraw as an intervenor on December 2, 2008, pursuant to Order No. 49.

18. The hearing on the merits on remand took place on December 3 and 4, 2008, and December 8 through December 12, 2008. The hearing was recessed on December 12, 2008, in order to allow the parties to work on concluding a settlement.

19. On December 16, 2008, the signatories submitted a settlement term sheet to reflect their agreement in principle resolving all outstanding issues regarding EGSI's application, including those issues raised by the Commission in its November 7, 2008 order on remand.

20. On December 16, 2008, the signatories submitted an agreed motion to implement interim rates.

21. On December 19, 2008, the SOAH ALJs filed Order No. 52, granting interim approval of rates consistent with the settlement term sheet, effective with bills rendered on and after January 28, 2009, for usage on and after December 19, 2008.

22. On February 5, 2009, the signatories submitted a stipulation resolving all outstanding issues in this docket.

23. On February 10, 2009, the SOAH ALJs filed Order No. 56, returning this docket to the Commission.

---

[3] The EGSI NUS was subsequently amended on June 27, 2008.

[4] EGSI letter filed February 18, 2009.

### *Description of the Stipulation and Settlement Agreement*

24. The signatories agree that EGSI will institute an overall increase in base rate revenues of $46.7 million.

25. The signatories agree to a reasonable return on equity for EGSI of 10.00%.

26. The signatories agree that the cost of service underlying the base-rate revenue increase does not include any unreasonable or unjust expenses.

27. The signatories agree that EGSI will implement a rate-case-expense rider to recover $2.3 million per year for three years. The rate-case expenses will be allocated to customer classes based on total base-rate revenues. The rates established under the rate-case expense rider will be determined based on energy consumption in kilowatt-hours (kWh), except for the Large Industrial Power Service (LIPS) customer class, whose rates will be set on a kilowatt (kW) basis.

28. The Signatories agree to leave the mechanisms for recovery of EGSI's municipal franchise-fee riders unchanged as a result of this docket.

29. The Signatories agree that EGSI's proposed Market Value Energy Rider (MVER) will not be offered as a result of this docket.

30. The signatories agree that the Incremental Purchased Capacity Recovery Rider (IPCR) will expire contemporaneously with the implementation of rates approved in Order No. 52.

31. The signatories agree that the base-rate revenue increase, the rate-case expense rider and the municipal franchise-fee riders addressed in the stipulation became effective for bills rendered on and after January 28, 2009 for usage on and after December 19, 2008, as approved in Order No. 52.

32. The signatories reached the following specific agreements regarding rate design as a part of the overall resolution of this docket:

    a. **Supplemental Short Term Service (SSTS).** Rate Schedule SSTS will terminate six months after a final, appealable order approving the stipulation is issued by the Commission in this docket. Beginning with the

base rates implemented as a result of this stipulation, EGSI will bill SSTS usage as follows: (SSTS charges + LIPS charges)/2.

b. **Interruptible Service (IS).** Rate Schedule IS will be modified as follows:

    i.      30-minute notice service is eliminated;

    ii.      The credit for 5-minute notice service is reduced to $3.75/kW-month;

    iii.      The credit for no-notice service is reduced to $4.88/kW-month;

    iv.      The credits shall be applied to the LIPS and LIPS-Time of Use (TOU) tariffs (current High Load Factor Service (HLFS) and Large Power Service (LPS) customers will be transferred to LIPS); and

    v.      Rate Schedule IS remains closed to new business.

c. **Competitive Generation Service.** EGSI's competitive generation-service proposal shall not be withdrawn, but shall be severed from this docket and addressed in a separate docket wherein the Commission will (a) exercise its authority to approve, reject, or modify EGSI's proposal; and (b) address recov￮￮ ￮ any costs unrecovered as a result of the implementation of the ￮￮tt.

d. ￮￮neous **Electric Service Charges.** No change shall be made to Miscellaneous Electric Service Charges.

e. **Lighting Class Rates.** Lighting-class rates for all lighting fixtures shall be designed in a manner so that each fixture is charged a uniform base-rate percentage increase as established for the entire lighting class.

f. **Additional Facilities Charge (AFC).** Rate Schedule AFC, governing additional-facilities charge, will be designed to result in a reduction to 1.49%, with the resulting revenue reduction allocated among those customer classes with AFC revenue based on the percentage of AFC revenues in each customer class.

g.     **Economic as Available Power Service/Standby Maintenance Service.** No substantive changes shall be made as a result of this docket to: (a) Rate Schedule EAPS, governing Economic-as-Available Power Service; or (b) Rate Schedule SMS, governing Standby Maintenance Service.

h.     **Interconnection Terms and Conditions.** No changes shall be made as a result of this docket to EGSI's terms and conditions regarding costs for interconnection of customers.

i.     **Electric Extension Policy.** No changes shall be made as a result of this docket to EGSI's electric extension policy.

j.     **Large Interruptible Power Service.** The signatories stipulate that the contract demand ratchet provisions in Rate Schedule LIPS will be retained; provided, however, that the billing demand provision contained in Paragraph V of Rate Schedule SSTS will no longer apply to customers taking service under Rate Schedule LIPS after Rate Schedule SSTS terminates.

33.     The signatories agree to the class-cost allocation set forth in Attachment A to the stipulation and further agree that this allocation is reasonable.

34.     The signatories agree to a River Bend nuclear generating station 20-year life extension adjustment to EGSI's calculation of nuclear depreciation and decommissioning costs effective January 1, 2009.

35.     The signatories agree that EGSI will reduce depreciation expense related to EGSI's steam production plants by the amount of $2,731,478 on a total Texas retail basis effective January 1, 2009.

36.     The signatories agree that EGSI will present a new depreciation study as part of its next base-rate case, or by January 5, 2010, whichever is earlier.

37.     The signatories agree that the base-rate increase, rate riders, and associated rate design and class-cost allocation agreed to in the stipulation are reasonable and are

reflected in the rate schedules approved by Order No. 52 and revised by errata filings on December 22, 2008, January 27, 2009, and March 5, 2009.

38.     The signatories agree that EGSI will fund its Public Benefit Fund at an annualized amount of $2 million.

39.     In order to include a greater portion of the eligible population in the Public Benefit Fund program, EGSI agrees to use its best efforts to contract for and implement an automatic enrollment program. EGSI's automatic enrollment program will be modeled upon the matching procedures used by other Texas utilities to identify eligible customers and will be implemented within 30 days of the Commission's filing of the final order in this case.

40.     The signatories agree that EGSI will amend its low-income energy-efficiency program on a trial basis as specified in the stipulation.

41.     The signatories agree that the amendment of EGSI's low-income energy-efficiency program does not increase base rates to recover uncollected expenses associated with revenues billed under EGSI's energy-efficiency rider approved in Docket No. 35626.[5]

42.     The signatories agree to a fuel disallowance of $4.5 million, booked in the month of a final Commission order approving the application, consistent with the stipulation.

43.     The signatories agree to adopt Commission Staff's position on the following resolution of fuel-related matters set out in Commission Staff's pre-filed direct testimony: (a) recovery of sulfur dioxide ($SO_2$) and nitrous oxide ($NO_x$) emissions revenues recorded in Account 411.8 and expenses recorded in Account 509 will be allowed as eligible fuel expense going forward until further order of the Commission realigning such costs; (b) special circumstances should be granted to treat the costs of natural-gas call options incurred during the reconciliation period

---

[5] *Application of Entergy Texas, Inc. for Approval of an Energy Efficiency Cost Recovery Factor (EECRF) Pursuant to PURA § 39.905(b) and P.U.C. Subst. R. 25.181(f)*, Docket No. 35626, Order (Aug. 14, 2008).

as eligible fuel expense; (c) good cause exists to sever and defer the River Bend performance-based ratemaking (PBR) calculation for the final seven months of the reconciliation period to EGSI's next fuel reconciliation proceeding; and (d) the River Bend PBR plan should terminate in light of EGSI's jurisdictional separation.

### *Evidence Supporting the Stipulation and Agreement*

44. Considered in light of (a) the pre-filed testimony by the parties entered into evidence, and (b) the additional evidence and testimony presented by the parties during the course of the hearing on the merits on EGSI's application, the stipulation is the result of compromise from each party, and these efforts, as well as the overall result of the stipulation viewed in light of the record evidence as a whole, support the reasonableness and benefits of the terms of the stipulation.

45. The evidence addressed in finding of fact 44 demonstrates that the rates, terms, and conditions resulting from the stipulation are just and reasonable and consistent with the public interest when the merits of the issues contested by Commission Staff and intervenors are considered.

46. The stipulated revenue requirement does not include any amounts for financial-based incentive compensation.

47. To the extent that affiliate costs are included in the stipulated revenue requirement and fuel expense, they are reasonable and necessary for each class of affiliate costs presented in EGSI's application.

48. To the extent that affiliate costs are included in the stipulated revenue requirement and fuel expense, the price charged to EGSI is not higher than the prices charged by the supplying affiliate for the same item or class of items to its other affiliates or divisions, or a non-affiliated person within the same market area or having the same market conditions.

49. The Texas retail revenue requirement in the stipulation does not include any of the following expenses, whether allocated or direct-billed to EGSI: legislative advocacy expenses; entertainment; charitable contributions; advertising expense to promote the increased consumption of electricity or to promote the image of the

electric utility industry; advertising products marketed by other affiliates; civil penalties or fines; any other expenses listed in PURA §§ 36.061, 36.062, and 36.063; payments made to cover costs of an accident, equipment failure, or negligence at a utility facility owned by a person or governmental body not selling power inside the State of Texas (except those made under an insurance or risk-sharing arrangement executed before the date of loss); the costs for processing a refund or credit under PURA § 36.110; any profit or loss that results from the sale of merchandise not integral to providing utility service; construction work in progress in rate base; or plant held for future use in rate base.

50.    EGSI's current supplemental short-term service, Schedule SSTS, should be terminated within six months after the filing of a final, appealable Commission order in this docket, as provided for in the stipulation.

51.    It is reasonable to modify EGSI's current interruptible service, Schedule IS, in accordance with the terms and conditions of the stipulation.

52.    It is reasonable in light of the compromise reached in the stipulation for no substantive modifications to be made to EGSI's economic as-available power service, Schedule EAPS, or standby maintenance service, Schedule SMS.

53.    The depreciation and decommissioning adjustments for nuclear production assets agreed to in the stipulation and consistent with Louisiana rate treatment are reasonable.

54.    The depreciation adjustments to EGSI's steam production assets agreed to in the stipulation are reasonable.

55.    The increase in storm cost accruals provided for in the stipulation is reasonable.

56.    The low-income programs provided for in the stipulation are reasonable.

57.    EGSI's energy-efficiency costs are recovered through a rider approved by the Commission in Docket No. 35626.

58.    The PBR plan for the River Bend nuclear generating station contemplates an annual calculation of penalties and rewards. Good cause exists to sever and defer

the PBR calculation for the final seven months of the reconciliation period to EGSI's next fuel reconciliation proceeding.

59.     It is reasonable to terminate the application of the PBR plan to the River Bend operations on and after January 1, 2008 when Entergy Texas, Inc. no longer has an ownership interest in River Bend.

60.     EGSI is entitled to a special circumstances exception for the cost of the natural-gas call options because they resulted in increased reliability of supply and reduced fuel expense.

61.     The class allocation methodologies described in the stipulation are reasonable.

62.     The total level of invested capital in the Texas retail revenue requirement is reasonable.

63.     The EGSI stipulation proposes to collect the existing incremental franchise fees of the Cities of Beaumont, Port Arthur, and Conroe as a municipal franchise-fee rider. The Commission has reviewed its finding in paragraph II.E of its remand order of November 7, 2008 and determines that the existing incremental franchise fees were the result of franchise agreements adopted subsequent to the passage of PURA § 39.456.

## II.  Conclusions of Law

1.      EGSI is a public utility as that term is defined in PURA § 11.004(1) and an electric utility as that term is defined in PURA § 31.002(6).

2.      The Commission exercises regulatory authority over EGSI and jurisdiction over the subject matter of this application pursuant to PURA §§ 14.001, 32.001, 32.101, 33.002, 33.051, 36.001–36.111, 36.203, 39.452, and 39.455.

3.      SOAH had jurisdiction over matters related to the conduct of the hearing and the preparation of a proposal for decision in this docket, pursuant to PURA § 14.053 and TEX. GOV'T CODE ANN. § 2003.049.

4. This docket was processed in accordance with the requirements of PURA and the Texas Administrative Procedure Act.[6]

5. EGSI provided notice of its application in compliance with PURA § 36.103, P.U.C. PROC. R. 22.51(a), and P.U.C. SUBST. R. 25.235(b)(1)-(3).

6. This docket contains no remaining contested issues of fact or law.

7. The stipulation, taken as a whole, is a just and reasonable resolution of all the issues it addresses, results in just and reasonable rates, terms and conditions, is supported by a preponderance of the credible evidence in the record, is consistent with the relevant provisions of PURA, and is consistent with the public interest.

8. EGSI has properly accounted for the amount of fuel and IPCR-related revenues collected pursuant to the fuel factor and Rider IPCR during the reconciliation period.

9 The revenue requirement, cost allocation, revenue distribution, and rate design implementing the stipulation result in rates that are just and reasonable, comply ᵂⁱᵗʰ ᵗʰᵉ ratemaking provisions in PURA, and are not unreasonably discriminatory, preferential, ᴏ ᴄ ᴄial.

10 Severᵉᵈ ᵢᵣ EGSI's proposed competitive generation service into a separate ᵐᵃrket sᴏ ᵗʰᵃᵗ it iᵣ ᵇᵉ addressed separately is reasonable.

11 EGSI is entitled to a special circumstances exception under P.U.C. SUBST. R. 25.236(a)(6) for the cost of natural gas call options.

12. Consistent with the stipulation, good cause exists to treat EGSI's emissions revenues and expenses referenced in finding of fact 43 as eligible fuel expense on a going-forward basis until further order of the Commission realigning such costs.

13. Based on the evidence in this docket, the overall total invested capital through the end of the test year meets the requirement in PURA § 36.053(a) that electric utility rates be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

---

[6] TEX. GOV'T. CODE ANN. Chapter 2001 (Vernon 2000 and Supp. 2007).

14. The Commission has reviewed its finding in paragraph II.E of its remand order of November 7, 2008 and determines that because the existing incremental franchise fees were the result of franchise agreements subsequent to the passage of PURA § 39.456, they qualify as new franchise agreements and are therefore in compliance with PURA § 39.456 when recovered as a municipal franchise-fee rider.

15. The final resolution of the instant docket does not impose any conditions, obligations, or limitations on EGSI's right to file a base-rate proceeding and obtain rate relief in accordance with PURA.

16. Consistent with the stipulation, EGSI has met its burden of proof in demonstrating that it is entitled to the agreed upon level of Texas retail base-rate and rider revenue.

17. Consistent with the stipulation and PURA, EGSI has met its burden of proof in demonstrating that the rates are just and reasonable.

## III. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1. Consistent with the stipulation, EGSI's application for authority to (a) change its rates; (b) reconcile its fuel and purchased power costs for the Reconciliation Period from January 1, 2006 to March 31, 2007, as well as deferred costs from prior proceedings; and (c) for other related relief is approved.

2. Consistent with the stipulation, the rates, terms, and conditions described in this order are approved.

3. Consistent with the stipulation, the tariffs and riders approved on an interim basis by Order No. 52 and revised by errata on December 22, 2008, January 27, 2009, and March 5, 2009, are approved.

4. Consistent with the stipulation, EGSI shall implement the low-income programs described in this order.

5. Consistent with the stipulation, EGSI's Competitive Generation Services tariff is severed from this docket and shall be addressed in *Application of Entergy Texas, Inc. for Approval of Competitive Generation Services Tariff,* Docket No. 36713.

6. Consistent with the stipulation, EGSI's storm-cost accruals shall be increased by $2 million for a total accrual of $3.65 million annually beginning January 1, 2009, which amount will be incorporated in revenues recovered through base rates.

7. Consistent with the stipulation, EGSI shall terminate rate schedule SSTS and Rider IPCR.

8. Consistent with the stipulation, EGSI shall adjust depreciation and decommissioning expense related to the River Bend nuclear generating station and depreciation expense related to EGSI's steam production assets.

9. Consistent with the stipulation, EGSI shall submit a new depreciation study.

10. Consistent with the stipulation, the Rider IPCR and fuel costs, including coal-related costs deferred from prior proceedings are reconciled and approved through March 31, 2007.

11. EGSI shall adjust its fuel over/under recovery balance consistent with the findings in this order.

12. The entry of this order consistent with the stipulation does not indicate the Commission's endorsement of any principle or methodology that may underlie the stipulation. Neither should entry of this order be regarded as precedent as to the appropriateness of any principle or methodology underlying the stipulation.

13. All other motions, requests for entry of specific findings of fact, conclusions of law, and ordering paragraphs, and any other requests for general or specific relief, if not expressly granted in this order, are hereby denied.

**SIGNED AT AUSTIN, TEXAS the _____ day of March 2009**

**PUBLIC UTILITY COMMISSION OF TEXAS**

_____
BARRY T. SMITHERMAN, CHAIRMAN

_____
DONNA L. NELSON, COMMISSIONER

_____
KENNETH W. ANDERSON, JR., COMMISSIONER

SOAH DOCKET NO. 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
PUC DOCKET NO. 37744

| APPLICATION OF ENTERGY TEXAS, | § | BEFORE THE STATE OFFICE |
| INC. FOR AUTHORITY TO CHANGE | § | OF |
| RATES AND RECONCILE FUEL COSTS | § | ADMINISTRATIVE HEARINGS |

DIRECT TESTIMONY AND EXHIBITS

OF

JACOB POUS

ON BEHALF OF

CERTAIN CITIES SERVED BY ENTERGY TEXAS, INC.

JUNE 9, 2010

Diversified Utility Consultants Inc.
1912 West Anderson Lane, Suite 202
Austin, TX 78757

between Texas and Louisiana reflected in the storm reserve be retained. This recommendation reverses the Company's proposed reassignment of costs.

Q. **PLEASE DISCUSS YOUR NEXT ADJUSTMENT TO THE INSURANCE RESERVE DEFICIT BALANCE.**

A. In association with the securitization process relating to Hurricanes Rita and Katrina, the Company has received insurance proceeds or has revised its insurance estimates subsequent to the analysis reflected in Adjustment 15 to the Company's filing.[204] The Company states there have been two additional changes that impact the insurance related amount reflected in the Company's filing. First, the actual proceeds for Hurricane Katrina received in December 2009 exceeded the estimated proceeds by $7,290. Second, the Company revised the estimated proceeds for Hurricane Rita that exceeded the previous estimate by $1,511,688.[205] Therefore, the combined total of these two insurance proceed related adjustments total $1,518,978 and should be recognized in this case.

Q. **PLEASE DISCUSS YOUR LAST ADJUSTMENT TO THE INSURANCE RESERVE DEFICIT BALANCE.**

A. I recommend reversal of Company proposed Adjustment 15. This proposed adjustment attempts to remove from the insurance reserve the unrecovered hurricane insurance proceeds, insurance proceeds in excess of insurance proceeds included in the securitization process and carrying costs.[206] ETI proposes to carve $25 million out of the insurance reserve and establish a separate regulatory component for which it also proposes a 5-year amortization. There is no valid basis for this proposed separate and unique treatment. Therefore, ETI's proposed Adjustment 15, Hurricane Securitization, should be eliminated by returning the $25 million amount to the insurance reserve. This recommendation does not impact rate base, but does reduce the net annual amortization by $3,791,732 due to the differing amortization periods (5 years for Adjustment 15 versus 20 years for storm insurance reserve).

---

[204] Response to Rose City 23-21.
[205] Id.
[206] Testimony of Mr. Wright at page 20.

113

118